**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

PRESTON DAMSKY, a law student at the
University of Florida Levin College of Law
    Plaintiff,

v.                                    Case No.:

CHRIS SUMMERLIN, in his official
capacity as the Dean of Students
of the University of Florida,
    Defendant.
_____/

## COMPLAINT

Plaintiff, PRESTON TERRY DAMSKY ("Plaintiff"), by and through undersigned counsel, sues Defendant CHRIS SUMMERLIN ("Defendant"), in his official capacity as the Dean of Students of the University of Florida, and states:

### INTRODUCTION

1.    This is an action brought under the First Amendment of the U.S. Constitution, 42 U.S.C. § 1983, and 42 U.S.C. § 1988 for a claim of First Amendment retaliation. Defendant unlawfully suspended and punished Plaintiff in response to Plaintiff's expression of various legal and political viewpoints. Defendant's retaliatory actions violate Plaintiff's freedom of speech rights under the First Amendment of the United States Constitution.

1

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

3.    Venue is proper in the United States District Court for the Northern District of Florida because the Plaintiff resides in, and the Defendant is located in or employed in, and some or all of the events giving rise to Plaintiff's claims occurred in Alachua County, Florida, which is within the Northern District of Florida. Venue is proper in the Gainesville Division under Local Rules 3.1(A)–(B) since Alachua County is within the Gainesville Division.

## PARTIES

4.    Plaintiff is a twenty-nine-year-old man domiciled in Alachua County, Florida and attending the University of Florida Levin College of Law ("UF Law").

5.    Defendant Chris Summerlin ("Defendant Summerlin") serves as the Dean of Students and the head of the University of Florida Dean of Students Office. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

6.    Plaintiff was at all relevant times enrolled as a law student at UF Law.

### *Fall Seminar Papers*

7.      In the Fall 2024 semester, Plaintiff wrote two seminar papers which were the subject of controversy at UF Law after one of the papers, written for a class taught by Professor J.M., was spread around the student body without the consent of the Plaintiff. These seminar papers argued, inter alia, that the United States was founded as a race-based nation state, and that foundational structuralist principles and certain formerly long-standing laws (which Plaintiff argued had acquired the status of "informal constitutional amendments") legally necessitated its preservation as such.

8.      At no point in conversation with Plaintiff did Professor J.M. express that he felt afraid of Plaintiff or that anything in his classwork or about his behavior suggested Plaintiff had intended to or did in fact threaten, intimidate, coerce, harass, disrupt the normal operations of the University, or incite others to do so. Plaintiff received an A grade in Professor J.M.'s seminar course.

9.      In January 2025, Plaintiff publicly received the best grade in the class (the "book award"), for the other seminar paper written in the "Advanced Constitutional Interpretation: Originalism and its Foes" course taught by sitting federal judge John Badalamenti ("Judge Badalamenti"). Shortly after, students submitted complaints about Plaintiff's exercise of his First Amendment rights and academic freedom.

10.    In conversations with Plaintiff, Judge Badalamenti informed Plaintiff that anonymous demands were made that the school retract Plaintiff's book award and denounce Plaintiff and his viewpoints publicly. Although Judge Badalamenti made it clear that he disagreed with Plaintiff's views, at no point did he say Plaintiff had intended to or did in fact threaten, intimidate, coerce, harass, disrupt the normal operations of the University, or incite others to do so.

11.    According to Dean McAlister, at a townhall meeting on January 16, 2025, "one student, who said she'd grown up with active shooter trainings," alleged that she "routinely scans the room for the exits whenever [Plaintiff] was present." This student was J.C., who has never interacted with Plaintiff and did not follow up on this allegation with the school administration (nor was any effort made by the school administration to follow up with her). This was the case despite student J.C. being in a class with Plaintiff in the Spring 2025 semester—Legal Drafting—that she could have switched out of and into another offering that semester of the same class.

12.    At all relevant times, Plaintiff has never given any indication to anyone affiliated with the school that he intended to commit a shooting or any other act of violence. At all relevant times Plaintiff has maintained that he could not understand why any reasonable person affiliated with the

University would believe he intended, planned, or threatened to commit a

shooting or any other act of violence.

13.    According to Dean McAlister, at the same meeting another student

"said they dropped classes when he was in the class and avoided him

whenever possible." Plaintiff has never been informed of who this student is

and thus has been deprived of an opportunity to defend himself from this

accusation which has, by Defendant Summerlin's own admission on August

8, 2025, influenced the school's determination that Plaintiff be subjected to

expulsion. No information was ever provided to Plaintiff as to what classes

these were, or how this student would have discovered Plaintiff was in

them given that what classes Plaintiff registers for is not knowledge

available to students before the instruction period begins. Upon information

and belief, this student is M.J., who has never interacted with Plaintiff.

14.    On January 24, 2025, Plaintiff met with Dean J.S. in her office. Dean

J.S. is also Plaintiff's current designated career advisor at UF Law. Dean

J.S. asked Plaintiff why students would make these comments at the

January 16, 2025 townhall and Plaintiff responded, in essence, that he did

not know and he thought they were either lying or being unreasonable.

Dean J.S. told Plaintiff that she did not invite Plaintiff to this meeting to tell

Plaintiff how to exercise his First Amendment rights or to stop him or

otherwise discourage him from doing so. Dean J.S. referred to Plaintiff as "brilliant" during this meeting and engaged him in cordial conversation about his future career prospects. Dean J.S. suggested Plaintiff pursue a career in academia and write a book. At no time during this meeting did Dean J.S. tell Plaintiff that Plaintiff had intended to or did in fact threaten, intimidate, coerce, harass, disrupt the normal operations of the University, or incited others to do so, or that his First Amendment protected expression had even approached these standards. Dean J.S. never expressed concern to Plaintiff that he had done anything wrong until July 28, 2025. McAlister has stated she directed Dean J.S. to meet with Plaintiff because she "was concerned for [Plaintiff's] mental health and wellbeing" and because McAlister believed Plaintiff "was making himself a pariah within the community." Plaintiff stated during his meeting with Dean J.S. on January 24, 2025 that his social life was pleasant, and that he had more friends at UF Law than ever before. McAlister has never contacted Plaintiff to discuss his mental health.

15.    On February 10, 2025, Dean McAlister sent out an e-mail to the UF Law student body informing them that Plaintiff would not be punished for his papers as they were protected under the First Amendment. Though she did not refer to Plaintiff by name in this e-mail, it was common knowledge

among the UF Law community that the e-mail was about Plaintiff, given how widely many in the student body had disseminated his paper for Professor J.M.'s Fall 2024 course.

### Noel Ignatiev Twitter Post

16.    Plaintiff created a Twitter account on February 19, 2025, operating under his first and middle name. Plaintiff did not use a picture of himself on Twitter as a "profile picture," or otherwise post a picture of himself, until after the end of the 2024–2025 school year.

17.    Noel Ignatiev is a former university educator and professor who achieved prominence for his academic and political work critiquing the concept and history of "whiteness" and "the white race."

18.    In the first article of the first issue of Ignatiev's publication "Race Traitor"—published in 1993—Ignatiev argued that society should "abolish the white race by any means necessary." His editorial argued that "[t]he white race is a historically constructed social formation" and that "[t]he key to solving the social problems of our age is to abolish the white race." He stated further:

> The white race is a club, which enrolls certain people at birth, without their consent, and brings them up according to its rules . For the most part the members go through life accepting the benefits of membership, without thinking about the costs . When individuals question the rules, the officers are quick to

remind them of all they owe to the club, and warn them of the dangers they will face if they leave it.

*Race Traitor* aims to dissolve the club, to break it apart, to explode it. Some people who sympathize with our aim have asked us how we intend to win over the majority of so-called whites to anti-racism. Others, usually less friendly, have asked if we plan to exterminate physically millions, perhaps hundreds of millions of people. Neither of these plans is what we have in mind.

19.    A physical copy of "Race Traitor" is catalogued in the University of Florida Library. A digital copy of "Race Traitor" is available for download via the University of Florida Library system (through its institutional subscription to the publisher Taylor & Francis) to those who are on the University WiFi network. PDFs of "Race Traitor" are publicly available and easily findable via a Google search.

20.    Since his death in 2019 Noel Ignatiev has been the subject of obituaries and articles by prominent media outlets and academic organizations including, but not limited to, The New York Times, The Los Angeles Times, Al Jazeera, the Heritage Foundation, and the American Historical Association. Various of these obituaries and articles clarify that Ignatiev denounced violent action to "abolish the white race."

21.    Ignatiev's journal "Race Traitor" was discussed as part of its endorsement by legal scholar Professor Derrick Bell in the October–September 2002 issue of Harvard Magazine wherein Ignatiev was quoted as rejecting violence. Plaintiff first learned about Professor Bell during his Spring 2024 Constitutional Law course. Professor C.H., who testified against Plaintiff at Plaintiff's July 28, 2025 hearing, has written at least one paper praising Professor Bell and arguing that law professors might benefit from introducing Professor Bell's writing into their courses.

22.    At all relevant times, Plaintiff was aware Noel Ignatiev did not advocate for violence in his call to "abolish the white race by any means necessary."

23.    On March 21, 2025—while off-campus and on Spring Break—Plaintiff posted on his Twitter account, that at the time had less than thirty followers, the following: "My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to 'abolish the White race by any means necessary' is what I think must be done with Jews. Jews must be abolished by any means necessary."

24.    Student S.J., who did not follow Plaintiff on Twitter but later claimed to frequently "monitor" his account, saw this Twitter post within twenty-four hours of Plaintiff posting it. Plaintiff has never knowingly interacted with

student S.J. on Twitter or at UF Law for any substantial period of time before Plaintiff's disciplinary hearing on July 28, 2025.

25.    Student S.J., who is Jewish, later admitted during Plaintiff's disciplinary hearing on July 28, 2025, that he did not feel threatened by this Twitter post. Student S.J. admitted he knew what Noel Ignatiev meant by his call to "abolish the white race by any means necessary" because, in the words of student S.J., he is "educated."

26.    Student S.J. showed Plaintiff's March 21, 2025 Twitter post to Dean McAlister almost one week later on the morning of Friday, March 28, 2025, during a public conversation that Plaintiff witnessed from across the room which lasted at least half an hour. Student S.J. was the first individual to show this Twitter post to Dean McAlister. Student S.J. shared at least 100–200 screenshots of Plaintiff's other Twitter posts with Dean McAlister in or around this time. None of these screenshots were placed in the Student Conduct and Conflict Resolution ("SCCR", the University office conducting Plaintiff's disciplinary proceedings) casefile.

27.    Plaintiff was told by a friend shortly after witnessing this conversation between student S.J. and Dean McAlister that student S.J. likely complained to Dean McAlister about Plaintiff's use of Twitter.

28.    On April 1, 2025, Professor L.L., Professor Z.K., and Professor S.S.
signed an e-mail to the UF Law faculty condemning Plaintiff's social media
activity, prior "hateful statements," and a perceived "pattern of escalation" in
his rhetoric. No copy of this e-mail has ever been shown to Plaintiff by
SCCR. After this e-mail had been sent, Professor L.L., who had never
priorly interacted with Plaintiff, gave an unsolicited reply via Twitter to
Plaintiff's March 21, 2025 Twitter post referenced herein at 6:47 PM on April
1, 2025 which read: "Are you saying you would murder me and my family?
Is that your position?".

29.    Plaintiff replied to Professor L.L. at 10:09 PM on April 1, 2025: "Did
Ignatiev want Whites murdered? If so, were his words as objectionable as
mine? If Ignatiev sought genocide, then surely a genocide of all Whites
would be an even greater outrage than a genocide of all Jews, given the far
greater number of Whites."

### April 2, 2025 to the Present

30.    On April 2, 2025, at 1:15 PM, Professor L.L. replied to Plaintiff "I
notice you didn't say no, but instead resorted to a whataboutism . . . Yes,
his words are despicable, but you implicitly admit yours are, too." Plaintiff
did not respond again to Professor L.L.. Shortly thereafter Professor L.L.
deleted her Twitter account.  Plaintiff did not speak to or interact with

Professor L.L. individually again until July 28, 2025. On July 28, 2025,

Professor L.L. admitted that she did not delete her Twitter account because

she was afraid of Plaintiff, but because she did not want to experience a

"Nazi pile-on" from others on Twitter.

31.    On April 2, 2025 at 5:40 PM, Plaintiff received correspondence from

Defendant Summerlin telling Plaintiff that he was being immediately placed

on interim suspension and that he was denied access to campus on the

sole grounds that Plaintiff was "allegedly involved in behavior that created a

material and substantial disruption to the academic operation of the UF

College of Law."

32.    On the night of April 2, 2025 into the morning of April 3, 2025, officers

with the University of Florida Police Department came three times to

Plaintiff's off-campus home to attempt contact with Plaintiff. These officers

succeeded on the third attempt and gave Plaintiff a written notice stating he

was barred from "[a]ll University of Florida properties within Alachua

County, Florida" and "Shands Hospital facilities at the University of Florida."

33.    The police did not have probable cause to believe Plaintiff had

committed a crime or had committed any act that would justify his

trespassing from public property on the independent initiative of the

University of Florida Police Department. Plaintiff has not been charged with a crime.

34.    After his trespassing, Plaintiff immediately reached out to the University to arrange for the continuation of his academic career remotely. Plaintiff had achieved some success in doing so by the night of April 4, 2025. Dean J.S. was notified of Plaintiff's nascent success in arranging for the continuation of his academic career, at the latest, by 12:52 PM on April 4, 2025.

35.    On April 4, 2025 at 7:11 PM, Dean McAlister sent an e-mail to the UF Law student body stating that "our normal semester routine . . . has been significantly disrupted by recently widely circulated social media posts" and telling students that they were right to feel "personally threatened." McAlister then informed the student body that UF Law would "begin swipe-card access only for all building entrances." On July 28, 2025, McAlister admitted to Plaintiff that she was thinking of litigation when she sent this e-mail. When asked about her choice of language which evoked the language of relevant First Amendment case law in a conclusory manner, McAlister told the Plaintiff, "I am a lawyer."

36.    Within a week of Plaintiff being placed on interim suspension, McAlister received complaints from faculty members who knew Plaintiff

was not a threat to the UF Law student body and that his off-campus social media posts, including the relevant posts about Noel Ignatiev discussed herein, were protected by the First Amendment.

37.    On July 28, 2025, Professor L.L. admitted to Plaintiff that at some point between April 3 and April 7, 2025, student Z.C. had a lengthy discussion with Professor L.L., who was student Z.C.'s professor, about her interaction with Plaintiff, and that she told student Z.C. about her legal opinion regarding Plaintiff's statements. At some point on or before April 7, 2025, student Z.C. would complete a fourteen-page spec essay he titled "Reflections on the Avoidable Downfall of a Racist" wherein he indicated his understanding that Professor L.L. aimed to entrap and "hang" Plaintiff. In this essay, student Z.C.—certainly no friend of Plaintiff's—further indicated he knew Ignatiev did not advocate for using violence to "abolish the white race" and freely professed his understanding that some or all Defendant or his agents were not "interpreting [Plaintiff's] statements in the context of the most accurate good faith interpretation of Harvard historian Noel Ignatiev's controversial theses on white identity."

38.    None of Plaintiff's professors during the Spring 2025 semester were anything less but friendly and professional in their e-mails with Plaintiff after he was suspended from campus. None of them expressed concern that

Plaintiff was a threat to themselves or anyone on campus. At least one of these professors attempted to assuage any possible student fears after Plaintiff was trespassed and expressed the opinion that nobody was in any danger and that the situation regarding Plaintiff had been characterized by foolish and unnecessary overreaction.

39.    On April 16, 2025, the Foundation of Individual Rights and Expression ("FIRE") sent a letter to Defendant Summerlin instructing Defendant Summerlin that his actions against Plaintiff were an illegal violation of Plaintiff's First Amendment and Due Process rights.

40.    Shortly thereafter, on April 16, 2025, Nancy Chrystal-Green, the University of Florida's Associate Vice President for Student Life, sent a letter to Plaintiff stating, inter alia, the following:

> In accordance with University of Florida Regulation 4.040, Section 11, the University is utilizing interim measures to protect the campus community from a threat of harm and prevent further disruption to its business and educational operations. This action is not meant to be punitive in nature. During this time, the University will further investigate the allegations and determine if conduct charges are warranted.
>
> The allegations giving rise to this interim suspension include complaints from numerous students and employees that they fear for their safety and do not want to attend class after reading antisemitic public facing posts on your social media such as "Jews must be abolished my [sic] any means necessary." Additionally, it was reported that you wore a t-shirt with an antisemitic message, "From the river to the sea," to the law school campus where you walked through hallways and

attended classes amongst numerous Jewish students and
faculty. Your conduct, in light of current events around the
world, has created a climate of fear that permeates the law
school campus and amounts to a material disruption close in
time to final exams. The University is obligated to stop the
disruption and ensure students have meaningful access to their
education without fear of harm from a fellow classmate.

41.    On April 21, 2025, Brande Smith, an attorney in the University of

Florida's General Counsel Office responsible for, inter alia, FERPA

compliance and Student Discipline, spoke with a representative from FIRE.

Upon information and belief, Brande Smith, operating in the course and

scope of her employment as an agent of Defendant, stated to FIRE's

representative that Plaintiff's social media posts or his wearing of a pro-

Palestine t-shirt would, on their own, have constituted protected

expression, but because Plaintiff did both the University believed he

created a material disruption. Aside from Plaintiff himself and his

viewpoints, there is no nexus between Plaintiff's social media activity and

his wearing of a pro-Palestine t-shirt.

42.    On April 23, 2025, Brande Smith was told by FIRE that the

university's justification for punishing Plaintiff was without merit, and that

their continued persecution of Plaintiff was illegal. FIRE communicated to

Brande Smith that they were urging the University to "immediately" rescind

Plaintiff's suspension.

43.     Plaintiff appealed his interim suspension on April 21, 2025, on the grounds that the allegations against him constituted First Amendment protected speech and expression. On April 29, 2025, Plaintiff's appeal was denied by James Tyger ("Tyger"), "Assistant Vice President, VPSL," and an inactive member of the Florida Bar not eligible to practice law in Florida. Tyger's letter to Plaintiff was brief, wholly conclusory, and did not contend with any points advanced in his interim suspension. Tyger's letter stated, in whole:

> In accordance with University Regulation 4.040, I have reviewed the appeal of your interim suspension as a designee for the Vice President of Student Life.
>
> The information received by the University of Florida alleges your involvement in behavior that threatens the health and safety of members of the university community. Your access to campus created a material disruption to the College of Laws' academic operations and its students' access to their education. Accordingly, your continued access to campus could endanger one or more other person's health or safety due to the severity of the allegations in your case. Therefore, I find it is reasonable to believe that the restrictions outlined in your interim suspension letter are appropriate for the circumstances.
>
> As such, I have decided to uphold the decision of the Dean of Students, Dr. Chris Summerlin and the interim suspension remains in place as outlined in Dean Summerlin's letter.

44.     Tyger's letter articulated no specific facts justifying his decision.

45.     An article was published in The New York Times on June 24, 2025 concerning Plaintiff's book award and suspension from campus.

46.    In response to this article, Dean McAlister penned an open letter to the law school, which she e-mailed to the student body and posted on UF Law's website, wherein she insulted Plaintiff, calling him an "extremist provocateur," and denigrated his viewpoints as "extreme," "odious," "revolting," "detestable," and "abhorrent." Moreover, McAlister openly discussed Plaintiff's trespassing from campus and his ongoing disciplinary process, and stated that Plaintiff's "conduct" was "threatening and substantially disruptive" despite the fact that Plaintiff had not been found responsible for threatening or substantially disruptive conduct at that time. Nonetheless, McAlister conceded that Plaintiff's viewpoints are "deeply held" and that his academic work "falls within the bounds of academic freedom and the First Amendment."

47.    Plaintiff was formally charged on May 29, 2025 with violations of University of Florida Regulation 4.040 Section 4.C "Disruptive Conduct" and Section 4.K "Harassment." In copying Sections 4.C and 4.K to give notice of the charges, Pamela Malyk, Assistant Dean and Director of SCCR, deliberately omitted the language from these sections which explicitly state that conduct protected by the First Amendment does not fall under the prohibitive umbrella of these sections. The formal charge notice offered the following justification for the charges:

18

The reported information included complaints from numerous students and employees that they fear for their safety such that they do not want to attend classes with you after reading threatening and anti- Semitic public-facing posts on your social media, such as your post in March 2025 that included this statement of your "position on Jews": "Jews must be abolished by any means necessary." This post was followed by an exchange with a professor at the law school who asked you: "Are you saying you would murder me and my family?" On another occasion, a student at the law school complained that you had agreed that your paper for the Originalism and its Critics [sic] seminar ended on a call for extralegal violence. These examples represent some, but not all, of your reported disruptive and threating [sic] behavior. Your conduct, especially in light of current events in this country and around the world, has created a climate of fear that permeates the law school campus and amounts to a material or substantial disruption of normal University operations.

48.    Defendant or his agents' correspondences with Plaintiff regarding his interim suspension and his disciplinary process, on and since April 2, 2025, have been filled with several objectively incorrect (but not necessarily insubstantial) statements of fact, restatements of University regulations, and typographical errors. These mistakes, if they are honest mistakes, demonstrate, at minimum, the hastiness and negligence with which Defendant conducted Plaintiff's disciplinary process and their investigation against Plaintiff.

49.    Plaintiff was not given a copy of the SCCR casefile against him to possess. Plaintiff has been denied the opportunity to have a copy of the

recording of his hearing, which the University states is their exclusive property.

50.    Plaintiff was not allowed to introduce documentary evidence at his hearing that his speech was protected under the First Amendment under existing Supreme Court precedents. To wit, Plaintiff was denied the opportunity to present case law, legal briefs, and legal opinions concerning the boundaries of the First Amendment to the University Officials Board conducting his hearing. Plaintiff was told by SCCR that the "Conduct Hearing is an education process and not a legal process" and that legal information was thus "not relevant" despite the fact the relevant conduct regulations explicitly exclude conduct protected by the First Amendment from their prohibitive umbrella.

51.    No witness at Plaintiff's hearing stated that Plaintiff threatened them.

52.    Plaintiff was notified by Defendant Summerlin on August 8, 2025, that he would be expelled from the University of Florida. Defendant Summerlin specifically cited Plaintiff's First Amendment protected social media activity and his First Amendment protected academic work as the alleged "conduct" justifying his expulsion. Defendant Summerlin specified no other alleged "conduct" in this letter.

53.    Plaintiff has appealed his expulsion on September 4, 2025, the date provided to him by Defendant Summerlin as the appeal submission deadline. Afterwards, Plaintiff may be immediately unenrolled and permanently deprived of an opportunity to continue at the University of Florida in any status if his appeal is denied.

### COUNT I – 42 U.S.C. § 1983, Violation of First Amendment, as applied to the states under the Fourteenth Amendment

54.    Plaintiff incorporates by reference Paragraphs 1–53 of this Complaint as though fully set forth below.

55.    Pursuant to 42 U.S.C. § 1983, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

56.    Plaintiff's alleged conduct, referenced above and cited by Defendant Summerlin in his decision to expel Plaintiff, is protected by the First Amendment to the United States Constitution as "core" speech and expression.

57.    Defendant knew that Plaintiff was engaged in protected speech and expression as referenced herein and all or some of Defendant's agents have conceded as such while operating within the course and scope of their employment.

58.    Plaintiff did not violate University of Florida Regulations 4.040 Section 4.C "Disruptive Conduct" or Section 4.K "Harassment."

59.    Defendant and his agents began their negative disciplinary actions against Plaintiff and ultimately determined to expel him without just cause and with reckless or callous indifference to Plaintiff's federally protected rights, or with evil motive and intent, because he exercised his First Amendment rights and academic freedom. Defendant's actions against Plaintiff constitute First Amendment retaliation.

60.    Defendant has punished Plaintiff, inter alia, because he falsely classified his off-campus speech and protected academic activity as "violent rhetoric." Defendant's actions against Plaintiff constitute unconstitutional content discrimination.

61.    Defendant or his agents have punished Plaintiff, inter alia, because they classified the viewpoints expressed in his off-campus speech and protected academic activity as "antisemitic," "extreme," "despicable,"

"hateful," "odious," "revolting," "detestable," and "abhorrent." Defendant's actions against Plaintiff constitute unconstitutional viewpoint discrimination.

62.    As a direct and proximate result of the violations of 42 U.S.C. § 1983, as referenced and cited herein, Plaintiff has been substantially deprived of the benefits and privileges of his education, and has been substantially and significantly injured in his academic career and post-graduation opportunities, and has been subjected to predictable reputational damage and severe emotional distress.

63.    As a direct and proximate result of the violations of 42 U.S.C. § 1983, as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against him, Plaintiff is entitled to all relief necessary to make him whole, including, but not limited to, immediate injunctive relief.

## PRAYER FOR RELIEF

For these reasons, Plaintiff respectfully requests that this Court enter judgment against Defendant and issue the following relief:

**I**.    Declare that Defendant's disciplinary action against Plaintiff violates his rights under the First Amendment;

**II**.    Enter a preliminary and permanent injunction directing Defendant to return Plaintiff to normal standing at the University and to allow his return to

the classroom, and enjoining Defendant from negatively altering Plaintiff's status at the University or taking further retaliatory action against Plaintiff for bringing this lawsuit or for advocating for his constitutional rights;

**III**.    Award Plaintiff appropriate compensatory damages;

**IV**.    Award Plaintiff appropriate punitive damages;

**V**.    Award reasonable attorney's fees and costs under 42 U.S.C. § 1988 and;

**VI**.    Award such other relief as Plaintiff is entitled to and that the Court may deem just and proper or that is necessary to make the Plaintiff whole.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiff demands a trial by jury as to all issues triable of right.

**DATED**: September 14, 2025

Respectfully submitted,

*/s/ Anthony F. Sabatini*
ANTHONY F. SABATINI, ESQ.
FL BAR No. 1018163
anthony@sabatinilegal.com
SABATINI LAW FIRM, P.A.
1601 E. 1st Ave.
MOUNT DORA, FL 32757
T: (352)-455-2928
Attorney for Plaintiff