# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# GAINESVILLE DIVISION

PRESTON DAMSKY,

*Plaintiff,*

v.

CHRIS SUMMERLIN, in his official capacity as Dean of Students of the University of Florida,

*Defendant.*

No.: 1:25-cv-00275-AW-MAF

## DEFENDANT'S MOTION TO DISMISS
## AND MEMORANDUM OF LAW

H. Christopher Bartolomucci
D.C. Bar No. 453423
Justin A. Miller*
D.C. Bar No. 90022870
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
cbartolomucci@schaerr-jaffe.com
jmiller@schaerr-jaffe.com

*\*Pro hac vice* application pending

*Counsel for Defendant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

MOTION TO DISMISS ......................................................................1

MEMORANDUM OF LAW ................................................................1

INTRODUCTION ...............................................................................1

MOTION TO DISMISS STANDARDS ..............................................3

BACKGROUND .................................................................................4

    A.    UF's Student Conduct Code ....................................................4

    B.    Procedural History ..................................................................5

    C.    Statement of Facts ..................................................................7

        1.    Damsky's Seminar Papers ............................................7

        2.    Damsky's Post ................................................................8

        3.    The Student Conduct Hearing ....................................10

ARGUMENT ....................................................................................16

    I.    Threats of Violence Are Not Protected Under the First Amendment. ............................................................................17

    II.    Damsky's Post Was a Threat. ...............................................18

    III.    The Eleventh Circuit's Decision in *Boim* Confirms UF's Authority to Take Action Based on Damsky's Threatening and Disruptive Post. ..............................................................22

    IV.    Threats Made Off-Campus That Have On-Campus Effects Are Not Insulated From Review by School Officials. ...........................................26

    V.    Threatening Student Speech That Causes Significant Disruption on Campus Is Not Protected by the First Amendment. ..................................29

    VI.    Plaintiff's Claim for Money Damages Should Be Dismissed. ................32

CONCLUSION .................................................................................33

CERTIFICATION PURSUANT TO LOCAL RULE 7.1(F) ...................................34

CERTIFICATE OF SERVICE ..........................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Ala. Student Party v. Student Gov't Ass'n of Univ. of Ala.*,
   867 F.2d 1344 (11th Cir. 1989).................................................................. 26, 32

*Alvoid v. Sch. Dist. of Escambia Cnty.*,
   582 F. Supp.3d 1140 (N.D. Fla. 2021) ...................................................28

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................3

*Bell v. Itawamba Cnty. Sch. Bd.*,
   799 F.3d 379 (5th Cir. 2015) ...............................................................25

*Bishop v. Aronov,*
   926 F.2d 1066 (11th Cir. 1991)............................................................26

*Boim v. Fulton Cnty. Sch. Dist.*,
   494 F.3d 978 (11th Cir. 2007)........................................................ *passim*

*Carr v. Bd. of Regents of Univ. Sys. of Ga.*,
   249 F. App'x 146 (11th Cir. 2007).......................................................33

*Counterman v. Colorado,*
   600 U.S. 66 (2023) ........................................................................ 17, 21

*Cross v. State of Alabama,*
   49 F.3d 1490 (11th Cir. 1995)..............................................................32

*Doe v. Valencia College,*
   903 F.3d 1220 (11th Cir. 2018).................................................... 27, 30

*Hafer v. Melo,*
   502 U.S. 21 (1991) ..............................................................................32

*Healy v. James,*
   408 U.S. 169 (1972) ...................................................................... 29, 30

*Johnson v. City of Atlanta,*
   107 F.4th 1292 (11th Cir. 2024) ........................................................3, 4

*Jones v. BrenCo, LLC,*
   No. 5:23-cv-160-AW-MJF, 2023 WL 8517472
   (N.D. Fla. Nov. 17, 2023).......................................................................3

*Mahanoy Area Sch. Dist. v. B. L.*,
    594 U.S. 180 (2021) ............................................................... 27, 28, 32

*Morse v. Frederick*,
    551 U.S. 393 (2007) ............................................................... 24, 25, 31

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ............................................................... 17

*Ponce v. Socorro Indep. Sch. Dist.*,
    508 F.3d 765 (5th Cir. 2007) ............................................... 25

*Ruhl v. Spear*,
    639 F. App'x 624 (11th Cir. 2016) ....................................... 32

*Shanley v. Ne. Indep. Sch. Dist.*,
    462 F.2d 960 (5th Cir. 1972) ............................................... 27

*Smith v. Fla. Dep't of Corrs.*,
    318 F. App'x 726 (11th Cir. 2008) ....................................... 32

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ............................................. 30

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) .................................................... *passim*

*United States v. Baker*,
    514 F. Supp.3d 1369 (N.D. Fla. 2021) ................................. 19, 22

*United States v. Brown*,
    479 F.2d 1170 (2d Cir. 1973) ............................................... 19

*United States v. Fleury*,
    20 F.4th 1353 (11th Cir. 2021) ............................................. 18, 23

*United States v. Kaye*,
    No. 23-11423, 2024 WL 164810 (11th Cir. Jan. 16, 2024) ................ 22

*United States v. Ramos*,
    No. 5:24-cr-34 (MTT), 2024 WL 4335912
    (M.D. Ga. Sept. 27, 2024) ................................................... 20

*Virginia v. Black*,
    538 U.S. 343 (2003) ............................................................. 17

*Widmar v. Vincent*,
     454 U.S. 263 (1981) ....................................................................30

*Will v. Mich. Dep't of State Police,*
     491 U.S. 58 (1989) ......................................................................33

**Statutes**

42 U.S.C. §1983 ...............................................................................7

Fla. Stat. §1006.60 ................................................................... 4, 26

Fla. Stat. §1006.61 ..........................................................................4

**Rules**

Fed. R. Civ. P. 12 .............................................................................1

Fla. R. App. P. 9.190 .......................................................................7

**Other Authorities**

*Black's Law Dictionary* (12th ed. 2024) ....................................18

John M. Kang,
     *Martin v. Malcolm: Democracy, Nonviolence, Manhood*,
     114 W. Va. L. Rev. 937 (2012) ...............................................19

Malcolm X,
     *At the Audubon, in* Malcolm X Speaks (George Breitman ed., 1990) ...............19

Symposium:
     *Third Annual Law vs. Antisemitism Conference:*
     *Lessons for the Trump Administration From the Biden*
     U.S. National Strategy to Counter Antisemitism,
     19 FIU L. Rev. 789 (2025) ......................................................20

UF Regulation 4.040,
     Student Honor Code and Student Conduct Code (as amended 2023) ........ 4, 5, 26

## MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Chris Summerlin, in his official capacity as Dean of Students of the University of Florida, hereby moves to dismiss Plaintiff's Complaint (Doc. 1) for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

## MEMORANDUM OF LAW

Defendant submits this memorandum in support of his motion to dismiss Plaintiff's Complaint.

## INTRODUCTION

During his 2L year at the University of Florida's law school ("UF Law"), Preston Damsky posted the following on the X social media platform: "My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to 'abolish the White race by any means necessary' is what I think must be done with Jews. Jews must be abolished by any means necessary." ¶23.[1]

If there were any ambiguity about the threatening nature of Damsky's post, he soon dispelled it. Professor Lyrissa Lidsky, a Jewish member of the UF Law faculty, heard about Damsky's post and replied to it on X. She asked him: "Are you saying you would murder me and my family? Is that your position?" ¶28. Far from

---

[1] All paragraph citations are to the Complaint.

assuring her that he was not threatening violence against Jews, Damsky ducked her questions and responded with talk of genocide: "Did Ignatiev want Whites murdered?  If so, were his words as objectionable as mine?  If Ignatiev sought genocide, then surely a genocide of all Whites would be an even greater outrage than a genocide of all Jews, given the far greater number of Whites."  ¶29.

News of Damsky's post[2] quickly spread at UF Law and threw the campus into turmoil.  Students, faculty, and the Dean of UF Law viewed the post as threatening violence against Jews.  Not long before this incident, Damsky had gained notoriety on campus for authoring two seminar papers that included calls for violence.

Following the post, UF placed Damsky on interim suspension, excluded him from campus, and commenced a process to determine if he had violated UF's Student Conduct Code, which prohibits threats and disruptive conduct.  A three-member University Officials Board ("UOB"), after a hearing, recommended to Chris Summerlin, UF's Dean of Students, that Damsky be found responsible for violating the Code.  The sanction recommended by the UOB was expulsion.  Dean Summerlin accepted the UOB's recommendations.

In this lawsuit, Damsky contends his post on X was protected speech.  That is not so.  The First Amendment does not protect threats by students that materially and

---

[2] References herein to Damsky's "post" are to his original post on X calling for the abolition of Jews as well as his subsequent exchange with Professor Lidsky.

substantially disrupt school operations.  Damsky's post was reasonably perceived as a threat, one that disrupted the learning environment at UF Law, its students' ability to access their education, and ordinary life on campus.  Because Damsky's First Amendment claim lacks merit, his Complaint should be dismissed.

## MOTION TO DISMISS STANDARDS

To survive a motion to dismiss, a plaintiff must allege "sufficient factual matter ... to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  At this stage, "the court accepts all well-pleaded facts as true and views them in the light most favorable to the plaintiff." *Jones v. BrenCo, LLC*, No. 5:23-cv-160-AW-MJF, 2023 WL 8517472, at *1 (N.D. Fla. Nov. 17, 2023).

On a motion to dismiss, "a court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).

Defendant is submitting several documents with this motion to dismiss; each is central to Plaintiff's claim and authentic.  *See* Decl. of Heather White & Exs. A–H; Decl. of Merritt E. McAlister & Exs. I–K.  One of the exhibits is the audio recording of the July 28, 2025 UOB hearing, which may be considered here.  *See*

3

Ex. E; *Johnson*, 107 F.4th at 1298 (finding it proper to consider videos central to plaintiff's claim because the incorporation-by-reference doctrine is not limited to written instruments). For the convenience of the court and parties, a transcript of the audio recording has been prepared by a certified court reporter. *See* Ex. F.

## BACKGROUND

### A.    UF's Student Conduct Code

Florida law requires all state universities to adopt "codes of conduct and appropriate penalties for violation of rules or regulations by students, to be administered by the institution." Fla. Stat. §1006.60(1). Such rules and regulations shall provide for the "discipline of any student who intentionally acts to impair, interfere with, or obstruct the orderly conduct, processes, and functions of the institution" and "may apply to acts conducted on or off campus[.]" *Id*. §1006.60(6).

A student who attends a state university shall "be deemed to have given his or her consent to the policies of that institution," including the "prohibition against disruptive activities[.]" *Id*. §1006.61(1). A student who has "participated in disruptive activities … may be immediately expelled from the institution for a minimum of 2 years." *Id*. §1006.61(2).

In keeping with state law, UF has adopted a Student Conduct Code. *See* UF Regulation 4.040, Student Honor Code and Student Conduct Code (as amended 2023), https://policy.ufl.edu/regulation/4-040/. Section 4.C of the Code prohibits

"Disruptive Conduct," defined as "Conduct that is materially or substantially disruptive to the normal operations of the University, or that incites others to do so, in any of the following activities: teaching, learning, research, administrative functions, disciplinary proceedings, other University Activities whether on or off campus, and other authorized activities that take place on campus." *Id.* Reflecting UF's commitment to principles of free speech, the Code instructs that "[d]isruptive conduct does not include any conduct protected by the First Amendment." *Id.*

Section 4.K prohibits "Harassment" which includes "Threats, intimidation, Coercion, or any other conduct that places a Reasonable person in fear of physical harm, through words or actions, or objectively disrupts a person's daily activities, including education and employment." *Id.* But "[h]arassment does not include conduct protected by the First Amendment." *Id.*

## B.    Procedural History

On April 2, 2025, UF informed Damsky that, based on reports that he had disrupted UF Law's academic operations, he was being placed on interim suspension and excluded from campus. ¶31; *see also* Letter from Chris Summerlin, Dean of Students, UF, to Preston Damsky (Apr. 2, 2025), Ex. A. Two weeks later, UF granted Damsky's request for an extension of time to appeal his interim suspension. ¶40; *see also* Letter from Nancy Chrystal-Green, Associate Vice President for Student Life, UF, to Preston Damsky (Apr. 16, 2025), Ex. B. The following week, Damsky

5

appealed his interim suspension.  ¶43.  UF denied Damsky's appeal.  *Id*.; *see also* Letter from James Tyger, Assistant Vice President, Student Life, UF, to Preston Damsky (Apr. 29, 2025), Ex. C.

On May 29, 2025, UF informed Damsky he was being charged with violating the Student Conduct Code by engaging in Disruptive Conduct and Harassment.  *See* ¶47; Letter from Pamela Malyk, Assistant Dean and Director of Student Conduct & Conflict Resolution, UF, to Preston Damsky (May 29, 2025), Ex. D.  A student conduct hearing on the charges was set for July 28, 2025, and took place before three UOB members.  *See* Ex. E (Audio Recording)[3]; Transcript of Audio Recording (July 28, 2025), Ex. F.  At the hearing, several witnesses provided information to the UOB, including Merritt McAlister, the Interim Dean of UF Law; Janice Shaw, the Senior Assistant Dean of Students at UF Law; and UF Law Professors Lyrissa Lidsky, Christopher Hampson, and Zachary Kaufman.  Damsky attended the entire hearing, provided information to the UOB, answered its questions, asked questions of the witnesses, and made closing remarks.

Following the hearing, on August 8, 2025, Dean Summerlin informed Damsky that the UOB had recommended that he be found responsible for Disruptive

---

[3] The audio recording on USB has been filed with this Court pursuant to the rules governing filing of non-paper exhibits, and has been served on Plaintiff's counsel electronically and on USB.

Conduct and Harassment in violation of the Code and had proposed expulsion as a sanction. Dean Summerlin accepted the UOB's recommendations. ¶52; *see also* Letter from Chris Summerlin, Dean of Students, UF, to Preston Damsky (Aug. 8, 2025), Ex. G. Almost one month later, Damsky appealed his expulsion. ¶53.

On September 14, 2025, Plaintiff filed his one-count Complaint asserting a First Amendment claim under 42 U.S.C. §1983. Doc. 1 ¶¶54–63.

On October 9, 2025, a three-member Appeal Panel convened by UF denied Damsky's appeal. *See* Letter from Heather White, Vice President of Student Life, UF, to Preston Damsky (Oct. 9, 2025), Ex. H. Damsky has not yet exhausted his appeal in state court. Fla. R. App. P. 9.190(b)(3).

## C.    Statement of Facts

### 1.    Damsky's Seminar Papers

"In the Fall 2024 semester, Plaintiff wrote two seminar papers which were the subject of controversy at UF Law[.]" ¶7. Damsky's papers argued that "the United States was founded as a race-based nation state" for the white race and must be preserved as such. *Id.* The first paper, titled "American Restoration: An Article 5 Proposal," stated:

> [W]e should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is

rightfully ours.  This land, America, our due inheritance, is worth the struggle.

Ex. I [excerpted].

The second paper, titled "National Constitutionalism," stated:

The Supreme Court and inferior federal courts have the power to arrest the dispossession of White America. … If the People are not granted relief from the government—which includes the judiciary—then, if they are to survive as masters in the land of their ancestors, they must exercise "their revolutionary right to dismember or overthrow" the government.[ ] And that will be a process which no deskbound jurist can gleefully look forward to; for it will be a controversy decided not by the careful balance of Justitia's scales, but by the gruesome slashing of her sword.

Ex. J [excerpted] (footnote omitted).

### 2.    Damsky's Post

On March 21, 2025, Damsky posted on his X account that "My position on Jews is simple: … Jews must be abolished by any means necessary."  ¶23; *see also* Preston Damsky (@preston_terry_), X (Apr. 1, 2025, at 3:48 PM), https://x.com/preston_terry_/status/1903171971812036796 (reflecting 25,200 views as of Oct. 7, 2025).  On April 1, 2025, he and Professor Lidsky exchanged messages about it.  ¶¶28–29.  His original post and their exchange on April 1 appear below.



Ex. K.

A further reply by Professor Lidsky on April 2 stated that "I notice you didn't say no, but instead resorted to a whataboutism … Yes, his words are despicable, but you implicitly admit yours are, too."  ¶30.

### 3.    The Student Conduct Hearing

At the July 28, 2025 hearing, witnesses informed the UOB that Damsky's post was understood as a threat by students, faculty, and staff at UF Law, and that the post massively disrupted the law school's operations.[4]

Dean McAlister told the UOB that Damsky "made unacceptable threats against our Jewish faculty, students, and staff, and those threats predictably created a substantial and material disruption to the operation of the law school." Ex. F at 13. The law student who first told her about the post "was shaking with tears in his eyes and emotion in his voice" and said "he was afraid to be at a law school" with Damsky. *Id*. at 14. News of Damsky's post "spread like wildfire" through UF Law, which has "a large and engaged Jewish community[.]" *Id*.

A faculty member told the Dean that he was afraid for the "safety of his family, himself, and his students." *Id*. "Students were afraid to study on campus as we headed into finals." *Id*. "A staff member asked for her name and picture to be taken off the website because she had a Jewish surname, and she ultimately quit her job several weeks later." *Id*.

In the wake of Damsky's post, "business as usual at the law school ground to a halt. All that anyone was doing or talking about was Mr. Damsky and his X posts."

---

[4] Although the hearing witnesses were not under oath, the UOB Chair admonished the witnesses that they were "expected to tell the truth in this hearing. Failure to do so can be construed as a violation of the Student Conduct Code[.]" Ex. F at 4.

*Id*.  The Dean "received a request to post a police officer outside of a classroom because Mr. Damsky was enrolled in the class, which had Jewish students.  We had a police officer who had to attend a Jewish Law Students Association event out of fear that Mr. Damsky might show up."  *Id*. at 14–15.  "[O]ne professor cancel[led] class out of stress from the situation[.]"  *Id*. at 15.

Dean McAlister stated that "[t]his was not the first time Mr. Damsky had called for violence.  When he did so in the fall in the context of a seminar paper, I concluded that the statements in that context were not threatening because they were written in an academic paper and not put out on X to terrorize a community that he knew was looking."  *Id*. at 15–16.  But Damsky's post on X was different, in part because he understood when he posted that "some members of our community perceived him as a threat."  *Id*. at 16.  "At a town hall in January, at least two students expressed to me their palpable fear of Mr. Damsky.  One said she scanned the exits when he was in a room.  Another avoided taking classes with him out of fear of what he might do."  *Id*.  "Damsky was aware of these comments and he discussed them with Dean Shaw[.]"  *Id*.

The Dean noted that, in Damsky's exchange with Professor Lidsky, *see* Ex. K, he had an opportunity to explain that he was not threatening violence, but he did not do so.  Instead, "Damsky equivocated in his response and invoked the concept of genocide."  Ex. F at 17.  "At that point, the meaning of his words became clear.

11

He was threatening the Jewish people on our campus.  He was calling for and supportive of genocide by, 'Any means necessary.'"  *Id*.  "I felt in that moment that we were on notice, that there was some real chance that someone could take action against our community and that terrified me."  *Id*. at 21.

The next witness was Senior Assistant Dean of Students Janice Shaw.  She told the UOB that, in Fall 2024, she received "complaints from students about a paper Preston wrote that several students reported they interpreted as having a call for violence."  *Id*. at 73–74.  Following the townhall in January 2025, Dean Shaw met with Damsky.  "During that meeting, I asked Preston if he was aware that students were talking about him at the recent town hall, and that they were afraid of him."  *Id*. at 74.  "And based on that direct conversation, Preston was made aware that students feared him and they thought he might do something that would negatively impact their safety."  *Id*. at 75.

After Damsky tweeted out his post, "several students came into my office crying about the fear they felt."  *Id*. at 75.  One "student was uncontrollably crying in my office about the fear and anger she felt about that the fact that she might be attacked at school and that Preston wanted her or her friends to suffer physical harm."  *Id*. at 76.  "In written complaints, another student said they feared that his words would become actions.  And one wrote that she did not feel safe walking the

halls at UF or attending Jewish Law Student Association events or even being by herself." *Id.*

Professor Lidsky spoke next. She stated that, after learning of Damsky's post, she "decided to engage in my own counter speech to try to discern [his] intent[.]" *Id*. at 100. She gave him "a chance to step back from the edge" but instead "he responded by deflecting[.]" *Id*. at 100–01. "In the next couple of days … at least 15 students came to my office expressing fear for my safety and concern that Mr. Damsky might come to the law school armed. Some students asked me if I thought he had a gun. Some students said that because they feared I was a target, they were afraid to attend my class." *Id*. at 101. Lidsky and her husband "slept with a baseball bat beside the bed for the next couple of weeks." *Id*. at 102. And "the toll of trying to reassure my students that they were safe and that I was safe together with the worry that I might have exposed my family to some sort of danger led me to cancel my class the following Monday." *Id*. at 103. Professor Lidsky noted that "shortly after Mr. Damsky was trespassed off campus, a white supremacist at FSU shot and killed innocent victims." *Id*. at 104.

Professor Christopher Hampson told the UOB that in October 2024 he received a draft of Mr. Damsky's seminar paper "American Restoration." *Id.* at 140. One of Professor Hampson's students told him that he and several of his classmates were concerned that the paper ended on what they understood to be a call for

violence. *Id.* at 140–41. Professor Hampson stated that, in the same semester, Damsky had included a call to violence in another paper, "National Constitutionalism." *Id.* at 141.

"On April 1st, four law professors emailed the faculty about Mr. Damsky's tweet, noting the pattern of escalation against his previous calls for violence." *Id*. at 143. "The student community was deeply alarmed by this point. I learned that students were concerned for their personal safety and were actively avoiding registering for classes if Mr. Damsky was in them. I also know that two faculty members, both women of color, were trying to figure out whether they could safely come to campus at all and whether they should move all their classes online." *Id.*

Professor Zachary Kaufman, the Jewish Law Students Association's faculty advisor, told the UOB that Damsky "has sowed terror and anguish among Jewish members, students, staff, and faculty of our community, and he has massively disrupted our law school's academic community within our law school's walls and beyond, in the day-to-day lives of our students, staff, and faculty." *Id*. at 161.

"Awareness and discussion of [Damsky's] post spread through our law school community like wildfire. Many members of our law school community, Jews and non-Jews alike, interpreted Mr. Damsky's message to be a concrete, credible call for genocidal violence against Jews, including Jews in our law school community, as well as their families." *Id*. at 162. "Mr. Damsky's post caused many Jews in our

law school community to feel immense fear and anxiety. And he wrote those posts on social media during the final month of the semester when students wanted and for their grades and careers needed to focus on their studies." *Id*. at 162–63.

"Some students were so concerned about the potential need for self-defense against Mr. Damsky that they carried pepper spray and escorted each other to and from their cars in our law school parking lot. Several students cried from fear of Mr. Damsky and what he might do." *Id*. at 164. "Many students' studying was disrupted by participating in hours-long conversations with their parents and peers about Mr. Damsky, what he might do, how they could protect themselves, and what the administration at the law school could or should do to protect them." *Id*. at 164. "Some students skipped academic events, missed classes, or were late to classes because they were focused on attending town halls or participating in conversations with each other or with faculty or administrators about their safety." *Id*.

"In direct response to Mr. Damsky's social media posts, the law school administration arranged for heightened security on campus, including cameras in the faculty parking lot and more frequent police patrols." *Id*. at 165. On April 4th, the Dean "announced via email that Mr. Damsky had been trespassed from campus, that police patrols and event security had recently increased, and that starting on April 7th, the law school would change its security protocols from having all doors unlocked during business hours to having most of them locked and accessible only

through ID card access." *Id*. at 167.  "[M]any Jewish students expressed difficulty in studying for and taking exams.  They stated that their studying was disrupted by their sincerely and reasonably held fear that Mr. Damsky would stage or incite an attack against Jews at our law school and perhaps in our wider university.  Several students believe that the disruption Mr. Damsky caused prevented them from achieving their full academic potential and that their grades and career prospects, upon which grades in law school are so dependent, thus suffered." *Id*. at 168.

## ARGUMENT

Damsky's First Amendment claim fails as a matter of law, for two reasons. First, threats of violence by a student directed toward a school are not protected under any circumstances, and Damsky's original post—in which he declared that "Jews must be abolished by any means necessary" (¶23)—and his subsequent exchange with Professor Lidsky were reasonably perceived by UF Law's students, faculty, staff, and Dean, and other UF officials as a threat.  Second, even if Damsky's posts were not threats, student speech that disrupts the learning environment at school is not protected, and Damsky's speech caused material and substantial disruption at UF Law.

**I.        Threats of Violence Are Not Protected Under the First Amendment.**

The Supreme Court has made it clear that "[t]he First Amendment does not protect violence." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). Nor does the First Amendment protect threats of violence, a "historically unprotected category of communication." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). "True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection." *Id*. at 72.

"True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Id*. at 74 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). "And a statement can count as such a threat based solely on its objective content." *Id*. at 72. "The speaker need not actually intend to carry out the threat." *Black*, 538 U.S. at 359-60. "Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat[.]" *Counterman*, 600 U.S. at 74. "The existence of a threat depends not on the mental state of the author, but on what the statement conveys to the person on the other end." *Id*. (cleaned up). The focus is on the person receiving the threat for good reason: "[A] prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Black*, 538 U.S. at 360 (cleaned up).

17

## II.    Damsky's Post Was a Threat.

Damsky's post was not protected speech but a threat.  His post was reasonably regarded as a threat of violence by Dean McAlister and students, faculty, and staff of UF Law as well as the three UOB members and Dean Summerlin.  And Damsky's threatening post materially and substantially disrupted the educational mission of UF Law, the ability of law school students to access their education, and ordinary life on campus.

The witnesses at the July 28, 2025 hearing told the UOB that many members of the UF Law community viewed Damsky's post as a threat.  *See supra* pages 10–16.  And it was reasonable to view the post that way.  Damsky announced on public-facing social media that "My position on Jews is simple: … Jews must be abolished by any means necessary."  ¶23; Ex. K.  The verb "abolish" means "[t]o annul, eliminate, or destroy[.]"  *Abolish*, *Black's Law Dictionary* (12th ed. 2024).  Thus, Damsky's "simple" "position on Jews" that "Jews must be abolished" is hardly different than saying all Jews must be eliminated.[5]  And context matters.  Damsky's post came on the heels of his two seminar papers that included calls for violence.  *See* Exs. I & J; *see also* Ex. F at 15 ("This was not the first time Mr. Damsky had

---

[5] It is also relevant that Damsky wrote his post in the present tense.  The Eleventh Circuit has explained that when "message[s] [are] worded in the present tense [they] evidence[ ] an intent to intimidate and place the recipient of the message in fear of bodily harm or death."  *United States v. Fleury*, 20 F.4th 1353, 1365 (11th Cir. 2021).

called for violence.") (statement of Dean McAlister). Before Damsky posted his threat, he was on notice that some students feared him. Dean Shaw had told him so when they met. *Id.* at 74–75 (statement of Dean Shaw). But Damsky posted his threatening "position on Jews" anyway.

Damsky's use of the phrase "by any means necessary" was also threatening. That phrase conveys a willingness to use violence to achieve one's aims. *See, e.g.*, *United States v. Brown*, 479 F.2d 1170, 1174–75 (2d Cir. 1973) (Defendant's statement that "he would protect himself from what he considered force and violence by the police or military 'by whatever means necessary' … could properly have raised a serious question in the sentencing judge's mind as to whether Brown posed a threat of violent or anti-social conduct to the community").[6] Damsky's post that "Jews must be abolished by any means necessary" was reasonably seen as a threat. *Cf. United States v. Baker*, 514 F. Supp.3d 1369, 1379 (N.D. Fla. 2021) (finding probable cause that defendant made a criminal threat when he posted that "We will drive them [racist mobs] out of Tallahassee with every caliber available");

---

[6] Damsky's use of the phrase "by any means necessary" recalls language used by Malcolm X in the 1960's. And "if there was one maxim that encapsulated Malcolm's political ethos, it was his threatening pronouncement that blacks should pursue '*any* means necessary' to advance their rights." John M. Kang, *Martin v. Malcolm: Democracy, Nonviolence, Manhood*, 114 W. Va. L. Rev. 937, 944–45 (2012) (quoting Malcolm X, *At the Audubon, in* Malcolm X Speaks, 88, 96 (George Breitman ed., 1990)).

*United States v. Ramos*, No. 5:24-cr-34 (MTT), 2024 WL 4335912, at *2 (M.D. Ga. Sept. 27, 2024) ("[A] reasonable person could construe [a] handwritten message 'We have the Zyklon B … GASTHEJEWS' mailed to [a] Rabbi's home address as a threat.").

The phrase "by any means necessary" is especially threatening to Jews after the October 7, 2023, massacre of Israeli and American Jews by Hamas. As University of Miami law professor Lili Levi has written: "Many Jews … see the phrase ['by any means necessary'] as calling for ethnic violence against Jews— particularly in light of statements by Hamas representatives that the October 7 atrocities would continue to be committed as many times as necessary." Symposium: *Third Annual Law vs. Antisemitism Conference: Lessons for the Trump Administration From the Biden* U.S. National Strategy to Counter Antisemitism, 19 FIU L. Rev. 789, 824–25 (2025).

If there were any doubt about the meaning of Damsky's original post, his subsequent exchange with Professor Lidsky confirmed its threatening nature. When she asked him, "Are you saying you would murder me and my family? Is that your position?" (¶28; Ex. K), Damsky did not say no. Instead, he replied to her questions with other questions, and he brought the topic of genocide into the conversation: "Did Ignatiev want Whites murdered? If so, were his words as objectionable as mine? If Ignatiev sought genocide, then surely a genocide of all Whites would be

an even greater outrage than a genocide of all Jews, given the far greater number of Whites." ¶29; Ex. K. After his meeting with Dean Shaw, and especially after his exchange with Professor Lidsky, it is clear that Damsky "consciously disregarded a substantial risk that his communications would be viewed as threatening violence" by the UF Law community. *Counterman*, 600 U.S. at 69. "Preston knew that students were afraid of him and he continued to fan the flames of fear through his tweet and his response to Professor Lidsky." Ex. F at 77 (statement of Dean Shaw).

The Complaint alleges that "Plaintiff was aware Noel Ignatiev did not advocate for violence in his call to 'abolish the white race by any means necessary.'" ¶22. While Damsky may have been familiar with the writings of Noel Ignatiev— not exactly a household name—most people are not. And Damsky never explained in his post that Ignatiev was not calling for violence (if that is so). Damsky's post conveyed that Ignatiev wanted to abolish the white race and that Damsky wanted the same for Jews. Damsky alleges that Ignatiev's "Race Traitor" is available in the UF library (¶19), but those who saw Damsky's post did not have to run to the library to bone up on Ignatiev's writings before they could reasonably perceive the post as a threat against Jews. Even someone familiar with Ignatiev's writings could properly regard the post as a threat. As Dean McAlister pointed out at the UOB hearing, whereas Ignatiev wanted to abolish *whiteness* as a concept, Damsky called for abolishing Jews, not Jewishness. *See* Ex. F at 13.

21

Damsky's post was reasonably understood as a threat, one that threw the UF Law campus into turmoil, as multiple witnesses told the UOB. *See supra* pages 10–16. Damsky's threatening post caused material and substantial disruption at UF Law and for that reason, too, was not protected speech. *See* Part V *infra*.

Damsky's post was not protected political speech. If "speech satisfie[s] the elements of a true threat, … it [i]s not protected political speech." *United States v. Kaye*, No. 23-11423, 2024 WL 164810, at *6 (11th Cir. Jan. 16, 2024), *cert. denied mem.*, 114 S. Ct. 1127 (2024); *see Baker*, 514 F. Supp.3d at 1381 ("Amalgamating true threats with political commentary does not immunize the former."). In addition, a school may regulate its students' political speech where, as here, it "substantially interfere[s] with the work of the school or impinge[s] upon the rights of other students." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969). *See* Part V *infra*.

## III. The Eleventh Circuit's Decision in *Boim* Confirms UF's Authority to Take Action Based on Damsky's Threatening and Disruptive Post.

In *Boim v. Fulton County School District*, 494 F.3d 978 (11th Cir. 2007), a high school student, Rachel, was suspended based on a narrative she wrote in her notebook. Titled "Dream," Rachel described shooting her math teacher. *Id*. at 980–81. The Eleventh Circuit upheld the suspension because the narrative "clearly caused and was reasonably likely to further cause a material and substantial disruption to the 'maintenance of order and decorum' within" the school. *Id*. at 983.

The Court's opinion observed that, "in the eight years preceding the incident underlying the instant appeal, there had been 10 well-known, student-perpetrated shootings in schools, not including college campuses, located within the United States." *Id.* It also noted the "numerous other school shootings that have occurred internationally and on college campuses, both during the relevant time period and since then, most notably the Virginia Tech massacre, in which 32 people were murdered." *Id.* at 983 n.5.

The Eleventh Circuit considered this history of school violence in rejecting Rachel's claim that her writing was protected speech.

> [I]n this climate of increasing school violence and government oversight, and in light of schools' undisputably compelling interest in acting quickly to prevent violence on school property, especially during regular school hours, we must conclude that the defendants did not violate Rachel's First Amendment rights. We can only imagine what would have happened if the school officials, after learning of Rachel's writing, did nothing about it and the next day Rachel did in fact come to school with a gun and shoot and kill her math teacher. In our view, it is imperative that school officials have the discretion and authority to deal with incidents like the one they faced in this case.

*Id.* at 984.[7]

---

[7] Sadly, the spate of lethal school violence has not diminished since *Boim*. The tragic shooting in Parkland, Florida, in which 17 elementary school students were killed, occurred in 2018. *See Fleury*, 20 F.4th at 1359. UF Law has had students who are survivors of the Parkland attack. *See* Ex. F at 15, 104.

*Boim* held that, "[j]ust as there is no First Amendment right to falsely yell 'fire' in a crowded theater … there also is no First Amendment right allowing a student to knowingly make comments, whether oral or written, that reasonably could be perceived as a threat of school violence, whether general or specific, while on school property during the school day." *Id.*[8]  The Court held that "Rachel's first-person narrative could reasonably be construed as a threat of physical violence against her sixth-period math teacher. … Rachel created an appreciable risk of disrupting [the school] in a way that, regrettably, is not a matter of mere speculation or paranoia." *Id.* at 985.

*Boim* also relied on the Supreme Court's decision in *Morse v. Frederick*, 551 U.S. 393 (2007).  In that case, a high school student displayed a banner with a message that the principal reasonably regarded as promoting illegal drug use ("BONG HiTS 4 JESUS").  *Id.* at 397.  The principal confiscated the banner and suspended the student.  The Supreme Court held that school officials may, "consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Id.* at 403.  In *Boim*, the Eleventh Circuit concluded that "[t]hat same rationale applies equally, if not more strongly, to speech reasonably construed as a threat of school violence." *Boim*,

---

[8] The same goes for threats of school violence reasonably perceived as such but delivered from off campus. *See* Part IV *infra*.

494 F.3d at 984.   Here, Dean McAlister, the UOB, and Dean Summerlin all reasonably regarded Damsky's post as threatening violence, particularly against Jews at the law school.

In a case decided soon after *Boim*, the Fifth Circuit admonished that "[o]ur recent history demonstrates that threats of an attack on a school and its students *must* be taken seriously." *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 771 (5th Cir. 2007).   One of the special characteristics of the school environment is that "school attendance results in the creation of an essentially captive group of persons protected only by the limited personnel of the school itself.   This environment makes it possible for a single armed student to cause massive harm to his or her fellow students with little restraint and even less forewarning." *Id*. (citing *Morse*, 551 U.S. at 424 (Alito, J., concurring)).   "School administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance." *Id*. at 772.   "[N]umerous, recent examples of school violence exist in which students have signaled potential violence through speech, writings, or actions, and then carried out violence against school communities, after school administrators and parents failed to properly identify warning signs." *Bell v. Itawamba Cnty. Sch. Bd*., 799 F.3d 379, 399 (5th Cir. 2015) (en banc).

25

Here, UF officials, including Dean McAlister and Dean Summerlin, acted promptly and responsibly to protect the safety of the UF Law community in the face of "speech reasonably construed as a threat of school violence." *Boim*, 494 F.3d at 984. Deference to their judgment about what was needed in the moment is appropriate. *See Ala. Student Party v. Student Gov't Ass'n of Univ. of Ala.*, 867 F.2d 1344, 1347 (11th Cir. 1989); *Bishop v. Aronov,* 926 F.2d 1066, 1075 (11th Cir. 1991) ("Federal judges should not be ersatz deans or educators.").

## IV.   Threats Made Off-Campus That Have On-Campus Effects Are Not Insulated From Review by School Officials.

Damsky suggests he was free to say what he did in his post because he said it "while off-campus and on Spring Break." ¶23. Damsky is wrong. True threats are punishable regardless of where or when they are made. Moreover, Florida law and UF's Student Conduct Code permit UF to address off-campus conduct that has on-campus effects. *See* Fla. Stat. §1006.60(6); Code §1.C and §4.C.[9]

So does the First Amendment. Binding court decisions confirm that disruptive or threatening student speech may be proscribed even when off-campus speech is at issue. In *Tinker*, the Supreme Court explained that "conduct by [a] student, *in class or out of it*, which for any reason—whether it stems from time, place, or type of

---

[9] Code §1.C provides: "The University may apply the Student Conduct Code … to Students whose conduct may have an adverse impact on the health, safety, or welfare of people, property, the University Community, or the pursuit of its objectives, regardless of where such conduct occurs, even if off campus."

behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Tinker*, 393 U.S. at 513 (emphasis added).

After *Tinker*, the Fifth Circuit, in a decision binding on the subsequently created Eleventh Circuit, declined "to hold that *any* attempt by a school district to regulate conduct that takes place off the school ground and outside school hours can never pass constitutional muster." *Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960, 974 (5th Cir. 1972). More recently, the Eleventh Circuit itself, in *Doe v. Valencia College*, 903 F.3d 1220 (11th Cir. 2018), ruled: "There is no absolute bar against schools disciplining a student for off-campus conduct that violates the rights of another student." *Id*. at 1231. The *Doe* court rejected a suspended student's argument that "the school was powerless to do anything about his misbehavior because he did it all while he was off campus" during "the break between summer and fall classes." *Id*. In light of *Doe*, Damsky's "Spring Break" argument must fail.

In *Mahanoy Area School District v. B. L.*, 594 U.S. 180 (2021), which involved a student's off-campus use of social media, the Supreme Court rejected the idea that "the special characteristics that give schools additional license to regulate student speech always disappear when a school regulates speech that takes place off campus." *Id*. at 188. The Court confirmed that "[t]he school's regulatory interests remain significant in some off-campus circumstances." *Id*. The Court cited "several

27

types of off-campus behavior that may call for school regulation," including "threats aimed at teachers or other students." *Id*.

Finally, in *Alvoid v. School District of Escambia County*, 582 F. Supp.3d 1140 (N.D. Fla. 2021), the court observed that "federal courts have uniformly agreed that language reasonably perceived as threatening school violence is not constitutionally protected—whether such language is written or oral, and whether it occurs at school or elsewhere." *Id*. at 1156 n.14 (quotation marks omitted).

Here, Damsky posted on social media a message that was widely perceived as a threat against Jews and he chose to amplify those perceptions when a member of the school confronted him, both of which caused significant disruption at the law school. He did not have a free pass to do this just because he was off campus or on holiday. At the time, Damsky was enrolled as a student at UF Law, and that status does not end during Spring Break or when the semester ends. Students remain enrolled year-round until their degrees are completed or they voluntarily or involuntarily withdraw from the university. If Damsky had phoned in a bomb threat from the beach on a Saturday, it would have made no difference to UF's ability to apply its conduct rules to him. So too here, it does not matter where or when Damsky wrote and published his threatening and disruptive post. The on-campus effects of his off-campus speech permit the school to regulate the speech.

Finally, and in any event, even if Damsky's original post was off-campus speech, his exchange with Professor Lidsky should be regarded as on-campus speech since it involved direct public communication with a UF Law faculty member.

## V.   Threatening Student Speech That Causes Significant Disruption on Campus Is Not Protected by the First Amendment.

Damsky's post was reasonably perceived as a threat, and UF had the right to regulate that speech due to its threatening nature and the serious disruption it caused at UF Law.   In *Tinker*, the Supreme Court held that, "in light of the special characteristics of the school environment," a school is allowed to engage in "reasonable regulation of speech-connected activities[.]"  *Tinker*, 393 U.S. at 506, 513.  When student speech "materially disrupts classwork or involves substantial disorder or invasion of the rights of others," it is "not immunized" by the First Amendment.  *Id*. at 513.  School authorities have a right and a duty to take action when they "reasonably … forecast substantial disruption of or material interference with school activities" or when "disturbances or disorders on the school premises in fact occurred."  *Id*. at 514.

These principles apply in the higher education setting.  In *Healy v. James*, 408 U.S. 169 (1972), the Court recognized that "a college has a legitimate interest in preventing disruption on the campus," *id*. at 184, and that student speech "activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an

education," *id*. at 189.  *Healy* recognized that, "[i]n the context of the 'special characteristics of the school environment,'" a school's power to "prohibit 'lawless action' is not limited to acts of a criminal nature," but includes "actions which 'materially and substantially disrupt the work and discipline of the school.'"  *Id*. (quoting *Tinker*, 393 U.S. at 506, 513).  In *Widmar v. Vincent*, 454 U.S. 263 (1981), the Court "affirm[ed] the continuing validity of cases, *e.g.*, *Healy* … that recognize a University's right to exclude even First Amendment activities" having such adverse effects.  *Id*. at 277.  "A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission[.]"  *Id*. at 267 n.5.  And in *Doe v. Valencia College*, the Eleventh Circuit applied *Tinker*, *see* 903 F.3d at 1229–31, and held that, because Valencia "reasonably concluded" that a student's conduct interfered with the rights of another student, "Valencia was free to regulate it under *Tinker* without impinging on … First Amendment rights."  *Id*. at 1230.[10]

The test to be applied here is whether UF reasonably believed that Damsky's post was a threat that caused disruption on campus.  In *Morse*, the Court reaffirmed

---

[10] Although the Eleventh Circuit has noted that "*Tinker*'s deferential standard doesn't apply to viewpoint-based restrictions," *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022), the instant case involves no such restriction.  Neither the Eleventh Circuit nor the Supreme Court has ever questioned a university's ability to discipline student speech based, not on its viewport, but on its threatening nature and disruptive effects.

that student expression may be regulated if "school officials reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'" 551 U.S. at 403 (quoting *Tinker*, 393 U.S. at 513). School administrators may therefore restrict student speech "when that speech is reasonably viewed as promoting illegal drug use." *Id*. That holding also applies to student speech threatening violence. In a concurring opinion, Justice Alito, joined by Justice Kennedy, explained that "due to the special features of the school environment, school officials must have greater authority to intervene before speech leads to violence." *Id*. at 425 (Alito, J., concurring). In the school setting, the First Amendment "permits school officials to step in before actual violence erupts." *Id*. "Experience shows that schools can be places of special danger." *Id*. at 424 (Alito, J., concurring).

In *Boim* the Eleventh Circuit held that *Morse* applies to student threats. Citing Justice Alito's concurrence, the *Boim* Court held that *Morse*'s "rationale applies equally, if not more strongly, to speech reasonably construed as a threat of school violence." 494 F.3d at 984. *See* Part III *supra*.

In *Mahanoy*, a case arising from a high school's attempt to discipline a student for vulgar off-campus speech on social media, the Court sided with the student on the facts presented but reaffirmed that "the special characteristics that give schools

additional license to regulate student speech" allow schools to regulate, among other things, "threats aimed at teachers or other students."  594 U.S. at 188.

A university's assessment of the need to regulate threatening or disruptive student speech is entitled to significant deference.  "The University should be entitled to place reasonable restrictions" on such speech "to minimize the disruptive effect" of it.  *Ala. Student Party*, 867 F.2d at 1347.  "The University judgment on matters such as this should be given great deference by federal courts."  *Id.* Unfortunately, the days are long gone that school officials could assume that threatened violence would not likely occur.  UF perceived a threat and acted to prevent it.

## VI.    Plaintiff's Claim for Money Damages Should Be Dismissed.

Plaintiff's Complaint seeks both compensatory and punitive damages.  But Plaintiff has sued Dean Summerlin in his official, not individual, capacity.  ¶5.  And the Eleventh Amendment bars a Section 1983 suit for money damages against a state official sued in his official capacity.  *See Cross v. State of Alabama*, 49 F.3d 1490, 1503 (11th Cir. 1995); *Smith v. Fla. Dep't of Corrs.*, 318 F. App'x 726, 728 (11th Cir. 2008); *Ruhl v. Spear*, 639 F. App'x 624, 625 (11th Cir. 2016) (per curiam). Plaintiff's official-capacity suit against Dean Summerlin is no different than a suit against the State of Florida.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity … should be treated as suits against

the State.").  But "States and state officials acting in their official capacities cannot be sued for money damages under § 1983 because they are not considered to be 'persons' for the purposes of the statute."  *Carr v. Bd. of Regents of Univ. Sys. of Ga.*, 249 F. App'x 146, 148 (11th Cir. 2007) (citing *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989)).  Accordingly, Plaintiff's claim for compensatory and punitive damages should be dismissed whether or not his claim for declaratory and injunctive relief survives (which it should not).

### CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss should be granted, and Plaintiff's Complaint should be dismissed.

Respectfully submitted,

/s/ *H. Christopher Bartolomucci*
H. Christopher Bartolomucci
D.C. Bar No. 453423
Justin A. Miller*
D.C. Bar No. 90022870
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
cbartolomucci@schaerr-jaffe.com
jmiller@schaerr-jaffe.com

**Pro hac vice* application pending

*Counsel for Defendant*

Dated:  October 10, 2025

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(F)

Pursuant to Local Rule 7.1(F), I certify that the foregoing is in compliance with the Court's word limit. According to the word processing program used to prepare this memorandum, the document contains 7,841 words, excluding those portions exempted under the Rule.

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I certify that on October 10, 2025, I caused the foregoing Motion to Dismiss and Memorandum of Law, the accompanying Declarations of Heather White and Merritt E. McAlister, and the attached exhibits—except Exhibit E—to be filed with the Clerk of Court, and thereby served on all parties to this matter via the Court's CM/ECF filing system.  I further certify that Exhibit E, comprised of audio recordings, was transmitted on a USB to the Court Clerk via overnight commercial carrier, and served on counsel for all parties via an electronic link for immediate download, and on a USB via overnight commercial carrier.

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci

*Counsel for Defendant*