**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINSVILLE DIVISION**

| | |
|---|---|
| PRESTON DAMSKY, a law student at the University of Florida Levin College of Law, | |
| *Plaintiff*, | Case No. 1:25-cv-275-AW-MAF |
| v. | |
| CHRIS SUMMERLIN, in his official capacity as the Dean of Students of the University of Florida, | |
| *Defendants*. | |

---

**BRIEF OF *AMICUS CURIAE* AMERICAN CIVIL LIBERTIES UNION
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION**

---

Emerson J. Sykes*
NY Bar No. 5020078
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
esykes@aclu.org


*Admitted *pro hac vice*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................... ii

CORPORATE DISCLOSURE STATEMENT ........................................................v

STATEMENT OF INTEREST................................................................................1

INTRODUCTION ..................................................................................................2

ARGUMENT ..........................................................................................................3

    I.   DISRUPTION IS NOT THE APPRORIATE STANDARD IN THE
        HIGHER EDUCATION CONTEXT ........................................................3

        A. UF applied a disruption standard to Mr. Damsky ...........................3

        B. *Tinker*'s disruption standard is a poor fit in higher education..........5

        C. The Eleventh Circuit has recognized the problems with
            applying *Tinker* in higher education................................................10

        D. Other circuit courts use *Tinker* as a floor in higher education,
            not a ceiling ....................................................................................13

    II. EVEN IN THE K-12 CONTEXT, *TINKER* IS THE WRONG
        TEST FOR OFF-CAMPUS SOCIAL MEDIA POSTS ...........................14

CONCLUSION ......................................................................................................17

CERTIFICATE OF COMPLIANCE......................................................................17

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Free Speech Coalition*,
  535 U.S. 234 (2002)................................................................................7

*Bethel School District No. 403 v. Fraser*,
  478 U.S. 675 (1986)................................................................................7

*DeJohn v. Temple University*,
  537 F.3d 301 (3d Cir. 2008)............................................................ 9, 13

*Doe v. Valencia Colleges*,
  903 F.3d 1220 (11th Cir. 2018)...........................................................11

*Gay Lesbian Bisexual Alliance v. Pryor*,
  110 F.3d 1543 (11th Cir. 1997)............................................................12

*Gillman ex rel. Gillman v. School Board for Holmes County, Florida*,
  567 F. Supp. 2d 1359 (N.D. Fla. 2008)..................................................6

*Harris v. Forklift Systems, Inc.*,
  510 U.S. 17 (1993)..................................................................................5

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988)................................................................................7

*Healy v. James*,
  408 U.S. 169 (1972)......................................................................3, 10, 11

*Keyishian v. Board of Regents of University of State of New York*,
  385 U.S. 589 (1967)........................................................................9, 11

*Mahanoy Area School District v. B. L. ex rel. Levy*,
  594 U.S. 180 (2021)............................................................. 1, 3, 15, 16

*McCauley v. University of the Virgin Islands*,
  618 F.3d 232 (3d Cir. 2010)............................................................ 8, 14

*Minnesota State Board for Community Colleges v. Knight*,
  465 U.S. 271 (1984)..............................................................................10

*New Jersey v. T.L.O.*,
    469 U.S. 325 (1985) ..................................................................................8

*Papish v. Board of Curators of University of Missouri*,
    410 U.S. 667 (1973) .........................................................................10, 11

*Reno v. American Civil Liberties Union*,
    521 U.S. 844 (1997) ................................................................................16

*Rosenberger v. Rectors and Visitors of University of Virginia*,
    515 U.S. 819 (1995) ................................................................................12

*Speech First v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ......................................................10, 11, 12, 13

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957) ...............................................................................3, 9

*Sypniewski v. Warren Hills Regional Board of Education*,
    307 F.3d 243 (3d. Cir. 2002) ..................................................................14

*Tilton v. Richardson*,
    403 U.S. 672 (1971) ..................................................................................8

*Tinker v. Des Moines Independent School Community District*,
    393 U.S. 503 (1969) ......................................................................... *passim*

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ..................................................................................8

## Other Authorities

Claire Moses, *Louisiana Public School Principal Who Punished Student for
    Dancing Apologizes*, N.Y. Times (Oct. 12, 2023) ................................6

Erwin Chemerinsky, *Students Do Leave Their First Amendment Rights at the
    Schoolhouse Gate: What's Left of Tinker?*, 48 Drake L. Rev. 527 (2000) ...........5

Justin Driver, *Freedom of Expression Within the Schoolhouse Gate*, 73 Ark.
    L. Rev. 1 (2020) ......................................................................................5

National Center for Educational Statistics, *2022 Digest of Education
    Statistics Table 303.40* (2022)................................................................8

Press Release, ACLU Ohio, *ACLU Urges Shaker Heights High School to Reverse Decision to Punish Students for Free Speech* (Nov. 14, 2016)...............6

Robby Soave, *High School Suspends 2 Students for Posting Gun Range Photos on Snapchat, ACLU Files Suit*, Reason (Apr. 11, 2019) .........................6

Student Honor Code and Student of Conduct, Univ. of Fla. Reg. 4.040..................4

**Constitutional Provisions**

U.S. Const. amend. XXVI § 1 ...................................................................................9

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 7.1 of the Federal Rule of Civil Procedure, *amicus curiae* American Civil Liberties Union states that it does not have a parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

Dated: October 10, 2025                    By:    */s/ Emerson J. Sykes*
                                                   Emerson J. Sykes

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, non-profit organization with over 2 million members, dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. The ACLU has represented the students in many of the Supreme Court's cases regarding student free speech, including *Mahanoy Area School District v. B. L. ex rel. Levy*, 594 U.S. 180 (2021), and *Tinker v. Des Moines Independent School Community District*, 393 U.S. 503 (1969). As an organization committed to protecting the right to freedom of speech, the ACLU has a strong interest in the proper resolution of this case.

---

[1] The ACLU certifies that no person or entity, other than the ACLU, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

## INTRODUCTION

Preston Damsky is a student at the University of Florida Levin College of Law ("UF Law") who has been expelled for expressing overtly racist and antisemitic views. He has advocated an explicitly White supremacist version of constitutional originalism and militarized White nationalism. Mr. Damsky was expelled after a disciplinary committee found that a social media exchange with a UF Law professor amounted to "disruptive conduct" and "harassment." Without doubt, Mr. Damsky's views are antithetical to the principles *amicus curiae* ACLU has tirelessly defended for more than 100 years. Still, the ACLU is concerned about the University of Florida disciplining students using a disruption standard, which is inappropriate in a higher education context.

The Supreme Court in *Tinker v. Des Moines Independent Community School District* recognized *schoolchildren's* right to silent protest because their black armbands did not "materially and substantially disrupt the work and discipline of the school." 393 U.S. 503, 513 (1969). UF's student code of conduct includes a charge called "disruptive conduct," and also incorporates this disruption standard into the definition of harassment. Therefore, both of the charges against Mr. Damsky suffer from the same constitutional flaw. UF cannot hold its adult students to a standard created for students as young as five years old. That is especially true when the adult is engaging in speech off-campus. Even for K-12 students, the Supreme Court has

2

recognized that school officials have less authority to regulate young peoples' speech off campus. *Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 594 U.S. 180, 189–190 (2021).

Prohibiting government censorship is important for everyone, no matter the viewpoint being expressed, particularly in the university context. In its precedents governing higher education, the Supreme Court has recognized that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). And in *Healy v. James*, which addressed college students' First Amendment rights directly, the Court said it "can[not] be too often repeated that the freedoms . . . guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish." 408 U.S. 169, 188 (1972) (cleaned up).

## ARGUMENT

### I. DISRUPTION IS NOT THE APPRORIATE STANDARD IN THE HIGHER EDUCATION CONTEXT

#### A. UF applied a disruption standard to Mr. Damsky.

Preston Damsky was expelled for violating the student honor and student conduct code, University of Florida Regulation 4.040, Section (4)(C) "Disruptive

Conduct" and Section (4)(K) "Harassment." Compl. ¶¶ 47, 52, Dkt. No. 1. Section

(4)(C) reads as follows[2]:

> (4)(C) Disruptive Conduct: Conduct that is *materially or substantially disruptive* to the normal operations of the University, or that incites others to do so, in any of the following activities: teaching, research, administrative functions, disciplinary proceedings, other University Activities whether on or off campus, and other authorized activities that take place on campus. In evaluating whether conduct is materially or substantially disruptive, the University may consider the totality of factors, including but not limited to whether there was an intent to prevent the activity or event from continuing to completion and whether the conduct was a sustained and continuous disruption. Disruptive conduct does not include any conduct protected by the First Amendment. (emphasis added)

And Section (4)(K) reads,

> (4)(K) Harassment: Threats, intimidation, Coercion, or any other conduct that places a Reasonable person in fear of physical harm, through words or actions, or objectively *disrupts* a person's daily activities, including education and employment. Harassment does not include conduct protected by the First Amendment. (emphasis added)

In addition to the formal charges for violating the Student Conduct Code, UF

Law also made clear in its correspondence with Mr. Damsky that he was being

disciplined for "material and substantial disruption to the academic operations of the

UF College of Law." Compl. ¶ 31, Dkt. No. 1; Mot. for Prelim. Inj. ¶ 2, Dkt. No. 6.

UF Law used similar language in an email to students, alleging that Mr. Damsky

"significantly disrupted" campus activities. Compl. ¶ 35, Dkt. No. 1. UF's

---

[2] Student Honor Code and Student of Conduct, Univ. of Fla. Reg. 4.040 (4)(C), (K), https://perma.cc/SWW8-LLJ4.

application of the inappropriate disruption standard, both as part of the disruptive conduct charge and through UF's definition of harassment that incorporates disruption,[3] to effectuate Mr. Damsky's expulsion is sufficient reason to grant Plaintiff's requested relief.

**B.    *Tinker*'s disruption standard is a poor fit in higher education.**

The so-called disruption standard is derived from *Tinker*, which held that a group of public school students in elementary, middle, and high school could not be disciplined for their silent protest of the Vietnam War at school unless their speech "materially *disrupts* classwork or involves substantial disorder or invasion of the rights." 393 U.S. at 513 (emphasis added). *Tinker* was a landmark decision, famously holding that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506. It has been called a "momentous innovation in the recognition of students' constitutional rights,"[4] but commentators also observe that *Tinker*'s legacy is decidedly mixed.[5]

---

[3] Notably, the definition of harassment under Title VI, Title VII, and Title IX does not include disruption. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

[4] Justin Driver, *Freedom of Expression Within the Schoolhouse Gate*, 73 Ark. L. Rev. 1, 14 (2020).

[5] *See, e.g.*, Erwin Chemerinsky, *Students Do Leave Their First Amendment Rights at the Schoolhouse Gate: What's Left of Tinker?*, 48 Drake L. Rev. 527 (2000).

Since *Tinker* was decided, it has been used to vindicate students' speech rights in countless cases throughout the country, including in this district, *see Gillman ex rel. Gillman v. School Bd. for Holmes Cnty., Fla.*, 567 F. Supp. 2d 1359 (N.D. Fla. 2008) (holding that prohibiting a student from wearing t-shirts advocating gay rights violated *Tinker*), but many courts have also interpreted the disruption standard so deferentially that relatively innocuous speech has been punished as disruptive. For example, in recent years students have been disciplined for:

- criticism of another student for sending racist messages;[6]

- photos depicting a weekend trip to a gun range, with guns that were "legally purchased and properly permitted";[7] and

- a video of a 17-year-old girl dancing at a party over the weekend because she "wasn't living in the Lord's way."[8]

On balance, *Tinker* remains vital precedent for public school students, but it is too deferential to school officials for the higher education context. *Amicus curiae* ACLU litigated *Tinker* and remains a champion of the decision, but at the same time,

---

[6] Press Release, ACLU Ohio, *ACLU Urges Shaker Heights High School to Reverse Decision to Punish Students for Free Speech* (Nov. 14, 2016), https://perma.cc/8WH2-7NAZ.

[7] Robby Soave, *High School Suspends 2 Students for Posting Gun Range Photos on Snapchat, ACLU Files Suit*, Reason (Apr. 11, 2019), https://perma.cc/787K7LKT.

[8] Claire Moses, *Louisiana Public School Principal Who Punished Student for Dancing Apologizes*, N.Y. Times (Oct. 12, 2023), https://perma.cc/W6HM-VNKN.

the ACLU insists that *Tinker* be limited to K-12 schools. We take this position for three main reasons.

First, as the Supreme Court has stressed repeatedly, school administrators "must be able to take into account the emotional maturity of the intended audience in determining" how to deal with student speech. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988). In *Bethel School District No. 403 v. Fraser*, for example, while holding that a high school could discipline a student for giving a lewd speech at a school assembly, the Court took pains to distinguish the speech—and reactions—of a teenager from those of an adult, explicitly recognizing that "[t]he First Amendment guarantees wide freedom in matters of adult public discourse." 478 U.S. 675, 682 (1986). The Court noted that "the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point," even though "the same latitude [need not] be permitted to children in a public school." *Id.* at 682. Indeed, the Supreme Court has repeatedly held that adults cannot be limited to seeing only that which children see. *See, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 252 (2002) (citing string of cases that "establish . . . that speech within the rights of adults to hear may not be silenced completely in an attempt to shield children from it").

At the college level, less than 0.1 percent of students are under the age of 18.[9] As adults, college students "are less impressionable than younger students." *Widmar v. Vincent*, 454 U.S. 263, 276 n.14 (1981). "There is substance to the contention that college students are less impressionable and less susceptible to . . . indoctrination." *Tilton v. Richardson*, 403 U.S. 672, 686 (1971). Therefore, college officials—much less graduate-school officials—cannot assert that they share the need of secondary school administrators to protect impressionable young minds from certain speech.

Second, the Supreme Court has recognized that grade schools have a variety of special disciplinary needs that require "the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." *New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985). For example, secondary schools can require attendance and set students' class schedules. In contrast, "public universities operate in a manner that gives students great latitude: for example, university students routinely (and unwisely) skip class; they are often entrusted to responsibly use laptops in the classroom; they bring snacks and drinks into class; and they choose their own classes." *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 246 (3d Cir. 2010). In other words, in college, "students are given opportunities to [act] as adults." *Id.* Many legal rights and freedoms attach as soon as an individual reaches adulthood, *see, e.g.*, U.S.

---

[9] *See* Nat'l Ctr. for Educ. Stats., *2022 Digest of Education Statistics Table 303.40* (2022), https://perma.cc/H8AF-KZEP.

Const. amend. XXVI § 1 (establishing "the right of citizens . . . who are eighteen years of age or older [ ] to vote"); by that same token, college students must enjoy the First Amendment rights of adults.[10]

Finally, the educational mission of colleges depends upon freedom of speech. Colleges teach students to question the things previously taught to them as children. "The essentiality of freedom in the community of American universities is almost self-evident." *Sweezy*, 354 U.S. at 250. "The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (cleaned up). Therefore, on college campuses, "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.* (quoting *Sweezy*, 354 U.S. at 250); *see also DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008) ("[F]ree speech is of critical importance because it is the lifeblood of academic freedom.").

---

[10] Of course, this does not mean that universities cannot discipline college students under properly defined harassment, stalking, threat, or other disciplinary provisions. Schools not only can, but sometimes must, address such conduct pursuant to their obligations under Title VI, Title IX, and the Rehabilitation Act of 1973.

The Supreme Court has "frequently affirmed that 'the intellectual give and take of campus debate' is entitled to constitutional protection." *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 293 (1984) (Marshall, J., concurring) (quoting *Healy*, 408 U.S. at 181). Indeed, the Supreme Court's precedents "leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180; *see also Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973).

### C.     The Eleventh Circuit has recognized the problems with applying *Tinker* in higher education.

In a recent case challenging the University of Central Florida's ("UCF") discriminatory harassment and bias-related incident policies, the Eleventh Circuit addressed the appropriateness of applying *Tinker* in higher education. *Speech First v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022). In a three-paragraph footnote, the Eleventh Circuit spelled out its observations and analysis. The court noted that UCF sought "the benefit of the more deferential First Amendment standard articulated in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), and its progeny." *Id.* The court pointed out that UCF "assert[ed] that its discriminatory-harassment policy complies with *Tinker* because it prevents campus disruption." *Id.* "The district court likewise relied heavily

on *Tinker*'s *indulgent* framework." *Id.* (emphasis added). But, the Eleventh Circuit noted, "[t]here are three problems" with this approach. *Id.*

First, the Eleventh Circuit wrote that "it's not at all clear that *Tinker*'s more lenient standard applies in the university—as opposed to the elementary- and secondary-school—setting." *Id*. To be sure, the court observed, it had on one occasion applied *Tinker* in the college setting. *Id.* (citing *Doe v. Valencia Coll.*, 903 F.3d 1220, 1229 (11th Cir. 2018)). And "the Supreme Court once cited *Tinker* for the proposition that state universities have an 'undoubted prerogative to enforce reasonable rules governing student conduct'—even while reaffirming that "state colleges and universities are not enclaves immune from the sweep of the First Amendment,'" *Id.* (quoting *Papish*, 410 U.S. at 669–70). But the Eleventh Circuit did not find these references to *Tinker* dispositive of its application in the university setting. After all, the court pointed out, "the Supreme Court has emphasized that its 'precedents . . . leave no room for the view that, because of the acknowledged need for order [in state educational institutions,] First Amendment protections should apply with less force on college campuses than in the community at large.'" *Id.* (quoting *Healy*, 408 U.S. at 180); *see also id.* (quoting *Keyishian*, 385 U.S. at 603, on the importance of academic freedom and the need to protect speech on campus). The court also pointed to Eleventh Circuit caselaw that "emphasize[s] 'that the dangers of viewpoint discrimination are *heightened* in the university setting." *Id*.

11

(quoting *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997) (citing *Rosenberger v. Rectors and Visitors of Univ. of Va.*, 515 U.S. 819 (1995))).

Second, the Eleventh Circuit recognized that "the Supreme Court recently limited *Tinker*'s application, even in the high-school setting." *Id.* Citing *Mahanoy Area Sch. Dist.*, the Eleventh Circuit highlighted that "courts must be more skeptical of a school's efforts to regulate off-campus speech and that when it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention." *Id.* (cleaned up). The court explained that "even if the *Tinker* framework applied here as a general matter, UCF's policy, which reaches beyond the classroom, may well fall (at least in part) outside of it." *Id*; *see also infra* Section II.

Third, the Eleventh Circuit pointed out that "by its own terms, *Tinker*'s deferential standard doesn't apply to viewpoint-based restrictions like the one we confront here." *Speech First*, 32 F.4th at 1127 n.6. The court then quoted *Tinker*, which held that "[i]n order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id*. (quoting *Tinker*, 393 U.S. at 509). The Eleventh Circuit concluded that "even if UCF could

(per *Tinker*) restrict harassing speech that disrupts the school's functions, it couldn't do so, as it has here, based on the viewpoint of that speech. Put simply, the University can't pick and choose which types of disruptive speech to prohibit." *Id.*

Thus, in *Speech First*, the Eleventh Circuit has given a clear command that, whatever *Tinker*'s continued viability in higher education contexts with respect to on-campus speech, it simply does not apply under the circumstances of this case, where the speech was made off-campus and was punished based on the viewpoint expressed. *See infra* Section II.

### D. Other circuit courts use *Tinker* as a floor in higher education, not a ceiling.

Taken together, this means that *Tinker* cannot represent the ceiling for protection of speech on college campuses. While some courts, including the Supreme Court, have invoked *Tinker* in cases that concern the speech of college students, courts typically do so not to justify curtailing the rights of college students, but to hold that the government action at issue fails to satisfy even the standard established for schoolchildren. *See, e.g.*, *DeJohn*, 537 F.3d at 316–20 (holding that a college sexual harassment policy failed to satisfy even the *Tinker* standard in part because it did not include "any requirement akin to a showing of severity or pervasiveness," while recognizing that "public secondary and elementary school administrators are granted more leeway to restrict speech than public colleges and

universities" (citation modified) (quoting *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 260 (3d. Cir. 2002)).

Indeed, the Third Circuit held that *Tinker* cannot constitute the ceiling of protection for college student speech for many of the reasons discussed above, including "the differing pedagogical goals of each institution," "the special needs of school discipline in public elementary and high schools," and "the maturity of the students," among others. *McCauley*, 618 F.3d at 242–43. College students must be afforded the same First Amendment rights as other adults. Under that analysis, UF's reliance on a disruption standard to discipline students for their speech is unconstitutional.

## II.    EVEN IN THE K-12 CONTEXT, *TINKER* IS THE WRONG TEST FOR OFF-CAMPUS SOCIAL MEDIA POSTS

Mr. Damsky apparently was expelled primarily for a social media exchange he had with a professor off-campus and outside school hours that the school asserted disrupted its operations. Compl. ¶¶ 16–29, 47, Dkt. No. 1.[11] But even in K-12, the

---

[11] Two seminar papers Mr. Damsky wrote also prompted strong reactions from classmates and community members, but UF seems to recognize that academic papers, no matter how offensive the views they advance, are generally protected by the First Amendment and academic freedom. Compl. ¶ 15, Dkt. No. 1. As such, UF based its expulsion decision on Mr. Damsky's social media posts. Accordingly, this brief focuses on those posts as well.

Supreme Court and the Eleventh Circuit recognize that *Tinker* is the wrong standard for regulating off-campus speech.

In *Mahanoy*, the Supreme Court explained that school officials cannot reflexively extend the rules justifying discipline for disruptive on-campus speech to speech uttered outside of the school environment, even where features of the speech "risk[] transmission to the school itself." 594 U.S. at 191. "[W]hen schools regulate speech that occurs under its supervision," they have "a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others,'" and that special interest can call for "special [First Amendment] leeway." *Id.* at 188 (quoting *Tinker*, 393 U.S. at 513). When it comes to "much off-campus speech," however, "the leeway the First Amendment grants to schools in light of their special characteristics is diminished" for at least two relevant reasons. *Id*. at 188–90.

First, "from the student speaker's perspective," if schools were able to regulate off-campus speech just because it might be considered disruptive if uttered on-campus, young people who attend public school would never have the ability to speak freely. *Id.* at 189. They could never take a position that might be controversial, unpopular, or disruptive in their local community. As discussed above, that would not only rob them of their rights, but it would also deprive other adults and young people of the benefits of hearing from them. *Cf. Reno v. ACLU*, 521 U.S. 844, 874

15

(1997) (government cannot "suppress[ ] a large amount of speech that adults have a constitutional right to receive" in "order to deny minors access to potentially harmful speech").

Second, when "the expression takes place off campus," the school itself has a "strong interest" in "protecting a student's unpopular expression." *Mahanoy*, 594 U.S. at 190. This interest reflects an obligation to educate students in the civic virtues of free speech, and to do so by setting examples for students to follow. "America's public schools" bear the responsibility of teaching young people that "[o]ur representative democracy only works if we protect the . . . free exchange [of ideas]." *Id*. "That protection must include the protection of unpopular ideas, for popular ideas have less need for protection." *Id*. And what is popular in one school district, whether that's support for gun control or disbelief in climate change, may be unpopular or disruptive in another.

That said, even under *Mahanoy*, specific "types of off-campus behavior . . . may call for school regulation." *Id*. at 188. For example, a school's "highly general" interest in preventing disruption may be implicated by "serious or severe bullying or harassment targeting particular individuals; threats aimed at teachers or other students; the failure to follow rules concerning lessons, the writing of papers, the use of computers, or participation in other online school activities; and breaches of school security devices, including material maintained within school computers." *Id*.

16

But the Supreme Court was equally clear that a school's general interest in preventing disruption is not enough, on its own, to authorize punishment for off-campus speech. That is all the more true in higher education.

## CONCLUSION

For the reasons described above, this Court should reject the imposition of *Tinker*'s disruption standard on off-campus social media posts by a graduate student.


Dated: October 10, 2025                    Respectfully submitted,

                                           */s/Emerson J. Sykes*
                                           Emerson J. Sykes
                                           NY Registration No. 5020078
                                           AMERICAN CIVIL LIBERTIES UNION
                                           FOUNDATION
                                           125 Broad Street, 18th Floor
                                           New York, NY 10004
                                           esykes@aclu.org

                                           *Counsel for Amicus Curiae*


## CERTIFICATE OF COMPLIANCE

I certify that this memorandum contains 3,849 words, per Microsoft Word's word count, which complies with the word limit requirements set forth in Local Rule 7.1(F).


Dated: October 10, 2025              By:    /s/ Emerson J. Sykes
                                            Emerson J. Sykes

                                            *Counsel for Amicus Curiae*

17