# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# GAINESVILLE DIVISION

PRESTON DAMSKY,

*Plaintiff*,

v.

CHRIS SUMMERLIN, in his official
capacity as Dean of Students of the
University of Florida,

*Defendant*.

No.: 1:25-cv-00275-AW-MAF

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

H. Christopher Bartolomucci
Justin A. Miller*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
cbartolomucci@schaerr-jaffe.com
jmiller@schaerr-jaffe.com

*Pro hac vice* application pending

*Counsel for Defendant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................... ii

INTRODUCTION ...........................................................................1

BACKGROUND ............................................................................1

    A.    UF's Student Conduct Code ............................................1

    B.    Procedural History.......................................................3

    C.    Statement of Facts ......................................................5

          1.    Damsky's Seminar Papers.........................................5

          2.    Damsky's Posts ...................................................6

          3.    The Student Conduct Hearing.....................................7

PRELIMINARY INJUNCTION STANDARDS ......................................14

ARGUMENT ..............................................................................14

    I.    Plaintiff Lacks a Substantial Likelihood of Success on the Merits..........14

        A.    True Threats Are Not Protected Under the First Amendment. ......15

        B.    Damsky's Post Was a Threat........................................16

        C.    The Eleventh Circuit's Decision in *Boim* Confirms UF's Authority to Take Action Based on Damsky's Threatening and Disruptive Post. ....................................................20

        D.    Threats Made Off-Campus That Have On-Campus Effects Are Not Insulated From Review by School Officials...................24

        E.    Threatening Student Speech That Causes Significant Disruption on Campus Is Not Protected by the First Amendment. .................................................27

    II.    Plaintiff Will Not Suffer Irreparable Injury Absent an Injunction. ..........30

    III.    The Balance of Harms and Public Interest Do Not Support an Injunction....................................................33

CONCLUSION ............................................................................34

CERTIFICATION PURSUANT TO LOCAL RULE 7.1(F)...................................35

CERTIFICATE OF SERVICE ............................................................36

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ..................................................................... 14

*Ala. Student Party v. Student Gov't Ass'n of Univ. of Ala.*,
867 F.2d 1344 (11th Cir. 1989) ............................................................... 24, 30

*Alvoid v. Sch. Dist. of Escambia Cnty.*,
582 F. Supp. 3d 1140 (N.D. Fla. 2021) ........................................................ 26

*Bell v. Itawamba Cnty. Sch. Bd.*,
799 F.3d 379 (5th Cir. 2015) ........................................................................ 24

*Bishop v. Aronov*,
926 F.2d 1066 (11th Cir. 1991) .................................................................... 24

*Bloedorn v. Grube*,
631 F.3d 1218 (11th Cir. 2011) .................................................................... 34

*Boim v. Fulton Cnty. Sch. Dist.*,
494 F.3d 978 (11th Cir. 2007) ............................................................... *passim*

*Coronado v. Valleyview Pub. Sch. Dist. 365-U*,
537 F.3d 791 (7th Cir. 2008) ........................................................................ 34

*Counterman v. Colorado*,
600 U.S. 66 (2023) ................................................................................. 15, 19

*Doe v. Tex. A&M Univ.*,
No. H-20-4332, 2021 WL 257059 (S.D. Tex. Jan. 26, 2021) ........................ 32

*Doe v. Valencia Coll.*,
903 F.3d 1220 (11th Cir. 2018) ............................................................... 25, 28

*Elrod v. Burns*,
427 U.S. 347 (1976) ...................................................................................... 32

*Faculty Senate Fla. Int'l Univ. v. Winn*,
477 F. Supp. 2d 1198 (S.D. Fla. 2007) ......................................................... 31

Florida v. HHS,
19 F.4th 1271 (11th Cir. 2021) ..................................................................... 33

*Healy v. James*,
408 U.S. 169 (1972) ...................................................................................... 27

*Hodges v. Bd. of Supervisors La. State Univ.*,
No. 20-1456, 2020 WL 5017665 (E.D. La. Aug. 25, 2020)..................................32

*Mahanoy Area Sch. Dist. v. B.L.*,
594 U.S. 180 (2021) ............................................................... 25, 29, 34

*Morse v. Frederick*,
551 U.S. 393 (2007) ........................................................ 22, 23, 28, 29

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) ...............................................................................15

*Papish v. Bd. of Curators Univ. of Mo.*,
410 U.S. 667 (1973) ...............................................................................30

*Ponce v. Socorro Indep. Sch. Dist.*,
508 F.3d 765 (5th Cir. 2007) ...............................................................23

*Shanley v. Ne. Indep. Sch. Dist.*,
462 F.2d 960 (5th Cir. 1972) ...............................................................25

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000)............................................................32

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022)............................................................28

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ......................................................... 20, 25, 27, 28

*United States v. Baker*,
514 F. Supp. 3d 1369 (N.D. Fla. 2021) ....................................... 17, 20

*United States v. Brown*,
479 F.2d 1170 (2d Cir. 1973).................................................................17

*United States v. Fleury*,
20 F.4th 1353 (11th Cir. 2021)...................................................... 16, 22

*United States v. Kaye*,
No. 23-11423, 2024 WL 164810 (11th Cir. Jan. 16, 2024)..................20

*United States v. Ramos*,
No. 5:24-cr-34 (MTT), 2024 WL 4335912 (M.D. Ga. Sept. 27, 2024)..............18

*Van Arsdel v. Tex. A&M Univ.*,
628 F.2d 344 (5th Cir. 1980) ...............................................................31

*Virginia v. Black,*
    538 U.S. 343 (2003) ..............................................................................15

*Widmar v. Vincent,*
    454 U.S. 263 (1981) ..............................................................................28

*Wreal, LLC v. Amazon.com, Inc.,*
    840 F.3d 1244 (11th Cir. 2016)..............................................................30

*Yelapi v. DeSantis,*
    487 F. Supp. 3d 1278 (N.D. Fla. 2020) .................................................14

**Statutes**

Fla. Stat. §1006.60 .............................................................................2, 24

Fla. Stat. §1006.61 ....................................................................................2

**Rule**

Fla. R. App. P. 9.190 .................................................................................5

**Other Authorities**

*Black's Law Dictionary* (12th ed. 2024) ................................................16

John M. Kang,
    *Martin v. Malcolm: Democracy, Nonviolence, Manhood,*
    114 W. Va. L. Rev. 937 (2012) ..............................................................17

Malcolm X,
    *At the Audubon, in* Malcolm X Speaks (George Breitman ed., 1990)................17

Symposium:
    *Third Annual Law vs. Antisemitism Conference:*
    *Lessons for the Trump Administration From the Biden*
    U.S. National Strategy to Counter Antisemitism,
    19 FIU L. Rev. 789 (2025) ....................................................................18

UF Regulation 4.040,
    Student Honor Code and Student Conduct Code (as amended 2023) ........ 2, 3, 24

Defendant submits this opposition to Plaintiff's motion for a preliminary injunction (Doc. 6) ("Mot.").

## INTRODUCTION

In his motion, Preston Damsky plays fast and loose with the reasons for his expulsion. The University of Florida did not expel him for expressing "legal and political viewpoints concerning American history, race, and identity[.]" Mot. 1-2. It did so because he made a threat that significantly disrupted UF's law school. Damsky posted on his X account that "My position on Jews is simple: ... Jews must be abolished by any means necessary." ¶23.[1] He then equivocated and invoked genocide when a Jewish faculty member, Lyrissa Lidsky, asked if he were calling for the murder of her family. ¶¶28-29.[2] Damsky claims that "[n]o one was disrupted or threatened" by his post. Mot. 6. That is far from true. *See infra* at 7-14. Because Damsky's constitutional claim lacks merit, and because he has not shown irreparable harm or the other preliminary injunction factors, his motion should be denied.

## BACKGROUND

### A.   UF's Student Conduct Code

Florida law requires state universities to adopt "codes of conduct and appropriate penalties for violation of rules or regulations by students, to be

---

[1] Paragraph citations are to the Complaint (Doc. 1).

[2] References to Damsky's "post" are to his post calling for Jews to be abolished and his subsequent exchange with Professor Lidsky.

administered by the institution." Fla. Stat. §1006.60(1).  Such rules and regulations shall provide for the "discipline of any student who intentionally acts to impair, interfere with, or obstruct the orderly conduct, processes, and functions of the institution" and "may apply to acts conducted on or off campus[.]"  §1006.60(6).

A student who attends a state university shall "be deemed to have given … consent to the policies of that institution," including the "prohibition against disruptive activities[.]"  §1006.61(1).  A student who has "participated in disruptive activities … may be immediately expelled from the institution for a minimum of 2 years."  §1006.61(2).

In keeping with state law, UF has adopted a Student Conduct Code.  *See* UF Regulation 4.040, Student Honor Code and Student Conduct Code (as amended 2023), https://policy.ufl.edu/regulation/4-040/.  Section 4.C prohibits "Disruptive Conduct," defined as "Conduct that is materially or substantially disruptive to the normal operations of the University … in any of the following activities: teaching, learning, research, administrative functions, disciplinary proceedings, or other University Activities whether on or off campus, and other authorized activities that take place on campus."  *Id*.

Section 4.K prohibits "Harassment" which includes "Threats, intimidation, Coercion, or any other conduct that places a Reasonable person in fear of physical

harm, through words or actions, or objectively disrupts a person's daily activities, including education or employment." *Id*.

Disruptive Conduct and Harassment "do[] not include conduct protected by the First Amendment." *Id*.

**B.    Procedural History**

On April 2, 2025, UF informed Damsky that, based on reports that he had disrupted UF Law's academic operations, he was being placed on interim suspension and excluded from campus.  Letter from Chris Summerlin, Dean of Students, UF, to Preston Damsky (Apr. 2, 2025), Ex. A.  UF granted Damsky's request for an extension of time to appeal his interim suspension.  Letter from Nancy Chrystal-Green, Associate Vice President for Student Life, UF, to Preston Damsky (Apr. 16, 2025), Ex. B.  Damsky appealed his interim suspension, and UF denied it.  Letter from James Tyger, Assistant Vice President, Student Life, UF, to Preston Damsky (Apr. 29, 2025), Ex. C.

On May 29, 2025, UF informed Damsky he was being charged with violating the Code by engaging in Disruptive Conduct and Harassment.  Letter from Pamela Malyk, Assistant Dean and Director of Student Conduct & Conflict Resolution, UF, to Preston Damsky (May 29, 2025), Ex. D.  A student conduct hearing on the charges was set for July 28, 2025, and took place before three University Officials Board

("UOB") members.  *See* Ex. E (Audio Recording)[3]; Transcript of Audio Recording (July 28, 2025), Ex. F.  At the hearing, several witnesses provided information to the UOB, including Merritt McAlister, the Interim Dean of UF Law; Janice Shaw, the Senior Assistant Dean of Students at UF Law; and UF Law Professors Lyrissa Lidsky, Christopher Hampson, and Zachary Kaufman.  Damsky attended the entire hearing, provided information to the UOB, answered its questions, asked questions of the witnesses, and made closing remarks.

Following the hearing, on August 8, 2025, Dean Summerlin informed Damsky that the UOB had recommended that he be found responsible for Disruptive Conduct and Harassment in violation of the Code and had proposed expulsion as a sanction.  Dean Summerlin accepted the UOB's recommendations.  Letter from Chris Summerlin, Dean of Students, UF, to Preston Damsky (Aug. 8, 2025), Ex. G. Damsky appealed his expulsion.  ¶53.

On September 14, 2025, Plaintiff filed his Complaint.

On October 9, 2025, a three-member Appeal Panel convened by UF denied Damsky's appeal.  *See* Letter from Heather White, Vice President of Student Life,

---

[3] The audio recording on USB has been filed with this Court pursuant to the rules governing filing of non-paper exhibits, and served on Plaintiff's counsel electronically and on USB.

UF, to Preston Damsky (Oct. 9, 2025), Ex. H.  Damsky has not yet exhausted his appeal in state court.  Fla. R. App. P. 9.190(b)(3).

## C.    Statement of Facts

### 1.    Damsky's Seminar Papers

"In the Fall 2024 semester, Plaintiff wrote two seminar papers which were the subject of controversy at UF Law[.]"  ¶7.  Damsky's papers argued that "the United States was founded as a race-based nation state" for the white race and must be preserved as such.  *Id*.  The first paper, titled "American Restoration: An Article 5 Proposal," stated:

> [W]e should feel no shame about feeling attached to those with whom we share a common racial origin.  The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty.  The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours.  This land, America, our due inheritance, is worth the struggle.

Ex. I [excerpted]

> The second paper, titled "National Constitutionalism," stated:

> The Supreme Court and inferior federal courts have the power to arrest the dispossession of White America. … If the People are not granted relief from the government—which includes the judiciary—then, if they are to survive as masters in the land of their ancestors, they must exercise "their revolutionary right to dismember or overthrow" the government.[]  And that will be a process which no deskbound jurist can gleefully look forward to; for it will be a controversy decided not by the

careful balance of Justitia's scales, but by the gruesome slashing of her sword.

Ex. J [excerpted] (footnote omitted).

### 2.    Damsky's Posts

On March 21, 2025, Damsky posted on his X account that "My position on Jews is simple: … Jews must be abolished by any means necessary." ¶23.  On April 1, 2025, he and Professor Lidsky exchanged messages about his post.  ¶¶28-29.  His original post and their subsequent exchanges appear below.  *See also* Ex. K.





### 3.    The Student Conduct Hearing

At the July 28, 2025 hearing, witnesses informed the UOB that Damsky's post was understood as a threat by students, faculty, and staff at UF Law, and that the post massively disrupted the law school's operations.[4]

Dean McAlister told the UOB that Damsky "made unacceptable threats against our Jewish faculty, students, and staff, and those threats predictably created a substantial and material disruption to the operation of the law school."  Ex. F at 13.  The law student who first told her about the post "was shaking with tears in his eyes and emotion in his voice" and said "he was afraid to be at a law school" with

---

[4] Each UF witness discussed herein has provided a declaration attesting that they told the UOB the truth.

Damsky. *Id*. at 14. News of Damsky's post "spread like wildfire" through UF Law, which has "a large and engaged Jewish community[.]" *Id*.

A faculty member told the Dean that he was afraid for the "safety of his family, himself, and his students." *Id*. "Students were afraid to study on campus as we headed into finals." *Id*. "A staff member asked for her name and picture to be taken off the website because she had a Jewish surname, and she ultimately quit her job several weeks later." *Id*.

In the wake of Damsky's post, "business as usual at the law school ground to a halt. All that anyone was doing or talking about was Mr. Damsky and his X posts." *Id*. The Dean "received a request to post a police officer outside of a classroom because Mr. Damsky was enrolled in the class, which had Jewish students. We had a police officer who had to attend a Jewish Law Students Association event out of fear that Mr. Damsky might show up." *Id*. at 14-15. "[O]ne professor cancel[led] class out of stress from the situation[.]" *Id*. at 15.

Dean McAlister stated that "[t]his was not the first time Mr. Damsky had called for violence. When he did so in the fall in the context of a seminar paper, I concluded that the statements in that context were not threatening because they were written in an academic paper and not put out on X to terrorize a community that he knew was looking." *Id*. at 15-16. But Damsky's post on X was different, in part because he understood when he posted that "some members of our community

perceived him as a threat." *Id*. at 16.  "At a town hall in January, at least two students expressed to me their palpable fear of Mr. Damsky.  One said she scanned the exits when he was in a room.  Another avoided taking classes with him out of fear of what he might do." *Id*.  "Damsky was aware of these comments and he discussed them with Dean Shaw." *Id*.

The Dean noted that, in Damsky's exchange with Professor Lidsky, *see* Ex. K, he had an opportunity to explain that he was not threatening violence, but he did not do so.  Instead, "Damsky equivocated in his response and invoked the concept of genocide." Ex. F at 17.  "At that point, the meaning of his words became clear. He was threatening the Jewish people on our campus.  He was calling for and supportive of genocide by, 'Any means necessary.'" *Id*.  "I felt in that moment that we were on notice, that there was some real chance that someone could take action against our community and that terrified me." *Id*. at 21.

The next witness was Senior Assistant Dean of Students Janice Shaw.  She told the UOB that, in Fall 2024, she received "complaints from students about a paper Preston wrote that several students reported they interpreted as having a call for violence." *Id*. at 73-74.  Following the townhall in January 2025, Dean Shaw met with Damsky.  "During that meeting, I asked Preston if he was aware that students were talking about him at the recent town hall, and that they were afraid of him." *Id*. at 74.  "And based on that direct conversation, Preston was made aware

that students feared him and they thought he might do something that would negatively impact their safety." *Id*. at 75.

After Damsky tweeted out his post, "several students came into my office crying about the fear they felt." *Id*. at 75. One "student was uncontrollably crying in my office about the fear and anger she felt about that the fact that she might be attacked at school and that Preston wanted her or her friends to suffer physical harm." *Id*. at 76. "In written complaints, another student said they feared that his words would become actions. And one wrote that she did not feel safe walking the hall at UF or attending Jewish Law Student Association events or even being by herself." *Id*.

Professor Lidsky spoke next. She stated that, after learning of Damsky's post, she "decided to engage in my own counter speech to try to discern [his] intent[.]" *Id*. at 100. She gave him "a chance to step back from the edge" but instead "he responded by deflecting[.]" *Id*. at 100-01. "In the next couple of days … at least 15 students came to my office expressing fear for my safety and concern that Mr. Damsky might come to the law school armed. Some students asked me if I thought he had a gun. Some students said that because they feared I was a target, they were afraid to attend my class." *Id*. at 101. Lidsky and her husband "slept with a baseball bat beside the bed for the next couple of weeks." *Id*. at 102. And "the toll of trying to reassure my students that they were safe and that I was safe together with the

worry that I might have exposed my family to some sort of danger led me to cancel my class the following Monday." *Id*. at 103.  Professor Lidsky noted that "shortly after Mr. Damsky was trespassed off campus, a white supremacist at FSU shot and killed innocent victims." *Id*. at 104.

Professor Christopher Hampson told the UOB that in October 2024 he received a draft of Mr. Damsky's seminar paper "American Restoration." *Id.* at 140. One of Professor Hampson's students told him that he and several of his classmates were concerned that the paper ended on what they understood to be a call for violence. *Id.* at 140-41.  Professor Hampson stated that, in the same semester, Damsky had included a call to violence in another paper, "National Constitutionalism." *Id.* at 141.

"On April 1st, four law professors emailed the faculty about Mr. Damsky's tweet, noting the pattern of escalation against his previous calls for violence." *Id*. at 143.  "The student community was deeply alarmed by this point.  I learned that students were concerned for their personal safety and were actively avoiding registering for classes if Mr. Damsky was in them.  I also know that two faculty members, both women of color, were trying to figure out whether they could safely come to campus at all and whether they should move all their classes online." *Id*.

Professor Zachary Kaufman, the Jewish Law Students Association's faculty advisor, told the UOB that Damsky "has sowed terror and anguish among Jewish

members, students, staff, and faculty of our community, and he has massively disrupted our law school's academic community within our law school's walls and beyond, in the day-to-day lives of our students, staff, and faculty." *Id.* at 161.

"Awareness and discussion of [Damsky's] post spread through our law school community like wildfire. Many members of our law school community, Jews and non-Jews alike, interpreted Mr. Damsky's message to be a concrete, credible call for genocidal violence against Jews, including Jews in our law school community, as well as their families." *Id.* at 162. "Mr. Damsky's post caused many Jews in our law school community to feel immense fear and anxiety. And he wrote those posts on social media during the final month of the semester when students wanted and for their grades and careers needed to focus on their studies." *Id.* at 162-63.

"Some students were so concerned about the potential need for self-defense against Mr. Damsky that they carried pepper spray and escorted each other to and from their cars in our law school parking lot. Several students cried from fear of Mr. Damsky and what he might do." *Id.* at 164. "Many students' studying was disrupted by participating in hours-long conversations with their parents and peers about Mr. Damsky, what he might do, how they could protect themselves, and what the administration at the law school could or should do to protect them." *Id.* at 164. "Some students skipped academic events, missed classes, or were late to classes

12

because they were focused on attending town halls or participating in conversations with each other or with faculty or administrators about their safety." *Id*.

"In direct response to Mr. Damsky's social media posts, the law school administration arranged for heightened security on campus, including cameras in the faculty parking lot and more frequent police patrols." *Id*. at 165.  On April 4th, the Dean "announced via email that Mr. Damsky had been trespassed from campus, that police patrols and event security had recently increased, and that starting on April 7th, the law school would change its security protocols from having all doors unlocked during business hours to having most of them locked and accessible only through ID card access." *Id*. at 167.  "[M]any Jewish students expressed difficulty in studying for and taking exams.  They stated that their studying was disrupted by their sincerely and reasonably held fear that Mr. Damsky would stage or incite an attack against Jews at our law school and perhaps in our wider university.  Several students believe that the disruption Mr. Damsky caused prevented them from achieving their full academic potential and that their grades and career prospects, upon which grades in law school are so dependent, thus suffered." *Id*. at 168.

Damsky showed no contrition at the hearing.  *E.g., id*. at 318-22.

## PRELIMINARY INJUNCTION STANDARDS

"A preliminary injunction is an extraordinary and drastic remedy[.]" *Yelapi v. DeSantis*, 487 F. Supp. 3d 1278, 1282 (N.D. Fla. 2020) (Winsor, J.) (citing *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.,* 557 F.3d 1177, 1198 (11th Cir. 2009)). "[A] movant must clearly establish (1) a substantial likelihood of success on the merits, (2) that it will suffer irreparable injury without an injunction, (3) that the threatened injury outweighs damage the injunction may inflict on the nonmovant, and (4) that the injunction would not be adverse to public interest. A failure to satisfy any one factor is fatal." *Id*. at 1283 (citing *ACLU*, 557 F.3d at 1198).

## ARGUMENT

### I.    Plaintiff Lacks a Substantial Likelihood of Success on the Merits.

Damsky's First Amendment claim fails as a matter of law, for two reasons. First, threats of violence by a student directed toward a school are not protected under any circumstances, and Damsky's original post declaring that "Jews must be abolished by any means necessary" (Ex. K) and his subsequent exchange with Professor Lidsky were reasonably perceived by UF Law's students, faculty, staff, and Dean, and other UF officials as a threat. Second, even if Damsky's posts were not threats, student speech that disrupts the learning environment at school is not protected, and Damsky's speech caused material and substantial disruption at UF Law.

### A.    True Threats Are Not Protected Under the First Amendment.

The Supreme Court has made clear that "[t]he First Amendment does not protect violence." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). Nor does the First Amendment protect threats, a "historically unprotected category of communication." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). "True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection." *Id.* at 72.

"True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Id.* at 74 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). "And a statement can count as such a threat based solely on its objective content." *Id.* at 72. "The speaker need not actually intend to carry out the threat." *Black*, 538 U.S. at 359-60. "Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat[.]" *Counterman*, 600 U.S. at 74. "The existence of a threat depends not on the mental state of the author, but on what the statement conveys to the person on the other end." *Id.* (cleaned up). The focus is on the person receiving the threat because "a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Black*, 538 U.S. at 360 (cleaned up).

15

### B.    Damsky's Post Was a Threat.

Damsky's post was not protected speech but a threat.  His post was reasonably regarded as a threat of violence by Dean McAlister and students, faculty, and staff of UF Law as well as the three UOB members and Dean Summerlin.  And Damsky's threatening post materially and substantially disrupted the educational mission of UF Law, the ability of law school students to access their education, and ordinary life on campus.

The witnesses at the July 28, 2025 hearing told the UOB that many members of the UF Law community viewed Damsky's post as a threat.  *See supra* pages 7-14.  And it was reasonable to view the post that way.  Damsky announced on public-facing social media that "My position on Jews is simple: … Jews must be abolished by any means necessary."  Ex. K.  The verb "abolish" means "[t]o annul, eliminate, or destroy[.]"  *Abolish*, *Black's Law Dictionary* (12th ed. 2024).  Thus, Damsky's "simple" "position on Jews" that "Jews must be abolished" is hardly different than saying all Jews must be eliminated.[5]  And context matters.  Damsky's post came on the heels of his two seminar papers that included calls for violence.  *See* Exs. I, J; *see also* Ex. F at 15 ("This was not the first time Mr. Damsky had called for

---

[5] It is also relevant that Damsky wrote his post in the present tense.  The Eleventh Circuit has explained that when "message[s] [are] worded in the present tense [they] evidence[] an intent to intimidate and place the recipient of the message in fear of bodily harm or death."  *United States v. Fleury*, 20 F.4th 1353, 1365 (11th Cir. 2021).

violence." (Dean McAlister statement)).  Before Damsky posted his threat, he was on notice that some students feared him.  Dean Shaw had told him so when they met. *See* Ex. F at 74-75 (Dean Shaw statement).  But Damsky posted his threatening "position on Jews" anyway.

Damsky's use of the phrase "by any means necessary" was also threatening. That phrase conveys a willingness to use violence to achieve one's aims.  *See*, *e.g*., *United States v. Brown*, 479 F.2d 1170, 1174–75 (2d Cir. 1973) (Defendant's statement that "he would protect himself from what he considered force and violence by the police or military 'by whatever means necessary' … could properly have raised a serious question in the sentencing judge's mind as to whether Brown posed a threat of violent or anti-social conduct to the community").[6]  Damsky's post that "Jews must be abolished by any means necessary" was reasonably seen as a threat. *Cf. United States v. Baker*, 514 F. Supp. 3d 1369, 1379 (N.D. Fla. 2021) (finding probable cause that defendant made a criminal threat when he posted that "We will drive them [racist mobs] out of Tallahassee with every caliber available"); *United*

---

[6] Damsky's use of the phrase "by any means necessary" recalls language used by Malcolm X in the 1960s.  And "if there was one maxim that encapsulated Malcolm's political ethos, it was his threatening pronouncement that blacks should pursue '*any* means necessary' to advance their rights."  John M. Kang, *Martin v. Malcolm: Democracy, Nonviolence, Manhood*, 114 W. Va. L. Rev. 937, 944-45 (2012) (quoting Malcolm X, *At the Audubon, in* Malcolm X Speaks, 88, 96 (George Breitman ed., 1990)).

*States v. Ramos*, No. 5:24-cr-34 (MTT), 2024 WL 4335912, *2 (M.D. Ga. Sept. 27, 2024) ("[A] reasonable person could construe [a] handwritten message 'We have the Zyklon B … GASTHEJEWS' mailed to [a] Rabbi's home address as a threat.").

The phrase "by any means necessary" is especially threatening to Jews after the October 7, 2023, massacre of Israeli and American Jews by Hamas. As University of Miami law professor Lili Levi has written: "Many Jews … see the phrase ['by any means necessary'] as calling for ethnic violence against Jews— particularly in light of statements by Hamas representatives that the October 7 atrocities would continue to be committed as many times as necessary." Symposium: *Third Annual Law vs. Antisemitism Conference: Lessons for the Trump Administration From the Biden* U.S. National Strategy to Counter Antisemitism, 19 FIU L. Rev. 789, 824-25 (2025).

If there were any doubt about the meaning of Damsky's original post, his subsequent exchange with Professor Lidsky confirmed its threatening nature. When she asked him, "Are you saying you would murder me and my family? Is that your position?" (Ex. K), Damsky did not say no. Instead, he replied to her questions with other questions, and he brought the topic of genocide into the conversation: "Did Ignatiev want Whites murdered? If so, were his words as objectionable as mine? If Ignatiev sought genocide, then surely a genocide of all Whites would be an even greater outrage than a genocide of all Jews, given the far greater number of Whites."

18

*Id.* After his meeting with Dean Shaw, and especially after his exchange with Professor Lidsky, it is clear that Damsky "consciously disregarded a substantial risk that his communications would be viewed as threatening violence" by the UF Law community. *Counterman*, 600 U.S. at 69. "Preston knew that students were afraid of him and he continued to fan the flames of fear through his tweet and his response to Professor Lidsky." Ex. F at 77 (Dean Shaw statement).

Damsky alleges that he "was aware Noel Ignatiev did not advocate for violence in his call to 'abolish the white race by any means necessary.'" ¶22. While Damsky may have been familiar with the writings of Noel Ignatiev—not exactly a household name—most people are not. And Damsky never explained in his post that Ignatiev was not calling for violence (if that is so). Damsky's post conveyed that Ignatiev wanted to abolish the white race and that Damsky wanted the same for Jews. Damsky alleges that Ignatiev's "Race Traitor" is available in the UF library (¶19), but those who saw Damsky's post did not have to run to the library to bone up on Ignatiev's writings before they could reasonably perceive the post as a threat against Jews. Even someone familiar with Ignatiev's writings could properly regard the post as a threat. As Dean McAlister pointed out at the UOB hearing, whereas Ignatiev wanted to abolish *whiteness* as a concept, Damsky called for abolishing Jews, not Jewishness. *See* Ex. F at 13.

19

Damsky's post was reasonably understood as a threat, one that threw the UF Law campus into turmoil, as multiple witnesses told the UOB. *See supra* pages 7-14. Damsky's threatening post caused material and substantial disruption at UF Law and for that reason, too, was not protected speech. *See* Part I.E *infra*.

Damsky argues that his post was protected political speech. *Cf.* Mot. 1-2, 6. It was not. If "speech satisfie[s] the elements of a true threat, … it [i]s not protected political speech." *United States v. Kaye*, No. 23-11423, 2024 WL 164810, *6 (11th Cir. Jan. 16, 2024), *cert. denied*, 114 S.Ct. 1127 (2024); *see Baker*, 514 F. Supp. 3d at 1381 ("Amalgamating true threats with political commentary does not immunize the former."). Furthermore, a school may regulate its students' political speech where, as here, it "substantially interfere[s] with the work of the school or impinge[s] upon the rights of other students." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969).

## C. The Eleventh Circuit's Decision in *Boim* Confirms UF's Authority to Take Action Based on Damsky's Threatening and Disruptive Post.

In *Boim v. Fulton County School District*, 494 F.3d 978 (11th Cir. 2007), a high school student, Rachel, was suspended based on a narrative she wrote in her notebook. Titled "Dream," Rachel described shooting her math teacher. *Id.* at 980-81. The Eleventh Circuit upheld the suspension because the narrative "clearly

caused and was reasonably likely to further cause a material and substantial disruption to the 'maintenance of order and decorum' within" the school.  *Id*. at 983.

The Court's opinion observed that, "in the eight years preceding the incident underlying the instant appeal, there had been 10 well-known, student-perpetrated shootings in schools, not including college campuses, located within the United States." *Id*.  It also noted the "numerous other school shootings that have occurred internationally and on college campuses, both during the relevant time period and since then, most notably the Virginia Tech massacre, in which 32 people were murdered." *Id*. at 983 n.5.

The Eleventh Circuit considered this history of school violence in rejecting Rachel's claim that her writing was protected speech.

> [I]n this climate of increasing school violence and government oversight, and in light of schools' undisputably compelling interest in acting quickly to prevent violence on school property, especially during regular school hours, we must conclude that the defendants did not violate Rachel's First Amendment rights.  We can only imagine what would have happened if the school officials, after learning of Rachel's writing, did nothing about it and the next day Rachel did in fact come to school with a gun and shoot and kill her math teacher.  In our view, it is imperative that school officials have the discretion and authority to deal with incidents like the one they faced in this case.

*Id*. at 984.[7]

---

[7] Sadly, the spate of lethal school violence has not diminished since *Boim*.  The tragic shooting in Parkland, Florida, in which 17 students were killed, occurred in

*Boim* held that, "[j]ust as there is no First Amendment right to falsely yell 'fire' in a crowded theater … there also is no First Amendment right allowing a student to knowingly make comments, whether oral or written, that reasonably could be perceived as a threat of school violence, whether general or specific, while on school property during the school day." *Id.*[8]  The Court held that "Rachel's first-person narrative could reasonably be construed as a threat of physical violence against her sixth-period math teacher. … Rachel created an appreciable risk of disrupting [the school] in a way that, regrettably, is not a matter of mere speculation or paranoia." *Id.* at 985.

*Boim* also relied on the Supreme Court's decision in *Morse v. Frederick*, 551 U.S. 393 (2007).  In that case, a high school student displayed a banner with a message that the principal reasonably regarded as promoting illegal drug use ("BONG HiTS 4 JESUS").  *Id.* at 397.  The principal confiscated the banner and suspended the student.  The Supreme Court held that school officials may, "consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Id.* at 403.  In *Boim*, the Eleventh Circuit concluded that "[t]hat same rationale applies equally, if not

---

2018.  *See Fleury*, 20 F.4th at 1359.  UF Law has had students who are survivors of the Parkland attack.  *See* Ex. F at 15, 104.

[8] The same goes for threats of school violence reasonably perceived as such but delivered from off campus.  *See* Part I.D *infra*.

more strongly, to speech reasonably construed as a threat of school violence." *Boim*, 494 F.3d at 984. Here, Dean McAlister, the UOB, and Dean Summerlin all reasonably regarded Damsky's post as threatening violence, particularly against Jews at the law school.

In a case decided soon after *Boim*, the Fifth Circuit admonished that "[o]ur recent history demonstrates that threats of an attack on a school and its students *must* be taken seriously." *Ponce v. Socorro Indep. Sch. Dist*., 508 F.3d 765, 771 (5th Cir. 2007). One of the special characteristics of the school environment is that "school attendance results in the creation of an essentially captive group of persons protected only by the limited personnel of the school itself. This environment makes it possible for a single armed student to cause massive harm to his or her fellow students with little restraint and even less forewarning." *Id*. (citing *Morse*, 551 U.S. at 424 (Alito, J., concurring)). "School administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance." *Id*. at 772. "[N]umerous recent examples of school violence exist in which students have signaled potential violence through speech, writings, or actions, and then carried out violence against school communities, after school administrators and

parents failed to properly identify warning signs." *Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 399 (5th Cir. 2015) (en banc).

Here, UF officials, including Dean McAlister and Dean Summerlin, acted promptly and responsibly to protect the safety of the UF Law community in the face of "speech reasonably construed as a threat of school violence." *Boim*, 494 F.3d at 984. Deference to their judgment about what was needed in the moment is appropriate. *See Ala. Student Party v. Student Gov't Ass'n of Univ. of Ala.*, 867 F.2d 1344, 1347 (11th Cir. 1989); *Bishop v. Aronov,* 926 F.2d 1066, 1075 (11th Cir. 1991) ("Federal judges should not be ersatz deans or educators.").

### D.     Threats Made Off-Campus That Have On-Campus Effects Are Not Insulated From Review by School Officials.

Damsky suggests he was free to say what he did in his post because he said it while "off-campus." Mot. 1, 3, 6. Damsky is wrong. True threats are punishable regardless of where or when they are made. Moreover, Florida law and UF's Code permit UF to address off-campus conduct that has on-campus effects. *See* Fla. Stat. §1006.60(6); Code §§1.C, 4.C.

So does the First Amendment. Binding court decisions confirm that disruptive or threatening student speech may be proscribed even when off-campus speech is at issue. In *Tinker*, the Supreme Court explained that "conduct by [a] student, *in class or out of it*, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion

of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Tinker*, 393 U.S. at 513 (emphasis added).

After *Tinker*, the Fifth Circuit, in a decision binding on the Eleventh Circuit, declined "to hold that *any* attempt by a school district to regulate conduct that takes place off the school ground and outside school hours can never pass constitutional muster." *Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960, 974 (5th Cir. 1972). More recently, the Eleventh Circuit itself, in *Doe v. Valencia College*, 903 F.3d 1220 (11th Cir. 2018), ruled: "There is no absolute bar against schools disciplining a student for off-campus conduct that violates the rights of another student." *Id*. at 1231. The *Doe* court rejected a suspended student's argument that "the school was powerless to do anything about his misbehavior because he did it all while he was off campus" during "the break between summer and fall classes." *Id*.

In *Mahanoy Area School District v. B.L.*, 594 U.S. 180 (2021), which involved a student's off-campus use of social media, the Supreme Court rejected the idea that "the special characteristics that give schools additional license to regulate student speech always disappear when a school regulates speech that takes place off campus." *Id.* at 188. The Court confirmed that "[t]he school's regulatory interests remain significant in some off-campus circumstances." *Id*. The Court cited "several types of off-campus behavior that may call for school regulation," including "threats aimed at teachers or other students." *Id*.

25

Finally, in *Alvoid v. School District of Escambia County*, 582 F. Supp. 3d 1140 (N.D. Fla. 2021), the court observed that "federal courts have uniformly agreed that language reasonably perceived as threatening school violence is not constitutionally protected—whether such language is written or oral, and whether it occurs at school or elsewhere." *Id*. at 1156 n.14 (quotation marks omitted).

Here, Damsky posted on social media a message that was widely perceived as a threat against Jews and he chose to amplify those perceptions when a member of the school confronted him, both of which caused significant disruption at the law school. He did not have a free pass to do this just because he was off campus or on holiday. At the time, Damsky was enrolled as a student at UF Law, and that status does not end during Spring Break or when the semester ends. If Damsky had phoned in a bomb threat from the beach on a Saturday, it would have made no difference to UF's ability to apply its conduct rules to him. So too here, it does not matter where or when Damsky wrote and published his threatening and disruptive post. The on-campus effects of his off-campus speech permit the school to regulate the speech.

Finally, and in any event, even if Damsky's original post was off-campus speech, his exchange with Professor Lidsky should be regarded as on-campus speech since it involved direct public communication with a UF Law faculty member.

E.    **Threatening Student Speech That Causes Significant Disruption on Campus Is Not Protected by the First Amendment.**

Damsky's post was reasonably perceived as a threat, and UF had the right to regulate that speech due to its threatening nature and the serious disruption it caused. In *Tinker*, the Court held that, "in light of the special characteristics of the school environment," a school is allowed to engage in "reasonable regulation of speech-connected activities[.]" 393 U.S. at 506, 513. When student speech "materially disrupts classwork or involves substantial disorder or invasion of the rights of others," it is "not immunized" by the First Amendment. *Id*. at 513. School authorities have a right and a duty to take action when they "reasonably … forecast substantial disruption of or material interference with school activities" or when "disturbances or disorders on the school premises in fact occurred." *Id*. at 514.

These principles apply in the higher education setting. In *Healy v. James*, 408 U.S. 169 (1972), the Court recognized that "a college has a legitimate interest in preventing disruption on the campus," *id*. at 184, and that student speech "activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education," *id*. at 189. *Healy* recognized that, "[i]n the context of the 'special characteristics of the school environment," a school's power to "prohibit 'lawless action' is not limited to acts of a criminal nature," but includes "actions which 'materially and substantially disrupt the work and discipline of the school.'" *Id*.

27

(quoting *Tinker*, 393 U.S. at 506, 513). In *Widmar v. Vincent*, 454 U.S. 263 (1981), the Court "affirm[ed] the continuing validity of cases, *e.g.*, *Healy* … that recognize a University's right to exclude even First Amendment activities" having such adverse effects. *Id*. at 277. "A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission[.]" *Id*. at 267 n.5. And in *Doe v. Valencia College*, the Eleventh Circuit applied *Tinker*, *see* 903 F.3d at 1229-31, and held that, because Valencia "reasonably concluded" that a student's conduct interfered with the rights of another student, "Valencia was free to regulate it under *Tinker* without impinging on … First Amendment rights." *Id*. at 1230.[9]

The test to be applied here is whether UF reasonably believed that Damsky's post was a threat that caused disruption on campus. In *Morse*, the Court reaffirmed that student expression may be regulated if "school officials reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'" *Morse*, 551 U.S. at 403 (quoting *Tinker*, 393 U.S. at 513). School administrators may therefore restrict student speech, "when that speech is reasonably

---

[9] Although the Eleventh Circuit has noted that "*Tinker*'s deferential standard doesn't apply to viewpoint-based restrictions," *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022), the instant case involves no such restriction. Neither the Eleventh Circuit nor the Supreme Court has ever questioned a university's ability to discipline student speech based, not on its viewpoint, but on its threatening nature. Nor does the ACLU's *amicus* brief (Doc. 12-1 at 9 n.10).

viewed as promoting illegal drug use." *Id*. That holding also applies to student speech threatening violence. In a concurring opinion, Justice Alito, joined by Justice Kennedy, explained that "due to the special features of the school environment, school officials must have greater authority to intervene before speech leads to violence." *Id*. at 425 (Alito, J., concurring). In the school setting, the First Amendment "permits school officials to step in before actual violence erupts." *Id*. "Experience shows that schools can be places of special danger." *Id*. at 424 (Alito, J., concurring).

In *Boim* the Eleventh Circuit held that *Morse* applies to student threats. Citing Justice Alito's concurrence, the *Boim* Court held that *Morse*'s "rationale applies equally, if not more strongly, to speech reasonably construed as a threat of school violence." 494 F.3d at 984.

In *Mahanoy*, a case arising from a high school's attempt to discipline a student for vulgar off-campus speech on social media, the Court sided with the student on the facts presented but reaffirmed that "the special characteristics that give schools additional license to regulate student speech" allow schools to regulate, among other things, "threats aimed at teachers or other students." 594 U.S. at 188.

A university's assessment of the need to regulate threatening or disruptive student speech is entitled to significant deference. "The University should be entitled to place reasonable restrictions" on such speech "to minimize the disruptive

effect" of it.  *Ala. Student Party*, 867 F.2d at 1347.  "The University judgment on matters such as this should be given great deference by federal courts."  *Id*. Unfortunately, the days are long gone that school officials could assume that threatened violence would not likely occur.  UF perceived a threat and acted to prevent it.

Plaintiff's reliance (at 4-5) on *Papish v. Board of Curators of University of Missouri*, 410 U.S. 667 (1973) (per curiam), is misplaced.  There, a student was expelled "because of the disapproved content" of his campus newspaper.  *Id*. at 670. Here, UF expelled Damsky because he made a threat and disrupted the campus. *Papish* reaffirmed the constitutionality of a university's "nondiscriminatory application of reasonable rules governing conduct."  *Id*. at 671.  That is what the instant case is about.

## II. Plaintiff Will Not Suffer Irreparable Injury Absent an Injunction.

Damsky claims that he will be irreparably harmed unless the Court enjoins (1) his interim suspension and (2) his expulsion.  Mot. 6.  Both claims fail.

Damsky cannot show irreparable harm with respect to his interim suspension because of his six-month delay in seeking preliminary relief.  *See Wreal, LLC v. Amazon.com, Inc*., 840 F.3d 1244, 1248-49 (11th Cir. 2016).  UF suspended Damsky on April 2 and denied his appeal of the suspension on April 29.  *See* Exs. A, C.  Yet

Damsky did not move for a preliminary injunction until September 29—six months after the suspension and five months after the denial of his appeal.

The interim suspension does not cause Damsky irreparable harm for two other reasons. First, after he was suspended near the end of his 2L year, Damsky remained enrolled at UF Law and continued to take his classes. McAlister Decl. ¶4. UF allowed him to do so remotely and to take his exams at the end of the semester. *Id*. Now a 3L, Damsky was allowed to take classes this semester until the UF Appeal Panel rejected his appeal of his expulsion. *Id*. Second, the interim suspension is moot because it has been overtaken by the expulsion. Exs. G, H. Enjoining the interim suspension now would do Damsky no good because he has been expelled.

Nor can Damsky show irreparable harm with respect to his expulsion. If he ultimately prevails in this case, Damsky may resume his studies at UF Law. His only harm will have been the delay in completing law school. But such a delay does not constitute irreparable harm. *See Van Arsdel v. Tex. A&M Univ*., 628 F.2d 344, 346 (5th Cir. 1980) (vacating preliminary injunction that reinstated plaintiff as a tenured professor because "reinstatement after trial, coupled with back pay, would suffice to redress [his] alleged wrong"); *Faculty Senate Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007) (relying on "particularly instructive" *Van Arsdel* decision in finding "it is unlikely that delay in completing [academic] research or obtaining a degree is irreparable harm"). As many courts have held,

delayed education is not irreparable harm because it can be compensated with damages. *See Doe v. Tex. A&M Univ.*, No. H-20-4332, 2021 WL 257059, *8 (S.D. Tex. Jan. 26, 2021) (citing cases); *Hodges v. Bd. of Supervisors La. State Univ.*, No. 20-1456, 2020 WL 5017665, *4 (E.D. La. Aug. 25, 2020) (same).

Damsky argues that any loss of First Amendment rights is irreparable harm. Mot. 7 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). But in *Siegel v. LePore*, the Eleventh Circuit rejected the notion that a "violation of constitutional rights always constitutes irreparable harm." 234 F.3d 1163, 1177 (11th Cir. 2000) (en banc). In First Amendment cases, *Siegel* explained, irreparable harm is presumed only if there is "an imminent likelihood that pure speech will be chilled or prevented altogether." *Id*. at 1178. Here, Damsky has not carried his burden of showing he will be chilled or prevented from speaking. In fact, available evidence is to the contrary.

In June 2025, after his interim suspension, an un-chilled Damsky gave a frank interview to the *New York Times*. Ex. L. And even after his suspension and expulsion Damsky has frequently used his X account to express his unvarnished views on Jews and Israel (to him, "the Jewish gangster entity") and discuss his White Nationalism. A small sample of his recent posts, some employing violent rhetoric, are collected in Exhibit M. For example, on September 9, Damsky posted that North

Carolina Governor "Josh Stein (J)[10] thinks DeCarlos Brown should be treated with kid gloves. And because you can't say 'No, Jew,' they will continue to get their way. If we do not toss these repugnant, anti-social gangsters out of our governments, all of our necks may very well end up getting slashed." Ex. M-13.

Even a quick perusal of Damsky's X account confirms that his speech has not been chilled. Damsky posted on June 28: "This process was meant to punish and silence me. But that has backfired. … I have not been silenced, both my resolve and my ideas have been amplified. And I will never be silent until there is no further need to speak." Ex. M-5. And Damsky's post calling for Jews to be abolished by any means necessary is still on his X account. He even reposted it on June 25, after his suspension. Ex. M-4.

### III.    The Balance of Harms and Public Interest Do Not Support an Injunction.

"The last two requirements for a preliminary injunction involve a balancing of the equities between the parties and the public. Where the government is the party opposing the preliminary injunction, its interest and harm—the third and fourth elements—merge with the public interest." *Florida v. HHS*, 19 F.4th 1271, 1293 (11th Cir. 2021).

UF and the public have a compelling interest in protecting students from violence and from threats that disrupt the educational process. *See Mahanoy*, 594

---

[10] The "(J)" after Gov. Stein's name apparently was meant to mark him as Jewish.

U.S. at 188 ("[S]chools have a special interest in regulating speech that materially disrupts classwork or involves substantial disorder or invasion of the rights of others." (cleaned up)); *Bloedorn v. Grube*, 631 F.3d 1218, 1238 (11th Cir. 2011) ("The University … has a significant interest in ensuring safety and order on campus[.]").  This compelling public interest in student safety and maintaining an educational environment conducive to learning far outweighs any interest Damsky may have.  His "proposed injunction would harm the public interest by undermining the authority of school officials and threatening the safety of students."  *Coronado v. Valleyview Pub. Sch. Dist. 365-U*, 537 F.3d 791, 797-98 (7th Cir. 2008).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction should be denied.

Respectfully submitted,

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci
Justin A. Miller*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
cbartolomucci@schaerr-jaffe.com
jmiller@schaerr-jaffe.com

*\*Pro hac vice* application pending

*Counsel for Defendant*

Dated:  October 14, 2025

34

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(F)

Pursuant to Local Rule 7.1(F), I certify that the foregoing is in compliance with the Court's word limit.  According to the word processing program used to prepare this memorandum, the document contains 7,965 words, excluding those portions exempted under the Rule.

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I certify that on October 14, 2025, I caused the foregoing Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, the accompanying Declarations of Heather White, Merritt E. McAlister, Janice Shaw, Lyrissa B. Lidsky, Zachary D. Kaufman, Christopher D. Hampson, and H. Christopher Bartolomucci, and the attached exhibits—except Exhibit E—to be filed with the Clerk of Court, and thereby served on all parties to this matter via the Court's CM/ECF filing system.

I further certify that on October 14, 2025, Exhibit E—comprised of audio recordings—was transmitted on a USB to the Court Clerk via overnight commercial carrier. I further certify that Exhibit E's audio recordings were previously served on counsel for all parties on October 10, 2025, via an electronic link for immediate download, and on a USB via overnight commercial carrier.

/s/ H. Christopher Bartolomucci
H. Christopher Bartolomucci

*Counsel for Defendant*

36