**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

PRESTON DAMSKY,

                     *Plaintiff*,

      v.

CHRIS SUMMERLIN, in his official
capacity as Dean of Students of the
University of Florida,

                     *Defendant*.

No.: 1:25-cv-00275-AW-MAF

## DECLARATION OF MERRITT E. McALISTER

1.      I am Merritt E. McAlister, the Interim Dean and Levin, Mabie & Levin Professor of Law at the Levin College of Law at the University of Florida ("UF").

2.      I am submitting this declaration in connection with Defendant's opposition to Plaintiff's motion for a preliminary injunction.

3.      I was a witness at Preston Damsky's student conduct hearing on July 28, 2025, and provided information to the University Officials Board ("UOB").  At the start of the hearing, the Chair of the UOB admonished all of the witnesses that they were expected to tell the truth, and I did tell the truth at the hearing.

4.      Following Mr. Damsky's interim suspension in April 2025, near the end of his 2L year, Mr. Damsky remained enrolled at UF Law and continued to take his classes.  UF allowed him to do so remotely and to take his exams at the end of the

semester.  At the start of his 3L year, in the Fall of 2025, Mr. Damsky remained enrolled at UF Law and was allowed to take classes remotely pending his appeal of his expulsion.  An Appeal Panel denied his appeal on October 9, 2025.  Following that decision, Mr. Damsky is no longer enrolled or taking classes at UF Law.

5.      Exhibit I hereto is an excerpt from a seminar paper written by Mr. Damsky titled "American Restoration: An Article 5 Proposal."

6.      Exhibit J hereto is an excerpt from a seminar paper written by Mr. Damsky titled "National Constitutionalism."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 13, 2025.

_____
Merritt E. McAlister

2

# EXHIBIT I
# [excerpted]

# American Restoration: An Article V Proposal (DRAFT)
## by Preston Terry

## Contents

Introduction ................................................................................................................. 1

Popular Sovereignty and Constituent Power in the American System ........................................... 2

The Historic American Nation ................................................................................................ 7

Restoring Sovereignty to the People – Article V, Section 2 ........................................................ 17

    Paragraph 1 of Article V, Section 2 ................................................................................. 18

    Paragraph 2 of Article V, Section 2 ................................................................................. 21

    Paragraph 3 of Article V, Section 2 ................................................................................. 23

    Paragraph 4 of Article V, Section 2 ................................................................................. 24

Conclusion – Why Should This Be Done? ............................................................................... 25

**Introduction**

    In American constitutional jurisprudence, the People are sovereign. The People's government is their own creation, and this government may not usurp the power which brought it into existence. What, then, is the constitutional status of policies which alter, replace, or destroy the People? Moreover, are there any observable indicators that the People are being altered, replaced, or destroyed? And if such processes are constitutionally dubious, and we verify that they are indeed occurring, what should be done?

    This paper provides provocative answers to these questions rooted in empirical evidence, history, legal opinions, and the text of the Constitution. It argues that policies which alter, replace, or destroy the People is wholly illegitimate and unconstitutional. Lengthy historical analysis of the consensus view regarding the original and long-held conception of the People is provided; and it is determined that the People formed and maintained their government along nationalist lines, placing particular emphasis on their shared ancestral heritage. Evidence is provided which indicates that demographic challenges facing the People are currently threatening to reduce them to a minority status—within the coming decades—in the country that is their constitutional birthright. It calls upon the people to prevent this result by undertaking a political restoration and reasserting their rightful claim to sovereignty and primacy within the American body politic. Finally, it suggests changes, in the form of an additional section, to Article V as a means of entrenching this restoration and helping to ensure that such a struggle is never again needed to prevent similar constitutional evils.

every 72 hours, reflects concern with the squeamishness towards the use of violence by the average person. Individuals may find it difficult to accept that it may be, depending on the circumstances, necessary for (or beneficial towards) national survival to kill certain officials. Thus, after a week of deliberations, only a majority in favor of acquittal should be necessary to free a defendant.

In 1787, Thomas Jefferson wrote that, "[t]he tree of liberty must be refreshed from time to time with the blood of patriots and tyrants."[106] Relatedly, Alexander Hamilton wrote of the necessity of fostering "a large body of citizens, little, if at all, inferior to [the standing army] in discipline and the use of arms, who stand ready to defend their own rights and those of their fellow-citizens."[107] Given Founders who held such sentiments, it is hardly surprising that the Second Amendment, in order to provide for "the security of a free State," demands that "the right of the people to keep and bear Arms, shall not be infringed."[108] Recognizing this heritage, and the validity of these sentiments, this paragraph provides the People with textual basis for—and procedural vindication of—the right to not merely keep and bear arms, but to use those arms to defend their panoply of rights. It must be noted that threats to the sovereign People do not only come from the realm of demographic change. In a republic, one of the greatest threats to popular sovereignty and liberty is the ambition of the People's elected leaders. No patriot should be expected to stand idly by while this ambition—and its concomitant lust for power and avariciousness—drives a nation into ruin. This paragraph gives the assassin the right to justify himself and to inquire of the People who among them is so base that would be a bondman, so vile that will not love their country. Then, he shall pause for a reply.[109]

**Conclusion – Why Should This Be Done?**

One may grant the correctness of my analysis regarding how popular sovereignty restrains the actions of the constituted government, accept that America was a White country for most of its history (and was founded as such), and concede that these principles are in tension with historical and contemporary processes of demographic change in America. One may even grant that, given the ends sought to be advanced, my Article V, Section 2 proposal is wise and well-reasoned. However, the objection may still be heard that this is all wrong. The United States is no longer a White country, and, moreover, that White country "is never coming back," so "[a]rguing that anything like it should is pointless—and thus, simply mean."[110] Indeed, given the tremendous social upheavals my proposal would entail—the lives of hundreds of millions of people across the world would be dramatically changed—it might be contended that these arguments are not only mean, but reprehensible. And obviously, this feeling would be felt most acutely by those non-Whites living in America whose lives would be most negatively impacted.

[106] "From Thomas Jefferson to William Stephens Smith, 13 November 1787," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-12-02-0348. [Original source: *The Papers of Thomas Jefferson*, vol. 12, *7 August 1787–31 March 1788*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1955, pp. 355–357.]

[107] THE FEDERALIST NO. 29, at XYZ (Alexander Hamilton) (XYZ ed., XYZyear)

[108] U.S. CONST. amend. II.

[109] WILLIAM SHAKESPEARE, JULIUS CAESAR act 3, sc. 2, ll. 1563–68.

[110] John McWhorter, *She Is Outrageous, Demeaning, Dangerous. She Shouldn't Be Punished.*, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/opinion/amy-wax-academic-freedom-penn.html (applying this argument against University of Pennsylvania Law Professor Amy Wax).

118

For better or worse, history is an unalterable inheritance. We can no more change history than we can change the orientation or intensity of the stars in the night sky. It is also true that, like those stars, history may position and guide us. Our Constitution, and the fundamental principles it embodies, is one such guiding historical inheritance. Of course, unlike history or the stars, we can change the Constitution; as a practical matter, we can do away with part or all of it as we wish, provided we have the will and the power to do so. Nonetheless, we seem to abide by it (or at least, pretend like we abide by it) in large part because we have respect for the history that formed it and delivered it to us in the present. Like the man of wealth and prudence who has inherited a luxurious mansion in which his family has lived for generations, and who tempers his exuberance and his desire to tear the whole thing down and build a water park in its stead so that he may deliver his abode to his children, and that his children may deliver it to theirs, and so on, we resist throwing out our Constitution. We thus say that we limit ourselves to making relatively small and incremental changes which do not dramatically change the character of the whole document and the government which it gives textual authority to.

But as this paper demonstrates, the Constitution has, effectively, been thrown out. Through the demographic changes caused by our government, the Constitution's overarching principle—the sovereignty of the People—is now a dead letter. When Chin & Finkelman argue that the 1790 Naturalization Act "deserves a place of dishonor,"[111] what they are essentially saying is that the founding of the United States deserves a place of dishonor. Many non-Whites may agree with that proposition, and they may feel joyful that the government of the United States has usurped the People's sovereignty. After all, without this usurpation, non-Whites may not have ever been permitted to become citizens of this country. But at what cost was this "victory" over the People won? Do non-Whites truly believe that, after the government has usurped sovereignty from the People, sovereignty shall pass to them? Furthermore, if the racial attitudes of the Founders which brought White nationalism in to force in the United States are merely a bygone relic of an age that should be forgotten—nay, dishonored!—then why should the government respect any other provision of the Constitution? Why should the Founders' concern with the Crown's restriction on their free speech give legitimacy to the First Amendment? Why should their hatred of general warrants give legitimacy to the Fourth Amendment? Why should their fear of the thumbscrew and the breaking wheel give legitimacy to the Fifth and Eighth Amendments? And if that legitimacy comes not from the history of this country and the Founders, then where will it be found?

Finally, I shall speak directly to my brothers and sisters, the People. Can you honestly say these changes have been for the better? As the years go on, and those around you not only look less like you, but look upon you more and more with contempt and with a barely veiled desire for vengeance,[112] does your love for this country and its inhabitants grow? Do you feel as if you are

---

[111] Chin & Finkelman, *supra* note 42, at 1048.

[112] *See, e.g., Regents of Univ. of California v. Bakke*, 438 U.S. 265, 387 (1978) (Marshall, J., concurring in part and dissenting in part) (remarking that "it must be remembered that, during most of the past 200 years, the Constitution . . . did not prohibit the most ingenious and pervasive forms of discrimination" and using this fact to justify discrimination against Whites); WILLIAM O. DOUGLAS, THE COURT YEARS: 1939 TO 1975 (getprintcopy) (1980) (quoting Justice Thurgood Marshall as saying in conference on an early case evaluating the constitutionality of discrimination against Whites, "You guys have been practicing discrimination for years. Now it's our turn.").

united to your fellow citizens "by the strongest ties," or do you feel as if America has been "split into a number of unsocial, jealous, and alien" groups?[113] If you are increasingly apprehensive about these changes, you are not alone.[114] However, feeling despondent and helpless is hardly a way to rectify the evils which have been visited upon us. Our Founders understood the importance of forming a nation upon the solid foundation of common ancestry. They understood that it is a part of "human nature . . . that its affections are commonly weak in proportion to the distance or diffusiveness of the object;" and thus, "a man is more attached to his family than to his neighborhood, to his neighborhood than to the community at large."[115] Similarly, we should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle. And if the prize does not motivate you, then consider the cost of defeat; "[W]henever the dissolution of the Union arrives, America will have reason to exclaim, in the words of the poet: 'FAREWELL! A LONG FAREWELL TO ALL MY GREATNESS.'"[116]

---

[113] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay).

[114] *See* Robert D. Putnam, E Pluribus Unum*: Diversity and Community in the Twenty-first Century*, 30 Scandinavian Pol. Stud. 138 (2007) (arguing that "immigration and ethnic diversity challenge social solidarity and inhibit social capital"). See *generally* ROBERT D. PUTNAM, BOWLING ALONE: THE COLLAPSE AND REVIVAL OF AMERICAN COMMUNITY (2000) (discussing "the decline of the last several decades" in "social capital" and a sense of community belonging and civic engagement among Americans).

[115] THE FEDERALIST NO. 17, at XYZ (Alexander Hamilton) (XYZ ed., XYZyear).

[116] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay) (emphasis in original).

# EXHIBIT J
# [excerpted]

# National Constitutionalism
*An Originalist and Structuralist Analysis of Border Policy, Immigration and Naturalization Law, and the Fourteenth Amendment*
**Preston Terry**

## Contents

Introduction................................................................................................1

The Originalist Foundations of National Constitutionalism.........................................2

"The People" as Nation: *Verdugo-Urquidez* and *Heller* ..............................................11

National Constitutionalism Distilled for Jurists ........................................................15

National Constitutionalism Applied to Immigration Policy, Naturalization Law, and Alienage Classifications...........................................................................................17

    Border Control, the Guarantee Clause, and the State War Power ...............................19

    Immigration and Naturalization Law.....................................................................21

    Alienage Classifications and the Citizenship Clause.................................................23

Conclusion ...................................................................................................26

## Introduction

This paper proposes that constitutional governance relies upon several structural principles and implicit assumptions—rooted in our national history and the Constitution's text—about the significance of "We the People" in the constitutional scheme. This descriptive claim, coupled with a normative claim that these principles and assumptions should be preserved and aggressively asserted, is termed "national constitutionalism." National constitutionalism posits that, regardless of certain textual provisions with a seemingly open-ended scope of application, the Constitution's establishment of a nation-state under the sovereignty of the People must be considered its paramount purpose which may not be permissibly undermined by any governmental acts or omissions absent the direct and unambiguous consent of the People.[1] Originalism's two dominant

---

[1] In this discussion, the phrase "the People" will be understood as being coterminous with the phrase "the nation." *See* AZAR GAT WITH ALEXANDER YAKOBSON, NATIONS: THE LONG HISTORY AND DEEP ROOTS OF POLITICAL ETHNICITY AND NATIONALISM 18 (2012) (defining "nation" as a population with a sense of shared kinship, culture,

varieties—original intent originalism and original public meaning originalism[2]—both suggest the propriety of applying national constitutionalism to at least one area of law where courts have heretofore been inclined to view the so-called "political branches" (i.e., Congress and President) as possessing plenary, nonjusticiable authority: immigration and naturalization policy.[3] Additionally, the logic of national constitutionalism suggests an urgent need to overturn much of the Court's modern Fourteenth Amendment jurisprudence, and even consider the constitutionality of the Fourteenth (and Fifteenth) Amendments entirely.

**The Originalist Foundations of National Constitutionalism**

Original intent originalism "holds that the intent of the author of words or language determines the meaning of those words."[4] Original intent originalists defend this exegetical method by arguing that the true meaning of any authored language is inseparable from the author's intent.[5] McGinnis & Rappaport contend that original intent originalism's advantages are non-availing when the language at issue has multiple authors because "the individual intentions of each

---

common identity, history, and fate, that is either politically sovereign or actively striving to achieve political self-determination and self-government); CARL SCHMITT, CONSTITUTIONAL THEORY 127 (Jeffrey Seitzer, ed. & trans., 2008) (noting that "[n]ation and people are often treated as equivalent concepts" but that "[nation] denotes, specifically, the people as a unity capable of political action, . . . while the people not existing as a nation is somehow only something that belongs together ethnically or culturally, but it is not necessarily a bonding of men existing politically").

[2] John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 NW. U. L. REV. 751, 758 (2009) (describing these two varieties as "the two leading positive theories" of originalist interpretation).

[3] *See, e.g.*, California v. United States, 104 F.3d 1086, 1090–91 (9th Cir. 1997) (holding that California's plea for relief under the Guarantee Clause due to the federal government's failure to secure the southern border "presents a nonjusticiable political question" by noting that "[t]he Supreme Court has held that the political branches have plenary powers over immigration" and explaining further that "[f]or this Court to determine that the United States has been 'invaded' when the political branches have made no such determination would disregard the constitutional duties that are the specific responsibility of other branches of government, and would result in the Court making an ineffective non-judicial policy decision") (citing Fiallo v. Bell, 430 U.S. 787, 792 (1977)).

[4] McGinnis & Rappaport, *supra* note 2.

[5] *Id.* at 759 (recounting that "[Richard Kay] argues that readers do not understand texts independently of real or presumed human intentions . . . [r]ather, meaning is fundamentally connected with a human agent who intended to communicate something").

2

World War II era) do not amount to unconstitutional, revolutionary usurpations by the constituted government power.

## Conclusion

Our Constitution will survive only if "the people share a common, historic commitment to certain simple but fundamental principles which preserve their freedom."[92] One of those principles, accepted by our Founders who as a whole "unambiguously conceived of the United States as a White country,"[93] was nationalism—specifically, racial nationalism. If we abandon that principle while turning over America to a non-White majority, a majority that will not share a common, historic commitment to anything, what else shall we abandon along the way? If non-Whites believe that America's White nationalist founding "deserves a place of dishonor"[94] in our history, then—given the fundamentality of this principle in the original constitutional framework—what is to stop any other constitutional provision from being similarly repudiated?

The Supreme Court and inferior federal courts have the power to arrest the dispossession of White America. All they must do is substitute bad landmark precedent for good landmark precedent. Failure to do so is not judicial humility, but, at best, judicial surrender in the face of a terrible crime. At worst, it is complicity in that crime. The People cannot be expected to meekly swallow this demographic assault on their sovereignty. If the People are not granted relief from the government—which includes the judiciary—then, if they are to survive as masters in the land of their ancestors, they must exercise "their revolutionary right to dismember or overthrow" the

---

[92] *See* Chavez v. Martinez, 538 U.S. 760, 794 (2003) (Kennedy, J., concurring in part).
[93] Chin & Finkelman, *supra* note 41, at 1048.
[94] *See Id.*

government.[95] And that will be a process which no deskbound jurist can gleefully look forward to; for it will be a controversy decided not by the careful balance of Justitia's scales, but by the gruesome slashing of her sword.

---

[95]    Abraham    Lincoln,    First    Inaugural    Address    (Mar.    4,    1861), https://avalon.law.yale.edu/19th_century/lincoln1.asp.

27