# EXHIBIT 3
## [ECF No. 17-1 Replacement]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

PRESTON DAMSKY,

*Plaintiff,*

v.

CHRIS SUMMERLIN, in his official
capacity as Dean of Students of the
University of Florida,

*Defendant.*

No.: 1:25-cv-00275-AW-MAF

## <u>DECLARATION OF HEATHER WHITE</u>

1.    I am Dr. Heather White, Vice President for Student Life at the University of Florida ("UF").

2.    I am submitting this declaration in connection with Defendant's opposition to Plaintiff's motion for a preliminary injunction.

3.    Exhibit A hereto is a true and correct copy of a letter from Dr. Chris Summerlin, Dean of Students, UF, to Preston Damsky (Apr. 2, 2025).

4.    Exhibit B hereto is a true and correct copy of a letter from Dr. Nancy Chrystal-Green, Associate Vice President for Student Life, UF, to Preston Damsky (Apr. 16, 2025).

5.    Exhibit C hereto is a true and correct copy of a letter from Dr. James Tyger, Assistant Vice President, Student Life, UF, to Preston Damsky (Apr. 29, 2025).

6.    Exhibit D hereto is a true and correct copy of a letter from Pamela Malyk, Assistant Dean and Director of Student Conduct & Conflict Resolution, UF, to Preston Damsky (May 29, 2025).

7.    Exhibit E hereto is the audio recording of Preston Damsky's student conduct hearing before the University Officials Board on July 28, 2025.

8.    Exhibit F hereto is a transcript of the audio recording of the student conduct hearing prepared by a certified court reporter.

9.    Exhibit G hereto is a true and correct copy of a letter from Dr. Chris Summerlin, Dean of Students, UF, to Preston Damsky (Aug. 8, 2025).

10.    Exhibit H hereto is a true and correct copy of a letter from Dr. Heather White, Vice President for Student Life, UF, to Preston Damsky (Oct. 9, 2025).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 13, 2025.

_Heather White_

_____
Heather White, EdD

2

# EXHIBIT A



**Division of Student Life**
Dean of Students Office

202 Peabody Hall
PO Box 114075
Gainesville, FL 32611-4075
352-392-1261
352-392-5566 Fax

April 2, 2025

Preston Damsky
Sent electronically to ███████████████

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2024803701

Dear Preston:

Your name was forwarded to me by employees and students regarding incidents which were reported to our office between March 28, 2025 and April 1, 2025. According to the reported information, you were allegedly involved in behavior that created a material and substantial disruption to the academic operation of the UF College of Law.

Pursuant to the University of Florida Regulation 4.040, Section 11 Interim Restrictions for Students, you are hereby immediately placed on interim suspension from the University of Florida, pending resolution of the allegations. During this interim suspension you are denied access to campus property and all other University activities and privileges. You may continue to participate in online classes so long as they do not require your physical presence on campus property.

The Regulation reads, in part, as follows:

Interim suspension --which will prohibit access to campus and may preclude access to classes, instruction, and other educational support. Criteria includes:

1. Allegations of conduct that could reasonably cause harm to members of the University Community or property.

2. A reasonable belief that a Student's continued access to campus or campus activities could endanger one or more other person's health, safety, or property and that prohibiting access will ameliorate safety for the University Community.

3. A reasonable belief that further contact between two or more persons involved in the alleged interactions could result in perpetuation or escalation of behavior.

4. A reasonable belief that limited access is not a viable option under the circumstances.

5. A requirement of a Student conduct Hearing as soon as practicable.

6. Recommendation to, and final approval, by the Dean of Students or Designee.

7. An opportunity to appeal to the Vice President for Student Life (VPSL) or designee within three (3) Class Days(April 7, 2025) to request modification or nullification.


If you wish to appeal the interim suspension, you may submit your written appeal information via this webform, which will be routed to the appropriate staff member.

Upon completion of the investigation, if formal conduct charges are warranted, a formal charge letter will be forwarded to you detailing the alleged violation(s) of the Student Code of Conduct. In order to resolve the Conduct matter, you would be required to attend an informational meeting with Student Conduct and Conflict Resolution. During this meeting you would have the opportunity to review the information that was received and discuss your rights and resolution options regarding this matter.

To obtain more information about the Student Conduct Code and the student conduct process, you may visit the Student Conduct and Conflict Resolution website at sccr.dso.ufl.edu.

Sincerely,

Chris Summerlin
Dean of Students

CC:  Bart Knowles, University of Florida Police Department
     Latrell Simmons, University of Florida Police Department
     Scott Summers, University of Florida Police Department
     Jeff Moran, University of Florida Police Department
     Trevor Henderson, University of Florida Police Department

# EXHIBIT B

# UF UNIVERSITY *of* FLORIDA

**Division of Student Life**
Office of the Vice President

PO Box 113250
Gainesville, FL 32611
352-392-1265
352-392-7301 Fax
https://studentlife.ufl.edu/

April 16, 2025

Preston Damsky
Sent electronically to ▉▉▉▉▉▉▉▉

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2024803701

Dear Preston,

In accordance with University Regulation 4.040, I have reviewed the your request of extension of the appeal submission deadline as a designee for the Vice President of Student Life.

Your request for an extension to submit an appeal is granted. Your new appeal submission deadline is by 11:59 pm, Monday, April 21st, 2025. Please submit your appeal through this link. https://cm.maxient.com/reportingform.php?UnivofFlorida&layout_id=22

In accordance with University of Florida Regulation 4.040, Section 11, the University is utilizing interim measures to protect the campus community from a threat of harm and prevent further disruption to its business and educational operations. This action is not meant to be punitive in nature. During this time, the University will further investigate the allegations and determine if conduct charges are warranted.

The allegations giving rise to this interim suspension include complaints from numerous students and employees that they fear for their safety and do not want to attend class after reading antisemitic public facing posts on your social media such as "Jews must be abolished my any means necessary." Additionally, it was reported that you wore a t-shirt with an antisemitic message, "From the river to the sea," to the law school campus where you walked through hallways and attended classes amongst numerous Jewish students and faculty. Your conduct, in light of current events around the world, has created a climate of fear that permeates the law school campus and amounts to a material disruption close in time to final exams. The University is obligated to stop the disruption and ensure students have meaningful access to their education without fear of harm from a fellow classmate.

At the conclusion of its investigation, if the University determines conduct charges are warranted, you will be notified in writing in accordance with University of Florida Regulation 4.040. During this period of interim suspension, you are not prohibited from accessing course material provided by your faculty remotely, at their discretion, and you will have access to your (take-home) final exams.

The original interim suspension letter is attach for your reference.

Sincerely,

Nancy Chrystal-Green, PhD
Associate Vice President for Student Life

CC:   Student Conduct and Conflict Resolution
        Chris Summerlin, Dean of Students
        Kristy Sasser, University of Florida Police Department
        Latrell Simmons, University of Florida Police Department
        Scott Summers, University of Florida Police Department

# EXHIBIT C



**Division of Student Life**
Office of the Vice President

PO Box 113250
Gainesville, FL 32611
352-392-1265
352-392-7301 Fax
https://studentlife.ufl.edu/

April 29, 2025

Preston Damsky
Sent electronically to ███████████████

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2024803701

Dear Preston,

In accordance with University Regulation 4.040, I have reviewed the appeal of your interim suspension as a designee for the Vice President of Student Life.

The information received by the University of Florida alleges your involvement in behavior that threatens the health and safety of members of the university community. Your access to campus created a material disruption to the College of Laws' academic operations and its students' access to their education. Accordingly, your continued access to campus could endanger one or more other person's health or safety due to the severity of the allegations in your case. Therefore, I find it is reasonable to believe that the restrictions outlined in your interim suspension letter are appropriate for the circumstances.

As such, I have decided to uphold the decision of the Dean of Students, Dr. Chris Summerlin and the interim suspension remains in place as outlined in Dean Summerlin's letter.

Sincerely,

James Tyger
Assistant Vice President, VPSL

CC:   Student Conduct and Conflict Resolution
      Chris Summerlin, Dean of Students
      Kristy Sasser, University of Florida Police Department

6

Latrell Simmons
Scott Summers, University of Florida Police Department

# EXHIBIT D



**Division of Student Life**
Dean of Students Office

202 Peabody Hall
PO Box 114075
Gainesville, FL 32611-4075
352-392-1261
352-392-5566 Fax

May 29, 2025

Preston Damsky
Sent electronically to ███████████████

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2024803701

Dear Preston,

Student Conduct & Conflict Resolution has received information from students and employees indicating you may have engaged in conduct violating University of Florida Regulation 4.040, the Student Honor Code and Student Conduct Code.

The reported information included complaints from numerous students and employees that they fear for their safety such that they do not want to attend classes with you after reading threatening and anti-Semitic public-facing posts on your social media, such as your post in March 2025 that included this statement of your "position on Jews": "Jews must be abolished by any means necessary." This post was followed by an exchange with a professor at the law school who asked you: "Are you saying you would murder me and my family?" On another occasion, a student at the law school complained that you had agreed that your paper for the Originalism and its Critics seminar ended on a call for extralegal violence. These examples represent some, but not all, of your reported disruptive and threating behavior. Your conduct, especially in light of current events in this country and around the world, has created a climate of fear that permeates the law school campus and amounts to a material or substantial disruption of normal University operations.

Based on the available information, an initial determination has been made that the Conduct Process should proceed, as outlined in section 6.E of Regulation 4.040. You are being charged with violating the following sections of Regulation 4.040:

- 4.C Disruptive Conduct: Conduct that is materially or substantially disruptive to the normal operations of the University, or that incites others to do so, in any of the following activities: teaching, learning, research, administrative functions, disciplinary proceedings, other University Activities whether on or off campus, and other authorized activities that take place on campus. In evaluating whether conduct is materially or substantially disruptive, the University may consider the totality of factors, including but not limited to whether there was an intent to prevent the activity or event from continuing to completion and whether the conduct was a sustained and continuous disruption.

- 4.K Harassment: Threats, intimidation, Coercion, or any other conduct that places a Reasonable person in fear of physical harm, through words or actions, or objectively disrupts a person's daily activities, including education and employment.

You are requested to attend an Information Meeting with ***Aimee Peeples on June 12, 2025 at 4:00pm, via Zoom video conference, meeting details are listed below. If you would like to attend your meeting in person, you may contact our office via email (DSOStudentConductandConflictResolution@ufsa.ufl.edu) at least one (1) business day prior to your scheduled appointment to accommodate your request.*** During this meeting you will have the opportunity to review the information that was received regarding this allegation, learn more about the conduct process, and discuss any questions you may have about your rights and available resolution options regarding this matter. Based on information available including the nature of this incident, prior conduct history, and/or aggravating or mitigating circumstances, this incident will be offered resolution options available for cases that could result in separation as defined in Regulation 4.040(6G.2.c). Any questions or concerns can also be addressed in this meeting.

Meeting URL: https://ufl.zoom.us/j/99514301665?pwd=GukIbEPYx4z8R8274ztccrWtScMZlm.1

Meeting ID: 995 1430 1665
Passcode: 216498

***Please take a moment to complete your student rights form before your scheduled meeting.*** The student rights form can be accessed here; you will be required to log-in with your UF credentials to authenticate your identity and digitally sign this form.

If you are unable to attend this meeting due to compelling circumstances, or if you would like to reschedule your meeting, you may contact our office via email (DSOStudentConductandConflictResolution@ufsa.ufl.edu). Additionally, if you would like to have an Advisor and/or a Support Person present during any Hearing or meeting with Student Conduct and Conflict Resolution, you must provide the appropriate signed privacy waiver to our office by 5:00 pm at least two (2) Class Days in advance via email to DSOStudentConductandConflictResolution@ufsa.ufl.edu. The FERPA privacy waiver and additional information on the Student Conduct and Student Honor Code can be reviewed on the Student Conduct and Conflict Resolution website.

Thank you for your cooperation.

Sincerely,

Pamela Malyk
Assistant Dean and Director - SCCR



**Division of Student Life**
**Dean of Students Office**
**Student Conduct and Conflict Resolution**

**Zoom Meeting Expectations – Information Meeting**

The following are expectations regarding your participation in your Zoom based meeting:

- Engage in the meeting professionally, as you would in an in-person Information Meeting.

- Ensure you are in a safe location before beginning your participation in your Information Meeting in order to prevent potential danger to you or other people (i.e. driving).

- Participate through a consistent and reliable Internet/WIFI connection to ensure your Information Meeting can occur without interruption (excessive interruptions will not be reason for resolution delay).

- Be in a **private location** as information discussed during an Information Meeting is considered part of your educational record protected by FERPA.

  - A **private location** means you are in a separate room by yourself. You should not have other people in the same room as you, even if you are using headphones.

  - If you would like a Support Person or an Advisor to participate in the meeting with you, you will need to complete a FERPA Waiver in compliance with expectations outlined in University Regulation 4.040. Your Support Person and/or an Advisor can participate from your private location or in their own private location.

  - The staff member facilitating your meeting may request a scan of the space you are in to confirm the privacy and safety at any point during the meeting.

  - If your space is deemed inappropriate by Student Conduct & Conflict Resolution staff due to privacy or safety concerns the meeting will be ended and may be rescheduled for a later date if you are not able to immediately relocate to an appropriate space.

- This is a live meeting and **no** audio or video recordings, photos, or screen captures are permitted. Failure to comply with this expectation can be a violation of the Student Conduct Code.

- The expectation is that your video will be turned on.

*Damsky v. Summerlin*
No. 1:25-cv-00275-AW-MAF
Defendant's Opposition to
Plaintiff's Motion for Preliminary Injunction

# EXHIBIT E

USB of audio files submitted to Court

# EXHIBIT F

Page 1

1      UNIVERSITY OF FLORIDA STUDENT CONDUCT CODE HEARING

2                    UNIVERSITY OFFICIALS BOARD

3                       Monday, July 28, 2025

4                            8:00 A.M.

5

6

7                       University of Florida

8

9

10

11

12

13   Reported by:

14   JOB No.:      7627756

15

16

17

18

19

20

21

22

23

24

25

Page 2

1                        A P P E A R A N C E S

2

3    Ryan Rushing

4    Dean Merritt McAlister

5    Dean Janice Shaw

6    Professor Lyrissa Lidsky

7    Professor Christopher Hampson

8    Professor Zachary Kaufman

9    ██████   █████████

10   ████████  █████████

11   Preston Terry Damsky

12   Aimee M. Peeples

13   Katie Vogel Anderson

14   Namodhi Wijeranthne

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                        R E C O R D I N G

2              MS. PEEPLES:  Ryan, the recording has started

3     and you can proceed.

4              MR. RUSHING:  Good morning. Today is Monday,

5     July 28, 2025. This is a student conduct code hearing

6     before the university officials board. My name is Ryan

7     and I will be serving as today's board chairperson.

8     This hearing has been scheduled for the purpose of

9     hearing information in a case involving Preston Terry

10    Damsky, who has been charged with allegedly violating

11    the student conduct code of the University of Florida.

12    This hearing is designed to allow all the information

13    to come forward.

14              The content of this hearing is confidential

15    and protected by federal law. We are audio recording

16    this hearing for appeal purposes. This is the only

17    recording permitted in today's proceedings. The

18    procedure for this hearing will be as follows. Preston

19    will be given an opportunity to make a statement to

20    the Board introducing himself. The following witnesses

21    will share information they may have regarding the

22    allegations of disruptive conduct and/or harassment.

23    The witnesses will be questioned by the Board followed

24    by Preston before being excused. Each witness will

25    have 15 minutes to share information and answer

Page 4

1   questions, which can be extended for need by the

2   Board.

3           Our witnesses today will include Dean Merritt

4   McAlister, Dean Janice Shaw, Professor Lyrissa Lidsky,

5   Professor Christopher Hampson, Professor Zachary

6   Kaufman, ███████████████, ████████████████, Daniel

7   Pincus and Mary Claire Jackson. Preston will be given

8   the opportunity to share information regarding the

9   allegations of disruptive conduct and harassment.

10  Following this, Preston will be questioned by the

11  Board. Finally, Preston will be given the opportunity

12  to make closing remarks before the Board begins

13  deliberation.

14          At this time, I would like to remind all

15  participants that you are expected to tell the truth

16  in this hearing. Failure to do so can be construed as

17  a violation of the Student Conduct Code, Section

18  4(p). I would also like to remind all participants in

19  this hearing that we do expect anyone to comply with

20  the Zoom meeting expectations set forth in order to

21  maintain professionalism and confidentiality. Failure

22  to do so can be construed as a violation of the

23  Student Conduct Code, Section 4(p).

24          The Board will make its recommendations

25  regarding responsibility for violation of the specific

Page 5

1    charges and possible sanctions to Dr. Chris Summerlin,

2    Dean of Students or their designee. Preston, upon

3    notification of the final decision, any appeal must be

4    filed in writing within 10 plus days of the decision

5    letter. Appeals need to be directed to the Vice

6    President for Student Life, Dr. Heather White or their

7    designee located in 135 Tigert Hall.

8            Are there any questions regarding our

9    procedure? At this time, I would like the Members of

10   the University Officials Board and all participants in

11   the hearing to introduce themselves for audio

12   recording purposes. I'm going to go by the order of

13   what I see on my Zoom screen. Aimee, you're first.

14           MS. PEEPLES:  My name is Aimee Peeples, I'm

15   the Hearing Advisor.

16           MR. RUSHING:  Thank you. Katie?

17           MS. ANDERSON:  I am Katie Vogel

18   Anderson, Committee Member.

19           MR. RUSHING:  Namodhi?

20           MS. WIJERANTHNE  I'm

21   Namodhi, Committee Member.

22           MR. RUSHING:  Dr. McAlister?

23           DEAN MCALISTER:  I'm Merritt McAlister, I'm

24   the Interim Dean at Levin College of Law.

25           MR. RUSHING:  Thank you. Preston? You're

Page 6

1   muted, sir.

2         MR. DAMSKY:  My name is Preston Damsky, I'm a

3   student.

4         MR. RUSHING:  Thank you.  █████?

5         MR. █████:  I'm █████████████, I'm a

6   student, a witness.

7         MR. RUSHING:  Thank you. Dr. Kaufman?

8         MR. KAUFMAN:  My name is Professor Zachary

9   Kaufman.

10        MR. RUSHING:  Thank you. Dr. Lidsky?

11        MS. LIDSKY:  I am Professor Lyrissa Lidsky, I

12   am the Ehrlich Eminent Scholar Chair in U.S.

13   Constitutional Law at the University of Florida, Levin

14   College of Law.

15        MR. RUSHING:  Thank you. Dr. Hampson?

16        MR. HAMPSON:  My name is Chris Hampson, I'm a

17   professor, and I'm here as a witness today.

18        MR. RUSHING:  Thank you. Dr. Shaw?

19        DEAN SHAW:  I'm Janice Shaw, I'm

20   the Senior Assistant Dean of Students

21   and Special Advisor to the Dean of Students.

22        MR. RUSHING:  Thank you.  █████?

23        MR. █████████:  My name is █████████,

24   I'm a student and a witness.

25        MR. RUSHING:  Thank you. Preston, it is

```
 1   alleged --
 2            MS. PEEPLES:  Let me --
 3            MR. RUSHING:  Okay.
 4            MS. PEEPLES:  -- let me just put -
 5   - sorry. Let me put all the voices --
 6            MR. RUSHING:  Okay.
 7            MS. PEEPLES:  -- in the Zoom waiting room.
 8            MR. RUSHING:  Okay. No problem.
 9            MS. PEEPLES:  No worries. Okay. All the
10   witnesses  are in the Zoom waiting room.
11            MR. RUSHING:  Thank you. Preston, it is
12   alleged that you are reportedly involved in conduct
13   including complaints from numerous students and
14   employees that they fear for their safety, such that
15   they do not want to attend classes with you after
16   reading threatening and anti-Semitic public-facing
17   posts on your social media, such as your post in March
18   2025 that included the statement of your, "Position on
19   Jews." "Jews must be abolished by any means
20   necessary."
21            This post was followed by an exchange with a
22   professor at the law school who asked you, "Are you
23   saying you would murder me and my family?" On another
24   occasion, a student at the law school complained that
25   you had agreed that your paper for the originalism and
```

Page 8

1   its Critics' seminar ended on a call for extra legal

2   violence. These examples represent some, but not all,

3   of your reported disruptive and threatening behavior.

4   Your conduct, especially in light of current events in

5   this country and around the world, has created a

6   climate of fear that permeates the law school campus

7   and amounts to a material or substantial disruption of

8   normal university operations.

9           You have been charged with allegedly

10  violating the following sections from the Student

11  Conduct Code, 4.C, disruptive conduct. Conduct that is

12  materially or substantially disruptive to the normal

13  operations of the university, or that incites others

14  to do so in any of the following activities: teaching,

15  learning, research, administrative functions,

16  disciplinary proceedings, other university activities,

17  whether on or off campus, and other authorized

18  activities that take place on campus. In evaluating

19  whether conduct is materially or substantially

20  disruptive, the university may consider the totality

21  of factors, including, but not limited to, whether

22  there was an intent to prevent the activity or event

23  from continuing to completion, and whether the conduct

24  is a sustained and continuous disruption.

25          4.K, harassment, threats, intimidation,

```
                                            Page 9
 1   coercion, or any other conduct that places a
 2   reasonable person at fear of physical harm, rewards,
 3   or actions, or objectively disrupts a person's daily
 4   activities, including education and employment.
 5   Preston, it is the Board's understanding that you do
 6   not accept responsibility for the alleged violations,
 7   and have requested a formal University Officials Board
 8   hearing to resolve this matter. Is that correct?
 9             MR. DAMSKY:  Yes.
10             MR. RUSHING:  Thank you. Aimee, are you going
11   to take the -- before I continue the script, are you
12   going to bring out back all the witnesses, or --
13             MS. PEEPLES:  I'll bring in our witnesses one
14   at a time.
15             MR. RUSHING:  Okay.
16             MS. PEEPLES:  Okay. So we're ready for Dean
17   McAlister. Yeah.
18             MR. RUSHING:  Well, do you want me to -- on
19   the bottom of page -- top of page, is that -- do you
20   want me to read that out loud or not?
21             MS. PEEPLES:  Yes. So hang on, let me put
22   Dean McAlister back in just a second.
23             MR. RUSHING:  Okay.
24             MS. PEEPLES:  Yes, I'm sorry, yeah.
25             MR. RUSHING:  Okay. Just for Preston, or --
```

1           MS. PEEPLES:  Correct.

2           MR. RUSHING:   Okay. Just for Preston,

3    okay. Thank you. The University Officials Board, also

4    known as the UOB, will take notice of the following.

5    Preston Terry Damsky, also known as the student, has

6    been charged with disruptive conduct and harassment in

7    violation of the UF Student Code of Conduct, otherwise

8    known as the Code. The Code defines disruptive conduct

9    as, "Conduct that is materially or substantially

10   disruptive to the normal operations of the university,

11   or that incites others to do so, in any of the

12   following activities: teaching, learning, research,

13   administrative functions, disciplinary proceedings, or

14   other university activities, whether on or off campus,

15   and other authorized activities that take place on

16   campus."  Code Section 4(c).  "In evaluating whether

17   conduct is materially or substantially disruptive, the

18   university may consider a totality of factors,

19   including, but not limited to, whether there was an

20   intent to prevent the activity or event from

21   continuous disruption. Disruptive conduct does not

22   include any conduct protected by the First

23   Amendment."

24           The Code defines harassment as, "Threats,

25   intimidation, coercion, or any other conduct that

1    places a reasonable person in fear of physical harm,

2    through words or actions, or objectively disrupts a

3    person's daily activities, including education or

4    employment."  Code Section 4(k). "Harassment does not

5    include conduct protected by the First Amendment."

6          The UOB is not tasked with determining

7    whether, as a legal matter, the student's conduct or

8    speech is protected by the First Amendment. The UOB

9    may and should presume that the student's conduct or

10   speech is protected by the First Amendment if it does

11   not constitute disruptive conduct or harassment. If

12   the UOB finds that the student is responsible for

13   disruptive conduct or harassment, it should presume

14   that the student's conduct or speech is, for that

15   reason, not protected by the First Amendment.

16          The UOB may and should take notice of the

17   fact that views differ with respect to the Israeli-

18   Palestinian conflict. The UOB may and should presume

19   that the student's speech or expression, using the

20   phrase, "From the river to the sea, Palestine will be

21   free", is protected by the First Amendment.

22          Preston, you may now provide a brief

23   statement to the Board introducing yourself as a

24   student.

25          MR. DAMSKY:  My name is Preston Damsky. I'm

Page 12

1  the student. I go to the law school. I prepared an

2  introductory statement to speak to the charges, but

3  apparently I'm not allowed to give that, so.

4  (Crosstalk)

5          MS. PEEPLES:  You are, Preston, just not at

6  this time. You are permitted to do that, just not at

7  this time.

8          MR. DAMSKY:  All right. Then I'll hold off.

9          MS. PEEPLES:  Okay.

10          MR. DAMSKY:  Thank you.

11          MR. RUSHING:  We will now bring in our first

12  witness, Dean Merritt McAlister.

13          MS. PEEPLES:  Okay.

14          MR. RUSHING:  Dean McAlister, what

15  information do you have to provide to the university

16  specifically related to disruptive conduct and/or

17  harassment?

18          DEAN MCALISTER:  Thank you, Mr. Chair. I have

19  a statement that I was going to read before answering

20  any questions. My name is Merritt McAlister. I'm now

21  in my third year of serving as the Interim Dean of the

22  Levin College of Law. I arrived at UF about seven

23  years ago as a faculty member. I've made a statement

24  for the record, but I'd like to highlight a few things

25  here with the time I have.

Page 13

1          Mr. Damsky has been on my radar for a long

2     time. We're not here because he's unpopular or

3     disliked or because he upsets and angers his fellow

4     students, although he has surely done that, we are

5     here because this March, Mr. Damsky crossed a line. He

6     made unacceptable threats against our Jewish faculty,

7     students, and staff, and those threats predictably

8     created a substantial and material disruption to the

9     operation of the law school. I've spent significant

10    time over the last two years fielding complaints about

11    Mr. Damsky. I've detailed those events in my

12    statement, and we've provided records of the

13    complaints and the concerns that we've received.

14          Most of that was business as usual, dealing

15    with upset students and faculty is part of my job. But

16    what happened in March was different. And it may be

17    hard to capture that fully for those who are outside

18    of the law school community, but I hope that today's

19    proceedings will help you understand that full

20    context. In March, Mr. Damsky posted his "Position on

21    Jews" on his X account, an account that was known to

22    many in the law school community. Although he couched

23    his statement in the academic garb of Noel Ignatiev,

24    who wrote about abolishing the concept

25    of, "Whiteness," Mr. Damsky distorted those statements

Page 14

1    to conclude, "Jews must be abolished by any means
2    necessary," not Jewishness, but Jews. Jews must be
3    abolished by any means necessary.
4            I learned of these tweets when a Jewish
5    student, who's a witness today, approached me with a
6    copy of the post. He was shaking with tears in his
7    eyes and emotion in his voice. And he told me he was
8    afraid to be at a law school when Mr. Damsky was also
9    a student. I understood that, and I felt his palpable
10   fear in that moment. On a campus like ours with a
11   large and engaged Jewish community, the posts spread
12   like wildfire. Within days they were circulating among
13   the faculty and students, and we had calls to lock
14   down campus, report Mr. Damsky to the police, increase
15   police presence and patrols, many steps that we did
16   take.
17           Faculty member looked me in the eye and told
18   me he was afraid for his safety of his family,
19   himself, and his students. Students were afraid to
20   study on campus as we headed into finals. A staff
21   member asked for her name and picture to be taken off
22   the website because she had a Jewish surname, and she
23   ultimately quit her job several weeks later. For that
24   week and the time from the post first being brought to
25   our attention to the time shortly after Mr. Damsky had

Page 15

1   been trespassed, business as usual at the law school

2   ground to a halt. All that anyone was doing or talking

3   about was Mr. Damsky and his X posts.

4           I received a request to post a police officer

5   outside of a classroom because Mr. Damsky was enrolled

6   in the class, which had Jewish students. We had a

7   police officer who had to attend a Jewish Law Students

8   Association event out of fear that Mr. Damsky might

9   show up. The campus was on edge with one professor

10  canceling class out of stress from the situation and

11  students expressing fear for that faculty member's

12  safety and their own when the professor engaged with

13  Mr. Damsky on X.

14          I expect that Mr. Damsky will tell you that

15  he is not violent and has no violent thoughts. That is

16  beside the point. No one knows whether violence will

17  occur until it is too late. I think of what FSU went

18  through only a few weeks after these events. From news

19  reports, it appears that that student was not known to

20  be violent, only known to have made extremist

21  statements. Our students have reminded me time and

22  again, as these events have unfolded, that they had

23  grown up in a different time than I had. We had

24  Parkland survivors on our campus and a community of

25  students who had experienced active shooter trainings

Page 16

1  as children.

2         This was not the first time Mr. Damsky had

3  called for violence. When he did so in the fall in the

4  context of a seminar paper, I concluded that the

5  statements in that context were not threatening

6  because they were written in an academic paper and not

7  put out on X to terrorize a community that he knew was

8  looking. The statements were different and they were

9  different for two important reasons.

10        First, Mr. Damsky understood at the time of

11 making the statements on X that some members of our

12 community perceived him as a threat. At a town hall in

13 January, at least two students expressed to me their

14 palpable fear of Mr. Damsky. One said she scanned the

15 exits when he was in a room. Another avoided taking

16 classes with him out of fear of what he might do. Mr.

17 Damsky was aware of these comments and he discussed

18 them with Dean Shaw as you'll hear from her today.

19 Although he said he's never thought of shooting or

20 stabbing anyone, that doesn't matter. Threats are

21 punishable because of the fear they cause in those on

22 the receiving end.

23        And it doesn't matter whether the person

24 making them has the means or intent to carry them out,

25 what does matter is whether the threat maker knows

1    that his conduct has created a substantial risk that

2    the statements would be received as threats of

3    violence. After two years of escalating conduct, Mr.

4    Damsky was aware of how his words would be perceived.

5    Indeed, I think that may be exactly what he wanted to

6    provoke our community and stoke fear. My job, however,

7    is to protect our campus from that kind of threat. No

8    student gets to terrorize others and hide behind the

9    First Amendment to do so.

10           Second, Mr. Damsky was given an opportunity

11   to retract the specific statement at issue, what he -

12   - to retract what he said and disclaim any threat of

13   violence with respect to these particular statements

14   on X. And he did not. Professor Lidsky, who you'll

15   also hear from today, engaged with him on X and asked

16   whether he would, "Murder her and her family." Mr.

17   Damsky equivocated in his response and invoked the

18   concept of genocide. He was on notice at that time

19   that these very statements were perceived as

20   threatening by members of our community. And instead

21   of disclaiming violence, he equivocated.

22           At that point, the meaning of his words

23   became clear. He was threatening the Jewish people on

24   our campus. He was calling for and supportive of

25   genocide by, "Any means necessary." Mr. Damsky has the

1  right to think what he thinks and say what he wants.
2  And I've taken a lot of heat at different times for
3  protecting his speech, but his statements have real
4  consequences. There are lines that he cannot cross, he
5  must abide the student code of conduct. It doesn't
6  matter whether he can be criminally prosecuted for the
7  posts or whether he'd have the right to make those
8  statements were he not a member of our academic
9  community, what matters is whether he made the
10 statements -- whether the statements he made were ones
11 that a reasonable person would have found threatening,
12 and whether he did so knowing that his statements
13 might cause fear and disruption. And that is exactly
14 what happened.
15          MR. RUSHING:  I will now open up the floor to
16 the Board members for questions for Dean McAlister.
17          MS. ANDERSON:  Dean McAlister, could you
18 please tell us how much it costs you all to have extra
19 security, which you mentioned at a couple of events --
20          DEAN MCALISTER:  Yeah.
21          MS. ANDERSON:  -- in a class?
22          DEAN MCALISTER:  So we have -- we spend -- I
23 think it's -- I forget exactly the rate, but it's
24 several hundred dollars an hour to have police
25 presence on campus. We've -- I don't know if we're

Page 19

```
 1   paying for, we still have cameras that are -
 2   - additional cameras that have been posted to law
 3   school. I'm just not aware if we are paying for those,
 4   but we absolutely have paid, you know, somewhere, you
 5   know, probably less than $1,000, but for additional
 6   police presence, as well as, you know, the increased
 7   patrols we're not -- we were not charged for. But
 8   whenever we have an officer posted on campus, we pay
 9   for that.
10           MS. ANDERSON:  And then I guess related to
11   that --
12           DEAN MCALISTER:  Uh-huh.
13           MS. ANDERSON:  -- how much time and money
14   approximately has been spent on this case at large,
15   including security, which we talked about, staff time,
16   canceled classes?
17           DEAN MCALISTER:  So there was at least one
18   canceled class. There was -- I mean, you know, my
19   time, I would say I've probably spent, you know, in
20   total something around 120 hours or more dealing with
21   issues related to Mr. Damsky. I would say since the
22   tweets, you know, I would -- something like 70 or 80
23   percent of that time has been spent since then. Now,
24   some of that is public relations issues related to the
25   New York Times article, which is, you know, separate
```

Page 20

```
 1   and apart from this, but I would say, you know, a
 2   significant portion of the 120 hours has been related
 3   to that.
 4        Dean Shaw, who you'll hear from, also spent -
 5   - has spent significant time meeting with students and
 6   I'll let her estimate that. But I would say that, you
 7   know, collectively, the law school has probably
 8   devoted, you know, several weeks solid to dealing with
 9   situation and the fallout from -- specifically from
10   the X posts. And that's, you know, several senior
11   administrators, faculty who have spent a lot of time
12   talking with and counseling students. You know, this
13   has taken up a significant portion of our time and
14   energy.
15        MS. ANDERSON:  And then other than what's in
16   the packet and what you've spoken to now, would you
17   like to comment on the impact that these alleged
18   behaviors have had on you and your role as leader at
19   the law school?
20        DEAN MCALISTER:  Sure. You know, this has
21   been a really, really difficult situation in lots of
22   ways. I -- you know, I -- you know, my -- although I
23   think I initially did not fear Mr. Damsky because I
24   did protect his speech rights, as things have
25   continued on, you know, we have become personally -
```

Page 21

1    - my wife and I, afraid talking about, you know,
2    buying a gun and keeping it in the home just to
3    protect ourselves in the event that, you know, the
4    worst case unfolds and, you know, thinking about
5    increased security measures around the dean's office.
6              You know, I mean, so there's a personal toll
7    to that. On the other hand, I'm -- you know, I have no
8    problem fielding complaints and concerns. like, that's
9    part of the job of a dean. And I think that -- you
10   know, that is what has been par for the course for
11   quite a while. But, you know, what happened in March
12   was really different. And I felt it immediately as
13   soon as the student told me the posts.
14             You know, we have such a large Jewish
15   community and I felt, you know, the worst case
16   scenario, right, for a dean is the fear that something
17   terrible unfolds on your campus, right? That there is,
18   you know, violence that you were aware of at some
19   level was possible, but you just didn't want to think
20   that it could happen. And I felt in that moment that
21   we were on notice, that there was some real chance
22   that someone could take action against our community
23   and that terrified me.
24             You know, we hold it together because that's
25   part of what a leader's job is to do. But, you know,

Page 22

1   it was a palpable sense of fear, intimidation, and the

2   mood just really shifted across campus. And I -- at

3   some level, I felt super powerless because everything

4   we were trying to do, like, whether it's increased

5   police patrols, cameras, all of that was sort of not

6   enough. Students were still afraid. Like, what if he

7   still comes back? What if he does these things? And,

8   you know, my efforts at reassurance were not enough.

9   But, you know, eventually, I think we got to a place

10  of some calm.

11          But, you know, a community that had -- as I

12  had, you know, over time, tried to tell them, like -

13  - we used it as an educational tool for some -- to

14  some extent, right, about what the First Amendment is

15  and what academic freedom means and all of that. But

16  at some point it hit the line where that was no longer

17  students who felt threatened personally in their

18  community where they were supposed to be safe and

19  studying for finals. There was no more justification

20  that we could give.

21          MS. ANDERSON:  And a moment ago in your

22  statement, you had mentioned that, was it Preston was

23  on notice?

24          DEAN MCALISTER:  Yes.

25          MS. ANDERSON:  And specifically --

Page 23

1              DEAN MCALISTER:  Uh-huh.

2              MS. ANDERSON:  -- what you -- I guess my

3     question is, what specifically do you mean when you

4     say --

5              DEAN MCALISTER:  Sure.

6              MS. ANDERSON:  -- that Preston was on notice?

7              DEAN MCALISTER:  So we had had this -- we had

8     had a town hall in January of this year where -- and

9     this was after one of the incidents that I described

10    in my statement, which was after Mr. Damsky had

11    received a book award. And we had a number of students

12    who were very upset about the book award. And, you

13    know, I had made the determination that that was

14    protected speech and I was not going to take the book

15    award away. But they were upset about that, and at the

16    town hall, a number of the students were trying -

17    - they were specifically very upset that there were

18    some statements in a paper that were calls to

19    violence. They were calls for racial violence, sort of

20    racial overthrow and violent rhetoric.

21             And students were trying to explain to me

22    that the fear they felt was very real and that I might

23    not fully understand it because I hadn't sort of lived

24    as they had in eras of school shooting and other

25    things. And so they were describing, you know,

1  scanning the exits when they saw Mr. Damsky or, you

2  know, choosing classes based on whether he was in the

3  class or not. And although I took that very seriously,

4  we had determined that at least the statements in the

5  paper were not sufficiently threatening to support,

6  you know, conduct proceedings at that time.

7          But Mr. Damsky learned of these statements, I

8  think he both had friends at the town hall, although

9  he was not there. But in particular, because he was

10 discussed at the town hall, I asked Janice Shaw, who

11 you'll hear from today, to talk to him to make sure

12 that he understands both how the community perceives

13 him and that there is a real risk that while he may be

14 able to say certain things, you know, we're a law

15 school, there could be professional consequences,

16 there could be ramifications for him if he continues

17 down a course of conduct.

18          And so he indicated that he was aware that

19 he'd heard that, that maybe he was even upset by the

20 fact that other students found him threatening. But -

21 - you know, and this is when he said that he hadn't

22 had sort of violent thoughts, but he was at least

23 aware that there was general sentiment in the

24 community about that. I think he was also specifically

25 aware that these particular tweets or X posts had been

Page 25

1   perceived as threatening because Professor Lidsky

2   asked him if that's what he meant. And instead of

3   saying, you know, "No, I don't mean to -- you know,

4   that I want to murder anyone or that anyone should be

5   murdered," he sort of -- he equivocates. He

6   says, "Well, is that what the original speaker

7   meant?" And, you know, something about, you know,

8   genocide of whites being worse than genocide of Jews,

9   et cetera.

10          So you know, I think in both instances, he

11  knew that he was -- you know, he was -- in my view, he

12  had been sort of walking right up to the line and we'd

13  been protecting his ability to walk right up to that

14  line. But as soon as he crossed over, we could not

15  tolerate that anymore.

16          MS. ANDERSON:  Thank you, Dean McAlister.

17          DEAN MCALISTER:  Thank you.

18          MR. RUSHING:  Preston, you may now ask any

19  questions relevant to the allegations you have for

20  Dean McAlister.

21          MR. DAMSKY:  Now, am I going to be able to

22  show Dean McAlister tweets? Any questions around them?

23          MR. RUSHING:  I can have Aimee share the case

24  packet if you would like for us to do that.

25          MR. DAMSKY:  Yes, I would. Okay.

Page 26

```
 1              MS. PEEPLES:  Tell me what page.
 2              MR. DAMSKY:  Yeah. I'll get to it.
 3              MS. PEEPLES:  Okay.
 4              MR. DAMSKY:  Thank you. Hello, Dean
 5    McAlister. Thank you for taking the questions. At the
 6    beginning of your April 1st report, you write, and I
 7    quote, "For the better part of two years, we've been
 8    dealing with a law student who has expressed extreme
 9    views that nearly all in our community find deeply
10    disturbing, racist, and anti-Semitic.""
11              DEAN MCALISTER:  Uh-huh.
12              MR. DAMSKY:  Just to be clear, so long as my
13    speech is protected by the First Amendment, it is
14    entirely irrelevant for the purpose of determining
15    what the school can and cannot regulate. For whether
16    it's harassment or disruptive, whether anyone finds
17    what I say to be both deeply disturbing, racist, and
18    anti-Semitic, or whether it is both extreme. Is that
19    right?
20              DEAN MCALISTER:  Of course. The First
21    Amendment protects extremist views, hate speech, et
22    cetera, but it doesn't protect threats or substantial
23    disruptions of an academic community.
24              MR. DAMSKY:  And just because speech or
25    expression might be considered extreme or deeply
```

Page 27

1    disturbing, racist, and anti-Semitic, that doesn't

2    affect the analysis as to whether the speech is

3    protected under the First Amendment, right?

4              DEAN MCALISTER:  Correct. And I have

5    protected the right of you and others to make

6    statements that are extreme.

7              MR. DAMSKY:  Okay. So for your timeline of

8    events, and by the way, when did you write that

9    timeline?

10             DEAN MCALISTER:  I believe that is from my

11   initial referral to the Student Conduct Office.

12             MR. DAMSKY:  (Crosstalk).

13             DEAN MCALISTER:  Oh, the timeline? The

14   timeline of events, that is -- that was written more

15   recently in preparation for this hearing, but you

16   quoted originally from a communication that happened

17   right around the time of these events.

18             MR. DAMSKY:  And when you say more recently,

19   do you have a rough idea?

20             DEAN MCALISTER:  Sometime in the last month.

21             MR. DAMSKY:  (Crosstalk).

22             DEAN MCALISTER:  Once we had the hearing date

23   and I needed to submit a statement, yes.

24             MR. DAMSKY:  That's before --

25             DEAN MCALISTER:  But I made it in reference

Page 28

1    to -- sorry.

2         MR. DAMSKY:  That'd be before or after, like,

3    June 21st?

4         DEAN MCALISTER:  Parts of it were probably

5    written before, so I took some material from, you

6    know, emails and other communications and things. So

7    it's a mixture, but some of it was after, for sure.

8         MR. DAMSKY:  Okay. So now in that timeline

9    that you were just talking about, and you stated about

10   conduct on group me in September of 2023, that, and I

11   quote, "Mr. Damsky's speech was protected, it would

12   mean a substantially (inaudible) more

13   frightening." How did you arrive at that conclusion?

14        DEAN MCALISTER:  So I -- a couple of

15   different reasons. If we're evaluating substantial

16   disruption, the speech happened sort of in a private-

17   ish for so it was on a GroupMe chat. The laws suggest

18   that, you know, not sort of public posting is

19   different. It was also the case that I -- you know, I

20   thought that the nature of the dialog was sufficiently

21   sort of academic in nature. About sort of academic

22   ideas, et cetera, not any kind of threat to any

23   individual or group, not suggesting, you know,

24   violence against an individual or group, at least if

25   that was the case, it was very abstract.

1        And, you know, I generally am a very strong
2    believer in academic freedom and free speech, and so,
3    you know, we give -- we would give any student a wide
4    berth. And I thought that, you know, there is a line
5    where some students are just going to be upset about
6    the ideas and -- you know, and my sense was at the
7    time that that was what was happening. Students were
8    upset about the ideas and that that was an opportunity
9    for discussion and dialog instead of, you know, taking
10   administrative action.
11        MR. DAMSKY:  And on my conduct in Professor
12   Macklin's constitutional law class in spring of 2024,
13   you said, "The speech was a protected speech made in
14   the context of a classroom discussion and not outside
15   the bounds of academic freedoms." Is that right?
16        DEAN MCALISTER:  Yes.
17        MR. DAMSKY:  And then the paper written for
18   Professor Marshfield's constitutional change class in
19   fall of 2024, that, "In consultation with the course's
20   professor, a First Amendment scholar on the faculty
21   and general counsel's office, we concluded that the
22   paper statement did not constitute true threats and
23   were protected under the First Amendment."
24        DEAN MCALISTER:  Uh-huh.
25        MR. DAMSKY:  Why wasn't it a true threat?

Page 30

1           DEAN MCALISTER:   So at least these are all
2    context specific determinations, but in the context of
3    a paper that was written, you know, I -- it was a
4    footnoted paper that was intended for a limited
5    audience for just, you know, the professor and your
6    own academic writing. We concluded that the paragraph
7    in particular at the end of the paper that was, I
8    think, reasonably interpreted as a call to violence
9    was abstract and academic in nature. It was also a
10   draft. And at the time we -- the professor felt
11   confident that through the process of editing and
12   revision, that that could be addressed through sort of
13   an academic process.
14           But I will say that I thought that the nature
15   of the dialog and the nature of what was happening in
16   your conduct, began escalating at that point in time.
17   So I was concerned about the statements, but I did not
18   think they were threatening or, you know,
19   significantly disruptive at that time, based at least
20   on the fact that it was a academic writing, a
21   footnoted paper, an early draft in a class.
22           MR. DAMSKY:   And your email to the school on
23   February 10th was essentially an admission paper I
24   wrote for Jennifer Dalamenty was, to use your words
25   with regard to my conduct in common law, protected

Page 31

1   speech and not outside the boundaries. Is that right?

2           DEAN MCALISTER:  Again, similar to the

3   conclusion about the other paper was that, you know,

4   we are a law school and I'm going to protect speech

5   and academic freedom to the greatest extent I can

6   until the line is crossed. So yes, we concluded that

7   that paper was also -- you know, was not neither

8   threatening nor caused a substantial disruption.

9           MR. DAMSKY:  But just to be clear, it's

10  generally accepted that my right to freedom of speech

11  is greater off campus than on campus. Is that correct?

12          DEAN MCALISTER:  So I don't think we're -

13  - you know, I don't know how much we want to get into

14  this (crosstalk).

15          MR. RUSHING:  Yeah. We don't want to get into

16  any legal issues (crosstalk).

17          MR. DAMSKY:  Why did the school find it

18  necessary to scrutinize the papers to this degree? Was

19  the awarding of a top grade by a federal judge -- a

20  sitting federal judge, not a plain enough

21  establishment of its academic legitimacy in law school

22  context?

23          DEAN MCALISTER:  You know, we're not here

24  about the paper, so -- but, you know, I --

25          MR. DAMSKY:  Sorry. Just to interrupt you. We

1    may not be here with regards to the paper, but it is

2    in the packet for a reason.

3              DEAN MCALISTER:  Okay.

4              MR. DAMSKY:  So I mean, I assume I may be

5    judged on that, so I just wanted to make sure --

6              DEAN MCALISTER:  Right.

7              MR. DAMSKY:  -- that it's absolutely --

8              DEAN MCALISTER:  Sure.

9              MR. DAMSKY:  -- acceptable. And Mr. ███████,

10   I believe will be giving testimony about the papers,

11   so we kind of aren't here about the papers.

12             DEAN MCALISTER:  So my view was while -- so

13   yes. I generally -- so I've made my position on this

14   pretty clear in a variety of contexts, but one,

15   academic grading decisions are protected by academic

16   freedom. We don't have any mechanism for revisiting

17   grading decisions at the law school and book awards

18   are part of that process. So I -- or there are

19   limited, I should say, mechanisms for revisiting

20   grading decisions based on either bias or some kind of

21   numerical error in the grading. And so I take the

22   position that my job is to defend the academic freedom

23   of our faculty members to issue grading decisions. And

24   once that decision is made, I stand behind it.

25             We reviewed the paper because of concerns

Page 33

1    that -- making sure that there wasn't anything in the
2    paper that either would constitute harassment or
3    threats. You know, there was some disruption that
4    happened after the paper, but I draw a distinction as
5    I've tried to explain here between, you know, students
6    being upset and students having what I -- students and
7    faculty, I should say, because in particular what
8    happened in March was really something that affected
9    faculty in particular, that there's a distinction
10   between people being upset or angry and being unable
11   to learn in their learning environment. And, you know,
12   there was nothing in a paper that frankly had not even
13   been circulated, this paper had not been circulated,
14   that would cause that.
15          And I saw nothing threatening about any
16   specific group in the paper, although arguably against
17   immigrants, but I -- you know, that was in my view,
18   some of the statements in there were consistent with
19   our current immigration policy.
20          MR. DAMSKY:  Right. So in other words, and
21   frankly, you did kind of just admit it before I
22   somewhat perhaps rudely interrupted you, you would not
23   recommend that the Board consider any other conduct
24   aside from the tweet. Is that correct?
25          DEAN MCALISTER:  So the tweets are the source

 1    of what -- why we're here. I do think it is relevant

 2    to understand the history here for a couple of

 3    reasons. One, I think frankly, we've gone out of our

 4    way to protect your right to speak, express extreme

 5    views and do that despite, you know, significant upset

 6    within the law school community. And we've tolerated

 7    and navigated that. And that's relevant because what

 8    happened then in March just elevated and escalated the

 9    conduct to an unacceptable degree.

10           But second, it's also relevant because that

11    history shows some understanding and awareness on your

12    part of how your speech and, you know, how it had been

13    received and the real fear that members of our

14    community had. And instead of sort of backing down or

15    holding the line, there was an escalation and an

16    aggression that happened that really exacerbated that

17    fear that caused us to react and have to take tangible

18    measures to protect the community. So I think it is

19    relevant in terms of a course of conduct and a

20    history, as well as how the community understood and

21    received your threats, which was just different than

22    had you -- you know, had you been unknown to the

23    community and just sent out sort of, you know, your

24    random thoughts on the internet.

25           MR. DAMSKY:  Now, I first became, as you say,

Page 35

1   known with regards to at least the paper. Now, do you

2   have any knowledge -- did I distribute that paper or

3   was that distributed without my consent, broadly

4   speaking?

5         DEAN MCALISTER:  I do not actually know how

6   the paper first became distributed, but I do believe

7   that at least someone in the class distributed it. You

8   have since distributed your work fairly widely to the

9   entire internet. So my understanding was some of the -

10  - the paper in Judge Badalamenti's class was not

11  generally distributed, but that it was distributed

12  later by you, is my understanding, not by him.

13        MR. DAMSKY:  (Inaudible). I didn't become

14  known a month ago, just to be clear. I mean, that's

15  when I posted it.

16        DEAN MCALISTER:  No, but even before then,

17  that the paper had been distributed by you. I mean,

18  you told me that you had sent the paper, for example,

19  to the newspaper, to The Alligator.

20        MR. DAMSKY:  Now, I want to ask you about

21  when you first learned about this tweet, which was on

22  the morning of March 28th, correct --

23        DEAN MCALISTER:  Uh-huh.

24        MR. DAMSKY:  -- at the Weekly Copywriting

25  Meeting?

Page 36

```
 1              DEAN MCALISTER:  Yes.
 2              MR. DAMSKY:  And the tweet had been sent on
 3    March 21st. Is that right?
 4              DEAN MCALISTER:  I believe so. I don't
 5    remember.
 6              MR. DAMSKY:  And ███████████, he was the
 7    first person to bring that tweet to your attention,
 8    correct?
 9              DEAN MCALISTER:  Yes.
10              MR. DAMSKY:  Okay. Now, in your undated
11    timeline of events you wrote in the section subtitled
12    February 2025, that we had been aware of, and then
13    monitored a previous X account of mine, right?
14              DEAN MCALISTER:  Uh-huh.
15              MR. DAMSKY:  Who made you aware of that
16    account?
17              DEAN MCALISTER:  That was at some time during
18    the '23, '24 academic year, I don't remember exactly
19    when, it may have been Dean Shaw, it may have been a
20    student, but we had referred that to the Student
21    Conduct Office, just so they were aware of that as
22    well.
23              MR. DAMSKY:  Is the ultimate originator who
24    made you aware of that also Mr. ███████
25              DEAN MCALISTER:  I -- at least not for me. I
```

Page 37

1    don't know if he was, but no. The first time I'd ever

2    spoken to Mr. ██████ was that morning on March

3    28th.

4              MR. DAMSKY:  I've been told that Mr.

5    ██████ had screenshotted a substantial portion of

6    my tweets on both Twitter accounts. Do you know if

7    that's true?

8              DEAN MCALISTER:  I -- he did --

9              MR. MR. RUSHING:  I do want to stop

10   here because I think we are focusing on your behavior

11   in this hearing, Preston, and not the behavior of

12   other students.

13             MR. DAMSKY:  With all due respect, Ryan, it's

14   relevant because I am attempting to convince you that

15   Mr. ██████ is actually lying about any sort of

16   attitude of fear that he has.

17             MR. RUSHING:  I believe those questions may

18   be best directed to Mr. ██████ and not the Dean.

19             MR. DAMSKY:  Well, okay. I would like to

20   know, Dean McAlister --

21             MS. PEEPLES:  Preston?

22             MR. DAMSKY:  -- if he's sending you --

23             MS. PEEPLES:  Preston?

24             MR. DAMSKY:  -- the tweet at issue, did Mr.

25   ██████ also send you other tweets?

```
 1            MS. PEEPLES:  Okay, I was going to say,
 2   Preston, you can focus questions regarding ████
 3   ██████████  on what Dean McAlister knows. What you're
 4   doing --
 5            MR. DAMSKY:  Well, I'm asking --
 6            MS. PEEPLES:  Yes.
 7            MR. DAMSKY:  -- for if Mr. ████████  sent her
 8   additional tweets.
 9            MS. PEEPLES:  I agree, I agree. I was just -
10   - I was trying to let you know, you can absolutely ask
11   Dean McAlister questions --
12            MR. DAMSKY:  Okay. Thank you.
13            MS. PEEPLES:  -- as far as what she knows
14   about ████████████ .
15            MR. DAMSKY:  Yeah.
16            DEAN MCALISTER:  Yes, he --
17            MR. DAMSKY:  Yeah. Absolutely.
18            DEAN MCALISTER:  -- he sent me other tweets
19   as well, yes. (Crosstalk).
20            MR. DAMSKY:  About how many?
21            DEAN MCALISTER:  I mean, I would think it was
22   a lot. It was all of your tweets. But the only ones
23   that I thought, although many were, you know, anti-
24   Semitic and racist, I thought that the -- you know,
25   the tweet at issue that he had originally showed me
```

Page 39

```
 1   was the one that, in my view, was a real threat.
 2           MR. DAMSKY:  So he sent you all of my tweets
 3   from both accounts?
 4           DEAN MCALISTER:  I don't know, because I
 5   don't know if it was the entire university.
 6           MR. DAMSKY:  Or some of the tweets from the
 7   other account.
 8           DEAN MCALISTER:  (Crosstalk) he sent a large
 9   volume of information.
10           MR. DAMSKY:  So Mr. ███████ based on the
11   image that he sent you, it doesn't look like he ever
12   follows my Twitter account. Is that correct? He
13   doesn't follow it, and you know how Twitter works,
14   because you have one.
15           DEAN MCALISTER:  Sure.
16           MR. DAMSKY:  He's not a follower of my
17   account.
18           DEAN MCALISTER:  Well, I -- I mean, I've
19   looked at your Twitter account, and I'm not a
20   follower. So you don't have to be a follower, right,
21   to look at anyone's Twitter account. So that was --
22           MR. DAMSKY:  So for every screenshot ██████
23   ██████ took of my Twitter, he had to go to my
24   profile, manually, take a screenshot, and save it.
25           DEAN MCALISTER:  You'd have to ask him how he
```

Page 40

1  did it, but --

2          MR. DAMSKY:  Well, I -- so you're telling me

3  here that you have no idea how he did that?

4          DEAN MCALISTER:  I'm saying I didn't do it. I

5  assume if I were to take screenshots of someone's

6  Twitter feed, that's how I would do it, but I --

7          MR. DAMSKY:  And he sent you hundreds of

8  these, correct?

9          DEAN MCALISTER:  I -- you probably have it in

10  the record, I'm guessing --

11          MR. DAMSKY:  No, I do not, Dean McAlister --

12          DEAN MCALISTER:  Okay.

13          MR. DAMSKY:  -- so that's why I'm asking

14  you.

15          DEAN MCALISTER:  So --

16          MR. DAMSKY:  Because it's not in the record.

17          DEAN MCALISTER:  So what I can tell you is

18  the only -- the precipitating event here, and the

19  thing that caused me concern was the -- was a serious

20  concern, and that affected the community most

21  significantly, was that -- was the tweet about

22  abolishing Jews. Other stuff was --

23          MR. DAMSKY:  With regard to that tweet,

24  sorry, you mentioned that Noel Ignatiev talked about

25  abolishing whiteness, but I believe in the exact quote

Page 41

1    that I used on Twitter, he said -- talking about
2    abolishing the white race by any means necessary.
3              MS. PEEPLES:  Preston, I'm just going to ask
4    --
5              MR. DAMSKY:  (Crosstalk).
6              MS. PEEPLES:  Preston, I'm just going to ask,
7    and for everybody, really, because I know we all have
8    a lot of questions. Let's let each person complete
9    whatever it is that they're saying --
10             MR. DAMSKY:  My mistake.
11             MS. PEEPLES:  -- before we ask another
12   question.
13             DEAN MCALISTER:  Okay. Sorry. I did -- I --
14   you know, I'm not an expert on the Noel Ignatiev
15   stuff, and I don't know -- you know, I don't think
16   that's very relevant in the sense that, you know,
17   students don't need to go look up, you know, what some
18   obscure philosopher or sort of thinker thought in
19   order to understand what you said, which, you know,
20   very clearly stated, "Jews must be abolished by any
21   means necessary." And I think a reasonable student,
22   especially a Jewish student, a Jewish faculty member,
23   Jewish staff member reads that, and there's not a lot
24   of ambiguity there about what that statement means.
25             And that's certainly how I took it, that's

Page 42

1   how other members of our senior leadership team,

2   students, staff, faculty took it. And it was

3   materially different, in our view, from other

4   statements made in the context of academic papers or,

5   you know, the statements in the group chat, all of

6   that. And I felt confident about that because we had

7   preserved the ability to engage in speech and conduct

8   up until that line. And it was obvious to us that the

9   line had been crossed.

10          MR. DAMSKY:  Okay. Ms. Peeples, I'm just

11  curious, did you add the exhibits I sent you on

12  Friday, the couple pictures of Google?

13          MS. PEEPLES:  The only things that were added

14  were things that were deemed relevant.

15          MR. DAMSKY:  Can I take a look at that case

16  packet by chance? I don't know how to access.

17          MS. PEEPLES:  Sorry, yes, yes, yes. Let me

18  give you that.

19          MR. DAMSKY:  I'll ask just a follow-up

20  question while you're doing it. Dean McAlister, did

21  you ever Google the name Noel Ignatiev? Because you

22  referred to him as an expert scholar, but I believe if

23  you Google him, one of the top three results, or two

24  of the top three results are an article in the New

25  Yorker mag on his obituary and an article in the New

Page 43

1    York Times.

2              DEAN MCALISTER:  Yes, I did Google him.

3              MR. DAMSKY:  And did you then read what he

4    meant by abolishing white race by any means necessary?

5    And as a follow-up to that quickly, did he mean

6    exterminationism or did he explicitly disclaim that?

7              DEAN MCALISTER:  So I'm not an academic

8    expert on what he meant. And I also don't think that

9    students should need to Google, you know, people's

10   names in order to understand what otherwise seemed

11   very plain. And when you had an opportunity to clarify

12   it, you know, you could have said, "No, of course I

13   don't mean murdering people or killing people," but

14   you didn't. And I understand that you -- you know,

15   you've intellectualized this, but that's not the way

16   people feel when they read your words.

17             MR. DAMSKY:  Since we're not here for the -

18   - anything else -- since we're not here for anything

19   else according to the tweet, I guess you guys don't

20   really need to consider anything else that I was going

21   to ask Dean McAlister about aside from on the tweet.

22   So give me one minute, I apologize.

23             MR. RUSHING:  Take your time, it's all right.

24             MS. PEEPLES:  Preston --

25             MR. DAMSKY:  All right.  (Crosstalk) --

Page 44

1              MS. PEEPLES:  -- I'm going to share with you,

2      just one second, I'm sorry. I had to restart my

3      computer or my Dropbox.

4              MR. DAMSKY:  (Crosstalk).

5              MS. PEEPLES:  Let me give you -- so this is

6      the Dropbox link to the case packet that you reviewed

7      on Friday. And that is what the Board has. So if you

8      want to just take a couple of minutes and look for

9      what you're looking for.

10             MR. DAMSKY:  And does -- Dean McAlister, does

11     she have access to this as well?

12             MS. PEEPLES:  No, which is why I'm happy to

13     share it on my screen.

14             MR. DAMSKY:  Okay.

15             MS. PEEPLES:  You just let me know what page

16     you would like for me to --

17             MR. DAMSKY:  Thank you.

18             MS. PEEPLES:  -- bring up.

19             MR. DAMSKY:  Yeah. You know, it takes a

20     little while to load here.

21             MS. PEEPLES:  Yes. So what I did, Preston, if

22     this is helpful to you, I don't know if you remember

23     seeing on Friday, the table of exhibits, your table of

24     exhibits has the red page number in the case packet.

25             MR. DAMSKY:  That's, thank you, very sweet of

Page 45

1    you, thank you. All right. It's still loading for me.

2            MS. PEEPLES:  Okay.

3            MR. DAMSKY:  Hold on. Dean McAlister, since

4    we're waiting so long and I don't want to just have

5    you sit there in silence, when did you first learn

6    that I had requested to continue my academics after I

7    had been transferred from campus on April 2nd at about

8    5.40 p.m.?

9            DEAN MCALISTER:  What do you mean by continue

10   your academics? You mean finish the semester?

11           MR. DAMSKY:  Arrange for alternative means --

12           DEAN MCALISTER:  Yeah.

13           MR. DAMSKY:  -- to complete my coursework.

14           DEAN MCALISTER:  Yes, so I was aware that was

15   -- we had the ability to do that. We're not required

16   to do it, but because we were so close to the end of

17   the semester, you know, I had originally fielded some

18   questions from some faculty members about what to do

19   for you, and I indicated that they were -- they had

20   the ability, if they wish, to make arrangements to

21   help you complete the semester. I believe there were

22   some specific then asks, maybe within a week or so, I

23   don't remember the exact date, about whether to allow

24   -- in particular, what I remember coming to me was

25   questions about how to allow you to complete final

1    exams that were otherwise supposed to be on campus in
2    person.
3            And I did tell faculty members either
4    directly, but I think it may have been through either
5    Dean Shaw or Dean Mitchell, that I would encourage
6    them to be cooperative and let you find or make
7    alternative arrangements to finish the semester.
8            MR. DAMSKY:  Okay.
9            DEAN MCALISTER:  We were -- I mean, it was -
10   - April classes were about to end, you know, you
11   should have -- I wanted to try to help you finish the
12   semester.
13           MR. DAMSKY:  Thank you. Can we go to page
14   191, Ms. Peeples?
15           MS. PEEPLES:  Yes.
16           MR. DAMSKY:  I believe it's actually -- and
17   it's kind of weird here, it's like 194 in Dropbox, but
18   it's marked as 191 on the page itself.
19           MS. PEEPLES:  Okay.
20           MR. DAMSKY:  Dean McAlister, I just want to
21   show you some stuff --
22           DEAN MCALISTER:  Okay.
23           MR. DAMSKY:  -- I'm guessing you haven't seen
24   before.
25           MS. PEEPLES:  Preston, is this the page?

Page 47

```
 1              MR. DAMSKY:  That is the one.
 2              MS. PEEPLES:  Okay.
 3              MR. DAMSKY:  All right. So Dean McAlister,
 4    it's your position that basically, you know, a lot of
 5    people on campus, they're afraid of me, right? I mean,
 6    just briefly, like yes or no, right? That's kind of
 7    what you've been arguing here, right?
 8              DEAN MCALISTER:  I mean, that is part of what
 9    we've been explaining, yes.
10              MR. DAMSKY:  Okay.
11              DEAN MCALISTER:  And I think over time,
12    absolutely, yes.
13              MR. DAMSKY:  All right. So here is the night
14    of the GroupMe chat. I'm not sure, I think it's
15    actually September 21st. I think I'm looking at
16    it incorrectly. I apologize. But this is a reaction in
17    the National Warriors Guild (ph) chat on GroupMe. Now,
18    I'm not a part of this group chat, but I have this.
19              DEAN MCALISTER:  Uh-huh.
20              MR. DAMSKY:  So this is basically the
21    National Warriors Guild, which by the way, Dean
22    McAlister's fairly active group in terms of the people
23    that express concerns about me too, right?
24              DEAN MCALISTER:  I have to admit, I don't
25    know all of these names.
```

1          MR. DAMSKY:  The president of the National
2    Warriors Guild is Mary Claire Jackson. How many times
3    has she spoken to you about this?
4          DEAN MCALISTER:  She's spoken to me at least
5    once, probably twice about this.
6          MR. DAMSKY:  And ███████████'s in this
7    group too.
8          DEAN MCALISTER:  Okay.
9          MR. DAMSKY:  And as is Jenna Callison.
10         DEAN MCALISTER:  Okay.
11         MR. DAMSKY:  And Ms. Callison, that's the --
12   (inaudible), and she looks for the exits, right?
13         DEAN MCALISTER:  I do not -- I did not know
14   the student who said that, but sure. I mean, if -- I
15   have no reason to either agree or disagree with that
16   statement.
17         MR. DAMSKY:  You never asked her for her
18   name?
19         DEAN MCALISTER:  So I -- so the -- Janice
20   Shaw was the one who -- so generally, I don't follow-
21   up directly with the students, Dean Shaw does. But I
22   admittedly did not -- I did not know the student who
23   said that.
24         MR. DAMSKY:  All right. So anyway, so as I
25   said, this is the National Warriors Guild GroupMe and

Page 49

1   chat on September, I believe it's actually 23, 2023.

2           DEAN MCALISTER:  Uh-huh.

3           MR. DAMSKY:  The same day I sent a message

4   on GroupMe meeting, you can kind of see it, it's in

5   there.

6           DEAN MCALISTER:  Uh-huh.

7           MR. DAMSKY:  The message -- as Dean McAlister

8   has admitted, the message was First Amendment

9   protected speech. So this is how the student body

10  reacts to First Amendment protected speech. Can we go

11  to the third page? So I guess that would be 193.

12          Thank you. So you'll see in the top left,

13  Mary Byler (ph), at least solely in response to that

14  one message, is that -- "Is that like reportable or an

15  ethics violation? I feel like I wouldn't want somebody

16  with those thoughts being an attorney." Dean

17  McAlister, to the best of your knowledge with regard

18  to bar ethics work, that message was not reportable

19  and not an ethics violation. And the reason I ask is

20  because I believe that the fact that it's not is going

21  to explain how the student body behaves.

22          DEAN MCALISTER:  So I want to be really

23  clear, this is beyond whatever this little sort of a

24  handful of group of students did -- said, you know, a

25  year and a half ago. I'm not entirely sure how this is

1   relevant to, you know, what happens in March of '25.

2   But if the question is, were there students who were

3   upset and angered by your statements earlier?

4   Absolutely. But again, the law school did not

5   discipline you or take action at that time.

6           And, you know, I -- the question of whether

7   it would have been reportable, you know, I know that

8   at times law schools have reported different

9   incidents. It depends on what the questions are asked,

10  which bar asks them, et cetera. But, you know, at this

11  point in time, I -- you know, if you're just trying to

12  establish that folks were unhappy and angry about the

13  things you said, that's absolutely the case. But that

14  didn't cause us to take action until the statements

15  became threatening and caused a much more material

16  disruption to our ongoing operations.

17          MR. DAMSKY:  Can we go to the next page?

18  So sorry. I think we go to the next page after that.

19  My apologies. Okay. Cool. You'll see that Mr.

20  Kersgaard (ph) on the left there says, "So who's going

21  to make the -- make racist afraid again T-shirt?" Dean

22  McAlister, would somebody be -- would you ever report

23  anybody to student conduct for that T-shirt?

24          DEAN MCALISTER:  I mean, like, it depends on

25  the context, right? So all of these are context

Page 51

1    specific. This is a -- as best as I can tell, this is

2    a private group chat. I've never seen that..no one

3    ever reported that to us. So you know, it certainly

4    doesn't cause a material disruption if it's a, you

5    know, private statements made in a -- I don't even

6    know how many members of this group there are. It

7    doesn't look like, you know, a ton. So you know, all

8    these things are context specific.

9              MR. DAMSKY:  Did you see the -- yeah. They

10   are. Did you see the message under Mr. Kersgaard? It's

11   Tyler Vissugosin. He's a graduate now. It

12   says, "We dog piled a guy for parking ordinances.

13   Racism should get this guy redacted." Now you'll note

14   that that has 10 likes. Ms. -- Dean McAlister, do you

15   know what it means to say somebody should be redacted?

16             DEAN MCALISTER:  I do not. I guess that's -

17   - I would -- I -- maybe it means canceled, I don't

18   know. You, by the way, should have -- if you became

19   aware of these and they were threatening to you, you

20   should have reported them. I mean, these are --

21             MR. DAMSKY:  I became aware of this when

22   certain students told me after I had been trusted that

23   this is what had been going on for the past two years.

24             DEAN MCALISTER:  Okay. Well, I was never

25   aware of this. And I certainly think this is if -- you

Page 52

1    know, I would want the full context, but we're not

2    here about, you know, other views written, you know, a

3    year and a half ago. It's the statements that I was

4    made aware of in March and that's what's relevant --

5                MR. DAMSKY:  Okay.

6                DEAN MCALISTER:  -- these aren't.

7                MR. DAMSKY:  So you are willing to really

8    strongly say to the Board right now that they should

9    only consider in judging me for the charged conduct

10   then the tweet. Is that what you're saying?

11               DEAN MCALISTER:  No, I'm saying there's a --

12               MR. DAMSKY:  (Crosstalk).

13               DEAN MCALISTER:  -- course of conduct while

14   you should certainly not be punished for the -- any

15   individual action, you know, whether it's the paper or

16   other things, at least at the time we determined those

17   individual things did not rise to the level of being

18   threatening or substantially disruptive.

19               MR. DAMSKY:  So it's (crosstalk) --

20               DEAN MCALISTER:  But it's a course of conduct

21   -- excuse me. I wasn't done. But it's a course of

22   conduct that over time both establishes that you were

23   aware of how you were being perceived in the

24   community, knew that people felt threatened by you.

25   And instead of backing down, you escalated by issuing

1   a statement that called, the Jews should be abolished

2   by any means necessary, in a community that's heavily

3   Jewish that is very engaged Jewish faculty, students

4   and staff. And that that is different. And the prior

5   conduct is relevant as both how the community

6   understood the situation as well as your own knowledge

7   of how you had been perceived. And the likelihood that

8   speech like what was said on X would cause real fear

9   within the community.

10          MR. DAMSKY:  (Crosstalk) --

11          DEAN MCALISTER:  So I think that is relevant

12   as a course of conduct to understand the full context

13   of what happens when the X posts are made in March.

14          MR. DAMSKY:  But so the course of conduct in

15   your words is just me exercising my rights validly and

16   then people being upset about that?

17          DEAN MCALISTER:  It is continually pushing

18   the envelope, yes.

19          MR. DAMSKY:  Is there an envelope? It's

20   either it's a binary thing. It's either protected or

21   it's not. There's no gray zone.

22          DEAN MCALISTER:  I understand. Except that I

23   think that there's a sensitivity to, one, how -- what

24   -- you know, students don't shed their rights at the

25   schoolhouse door, that's true, or the university door.

Page 54

1   But these things are context specific, they depend on
2   all of the information that's experienced over time.
3   This is not an isolated snapshot of someone, you know,
4   you were -- if you were not a student in the
5   community, not a member of a community, what you say
6   on X, you know, that's your own business, but this is
7   different.
8           We're in an academic community surrounded by
9   academic peers who are engaged in learning and
10  studying and having debates and all of that. And
11  there's a wide berth and we've protected that wide
12  berth, but doesn't mean you get to threaten or harass.
13  And that is where both the threats and the harassment
14  became such a disruption to the ability of students to
15  learn. And that's the line we're drawing. So yes, the
16  prior incidents are relevant to understanding the full
17  context. And to help understand like, sure, you can
18  say extreme things in a GroupMe chat or in a paper,
19  all of that has been protected, but you can't go on a
20  public forum and call for the -- you know, for the
21  abolition of a group of people who are part of our
22  community. And then when asked if that's what you
23  mean, instead of saying, of course you don't mean
24  that, you equivocate, and that's the line we're
25  drawing.

```
                                              Page 55
 1            MR. DAMSKY:  There we go. Sorry. I'm figuring
 2   out Zoom, I apologize. Okay. Can we go to page 243 of
 3   this (inaudible)?
 4            MS. PEEPLES:  Yes.
 5            MR. DAMSKY:  Right now. Dean McAlister,
 6   genuinely, I don't know if you've ever seen this
 7   either.
 8            DEAN MCALISTER:  Uh-huh. I have.
 9            MR. DAMSKY:  So this is the whole -- okay. So
10   you've seen all of it?
11            DEAN MCALISTER:  Uh-huh.
12            MR. DAMSKY:  Okay. Including Professor
13   Lidsky's case. Oh, well, yeah. That's right.
14            DEAN MCALISTER:  The whataboutism thing, yes.
15            MR. DAMSKY:  Yes, yes. And just out of
16   curiosity, when did you first see this?
17            DEAN MCALISTER:  I believe I saw it the night
18   it was posted, on April 1.
19            MR. DAMSKY:  Well, if you'll scroll down to
20   the next page, Ms, Peeples. Actually, the whataboutism
21   post comes on April 2nd, at 1.05 --
22            DEAN MCALISTER:  Okay.
23            MR. DAMSKY:  -- in the afternoon.
24            DEAN MCALISTER:  All right. Then I would have
25   seen it the next morning or something like that. I
```

Page 56

1   probably wasn't looking at it at 1.05.

2           MR. DAMSKY:  Now, does Lyrissa Lidsky sound

3   like I just, like she thinks that I just told her that

4   I would murder her family? Or does she sound like

5   somebody who's engaging in what's called argument-mad

6   logic, the fallacies -- the fallacies, not fallacies?

7           DEAN MCALISTER:  I think you should talk with

8   Professor Lidsky about her own subjective experience

9   of this.

10          MR. DAMSKY:  I have a lot to ask Professor

11  Lidsky. Okay. So -- and then, sorry, Ms.

12  Peeples. Let's go to -- one second, sorry. One second.

13  Can we go to, well, 247. Now, this is -- just a pretty

14  basic screenshot. This is the -- what's -- Noel

15  Ignatiev's journal, Race Traitor. Now, that's where

16  those words from the tweet about abolishing the white

17  race by all means necessary, that's where those come

18  from. Are you aware that you can get that online

19  through the UF Library System, Dean McAlister?

20          DEAN MCALISTER:  I did not check it out.

21  So you know, again, my -- the law does not require us

22  to, like, go investigate what Noel Ignatiev meant. I -

23  - a reasonable person can take your tweets and

24  understand them on their face.

25          MR. DAMSKY:  But on their face, I explicitly

Page 57

1    tied the meaning of abolish to what he meant.
2    (Crosstalk).
3                DEAN MCALISTER:  I don't think anyone needs
4    to look up academic work to understand. You said --
5    you made a very clear one sentence, Jews must be
6    abolished by any means necessary. I think a reasonable
7    reader of that statement can take that statement on
8    its face.
9                MR. DAMSKY:  So you would think that in
10   evaluating somebody, what I said, you could just
11   ignore the first part? That that just can go out the
12   window?
13               DEAN MCALISTER:  I don't know that you can
14   ignore it, but I don't think that -- I don't think it
15   is reasonable to expect that everyone goes and does a
16   deep dive on, you know, various academic strands of
17   thought to understand a statement that seems very sort
18   of simple on its face, that Jews must be abolished by
19   any means necessary.
20               MR. DAMSKY:  Even law students don't have to
21   do that? Even graduates (crosstalk)?
22               DEAN MCALISTER:  I think the public,
23   generally, this is a post on X. I think people can
24   understand what that means without doing a deep dive.
25   But regardless, you then clarified in the subsequent

Page 58

1    exchange with Professor Lidsky that you were referring

2    to genocide. Now, maybe you're suggesting that

3    Ignatiev was referring to genocide too, but the word

4    genocide then starts coming up. So I think in full

5    context, I think it's very reasonable that someone

6    understands that as a threat to exterminate, to

7    abolish, to commit genocide of the Jewish community.

8            MS. PEEPLES:  Do you want me to continue

9    (crosstalk) --

10           MR. DAMSKY:  And was that always your

11   position when you explained that to faculty? Did you

12   take that position too?

13           DEAN MCALISTER:  So there was never a -- I

14   never had a conversation with the faculty about this

15   particular -- you know, things we moved very quickly

16   once the tweet was out. So any conversation that

17   happened with the faculty was after there was already

18   student conduct proceedings. And I -- at that point in

19   time, because that's FERPA protected information, we

20   had very little to say about the specific incident.

21           MS. PEEPLES:  Preston, do you want me to

22   continue sharing the screen?

23           MR. DAMSKY:  I'm sorry. What happened?

24           MS. PEEPLES:  Do you want me to continue

25   sharing the screen?

Page 59

1              MR. DAMSKY:  Yes, please.

2              MS. PEEPLES:  Okay.

3              MR. DAMSKY:  Yes. All right. Can we go to -

4    - sorry. One second. Can we get to page 263, please?

5    And then actually, can we go to 264?

6              MS. PEEPLES:  Uh-huh.

7              MR. DAMSKY:  So this is the reaction to the

8    dudes in my trespassing in the class of 2025 chat.

9    Now, you'll see what Donovan Mallard (ph) said there.

10   Now, I don't know if you can recognize

11   that, Dean McAlister, it was -- I was just a little

12   kid when this happened, but that's Paul Bremer going

13   up to the stand when the United States captured Saddam

14   Hussein, and he said, "Ladies and gentlemen, we got

15   him." And that's his reaction to my trespassing

16   notice. And you'll see on the right side there, Lauren

17   Cates (ph) says in response to that, "Lidsky is a real

18   one." Now, if Lyrissa Lidsky was apparently some

19   victim of a terrible threat, why do they seem so

20   celebratory and congratulatory with how they view her?

21             DEAN MCALISTER:  I've not seen these things

22   before, these statements, but regardless, like, again,

23   Professor Lidsky is a witness here, and you should

24   feel free to ask her questions about her experience.

25             MS. PEEPLES:  Yeah. Preston, I want you to be

Page 60

1    able to ask Dean McAlister all the relevant questions
2    that you have to ask her --
3            MR. DAMSKY:  Okay. All right.
4            MS. PEEPLES:  -- but if you can focus on
5    information that she knows.
6            MR. DAMSKY:  Yeah. Sorry.
7            MS. PEEPLES:  That's okay.
8            MR. DAMSKY:  So can we go to -- I'm
9    sorry. Because I do have -- I'll get off that. Can we
10   go to 270 -- or I'm sorry, 271. Okay. So here are four
11   emails I sent to my four professors about 30 minutes
12   after I received an email from Ms. Pamela Malik (ph),
13   basically, telling me that I could reach out to my
14   professors and arrange alternate means of completing
15   my semester. So this was the day after I received -
16   - about a day and a half because I had been mailed my
17   trespass notice on the 1st of April or -- I'm sorry,
18   the 2nd of April at about 5.40 p.m., but then I had
19   been --  then I was contacted by the police in the
20   morning of April 3rd.
21            So these emails that I sent are all pretty
22   standard. I just gave the class name and said, "Hey,
23   I've been placed on interim suspension, and they all
24   happened at about 1.20 p.m." By the way, this was
25   after -- this was about 30 minutes after Ms. Malik got

1    in contact with me and said that I could do this.

2              DEAN MCALISTER:  Uh-huh.

3              MR. DAMSKY:  I said, "Hey," here, I'm talking

4    to Professor Leah Johnston, who --

5              DEAN MCALISTER:  Uh-huh.

6              MR. DAMSKY:  -- I took two classes up and

7    said, "Hey, Professor Johnston, hello, I've been

8    placed on interim suspension. I cannot attend in

9    person classes. I was hoping to still access lectures

10   in criminal procedure adversary system in the mental

11   health lobby. According to Zoom, interning requires

12   assignments through Canvas or by email." I didn't get

13   Dean Shaw's message. Professor Johnston got back to me

14   about two hours later and said, "Absolutely. I will

15   send you links later today."

16             DEAN MCALISTER:  Uh-huh.

17             MR. DAMSKY:  And then in the next exhibit

18   down, the one that I marked 76, this is to Professor

19   Hardy (ph) now --

20             MS. PEEPLES:  Oh, you marked 76, okay.

21             MR. DAMSKY:  Yeah. To Professor Hardy. Now,

22   Professor Hardy and Professor Scott took a little bit

23   longer to get back to me, but you'll see on 272, she

24   did eventually get back to me on the 8th, which was

25   Tuesday. So just under a week later. And she

Page 62

1    said, "Preston, thank you so much for reaching out. I

2    hope all is well. I don't typically record my classes,

3    but I will allow you to log in via Zoom."

4                 DEAN MCALISTER:  Uh-huh.

5                 MR. DAMSKY:  And you'll see that, you know --

6                 DEAN MCALISTER:  Uh-huh.

7                 MR. DAMSKY:  -- she sent me additional

8    information.

9                 DEAN MCALISTER:  Uh-huh.

10                MR. DAMSKY:  Professor Scott, right around

11   the same time, interestingly, said on 273, "Thank you

12   for letting me know. I recorded yesterday's lecture

13   and will upload it to Canvas for you. Most other

14   assignments will be due via Canvas. Anyway, we can

15   discuss how to deal with the final exam in the coming

16   day. I hope all is going well for you. Please reach

17   out if you need anything." Now, Professor Collier was

18   a little bit harder to get in touch with, but you'll

19   see here, Dean McAlister, even after knowing that I

20   had reached out to these professors, she sent out this

21   email on -- sorry, 7.11 p.m. on the 4th of April. And

22   so this is on, yeah, 275. So you sent out this email

23   in time of responding to community concerns.

24                DEAN MCALISTER:  Uh-huh.

25                MR. DAMSKY:  You said, "Dear students," and

Page 63

1    I'm just going to read the first paragraph --

2                DEAN MCALISTER:  Uh-huh.

3                MR. DAMSKY:  -- because it's kind of the

4    important part, "I know that our normal semester

5    routine, winding down classes, gearing up for finals,

6    has been significantly disrupted by recent widely

7    circulated social media posts. Many of you are

8    rightfully feeling deeply offended, angry, and even

9    personally threatened." Now, Dean McAlister, level

10   with me here. Did you use the phrase significantly

11   disrupted, did that just come to your mind when you

12   were writing this, or did you use those words for a

13   reason?

14               DEAN MCALISTER:  I mean, you know, I drafted

15   the message, which I thought reflected at the time

16   what was going on.

17               MR. DAMSKY:  So the words -- the phrase

18   significantly disrupted has just -- that just -- that

19   was -- that's what you thought was the best. It has no

20   significance in, I don't know, a legal context.

21               DEAN MCALISTER:  I mean, you know, Preston, I

22   am a lawyer, I understand the legal rules. But it's

23   also --

24               MR. DAMSKY:  (Crosstalk).

25               DEAN MCALISTER:  --you know, at that point in

Page 64

1   time, the law school's position was clearly that you

2   had engaged in a significant disruption. There was a

3   conduct proceeding that had begun, so that was the

4   appropriate language to use.

5          MR. DAMSKY:  Now, you said that they were

6   feeling rightly threatened, but Dean McAlister, I

7   mean, shouldn't you have known by this point that I

8   wasn't a threat to anyone?

9          DEAN MCALISTER:  I have no way of knowing

10  that for sure, Preston. I think that's part of the

11  challenge here, is that all we can do is take what

12  someone's words are and the words are threatening, and

13  reasonable people read them and felt threatened by

14  them. And that's what we have to go on. I have -- you

15  know, as you know, you and I don't know each other

16  very well. We've not spoken very -- like, maybe twice

17  before this particular event. So I have no way of

18  making that assessment. I'm not a -- I am a lawyer by

19  training, but I'm not a psychological expert. I can't

20  make those assessments myself.

21         My job is to protect the community as best I

22  can and to respond to what I thought was both a

23  serious disruption at a really inopportune time as we

24  headed into finals and, you know, serious concerns

25  that I had received from many different faculty,

Page 65

1    students, and staff. And that's part of what was very

2    different about what happened in March, was that, you

3    know, before it was students who were clearly, as

4    you've shown, right, frustrated, angry, didn't like

5    what was said, but something was different about this

6    and that it was tangible, it was visceral within the

7    community, and that's what I was responding to in that

8    message.

9              MR. DAMSKY:  All right. Dean McAlister, I

10   don't want to hold up too much of your time, but I

11   think -- so just to be clear, you did say that when

12   ██████████████ approached you, he had tears in his

13   eyes and he was shaking?

14             DEAN MCALISTER:  Yes.

15             MR. DAMSKY:  Now, I want to show you -

16   - sorry, one second. I'm sorry. Okay. Can we go to

17   308? And Dean McAlister, just to be clear.

18             DEAN MCALISTER:  Uh-huh.

19             MR. DAMSKY:  It's your opinion that what made

20   ██████████████ have tears in his eyes and shaking was

21   the tweet itself, right?

22             DEAN MCALISTER:  That was my impression at

23   that time.

24             MR. DAMSKY: Okay. Well, here is

25   ██████████████ on June 21, 2025. You'll see, after

Page 66

1    the New York Times article came out, I pinned the

2    tweet because, frankly, I felt very disappointed that,

3    once again, nobody had put in the full context of the

4    tweet and what I said, so I pinned it. And

5    Mr. ▇▇▇▇▇, at 8:21, after he, once again, went to

6    my profile on his own accord without anybody forcing

7    him to, said, "This fucker pinned -- " and I apologize

8    for my language, but this is what the man wrote, "This

9    fucker pinned the original tweet." Now, Dean

10    McAlister, I know you said you're not an expert

11    psychologist. Does this seem like a man that's

12    scared or does this seem like a man that's mad?

13            DEAN MCALISTER:  I can't speak to his state

14    of mind. All I can speak to is, you know, my sense of

15    what we assess is whether a reasonable person reading

16    that would have felt threatened. It doesn't matter

17    whether you had the subjective intent to follow

18    through or not. That's not what matters. You know, I -

19    - you'll have an opportunity to speak to

20    Mr.▇▇▇▇▇, and I think that's for this Board to

21    make a determination about whether the fear was real

22    and reasonable, and that's the question before the

23    fact-finders.

24            MR. DAMSKY:  Okay. Well then, I'll just ask

25    you one more question, just so we can wrap it up. Now

Page 67

```
 1   -- I'm sorry. A couple more. After you finished

 2   speaking with Mr. ███████ -- by the way, about how

 3   often -- a few more minutes. About how long did you

 4   speak to him, (inaudible) with the dean when he first

 5   showed you the tweet?

 6             DEAN MCALISTER:  Not very long. It was a

 7   short conversation. He mostly showed me the tweet,

 8   and, you know, he asked me something on the lines of

 9   he sort of -- he understood that speech was generally

10   protected, but that he thought that threats were not,

11   and so he showed me the tweet and asked whether, you

12   know, I thought that was different, and I said that I

13   did, and I asked him to send it to me. Because I had

14   not -- at this point in time, while we had been aware

15   of a prior X account, we were not aware of this one,

16   and so I needed to be able to report it up the chain

17   and have access -- and at least know what the handle

18   was. So it was a short conversation, in less than five

19   minutes.

20             MR. DAMSKY: Now, Dean McAlister, I was there,

21   and I was paying attention to you guys talking, and it

22   didn't seem like it was five minutes. It seemed

23   substantially longer than that. But I'll take your

24   word for it, we're not going to argue. After you

25   finished speaking to him, did Mr. ███████ scared
```

Page 68

```
 1   as he must have been out of his mind by my mere
 2   presence, did he leave the room?
 3             DEAN MCALISTER:  He did not. I remember he
 4   was sitting down behind me in the table --
 5             MR. DAMSKY:  And Peter Molker (ph)?
 6             DEAN MCALISTER:  Right.
 7             MR. DAMSKY:  And Sabrina Lopez (ph), right?
 8             DEAN MCALISTER:  Sure. Yeah. So I mean, I was
 9   there -- you know, I'm there generally every Friday,
10   and, you know, there were several deans and others
11   there, and he did stay for a while. I don't remember
12   exactly how long.
13             MR. DAMSKY: And you showed Peter Molker your
14   phone. Did you show him my tweet?
15             DEAN MCALISTER:  I believe I might have,
16   yeah.
17             MR. DAMSKY:  You might have or you didn't?
18             DEAN MCALISTER:  I probably did, if -- I
19   don't remember exactly. I know that, so I have a
20   senior leadership team, and it was shared among those
21   folks. I remember while I was there at the Coffee and
22   Donuts for the Dean, contacting Dean Shaw to have her
23   begin to review and send to main campus. So I probably
24   also told Dean Molker then, at the same time, too.
25             MR. DAMSKY:  Were you aware that
```

1    Mr. ███████'s LinkedIn resume states that he was

2    self-employed as a choreographer from May 2001 to

3    January 2013, which is up about 21 months? And then he

4    not only, "Choreographed and performed regional tour

5    and variety shows," but also, "Taught workshops in New

6    York, New Jersey, Washington, D.C., and

7    Stockholm." Did you know that?

8            DEAN MCALISTER:  No, but I'm not sure what

9    relevance that has. But --

10           MR. RUSHING:  Do you think it's possible he

11   could have played up (crosstalk) --

12           DEAN MCALISTER:  Preston, could you tell us

13   what the purpose -- Preston, could you tell us what

14   the purpose of this line?

15           MR. DAMSKY:  Yeah. I'm asking in hindsight if

16   Dean McAlister is starting to think that maybe

17   ██████████████ lied to her. Or maybe she just doesn't

18   care.

19           MR. RUSHING:  Well, we need to make sure to

20   keep our questions focused on what she knows in

21   disruptive conduct and harassment. So please make sure

22   to tailor your questions specifically on those as much

23   as possible.

24           MR. DAMSKY:  Thank you. Did you ask

25   Mr. ████████ when you first saw the tweet?

Page 70

```
 1              DEAN MCALISTER:  I did not.
 2              MR. DAMSKY:  Okay. And did you know that
 3    Mr. ███████   and I have a Friday morning class with
 4    Professor Johnson?
 5              DEAN MCALISTER:  I did not. I did not look at
 6    the schedule.
 7              MR. DAMSKY:  Okay. All right. Dean McAlister,
 8    do you want me to send you the seven files that I
 9    have?
10              DEAN MCALISTER:  You know, at this point in
11    time, the decision is for the Board, I'm not sure -
12    - if you want to make a complaint about any particular
13    statements here, then you should do that. And there's
14    both a process at the student conduct website, but you
15    have that ability to initiate any -- to raise any
16    concerns you have about threats that you may have
17    received. And I encourage you to do that.
18              MR. DAMSKY:  Thank you.
19              MS. PEEPLES:  Okay. Are we done -- you're
20    done with your questions, Preston? I'm going to stop
21    sharing.
22              MR. DAMSKY:  For Dean McAlister, yes.
23              MS. PEEPLES:  Okay. Yeah, that's what I
24    meant.
25              MR. DAMSKY:  That was my longer one --
```

```
                                            Page 71

 1            MS. PEEPLES:  Okay.

 2            MR. DAMSKY:  -- so I apologize for how long

 3     it went on.

 4            MS. PEEPLES:  No, no, that's fine. That's

 5     fine.

 6            DEAN MCALISTER:  Okay. Is there anything more

 7     that -- am I needed today?

 8            MR. RUSHING:  Oh, I'll go ahead and proceed.

 9            MS. PEEPLES:  Yes.

10            MR. RUSHING:  Are there any additional

11     questions for Dean McAlister from any party at this

12     time? Thank you, Dean McAlister, for your time, you

13     are free to leave.

14            MS. PEEPLES:  You can just remove yourself

15     from the meeting. Thank you.

16            DEAN MCALISTER:  Okay. All right, thank you.

17     Thank you, all.

18            MR. RUSHING:  Does anybody need a bathroom

19     break or anything before we proceed?

20            MS. PEEPLES:  Okay. Maybe --

21            MR. RUSHING:  We will now bring --

22            MS. PEEPLES:  Let's do one after the next.

23            MR. RUSHING:  Okay. All right. We'll do that.

24     That's okay.

25            MS. PEEPLES:  (Crosstalk) have everybody like
```

Page 72

1    a five minute break.

2            MR. RUSHING:  All right. That's sounds good.

3    Thank you.

4            MS. PEEPLES:  Is that okay, Preston?

5            MR. DAMSKY:  Yes, ma'am.

6            MR. RUSHING:  Okay. Thank you. All right. We

7    will now bring in our next witness, Dean Janice Shaw.

8            MS. PEEPLES:  It's Janice, by the way.

9            MR. RUSHING:  Janice -- Janice Shaw, sorry.

10           MS. PEEPLES:  That's okay.

11           MR. RUSHING:  Janice. Dean Shaw, what

12   information do you have to provide to the university

13   specifically related to disruptive conduct and/or

14   harassment?

15           DEAN SHAW:  Okay. So I'm Janice Shaw. I

16   joined UF in June, 2020 as the Assistant Dean of

17   Career and Professional Development. In August, 2024,

18   I was promoted to the title of Senior Assistant Dean

19   of Students and Special Advisor to the Dean, which

20   expanded my role to now include leading the career

21   office and helping to create a positive academic and

22   personal experience for students in the law school. In

23   that role, I'm the contact for students to address

24   concerns about issues that are interfering or

25   disrupting their ability to learn, also student orgs,

Page 73

1    co-curriculars and other student life functions. And I
2    report directly to Interim Dean Barrett McAlister.
3              My first time learning about Preston was not
4    a great start in August, 2023. Shortly after the start
5    of the fall 2023 semester, a former member of my
6    staff, Andrea Cormier, reached out to me to discuss an
7    incident. In her role overseeing on-campus interviews,
8    she was stationed outside of her office on the second
9    floor of Bruton-Geer Hall. She was overseeing
10   interviews when the exterior door suddenly locked and
11   a person that she did not know was trying to access
12   the building through the locked doors. She told him to
13   use his ID card through the locked doors, but that
14   person instead was banging, kicking, yanking the glass
15   door and yelling, "Let me in the F-ing door." She said
16   she was concerned about her safety because the person
17   seemed enraged and she did not let the unknown person
18   in.
19             A few minutes later, the person came in and
20   yelled at her, "Why didn't you let me in the F-ing
21   door? I told you I was an F-ing student." And Andrea
22   was another -- with another member of the office at
23   the time and they both reported that this exchange
24   made them very uncomfortable and afraid and they
25   ultimately learned that that person was Preston. So

Page 74

1    that was my first time learning about Preston.

2            After taking the role of Dean of Students in

3    August, 2024, I continued to learn more about

4    Preston's impact on other students. In the fall 2024

5    semester, I began receiving complaints from students

6    about a paper Preston wrote that several students

7    reported they interpreted as having a call for

8    violence. I spoke with several of those students about

9    their concerns and I also received complaints about

10   the comments Preston made in and outside classes at

11   the law school.

12           In January 2025, at the start of the spring

13   semester, Dean McAlister held a town hall, which she

14   does at the start of every semester. At the town hall,

15   multiple students remarked that they were afraid of

16   Preston. One student said she looked for exits

17   whenever she was in the room with him and other

18   students said they would not take classes with

19   him. But town halls do not have a set agenda, but

20   Preston was a significant topic during the town hall.

21   At Dean McAlister's direction, I reached out to

22   Preston to discuss the town hall with him.

23           And we met in my office on January 24th,

24   2025. During that meeting, I asked Preston if he was

25   aware that students were talking about him at the

Page 75

1  recent town hall and that they were afraid of him.
2  Preston shared that a classmate had told him about the
3  comments and the questions that were made about him
4  during the town hall. I also shared with him what I
5  heard the students say at the town hall. I asked for
6  his thoughts and reactions to the comments and we
7  discussed how his rhetoric could cause fear in others.
8  Preston shared that he knew his comments would offend
9  and hurt people. And based on that direct
10  conversation, Preston was made aware that students
11  feared him and they thought he might do something that
12  would negatively impact their safety.
13         A few weeks later on February 13, 2025,
14  Ronald Anderson, who's the university ombudsman,
15  reached out to me to ask about Preston. He had
16  received a call from the FBI because someone had
17  reported Preston to the FBI. In the first week of
18  April, 2025, I learned of the tweet that Preston
19  posted to X that said, "Jews must be abolished at all
20  costs." Preston posted this comment after being told
21  in our January meeting that some students were scared
22  of him. After Preston's exchange with Professor
23  Lidsky, several students were visibly upset and waited
24  in a large group to speak with Dean McAlister at a
25  student life event that I attended.

Page 76

1          That same day, several students came into my

2     office crying about the fear they felt. One student

3     who was in Professor Lidsky's Friday morning class,

4     stated that she was really concerned about her because

5     she said Professor Lidsky looked very anxious and

6     jumped every time the classroom door opened. The

7     student said that she and other people in the class

8     were also afraid and jumpy throughout the entire

9     class. Through tears, that student confided to me that

10    she had experienced a school shooting and she was very

11    scared that she might have the same experience at UF.

12          Another student was uncontrollably crying in

13    my office about the fear and anger she felt about the

14    fact that she might be attacked at school and that

15    Preston wanted her or her friends to suffer physical

16    harm. In written complaints, another student said they

17    feared that his words would become actions. And one

18    wrote that she did not feel safe walking the halls at

19    UF or attending Jewish Law Student Association events

20    or even being by herself.

21          Another student said that when she studied in

22    the second floor of Bruton Geer, that she wore

23    earphones and she had her head down focused on her

24    reading, which meant she was not alert or aware of her

25    surroundings. And she said she didn't feel safe

Page 77

1    studying there anymore because if anything happened,

2    she would be vulnerable. I contacted several students

3    about this hearing and they said they were too scared

4    to participate. Several students I spoke with after

5    the tweets were anxious and in emotional pain and they

6    reported that they were unable to focus on their

7    studies.

8            Many complaints focused on a lack of safety

9    and just general fear of danger. We were a few weeks

10   away from the end of semester and with exams

11   approaching, this was a significant disruption as the

12   students were increasingly fearful and hypervigilant.

13   It was a difficult time as students were sending

14   complaints to our portal, they were expressing fear,

15   frustration. And as the Dean of Students, part of my

16   job is to make sure that the students are able to

17   focus on their education without disruption and it was

18   becoming increasingly hard to do that.

19           So I would -- over the course of the spring

20   semester, I would estimate that more than half of the

21   complaints I received from the law school's online

22   complaint portal were about Preston. And after our

23   conversation in January, Preston knew that students

24   were afraid of him and he continued to fan the flames

25   of fear through his tweet and his response to

Page 78

1  Professor Lidsky.

2          MR. RUSHING:  I will now open up the floor to

3  the Board members for questions for Dean Shaw.

4          MS. WIJERANTHNE  So over the course of this

5  incident, like reports, did you take any actions? What

6  did you do to, like, help these students in distress?

7          DEAN SHAW:  Well, you know, we -- as Dean of

8  Students, you try to point students to resources that

9  can help them, resources that the school provides to

10  help them. And so we point them to our licensed mental

11  health counselor as a resource for them to talk to

12  about their fears and their concerns. We point them to

13  the GatorSafe App. We tell them that if anything

14  happens, they can always use the GatorSafe App. And we

15  talk to them about being able to, you know, use the

16  emergency line should they ever fear that anything's

17  happening. We also gave them instructions to, you

18  know, just stay aware and remain vigilant about what's

19  happening and what's going on around them.

20          And then, you know, there's coaching that

21  takes place, right? When someone comes to you and

22  expresses their emotional pain, you try to coach them

23  on what they can control and recognizing the

24  importance of focusing on what they can control. And

25  because it's an educational institution, trying to

1    refocus them back to their studies.

2              MS. WIJERANTHNE  So were you impacted in any

3    way throughout this process of -- I mean, through

4    these complaints and everything?

5              DEAN SHAW:  Yes, I was definitely impacted.

6    When I spoke with Preston in January, he said that his

7    words -- he knew that his words, his rhetoric, could

8    offend and hurt people. And he said, "I believe you

9    are probably offended and hurt by what I said." And I

10   didn't answer that question at the time, but it is

11   hard to be in a community with people who express

12   views that are very counter to your humanity. And I

13   think in general, that was part of what was happening,

14   that people felt that the value of their humanity was

15   being challenged and that -- those words, if your

16   value of your humanity is challenged in words, could

17   that become actions?

18             And so it was very, very hard to see the pain

19   that students were experiencing, the frustration that

20   they were experiencing and to not necessarily feel

21   like there was a ton of action that could be taken to

22   do anything about it. So it was generally a

23   frustrating time in the law school because there was a

24   lot of angst and fear and not much that could be done.

25             MR. RUSHING:  Preston, you may now ask any

Page 80

1    questions relevant to the allegations you have for
2    Dean Shaw.
3                MR. DAMSKY:  Yeah. So hi, Dean Shaw. Thank
4    you for taking my question today. You monitor the
5    community concerns reporting system.  Is that's
6    correct, you're the primary point of contact on that?
7                DEAN SHAW:  I receive the complaints from the
8    online portal, yes.
9                MR. DAMSKY:  Can we go to the student report
10   on page 137? It's a Student D. It's 137, the red
11   numbering there.
12               MS. PEEPLES:  Got you.
13               DEAN SHAW:  I don't have access to that.
14               MR. DAMSKY:  Yeah. I'm sorry, Ms. -- yeah.
15               MR. RUSHING:  Aimee's going to share it.
16               MS. PEEPLES:  I'm going to share my screen.
17   Hang on one second.
18               MR. DAMSKY:  Okay.
19               MS. PEEPLES:  Okay. There you go, 137.
20               MR. DAMSKY:  Now -- actually, can we go up
21   just one --
22               MS. PEEPLES:  Uh-huh.
23               MR. DAMSKY:  -- to 136?
24               DEAN SHAW:  So I should clarify very quickly
25   that I began receiving these portal complaints in

Page 81

1   August of 2024 when I took over for this role. I did

2   not have prior access to any complaints that came in

3   before that time.

4           MR. DAMSKY:  Fair enough.

5           DEAN SHAW:  Okay.

6           MR. DAMSKY:  So this is the group main

7   message on (crosstalk) --

8           MS. PEEPLES:  You want me to go through it?

9   Sorry.

10          MR. DAMSKY:  Yes, the 136, please, on the

11  night of September 1st. So I mean, Ms. Shaw, I don't

12  know. Have you seen this message before?

13          DEAN SHAW:  No, I haven't seen the message

14  because I don't actually have social media, So I --

15          MR. DAMSKY:  Oh, no. I mean -- yeah.

16          DEAN SHAW:  Yeah.

17          MR. DAMSKY:  I'm just wondering if you had

18  seen it as part of your duties. Okay. So we can go

19  back and look up at it, but can we go down just one

20  to Student D? So this was a report that was made about

21  that message. So you'll see it says -- this is how

22  they quoted me. The first statement read in part, "The

23  United States lost 19.3 million white, and they added

24  a sick, faces on that over the past decade." Then they

25  put ellipses, "So why on earth should white people

Page 82

1   care at all about," and then in bracket, "Another

2   student's criticism of our demographic share in any

3   institution," and they put ellipses. "Why should we

4   feel anything but pure contempt for the student," in

5   brackets, "And anyone else?" So Dean Shaw, I guess you

6   wouldn't know, but was I -- to the best of your

7   knowledge, was I referring to a student with that

8   message?

9          DEAN SHAW:  You know, I really don't know,

10  plus (crosstalk).

11         MR. DAMSKY:  Okay. So you said -- so sorry.

12  So you said you started getting them in August of

13  2024?

14         DEAN SHAW:  Yes, when I took over as Dean of

15  Students. Before that, I was the Career Dean, and so I

16  wasn't privy to these types of communications.

17         MR. DAMSKY:  Understood. Okay. So --

18         MS. PEEPLES:  Preston, that might be

19  information you want to share when you share with

20  the Committee.

21         MR. DAMSKY:  Yeah. Thank you.

22         MS. PEEPLES:  Yeah.

23         MR. DAMSKY:  Yeah. So you did start getting

24  the reports about the book award. Is that correct?

25         DEAN SHAW:  Yes, I started getting the

Page 83

1   reports in fall of 2024, and so the book award

2   happened after that. So I did receive --

3           MR. DAMSKY:  And is it safe to say -- and I'm

4   just kind of summarizing here. Is it safe to say that

5   most of the reports, if not all of them, didn't even

6   know which paper I had won the award for?

7           DEAN SHAW:  I can't really speak to what the

8   people knew or what paper they were referring to. I

9   can't speak to that either.

10          MR. DAMSKY:  Can we go to 142, that should be

11  good. All right.Okay. Okay. I'm sorry, 140 --

12  actually, do we have the -- did you receive the

13  anonymous tip on February the 3rd?

14          DEAN SHAW:  (Crosstalk).

15          MR. DAMSKY:  (Crosstalk)?

16          DEAN SHAW:  What was the anonymous tip?

17          MR. DAMSKY:  About going to the press. It was

18  from an anonymous tip.

19          DEAN SHAW:  An anonymous tip in written form

20  or verbal form?

21          MR. DAMSKY:  I believe it was submitted kind

22  of out of order.

23          MS. PEEPLES:  You think it's one of the new

24  report from a community concern submission? Is that

25  what you're looking for, Preston?

Page 84

```
 1              MR. DAMSKY:  Well, it was on February 3rd.
 2              MS. PEEPLES:  Okay.
 3              MR. DAMSKY:  Well, okay. Yeah. It might've
 4    been -- is it 160?
 5              MS. PEEPLES:  160?
 6              MR. DAMSKY:  163, maybe. No, that's not it
 7    either. All right. Well --
 8              MS. PEEPLES:  You want me to look for it? Can
 9    you give me some idea of what you're looking for and
10    I'll look for it for you?
11              MR. DAMSKY:  Well, it says, "I'm going to go
12    to the game until Sun unless you report, check that
13    all notes are empty to the bar."
14              MS. PEEPLES:  Okay. Let me --
15              MR. DAMSKY:  That is the gist of the message.
16    And it was on February the 3rd.
17              MS. PEEPLES:  Okay. I will look for that.
18    I'll stop sharing for just a second while I look for
19    that. Was it an anonymous message? Do you remember?
20              MR. DAMSKY:  Yeah. Yeah. Yeah. It was.
21              MS. PEEPLES:  Okay.
22              MR. DAMSKY:  All right. I found it. Sorry. It
23    is on -- it's on -- it starts at 45. It's right at the
24    bottom. My apologies.
25              MS. PEEPLES:  Page 145 or page 45?
```

Page 85

1          MR. DAMSKY:  45, yeah.

2          MS. PEEPLES:  45, okay. Oh, okay, I've

3    seen the list, sorry.

4          MR. DAMSKY:  Yeah. And it's at the bottom. It

5    was submitted

6          MS. PEEPLES:  Okay.

7          MR. DAMSKY:  -- February 3, 2025.

8          MS. PEEPLES:  Here you go.

9          MR. DAMSKY:  Now, I believe this is part of

10   the community concern portal. So it says, "I'm writing

11   anonymously to raise a serious concern shared by

12   multiple members of the UF Law community regarding a

13   recent book award given in Judge

14   John Badalamenti in his constitutional law seminar.

15   The award was presented to a paper titled "American

16   Restoration" an Article V Proposal." Now, Dean Shaw,

17   to the best of your knowledge, that's not the title of

18   the book that won the award. Is that right?

19         DEAN SHAW:  I'm going to be totally honest. I

20   don't remember the title of the paper. I did receive

21   the paper, but I don't remember the title of the

22   paper.

23         MR. DAMSKY:  And you read both of my papers

24   during the fall semester, right? You told me

25   (crosstalk).

Page 86

```
 1              DEAN SHAW:  That is -- I didn't read them
 2      during the fall semester. I read the Mansfield one in
 3      the fall semester, and I read the Badalamenti one in
 4      the spring semester.
 5              MR. DAMSKY:  Okay.
 6              DEAN SHAW:  But yes, I did read both of them.
 7              MR. DAMSKY:  Yes. Okay. So -- okay. I don't
 8      remember this one. All right. I'll just ask you about
 9      your statement. You don't have to share. You stated,
10      quote -- that you -- so this was our meeting in
11      January, I believe. You said you focused our
12      conversation on, "Helping him understand and build
13      awareness around how his words were not only
14      offensive, disruptive to the learning environment, and
15      causing fear in the greater law community." Is that
16      correct, Dean Shaw?
17              DEAN SHAW:  That's correct. That's what I
18      stated.
19              MR. DAMSKY:  Now, do you recall telling me
20      during this meeting that I was -- and I mean, unless
21      I'm just completely forgetting this, and I
22      quote, "Brilliant"?
23              DEAN SHAW:  I don't remember -- I don't
24      recall calling you brilliant, but I definitely -- we
25      talked about your career prospects. So at some point
```

Page 87

```
1   in the conversation, we did change gears and started
2   talking about what you might do for the summer. And I
3   did mention that you are a very, very strong student
4   and that you perform very well in school.
5          MR. DAMSKY:  Do you remember telling me that
6   you weren't going to tell me how to exercise my free
7   speech?
8          DEAN SHAW:  I recall being very open to the
9   fact that you have the right to free speech at the
10  University of Florida and in America generally.
11         MR. DAMSKY:  Do you remember asking me if I
12  would ever consider a career in academia?
13         DEAN SHAW:  I do remember that. I remember
14  talking to you about perhaps becoming a professor as
15  the Dean of Careers, as well as Dean of Students. I am
16  tasked with making sure the law school has 100
17  percent employment, which means every single student
18  in the law school, I see as someone who needs to find
19  a legal job. And so I was talking to you about what
20  your career prospects might be.
21         And we talked about you wanting to be a
22  prosecutor and some of the other things that you
23  considered for your career path. And I did mention to
24  you that you liked writing a lot and that you were
25  obviously a good writer because you had won a book
```

Page 88

1  award -- or several book awards, and perhaps, being a
2  professor would be something you could consider.
3          MR. DAMSKY:  Now, this one really made me
4  chuckle at the time. Do you remember that after I told
5  you that we were talking about our -- my papers and I
6  told you that, you know, there were certain points
7  that I wish that I had and I was somewhat annoyed how
8  I couldn't put all those clarifying points that I
9  wanted to put in my papers because of the word limits.
10  Did you tell me that I would have to put it in a book
11  someday?
12          DEAN SHAW:  I don't remember that part,
13  Preston, but it is possible. I don't recall saying
14  that part about a book, but I don't recall it.
15          MR. DAMSKY:  Well, okay. Fair enough. These
16  are really the things that I remember. I'm just
17  asking, given that that was kind of my recollection of
18  the situation, Dean Shaw, how exactly was I supposed
19  to take away from our conversation that my words were
20  -- and this is your words, not only offensive, but
21  disruptive to the learning environment and causing
22  fear in the greater law school community? Because
23  frankly, I don't remember you telling me that at all.
24  I never remember you saying that they were disruptive.
25          DEAN SHAW:  Well, Preston, that's fine,

Page 89

```
 1    perhaps that you don't recall that. What I do recall
 2    was the purpose of the conversation was to talk about
 3    the town hall. And the town hall students stated that
 4    they were scared and that their ability to learn was
 5    being disrupted. They weren't taking classes. While
 6    they were in classes, they were looking for exits. So
 7    logically, that's a disruption.
 8            MR. DAMSKY:  And how many students -- because
 9    in Dean McAlister's April 1st report, she says that
10    this was about three students at the town hall. And
11    then in her second report, she says it's about half a
12    dozen. So we double it. But roughly how many students
13    -- because I think you were actually there as she made
14    that clear. How many students will you say expressed
15    fear at the first town hall, the one in the beginning
16    of spring?
17            DEAN SHAW:  There were a number of
18    students. You know, to be precise, it's hard for us -
19    - and there's a lot that goes on, so it's hard to
20    recall the precise number. I believe 2 or 3 students
21    had what they would probably say, potentially is the
22    courage to speak up. There was a general sentiment
23    that came across to me over the course of the school
24    year in dealing with students, that students were
25    scared to say anything. And so for a student to say
```

Page 90

1    something in a town hall took a lot of courage on

2    their part, as they believed.

3          And there were students who were speaking to

4    represent other students. And I received complaints

5    and had communications with students who said, "I am

6    the only one who has the courage to say something. I'm

7    speaking on behalf of my friends who are afraid to say

8    something." So the number of students might not really

9    accurately reflect how many were impacted.

10          MR. DAMSKY:  And one of the student --

11    students that told you that the -- the student that

12    told you that she was looking for the exit, that was

13    Jenna Callison, correct?

14          DEAN SHAW:  I'll be 100 percent honest with

15    you, Preston. I did not know who the student was, and

16    I did not ever learn who that student was. At the town

17    hall, students don't announce themselves before they

18    speak. And so if you're not familiar with the student,

19    then you don't actually know the name of the person

20    speaking. So I did not know who the student was, and I

21    never learned that student's name.

22          MR. DAMSKY:  So none of these students felt

23    so fearful that they actually wanted to follow-

24    up? They just went up to a mic, said their piece, and

25    then left. Is that correct?

1           DEAN SHAW:  So there's no microphone, so no
2     one goes up to the mic. They're just sitting and
3     laughing and just speaking. it -- I think perhaps I
4     don't see the relevance of the follow-up because the
5     town hall is the opportunity to share your views. And
6     that's the place where you express in front of a room
7     of other students and administrators, the things that
8     are on the top of your mind, the things that you're
9     concerned about as you head into the spring semester.
10    So the follow-up is not important because speaking at
11    the town hall is expressing your concern. There's not
12    a required meant for a follow-up.
13          MR. DAMSKY:  And then -- now did you get
14    reports about me in criminal procedure?
15          DEAN SHAW:  Was the professor of that class,
16    Tracy Macklin?
17          MR. DAMSKY:  It was.
18          DEAN SHAW:  I do believe I might have -- I do
19    believe that I heard some things about comments he
20    made in that class, yes.
21          MR. DAMSKY:  And did you ever speak to
22    Professor Macklin about me?
23          DEAN SHAW:  Dean McAlister asked me to
24    contact Professor Macklin and I called him. We had a
25    phone conversation about you, yes.

Page 92

1              MR. DAMSKY:  And what did he say?

2              DEAN SHAW:  Professor Macklin said that you

3     were a brilliant student, as I recall. He said that

4     you -- you know, you went to his office hours

5     regularly, so he felt that he knew you outside of the

6     classroom. Professor Macklin and I talked about your

7     views -- his experience of your views in the

8     classroom. He said that you -- I recall that he said

9     that you made comments that were -- I'm trying to

10    think of the word. But you made comments that were not

11    popular and sometimes you said things that definitely

12    pushed the limits. He also said --

13             MR. DAMSKY:  And --

14             DEAN SHAW:  Uh-huh. Okay. Okay.

15             MR. DAMSKY:  No, go ahead, complete that, I'm

16    sorry.

17             DEAN SHAW:  Nope, go ahead, Preston.

18             MR. DAMSKY:  You said he also said -- and

19    then you were going to say something. So what were you

20    going to say?

21             DEAN SHAW:  Oh, you know, just trying to

22    recall the conversation off the top of my head. He

23    also said that he pushed back whenever you made

24    comments that he thought were on the line or crossing

25    the line or did not have, like, the intellectual rigor

Page 93

1  that he thought they did, so he would push back on

2  you.

3           MR. DAMSKY:  Yeah. And I made comments to you

4  when we met that I have a lot of respect for Professor

5  Macklin and think he's an incredible teacher, right?

6  (Crosstalk).

7           DEAN SHAW:  I recall you -- no, go ahead,

8  Preston, finish --I mean, you were --

9           MR. DAMSKY:  I was going to say, it was a

10  little bit of like -- I was going to say, I think I

11  said that during the first time that we met in

12  November when you first called me to your office.

13           DEAN SHAW:  That is -- that's what I was

14  going to say. I think some of this, you know, it's not

15  necessarily in the record in my statement, but we did

16  meet in November of 2024. And during that

17  conversation, which I think just covered more general

18  topics and I was trying to learn more about your job

19  search and what your plans were for the summer and

20  those types of things, we did talk about Professor

21  Macklin. And you did express that you were very fond

22  of him and you thought he was fantastic.

23           MR. DAMSKY:  Now, you were copied in on all

24  the emails. Can we go to, I think they're 70 -- I

25  don't know.

Page 94

1            DEAN SHAW:  Which emails are these?

2            MR. DAMSKY:  Yeah. One second, I'm sorry.

3            MS. PEEPLES:  You're talking about the emails

4    with faculty?

5            MR. DAMSKY:  Yes.

6            MS. PEEPLES:  270 --

7            MR. DAMSKY:  Thank you.

8            MS. PEEPLES:  -- 271.

9            MR. DAMSKY:  Thank you, I really appreciate

10   it.

11           MS. PEEPLES:  Yeah.

12           MR. DAMSKY:  And so you were copied into the

13   emails that I had with Professor Johnson, Professor

14   Hardy, Professor Scott and also Professor Collier,

15   right?

16           DEAN SHAW:  What was the timing of these?

17           MR. DAMSKY:  These were on April 4th at

18   around 1.20 p.m..

19           DEAN SHAW:  What were these in reference to?

20           MR. DAMSKY:  Getting back into class

21   remotely. (Inaudible).

22           DEAN SHAW:  Yes, if I was copied on it, then

23   I was copied on those. Yes --

24           MR. DAMSKY:  Okay.

25           DEAN SHAW:  -- for ones that are obviously

Page 95

```
 1   here. Uh-huh.
 2              MR. DAMSKY:  Yeah. All right. I just have one
 3   final thing. So Dean Shaw, like you said, you're also
 4   my career advisor, right?
 5              DEAN SHAW:  That is correct, Preston. I
 6   became your career advisor, I'd say, during your
 7   second year of law school. I didn't -- we didn't have
 8   a chance to work together your first year. I believe
 9   you were assigned to a different advisor.
10              MR. DAMSKY:  Yeah. I believe her name was
11   Melissa MacDougall, if I recall.
12              DEAN SHAW:  Right. And she left the law
13   school.
14              MR. DAMSKY:  Yeah. She left and I was given
15   the choice to choose my career advisor, right?
16              DEAN SHAW:  Yes. After Melissa left, we
17   allowed students to choose who they'd like to work
18   with and if they didn't have a preference, we just
19   assigned them to someone else.
20              MR. DAMSKY:  And I chose you, right?
21              DEAN SHAW:  I believe you did. I believe you
22   did. There were a few students who expressed a choice
23   and as I recall, I believe you were on the list of
24   students who selected me.
25              MR. DAMSKY:  And do you know I -- and I think
```

Page 96

1    it was actually my spring semester of first year, but
2    --
3             DEAN SHAW:  That sounds about right.
4             MR. DAMSKY:  Yeah.
5             DEAN SHAW:  Melissa left in, like, March or
6    April of 2024, which would have been your --
7             MR. DAMSKY:  Do you know I chose you because
8    my legal writing TA told me you were the best career
9    advisor?
10            DEAN SHAW:  I did not know that, Preston. I
11   was not aware of that.
12            MR. DAMSKY:  Thank you, that's all I have.
13            DEAN SHAW:  Okay.
14            MR. RUSHING:  Are there any additional
15   questions for Dean Shaw from any party at this time?
16   And I'm going to go ahead and ask a question. Dean
17   Shaw, did you put Preston on notice? And what did you
18   say to Preston to put him on notice that his speech or
19   behavior is causing disruption or harassment?
20            DEAN SHAW:  During the January 24th meeting,
21   we discussed -- the town hall and we discussed what
22   people were saying down -- during the town halls, we
23   discussed the papers that Preston had written, and I
24   believe in that conversation that -- what I expressed
25   to him, put him on notice, that students were afraid

1  of him and that the law school was starting to become

2  disrupted. I think when the disruption started to gain

3  further steam, Preston and I hadn't spoken after that

4  January 24th time.

5          So January 24th meeting was the time when he

6  was put on notice that students were afraid, that

7  students were not taking classes with him because they

8  did not want to be in the classroom with him, that

9  they, you know, were not safe -- they weren't feeling

10 safe at that point. And I believe that I mentioned to

11 him that there were complaints about him.

12         MR. RUSHING:  Are there any further

13 questions? Thank you, Dean Shaw, for your time. You

14 are free to leave.

15         MS. PEEPLES:  You can just remove yourself

16 from the meeting.

17         DEAN SHAW:  Okay.

18         MS. PEEPLES:  Okay. So let's just take five

19 minutes. Is that enough time for everybody just to

20 take a short biology break? Okay. All right. I'm going

21 to put everyone in the waiting room while we take our

22 break.

23         (Off the record.)

24         MS. PEEPLES:  Hey, Preston. Okay. I've

25 started the recording again. We're ready to move

Page 98

1    forward with the next witness. So go ahead, Ryan.

2              MR. RUSHING:   Thank you. We will now bring in

3    our next witness, Professor Lyrissa Lidsky.

4              MS. PEEPLES:   Okay. I'm going to bring her

5    in.

6              MR. RUSHING:   Professor Lidsky, what

7    information do you have to provide to the university

8    specifically related to disruptive conduct and or

9    harassment? And you're muted.

10             MS. LIDSKY:   Sorry. Hi, I became a professor

11   at UF Law in 1994 and a tenured full professor in

12   1999. I was an associate dean at UF for five years.

13   And for five years, I was dean of the University of

14   Missouri School of Law from 2017 to '22, returning to

15   UF three years ago as an eminent scholar chair. I've

16   taught thousands of law students in my career and my

17   subjects include First Amendment law and

18   constitutional law. And as a scholar, I focus on the

19   law governing threats, cyberbullying, incitement and

20   defamation.

21             I am not aware of ever having met

22   Mr. Damsky in person. The first time I ever heard of

23   him was in fall 2023 when he posted comments about

24   white replacement theory in a 1L group chat. The next

25   time I heard about him was during the fall of his 2L

1    year when he submitted his white supremacist themed

2    paper for peer review in Professor

3    Marshfield's  class. The third time I heard of him was

4    when students became outraged after he received the

5    top grade in Judge John Badalamenti's seminar on

6    originalism. And I just want to mention that Judge

7    Badalamenti is one of my former students and a friend.

8             In each of these instances, students and

9    colleagues ask me how they should respond to Mr.

10   Damsky's speech. And I responded that based on First

11   Amendment principles the proper remedy for speech we

12   hate typically is counter speech. This is consistent

13   with the principles to which I have devoted my career.

14   I have previously written scholarship defending the

15   Supreme Court's refusal to criminalize Holocaust

16   denial despite myself being Jewish and despite having

17   had my life transformed by my trip to Auschwitz.

18             Several years ago, I wrote an op-ed in The

19   Alligator defending the First Amendment rights of a

20   man walking around campus wearing a swastika

21   (crosstalk) --

22             MR. RUSHING:  Professor Lidsky, I just want

23   to --

24             MS. LIDSKY:  Yes.

25             MS. PEEPLES:  -- I just want to help focus.

Page 100

1   We're not here to determine what is free speech, so --

2          MS. LIDSKY:  I know. I'm getting there but

3   it's relevant to why I interacted with him in the way

4   I did.

5          MS. PEEPLES :  Okay.

6          MS. LIDSKY:  So I am about to get into that.

7   I know your time is valuable. Okay. So -- but with

8   that background, I'm here today to describe my own

9   attempt to engage Mr. Damsky with counter speech on

10  the social media platform X. So on April 1st of last

11  semester it came to my attention that Mr. Damsky had

12  posted on X that both immigrants and Jews should be

13  abolished by whatever means necessary.

14         Two of my colleagues and I decided that the

15  faculty should be made aware of the seemingly

16  escalating pattern of attention seeking calls for

17  violence by our student, Mr. Damsky. We were aware

18  that since the Hamas attack on Israel on October 7,

19  2023, anti-Semitic and anti-Zionist rhetoric had

20  escalated across the United States and we were also

21  aware that Jews had been attacked and murdered

22  worldwide. After sending this email, I decided to

23  engage in my own counter speech to try to discern the

24  intent behind Mr. Damsky's language, whatever means

25  necessary.

Page 101

1          At that point, I assumed he was an attention
2    seeking provocateur who would back down when
3    confronted. So I asked him on X, are you saying you
4    would kill me and my children? Is that your position?
5    By making this post, I gave Mr. Damsky a chance to
6    step back from the edge and admit that he was not
7    expressing a desire to commit violence or an intent to
8    inspire fear in those of us he does not consider
9    white. Instead, he responded by deflecting and saying
10   that I should be more concerned about calls for the
11   abolition of whiteness because there are more whites
12   than Jews.
13          His response surprised me. I knew he had
14   already lost a job as a prosecutor based on his
15   extreme views, which would make a reasonable person
16   reluctant to double down in this way. But his response
17   showed me he cared more about furthering white
18   supremacy than he cared about his future career and he
19   also seemed to want to create ambiguity about whether
20   he would actually carry out violence towards me and my
21   family. In the next couple of days after this
22   interaction with Mr. Damsky, I estimate that at least
23   15 students came to my office expressing fear for my
24   safety and concern that Mr. Damsky might come to the
25   law school armed.

1          Some students asked me if I thought he had a

2     gun. Some students said that because they feared I was

3     a target, they were afraid to attend my class. I also

4     received a call from a parent of a student who asked

5     me whether I thought the law school's response to the

6     situation was adequate because she was fearful for her

7     daughter's safety. I had not been afraid up until this

8     point, but though I tried my best to hide it from my

9     students, their reactions made me afraid. A doctor

10    friend of mine once told me that if you're ever around

11    a person that raises hackles on the back of your neck,

12    you should pay close attention to that instinct.

13         So when so many of the students who had been

14    in classes and actually been around Mr. Damsky thought

15    there was a reason to be afraid, I did become somewhat

16    afraid. I took down my X account completely. I also

17    felt compelled to tell my husband what I'd done. Now,

18    my husband is a criminal defense attorney and he's

19    represented many dangerous people and he's not a

20    particularly fearful person, but we nonetheless slept

21    with a baseball bat beside the bed for the next couple

22    of weeks. Meanwhile, I tried to continue teaching

23    because the end of the semester was getting near.

24         In my constitutional law class, my head would

25    pivot to the door every time someone came in late. And

Page 103

1    after my con law class, a couple students stayed
2    behind and one of them was a Jewish student and she
3    was so fearful she was sobbing and so I -- you know,
4    I tried to calm her down. But after that, I went to
5    the dean's office and I said, "Look, we're going to go
6    to swipe access in the law school anyway in about a
7    week for exams, in order to -- why don't we just make
8    people feel safer coming to class by going ahead to
9    swipe access and not alarm them by saying, you know,
10   we're doing it because we think there's a threat, but
11   just make them feel safer like we're going into exams
12   early."
13          Then that -- on the Friday afternoon of that
14   same week, it was after Mr. Damsky had been barred
15   from coming to campus. I got a call on Friday
16   afternoon at my home by one of the rabbi from Chabad.
17   I don't know if you know much about Chabad, but it
18   caters to Jewish students. And evidently, the Jewish
19   law students at Chabad had been so concerned about my
20   safety and theirs that they had discussed it with the
21   rabbi and the rabbi has become of necessity an expert
22   on security in the aftermath of October 7th and he
23   offered to send private security to my home if I
24   wanted it and he also help -- offered to help me get a
25   firearm if I wanted that.

Page 104

1    Needless to say, this conversation didn't

2  exactly make me feel more secure. Now, I regret to

3  confess that the toll of trying to reassure my

4  students that they were safe and that I was safe

5  together with the worry that I might have exposed my

6  family to some sort of danger led me to cancel my

7  class the following Monday. The message I sent to my

8  students at that time said, "I'm not ill, just utterly

9  exhausted." In my entire career, I've never canceled

10  class in a similar situation. Indeed, I taught all the

11  way through chemotherapy for breast cancer.

12    Based on my experiences, it appears to me

13  that Mr. Damsky enjoys agitating and provoking his

14  fellow students. He understands that a number of them

15  perceive his behavior as threatening and he appears to

16  enjoy inspiring those feelings. He also appears to

17  enjoy the controversy his behavior has generated.

18  We've had Parkland survivors in the law school and the

19  possibility of a mass shooting is not abstract for

20  them.

21    Indeed, shortly after Mr. Damsky was

22  trespassed off campus, a white supremacist at FSU shot

23  and killed innocent victims. Mr. Damsky is a law

24  student and both parts of that phrase are important.

25  In order to be admitted to have a law license, one has

Page 105

1    to pass a character and fitness examination and one of
2    the rules of conduct for Florida lawyers says you
3    cannot engage in conduct prejudicial to the
4    administration of justice, which is why he lost his
5    job at the prosecutor's office.
6              But as a student, Mr. Damsky has shown a lack
7    of respect for his fellow students and their right to
8    focus on their education. I thank you for your
9    attention.
10             MR. RUSHING:  I will now open up the floor to
11   the Board members for questions for Professor Lidsky.
12             MS. ANDERSON:  Professor Lidsky, beyond what
13   you have -- what's in the case packet and what you've
14   just said now in your opening statement, is there
15   anything else you would just like to speak to
16   regarding the impact that this case has had on you?
17             MS. LIDSKY:  I mean, obviously I thought long
18   and hard about what I was going to say today and I
19   carefully -- you notice you didn't share any names
20   whatsoever. I am not a fearful person, that's just not
21   the way I roll it's -- and I'm not -- one of the
22   things -- yeah. Let me say, one of the things -- one
23   of the reasons I got off X, I had thousands and
24   thousands of followers on X. I used my social media to
25   promote my professional career and I just decided that

Page 106

1    I didn't want to be the target of basically a Nazi

2    pylon as a result of my encounter with Mr.

3    Damsky. That it's -- I just decided it was not good

4    for me to continue being on X in that manner.

5              I have other social media presence, I use

6    other social media in different ways, but I just

7    decided the risk to me of having, like, death threats

8    and such from my involvement in this. I was incredibly

9    grateful. I was so grateful that the alligator story

10   didn't mention my name. I was so grateful that the New

11   York Times story didn't mention my name. I was so

12   grateful that the USA Today story, that none of them

13   mentioned my name because this is the kind of thing

14   that can result in death threats. Judge Badalamenti is

15   a good friend of mine. Judge Badalamenti, they've

16   arrested somebody as a result of him getting death

17   threats after the New York Times story.

18             It's -- I just -- you know, there are people

19   out there that are dangerous people and there's a lot

20   of hatred of Jews in the world right now and, you

21   know, I follow closely what happens like the bombing

22   of Jews in Colorado that resulted in a death. I mean,

23   they were calling for the hostages to be released. So

24   again, I'm not a fearful person and I'm not -- I'm

25   Generation X, which matters here because I'm not of

1    the generation that our students are -- where they've

2    been through Parkland, they've been -- you know, I

3    have a different outlook on life.

4            I've always been a big supporter in counter

5    speech against speech we hate. I want to know where

6    the anti-Semites are, right? I've written that in my

7    scholarship is if you suppress people's speech, you

8    send them underground, it becomes more dangerous. I

9    don't know if I responded to your question. I'm --

10   it's been emotional. I have to say it's been

11   emotional. It has.

12           MS. ANDERSON:  You did respond. Thank you for

13   your response.

14           MR. RUSHING:  Preston, you may now ask any

15   questions relevant to the allegations you have for

16   Professor Lidsky.

17           MR. DAMSKY:  Hello, Professor Lidsky. Thank

18   you for taking my question today. I've never been in

19   any of your classes, right? You've said that.

20           MS. LIDSKY:  Correct.

21           MR. DAMSKY:  And then aside from our Twitter

22   interaction, have we ever directly interacted before

23   today, exchanged words, shook hands, nodded towards

24   each other, anything like that?

25           MS. LIDSKY:  No.

```
 1            MR. DAMSKY:  So on that basis, would you say
 2   that you had a deep understanding of the type of
 3   person I am when you replied to my agnostic tweet?
 4            MS. LIDSKY:  No.
 5            MR. DAMSKY:  So you said you first learned
 6   about me in fall of 2023 from a GroupMe chat?
 7            MS. LIDSKY:  Yes.
 8            MR. DAMSKY:  Okay. And then again, with
 9   Professor Marshfield, and then again after that, when
10   I got the book award from Judge Badalamenti?
11            MS. LIDSKY:  Yes.
12            MR. DAMSKY:  And then at any point, were you
13   asked to evaluate whether any of my political
14   statements or academic reports were protected under
15   the First Amendment?
16            MS. LIDSKY:  Yes.
17            MR. DAMSKY:  And what was your determination?
18            MS. PEEPLES:  Okay. So we're not getting into
19   the free speech aspect of it. So can you just talk a
20   little bit about what you're looking for here,
21   Preston?
22            MR. DAMSKY:  Okay. That's fine. Now, why do
23   you think the law school found it necessary to
24   scrutinize my papers to this degree? Was the awarding
25   of the top grade by the judge not good enough? Did it
```

Page 109

```
 1   not establish its academic legitimacy?
 2            MS. LIDSKY:  I -- could you rephrase that?
 3            MR. DAMSKY:  I'm sorry. Were you asked to
 4   look at my paper for Judge Badalamenti?
 5            MS. LIDSKY:  Actually, I didn't look at your
 6   paper for Judge Badalamenti.
 7            MR. DAMSKY:  Did you look at my paper for
 8   Professor Marshfield?
 9            MS. LIDSKY:  Yes.
10            MR. DAMSKY:  So when and from whom did you
11   learn about my Twitter account?
12            MS. LIDSKY:  It was on April 1st, I believe.
13            MR. DAMSKY:  And did you hear about it from
14   faculty, students?
15            MS. LIDSKY:  I think it was students and I -
16   - but again, I -- the dean had mentioned it also. I'm
17   a faculty council member.
18            MR. DAMSKY:  So it's possible -- I mean,
19   obviously, you know, this, you had experience on
20   Twitter. It's possible to remember anonymous or
21   pseudonymous on Twitter, correct? A lot of people do
22   that.
23            MS. LIDSKY:  It is.
24            MR. DAMSKY:  And you admitted that you say
25   you like people with my views -- controversial views.
```

Page 110

1    I would assume just any sort of political views to be

2    kind of out in the open. You appreciate open

3    discourse?

4             MS. LIDSKY:  I do.

5             MR. DAMSKY:  So might the forthrightness of

6    attaching my actual name to these beliefs, would that

7    be a good indication that I was not making, you know,

8    criminal threats?

9             MS. LIDSKY:  I didn't say you were making a

10   criminal threat.

11            MR. DAMSKY:  Would you say that I was making

12   -- did you feel like I was making a true threat when I

13   replied to you?

14            MS. LIDSKY:   I would have to answer as a

15   First Amendment expert to that question. I can answer

16   it as a First Amendment expert.

17            MS. PEEPLES:  If you can answer it as an

18   individual who experienced this event, that's what the

19   Board is looking for. Is for how you were personally

20   impacted, what your personal response was.

21            MS. LIDSKY:  Okay. As I just said, I -- let

22   me repeat what I said. I was surprised by your

23   response. I learned later that I thought perhaps you

24   didn't fully realize that I was a First Amendment law

25   professor at your law school. But I learned later that

Page 111

1    you did know exactly who I was when you responded to

2    me, a student told me that. And I -- they told me you

3    said -- they told you not to respond to me. And so

4    when you responded with the deflection, with the

5    whataboutism, it told me -- I wanted to give you a

6    chance to say, "No, I don't have that intent, or I'm

7    not being reckless in creating fear in others." I

8    wanted to give you a chance to step back.

9            And I thought you wanted to create continued

10   ambiguity, but I still was not alarmed because, as you

11   say, I don't know you. I don't know you, and I had

12   judged from your actions that you liked the attention

13   of creating controversy around the law school,

14   creating, provoking, agitating, creating that

15   controversy amongst the students. So at that time, did

16   I subjectively feel afraid? No, not until students

17   came to me and they were afraid and they actually know

18   you did I become afraid. Because I'm just not normally

19   a fearful person, so.

20           MR. DAMSKY:  And just to be clear, you chose

21   to interact with me. I never, like, have to deal with

22   your private messages or anything like that.

23           MS. LIDSKY:  Correct.

24           MR. DAMSKY:  And just to be clear, the

25   original tweet, the tweet mentioning Noel Ignatiev,

```
                                            Page 112
 1    that made no mention of you or your family
 2    specifically, correct?
 3              MS. LIDSKY:  It did not.
 4              MR. DAMSKY:  Now, when you read the tweet
 5    before you engaged with me, did you Google the name
 6    Noel Ignatiev or were you already aware of who that
 7    was?
 8              MS. LIDSKY:  No.
 9              MR. DAMSKY:  No. So you didn't Google his
10    name? You didn't think that would (inaudible)? You
11    just assumed that I was talking about murder?
12              MS. LIDSKY:  I --
13              MS. PEEPLES:  Can you kind of ask -- do you -
14    - that was like multiple questions. Can you take them
15    one at a time?
16              MR. DAMSKY:  Yeah. Okay. So sorry. Let's just
17    -- let's re-capitulate. Before you engaged with me,
18    you had read the tweet, right? I mean, you didn't just
19    write it on the screen, right? And so you read the
20    tweet, and did you think to Google the name Noel
21    Ignatiev or anything, or did you just immediately read
22    that tweet and think, he's talking about murdering me
23    and my family?
24              MS. LIDSKY:  No, I scrolled down through the
25    prior tweets. I saw there was a tweet about immigrants
```

Page 113

1   that also mentioned the similar language, by whatever
2   means necessary. To me, by whatever means necessary,
3   it bespeaks Holocaust-type elimination of whole
4   categories of people. And so the fact that that
5   language had been paralleled in the tweet about the
6   immigrant, and then it's about Jews, and then I read
7   down through the tweet, and this was, like, consistent
8   with a pattern of saying people need to be eliminated,
9   abolished, you know, gotten rid of. But what
10  particularly alarmed me, just from my perspective on
11  knowing about the history of the Holocaust in
12  particular, it was the by whatever means necessary
13  language. To me, that's a call for genocide.
14          MR. DAMSKY:  Now, did you ever at any point
15  after that look up what Noel Ignatiev meant by to
16  abolish the white race, by any means necessary?
17          MS. LIDSKY:  No.
18          MR. DAMSKY:  Okay. Now, you've written a
19  paper before, and I only mentioned this not to speak
20  to her scholarship, but just to kind of speak to her
21  acting in good faith, frankly. You've written a paper
22  before on the importance of evaluating threats in
23  context. Is that correct?
24          MS. LIDSKY:  I have.
25          MR. DAMSKY:  So you didn't think that to

Page 114

1   figure out whether or not I was trying to threaten

2   you, it might be important to look up the context of

3   what Noel Ignatiev meant by to abolish the white race,

4   by any means necessary? You just felt like, "Well,

5   we'll just skip over that."

6           MS. LIDSKY:  I thought your speech needed

7   refutation, whether or not it was a threat or not, and

8   I thought I would ask to clarify whether it was a

9   threat or not. There's a simple way to clarify, and

10  that's by looking at the intent of the speaker. And so

11  I asked the question that would clarify whether it was

12  a threat, and my clarification was met with further

13  ambiguity.

14          MR. DAMSKY:  But it is your position that you

15  did not interpret -- even after my response, you did

16  not interpret it as a threat?

17          MS. LIDSKY:  Yes, not in the criminal sense

18  of the word threat, yes.

19          MR. DAMSKY:  Well, when I --

20          MS. LIDSKY:  I did not report it to the

21  police at that point (crosstalk) --

22          MR. DAMSKY:  When did -- Okay. So in other

23  words --

24          MS. LIDSKY:  -- whether I evaluated it as a

25  criminal threat.

Page 115

1            MS. PEEPLES:  One at a time.

2            MR. DAMSKY:  I'm sorry.

3            MS. PEEPLES:  That's okay.

4            MR. DAMSKY:  You didn't feel like you were

5    physically in danger after that response?

6            MS. LIDSKY:  No, not at that time.

7            MR. DAMSKY:  Okay. And you said that you were

8    afraid of a, "Nazi pile on" so that's why you deleted

9    your X. Do you remember how many followers I had

10   on X at the time?

11           MS. LIDSKY:  Not that many.

12           MR. DAMSKY:  Not that many, right? So who was

13   going to file on?

14           MS. LIDSKY:  I am a -- You know, I've seen

15   these things go viral for lesser reasons. I just

16   decided I wanted far away from it. I don't need that

17   in my life.

18           MR. DAMSKY:  But you didn't think that when

19   you reached out to engage in the first place, that

20   didn't occur to you?

21           MS. LIDSKY:  I thought I wanted to know what

22   the law school was dealing with. Like, I wanted to

23   know, are -- you know, is this someone who is, you

24   know, willing to cross the line?

25           MR. DAMSKY:  And again, you're still not

1   aware of what Ignatiev meant by abolish?

2            MS. LIDSKY:  I mean, I have a feeling of what

3   he means. Like, I mean, he's like a woke category of

4   whiteness. You know, he meant something else.

5            MR. DAMSKY:  Okay. So you've learned that

6   since that he did not mean murder?

7            MS. LIDSKY:  That's what I suspect is implied

8   by your question, but have I read him? No.

9            MR. DAMSKY:  Okay. But you have learned since

10  that he did not mean murder?

11           MS. LIDSKY:  I suppose he didn't. I mean,

12  you're the one who relied on Ignatiev. I am not here

13  to interpret Ignatiev not having read him.

14           MR. DAMSKY:  Okay. So again -- so you didn't

15  interpret my reply as absolutely affirmative that I

16  would murder you and your family. So, okay. Have you

17  spoken to ██████████████ at all since March 21st?

18           MS. LIDSKY:  Since when? Since March 23rd?

19           MR. DAMSKY:  March 21st, ███████████████.

20           MS. LIDSKY:  The only time I ever spoke to

21  him was after the dean's town hall meeting, and he

22  expressed to me that, you know, he had had encounters

23  and was fearful and that kind of thing. That's the

24  only time I've ever spoken to him.

25           MR. DAMSKY:  (Crosstalk). I'm sorry. You said

Page 117

1    he'd had encounters with me. Is that correct?

2              MS. LIDSKY:  He said he'd been in class. I

3    mean, I didn't -- he taught for a while, but I don't

4    remember the full substance, but he said he'd been in

5    classes with you and, like, he felt he should engage

6    in countering your -- you know, your statements.

7              MR. DAMSKY:  But you're aware, like, he never

8    said anything to me. He never -- like, when you -

9    - okay. Sorry.

10             MS. LIDSKY:  I actually am not aware. I spoke

11   to him once after the dean's town hall meeting.

12             MR. DAMSKY:  When you said that he said that

13   he should counter my statements, did you assume -- did

14   you interpret that as saying that he should use his

15   speech to counter my statements?

16             MS. LIDSKY:  Of course.

17             MR. DAMSKY:  Okay. And -- but did he ever say

18   that or do you just interpret that? Did he say -

19   - well, what specifically did he say what you can

20   remember?

21             MS. LIDSKY:  He said that he had -- like, as

22   I interpreted what he said, and this is one

23   conversation with a student I'd never met before, but

24   who was very agitated after the dean's town hall. He

25   said he had been trying to, you know, since he'd been

1    in law school, counter your, like, white supremacist
2    ideas as expressed in law school, you know, when he
3    was in class with you.
4            MR. DAMSKY:  Well, ever since we had shared
5    that first class, okay, cool.
6            MS. LIDSKY:  Oh, you were in 1L together?
7            MR. DAMSKY:  Well, he was in our
8    constitutional law class. He's -- I think he missed
9    the semester. I don't know why. I've
10   never (inaudible) him before in my life.
11           MS. LIDSKY:  He (inaudible) had health
12   problems, I do recall that.
13           MR. DAMSKY:  Now -- sorry, Ms. Peebles. Give
14   me a second. I'm going to ask you to --
15           S :  Okay.
16           MR. DAMSKY:  -- share screen.
17           MS. PEEPLES:  Share the screen? Okay.
18           MR. DAMSKY:  Right there. Can we go to 278?
19   Now, Professor Lidsky, how close are you to Zach
20   Kosner (ph)? I believe his full name is Zachariah
21   Kosner.
22           MS. LIDSKY:  Who is Zach Kosner?
23           MR. DAMSKY:  Well, you follow him on
24   Instagram and he follows you too. Is he a student of
25   yours?

Page 119

1            MS. LIDSKY:  Oh, yeah. Okay. Yeah. Zach.
2    Okay. Yeah. Okay. All right.
3            MR. DAMSKY:  And did you meet with him on or
4    before April 7th to talk about our interaction?
5            MS. LIDSKY:  I spoke to -- he wanted to
6    engage in writing something, I spoke to him, yeah.
7            MR. DAMSKY:  And then, what date was that?
8            MS. LIDSKY:  I don't know which specific date
9    it was, but it was -- he wanted to write something
10   for, I think it was, like, an online publication,
11   maybe medium or something like that.
12           MR. DAMSKY:  Well, was it -- you recall, was
13   it before or after you canceled your class on Friday?
14           MS. LIDSKY:  Truthfully, I have no idea.
15           MR. DAMSKY:  You don't remember?
16           RYAN  I need to stop for just a second. My
17   headphones are running out of battery (crosstalk).
18           MR. DAMSKY:  No problem, take your time.
19           RYAN  -- I need a minute to switch them out.
20   Thank you. Okay. Can everybody hear me?
21           UNIDENTIFIED SPEAKER :  Yes.
22           MR. DAMSKY:  (Inaudible).
23           RYAN  Okay. We're all good to proceed. Thank
24   you.
25           MR. DAMSKY:  So you said you don't remember,

Page 120

1    but you'll see from this log, this is on April 7th. He

2    said, "In my conversation with Lidsky, she outlined

3    which cases I should cite to elaborate on how exactly

4    his comment crossed an actionable line." Do you

5    remember having that sort of conversation that he's

6    referring to?

7              MS. LIDSKY:  I didn't say what it said there,

8    but yes. I had a conversation with Zach about the

9    various cases that affect this kind of situation, yes.

10             MR. DAMSKY:  Did you speak to him about

11   threats?

12             MS. LIDSKY:  I'm sure I must've spoken to him

13   about several lines of cases, including the lines of

14   cases defining when a threat crosses the line into

15   unprotected speech, but also the cases about Title VI,

16   the cases about lawyer regulation, about student

17   speech regulation, et cetera.

18             MR. DAMSKY:  Yeah. But when you spoke to him

19   about threats, did you tell him that those were not

20   appropriate to the case? Because as you told me, you

21   didn't feel threatened. Is that right?

22             MS. LIDSKY:  I -- that --

23             MS. PEEPLES:  Preston, help me help -

24   - Preston, can you clarify a little bit? Are you -

25   - because what we want to talk -- focus on is this

Page 121

1   situation as opposed to a First Amendment protected
2   speech sort of discussion in general. So I --
3           MR. DAMSKY:  No, I -- yeah. I understand.
4           MS. PEEPLES:  -- I think you're trying to ask
5   about this specific situation, right?
6           MR. DAMSKY:  This is a rather odd case,
7   that's for sure --
8           MS. PEEPLES:  Gotcha. Yeah.
9           MR. DAMSKY:  -- because we're using legal
10  language to sort of describe emotions. So Professor
11  Lidsky, I did ask you if you felt threatened and you
12  said that you did not, and you did not call the police
13  on me because you didn't feel threatened. Is that, is
14  that right? I'm just trying to read the situation.
15          MS. LIDSKY:  What I said exactly is, I did
16  not think that our interaction on Twitter met the
17  definition of a criminal threat --
18          MR. DAMSKY:   Okay.
19          MS. LIDSKY:  At that juncture.
20          MR. DAMSKY:  Now -- so he did tell you about
21  this essay he wanted to write, which he
22  titled, reflections on the avoidable downfall of a
23  racist.
24          MS. LIDSKY:  Yes, he did.
25          MR. DAMSKY:  Okay. Sorry. One second. Always

Page 122

1    puts me in the -- all right. Can we scroll down

2    to 279, please, Ms. Peeples.

3              MS. PEEPLES:   Uh-huh.

4              MR. DAMSKY:   So this is the essay. Now, in

5    this, he says that you happen to stumble upon my

6    Twitter account. Now, again, you -- you've said that

7    that's not true. You would be directly --

8              MS. LIDSKY:   (Crosstalk).

9              MR. DAMSKY:   Yeah. Okay. All right. Okay. And

10   if we could go to the next page, Ms.

11   Peeples. Yeah. I'm -- yeah. Thank you. Sorry. I'm

12   trying to do it on my screen too.

13             MS. PEEPLES:   That's okay.

14             MR. DAMSKY:   So I'm going to read you what he

15   wrote. He said, now you'll -- this is kind of

16   sarcastic, but he says, "Preston, no doubt possessed

17   by the mystery spirit of April Fool's Day, felt the

18   need to over explain what I'm sure he considered a

19   very cheeky bit of wordplay. He seems to have

20   convinced himself that by conditioning his desire

21   to, 'Murder Jews' on the question of whether

22   professor, not his academic critiques of whiteness is

23   constructed identity should be interpreted as a call

24   to kill white people. You could secure all the

25   plausible deniability he needed to allow his obvious

Page 123

1   veiled threat to skirt by with a mocking wink and no
2   real consequences." Now, was it your opinion at the
3   time that you interacted with me that my tweet was an
4   obvious veiled threat?
5        MS. LIDSKY:  I am not responsible for
6   anything Zach concluded or Zach wrote. Here's what I -
7   - here's my conclusion. My conclusion is you went to
8   great pains to leave ambiguity as to your intent. The
9   other thing I know is that I, based on my background,
10  did not at that point interpret it as requiring me to
11  pick up the phone and call the police. However, other
12  people who don't have my background, who looked at it
13  and who had more acquaintance with you personally,
14  were much more alarmed than I upon reading that.
15       MR. DAMSKY:  With all due respect, Professor
16  Lidsky, you know, I don't -- what is your background
17  have to do with how personally safe that you felt? You
18  know, a First Amendment scholar can feel just as
19  threatened just as easily as anybody else.
20       MS. LIDSKY:  Well, ultimately I did.
21       MR. DAMSKY:  But not at the time that you
22  interacted with me and not at the time that you
23  received my reply later after we had ceased talking.
24       MS. LIDSKY:  I was alarmed that you hadn't
25  stepped back from the edge.

```
                                                Page 124
   1            MR. DAMSKY:  And I want to read --
   2            MS. LIDSKY:  And I still -- like, anyway, I
   3    was alarmed that you hadn't stepped back from the
   4    edge.
   5            MR. DAMSKY:  Now, I just want to read to you
   6    this next paragraph because it does suggest action on
   7    your part, "Unfortunately, he failed to consider the
   8    implications of publicly admitting that there are any
   9    plausible circumstances under which he would feel
  10    justified indiscriminately murdering Jewish people,
  11    nor did he consider that in the framing of her
  12    question, the renowned constitutional law scholar and
  13    expert on protected speech had allowed him the
  14    opportunity to convert this vague, generalized threat,
  15    putting hashtag Jews on notice into a very particular
  16    threat against Professor Lidsky and her family
  17    specifically. And he took that opportunity without
  18    hesitation. You'd think after the Nuremberg trials,
  19    these guys would have learned not to grab every piece
  20    of rope they're offered. Sometimes the intention is to
  21    see you hang on it." Professor Lidsky, when you
  22    interacted with me, did you intend to see me hang on
  23    your words?
  24            MS. LIDSKY:  Had you said, "Yes, I intend to
  25    kill you and your children," that would have been fine
```

Page 125

1    with me.

2            MR. DAMSKY:  It would have been fine with you

3    if I had said I intend -- I'm sorry.

4            MS. LIDSKY:  No, let me clarify. I asked what

5    your intent was because I wanted to know if you were

6    willing to go all the way to a personalized threat, in

7    which case there was no doubt what would have happened

8    after that. You would have been arrested. Had you

9    said, "Yes, I intend to kill you and your family," I

10   would have immediately called the police. You would

11   have been arrested. Period.

12           MR. DAMSKY:  So did you want me to do that?

13           MS. LIDSKY:  As I said, I gave you the

14   opportunity. I wanted to find out why a person would

15   continue doing this. What makes -- are you a threat or

16   are you not a threat? The way to do that is to discern

17   your intent.

18           MR. DAMSKY:  So you had between the choice of

19   -- and I'm just being hypothetical here, between the

20   choice of, "Yes, I'm going to kill you and your family

21   and no, absolutely not," those were just two equal

22   (crosstalk).

23           MS. LIDSKY:  No, no, no. Don't -- that's

24   absurd.

25           MR. DAMSKY:  Okay. So the answer is --

Page 126

1          MS. LIDSKY:  That's absurd.

2          MR. DAMSKY:  So he's wrong. So you wanted me

3    to say no. So your intention was not to see me hang on

4    it, your intention was to hopefully get a no. Is that

5    your position?

6          MS. LIDSKY:  My intention was to hopefully

7    get a no. So you would step back and then -- you know,

8    you've created a very difficult position for somebody

9    in the dean's position. I've been a dean. It's a very

10   difficult position you put her in repeatedly. Because,

11   you know, it's not fun to be the defender of the of

12   Nazis and say, "Oh, the First Amendment requires

13   it." Nobody really likes that response, even though

14   it's the absolute correct response and the proper

15   response. And so --

16         MR. DAMSKY:  So you --

17         MS. LIDSKY:  -- no, I -- you can continue.

18         MR. DAMSKY:  So you did what you did because

19   of the Dean?

20         MS. LIDSKY:  That's not what I'm saying. I

21   wanted to know what your intent was. I want to know if

22   I have a student in my midst who would do violence to

23   me and my family. You can understand that, surely.

24         MR. DAMSKY:  So if I can read just one more

25   part at the bottom of 280, Ms. Peeples. It's our

1   end, Professor Lidsky. it says, "Caught up in the
2   euphoria of his own cleverness. He also failed to
3   account for the possibility of an altogether different
4   type of reaction. And here he is playing a
5   hypothetical character. Who the hell is Noel Ignatiev?
6   Scratch that. Doesn't matter. This kid just posted
7   that he might want to kill all Jewish people twice in
8   the last 10 days. Which school is he attending? The
9   law school. Jesus Christ. We better do something
10  before we have an incident on our hands. And that's
11  officer-friendly UF campus security.
12          "Rather than play along with the bit by
13  interpreting the statements in the context of the most
14  accurate, good faith interpretation of Harvard Noel -
15  - Harvard historian Noel Ignatiev's controversial
16  thesis on white identity, the officers of the UFPD
17  seemingly chose to interpret them in the context of
18  pressing the political record of extreme racist, anti-
19  Semitic hostility and implied desire to enact the
20  violence upon minorities and political opponents."
21          Now, the tweet he chooses to represent that
22  I'll deal with later, but do you agree with Mr. Kosner
23  that the most accurate good faith interpretation of
24  Harvard historian Noel Ignatiev's controversial thesis
25  on white identity is that abolish does not mean

1    physical extermination? Are you there now? Well, you
2    said no. I'm wondering when you had that discussion
3    with Mr. Kosner, did he tell you that?
4              MS. LIDSKY:  Can you clarify?
5              MR. DAMSKY:  Yeah. When Mr. Kosner spoke to
6    you, did he communicate to you that what Noel
7    Ignatiev meant by the word of -- by the phrase abolish
8    the white race by any means necessary was not a call
9    to physical extermination and that he had explicitly
10   explained that numerous times? Did he tell you that?
11             MS. LIDSKY:  I don't know. I don't remember.
12             MR. DAMSKY:  Okay. Before --
13             MS. PEEPLES:  Preston, I just want to make
14   sure we're -- because we've talked a lot about
15   Zach Kosner and --
16             MR. DAMSKY:  Okay.
17             MS. PEEPLES:  -- as it relates to Professor
18   Lidsky's conversations and understanding, but I want
19   to make sure we're staying on track relevancy wise
20   with your alleged behavior.
21             MR. DAMSKY:  Sure. So when did you send your
22   email to the school faculty?
23             MS. LIDSKY:  April 1st.
24             MR. DAMSKY:  April 1st. Now, was that before
25   or after you first interacted with me?

1           MS. LIDSKY:  I believe -- I -- if memory

2    serves, which I no longer have access to my own tweets

3    because when I took my account down, I didn't make

4    copies of them and so I don't have them, but I believe

5    it was before.

6           MR. DAMSKY:  Okay. So in other words, the

7    pattern of escalating conduct that we refer to it was

8    just the first week, that was satisfactory in your

9    mind?

10          MS. LIDSKY:  No, I thought it's, like, a

11   whole pattern throughout law school of wanting more

12   and more attention for extremist views.

13          MR. DAMSKY:  Professor, you reviewed my paper

14   for Professor Marshall's class, would you consider for

15   that to be an example of wanting more and more

16   attention?

17          MS. LIDSKY:  I reviewed the last couple of

18   pages.

19          MR. DAMSKY:  Okay.

20          MS. LIDSKY:  And yes, I interpreted it as

21   attention seeking because it was going into a peer

22   review process where some of the peers were peers who

23   would be greatly offended and sensed, you know, by

24   this -- by the theme that -- yeah, I thought it was. I

25   thought it was, you know, provocative in the sense of

Page 130

1    intended to provoke.

2              MR. DAMSKY:  But not threatening.

3              MS. LIDSKY:  No.

4              MR. DAMSKY:  Okay. And just out of curiosity,

5    you know, I might disagree with you on that, but -

6    - about the intent, but if that were the intent, does

7    that take it out? I mean, that doesn't make it -- like

8    you said, that doesn't make it any more threatening,

9    any more disruptive to the normal everyday going to

10   class aspect of school. Sure. It might make people

11   talk about it more outside of class, but just because

12   people spread around your paper or whatever, that

13   doesn't affect people -- that doesn't affect the

14   schedule of class, right?

15             MS. LIDSKY:  Right.

16             MR. DAMSKY:  Okay. And you said you were glad

17   that your name hadn't appeared in any media coverage?

18             MS. LIDSKY:  Yes.

19             MR. DAMSKY:  And you didn't cancel your class

20   on Wednesday or Thursday?

21             MS. LIDSKY:  No.

22             MR. DAMSKY:  Okay. Can we pull up -

23   - (crosstalk).

24             MS. LIDSKY:  I don't -- not to my

25   knowledge. I don't think so.

Page 131

1              MR. DAMSKY:  Okay. Now, what was your

2     reaction to the Alligator article?

3              MS. PEEPLES:  Are we still talking about

4     threat and harassment -- disruption and harassment?

5              MR. DAMSKY:  Well, I'm wondering if Professor

6     Lidsky felt more or less disrupted by the Alligator

7     article.

8              MS. PEEPLES:  Okay.

9              MS. LIDSKY:  What day was the Alligator

10    article?

11             MR. DAMSKY:  It was on April 21st.

12             MS. LIDSKY:  Again, I was glad my name had

13    not been involved, so I wouldn't face a further

14    barrage of questions, even though it mentioned our

15    interaction. But I -- it meant that I didn't have to

16    face questions from afar.

17             MR. DAMSKY:  So you were relieved? I mean, is

18    that fair to say?

19             MS. LIDSKY:  I was really relieved, yeah. I

20    was very relieved actually.

21             MR. DAMSKY:  Okay. Did you tell faculty

22    members or anyone else at the university that I said I

23    wanted to exterminate or eliminate Jews?

24             MS. LIDSKY:  I mean, in the sense that I

25    quoted your post on Twitter, yes.

1              MR. DAMSKY:  And you said that without

2      reference to the verb abolish or any part

3      about Ignatiev?

4              MS. LIDSKY:  Yeah. I was paraphrasing and I

5      slipped and used eliminate instead of abolish. I don't

6      see the difference in those two words as being

7      significant, but I suppose --

8              MR. DAMSKY:   And --

9              MS. LIDSKY:  A colleague of mine suggested

10     that he saw a big difference in the term eliminate

11     versus abolish. And evidently that's the gist of your

12     question. I don't see -- I see those as synonyms.

13             MR. DAMSKY:  I mean, I didn't -- I'm just -

14     - because I just assumed you talked to faculty about

15     this, so. Have you gotten pushback from this -- from

16     your involvement in this from the faculty?

17             MS. LIDSKY:  A little.

18             MR. DAMSKY:  Do they feel like you caused the

19     disruption?

20             MS. LIDSKY:  Nope.

21             MR. DAMSKY:  So why would they push back?

22             MS. LIDSKY:  One faculty member, you know,

23     believes everything you said and did was fully

24     protected. And that means that you should not have

25     been trespassed off of campus and so --

```
                                        Page 133
1              MR. DAMSKY:  And you disagree?
2              MS. LIDSKY:  I don't decide that. That's not
3    my decision.
4              MS. PEEPLES:  Yes.  So we're back.
5              MR. DAMSKY:  Why would you get up -- why
6    would you get upset with him?
7              MR. MR. RUSHING:  Hold on for a second.
8              MR. DAMSKY:  I'm sorry.
9              MS. PEEPLES:  It's okay.
10             MS. LIDSKY:  I didn't get upset with him. He
11   thought I was saying something I wasn't saying. I was
12   asked at a faculty meeting to explain why the issue is
13   legally complex and I did explain the legal
14   complexity.
15             MS. PEEPLES:  And that's not why we're here.
16   We're here to talk about whether behavior was
17   disruptive and/or harassment.
18             MR. DAMSKY:  And have you -- now you deleted
19   your Twitter, you said. And I don't believe you
20   created a new one. I mean, you didn't mention
21   that. Have you tried to solicit anybody else to reach
22   out to me?
23             MS. LIDSKY:  No.
24             MR. DAMSKY:  No. You haven't talked -- have
25   you talked to Zach Kosner since your second meeting?
```

                                                      Page 134

 1              MS. LIDSKY:  Not that I recall, no.

 2              MR. DAMSKY:  Okay. Hey, did you participate

 3     in a panel discussion moderated by Bruce Brown with

 4     Boyd Abrams (ph) and Jamil Daffer (ph) on September

 5     15, 2023?

 6              MS. LIDSKY:  At the American Constitution

 7     Society, yes.

 8              MR. DAMSKY:  And did you say that the biggest

 9     struggles that you had (inaudible)?

10              MS. LIDSKY:  Not the American Constitution

11     Society. I'm sorry. The center in Philadelphia -- the

12     constitutional center in Philadelphia, is that the one

13     you're talking about?

14              MR. DAMSKY:  You know, Professor Lidsky, I

15     know you're very popular, so I actually don't know

16     which one. You might've been -- I believe it was in

17     Philadelphia. The moderator was Bruce Brown and Boyd

18     Abrams and Jamil Daffer. You were asked which

19     struggles you had in teaching First Amendment

20     doctrine to your students. You said, "The biggest

21     tension I see in students today is they see a big

22     tension between liberty and equality. And so they are

23     much more interested in punishing speech that might be

24     thought to threaten equality as what they see as hate

25     speech."

1           MS. LIDSKY:  Yes. Yes, I said that.

2           MR. DAMSKY:  Do you think that's

3    influenced the campus reaction?

4           MS. LIDSKY:  Possibly, yes.

5           MR. DAMSKY:  Did you also say, "The younger

6    generation sees emotional harm as a threat to their

7    very safety in a way that might justify speech

8    regulation." And you see this slide, right? Speech

9    that's offensive becomes speech that makes me feel

10   unsafe. And would you still say that that's true

11   almost two years later?

12          MS. PEEPLES:  I'm sorry. You think that we're

13   wandering back into the First Amendment kind of

14   territory?

15          MR. DAMSKY:  Well, I'm actually -- I'm trying

16   to ask her about the attitude of the law school

17   community and the impact of my --

18          MS. PEEPLES:  Okay. That's fine. As long as

19   that's the -- that's where we're going.

20          MR. DAMSKY:  Yeah. I'm not going to ask

21   her First Amendment. I'm specifically just asking

22   her essentially if some of our classmates, what will -

23   - as she said, do they feel physically -- do they

24   speech -- that I'm quoting against speech that's

25   offensive becomes speech that makes me feel unsafe. Is

1   that still the attitude of some of our classmates --

2           MS. LIDSKY:  Yes.

3           MR. DAMSKY:  -- or some of your students?

4           MS. LIDSKY:  Yes.

5           MR. PEEPLES:  Preston, I'm not trying to rush

6   you at all. I just --

7           MR. DAMSKY:   I know.

8           MS. PEEPLES:  -- can you think -- can you

9   just let me know, give me an idea? Because what I want

10  to do is it's afternoon. I was going to take a break

11  for lunch and let the folks waiting know that we're

12  going to take a break, if you're almost wrapped up

13  with your questions.

14          MR. DAMSKY:  Yeah. Okay. Professor

15  Lidsky, last thing, this will be kind of quick. I want

16  to just read through your constitutional law syllabus

17  from last spring. You wrote in and I quote, "I'm

18  interested in teaching you how to make constitutional

19  arguments. Arguments that other lawyers would

20  recognize as appropriate for resolving tested issues

21  of constitutional law. That said the contents of this

22  course will never really touch on your personal

23  political beliefs. And even that is you may consider

24  fundamentally your identity. I ask that you practice

25  empathy and be sensitive to the different experiences,

1  perspectives, and opinions of classmates they bring to

2  our discussions." Now, if I were your student, would

3  that have included my different experiences,

4  perspectives, and opinions?

5          MS. PEEPLES:  Yes. And it's possible if you

6  are readmitted, you will be my student. I understand

7  you're assigned to take First Amendment law, it's

8  possible you will be, and I will adhere to what I

9  said.

10         MR. DAMSKY:  And you also said you may find

11  me articulating arguments and perspectives that I deem

12  to be missing from our discussion. You may find that I

13  call on you to articulate the other side and I

14  challenge you to learn to articulate -- sorry. I

15  (inaudible). All right. Professor Lidsky, I won't hold

16  you for any longer. I apologize. Thank you very much.

17         MR. MR. RUSHING:  Are there any additional

18  questions for Professor Lidsky from any party at this

19  time? Thank you for Professor Lidsky for your time,

20  you're free to leave.

21         MS. PEEPLES:  You can just remove yourself

22  from the meeting. Thank you so much. It's at the top -

23  - the three dots up at the top right corner of your

24  window, and it lets you leave the meeting.

25         MS. LIDSKY:  Okay.

1           MS. PEEPLES:  Or it should let you leave the

2    meeting, or you can go down to where it says end and

3    you just say you're leaving the meeting.

4           MS. LIDSKY:  Okay. It may take me a second --

5           MS. PEEPLES:  That's okay.

6           MS. LIDSKY:  -- bear with me.

7           MS. PEEPLES:  Oh, she's got it. Okay. All

8    right. So if we take a break -- it's 12:10 right now,

9    if we take a half hour break for lunch, is that enough

10   time for everyone --

11          MR. DAMSKY:  Yeah. I think half an hour will

12   be appropriate.

13          MS. PEEPLES:  -- to grab lunch? Preston, does

14   that work for you?

15          MR. DAMSKY:  Oh, I mean, yeah.

16          MS. PEEPLES:  Okay. All right. I'm going to

17   let everyone in the waiting room know that that we're

18   going to just take a half hour break. I'm going to put

19   all of our committee members in their breakout room.

20   Preston, do you want to go in a breakout room or you

21   want to -- let me put you back in the waiting room

22   until we get started back again?

23          MR. DAMSKY:  You know, quite frankly, those

24   people -- I don't know enough about Zoom to really

25   know the difference. So just do whatever you think is

                                                    Page 139

1   best.

2           MS. PEEPLES:  Okay. That's fine. All right.

3   I'm going to put you back in the waiting room and I'll

4   bring the five of us -- the six of us back together

5   when we get ready to start again. 12:10, so 12:40.

6   Thank you. Okay. Breakout room for you guys.

7           (Off the record.)

8           MS. PEEPLES:  Where did they go? Hey there,

9   Preston. Can you hear me?

10          MR. DAMSKY:  I don't think you can hear me.

11  He's way down here.

12          MS. PEEPLES:  You're muted. You just need to

13  unmute yourself, Preston.

14          MR. DAMSKY:  I'm sorry. Sorry. My apologies.

15          MS. PEEPLES:  No worries. No worries. Okay.

16  So the recording is going, Ryan, you are --

17          MR. RUSHING:  Uh-huh.

18          MS. PEEPLES:  -- free to move forward with

19  the script and --

20          MR. RUSHING:  All right. Sounds good. We will

21  now bring in our next witness, Professor Christopher

22  Hampson.

23          MS. PEEPLES:  Okay. I'm bringing him in.

24  We're just waiting for him to join

25          MR. RUSHING:  Professor Hampson, what

Page 140

1    information do you have to provide to the university
2    specifically related to disruptive conduct and/or
3    harassment? Sir, you're muted.
4            MR. HAMPSON:   Thank you. Good afternoon,
5    everyone. My name is Christopher Hampson and I'm a
6    professor at the law school. I am here because
7    students, alumni, and faculty shared concerns with me
8    that Mr. Damsky presented a security risk to the law
9    school based on cause to violence and thinly veiled
10   threats at the end of two academic papers and a social
11   media exchange.
12           I should add to the best of my recollection,
13   I have not met Mr. Damsky and I've not had him as a
14   student in class, but I'm here to share what I know
15   and to underscore how broadly Mr. Damsky's threatening
16   language spread across the law school community. On
17   October 28, 2024, a former faculty member at UF Law
18   shared with me a draft of Mr. Damsky's paper called
19   American Restoration. He told me that current students
20   at UF Law had shared it with him. Shortly after that,
21   one of my students asked to speak with me in my
22   office. He told me that several of his colleagues were
23   concerned about the same paper. He described it to me
24   as a security risk and pointed me to the last
25   paragraph.

1          For context, the paper expressed alarm at the

2     demographic changes in the United States and argued

3     that the constitution can be amended only by white

4     people. Mr. Damsky went on to write this, "The

5     founding generations of Americans were also no

6     strangers to fighting, killing, and dying on behalf of

7     their rights and sovereignty. The hour is late, but we

8     are not yet so outnumbered and so neutered that we

9     cannot seize back what is rightfully ours. This land,

10    America, our due inheritance, is worth the struggle."

11         My student conveyed to me that he and several

12    other classmates understood this conclusion to be a

13    call for violence against immigrants and people of

14    color. They expressed deep concern that Mr. Damsky was

15    a security risk to the law school. During the same

16    semester, Mr. Damsky wrote another paper called

17    National Constitutionalism for another class. Like his

18    first paper, Mr. Damsky ended the second paper with a

19    call to violence. But this time, it was even more

20    graphic and directed at federal judges. And I'll

21    convey to you the last paragraph in full, "The Supreme

22    Court and inferior federal courts have the power to

23    arrest the dispossesion of White America. All they

24    must do is substitute bad landmark precedent for good

25    landmark precedent. Failure to do so is not judicial

Page 142

```
 1    humility, but at best judicial surrender in the face
 2    of a terrible crime.  At worst, it is complicity in
 3    that crime. The People cannot be expected to meekly
 4    swallow this demographic assault on their sovereignty.
 5    If the People are not granted relief from the
 6    government, which includes the judiciary, then if they
 7    are to survive as masters in the land of their
 8    ancestors, they must exercise "their revolutionary
 9    right to dismember or overthrow" the government. And
10    that will be a process which no desk-bound jurist can
11    gleefully look forward to, for it will be a
12    controversy decided not by the careful balance of
13    Justitia's scales, but by the gruesome slashing of her
14    sword."
15              I understand this paragraph as a thinly
16    veiled threat against the federal judiciary. The call
17    for federal judges to rule a particular way or be
18    faced with violence is antithetical to everything we
19    stand for at the law school. The threat is driven home
20    by the fact that sitting federal judges teach several
21    classes at UF Law, and this was one of them. Then on
22    March 21, 2025, Mr. Damsky posted on Twitter, or
23    X, "My position on Jews is simple. Whatever Harvard
24    professor Noel Ignatiev meant by his call to "abolish
25    the White race by any means necessary" is what I think
```

Page 143

1    must be done with Jews. Jews must be abolished by any
2    means necessary.
3              On April 1st, in response, Professor Lidsky
4    asked on X, "Are you saying you would murder me and my
5    family? Is that your position?" Mr. Damsky
6    responded, "Did Ignatiev want Whites murdered? If so,
7    were his words as objectionable as mine? If Ignatiev
8    sought genocide, then surely a genocide of all Whites
9    would be an even greater outrage than a genocide of
10   all Jews, given the far greater number of Whites." On
11   April 1st, four law professors emailed the faculty
12   about Mr. Damsky's tweet, noting the pattern of
13   escalation against his previous calls for violence. I
14   spoke with Professor Lidsky and Professor Kaufman,
15   both of whom expressed security concerns to me.
16             The student community was deeply alarmed by
17   this point. I learned that students were concerned for
18   their personal safety and were actively avoiding
19   registering for classes if Mr. Damsky was in them. I
20   also know that two faculty members, both women of
21   color, were trying to figure out whether they could
22   safely come to campus at all and whether they should
23   move all their classes online. On April 3rd of
24   Thursday, UFPD trespassed Mr. Damsky from campus. I
25   spoke with two Jewish students on April 4th, one of

Page 144

1    whom said that his synagogue heightened security that
2    weekend. I don't know whether the synagogue made that
3    decision before or after the trespass order.
4         Once UFPD trespassed Mr. Damsky from campus
5    and the campus doors were locked, the community was
6    naturally incredibly alarmed. Accordingly, I focused
7    my comments on what happened between October 28, 2024,
8    and April 3, 2025, before the trespass order. That
9    said, what I see looking back over that six-month
10   period is a pattern of written threats of violence,
11   beginning with a call to violent insurrection,
12   followed by a threat of violence against federal
13   judges, and lastly, with a somewhat ambiguous threat
14   against Jews. Those threats were deeply concerning to
15   the UF Law community, disruptive to our classroom and
16   work environment, and even extended beyond Mr.
17   Damsky's classes to other students, faculty, and
18   alumni of the law school. I am happy to answer your
19   questions.
20        MR. RUSHING:  Thank you. I will now open up
21   the floor to the Board members for questions for
22   Professor Hampson.
23        MS. WIJERANTHNE  So did any students
24   personally confronted you or, like, complain to you
25   about this situation?

1          MR. HAMPSON:  Yes. As I mentioned, the first

2   time that happened was in late October or early

3   November 2024. One of my students asked to speak with

4   me in my office about the first paper.

5          MS. WIJERANTHNE  And that was the only time

6   that somebody personally complained to you or was

7   there any more complaints?

8          MR. HAMPSON:  Well, I'm trying to tease apart

9   complaints about security risk from complaints about

10  Mr. Damsky's views. The latter, in my view, are not

11  relevant to this proceeding. I've heard numerous

12  complaints about the views. In terms of security risk,

13  the student who spoke with me in late fall 2024 is the

14  one I recall. I also spoke with two Jewish students on

15  April 4th, and they also expressed that there was deep

16  concern in their circles as well.

17         MR. RUSHING:  Preston, you may now ask any

18  questions relevant to the allegations you have for

19  Professor Hampson.

20         MR. DAMSKY:  Thank you, sir. Hello, Professor

21  Hampson. Thank you for taking my questions. So from

22  what you said, you said students said that I

23  threatened violence through my papers and through the

24  tweet?

25         MR. HAMPSON:  Correct.

Page 146

1           MR. DAMSKY:  And you're aware that the school
2     determined that no such threat had been made through
3     the papers?
4           MR. HAMPSON:  I'm aware that the school made
5     that determination with respect to one paper, I'm not
6     aware that any determination was made with respect to
7     the second paper.
8           MR. DAMSKY:  And you said -- and the second
9     paper being the national constitutionalism?
10          MR. HAMPSON:  Yes.
11          MR. DAMSKY:  Are you familiar with Dean
12    McAlister's email on the 10th of March?
13          MR. HAMPSON:  I believe so. I don't have it
14    in front of me.
15          MR. DAMSKY:  Ms. Peebles, can I get -- sorry,
16    I don't know if I still have it. Oh, I do. So I'll
17    have it. Thank you.
18          MS. PEEPLES:  Yeah.
19          MR. DAMSKY:  Ms. Peebles, do you know if they
20    ever added the email that Dean McAlister sent to the
21    school?
22          MS. PEEPLES:  There was -- yes.
23          MR. DAMSKY:  I'm trying to pull it up as
24    well.
25          MS. PEEPLES:  There was the --

1            MR. DAMSKY:  Yes.

2            MS. PEEPLES:  -- reaffirming our values.

3            MR. DAMSKY:  (Crosstalk) page 56

4            MS. PEEPLES:  Is that the one you want? Okay.

5    Oh, grading and First Amendment, okay. Okay. Let me

6    share my screen. Okay. Can you see it?

7            MR. DAMSKY:  So --

8            MS. PEEPLES: Okay. Can you see it on your

9    screen?

10           MR. DAMSKY:  Yes, I can.

11           MS. PEEPLES:  Okay.

12           MR. DAMSKY:  So Professor Hampson, are you

13   aware that this was essentially directed at that paper

14   that you're saying that no formal determination was

15   made?

16           MR. HAMPSON:  Yes, this email is related to

17   the national constitutionalism paper. And in

18   particular, that's the first sentence says it's about

19   concerns that the paper was given a book award. Or

20   rather that the student was given a book award for the

21   class in which he wrote the paper.

22           MR. DAMSKY:  Okay. And it says, "We won't

23   disturb those debates unless they violate balance of

24   free speech, including specific threats or harassment.

25   We will carefully evaluate any complaint with those

Page 148

```
 1   limits in mind. But when we determine that the First
 2   Amendment protects the speech, the Board of Law will
 3   protect the speaker's right to speak. My job
 4   ultimately is to preserve the college's neutrality so
 5   that you -- each of you, including all faculty, staff,
 6   and students can have a forum for vigorous debate,
 7   civil discourse, and respectful disagreement. We will
 8   do that while preserving your safety and security
 9   within our community." Would you say it's fair to say
10   that that email basically indicates the school
11   determined that no such threat had been made?
12            MR. HAMPSON:  I'm not here to offer my
13   opinions on Dean McAlister's emails, I'm here to share
14   facts based on what I know.
15            MR. DAMSKY:  And are you aware that the
16   national constitutionalism paper that you say is a
17   threat at the judiciary, that was graded by a sitting
18   federal judge?
19            MR. HAMPSON:  Yes, that's my understanding.
20            MR. DAMSKY:  And of course, you're very much
21   aware that sitting federal judges have, like,
22   U.S. Marshal protection. You know, basically, the
23   entire machinery of federal law enforcement is kind of
24   at their disposal to protect them if they feel
25   threatened.
```

1          MR. HAMPSON:  I agree with that.

2          MR. DAMSKY:  And are you aware that since

3    this controversy has kind of blown up into the media

4    environment, that Judge Badalamenti, the professor

5    involved that graded the paper, he had -- somebody was

6    arrested for threatening Professor Badalamenti  --

7    Judge Badalamenti?

8          MR. HAMPSON:  I had heard that Judge

9    Badalamenti had received threats, I'm not aware of

10   whether someone was arrested or not, but I have heard

11   that he's received threats.

12         MR. RUSHING:  I just want to remind everybody

13   that we're asking questions about Professor Hampson's

14   direct knowledge. So if you could continue, please.

15         MR. DAMSKY:  Yeah. You said four professors

16   sent the email on April 1st?

17         MR. HAMPSON:  It was signed by four

18   professors.

19         MR. DAMSKY:  And that was Professor Lidsky

20   and Professor Kaufman were among them?

21         MR. HAMPSON:  Yes.

22         MR. DAMSKY:  And you described it as a

23   somewhat ambiguous threat against Jews. So would you

24   say that threat was more ambiguous, in your opinion,

25   than the threat that you've received in the paper?

1          MR. HAMPSON:  I don't want to speculate. The

2     reason I describe it as somewhat ambiguous is because

3     the reference to Noel Ignatiev in the first tweet, I

4     believe that's why Professor Lidsky asked you to

5     clarify.

6          MR. DAMSKY:  To the best of your knowledge,

7     has anything that I have ever said on my Twitter, or

8     in an academic environment, or at any other sort of

9     forum has it ever been directed at the law school in

10    terms of conduct that you see this potentially

11    threatening?

12         MR. HAMPSON:  Not entirely sure what you mean

13    by directed at. The calls to violence that I see in

14    the paper and the tweet reference people of certain

15    demographics who are present at the law school.

16         MR. DAMSKY:  But they don't specifically say,

17    for example, with regard to the tweet, Jews at UF Law

18    or Jews at the University of Florida?

19         MR. HAMPSON:  You did not write Jews at the

20    University of Florida or UF Law.

21         MR. DAMSKY:  Or Gainesville?

22         MR. HAMPSON:  You did not write that.

23         MR. DAMSKY:  (Crosstalk).

24         MR. HAMPSON:  You did not write that,

25    correct.

1              MR. DAMSKY:  Okay. Now, Professor Hampson,

2    you said that, I mean, for the best of your

3    recollection, we've never been in any classes. I

4    concur. I also have no such recollection. Have we ever

5    even interacted before? Exchange words, shook hands,

6    nodded towards each other, anything aside from what

7    we're doing right now?

8              MR. HAMPSON:  As I said, not to the best of

9    my recollection.

10             MR. DAMSKY:  So would you say that you have

11   a deep understanding of the type of person that I am?

12             MR. HAMPSON:  Sorry. Could you repeat the

13   question?

14             MR. DAMSKY:  Do you feel like you know me

15   personally?

16             MR. HAMPSON:  I do not.

17             MR. DAMSKY:  And do you think the professors

18   -- have you ever encountered, in your faculty

19   meetings, professors who defend -- have defended what

20   I've said? Not perhaps the viewpoint, but don't

21   believe that it was threatening?

22             MR. HAMPSON:  So let me restate the question

23   and see if, I understand it. You're asking if I've run

24   across other faculty members who don't believe that it

25   was threatening, what you've written?

```
                                          Page 152

 1           MR. DAMSKY:  Well, see, this is the
 2     difficulty of the hearing. What I want to ask you is,
 3     have you encountered faculty members that have said
 4     what I've said, within the bounds of the First
 5     Amendment?
 6           MS. PEEPLES:  So yeah. You're right, Preston.
 7           MR. DAMSKY:  Sorry again, I really don't mean
 8     to speak about the First Amendment.
 9           MR. HAMPSON:  Yeah. So -- and I feel like I
10     can speak to that. Your question is asking me for
11     legal expertise, which I can't provide on behalf of
12     myself. And I certainly can't -- wouldn't testify to
13     what other people who aren't me think the First
14     Amendment means.
15           MR. DAMSKY:  Let me put it in a more specific
16     way. Have you encountered any faculty members
17     who think that I have the right to remain in school?
18           MS. PEEPLES:  So Preston, can you -- I'm
19     trying to help you get to the information you're
20     looking for and stay in bounds of the hearing.
21     Professor Hampson provided information that people
22     shared with him that your posts, papers
23     provided statements that were perceived as
24     threatening.
25           MR. DAMSKY:  Okay.
```

1          MS. PEEPLES:  Are you trying to ask him if he

2     is also aware of people in the law school community

3     that did not believe it was threatening? Is that what

4     you're saying?

5          MR. DAMSKY:  That is roughly what I'm trying

6     to get at, yeah.

7          MR. HAMPSON: Well, I mean, you shared earlier

8     an email from Dean Merrick McAlister that discussed

9     the First Amendment in the context of your papers.

10          MR. DAMSKY:  Okay. How about since I've been

11     -- how about since April, 1st or 2nd -- or April 1st

12     (inaudible)?

13          MR. HAMPSON:  Well, what I can say is a lot

14     of people have discussed the concluding paragraphs of

15     these two papers and the tweets. I've shared that an

16     alumni, at least one student, so two faculty members

17     and the two other students that I talked to all

18     thought that there was a security risk in them. I

19     think other people are trying to figure out, you know,

20     there's a very strong commitment to First Amendment

21     and academic freedom at UF Law, and people may

22     disagree. I don't think what other faculty members

23     think about this is really relevant to this proceeding

24     because it's for the Board to decide whether the

25     conduct crosses the line. You're asking for legal

Page 154

1    expertise, I think, or you're asking me to identify
2    other people who could be witnesses, and I don't think
3    either of those things is within my role.
4            MR. DAMSKY:  Professor Hampson, have you
5    heard any faculty members describing Noel Ignatiev as
6    an obscure scholar or something along those lines?
7    Perhaps not those exact words.
8            MR. HAMPSON:  Not to my recollection.
9            MR. DAMSKY:  Okay. Do you know who Derek Bell
10   is?
11           MR. HAMPSON:  Sorry. Give me the last name
12   again.
13           MR. DAMSKY:  Bell, B-E-L -- B-E-L-L, like a,
14   you know, thing in the church people.
15           MR. HAMPSON:  Yes, the name is familiar to
16   me.
17           MR. DAMSKY:  Okay. And you wrote a paper that
18   talks about Mr. Bell. Is that correct? Critical theory
19   and commercial law in the sunshine.
20           MR. HAMPSON: That's right.
21           MR. DAMSKY:  Okay. And the objective of that
22   paper was to teach people -- was to encourage
23   the academic freedom for professors to teach critical
24   theory -- critical legal theory, critical race theory.
25   Is that about correct?

1          MR. HAMPSON: I mean, I think the paper stands

2     for itself. We can submit it into the record if it's

3     relevant. I don't see what you're driving at with

4     this.

5          MR. DAMSKY:  Yeah. I don't --

6          MS. PEEPLES:  I'm not seeing the relevance of

7     this line of questioning. Would you like to elaborate,

8     sir, on what you're trying to get at?

9          MR. DAMSKY:  Well, in one of his papers,

10    Professor Bell writes that, and I quote, "There are

11    many white anti-racist groups who are organizing and

12    enacting plans to reduce the dangers and disadvantages

13    of using whiteness as a measure of war in a normative

14    standard. A national network of groups call themselves

15    race traitors. They reject loyalty to whiteness in

16    favor of loyalty to humanity. Thus, if a white person

17    tells a racist joke or a story to a group of whites, a

18    member of the group would say, "Oh, you must've told

19    that story in front of me because you assume I am

20    white. I am actually black and just look white.'" And

21    let me tell you why I found that story funny. Now in

22    footnote, Mr. Bell says, "See, for example, Race

23    Traitor edited by Noel Ignatiev and George John Garvey

24    (ph)." And then he goes on to describe Race Traitor as

25    a journal published in Cambridge, Massachusetts

1    that, "Aims to serve as an intellectual center for

2    whites and others seeking to abolish the white

3    race." Were you aware of Professor Bell's writing

4    (crosstalk)?

5            MR. RUSHING:  I have not -- I'm not seeing

6    how any of that is relevant to your case.

7            MR. DAMSKY:  Well, essentially what I'm

8    trying to ask is if Mr. Hampson finds the notion of

9    abolishing the white race to be frightening.

10           MR. RUSHING:  Okay. You can ask that.

11           MR. DAMSKY:  That's the gist of it.

12           MR. RUSHING:  You can ask that. You can ask

13   that.

14           MR. DAMSKY:  Okay. Professor Hampson, do you

15   find the idea of abolishing the white race

16   (inaudible)?

17           MR. HAMPSON:  Yeah. So, you know, I

18   appreciate the effort to go from my essay to Derek

19   Bell to Noel Ignatiev. Ignatiev authored -- co-

20   authored a journal in Cambridge, Massachusetts called

21   Race Traitors. And that's, I believe, the origin of

22   the phrase abolish the white race by any means

23   necessary in your tweet. What Ignatiev meant by that

24   was whiteness as a category. And so this is again, why

25   I describe your tweet as potentially ambiguous and why

1    I think Professor Lidsky asked whether you would

2    clarify by saying whether you were calling for

3    violence or not.

4          MR. DAMSKY:  So a literal -- to your

5    understanding, a literal reading of my tweet with

6    respect to Noel Ignatiev would be that I was not

7    calling for extermination.

8          MR. HAMPSON:  Well, I don't know. What

9    Ignatiev said and wrote and what you quoted is abolish

10   the white race. There's a little bit of change in

11   language toward the end of your tweet to Jews, as a

12   collective of people. There's no reference to a Jewish

13   race or Jewishness. I don't know what you meant by it.

14   What I know is what it communicated to people and the

15   effects that it had in reading it. And in particular,

16   Lidsky's request to clarify in your response to her

17   request.

18         MR. DAMSKY:  Okay. Last question,

19   Professor Hampson. Should I be -- do you find it

20   threatening that I have repeated or disruptive that I

21   have repeatedly worn a t-shirt -- or otherwise

22   harassing, my apologies. That I have repeatedly worn a

23   t-shirt that says from the river to the sea, Palestine

24   will be free?

25         MR. HAMPSON:  I do not find it threatening. I

                                          Page 158

1    know that phrase is a contested one, and I believe

2    some people might find it threatening, I do not. And

3    to my -- I do not know what role this t-shirt that you

4    mentioned has played in the proceeding at all. It's

5    not something I have personal knowledge about.

6              MR. DAMSKY:  Okay. Thank you.

7              MR. RUSHING:  Are there any additional

8    questions for Professor Hampson from any party at this

9    time?

10             MS. ANDERSON:  One last question. Professor

11   Hampson, did you have any personal impact as it

12   relates to disruption or harassment that we're talking

13   about from the April tweet?

14             MR. HAMPSON:  Do you mean, me personally --

15             MS. ANDERSON:  Yeah. (Crosstalk).

16             MR. HAMPSON:  -- compared to people who said

17   things to me? No, I don't think that I did.

18             MS. ANDERSON:  Okay.

19             MR. HAMPSON:  My role here is to convey what

20   people have communicated to me, which I think speaks

21   to the scope and breadth of the concern in the

22   community. But I don't think I personally felt like I

23   was being threatened or harassed.

24             MS. ANDERSON:  Okay. Thank you.

25             MR. RUSHING:  Are there any further

Page 159

1    questions? Thank you, Professor Hmpson for your time,
2    you are free to leave.
3              MR. HAMPSON:   Thank you, everyone.
4              MS. PEEPLES:   You can just leave the meeting.
5    Good. Okay. Our next witness is?
6              MR. RUSHING:   Zachary Kaufman.
7              MS. PEEPLES:   Okay. I'm going to bring him.
8              MR. RUSHING:   We will now bring in our next
9    witness, Professor Zachary Kaufman.
10             MS. PEEPLES:   Okay.
11             MR. RUSHING:   Professor Kaufman, what
12   information do you have to provide to the university
13   specifically related to disruptive conduct and/or
14   harassment?
15             MR. KAUFMAN:   Yeah. Should I begin?
16             MS. PEEPLES:   Yes.
17             MR. KAUFMAN:   Thank you.
18             MR. RUSHING:   Yes, sir. Please begin.
19             MR. KAUFMAN:   Thank you for the opportunity
20   to speak at this hearing. Sorry, one second. Let me
21   get my water. Thank you for the opportunity to speak
22   at this hearing. Please allow me to introduce myself.
23   I will provide certain details as my experience and
24   expertise inform my testimony. My name is Zachary
25   Kaufman, I'm a tenured full professor of law at the

1   University of Florida Levin College of Law. At the

2   Levin College of Law, I teach four courses, criminal

3   law, international law, national security law, and a

4   course titled Law and Justice for Atrocity Crimes,

5   which involves my area of specialty genocide.

6          In addition to teaching, I perform multiple

7   service roles at the Levin College of Law. Among other

8   service positions I hold, I am the inaugural director

9   of the Initiative on International Law and the law

10  school's new program in law and government, the chair

11  of the International Programs Committee, and the

12  faculty advisor to the Florida Journal of

13  International Law, the International Law Society, and

14  the Jewish Law Students Association.

15         I'm also honored to hold appointments as a

16  faculty affiliate in four other components of the

17  university, the Department of Political Science, the

18  Center for African Studies, the Institute for National

19  Security, and the Bud Shorstein Center for Jewish

20  Studies. Before I became a full-time academic, I

21  served in all three branches of the U.S. government,

22  including at the U.S. Supreme Court, the U.S. Court of

23  Appeals for the First Circuit, the U.S. Senate Foreign

24  Relations Committee, and the U.S. Departments of State

25  and Justice. And I served at three international

                                                    Page 161

 1    criminal tribunals, the International Criminal Court,

 2    as well as the U.N. International Criminal Tribunals

 3    for Rwanda and for the former Yugoslavia.

 4              My work as a practitioner focused on the

 5    investigation and prosecution of suspected

 6    perpetrators of genocide, war crimes, and crimes

 7    against humanity. I have no relationship with Preston

 8    Damsky. He has never been a student in any of my

 9    courses, and I do not recall ever speaking with him.

10    As far as I can remember, this is the first time we

11    have met. I am familiar with Mr. Damsky and his

12    conduct through hearing about his academic work,

13    listening to students, staff, and faculty talk about

14    him, reading his posts on the social media site X,

15    formerly known as Twitter, and reading media coverage

16    involving him.

17              Given my position as the faculty advisor to

18    the Jewish Law Students Association, and as a Jew

19    myself, I will focus my testimony on the perspective

20    of Jews with whom I have spoken and my own

21    perspective. As I will discuss in my testimony, it is

22    my view that Mr. Damsky has disrespected,

23    discriminated against, intimidated, harassed, and

24    threatened Jews in and beyond our law school

25    community. In doing so, he has sowed terror and

Page 162

1    anguish among Jewish members, students, staff, and
2    faculty of our community, and he has massively
3    disrupted our law school's academic community within
4    our law school's walls and beyond, in the day-to-day
5    lives of our students, staff, and faculty.
6              On March 7th of this year, Mr. Damsky
7    declared on X, "The Jews are the common enemy of
8    humanity." Two weeks later, on March 21st, Mr. Damsky
9    posted to X a message that included the following
10   statement, "What I think must be done with Jews, Jews
11   must be abolished by any means necessary."  While Mr.
12   Damsky's prior conduct had already caused disruption
13   in our law school community, this post compounded that
14   disruption exponentially. Awareness and discussion of
15   this post spread through our law school community like
16   wildfire. Many members of our law school community,
17   Jews and non-Jews alike, interpreted Mr. Damsky's
18   message to be a concrete, credible call for genocidal
19   violence against Jews, including Jews in our law
20   school community, as well as their families.
21             In response to Mr. Damsky's March 21st post,
22   my colleague on the law school faculty, Professor
23   Lyrissa Lidsky, replied to Mr. Damsky on X by writing
24   the following question, "Are you saying you would
25   murder me and my family? Is that your position?" In

Page 163

1    Mr. Damsky's response to Professor Lidsky, he did not

2    say no. Because of my role as the faculty advisor to

3    the Jewish Law Students Association, because I myself

4    am Jewish, and because of my expertise in genocide,

5    including genocidal rhetoric and incitement, students,

6    staff, and faculty at our law school and in our

7    greater university contacted me to discuss Mr.

8    Damsky's posts and his other concerning conduct.

9         Mr. Damsky's post caused many Jews in our law

10   school community to feel immense fear and anxiety. And

11   he wrote those posts on social media during the final

12   month of the semester when students wanted and for

13   their grades and careers needed to focus on their

14   studies. Let me provide some examples. Many Jewish

15   students feared Mr. Damsky and potential attacks from

16   him. That was a rational fear rooted in recent events.

17   These students grew up in an era of mass shootings,

18   including in schools, at synagogues, and at Jewish

19   community centers by mass murderers who spewed similar

20   anti-Semitic and racist views as Mr. Damsky.

21        Many of our Jewish students come from South

22   Florida and specifically Parkland, where the deadliest

23   mass shooting at a high school in U.S. history

24   occurred in 2018 at Marjory Stoneman Douglas High

25   School. That same year, the deadliest attack against

Page 164

1    Jews in U.S. history occurred at the Tree of Life
2    Synagogue in Pittsburgh. As a result of these and many
3    other attacks in recent years at schools and against
4    Jews and Jewish institutions, our Jewish students,
5    staff, and faculty are all too familiar with mass
6    murder driven by anti-Semitism and other hate. Jews
7    have also been conditioned to be prepared for such
8    attacks through repeated training and active shooter
9    drills.

10           These events and trends were important
11   contextual factors driving community members'
12   interpretation of Mr. Damsky's disturbing behavior and
13   rhetoric. Many of our community members were thus
14   terrified that Mr. Damsky would go on a similar
15   murderous rampage. Many of our community members were
16   thus on edge whenever they heard a door slam, a water
17   bottle drop, or any other loud sound. Some students
18   were so concerned about the potential need for self-
19   defense against Mr. Damsky that they carried pepper
20   spray and escorted each other to and from their cars
21   in our law school parking lot. Several students cried
22   from fear of Mr. Damsky and what he might do.

23           Many students' studying was disrupted by
24   participating in hours-long conversations with their
25   parents and peers about Mr. Damsky, what he might do,

Page 165

1    how they could protect themselves, and what the
2    administration at the law school could or should do to
3    protect them. Some students skipped academic events,
4    missed classes, or were late to classes because they
5    were focused on attending town halls or participating
6    in conversations with each other or with faculty or
7    administrators about their safety. Students who were
8    tardy to or missed class felt uncomfortable stating
9    the reason. These students thus wonder if their
10   tardiness or absenteeism affected their grades.

11            Some students left campus entirely out of
12   fear of Mr. Damsky. These students sought refuge in
13   their apartments or at their parents' homes for the
14   sake of their physical safety and mental health. In
15   doing so, they abandoned their usual study places and
16   partners, disrupting their academic routines and
17   preparation for exams. Instead of going home, at least
18   one student's parents came to stay with them for
19   multiple weeks. While it was comforting for this
20   student to have their parents with them, their
21   parents' company was not conducive to the students'
22   studying.

23            In direct response to Mr. Damsky's social
24   media posts, the law school administration arranged
25   for heightened security on campus, including cameras

Page 166

1    in the faculty parking lot and more frequent police

2    patrols. On April 2nd, a week and a half after Mr.

3    Damsky's March 21st post, I was scheduled to deliver a

4    public lecture at our law school entitled The

5    International Criminal Court, The United States and

6    Israel, An Exploration of International Law,

7    Jurisdiction and Accountability. That event was co-

8    sponsored by seven organizations, the Florida

9    International Law Society, the Florida Journal of

10   International Law, the Florida Jewish Law Students

11   Association, UF Law's Middle Eastern and North African

12   Law Students Association, the Jewish Grad

13   Organization, the UF Bud Shorstein Center for Jewish

14   Studies and UF Hillel.

15           Given the subject matter of my lecture, as

16   well as the co-sponsorship by multiple Jewish

17   organizations, many members of our law school

18   community, as well as the wider university, feared

19   that Mr. Damsky would cause some sort of disturbance

20   at the event, including perhaps a violent attack. As a

21   result, many members of our community, myself

22   included, lobbied the administration to have security

23   present at the event. I personally felt that it was

24   important to have security present at the event

25   because of my experience over more than 25 years as a

1   scholar and practitioner with how genocidal rhetoric,

2   like that of Mr. Damsky, can and often does lead to

3   violence.

4           Especially at a time when antisemitism,

5   including violent antisemitism, has been surging

6   astronomically in the United States and around the

7   world, I believe that having security on hand was

8   crucial to deter, or if deterrence failed, respond to

9   an anti-Semitic attack by Mr. Damsky. I've delivered

10  more than 400 lectures throughout my career, many of

11  which have been on equally or even more controversial

12  topics, and some of which also related to Israel or

13  Jews. Never before had I requested police presence at

14  a lecture I've delivered, indicating my assessment of

15  how unusually disruptive and threatening Mr. Damsky

16  is.

17          The administration did facilitate the

18  presence of multiple uniformed police officers, both

19  inside and outside the building. The police also had

20  and circulated a photo of Mr. Damsky so that they

21  could immediately identify him. This police presence

22  and their precautions confirmed that the

23  administration seriously considered what many Jewish

24  students, staff, and faculty had already concluded

25  that Mr. Damsky presented a threat.

Page 168

1          On April 4th, two days after my April 2nd

2    public lecture, Interim Dean Merritt McAlister

3    announced via email that Mr. Damsky had been

4    trespassed from campus, that police patrols and event

5    security had recently increased, and that starting on

6    April 7th, the law school would change its security

7    protocols from having all doors unlocked during

8    business hours to having most of them locked and

9    accessible only through ID card access. These

10   increased security measures to protect against Mr.

11   Damsky, advocated by members of our law school

12   community, reflected the widespread alarm about Mr.

13   Damsky.

14          Exams then began on April 25th, just a month

15   after what many seriously considered to be Mr.

16   Damsky's call for genocide against Jews, and just a

17   few weeks after he was trespassed from campus and

18   heightened security measures were instituted to

19   protect against him, many Jewish students expressed

20   difficulty in studying for and taking exams. They

21   stated that their studying was disrupted by their

22   sincerely and reasonably held fear that Mr. Damsky

23   would stage or incite an attack against Jews at our

24   law school and perhaps in our wider university.

25   Several students believe that the disruption Mr.

1  Damsky caused prevented them from achieving their full

2  academic potential and that their grades and career

3  prospects, upon which grades in law school are so

4  dependent, thus suffered.

5          Leading up to and since those spring semester

6  exams, Jews' fear of Mr. Damsky has been further

7  confirmed both by anti-Semitic messages he has

8  continued posting to social media, as well as a

9  statement quoted in the New York Times article last

10  month in which Mr. Damsky said that it would not be

11  wrong to refer to him as a Nazi. In his posts on X,

12  Mr. Damsky spewing anti-Semitic tropes and conspiracy

13  theories refers to Jews as, for example, "A tribe of

14  rootless, child-killing vice merchants who

15  are, 'Evil', 'Socially

16  destructive', 'Psychopathic', 'Murderers', and

17  'A rogue gang of butchers' who, 'Love war, peace as

18  their foe', who engage in, 'Bad faith, nepotistic

19  scheming', who, even if American citizens are more

20  loyal to Israel than the United States,

21  who, 'Occupy' the whole American government, who

22  control and manipulate the media, who seek, 'Supremacy

23  and domination', who harm, 'Whites in the United

24  States', and whom world governments must, 'Subdue.'"

25          Several students and faculty members are so

                                              Page 170

1    afraid of Mr. Damsky and what he might do to them that
2    they declined to participate in this very hearing. Mr.
3    Damsky's conduct continues to disrupt our academic
4    community in other ways. Jewish students, staff, and
5    faculty continue to be forced to discuss and answer
6    questions about Mr. Damsky by their families, their
7    friends, their employers, and the press. At a
8    University of Florida Levin College of Law alumni
9    reception I attended at the annual Florida Bar
10   Association conference last month, Mr. Damsky's
11   troubled conduct and the threat he poses was the
12   single most common topic of conversation. Jewish
13   students feel enormous anxiety and fear about the
14   prospect of Mr. Damsky returning to campus this fall.
15          In closing, I want to reiterate that Mr.
16   Damsky has disrespected, discriminated against,
17   intimidated, harassed, and threatened Jews in and
18   beyond our law school community causing massive,
19   widespread disruption, anxiety, and fear. Thank you.
20          MR. RUSHING:  I will now open up the floor to
21   the Board members for questions for Professor Kaufman.
22   So it appears --
23          MS. WIJERANTHNE  So when you saw this tweet,
24   how did you perceive this message? And after that, did
25   your academic and personal life changed according to

1    that or how did you perceive this message?

2            MR. KAUFMAN:  How did I perceive the message?

3    And which one are you talking about, (crosstalk)?

4            MS. WIJERANTHNE  The tweet -- the statement

5    on the tweet. The tweet -- the original tweet. The X

6    message, sorry, on April 1st, I believe.

7            MR. KAUFMAN:  Are you talking about the March

8    21st tweet?

9            MS. WIJERANTHNE  Yes, the March 21st X

10   message, yes.

11           MR. KAUFMAN:  Okay. There are many tweets.

12   The March 21st tweet is but one of them. That's the

13   one in which Mr. Damsky calls for the abolition of

14   Jews by any means necessary. Especially in context

15   with his other conduct, I consider that a credible

16   call for genocide against Jews, just as many other

17   people have.

18           MS. WIJERANTHNE  So did this perception then

19   change the way you -- I mean, did it really impact

20   your day-to-day life or, like, the academic ways that

21   you usually work in day-to-day life, I guess?

22           MR. KAUFMAN:  Yes, it impacted my life

23   tremendously. As the faculty advisor for the Jewish

24   Law Students Association and as an expert in genocide,

25   many people sought to talk with me about Mr. Damsky's

Page 172

1  tweet on March 21st as well as many of his other

2  tweets and disturbing behavior. So I was inundated in

3  meetings with students, staff, and faculty. I myself

4  had to consider my own personal safety and that of my

5  family and of my colleagues and of my students. I

6  engaged in conversations with the administration about

7  security at the law school and around my event that I

8  mentioned, the one in which I lectured on the

9  International Criminal Court Israel and the United

10 States.

11         This is all to say that, yes, Mr. Damsky's

12 conduct has tremendously and it continues to

13 tremendously impact my life as a professor and as a

14 Jew and as a concerned citizen.

15         MR. RUSHING:  Preston, you may now ask any

16 questions relevant to the allegations you have for

17 Professor Kaufman.

18         MR. DAMSKY:  Hello, Professor Kaufman. Thank

19 you for taking my questions. You stated that you

20 interpreted my tweet as a credible call for genocide

21 against Jews. Can you explain to me what you mean by

22 the term credible?

23         MR. KAUFMAN:  I believe in context with other

24 of your disturbing behavior and in the plain English

25 of your message that you were uttering a call for

Page 173

1   genocide against Jews.

2           MR. DAMSKY:  You don't believe that I have

3   the ability to -- or do you believe that I have the

4   ability to carry out such a genocide?

5           MR. KAUFMAN:  Why would you not?

6           MR. DAMSKY:  So I, as a single person, am

7   able to commit genocide in your estimation?

8           MR. KAUFMAN:  It's not my estimation. The

9   legal definition of genocide has no limit on

10  numerosity. Given some of your other posts, you seem

11  confused on this issue. The legal definition of

12  genocide is the target killing in whole or in part of

13  a group. And there are certain acts that fulfill that

14  definition. And yes, a single individual can commit

15  genocide. And many people throughout history and in

16  the international criminal tribunals that I've served

17  in have been convicted as individuals in perpetrating

18  genocide.

19          MR. DAMSKY:  But those individuals were heads

20  of state, armies. I don't have an army to the best of

21  your knowledge, correct?

22          MR. KAUFMAN:  I don't know what you have. You

23  have followers on Twitter with whom you engage, some

24  of whom you do not engage in. I don't know anything

25  about your personal life. This is the first time I've

1    ever meeting you. I don't know what associations you
2    have, I don't know who subscribes to your beliefs. We
3    do know that there's widespread antisemitism,
4    including violent antisemitism in the United States
5    and beyond. I have no idea what you're capable of and
6    what you intend to do.
7            MR. DAMSKY:  So first off -- not first now,
8    but did you ever report my paper to the FBI?
9            MR. KAUFMAN:  Excuse me?
10           MR. DAMSKY:  Did you report any of my
11   academic work, my paper in either Jonathan Marshfield
12   or Judge Badalamenti's class? Did you report them to
13   the FBI or report me for writing them more accurately?
14           MR. KAUFMAN:  I decline to answer that
15   question.
16           MR. DAMSKY:  So you mentioned -- well, in an
17   article that you were quoted, you said recognizing
18   that bystanders enable injustice. You've been recently
19   focusing on how we could probably be bystanders and
20   even perpetrators to act instead as upstanders. Doing
21   so could help ameliorate crises, including
22   genocide. Is that's correct?
23           MR. KAUFMAN:  I believe so, yes.
24           MR. DAMSKY:  Okay. You stated that I was
25   confused due to some of my posts on it. Oh, yes,

Page 175

1    before we get to that, do you actively go to

2    my X account to search and look at my posts?

3            MR. KAUFMAN:  I have visited your X account

4    as have many other people.

5            MR. DAMSKY:  About how many times would you

6    say?

7            MR. KAUFMAN:  I have no idea.

8            MR. DAMSKY:  More than five?

9            MR. KAUFMAN:  I don't know.

10           MR. DAMSKY:  But more than once.

11           MR. KAUFMAN:  I have visited your account

12   more than once, yes.

13           MR. DAMSKY:  So you stated, based on some of

14   my posts, I seem confused. Could you explain what you

15   meant by that?

16           MR. KAUFMAN:  You appear to be confused about

17   many things. The thing that I referenced was the

18   definition of genocide. You try to make a distinction

19   between yourself and Professor Noel Ignatiev based on

20   numerology. He said that the -- let me get your

21   quote, "If Ignatiev saw genocide, then surely a

22   genocide of all whites would be an even greater

23   outrage than genocide of all Jews, given the far

24   greater number of genocides -- excuse me, of whites."

25               Genocide is not based on numerosity. The

Page 176

1   outrage is in the crime of genocide itself, and it's

2   seeking to eradicate a group. That's why it's often

3   considered to be the most egregious crime possible.

4   The crime of crimes, as the UN International Criminal

5   Tribunal for Rwanda has defined it. You seem confused

6   about the definition of genocide and why genocide

7   outrages.

8          MR. DAMSKY:  This question goes to the

9   witness's of credibility. Is Israel actively

10  committing a genocide in the Gaza Strip right now?

11         MR. RUSHING:  That question is not relevant,

12  sir.

13         MR. DAMSKY:  The man holds himself out as a

14  scholar of genocide (crosstalk).

15         MR. RUSHING: Sir, I don't -- I decide that is

16  not relevant to this hearing.

17         MR. DAMSKY:  Okay. (Inaudible).

18         MS. PEEPLES:  Preston, it just -- if it

19  helps, what were -- I understand -- we understand

20  Professor Kaufman has shared all the things that he

21  has done. This focus for this hearing body is on what

22  Professor Kaufman can share as far as the impact of

23  the law school community and his own knowledge of

24  behavior as it relates to disruptive conduct and/or

25  harassment.

1        MR. DAMSKY:  Well, Ms. Peeples, what I'm

2   essentially trying to argue here is that Professor

3   Kaufman is incredibly biased against me as a witness

4   because he doesn't like the things that I say and I'm

5   trying to demonstrate that. I'll just try and ask the

6   questions and if I can't ask them, then I can't ask

7   them.

8        MS. PEEPLES:  Okay.

9        MR. DAMSKY:  Professor Kaufman, is it true

10  that you posted to Twitter and to LinkedIn shortly

11  after the October 7th attacks about your signing of a

12  quote -- signing of a statement quote about the Hamas

13  terrorist organization's heinous attack on

14  (inaudible)?

15        MR. KAUFMAN:  Not relevant.

16        MR. DAMSKY:  So you declined to answer?

17        MR. KAUFMAN:  Not relevant, sir.

18        MS. PEEPLES:  (Crosstalk).

19        MR. DAMSKY: Okay. I'm sorry. I didn't hear if

20  you said that, so my apologies. Professor Kaufman -- I

21  think this is relevant. Professor Kaufman, you hosted

22  an event on Wednesday, February 19, 2025 in the Martin

23  Levin Advocacy Center room 106 at UF Law featuring

24  Ambassador Dennis Ross and Ghaith al-Omari who are

25  both members of the Washington Institute for Near

Page 178

1  East Policy or WINEP, correct?

2          MR. KAUFMAN:  Yes. Also not relevant.

3          MS. PEEPLES:  So Professor Kaufman, the -

4  - you don't get to decide what's relevant or not

5  relevant. If it's not relevant, either I will step in

6  or the chair will step in. What I will ask is,

7  Preston, can you -- is this -- are you still going to

8  credibility questions?

9          MR. DAMSKY:  Well, actually, I think Mr.

10  Kaufman actually does know why this question is

11  relevant. Mr. Kaufman (crosstalk).

12          MS. PEEPLES:  Wait, wait, wait.

13          MR. DAMSKY:  Well, hold on, hold on. Let me

14  ask (inaudible).

15          MS. PEEPLES:  I know. Let me just -- let me

16  clarify for Professor Kaufman. You can decline to

17  answer any question you wish and you just can say you

18  declined to respond. The relevancy determination will

19  be shared by Ryan as the chair or by myself as the

20  hearing advisor. Preston can ask the question, if you

21  want to pause, Professor Kaufman, to allow for an

22  evaluation of relevancy or to determine whether or not

23  you'd like to answer the question, that would probably

24  be the most effective way to go about it.

25          MR. KAUFMAN:  Okay.

Page 179

1              MR. DAMSKY:  Do you recall my presence at

2     that event?

3              MR. KAUFMAN:  Which event?

4              MR. DAMSKY:  The event on February 19, 2025,

5     featuring Ambassador Ross and Ghaith al-Omari. It was

6     in MLAC room 106.

7              MS. PEEPLES:  And then Preston, I'm going to

8     ask you just to help us understand the relevancy as

9     far as you're asking this. Is this going to behaviors

10    that you engaged in as far as disruptive conduct

11    and/or harassment?

12             MR. DAMSKY:  Well, I am first going to ask

13    the -- well, I'm asking Professor Kaufman if he

14    recalls my attendance at that event.

15             MS. PEEPLES:  Yes. So what I'm trying to

16    understand is this whole line of questioning. Is this

17    --

18             MR. DAMSKY:  I want to ask him if he believes

19    that I was (inaudible) at that event.

20             MS. PEEPLES:  Okay.

21             MR. DAMSKY:  Yes.

22             MR. KAUFMAN:  Yes, I recall your presence.

23             MR. DAMSKY:  Do you believe that I was

24    disruptive or harassing at that event?

25             MR. KAUFMAN:  No, I do not believe you were

Page 180

1    harassing at -- or disruptive at the event.

2              MR. DAMSKY:  Okay. And I did ask a question.

3    I won't go into the details.

4              MR. KAUFMAN:  (Crosstalk).

5              MR. RUSHING:  I did ask --

6              MS. PEEPLES:  Yeah. He said yes for just a

7    minute.

8              MR. DAMSKY:  I'm sorry about that.

9              MS. PEEPLES:  Okay.

10             MR. DAMSKY:  Please, Mr. Damsky, continue.

11             MR. KAUFMAN:  Yes.

12             MR. DAMSKY:  Thank you, sir. Now, we won't

13   get into the details of the question because I would

14   imagine that would be found irrelevant. But do you

15   recall that I asked the question to Mr. Ross and

16   Mr. al-Omari?

17             MR. KAUFMAN:  Yes, I recall.

18             MR. DAMSKY:  Okay. Now, are you, by chance,

19   aware that the first post that I made -- like I said,

20   that event was on February 19th, are you aware the

21   first post that I made on my current Twitter account,

22   essentially when I created it, was on February 19th at

23   11:37 p.m.? So about -- that was the night after your

24   panel talk?

25             MR. KAUFMAN:  I have neither memorized the

Page 181

1    date or time of your posts.

2              MR. DAMSKY:  So you're (crosstalk)?

3              MR. KAUFMAN:  (Crosstalk).

4              MR. DAMSKY:  Are you aware on the next day I

5    tweeted out, "It is wrong to equate the Palestinian

6    resistance and the Jewish entity. The Palestinians are

7    fighting a morally unimpeachable war of liberation so

8    that their people may control their own destiny. The

9    Jews are running an illegitimate terrorist entity

10   in (inaudible).

11             MR. KAUFMAN:  I'm not sure of the relevance

12   of this question, sir. (Crosstalk).

13             MR. DAMSKY:  Are you aware that I am -

14   - Professor Kaufman, are you aware that -- and this

15   was the account that I made yesterday, I've used my

16   Twitter account to say that Israel's conduct in

17   Palestine is a genocide or is denocide about 20 times.

18   Have you seen that or anything like that?

19             MS. PEEPLES:  So again, is the relevancy of

20   it would be -- are you asking about behavior that you

21   engaged in that could either be perceived as

22   disruptive conduct or harassment?

23             MR. DAMSKY:  Well, Mr. -- I'm asking if he's

24   seen any of these posts, and then I intend to ask him

25   if he perceives any of those posts as disruptive

Page 182

1    conduct or harassment.

2              MS. PEEPLES:  Okay.

3              MR. KAUFMAN:  I have read your position on

4    Israel's conduct. Many people share your view. I do

5    not interpret that in and of itself as disruptive,

6    threatening or harassing.

7              MR. DAMSKY:  What about wearing a T-shirt

8    that says, "From the river to the sea, Palestine will

9    be free."

10             MR. KAUFMAN:  I have not seen you wear such a

11   T-shirt.

12             MR. DAMSKY:  Are you aware that I've worn

13   such a T-shirt? Have you heard anything in the law

14   school community?

15             MR. KAUFMAN:  I heard that you have worn such

16   a T-shirt.

17             MR. DAMSKY:  And has anybody said that it was

18   disruptive or threatening or harassing?

19             MR. KAUFMAN:  I think some people hold that

20   view, I personally do not hold that view.

21             MR. DAMSKY:  And just to be clear, Ms.

22   Peeples, I can't ask any questions about the bias of

23   the witness.

24             MS. PEEPLES:  About the -- you can --

25             MR. DAMSKY:  The bias of the witness?

1            MS. PEEPLES:  Questions about --
2   well, Preston, if you want to ask a question and give
3   us a minute to determine if it's relevant or not, as
4   far as whether you believe a witness would be biased,
5   that would be information you would want to share
6   during your opportunity to speak directly with the
7   Board. If there are questions that you need to ask in
8   order to elicit whether or not the witness has a bias
9   or goes to the witness's credibility, you can
10  certainly ask the question, but then you'll need to
11  give a minute for us to make a determination whether
12  it's a relevant question or not.
13            MR. DAMSKY:  Okay. Professor Kaufman, do you
14  feel particularly compelled to speak here today
15  because of my position on the Israel-Palestine
16  conflict?
17            MR. KAUFMAN:  Can you repeat the question,
18  please? I'm sorry.
19            MR. DAMSKY:  Do you feel particularly
20  compelled to speak here today because of my position
21  on the Israel-Palestine conflict and how loudly I
22  speak out about it on social media?
23            MR. KAUFMAN:  No, it's irrelevant.
24            MR. DAMSKY:  Okay. Thank you.
25            MR. RUSHING:  Are there any additional

Page 184

1    questions for Professor Kaufman from any party at this
2    time?
3              MR. KAUFMAN:  Can I clarify -- sorry. Can I
4    clarify my last answer?
5              MR. RUSHING:  That's fine with me. Aimee, is
6    that okay?
7              MS. PEEPLES:  Yeah. That's fine.
8              MR. RUSHING:  Okay. Yeah. Go ahead.
9              MR. KAUFMAN:  Mr. Damsky, is that okay with
10   you?
11             MR. DAMSKY:  Yes, sir.
12             MR. KAUFMAN:  I don't -- you asked if I felt
13   particularly compelled to speak here because of your
14   position on Israel-Palestine. Is that correct?
15             MR. DAMSKY:  Yes, sir.
16             MR. KAUFMAN:  I don't feel particularly
17   compelled to speak here today because of your view
18   that Israel is committing genocide against
19   Palestinians in Gaza. The way that it relates to my
20   concern about your troubling rhetoric and conduct is
21   that you seem to impute any objection or any concerns
22   you have with Israel's conduct to Jews. And you weave
23   into that anti-Semitic tropes and conspiracy theories
24   about Jews controlling governments and the media. And
25   you also attribute conduct by Israel to Jews, not just

Page 185

1    Israelis, but Jews, despite the fact that Israeli

2    military and government is made up by people other

3    than just Jews.

4            But to Jews' character, or sort of innate

5    character, you've written, you've posted numerous

6    times about your view of Jews being, you know,

7    uncontrollably bloodthirsty, criminal, gangsters and,

8    you know, seeking domination and suppression of

9    anybody with whom they apparently disagree. And so

10   it's not that -- I'm not concerned about your position

11   about Israel's conduct or potential conduct or

12   possible conduct. What I'm concerned about, among

13   other -- among many other things about what you post,

14   is what you attribute to Jews and their character.

15           MR. DAMSKY:  May I ask a follow-up?

16           MR. RUSHING:  You may.

17           MR. DAMSKY:  Okay. Just one. Do you know of

18   any conduct, aside from my papers, that you would

19   consider to be threatening and harassing? Aside from

20   my papers, is it just the Twitter?

21           MR. KAUFMAN:  No. I've heard from some Jewish

22   students that they feel that you've discriminated

23   against them in tangible ways.

24           MR. DAMSKY:  Could you describe that?

25           MR. KAUFMAN:  For the sake of the anonymity

1   of the student at issue who believes that you would be
2   able to identify them, I've been asked not to share
3   any details. All I can say is, generally, there are
4   Jewish students who feel that you have discriminated
5   against them and harassed them specifically, and they
6   believe that you have done so because they're Jewish.
7           MS. PEEPLES:  But you aren't able to provide
8   the detail of the behavior?
9           MR. KAUFMAN:  That's correct. The students in
10  question believe that if I were to reveal details,
11  that Mr. Damsky would be able to identify them because
12  they so fear him. They would prefer -- and actually
13  not that they would prefer, they have requested and I
14  have agreed not to share details.
15          MS. PEEPLES:  Okay. So other -- so go ahead,
16  Ryan.
17          MR. RUSHING:  Are there any further
18  questions? Okay. Seeing none, thank you, Professor
19  Kaufman, for your time, you are free to leave.
20          MR. KAUFMAN:  Thank you.
21          MS. PEEPLES:  Thank you.
22          MR. DAMSKY:  Ms. Peeples, I'm sorry. Can I
23  have just kind of break in here?
24          MS. PEEPLES:  Okay.
25          MR. RUSHING:  Yeah. Absolutely. Let's do -

1  - do you need a five-minute or ten-minute break?

2          MR. DAMSKY:  How am I supposed to defend

3  against that?

4          MS. PEEPLES:  Okay. So Preston, just

5  generally speaking, the credibility of information

6  shared or of a particular witness will be weighed by

7  the hearing body and if -- and you can specifically

8  address what you believe would be a way to

9  appropriately weigh credibility of information or

10  witnesses when you speak to the hearing body. That's

11  something that goes into the deliberation, is a

12  weighing of the credible information and credible

13  witnesses. So just because something's shared does not

14  mean it is given the full weight that everything else

15  is shared. There is a credibility assessment. Does

16  that make sense?

17          MR. DAMSKY:  Yeah.

18          MS. PEEPLES:  Okay. Do you --

19          MR. RUSHING:  Is everybody ready to proceed

20  or do we want to take a break here?

21          MR. DAMSKY:  No, I'm ready.

22          MS. PEEPLES:  Okay.

23          MR. RUSHING:  Okay. All right. We will now

24  bring in our next witness, ███████████.

25          MS. PEEPLES:  Okay.

Page 188

1          MR. RUSHING:  █████████, what information do you

2    have to provide to the university specifically related

3    to disruptive conduct and/or harassment?

4          MR.█████████  I was in one of the seminar

5    classes that Preston was in, it was constitutional

6    change. It was John Marshfield's class and we all read

7    the paper that he wrote. And when we were giving

8    feedback and such, he explicitly stated that the essay

9    was a call for -- I believe the words were I asked is

10   this paper a call for contemporary racial violence

11   against Black people in America? I don't know if

12   that's the exact words but that was the idea and he

13   said, if I recall correctly, "Yes." Which I took to be

14   -- I mean, it is a statement that he was advocating

15   for violence which I took as also potentially

16   indicative of a chance of him committing violence.

17   That's mostly it.

18          MR. RUSHING:  Thank you. I'll now open up the

19   floor to the Board Members for questions for ████████.

20          MS. ANDERSON:  ████████--

21          MR. RUSHING:  (Crosstalk) -- go ahead.

22          MS. ANDERSON:  You want me to go?

23          MS. PEEPLES:  Uh-huh.

24          MS. ANDERSON:  Okay. ████████ just to be

25   clear, what can you tell us about what you observed

1    yourself and what you -- the impact that resulted from

2    what you directly witnessed? Like, not -- like, you

3    yourself.

4            MR. ███████    The -- I myself witnessed him

5    -- I read the paper obviously, and read it to be a

6    call for violence. And then I personally asked him

7    whether it was intended as a call for violence and he

8    stated, "Yes, it was." So to me, that was disturbing

9    particularly given that there were a number of non-

10   white students in that class to explicitly call for

11   racial violence suggests to me somebody that is worth

12   being worried about or scared of.

13           MS. ANDERSON:  Thanks, ███████.

14           MS. WIJERANTHNE  Yes, so I kind of wanted to

15   have more information about how this peer review

16   process work. So I understand that all of you wrote a

17   paper and then this is circulated between the

18   classmates? Or was it just you got his paper? Or how

19   did it work?

20           MR.███████:  So it was we had like there

21   were rolling deadlines so it's like a few students

22   each class period were like up for peer review so we

23   put our paper draft into like a discussion board on

24   canvas. And our homework -- it was I think three

25   students went each day that we did the peer review.

1   The homework for that day would be that you go through

2   and you read all of your classmates' papers. And then

3   you come in and it was just kind of like a roundtable

4   open discussion about the papers that we had read.

5          MS. WIJERANTHNE  Okay. So intellectually -- I

6   don't know about law, but intellectually, does this

7   have merit to discuss difficult subject matter, I

8   think, within your subject or is it something that is

9   encouraged?

10         MR. ████████:  Making sure I understand the

11  question, is it encouraged to discuss difficult or

12  troubling subject matters, like, in that course?

13         MS. WIJERANTHNE  Yes, like, a difficult

14  subject point -- not points of view, I mean, like

15  throughout the history, we see that there are these

16  kinds of topics being discussed intellectually. So is

17  that something encouraged within these courses

18  (crosstalk)?

19         MR. ████████  Yeah. I would say that this

20  course encouraged the discussion of difficult topics.

21         MS. ANDERSON:  And so, ██████, the

22  information that you are sharing is only related to

23  the academic paper that you read in Preston's?

24         MR. ████████  Yeah. The paper and the

25  discussion of the paper in class. But I haven't really

1   ever interacted with Preston outside of class. I mean,

2   I'm sure we've spoken, but never, like, at length.

3          MS. ANDERSON:  I guess related to that, is

4   there anything else you would like to share about the

5   impact that all of this has had on you?

6          MR. ███████  I haven't had a crazy impact

7   on me personally because I'm white and he's

8   threatening the non-white students of the school. I

9   mean, it's disturbing to me that on a day-to-day

10  basis, my classmates have all been around this guy

11  when there's -- when he's made explicit statements

12  calling for violence that would include many of those

13  classmates that have to be around him. And I find it

14  bothersome and disturbing and upsetting.

15         MS. WIJERANTHNE Thank you. So how did this

16  impact the day-to-day academic work after the day of

17  peer review?

18         MR.███████  So that -- it was really near

19  the end of the course, so really, the way that it

20  worked was we had, like, a whole semester of

21  discussions and then we wrote these papers. So after

22  that peer review, like, class discussion was over. So

23  it didn't affect that specific class a great deal. I

24  think that that was kind of the start on a lot of

25  people getting to know Preston's like anti-Semitic and

Page 192

1   racist and et cetera statements. So I think it kind of

2   contributed to a general unease amongst the school of

3   people being around Preston. But that pretty much was

4   the very end of that class. So it kind of concluded

5   that class's interactions.

6                MR. RUSHING:  Are there any more questions

7   from the Board? Preston, you may now ask any questions

8   relevant to the allegations you have for ███████.

9                MR. DAMSKY:  Hello, Mr. ███████████ Thank you

10  for taking my questions. Now, you stated just now that

11  you asked me if my paper was -- specifically the

12  conclusion, was a call for -- and I believe I'm

13  quoting you, a contemporary -- a call for contemporary

14  racial violence against black people. Is that correct?

15               MR. ███████████  Yeah. Like I said, I don't

16  know the exact words, but something to that effect.

17               MR. DAMSKY:  Ms. Peeples, I'm wondering if

18  you could share page 92, (inaudible) --

19               MS. PEEPLES:  Yes.

20               MR. DAMSKY:  -- it's his report. Mr.

21  ███████████, do you see -- you said, I believe I'm

22  reading this correctly, but correct me if I'm wrong.

23  It says, "For clarity -- " and you sent this on

24  October 30th, which was -- just to be clear, that was

25  the day that it happened?

1          MR. ▮▮▮▮▮▮:  I don't recall if it was the
2    exact same  day or one of the next couple of days.
3          MR. DAMSKY:  Oh, our class met on Wednesday.
4     Is that correct?
5          MR. ▮▮▮▮▮:  I think so.
6          MR. DAMSKY:  Okay. And then it got out at
7    around 5:30. Is that correct?
8          MR. ▮▮▮▮▮:  The class was probably about
9    right, yeah.
10         MR. DAMSKY:  Okay. And you sent this email at
11   5:48?
12         MR. ▮▮▮▮▮:  Yep.
13         MR. DAMSKY:  Okay. You say, "For clarity, my
14   recollection of the exact wording is that I asked
15   Preston, was the last paragraph in your paper intended
16   to be a call for contemporary extralegal violence? To
17   which he responded, yes." Mr. ▮▮▮▮▮, do you
18   remember a line in my paper by a scholar that we read
19   named Richard Albert? And Mr. Albert says --I'm trying
20   to find it. Mr. Albert says something to the effects
21   of, "Designating violence as extralegal says nothing
22   about its legitimacy."
23         MR. ▮▮▮▮▮:  I don't remember the exact
24   quote, but I believe that that is a quote by Richard
25   Albert.

```
 1          MR. DAMSKY:  Okay. And now, I wrote down kind
 2   of our -- after seeing your report on Wednesday, I
 3   wrote down kind of what I recall because I frankly had
 4   no idea that you would speak. What I recall is you
 5   asked me if my paper was called for revolutionary
 6   violence. Revolutionary -- I think you might have said
 7   even revolutionary extralegal violence.
 8          MR.███████████   I don't recall using
 9   revolutionary.
10          MR. DAMSKY:  I'm sorry. Say that again.
11          MR. █████████:  I don't recall saying the word
12   revolutionary.
13          MR. DAMSKY:  Okay. And I said something along
14   -- what I wrote down, I think a little bit more
15   pertinent maybe, is I said something along the lines
16   of, or I recall saying something along the lines
17   of, "I don't reject that if that's what it
18   takes." Does that sound about right? I mean, would
19   that be?
20          MR. ████████   I don't know. I mean, that
21   sounds like something you might say if that's your
22   question.
23          MR. DAMSKY:  Okay. Okay. Did I also say
24   something along the lines of all politics and all law
25   is violence? Does that sound familiar?
```

1             MR. ███████    Not really, but you might have
2   said it.
3             MR. DAMSKY:  Do you -- just out of curiosity,
4   do you agree or disagree with that statement?
5             MR. ██████:    What statement? That all law
6   is like derived from violence or something to that
7   effect?
8             MR. DAMSKY:  Sure.
9             MR. RUSHING:  Is that a question about the
10  quote or is that a question about his personal
11  beliefs?
12            MR. DAMSKY:  Well, sir, it goes towards
13  whether or not he would consider the -- what I said to
14  be threatening. Because I presume that Mr.
15  ███████ does not think that legal advocacy in general
16  is threatening, even if it has an underlying violent
17  core. Is what (inaudible),
18            MR. RUSHING:  All right. Thank you. That
19  clarifies things for me.
20            MS. PEEPLES:  You can ask the question agai.
21            MR. ███████    Could you ask the question
22  again?
23            MS. PEEPLES:  Yeah. You can ask.
24            MR. DAMSKY:  I was wondering, do you
25  essentially believe that -- and I believe -- and I'm

1    trying to recount what you just said, that the core of

2    all law is violence?

3                 MR. ███████    I believe that law is enforced

4    with violence, if that's the question.

5                 MR. DAMSKY:  Yes. Now --Ms.  Peeples, I was

6    wondering if we can go to --

7                 MS. PEEPLES:  Uh-huh.

8                 MR. DAMSKY:  -- sorry. Did the thing where it

9    switches me to full screen.

10                 MS. PEEPLES:  That's okay.

11                 MR. DAMSKY:  Give me one minute.

12                 Now, I was told I could bring this in as an

13    exhibit. Can we go to page 176 -- or 175 first, and

14    then we can scroll down to 176?

15                 MS. PEEPLES:  Okay. Are you there, Preston?

16                 MR. DAMSKY:  Yeah. I'm sorry.

17                 MS. PEEPLES:  No, you're okay.

18                 MR. DAMSKY: Just trying to make a

19    choice. Okay. So Mr. ███████  this is the -- this is

20    UF's Freedom of Expression Statement kind of a

21    governing thing, and it was published April 2019. Can

22    we go down the first paragraph (inaudible) 176?

23                 MS. PEEPLES:  Uh-huh.

24                 MR. DAMSKY:  And I'm just going to read you

25    one sentence here. It said, "First, UF will -- " well,

Page 197

1   two, I'll set up the context, "The preceding

2   information is not meant to suggest that there are no

3   limits on the expression of one idea. First, UF will

4   restrict any speech, violence, or lie, including, but

5   not limited to genuine threats of violence or harm in

6   statements designed to incite others to engage in

7   imminent, unlawful conduct." Now, in relation to what

8   I just read, do you remember what I was wearing when I

9   gave my presentation?

10          MR. ███████    No, I don't remember what you

11  were wearing.

12          MR. DAMSKY:  Is it safe to say that I was,

13  like, wearing a suit and -- a dress suit -- or dress

14  shoes?

15          MR. ███████    Probably not.

16          MR. DAMSKY:  (Crosstalk) doesn't wear a tie,

17  but I seem to recall wearing a suit. Does that sound

18  (crosstalk)?

19          MR. ███████    Yeah. That sounds about right.

20          MR. DAMSKY:  Okay Do you think that I was

21  trying -- now, I'm asking for your sense of the

22  moment. Do you think I was trying to incite a mob, or

23  otherwise incite people to imminent violence in that

24  moment, when I presented my paper to a group of about

25  a dozen or so -- Okay. First question. Would you say

1    that most of the people in the classroom did not agree
2    with me, if not every single one of them?
3                 MR. ██████████    I don't know what other people
4    in the room thought.
5                 MR. DAMSKY:  Okay Did anybody say that they
6    agreed with me?
7                 MR. ██████████    Nope.
8                 MR. DAMSKY:  Okay. So I will just say, when
9    I'm coloring this question, it was my impression that
10   I did not think that anybody agreed with me. And I
11   would say that they generally tended to disagree. So
12   my question is, do you think I was trying to incite a
13   mob when I presented my paper to a group of about a
14   dozen or so fairly ideologically hostile law students,
15   while I was dressed in a suit and dress shoes? Was
16   that your sense of the moment? Was I trying to incite
17   you to create a mob?
18                 MR. ██████████    I did not feel that you were
19   trying to incite me to create a mob, no.
20                 MR. DAMSKY:  And I didn't say we needed to go
21   do something right then and there that was violent?
22                 MR. ██████████    Did you say we need to go do
23   something right here and now that is violent, no.
24                 MR. DAMSKY:  Okay. And just to be clear,
25   regardless of my intent, there's no mob actually

Page 199

1    formed after I gave my presentation to enact when I

2    was advocating for things that I was advocating for in

3    the paper?

4             MR. ███████    No, there was not a mob in

5    that classroom.

6             MR. DAMSKY:  Nobody -- I wasn't that moving,

7    in other words.

8             MR.███████    Can you clarify the question,

9    please?

10            MR. DAMSKY:  I -- nobody was spurred towards

11   extralegal or revolutionary violence after that

12   presentation. Is that correct?

13            MR. ███████    That's correct. You did not

14   successfully spur anyone to violence.

15            MR. DAMSKY:  Do you remember me asking you if

16   the American Revolution was an example of extralegal

17   violence or revolutionary violence?

18            MR. ███████ :  I remember a discussion to

19   that effect.

20            MR. DAMSKY:  And do you remember me asking

21   you if it was immoral?

22            MR. ███████    Yes, and I said -- I don't

23   know if you asked me about the Revolutionary War. You

24   asked if all extralegal violence -- all extralegal

25   action, I believe, is immoral. And I said, "No, I

Page 200

```
 1   don't believe that."
 2            MR. DAMSKY:  Okay. But you did say that my
 3   ideas were wrong.
 4            MR. ██████████    Yes.
 5            MR. DAMSKY:  Which is, of course, you're
 6   right.
 7            MR. ██████████    Gee, thank you.
 8            MR. DAMSKY:  So just hypothetically, you
 9   wouldn't feel like uncomfortable in class if someone
10   were to praise the American Revolution, even if they
11   emphasized its violent aspects?
12            MR. ████████    I'm not sure what my thoughts
13   on the American Revolution have to do with this,
14   respectfully.
15            MS. PEEPLES:  Preston, can you help -
16   - like, help us understand what your line of
17   questioning is, the relevancy of it?
18            MR. DAMSKY:  Sorry. Essentially, I'm
19   wondering -- my question is -- well, Mr. ████████, do
20   you feel threatened by my speech?
21            MR. ██████████    No, I'm white.
22            MR. DAMSKY:  Okay. All right.
23            MR. ██████████    If I were not white, I
24   would have felt threatened by your speech, I suspect.
25            MR. DAMSKY:  If you were not white, you would
```

1    have felt threatened by my speech. Now, is that -- and
2    that's solely because of the ideas within the paper?
3              MR. ███████    It's because you said that
4    white people should fight and die to make America only
5    white. And I feel like fighting and dying really
6    evokes violence.
7              MR. DAMSKY:  But just to be clear. I wasn't
8    advocating for any of the non-white students to be
9    fought with then and there, correct?
10             MR. ███████    Can you clarify that question
11   for me?
12             MR. DAMSKY:  You said that we had non-white
13   students in class. I wasn't advocating for any of them
14   to be fought right then and there, correct? Because
15   you said I wasn't advocating for any form of violence.
16             MR. ███████    I mean, you didn't specify a
17   time. It seemed like you were advocating for violence
18   against non-white people at basically any and all
19   times.
20             MR. DAMSKY:  And can you point to the aspect
21   of the paper that made you think that?
22             MR. ███████:  I don't have the paper in
23   front of me.
24             MR. DAMSKY:  One second.
25             MR. ███████    It was the part near the end

Page 202

```
 1    about how people should be willing to -- it says
 2    something about believing that the U.S. should be
 3    whites only. And then it says that -- something to the
 4    effect of that white brothers and sisters needs to
 5    fight and die for their beliefs. I don't have the
 6    exact words, like I said.
 7              MR. DAMSKY:  One second. So I'll let you read
 8    the conclusion. Ms. Peeples, can you go to page 222?
 9    Now, do you see anything on that page that made you
10    think that I was advocating for any of my classmates
11    to be fought with right then and there?
12              MR. █████████   Let me read it. This paragraph
13    isn't the paragraph I referred to. This paragraph
14    doesn't call anybody to any action, it doesn't seem.
15              MR. DAMSKY:  Thank you, sir. Can you go to
16    the next page, Ms. Peeples?
17              MS. PEEPLES:  Uh-huh.
18              MR. DAMSKY:  I'm sorry. You probably have to
19    strain your eyes a little. Ms. Peeples, can you go to
20    paragraph by paragraph? (Crosstalk).
21              MS. PEEPLES:  Yes. I'm going to make it
22    bigger.
23              MR. DAMSKY:  Yes, please. So you can read
24    that first and tell me, and then she'll slow down
25    briefly.
```

```
 1              MR. ███████   What are you asking me?
 2              MR. DAMSKY:  I'm asking you if the --
 3     to point out the line that you think indicates that I
 4     was advocating for any of my classmates to be fought
 5     with at that point in time.
 6              MS. PEEPLES:  Okay. Now, Preston, we're not
 7     going to go through the entire paper, correct?
 8              MR. DAMSKY:  No, there's only two pages.
 9              MS. PEEPLES:  Okay. Gotcha.
10              MR. DAMSKY:  And he specifically cited this
11     section of the paper as the one that he had done.
12              MR. ███████   Can we go to the section that
13     I cited instead of me reading through paragraph by
14     paragraph?
15              MR. DAMSKY:  Well, then maybe it's the next
16     paragraph. I mean, I don't know. Which line are you
17     looking for?
18              MR. ███████    There's some line about --
19              MR. DAMSKY:  Oh, the brothers and sisters
20     line (crosstalk)?
21              MR. ███████   -- you need to -- brothers and
22     sisters need to fight and die.
23              MR. DAMSKY:  Yeah. It's the last paragraph.
24     So -- okay. It'll start there.
25              MS. PEEPLES:  Here?
```

Page 204

```
 1              MR. DAMSKY:  Sorry. There's -- yeah. Well,
 2      you're going to have to scroll down after this.
 3              MS. PEEPLES:  Like this?
 4              MR. DAMSKY:  Yes, ma'am.
 5              MR. ████████    Can we scroll down a tick or
 6      two to the -- yeah. This is the part. And yes, it does
 7      make me feel that way.
 8              MR. DAMSKY:  And can you just read the line
 9      or is it just the whole paragraph?
10              MR. ████████    I can read the whole paragraph
11      for you if you'd like.
12              MR. DAMSKY:  It's the whole -- so it's the
13      whole paragraph?
14              MR. ████████    Yeah. I mean, it's not any one
15      word or sentence taken outside of context. It's
16      the work put in front of us taken as a whole.
17              MR. DAMSKY:  Okay. Now, Mr. ████████, and
18      this goes to the disruption of the activity or the
19      conduct. Mr. ██████, do you have any role in
20      stipulating my paper?
21              MR.████████    Can you repeat that? Sorry.
22              MR. DAMSKY:  Okay. Let's set the background.
23              MR. ████████    I just didn't hear because
24      of my computer. If you could just repeat it.
25              MR. DAMSKY:  No, no problem. I just -- I
```

Page 205

1  should ask the question better because I don't know if

2  the Board is aware of this. So after -- so first of

3  all, I put this paper out on Canvas for the whole

4  class to read, as was required as part of the work,

5  correct? We had to give where the upload of the paper

6  on Canvas a week before we presented. And then all of

7  our peers would read it, make comments. And then by

8  the next week, they would present the comments to us

9  what they thought, what they thought we should

10 improve, change, whatever thought that they had about

11 it. Is that correct?

12            MR. ███████    Yeah.

13            MR. DAMSKY:  Okay. So I believe this

14 presentation was on the 30th, so I would have

15 submitted it on the 23rd. Now, at some point in time

16 between when I uploaded it on the 23rd, this paper

17 started spreading around the school. Is that correct?

18            MS. PEEPLES:  How is this relevant to whether

19 -- to this honorable board hearing --

20            MR.████████:  -- if I can ask.

21            MS. PEEPLES:  -- we can decide relevancy,

22 ██████.

23            MR. RUSHING:  Yeah. You don't have to set

24 relevancy. If you wish to decline an answer, you may

25 do so at any time.

1          MR. ████████     Okay. I -- did people discuss
2    this paper at the school, yeah.
3          MR. DAMSKY:  Okay. And it was circulated? I
4    mean, like people had copies from the ones that I
5    uploaded.
6          MR. ████████:  Uh huh.
7          MR. DAMSKY:  Okay. And do you think that that
8    caused the disruption?
9          MR. ████████:  I don't know what you mean. I
10   think it's caused a discussion.
11         MR. DAMSKY:  Okay. But nobody was prevented
12   from going to class?
13         MR. ████████    I mean, I imagine people
14   probably felt uncomfortable or hesitant to go to class
15   if they were one of the groups against which you
16   called for violence.
17         MR. DAMSKY:  Oh, probably the statute.
18         MS. PEEPLES:  Wait, wait. You're going to --
19   why are you going to (Crosstalk).
20         MR. DAMSKY:  Hold on.
21         MR. ████████    I don't think I was being
22   asked a statutory question, I think I was being asked
23   whether, like, people -- you said, "Did it stop anyone
24   from going to school?" And I said, "I don't know,
25   maybe."

Page 207

```
 1            MR. DAMSKY:  Okay. But you have no concrete
 2    knowledge.
 3            MR. ██████████   It didn't stop me from going
 4    to school. I went to school, so.
 5            MR. DAMSKY:  Okay. And to the best of your
 6    knowledge, did I circulate that paper outside of our
 7    classroom? Did it -- in other words, what I'm trying
 8    to ask you -- because I'm sure you -- would you agree
 9    that the paper basically spread around the whole
10    school? Is that correct?
11            MR.████████:  I think that the paper spread
12    around school to some degree.
13            MR. DAMSKY:  Okay. When you say to some
14    degree, can you describe to what degree your
15    impression of how it spread was?
16            MR. ████████:  More than one person had it
17    and less than everyone.
18            MR. DAMSKY:  Okay. So that's specificity,
19    okay. What do you think resulted in more -- to the
20    extent that any disruption might have occurred, do you
21    think that was caused more by my presentation among
22    our fellows?
23            MR. ████████:  Can you describe what you mean
24    by disruption? Like, just in terms of, like,
25    discussion or like --
```

Page 208

1             MR. DAMSKY:  That's why I wanted to look at

2    the statute. It's okay So disruption -- any conduct

3    that would -- or any material or substantial

4    disruptive to the normal operations of the university

5    and teaching, learning, research, admin functions,

6    whether on or off campus, other authorized activities

7    to take place on campus.

8             MS. PEEPLES:  So Preston -- Preston, I'm

9    just -- let me just --          is a student at the law

10   school --

11            MR. DAMSKY:  Okay.

12            MS. PEEPLES:  -- so he can speak to his

13   experience and whether he personally experienced any

14   disruption in his educational experience. He can -

15   - you can ask him if he is aware of anyone else that

16   experienced disruption in their academic experience.

17   But I don't think -- he's not the right person to

18   address the overall school disruption.

19            MR. DAMSKY:  I will try and just have this be

20   my last question --

21            MS. PEEPLES:  Okay.

22            MR. DAMSKY:  -- because I think that's a way

23   to break it (inaudible). Aside from discussion, do you

24   know of anything else that my paper and potentially

25   her feelings, do you know of anything else that my

1  paper caused at the school?

2       MR. ██████   I don't know of anything the

3  paper caused other than discussion, if I understand

4  the question, right?

5       MR. DAMSKY:  Yes. Thank you very much, sir.

6  That's all.

7       MR. RUSHING:  Are there any additional

8  questions for ████ from any party at this time?

9  Thank you, ████, for your time, you're free to

10 leave.

11      MR. ██████:  Yeah. Have a good day.

12      MS. PEEPLES:  Thank you.

13      MR. RUSHING:  Okay. We will -- sir, do you

14 need a break or are you okay to proceed?

15      MR. DAMSKY:  No, it's just -- I'm ready. I

16 think this is the last one, Ms. Peeples?

17      MS. PEEPLES:  Yes. That's the -- this is the

18 last witness present in the waiting room.

19      MR. DAMSKY:  Okay.

20      MR. RUSHING:  Okay. We will now bring in our

21 next witness, ██████████. ████, what information

22 do you have to provide to the university specifically

23 related to disruptive conduct and/or harassment?

24      MR. ██████:  I don't have any reports of

25 harassment as far as conduct. It was comments made in

Page 210

```
 1   classes about the criminality of black people
 2   specifically about white supremacy being a national
 3   state interest, about gays in the military being a
 4   national security threat. And at some point I was
 5   shown his Twitter account, the last one before this
 6   one, the one that got deleted, where he reaffirmed the
 7   inherent criminality of black people sort of.
 8   Reminisced about the days of executing black children
 9   for their crimes. Said that his support for Palestine
10   was a means to an end and quite often discussed how
11   Jews are parasites, the enemies of humanity.
12           And as an Ashkenazi Jew with a black Puerto
13   Rican wife, it just made me significantly
14   uncomfortable. And he was kind of in my line of sight
15   in all these classes and he made these constant overt
16   performative smirks whenever there was anything that
17   could even be remotely related to his, I don't know,
18   ideology. So Professor Maclin, for example, would
19   constantly try to get people to acknowledge that a
20   justice was correct in their ruling. So he would say,
21   so white is right. And Mr. Damsky would smirk quite
22   large -- largely just very big smirks every single
23   time. Laugh, giggle, whatever you want to call it,
24   just making it very well known that his -- you know,
25   he disagreed with anybody who was trying to make a
```

1  point that perhaps he disagreed with. It was a

2  constant disruption.

3         And at some point in his Twitter, he started

4  discussing someone named Daniel Penny (ph), who killed

5  a friend of mine in public on video in New York. And

6  then he was expressing opinions about the person who

7  was killed, which were just fundamentally ignorant and

8  stupid and uninformed. And it made me uncomfortable to

9  the point where being around him just got under my

10 skin. So perhaps it's just me. I was personally

11 disrupted just by knowing he was there, seeing all of

12 his inner reactions to things and knowing what he

13 thought about how invaders, i.e. Hispanic people, or

14 as he calls them, subcontinentals, should be

15 violently, if not lethally removed from the country if

16 they resisted.

17        About how, again, certain suspects in crimes

18 were likely black. And finding out that he wants to be

19 a prosecutor, I just didn't think that he should be

20 allowed to do that. And perhaps the school should not

21 endorse him. And which would be why I made it known

22 that I have these opinions about this person and that

23 the school should know about his public statements,

24 which he at one point tweeted that he refused to do

25 anonymously or pseudonymously because he stands by

Page 212

1    them all. So disruption, perhaps just me. I do know

2    there are people who decided not to take classes

3    because he was in them. But I've had one exchange with

4    him in real life, and it was indirectly when I

5    corrected him about Bahamanians, as he called them,

6    not being people. And that was it and that was in

7    class.

8            So, yes, disruptive -- quite disruptive to

9    me, knowing who he is and seeing the public statements

10   he makes. You know, the papers were secondary, the

11   awards, I couldn't care less about. It's embarrassing,

12   it's humiliating, but it was all the stuff in class,

13   you know, synthesized with what I know about him

14   publicly that made me extremely uncomfortable,

15   especially when there are several mentions of how

16   violence is a valid means of achieving your political

17   goals.

18           And being Jewish, again, when I submitted the

19   tweet to Dean McAlister, I became a little bit

20   concerned because of, you know, the aggression that he

21   displays online and the willingness he has to make his

22   opinions known to some extent in class. His

23   performative support for Palestine, being rooted in

24   his disdain and loathing for Jews as parasites and

25   people, which is how I interpreted it being a means to

1    an end, it was unsettling. And I became nervous during

2    finals that he might do something retaliatory and

3    either come after me for whatever reason, although I

4    feel like it's more likely he'd seek the system on me

5    somehow. But yeah. So that's the disruption that

6    caused me.

7            MR. RUSHING:  Thank you. I will now open up

8    the floor to the Board members for questions for

9    ███████.

10           MS. ANDERSON:  ███████, can you just tell us a

11   little bit about how your semester ended? What did you

12   do to deal with all of this? And how was it different

13   than what you would normally have done during your

14   school year?

15           MR. ███████████  Ultimately, I just

16   progressed. This -- so I mean, sorry. My noise

17   cancelation kicked in and it's extremely disorienting.

18   Anyway, so I submitted this in March 21st, I was not

19   expecting what happened to happen. I mean, obviously,

20   I don't disagree with the school getting rid of him,

21   although I simply just thought it would be more about

22   notifying the bar and letting the tips fall where they

23   may.

24           So when that happened, it became a little

25   nerve wracking. I did ask to take my finals in a

Page 214

1    locked room. And ultimately, I kind of -- the Jewish
2    people that I know came out and started talking about
3    it a lot and, you know. Professor Lidsky discussed
4    that I spoke to her about it because she didn't know
5    that it was -- that I was the one that sort of started
6    that aspect of it. And she said that she was getting
7    nervous. And so I maybe got a little bit, you know,
8    reactive to it at the time. But ultimately, after the
9    semester ended, I moved to Ocala, although that's not
10   the reason why, but I did. So, you know, it's better
11   to be away.
12          But ultimately, I don't know. I'm not going
13   to say I have any direct reason to suspect anything
14   would happen to me. However, if someone is going to
15   outwardly talk about extrajudicial murder being
16   sanctioned for any reason and eliminating my entire
17   race of people, it's not much of a stretch, but I
18   can't -- you know, it'd be disingenuous to say that
19   he's ever threatened me or I've ever seen him threaten
20   anybody, honestly. So my semester was stressful at the
21   end, but ultimately I did fine.
22          MS. ANDERSON:  Thank you, ████.
23          DEAN MCALISTER:  Now, Namodhi, do you have
24   any questions? Okay. Preston, you may now ask any
25   questions relevant to the allegations you have for

Page 215

1    ███████.

2            MR. DAMSKY:  Hello, Mr. ███████. Thanks for

3    taking my questions. You mentioned that you spoke to

4    Professor Lidsky at the town hall. Did you tell her

5    that you had been trying to counter me since you knew

6    me for something along those lines?

7            MR. ███████:  Trying to what?

8            MR. DAMSKY:  Counter me since you knew me for

9    something along those lines.

10           MR. ███████I:  I don't.

11           MR. DAMSKY:  Do you remember what you said to

12   Professor Lidsky?

13           MR.███████:  No, we talked for about an

14   hour. There were two other people there, too. So I

15   don't even know what countering you means. I made it

16   very clear that as soon as I found out who and what

17   you are, I was not a fan. And if I could in any way -

18   - you know, if I in any way saw anything that was out

19   of line, I would report it. But I don't even know what

20   countering you means, and that's not a word I would

21   use in that context.

22           MR. DAMSKY:  Okay. Those were her words, so

23   that's why I asked. Out of curiosity, do you ever tell

24   me that I think you mentioned Bahamians, I don't

25   recall. Did you ever tell me that I was -- incorrect

```
1    through your own speech, do you ever argue with me in
2    that way?
3              MR. [REDACTED]   I've never spoken to you
4    directly.
5              MR. DAMSKY:  When you say you've never spoken
6    to me directly, have you ever spoken indirectly?
7              MR. [REDACTED]:  In class when you said that
8    Bahamians are not people or not the people, to be more
9    accurate. And then I simply spoke up and yelled that
10   that's ridiculous and that they are people. I don't
11   even know if I was looking at you, but it was
12   obviously directed at you. However, I was just sort of
13   talking.
14             MR. DAMSKY:  So when -- did you understand me
15   when I said that the Bahamian weren't people, did you
16   understand that I was saying that they weren't human
17   beings or that they weren't Americans, which one was
18   more accurate to your understanding?
19             MR. [REDACTED]:  Well, in the context of
20   everything else I knew about you, I understood that
21   you meant they were not human beings. However, I do
22   notice that you have -- that you will couch it in as
23   sanitized language as possible. And so I assume that
24   you were trying to convey that they were not part of
25   the people under the Constitution. However, I had no
```

Page 217

1    other way to interpret it than in the context of

2    everything you've said about people who are not white.

3              MR. DAMSKY:  In fact, I -- that was what one

4    of my papers was about, correct? How the term the

5    people in the Constitution essentially referred to the

6    American nation, would that be about right?

7              MR. ██████████    White people.

8              MR. DAMSKY:  Sure. But as I define it as

9    the American nation. Is that correct?

10             MS. PEEPLES:  I'm not sure --

11             MR. ██████████:  White people.

12             MS. PEEPLES:  Yeah. I'm not sure that -- what

13   are you trying to get to?

14             MR. DAMSKY:  I'm not going to say the only

15   reason I ask is I'm just trying to wonder if

16   Mr.████████ when he says -- when I said that

17   Bahamians weren't the people --

18             MR. ████████:  Bahamians.

19             MR. DAMSKY: -- (crosstalk) the understanding

20   that -- I apologize. If he understood that is me

21   saying they weren't -- I believe he answered it.

22             MS. PEEPLES:  Okay.

23             MR. DAMSKY:  It was someone. So in other

24   words, to what Professor Lidsky put it, although you

25   said you talked to her, you only kind of -- so you

Page 218

1    said you wouldn't call it countering. What would you

2    use?

3                MR. J███████:  Monitoring publicly.

4                MR. DAMSKY:  Okay.

5                MR. ████████:  Listening to you.

6                MR. DAMSKY:  And so you've only ever

7    monitored me publicly and then reported me to the

8    administration?

9                MR. ████████:  Correct. Your Twitter was -

10   - X, whatever, was public, now it's gone. Now the new

11   one is public and I keep an eye on it.

12               MR. DAMSKY:  Okay. And do you screenshot

13   every tweet that I make?

14               MR. ████████:  No.

15               MR. DAMSKY:  About what percentage do you

16   screenshot?

17               MR. ████████:  Couldn't tell you. Don't know

18   how many times you've tweeted.

19               MR. DAMSKY:  About how many screenshots would

20   you say that you have on Twitter?

21               MR. ████████:  Over 100.

22               MR. DAMSKY:  Over 200?

23               MR. ████████   No.

24               MR. DAMSKY:  And that's of my current account

25   for both accounts?

Page 219

```
 1           MR. ██████████    Both.
 2           MR. DAMSKY:  And you said you sent all those
 3    to Dean McAlister?
 4           MR. ██████████    No.
 5           MR. DAMSKY:  How many?
 6           MR. ██████████:  Most of the old ones and the
 7    new one that I sent her and since then, none.
 8           MR. DAMSKY:  Okay.
 9           MR. ██████████:  Only the ones that I thought
10    made you unfit to practice law as a prosecutor,
11    particularly.
12           MR. DAMSKY:  Okay. And would you say that you
13    were primarily motivated by your opinion that I was
14    unfit to practice law?
15           MR. ██████████    Well, and dangerous,
16    potentially dangerous.
17           MR. DAMSKY:  But you stated that I've never
18    threatened you or you have no evidence of harassment
19    or anything. It's just a general feeling of fear.
20           MR. ██████████:  I doubt you knew I existed
21    beyond my loudness.
22           MR. DAMSKY:  Okay. Well, Mr. ██████████I
23    just have some questions. Sorry. Those are the
24    questions that I had from Professor
25    Lidsky. (Inaudible). So first off, Mr. ██████████, how
```

Page 220

1   old are you?

2          MR. ██████████ :  Forty-two.

3          MR. DAMSKY:  Okay. And we've had three

4   classes together, correct?

5          MR. ██████████    Four.

6          MR. DAMSKY:  Four?

7          MR. ██████████ :  Yes.

8          MS. PEEPLES:  I -- we're recording an audio

9   recording, so I need one person to talk at a time. So

10  let the question finish before the response, if you

11  don't mind.

12         MR. ██████████    Got it.

13         MR. DAMSKY:  Mr. ██████████ , I have -- I'll

14  tell you, I have common law with Professor Maclin,

15  police practices with Professor and criminal procedure

16  aggressive system with Professor Leah Johnson. What's

17  the one that I'm missing?

18         MR.██████████    Did you take evidence with

19  Cook?

20         MR. DAMSKY:  I did. Okay. You remember.

21         MR. ██████████ :  (Crosstalk) yes.

22         MR. DAMSKY:  Now, as you basically introduce

23  yourself by saying you really weren't a fan of the

24  ideas that I presented in common law, were you?

25         MR. ██████████ :  No.

1            MR. DAMSKY:  And you didn't like the idea is
2    that I presented in police practices either?
3            MR. ▇▇▇▇▇▇▇       No.
4            MR. DAMSKY:  And those were both Professor
5    Maclin's top classes?
6            MR. ▇▇▇▇▇▇▇       Correct.
7            MR. DAMSKY:  Now, the ideas I presented in
8    police practice, would you define them as pro police?
9            MS. PEEPLES:  Preston?
10           MR. ▇▇▇▇▇▇▇   :   Pro police?
11           MS. PEEPLES:  Preston, help me understand
12   where we're going with these questions.
13           MR. DAMSKY:  (Crosstalk).
14           MS. PEEPLES:  I'm asking -- I'm sorry. I'm
15   just asking from the standpoint of are we still
16   looking at the allegations?
17           MR. DAMSKY:  Yeah. Well, Mr. ▇▇▇▇▇▇▇ said -
18   - and I believe I have is that he said I would seek
19   the system on him.
20           MS. PEEPLES:  Okay.
21           MR. DAMSKY:  I'm wondering if he identifies
22   me with the police or if he thinks I'm not.
23           MS. PEEPLES:  Okay.
24           MR. DAMSKY:  Well, hold on. So were the ideas
25   that I presented in police practices that -- the

1    positions that I took, were they generally pro police?

2           MR.███████      I think for the most part,

3    you tended to lean towards sort of draconian justice

4    against more or less any accused, however, there were

5    times when you were against police overreach to some

6    degree. When I said seek the system, I meant sue me.

7           MR. DAMSKY:  Oh, okay. Well, just out of

8    curiosity, why would you think that? I thought you

9    said that -- you thought tha --t I thought you -- I'm

10   sorry. I thought that you said that you didn't even

11   think that I thought that you existed, if that makes

12   sense.

13          MR.████████:  Well, you do now.

14          MR. DAMSKY:  Okay. So now you think that I'll

15   sue you.

16          MR.███████:  If you found out, yes. Once

17   this hearing started, yes.

18          MR. DAMSKY:  Okay. So your opinion is that

19   I've just learned you, now you're in (inaudible)?

20          MR.████████:  I assume. I mean, I know that

21   you would have noticed my face at some point, and

22   there were times when, I don't know, you went to

23   Jennifer St. George's party uninvited, and I don't

24   know if you saw me there. But you've been around me

25   enough and you might have seen me looking at you, you

```
 1   might the way that I'm looking at you now. But no,
 2   we've never spoken, I don't know if you registered me
 3   at all, but I didn't care.
 4             MS. PEEPLES:  Okay. So I want to bring us
 5   back to --
 6             MR. DAMSKY:  Well, let's go -- so this goes
 7   past experience.
 8             MS. PEEPLES:  Okay. But we still need to
 9   stay, like, with --
10             MR. DAMSKY:  Okay.
11             MS. PEEPLES:  -- what information does he
12   have or what questions do you have related to the
13   allegations of disruptive conduct and/or harassment?
14             MR. DAMSKY:  Well, Mr. ████████ says that he
15   has no reports of harassment.
16             MS. PEEPLES:  Okay.
17             MR. DAMSKY:  Is that -- that's correct?
18             MR. ██████:  Correct.
19             MR. DAMSKY:  So you're only alleging
20   (inaudible) conduct?
21             MR. ██████:  I'm saying I was disrupted by
22   your conduct.
23             MR. DAMSKY:  And specifically, just -- is
24   that primarily the things that I said on social media?
25             MR. ██████:  Well, the things you said in
```

Page 224

 1    class were what, you know. What started it and they

 2    were pretty horrendous and, you know, a lot of people

 3    knew about you, apparently because of your GroupMe

 4    posts that got the group taken down. And so people

 5    shared your Twitter, although I don't think anyone

 6    seemed to be as annoyed by it or bothered by it or

 7    disgusted by it as I was. So yeah. I had no choice, I

 8    suppose, but to subject myself to all of it. And then

 9    again, when you were talking about someone who I've

10    known since they were 16 before they were murdered at

11    30, it was a bit much.

12            MR. DAMSKY:  So that's -- the Daniel Penney

13    thing, really, that disrupted you significantly?

14            MR. ████████    I mean, I was already quite

15    disrupted. It was essentially just a lateral shift to

16    a different kind of disrupted, but it was no more than

17    I was before by everything that you were saying.

18            MR. DAMSKY:  So that took it to the next

19    level?

20            MR. ████████    I suppose if there was a next

21    level, no, there wasn't. It was the same level. It was

22    just personal on some level. But, you know, I have,

23    again, a Black and Hispanic wife who you think is

24    inherently criminal and an invader, according to your

25    tweets. So it was already personal. It was different

```
 1   to know for a fact that you were spouting off nonsense
 2   about someone you knew nothing about. So it's very
 3   different when you see something in real time, in real
 4   life, and you know facts that someone doesn't know
 5   online. It's very different.
 6            I had a video go viral and people were
 7   talking about me, and it was just strange to see it
 8   from that perspective and to see this from this
 9   perspective with J.D. Vance talking about how he's a
10   hero, you talking about how my friend was some sort of
11   degenerate, inherently immoral, morally depraved
12   sociopath or psychopath or whatever you called him,
13   was just a little bit shocking, but perfectly
14   consistent with everything else that you said about
15   the humanity or lack of humanity of anybody who isn't
16   white or anybody who is Jewish. So, again, not more
17   disgusted, just different level or layer of disgust.
18            MS. PEEPLES:  And ██████ if there are
19   questions that you prefer not to answer, you
20   absolutely have the right to decline to answer.
21            MR. █████████  All right.
22            MR. DAMSKY:  And I apologize, Mr. █████████,
23   for pressing on this point. But just to be clear, so
24   the Board understands, Daniel Penney killed Jordan
25   Neely (ph) and then he was acquitted in a murder
```

Page 226

```
1   trial. Is that correct?
2           MR. ██████:  It was a manslaughter trial,
3   negligent homicide.
4           MR. DAMSKY:  Right. So he was found not
5   guilty of the crime.
6           MR. ██████:  He was acquitted of negligent
7   homicide and manslaughter was pulled when the jury
8   deadlocked.
9           MR. DAMSKY:  Okay. So Mr. Penney was not a
10  criminal for what he did under the system. He's not
11  considered a criminal for what he did to Jordan
12  Neely. Is that correct?
13          MR.██████:  He is not a convicted person.
14          MR. DAMSKY:  Okay.
15          MR. ██████:  And that's as far as we're
16  going to go on that topic.
17          MR. DAMSKY:  Okay. And I believe you -- just
18  to make clear, we've never -- yeah. We never
19  interacted directly before today, you said that and
20  I've never insulted you or been uncool to you
21  personally?
22          MR. ██████:  You've never spoken to me.
23          MR. DAMSKY:  Do you think of a deep
24  understanding of the type of person I am based on just
25  my Twitter activity?
```

1          MR. ████████:  I have a deep understanding
2     of your beliefs.
3          MR. DAMSKY:  Okay.
4          MR. ████████   There's no such thing as this
5     abstract concept of a person as far as I'm concerned,
6     you are what you say. So I know what you say and I'm,
7     as you brought up, 42 years old, I've seen it for a
8     long time and I've dealt with it for a long time and
9     it's pretty unoriginal and predictable. So while, yes,
10    I give people the chance to sort of clarify who and
11    what they are, you've done that.
12         MR. DAMSKY:  And did you wish that the
13    university would have kicked me out in the past for
14    comments, for example, made in Constitutional Law or
15    others?
16         MR. ████████   Personally, yes. However, I
17    don't think there were grounds to do it. Not for that.
18         MR. DAMSKY:  And just out of curiosity, when
19    did you come to learn about my having a Twitter
20    account (inaudible)?
21         MR. ████████:  I wouldn't tell you. It
22    was in 2024.
23         MR. DAMSKY:  And you never followed me on
24    Twitter?
25         MR. ████████:  No.

1          MR. DAMSKY:  So each time you access my

2    Twitter account, you specifically went to, like, the

3    search bar, type my name in or went to the history and

4    then hit it?

5          MR. ▓▓▓▓▓▓▓     Yeah. I don't use Twitter

6    much. You're right there.

7          MR. DAMSKY:  Okay. Good. And like the

8    engagement from my very low follower count at the

9    time, that didn't, like, send it to your feed, right?

10          MR. ▓▓▓▓▓▓▓:  Absolutely not. I have not

11    followed anyone like you.

12          MR. DAMSKY:  Okay. Understood. So every time

13    you viewed my Twitter, you chose to.

14          MR. ▓▓▓▓▓▓▓:  Absolutely.

15          MR. DAMSKY:  Are the beliefs that I express

16    on my Twitter basically, are they all that different

17    from the things I've said in class or my academic work

18    or perhaps even talking, like, outside of class,

19    friends? I mean, it's all kind of just the same thing

20    or --

21          MR. ▓▓▓▓▓▓▓     I mean, I don't think you are

22    reckless enough to say some of the things you say on

23    Twitter in class since they involve quite a lot of

24    violence a lot of the time. Although I do remember you

25    saying once that it was better to be whipped in public

Page 229

1    for a day than to be put in jail or prison for a year

2    and how that would be a -- you know, a more humane

3    alternative. I mean, honestly, stuff -- crazy stuff

4    that you would say. But that was just, you know, you

5    talking to someone after class.

6              But no, what you say in class is sanitized.

7    As far as I'm concerned, compared to what you say

8    online, which is that, you know, black people should

9    be executed for crimes against white people. And, you

10   know, we broke no compromise and all this other weird

11   antiquarian language. And, you know, a lot of violence

12   online and a lot of overt vile and hatred that, again,

13   didn't often come out in class. You would sort of

14   couch it in this idea that, well, blacks commit more

15   crimes, probably statistically because they're over

16   police, but you ignore that. So yeah. It's very

17   different in class, which, you know, is you are highly

18   skilled at, you know, your legal work, apparently. So

19   not surprised.

20             MR. DAMSKY:  And prior to my tweet of March

21   21st, referencing you all, (inaudible), did you think

22   that all my tweets were personal? I'm sorry. You can't

23   answer that, I apologize. But just to be clear,

24   despite your hatred of my BS, you kept coming to them?

25             MR. ███████    I'm sorry?

Page 230

1              MR. DAMSKY:  You hated the things that you
2       read on my Twitter, but you kept coming to them.
3              MR. ███████:  Yeah. I monitored you. I
4       thought you were possibly dangerous.
5              MR. DAMSKY:  Yeah. Sorry. Some of the
6       questions were stated a little differently. Okay. Now,
7       when did you first see the tweet I posted on March
8       21st about (Inaudible)?
9              MR.███████:  Less than 24 hours after you
10      tweeted it.
11             MR. DAMSKY:  So on March 22nd, probably, or
12      was it that night?
13             MR. ███████:  I'll take your word for it. I
14      don't know.
15             MR. DAMSKY:  So sometime between March 21st
16      and March 22nd. Is that correct?
17             MR.███████:  I will take your word for it.
18             MR. DAMSKY:  And did you miss any class that
19      week because of the tweet?
20             MR. ███████  I don't know. I've missed
21      class for health reasons for two years.
22             MR. DAMSKY:  Okay. But you were never so
23      afraid of what I said in that tweet that it stopped
24      you from going to class, were you?
25             MR. ███████:  No.

```
                                                      Page 231
  1             MR. DAMSKY:  And did you go to Professor
  2   Johnson's class on the morning of March 28th?
  3             MR. ███████    Johnston or Johnson? I had
  4   both professors last semester.
  5             MR. DAMSKY:  Leah Johnston at criminal. The
  6   class that we shared on the morning of Friday.
  7             MR. ███████:  I likely did. I don't know.
  8   Again, I had health issues and so I could have missed
  9   it. It was not because of you.
 10             MR. DAMSKY:  Okay. So likely did. But if you
 11   missed it, not because of me. So you weren't really
 12   all that afraid of the tweet? Like, you weren't -- it
 13   didn't make you any more afraid than anything else
 14   that I (inaudible) did.
 15             MR. ███████:  Well, like I said, I'm used
 16   to it. I wasn't really necessarily afraid until you
 17   got kicked out.
 18             MR. DAMSKY:  And just to be clear, the tweet
 19   doesn't mention you or anyone else by name except for,
 20   I guess, Noel Ignatiev?
 21             MR. ███████:  Obviously.
 22             MR. DAMSKY:  Okay. It doesn't mention the
 23   school or Gainesville?
 24             MR. ███████:  No, it just mentioned Jews
 25   and I'm a Jew.
```

Page 232

1            MR. DAMSKY:  And it doesn't -- it didn't
2    mention a specific time the way that you understood
3    it?
4            MR. ▮▮▮▮▮▮▮   By any means necessary,
5    no. That was not a time, that was a whatever.
6            MR. DAMSKY:  And from the way that you
7    understood the tweet when you read it, did you see it
8    as me saying that an action would be done? Or did you
9    see it as me saying that something should be done?
10           MR. ▮▮▮▮▮▮▮ :  Should, obviously. I know
11   exactly what you tweeted. I did not say that it was a
12   direct call to violence like some of the other tweets
13   that you've tweeted. But it was clearly an advocate
14   and advocacy for genocide.
15           MR. DAMSKY:  So it wasn't a direct call for
16   violence, but it was advocating for them?
17           MR. ▮▮▮▮▮▮▮ :  Well, not a call to start the
18   violence, but, you know, a sort of injunction of under
19   ideal circumstances, we'll get this going. You know,
20   it should happen is, obviously different from let's
21   get started. But, I mean, it is what it is, you know,
22   what you tweeted.
23           MR. DAMSKY:  Yes. When you read the tweet,
24   did you Google the name Noel Ignatiev?
25           MR. ▮▮▮▮▮▮▮ :  No, I'm 42 and I'm educated.

Page 233

1       MR. DAMSKY:  So you knew who Noel

2  Ignatiev was?

3       MR. ███████  I knew what that quote was

4  and I know what the context of it is. It was about

5  abolishing whiteness of the concept, not a people. It

6  was a disingenuous interpretation of it.

7       MR. DAMSKY:  So it's your belief that I

8  understood it to be abolishing white people as a

9  physically abolishing them.

10       MR. ███████  Yes.

11       MR. DAMSKY:  And you base that off?

12       MR. ███████  The context of your

13  tweet. And then when -- I mean, I don't know how to

14  say it, I'm pretty sure that he originally said

15  abolish whiteness and you said abolish white people

16  or something. Either way, it was very obvious that the

17  way that you then equated abolishing Jews to it was

18  based on everything else you tweeted about how you

19  should wipe these parasites off the face of the earth

20  or however you put it. It, I mean, is brainless, but

21  it was very obvious. That's how I interpret it.

22       MR. DAMSKY:  I've said wipe these parasites

23  off the face of the earth?

24       MR. ███████  You have called Jews and

25  Israel a parasite and talked about getting rid of

Page 234

```
 1   them. I have -- you know, I can sort through the
 2   tweets that I put aside for this, if you'd like.
 3              MR. DAMSKY:  Actually, I am kind of curious,
 4   what was the tweet about Palestine being a means to an
 5   end?
 6              MR. ███████     You said that your support
 7   for Palestine was simply a means to an end.
 8              MR. DAMSKY:  When did I tweet that out?
 9              MR. ███████:  It was on your first account.
10              MR. DAMSKY:  Do you have the date?
11              MR. ███████:  No.
12              MR. DAMSKY:  Do you have it? It's -- so it's
13   not -- okay.
14              MR. ███████:  If I'm right about any of
15   them --
16              MR. DAMSKY:  And that's the --
17              MR. ███████    -- but I'm happy to submit
18   them all.
19              MR. DAMSKY:  That's the exact wording that I
20   see support for Palestine as a means. Can you tell me
21   the exact wording, sorry, for the full tweet?
22              MR. ███████:  The wording of that
23   statement --
24              MR. DAMSKY:  Yes.
25              MR. ███████    -- is part of a reply to
```

Page 235

```
 1    someone else. And it was specifically that your
 2    support for Palestine was a means to an end. I don't
 3    remember the rest of it. It would take a while to find
 4    it, but I have it somewhere. I'm happy to submit them
 5    all as some sort of supplemental evidence, if you'd
 6    like, or if that's allowed. I don't know. I have
 7    emailed them to other parts of people in the
 8    administration. So they can follow-up.
 9            MR. DAMSKY:  So you -- and so just to get
10    back to it, Mr.███████████ you knew what he meant
11    by abolished the white race was not a call for
12    extermination.
13            MR. ████████████:  That's how I see it, and I
14    would venture to say that's how most people see it.
15            MR. DAMSKY:  But you don't think that's how I
16    saw it.
17            MR.███████████:  I don't think that that's how
18    you saw it, however, even if that is how you saw it,
19    that's not how you meant what you said after it, as
20    far as I'm concerned. And again, based on your own
21    statements.
22            MR. DAMSKY:  So you said you don't use
23    Twitter very often?
24            MR. ███████████:  Not any time recently. I
25    mean, I have not used it often any time recently,
```

1    perhaps once here and there.

2          MR. DAMSKY:  Is it fair to say that your

3    primary purpose for having a Twitter account is to

4    monitor me, is that (crosstalk)?

5          MR. ███████    Absolutely not. No.

6          MR. DAMSKY:  Okay.

7          MR. ███████    My primary purpose of having

8    Twitter since probably 2011, I used to follow people

9    before Instagram was a thing. And when I still liked

10   Twitter, I was not a fan of the change in management.

11   So I use it a lot less. And it's become a cesspool, as

12   everyone says. So no. It's not the primary purpose for

13   having it. It's perhaps what I've used it for, you

14   know, in the recent past. Law school is demanding and

15   I don't have a lot of time to scroll on Twitter.

16         MR. DAMSKY:  So Mr.███████  you didn't

17   come up to Dean McAlister on March 28th, like, when

18   you told her about the tweet, like, you didn't have

19   like tears in your eyes?

20         MR. ███████    I was upset, I don't know

21   about tears. I mean, if I did, then it was getting

22   into some of the personal stuff. But I talked to her

23   for about a half hour. I was not sitting there tearing

24   up the whole time. However, it's not beyond me to do

25   that. I will tear up when I talk about something that

1  is making me disgusted and overwhelmed with how tired
2  I am of this in my life.
3          MR. DAMSKY:  So if you were -- if any bit of
4  you being upset with this because, frankly, you just
5  didn't like me into that? You just kind
6  of (inaudible) you were just tired of me.
7          MR. ▓▓▓▓▓▓    Tired of you, no. Tired of
8  people like you. You I don't really have much to do
9  with.
10         MR. DAMSKY:  And did you feel like you were -
11 - like, it -- were you shaking? I mean --
12         MR.▓▓▓▓▓▓    Probably.
13         MR. DAMSKY:  And -- but it wasn't out of fear
14 or just kind of like being tired of me or angry?
15         MR. ▓▓▓▓▓▓    I mean, you were in the room,
16 so part of it was a little bit of nerves that you
17 would sort of put it together. Or that you would hear
18 something I was saying. And my hearing is trash, so
19 sometimes I talk too loud and I was worried about
20 perhaps being overheard.
21         MR. DAMSKY:  And if you have been overheard,
22 what were you worried about?
23         MR. ▓▓▓▓▓▓    Well, I'm not exactly sure
24 what you were capable of, so if you ended up with
25 consequences from that interaction, which you did, I

Page 238

```
1    mean, I wouldn't put it past anybody to react badly to
2    having their career torpedoed, especially someone as
3    ambitious as you. So that plus of violent and open
4    hatred for people like me is nerve wracking. Like I
5    said, if you overheard what happened, maybe you
6    wouldn't put it together right away or maybe you
7    would, I don't know.
8             MR. DAMSKY:  Okay.
9             MR. ███████████   I -- honestly, you know, my
10   state of mind at the time was intense, I could not
11   give you a granular breakdown of everything going
12   through my mind. I was also, again, a little bit sick
13   and tired and overwhelmed. And this was, you know, not
14   something I had intended to waste my time on.
15            MR. DAMSKY:  You said you were worried I'd
16   put it together, I mean, obviously, like, as you said,
17   like, you know, I put it together now, right? Or are
18   you --
19            MR.███████████   That you were given my
20   email. But yeah.
21            MR. DAMSKY:  Well, are you --
22            MR. ███████████    I'm sorry.
23            MR. DAMSKY:  Yeah. Are you worried now?
24            MR.███████████   I don't know, Preston.
25            MR. DAMSKY:  Okay.
```

Page 239

1           MR. ████████  I don't know if I should be
2   worried.
3           MR. DAMSKY:  I'm not -- I'm sorry. When
4   I asked that question, I'm not trying to intimidate
5   the witness, Mr. ████████. No worry (inaudible).
6           MS. PEEPLES:  Is your question going to
7   disruptive conduct, harassment as it pertains to a
8   person feeling threatened?
9           MR. DAMSKY:  Yeah, yeah. It is because he
10  said that he was physically shaking or he was worried
11  that I would put it together. But obviously -
12  - and that I would figure it out. But what I'm saying
13  is now you're coming forward. You don't have such a
14  worry now. Is that accurate? I mean --
15          MS. PEEPLES:  So let me just --
16          MR. ████████:  My email was redacted without
17  my participation as far as I -- well, no. It was
18  unredacted, you were not (crosstalk).
19          MR. DAMSKY:  Hold on. Hold on.
20          MS. PEEPLES:  Can I just -- yeah. Just one
21  second. What the time frame of the behavior that we're
22  talking about has already occurred. So anything now
23  would be in the realm of retaliation, which is not as
24  -- is a violation of the student conduct code as well.
25  Somebody takes retaliation for somebody taking

1    advantage of utilizing the student conduct process. So

2    it -- Preston, you may certainly ask ████████questions

3    about his feeling of any threats from you as it

4    pertains to the behavior that we're looking at. But

5    anything related to moving forward, would be not part

6    of the decision today by the Board. Does that make

7    sense? I know -- I don't know exactly what you're

8    trying to get at, but --

9             MR. DAMSKY:  No. Well, I suppose I can just

10   bring up when I make my statement.

11            MS. PEEPLES:  Okay.

12            MR. DAMSKY:  Yeah.

13            MS. PEEPLES:  Yeah.

14            MR. DAMSKY:  And were you caught and -- so if

15   you were constantly, like -- and Mr. ████████  I'm

16   not trying to intimidate you or anything like that.

17   You're fine. Were you -- if you were constantly, like,

18   looking at me during that March 28 meeting with the

19   dean, that wasn't because you were, like, scared of

20   me, I guess, you were just trying to kind of figure

21   out, like, if I was aware of you. Is that accurate?

22            MR. ████████     I was trying to figure out if

23   you were aware of what was going on, yes. But

24   ultimately, I mean, I had my back to you most of the

25   time. Dean McAlister was looking at you and I'm sure

1   she was making sure of the same thing. I would turn
2   around from time to time.
3           MR. DAMSKY:  Now, do you know -- do you
4   remember what I was doing at that coffee with the dean
5   when I was sitting there?
6           MR. ███████    You were standing around
7   talking to people.
8           MR. DAMSKY:  Okay.
9           MR. ███████:  Maybe sitting at some
10  point. Honestly, again, I was talking to her for at
11  least a half an hour.
12          MR. DAMSKY:  So it could have been more than
13  half an hour.
14          MR. ███████:  Could be.
15          MR. DAMSKY:  So if I were to tell you -
16  - would you have any recollection of me talking with
17  the dean, like, reading in my casebook or highlighting
18  in my casebook, would that be?
19          MR. ███████:  No.
20          MR. DAMSKY:  Okay. But I was sitting, talking
21  to people, just kind of being, you know?
22          MR. ███████:  When I saw you, you were
23  standing around talking to people.
24          MR. DAMSKY:  Okay. And after you told Dean
25  McAlister about my tweet, did you leave immediately?

Page 242

```
 1          MR. ███████    Nope. Talked to her for over
 2   a half an hour or at least a half an hour.
 3          MR. DAMSKY:  No, okay. But after -- I'm
 4   sorry. After you finished speaking to her for at least
 5   half an hour, did you immediately leave the cafe?
 6          MR. ██████:  Nope. I sat down to compose
 7   an email with information she'd requested.
 8          MR. DAMSKY:  Now, did Dean McAlister talk to
 9   you again when you were still in the cafe?
10          MR.██████:  She said a couple of words to
11   me and then walked out. That was it. Well, no. At one
12   point she came up and asked for your Twitter
13   information, like, the actual profile, so she could
14   look at it, presumably, and that was it. And then she
15   walked by and said a couple of words to me on her way
16   out.
17          MR. DAMSKY:  Do you remember what she said to
18   you?
19          MR. ██████    Not at the top of my head,
20   no.
21          MR. DAMSKY:  So would you say primarily that
22   the tweet made you, like, scared or just kind of
23   pissed off? I mean, that (crosstalk).
24          MR. ██████:  A combination of things, your
25   Twitter in general made me disgusted. I don't know
```

1    about pissed off, that's a lot of energy. Scared for

2    black people. Scared for -- I don't know, the legal

3    system that I think that you would destroy your own

4    career by doing something insane during law school.

5    Maybe not. But in general, it's whether I was directly

6    scared of immediate violence or anything from you does

7    not in any way diminish how capable I thought you were

8    of participating in it.

9          MR. DAMSKY:  And when you say participating

10   in it, can you describe what you have in mind? As a

11   general matter, do you mean -- because I'm just like

12   you -- for example, you said that I was very

13   ambitious. Are you more afraid that I'll, like, attain

14   power or something and abuse the power? Or are you

15   more afraid that I will, you know -- like, for

16   example, a lot that's been brought up today is the

17   claim that people have been afraid of me committing

18   mass shooting. So are you more afraid of mass shooting

19   or kind of just like me becoming, you know, for lack

20   of a better word, like Hitler or something like that,

21   or just a corrupt prosecutor or something like that?

22         MR. ██████████   Well, if I can generalize,

23   people like you do tend to, in my opinion, not react

24   well to having your entitlement shattered. So this

25   taken away from you, from the things I've seen, you

Page 244

1    know, when you came to that party and you were lurking
2    around for a little bit, I don't know, perhaps it is -
3    - well, either way, it's not that -- this is Florida
4    and it's 2025, it's not beyond people with your
5    beliefs to do things like shoot up a school. However,
6    you do say that school shooters don't deserve due
7    process. So perhaps you have an opinion about them and
8    that would stop you from doing it. I don't know.
9            Either way, all bets are off when someone's
10   life gets destroyed. And when someone has violent
11   beliefs and advocates for violence and murder, it's
12   not out of the realm of possibility. So yes. I don't
13   know what would happen -- I didn't know what would
14   happen when this happened. So yeah. It was on my mind.
15   It's why I asked for a locked room during
16   finals because the picture of you getting trespassed,
17   you looked pretty upset.
18           MR. DAMSKY:  So it was only once I got
19   trespassed that you started to fear, kind of, for your
20   immediate life?
21           MS. PEEPLES:  Okay. Preston, so you can go
22   ahead. I'm sorry. I didn't mean to interrupt your
23   question. It's starting to feel a little repetitive.
24           MR. DAMSKY:  Okay. Okay. I'm sorry.
25           MS. PEEPLES:  That's okay.

```
 1            MR. DAMSKY:  Okay.
 2            MS. PEEPLES:  But I just want to be cognizant
 3     of the time and make sure that --
 4            MR. DAMSKY:  Yeah, yeah, yeah. No, I
 5     understand. Okay. Well, Mr. ███████  did you ever
 6     say that you would like to see me punched in the face
 7     or that you ever wanted to punch me in the face?
 8            MR.███████:  I have no idea. It doesn't
 9     sound like me, but who knows? I doubt it. Yeah. No,
10     that's not something I would say.
11            MR. DAMSKY:  Okay. So, Mr.███████, just to
12     be clear, you weren't -- when you spoke to when you
13     spoke to Dean McAlister, you weren't trying to put on
14     airs or anything? You weren't like pretending to be
15     afraid?
16            MR.███████:  No, I didn't -- no.
17            MR. DAMSKY:  And in your opinion, you really
18     didn't feel like you were afraid in terms of, like,
19     the actual physical fear, you were just afraid that I
20     was going to find out? I'm sorry, Ms. Peeples. It was
21     last time (inaudible).
22            MS. PEEPLES:  Okay.
23            MR. ███████  I was having a fight or
24     flight response while doing it because, you know, I
25     don't know you, I just know, capital Y you. The people
```

1  like you and the violence that you advocate and

2  embrace. And I didn't know what would happen when I

3  did that, knowing you were there. So despite what I

4  say about how I write -- despite rationally knowing or

5  thinking that, you know, you're on a career track that

6  you were focused on and not necessarily going to pop

7  off for no reason, I didn't know what would happen.

8  And you were there, didn't expect that either.

9        MR. DAMSKY:  One second, Mr. ███████  All

10  right. I'm sorry. I have more questions to ask, but I

11  want to make sure that I've asked all the right

12  questions --

13        MS. PEEPLES:  Okay.

14        MR. DAMSKY:  -- before I ask them. And just

15  to be clear, Mr. █████, to the best of your

16  knowledge, I never publicized my Twitter. I mean, I

17  know it was public under my name, but I never went

18  around showing it to people. Like. that's not how you

19  found it, right?

20        MR. ███████   That's how I found out, I

21  don't know what you've done. Never talked to you.

22        MR. DAMSKY:  Okay. Okay Mr. ███████, have

23  you ever referred to me as a fucker?

24        MR. ██████:  Probably.

25        MR. DAMSKY:  All right. And did you take --

1   when you -- did you ever find out that I had -- I

2   mean, I believe you mentioned that I had lost my

3   internship.

4           MR. ▓▓▓▓▓▓▓:  I found out a couple of weeks

5   ago.

6           MR. DAMSKY:  How did that make you feel?

7           MR. ▓▓▓▓▓▓▓:  Relieved. I wouldn't have

8   cared if it were corporate, necessarily, although I

9   would think that you don't deserve to have a job as a

10  lawyer. But I didn't even know you were going to an

11  actual internship as a prosecutor, that I found out

12  that you were -- I found out that you had your chip

13  and then lost it at the same time.

14          MR. RUSHING:  I just want to break in here.

15  We're only concerned about activities that took place

16  up until the point where charges were issued, anything

17  after that point is open for our consideration.

18          MR. DAMSKY:  Okay. When did you -- thank

19  you. When did you find out -- so you're -- you didn't

20  have knowledge that I was trying to be a prosecutor?

21          MR. ▓▓▓▓▓▓▓:  Oh, I knew you were trying to

22  be a prosecutor. I didn't know about your internship

23  until I found out you'd lost it.

24          MR. DAMSKY:  And when you knew -- because you

25  knew that I was trying to be a prosecutor, I guess

Page 248

1   my -- I believe I mentioned it in Professor Johnson's

2   class, but when did you first figure that out?

3              MR. ████████:  Last year. It's not a secret.

4   You talk to a lot of people all the time, so you're -

5   - everything that you talk about that is relevant to

6   yourself is known.

7              MR. DAMSKY:  And these people that I talk to

8   -- what do you mean I talk to -- (inaudible) on the

9   law school campus?

10             MR. ████████:  Yes.

11             MS. PEEPLES:  So Preston, are we still

12  focused on the charges because it feels like we're

13  kind of getting into personal feelings about you by

14  Mr.████████?

15             MR. DAMSKY:  So to the -- so in other words,

16  not everybody on campus is afraid of me or something

17  like that?

18             MS. PEEPLES:  Okay.

19             MR. ████████:  I can't speculate about other

20  people. However, just watching you talk to them, I

21  assume they don't know you well enough or they don't

22  know about your Twitter or they just don't care. Maybe

23  they're scumbags too, I don't know. I don't know

24  people who you talk to other than a few who

25  uncomfortably deal with it when you talk to them.

Page 249

1          MR. DAMSKY:  Okay. All right. Well, let me
2     check again, I'm sorry. And did you feel more
3     frightened by the fact that I won the book award?
4     (Crosstalk).
5          MR. ███████    Threatened by you winning an
6     award, no. I thought it was -- you know, you got one
7     for a multiple choice test and then some small classes
8     and space law. I don't care about the awards. You
9     know, a friend of mine won all of them, okay? So I
10    really don't -- I don't know why I'd be threatened by
11    you winning an award.
12         MR. DAMSKY:  And you're not in general, like,
13    threatened by the papers? You said you're just
14    threatened by you, capital Y. but you just -- it's
15    just -- essentially, I mean, I don't want to put words
16    in your mouth. Would it be fair to say that you are
17    threatened by my existence?
18         MR. ███████:  Your presence because I think
19    you're dangerous inherently based on your
20    beliefs. Maybe not inherently, maybe it's the wrong
21    word, but I think you are fundamentally a dangerous
22    person overall. And perhaps you simply haven't
23    escalated the violence yet because maybe your life
24    hasn't been frustrating enough. But I do think that
25    the threat is there. Whether I'm, you know, too stupid

Page 250

1    to really perceive it, I don't know, but I do know for
2    a fact that you're a dangerous person.
3                    MS. PEEPLES:  Okay.
4                    MR. RUSHING:  So I believe that --
5                    MS. PEEPLES:  Yeah. This is --
6                    MR. RUSHING:  -- I believe that the Board has
7    had enough information about the witnesses feelings
8    about this matter. So if we could move on to a
9    different topic, please.
10                   MR. DAMSKY:  No, I think I'm good. I don't --
11   hold on one second. You said my aggression displayed
12   online. Do you just mean the things that I said?
13                   MR. ██████████     Yeah. Talking about genocide,
14   like, as in advocating for it and you -- yeah. I think
15   that's aggressive. The things you say are aggressive.
16   Perhaps you aren't like, you know, getting in flame
17   wars with people or yelling at them in a way that you
18   do when you're typing, but the things that you say are
19   extremely aggressive. The paper that you published
20   talking about extrajudicial assassinations, that's
21   aggressive. I think you're an aggressive person,
22   whether you manifest it in person, whether you are
23   holding it back, I don't know, I don't care. What you
24   say is objectively aggressive.
25                   MR. DAMSKY:  Thank you, Mr. ██████████

Page 251

```
 1              MR. RUSHING:  Are there any additional
 2      questions for ▆▆▆▆▆ from any party at this time? All
 3      right. Thank you, ▆▆▆▆▆, for your time and you're free
 4      to leave.
 5              MS. PEEPLES:  Thank you.
 6              MR. ▆▆▆▆▆▆▆▆▆  Thank you.
 7              MR. DAMSKY:  Ms. Peeples, were you recording
 8      that?
 9              MS. PEEPLES:   The hearing is being
10      recorded. Okay. So --
11              MR. DAMSKY:  (Inaudible).
12              MS. PEEPLES:  -- the -- we're going to take a
13      short break. You'll need 10 minutes and then we'll
14      come back, Preston, for you to provide your
15      information.
16              MR. DAMSKY:  And do you still have -- you
17      have the recordings of all the witnesses, including
18      Dean McAlister?
19              MS. PEEPLES:  Preston, the hearing is
20      recorded for appeal purposes.
21              MR. DAMSKY:  Okay.
22              MS. PEEPLES:  Okay. I'm going to put everyone
23      in the waiting room, we'll bring you back in 10
24      minutes. It's 3:10 now, so we'll come back at 3:20.
25              (Off the record.)
```

Page 252

1              MS. PEEPLES:  Okay. Hey there,
2     Preston. Okay. The recorder's going. Ryan, you can
3     continue reading the script.
4              MR. RUSHING:  Okay. So at this point, we
5     would bring in the next witness requested by Preston,
6     Daniel Pincus. And the Board --
7              MR. DAMSKY:  If it's okay, I don't actually
8     want to call since I haven't even given them the Zoom.
9              MS. PEEPLES:  Okay.
10             MR. DAMSKY:  So --
11             MS. PEEPLES:  Okay.
12             MR. DAMSKY:  -- this one a little long, and I
13    think we kind of all know what's happening. I mean,
14    you guys have enough info to go off of, Mr. Pincus and
15    Ms. Jackson won't really provide anything new.
16             MR. RUSHING:  Okay. All right. So Preston,
17    please proceed by sharing any information you may have
18    regarding the allegations of disruptive conduct and/or
19    harassment.
20             MR. DAMSKY:  Okay. Thank you, sir. Ms.
21    Peeples, can you pull up the Dropbox file?
22             MS. PEEPLES:  Uh-huh. Yeah. Which page?
23             MR. DAMSKY:  Well --
24             MS. PEEPLES:  Which -- do you know what page
25    you'd like? What page?

1            MR. DAMSKY:  I mean, Ms. Peeples, do you

2     think it might help -- I mean, is there like a set way

3     that we're going to do this or anything? I mean, is it

4     -- would it -- might it be helpful if I got started

5     out asking questions and then maybe I could sort of go

6     -- like, is there a set way that we do this?

7            MS. PEEPLES:  Yeah. So the set way that we do

8     it is the student -- the accused student is given an

9     opportunity to just share information and

10    this is related to the allegations of disruptive

11    conduct in this particular case and/or harassment. So

12    if there's information you want to provide -- address

13    (crosstalk) --

14            MR. DAMSKY:  Okay. Okay. So you won't -- in

15    other words, you won't --

16            MS. PEEPLES:  So you can address things that

17    have happened during the hearing today that you would

18    like to highlight and bring up. You can ask me to

19    share my screen and bring up particular parts of the

20    case packet that you would like to particularly note

21    for the hearing body. You can share -- you know, any

22    information you want to share about these series of

23    events --

24            MR. DAMSKY:  Okay.

25            MS. PEEPLES:  -- and the -- or you can say,

Page 254

1    you know, "I just want to answer questions and leave
2    everything for closing remarks." I mean, that's
3    totally up to you.
4            MR. DAMSKY:  Okay. Well, I guess I'll just
5    give the -- kind of intro statements that I wanted to
6    do --
7            MS. PEEPLES:  okay.
8            MR. DAMSKY:  -- and then maybe we can go
9    through the thing. So you know, we heard from Dean
10   McAlister at the beginning of her statement. She said
11   that I have been on the radar for a long time. And as
12   long as you've learned, that is true. Her statement
13   said, "For the better part of two years, we've been
14   dealing with a law student who has expressed extreme
15   views that nearly all in our community find deeply
16   disturbing, racist and anti-
17   Semitic." Well, you've probably kind of learned from
18   █████████████, not everybody in the law school
19   community feels that way. I disagree with the notion
20   that nearly everyone in the law community disagrees
21   with my views.
22           Certainly, I do not believe the consensus
23   position is that they are deeply disturbing. And
24   certainly not when these views are considered
25   separately. Regardless, that's only of my

1    own importance. Dean McAlister is correct. And Ms.

2    Peebles, am I allowed to speak to the First Amendment

3    here? Or is that not -- because you didn't say it's

4    for the Charter, so.

5            MS. PEEPLES:  Are you allowed to speak to

6    what? Say it again.

7            MR. DAMSKY:  The First Amendment.

8            MS. PEEPLES:  We're going to give you some

9    latitude on that, Preston. But that is not what the

10   hearing body is going to be deciding. So --

11           MR. DAMSKY:  Okay.

12           MS. PEEPLES:  -- if you want to speak to

13   specific aspects, but just keeping in mind, the

14   hearing body is going to be looking at the behaviors

15   and determining disruptive conduct and/or harassment.

16           MR. DAMSKY:  Okay. Well, I'll just note that

17   -- I know it's so difficult to do it otherwise.

18           MS. PEEPLES:  Yeah.

19           MR. DAMSKY:  I mean, I'll just note that -- I

20   believe you said the rule -- and I'm abiding by what

21   you said or I'm doing my best, was that things are

22   presumed protected unless they are found to meet the

23   definition in which they are not presumed to be.

24           MS. PEEPLES:  Would it be helpful to you to

25   repeat that section of the script?

Page 256

1            MR. DAMSKY:  That might be helpful if we
2    could hear that again.
3            MS. PEEPLES:  Okay. Ryan, are you able to go
4    back and read that section of the script?
5            MR. RUSHING:  Yes. It's the part that starts
6    with the University Officials Board will take notice
7    of?
8            MS. PEEPLES:  Yes.
9            MR. RUSHING:  Okay. I'll reread it. The
10   University Officials Board, or UOB, will take notice
11   of the following. Preston Terry Damsky, or the
12   student, has been charged with disruptive conduct and
13   harassment in violation of the UF Student Code of
14   Conduct, otherwise known as the Code. The Code defines
15   disruptive conduct as conduct that is materially or
16   substantially disruptive to the normal operations of
17   the university, or that incites others to do so in any
18   of the following activities; teaching, learning,
19   research, administrative functions, disciplinary
20   proceedings, or other university activities, whether
21   on or off campus, and other authorized activities that
22   take place on campus. This is in the Code, Section
23   4(c).
24            In evaluating whether conduct is materially
25   or substantially disruptive, the university may

Page 257

1  consider the totality of factors, including but not

2  limited to, whether there was an intent to prevent the

3  activity or prevent continuous disruption. Disruptive

4  conduct does not include any conduct protected by the

5  First Amendment. Code defines harassment as threats,

6  intimidation, coercion, or any other conduct that

7  places a reasonable person in fear of physical harm

8  through words or actions, or objectively disrupts a

9  person's daily activities, including education or

10  employment. Code, Section 4(k).

11          Harassment does not include conduct protected

12  by the First Amendment. The UOB is not tasked with

13  determining whether, as a legal matter, the student's

14  conduct or speech is protected by the First Amendment.

15  The UOB may and should presume that the student's

16  conduct or speech is protected by the First Amendment,

17  it does not constitute disruptive conduct or

18  harassment. If the UOB finds that the student is

19  responsible for disruptive conduct or harassment, it

20  should presume that the student's conduct or speech

21  is, for that reason, not protected by the First

22  Amendment.

23          The UOB may and should take notice of the

24  fact that these differ with respect to the Israeli-

25  Palestinian conflict. The UOB may and should presume

Page 258

1    that the student's speech or expression using the

2    phrase, "From the river to the sea, Palestine will be

3    free," is protected by the First Amendment.

4            MR. DAMSKY:  Okay. And just out of curiosity,

5    Ms. Peebles, is the Board -- are they to review

6    recordings, or is the recording solely for the appeal

7    purpose?

8            MS. PEEPLES:  So the recording is for appeal

9    purposes.

10           MR. DAMSKY:  Okay. All right. So I'll read

11   what I wrote, and I apologize. I guess I just didn't

12   understand properly, but I thought this would be

13   presented at the beginning, but I think, frankly,

14   maybe it's somewhat better that I present it at the

15   end. I wrote this in one course. I believe we're here

16   in part because I've exercised my constitutional

17   rights by engaging in protected speech and expression

18   that a vocal minority of students and faculty object

19   to.

20           I say in part because you will soon learn, or

21   perhaps I hope have learned, that it's not even the

22   speech and expression that truly bothers these people.

23   I don't believe it is an exaggeration to say that I

24   could have my mouth sewn shut and my access to the

25   internet cut off, and many of the individuals who you

Page 259

 1   have become aware of would still hate me and claim, in

 2   my opinion falsely to, "Fear me." These people do not

 3   object to my speech or expression. They object to the

 4   mere fact that I believe the things that I do.

 5          One anonymous report put it, they object to

 6   the fact, and I quote, "That he is able to take

 7   classes at this institution and exist among Jewish

 8   students when he believes wholeheartedly these

 9   ideologies." There was another individual put in a

10   private chat, and I quote, "Anyone with those views

11   should honestly not be allowed on a campus where there

12   are POCs, that is people of color or persons of color,

13   or be licensed to practice for that matter." And

14   almost everything that I've said, written, or

15   expressed has, at some point in the past, been

16   conceded by the school to be protected in the First

17   Amendment. That is to say, they did not at the time

18   believe that it was a disruption or it was harassment.

19          I say, actually written or expressed, because

20   I believe there is at least one accusation in the case

21   file, which is not supported by any corroboration. In

22   fact, I believe there are some more to that. I mean,

23   you heard Professor Kaufman. He said that I

24   discriminated against Jewish students. Now, I asked

25   him what that meant, and he simply would not say. It

Page 260

1    was wholly conclusory. I don't know how on earth I'm

2    supposed to defend against that or provide an

3    explanation against that. It is entirely

4    uncorroborated.

5            There are other things. When I wrote that,

6    for example, there is a line in the case file. And

7    look, as you've learned, I don't hide my beliefs. I've

8    never hidden my beliefs, I'm fairly open about the

9    things that I think. I welcome debate. I welcome, as

10   Professor Lidsky put it, counter-speech. That's a fine

11   way of saying it. It's a disagreement, it's spirited.

12   But one thing in the case file that kind of sticks in

13   my craw, and it's only one, again, entirely

14   uncorroborated, is that in evidence class, which you

15   and Mr. ██████ said that we were part of. Now, I'm

16   not saying that he was the one that made this

17   report, I don't know. But it said that I said that a

18   black student was loud because of the way that they

19   presented the paper.

20           Now, I forgot to ask Mr. ██████ this, but

21   evidence class is one of the most packed law school

22   classes that you'll have. It's basically a mandatory

23   course. I think it actually is a mandatory course, I'm

24   not sure.

25           MS. PEEPLES:  Yeah.

```
 1          MR. DAMSKY:  There would have been at least
 2     100 -- yeah. Ms. Peeples is a lawyer she would know.
 3     There would have been at least 100 people in that
 4     class, I believe, with Professor Cook. And look, I'm -
 5     - as you'll see from the information that I present, I
 6     have been aware that I have, for lack of a better
 7     word, and I don't begrudge them, I don't hate them,
 8     but enemies. If I had said something like that in open
 9     class to insult this student, there would be 20
10     reports about it. So I ask you to consider these
11     things when you read through the case file. Just
12     consider, is this corroborated? Does this seem -
13     - while it might seem like something I would say, does
14     it seem like it's a place where I would say it?
15          I understand the importance of being
16     professional in a class. Mr. ██████ noted that I
17     would occasionally smirk in Professor Maclin's class.
18     Professor Maclin is one of the most beloved professors
19     at UF Law. Man, he's funny. Like, I wasn't the only
20     one that smirked whenever he would say, "White is
21     right." And I note here, too, that Professor Maclin is
22     black, okay? So when he says that and he needles
23     people like that and he gets them to say it back, he
24     knows that he's trying to be humorous. So why that was
25     kind of something that Mr. ██████ picked up on, I
```

1    don't know. People enjoyed Professor Maclin's class.

2    People smiled at it. That's why I took two of them, he

3    was a great professor.

4            Anyway, as I was saying. There are multiple

5    examples of people taking things that I've either said

6    or written, but misrepresenting them. I tried to bring

7    this to Dean Shaw's attention. In fairness, I guess

8    she was kind of unaware of the recent taking over of

9    the anonymous report system. But the way that my words

10   get twisted -- look, if they're offensive as they are,

11   there should be no reason to twist them. Why, for

12   example, I mean, bring it up on page -- sorry, Ms.

13   Peeples. On page -- well, I'll read the thing first

14   (inaudible). This sticks out to me. Okay. All

15   right. Let's take a look -- I'm sorry. Let's take a

16   look at page, I believe it's 126. So this was, as Mr.

17   ██████████ said, kind of the post that put me on the

18   map. And I'll explain what all this was about.

19   Actually, maybe it's best if we just -- I mean, 126 is

20   good, but -- yeah.

21           MS. PEEPLES:  You want a different page?

22           MR. DAMSKY:  Yeah. One second, Ms. Peeples. I

23   think it would be best if I made a note permanently

24   here for the first time, which is where my exhibit

25   table starts, which is --

1           MS. PEEPLES:  Your exhibit table --

2           MR. DAMSKY:  (Crosstalk).

3           MS. PEEPLES:  -- starts -- yes. 171.

4           MR. DAMSKY:  All right. Maybe it'd be best if

5      I just kind of go through my exhibits first --

6           MS. PEEPLES:  Okay.

7           MR. DAMSKY:  -- and I'll take a look at the

8      ones provided because mine are presented in

9      chronological order and it's just a little bit easier

10     to kind of go through. So I believe we can start on --

11     if, I guess, you can start on 175. And am I allowed to

12     read this, Ms. Peeples?

13          MS. PEEPLES:  You can read it, but you might

14     want to use your time more wisely than just reading

15     something. If you want the Committee -- if you want

16     the Board to note something and to go back and review

17     it, you could (crosstalk).

18          MR. DAMSKY:  Okay. I ask you simply to keep

19     every decision you make, every analysis that you

20     undertake with these two pages in mind, 175 and 176,

21     particularly the top paragraph on -- well, the first

22     paragraph of 175 and the first paragraph of 176, those

23     will tell you kind of how open-ended UF's commitment

24     to free expression is. And on 176, the restrictions

25     that exist and you can evaluate everything in that

Page 264

1   light. So on page 180, we could go to there.

2           MS. PEEPLES:  Uh-huh.

3           MR. DAMSKY:  Page 180, so this was posted -

4   - this is Instagram. This was posted in the group that

5   on September 21st, and I don't have a screenshot and

6   nobody knows. I can tell it's not in any of the case

7   file, but a student at the school, she posted this

8   screenshot of basically the image on the left, not

9   the comments on the right, but the image on the left.

10  And it did have -- I think it did have the caption,

11  which is how many do you see for a possible, I

12  think, (inaudible)? Swipe and share your thoughts in

13  the comments. He's talking about how many black

14  students you see. In fact, the subtitle at the top is

15  how many black faces do you see? This is what

16  diversity looks like in 2025.

17          And this student who I believe is -- she is

18  about -- in the front row from the right, she is about

19  third or fourth from the right, depending on where you

20  want to kind of start it. She's wearing gray. She's

21  next to a woman in, like, beige pants. Identifying her

22  isn't important, but she's in the front row. And she

23  stated -- like, from my recollection, she stated -

24  - and you can go to 182 now. She stated essentially

25  that, "I wish I hadn't stood in the front." And I

Page 265

1  don't know if she was joking. I mean, I don't know. It

2  seems kind of sincere to me because this image had

3  been making the rounds. And in fact, you can even see

4  I called it a look at 177. This was the school's

5  Facebook page. And this has been up for -- this post

6  was made in September 13, so, like, eight days before

7  that Instagram post was made.

8          And this woman here, Stacey Patton (ph), she

9  says, "What are you people complaining about? There's

10  lots of diverse students. Look at all those diverse

11  shades of pale." And you can see in the reactions that

12  it had, you know, like, 900 people. So this is kind of

13  the fact that our classes, majority white or as Ms.

14  Patton puts it, majority diverse shades of pale, it

15  kind of had a little bit of a (inaudible). In fact, I

16  don't have it in the case file, but I can attest that

17  there was an op-ed that I read at the time that was

18  talking about this. And it basically said that our

19  diversity, those were correct democracy. So I

20  said, "The United States lost 19.3 million white faces

21  on that over the past decade, which I'm sure fills

22  this man -- " I'm sorry. I'm looking at 182.

23          MS. PEEPLES:  Uh-huh.

24          MR. DAMSKY:  " -- which I'm sure fills this

25  man with nothing but joy." So why aren't white people

Page 266

1    care at all about his criticisms of our demographic
2    share in any institution? And even better question is,
3    why should we do anything but pure contempt for him?
4    That is the Instagram author for him and anyone else
5    who expresses and shares such naked hatred for us. So
6    to be clear, when I told him, I wasn't referring to
7    the girl who posted the picture and said, "I shouldn't
8    have stood in front." I was referring to the Instagram
9    user who was not a member of the U.S. Totally
10   unaffiliated. And with that in mind, you can see what
11   -- we'll go back briefly to -- oh, I got it, 53.
12              MS. PEEPLES:  Fifty-three?
13              MR. DAMSKY:  Yes, page 53. You can see this
14   is written as -- during the morning and afternoon of
15   Friday, September 22nd, a current law student in the
16   U.S. was self-identified in the press and posted two
17   statements in a public chat on the GroupMe platform
18   that it openly writes supremacist and inflammatory
19   content. After the first one was removed from the chat
20   by moderator, the second one reinforcing that he stood
21   by his initial statements. The first statement read in
22   part, "The United States lost 19.3 million white faces
23   on that over the past decade". I mean, you see the
24   ellipses. So why on earth should white people care at
25   all about another student's criticism of our

Page 267

1    demographic share in any institution? Why should we do
2    anything but pure contempt for the student and anyone
3    else?
4              Well, plainly, that's not what I said. There
5    were brackets giving the -- what is the text supposed
6    to be context of the archiving context. They're
7    twisting what I said. And this was basically posted
8    and like a media or from the way that (inaudible) this
9    was done right when I posted that. So as I said, just
10   keep in mind that don't necessarily take what people
11   say that I said unless there's -- like, I'm open about
12   what I say. I usually put it on record. There's very
13   few examples -- like, there's no reason if you hear
14   somebody say that I said something, it's best to just
15   look at it and look at it in context. Which frankly, a
16   lot of my classmates don't seem to want to do. And it
17   is -- I'm not going to say it's frustrating, it's -
18   - if it's mad or anything, but it is somewhat annoying
19   that was done repeatedly over the past few years.
20             So continuing on. So of that
21   debate, Dean McAlister writes in her report, and I
22   quote, "Mr. Damski speech was protected. It was
23   neither substantially disruptive nor
24   threatening." That goes to the conduct chart. She is
25   saying that that conduct does not meet the definition

Page 268

```
 1    of the chart. "Accordingly, we could not punish him
 2    for his speech." And I'm asking you not to punish me
 3    for it either. You've learned about debates and
 4    discussions in our spring 2024 constitutional law
 5    class of these. The dean writes, and I quote, "The
 6    speech was protected speech made in the context of a
 7    classroom discussion and not outside the bounds of
 8    academic freedom."
 9              Again, you should also honor the fact that
10    speech is protected. You heard about the paper written
11    for two seminar courses in the fall 2024 semester. One
12    of these, a paper written for a class of
13    constitutional change. Now, that is -- you know, he
14    read the paper at the very least -- I mean, I assume
15    most of it. That is what ████████has testified to
16    or gave testimony to the witness for of these -- a
17    paper written for a class of constitutional change.
18    The dean writes and again, I quote, "In consultation
19    with the course's professor, a First Amendment scholar
20    on the faculty in the general counsel's office, we
21    concluded that the paper statement did not constitute
22    true threats and were protected under the First
23    Amendment."
24              So again, I'm asking you to honor the fact
25    that my paper is protected under the First Amendment.
```

Page 269

1    Another paper written for that semester for a class on

2    the legal theory of originalism, received a perfect

3    score in the award for the best paper in the class.

4    That class was taught and graded by a sitting federal

5    judge. After certain students became angry that I

6    would be recognized for the grade I earned with this

7    award, which, as Dean McAlister says, takes positions

8    that are in line with the current administration. So

9    they're not even all that extreme. I mean, I'm

10   actually not a big Trump supporter. But nonetheless,

11   they're not -- and that doesn't -- that's not

12   particularly relevant. But the point is, the degree to

13   which academic freedom, some people would like to

14   stifle my gaze.

15            I mean, you heard ███████████. I

16   expressed support for Daniel Penney, who was

17   acquitted, acquitted of his crime. And because of

18   that, Mr.████████ is disgusted with me. Now, if you

19   heard correctly from Mr. ██████████'s testimony, he

20   basically didn't say much (inaudible). He came out and

21   said that he had no reports of harassment. He didn't

22   even really say that I was disruptive in terms of my

23   conduct, he asserted that my existence was disruptive

24   and not even my existence in particular. I am sort of

25   just, lack of a better word, a scapegoat for people

Page 270

1    that Mr. ███████ has strong political disagreement

2    with. And he's welcome to that disagreement, but I

3    shouldn't be kicked out of it.

4            So again, the class -- the original is a

5    great class, was taught and graded by a sitting

6    federal judge. After certain students became angry

7    that I would be recognized for the

8    great (inaudible) with this award, all students are so

9    recognized when they are in the best grade in class.

10   The dean sent out a school wide email, which reads in

11   part and I quote, "As a state institution bound by

12   the First and 14th Amendment, no faculty member may

13   engage in discrimination in the evaluation process.

14   That means we evaluate student work based on its

15   objective criteria as possible. In a seminar, grades

16   are usually informed by the quality of the research,

17   legal analysis and writing. A faculty member may

18   not grade down a paper that is otherwise successful

19   simply because he or she disagrees with the paper

20   advances."

21           Okay. I'm sorry. That doesn't really go to

22   the charge. But I would say that, obviously, this

23   email was unambiguously in the case file.

24   Unambiguously, an implicit admission that this paper

25   was also completely within the bounds of the First

1    Amendment and within the bounds of academic freedom. I

2    can tell you one law school friend joke to be seen to

3    be avail was my, "Pardon." You didn't hear a lot today

4    about my wearing of a T-shirt. Even

5    Professor Kaufman said that he didn't think that my

6    wearing of a T-shirt was disruptive. Nobody went on

7    the record to say that my T-shirt was disruptive. The

8    only person that has said anything about the T-shirt

9    is Dean McAlister in her initial report. And she says

10   that people have complained about it.

11          People can complain about my shirt, people -

12   - I mean, that's fine. But it's not disruptive, it's

13   not harassing, I don't wear it every day. But even if

14   I was kind of -- if I chose to, I don't think it would

15   be disruptive or harassing. Really, why we're here is

16   a tweet of mine sent on March 21, 2025 at 3:48 in the

17   afternoon. Now, I'll make the following observations

18   and claims on this tweet in the subsequent

19   conversation. Now, I'm going to walk through this.

20          But all the tweets were made when off campus.

21   The original tweet was posted during spring break. I

22   didn't intend for any of these tweets or any other

23   tweets I made to be threatening, nor do I believe that

24   they were either threatening or disruptive. The

25   professor's final reply to me, which I did not respond

Page 272

1  to, is most definitely not the sort of reply someone
2  makes if they feel self-threatened. And indeed,
3  Professor Linsky, though she spoke of sleeping with a
4  baseball bat, she seemed more unnerved about what I
5  might do after I got trespassed.
6          But we know what I did after I got
7  trespassed. As you'll read, I immediately did my best
8  to finish out the semester, and I did quite strong in
9  my academics. I got the best grade in three out of
10 five classes. It was actually the best semester that I
11 ever had in law school in terms of my academics. I
12 dedicated myself single-mindedly to my academics. The
13 only other thing that I did those days was walk my
14 dogs and go to the gym and eat. All the tweets were
15 made when I was off campus -- yeah. I?m sorry. The
16 professor's final reply to me, which I did not respond
17 to, was most definitely not the sort of reply someone
18 makes if they feel threatened. The tweet is, in
19 context, perhaps provocative -- okay. More than
20 perhaps. But in terms of its likelihood to provoke
21 someone into feeling physical danger, it's completely
22 anodyne.
23          Again, indeed, Professor Lidsky didn't feel
24 that way either, she just -- there's just kind of
25 people feel, because I have the things -- because I

1    believe the things that I believe, that I'm a threat.
2    But there's been no behavior to indicate that. Being
3    provocative is not enough to deny (inaudible) speech
4    the First Amendment protection it deserves. Again,
5    read the free speech statement. So I was trespassed
6    from campus and placed on interim suspension on April
7    2nd. And after that, again, I can't speak to all of
8    this, I know. Again, nothing about how the shirt was
9    disruptive or harassing. But if you read in the April
10    16th letter, the only thing that the school alleged
11    that I did wrong in the April 16th letter, which was
12    to justify my interim suspension, was the fact that I
13    had sent the tweet, which they didn't quote in full
14    context, and the fact that I had been reported to wear
15    a T-shirt.
16            Anyway, private chat logs, which I think are
17    very interesting. Now, I didn't question Mr. ████████
18    (inaudible) Ms. Peeples, I hope you won't think that
19    any correspondence I've sent to people regarding
20    (inaudible) this letter is to be considered
21    retaliation. I knew who all these people were. I've
22    known for a year. I have friends. People show me this
23    stuff. Because as you'll read from some of these logs,
24    it is concerning. People have told me for the past
25    year that Mr. ████████ wants to punch me in the face.

1    Now, his response to that was fairly interesting. Out

2    of (inaudible), very talkative, Mr. ████████. He

3    said, and this is what I wrote down, "No idea, doesn't

4    sound like me, who knows, I doubt it."

5          Well, if you want to talk about equivocating,

6    until that last one is -- until I doubt it, that was

7    kind of equivocating. Look, it's what I've been told,

8    whether or not he said it or not, that's what I've

9    been told. I know -- I've known for a year that Mr.

10   ████████ has screen-shotted my tweets. You'll notice

11   I asked Dean McAlister about it in -- the first thing.

12   Before I ever asked Mr. ████████ about it, I knew

13   about how he screen-shotted my tweet. And like I said,

14   it's his right to monitor me if he wants. I think it's

15   somewhat strange, but if that's what he wants to do,

16   he's more than welcome.

17          Now, to the extent that -

18   - see, Dean McAlister makes it sound that because I

19   know that people, "Monitor my Twitter

20   account", that somehow means that I am trying to

21   provoke them. I'm not. My tweets are what they are. He

22   doesn't have to read them. Nobody has to read my

23   tweets. I don't go on the professor's profiles. I

24   don't interact with them over social media. I just

25   have my little thing. I put my thoughts out there and

Page 275

1  people can do with them what they want. As I said,
2  private chat logs paint a very different picture of
3  what I think is a small fraction of the student body
4  that is hostile towards me. And they're hostility
5  derived, in my opinion, not from fear or not from any
6  concrete fear of what I've done or even what I might
7  do, but purely, frankly, a hatred of me and my beliefs
8  and a desire to see me academically, professionally
9  and personally and physically harmed.
10       I don't take much joy in it, but I can live
11  with their hatred. And they absolutely have the right
12  to hate me. And as I think you found out, all these
13  people, all of them, from -- with the exception, I
14  suppose, of Dean Shaw, but even her, I mean, I
15  probably had the most contact with when I went to her
16  office in January when she asked me to come to her
17  office, all of these people I have had minimal, if
18  any, contact with or interaction with, especially in a
19  face-to-face setting.
20       Now, ask yourself how I received all these
21  screenshots and logs from the private chat of a
22  progressive legal group, the National Lawyers Guild.
23  Despite my politics, I have friends and allies from
24  across the political spectrum among the student body.
25  Likewise, I have friends and allies among the Levin

Page 276

1  faculty. You can tell that some of -- frankly,
2  Professor Lidsky did figure out pretty quickly that
3  she knew that teachers advocated for me and had told
4  me things that she had said in faculty meetings. And
5  you can read the emails that the teachers sent to me.
6          If we could go to -- again, first of all, I'd
7  like to bring your attention to one thing just since I
8  went past it. This is a great example. If we can go to
9  page 231. Now, Christopher Hampson told you that he
10  interpreted my national constitutionalism paper as a
11  threat against the federal judiciary. Well, here you
12  can see Professor Badalament --  oh, I'm sorry. Judge
13  Badalamenti, who's a sitting federal district court
14  judge on, I believe that's January 7, 2025, which is
15  when I got the book award, either the day that I got
16  it or the day before. I think that might have been
17  when we got our grades back, but sometime before the
18  book awards come out the next day. He -- actually, he
19  emailed me at 12:44, you can see it in the
20  bottom. At 12:44, he said, "Hi, Preston, I hope you're
21  having a nice break. Please zap me your best contact
22  number. Nothing urgent. Happy New Year, Judge B."
23          Of course, I gave Judge Badalamenti my cell
24  phone number. And if you'll scroll down one slide, Ms.
25  Peeples --

1          MS. PEEPLES:  Uh-huh.

2          MR. DAMSKY:  -- you can see me and Judge

3    Badalamenti. Now, we don't talk all the time, but he's

4    talked to me sometimes. And I even talked to him after

5    I got trespassed. Now, I haven't talked to him

6    since, I haven't reached out because I know, I mean,

7    frankly, it's -- the situation, you can tell there are

8    professors that are very hostile against me. And the

9    whole situation is politically difficult. You heard

10   what Professor Lidsky said, "I put the dean in a

11   difficult situation." Dean is an interim dean. She

12   wants to keep her job. People are pressuring her to

13   punish me. Don't believe me, that's in the dean's

14   original statement. If we can go up to where I'm -

15   - so yeah. Anyway, this is my -- this is the call

16   record that I have with Judge Badalamenti. You can see

17   I called him on January 7th, February 17th, March

18   11th.

19          Some of these are dates where -- for example,

20   the February 17th call was made in reaction to the

21   dean's email. Judge Badalamenti had told me that he

22   thought my paper was perfectly First Amendment

23   protected. He thought it was well written. He said he

24   didn't agree with a word in it, but he thought it was

25   well argued and well done. And he was insulted that

Page 278

1    somebody would ask him to take away a grade for a
2    paper that he felt was academically rigorous and,
3    again, within the bounds of the First Amendment. So he
4    called me on February 17th, about a week after the
5    dean's message. You can see that it lasted for an hour
6    and 15 minutes.
7         You can see he called me again on March 11th,
8    which is the day that I found out that they were not
9    going to run the story in The Alligator. The Alligator
10   is a local newspaper, they were going to run a story
11   about me getting the book award. I talked to The
12   Alligator, and they decided not to run the story. Why?
13   I don't know. But I mean, I don't want to sound
14   narcissistic or anything, but given how they
15   immediately published the story once I got trespassed,
16   I don't think that they decided to not run the story
17   because it made me look bad. So to go back up -- I'm
18   sorry. Again -- okay. So let's go to -- so if Judge -
19   - if Chris Hampson was correct that this was a threat
20   against the federal judiciary, why on earth would
21   Judge Badalamenti contact me so much? Why would he be
22   so friendly? It doesn't make any sense because it's
23   not a threat against the federal judiciary.
24        It is hyperbolic writing. It is politically
25   spirited. It is exactly the kind of thing that you

1   might hear on both left wing or right wing, farther

2   right, a little bit more radical politics. These sorts

3   of -- this revolutionary rhetoric, frankly, it's a

4   little globiating. I'll admit it. That's kind of -- I

5   mean, it is what it is. It's -- but it's not threats.

6   And it doesn't really seem that a lot of people were

7   really willing to testify that they saw it, they said

8   that other people interpret it, right, but I'm not

9   allowed to cross-examine them. I'm not allowed to ask

10  them, as I did Mr. █████████ kind of in what way he

11  thinks I'm (inaudible)? You have to understand a lot

12  of people think that I'm a threat just my existing.

13           If we could go up to -- I'm sorry. I'm going

14  -- so this was after I got trespassed. Again, we can

15  go up to 271, I'm going to read you what my professor

16  sent me, the emails that I had while I was

17  trespassing, while I was essentially persona non

18  grata, at least in terms of on-campus activities. I

19  would have been arrested if I had come back to campus.

20  Gosh knows worse could have happened. I mean, with

21  apparently some of the ways that they were talking

22  about it. But I asked Professor Johnson, essentially I

23  sent the same letter to everybody. She immediately

24  responded that she would get back to me with links to

25  continue my education.

Page 280

```
 1            And then if we go to 272. Professor Hardy -
 2     - and I'll note that Professor Hardy and Professor
 3     Scott are not tenured professors, that is why I assume
 4     it took so long for them to reach out. I think
 5     eventually Dean McAlister prevailed upon to allow me
 6     to complete my education. So essentially, she gave the
 7     go ahead to these non-tenured professors. But the
 8     tenured professors were immediately okay with letting
 9     me continue. Professor Hardy says, "Thank you so much
10     for reaching out. I hope all is well." Now, look, it's
11     good to be professional, "Thank you for -- thank you
12     so much, thank you for reaching out. Okay, thank you
13     so much for reaching out. I hope all is
14     well." Frankly, this does not sound like the words of
15     somebody that thinks that I'm a domestic terrorist.
16            Again, 273, Ryan Scott, "Thank you for
17     letting me know. I hope all is going well for you.
18     Please reach out if you need anything." And then I
19     spoke to Professor Collier (ph). You will see on 276,
20     Professor Collier told his, I believe their academic
21     assistants, Tanya Dampier (ph) to give me access to
22     the remaining classes on Zoom. And 277, this is a
23     record of Mr. -- Professor Collier calling me and
24     talking to me for 40 minutes and you will see that -
25     - I'm sorry. If we go down to a lot of this, it's kind
```

Page 281

1   of a -- if we go down to 297. I find 297 to be a very

2   fascinating -- I (inaudible) my dog is barking. 297 is

3   very interesting. This was a letter that Professor

4   Collier sent to Dean McAlister. He emailed me -- he

5   messaged me the letter that he wanted sent so that he

6   would know that I sent it.

7         Now, I didn't threaten him to get him to send

8   it or anything, he wanted to send it. He thought that

9   -- he considers me to be -- first of all, it's

10  interesting. He views my political sympathies at the

11  extreme progressive or leftist end of the political

12  spectrum. Some people do kind of struggle to figure

13  out what my -- all of these are because I don't mean

14  exactly one side or the other. I'm not a big fan of

15  Donald Trump, for example. Quiet. And sorry.

16  (Crosstalk).

17        MS. PEEPLES:  Do you want to take a minute?

18        MR. DAMSKY:  Yeah. No, no. She's good.

19        MS. PEEPLES:  Okay.

20        MR. DAMSKY:  And she says, he considers me a

21  thoughtful, intelligent student, and he's concerned

22  about the situation that I find myself in. He said he

23  would have advised me not to express what he thought.

24  But from the whole context of the statement, it

25  appears to involve in ongoing dispute with the Harvard

Page 282

```
 1    professor. Listen now, I wasn't in an ongoing dispute
 2    with the professor, I was somewhat criticizing his
 3    work. But without doubt, as I'll soon show you, Noel
 4    Ignatiev -- and I knew this, as Patrick has said, I
 5    don't know why he doubts that I would know this. He
 6    seemed to insist that he knew who Noel Ignatieff was,
 7    which is fascinating. Not fascinating, but I mean, I'm
 8    not terribly surprised. Noel Ignatiev is not an
 9    obscure academic, contrary to what Merrick McAlister
10    might say.
11            When you Google Noel Ignatiev, you will find
12    out that when he died in 2019, they were apparently
13    glowing obituaries out of the New York Times. I've
14    known Noel Ignatiev for 10 years, ever since I started
15    kind of paying attention to politics. He's not an
16    obscure academic. And ████████████  knew who he was.
17    ████████████████  knew who he was when he reported the
18    tweet. And none of this would have happened if ████
19    ████████████  had never reported the tweet. And you heard,
20    he wasn't really afraid, the only thing he was afraid
21    of was that I was going to find out who he was. Well,
22    as I've told you, essentially, I knew that████████
23    ████████████  was monitoring me, as he put it, for a year.
24    I knew it for a year.
25            None of this is surprising. He thinks that I
```

1   have no friends, which is bizarre, because I do. And

2   as he says, I'm talking with people. He sees me

3   talking with people on campus, but he just assumes

4   that nobody could possibly be friends with me. What

5   was wrong? And I have -- obviously, somebody gave me

6   these logs. I'm not in the NLT GroupMe chat, I'm not -

7   - like, I don't have, like, a sock puppet account in

8   the GroupMe chat, somebody gave me those.

9          As Professor Collier says, he doesn't see

10  anything to rise to the level of unprotected speech.

11  And he says, "Look," he says, "Perhaps they can cause

12  understandable stress, but liabilities should be

13  limited to those expressed on official university or

14  law school forums and websites." Now, let me take that

15  for what it's worth. This is another, 298. This is a

16  message that I sent on the 17th, again, to Professor

17  Hardy. There's a Zoom issue. This was the last class.

18  I said, you know, "It's okay that I couldn't finish,

19  because the Zoom was kind of cut out (inaudible)." And

20  I was like, "Oh, you know, this is why I left." He

21  said, "Preston, I'm so sorry. So much was going on

22  today that I forgot to activate the Zoom link. Please

23  accept my apologies. It's totally my fault, and I'm

24  certainly excused for absence."

25          I just reviewed subject matter performance

Page 284

```
 1   provision, she's a contract drafting professor, end
 2   game, general provisions, since we're in class, et
 3   cetera, et cetera. "I gave your class last week --
 4   " I'm sorry, "I really appreciate your kind words. You
 5   are really bright and talented, and I want you to take
 6   care of yourself. Have a great summer." Again, there's
 7   professional, and then there's just kind of being nice
 8   or sympathetic. Kirsten Hardy, in case you can't tell,
 9   she is a Black woman. I'm sure she has heard of the
10   things that I've said, okay? And I'm sure she
11   disagrees strongly with them. As I said that, I'm sure
12   that Dean Shaw was strong with them, and I knew she
13   did, and that's her right. But I am perfectly capable
14   of being professional and friendly to everybody that I
15   encounter. And I am. I am.
16          Again, 303, this is a book award
17   correspondence from Professor Johnson. She says, I'm
18   sorry, "Congratulations again. I hope you are doing
19   well." Again, (inaudible). And then 305, because I
20   took two of her classes. She says, "Congratulations.
21   You won a book award in our mental health law
22   class." Number two and counting, "I'm so glad your
23   hard work paid off. Congratulations on this wonderful
24   accomplishment, and I hope you're doing well." Again,
25   very friendly -- professional, but friendly. Now,
```

Page 285

1    again, Professor Johnson is certainly not somebody
2    that agrees with my politics. The people that I
3    interact with have -- all of these people, all of
4    them, there's nobody that I've ever even talked to
5    before.
6            This is the first time today that I've spoken
7    to Professor Hampson, aside from on Twitter for that
8    one conversation, this is the first time that I've
9    spoken to Professor Lidsky. I spoke to Dean McAlister
10   for about 10 minutes in her office privately. But
11   aside from that, I haven't really spoken to her. I
12   have spoken to Dean Shaw for a couple hours, but I
13   always thought that our meetings were fairly friendly.
14   I frankly don't remember her ever telling me that my
15   speech was becoming a disruption to the school.
16   There's no -- I didn't think I had to make
17   contemporary notes about the minutes of our meetings,
18   so I can't (inaudible), you'll have to just evaluate
19   how you feel.
20           But look, I'm not sure if you guys heard it,
21   but I believe that I asked Dean McAlister how long she
22   was speaking to ████████████. I believe she
23   said 5 to 10 minutes. You heard Mr.████████ say it
24   was at least half an hour. Now, again, I watch Mr.
25   ████████ when he's in the same room as me because I

```
 1    have heard that he wants to punch me. Now, do I think
 2    that he necessarily will? No, but I like to -- I do
 3    pay attention, particularly when he's talking to the
 4    dean because I know he monitors my Twitter. And I
 5    don't know -- I figure that he's always kind of -- I
 6    always figure that he's kind of trying to get me in
 7    trouble. But I thought that my speech was perfectly
 8    within the lines. I didn't think I was never trying to
 9    threaten anybody at the school, I was never trying to
10    disrupt school activities, I thought that everything
11    that I said was perfectly within the balance of the
12    First Amendment.
13            And seemingly, Mr. ██████████ said, you know,
14    he didn't really think that tweet was particularly any
15    worse than any of the others, but he could -- for some
16    reason, he felt that that one would be better. And I
17    don't know if he exaggerated the way that he went to
18    Dean McAlister. He said he didn't. He said that he
19    just was kind of looking to see if I figured him out.
20    But again, he has no problem coming forward today, so
21    I don't take it seriously. For somebody that is so
22    involved with this, I find it interesting that it's
23    basically at the root of it. Again, Mr. ██████████
24    basically said that -- you know, and he had seen the
25    tweet too, I believe he said he'd seen it on March
```

Page 287

1    21st within 24 hours of me sending it. It didn't
2    bother him at all. He waited until coffee with
3    the dean to show the dean personally.
4            Mr. ████████ didn't think that I was an
5    imminent threat of committing violence on the school
6    campus. He sat on the tweet. He sat on it. So let's
7    talk about the tweet. Let's go to -- okay. Let's go to
8    243. So I said, "My position on Jews is simple.
9    Whatever Harvard Professor Noel Ignatiev had meant by
10   his call to abolish the white race by any means
11   necessary, is what I think must be done with Jews.
12   Jews must be abolished by any means necessary." Now,
13   Professor Lidsky said that she was speaking to me to
14   talk me off the ledge. What ledge was I on? And she
15   was responding to me almost 10 days later -- 10 or 11
16   days later. I don't know. I mean, I can look at the -
17   - count them out, I guess. But March -- so March 21st,
18   22nd, 23rd, 24th, 25th, 26th, 27th, 28th, 29th, 30th,
19   31, 32. I believe that's a lot of days. It's more than
20   a week, more than a week later. What ledge was I on? I
21   wasn't on a ledge.
22           I wasn't particularly happy about what
23   Dean McAlister refers to in one of her letters, which
24   is how I lost my summer internship. But I certainly
25   wasn't going to risk it by taking it out on anybody,

Page 288

1   let alone the school. I was focused on, "Well, what am
2   I going to do this summer? I'll have to figure out
3   something to do. Maybe a professor will take me on as
4   a research assistant." So Professor Lidsky
5   responds, "Are you saying you would murder me and my
6   family? Is that your position?" I responded to
7   her, "Did Ignatiev want white's murdered?" I knew that
8   he did not. I knew exactly what Noel Ignatiev meant.
9   He was talking about deconstructing an identity.
10          I said -- but I asked, if so -- because I'm
11  just going with her assumption. Because in my opinion,
12  the tweet has two purposes. First of all, I mean it
13  sincerely. I think it would be ideal if the identity
14  group of Jewishness or Jews or whatever you want to
15  call it, if that identity group was deconstructed as
16  Ignatiev talks about. But I also find it interesting,
17  the reaction. Ignatiev can publish the white race -
18  - abolish the white race by means necessary and he can
19  still work at Harvard. He can still work at other
20  universities. But if you say abolish Jews by any means
21  necessary, well, you see what happens. You get tossed
22  out of your law school.
23          And so it is sort of to call attention to a
24  double standard about the rhetoric that people use.
25  How rhetoric against one group is fine, rhetoric

1    against the other -- that exact same rhetoric against

2    another group is not fine. But I responded, did

3    Ignatiev want white's murdered?" So playing along, "If

4    so were his words as objectionable as mine? If

5    Ignatiev sought genocide, then surely a genocide of

6    all whites would mean greater outrage than the

7    genocide of all Jews, given the far greater number

8    of whites." If we accept that people are inherently

9    equal, it would seem to me that mass murder of a

10   larger group would be worse than mass murder of a

11   larger group -- smaller group.

12          Certainly, both would be tragic, and I'm not

13   advocating for either, but it seems odd to me that

14   people would take greater offense at the call to -

15   - or what they perceive as a call to commit a genocide

16   against a smaller group than the exact same call using

17   the exact same rhetoric against a larger group. It

18   makes no sense. There is a double standard there. Why

19   does the double standard exist? Let's interrogate

20   that. Professor Lidsky responded a day later at 1:05,

21   (inaudible).

22          MS. PEEPLES:  uh-huh.

23          MR. DAMSKY:  She responded a day later, "I

24   noticed you didn't say no, but instead resorted to,

25   what about us? Yes, his words are despicable, but you

Page 290

1    implicitly admit yours are too." That is a perfectly
2    acceptable -- I mean, I'm not complaining about the
3    response. That is the response of somebody having a
4    debate through Twitter or any other online medium. It
5    is a tactical reasoning for the argument. I mean,
6    maybe not a horrible, we're probably not like best
7    friends during this debate, but we're not at each
8    other's throats. I didn't threaten any violence
9    against her family. I didn't mention her family. I
10   didn't mention her. I just took what she said and
11   evaluated the implications of it, of her assumption
12   about what Ignatiev meant.
13           And then you can get the timestamps on the
14   next one at 244. And I just bring this up to note,
15   Professor Lidsky said on 245 -- Professor Lidsky is a
16   Zionist. I suspect that she doesn't like me as I
17   suspect Professor Hampson doesn't like me because I'm
18   a critic of Israel and she doesn't like this. I won't
19   dwell too much on that, but I bring it up for the
20   credible witnesses. Okay, again, 247, this is
21   Ignatiev's journal where he wrote that is in the
22   library. It's there. It wasn't hidden, it's not
23   obscured. There's a print copy. It's no -- it's
24   checked out, I guess, when I took this, but there is a
25   print copy and there's also the book. And you can find

1  a PDF of the journal online if you'll scroll down a

2  bit, Ms. Peeples.

3          So this is the issue where it takes place.

4  And I'll just read briefly, "So the white race --

5  " I'm sorry. 250. So this actually -- this editorial

6  is entitled, but I believe it's commonly been

7  described to Ignatiev, "The white race is a

8  historically -- " and he's taken ownership of the

9  ideas with them, "The white race is a historically

10  constructed social formation, historically constructed

11  because like royalty, it is a product of some people's

12  responses to historical circumstances. A social

13  formation because it is a factor of society in

14  corresponding to no classification recognized by

15  natural science."

16          Okay. One second. Let's go to 2.51. I'm

17  reading under where it says dissolve the club. This is

18  the same article. Second paragraph -- well, I'll read

19  the first one too, "The white race is a club, as in a

20  group of people, which involves certain people who

21  were birthed without their consent, brings them up

22  according to the rules. For the most part, the members

23  go through life, accepting the benefits of membership

24  without thinking about the cost. When individuals

25  question the rules, the officers are quick to remind

Page 292

1  them of all they owe to the club and warn them of the

2  dangers they will face if they leave it. Race-traitor

3  aims to dissolve the club, to break it apart, to

4  explode it."

5          Now that is -- to explode it -- to explode

6  the club, that is, one could say violent rhetoric, but

7  he continues, "Some people who sympathize with our

8  aims have asked us how we intend to win over the

9  majority of so-called whites who are anti-racist.

10  Others, usually less friendly, have asked if we plan

11  to exterminate physically millions, perhaps hundreds

12  of millions of people. Neither of these plans is what

13  we have in mind." There you go, he explicitly

14  disclaims violence. And then you can read more. I have

15  more in there. It's more complex stuff. But -- and

16  then if you go to 255, this is another additional

17  break here, number four. And then you can scroll

18  around to 256. You notice there's an article there, 1,

19  2, 3, 4, 5 down, called Abolish the Jewish Caste.

20          And then I have that in 257. The author

21  explicitly said it in the first paragraph -- or in the

22  first footnote, the author regards the term caste and

23  race as synonymous. Both refer to non-biological,

24  historically constructed entities. In view of the

25  longstanding use of the term Jewish race and anti-

Page 293

1    Semitic rhetoric, the author prefers to use the term
2    caste in order to avoid any form of misunderstanding.
3    So essentially what he is saying is abolish the Jewish
4    race in Palestine. He's saying abolish the Jewish
5    race. I mean, that is -- I mean, look, I'm stripping
6    out of context a bit, but I'm boiling it down to its
7    essence to make it analogous to what I said.
8            Again, this is something available in the
9    library. The rhetoric itself is what I'm being
10   punished for, not the ideas behind them. People
11   say, "Well, oh, you know, it's not anybody's job to go
12   looking for the meaning of these things." Well, but
13   the meaning is inherently somewhat hidden. It invites
14   looking it up. Abolish isn't inherently a violent
15   term. In fact, abolish is a term, in my opinion, that
16   sounds in law. One never says -- the robber doesn't
17   say, "Give me all your money or I'm going to abolish
18   you," okay? That's not the verb they use. They say
19   kill, or murder, or shoot. So I don't even think that
20   taking it -- even if you strip it of context, I don't
21   think -- of the Ignatiev part, I don't even think that
22   it's necessarily so clear that it's a call for
23   violence.
24           And certainly not, again, anything -- look at
25   the free speech statement. It has to be a call for

Page 294

 1   imminent violence, imminent. That's not what I did.
 2   And again, all of the -- all my Twitter takes place
 3   off campus, by definition. It is off campus activity.
 4   You can see if you scroll down, Professor Stavros
 5   (ph), like I said, Princeton educated, Harvard now
 6   educated, teaches at the same college that I did, I
 7   took his course, he teaches at the University of
 8   Florida, Western Michigan University, University of
 9   Michigan. He is a storied academic. And there he used
10   essentially the same kind of rhetoric.
11           I'm not going to go through all these logs,
12   but I think they're very interesting and you see the
13   kind of reactions people have (inaudible). For
14   example, let's go to 267. Here is a university student
15   who contacted her, at least for some time. She did
16   seem the kind of equivocated whether or not she knew
17   him, I don't know why. Perhaps she knew that I -- you
18   know, you'll see what Mr. Kosner said to me later, for
19   this Frodo Swaggins character. So Frodo Swaggins is
20   Zach Kosner, as I think we established that. This is
21   what he posted on my wall after I got trespassed.
22           So he said, "Worth it? And then blackened it.
23   So this was hours after -- it was the afternoon after
24   I got trespassed. Now, does this seem like a guy who's
25   afraid that I'm going to commit some violence? He's

Page 295

```
 1    taunting me. Now, it's his right to taunt me. Look,
 2    it's his right to taunt me and I didn't do anything
 3    against him. I didn't retaliate against him, I'm not
 4    going to do anything against him, but again, this is
 5    not somebody that's acting afraid. And I suspect that
 6    given this guy's ties, you'll see in the national
 7    words over the chat, which is a group that's been
 8    particularly active against me and has substantial
 9    overlap with other Kennedy groups on campus, that a
10    lot of these people aren't afraid of me.
11           In fact, you'll see that after I -- go to -
12    - I'm sorry. You will go to 308. So this was after a
13    New York Times story was published about the book
14    award that I got in the national constitutionalism
15    class that was -- because Judge Badalamenti gave me
16    the book awards. That was deemed to be somewhat of
17    controversy, okay? And you'll see Mr. ███████s
18    reaction to the fact that I had pinned the tweet to
19    provide people who are coming to my profile now, after
20    the New York Times story came up with the whole
21    context of what I said. He said, "This fucker pinned
22    me the original tweet." Again, he's not mad, he's
23    like  or -- I'm sorry. He's not scared, he's mad.
24           And you'll see Sam Mendes (ph), who is
25    somebody that goes back all the way to
```

Page 296

1   the GroupMe chat in September of 2023, she

2   said, "Desperately clinging to the attention while it

3   lasts because he knows his career is over." Well,

4   frankly, I don't know my career is over. It will be

5   severely disrupted if I'm expelled, but just because I

6   have what is negative press doesn't mean that I can't

7   be a lawyer. You can't discriminate against somebody

8   on admission to the bar based on their political

9   beliefs. So no, like, I don't believe that my career

10  is over. These people might think so, but they think

11  that because I've gotten in trouble at school, not

12  because I've been revealed as having political

13  beliefs.

14          Granted, I'm probably never going to get a

15  job at a big law firm, but I never wanted a job at a

16  big law firm. So yes, she said, "Desperately clinging

17  to the attention while it lasts because he knows his

18  career is over." And then she posted a giggling emoji

19  and then a party hat. And then -- this is an

20  interesting exchange. Then -- I'm sorry, 309. There

21  they are saying like, oh, my career is over before it

22  started. And then you'll see Caroline Bradley (ph)

23  left the group. Well, if you read Dean McAlister's

24  letter, Caroline Bradley's mother is state senator,

25  Jennifer Bradley, who is in board over -- a Republican

Page 297

 1   state senator who is in board with Dean McAlister to

 2   essentially strip me of the book award that I got in

 3   the National Constitution class because she believes

 4   that it is hate speech.

 5            So yeah. Pressure -- outside pressure has

 6   been put on the dean. You heard that somebody called

 7   the FBI over my paper. Dean Shaw said that. When I

 8   asked Professor Kaufman, who I frankly kind of just

 9   assumed it was him based on the fact that he was

10   testifying here, he immediately denied wanting to

11   answer that question. He said, "No, I will not --

12   like, not responding or, you know, I vote my right to

13   not respond." He decided not to respond to that. He

14   called the FBI on me or somebody called the FBI on me.

15   I can't say it was him. Somebody called the FBI on me

16   because of my paper the school deemed the protected

17   speech.

18            So what other steps would these people take?

19   What would they make up? Professor Kaufman wouldn't

20   tell us how I discriminated against Jewish students.

21   He must have something -- some sort of conduct in

22   mind, but he wouldn't say it. Well, now is the time to

23   say it, Professor Kaufman. Like this is your chance to

24   get me kicked out. And given that he wouldn't say that

25   -- he never provided names of other students who are

Page 298

 1    crying or this and that, who's to say he's not making

 2    the whole thing up or heavily exaggerating everything?

 3            Let's see, 311 -- ████████████ said on

 4    625, again, he said, "I only learned about you at

 5    least in the internship a few weeks ago. He wasn't

 6    lying there. ████████████ more or less told the

 7    entire truth. I can't say the same, in my opinion,

 8    what we may find out for Dean McAlister and Dean Shaw

 9    or any of the other professors, but ████████████

10    told you how he felt. He told you what he did. Listen

11    to him as a witness. His thoughts are really the

12    thoughts of, I think, most of these people. He's not

13    necessarily afraid of me because of anything that I'm

14    going to do, although he did say that he worried after

15    I got trespassed on campus. But as Ms. Peeples has

16    said, and as you guys know, the conduct -- we're not

17    here for anything that happened after, it's the

18    conduct before.

19            And none of these people were actually afraid

20    of me before, not in any sort of legitimate sense of

21    imminent bodily harm or even harassment. They just

22    didn't like me for the things that I believed. And

23    that's the right -- again, I'm not saying -- Professor

24    Lidsky, I wouldn't have minded - I wouldn't have

25    minded debating her. Like, that's completely okay, no

1   bother. I mean, I didn't -- I wasn't going to back
2   down in terms of back off my convictions, but I
3   certainly wasn't going to respond in any hostile way
4   to her request or her engagement with me, so
5   yeah. Again, ███████████████, "I don't know what
6   a good outcome of this could be when it all started,
7   but this has to count as one possibility." You would
8   assume if I was such a threat to the campus, the
9   positive outcome that Mr. ███████ would have been
10  looking for would have been the fact that I got
11  trespassed, but he was waiting for something. He was
12  waiting for damage to my career because he doesn't
13  want me to be a prosecutor.
14          And when you read these logs, you'll read,
15  hey, like most of these people don't even care about
16  my tweets. Daniel Pincus, who I have up above because
17  I believe he is the Daniel in the Alligator article
18  that spoke anonymously because he's only -- to the
19  best of my knowledge, only one of two Daniels in the
20  graduating 3L class. He says, "I'm really annoyed that
21  people are focusing on the tweet and not his call for
22  violence in the papers." Most of these people are only
23  mad at the papers. They actually don't really care
24  what I say on Twitter.
25          Even on 312, Anna Zachary (ph), "I thought

Page 300

1   the tweets would be easier to defend, but the paper
2   straight up called for violence." Well, that's not
3   what the school thought or certainly didn't think that
4   it was in any way a conduct code violation. You'll see
5   too here, if we can go to page 315. This was a Reddit
6   post that was sent to me. Now, look, it's an anonymous
7   user, I don't know who this user is, but if you -- I'm
8   sorry. If you go down to 316, Ms. Peebles, you can
9   tell that this person posted on -- there you go, April
10  4th. So before any of this had any press coverage,
11  they'd posted about -- right around when I got
12  trespassed, they had posted that, you know, somebody
13  got trespassed from the school.
14          And in the above post, which is -- actually,
15  I'm sorry. We'll go up again, Ms. Peebles --
16          MS. PEEPLES:  Uh-huh.
17          MR. DAMSKY:  -- to 315, which is about if
18  people knew me, this person says -- and there's just
19  one line that I really want to focus on. If we can
20  scroll down over so slightly.
21          MS. PEEPLES:  And Preston, I know we're
22  almost at the end of it, but I want to make sure --
23  because it's almost 4:30.
24          MR. DAMSKY:  Okay. Yeah. I'll take your
25  questions, guys. I'm totally open for questions. You

Page 301

 1   know, you can read through the file. I hope that I
 2   kind of organized it in a way that you can
 3   understand. But -- and I think I made my points clear.
 4   Anyway, I'll take your questions.
 5            MR. RUSHING:  All right. Thank you. I will
 6   now open up the floor to the Board member for
 7   questions for Preston.
 8            MS. ANDERSON:  All right. So Preston, I just
 9   want to know, did you intend to pressure, coerce, or
10   silence members of any group at the University of
11   Florida? And if not, what was the goal of the speech
12   that you used?
13            MR. DAMSKY:  Well, no. I mean, to answer your
14   first question, absolutely not. I love having debates
15   with class members. Like, that is why I love Professor
16   Maclin's classes so much. Because classes, I've called
17   them, like, gladiatorial style before, but they're
18   essentially just debate classes. Like, it's very rapid
19   fire. He picks on students and you're kind of supposed
20   to present a position and you -- I love it. I never
21   once have ever tried to silence anybody. When you say
22   what was the goal of the speech that I used, I think
23   you'll have to be more specific because there's quite
24   a bit at issue here.
25            MS. ANDERSON:  Yeah. I think I was just

Page 302

```
 1   wondering, like, if your goal wasn't to silence or
 2   pressure or coerce other members of the UF community,
 3   then what was the goal? And it sounds like you sort of
 4   answered both questions by mentioning that you like
 5   the debate and that's one of the reasons that you
 6   wanted to engage in that way. And I guess maybe just,
 7   let me take a step back further and just ask like, as
 8   you, Preston, how has all of this impacted you? So you
 9   did mention if you were to get expelled, but, you
10   know, you said that in passing, but what would that
11   mean for you? So how has this impacted you? And if you
12   were to be expelled, what would that mean for you?
13            MR. DAMSKY:  Well, it would mean that for the
14   foreseeable future, unless I could appeal or have some
15   remedy outside of the university system, and by which
16   I'm referring to the courts, my law career would be
17   over for -- or at least for -- like I said, it would
18   be certainly be put on pause. I think that's obvious.
19   I would not be enjoyable. Like, I want to go to school
20   again in three weeks, but (inaudible), I want to
21   graduate. I -- and so it would be bad. I mean, to put
22   it lightly, it would be very bad. It's not something
23   that I want to happen to me.
24            MS. ANDERSON:  And in the interim during this
25   time where you've been trespassed to now, do you mind
```

1    sharing, like, how has this impacted your day-to-day?

2    What have you been up to? You mentioned your dogs, I

3    have dogs too. But what have you been doing and how

4    has this impacted your life?

5            MR. DAMSKY:  Well, I've worked, you

6    know, it's not fun to not be able to go to campus, but

7    it's not, I guess, the worst thing. I mean, you just

8    avoid campus. That's pretty much the only, like, real

9    restriction on me is that I can't go to campus. So

10   I've honored that restriction. Well, I follow UF

11   boundaries, but I mean, yeah. So there hasn't been a

12   side -- I mean, it's summer now. So in terms of the

13   actual conduct process, I will say the worst thing in

14   the summer was that I lost the internship, but that

15   was kind of an outside of the law school thing. I

16   mean, ostensibly, I don't know how true that is. We

17   may find out one day, but no. Right now, the impact is

18   minimal.

19           Like I said, I can't lie -- I'm not going to

20   lie to you, I had my best academic performance

21   last quarter -- last semester. And like, I mean, I got

22   three book awards. I'm right on the cusp. I mean, I --

23   if I were to graduate, I'd almost certainly graduate

24   with honors. And I'm on the cusp of graduating with

25   high honors. I will never graduate summa cum laude in

Page 304

1   school. I'm not that good of a student, but I'm on the

2   cusp of graduating with high honors and I'd like to

3   complete it. But I think the biggest impact, even like

4   a short term suspension would be that I probably lose

5   my scholarship and then I just -- I couldn't afford

6   it, so.

7           MS. ANDERSON:  And then I'll ask one last

8   question and turn it over to Namodhi and Ryan. Just

9   going back to what we started with. So when others

10  reacted to what you had posted online or what was said

11  in class or on campus, do you think that you engaged

12  them in ways that escalated or alleviated the amount

13  of concern?

14          MR. DAMSKY:  Well, I think anybody that talks

15  to me is generally alleviated. You know, I -- some of

16  these things I couldn't submit, but one thing that's

17  kind of hurt is there's been a couple people,

18  like, 2 or 3 that I thought I was friends with. And

19  they submitted, like, reports or whatever, or they're

20  talking, it's high school stuff, it doesn't really

21  matter. But there have been some people who I thought

22  were friends with, but apparently don't like me all

23  that much. But also aren't quite afraid of me. I hang

24  out with them out of campus, so I don't know.

25          It's very weird, I will say, you know, look,

Page 305

1    here's something you kind of got to understand, I grew
2    up a lot. Maybe you've gotten an insight into this
3    today. One of my buddies calls it Lebanon High. It's a
4    lot of drama, okay? People are pretty cutthroat. So
5    when I engage with people, I think it's always -- and
6    when I engage directly with them, I always think I'll
7    engage with them. And I'm willing to talk to and break
8    bread with anybody, like, I just have no issues with
9    that. So I've always been professional with people, I
10   think. That's always been my impression of how I
11   behave.
12            MS. ANDERSON:  Thanks, Preston. I'll turn it
13   over.
14            MS. WIJERANTHNE  Hi, Preston. So were you
15   aware that specific individuals altered their routines
16   in terms of skipping classes, avoiding offices, and et
17   cetera, and -- because of your posts?
18            MR. DAMSKY:  I'm sorry. Did you ask me if I
19   was aware?
20            MS. WIJERANTHNE  Yeah.
21            MR. DAMSKY:  Well, I mean, I was never aware
22   before any of this happened. No. No, absolutely not.
23   The only indication that I had gotten that students
24   were afraid of me was the one -- as Dean Shaw said,
25   the one comment at the Coffee with the dean -- I'm

Page 306

1    sorry. Not the Coffee with the dean, the town hall in
2    the beginning of spring, where the girl said that she
3    looks for the exits wherever I'm around. Everybody
4    told me that that was just melodramatic. And this girl
5    was just saying something that was really -- it hurt
6    me. But I have never been aware of people saying, oh,
7    they don't do classes that I'm in. And I've also never
8    witnessed anybody that had a class that I was in that
9    dropped it. I'm -- frankly, I'm kind of skeptical of
10   that. I don't know how true that is, but I was never
11   aware.
12           And look, Dean Shaw, what she says in her
13   report is that -- here, let me get it exactly. She
14   says essentially that I had told him that I was not
15   only offensive, but disruptive to the learning
16   environment and causing fear in the greater law school
17   community. And in my heart, she never used that phrase
18   in life with me. When I had a conversation with her,
19   the questions that I asked her, those were my
20   recollection and the meaning of the act. Did she ask
21   me -- if she was correct in asking me, "Well, do you
22   understand why people might be offended by what you're
23   saying?" I said, "Yes, I understand why they're
24   offended." The things that I say are controversial.
25           But I will say I'm offended by what a lot of

Page 307

1   my classmates say. The classmates, I have just as
2   strong disagreements with them as they have with me,
3   but I'm not skipping classes. And the disagreements
4   are what they are, that's just -- that's part of
5   living life. So no, to answer your question, I'm
6   sorry. I had not been aware of that. The only
7   allegation that I had heard of somebody saying that
8   they were afraid of me is the comment and copy of the
9   dean. And I've been told who made that comment and
10  I've never interacted with that person in my life.
11  Never once.
12           I will tell you from what I understand
13  (inaudible) -- can I say who? I believe that that
14  person is Jenna Callison. She's in the logs and the
15  NLG logs in September. I haven't really seen her since
16  in any that anybody has shown me, but then -- I
17  mean, I never retaliated against her. I never like
18  sneered at her in the hallway or anything like that.
19  In fact, I had a class with her. I was in -- I believe
20  she was in Professor Hardy's class with me. So she
21  didn't leave. We had a class together last semester.
22  If I'm understanding who that is, but I was told by
23  multiple people that she's the one that made that
24  comment. And I asked Dean Sean, she said she didn't
25  know who the student was, which I found fascinating.

Page 308

1   Nobody apparently knows that the student was Jenna

2   Callison.

3           I mean, I'm presuming that they're telling

4   the truth. They could deny answering it. Although of

5   course, if they're that concerned about the student's

6   anonymity, maybe they feel like they have to lie, but

7   they don't have to lie. I've known who it was. So

8   yeah. Even like I said, that student, she was in a

9   class with me last semester, she didn't leave. And she

10  could have too, because I believe that is -- that was

11  legal drafting. Legal drafting, they offer, like,

12  4 or 5 sections in that a semester. She easily could

13  have found another one, I'm sure, but she stayed in

14  the one that I was in.

15          So frankly, I question the sincerity of some

16  of these people and it hurts somebody who I like that.

17  But I mean, I don't know, maybe I'm wrong, but that's

18  my impression now.

19          MS. WIJERANTHNE  So from what I understand,

20  you had a class with her after you knew that certain

21  individuals were uncomfortable. So did you take any -

22  - I think what I'm trying to ask you is that after

23  that allegation, did you try to avoid or did you take,

24  like, any precautions towards when you, like, have to

25  face her during the class that semester?

Page 309

1          MR. DAMSKY:  Yeah. I never had the -- you

2    know, class was not often, in particular, the class of

3    legal drafting. It's not very collaborative. I didn't

4    sit next to her in class or anything. I wasn't trying

5    to bother. I didn't know she was in the class. In

6    fact, I didn't hear about what she said until after I

7    was already -- I was in the class and I had heard. And

8    then the comment was told that I was, "Oh, well, I

9    have a class with that student."

10         So I already was in the class with her when I

11   heard that she had said that at the town hall. But

12   yeah. I don't -- no, I mean, I wouldn't, like,

13   antagonize her by trying to take a class she was in

14   just to terrorize her. But like I said, I don't really

15   know if she's all that afraid of me, I just -- I will

16   say one thing. I don't know how genuine this is.

17   Obviously, like, school shooters are terrible

18   people, I'm not one, but I -- it does seem to be a

19   common thing that's brought up. I'm from California. I

20   know Florida has a parking thing. We didn't -- we

21   never really had anything like that. I mean, it's kind

22   of a national phenomenon, but -- so maybe I just don't

23   understand how she feels. But at the same time, I

24   don't know why it should be designated as a potential

25   school shooter just because of the things that are in

                                                      Page 310

1    my head that have nothing to do with how I feel about
2    my classmates.
3              Guys, I don't really think about my
4    classmates all that much. I wake up, I go to the gym,
5    I go to class, I come home, I eat my food, I walk my
6    dogs, I relax. That's what I do all day. I don't
7    really think about how to antagonize my classmates. I
8    think about how to live my life and how to be with my
9    friends and just, you know, do the best that I can.
10             MS. WIJERANTHNE  So in your perspective, what
11   led to this situation?
12             MR. DAMSKY:  I mean, everybody that I talked
13   to said the same thing which was the GroupMe chat.
14   Now, granted, if I had just, like, shut up after the
15   GroupMe chat thing, sure. I mean, yeah. We probably
16   wouldn't be in the situation, but I don't really feel
17   like I need to shut up so long as I'm not violating
18   the rules and I didn't think that I was violating the
19   rules. You know, I mean, that's a very complex
20   question, I guess.
21             Certainly, like, I did things. I sent the
22   tweet. I'm not denying to you or anything that I
23   didn't send the tweet or that I didn't write the
24   papers and I didn't wear the t-shirt. I mean, come on.
25   Is that really like a rule? Are we really doing that?

1    I'm not denying any of these things. I mean, the big

2    things, some of the little things. I'll say, "Well,

3    yeah. I didn't do that or, you know, I don't remember

4    that." But the big thing is to get the whole school

5    thing that you've heard about over and over and over

6    again today. I don't deny that.

7           But why are we here? I don't know. I mean,

8    Dean McAlister says in a statement that her efforts to

9    instruct the students on the First Amendment have not

10   been successful, essentially. I think she uses a

11   different term. But let me see. What exactly? I think

12   it was the last question I asked her. She says, "Our

13   efforts to educate students on the First Amendment and

14   what it requires of us and our faculty have not been

15   convincing." And you've heard Lyrissa

16   Lidsky say, "Look, a lot of the student body

17   views what they perceive as hate speech, offensive

18   speech to be a threat to their personal safety." But

19   all that stuff is not -- it's not harassment or it's

20   not disruptive just because it's offensive.

21          So what led here? I don't know. I mean, I

22   don't know. People, there is, like I said, a small

23   fraction of students that don't like me, don't type of

24   that. But I think they took it too far. ███████

25   ███████ said he saw the tweet 24 hours and then sat

Page 312

1    on it for a week. That's not a guy that's, like,

2    legitimately afraid of me as a serious threat. Okay.

3    That is a guy that is just waiting to speak to the

4    dean in person when she's available. So he

5    can persuade her as best as possible to take this

6    seriously. So I don't know. I don't know what led

7    here.

8            I can tell you, if I get back in, I probably

9    will be pretty shut up, for the rest of the school

10   year. I won't even be -- won't even really be chatting

11   with anybody in the halls unless I've known him since

12   before this. I won't be raising my hand in class. I'll

13   just be keeping my head down for the rest of the year

14   to get out of here. But God knows, like I said, I

15   don't even know if that would be enough. I don't even

16   know if that would be enough.

17           MS. WIJERANTHNE  So reflecting on your

18   conduct in your belief, was your conduct fit within

19   the UF definition of disruption or harassment?

20           MR. DAMSKY:  No, I don't think so. I mean,

21   you heard it from ███████████ himself, like, "Oh,

22   you've heard it from all of them." Like, they -

23   - nobody saw a fit to punish me for anything that I

24   had done prior to the tweet of March 21st. And listen

25   to what Mr. ████████ says about that tweet. Like,

Page 313

1    it's not -- it was nothing out of the ordinary. And

2    you listen to what he said. Like, I don't really

3    think any of it fits within. And it's all off campus

4    stuff too. And that matters. It matters, like, I'm

5    allowed to have my private life. My Twitter is -- I

6    mean, look, it's public facing, right? But it is a

7    private thing that I do off campus. It has nothing to

8    do with the school, nothing.

9           Look, sometimes do I, like, hear about things

10   in school? Like I told Professor Kaufman, for example,

11   that -- or I was trying to kind of get at it, that,

12   you know, I didn't like the presentation that was

13   given by the ambassador that came to speak. It wasn't

14   like it -- I was furiously angry or anything, but I

15   didn't like what he had to say. I disagreed strongly

16   with it. So I was like, you know what? I'm going to

17   get back on Twitter, start, you know, saying my piece

18   of the world again, because I don't want to -- I

19   can't, you know, shout the ambassador down. He has a

20   right to speak on campus. I never disrupt him.

21          You'll notice he said that at the speech, I

22   was not disruptive, I was not harassing. So I consider

23   -- and it's not like I would be absent from social

24   media, but I consider the Twitter to be a better

25   alternative almost. Like, it's just my own sort of

Page 314

1   private -- mixed, private, public space, but it's not

2   directed at anything at school. Even if something

3   school, like the ambassador talking about the peace

4   settlement in Israel, which really has nothing to do

5   with the school, it's a (inaudible) at school, it's a

6   world event. Yeah. So no, no. I maintain that I'm not

7   responsible for charged comment.

8           MS. WIJERANTHNE  So one last question. So in

9   case you were not alleged of the accusations and you

10  were -- if you were to go back to school, how would

11  that impact you and your school, like, colleagues and

12  faculty?

13          MR. DAMSKY:  Gosh. Well, I'll tell you, it

14  would be quite the controversy. I know there are

15  friends that would love to see me back. Look, all the

16  people that gave me these logs, do you think they gave

17  them to me so that I would fail and not be back in

18  school? They gave me the logs so I could best make my

19  case to you guys. So there would be mixed reactions.

20  There are faculty members in school, and I will tell

21  you some of those teachers, absolutely, even though

22  they disagree with my politic, they don't want to set

23  the precedent where you can have essentially a

24  heckler's veto and say like, "Oh, I was afraid that he

25  was going to do X, Y, Z," without any real reason, I

Page 315

1   mean, any real basis for saying that in terms of

2   material fact or reality. They don't want to set that

3   precedent for their students.

4        So some people are going to be mad, some

5   people are going to be happy. I know I'll get

6   congratulatory texts and messages and probably get a

7   bear -- get some beer with some people that I know

8   from the school. But, you know, I'll have to -- I was

9   thinking -- honestly, I don't know how safe I would

10  feel going back to the school. I'm a little worried

11  for my safety, not so much physically, but I would be

12  worried because, like I said, I think some people have

13  lied. I think there are people that just exaggerate

14  things with this makeup accusation. So honestly, I

15  would probably want to ask, like, the dean for the

16  best way to sort of do this.

17        And that almost seems like it would be even

18  more disruptive the way things were before. But I

19  don't know if maybe I could get, like, an escort to

20  and from class. But that would be ideal. But I don't

21  know. I'm -- I don't know. I mean, that's -- first, I

22  got to be able to get back into class first. You guys

23  got to find me not responsible and then the dean has

24  to uphold the recommendation. So I know that seems

25  like a long way off. So I can't tell you for sure what

Page 316

1   the impact would be. But I know it would be

2   controversial in and of itself. But I would tell you

3   it'll be controversial even if I'm not allowed to come

4   back, so.

5            MS. WIJERANTHNE:  That's all my questions.

6   Thank you.

7            MR. RUSHING:  Okay. Preston, what led you to

8   not clarifying Noel -- you know, the Harvard

9   professor? I don't know if I could say his last name

10  properly. What led you to not clarifying that man's

11  interpretation explicitly in the X post response to

12  Professor Lidsky?

13           MR. DAMSKY:  Well, I mean, honestly, I -- not

14  any intent to threaten Professor Lidsky. And again, I

15  don't think she interpreted it as such. I wanted to

16  interrogate led her to ask that question and what the

17  -- what -- kind of what we could sort of unpack from

18  the fact that she asked that question. I forget who it

19  was. Somebody said -- I think it might have been

20  Professor Kaufman, it could have been Professor

21  Hampson. They said -- I have it here. They said -

22  - yes, it was Professor Kaufman. He said that I did

23  not say no when asked.

24           Well, part of freedom of speech is actually

25  not being compelled to speak either. I wonder if

Page 317

1   Professor Lidsky or Professor Zach Kaufman, if they --
2   if their theory is the kind of things, you know, what
3   if I just deleted my Twitter when she said that? Would
4   that have been considered to be -- I don't know, it
5   seems like that would have almost been considered to
6   be even more honest. I don't know. I don't think
7   she's -- I frankly, I thought it was kind of a bad
8   faith question. I think she knew that Ignatiev didn't
9   mean any sins.
10          So I don't know what led me not to clarify, I
11  was kind of trying to reverse the question and see -
12  - you know, I was trying to get her to investigate
13  what he meant and then to see -- to legitimately
14  investigate what he meant and to see, you know, did
15  she -- how did she feel about this deconstruction of
16  identity being processed to -- being done to a group
17  that she identifies with? Because, you know, people -
18  - don't get me wrong. Noel Ignatiev doesn't call for
19  violence. I believe that wholeheartedly. I believed it
20  when I sent the tweet. I knew who Noel Ignatiev was. I
21  read that article. Like ███████████ says, I'm
22  educated, okay? I knew who he was. But that doesn't
23  mean that what Noel Ignatiev says isn't offensive to a
24  lot of people. So -- or it's not like I was intending
25  to be offensive.

Page 318

1          Frankly, I actually sort of do agree with
2    what I said, it's just in the plain meaning of what he
3    meant. I don't necessarily think that that would be --
4    if we did deconstruct the Jewish identity, that would
5    be a bad thing. I'm somewhat of an atheist, so I find
6    the kind of old testament nature of Judaism to be
7    somewhat revolting. But I understand that other people
8    obviously feel differently. I have my religious
9    beliefs, I have my political beliefs, they are what
10   they are. What led me not to answer? I don't know. I
11   didn't think -- I knew that she wasn't afraid, I knew
12   what I said -- I didn't know. I couldn't read her
13   mind. But I think we sort of elicited testimony that
14   she wasn't really afraid of what I said. I knew that
15   she knew that Noel Ignatiev didn't mean murder and I
16   wanted to ask her about that. I thought her question
17   was in bad faith and I didn't want to really play
18   ball. Does that answer your question?
19          MR. RUSHING:  Yes, sir. We've kind of danced
20   around this next question, but I want to ask it
21   explicitly to you, if that's alright. So if you're
22   allowed to return or engage with -- where you left off
23   virtually, what concrete steps would you commit to so
24   similar alleged disruption or harassment does not
25   occur?

1           MR. DAMSKY:  I don't know. I haven't been -
2  - I mean, I'm sorry. I'm not trying to dance around
3  that. I don't -- nothing's been suggested to me. I
4  haven't had really any contact aside from SCCR since
5  this all started. Like, nobody suggested any sort of
6  like settlement or anything like that.
7           MS. PEEPLES:  So Preston, this might help you
8  answer the question. We -- I have mentioned to you
9  several times that this is an educational process. So
10 the question is really being asked from an educational
11 viewpoint, like thinking about -- because what we
12 always hope is that students will take away some
13 positive from -- or we want to know what students have
14 taken away. How -- do they -- are there things that
15 they have learned from this experience? So I think --
16 and Ryan, I don't mean to put words in your mouth, but
17 knowing that this is an educational process, the
18 question is more from, you know, for lack of a better
19 word, what have you learned from all of this? And what
20 do you -- what -- are there things that you might do
21 differently in the future? Does that capture it, Ryan?
22 Okay
23          MR. RUSHING:  Yes.
24          MR. DAMSKY:  I don't know. I could very
25 easily say, "Well, look, I would tone it down on

Page 320

1   Twitter," or something like that. But again, I don't
2   feel like I've broken the conduct code, so I don't
3   know why I would necessarily commit to that. You know,
4   it would have been nice -- I feel like if the school -
5   - I'd almost want to ask, like, what would the school
6   (inaudible)? And it would have been nice if just like
7   somebody had asked me, like, "Hey, you know, are you,
8   like, planning on doing something terrible?" I don't
9   know why they would think that. But I don't know. I
10  don't -- I'm sorry. I apologize for dancing
11  on the question like you said.
12          I guess one thing I could do would just be
13  the -- one thing that comes up in my mind is message
14  that seems sort of -- and I don't know if she would
15  even want this, but it seems sort of interesting. She
16  said, "Well, you know, this is the only -- " and I
17  don't consider this to be relevant with regard to the
18  professors because we just don't interact with the
19  professor's (inaudible) which you don't take. But she
20  basically said, "Well, you never really came and
21  talked except for the one time." He said, like, "We
22  didn't really have a lot of talk."
23          Now, I didn't really think that I needed ever
24  to talk to the dean. I had no real concerns. But I
25  don't know, maybe keep in touch with the dean more.

Page 321

1    She was always welcome to contact me, same thing with
2    Janice Shaw. Janice Shaw, I don't know what the
3    situation was for the first time, she asked me to come
4    into her office in November. But when she asked me to
5    come into her office in January, I was there the next
6    day. I answered her email promptly and I was there the
7    next day. So I'm always open to talk. But I don't --
8    see, there's not much that I really can commit to
9    doing because, like, people just -- okay. The big
10   thing is, you know, partly something like the things
11   that I put out, like, my papers and all or my tweets,
12   like, they get picked up on and then disseminated and
13   they become outside my control.
14            So aside from just staying mute, I don't
15   really know what else I could do. Frankly, I don't
16   know why I should have to stay mute when nobody else
17   has to stay mute. If -- obviously, if I'm found to
18   have violated the code, I'll cease and desist from any
19   of that activity again. But -- or perhaps a better
20   thing to do would be, I don't know, maybe just seek
21   consultation. Like, "Hey, can I do this? Is that okay?
22   Like, do you think this will cause problems?" Because
23   I'll be honest, I -- a lot of this, I can't even,
24   like, predict how big the reactions are. I'm not doing
25   it to get a rise out of it. I just -- I -- when I

1    wrote my papers, I was just like, "Well, I feel like

2    this is entirely within the bounds of the subject

3    matter. And it's, like, a topic that I'm interested

4    in. This is kind of the way that I take the

5    readings." I got the book award in that one class. I

6    got an A on the paper and the other.

7              It's not like I was just -- and you'll -- I

8    think you'll be able to read. Like, I didn't even

9    surprise Judge Badalamenti with the paper that I

10   wrote. So -- but I guess just being staying more in

11   touch with administrators or professors, I guess, is

12   one thing that I could certainly commit to.

13             MR. RUSHING:  Thank you. I have hopefully the

14   last question here to ask you. So after all of this,

15   have you considered the benefit of learning more about

16   students who experienced school violence and how you

17   might engage in difficult conversations and ideas such

18   as what has been discussed today?

19             MR. DAMSKY:  I mean, look, in any student

20   that has experienced, like, school violence, you know,

21   all of my sympathies go out to them. I don't -- I

22   mean, yes, I suppose. But I've never intended to

23   commit school violence, so I don't know exactly. Like,

24   there's no -- like, I see eye to eye with them in

25   general on the immorality of such acts. But yeah. I

Page 323

1    suppose to answer your question, yes.

2              MR. RUSHING:  Thank you. Are there any other

3    questions for Preston at this time? All right,

4    Preston, you are now welcome to make any closing

5    remarks.

6              MR. DAMSKY:  As I said, I -- I'm just -- some

7    of the people who testified, look, I just don't think

8    they're telling you a full picture about who I am.

9    It's very difficult. You know, there is, like, a lot

10   of social pressure in school kind of against a lot of

11   things, like, the politics in the school. And I don't

12   mean like the politics in terms of what's right or not

13   right or ideology or anything, but the kind of social

14   politics of who's getting paid and kind of the clubs

15   and all that. It's very intense. I don't know. It was

16   difficult for me to find anybody to kind of like speak

17   on my behalf because they're scared. They're scared of

18   ostracism and professional consequences. I'm sure they

19   would love to. I'm sure they would absolutely want to

20   do anything they could to help me. It's difficult to

21   ask somebody to put their neck out on the line for me

22   in terms of, like, a career thing.

23             So I don't know. I hope you'll pay attention

24   to the case file. It's difficult to kind of explain.

25   You will see what you see and then you'll come to the

Page 324

1    conclusions that you've come to. And again, I just ask

2    that you really take to heart the school's free

3    expression statement and the aspects of the

4    regulations referring to the First Amendment and that

5    you do indulge a strong presumption that my speech,

6    particularly that that's been deemed within the bounds

7    of academic freedom and it takes place off campus and

8    it isn't directed towards the school. I hope you'll

9    indulge in a strong presumption that that's First

10   Amendment protection.

11        And I think if you do, like, you will find me

12   not responsible. But I do thank you for your time

13   today. I know we've gone literally a 100 percent over

14   the allotted or more than that even, so I really

15   appreciate how much time that you've dedicated to

16   this. I know it's a lot, so thank you.

17        MR. RUSHING:  Thank you. Preston, in a moment

18   you will be dismissed for the University Officials

19   Board to deliberate. Preston, as a reminder, the

20   University Officials Board makes recommendations to

21   the Dean of Students is not a final decision. You can

22   expect to receive a decision letter via email once the

23   Dean of Students or (inaudible) has reviewed the

24   Board's recommendations. Any sanctions issued if you

25   are found responsible do not become effective until

Page 325

1    the appeals period has concluded, if you so choose to

2    appeal.

3              Information regarding the appeal process will

4    be included in your decision letter. If you need any

5    further information, you can contact Student Conduct

6    and Conflict Resolution via phone or through email.

7    Remember today's proceedings are confidential. Thank

8    you for your participation in this hearing.

9              MS. PEEPLES:  Thank you, Preston. Your -- the

10   hearing's done, I'm going to turn the recorder off

11   unless you have any questions for me before we excuse

12   you.

13             MR. DAMSKY:  (Crosstalk).

14             MS. PEEPLES:  Okay.

15

16

17

18

19

20

21

22

23

24

25

Page 326

1                   CERTIFICATE OF NOTARY PUBLIC

2    I, Rodie Dean, the officer before whom the foregoing

3    proceedings were taken, do hereby certify that any

4    witness(es) in the foregoing proceedings, prior to

5    testifying, were duly sworn; that the proceedings were

6    recorded by me and thereafter reduced to typewriting

7    by a qualified transcriptionist; that said digital

8    audio recording of said proceedings are a true and

9    accurate record to the best of my knowledge, skills,

10   and ability; that I am neither counsel for, related

11   to, nor employed by any of the parties to the action

12   in which this was taken; and, further, that I am not a

13   relative or employee of any counsel or attorney

14   employed by the parties hereto, nor financially or

15   otherwise interested in the outcome of this action.

16                              *Rodie Dean*

17

18                              Notary Public

19                              Rodie Dean

20

21

22

23

24

25

Page 327

1                 CERTIFICATE OF TRANSCRIBER

2                 I, LLOYD BASS, do hereby certify that this

3        transcript was prepared from the digital audio

4        recording of the foregoing proceeding, that said

5        transcript is a true and accurate record of the

6        proceedings to the best of my knowledge, skills, and

7        ability; that I am neither counsel for, related to,

8        nor employed by any of the parties to the action in

9        which this was taken; and, further, that I am not a

10       relative or employee of any counsel or attorney

11       employed by the parties hereto, nor financially or

12       otherwise interested in the outcome of this action.

13

14                          /S/ Lloyd Bass

15                               Lloyd Bass

16

17

18

19

20

21

22

23

24

25

[1 - 22nd]

**1**

**1**  55:18 292:18
**1,000**  19:5
**1.05**  55:21
**1.05.**  56:1
**1.20**  60:24
94:18
**10**  5:4 51:14
127:8 251:13
251:23 282:14
285:10,23
287:15,15
**100**  87:16
90:14 218:21
261:2,3 324:13
**106**  177:23
179:6
**10th**  30:23
146:12
**11**  287:15
**11:37**  180:23
**11th**  277:18
278:7
**120**  19:20 20:2
**126**  262:16,19
**12:10**  138:8
139:5
**12:40**  139:5
**12:44**  276:19
276:20
**13**  75:13 265:6
**135**  5:7

**136**  80:23
81:10
**137**  80:10,10,19
**140**  83:11
**142**  83:10
**145**  84:25
**14th**  270:12
**15**  3:25 101:23
134:5 278:6
**16**  224:10
**160**  84:4,5
**163**  84:6
**16th**  273:10,11
**171**  263:3
**175**  196:13
263:11,20,22
**176**  196:13,14
196:22 263:20
263:22,24
**177**  265:4
**17th**  277:17,20
278:4 283:16
**180**  264:1,3
**182**  264:24
265:22
**18266**  326:17
**19**  177:22
179:4
**19.3**  81:23
265:20 266:22
**191**  46:14,18
**193**  49:11
**194**  46:17

**1994**  98:11
**1999**  98:12
**19th**  180:20,22
**1:05**  289:20
**1l**  98:24 118:6
**1st**  26:6 60:17
81:11 89:9
100:10 109:12
128:23,24
143:3,11
149:16 153:11
153:11 171:6

**2**

**2**  89:20 292:19
304:18
**2.51.**  291:16
**20**  181:17
261:9
**200**  218:22
**2001**  69:2
**2011**  236:8
**2013**  69:3
**2017**  98:14
**2018**  163:24
**2019**  196:21
282:12
**2020**  72:16
**2023**  28:10
49:1 73:4,5
98:23 100:19
108:6 134:5
296:1

**2024**  29:12,19
72:17 74:3,4
81:1 82:13
83:1 93:16
96:6 140:17
144:7 145:3,13
227:22 268:4
268:11
**2025**  1:3 3:5
7:18 36:12
59:8 65:25
74:12,24 75:13
75:18 85:7
142:22 144:8
177:22 179:4
244:4 264:16
271:16 276:14
**21**  65:25 69:3
142:22 271:16
**21st**  28:3 36:3
47:15 116:17
116:19 131:11
162:8,21 166:3
171:8,9,12
172:1 213:18
229:21 230:8
230:15 264:5
287:1,17
312:24
**22**  98:14
**222**  202:8
**22nd**  230:11,16
266:15 287:18

**23**  36:18 49:1
**231**  276:9
**23rd**  116:18
  205:15,16
  287:18
**24**  36:18 230:9
  287:1 311:25
**243**  55:2 287:8
**244**  290:14
**245**  290:15
**247**  56:13
  290:20
**24th**  74:23
  96:20 97:4,5
  287:18
**25**  50:1 166:25
**250**  291:5
**255**  292:16
**256**  292:18
**257**  292:20
**25th**  168:14
  287:18
**263**  59:4
**264**  59:5
**267**  294:14
**26th**  287:18
**270**  60:10 94:6
**271**  60:10 94:8
  279:15
**272**  61:23
  280:1
**273**  62:11
  280:16

**275**  62:22
**276**  280:19
**277**  280:22
**278**  118:18
**279**  122:2
**27th**  287:18
**28**  1:3 3:5
  140:17 144:7
  240:18
**280**  126:25
**28th**  35:22 37:3
  231:2 236:17
  287:18
**297**  281:1,1,2
**298**  283:15
**29th**  287:18
**2l**  98:25
**2nd**  45:7 55:21
  60:18 153:11
  166:2 168:1
  273:7

**3**

**3**  85:7 89:20
  144:8 292:19
  304:18
**30**  60:11,25
  224:11
**303**  284:16
**305**  284:19
**308**  65:17
  295:12
**309**  296:20

**30th**  192:24
  205:14 287:18
**31**  287:19
**311**  298:3
**312**  299:25
**315**  300:5,17
**316**  300:8
**32**  287:19
**3:10**  251:24
**3:20**  251:24
**3:48**  271:16
**3l**  299:20
**3rd**  60:20
  83:13 84:1,16
  143:23

**4**

**4**  4:18,23 10:16
  11:4 256:23
  257:10 292:19
  308:12
**4.c**  8:11
**4.k**  8:25
**40**  280:24
**400**  167:10
**42**  227:7
  232:25
**45**  84:23,25
  85:1,2
**4:30**  300:23
**4th**  62:21 94:17
  143:25 145:15
  168:1 300:10

**5**

**5**  285:23
  292:19 308:12
**5.40**  45:8 60:18
**53**  266:11,13
**56**  147:3
**5:30**  193:7
**5:48**  193:11

**6**

**625**  298:4

**7**

**7**  100:18
  276:14
**7.11**  62:21
**70**  19:22 93:24
**76**  61:18,20
**7627756**  1:14
**7th**  103:22
  119:4 120:1
  162:6 168:6
  177:11 277:17

**8**

**80**  19:22
**8:00**  1:4
**8:21**  66:5
**8th**  61:24

**9**

**900**  265:12
**92**  192:18

| a | | | |
|---|---|---|---|
| **a.m.** 1:4 | **abolished** 7:19 | **abstract** 28:25 | **academics** 45:6 |
| **abandoned** | 14:1,3 41:20 | 30:9 104:19 | 45:10 272:9,11 |
| 165:15 | 53:1 57:6,18 | 227:5 | 272:12 |
| **abide** 18:5 | 75:19 100:13 | **absurd** 125:24 | **accept** 9:6 |
| **abiding** 255:20 | 113:9 143:1 | 126:1 | 283:23 289:8 |
| **ability** 25:13 | 162:11 235:11 | **abuse** 243:14 | **acceptable** 32:9 |
| 42:7 45:15,20 | 287:12 | **academia** | 290:2 |
| 54:14 70:15 | **abolishing** | 87:12 | **accepted** 31:10 |
| 72:25 89:4 | 13:24 40:22,25 | **academic** 13:23 | **accepting** |
| 173:3,4 326:10 | 41:2 43:4 | 16:6 18:8 | 291:23 |
| 327:7 | 56:16 156:9,15 | 22:15 26:23 | **access** 42:16 |
| **able** 24:14 | 233:5,8,9,17 | 28:21,21 29:2 | 44:11 61:9 |
| 25:21 60:1 | **abolition** 54:21 | 29:15 30:6,9 | 67:17 73:11 |
| 67:16 77:16 | 101:11 171:13 | 30:13,20 31:5 | 80:13 81:2 |
| 78:15 173:7 | **above** 299:16 | 31:21 32:15,15 | 103:6,9 129:2 |
| 186:2,7,11 | 300:14 | 32:22 36:18 | 168:9 228:1 |
| 256:3 259:6 | **abrams** 134:4 | 42:4 43:7 54:8 | 258:24 280:21 |
| 303:6 315:22 | 134:18 | 54:9 57:4,16 | **accessible** |
| 322:8 | **absence** 283:24 | 72:21 108:14 | 168:9 |
| **abolish** 57:1 | **absent** 313:23 | 109:1 122:22 | **accomplishm...** |
| 58:7 113:16 | **absenteeism** | 140:10 150:8 | 284:24 |
| 114:3 116:1 | 165:10 | 153:21 154:23 | **accord** 66:6 |
| 127:25 128:7 | **absolute** | 160:20 161:12 | **account** 13:21 |
| 132:2,5,11 | 126:14 | 162:3 165:3,16 | 13:21 36:13,16 |
| 142:24 156:2 | **absolutely** 19:4 | 169:2 170:3,25 | 39:7,12,17,19 |
| 156:22 157:9 | 32:7 38:10,17 | 171:20 174:11 | 39:21 67:15 |
| 233:15,15 | 47:12 50:4,13 | 190:23 191:16 | 102:16 109:11 |
| 287:10 288:18 | 61:14 116:15 | 208:16 228:17 | 122:6 127:3 |
| 288:20 292:19 | 125:21 186:25 | 268:8 269:13 | 129:3 175:2,3 |
| 293:3,4,14,15 | 225:20 228:10 | 271:1 280:20 | 175:11 180:21 |
| 293:17 | 228:14 236:5 | 282:9,16 294:9 | 181:15,16 |
| | 275:11 301:14 | 303:20 324:7 | 210:5 218:24 |
| | 305:22 314:21 | **academically** | 227:20 228:2 |
| | 323:19 | 275:8 278:2 | 234:9 236:3 |

274:20 283:7
**accountability**
166:7
**accounts** 37:6
39:3 218:25
**accurate**
127:14,23
216:9,18
239:14 240:21
326:9 327:5
**accurately** 90:9
174:13
**accusation**
259:20 315:14
**accusations**
314:9
**accused** 222:4
253:8
**achieving**
169:1 212:16
**acknowledge**
210:19
**acquaintance**
123:13
**acquitted**
225:25 226:6
269:17,17
**act** 174:20
306:20
**acting** 113:21
295:5
**action** 21:22
29:10 50:5,14
52:15 79:21

124:6 199:25
202:14 232:8
326:11,15
327:8,12
**actionable**
120:4
**actions** 9:3
11:2 76:17
78:5 79:17
111:12 257:8
**activate** 283:22
**active** 15:25
47:22 164:8
295:8
**actively** 143:18
175:1 176:9
**activities** 8:14
8:16,18 9:4
10:12,14,15
11:3 208:6
247:15 256:18
256:20,21
257:9 279:18
286:10
**activity** 8:22
10:20 204:18
226:25 257:3
294:3 321:19
**acts** 173:13
322:25
**actual** 110:6
242:13 245:19
247:11 303:13

**actually** 35:5
37:15 46:16
47:15 49:1
55:20 59:5
80:20 81:14
83:12 89:13
90:19,23 96:1
101:20 102:14
109:5 111:17
117:10 131:20
134:15 135:15
155:20 178:9
178:10 186:12
198:25 234:3
252:7 259:19
260:23 262:19
269:10 272:10
276:18 291:5
298:19 299:23
300:14 316:24
318:1
**add** 42:11
140:12
**added** 42:13
81:23 146:20
**addition** 160:6
**additional** 19:2
19:5 38:8 62:7
71:10 96:14
137:17 158:7
183:25 209:7
251:1 292:16
**address** 72:23
187:8 208:18

253:12,16
**addressed**
30:12
**adequate** 102:6
**adhere** 137:8
**admin** 208:5
**administration**
105:4 165:2,24
166:22 167:17
167:23 172:6
218:8 235:8
269:8
**administrative**
8:15 10:13
29:10 256:19
**administrators**
20:11 91:7
165:7 322:11
**admission**
30:23 270:24
296:8
**admit** 33:21
47:24 101:6
279:4 290:1
**admitted** 49:8
104:25 109:24
**admittedly**
48:22
**admitting**
124:8
**advances**
270:20
**advantage**
240:1

adversary
61:10
advised 281:23
advisor 5:15
6:21 72:19
95:4,6,9,15
96:9 160:12
161:17 163:2
171:23 178:20
advocacy
177:23 195:15
232:14
advocate
232:13 246:1
advocated
168:11 276:3
advocates
244:11
advocating
188:14 199:2,2
201:8,13,15,17
202:10 203:4
232:16 250:14
289:13
afar 131:16
affect 27:2
120:9 130:13
130:13 191:23
affected 33:8
40:20 165:10
affiliate 160:16
affirmative
116:15

afford 304:5
afraid 14:8,18
14:19 21:1
22:6 47:5
50:21 73:24
74:15 75:1
76:8 77:24
90:7 96:25
97:6 102:3,7,9
102:15,16
111:16,17,18
115:8 170:1
230:23 231:12
231:13,16
243:13,15,17
243:18 245:15
245:18,19
248:16 282:20
282:20 294:25
295:5,10
298:13,19
304:23 305:24
307:8 309:15
312:2 314:24
318:11,14
african 160:18
166:11
aftermath
103:22
afternoon
55:23 103:13
103:16 136:10
140:4 266:14
271:17 294:23

agai 195:20
agenda 74:19
aggression
34:16 212:20
250:11
aggressive
220:16 250:15
250:15,19,21
250:21,24
agitated 117:24
agitating
104:13 111:14
agnostic 108:3
ago 12:23
22:21 35:14
49:25 52:3
98:15 99:18
247:5 298:5
agree 38:9,9
48:15 127:22
149:1 195:4
198:1 207:8
277:24 318:1
agreed 7:25
186:14 198:6
198:10
agrees 285:2
ahead 71:8
92:15,17 93:7
96:16 98:1
103:8 184:8
186:15 188:21
244:22 280:7

aimee 2:12 5:13
5:14 9:10
25:23 184:5
aimee's 80:15
aims 156:1
292:3,8
airs 245:14
al 177:24 179:5
180:16
alarm 103:9
141:1 168:12
alarmed
111:10 113:10
123:14,24
124:3 143:16
144:6
albert 193:19
193:19,20,25
alert 76:24
alike 162:17
allegation
307:7 308:23
allegations
3:22 4:9 25:19
80:1 107:15
145:18 172:16
192:8 214:25
221:16 223:13
252:18 253:10
alleged 7:1,12
9:6 20:17
128:20 273:10
314:9 318:24

[allegedly - anonymous]                                        Page 6

| | | | |
|---|---|---|---|
| **allegedly** 3:10 | **ambassador** | 257:5,12,14,16 | 158:15,18,24 |
| 8:9 | 177:24 179:5 | 257:22 258:3 | 188:20,22,24 |
| **alleging** 223:19 | 313:13,19 | 259:17 268:19 | 189:13 190:21 |
| **alleviated** | 314:3 | 268:23,25 | 191:3 213:10 |
| 304:12,15 | **ambiguity** | 270:12 271:1 | 214:22 301:8 |
| **allies** 275:23,25 | 41:24 101:19 | 273:4 277:22 | 301:25 302:24 |
| **alligator** 35:19 | 111:10 114:13 | 278:3 286:12 | 304:7 305:12 |
| 99:19 106:9 | 123:8 | 311:9,13 324:4 | **andrea** 73:6,21 |
| 131:2,6,9 | **ambiguous** | 324:10 | **anger** 76:13 |
| 278:9,9,12 | 144:13 149:23 | **america** 87:10 | **angered** 50:3 |
| 299:17 | 149:24 150:2 | 141:10,23 | **angers** 13:3 |
| **allotted** 324:14 | 156:25 | 188:11 201:4 | **angry** 33:10 |
| **allow** 3:12 | **ambitious** | **american** 85:15 | 50:12 63:8 |
| 45:23,25 62:3 | 238:3 243:13 | 134:6,10 | 65:4 237:14 |
| 122:25 159:22 | **ameliorate** | 140:19 169:19 | 269:5 270:6 |
| 178:21 280:5 | 174:21 | 169:21 199:16 | 313:14 |
| **allowed** 12:3 | **amended** 141:3 | 200:10,13 | **angst** 79:24 |
| 95:17 124:13 | **amendment** | 217:6,9 | **anguish** 162:1 |
| 211:20 235:6 | 10:23 11:5,8 | **americans** | **anna** 299:25 |
| 255:2,5 259:11 | 11:10,15,21 | 141:5 216:17 | **announce** |
| 263:11 279:9,9 | 17:9 22:14 | **amount** 304:12 | 90:17 |
| 313:5 316:3 | 26:13,21 27:3 | **amounts** 8:7 | **announced** |
| 318:22 | 29:20,23 49:8 | **analogous** | 168:3 |
| **alright** 318:21 | 49:10 98:17 | 293:7 | **annoyed** 88:7 |
| **altered** 305:15 | 99:11,19 | **analysis** 27:2 | 224:6 299:20 |
| **alternate** 60:14 | 108:15 110:15 | 263:19 270:17 | **annoying** |
| **alternative** | 110:16,24 | **ancestors** 142:8 | 267:18 |
| 45:11 46:7 | 121:1 123:18 | **anderson** 2:13 | **annual** 170:9 |
| 229:3 313:25 | 126:12 134:19 | 5:17,18 18:17 | **anodyne** |
| **altogether** | 135:13,21 | 18:21 19:10,13 | 272:22 |
| 127:3 | 137:7 147:5 | 20:15 22:21,25 | **anonymity** |
| **alumni** 140:7 | 148:2 152:5,8 | 23:2,6 25:16 | 185:25 308:6 |
| 144:18 153:16 | 152:14 153:9 | 75:14 105:12 | **anonymous** |
| 170:8 | 153:20 255:2,7 | 107:12 158:10 | 83:13,16,18,19 |

84:19 109:20
259:5 262:9
300:6
**anonymously**
85:11 211:25
299:18
**answer** 3:25
79:10 110:14
110:15,17
125:25 144:18
170:5 174:14
177:16 178:17
178:23 184:4
205:24 225:19
225:20 229:23
254:1 297:11
301:13 307:5
318:10,18
319:8 323:1
**answered**
217:21 302:4
321:6
**answering**
12:19 308:4
**antagonize**
309:13 310:7
**anti** 7:16 26:10
26:18 27:1
38:23 100:19
100:19 107:6
127:18 155:11
163:20 164:6
167:9 169:7,12
184:23 191:25

254:16 292:9
292:25
**antiquarian**
229:11
**antisemitism**
167:4,5 174:3
174:4
**antithetical**
142:18
**anxiety** 163:10
170:13,19
**anxious** 76:5
77:5
**anybody** 50:23
66:6 71:18
123:19 133:21
182:17 185:9
198:5,10
202:14 210:25
214:20 225:15
225:16 238:1
286:9 287:25
301:21 304:14
305:8 306:8
307:16 312:11
323:16
**anybody's**
293:11
**anymore** 25:15
77:1
**anyone's** 39:21
**anything's**
78:16

**anyway** 48:24
62:14 103:6
124:2 213:18
262:4 273:16
277:15 301:4
**apart** 20:1
145:8 292:3
**apartments**
165:13
**apologies** 50:19
84:24 139:14
157:22 177:20
283:23
**apologize** 43:22
47:16 55:2
66:7 71:2
137:16 217:20
225:22 229:23
258:11 320:10
**app** 78:13,14
**apparently**
12:3 59:18
185:9 224:3
229:18 279:21
282:12 304:22
308:1
**appeal** 3:16 5:3
251:20 258:6,8
302:14 325:2,3
**appeals** 5:5
160:23 325:1
**appear** 175:16
**appeared**
130:17

**appears** 15:19
104:12,15,16
170:22 281:25
**appointments**
160:15
**appreciate** 94:9
110:2 156:18
284:4 324:15
**approached**
14:5 65:12
**approaching**
77:11
**appropriate**
64:4 120:20
136:20 138:12
**appropriately**
187:9
**approximately**
19:14
**april** 26:6 45:7
46:10 55:18,21
60:17,18,20
62:21 75:18
89:9 94:17
96:6 100:10
109:12 119:4
120:1 122:17
128:23,24
131:11 143:3
143:11,23,25
144:8 145:15
149:16 153:11
153:11 158:13
166:2 168:1,1

168:6,14 171:6
196:21 273:6,9
273:11 300:9
**archiving**
267:6
**area** 160:5
**arguably** 33:16
**argue** 67:24
177:2 216:1
**argued** 141:2
277:25
**arguing** 47:7
**argument** 56:5
290:5
**arguments**
136:19,19
137:11
**armed** 101:25
**armies** 173:20
**army** 173:20
**arrange** 45:11
60:14
**arranged**
165:24
**arrangements**
45:20 46:7
**arrest** 141:23
**arrested**
106:16 125:8
125:11 149:6
149:10 279:19
**arrive** 28:13
**arrived** 12:22

**article** 19:25
42:24,25 66:1
85:16 131:2,7
131:10 169:9
174:17 291:18
292:18 299:17
317:21
**articulate**
137:13,14
**articulating**
137:11
**ashkenazi**
210:12
**aside** 33:24
43:21 107:21
151:6 185:18
185:19 208:23
234:2 285:7,11
319:4 321:14
**asked** 7:22
14:21 17:15
24:10 25:2
48:17 50:9
54:22 67:8,11
67:13 74:24
75:5 91:23
101:3 102:1,4
108:13 109:3
114:11 125:4
133:12 134:18
140:21 143:4
145:3 150:4
157:1 180:15
184:12 186:2

188:9 189:6
192:11 193:14
194:5 199:23
199:24 206:22
206:22 215:23
239:4 242:12
244:15 246:11
259:24 274:11
274:12 275:16
279:22 285:21
288:10 292:8
292:10 297:8
306:19 307:24
311:12 316:18
316:23 319:10
320:7 321:3,4
**asking** 38:5
40:13 69:15
87:11 88:17
135:21 149:13
151:23 152:10
153:25 154:1
179:9,13
181:20,23
197:21 199:15
199:20 203:1,2
221:14,15
253:5 268:2,24
306:21
**asks** 45:22
50:10
**aspect** 108:19
130:10 201:20
214:6

**aspects** 200:11
255:13 324:3
**assassinations**
250:20
**assault** 142:4
**asserted** 269:23
**assess** 66:15
**assessment**
64:18 167:14
187:15
**assessments**
64:20
**assigned** 95:9
95:19 137:7
**assignments**
61:12 62:14
**assistant** 6:20
72:16,18 288:4
**assistants**
280:21
**associate** 98:12
**association**
15:8 76:19
160:14 161:18
163:3 166:11
166:12 170:10
171:24
**associations**
174:1
**assume** 32:4
40:5 110:1
117:13 155:19
216:23 222:20
248:21 268:14

[assume - back]                                                    Page 9

280:3 299:8
**assumed** 101:1
112:11 132:14
297:9
**assumes** 283:3
**assumption**
288:11 290:11
**astronomically**
167:6
**atheist** 318:5
**atrocity** 160:4
**attaching** 110:6
**attack** 100:18
163:25 166:20
167:9 168:23
177:13
**attacked** 76:14
100:21
**attacks** 163:15
164:3,8 177:11
**attain** 243:13
**attempt** 100:9
**attempting**
37:14
**attend** 7:15
15:7 61:8
102:3
**attendance**
179:14
**attended** 75:25
170:9
**attending**
76:19 127:8
165:5

**attention** 14:25
36:7 67:21
100:11,16
101:1 102:12
105:9 111:12
129:12,16,21
262:7 276:7
282:15 286:3
288:23 296:2
296:17 323:23
**attest** 265:16
**attitude** 37:16
135:16 136:1
**attorney** 49:16
102:18 326:13
327:10
**attribute**
184:25 185:14
**audience** 30:5
**audio** 3:15 5:11
220:8 326:8
327:3
**august** 72:17
73:4 74:3 81:1
82:12
**auschwitz**
99:17
**author** 266:4
292:20,22
293:1
**authored**
156:19,20
**authorized**
8:17 10:15

208:6 256:21
**avail** 271:3
**available** 293:8
312:4
**avoid** 293:2
303:8 308:23
**avoidable**
121:22
**avoided** 16:15
**avoiding**
143:18 305:16
**award** 23:11,12
23:15 82:24
83:1,6 85:13
85:15,18 88:1
108:10 147:19
147:20 249:3,6
249:11 269:3,7
270:8 276:15
278:11 284:16
284:21 295:14
297:2 322:5
**awarding**
31:19 108:24
**awards** 32:17
88:1 212:11
249:8 276:18
295:16 303:22
**aware** 16:17
17:4 19:3
21:18 24:18,23
24:25 36:12,15
36:21,24 45:14
51:19,21,25

52:4,23 56:18
67:14,15 68:25
74:25 75:10
76:24 78:18
96:11 98:21
100:15,17,21
112:6 116:1
117:7,10 146:1
146:4,6 147:13
148:15,21
149:2,9 153:2
156:3 180:19
180:20 181:4
181:13,14
182:12 205:2
208:15 240:21
240:23 259:1
261:6 305:15
305:19,21
306:6,11 307:6
**awareness**
34:11 86:13
162:14

**b**

**b** 154:13,13
276:22
**back** 9:12,22
22:7 61:13,23
61:24 79:1
81:19 92:23
93:1 94:20
101:2,6 102:11
111:8 123:25

124:3 126:7
132:21 133:4
135:13 138:21
138:22 139:3,4
141:9 144:9
223:5 235:10
240:24 250:23
251:14,23,24
256:4 261:23
263:16 266:11
276:17 278:17
279:19,24
295:25 299:1,2
302:7 304:9
312:8 313:17
314:10,15,17
315:10,22
316:4
**background**
100:8 123:9,12
123:16 204:22
**backing** 34:14
52:25
**bad** 141:24
169:18 278:17
302:21,22
317:7 318:5,17
**badalament**
276:12
**badalamenti**
85:14 86:3
99:7 106:14,15
108:10 109:4,6
149:4,6,7,9

276:13,23
277:3,16,21
278:21 295:15
322:9
**badalamenti's**
35:10 99:5
174:12
**badly** 238:1
**bahamanians**
212:5
**bahamian**
216:15
**bahamians**
215:24 216:8
217:17,18
**balance** 142:12
147:23 286:11
**ball** 318:18
**banging** 73:14
**bar** 49:18
50:10 84:13
170:9 213:22
228:3 296:8
**barking** 281:2
**barrage** 131:14
**barred** 103:14
**barrett** 73:2
**base** 233:11
**baseball** 102:21
272:4
**based** 24:2
30:19 32:20
39:10 75:9
99:10 101:14

104:12 123:9
140:9 148:14
175:13,19,25
226:24 233:18
235:20 249:19
270:14 296:8
297:9
**basic** 56:14
**basically** 47:4
47:20 60:13
106:1 148:10
148:22 201:18
207:9 220:22
228:16 260:22
264:8 265:18
267:7 269:20
286:23,24
320:20
**basis** 108:1
191:10 315:1
**bass** 327:2,14
327:15
**bat** 102:21
272:4
**bathroom**
71:18
**battery** 119:17
**bear** 138:6
315:7
**becoming**
77:18 87:14
243:19 285:15
**bed** 102:21

**beer** 315:7
**began** 30:16
74:5 80:25
168:14
**beginning** 26:6
89:15 144:11
254:10 258:13
306:2
**begins** 4:12
**begrudge** 261:7
**begun** 64:3
**behalf** 90:7
141:6 152:11
323:17
**behave** 305:11
**behaves** 49:21
**behavior** 8:3
37:10,11 96:19
104:15,17
128:20 133:16
164:12 172:2
172:24 176:24
181:20 186:8
239:21 240:4
273:2
**behaviors**
20:18 179:9
255:14
**beige** 264:21
**beings** 216:17
216:21
**belief** 233:7
312:18

**beliefs** 110:6
136:23 174:2
195:11 202:5
227:2 228:15
244:5,11
249:20 260:7,8
275:7 296:9,13
318:9,9
**believe** 27:10
32:10 35:6
36:4 37:17
40:25 42:22
45:21 46:16
49:1,20 55:17
68:15 79:8
83:21 85:9
86:11 89:20
91:18,19 95:8
95:10,21,21,23
96:24 97:10
109:12 118:20
129:1,4 133:19
134:16 146:13
150:4 151:21
151:24 153:3
156:21 158:1
167:7 168:25
171:6 172:23
173:2,3 174:23
179:23,25
183:4 186:6,10
187:8 188:9
192:12,21
193:24 195:25

195:25 196:3
199:25 200:1
205:13 217:21
221:18 226:17
247:2 248:1
250:4,6 254:22
255:20 258:15
258:23 259:4
259:18,20,22
261:4 262:16
263:10 264:17
271:23 273:1,1
276:14 277:13
280:20 285:21
285:22 286:25
287:19 291:6
296:9 299:17
307:13,19
308:10 317:19
**believed** 90:2
298:22 317:19
**believer** 29:2
**believes** 132:23
179:18 186:1
259:8 297:3
**believing** 202:2
**bell** 154:9,13
154:18 155:10
155:22 156:19
**bell's** 156:3
**beloved** 261:18
**benefit** 322:15
**benefits** 291:23

**berth** 29:4
54:11,12
**bespeaks** 113:3
**best** 37:18
49:17 51:1
63:19 64:21
82:6 85:17
96:8 102:8
139:1 140:12
142:1 150:6
151:2,8 173:20
207:5 246:15
255:21 262:19
262:23 263:4
267:14 269:3
270:9 272:7,9
272:10 276:21
290:6 299:19
303:20 310:9
312:5 314:18
315:16 326:9
327:6
**bets** 244:9
**better** 26:7
127:9 205:1
214:10 228:25
243:20 254:13
258:14 261:6
266:2 269:25
286:16 313:24
319:18 321:19
**beyond** 49:23
105:12 144:16
161:24 162:4

170:18 174:5
219:21 236:24
244:4
**bias** 32:20
182:22,25
183:8
**biased** 177:3
183:4
**big** 107:4
132:10 134:21
210:22 269:10
281:14 296:15
296:16 311:1,4
321:9,24
**bigger** 202:22
**biggest** 134:8
134:20 304:3
**binary** 53:20
**biological**
292:23
**biology** 97:20
**birthed** 291:21
**bit** 61:22 62:18
93:10 108:20
120:24 122:19
127:12 157:10
194:14 212:19
213:11 214:7
224:11 225:13
237:3,16
238:12 244:2
263:9 265:15
279:2 291:2
293:6 301:24

**[bizarre - broadly]**

**bizarre** 283:1
**black** 155:20
  188:11 192:14
  210:1,7,8,12
  211:18 224:23
  229:8 243:2
  260:18 261:22
  264:13,15
  284:9
**blackened**
  294:22
**blacks** 229:14
**bloodthirsty**
  185:7
**blown** 149:3
**board** 1:2 3:6,7
  3:20,23 4:2,11
  4:12,24 5:10
  9:7 10:3 11:23
  18:16 33:23
  44:7 52:8
  66:20 70:11
  78:3 105:11
  110:19 144:21
  148:2 153:24
  170:21 183:7
  188:19 189:23
  192:7 205:2,19
  213:8 225:24
  240:6 250:6
  252:6 256:6,10
  258:5 263:16
  296:25 297:1
  301:6 324:19

  324:20
**board's** 9:5
  324:24
**bodily** 298:21
**body** 49:9,21
  176:21 187:7
  187:10 253:21
  255:10,14
  275:3,24
  311:16
**boiling** 293:6
**bombing**
  106:21
**book** 23:11,12
  23:14 32:17
  82:24 83:1
  85:13,18 87:25
  88:1,10,14
  108:10 147:19
  147:20 249:3
  276:15,18
  278:11 284:16
  284:21 290:25
  295:13,16
  297:2 303:22
  322:5
**bother** 287:2
  299:1 309:5
**bothered** 224:6
**bothers** 258:22
**bothersome**
  191:14
**bottle** 164:17

**bottom** 9:19
  84:24 85:4
  126:25 276:20
**bound** 142:10
  270:11
**boundaries**
  31:1 303:11
**bounds** 29:15
  152:4,20 268:7
  270:25 271:1
  278:3 322:2
  324:6
**boyd** 134:4,17
**bracket** 82:1
**brackets** 82:5
  267:5
**bradley** 296:22
  296:25
**bradley's**
  296:24
**brainless**
  233:20
**branches**
  160:21
**bread** 305:8
**breadth** 158:21
**break** 71:19
  72:1 97:20,22
  136:10,12
  138:8,9,18
  186:23 187:1
  187:20 208:23
  209:14 247:14
  251:13 271:21

  276:21 292:3
  292:17 305:7
**breakdown**
  238:11
**breakout**
  138:19,20
  139:6
**breast** 104:11
**bremer** 59:12
**brief** 11:22
**briefly** 47:6
  202:25 266:11
  291:4
**bright** 284:5
**brilliant** 86:22
  86:24 92:3
**bring** 9:12,13
  12:11 36:7
  44:18 71:21
  72:7 98:2,4
  137:1 139:4,21
  159:7,8 187:24
  196:12 209:20
  223:4 240:10
  251:23 252:5
  253:18,19
  262:6,12 276:7
  290:14,19
**bringing**
  139:23
**brings** 291:21
**broadly** 35:3
  140:15

| | | | |
|---|---|---|---|
| **broke** 229:10 | **california** | 265:4 277:17 | 104:22 127:11 |
| **broken** 320:2 | 309:19 | 278:4,7 292:9 | 132:25 135:3 |
| **brothers** 202:4 | **call** 8:1 30:8 | 292:19 297:6 | 143:22,24 |
| 203:19,21 | 54:20 74:7 | 297:14,14,15 | 144:4,5 165:11 |
| **brought** 14:24 | 75:16 102:4 | 300:2 301:16 | 165:25 168:4 |
| 227:7 243:16 | 103:15 113:13 | **calling** 17:24 | 168:17 170:14 |
| 309:19 | 121:12 122:23 | 86:24 106:23 | 208:6,7 248:9 |
| **brown** 134:3 | 123:11 128:8 | 157:2,7 191:12 | 248:16 256:21 |
| 134:17 | 137:13 141:13 | 280:23 | 256:22 259:11 |
| **bruce** 134:3,17 | 141:19 142:16 | **callison** 48:9,11 | 271:20 272:15 |
| **bruton** 73:9 | 142:24 144:11 | 90:13 307:14 | 273:6 279:18 |
| 76:22 | 155:14 162:18 | 308:2 | 279:19 283:3 |
| **bs** 229:24 | 168:16 171:16 | **calls** 14:13 | 287:6 294:3,3 |
| **bud** 160:19 | 172:20,25 | 23:18,19 | 295:9 298:15 |
| 166:13 | 188:9,10 189:6 | 100:16 101:10 | 299:8 303:6,8 |
| **buddies** 305:3 | 189:7,10 | 143:13 150:13 | 303:9 304:11 |
| **build** 86:12 | 192:12,13 | 171:13 211:14 | 304:24 313:3,7 |
| **building** 73:12 | 193:16 202:14 | 305:3 | 313:20 324:7 |
| 167:19 | 210:23 218:1 | **calm** 22:10 | **cancel** 104:6 |
| **business** 13:14 | 232:12,15,17 | 103:4 | 130:19 |
| 15:1 54:6 | 235:11 252:8 | **cambridge** | **cancelation** |
| 168:8 | 277:15,20 | 155:25 156:20 | 213:17 |
| **butchers** | 287:10 288:15 | **cameras** 19:1,2 | **canceled** 19:16 |
| 169:17 | 288:23 289:14 | 22:5 165:25 | 19:18 51:17 |
| **buying** 21:2 | 289:15,16 | **campus** 8:6,17 | 104:9 119:13 |
| **byler** 49:13 | 293:22,25 | 8:18 10:14,16 | **canceling** 15:10 |
| **bystanders** | 299:21 317:18 | 14:10,14,20 | **cancer** 104:11 |
| 174:18,19 | **called** 16:3 53:1 | 15:9,24 17:7 | **canvas** 61:12 |
| **c** | 56:5 91:24 | 17:24 18:25 | 62:13,14 |
| | 93:12 125:10 | 19:8 21:17 | 189:24 205:3,6 |
| **c** 2:1 3:1 10:16 | 140:18 141:16 | 22:2 31:11,11 | **capable** 174:5 |
| 256:23 | 156:20 194:5 | 45:7 46:1 47:5 | 237:24 243:7 |
| **cafe** 242:5,9 | 206:16 212:5 | 68:23 73:7 | 284:13 |
| | 225:12 233:24 | 99:20 103:15 | |

**capital** 245:25
249:14
**capitulate**
112:17
**caption** 264:10
**capture** 13:17
319:21
**captured** 59:13
**card** 73:13
168:9
**care** 69:18 82:1
212:11 223:3
248:22 249:8
250:23 266:1
266:24 284:6
299:15,23
**cared** 101:17
101:18 247:8
**career** 72:17,20
82:15 86:25
87:12,20,23
95:4,6,15 96:8
98:16 99:13
101:18 104:9
105:25 167:10
169:2 238:2
243:4 246:5
296:3,4,9,18,21
299:12 302:16
323:22
**careers** 87:15
163:13
**careful** 142:12

**carefully**
105:19 147:25
**caroline** 296:22
296:24
**carried** 164:19
**carry** 16:24
101:20 173:4
**cars** 164:20
**case** 3:9 19:14
21:4,15 25:23
28:19,25 42:15
44:6,24 50:13
55:13 105:13
105:16 120:20
121:6 125:7
156:6 253:11
253:20 259:20
260:6,12
261:11 264:6
265:16 270:23
284:8 314:9,19
323:24
**casebook**
241:17,18
**cases** 120:3,9
120:13,14,15
120:16
**caste** 292:19,22
293:2
**categories**
113:4
**category** 116:3
156:24

**caters** 103:18
**cates** 59:17
**caught** 127:1
240:14
**cause** 16:21
18:13 33:14
50:14 51:4
53:8 75:7
140:9 166:19
283:11 321:22
**caused** 31:8
34:17 40:19
50:15 132:18
162:12 163:9
169:1 206:8,10
207:21 209:1,3
213:6
**causing** 86:15
88:21 96:19
170:18 306:16
**cease** 321:18
**ceased** 123:23
**celebratory**
59:20
**cell** 276:23
**center** 134:11
134:12 156:1
160:18,19
166:13 177:23
**centers** 163:19
**certain** 24:14
51:22 88:6
150:14 159:23
173:13 211:17

269:5 270:6
291:20 308:20
**certainly** 41:25
51:3,25 52:14
152:12 183:10
240:2 254:22
254:24 283:24
285:1 287:24
289:12 293:24
299:3 300:3
302:18 303:23
310:21 322:12
**certificate**
326:1 327:1
**certify** 326:3
327:2
**cesspool** 236:11
**cetera** 25:9
26:22 28:22
50:10 120:17
192:1 284:3,3
305:17
**chabad** 103:16
103:17,19
**chain** 67:16
**chair** 6:12
12:18 98:15
160:10 178:6
178:19
**chairperson**
3:7
**challenge** 64:11
137:14

**[challenged - class]**

Page 15

challenged
79:15,16
chance 21:21
42:16 95:8
101:5 111:6,8
180:18 188:16
227:10 297:23
change 29:18
87:1 157:10
168:6 171:19
188:6 205:10
236:10 268:13
268:17
changed
170:25
changes 141:2
character
105:1 127:5
185:4,5,14
294:19
charge 270:22
charged 3:10
8:9 10:6 19:7
52:9 256:12
314:7
charges 5:1
12:2 247:16
248:12
chart 267:24
268:1
charter 255:4
chat 28:17 42:5
47:14,17,18
49:1 51:2

54:18 59:8
98:24 108:6
259:10 266:17
266:19 273:16
275:2,21 283:6
283:8 295:7
296:1 310:13
310:15
chatting 312:10
check 56:20
84:12 249:2
checked 290:24
cheeky 122:19
chemotherapy
104:11
child 169:14
children 16:1
101:4 124:25
210:8
chip 247:12
choice 95:15,22
125:18,20
196:19 224:7
249:7
choose 95:15
95:17 325:1
chooses 127:21
choosing 24:2
choreographed
69:4
choreographer
69:2
chose 95:20
96:7 111:20

127:17 228:13
271:14
chris 5:1 6:16
278:19
christ 127:9
christopher 2:7
4:5 139:21
140:5 276:9
chronological
263:9
chuckle 88:4
church 154:14
circles 145:16
circuit 160:23
circulate 207:6
circulated
33:13,13 63:7
167:20 189:17
206:3
circulating
14:12
circumstances
124:9 232:19
291:12
cite 120:3
cited 203:10,13
citizen 172:14
citizens 169:19
civil 148:7
claim 243:17
259:1
claims 271:18
claire 4:7 48:2

clarification
114:12
clarified 57:25
clarifies 195:19
clarify 43:11
80:24 114:8,9
114:11 120:24
125:4 128:4
150:5 157:2,16
178:16 184:3,4
199:8 201:10
227:10 317:10
clarifying 88:8
316:8,10
clarity 192:23
193:13
class 15:6,10
18:21 19:18
24:3 29:12,18
30:21 35:7,10
59:8 60:22
70:3 76:3,7,9
91:15,20 94:20
99:3 102:3,24
103:1,8 104:7
104:10 117:2
118:3,5,8
119:13 129:14
130:10,11,14
130:19 140:14
141:17 147:21
165:8 174:12
188:6 189:10
189:22 190:25

191:1,22,23
192:4 193:3,8
200:9 201:13
205:4 206:12
206:14 212:7
212:12,22
216:7 224:1
228:17,18,23
229:5,6,13,17
230:18,21,24
231:2,6 248:2
260:14,21
261:4,9,16,17
262:1 268:5,12
268:17 269:1,3
269:4 270:4,5
270:9 283:17
284:2,3,22
295:15 297:3
299:20 301:15
304:11 306:8
307:19,20,21
308:9,20,25
309:2,2,4,5,7,9
309:10,13
310:5 312:12
315:20,22
322:5
**class's** 192:5
**classes** 7:15
16:16 19:16
24:2 46:10
61:6,9 62:2
63:5 74:10,18

89:5,6 97:7
102:14 107:19
117:5 142:21
143:19,23
144:17 151:3
165:4,4 188:5
210:1,15 212:2
220:4 221:5
249:7 259:7
260:22 265:13
272:10 280:22
284:20 301:16
301:16,18
305:16 306:7
307:3
**classification**
291:14
**classmate** 75:2
**classmates**
135:22 136:1
137:1 141:12
189:18 190:2
191:10,13
202:10 203:4
267:16 307:1,1
310:2,4,7
**classroom** 15:5
29:14 76:6
92:6,8 97:8
144:15 198:1
199:5 207:7
268:7
**clear** 17:23
26:12 31:9

32:14 35:14
49:23 57:5
65:11,17 89:14
111:20,24
182:21 188:25
192:24 198:24
201:7 215:16
225:23 226:18
229:23 231:18
245:12 246:15
266:6 293:22
301:3
**clearly** 41:20
64:1 65:3
232:13
**cleverness**
127:2
**climate** 8:6
**clinging** 296:2
296:16
**close** 45:16
102:12 118:19
**closely** 106:21
**closing** 4:12
170:15 254:2
323:4
**club** 291:17,19
292:1,3,6
**clubs** 323:14
**coach** 78:22
**coaching** 78:20
**code** 1:1 3:5,11
4:17,23 8:11
10:7,8,8,16,24

11:4 18:5
239:24 256:13
256:14,14,22
257:5,10 300:4
320:2 321:18
**coerce** 301:9
302:2
**coercion** 9:1
10:25 257:6
**coffee** 68:21
241:4 287:2
305:25 306:1
**cognizant**
245:2
**collaborative**
309:3
**colleague** 132:9
162:22
**colleagues** 99:9
100:14 140:22
172:5 314:11
**collective**
157:12
**collectively**
20:7
**college** 5:24
6:14 12:22
160:1,2,7
170:8 294:6
**college's** 148:4
**collier** 62:17
94:14 280:19
280:20,23
281:4 283:9

**color**   141:14
   143:21 259:12
   259:12
**colorado**
   106:22
**coloring**   198:9
**combination**
   242:24
**come**   3:13
   56:17 63:11
   101:24 143:22
   163:21 190:3
   213:3 227:19
   229:13 236:17
   251:14,24
   275:16 276:18
   279:19 310:5
   310:24 316:3
   321:3,5 323:25
   324:1
**comes**   22:7
   55:21 78:21
   320:13
**comforting**
   165:19
**coming**   45:24
   58:4 62:15
   103:8,15
   229:24 230:2
   239:13 286:20
   295:19
**comment**   20:17
   75:20 120:4
   305:25 307:8,9

307:24 309:8
   314:7
**comments**
   16:17 74:10
   75:3,6,8 91:19
   92:9,10,24
   93:3 98:23
   144:7 205:7,8
   209:25 227:14
   264:9,13
**commercial**
   154:19
**commit**   58:7
   101:7 173:7,14
   229:14 289:15
   294:25 318:23
   320:3 321:8
   322:12,23
**commitment**
   153:20 263:23
**committee**   5:18
   5:21 82:20
   138:19 160:11
   160:24 263:15
**committing**
   176:10 184:18
   188:16 243:17
   287:5
**common**   30:25
   162:7 170:12
   220:14,24
   309:19
**commonly**
   291:6

**communicate**
   128:6
**communicated**
   157:14 158:20
**communication**
   27:16
**communicati...**
   28:6 82:16
   90:5
**community**
   13:18,22 14:11
   15:24 16:7,12
   17:6,20 18:9
   21:15,22 22:11
   22:18 24:12,24
   26:9,23 34:6
   34:14,18,20,23
   40:20 52:24
   53:2,5,9 54:5,5
   54:8,22 58:7
   62:23 64:21
   65:7 79:11
   80:5 83:24
   85:10,12 86:15
   88:22 135:17
   140:16 143:16
   144:5,15 148:9
   153:2 158:22
   161:25 162:2,3
   162:13,15,16
   162:20 163:10
   163:19 164:11
   164:13,15
   166:18,21

168:12 170:4
   170:18 176:23
   182:14 254:15
   254:19,20
   302:2 306:17
**company**
   165:21
**compared**
   158:16 229:7
**compelled**
   102:17 183:14
   183:20 184:13
   184:17 316:25
**complain**
   144:24 271:11
**complained**
   7:24 145:6
   271:10
**complaining**
   265:9 290:2
**complaint**
   70:12 77:22
   147:25
**complaints**
   7:13 13:10,13
   21:8 74:5,9
   76:16 77:8,14
   77:21 79:4
   80:7,25 81:2
   90:4 97:11
   145:7,9,9,12
**complete**   41:8
   45:13,21,25
   92:15 280:6

[complete - conduct]                                      Page 18

| | | | |
|---|---|---|---|
| 304:3 | 85:10,11 91:11 | **concluding** | 50:23 52:9,13 |
| **completely** | 101:24 141:14 | 153:14 | 52:20,22 53:5 |
| 86:21 102:16 | 145:16 158:21 | **conclusion** | 53:12,14 58:18 |
| 270:25 272:21 | 184:20 304:13 | 28:13 31:3 | 64:3 69:21 |
| 298:25 | **concerned** | 123:7,7 141:12 | 70:14 72:13 |
| **completing** | 30:17 73:16 | 192:12 202:8 | 98:8 105:2,3 |
| 60:14 | 76:4 91:9 | **conclusions** | 129:7 140:2 |
| **completion** | 101:10 103:19 | 324:1 | 150:10 153:25 |
| 8:23 | 140:23 143:17 | **conclusory** | 159:13 161:12 |
| **complex** | 164:18 172:14 | 260:1 | 162:12 163:8 |
| 133:13 292:15 | 185:10,12 | **concrete** | 170:3,11 |
| 310:19 | 212:20 227:5 | 162:18 207:1 | 171:15 172:12 |
| **complexity** | 229:7 235:20 | 275:6 318:23 | 176:24 179:10 |
| 133:14 | 247:15 281:21 | **concur**   151:4 | 181:16,22 |
| **complicity** | 308:5 | **conditioned** | 182:1,4 184:20 |
| 142:2 | **concerning** | 164:7 | 184:22,25 |
| **comply**   4:19 | 144:14 163:8 | **conditioning** | 185:11,11,12 |
| **components** | 273:24 | 122:20 | 185:18 188:3 |
| 160:16 | **concerns**   13:13 | **conducive** | 197:7 204:19 |
| **compose**   242:6 | 21:8 32:25 | 165:21 | 208:2 209:23 |
| **compounded** | 47:23 62:23 | **conduct**   1:1 3:5 | 209:25 223:13 |
| 162:13 | 64:24 70:16 | 3:11,22 4:9,17 | 223:20,22 |
| **compromise** | 72:24 74:9 | 4:23 7:12 8:4 | 239:7,24 240:1 |
| 229:10 | 78:12 80:5 | 8:11,11,11,19 | 252:18 253:11 |
| **computer**   44:3 | 140:7 143:15 | 8:23 9:1 10:6,7 | 255:15 256:12 |
| 204:24 | 147:19 184:21 | 10:8,9,17,21,22 | 256:14,15,15 |
| **con**   103:1 | 320:24 | 10:25 11:5,7,9 | 256:24 257:4,4 |
| **conceded** | **conclude**   14:1 | 11:11,13,14 | 257:6,11,14,16 |
| 259:16 | **concluded**   16:4 | 12:16 17:1,3 | 257:17,19,20 |
| **concept**   13:24 | 29:21 30:6 | 18:5 24:6,17 | 267:24,25 |
| 17:18 227:5 | 31:6 123:6 | 27:11 28:10 | 269:23 297:21 |
| 233:5 | 167:24 192:4 | 29:11 30:16,25 | 298:16,18 |
| **concern**   40:19 | 268:21 325:1 | 33:23 34:9,19 | 300:4 303:13 |
| 40:20 83:24 | | 36:21 42:7 | 312:18,18 |

320:2 325:5
**conference**
170:10
**confess** 104:3
**confided** 76:9
**confident** 30:11
42:6
**confidential**
3:14 325:7
**confidentiality**
4:21
**confirmed**
167:22 169:7
**conflict** 11:18
183:16,21
257:25 325:6
**confronted**
101:3 144:24
**confused**
173:11 174:25
175:14,16
176:5
**congratulations**
284:18,20,23
**congratulatory**
59:20 315:6
**consensus**
254:22
**consent** 35:3
291:21
**consequences**
18:4 24:15
123:2 237:25
323:18

**consider** 8:20
10:18 33:23
43:20 52:9
87:12 88:2
101:8 124:7,11
129:14 136:23
171:15 172:4
185:19 195:13
257:1 261:10
261:12 313:22
313:24 320:17
**consideration**
247:17
**considered**
26:25 87:23
122:18 167:23
168:15 176:3
226:11 254:24
273:20 317:4,5
322:15
**considers** 281:9
281:20
**consistent**
33:18 99:12
113:7 225:14
**conspiracy**
169:12 184:23
**constant**
210:15 211:2
**constantly**
210:19 240:15
240:17
**constitute**
11:11 29:22

33:2 257:17
268:21
**constitution**
134:6,10 141:3
216:25 217:5
297:3
**constitutional**
6:13 29:12,18
85:14 98:18
102:24 118:8
124:12 134:12
136:16,18,21
188:5 227:14
258:16 268:4
268:13,17
**constitutional...**
141:17 146:9
147:17 148:16
276:10 295:14
**constructed**
122:23 291:10
291:10 292:24
**construed** 4:16
4:22
**consultation**
29:19 268:18
321:21
**contact** 61:1
72:23 80:6
91:24 275:15
275:18 276:21
278:21 319:4
321:1 325:5

**contacted**
60:19 77:2
163:7 294:15
**contacting**
68:22
**contemporary**
188:10 192:13
192:13 193:16
285:17
**contempt** 82:4
266:3 267:2
**content** 3:14
266:19
**contents**
136:21
**contested** 158:1
**context** 13:20
16:4,5 29:14
30:2,2 31:22
42:4 50:25,25
51:8 52:1
53:12 54:1,17
58:5 63:20
66:3 113:23
114:2 127:13
127:17 141:1
153:9 171:14
172:23 197:1
204:15 215:21
216:19 217:1
233:4,12 267:6
267:6,15 268:6
272:19 273:14
281:24 293:6

**[context - correctly]**                                                    Page 20

293:20 295:21
**contexts**   32:14
**contextual**
  164:11
**continually**
  53:17
**continue**   9:11
  45:6,9 58:8,22
  58:24 102:22
  106:4 125:15
  126:17 149:14
  170:5 180:10
  252:3 279:25
  280:9
**continued**
  20:25 74:3
  77:24 111:9
  169:8
**continues**
  24:16 170:3
  172:12 292:7
**continuing**
  8:23 267:20
**continuous**
  8:24 10:21
  257:3
**contract**   284:1
**contrary**   282:9
**contributed**
  192:2
**control**   78:23
  78:24 169:22
  181:8 321:13

**controlling**
  184:24
**controversial**
  109:25 127:15
  127:24 167:11
  306:24 316:2,3
**controversy**
  104:17 111:13
  111:15 142:12
  149:3 295:17
  314:14
**conversation**
  58:14,16 67:7
  67:18 75:10
  77:23 86:12
  87:1 88:19
  89:2 91:25
  92:22 93:17
  96:24 104:1
  117:23 120:2,5
  120:8 170:12
  271:19 285:8
  306:18
**conversations**
  128:18 164:24
  165:6 172:6
  322:17
**convert**   124:14
**convey**   141:21
  158:19 216:24
**conveyed**
  141:11
**convicted**
  173:17 226:13

**convictions**
  299:2
**convince**   37:14
**convinced**
  122:20
**convincing**
  311:15
**cook**   220:19
  261:4
**cool**   50:19
  118:5
██████   2:9 4:6
  6:4,5 187:24
  188:1,19,20,24
  189:13 190:21
  192:8 205:22
  208:9 209:8,9
  268:15
**cooperative**
  46:6
**copied**   93:23
  94:12,22,23
**copies**   129:4
  206:4
**copy**   14:6
  290:23,25
  307:8
**copywriting**
  35:24
**core**   195:17
  196:1
**cormier**   73:6
**corner**   137:23

**corporate**
  247:8
**correct**   9:8
  10:1 27:4
  31:11 33:24
  35:22 36:8
  39:12 40:8
  80:6 82:24
  86:16,17 90:13
  90:25 95:5
  107:20 109:21
  111:23 112:2
  113:23 117:1
  126:14 145:25
  150:25 154:18
  154:25 173:21
  174:22 178:1
  184:14 186:9
  192:14,22
  193:4,7 199:12
  199:13 201:9
  201:14 203:7
  205:5,11,17
  207:10 210:20
  217:4,9 218:9
  220:4 221:6
  223:17,18
  226:1,12
  230:16 255:1
  265:19 278:19
  306:21
**corrected**   212:5
**correctly**
  188:13 192:22

[correctly - criticism]                                        Page 21

269:19
**corresponden...**
  273:19 284:17
**corresponding**
  291:14
**corroborated**
  261:12
**corroboration**
  259:21
**corrupt** 243:21
**cost** 291:24
**costs** 18:18
  75:20
**couch** 216:22
  229:14
**couched** 13:22
**council** 109:17
**counsel** 326:10
  326:13 327:7
  327:10
**counsel's** 29:21
  268:20
**counseling**
  20:12
**counselor**
  78:11
**count** 228:8
  287:17 299:7
**counter** 79:12
  99:12 100:9,23
  107:4 117:13
  117:15 118:1
  215:5,8 260:10

**countering**
  117:6 215:15
  215:20 218:1
**counting**
  284:22
**country** 8:5
  211:15
**couple** 18:19
  28:14 34:2
  42:12 44:8
  67:1 101:21
  102:21 103:1
  129:17 193:2
  242:10,15
  247:4 285:12
  304:17
**courage** 89:22
  90:1,6
**course** 21:10
  24:17 26:20
  34:19 43:12
  52:13,20,21
  53:12,14 54:23
  77:19 78:4
  89:23 117:16
  136:22 148:20
  160:4 190:12
  190:20 191:19
  200:5 258:15
  260:23,23
  276:23 294:7
  308:5
**course's** 29:19
  268:19

**courses** 160:2
  161:9 190:17
  268:11
**coursework**
  45:13
**court** 141:22
  160:22,22
  161:1 166:5
  172:9 276:13
**court's** 99:15
**courts** 141:22
  302:16
**coverage**
  130:17 161:15
  300:10
**covered** 93:17
**craw** 260:13
**crazy** 191:6
  229:3
**create** 72:21
  101:19 111:9
  198:17,19
**created** 8:5
  13:8 17:1
  126:8 133:20
  180:22
**creating** 111:7
  111:13,14,14
**credibility**
  176:9 178:8
  183:9 187:5,9
  187:15
**credible** 162:18
  171:15 172:20

  172:22 187:12
  187:12 290:20
**cried** 164:21
**crime** 142:2,3
  176:1,3,4
  226:5 269:17
**crimes** 160:4
  161:6,6 176:4
  210:9 211:17
  229:9,15
**criminal** 61:10
  91:14 102:18
  110:8,10
  114:17,25
  121:17 160:2
  161:1,1,2
  166:5 172:9
  173:16 176:4
  185:7 220:15
  224:24 226:10
  226:11 231:5
**criminality**
  210:1,7
**criminalize**
  99:15
**criminally** 18:6
**crises** 174:21
**criteria** 270:15
**critic** 290:18
**critical** 154:18
  154:23,24,24
**criticism** 82:2
  266:25

| criticisms | 181:2,3,12 | **d** | 36:2,6,10,15,23 |
|---|---|---|---|
| 266:1 | 188:21 190:18 | **d** 3:1 80:10 | 37:4,13,19,22 |
| **criticizing** | 197:16,18 | 81:20 | 37:24 38:5,7 |
| 282:2 | 202:20 203:20 | **d.c.** 69:6 | 38:12,15,17,20 |
| **critics** 8:1 | 206:19 217:19 | **daffer** 134:4,18 | 39:2,6,10,16,22 |
| **critiques** | 220:21 221:13 | **daily** 9:3 11:3 | 40:2,7,11,13,16 |
| 122:22 | 236:4 239:18 | 257:9 | 40:23 41:5,10 |
| **cross** 18:4 | 242:23 249:4 | **dalamenty** | 42:10,15,19 |
| 115:24 279:9 | 253:13 263:2 | 30:24 | 43:3,17,25 |
| **crossed** 13:5 | 263:17 281:16 | **damage** 299:12 | 44:4,10,14,17 |
| 25:14 31:6 | 325:13 | **dampier** | 44:19,25 45:3 |
| 42:9 120:4 | **crucial** 167:8 | 280:21 | 45:11,13 46:8 |
| **crosses** 120:14 | **crying** 76:2,12 | **damski** 267:22 | 46:13,16,20,23 |
| 153:25 | 298:1 | **damsky** 2:11 | 47:1,3,10,13,20 |
| **crossing** 92:24 | **cum** 303:25 | 3:10 6:2,2 9:9 | 48:1,6,9,11,17 |
| **crosstalk** 12:4 | **curiosity** 55:16 | 10:5 11:25,25 | 48:24 49:3,7 |
| 27:12,21 31:14 | 130:4 195:3 | 12:8,10 13:1,5 | 50:17 51:9,21 |
| 31:16 38:19 | 215:23 222:8 | 13:11,20,25 | 52:5,7,12,19 |
| 39:8 41:5 | 227:18 258:4 | 14:8,14,25 | 53:10,14,19 |
| 43:25 44:4 | **curious** 42:11 | 15:3,5,8,13,14 | 55:1,5,9,12,15 |
| 52:12,19 53:10 | 234:3 | 16:2,10,14,17 | 55:19,23 56:2 |
| 57:2,21 58:9 | **current** 8:4 | 17:4,10,17,25 | 56:10,25 57:9 |
| 63:24 69:11 | 33:19 140:19 | 19:21 20:23 | 57:20 58:10,23 |
| 71:25 81:7 | 180:21 218:24 | 23:10 24:1,7 | 59:1,3,7 60:3,6 |
| 82:10 83:14,15 | 266:15 269:8 | 25:21,25 26:2 | 60:8 61:3,6,17 |
| 85:25 93:6 | **curriculars** | 26:4,12,24 | 61:21 62:5,7 |
| 99:21 114:21 | 73:1 | 27:7,12,18,21 | 62:10,25 63:3 |
| 116:25 119:17 | **cusp** 303:22,24 | 27:24 28:2,8 | 63:17,24 64:5 |
| 122:8 125:22 | 304:2 | 29:11,17,25 | 65:9,15,19,24 |
| 130:23 147:3 | **cut** 258:25 | 30:22 31:9,17 | 66:24 67:20 |
| 150:23 156:4 | 283:19 | 31:25 32:4,7,9 | 68:5,7,13,17,25 |
| 158:15 171:3 | **cutthroat** 305:4 | 33:20 34:25 | 69:15,24 70:2 |
| 176:14 177:18 | **cyberbullying** | 35:13,20,24 | 70:7,18,22,25 |
| 178:11 180:4 | 98:19 | | 71:2 72:5 80:3 |

| | | | |
|---|---|---|---|
| 80:9,14,18,20 | 115:2,4,7,12,18 | 144:4 145:20 | 180:10,10,12 |
| 80:23 81:4,6 | 115:25 116:5,9 | 146:1,8,11,15 | 180:18 181:2,4 |
| 81:10,15,17 | 116:14,19,25 | 146:19,23 | 181:13,23 |
| 82:11,17,21,23 | 117:7,12,17 | 147:1,3,7,10,12 | 182:7,12,17,21 |
| 83:3,10,15,17 | 118:4,7,13,16 | 147:22 148:15 | 182:25 183:13 |
| 83:21 84:1,3,6 | 118:18,23 | 148:20 149:2 | 183:19,24 |
| 84:11,15,20,22 | 119:3,7,12,15 | 149:15,19,22 | 184:9,11,15 |
| 85:1,4,7,9,23 | 119:18,22,25 | 150:6,16,21,23 | 185:15,17,24 |
| 86:5,7,19 87:5 | 120:10,18 | 151:1,10,14,17 | 186:11,22 |
| 87:11 88:3,15 | 121:3,6,9,18,20 | 152:1,7,15,25 | 187:2,17,21 |
| 89:8 90:10,22 | 121:25 122:4,9 | 153:5,10 154:4 | 192:9,17,20 |
| 91:13,17,21 | 122:14 123:15 | 154:9,13,17,21 | 193:3,6,10,13 |
| 92:1,13,15,18 | 123:21 124:1,5 | 155:5,9 156:7 | 194:1,10,13,23 |
| 93:3,9,23 94:2 | 125:2,12,18,25 | 156:11,14 | 195:3,8,12,24 |
| 94:5,7,9,12,17 | 126:2,16,18,24 | 157:4,18 158:6 | 196:5,8,11,16 |
| 94:20,24 95:2 | 128:5,12,16,21 | 161:8,11,22 | 196:18,24 |
| 95:10,14,20,25 | 128:24 129:6 | 162:6,8,23 | 197:12,16,20 |
| 96:4,7,12 | 129:13,19 | 163:15,20 | 198:5,8,20,24 |
| 98:22 100:9,11 | 130:2,4,16,19 | 164:14,19,22 | 199:6,10,15,20 |
| 100:17 101:5 | 130:22 131:1,5 | 164:25 165:12 | 200:2,5,8,18,22 |
| 101:22,24 | 131:11,17,21 | 166:19 167:2,9 | 200:25 201:7 |
| 102:14 103:14 | 132:1,8,13,18 | 167:15,20,25 | 201:12,20,24 |
| 104:13,21,23 | 132:21 133:1,5 | 168:3,11,13,22 | 202:7,15,18,23 |
| 105:6 106:3 | 133:8,18,24 | 169:1,6,10,12 | 203:2,8,10,15 |
| 107:17,21 | 134:2,8,14 | 170:1,6,14,16 | 203:19,23 |
| 108:1,5,8,12,17 | 135:2,5,15,20 | 171:13 172:18 | 204:1,4,8,12,17 |
| 108:22 109:3,7 | 136:3,7,14 | 173:2,6,19 | 204:22,25 |
| 109:10,13,18 | 137:10 138:11 | 174:7,10,16,24 | 205:13 206:3,7 |
| 109:24 110:5 | 138:15,23 | 175:5,8,10,13 | 206:11,17,20 |
| 110:11 111:20 | 139:10,14 | 176:8,13,17 | 207:1,5,13,18 |
| 111:24 112:4,9 | 140:8,13 141:4 | 177:1,9,16,19 | 208:1,11,19,22 |
| 112:16 113:14 | 141:14,16,18 | 178:9,13 179:1 | 209:5,15,19 |
| 113:18,25 | 142:22 143:5 | 179:4,12,18,21 | 210:21 215:2,8 |
| 114:14,19,22 | 143:19,24 | 179:23 180:2,8 | 215:11,22 |

[damsky - dealing]                                                    Page 24

| | | | |
|---|---|---|---|
| 216:5,14 217:3 | 242:3,8,17,21 | 143:12 144:17 | **day** 49:3 60:15 |
| 217:8,14,19,23 | 243:9 244:18 | 145:10 162:12 | 60:16 62:16 |
| 218:4,6,12,15 | 244:24 245:1,4 | 162:17,21 | 76:1 122:17 |
| 218:19,22,24 | 245:11,17 | 163:1,8,9 | 131:9 162:4,4 |
| 219:2,5,8,12,17 | 246:9,14,22,25 | 164:12 165:23 | 171:20,20,21 |
| 219:22 220:3,6 | 247:6,18,24 | 166:3 168:16 | 171:21 181:4 |
| 220:13,20,22 | 248:7,15 249:1 | 170:3,10 | 189:25 190:1 |
| 221:1,4,7,13,17 | 249:12 250:10 | 171:25 172:11 | 191:9,9,16,16 |
| 221:21,24 | 250:25 251:7 | **dance** 319:2 | 191:16 192:25 |
| 222:7,14,18 | 251:11,16,21 | **danced** 318:19 | 193:2 209:11 |
| 223:6,10,14,17 | 252:7,10,12,20 | **dancing** 320:10 | 229:1 271:13 |
| 223:19,23 | 252:23 253:1 | **danger** 77:9 | 276:15,16,18 |
| 224:12,18 | 253:14,24 | 104:6 115:5 | 278:8 289:20 |
| 225:22 226:4,9 | 254:4,8 255:7 | 272:21 | 289:23 303:1,1 |
| 226:14,17,23 | 255:11,16,19 | **dangerous** | 303:17 310:6 |
| 227:3,12,18,23 | 256:1,11 258:4 | 102:19 106:19 | 321:6,7 |
| 228:1,7,12,15 | 258:10 261:1 | 107:8 219:15 | **days** 5:4 14:12 |
| 229:20 230:1,5 | 262:22 263:2,4 | 219:16 230:4 | 101:21 127:8 |
| 230:11,15,18 | 263:7,18 264:3 | 249:19,21 | 168:1 193:2 |
| 230:22 231:1,5 | 265:24 266:13 | 250:2 | 210:8 265:6 |
| 231:10,18,22 | 277:2 281:18 | **dangers** 155:12 | 272:13 287:15 |
| 232:1,6,15,23 | 281:20 289:23 | 292:2 | 287:16,19 |
| 233:1,7,11,22 | 300:17,24 | **daniel** 4:6 | **deadliest** |
| 234:3,8,10,12 | 301:13 302:13 | 211:4 224:12 | 163:22,25 |
| 234:16,19,24 | 303:5 304:14 | 225:24 252:6 | **deadlines** |
| 235:9,15,22 | 305:18,21 | 269:16 299:16 | 189:21 |
| 236:2,6,16 | 309:1 310:12 | 299:17 | **deadlocked** |
| 237:3,10,13,21 | 312:20 314:13 | **daniels** 299:19 | 226:8 |
| 238:8,15,21,23 | 316:13 319:1 | **date** 27:22 | **deal** 62:15 |
| 238:25 239:3,9 | 319:24 322:19 | 45:23 119:7,8 | 111:21 127:22 |
| 239:19 240:9 | 323:6 325:13 | 181:1 234:10 | 191:23 213:12 |
| 240:12,14 | **damsky's** 28:11 | **dates** 277:19 | 248:25 |
| 241:3,8,12,15 | 99:10 100:24 | **daughter's** | **dealing** 13:14 |
| 241:20,24 | 140:15,18 | 102:7 | 19:20 20:8 |

26:8 89:24
115:22 254:14
**dealt** 227:8
**dean** 2:4,5 4:3
4:4 5:2,23,24
6:19,20,21
9:16,22 12:12
12:14,18,21
16:18 18:16,17
18:20,22 19:12
19:17 20:4,20
21:9,16 22:24
23:1,5,7 25:16
25:17,20,22
26:4,11,20
27:4,10,13,20
27:22,25 28:4
28:14 29:16,24
30:1 31:2,12
31:23 32:3,6,8
32:12 33:25
35:5,16,23
36:1,4,9,14,17
36:19,25 37:8
37:18,20 38:3
38:11,16,18,21
39:4,8,15,18,25
40:4,9,11,12,15
40:17 41:13
42:20 43:2,7
43:21 44:10
45:3,9,12,14
46:5,5,9,20,22
47:3,8,11,19,21

47:24 48:4,8
48:10,13,19,21
49:2,6,7,16,22
50:21,24 51:14
51:16,24 52:6
52:11,13,20
53:11,17,22
55:5,8,11,14,17
55:22,24 56:7
56:19,20 57:3
57:13,22 58:13
59:11,21 60:1
61:2,5,13,16
62:4,6,9,19,24
63:2,9,14,21,25
64:6,9 65:9,14
65:17,18,22
66:9,13 67:4,6
67:20 68:3,6,8
68:15,18,22,22
68:24 69:8,12
69:16 70:1,5,7
70:10,22 71:6
71:11,12,16
72:7,11,15,16
72:18,19 73:2
74:2,13,21
75:24 77:15
78:3,7,7 79:5
80:2,3,7,13,24
81:5,13,16
82:5,9,14,14,15
82:25 83:7,14
83:16,19 85:16

85:19 86:1,6
86:16,17,23
87:8,13,15,15
88:12,18,25
89:9,17 90:14
91:1,15,18,23
91:23 92:2,14
92:17,21 93:7
93:13 94:1,16
94:19,22,25
95:3,5,12,16,21
96:3,5,10,13,15
96:16,20 97:13
97:17 98:12,13
109:16 126:9
126:19 146:11
146:20 148:13
153:8 168:2
212:19 214:23
219:3 236:17
240:19,25
241:4,17,24
242:8 245:13
251:18 254:9
255:1 262:7
267:21 268:5
268:18 269:7
270:10 271:9
274:11,18
275:14 277:10
277:11,11
280:5 281:4
284:12 285:9
285:12,21

286:4,18 287:3
287:3,23
296:23 297:1,6
297:7 298:8,8
305:24,25
306:1,12 307:9
307:24 311:8
312:4 315:15
315:23 320:24
320:25 324:21
324:23 326:2
326:19
**dean's** 21:5
103:5 116:21
117:11,24
126:9 277:13
277:21 278:5
**deans** 68:10
**dear** 62:25
**death** 106:7,14
106:16,22
**debate** 148:6
260:9 267:21
290:4,7 301:18
302:5
**debates** 54:10
147:23 268:3
301:14
**debating**
298:25
**decade** 81:24
265:21 266:23
**decide** 133:2
153:24 176:15

178:4 205:21

**decided** 100:14
100:22 105:25
106:3,7 115:16
142:12 212:2
278:12,16
297:13

**deciding**
255:10

**decision** 5:3,4
32:24 70:11
133:3 144:3
240:6 263:19
324:21,22
325:4

**decisions** 32:15
32:17,20,23

**declared** 162:7

**decline** 174:14
178:16 205:24
225:20

**declined** 170:2
177:16 178:18

**deconstruct**
318:4

**deconstructed**
288:15

**deconstructing**
288:9

**deconstruction**
317:15

**dedicated**
272:12 324:15

**deem** 137:11

**deemed** 42:14
295:16 297:16
324:6

**deep** 57:16,24
108:2 141:14
145:15 151:11
226:23 227:1

**deeply** 26:9,17
26:25 63:8
143:16 144:14
254:15,23

**defamation**
98:20

**defend** 32:22
151:19 187:2
260:2 300:1

**defended**
151:19

**defender**
126:11

**defending**
99:14,19

**defense** 102:18
164:19

**define** 217:8
221:8

**defined** 176:5

**defines** 10:8,24
256:14 257:5

**defining** 120:14

**definitely** 79:5
86:24 92:11
272:1,17

**definition**
121:17 173:9
173:11,14
175:18 176:6
255:23 267:25
294:3 312:19

**deflecting**
101:9

**deflection**
111:4

**degenerate**
225:11

**degree** 31:18
34:9 108:24
207:12,14,14
222:6 269:12

**deleted** 115:8
133:18 210:6
317:3

**deliberate**
324:19

**deliberation**
4:13 187:11

**deliver** 166:3

**delivered** 167:9
167:14

**demanding**
236:14

**democracy**
265:19

**demographic**
82:2 141:2
142:4 266:1
267:1

**demographics**
150:15

**demonstrate**
177:5

**deniability**
122:25

**denial** 99:16

**denied** 297:10

**dennis** 177:24

**denocide**
181:17

**deny** 273:3
308:4 311:6

**denying** 310:22
311:1

**department**
160:17

**departments**
160:24

**depend** 54:1

**dependent**
169:4

**depending**
264:19

**depends** 50:9
50:24

**depraved**
225:11

**derek** 154:9
156:18

**derived** 195:6
275:5

**describe** 100:8
121:10 150:2

**[describe - disagreed]**                                                                 Page 27

155:24 156:25
185:24 207:14
207:23 243:10
**described** 23:9
140:23 149:22
291:7
**describing**
23:25 154:5
**deserve** 244:6
247:9
**deserves** 273:4
**designated**
309:24
**designating**
193:21
**designed** 3:12
197:6
**designee** 5:2,7
**desire** 101:7
122:20 127:19
275:8
**desist** 321:18
**desk** 142:10
**desperately**
296:2,16
**despicable**
289:25
**despite** 34:5
99:16,16 185:1
229:24 246:3,4
275:23
**destiny** 181:8
**destroy** 243:3

**destroyed**
244:10
**destructive**
169:16
**detail** 186:8
**detailed** 13:11
**details** 159:23
180:3,13 186:3
186:10,14
**deter** 167:8
**determination**
23:13 66:21
108:17 146:5,6
147:14 178:18
183:11
**determinations**
30:2
**determine**
100:1 148:1
178:22 183:3
**determined**
24:4 52:16
146:2 148:11
**determining**
11:6 26:14
255:15 257:13
**deterrence**
167:8
**development**
72:17
**devoted** 20:8
99:13
**dialog** 28:20
29:9 30:15

**die** 201:4 202:5
203:22
**died** 282:12
**differ** 11:17
257:24
**difference**
132:6,10
138:25
**different** 13:16
15:23 16:8,9
18:2 21:12
28:15,19 34:21
42:3 50:8 53:4
54:7 64:25
65:2,5 67:12
95:9 106:6
107:3 127:3
136:25 137:3
213:12 224:16
224:25 225:3,5
225:17 228:16
229:17 232:20
250:9 262:21
275:2 311:11
**differently**
230:6 318:8
319:21
**difficult** 20:21
77:13 126:8,10
190:7,11,13,20
255:17 277:9
277:11 322:17
323:9,16,20,24

**difficulty** 152:2
168:20
**digital** 326:7
327:3
**diminish** 243:7
**direct** 75:9
149:14 165:23
214:13 232:12
232:15
**directed** 5:5
37:18 141:20
147:13 150:9
150:13 216:12
314:2 324:8
**direction** 74:21
**directly** 46:4
48:21 73:2
107:22 122:7
183:6 189:2
216:4,6 226:19
243:5 305:6
**director** 160:8
**disadvantages**
155:12
**disagree** 48:15
130:5 133:1
153:22 185:9
195:4 198:11
213:20 254:19
314:22
**disagreed**
210:25 211:1
313:15

[disagreement - disruptive]                                    Page 28

| | | | |
|---|---|---|---|
| **disagreement** 148:7 260:11 270:1,2 | 161:21 163:7 170:5 190:7,11 206:1 | **dismember** 142:9 | 64:2,23 77:11 77:17 89:7 |
| **disagreements** 307:2,3 | **discussed** 16:17 24:10 75:7 | **dismissed** 324:18 | 96:19 97:2 131:4 132:19 |
| **disagrees** 254:20 270:19 284:11 | 96:21,21,23 103:20 153:8 153:14 190:16 | **disorienting** 213:17 **displayed** | 158:12 162:12 162:14 168:25 170:19 204:18 |
| **disappointed** 66:2 | 210:10 214:3 322:18 | 250:11 **displays** 212:21 | 206:8 207:20 207:24 208:2 |
| **discern** 100:23 125:16 | **discussing** 211:4 | **disposal** 148:24 **dispossesion** | 208:14,16,18 211:2 212:1 |
| **disciplinary** 8:16 10:13 256:19 | **discussion** 29:9 29:14 121:2 128:2 134:3 | 141:23 **dispute** 281:25 | 213:5 257:3 259:18 285:15 312:19 318:24 |
| **discipline** 50:5 | 137:12 162:14 | 282:1 | **disruptions** |
| **disclaim** 17:12 43:6 | 189:23 190:4 190:20,25 | **disrespected** 161:22 170:16 | 26:23 **disruptive** 3:22 |
| **disclaiming** 17:21 | 191:22 199:18 206:10 207:25 | **disrupt** 170:3 286:10 313:20 | 4:9 8:3,11,12 8:20 10:6,8,10 |
| **disclaims** 292:14 | 208:23 209:3 268:7 | **disrupted** 63:6 63:11,18 89:5 | 10:17,21 11:11 11:13 12:16 |
| **discourse** 110:3 148:7 | **discussions** 137:2 191:21 | 97:2 131:6 162:3 164:23 | 26:16 30:19 52:18 69:21 |
| **discriminate** 296:7 | 268:4 **disdain** 212:24 | 168:21 211:11 223:21 224:13 | 72:13 86:14 88:21,24 98:8 |
| **discriminated** 161:23 170:16 | **disgust** 225:17 **disgusted** 224:7 | 224:15,16 296:5 | 130:9 133:17 140:2 144:15 |
| 185:22 186:4 259:24 297:20 | 225:17 237:1 242:25 269:18 | **disrupting** 72:25 165:16 | 157:20 159:13 167:15 176:24 |
| **discrimination** 270:13 | **disingenuous** 214:18 233:6 | **disruption** 8:7 8:24 10:21 | 179:10,24 180:1 181:22 |
| **discuss** 62:15 73:6 74:22 | **disliked** 13:3 | 13:8 18:13 28:16 31:8 33:3 50:16 51:4 54:14 | 181:25 182:5 182:18 188:3 208:4 209:23 |

212:8,8 223:13
239:7 252:18
253:10 255:15
256:12,15,16
256:25 257:3
257:17,19
267:23 269:22
269:23 271:6,7
271:12,15,24
273:9 306:15
311:20 313:22
315:18
**disrupts** 9:3
11:2 257:8
**disseminated**
321:12
**dissolve** 291:17
292:3
**distinction** 33:4
33:9 175:18
**distorted** 13:25
**distress** 78:6
**distribute** 35:2
**distributed**
35:3,6,7,8,11
35:11,17
**district** 276:13
**disturb** 147:23
**disturbance**
166:19
**disturbing**
26:10,17 27:1
164:12 172:2
172:24 189:8

191:9,14
254:16,23
**dive** 57:16,24
**diverse** 265:10
265:10,14
**diversity**
264:16 265:19
**doctor** 102:9
**doctrine**
134:20
**dog** 51:12
281:2
**dogs** 272:14
303:2,3 310:6
**doing** 15:2 38:4
42:20 57:24
103:10 125:15
151:7 161:25
165:15 174:20
241:4 243:4
244:8 245:24
255:21 284:18
284:24 303:3
310:25 320:8
321:9,24
**dollars** 18:24
**domestic**
280:15
**domination**
169:23 185:8
**donald** 281:15
**donovan** 59:9
**donuts** 68:22

**door** 53:25,25
73:10,15,15,21
76:6 102:25
164:16
**doors** 73:12,13
144:5 168:7
**dots** 137:23
**double** 89:12
101:16 288:24
289:18,19
**doubt** 122:16
125:7 219:20
245:9 274:4,6
282:3
**doubts** 282:5
**douglas** 163:24
**downfall**
121:22
**dozen** 89:12
197:25 198:14
**dr** 5:1,6,22 6:7
6:10,15,18
**draconian**
222:3
**draft** 30:10,21
140:18 189:23
**drafted** 63:14
**drafting** 284:1
308:11,11
309:3
**drama** 305:4
**draw** 33:4
**drawing** 54:15
54:25

**dress** 197:13,13
198:15
**dressed** 198:15
**drills** 164:9
**driven** 142:19
164:6
**driving** 155:3
164:11
**drop** 164:17
**dropbox** 44:3,6
46:17 252:21
**dropped** 306:9
**dudes** 59:8
**due** 37:13
62:14 123:15
141:10 174:25
244:6
**duly** 326:5
**duties** 81:18
**dwell** 290:19
**dying** 141:6
201:5

**e**

**e** 2:1,1 3:1
154:13,13
**earlier** 50:3
153:7
**early** 30:21
103:12 145:2
**earned** 269:6
**earphones**
76:23

**[earth - encountered]** Page 30

| | | | |
|---|---|---|---|
| **earth** 81:25 | 202:4 | **eliminating** | **emoji** 296:18 |
| 233:19,23 | **effective** | 214:16 | **emotion** 14:7 |
| 260:1 266:24 | 178:24 324:25 | **elimination** | **emotional** 77:5 |
| 278:20 | **effects** 157:15 | 113:3 | 78:22 107:10 |
| **easier** 263:9 | 193:20 | **ellipses** 81:25 | 107:11 135:6 |
| 300:1 | **effort** 156:18 | 82:3 266:24 | **emotions** |
| **easily** 123:19 | **efforts** 22:8 | **email** 30:22 | 121:10 |
| 308:12 319:25 | 311:8,13 | 60:12 61:12 | **empathy** |
| **east** 178:1 | **egregious** | 62:21,22 | 136:25 |
| **eastern** 166:11 | 176:3 | 100:22 128:22 | **emphasized** |
| **eat** 272:14 | **ehrlich** 6:12 | 146:12,20 | 200:11 |
| 310:5 | **eight** 265:6 | 147:16 148:10 | **employed** 69:2 |
| **ed** 99:18 | **either** 32:20 | 149:16 153:8 | 326:11,14 |
| 265:17 | 33:2 46:3,4 | 168:3 193:10 | 327:8,11 |
| **edge** 15:9 101:6 | 48:15 53:20,20 | 238:20 239:16 | **employee** |
| 123:25 124:4 | 55:7 83:9 84:7 | 242:7 270:10 | 326:13 327:10 |
| 164:16 | 154:3 174:11 | 270:23 277:21 | **employees** 7:14 |
| **edited** 155:23 | 178:5 181:21 | 321:6 324:22 | **employers** |
| **editing** 30:11 | 213:3 221:2 | 325:6 | 170:7 |
| **editorial** 291:5 | 233:16 244:3,9 | **emailed** 143:11 | **employment** |
| **educate** 311:13 | 246:8 262:5 | 235:7 276:19 | 9:4 11:4 87:17 |
| **educated** | 268:3 271:24 | 281:4 | 257:10 |
| 232:25 294:5,6 | 272:24 276:15 | **emails** 28:6 | **empty** 84:13 |
| 317:22 | 289:13 316:25 | 60:11,21 93:24 | **enable** 174:18 |
| **education** 9:4 | **elaborate** 120:3 | 94:1,3,13 | **enact** 127:19 |
| 11:3 77:17 | 155:7 | 148:13 276:5 | 199:1 |
| 105:8 257:9 | **elevated** 34:8 | 279:16 | **enacting** |
| 279:25 280:6 | **elicit** 183:8 | **embarrassing** | 155:12 |
| **educational** | **elicited** 318:13 | 212:11 | **encounter** |
| 22:13 78:25 | **eliminate** | **embrace** 246:2 | 106:2 284:15 |
| 208:14 319:9 | 131:23 132:5 | **emergency** | **encountered** |
| 319:10,17 | 132:10 | 78:16 | 151:18 152:3 |
| **effect** 192:16 | **eliminated** | **eminent** 6:12 | 152:16 |
| 195:7 199:19 | 113:8 | 98:15 | |

encounters
  116:22 117:1
encourage  46:5
  70:17 154:22
encouraged
  190:9,11,17,20
ended  8:1
  141:18 213:11
  214:9 237:24
  263:23
endorse  211:21
enemies  210:11
  261:8
enemy  162:7
energy  20:14
  243:1
enforced  196:3
enforcement
  148:23
engage  42:7
  100:9,23 105:3
  115:19 117:5
  119:6 169:18
  173:23,24
  197:6 270:13
  302:6 305:5,6
  305:7 318:22
  322:17
engaged  14:11
  15:12 17:15
  53:3 54:9 64:2
  112:5,17 172:6
  179:10 181:21
  304:11

engagement
  228:8 299:4
engaging  56:5
  258:17
english  172:24
enjoy  104:16
  104:17
enjoyable
  302:19
enjoyed  262:1
enjoys  104:13
enormous
  170:13
enraged  73:17
enrolled  15:5
entire  35:9 39:5
  76:8 104:9
  148:23 203:7
  214:16 298:7
entirely  26:14
  49:25 150:12
  165:11 260:3
  260:13 322:2
entities  292:24
entitled  166:4
  291:6
entitlement
  243:24
entity  181:6,9
envelope  53:18
  53:19
environment
  33:11 86:14
  88:21 144:16

  149:4 150:8
  306:16
equal  125:21
  289:9
equality  134:22
  134:24
equally  167:11
equate  181:5
equated  233:17
equivocate
  54:24
equivocated
  17:17,21
  294:16
equivocates
  25:5
equivocating
  274:5,7
era  163:17
eradicate  176:2
eras  23:24
error  32:21
es  326:4
escalated  34:8
  52:25 100:20
  249:23 304:12
escalating  17:3
  30:16 100:16
  129:7
escalation
  34:15 143:13
escort  315:19
escorted
  164:20

especially  8:4
  41:22 167:4
  171:14 212:15
  238:2 275:18
essay  121:21
  122:4 156:18
  188:8
essence  293:7
essentially
  30:23 135:22
  147:13 156:7
  177:2 180:22
  195:25 200:18
  217:5 224:15
  249:15 264:24
  279:17,22
  280:6 282:22
  293:3 294:10
  297:2 301:18
  306:14 311:10
  314:23
establish  50:12
  109:1
established
  294:20
establishes
  52:22
establishment
  31:21
estimate  20:6
  77:20 101:22
estimation
  173:7,8

**et** 25:9 26:21 28:22 50:10 120:17 192:1 284:2,3 305:16
**ethics** 49:15,18 49:19
**euphoria** 127:2
**evaluate** 108:13 147:25 263:25 270:14 285:18
**evaluated** 114:24 290:11
**evaluating** 8:18 10:16 28:15 57:10 113:22 256:24
**evaluation** 178:22 270:13
**event** 8:22 10:20 15:8 21:3 40:18 64:17 75:25 110:18 166:7 166:20,23,24 168:4 172:7 177:22 179:2,3 179:4,14,19,24 180:1,20 314:6
**events** 8:4 13:11 15:18,22 18:19 27:8,14 27:17 36:11 76:19 163:16

164:10 165:3 253:23
**eventually** 22:9 61:24 280:5
**everybody** 41:7 71:25 97:19 119:20 149:12 187:19 248:16 254:18 279:23 284:14 306:3 310:12
**everyday** 130:9
**evidence** 219:18 220:18 235:5 260:14 260:21
**evidently** 103:18 132:11
**evil** 169:15
**evokes** 201:6
**exacerbated** 34:16
**exact** 40:25 45:23 154:7 188:12 192:16 193:2,14,23 202:6 234:19 234:21 289:1 289:16,17
**exactly** 17:5 18:13,23 36:18 68:12,19 88:18 104:2 111:1 120:3 121:15

232:11 237:23 240:7 278:25 281:14 288:8 306:13 311:11 322:23
**exaggerate** 315:13
**exaggerated** 286:17
**exaggerating** 298:2
**exaggeration** 258:23
**exam** 62:15
**examination** 105:1
**examine** 279:9
**example** 35:18 129:15 150:17 155:22 169:13 199:16 210:18 227:14 243:12 243:16 260:6 262:12 276:8 277:19 281:15 294:14 313:10
**examples** 8:2 163:14 262:5 267:13
**exams** 46:1 77:10 103:7,11 165:17 168:14 168:20 169:6

**except** 53:22 231:19 320:21
**exception** 275:13
**exchange** 7:21 58:1 73:23 75:22 140:11 151:5 212:3 296:20
**exchanged** 107:23
**excuse** 52:21 174:9 175:24 325:11
**excused** 3:24 283:24
**executed** 229:9
**executing** 210:8
**exercise** 87:6 142:8
**exercised** 258:16
**exercising** 53:15
**exhausted** 104:9
**exhibit** 61:17 196:13 262:24 263:1
**exhibits** 42:11 44:23,24 263:5
**exist** 259:7 263:25 289:19

existed  219:20
222:11
existence
249:17 269:23
269:24
existing  279:12
exit  90:12
exits  16:15 24:1
48:12 74:16
89:6 306:3
expanded
72:20
expect  4:19
15:14 57:15
246:8 324:22
expectations
4:20
expected  4:15
142:3
expecting
213:19
expelled  296:5
302:9,12
experience  56:8
59:24 72:22
76:11 92:7
109:19 159:23
166:25 208:13
208:14,16
223:7 319:15
experienced
15:25 54:2
76:10 110:18
208:13,16

322:16,20
experiences
104:12 136:25
137:3
experiencing
79:19,20
expert  41:14
42:22 43:8
64:19 66:10
103:21 110:15
110:16 124:13
171:24
expertise
152:11 154:1
159:24 163:4
explain  23:21
33:5 49:21
122:18 133:12
133:13 172:21
175:14 262:18
323:24
explained
58:11 128:10
explaining  47:9
explanation
260:3
explicit  191:11
explicitly  43:6
56:25 128:9
188:8 189:10
292:13,21
316:11 318:21
explode  292:4,5
292:5

exploration
166:6
exponentially
162:14
exposed  104:5
express  34:4
47:23 79:11
91:6 93:21
228:15 281:23
expressed
16:13 26:8
89:14 95:22
96:24 116:22
118:2 141:1,14
143:15 145:15
168:19 254:14
259:15,19
269:16 283:13
expresses  78:22
266:5
expressing
15:11 77:14
91:11 101:7,23
211:6
expression
11:19 26:25
196:20 197:3
258:1,17,22
259:3 263:24
324:3
extended  4:1
144:16
extent  22:14
31:5 207:20

212:22 274:17
exterior  73:10
exterminate
58:6 131:23
292:11
extermination
128:1,9 157:7
235:12
exterminatio...
43:6
extra  8:1 18:18
extrajudicial
214:15 250:20
extralegal
193:16,21
194:7 199:11
199:16,24,24
extreme  26:8
26:18,25 27:6
34:4 54:18
101:15 127:18
254:14 269:9
281:11
extremely
212:14 213:17
250:19
extremist  15:20
26:21 129:12
eye  14:17
218:11 322:24
322:24
eyes  14:7 65:13
65:20 202:19
236:19

**f**

**f** 73:15,20,21
**face** 56:24,25
57:8,18 131:13
131:16 142:1
222:21 233:19
233:23 245:6,7
273:25 275:19
275:19 292:2
308:25
**facebook** 265:5
**faced** 142:18
**faces** 81:24
264:15 265:20
266:22
**facilitate**
167:17
**facing** 7:16
313:6
**fact** 11:17
24:20 30:20
49:20 66:23
76:14 87:9
113:4 142:20
185:1 217:3
225:1 249:3
250:2 257:24
259:4,6,22
264:14 265:3
265:13,15
268:9,24
273:12,14
293:15 295:11

295:18 297:9
299:10 307:19
309:6 315:2
316:18
**factor** 291:13
**factors** 8:21
10:18 164:11
257:1
**facts** 148:14
225:4
**faculty** 12:23
13:6,15 14:13
14:17 15:11
20:11 29:20
32:23 33:7,9
41:22 42:2
45:18 46:3
53:3 58:11,14
58:17 64:25
94:4 100:15
109:14,17
128:22 131:21
132:14,16,22
133:12 140:7
140:17 143:11
143:20 144:17
148:5 151:18
151:24 152:3
152:16 153:16
153:22 154:5
160:12,16
161:13,17
162:2,5,22
163:2,6 164:5

165:6 166:1
167:24 169:25
170:5 171:23
172:3 258:18
268:20 270:12
270:17 276:1,4
311:14 314:12
314:20
**fail** 314:17
**failed** 124:7
127:2 167:8
**failure** 4:16,21
141:25
**fair** 81:4 88:15
131:18 148:9
236:2 249:16
**fairly** 35:8
47:22 198:14
260:8 274:1
285:13
**fairness** 262:7
**faith** 113:21
127:14,23
169:18 317:8
318:17
**fall** 16:3 29:19
73:5 74:4 83:1
85:24 86:2,3
98:23,25 108:6
145:13 170:14
213:22 268:11
**fallacies** 56:6,6
56:6

**fallout** 20:9
**falsely** 259:2
**familiar** 90:18
146:11 154:15
161:11 164:5
194:25
**families** 162:20
170:6
**family** 7:23
14:18 17:16
56:4 101:21
104:6 112:1,23
116:16 124:16
125:9,20
126:23 143:5
162:25 172:5
288:6 290:9,9
**fan** 77:24
215:17 220:23
236:10 281:14
**fantastic** 93:22
**far** 38:13
115:16 143:10
161:10 175:23
176:22 179:9
179:10 183:4
209:25 226:15
227:5 229:7
235:20 239:17
289:7 311:24
**farther** 279:1
**fascinating**
281:2 282:7,7
307:25

| | | | |
|---|---|---|---|
| **fault** 283:23 | 106:24 111:19 | 170:13 183:14 | 76:13 79:14 |
| **favor** 155:16 | 116:23 | 183:19 184:16 | 90:22 92:5 |
| **fbi** 75:16,17 | **fears** 78:12 | 185:22 186:4 | 102:17 114:4 |
| 174:8,13 297:7 | **featuring** | 198:18 200:9 | 117:5 121:11 |
| 297:14,14,15 | 177:23 179:5 | 200:20 201:5 | 122:17 123:17 |
| **fear** 7:14 8:6 | **february** 30:23 | 204:7 213:4 | 131:6 158:22 |
| 9:2 11:1 14:10 | 36:12 75:13 | 237:10 244:23 | 165:8 166:23 |
| 15:8,11 16:14 | 83:13 84:1,16 | 245:18 247:6 | 184:12 200:24 |
| 16:16,21 17:6 | 85:7 177:22 | 249:2 272:2,18 | 201:1 206:14 |
| 18:13 20:23 | 179:4 180:20 | 272:23,25 | 278:2 286:16 |
| 21:16 22:1 | 180:22 277:17 | 285:19 308:6 | 298:10 |
| 23:22 34:13,17 | 277:20 278:4 | 310:1,16 | **ferpa** 58:19 |
| 37:16 53:8 | **federal** 3:15 | 315:10 317:15 | **fielded** 45:17 |
| 66:21 75:7 | 31:19,20 | 318:8 320:2,4 | **fielding** 13:10 |
| 76:2,13 77:9 | 141:20,22 | 322:1 | 21:8 |
| 77:14,25 78:16 | 142:16,17,20 | **feeling** 63:8 | **fifty** 266:12 |
| 79:24 86:15 | 144:12 148:18 | 64:6 97:9 | **fight** 201:4 |
| 88:22 89:15 | 148:21,23 | 116:2 219:19 | 202:5 203:22 |
| 101:8,23 111:7 | 269:4 270:6 | 239:8 240:3 | 245:23 |
| 163:10,16 | 276:11,13 | 272:21 | **fighting** 141:6 |
| 164:22 165:12 | 278:20,23 | **feelings** 104:16 | 181:7 201:5 |
| 168:22 169:6 | **feed** 40:6 228:9 | 208:25 248:13 | **figure** 114:1 |
| 170:13,19 | **feedback** 188:8 | 250:7 | 143:21 153:19 |
| 186:12 219:19 | **feel** 43:16 49:15 | **feels** 248:12 | 239:12 240:20 |
| 237:13 244:19 | 59:24 76:18,25 | 254:19 309:23 | 240:22 248:2 |
| 245:19 257:7 | 79:20 82:4 | **fellow** 13:3 | 276:2 281:12 |
| 259:2 275:5,6 | 103:8,11 104:2 | 104:14 105:7 | 286:5,6 288:2 |
| 306:16 | 110:12 111:16 | **fellows** 207:22 | **figured** 286:19 |
| **feared** 75:11 | 115:4 120:21 | **felt** 14:9 21:12 | **figuring** 55:1 |
| 76:17 102:2 | 121:13 123:18 | 21:15,20 22:3 | **file** 115:13 |
| 163:15 166:18 | 124:9 132:18 | 22:17 23:22 | 252:21 259:21 |
| **fearful** 77:12 | 135:9,23,25 | 30:10 42:6 | 260:6,12 |
| 90:23 102:6,20 | 148:24 151:14 | 52:24 64:13 | 261:11 264:7 |
| 103:3 105:20 | 152:9 163:10 | 66:2,16 76:2 | 265:16 270:23 |

301:1 323:24
**filed**   5:4
**files**   70:8
**fills**   265:21,24
**final**   5:3 45:25
62:15 95:3
163:11 271:25
272:16 324:21
**finally**   4:11
**finals**   14:20
22:19 63:5
64:24 213:2,25
244:16
**financially**
326:14 327:11
**find**   26:9 31:17
46:6 87:18
125:14 137:10
137:12 156:15
157:19,25
158:2 191:13
193:20 235:3
245:20 247:1
247:19 254:15
281:1,22
282:11,21
286:22 288:16
290:25 298:8
303:17 315:23
318:5 323:16
324:11
**finders**   66:23
**finding**   211:18

**finds**   11:12
26:16 156:8
257:18
**fine**   71:4,5
88:25 108:22
124:25 125:2
135:18 139:2
184:5,7 214:21
240:17 260:10
271:12 288:25
289:2
**finish**   45:10
46:7,11 93:8
220:10 272:8
283:18
**finished**   67:1
67:25 242:4
**fire**   301:19
**firearm**   103:25
**firm**   296:15,16
**first**   5:13 10:22
11:5,8,10,15,21
12:11 14:24
16:2,10 17:9
22:14 26:13,20
27:3 29:20,23
34:25 35:6,21
36:7 37:1 45:5
49:8,10 55:16
57:11 63:1
67:4 69:25
73:3 74:1
75:17 81:22
89:15 93:11,12

95:8 96:1
98:17,22 99:10
99:19 108:5,15
110:15,16,24
115:19 118:5
121:1 123:18
126:12 128:25
129:8 134:19
135:13,21
137:7 141:18
145:1,4 147:5
147:18 148:1
150:3 152:4,8
152:13 153:9
153:20 160:23
161:10 173:25
174:7,7 179:12
180:19,21
196:13,22,25
197:3,25
202:24 205:2
219:25 230:7
234:9 248:2
255:2,7 257:5
257:12,14,16
257:21 258:3
259:16 262:13
262:24 263:5
263:21,22
266:19,21
268:19,22,25
270:12,25
273:4 274:11
276:6 277:22

278:3 281:9
285:6,8 286:12
288:12 291:19
292:21,22
301:14 311:9
311:13 315:21
315:22 321:3
324:4,9
**fit**   312:18,23
**fitness**   105:1
**fits**   313:3
**five**   67:18,22
72:1 97:18
98:12,13 139:4
175:8 187:1
272:10
**flame**   250:16
**flames**   77:24
**flight**   245:24
**floor**   18:15
73:9 76:22
78:2 105:10
144:21 170:20
188:19 213:8
301:6
**florida**   1:1,7
3:11 6:13
87:10 105:2
150:18,20
160:1,12
163:22 166:8,9
166:10 170:8,9
244:3 294:8
301:11 309:20

**[focus - freedom]** Page 37

**focus** 38:2 60:4
77:6,17 98:18
99:25 105:8
120:25 161:19
163:13 176:21
300:19
**focused** 69:20
76:23 77:8
86:11 144:6
161:4 165:5
246:6 248:12
288:1
**focusing** 37:10
78:24 174:19
299:21
**foe** 169:18
**folks** 50:12
68:21 136:11
**follow** 39:13
42:19 43:5
48:20 66:17
90:23 91:4,10
91:12 106:21
118:23 185:15
235:8 236:8
303:10
**followed** 3:23
7:21 144:12
227:23 228:11
**follower** 39:16
39:20,20 228:8
**followers**
105:24 115:9
173:23

**following** 3:20
4:10 8:10,14
10:4,12 104:7
162:9,24
256:11,18
271:17
**follows** 3:18
39:12 118:24
**fond** 93:21
**food** 310:5
**fool's** 122:17
**footnote** 155:22
292:22
**footnoted** 30:4
30:21
**forced** 170:5
**forcing** 66:6
**foregoing**
326:2,4 327:4
**foreign** 160:23
**foreseeable**
302:14
**forget** 18:23
316:18
**forgetting**
86:21
**forgot** 260:20
283:22
**form** 83:19,20
201:15 293:2
**formal** 9:7
147:14
**formation**
291:10,13

**formed** 199:1
**former** 73:5
99:7 140:17
161:3
**formerly**
161:15
**forth** 4:20
**forthrightness**
110:5
**forty** 220:2
**forum** 54:20
148:6 150:9
**forums** 283:14
**forward** 3:13
98:1 139:18
142:11 239:13
240:5 286:20
**fought** 201:9
201:14 202:11
203:4
**found** 18:11
24:20 84:22
108:23 155:21
180:14 215:16
222:16 226:4
246:19,20
247:4,11,12,23
255:22 275:12
278:8 307:25
308:13 321:17
324:25
**founding** 141:5
**four** 60:10,11
143:11 149:15

149:17 160:2
160:16 220:5,6
292:17
**fourth** 264:19
**fraction** 275:3
311:23
**frame** 239:21
**framing** 124:11
**frankly** 33:12
33:21 34:3
66:2 88:23
113:21 138:23
194:3 237:4
258:13 267:15
275:7 276:1
277:7 279:3
280:14 285:14
296:4 297:8
306:9 308:15
317:7 318:1
321:15
**free** 11:21 29:2
59:24 71:13
87:6,9 97:14
100:1 108:19
137:20 139:18
147:24 157:24
159:2 182:9
186:19 209:9
251:3 258:3
263:24 273:5
293:25 324:2
**freedom** 22:15
29:2 31:5,10

32:16,22
153:21 154:23
196:20 268:8
269:13 271:1
316:24 324:7
**freedoms** 29:15
**frequent** 166:1
**friday** 42:12
44:7,23 68:9
70:3 76:3
103:13,15
119:13 231:6
266:15
**friend** 99:7
102:10 106:15
211:5 225:10
249:9 271:2
**friendly** 127:11
278:22 284:14
284:25,25
285:13 292:10
**friends** 24:8
76:15 90:7
170:7 228:19
273:22 275:23
275:25 283:1,4
290:7 304:18
304:22 310:9
314:15
**frightened**
249:3
**frightening**
28:13 156:9

**frodo** 294:19
294:19
**front** 91:6
146:14 155:19
201:23 204:16
264:18,22,25
266:8
**frustrated** 65:4
**frustrating**
79:23 249:24
267:17
**frustration**
77:15 79:19
**fsu** 15:17
104:22
**fucker** 66:7,9
246:23 295:21
**fulfill** 173:13
**full** 13:19 52:1
53:12 54:16
58:4 66:3
98:11 117:4
118:20 141:21
159:25 160:20
169:1 187:14
196:9 234:21
273:13 323:8
**fully** 13:17
23:23 110:24
132:23
**fun** 126:11
303:6
**functions** 8:15
10:13 73:1

208:5 256:19
**fundamentally**
136:24 211:7
249:21
**funny** 155:21
261:19
**furiously**
313:14
**further** 97:3,12
114:12 131:13
158:25 169:6
186:17 302:7
325:5 326:12
327:9
**furthering**
101:17
**future** 101:18
302:14 319:21

**g**

**g** 3:1
**gain** 97:2
**gainesville**
150:21 231:23
**game** 84:12
284:2
**gang** 169:17
**gangsters**
185:7
**garb** 13:23
**garvey** 155:23
**gatorsafe** 78:13
78:14

**gays** 210:3
**gaza** 176:10
184:19
**gaze** 269:14
**gearing** 63:5
**gears** 87:1
**gee** 200:7
**geer** 73:9 76:22
**general** 24:23
29:21 77:9
79:13 89:22
93:17 121:2
192:2 195:15
219:19 242:25
243:5,11
249:12 268:20
284:2 322:25
**generalize**
243:22
**generalized**
124:14
**generally** 29:1
31:10 32:13
35:11 48:20
57:23 67:9
68:9 79:22
87:10 186:3
187:5 198:11
222:1 304:15
**generated**
104:17
**generation**
106:25 107:1
135:6

**generations**
141:5
**genocidal**
162:18 163:5
167:1
**genocide** 17:18
17:25 25:8,8
58:2,3,4,7
113:13 143:8,8
143:9 160:5
161:6 163:4
168:16 171:16
171:24 172:20
173:1,4,7,9,12
173:15,18
174:22 175:18
175:21,22,23
175:25 176:1,6
176:6,10,14
181:17 184:18
232:14 250:13
289:5,5,7,15
**genocides**
175:24
**gentlemen**
59:14
**genuine** 197:5
309:16
**genuinely** 55:6
**george** 155:23
**george's** 222:23
**getting** 82:12
82:23,25 94:20
100:2 102:23

106:16 108:18
191:25 213:20
214:6 233:25
236:21 244:16
248:13 250:16
278:11 323:14
**ghaith** 177:24
179:5
**giggle** 210:23
**giggling** 296:18
**girl** 266:7
306:2,4
**gist** 84:15
132:11 156:11
**give** 12:3 22:20
29:3,3 42:18
43:22 44:5
84:9 111:5,8
118:13 136:9
154:11 183:2
183:11 196:11
205:5 227:10
238:11 254:5
255:8 280:21
293:17
**given** 3:19 4:7
4:11 17:10
85:13 88:17
95:14 143:10
147:19,20
161:17 166:15
173:10 175:23
187:14 189:9
238:19 252:8

253:8 278:14
289:7 295:6
297:24 313:13
**giving** 32:10
188:7 267:5
**glad** 130:16
131:12 284:22
**gladiatorial**
301:17
**glass** 73:14
**gleefully**
142:11
**globiating**
279:4
**glowing** 282:13
**go** 5:12 12:1
39:23 41:17
46:13 49:10
50:17,18 54:19
55:1,2 56:12
56:13,22 57:11
59:3,5 60:8,10
64:14 65:16
71:8 80:9,19
80:20 81:8,18
81:19 83:10
84:11 85:8
92:15,17 93:7
93:24 96:16
98:1 103:5
115:15 118:18
122:10 125:6
138:2,20 139:8
156:18 164:14

175:1 178:24
180:3 184:8
186:15 188:21
188:22 190:1
196:6,13,22
198:20,22
202:8,15,19
203:7,12
206:14 223:6
225:6 226:16
231:1 244:21
252:14 253:5
254:8 256:3
263:5,10,16
264:1,24
266:11 270:21
272:14 274:23
276:6,8 277:14
278:17,18
279:13,15
280:1,7,25
281:1 287:7,7
291:16,23
292:13,16
293:11 294:11
294:14 295:11
295:12 300:5,8
300:9,15
302:19 303:6,9
310:4,5 314:10
322:21
**goal** 301:11,22
302:1,3

| | | | |
|---|---|---|---|
| **goals** 212:17 | 179:7,9,12 | 139:20 140:4 | 270:5 |
| **god** 312:14 | 196:24 202:21 | 141:24 159:5 | **grades** 163:13 |
| **goes** 57:15 | 203:7 204:2 | 209:11 228:7 | 165:10 169:2,3 |
| 89:19 91:2 | 206:12,18,19 | 250:10 262:20 | 270:15 276:17 |
| 155:24 176:8 | 206:24 207:3 | 280:11 281:18 | **grading** 32:15 |
| 183:9 187:11 | 214:12,14 | 299:6 304:1 | 32:17,20,21,23 |
| 195:12 204:18 | 217:14 221:12 | **google** 42:12,21 | 147:5 |
| 223:6 267:24 | 226:16 230:24 | 42:23 43:2,9 | **graduate** 51:11 |
| 295:25 | 232:19 238:11 | 112:5,9,20 | 302:21 303:23 |
| **going** 5:12 9:10 | 239:6 240:23 | 232:24 282:11 | 303:23,25 |
| 9:12 12:19 | 245:20 246:6 | **gosh** 279:20 | **graduates** |
| 23:14 25:21 | 247:10 251:12 | 314:13 | 57:21 |
| 29:5 31:4 38:1 | 251:22 252:2 | **gotcha** 121:8 | **graduating** |
| 41:3,6 43:20 | 253:3 255:8,10 | 203:9 | 299:20 303:24 |
| 44:1 49:20 | 255:14 267:17 | **gotten** 113:9 | 304:2 |
| 50:20 51:23 | 271:19 278:9 | 132:15 296:11 | **granted** 142:5 |
| 59:12 62:16 | 278:10 279:13 | 305:2,23 | 296:14 310:14 |
| 63:1,16 67:24 | 279:15 280:17 | **governing** | **granular** |
| 70:20 78:19 | 282:21 283:21 | 98:19 196:21 | 238:11 |
| 80:15,16 83:17 | 287:25 288:2 | **government** | **graphic** 141:20 |
| 84:11 85:19 | 288:11 293:17 | 142:6,9 160:10 | **grata** 279:18 |
| 87:6 92:19,20 | 294:11,25 | 160:21 169:21 | **grateful** 106:9 |
| 93:9,10,14 | 295:4 296:14 | 185:2 | 106:9,10,12 |
| 96:16 97:20 | 298:14 299:1,3 | **governments** | **gray** 53:21 |
| 98:4 103:5,8 | 303:19 304:9 | 169:24 184:24 | 264:20 |
| 103:11 105:18 | 313:16 314:25 | **grab** 124:19 | **great** 73:4 |
| 115:13 118:14 | 315:4,5,10 | 138:13 | 123:8 191:23 |
| 122:14 125:20 | 325:10 | **grad** 166:12 | 262:3 270:5,8 |
| 129:21 130:9 | **good** 3:4 72:2 | **grade** 31:19 | 276:8 284:6 |
| 135:19,20 | 83:11 87:25 | 99:5 108:25 | **greater** 31:11 |
| 136:10,12 | 106:3,15 | 269:6 270:9,18 | 86:15 88:22 |
| 138:16,18,18 | 108:25 110:7 | 272:9 278:1 | 143:9,10 163:7 |
| 139:3,16 159:7 | 113:21 119:23 | **graded** 148:17 | 175:22,24 |
| 165:17 178:7 | 127:14,23 | 149:5 269:4 | 289:6,7,14 |

306:16
**greatest** 31:5
**greatly** 129:23
**grew** 163:17
305:1
**ground** 15:2
**grounds** 227:17
**group** 28:10,23
28:24 33:16
42:5 47:18,22
48:7 49:24
51:2,6 54:21
75:24 81:6
98:24 155:17
155:18 173:13
176:2 197:24
198:13 224:4
264:4 275:22
288:14,15,25
289:2,10,11,11
289:16,17
291:20 295:7
296:23 301:10
317:16
**groupme** 28:17
47:14,17 48:25
49:4 54:18
108:6 224:3
266:17 283:6,8
296:1 310:13
310:15
**groups** 155:11
155:14 206:15
295:9

**grown** 15:23
**gruesome**
142:13
**guess** 19:10
23:2 43:19
49:11 51:16
82:5 171:21
191:3 231:20
240:20 247:25
254:4 258:11
262:7 263:11
287:17 290:24
302:6 303:7
310:20 320:12
322:10,11
**guessing** 40:10
46:23
**guild** 47:17,21
48:2,25 275:22
**guilty** 226:5
**gun** 21:2 102:2
**guy** 51:12,13
191:10 294:24
312:1,3
**guy's** 295:6
**guys** 43:19
67:21 124:19
139:6 252:14
285:20 298:16
300:25 310:3
314:19 315:22
**gym** 272:14
310:4

**h**

**hackles** 102:11
**half** 49:25 52:3
60:16 77:20
89:11 138:9,11
138:18 166:2
236:23 241:11
241:13 242:2,2
242:5 285:24
**hall** 5:7 16:12
23:8,16 24:8
24:10 73:9
74:13,14,20,22
75:1,4,5 89:3,3
89:10,15 90:1
90:17 91:5,11
96:21 116:21
117:11,24
215:4 306:1
309:11
**halls** 74:19
76:18 96:22
165:5 312:11
**hallway** 307:18
**halt** 15:2
**hamas** 100:18
177:12
**hampson** 2:7
4:5 6:15,16,16
139:22,25
140:4,5 144:22
145:1,8,19,21
145:25 146:4

146:10,13
147:12,16
148:12,19
149:1,8,17,21
150:1,12,19,22
150:24 151:1,8
151:12,16,22
152:9,21 153:7
153:13 154:4,8
154:11,15,20
155:1 156:8,14
156:17 157:8
157:19,25
158:8,11,14,16
158:19 159:3
276:9 278:19
285:7 290:17
316:21
**hampson's**
149:13
**hand** 21:7
167:7 312:12
**handful** 49:24
**handle** 67:17
**hands** 107:23
127:10 151:5
**hang** 9:21
80:17 124:21
124:22 126:3
304:23
**happen** 21:20
122:5 213:19
214:14 232:20
244:13,14

246:2,7 302:23
**happened**
13:16 18:14
21:11 27:16
28:16 33:4,8
34:8,16 58:17
58:23 59:12
60:24 65:2
77:1 83:2
125:7 144:7
145:2 192:25
213:19,24
238:5 244:14
253:17 279:20
282:18 298:17
305:22
**happening** 29:7
30:15 78:17,19
79:13 252:13
**happens** 50:1
53:13 78:14
106:21 288:21
**happy** 44:12
144:18 234:17
235:4 276:22
287:22 315:5
**harass** 54:12
**harassed**
158:23 161:23
170:17 186:5
**harassing**
157:22 179:24
180:1 182:6,18
185:19 271:13

271:15 273:9
313:22
**harassment**
3:22 4:9 8:25
10:6,24 11:4
11:11,13 12:17
26:16 33:2
54:13 69:21
72:14 96:19
98:9 131:4,4
133:17 140:3
147:24 158:12
159:14 176:25
179:11 181:22
182:1 188:3
209:23,25
219:18 223:13
223:15 239:7
252:19 253:11
255:15 256:13
257:5,11,18,19
259:18 269:21
298:21 311:19
312:19 318:24
**hard** 13:17
77:18 79:11,18
89:18,19
105:18 284:23
**harder** 62:18
**hardy** 61:19,21
61:22 94:14
280:1,2,9
283:17 284:8

**hardy's** 307:20
**harm** 9:2 11:1
76:16 135:6
169:23 197:5
257:7 298:21
**harmed** 275:9
**harvard** 127:14
127:15,24
142:23 281:25
287:9 288:19
294:5 316:8
**hashtag** 124:15
**hat** 296:19
**hate** 26:21
99:12 107:5
134:24 164:6
259:1 261:7
275:12 297:4
311:17
**hated** 230:1
**hatred** 106:20
229:12,24
238:4 266:5
275:7,11
**head** 76:23
91:9 92:22
102:24 242:19
310:1 312:13
**headed** 14:20
64:24
**headphones**
119:17
**heads** 173:19

**health** 61:11
78:11 118:11
165:14 230:21
231:8 284:21
**hear** 16:18
17:15 20:4
24:11 109:13
119:20 139:9
139:10 177:19
204:23 237:17
256:2 267:13
271:3 279:1
309:6 313:9
**heard** 24:19
75:5 91:19
98:22,25 99:3
145:11 149:8
149:10 154:5
164:16 182:13
182:15 185:21
254:9 259:23
268:10 269:15
269:19 277:9
282:19 284:9
285:20,23
286:1 297:6
307:7 309:7,11
311:5,15
312:21,22
**hearing** 1:1 3:5
3:8,9,12,14,16
3:18 4:16,19
5:11,15 9:8
27:15,22 37:11

[hearing - hope]

77:3 152:2,20
159:20,22
161:12 170:2
176:16,21
178:20 187:7
187:10 205:19
222:17 237:18
251:9,19
253:17,21
255:10,14
325:8
**hearing's**
325:10
**heart** 306:17
324:2
**heat** 18:2
**heather** 5:6
**heavily** 53:2
298:2
**heckler's**
314:24
**heightened**
144:1 165:25
168:18
**heinous** 177:13
**held** 74:13
168:22
**hell** 127:5
**hello** 26:4 61:7
107:17 145:20
172:18 192:9
215:2
**help** 13:19
45:21 46:11

54:17 78:6,9
78:10 99:25
103:24,24
120:23,23
152:19 174:21
179:8 200:15
200:16 221:11
253:2 319:7
323:20
**helpful** 44:22
253:4 255:24
256:1
**helping** 72:21
86:12
**helps** 176:19
**hereto** 326:14
327:11
**hero** 225:10
**hesitant** 206:14
**hesitation**
124:18
**hey** 60:22 61:3
61:7 97:24
134:2 139:8
252:1 299:15
320:7 321:21
**hi** 80:3 98:10
276:20 305:14
**hidden** 260:8
290:22 293:13
**hide** 17:8 102:8
260:7
**high** 163:23,24
303:25 304:2

304:20 305:3
**highlight** 12:24
253:18
**highlighting**
241:17
**highly** 229:17
**hillel** 166:14
**hindsight** 69:15
**hispanic**
211:13 224:23
**historian**
127:15,24
**historical**
291:12
**historically**
291:8,9,10
292:24
**history** 34:2,11
34:20 113:11
163:23 164:1
173:15 190:15
228:3
**hit** 22:16 228:4
**hitler** 243:20
**hmpson** 159:1
**hold** 12:8 21:24
45:3 65:10
133:7 137:15
160:8,15
178:13,13
182:19,20
206:20 221:24
239:19,19
250:11

**holding** 34:15
250:23
**holds** 176:13
**holocaust**
99:15 113:3,11
**home** 21:2
103:16,23
142:19 165:17
310:5
**homes** 165:13
**homework**
189:24 190:1
**homicide** 226:3
226:7
**honest** 85:19
90:14 317:6
321:23
**honestly**
214:20 229:3
238:9 241:10
259:11 315:9
315:14 316:13
**honor** 268:9,24
**honorable**
205:19
**honored**
160:15 303:10
**honors** 303:24
303:25 304:2
**hope** 13:18
62:2,16 258:21
273:18 276:20
280:10,13,17
284:18,24

301:1 319:12
323:23 324:8
**hopefully** 126:4
126:6 322:13
**hoping** 61:9
**horrendous**
224:2
**horrible** 290:6
**hostages**
106:23
**hosted** 177:21
**hostile** 198:14
275:4 277:8
299:3
**hostility** 127:19
275:4
**hour** 18:24
138:9,11,18
141:7 215:14
236:23 241:11
241:13 242:2,2
242:5 278:5
285:24
**hours** 19:20
20:2 61:14
92:4 164:24
168:8 230:9
285:12 287:1
294:23 311:25
**huh** 19:12 23:1
26:11 29:24
35:23 36:14
47:19 49:2,6
55:8,11 59:6

61:2,5,16 62:4
62:6,9,24 63:2
65:18 80:22
92:14 95:1
122:3 139:17
188:23 196:7
196:23 202:17
206:6 252:22
264:2 265:23
277:1 289:22
300:16
**human** 216:16
216:21
**humane** 229:2
**humanity**
79:12,14,16
155:16 161:7
162:8 210:11
225:15,15
**humiliating**
212:12
**humility** 142:1
**humorous**
261:24
**hundred** 18:24
**hundreds** 40:7
292:11
**hurt** 75:9 78:5
79:9 304:17
306:5
**hurts** 308:16
**husband**
102:17,18

**hussein** 59:14
**hyperbolic**
278:24
**hypervigilant**
77:12
**hypothetical**
125:19 127:5
**hypothetically**
200:8

**i**

**i.e.** 211:13
**idea** 27:19 40:3
84:9 119:14
136:9 156:15
174:5 175:7
188:12 194:4
197:3 221:1
229:14 245:8
274:3
**ideal** 232:19
288:13 315:20
**ideas** 28:22
29:6,8 118:2
200:3 201:2
220:24 221:7
221:24 291:9
293:10 322:17
**identified**
266:16
**identifies**
221:21 317:17
**identify** 154:1
167:21 186:2

186:11
**identifying**
264:21
**identity** 122:23
127:16,25
136:24 288:9
288:13,15
317:16 318:4
**ideologically**
198:14
**ideologies**
259:9
**ideology**
210:18 323:13
**ignatieff** 282:6
**ignatiev** 13:23
40:24 41:14
42:21 56:22
58:3 111:25
112:6,21
113:15 114:3
116:1,12,13
127:5 128:7
132:3 142:24
143:6,7 150:3
154:5 155:23
156:19,19,23
157:6,9 175:19
175:21 231:20
232:24 233:2
282:4,8,11,14
287:9 288:7,8
288:16,17
289:3,5 290:12

291:7 293:21
317:8,18,20,23
318:15

**ignatiev's**
56:15 127:15
127:24 290:21

**ignorant** 211:7

**ignore** 57:11,14
229:16

**illegitimate**
181:9

**image** 39:11
264:8,9 265:2

**imagine** 180:14
206:13

**immediate**
243:6 244:20

**immediately**
21:12 112:21
125:10 167:21
241:25 242:5
272:7 278:15
279:23 280:8
297:10

**immense**
163:10

**immigrant**
113:6

**immigrants**
33:17 100:12
112:25 141:13

**immigration**
33:19

**imminent**
197:7,23 287:5
294:1,1 298:21

**immoral**
199:21,25
225:11

**immorality**
322:25

**impact** 20:17
74:4 75:12
105:16 135:17
158:11 171:19
172:13 176:22
189:1 191:5,6
191:16 303:17
304:3 314:11
316:1

**impacted** 79:2
79:5 90:9
110:20 171:22
302:8,11 303:1
303:4

**implications**
124:8 290:11

**implicit** 270:24

**implicitly**
290:1

**implied** 116:7
127:19

**importance**
78:24 113:22
255:1 261:15

**important** 16:9
63:4 91:10

104:24 114:2
164:10 166:24
264:22

**impression**
65:22 198:9
207:15 305:10
308:18

**improve**
205:10

**impute** 184:21

**inaudible** 28:12
35:13 48:12
55:3 67:4
94:21 112:10
118:10,11
119:22 134:9
137:15 153:12
156:16 176:17
177:14 178:14
179:19 181:10
192:18 195:17
196:22 208:23
219:25 222:19
223:20 227:20
229:21 230:8
231:14 237:6
239:5 245:21
248:8 251:11
262:14 264:12
265:15 267:8
269:20 270:8
273:3,18,20
274:2 279:11
281:2 283:19

284:19 285:18
289:21 294:13
302:20 307:13
314:5 320:6,19
324:23

**inaugural**
160:8

**incident** 58:20
73:7 78:5
127:10

**incidents** 23:9
50:9 54:16

**incite** 168:23
197:6,22,23
198:12,16,19

**incitement**
98:19 163:5

**incites** 8:13
10:11 256:17

**include** 4:3
10:22 11:5
72:20 98:17
191:12 257:4
257:11

**included** 7:18
137:3 162:9
166:22 325:4

**includes** 142:6

**including** 7:13
8:21 9:4 10:19
11:3 19:15
55:12 120:13
147:24 148:5
160:22 162:19

163:5,18
165:25 166:20
167:5 174:4,21
197:4 251:17
257:1,9
**incorrect**
215:25
**incorrectly**
47:16
**increase** 14:14
**increased** 19:6
21:5 22:4
168:5,10
**increasingly**
77:12,18
**incredible** 93:5
**incredibly**
106:8 144:6
177:3
**indicate** 273:2
**indicated** 24:18
45:19
**indicates**
148:10 203:3
**indicating**
167:14
**indication**
110:7 305:23
**indicative**
188:16
**indirectly**
212:4 216:6
**indiscriminat...**
124:10

**individual**
28:23,24 52:15
52:17 110:18
173:14 259:9
**individuals**
173:17,19
258:25 291:24
305:15 308:21
**indulge** 324:5,9
**inferior** 141:22
**inflammatory**
266:18
**influenced**
135:3
**info** 252:14
**inform** 159:24
**information**
3:9,12,21,25
4:8 12:15 39:9
54:2 58:19
60:5 62:8
72:12 82:19
98:7 140:1
152:19,21
159:12 183:5
187:5,9,12
188:1 189:15
190:22 197:2
209:21 223:11
242:7,13 250:7
251:15 252:17
253:9,12,22
261:5 325:3,5

**informed**
270:16
**ing** 73:15,20,21
**inherent** 210:7
**inherently**
224:24 225:11
249:19,20
289:8 293:13
293:14
**inheritance**
141:10
**initial** 27:11
266:21 271:9
**initially** 20:23
**initiate** 70:15
**initiative** 160:9
**injunction**
232:18
**injustice**
174:18
**innate** 185:4
**inner** 211:12
**innocent**
104:23
**inopportune**
64:23
**insane** 243:4
**inside** 167:19
**insight** 305:2
**insist** 282:6
**inspire** 101:8
**inspiring**
104:16

**instagram**
118:24 236:9
264:4 265:7
266:4,8
**instances** 25:10
99:8
**instinct** 102:12
**institute** 160:18
177:25
**instituted**
168:18
**institution**
78:25 82:3
259:7 266:2
267:1 270:11
**institutions**
164:4
**instruct** 311:9
**instructions**
78:17
**insult** 261:9
**insulted** 226:20
277:25
**insurrection**
144:11
**intellectual**
92:25 156:1
**intellectualized**
43:15
**intellectually**
190:5,6,16
**intelligent**
281:21

| | | | |
|---|---|---|---|
| **intend**  124:22 | **interaction** | **internet**  34:24 | **intimidate** |
| 124:24 125:3,9 | 101:22 107:22 | 35:9 258:25 | 239:4 240:16 |
| 174:6 181:24 | 119:4 121:16 | **interning**  61:11 | **intimidated** |
| 271:22 292:8 | 131:15 237:25 | **internship** | 161:23 170:17 |
| 301:9 | 275:18 | 247:3,11,22 | **intimidation** |
| **intended**  30:4 | **interactions** | 287:24 298:5 | 8:25 10:25 |
| 130:1 189:7 | 192:5 | 303:14 | 22:1 257:6 |
| 193:15 238:14 | **interest**  210:3 | **interpret** | **intro**  254:5 |
| 322:22 | **interested** | 114:15,16 | **introduce**  5:11 |
| **intending** | 134:23 136:18 | 116:13,15 | 159:22 220:22 |
| 317:24 | 322:3 326:15 | 117:14,18 | **introducing** |
| **intense**  238:10 | 327:12 | 123:10 127:17 | 3:20 11:23 |
| 323:15 | **interesting** | 182:5 217:1 | **introductory** |
| **intent**  8:22 | 273:17 274:1 | 233:21 279:8 | 12:2 |
| 10:20 16:24 | 281:3,10 | **interpretation** | **inundated** |
| 66:17 100:24 | 286:22 288:16 | 127:14,23 | 172:2 |
| 101:7 111:6 | 294:12 296:20 | 164:12 233:6 | **invader**  224:24 |
| 114:10 123:8 | 320:15 | 316:11 | **invaders** |
| 125:5,17 | **interestingly** | **interpreted** | 211:13 |
| 126:21 130:6,6 | 62:11 | 30:8 74:7 | **investigate** |
| 198:25 257:2 | **interfering** | 117:22 122:23 | 56:22 317:12 |
| 316:14 | 72:24 | 129:20 162:17 | 317:14 |
| **intention** | **interim**  5:24 | 172:20 212:25 | **investigation** |
| 124:20 126:3,4 | 12:21 60:23 | 276:10 316:15 | 161:5 |
| 126:6 | 61:8 73:2 | **interpreting** | **invites**  293:13 |
| **interact**  111:21 | 168:2 273:6,12 | 127:13 | **invoked**  17:17 |
| 274:24 285:3 | 277:11 302:24 | **interrogate** | **involve**  228:23 |
| 320:18 | **international** | 289:19 316:16 | 281:25 |
| **interacted** | 160:3,9,11,13 | **interrupt**  31:25 | **involved**  7:12 |
| 100:3 107:22 | 160:13,25 | 244:22 | 131:13 149:5 |
| 123:3,22 | 161:1,2 166:5 | **interrupted** | 286:22 |
| 124:22 128:25 | 166:6,9,10 | 33:22 | **involvement** |
| 151:5 191:1 | 172:9 173:16 | **interviews**  73:7 | 106:8 132:16 |
| 226:19 307:10 | 176:4 | 73:10 | |

**involves** 160:5
291:20
**involving** 3:9
161:16
**irrelevant**
26:14 180:14
183:23
**ish** 28:17
**isolated** 54:3
**israel** 100:18
166:6 167:12
169:20 172:9
176:9 183:15
183:21 184:14
184:18,25
233:25 290:18
314:4
**israel's** 181:16
182:4 184:22
185:11
**israeli** 11:17
185:1 257:24
**israelis** 185:1
**issue** 17:11
32:23 37:24
38:25 133:12
173:11 186:1
283:17 291:3
301:24
**issued** 247:16
324:24
**issues** 19:21,24
31:16 72:24
136:20 231:8

305:8
**issuing** 52:25
**it'd** 214:18
263:4
**it'll** 203:24
316:3

### j

**j.d.** 225:9
**jackson** 4:7
48:2 252:15
**jail** 229:1
**jamil** 134:4,18
**janice** 2:5 4:4
6:19 24:10
48:19 72:7,8,9
72:9,11,15
321:2,2
**january** 16:13
23:8 69:3
74:12,23 75:21
77:23 79:6
86:11 96:20
97:4,5 275:16
276:14 277:17
321:5
██████████
116:19
**jenna** 48:9
90:13 307:14
308:1
**jennifer** 30:24
222:23 296:25

**jersey** 69:6
**jesus** 127:9
**jew** 161:18
172:14 210:12
231:25
**jewish** 13:6
14:4,11,22
15:6,7 17:23
21:14 41:22,22
41:23 53:3,3
58:7 76:19
99:16 103:2,18
103:18 124:10
127:7 143:25
145:14 157:12
160:14,19
161:18 162:1
163:3,4,14,18
163:21 164:4,4
166:10,12,13
166:16 167:23
168:19 170:4
170:12 171:23
181:6 185:21
186:4,6 212:18
214:1 225:16
259:7,24
292:19,25
293:3,4 297:20
318:4
**jewishness** 14:2
157:13 288:14
**jews** 7:19,19
13:21 14:1,2,2

25:8 40:22
41:20 53:1
57:5,18 75:19
100:12,21
101:12 106:20
106:22 113:6
122:21 124:15
131:23 142:23
143:1,1,10
144:14 149:23
150:17,18,19
157:11 161:20
161:24 162:7
162:10,10,17
162:17,19,19
163:9 164:1,4
164:6 167:13
168:16,23
169:6,13
170:17 171:14
171:16 172:21
173:1 175:23
181:9 184:22
184:24,25
185:1,3,4,6,14
210:11 212:24
231:24 233:17
233:24 287:8
287:11,12
288:14,20
289:7
**job** 1:14 13:15
14:23 17:6
21:9,25 32:22

| | | | |
|---|---|---|---|
| 64:21 77:16 | **judaism** 318:6 | **jurisdiction** | 229:25 230:3,9 |
| 87:19 93:18 | **judge** 31:19,20 | 166:7 | 230:13,17,20 |
| 101:14 105:5 | 35:10 85:13 | **jurist** 142:10 | 230:25 231:3,7 |
| 148:3 247:9 | 99:5,6 106:14 | ██████ 2:10 | 231:15,21,24 |
| 277:12 293:11 | 106:15 108:10 | ██████ 4:6 | 232:4,10,17,25 |
| 296:15,15 | 108:25 109:4,6 | 6:23,23 36:6 | 233:3,10,12,24 |
| **john** 85:14 99:5 | 148:18 149:4,7 | 36:24 37:2,5 | 234:6,9,11,14 |
| 155:23 188:6 | 149:8 174:12 | 37:15,18,25 | 234:17,22,25 |
| **johnson** 70:4 | 269:5 270:6 | 38:3,7,14 | 235:10,13,17 |
| 94:13 220:16 | 276:12,14,22 | 39:10,23 65:12 | 235:24 236:5,7 |
| 231:3 279:22 | 276:23 277:2 | 65:20,25 66:5 | 236:16,20 |
| 284:17 285:1 | 277:16,21 | 66:20 67:2,25 | 237:7,12,15,23 |
| **johnson's** | 278:18,21 | 69:17,25 70:3 | 238:9,19,22,24 |
| 231:2 248:1 | 295:15 322:9 | 116:17 209:21 | 239:1,5,16 |
| **johnston** 61:4,7 | **judged** 32:5 | 209:24 213:15 | 240:15,22 |
| 61:13 231:3,5 | 111:12 | 215:2,7,10,13 | 241:6,9,14,19 |
| **join** 139:24 | **judges** 141:20 | 216:3,7,19 | 241:22 242:1,6 |
| **joined** 72:16 | 142:17,20 | 217:7,11,16,18 | 242:10,19,24 |
| **joke** 155:17 | 144:13 148:21 | 218:3,5,9,14,17 | 243:22 245:5,8 |
| 271:2 | **judging** 52:9 | 218:21,23 | 245:11,16,23 |
| **joking** 265:1 | **judicial** 141:25 | 219:1,4,6,9,15 | 246:9,15,20,22 |
| **jonathan** | 142:1 | 219:20,22,25 | 246:24 247:4,7 |
| 174:11 | **judiciary** 142:6 | 220:2,5,7,12,13 | 247:21 248:3 |
| **jordan** 225:24 | 142:16 148:17 | 220:18,21,25 | 248:10,14,19 |
| 226:11 | 276:11 278:20 | 221:3,6,10,17 | 249:5,18 |
| **joukowski's** | 278:23 | 222:2,13,16,20 | 250:13,25 |
| 48:6 | **july** 1:3 3:5 | 223:14,18,21 | 251:6 254:18 |
| **journal** 56:15 | **jumped** 76:6 | 223:25 224:14 | 260:15,20 |
| 155:25 156:20 | **jumpy** 76:8 | 224:20 225:21 | 261:16,25 |
| 160:12 166:9 | **juncture** | 225:22 226:2,6 | 262:17 269:15 |
| 290:21 291:1 | 121:19 | 226:13,15,22 | 269:18 270:1 |
| **joy** 265:25 | **june** 28:3 65:25 | 227:1,4,16,21 | 273:17,25 |
| 275:10 | 72:16 | 227:25 228:5 | 274:2,10,12 |
| | | 228:10,14,21 | 279:10 282:16 |

282:17,19,23
285:22,23,25
286:13,23
287:4 298:3,6
298:9 299:5,9
311:25 312:21
312:25 317:21
**█████**
69:1 269:19
295:17
**jury** 226:7
**justice** 105:4
160:4,25
210:20 222:3
**justification**
22:19
**justified** 124:10
**justify** 135:7
273:12
**justitia's**
142:13

**k**

**k** 11:4 257:10
**katie** 2:13 5:16
5:17
**kaufman** 2:8
4:6 6:7,8,9
143:14 149:20
159:6,9,11,15
159:17,19,25
170:21 171:2,7
171:11,22
172:17,18,23

173:5,8,22
174:9,14,23
175:3,7,9,11,16
176:20,22
177:3,9,15,17
177:20,21
178:2,3,10,11
178:16,21,25
179:3,13,22,25
180:4,11,17,25
181:3,11,14
182:3,10,15,19
183:13,17,23
184:1,3,9,12,16
185:21,25
186:9,19,20
259:23 271:5
297:8,19,23
313:10 316:20
316:22 317:1
**keep** 69:20
218:11 263:18
267:10 277:12
320:25
**keeping** 21:2
255:13 312:13
**kennedy** 295:9
**kept** 229:24
230:2
**kersgaard**
50:20 51:10
**kicked** 213:17
227:13 231:17
270:3 297:24

**kicking** 73:14
**kid** 59:12 127:6
**kill** 101:4
122:24 124:25
125:9,20 127:7
293:19
**killed** 104:23
211:4,7 225:24
**killing** 43:13
141:6 169:14
173:12
**kind** 17:7 28:22
32:11,20 33:21
46:17 47:6
49:4 63:3 83:4
83:21 88:17
106:13 110:2
112:13 113:20
116:23 120:9
122:15 135:13
136:15 148:23
149:3 186:23
189:14 190:3
191:24 192:1,4
194:1,3 196:20
210:14 214:1
217:25 224:16
228:19 234:3
237:5,14
240:20 241:21
242:22 243:19
244:19 248:13
252:13 254:5
254:17 260:12

261:25 262:8
262:17 263:5
263:10,23
264:20 265:2
265:12,15
271:14 272:24
274:7 278:25
279:4,10
280:25 281:12
282:15 283:19
284:4,7 286:5
286:6,19
294:10,13,16
297:8 301:2,19
303:15 304:17
305:1 306:9
309:21 313:11
316:17 317:2,7
317:11 318:6
318:19 322:4
323:10,13,14
323:16,24
**kinds** 190:16
**kirsten** 284:8
**knew** 16:7
25:11 52:24
75:8 77:23
79:7 83:8 92:5
101:13 215:5,8
216:20 219:20
224:3 225:2
233:1,3 235:10
247:21,24,25
273:21 274:12

**[knew - know]**                                                          Page 51

| | | | |
|---|---|---|---|
| 276:3 282:4,6 | 43:14 44:15,19 | 115:21,23,23 | 212:1,10,13,13 |
| 282:16,17,22 | 44:22 45:17 | 115:24 116:4 | 212:20 214:2,3 |
| 282:24 284:12 | 46:10 47:4,25 | 116:22 117:6 | 214:4,7,10,12 |
| 288:7,8 294:16 | 48:13,22 49:24 | 117:25 118:2,9 | 214:18 215:15 |
| 294:17 300:18 | 50:1,6,7,7,10 | 119:8 123:9,16 | 215:18,19 |
| 308:20 317:8 | 50:11 51:3,5,6 | 123:18 125:5 | 216:11 218:17 |
| 317:20,22 | 51:7,7,15,18 | 126:7,11,21,21 | 222:20,22,24 |
| 318:11,11,14 | 52:1,2,2,15 | 128:11 129:23 | 223:2 224:1,2 |
| 318:15 | 53:24 54:3,6 | 129:25 130:5 | 224:22 225:1,4 |
| **know**   18:25 | 54:20 55:6 | 132:22 134:14 | 225:4 227:6 |
| 19:4,5,6,18,19 | 56:21 57:13,16 | 134:15,15 | 229:2,4,8,10,11 |
| 19:22,25 20:1 | 58:15 59:10 | 136:7,9,11 | 229:17,18 |
| 20:7,8,10,12,20 | 62:5,12 63:4 | 138:17,23,24 | 230:14,20 |
| 20:22,22,25 | 63:14,20,21,25 | 138:25 140:14 | 231:7 232:10 |
| 21:1,3,4,6,7,10 | 64:15,15,15,24 | 143:20 144:2 | 232:18,19,21 |
| 21:11,14,15,18 | 65:3 66:10,14 | 146:16,19 | 233:4,13 234:1 |
| 21:24,25 22:8 | 66:18 67:8,12 | 148:14,22 | 235:6 236:14 |
| 22:9,11,12 | 67:17 68:9,10 | 151:14 153:19 | 236:20 238:7,9 |
| 23:13,25 24:2 | 68:19 69:7 | 154:9,14 | 238:13,17,24 |
| 24:6,14,21 | 70:2,10 73:11 | 156:17 157:8 | 239:1 240:7,7 |
| 25:3,3,7,7,10 | 78:7,15,18,20 | 157:13,14 | 241:3,21 |
| 25:11 28:6,18 | 81:12 82:6,9,9 | 158:1,3 173:22 | 242:25 243:2 |
| 28:19,23 29:1 | 83:6 88:6 | 173:24 174:1,2 | 243:15,19 |
| 29:3,4,6,9 30:3 | 89:18 90:15,19 | 174:3 175:9 | 244:1,2,8,13,13 |
| 30:5,18 31:3,7 | 90:20 92:4,21 | 178:10,15 | 245:24,25,25 |
| 31:13,13,23,24 | 93:14,25 95:25 | 185:6,8,17 | 246:2,5,7,17,21 |
| 33:3,5,11,17 | 96:7,10 97:9 | 188:11 190:6 | 247:10,22 |
| 34:5,12,22,23 | 100:2,7 103:3 | 191:25 192:16 | 248:21,22,23 |
| 35:5 37:1,6,20 | 103:9,17,17 | 194:20 198:3 | 248:23 249:6,9 |
| 38:10,23,24 | 106:18,21 | 199:23 203:16 | 249:10,25 |
| 39:4,5,13 41:7 | 107:2,5,9 | 205:1 206:9,24 | 250:1,1,16,23 |
| 41:14,15,15,16 | 109:19 110:7 | 208:24,25 | 252:13,24 |
| 41:17,19 42:5 | 111:1,11,11,17 | 209:2 210:17 | 253:21 254:1,9 |
| 42:16 43:9,12 | 113:9 115:14 | 210:24 211:23 | 255:17 260:1 |

260:17 261:2
262:1 265:1,1
265:12 268:13
272:6 273:8
274:9,19 277:6
278:13 280:17
281:6 282:5,5
283:18,20
286:4,5,13,17
286:24 287:16
293:11 294:17
294:18 296:4
297:12 298:16
299:5 300:7,12
300:21 301:1,9
302:10 303:6
303:16 304:15
304:24,25
306:10 307:25
308:17 309:2,5
309:15,16,20
309:24 310:9
310:19 311:3,7
311:21,22
312:6,6,15,16
313:12,16,17
313:19 314:14
315:5,7,8,9,19
315:21,21,24
316:1,8,9
317:2,4,6,10,12
317:14,17
318:10,12
319:1,13,18,24

320:3,3,7,9,9
320:14,16,25
321:2,10,15,16
321:20 322:20
322:23 323:9
323:15,23
324:13,16
**knowing** 18:12
62:19 64:9
113:11 211:11
211:12 212:9
246:3,4 319:17
**knowledge**
35:2 49:17
53:6 82:7
85:17 130:25
149:14 150:6
158:5 173:21
176:23 207:2,6
246:16 247:20
299:19 326:9
327:6
**known** 10:4,5,8
13:21 15:19,20
35:1,14 64:7
161:15 210:24
211:21 212:22
224:10 248:6
256:14 273:22
274:9 282:14
308:7 312:11
**knows** 15:16
16:25 38:3,13
60:5 69:20

245:9 261:24
264:6 274:4
279:20 296:3
296:17 308:1
312:14
**kosner** 118:20
118:21,22
127:22 128:3,5
128:15 133:25
294:18,20

**l**

**l** 154:13,13,13
**lack** 77:8 105:6
225:15 243:19
261:6 269:25
319:18
**ladies** 59:14
**land** 141:9
142:7
**landmark**
141:24,25
**language** 64:4
66:8 100:24
113:1,5,13
121:10 140:16
157:11 216:23
229:11
**large** 14:11
19:14 21:14
39:8 75:24
210:22
**largely** 210:22

**larger** 289:10
289:11,17
**lasted** 278:5
**lastly** 144:13
**lasts** 296:3,17
**late** 15:17
102:25 141:7
145:2,13 165:4
**lateral** 224:15
**latitude** 255:9
**laude** 303:25
**laugh** 210:23
**laughing** 91:3
**lauren** 59:16
**law** 3:15 5:24
6:13,14 7:22
7:24 8:6 12:1
12:22 13:9,18
13:22 14:8
15:1,7 19:2
20:7,19 24:14
26:8 29:12
30:25 31:4,21
32:17 34:6
50:4,8 56:21
57:20 64:1
72:22 74:11
76:19 77:21
79:23 85:12,14
86:15 87:16,18
88:22 95:7,12
97:1 98:11,14
98:16,17,18,19
101:25 102:5

| | | | |
|---|---|---|---|
| 102:24 103:1,6 | 182:13 190:6 | **leah** 61:4 | 254:1 292:2 |
| 103:19 104:18 | 194:24 195:5 | 220:16 231:5 | 307:21 308:9 |
| 104:23,25 | 196:2,3 198:14 | **lean** 222:3 | **leaving** 138:3 |
| 108:23 110:24 | 208:9 219:10 | **learn** 33:11 | **lebanon** 305:3 |
| 110:25 111:13 | 219:14 220:14 | 45:5 54:15 | **lecture** 62:12 |
| 115:22 118:1,2 | 220:24 227:14 | 72:25 74:3 | 166:4,15 |
| 118:8 124:12 | 236:14 243:4 | 89:4 90:16 | 167:14 168:2 |
| 127:9 129:11 | 248:9 249:8 | 93:18 109:11 | **lectured** 172:8 |
| 135:16 136:16 | 254:14,18,20 | 137:14 227:19 | **lectures** 61:9 |
| 136:21 137:7 | 260:21 261:19 | 258:20 | 167:10 |
| 140:6,8,16,17 | 266:15 268:4 | **learned** 14:4 | **led** 104:6 |
| 140:20 141:15 | 271:2 272:11 | 24:7 35:21 | 310:11 311:21 |
| 142:19,21 | 283:14 284:21 | 73:25 75:18 | 312:6 316:7,10 |
| 143:11 144:15 | 288:22 293:16 | 90:21 108:5 | 316:16 317:10 |
| 144:18 148:2 | 296:15,16 | 110:23,25 | 318:10 |
| 148:23 150:9 | 302:16 303:15 | 116:5,9 124:19 | **ledge** 287:14,14 |
| 150:15,17,20 | 306:16 | 143:17 222:19 | 287:20,21 |
| 153:2,21 | **law's** 166:11 | 254:12,17 | **left** 49:12 50:20 |
| 154:19 159:25 | **laws** 28:17 | 258:21 260:7 | 90:25 95:12,14 |
| 160:1,2,3,3,4 | **lawyer** 63:22 | 268:3 298:4 | 95:16 96:5 |
| 160:7,9,9,10,13 | 64:18 120:16 | 319:15,19 | 165:11 264:8,9 |
| 160:13,14 | 247:10 261:2 | **learning** 8:15 | 279:1 283:20 |
| 161:18,24 | 296:7 | 10:12 33:11 | 296:23 318:22 |
| 162:3,4,13,15 | **lawyers** 105:2 | 54:9 73:3 74:1 | **leftist** 281:11 |
| 162:16,19,22 | 136:19 275:22 | 86:14 88:21 | **legal** 8:1 11:7 |
| 163:3,6,9 | **layer** 225:17 | 208:5 256:18 | 31:16 63:20,22 |
| 164:21 165:2 | **lead** 167:2 | 306:15 322:15 | 87:19 96:8 |
| 165:24 166:4,6 | **leader** 20:18 | **leave** 68:2 | 121:9 133:13 |
| 166:9,10,10,12 | **leader's** 21:25 | 71:13 97:14 | 152:11 153:25 |
| 166:17 168:6 | **leadership** 42:1 | 123:8 137:20 | 154:24 173:9 |
| 168:11,24 | 68:20 | 137:24 138:1 | 173:11 195:15 |
| 169:3 170:8,18 | **leading** 72:20 | 159:2,4 186:19 | 229:18 243:2 |
| 171:24 172:7 | 169:5 | 209:10 241:25 | 257:13 269:2 |
| 176:23 177:23 | | 242:5 251:4 | 270:17 275:22 |

[legal - likes]                                                    Page 54

| | | | |
|---|---|---|---|
| 308:11,11 | **liberation** | 120:2,7,12,22 | 317:1 |
| 309:3 | 181:7 | 121:11,15,19 | **lidsky's**  55:13 |
| **legally**  133:13 | **liberty**  134:22 | 121:24 122:8 | 76:3 128:18 |
| **legitimacy** | **library**  56:19 | 123:5,16,20,24 | 157:16 |
| 31:21 109:1 | 290:22 293:9 | 124:2,16,21,24 | **lie**  197:4 |
| 193:22 | **license**  104:25 | 125:4,13,23 | 303:19,20 |
| **legitimate** | **licensed**  78:10 | 126:1,6,17,20 | 308:6,7 |
| 298:20 | 259:13 | 127:1 128:4,11 | **lied**  69:17 |
| **legitimately** | **lidsky**  2:6 4:4 | 128:23 129:1 | 315:13 |
| 312:2 317:13 | 6:10,11,11 | 129:10,17,20 | **life**  5:6 73:1 |
| **length**  191:2 | 17:14 25:1 | 130:3,15,18,21 | 75:25 99:17 |
| **lesser**  115:15 | 56:2,8,11 58:1 | 130:24 131:6,9 | 107:3 115:17 |
| **lethally**  211:15 | 59:17,18,23 | 131:12,19,24 | 118:10 164:1 |
| **letter**  5:5 | 75:23 76:5 | 132:4,9,17,20 | 170:25 171:20 |
| 273:10,11,20 | 78:1 98:3,6,10 | 132:22 133:2 | 171:21,22 |
| 279:23 281:3,5 | 99:22,24 100:2 | 133:10,23 | 172:13 173:25 |
| 296:24 324:22 | 100:6 105:11 | 134:1,6,10,14 | 212:4 225:4 |
| 325:4 | 105:12,17 | 135:1,4 136:2 | 237:2 244:10 |
| **letters**  287:23 | 107:16,17,20 | 136:4,15 | 244:20 249:23 |
| **letting**  62:12 | 107:25 108:4,7 | 137:15,18,19 | 291:23 303:4 |
| 213:22 280:8 | 108:11,16 | 137:25 138:4,6 | 306:18 307:5 |
| 280:17 | 109:2,5,9,12,15 | 143:3,14 | 307:10 310:8 |
| **level**  21:19 22:3 | 109:23 110:4,9 | 149:19 150:4 | 313:5 |
| 52:17 63:9 | 110:14,21 | 157:1 162:23 | **light**  8:4 264:1 |
| 224:19,21,21 | 111:23 112:3,8 | 163:1 214:3 | **lightly**  302:22 |
| 224:22 225:17 | 112:12,24 | 215:4,12 | **liked**  87:24 |
| 283:10 | 113:17,24 | 217:24 219:25 | 111:12 236:9 |
| **levin**  5:24 6:13 | 114:6,17,20,24 | 260:10 272:23 | **likelihood**  53:7 |
| 12:22 160:1,2 | 115:6,11,14,21 | 276:2 277:10 | 272:20 |
| 160:7 170:8 | 116:2,7,11,18 | 285:9 287:13 | **likely**  211:18 |
| 177:23 275:25 | 116:20 117:2 | 288:4 289:20 | 213:4 231:7,10 |
| **liabilities** | 117:10,16,21 | 290:15,15 | **likes**  51:14 |
| 283:12 | 118:6,11,19,22 | 298:24 311:16 | 126:13 |
| | 119:1,5,8,14 | 316:12,14 | |

| | | | |
|---|---|---|---|
| likewise 275:25 | links 61:15 | load 44:20 | longstanding |
| limit 173:9 | 279:24 | loading 45:1 | 292:25 |
| limited 8:21 | linsky 272:3 | loathing 212:24 | look 39:11,21 |
| 10:19 30:4 | list 85:3 95:23 | lobbied 166:22 | 41:17 42:15 |
| 32:19 197:5 | listen 282:1 | lobby 61:11 | 44:8 51:7 57:4 |
| 257:2 283:13 | 298:10 312:24 | local 278:10 | 70:5 81:19 |
| limits 88:9 | 313:2 | located 5:7 | 84:8,10,17,18 |
| 92:12 148:1 | listening | lock 14:13 | 103:5 109:4,5 |
| 197:3 | 161:13 218:5 | locked 73:10,12 | 109:7 113:15 |
| line 13:5 22:16 | literal 157:4,5 | 73:13 144:5 | 114:2 142:11 |
| 25:12,14 29:4 | literally 324:13 | 168:8 214:1 | 155:20 175:2 |
| 31:6 34:15 | little 44:20 | 244:15 | 208:1 242:14 |
| 42:8,9 54:15 | 49:23 58:20 | log 62:3 120:1 | 260:7 261:4 |
| 54:24 69:14 | 59:11 61:22 | logic 56:6 | 262:10,15,16 |
| 78:16 92:24,25 | 62:18 93:10 | logically 89:7 | 263:7 265:4,10 |
| 115:24 120:4 | 108:20 120:24 | logs 273:16,23 | 267:15,15 |
| 120:14 153:25 | 132:17 157:10 | 275:2,21 283:6 | 274:7 278:17 |
| 155:7 179:16 | 194:14 202:19 | 294:11 299:14 | 280:10 283:11 |
| 193:18 200:16 | 212:19 213:11 | 307:14,15 | 285:20 287:16 |
| 203:3,16,18,20 | 213:24 214:7 | 314:16,18 | 293:5,24 295:1 |
| 204:8 210:14 | 225:13 230:6 | long 13:1 26:12 | 300:6 304:25 |
| 215:19 260:6 | 237:16 238:12 | 45:4 67:3,6 | 306:12 311:16 |
| 269:8 300:19 | 244:2,23 | 68:12 71:2 | 313:6,9 314:15 |
| 323:21 | 252:12 263:9 | 105:17 135:18 | 319:25 322:19 |
| lines 18:4 67:8 | 265:15 274:25 | 164:24 227:8,8 | 323:7 |
| 120:13,13 | 279:2,4 311:2 | 252:12 254:11 | looked 14:17 |
| 154:6 194:15 | 315:10 | 254:12 280:4 | 39:19 74:16 |
| 194:16,24 | live 275:10 | 285:21 310:17 | 76:5 123:12 |
| 215:6,9 286:8 | 310:8 | 315:25 | 244:17 |
| link 44:6 | lived 23:23 | longer 22:16 | looking 16:8 |
| 283:22 | lives 162:5 | 61:23 67:23 | 44:9 47:15 |
| linkedin 69:1 | living 307:5 | 70:25 129:2 | 56:1 83:25 |
| 177:10 | lloyd 327:2,14 | 137:16 | 84:9 89:6 |
| | 327:15 | | 90:12 108:20 |

110:19 114:10
144:9 152:20
203:17 216:11
221:16 222:25
223:1 240:4,18
240:25 255:14
265:22 286:19
293:12,14
299:10
**looks** 48:12
264:16 306:3
**lopez** 68:7
**lose** 304:4
**lost** 81:23
101:14 105:4
247:2,13,23
265:20 266:22
287:24 303:14
**lot** 18:2 20:11
38:22 41:8,23
47:4 56:10
79:24 87:24
89:19 90:1
93:4 106:19
109:21 128:14
153:13 164:21
166:1 191:24
214:3 224:2
228:23,24
229:11,12
236:11,15
243:1,16 248:4
267:16 271:3
279:6,11

280:25 287:19
295:10 305:2,4
306:25 311:16
317:24 320:22
321:23 323:9
323:10 324:16
**lots** 20:21
265:10
**loud** 9:20
164:17 237:19
260:18
**loudly** 183:21
**loudness**
219:21
**love** 169:17
301:14,15,20
314:15 323:19
**low** 228:8
**loyal** 169:20
**loyalty** 155:15
155:16
**lunch** 136:11
138:9,13
**lurking** 244:1
**lying** 37:15
298:6
**lyrissa** 2:6 4:4
6:11 56:2
59:18 98:3
162:23 311:15

| **m** |
| --- |

**m** 2:12 272:15

**ma'am** 72:5
204:4
**macdougall**
95:11
**machinery**
148:23
**macklin** 91:16
91:22,24 92:2
92:6 93:5,21
**macklin's**
29:12
**maclin** 210:18
220:14 261:18
261:21
**maclin's** 221:5
261:17 262:1
301:16
**mad** 56:5 66:12
267:18 295:22
295:23 299:23
315:4
**made** 12:23
13:6 15:20
18:9,10 23:13
27:25 29:13
32:13,24 36:15
36:24 42:4
51:5 52:4
53:13 57:5
65:19 73:24
74:10 75:3,10
81:20 88:3
89:13 91:20
92:9,10,23

93:3 100:15
102:9 112:1
144:2 146:2,4
146:6 147:15
148:11 180:19
180:21 181:15
185:2 191:11
201:21 202:9
209:25 210:13
210:15 211:8
211:21 212:14
215:15 219:10
227:14 242:22
242:25 260:16
262:23 265:6,7
268:6 271:20
271:23 272:15
277:20 278:17
301:3 307:9,23
**mag** 42:25
**mailed** 60:16
**main** 68:23
81:6
**maintain** 4:21
314:6
**majority**
265:13,14
292:9
**make** 3:19 4:12
4:24 18:7
24:11 27:5
32:5 45:20
46:6 50:21,21
64:20 66:21

| | | | |
|---|---|---|---|
| 69:19,21 70:12 | 237:1 241:1 | 171:12 172:1 | **masters** 142:7 |
| 77:16 101:15 | 265:3 298:1 | 213:18 229:20 | **material** 8:7 |
| 103:7,11 104:2 | **malik** 60:12,25 | 230:7,11,15,16 | 13:8 28:5 |
| 128:13,19 | **mallard** 59:9 | 231:2 236:17 | 50:15 51:4 |
| 129:3 130:7,8 | **man** 66:8,11,12 | 240:18 271:16 | 208:3 315:2 |
| 130:10 136:18 | 99:20 176:13 | 277:17 278:7 | **materially** 8:12 |
| 175:18 183:11 | 261:19 265:22 | 286:25 287:17 | 8:19 10:9,17 |
| 187:16 196:18 | 265:25 | 287:17 312:24 | 42:3 256:15,24 |
| 201:4 202:21 | **man's** 316:10 | **marjory** | **matter** 9:8 11:7 |
| 204:7 205:7 | **management** | 163:24 | 16:20,23,25 |
| 210:25 212:21 | 236:10 | **marked** 46:18 | 18:6 66:16 |
| 218:13 226:18 | **mandatory** | 61:18,20 | 127:6 166:15 |
| 231:13 240:6 | 260:22,23 | **marshal** 148:22 | 190:7 243:11 |
| 240:10 245:3 | **manifest** | **marshall's** | 250:8 257:13 |
| 246:11 247:6 | 250:22 | 129:14 | 259:13 283:25 |
| 263:19 271:17 | **manipulate** | **marshfield** | 304:21 322:3 |
| 278:22 285:16 | 169:22 | 108:9 109:8 | **matters** 18:9 |
| 293:7 297:19 | **manner** 106:4 | 174:11 | 66:18 106:25 |
| 300:22 314:18 | **mansfield** 86:2 | **marshfield's** | 190:12 313:4,4 |
| 323:4 | **manslaughter** | 29:18 99:3 | **mcalister** 2:4 |
| **maker** 16:25 | 226:2,7 | 188:6 | 4:4 5:22,23,23 |
| **makes** 125:15 | **manually** 39:24 | **martin** 177:22 | 9:17,22 12:12 |
| 135:9,25 | **map** 262:18 | **mary** 4:7 48:2 | 12:14,18,20 |
| 212:10 222:11 | **march** 7:17 | 49:13 | 18:16,17,20,22 |
| 272:2,18 | 13:5,16,20 | **mass** 104:19 | 19:12,17 20:20 |
| 274:18 289:18 | 21:11 33:8 | 163:17,19,23 | 22:24 23:1,5,7 |
| 324:20 | 34:8 35:22 | 164:5 243:18 | 25:16,17,20,22 |
| **makeup** 315:14 | 36:3 37:2 50:1 | 243:18 289:9 | 26:5,11,20 |
| **making** 16:11 | 52:4 53:13 | 289:10 | 27:4,10,13,20 |
| 16:24 33:1 | 65:2 96:5 | **massachusetts** | 27:22,25 28:4 |
| 64:18 87:16 | 116:17,18,19 | 155:25 156:20 | 28:14 29:16,24 |
| 101:5 110:7,9 | 142:22 146:12 | **massive** 170:18 | 30:1 31:2,12 |
| 110:11,12 | 162:6,8,21 | **massively** | 31:23 32:3,6,8 |
| 190:10 210:24 | 166:3 171:7,9 | 162:2 | 32:12 33:25 |

| | | | |
|---|---|---|---|
| 35:5,16,23 | 71:6,11,12,16 | 93:8 105:17 | 262:12,19 |
| 36:1,4,9,14,17 | 73:2 74:13 | 106:22 109:18 | 265:1 266:23 |
| 36:25 37:8,20 | 75:24 91:23 | 112:18 116:2,3 | 268:14 269:9 |
| 38:3,11,16,18 | 146:20 153:8 | 116:6,10,11 | 269:15 271:12 |
| 38:21 39:4,8 | 168:2 212:19 | 117:3 127:25 | 275:14 277:6 |
| 39:15,18,25 | 214:23 219:3 | 130:7 131:17 | 278:13 279:5 |
| 40:4,9,11,12,15 | 236:17 240:25 | 131:24 132:13 | 279:20 281:13 |
| 40:17 41:13 | 241:25 242:8 | 133:20 138:15 | 282:7 287:16 |
| 42:20 43:2,7 | 245:13 251:18 | 150:12 151:2 | 288:12 289:6 |
| 43:21 44:10 | 254:10 255:1 | 152:7 153:7 | 290:2,5 293:5 |
| 45:3,9,12,14 | 267:21 269:7 | 155:1 158:14 | 293:5 296:6 |
| 46:9,20,22 | 271:9 274:11 | 171:19 172:21 | 299:1 301:13 |
| 47:3,8,11,19,24 | 274:18 280:5 | 187:14 188:14 | 302:11,12,13 |
| 48:4,8,10,13,19 | 281:4 282:9 | 190:14 191:1,9 | 302:21 303:7 |
| 49:2,6,7,17,22 | 285:9,21 | 194:18,20 | 303:11,12,16 |
| 50:22,24 51:14 | 286:18 287:23 | 201:16 203:16 | 303:21,22 |
| 51:16,24 52:6 | 297:1 298:8 | 204:14 206:4,9 | 305:21 307:17 |
| 52:11,13,20 | 311:8 | 206:13 207:23 | 308:3,17 |
| 53:11,17,22 | **mcalister's** | 213:16,19 | 309:12,21 |
| 55:5,8,11,14,17 | 47:22 74:21 | 222:20 224:14 | 310:12,15,19 |
| 55:22,24 56:7 | 89:9 146:12 | 228:19,21 | 310:24 311:1,7 |
| 56:19,20 57:3 | 148:13 296:23 | 229:3 232:21 | 311:21 312:20 |
| 57:13,22 58:13 | **mean** 19:18 | 233:13,20 | 313:6 315:1,21 |
| 59:11,21 60:1 | 21:6 23:3 25:3 | 235:25 236:21 | 316:13 317:9 |
| 61:2,5,16 62:4 | 28:12 32:4 | 237:11,15 | 317:23 318:15 |
| 62:6,9,19,24 | 35:14,17 38:21 | 238:1,16 | 319:2,16 |
| 63:2,9,14,21,25 | 39:18 43:5,13 | 239:14 240:24 | 322:19,22 |
| 64:6,9 65:9,14 | 45:9,10 46:9 | 242:23 243:11 | 323:12 |
| 65:17,18,22 | 47:5,8 48:14 | 244:22 246:16 | **meaning** 17:22 |
| 66:10,13 67:6 | 50:24 51:20 | 247:2 248:8 | 57:1 293:12,13 |
| 67:20 68:3,6,8 | 54:12,23,23 | 249:15 250:12 | 306:20 318:2 |
| 68:15,18 69:8 | 63:14,21 64:7 | 252:13 253:1,2 | **means** 7:19 |
| 69:12,16 70:1 | 68:8 79:3 | 253:3 254:2 | 14:1,3 16:24 |
| 70:5,7,10,22 | 81:11,15 86:20 | 255:19 259:22 | 17:25 22:15 |

41:2,21,24
43:4 45:11
51:15,17 53:2
56:17 57:6,19
57:24 60:14
87:17 100:13
100:24 113:2,2
113:12,16
114:4 116:3
128:8 132:24
142:25 143:2
152:14 156:22
162:11 171:14
210:10 212:16
212:25 215:15
215:20 232:4
234:4,7,20
235:2 270:14
274:20 287:10
287:12 288:18
288:20
**meant** 25:2,7
43:4,8 56:22
57:1 70:24
76:24 91:12
113:15 114:3
116:1,4 128:7
131:15 142:24
156:23 157:13
175:15 197:2
216:21 222:6
235:10,19
259:25 287:9
288:8 290:12

317:13,14
318:3
**measure**
155:13
**measures** 21:5
34:18 168:10
168:18
**mechanism**
32:16
**mechanisms**
32:19
**media** 7:17
63:7 81:14
100:10 105:24
106:5,6 130:17
140:11 149:3
161:14,15
163:11 165:24
169:8,22
183:22 184:24
223:24 267:8
274:24 313:24
**medium** 119:11
290:4
**meekly** 142:3
**meet** 93:16
119:3 255:22
267:25
**meeting** 4:20
20:5 35:25
49:4 71:15
74:24 75:21
86:10,20 96:20
97:5,16 116:21

117:11 133:12
133:25 137:22
137:24 138:2,3
159:4 174:1
240:18
**meetings**
151:19 172:3
276:4 285:13
285:17
**melissa** 95:11
95:16 96:5
**melodramatic**
306:4
**member** 5:18
5:21 12:23
14:17,21 18:8
41:22,23 54:5
73:5,22 109:17
132:22 140:17
155:18 266:9
270:12,17
301:6
**member's**
15:11
**members** 5:9
16:11 17:20
18:16 32:23
34:13 42:1
45:18 46:3
51:6 78:3
85:12 105:11
131:22 138:19
143:20 144:21
151:24 152:3

152:16 153:16
153:22 154:5
162:1,16
164:11,13,15
166:17,21
168:11 169:25
170:21 177:25
188:19 213:8
291:22 301:10
301:15 302:2
314:20
**membership**
291:23
**memorized**
180:25
**memory** 129:1
**mendes** 295:24
**mental** 61:10
78:10 165:14
284:21
**mention** 87:3
87:23 99:6
106:10,11
112:1 133:20
231:19,22
232:2 290:9,10
302:9
**mentioned**
18:19 22:22
40:24 97:10
106:13 109:16
113:1,19
131:14 145:1
158:4 172:8

174:16 215:3
215:24 231:24
247:2 248:1
303:2 319:8
**mentioning**
111:25 302:4
**mentions**
212:15
**merchants**
169:14
**mere** 68:1
259:4
**merit** 190:7
**merrick** 153:8
282:9
**merritt** 2:4 4:3
5:23 12:12,20
168:2
**message** 49:3,7
49:8,14,18
51:10 61:13
63:15 65:8
81:7,12,13,21
82:8 84:15,19
104:7 162:9,18
170:24 171:1,2
171:6,10
172:25 278:5
283:16 320:13
**messaged**
281:5
**messages**
111:22 169:7
315:6

**met** 74:23 93:4
93:11 98:21
114:12 117:23
121:16 140:13
161:11 193:3
**mic** 90:24 91:2
**michigan** 294:8
294:9
**microphone**
91:1
**middle** 166:11
**midst** 126:22
**might've** 84:3
134:16
**military** 185:2
210:3
**million** 81:23
265:20 266:22
**millions** 292:11
292:12
**mind** 63:11
66:14 68:1
91:8 129:9
148:1 220:11
238:10,12
243:10 244:14
255:13 263:20
266:10 267:10
292:13 297:22
302:25 318:13
320:13
**minded** 298:24
298:25

**mindedly**
272:12
**mine** 36:13
102:10 106:15
132:9 143:7
211:5 249:9
263:8 271:16
289:4
**minimal** 275:17
303:18
**minorities**
127:20
**minority**
258:18
**minute** 43:22
72:1 119:19
180:7 183:3,11
187:1,1 196:11
281:17
**minutes** 3:25
44:8 60:11,25
67:3,19,22
73:19 97:19
251:13,24
278:6 280:24
285:10,17,23
**misrepresenti...**
262:6
**missed** 118:8
165:4,8 230:20
231:8,11
**missing** 137:12
220:17

**missouri** 98:14
**mistake** 41:10
**misundersan...**
293:2
**mitchell** 46:5
**mixed** 314:1,19
**mixture** 28:7
**mlac** 179:6
**mob** 197:22
198:13,17,19
198:25 199:4
**mocking** 123:1
**moderated**
134:3
**moderator**
134:17 266:20
**molker** 68:5,13
68:24
**moment** 14:10
21:20 22:21
197:22,24
198:16 324:17
**monday** 1:3 3:4
104:7
**money** 19:13
293:17
**monitor** 80:4
236:4 274:14
274:19
**monitored**
36:13 218:7
230:3
**monitoring**
218:3 282:23

**monitors** 286:4
**month** 27:20
  35:14 144:9
  163:12 168:14
  169:10 170:10
**months** 69:3
**mood** 22:2
**morally** 181:7
  225:11
**morning** 3:4
  35:22 37:2
  55:25 60:20
  70:3 76:3
  231:2,6 266:14
**mother** 296:24
**motivated**
  219:13
**mouth** 249:16
  258:24 319:16
**move** 97:25
  139:18 143:23
  250:8
**moved** 58:15
  214:9
**moving** 199:6
  240:5
**multiple** 74:15
  85:12 112:14
  160:6 165:19
  166:16 167:18
  249:7 262:4
  307:23
**murder** 7:23
  17:16 25:4

56:4 112:11
116:6,10,16
122:21 143:4
162:25 164:6
214:15 225:25
244:11 288:5
289:9,10
293:19 318:15
**murdered** 25:5
  100:21 143:6
  224:10 288:7
  289:3
**murderers**
  163:19 169:16
**murdering**
  43:13 112:22
  124:10
**murderous**
  164:15
**must've** 120:12
  155:18
**mute** 321:14,16
  321:17
**muted** 6:1 98:9
  139:12 140:3
**mystery** 122:17

**n**

**n** 2:1 3:1
**naked** 266:5
**name** 3:6 5:14
  6:2,8,16,23
  11:25 12:20
  14:21 42:21

48:18 60:22
90:19,21 95:10
106:10,11,13
110:6 112:5,10
112:20 118:20
130:17 131:12
140:5 154:11
154:15 159:24
228:3 231:19
232:24 246:17
316:9
**named** 193:19
  211:4
**names** 43:10
  47:25 105:19
  297:25
**namodhi** 2:14
  5:19,21 214:23
  304:8
**narcissistic**
  278:14
**nation** 217:6,9
**national** 47:17
  47:21 48:1,25
  141:17 146:9
  147:17 148:16
  155:14 160:3
  160:18 210:2,4
  275:22 276:10
  295:6,14 297:3
  309:22
**natural** 291:15
**naturally** 144:6

**nature** 28:20
  28:21 30:9,14
  30:15 318:6
**navigated** 34:7
**nazi** 106:1
  115:8 169:11
**nazis** 126:12
**near** 102:23
  177:25 191:18
  201:25
**nearly** 26:9
  254:15,20
**necessarily**
  79:20 93:15
  231:16 246:6
  247:8 267:10
  286:2 293:22
  298:13 318:3
  320:3
**necessary** 7:20
  14:2,3 17:25
  31:18 41:2,21
  43:4 53:2
  56:17 57:6,19
  100:13,25
  108:23 113:2,2
  113:12,16
  114:4 128:8
  142:25 143:2
  156:23 162:11
  171:14 232:4
  287:11,12
  288:18,21

necessity
103:21
neck 102:11
323:21
need 4:1 5:5
41:17 43:9,20
62:17 69:19
71:18 113:8
115:16 119:16
119:19 122:18
139:12 164:18
183:7,10 187:1
198:22 203:21
203:22 209:14
220:9 223:8
251:13 280:18
310:17 325:4
needed 27:23
67:16 71:7
114:6 122:25
163:13 198:20
320:23
needles 261:22
needless 104:1
needs 57:3
87:18 202:4
neely 225:25
226:12
negative 296:6
negatively
75:12
negligent 226:3
226:6

neither 31:7
180:25 267:23
292:12 326:10
327:7
nepotistic
169:18
nerve 213:25
238:4
nerves 237:16
nervous 213:1
214:7
network
155:14
neutered 141:8
neutrality
148:4
never 16:19
48:17 51:2,24
58:13,14 88:24
90:21 104:9
107:18 111:21
117:7,8,23
118:10 136:22
151:3 161:8
167:13 191:2
216:3,5 219:17
223:2 226:18
226:18,20,22
227:23 230:22
246:16,17,21
260:8 282:19
286:8,9 293:16
296:14,15
297:25 301:20

303:25 305:21
306:6,7,10,17
307:10,11,17
307:17 309:1
309:21 313:20
320:20 322:22
new 19:25
42:24,25 66:1
69:5,6 83:23
106:10,17
133:20 160:10
169:9 211:5
218:10 219:7
252:15 276:22
282:13 295:13
295:20
news 15:18
newspaper
35:19 278:10
nice 276:21
284:7 320:4,6
night 47:13
55:17 81:11
180:23 230:12
nlg 307:15
nlt 283:6
nodded 107:23
151:6
noel 13:23
40:24 41:14
42:21 56:14,22
111:25 112:6
112:20 113:15
114:3 127:5,14

127:15,24
128:6 142:24
150:3 154:5
155:23 156:19
157:6 175:19
231:20 232:24
233:1 282:3,6
282:8,11,14
287:9 288:8
316:8 317:18
317:20,23
318:15
noise 213:16
non 162:17
189:9 191:8
201:8,12,18
279:17 280:7
292:23
nonsense 225:1
nope 92:17
132:20 198:7
242:1,6
normal 8:8,12
10:10 63:4
130:9 208:4
256:16
normally
111:18 213:13
normative
155:13
north 166:11
notary 326:1
326:18

note 51:13
253:20 255:16
255:19 261:21
262:23 263:16
280:2 290:14
noted 261:16
notes 84:13
285:17
nothing's 319:3
notice 10:4
11:16 17:18
21:21 22:23
23:6 59:16
60:17 96:17,18
96:25 97:6
105:19 124:15
216:22 256:6
256:10 257:23
274:10 292:18
313:21
noticed 222:21
289:24
notification 5:3
notifying
213:22
noting 143:12
notion 156:8
254:19
november
93:12,16 145:3
321:4
number 23:11
23:16 44:24
89:17,20 90:8

104:14 143:10
175:24 189:9
276:22,24
284:22 289:7
292:17
numbering
80:11
numerical
32:21
numerology
175:20
numerosity
173:10 175:25
numerous 7:13
128:10 145:11
185:5
nuremberg
124:18

o

o 3:1
obituaries
282:13
obituary 42:25
object 258:18
259:3,3,5
objection
184:21
objectionable
143:7 289:4
objective
154:21 270:15
objectively 9:3
11:2 250:24

257:8
obscure 41:18
154:6 282:9,16
obscured
290:23
observations
271:17
observed
188:25
obvious 42:8
122:25 123:4
233:16,21
302:18
obviously
87:25 94:25
105:17 109:19
189:5 213:19
216:12 231:21
232:10,20
238:16 239:11
270:22 283:5
309:17 318:8
321:17
ocala 214:9
occasion 7:24
occasionally
261:17
occupy 169:21
occur 15:17
115:20 318:25
occurred
163:24 164:1
207:20 239:22

october 100:18
103:22 140:17
144:7 145:2
177:11 192:24
odd 121:6
289:13
offend 75:8
79:8
offended 63:8
79:9 129:23
306:22,24,25
offense 289:14
offensive 86:14
88:20 135:9,25
262:10 306:15
311:17,20
317:23,25
offer 148:12
308:11
offered 103:23
103:24 124:20
office 21:5
27:11 29:21
36:21 72:21
73:8,22 74:23
76:2,13 92:4
93:12 101:23
103:5 105:5
140:22 145:4
268:20 275:16
275:17 285:10
321:4,5
officer 15:4,7
19:8 127:11

| | | | |
|---|---|---|---|
| 326:2 | 47:2,10 48:8 | 130:16,22 | 200:22 203:6,9 |
| **officers**   127:16 | 48:10 50:19 | 131:1,8,21 | 203:24 204:17 |
| 167:18 291:25 | 51:24 52:5 | 133:9 134:2 | 204:22 205:13 |
| **offices**   305:16 | 55:2,9,12,22 | 135:18 136:14 | 206:1,3,7,11 |
| **official**   283:13 | 56:11 59:2 | 137:25 138:4,5 | 207:1,5,13,18 |
| **officials**   1:2 3:6 | 60:3,7,10 | 138:7,16 139:2 | 207:19 208:2 |
| 5:10 9:7 10:3 | 61:20 65:16,24 | 139:6,15,23 | 208:11,21 |
| 256:6,10 | 66:24 70:2,7 | 147:4,5,5,6,8 | 209:13,14,19 |
| 324:18,20 | 70:19,23 71:1 | 147:11,22 | 209:20 214:24 |
| **oh**   27:13 55:13 | 71:6,16,20,23 | 151:1 152:25 | 215:22 217:22 |
| 61:20 71:8 | 71:24 72:4,6 | 153:10 154:9 | 218:4,12 219:8 |
| 81:15 85:2 | 72:10,15 80:18 | 154:17,21 | 219:12,22 |
| 92:21 118:6 | 80:19 81:5,18 | 156:10,14 | 220:3,20 |
| 119:1 126:12 | 82:11,17 83:11 | 157:18 158:6 | 221:20,23 |
| 138:7,15 | 84:2,3,14,17,21 | 158:18,24 | 222:7,14,18 |
| 146:16 147:5 | 85:2,2,6 86:5,7 | 159:5,7,10 | 223:4,8,10,16 |
| 155:18 174:25 | 86:7 88:15 | 171:11 174:24 | 226:9,14,17 |
| 193:3 203:19 | 92:14,14 94:24 | 176:17 177:8 | 227:3 228:7,12 |
| 206:17 222:7 | 96:13 97:17,18 | 177:19 178:25 | 230:6,22 |
| 247:21 266:11 | 97:20,24 98:4 | 179:20 180:2,9 | 231:10,22 |
| 276:12 283:20 | 100:5,7 108:8 | 180:18 182:2 | 234:13 236:6 |
| 293:11 296:21 | 108:18,22 | 183:13,24 | 238:8,25 |
| 306:6 309:8 | 110:21 112:16 | 184:6,8,9 | 240:11 241:8 |
| 312:21 314:24 | 113:18 114:22 | 185:17 186:15 | 241:20,24 |
| **okay**   7:3,6,8,9 | 115:3,7 116:5 | 186:18,24 | 242:3 244:21 |
| 9:15,16,23,25 | 116:9,14,16 | 187:4,18,22,23 | 244:24,24,25 |
| 10:2,3 12:9,13 | 117:9,17 118:5 | 187:25 188:24 | 245:1,5,11,22 |
| 25:25 26:3 | 118:15,17 | 190:5 193:6,10 | 246:13,22,22 |
| 27:7 28:8 32:3 | 119:1,2,2,20,23 | 193:13 194:1 | 247:18 248:18 |
| 36:10 37:19 | 121:18,25 | 194:13,23,23 | 249:1,9 250:3 |
| 38:1,12 40:12 | 122:9,9,13 | 196:10,15,17 | 251:10,21,22 |
| 41:13 42:10 | 125:25 128:12 | 196:19 197:20 | 252:1,2,4,7,9 |
| 44:14 45:2 | 128:16 129:6 | 197:25 198:5,8 | 252:11,16,20 |
| 46:8,19,22 | 129:19 130:4 | 198:24 200:2 | 253:14,14,24 |

254:4,7 255:11
255:16 256:3,9
258:4,10
261:22 262:14
263:6,18
270:21 272:19
278:18 280:8
280:12 281:19
283:18 284:10
287:7 290:20
291:16 293:18
295:17 298:25
300:24 305:4
312:2 316:7
317:22 319:22
321:9,21
325:14
**old** 219:6 220:1
227:7 318:6
**omari** 177:24
179:5 180:16
**ombudsman**
75:14
**once** 27:22
32:24 48:5
58:16 66:3,5
102:10 117:11
144:4 175:10
175:12 222:16
228:25 236:1
244:18 278:15
301:21 307:11
324:22

**ones** 18:10
38:22 94:25
206:4 219:6,9
263:8
**ongoing** 50:16
281:25 282:1
**online** 56:18
77:21 80:8
119:10 143:23
212:21 225:5
229:8,12
250:12 290:4
291:1 304:10
**op** 99:18
265:17
**open** 18:15
78:2 87:8
105:10 110:2,2
144:20 170:20
188:18 190:4
213:7 238:3
247:17 260:8
261:8 263:23
267:11 300:25
301:6 321:7
**opened** 76:6
**opening** 105:14
**openly** 266:18
**operation** 13:9
**operations** 8:8
8:13 10:10
50:16 208:4
256:16

**opinion** 65:19
123:2 149:24
219:13 222:18
243:23 244:7
245:17 259:2
275:5 288:11
293:15 298:7
**opinions** 137:1
137:4 148:13
211:6,22
212:22
**opponents**
127:20
**opportunity**
3:19 4:8,11
17:10 29:8
43:11 66:19
91:5 124:14,17
125:14 159:19
159:21 183:6
253:9
**opposed** 121:1
**order** 4:20 5:12
41:19 43:10
83:22 103:7
104:25 144:3,8
183:8 263:9
293:2
**ordinances**
51:12
**ordinary** 313:1
**organization**
166:13

**organization's**
177:13
**organizations**
166:8,17
**organized**
301:2
**organizing**
155:11
**orgs** 72:25
**origin** 156:21
**original** 25:6
66:9 111:25
171:5 270:4
271:21 277:14
295:22
**originalism**
7:25 99:6
269:2
**originally**
27:16 38:25
45:17 233:14
**originator**
36:23
**ostensibly**
303:16
**ostracism**
323:18
**outcome** 299:6
299:9 326:15
327:12
**outlined** 120:2
**outlook** 107:3
**outnumbered**
141:8

**outrage** 143:9
175:23 176:1
289:6
**outraged** 99:4
**outrages** 176:7
**outside** 13:17
15:5 29:14
31:1 73:8
74:10 92:5
130:11 167:19
191:1 204:15
207:6 228:18
268:7 297:5
302:15 303:15
321:13
**outwardly**
214:15
**overall** 208:18
249:22
**overheard**
237:20,21
238:5
**overlap** 295:9
**overreach**
222:5
**overseeing** 73:7
73:9
**overt** 210:15
229:12
**overthrow**
23:20 142:9
**overwhelmed**
237:1 238:13

**owe** 292:1
**own** 15:12 30:6
53:6 54:6 56:8
66:6 100:8,23
127:2 129:2
161:20 172:4
176:23 181:8
216:1 235:20
243:3 255:1
313:25
**ownership**
291:8

**p**

**p** 2:1,1 4:18,23
**p.m.** 45:8 60:18
60:24 62:21
180:23
**p.m..** 94:18
**packed** 260:21
**packet** 20:16
25:24 32:2
42:16 44:6,24
105:13 253:20
**page** 9:19,19
26:1 44:15,24
46:13,18,25
49:11 50:17,18
55:2,20 59:4
80:10 84:25,25
122:10 147:3
192:18 196:13
202:8,9,16
252:22,24,25

262:12,13,16
262:21 264:1,3
265:5 266:13
276:9 300:5
**pages** 129:18
203:8 263:20
**paid** 19:4
284:23 323:14
**pain** 77:5 78:22
79:18
**pains** 123:8
**paint** 275:2
**pale** 265:11,14
**palestine** 11:20
157:23 181:17
182:8 183:15
183:21 184:14
210:9 212:23
234:4,7,20
235:2 258:2
293:4
**palestinian**
11:18 181:5
257:25
**palestinians**
181:6 184:19
**palpable** 14:9
16:14 22:1
**pamela** 60:12
**panel** 134:3
180:24
**pants** 264:21
**paper** 7:25 16:4
16:6 23:18

24:5 29:17,22
30:3,4,7,21,23
31:3,7,24 32:1
32:25 33:2,4
33:12,13,16
35:1,2,6,10,17
35:18 52:15
54:18 74:6
83:6,8 85:15
85:20,21,22
99:2 109:4,6,7
113:19,21
129:13 130:12
140:18,23
141:1,16,18,18
145:4 146:5,7
146:9 147:13
147:17,19,21
148:16 149:5
149:25 150:14
154:17,22
155:1 174:8,11
188:7,10 189:5
189:17,18,23
190:23,24,25
192:11 193:15
193:18 194:5
197:24 198:13
199:3 201:2,21
201:22 203:7
203:11 204:20
205:3,5,16
206:2 207:6,9
207:11 208:24

209:1,3 250:19
260:19 268:10
268:12,14,17
268:21,25
269:1,3 270:18
270:19,24
276:10 277:22
278:2 297:7,16
300:1 322:6,9
**papers** 31:18
32:10,11 42:4
85:23 88:5,9
96:23 108:24
140:10 145:23
146:3 152:22
153:9,15 155:9
185:18,20
190:2,4 191:21
212:10 217:4
249:13 299:22
299:23 310:24
321:11 322:1
**par** 21:10
**paragraph**
30:6 63:1
124:6 140:25
141:21 142:15
193:15 196:22
202:12,13,13
202:20,20
203:13,14,16
203:23 204:9
204:10,13
263:21,22,22

291:18 292:21
**paragraphs**
153:14
**paralleled**
113:5
**paraphrasing**
132:4
**parasite** 233:25
**parasites**
210:11 212:24
233:19,22
**pardon** 271:3
**parent** 102:4
**parents** 164:25
165:13,18,20
165:21
**parking** 51:12
164:21 166:1
309:20
**parkland** 15:24
104:18 107:2
163:22
**part** 13:15 21:9
21:25 26:7
32:18 34:12
47:8,18 54:21
57:11 63:4
64:10 65:1
77:15 79:13
81:18,22 85:9
88:12,14 90:2
124:7 126:25
132:2 173:12
201:25 204:6

205:4 216:24
222:2 234:25
237:16 240:5
254:13 256:5
258:16,20
260:15 266:22
270:11 291:22
293:21 307:4
316:24
**participants**
4:15,18 5:10
**participate**
77:4 134:2
170:2
**participating**
164:24 165:5
243:8,9
**participation**
239:17 325:8
**particular**
17:13 24:9,25
30:7 33:7,9
45:24 58:15
64:17 70:12
113:12 124:15
142:17 147:18
157:15 187:6
253:11,19
269:24 309:2
**particularly**
102:20 113:10
183:14,19
184:13,16
189:9 219:11

253:20 263:21
269:12 286:3
286:14 287:22
295:8 324:6
**parties** 326:11
326:14 327:8
327:11
**partly** 321:10
**partners**
165:16
**parts** 28:4
104:24 235:7
253:19
**party** 71:11
96:15 137:18
158:8 184:1
209:8 222:23
244:1 251:2
296:19
**pass** 105:1
**passing** 302:10
**past** 51:23
81:24 223:7
227:13 236:14
238:1 259:15
265:21 266:23
267:19 273:24
276:8
**path** 87:23
**patrick** 282:4
**patrols** 14:15
19:7 22:5
166:2 168:4

| | | | |
|---|---|---|---|
| **pattern**  100:16 | 58:8,21,24 | 176:18 177:1,8 | 251:22 252:1,9 |
| 113:8 129:7,11 | 59:2,6,25 60:4 | 177:18 178:3 | 252:11,21,22 |
| 143:12 144:10 | 60:7 61:20 | 178:12,15 | 252:24 253:1,7 |
| **patton**  265:8 | 70:19,23 71:1 | 179:7,15,20 | 253:16,25 |
| 265:14 | 71:4,9,14,20,22 | 180:6,9 181:19 | 254:7 255:5,8 |
| **paul**  59:12 | 71:25 72:4,8 | 182:2,22,24 | 255:12,18,24 |
| **pause**  178:21 | 72:10 80:12,16 | 183:1 184:7 | 256:3,8 258:8 |
| 302:18 | 80:19,22 81:8 | 186:7,15,21,22 | 260:25 261:2 |
| **pay**  19:8 | 82:18,22 83:23 | 186:24 187:4 | 262:13,21,22 |
| 102:12 286:3 | 84:2,5,8,14,17 | 187:18,22,25 | 263:1,3,6,12,13 |
| 323:23 | 84:21,25 85:2 | 188:23 192:17 | 264:2 265:23 |
| **paying**  19:1,3 | 85:6,8 94:3,6,8 | 192:19 195:20 | 266:12 273:18 |
| 67:21 282:15 | 94:11 97:15,18 | 195:23 196:5,7 | 276:25 277:1 |
| **pdf**  291:1 | 97:24 98:4 | 196:10,15,17 | 281:17,19 |
| **peace**  169:17 | 99:25 100:5 | 196:23 200:15 | 289:22 291:2 |
| 314:3 | 108:18 110:17 | 202:8,16,17,19 | 298:15 300:16 |
| **peebles**  118:13 | 112:13 115:1,3 | 202:21 203:6,9 | 300:21 319:7 |
| 146:15,19 | 118:17 120:23 | 203:25 204:3 | 325:9,14 |
| 255:2 258:5 | 121:4,8 122:2 | 205:18,21 | **peer**  99:2 |
| 300:8,15 | 122:3,11,13 | 206:18 208:8 | 129:21 189:15 |
| **peeples**  2:12 | 126:25 128:13 | 208:12,21 | 189:22,25 |
| 3:2 5:14,14 7:2 | 128:17 131:3,8 | 209:12,16,17 | 191:17,22 |
| 7:4,7,9 9:13,16 | 133:4,9,15 | 217:10,12,22 | **peers**  54:9 |
| 9:21,24 10:1 | 135:12,18 | 220:8 221:9,11 | 129:22,22 |
| 12:5,9,13 26:1 | 136:5,8 137:5 | 221:14,20,23 | 164:25 205:7 |
| 26:3 37:21,23 | 137:21 138:1,5 | 223:4,8,11,16 | **penney**  224:12 |
| 38:1,6,9,13 | 138:7,13,16 | 225:18 239:6 | 225:24 226:9 |
| 41:3,6,11 | 139:2,8,12,15 | 239:15,20 | 269:16 |
| 42:10,13,17 | 139:18,23 | 240:11,13 | **penny**  211:4 |
| 43:24 44:1,5 | 146:18,22,25 | 244:21,25 | **people**  17:23 |
| 44:12,15,18,21 | 147:2,4,8,11 | 245:2,20,22 | 33:10 43:13,13 |
| 45:2 46:14,15 | 152:6,18 153:1 | 246:13 248:11 | 43:16 47:5,22 |
| 46:19,25 47:2 | 155:6 159:4,7 | 248:18 250:3,5 | 52:24 53:16 |
| 55:4,20 56:12 | 159:10,16 | 251:5,7,9,12,19 | 54:21 57:23 |

64:13 75:9
76:7 79:8,11
79:14 81:25
83:8 96:22
102:19 103:8
106:18,19
109:21,25
113:4,8 122:24
123:12 124:10
127:7 130:10
130:12,13
138:24 141:4
141:13 142:3,5
150:14 152:13
152:21 153:2
153:14,19,21
154:2,14,22
157:12,14
158:2,16,20
171:17,25
173:15 175:4
181:8 182:4,19
185:2 188:11
191:25 192:3
192:14 197:23
198:1,3 201:4
201:18 202:1
206:1,4,13,23
210:1,7,19
211:13 212:2,6
212:25 214:2
214:17 215:14
216:8,8,10,15
216:25 217:2,5

217:7,11,17
224:2,4 225:6
227:10 229:8,9
233:5,8,15
235:7,14 236:8
237:8 238:4
241:7,21,23
243:2,17,23
244:4 245:25
246:18 248:4,7
248:20,24
250:17 258:22
259:2,12 261:3
261:23 262:1,2
262:5 265:9,12
265:25 266:24
267:10 269:13
269:25 271:10
271:11,11
272:25 273:19
273:21,22,24
274:19 275:1
275:13,17
277:12 279:6,8
279:12 281:12
283:2,3 285:2
285:3 288:24
289:8,14
291:20,20
292:7,12
293:10 294:13
295:10,19
296:10 297:18
298:12,19

299:15,21,22
300:18 304:17
304:21 305:4,5
305:9 306:6,22
307:23 308:16
309:18 311:22
314:16 315:4,5
315:7,12,13
317:17,24
318:7 321:9
323:7
**people's** 43:9
107:7 291:11
**pepper** 164:19
**perceive**
104:15 170:24
171:1,2 250:1
289:15 311:17
**perceived**
16:12 17:4,19
25:1 52:23
53:7 152:23
181:21
**perceives** 24:12
181:25
**percent** 19:23
87:17 90:14
324:13
**percentage**
218:15
**perception**
171:18
**perfect** 269:2

**perfectly**
225:13 277:22
284:13 286:7
286:11 290:1
**perform** 87:4
160:6
**performance**
283:25 303:20
**performative**
210:16 212:23
**performed** 69:4
**period** 125:11
144:10 189:22
325:1
**permanently**
262:23
**permeates** 8:6
**permitted** 3:17
12:6
**perpetrating**
173:17
**perpetrators**
161:6 174:20
**person** 9:2 11:1
16:23 18:11
36:7 41:8 46:2
56:23 61:9
66:15 73:11,14
73:16,17,19,25
90:19 98:22
101:15 102:11
102:20 105:20
106:24 108:3
111:19 125:14

[person - played]                                              Page 70

151:11 155:16
173:6 207:16
208:17 211:6
211:22 220:9
226:13,24
227:5 239:8
249:22 250:2
250:21,22
257:7 271:8
300:9,18
307:10,14
312:4
**person's** 9:3
11:3 257:9
**persona** 279:17
**personal** 21:6
72:22 110:20
136:22 143:18
158:5,11
170:25 172:4
173:25 195:10
224:22,25
229:22 236:22
248:13 311:18
**personalized**
125:6
**personally**
20:25 22:17
63:9 110:19
123:13,17
144:24 145:6
151:15 158:14
158:22 166:23
182:20 189:6

191:7 208:13
211:10 226:21
227:16 275:9
287:3
**persons** 259:12
**perspective**
113:10 161:19
161:21 225:8,9
310:10
**perspectives**
137:1,4,11
**persuade** 312:5
**pertains** 239:7
240:4
**pertinent**
194:15
**peter** 68:5,13
**ph** 47:17 49:13
50:20 59:9,17
60:12 61:19
68:5,7 118:20
134:4,4 155:24
211:4 225:25
265:8 280:19
280:21 294:5
295:24 296:22
299:25
**phenomenon**
309:22
**philadelphia**
134:11,12,17
**philosopher**
41:18

**phone** 68:14
91:25 123:11
276:24 325:6
**photo** 167:20
**phrase** 11:20
63:10,17
104:24 128:7
156:22 158:1
258:2 306:17
**physical** 9:2
11:1 76:15
128:1,9 165:14
245:19 257:7
272:21
**physically**
115:5 135:23
233:9 239:10
275:9 292:11
315:11
**pick** 123:11
**picked** 261:25
321:12
**picks** 301:19
**picture** 14:21
244:16 266:7
275:2 323:8
**pictures** 42:12
**piece** 90:24
124:19 313:17
**pile** 115:8
**piled** 51:12
**pincus** 4:7
252:6,14
299:16

**pinned** 66:1,4,7
66:9 295:18,21
**pissed** 242:23
243:1
**pittsburgh**
164:2
**pivot** 102:25
**place** 8:18
10:15 22:9
78:21 91:6
115:19 208:7
247:15 256:22
261:14 291:3
294:2 324:7
**placed** 60:23
61:8 273:6
**places** 9:1 11:1
165:15 257:7
**plain** 31:20
43:11 172:24
318:2
**plainly** 267:4
**plan** 292:10
**planning** 320:8
**plans** 93:19
155:12 292:12
**platform**
100:10 266:17
**plausible**
122:25 124:9
**play** 127:12
318:17
**played** 69:11
158:4

**playing** 127:4
  289:3
**please** 18:18
  59:1,4 62:16
  69:21 81:10
  122:2 149:14
  159:18,22
  180:10 183:18
  199:9 202:23
  250:9 252:17
  276:21 280:18
  283:22
**plus** 5:4 82:10
  238:3
**pocs** 259:12
**point** 15:16
  17:22 22:16
  30:16 50:11
  58:18 63:25
  64:7 67:14
  70:10 78:8,10
  78:12 80:6
  86:25 97:10
  101:1 102:8
  108:12 113:14
  114:21 123:10
  143:17 190:14
  201:20 203:3,5
  205:15 210:4
  211:1,3,9,24
  222:21 225:23
  241:10 242:12
  247:16,17
  252:4 259:15

  269:12
**pointed** 140:24
**points** 88:6,8
  190:14 301:3
**police** 14:14,15
  15:4,7 18:24
  19:6 22:5
  60:19 114:21
  121:12 123:11
  125:10 166:1
  167:13,18,19
  167:21 168:4
  220:15 221:2,8
  221:8,10,22,25
  222:1,5 229:16
**policy** 33:19
  178:1
**politic** 314:22
**political** 108:13
  110:1 127:18
  127:20 136:23
  160:17 212:16
  270:1 275:24
  281:10,11
  296:8,12 318:9
**politically**
  277:9 278:24
**politics** 194:24
  275:23 279:2
  282:15 285:2
  323:11,12,14
**pop** 246:6
**popular** 92:11
  134:15

**portal** 77:14,22
  80:8,25 85:10
**portion** 20:2,13
  37:5
**poses** 170:11
**position** 7:18
  13:20 32:13,22
  47:4 58:11,12
  64:1 101:4
  114:14 126:5,8
  126:9,10
  142:23 143:5
  161:17 162:25
  182:3 183:15
  183:20 184:14
  185:10 254:23
  287:8 288:6
  301:20
**positions** 160:8
  222:1 269:7
**positive** 72:21
  299:9 319:13
**possessed**
  122:16
**possibility**
  104:19 127:3
  244:12 299:7
**possible** 5:1
  21:19 69:10,23
  88:13 109:18
  109:20 137:5,8
  176:3 185:12
  216:23 264:11
  270:15 312:5

**possibly** 135:4
  230:4 283:4
**post** 7:17,21
  14:6,24 15:4
  55:21 57:23
  101:5 131:25
  162:13,15,21
  163:9 166:3
  180:19,21
  185:13 262:17
  265:5,7 300:6
  300:14 316:11
**posted** 13:20
  19:2,8 35:15
  55:18 75:19,20
  98:23 100:12
  127:6 142:22
  162:9 177:10
  185:5 230:7
  264:3,4,7
  266:7,16 267:7
  267:9 271:21
  294:21 296:18
  300:9,11,12
  304:10
**posting** 28:18
  169:8
**posts** 7:17
  14:11 15:3
  18:7 20:10
  21:13 24:25
  53:13 63:7
  152:22 161:14
  163:8,11

165:24 169:11
173:10 174:25
175:2,14 181:1
181:24,25
224:4 305:17
**potential**
163:15 164:18
169:2 185:11
309:24
**potentially**
89:21 150:10
156:25 188:15
208:24 219:16
**power**  141:22
243:14,14
**powerless**  22:3
**practice**  136:24
219:10,14
221:8 259:13
**practices**
220:15 221:2
221:25
**practitioner**
161:4 167:1
**praise**  200:10
**precautions**
167:22 308:24
**precedent**
141:24,25
314:23 315:3
**preceding**
197:1
**precipitating**
40:18

**precise**  89:18
89:20
**predict**  321:24
**predictable**
227:9
**predictably**
13:7
**prefer**  186:12
186:13 225:19
**preference**
95:18
**prefers**  293:1
**prejudicial**
105:3
**preparation**
27:15 165:17
**prepared**  12:1
164:7 327:3
**presence**  14:15
18:25 19:6
68:2 106:5
167:13,18,21
179:1,22
249:18
**present**  150:15
166:23,24
205:8 209:18
258:14 261:5
301:20
**presentation**
197:9 199:1,12
205:14 207:21
313:12

**presented**
85:15 140:8
167:25 197:24
198:13 205:6
220:24 221:2,7
221:25 258:13
260:19 263:8
**preserve**  148:4
**preserved**  42:7
**preserving**
148:8
**president**  5:6
48:1
**press**  83:17
170:7 266:16
296:6 300:10
**pressing**
127:18 225:23
**pressure**  297:5
297:5 301:9
302:2 323:10
**pressuring**
277:12
**preston**  2:11
3:9,18,24 4:7
4:10,11 5:2,25
6:2,25 7:11 9:5
9:25 10:2,5
11:22,25 12:5
22:22 23:6
25:18 37:11,21
37:23 38:2
41:3,6 43:24
44:21 46:25

58:21 59:25
62:1 63:21
64:10 69:12,13
70:20 72:4
73:3,25 74:1,6
74:10,16,20,22
74:24 75:2,8
75:10,15,17,18
75:20 76:15
77:22,23 79:6
79:25 82:18
83:25 88:13,25
90:15 92:17
93:8 95:5
96:10,17,18,23
97:3,24 107:14
108:21 120:23
120:24 122:16
128:13 136:5
138:13,20
139:9,13
145:17 152:6
152:18 161:7
172:15 176:18
178:7,20 179:7
183:2 187:4
188:5 191:1
192:3,7 193:15
196:15 200:15
203:6 208:8,8
214:24 221:9
221:11 238:24
240:2 244:21
248:11 251:14

**[preston - professor]**                                                    Page 73

| | | | |
|---|---|---|---|
| 251:19 252:2,5 | **prevailed** 280:5 | **privy** 82:16 | **proceedings** |
| 252:16 255:9 | **prevent** 8:22 | **pro** 221:8,10 | 3:17 8:16 |
| 256:11 276:20 | 10:20 257:2,3 | 222:1 | 10:13 13:19 |
| 283:21 300:21 | **prevented** | **probably** 19:5 | 24:6 58:18 |
| 301:7,8 302:8 | 169:1 206:11 | 19:19 20:7 | 256:20 325:7 |
| 305:12,14 | **previous** 36:13 | 28:4 40:9 48:5 | 326:3,4,5,8 |
| 316:7 319:7 | 143:13 | 56:1 68:18,23 | 327:6 |
| 323:3,4 324:17 | **previously** | 79:9 89:21 | **process** 30:11 |
| 324:19 325:9 | 99:14 | 174:19 178:23 | 30:13 32:18 |
| **preston's** 74:4 | **primarily** | 193:8 197:15 | 70:14 79:3 |
| 75:22 190:23 | 219:13 223:24 | 202:18 206:14 | 129:22 142:10 |
| 191:25 | 242:21 | 206:17 229:15 | 189:16 240:1 |
| **presumably** | **primary** 80:6 | 230:11 236:8 | 244:7 270:13 |
| 242:14 | 236:3,7,12 | 237:12 246:24 | 303:13 319:9 |
| **presume** 11:9 | **princeton** | 254:17 275:15 | 319:17 325:3 |
| 11:13,18 | 294:5 | 290:6 296:14 | **processed** |
| 195:14 257:15 | **principles** | 304:4 310:15 | 317:16 |
| 257:20,25 | 99:11,13 | 312:8 315:6,15 | **product** 291:11 |
| **presumed** | **print** 290:23,25 | **problem** 7:8 | **professional** |
| 255:22,23 | **prior** 53:4 | 21:8 119:18 | 24:15 72:17 |
| **presuming** | 54:16 67:15 | 204:25 286:20 | 105:25 261:16 |
| 308:3 | 81:2 112:25 | **problems** | 280:11 284:7 |
| **presumption** | 162:12 229:20 | 118:12 321:22 | 284:14,25 |
| 324:5,9 | 312:24 326:4 | **procedure** 3:18 | 305:9 323:18 |
| **pretending** | **prison** 229:1 | 5:9 61:10 | **professionali...** |
| 245:14 | **private** 28:16 | 91:14 220:15 | 4:21 |
| **pretty** 32:14 | 51:2,5 103:23 | **proceed** 3:3 | **professionally** |
| 56:13 60:21 | 111:22 259:10 | 71:8,19 119:23 | 275:8 |
| 192:3 224:2 | 273:16 275:2 | 187:19 209:14 | **professor** 2:6,7 |
| 227:9 233:14 | 275:21 313:5,7 | 252:17 | 2:8 4:4,5,5 6:8 |
| 244:17 276:2 | 314:1,1 | **proceeding** | 6:11,17 7:22 |
| 303:8 305:4 | **privately** | 64:3 145:11 | 15:9,12 17:14 |
| 312:9 | 285:10 | 153:23 158:4 | 25:1 29:11,18 |
| | | 327:4 | 29:20 30:5,10 |

[professor - protected]                                                    Page 74

| | | | |
|---|---|---|---|
| 55:12 56:8,10 | 157:19 158:8 | 297:23 298:23 | **promptly** 321:6 |
| 58:1 59:23 | 158:10 159:1,9 | 301:15 307:20 | **proper** 99:11 |
| 61:4,7,13,18,21 | 159:11,25 | 313:10 316:9 | 126:14 |
| 61:22,22 62:10 | 162:22 163:1 | 316:12,14,20 | **properly** |
| 62:17 70:4 | 170:21 172:13 | 316:20,22 | 258:12 316:10 |
| 75:22 76:3,5 | 172:17,18 | 317:1,1 | **proposal** 85:16 |
| 78:1 87:14 | 175:19 176:20 | **professor's** | **prosecuted** |
| 88:2 91:15,22 | 176:22 177:2,9 | 271:25 272:16 | 18:6 |
| 91:24 92:2,6 | 177:20,21 | 274:23 320:19 | **prosecution** |
| 93:4,20 94:13 | 178:3,16,21 | **professors** | 161:5 |
| 94:13,14,14 | 179:13 181:14 | 60:11,14 62:20 | **prosecutor** |
| 98:3,6,10,11 | 183:13 184:1 | 143:11 149:15 | 87:22 101:14 |
| 99:2,22 105:11 | 186:18 210:18 | 149:18 151:17 | 211:19 219:10 |
| 105:12 107:16 | 214:3 215:4,12 | 151:19 154:23 | 243:21 247:11 |
| 107:17 108:9 | 217:24 219:24 | 231:4 261:18 | 247:20,22,25 |
| 109:8 110:25 | 220:14,15,16 | 277:8 280:3,7 | 299:13 |
| 118:19 121:10 | 221:4 231:1 | 280:8 298:9 | **prosecutor's** |
| 122:22 123:15 | 248:1 259:23 | 320:18 322:11 | 105:5 |
| 124:16,21 | 260:10 261:4 | **profile** 39:24 | **prospect** |
| 127:1 128:17 | 261:17,18,21 | 66:6 242:13 | 170:14 |
| 129:13,14 | 262:1,3 268:19 | 295:19 | **prospects** |
| 131:5 134:14 | 271:5 272:3,23 | **profiles** 274:23 | 86:25 87:20 |
| 136:14 137:15 | 276:2,12 | **program** | 169:3 |
| 137:18,19 | 277:10 279:15 | 160:10 | **protect** 17:7 |
| 139:21,25 | 279:22 280:1,2 | **programs** | 20:24 21:3 |
| 140:6 142:24 | 280:2,9,19,20 | 160:11 | 26:22 31:4 |
| 143:3,14,14 | 280:23 281:3 | **progressed** | 34:4,18 64:21 |
| 144:22 145:19 | 282:1,2 283:9 | 213:16 | 148:3,24 165:1 |
| 145:20 147:12 | 283:16 284:1 | **progressive** | 165:3 168:10 |
| 149:4,6,13,19 | 284:17 285:1,7 | 275:22 281:11 | 168:19 |
| 149:20 150:4 | 285:9 287:9,13 | **promote** | **protected** 3:15 |
| 151:1 152:21 | 288:3,4 289:20 | 105:25 | 10:22 11:5,8 |
| 154:4 155:10 | 290:15,15,17 | **promoted** | 11:10,15,21 |
| 156:3,14 157:1 | 294:4 297:8,19 | 72:18 | 23:14 26:13 |

**[protected - put]**

Page 75

27:3,5 28:11
29:13,23 30:25
32:15 49:9,10
53:20 54:11,19
58:19 67:10
108:14 121:1
124:13 132:24
255:22 257:4
257:11,14,16
257:21 258:3
258:17 259:16
267:22 268:6
268:10,22,25
277:23 297:16
**protecting** 18:3
25:13
**protection**
148:22 273:4
324:10
**protects** 26:21
148:2
**protocols** 168:7
**provide** 11:22
12:15 72:12
98:7 140:1
152:11 159:12
159:23 163:14
186:7 188:2
209:22 251:14
252:15 253:12
260:2 295:19
**provided** 13:12
152:21,23
263:8 297:25

**provides** 78:9
**provision** 284:1
**provisions**
284:2
**provocateur**
101:2
**provocative**
129:25 272:19
273:3
**provoke** 17:6
130:1 272:20
274:21
**provoking**
104:13 111:14
**pseudonymous**
109:21
**pseudonymo...**
211:25
**psychological**
64:19
**psychologist**
66:11
**psychopath**
225:12
**psychopathic**
169:16
**public** 7:16
19:24 28:18
54:20 57:22
166:4 168:2
211:5,23 212:9
218:10,11
228:25 246:17
266:17 313:6

314:1 326:1,18
**publication**
119:10
**publicized**
246:16
**publicly** 124:8
212:14 218:3,7
**publish** 288:17
**published**
155:25 196:21
250:19 278:15
295:13
**puerto** 210:12
**pull** 130:22
146:23 252:21
**pulled** 226:7
**punch** 245:7
273:25 286:1
**punched** 245:6
**punish** 268:1,2
277:13 312:23
**punishable**
16:21
**punished** 52:14
293:10
**punishing**
134:23
**puppet** 283:7
**pure** 82:4 266:3
267:2
**purely** 275:7
**purpose** 3:8
26:14 69:13,14
89:2 236:3,7

236:12 258:7
**purposes** 3:16
5:12 251:20
258:9 288:12
**push** 93:1
132:21
**pushback**
132:15
**pushed** 92:12
92:23
**pushing** 53:17
**put** 7:4,5 9:21
16:7 66:3
81:25 82:3
88:8,9,10
96:17,18,25
97:6,21 126:10
138:18,21
139:3 152:15
189:23 204:16
205:3 217:24
229:1 233:20
234:2 237:17
238:1,6,16,17
239:11 245:13
249:15 251:22
259:5,9 260:10
262:17 267:12
274:25 277:10
282:23 297:6
302:18,21
319:16 321:11
323:21

**puts**   122:1
265:14
**putting**   124:15
**pylon**   106:2

**q**

**qualified**   326:7
**quality**   270:16
**quarter**   303:21
**question**   23:3
41:12 42:20
50:2,6 66:22
66:25 79:10
80:4 96:16
107:9,18
110:15 114:11
116:8 122:21
124:12 132:12
151:13,22
152:10 157:18
158:10 162:24
174:15 176:8
176:11 178:10
178:17,20,23
180:2,13,15
181:12 183:2
183:10,12,17
186:10 190:11
194:22 195:9
195:10,20,21
196:4 197:25
198:9,12 199:8
200:19 201:10
205:1 206:22

208:20 209:4
220:10 239:4,6
244:23 266:2
273:17 291:25
297:11 301:14
304:8 307:5
308:15 310:20
311:12 314:8
316:16,18
317:8,11
318:16,18,20
319:8,10,18
320:11 322:14
323:1
**questioned**
3:23 4:10
**questioning**
155:7 179:16
200:17
**questions**   4:1
5:8 12:20
18:16 25:19,22
26:5 37:17
38:2,11 41:8
45:18,25 50:9
59:24 60:1
69:20,22 70:20
71:11 75:3
78:3 80:1
96:15 97:13
105:11 107:15
112:14 131:14
131:16 136:13
137:18 144:19

144:21 145:18
145:21 149:13
158:8 159:1
170:6,21
172:16,19
177:6 178:8
182:22 183:1,7
184:1 186:18
188:19 192:6,7
192:10 209:8
213:8 214:24
214:25 215:3
219:23,24
221:12 223:12
225:19 230:6
240:2 246:10
246:12 251:2
253:5 254:1
300:25,25
301:4,7 302:4
306:19 316:5
323:3 325:11
**quick**   136:15
291:25
**quickly**   43:5
58:15 80:24
276:2
**quiet**   281:15
**quit**   14:23
**quite**   21:11
138:23 210:10
210:21 212:8
224:14 228:23
272:8 301:23

304:23 314:14
**quote**   26:7
28:11 40:25
86:10,22
136:17 155:10
175:21 177:12
177:12 193:24
193:24 195:10
233:3 259:6,10
267:22 268:5
268:18 270:11
273:13
**quoted**   27:16
81:22 131:25
157:9 169:9
174:17
**quoting**   135:24
192:13

**r**

**r**   2:1 3:1,1
**rabbi**   103:16
103:21,21
**race**   41:2 43:4
56:15,17
113:16 114:3
128:8 142:25
154:24 155:15
155:22,24
156:3,9,15,21
156:22 157:10
157:13 214:17
235:11 287:10
288:17,18

291:4,7,9,19
292:2,23,25
293:4,5
**racial** 23:19,20
188:10 189:11
192:14
**racism** 51:13
**racist** 26:10,17
27:1 38:24
50:21 121:23
127:18 155:11
155:17 163:20
192:1 254:16
292:9
**radar** 13:1
254:11
**radical** 279:2
**raise** 70:15
85:11
**raises** 102:11
**raising** 312:12
**ramifications**
24:16
**rampage**
164:15
**random** 34:24
**rapid** 301:18
**rate** 18:23
**rather** 121:6
127:12 147:20
**rational** 163:16
**rationally**
246:4

**reach** 60:13
62:16 133:21
280:4,18
**reached** 62:20
73:6 74:21
75:15 115:19
277:6
**reaching** 62:1
280:10,12,13
**react** 34:17
238:1 243:23
**reacted** 304:10
**reaction** 47:16
59:7,15 127:4
131:2 135:3
277:20 288:17
295:18
**reactions** 75:6
102:9 211:12
265:11 294:13
314:19 321:24
**reactive** 214:8
**reacts** 49:10
**read** 9:20 12:19
43:3,16 63:1
64:13 81:22
85:23 86:1,2,3
86:6 112:4,18
112:19,21
113:6 116:8,13
121:14 122:14
124:1,5 126:24
136:16 182:3
188:6 189:5,5

190:2,4,23
193:18 196:24
197:8 202:7,12
202:23 204:8
204:10 205:4,7
230:2 232:7,23
256:4 258:10
261:11 262:13
263:12,13
265:17 266:21
268:14 272:7
273:5,9,23
274:22,22
276:5 279:15
291:4,18
292:14 296:23
299:14,14
301:1 317:21
318:12 322:8
**reader** 57:7
**reading** 7:16
66:15 76:24
123:14 157:5
157:15 161:14
161:15 192:22
203:13 241:17
252:3 263:14
291:17
**readings** 322:5
**readmitted**
137:6
**reads** 41:23
270:10

**ready** 9:16
97:25 139:5
187:19,21
209:15
**reaffirmed**
210:6
**reaffirming**
147:2
**real** 18:3 21:21
23:22 24:13
34:13 39:1
53:8 59:17
66:21 123:2
212:4 225:3,3
303:8 314:25
315:1 320:24
**reality** 315:2
**realize** 110:24
**really** 20:21,21
21:12 22:2
33:8 34:16
41:7 43:20
49:22 52:7
64:23 76:4
82:9 83:7 88:3
88:16 90:8
94:9 126:13
131:19 136:22
138:24 152:7
153:23 171:19
190:25 191:18
191:19 195:1
201:5 220:23
224:13 231:11

231:16 237:8
245:17 249:10
250:1 252:15
269:22 270:21
271:15 279:6,7
282:20 284:4,5
285:11 286:14
298:11 299:20
299:23 300:19
304:20 306:5
307:15 309:14
309:21 310:3,7
310:16,25,25
312:10 313:2
314:4 318:14
318:17 319:4
319:10 320:20
320:22,23
321:8,15 324:2
324:14
**realm**  239:23
244:12
**reason**  11:15
32:2 48:15
49:19 63:13
102:15 150:2
165:9 213:3
214:10,13,16
217:15 246:7
257:21 262:11
267:13 286:16
314:25
**reasonable**  9:2
11:1 18:11

41:21 56:23
57:6,15 58:5
64:13 66:15,22
101:15 257:7
**reasonably**
30:8 168:22
**reasoning**
290:5
**reasons**  16:9
28:15 34:3
105:23 115:15
230:21 302:5
**reassurance**
22:8
**reassure**  104:3
**recall**  86:19,24
87:8 88:13,14
89:1,1,20 92:3
92:8,22 93:7
95:11,23
118:12 119:12
134:1 145:14
161:9 179:1,22
180:15,17
188:13 193:1
194:3,4,8,11,16
197:17 215:25
**recalls**  179:14
**receive**  80:7
83:2,12 85:20
324:22
**received**  13:13
15:4 17:2
23:11 34:13,21

60:12,15 64:25
70:17 74:9
75:16 77:21
90:4 99:4
102:4 123:23
149:9,11,25
269:2 275:20
**receiving**  16:22
74:5 80:25
**recent**  63:6
75:1 85:13
163:16 164:3
236:14 262:8
**recently**  27:15
27:18 168:5
174:18 235:24
235:25
**reception**  170:9
**reckless**  111:7
228:22
**recognize**
59:10 136:20
**recognized**
269:6 270:7,9
291:14
**recognizing**
78:23 174:17
**recollection**
88:17 140:12
151:3,4,9
154:8 193:14
241:16 264:23
306:20

**recommend**
33:23
**recommendat...**
315:24
**recommendat...**
4:24 324:20,24
**record**  12:24
40:10,16 62:2
93:15 97:23
127:18 139:7
155:2 251:25
267:12 271:7
277:16 280:23
326:9 327:5
**recorded**  62:12
251:10,20
326:6
**recorder**
325:10
**recorder's**
252:2
**recording**  3:2
3:15,17 5:12
97:25 139:16
220:8,9 251:7
258:6,8 326:8
327:4
**recordings**
251:17 258:6
**records**  13:12
**recount**  196:1
**red**  44:24 80:10
**redacted**  51:13
51:15 239:16

**reddit** 300:5
**reduce** 155:12
**reduced** 326:6
**refer** 129:7
  169:11 292:23
**reference** 27:25
  94:19 132:2
  150:3,14
  157:12
**referenced**
  175:17
**referencing**
  229:21
**referral** 27:11
**referred** 36:20
  42:22 202:13
  217:5 246:23
**referring** 58:1
  58:3 82:7 83:8
  120:6 266:6,8
  302:16 324:4
**refers** 169:13
  287:23
**reflect** 90:9
**reflected** 63:15
  168:12
**reflecting**
  312:17
**reflections**
  121:22
**refocus** 79:1
**refuge** 165:12
**refusal** 99:15

**refused** 211:24
**refutation**
  114:7
**regard** 30:25
  40:23 49:17
  150:17 320:17
**regarding** 3:21
  4:8,25 5:8 38:2
  85:12 105:16
  252:18 273:19
  325:3
**regardless**
  57:25 59:22
  198:25 254:25
**regards** 32:1
  35:1 292:22
**regional** 69:4
**registered**
  223:2
**registering**
  143:19
**regret** 104:2
**regularly** 92:5
**regulate** 26:15
**regulation**
  120:16,17
  135:8
**regulations**
  324:4
**reinforcing**
  266:20
**reiterate**
  170:15

**reject** 155:15
  194:17
**related** 12:16
  19:10,21,24
  20:2 72:13
  98:8 140:2
  147:16 159:13
  167:12 188:2
  190:22 191:3
  209:23 210:17
  223:12 240:5
  253:10 326:10
  327:7
**relates** 128:17
  158:12 176:24
  184:19
**relation** 197:7
**relations** 19:24
  160:24
**relationship**
  161:7
**relative** 326:13
  327:10
**relax** 310:6
**released** 106:23
**relevance** 69:9
  91:4 155:6
  181:11
**relevancy**
  128:19 178:18
  178:22 179:8
  181:19 200:17
  205:21,24

**relevant** 25:19
  34:1,7,10,19
  37:14 41:16
  42:14 50:1
  52:4 53:5,11
  54:16 60:1
  80:1 100:3
  107:15 145:11
  145:18 153:23
  155:3 156:6
  172:16 176:11
  176:16 177:15
  177:17,21
  178:2,4,5,5,11
  183:3,12 192:8
  205:18 214:25
  248:5 269:12
  320:17
**relied** 116:12
**relief** 142:5
**relieved** 131:17
  131:19,20
  247:7
**religious** 318:8
**reluctant**
  101:16
**remain** 78:18
  152:17
**remaining**
  280:22
**remarked**
  74:15
**remarks** 4:12
  254:2 323:5

**[remedy - respectfully]**                                    Page 80

**remedy**  99:11
302:15
**remember**  36:5
36:18 44:22
45:23,24 68:3
68:11,19,21
84:19 85:20,21
86:8,23 87:5
87:11,13,13
88:4,12,16,23
88:24 109:20
115:9 117:4,20
119:15,25
120:5 128:11
161:10 193:18
193:23 197:8
197:10 199:15
199:18,20
215:11 220:20
228:24 235:3
241:4 242:17
285:14 311:3
325:7
**remind**  4:14,18
149:12 291:25
**reminded**
15:21
**reminder**
324:19
**reminisced**
210:8
**remotely**  94:21
210:17

**remove**  71:14
97:15 137:21
**removed**
211:15 266:19
**renowned**
124:12
**repeat**  110:22
151:12 183:17
204:21,24
255:25
**repeated**
157:20 164:8
**repeatedly**
126:10 157:21
157:22 267:19
**repetitive**
244:23
**rephrase**  109:2
**replacement**
98:24
**replied**  108:3
110:13 162:23
**reply**  116:15
123:23 234:25
271:25 272:1
272:16,17
**report**  14:14
26:6 50:22
67:16 73:2
80:9 81:20
83:24 84:12
89:9,11 114:20
174:8,10,12,13
192:20 194:2

215:19 259:5
260:17 262:9
267:21 271:9
306:13
**reportable**
49:14,18 50:7
**reported**  1:13
8:3 50:8 51:3
51:20 73:23
74:7 75:17
77:6 218:7
273:14 282:17
282:19
**reportedly**  7:12
**reporting**  80:5
**reports**  15:19
78:5 82:24
83:1,5 91:14
108:14 209:24
223:15 261:10
269:21 304:19
**represent**  8:2
90:4 127:21
**represented**
102:19
**republican**
296:25
**request**  15:4
157:16,17
299:4
**requested**  9:7
45:6 167:13
186:13 242:7
252:5

**require**  56:21
**required**  45:15
91:12 205:4
**requires**  61:11
126:12 311:14
**requiring**
123:10
**reread**  256:9
**research**  8:15
10:12 208:5
256:19 270:16
288:4
**resistance**
181:6
**resisted**  211:16
**resolution**
325:6
**resolve**  9:8
**resolving**
136:20
**resorted**
289:24
**resource**  78:11
**resources**  78:8
78:9
**respect**  11:17
17:13 37:13
93:4 105:7
123:15 146:5,6
157:6 257:24
**respectful**
148:7
**respectfully**
200:14

**respond** 64:22
99:9 107:12
111:3 167:8
178:18 271:25
272:16 297:13
297:13 299:3
**responded**
99:10 101:9
107:9 111:1,4
143:6 193:17
279:24 288:6
289:2,20,23
**responding**
62:23 65:7
287:15 297:12
**responds** 288:5
**response** 17:17
49:13 59:17
77:25 101:13
101:16 102:5
107:13 110:20
110:23 114:15
115:5 126:13
126:14,15
143:3 157:16
162:21 163:1
165:23 220:10
245:24 274:1
290:3,3 316:11
**responses**
291:12
**responsibility**
4:25 9:6

**responsible**
11:12 123:5
257:19 314:7
315:23 324:12
324:25
**rest** 235:3
312:9,13
**restart** 44:2
**restate** 151:22
**restoration**
85:16 140:19
**restrict** 197:4
**restriction**
303:9,10
**restrictions**
263:24
**result** 106:2,14
106:16 164:2
166:21
**resulted** 106:22
189:1 207:19
**results** 42:23
42:24
**resume** 69:1
**retaliate** 295:3
**retaliated**
307:17
**retaliation**
239:23,25
273:21
**retaliatory**
213:2
**retract** 17:11
17:12

**return** 318:22
**returning**
98:14 170:14
**reveal** 186:10
**revealed**
296:12
**reverse** 317:11
**review** 68:23
99:2 129:22
189:15,22,25
191:17,22
258:5 263:16
**reviewed** 32:25
44:6 129:13,17
283:25 324:23
**revision** 30:12
**revisiting** 32:16
32:19
**revolting** 318:7
**revolution**
199:16 200:10
200:13
**revolutionary**
142:8 194:5,6
194:7,9,12
199:11,17,23
279:3
**rewards** 9:2
**rhetoric** 23:20
75:7 79:7
100:19 163:5
164:13 167:1
184:20 279:3
288:24,25,25

289:1,17 292:6
293:1,9 294:10
**rican** 210:13
**richard** 193:19
193:24
**rid** 113:9
213:20 233:25
**ridiculous**
216:10
**right** 12:8 18:1
18:7 21:16,17
22:14 25:12,13
26:19 27:3,5
27:17 29:15
31:1,10 32:6
33:20 34:4
36:3,13 39:20
43:23,25 45:1
47:3,5,6,7,13
47:23 48:12,24
50:25 52:8
55:5,13,24
59:3,16 60:3
62:10 65:4,9
65:21 68:6,7
70:7 71:16,23
72:2,6 78:21
84:7,22,23
85:18,24 86:8
87:9 93:5
94:15 95:2,4
95:12,15,20
96:3 97:20
105:7 106:20

107:6,19
112:18,19
115:12 118:18
119:2 120:21
121:5,14 122:1
122:9 130:14
130:15 135:8
137:15,23
138:8,8,16
139:2,20 142:9
148:3 151:7
152:6,17
154:20 176:10
187:23 193:9
194:18 195:18
197:19 198:21
198:23 200:6
200:22 201:14
202:11 208:17
209:4 210:21
217:6 225:20
225:21 226:4
228:6,9 234:14
238:6,17
246:10,11,19
246:25 249:1
251:3 252:16
258:10 261:21
262:15 263:4
264:9,18,19
267:9 274:14
275:11 279:1,2
279:8 284:13
295:1,2 297:12

298:23 300:11
301:5,8 303:17
303:22 313:6
313:20 323:3
323:12,13
**right.okay.**
  83:11
**rightfully**  63:8
  141:9
**rightly**  64:6
**rights**  20:24
  53:15,24 99:19
  141:7 258:17
**rigor**  92:25
**rigorous**  278:2
**rise**  52:17
  283:10 321:25
**risk**  17:1 24:13
  106:7 140:8,24
  141:15 145:9
  145:12 153:18
  287:25
**river**  11:20
  157:23 182:8
  258:2
**robber**  293:16
**rodie**  326:2,19
**rogue**  169:17
**role**  20:18
  72:20,23 73:7
  74:2 81:1
  154:3 158:3,19
  163:2 204:19

**roles**  160:7
**roll**  105:21
**rolling**  189:21
**ronald**  75:14
**room**  7:7,10
  16:15 68:2
  74:17 91:6
  97:21 138:17
  138:19,20,21
  139:3,6 177:23
  179:6 198:4
  209:18 214:1
  237:15 244:15
  251:23 285:25
**root**  286:23
**rooted**  163:16
  212:23
**rootless**  169:14
**rope**  124:20
**ross**  177:24
  179:5 180:15
**rough**  27:19
**roughly**  89:12
  153:5
**rounds**  265:3
**roundtable**
  190:3
**routine**  63:5
**routines**  165:16
  305:15
**row**  264:18,22
**royalty**  291:11
**rudely**  33:22

**rule**  142:17
  255:20 310:25
**rules**  63:22
  105:2 291:22
  291:25 310:18
  310:19
**ruling**  210:20
**run**  151:23
  278:9,10,12,16
**running**  119:17
  181:9
**rush**  136:5
**rushing**  2:3 3:4
  5:16,19,22,25
  6:4,7,10,15,18
  6:22,25 7:3,6,8
  7:11 9:10,15
  9:18,23,25
  10:2 12:11,14
  18:15 25:18,23
  31:15 37:9,17
  43:23 69:10,19
  71:8,10,18,21
  71:23 72:2,6,9
  72:11 78:2
  79:25 80:15
  96:14 97:12
  98:2,6 99:22
  105:10 107:14
  133:7 137:17
  139:17,20,25
  144:20 145:17
  149:12 156:5
  156:10,12

158:7,25 159:6
159:8,11,18
170:20 172:15
176:11,15
180:5 183:25
184:5,8 185:16
186:17,25
187:19,23
188:1,18,21
192:6 195:9,18
205:23 209:7
209:13,20
213:7 247:14
250:4,6 251:1
252:4,16 256:5
256:9 301:5
316:7 318:19
319:23 322:13
323:2 324:17
**rwanda** 161:3
176:5
**ryan** 2:3 3:2,6
37:13 98:1
119:16,19,23
139:16 178:19
186:16 252:2
256:3 280:16
304:8 319:16
319:21

**s**

**s** 2:1 118:15
327:14

**sabrina** 68:7
**saddam** 59:13
**safe** 22:18
76:18,25 83:3
83:4 97:9,10
104:4,4 123:17
197:12 315:9
**safely** 143:22
**safer** 103:8,11
**safety** 7:14
14:18 15:12
73:16 75:12
77:8 101:24
102:7 103:20
135:7 143:18
148:8 165:7,14
172:4 311:18
315:11
**sake** 165:14
185:25
**sam** 295:24
**sanctioned**
214:16
**sanctions** 5:1
324:24
**sanitized**
216:23 229:6
**sarcastic**
122:16
**sat** 242:6 287:6
287:6 311:25
**satisfactory**
129:8

**save** 39:24
**saw** 24:1 33:15
55:17 69:25
112:25 132:10
170:23 175:21
215:18 222:24
235:16,18,18
241:22 279:7
311:25 312:23
**saying** 7:23
25:3 40:4 41:9
52:10,11 54:23
88:13,24 96:22
101:3,9 103:9
113:8 117:14
126:20 133:11
133:11 143:4
147:14 153:4
157:2 162:24
194:11,16
216:16 217:21
220:23 223:21
224:17 228:25
232:8,9 237:18
239:12 260:11
260:16 262:4
267:25 288:5
293:3,4 296:21
298:23 306:5,6
306:23 307:7
313:17 315:1
**says** 25:6 50:20
51:12 59:17
81:21 84:11

85:10 89:9,11
105:2 122:5,16
127:1 138:2
147:18,22
155:22 157:23
182:8 192:23
193:19,20,21
202:1,3 217:16
223:14 236:12
261:22 265:9
269:7 271:9
280:9 281:20
283:2,9,11,11
284:17,20
291:17 293:16
299:5,20
300:18 306:12
306:14 311:8
311:12 312:25
317:21,23
**scales** 142:13
**scanned** 16:14
**scanning** 24:1
**scapegoat**
269:25
**scared** 66:12
67:25 75:21
76:11 77:3
89:4,25 189:12
240:19 242:22
243:1,2,6
295:23 323:17
323:17

**sccr** 319:4

**scenario** 21:16

**schedule** 70:6
130:14

**scheduled** 3:8
166:3

**scheming**
169:19

**scholar** 6:12
29:20 42:22
98:15,18
123:18 124:12
154:6 167:1
176:14 193:18
268:19

**scholarship**
99:14 107:7
113:20 304:5

**school** 7:22,24
8:6 12:1 13:9
13:18,22 14:8
15:1 19:3 20:7
20:19 23:24
24:15 26:15
30:22 31:4,17
31:21 32:17
34:6 50:4
72:22 74:11
76:10,14 78:9
79:23 87:4,16
87:18 88:22
89:23 95:7,13
97:1 98:14
101:25 103:6

104:18 108:23
110:25 111:13
115:22 118:1,2
127:8,9 128:22
129:11 130:10
135:16 140:6,9
140:16 141:15
142:19 144:18
146:1,4,21
148:10 150:9
150:15 152:17
153:2 161:24
162:13,15,16
162:20,22
163:6,10,23,25
164:21 165:2
165:24 166:4
166:17 168:6
168:11,24
169:3 170:18
172:7 176:23
182:14 191:8
192:2 205:17
206:2,24 207:4
207:4,10,12
208:10,18
209:1 211:20
211:23 213:14
213:20 231:23
236:14 243:4
244:5,6 248:9
254:18 259:16
260:21 264:7
270:10 271:2

272:11 273:10
283:14 285:15
286:9,10 287:5
288:1,22
296:11 297:16
300:3,13
302:19 303:15
304:1,20
306:16 309:17
309:25 311:4
312:9 313:8,10
314:2,3,5,5,10
314:11,18,20
315:8,10 320:4
320:5 322:16
322:20,23
323:10,11
324:8

**school's** 64:1
77:21 102:5
160:10 162:3,4
265:4 324:2

**schoolhouse**
53:25

**schools** 50:8
163:18 164:3

**science** 160:17
291:15

**scope** 158:21

**score** 269:3

███ 2:10 4:6
6:22,23 36:6
38:2,14 39:22
48:6 61:22

62:10 65:12,20
65:25 69:17
94:14 116:17
116:19 209:21
209:21 213:9
213:10 214:22
215:1 225:18
240:2 251:2,3
254:18 269:15
280:3,16
282:16,17,18
282:22 285:22
298:3,6,9
299:5 311:24
312:21 317:21

**scratch** 127:6

**screen** 5:13
44:13 58:22,25
80:16 112:19
118:16,17
122:12 147:6,9
196:9 253:19
274:10,13

**screenshot**
39:22,24 56:14
218:12,16
264:5,8

**screenshots**
40:5 218:19
275:21

**screenshotted**
37:5

**script** 9:11
139:19 252:3

[script - seen]                                                Page 85

| | | | |
|---|---|---|---|
| 255:25 256:4 | **secondary** | 124:22 126:3 | **seek**  169:22 |
| **scroll**  55:19 | 212:10 | 132:6,12,12 | 213:4 221:18 |
| 122:1 196:14 | **secret**  248:3 | 134:21,21,24 | 222:6 321:20 |
| 204:2,5 236:15 | **section**  4:17,23 | 135:8 144:9 | **seeking**  100:16 |
| 276:24 291:1 | 10:16 11:4 | 147:6,8 150:10 | 101:2 129:21 |
| 292:17 294:4 | 36:11 203:11 | 150:13 151:23 | 156:2 176:2 |
| 300:20 | 203:12 255:25 | 152:1 155:3,22 | 185:8 |
| **scrolled**  112:24 | 256:4,22 | 190:15 192:21 | **seem**  59:19 |
| **scrutinize** | 257:10 | 202:9 225:3,7 | 66:11,12 67:22 |
| 31:18 108:24 | **sections**  8:10 | 225:8 230:7 | 173:10 175:14 |
| **scumbags** | 308:12 | 232:7,9 234:20 | 176:5 184:21 |
| 248:23 | **secure**  104:2 | 235:13,14 | 197:17 202:14 |
| **sea**  11:20 | 122:24 | 245:6 261:5 | 261:12,13,14 |
| 157:23 182:8 | **security**  18:19 | 264:11,14,15 | 267:16 279:6 |
| 258:2 | 19:15 21:5 | 265:3,11 | 289:9 294:16 |
| **sean**  307:24 | 103:22,23 | 266:10,13,23 | 294:24 309:18 |
| **search**  93:19 | 127:11 140:8 | 274:18 275:8 | **seemed**  43:10 |
| 175:2 228:3 | 140:24 141:15 | 276:12,19 | 67:22 73:17 |
| **second**  9:22 | 143:15 144:1 | 277:2,16 278:5 | 101:19 201:17 |
| 17:10 34:10 | 145:9,12 148:8 | 278:7 280:19 | 224:6 272:4 |
| 44:2 56:12,12 | 153:18 160:3 | 280:24 283:9 | 282:6 |
| 59:4 65:16 | 160:19 165:25 | 286:19 288:21 | **seemingly** |
| 73:8 76:22 | 166:22,24 | 294:4,12,18 | 100:15 127:17 |
| 80:17 84:18 | 167:7 168:5,6 | 295:6,11,17,24 | 286:13 |
| 89:11 94:2 | 168:10,18 | 296:22 298:3 | **seems**  57:17 |
| 95:7 118:14 | 172:7 210:4 | 300:4 311:11 | 122:19 265:2 |
| 119:16 121:25 | **see**  5:13 49:4 | 314:15 317:11 | 289:13 315:17 |
| 133:7,25 138:4 | 49:12 50:19 | 317:13,14 | 315:24 317:5 |
| 141:18 146:7,8 | 51:9,10 55:16 | 321:8 322:24 | 320:14,15 |
| 159:20 201:24 | 59:9,16 61:23 | 323:25,25 | **seen**  46:23 51:2 |
| 202:7 239:21 | 62:5,19 65:25 | **seeing**  44:23 | 55:6,10,25 |
| 246:9 250:11 | 79:18 81:21 | 155:6 156:5 | 59:21 81:12,13 |
| 262:22 266:20 | 87:18 91:4 | 186:18 194:2 | 81:18 85:3 |
| 291:16,18 | 120:1 124:21 | 211:11 212:9 | 115:14 181:18 |

| | | | |
|---|---|---|---|
| 181:24 182:10 | **semitic** 7:16 | **sensitivity** | **serious** 40:19 |
| 214:19 222:25 | 26:10,18 27:1 | 53:23 | 64:23,24 85:11 |
| 227:7 243:25 | 38:24 100:19 | **sent** 34:23 | 312:2 |
| 271:2 286:24 | 127:19 163:20 | 35:18 36:2 | **seriously** 24:3 |
| 286:25 307:15 | 167:9 169:7,12 | 38:7,18 39:2,8 | 167:23 168:15 |
| **sees** 135:6 | 184:23 191:25 | 39:11 40:7 | 286:21 312:6 |
| 283:2 | 254:17 293:1 | 42:11 49:3 | **serve** 156:1 |
| **seize** 141:9 | **semitism** 164:6 | 60:11,21 62:7 | **served** 160:21 |
| **selected** 95:24 | **senate** 160:23 | 62:20,22 104:7 | 160:25 173:16 |
| **self** 69:2 164:18 | **senator** 296:24 | 146:20 149:16 | **serves** 129:2 |
| 266:16 272:2 | 297:1 | 192:23 193:10 | **service** 160:7,8 |
| **semester** 45:10 | **send** 37:25 | 219:2,7 270:10 | **serving** 3:7 |
| 45:17,21 46:7 | 61:15 67:13 | 271:16 273:13 | 12:21 |
| 46:12 60:15 | 68:23 70:8 | 273:19 276:5 | **set** 4:20 74:19 |
| 63:4 73:5 74:5 | 103:23 107:8 | 279:16,23 | 197:1 204:22 |
| 74:13,14 77:10 | 128:21 228:9 | 281:4,5,6 | 205:23 253:2,6 |
| 77:20 85:24 | 281:7,8 310:23 | 283:16 300:6 | 253:7 314:22 |
| 86:2,3,4 91:9 | **sending** 37:22 | 310:21 317:20 | 315:2 |
| 96:1 100:11 | 77:13 100:22 | **sentence** 57:5 | **setting** 275:19 |
| 102:23 118:9 | 287:1 | 147:18 196:25 | **settlement** |
| 141:16 163:12 | **senior** 6:20 | 204:15 | 314:4 319:6 |
| 169:5 191:20 | 20:10 42:1 | **sentiment** | **seven** 12:22 |
| 213:11 214:9 | 68:20 72:18 | 24:23 89:22 | 70:8 166:8 |
| 214:20 231:4 | **sense** 22:1 29:6 | **separate** 19:25 | **several** 14:23 |
| 268:11 269:1 | 41:16 66:14 | **separately** | 18:24 20:8,10 |
| 272:8,10 | 114:17 129:25 | 254:25 | 68:10 74:6,8 |
| 303:21 307:21 | 131:24 187:16 | **september** | 75:23 76:1 |
| 308:9,12,25 | 197:21 198:16 | 28:10 47:15 | 77:2,4 88:1 |
| **seminar** 8:1 | 222:12 240:7 | 49:1 81:11 | 99:18 120:13 |
| 16:4 85:14 | 278:22 289:18 | 134:4 264:5 | 140:22 141:11 |
| 99:5 188:4 | 298:20 | 265:6 266:15 | 142:20 164:21 |
| 268:11 270:15 | **sensed** 129:23 | 296:1 307:15 | 168:25 169:25 |
| **semites** 107:6 | **sensitive** | **series** 253:22 | 212:15 319:9 |
| | 136:25 | | |

severely  296:5
sewn  258:24
shades  265:11
  265:14
shaking  14:6
  65:13,20
  237:11 239:10
share  3:21,25
  4:8 25:23 44:1
  44:13 80:15,16
  82:2,19,19
  86:9 91:5
  105:19 118:16
  118:17 140:14
  147:6 148:13
  176:22 182:4
  183:5 186:2,14
  191:4 192:18
  253:9,19,21,22
  264:12 266:2
  267:1
shared  68:20
  75:2,4,8 85:11
  118:4 140:7,18
  140:20 152:22
  153:7,15
  176:20 178:19
  187:6,13,15
  224:5 231:6
shares  266:5
sharing  58:22
  58:25 70:21
  84:18 190:22
  252:17 303:1

shattered
  243:24
shaw  2:5 4:4
  6:18,19,19
  16:18 20:4
  24:10 36:19
  46:5 48:20,21
  68:22 72:7,9
  72:11,15,15
  78:3,7 79:5
  80:2,3,7,13,24
  81:5,11,13,16
  82:5,9,14,25
  83:7,14,16,19
  85:16,19 86:1
  86:6,16,17,23
  87:8,13 88:12
  88:18,25 89:17
  90:14 91:1,15
  91:18,23 92:2
  92:14,17,21
  93:7,13 94:1
  94:16,19,22,25
  95:3,5,12,16,21
  96:3,5,10,13,15
  96:17,20 97:13
  97:17 275:14
  284:12 285:12
  297:7 298:8
  305:24 306:12
  321:2,2
shaw's  61:13
  262:7

she'd  242:7
she'll  202:24
shed  53:24
shift  224:15
shifted  22:2
shirt  50:21,23
  157:21,23
  158:3 182:7,11
  182:13,16
  271:4,6,7,8,11
  273:8,15
  310:24
shocking
  225:13
shoes  197:14
  198:15
shook  107:23
  151:5
shoot  244:5
  293:19
shooter  15:25
  164:8 309:25
shooters  244:6
  309:17
shooting  16:19
  23:24 76:10
  104:19 163:23
  243:18,18
shootings
  163:17
shorstein
  160:19 166:13
short  67:7,18
  97:20 251:13

304:4
shortly  14:25
  73:4 104:21
  140:20 177:10
shot  104:22
shotted  274:10
  274:13
shout  313:19
show  15:9
  25:22 46:21
  65:15 68:14
  273:22 282:3
  287:3
showed  38:25
  67:5,7,11
  68:13 101:17
showing  246:18
shown  65:4
  105:6 210:5
  307:16
shows  34:11
  69:5
shut  258:24
  310:14,17
  312:9
sick  81:24
  238:12
side  59:16
  137:13 281:14
  303:12
sight  210:14
signature
  326:17

**[signed - somebody]**                                    Page 88

| | | | |
|---|---|---|---|
| **signed**  149:17 | 173:14 198:2 | **skeptical**  306:9 | 105:24 106:5,6 |
| **significance** | 210:22 272:12 | **skilled**  229:18 | 140:10 161:14 |
| 63:20 | **sins**  317:9 | **skills**  326:9 | 163:11 165:23 |
| **significant**  13:9 | **sir**  6:1 140:3 | 327:6 | 169:8 183:22 |
| 20:2,5,13 34:5 | 145:20 155:8 | **skin**  211:10 | 223:24 274:24 |
| 64:2 74:20 | 159:18 176:12 | **skip**  114:5 | 291:10,12 |
| 77:11 132:7 | 176:15 177:17 | **skipped**  165:3 | 313:23 323:10 |
| **significantly** | 180:12 181:12 | **skipping** | 323:13 |
| 30:19 40:21 | 184:11,15 | 305:16 307:3 | **socially**  169:15 |
| 63:6,10,18 | 195:12 202:15 | **skirt**  123:1 | **society**  134:7 |
| 210:13 224:13 | 209:5,13 | **slam**  164:16 | 134:11 160:13 |
| **signing**  177:11 | 252:20 318:19 | **slashing**  142:13 | 166:9 291:13 |
| 177:12 | **sisters**  202:4 | **sleeping**  272:3 | **sociopath** |
| **silence**  45:5 | 203:19,22 | **slept**  102:20 | 225:12 |
| 301:10,21 | **sit**  45:5 309:4 | **slide**  135:8 | **sock**  283:7 |
| 302:1 | **site**  161:14 | 276:24 | **solely**  49:13 |
| **similar**  31:2 | **sitting**  31:20 | **slightly**  300:20 | 201:2 258:6 |
| 104:10 113:1 | 68:4 91:2 | **slipped**  132:5 | **solicit**  133:21 |
| 163:19 164:14 | 142:20 148:17 | **slow**  202:24 | **solid**  20:8 |
| 318:24 | 148:21 236:23 | **small**  249:7 | **somebody** |
| **simple**  57:18 | 241:5,9,20 | 275:3 311:22 | 49:15 50:22 |
| 114:9 142:23 | 269:4 270:5 | **smaller**  289:11 | 51:15 56:5 |
| 287:8 | 276:13 | 289:16 | 57:10 106:16 |
| **simply**  213:21 | **situation**  15:10 | **smiled**  262:2 | 126:8 145:6 |
| 216:9 234:7 | 20:9,21 53:6 | **smirk**  210:21 | 149:5 189:11 |
| 249:22 259:25 | 88:18 102:6 | 261:17 | 239:25,25 |
| 263:18 270:19 | 104:10 120:9 | **smirked**  261:20 | 267:14 278:1 |
| **sincere**  265:2 | 121:1,5,14 | **smirks**  210:16 | 280:15 283:5,8 |
| **sincerely** | 144:25 277:7,9 | 210:22 | 285:1 286:21 |
| 168:22 288:13 | 277:11 281:22 | **snapshot**  54:3 | 290:3 295:5,25 |
| **sincerity** | 310:11,16 | **sneered**  307:18 | 296:7 297:6,14 |
| 308:15 | 321:3 | **sobbing**  103:3 | 297:15 300:12 |
| **single**  87:17 | **six**  139:4 144:9 | **social**  7:17 63:7 | 307:7 308:16 |
| 170:12 173:6 | | 81:14 100:10 | 316:19 320:7 |

**[somebody - speaking]**

| | | | |
|---|---|---|---|
| 323:21 | 121:25 122:11 | **sort** 22:5 23:19 | **sounds** 72:2 |
| **someday** 88:11 | 125:3 133:8 | 23:23 24:22 | 96:3 139:20 |
| **someone's** 40:5 | 134:11 135:12 | 25:5,12 28:16 | 194:21 197:19 |
| 64:12 244:9 | 137:14 139:14 | 28:18,21,21 | 293:16 302:3 |
| **something's** | 139:14 146:15 | 30:12 34:14,23 | **source** 33:25 |
| 187:13 | 151:12 152:7 | 37:15 41:18 | **south** 163:21 |
| **somewhat** | 154:11 159:20 | 49:23 57:17 | **sovereignty** |
| 33:22 88:7 | 171:6 177:19 | 67:9 104:6 | 141:7 142:4 |
| 102:15 144:13 | 180:8 183:18 | 110:1 120:5 | **sowed** 161:25 |
| 149:23 150:2 | 184:3 186:22 | 121:2,10 150:8 | **space** 249:8 |
| 258:14 267:18 | 194:10 196:8 | 166:19 185:4 | 314:1 |
| 274:15 282:2 | 196:16 200:18 | 210:7 214:5 | **speak** 12:2 34:4 |
| 293:13 295:16 | 202:18 204:1 | 216:12 222:3 | 66:13,14,19 |
| 318:5,7 | 204:21 213:16 | 225:10 227:10 | 67:4 75:24 |
| **soon** 21:13 | 219:23 221:14 | 229:13 232:18 | 83:7,9 89:22 |
| 25:14 215:16 | 222:10 229:22 | 234:1 235:5 | 90:18 91:21 |
| 258:20 282:3 | 229:25 230:5 | 237:17 253:5 | 105:15 113:19 |
| **sorry** 7:5 9:24 | 234:21 238:22 | 269:24 272:1 | 113:20 120:10 |
| 28:1 31:25 | 239:3 242:4 | 272:17 288:23 | 140:21 145:3 |
| 40:24 41:13 | 244:22,24 | 297:21 298:20 | 148:3 152:8,10 |
| 42:17 44:2 | 245:20 246:10 | 302:3 313:25 | 159:20,21 |
| 50:18 55:1 | 249:2 262:12 | 315:16 316:17 | 183:6,14,20,22 |
| 56:11,12 58:23 | 262:15 265:22 | 318:1,13 319:5 | 184:13,17 |
| 59:4 60:6,9,10 | 270:21 272:15 | 320:14,15 | 187:10 194:4 |
| 60:17 62:21 | 276:12 278:18 | **sorts** 279:2 | 208:12 255:2,5 |
| 65:16,16 67:1 | 279:13 280:25 | **sought** 143:8 | 255:12 273:7 |
| 72:9 80:14 | 281:15 283:21 | 165:12 171:25 | 312:3 313:13 |
| 81:9 82:11 | 284:4,18 291:5 | 289:5 | 313:20 316:25 |
| 83:11 84:22 | 295:12,23 | **sound** 56:2,4 | 323:16 |
| 85:3 92:16 | 296:20 300:8 | 164:17 194:18 | **speaker** 25:6 |
| 94:2 98:10 | 300:15 305:18 | 194:25 197:17 | 114:10 119:21 |
| 109:3 112:16 | 306:1 307:6 | 245:9 274:4,18 | **speaker's** 148:3 |
| 115:2 116:25 | 319:2 320:10 | 278:13 280:14 | **speaking** 35:4 |
| 117:9 118:13 | | | 67:2,25 90:3,7 |

**[speaking - staff]**

90:20 91:3,10
161:9 187:5
242:4 285:22
287:13
**speaks** 158:20
**special** 6:21
72:19
**specialty** 160:5
**specific** 4:25
17:11 30:2
33:16 45:22
51:1,8 54:1
58:20 119:8
121:5 147:24
152:15 191:23
232:2 255:13
301:23 305:15
**specifically**
12:16 20:9
22:25 23:3,17
24:24 69:22
72:13 98:8
112:2 117:19
124:17 135:21
140:2 150:16
159:13 163:22
186:5 187:7
188:2 192:11
203:10 209:22
210:2 223:23
228:2 235:1
**specificity**
207:18

**specify** 201:16
**spectrum**
275:24 281:12
**speculate** 150:1
248:19
**speech** 11:8,10
11:14,19 18:3
20:24 23:14
26:13,21,24
27:2 28:11,16
29:2,13,13
31:1,4,10
34:12 42:7
49:9,10 53:8
67:9 87:7,9
96:18 99:10,11
99:12 100:1,9
100:23 107:5,5
107:7 108:19
114:6 117:15
120:15,17
121:2 124:13
134:23,25
135:7,8,9,24,24
135:25 147:24
148:2 197:4
200:20,24
201:1 216:1
257:14,16,20
258:1,17,22
259:3 260:10
267:22 268:2,6
268:6,10 273:3
273:5 283:10

285:15 286:7
293:25 297:4
297:17 301:11
301:22 311:17
311:18 313:21
316:24 324:5
**spend** 18:22
**spent** 13:9
19:14,19,23
20:4,5,11
**spewed** 163:19
**spewing** 169:12
**spirit** 122:17
**spirited** 260:11
278:25
**spoke** 74:8 77:4
79:6 116:20
117:10 119:5,6
120:18 128:5
143:14,25
145:13,14
214:4 215:3
216:9 245:12
245:13 272:3
280:19 285:9
299:18
**spoken** 20:16
37:2 48:3,4
64:16 97:3
116:17,24
120:12 161:20
191:2 216:3,5
216:6 223:2
226:22 285:6,9

285:11,12
**sponsored**
166:8
**sponsorship**
166:16
**spouting** 225:1
**spray** 164:20
**spread** 14:11
130:12 140:16
162:15 207:9
207:11,15
**spreading**
205:17
**spring** 29:12
74:12 77:19
86:4 89:16
91:9 96:1
136:17 169:5
268:4 271:21
306:2
**spur** 199:14
**spurred** 199:10
**st** 222:23
**stabbing** 16:20
**stacey** 265:8
**staff** 13:7 14:20
19:15 41:23
42:2 53:4 65:1
73:6 148:5
161:13 162:1,5
163:6 164:5
167:24 170:4
172:3

**[stage - stopped]**

**stage**  168:23
**stand**  32:24
59:13 142:19
**standard**  60:22
155:14 288:24
289:18,19
**standing**  241:6
241:23
**standpoint**
221:15
**stands**  155:1
211:25
**start**  73:4,4
74:12,14 82:23
139:5 191:24
203:24 232:17
263:10,11
264:20 313:17
**started**  3:2
82:12,25 87:1
97:2,25 138:22
205:17 211:3
214:2,5 222:17
224:1 232:21
244:19 253:4
282:14 296:22
299:6 304:9
319:5
**starting**  69:16
97:1 168:5
244:23
**starts**  58:4
84:23 256:5
262:25 263:3

**state**  66:13
160:24 173:20
210:3 238:10
270:11 296:24
297:1
**stated**  28:9
41:20 76:4
86:9,18 89:3
168:21 172:19
174:24 175:13
188:8 189:8
192:10 219:17
230:6 264:23
264:23,24
**statement**  3:19
7:18 11:23
12:2,19,23
13:12,23 17:11
22:22 23:10
27:23 29:22
41:24 48:16
53:1 57:7,7,17
81:22 86:9
93:15 105:14
162:10 169:9
171:4 177:12
188:14 195:4,5
196:20 234:23
240:10 254:10
254:12 266:21
268:21 273:5
277:14 281:24
293:25 311:8
324:3

**statements**
13:25 15:21
16:5,8,11 17:2
17:13,19 18:3
18:8,10,10,12
23:18 24:4,7
27:6 30:17
33:18 42:4,5
50:3,14 51:5
52:3 59:22
70:13 108:14
117:6,13,15
127:13 152:23
191:11 192:1
197:6 211:23
212:9 235:21
254:5 266:17
266:21
**states**  59:13
69:1 81:23
100:20 141:2
166:5 167:6
169:20,24
172:10 174:4
265:20 266:22
**stating**  165:8
**stationed**  73:8
**statistically**
229:15
**statute**  206:17
208:2
**statutory**
206:22

**stavros**  294:4
**stay**  68:11
78:18 152:20
165:18 223:9
321:16,17
**stayed**  103:1
308:13
**staying**  128:19
321:14 322:10
**steam**  97:3
**step**  101:6
111:8 126:7
178:5,6 302:7
**stepped**  123:25
124:3
**steps**  14:15
297:18 318:23
**sticks**  260:12
262:14
**stifle**  269:14
**stipulating**
204:20
**stockholm**  69:7
**stoke**  17:6
**stoneman**
163:24
**stood**  264:25
266:8,20
**stop**  37:9 70:20
84:18 119:16
206:23 207:3
244:8
**stopped**  230:23

**storied**  294:9
**story**  106:9,11
    106:12,17
    155:17,19,21
    278:9,10,12,15
    278:16 295:13
    295:20
**straight**  300:2
**strain**  202:19
**strands**  57:16
**strange**  225:7
    274:15
**strangers**  141:6
**stress**  15:10
    283:12
**stressful**
    214:20
**stretch**  214:17
**strip**  176:10
    293:20 297:2
**stripping**  293:5
**strong**  29:1
    87:3 153:20
    270:1 272:8
    284:12 307:2
    324:5,9
**strongly**  52:8
    284:11 313:15
**struggle**  141:10
    281:12
**struggles**  134:9
    134:19
**student**  1:1 3:5
    3:11 4:17,23

5:6 6:3,6,24
7:24 8:10 10:5
10:7 11:12,24
12:1 14:5,9
15:19 17:8
18:5 21:13
26:8 27:11
29:3 36:20,20
41:21,22 48:14
48:22 49:9,21
50:23 54:4
58:18 70:14
72:25 73:1,21
74:16 75:25
76:2,7,9,12,16
76:19,21 80:9
80:10 81:20
82:4,7 87:3,17
89:25 90:10,11
90:15,16,18,20
92:3 100:17
102:4 103:2
104:24 105:6
111:2 117:23
118:24 120:16
126:22 137:2,6
140:14 141:11
143:16 145:13
147:20 153:16
161:8 165:20
186:1 208:9
239:24 240:1
253:8,8 254:14
256:12,13

257:18 260:18
261:9 264:7,17
266:15 267:2
270:14 275:3
275:24 281:21
294:14 304:1
307:25 308:1,8
309:9 311:16
322:19 325:5
**student's**  11:7
    11:9,14,19
    82:2 90:21
    165:18 257:13
    257:15,20
    258:1 266:25
    308:5
**students**  5:2
    6:20,21 7:13
    13:4,7,15
    14:13,19,19
    15:6,7,11,21,25
    16:13 20:5,12
    22:6,17 23:11
    23:16,21 24:20
    29:5,7 33:5,6,6
    37:12 41:17
    42:2 43:9
    48:21 49:24
    50:2 51:22
    53:3,24 54:14
    57:20 62:25
    65:1,3 72:19
    72:22,23 74:2
    74:4,5,6,8,15

74:18,25 75:5
75:10,21,23
76:1 77:2,4,12
77:13,15,16,23
78:6,8,8 79:19
82:15 87:15
89:3,8,10,12,14
89:18,20,24,24
90:3,4,5,8,11
90:17,22 91:7
95:17,22,24
96:25 97:6,7
98:16 99:4,7,8
101:23 102:1,2
102:9,13 103:1
103:18,19
104:4,8,14
105:7 107:1
109:14,15
111:15,16
134:20,21
136:3 140:7,19
140:21 143:17
143:25 144:17
144:23 145:3
145:14,22
148:6 153:17
160:14 161:13
161:18 162:1,5
163:3,5,12,15
163:17,21
164:4,17,21,23
165:3,7,9,11,12
165:21 166:10

166:12 167:24
168:19,25
169:25 170:4
170:13 171:24
172:3,5 185:22
186:4,9 189:10
189:21,25
191:8 198:14
201:8,13
258:18 259:8
259:24 264:14
265:10 269:5
270:6,8 297:20
297:25 301:19
305:23 311:9
311:13,23
315:3 319:12
319:13 322:16
324:21,23
**studied** 76:21
**studies** 77:7
  79:1 160:18,20
  163:14 166:14
**study** 14:20
  165:15
**studying** 22:19
  54:10 77:1
  164:23 165:22
  168:20,21
**stuff** 40:22
  41:15 46:21
  212:12 229:3,3
  236:22 273:23
  292:15 304:20

311:19 313:4
**stumble** 122:5
**stupid** 211:8
  249:25
**style** 301:17
**subcontinent...**
  211:14
**subdue** 169:24
**subject** 166:15
  190:7,8,12,14
  224:8 283:25
  322:2
**subjective** 56:8
  66:17
**subjectively**
  111:16
**subjects** 98:17
**submission**
  83:24
**submit** 27:23
  155:2 234:17
  235:4 304:16
**submitted**
  83:21 85:5
  99:1 205:15
  212:18 213:18
  304:19
**subscribes**
  174:2
**subsequent**
  57:25 271:18
**substance**
  117:4

**substantial** 8:7
  13:8 17:1
  26:22 28:15
  31:8 37:5
  208:3 295:8
**substantially**
  8:12,19 10:9
  10:17 28:12
  52:18 67:23
  256:16,25
  267:23
**substitute**
  141:24
**subtitle** 264:14
**subtitled** 36:11
**successful**
  270:18 311:10
**successfully**
  199:14
**suddenly** 73:10
**sue** 222:6,15
**suffer** 76:15
**suffered** 169:4
**sufficiently**
  24:5 28:20
**suggest** 28:17
  124:6 197:2
**suggested**
  132:9 319:3,5
**suggesting**
  28:23 58:2
**suggests** 189:11
**suit** 197:13,13
  197:17 198:15

**summa** 303:25
**summarizing**
  83:4
**summer** 87:2
  93:19 284:6
  287:24 288:2
  303:12,14
**summerlin** 5:1
**sun** 84:12
**sunshine**
  154:19
**super** 22:3
**supplemental**
  235:5
**support** 24:5
  210:9 212:23
  234:6,20 235:2
  269:16
**supported**
  259:21
**supporter**
  107:4 269:10
**supportive**
  17:24
**suppose** 116:11
  132:7 224:8,20
  240:9 275:14
  322:22 323:1
**supposed** 22:18
  46:1 88:18
  187:2 260:2
  267:5 301:19
**suppress** 107:7

**suppression** 185:8
**supremacist** 99:1 104:22 118:1 266:18
**supremacy** 101:18 169:22 210:2
**supreme** 99:15 141:21 160:22
**sure** 20:20 23:5 24:11 28:7 32:5,8 33:1 39:15 47:14 48:14 49:25 54:17 64:10 68:8 69:8,19 69:21 70:11 77:16 87:16 120:12 121:7 122:18 128:14 128:19,21 130:10 150:12 181:11 190:10 191:2 195:8 200:12 207:8 217:8,10,12 233:14 237:23 240:25 241:1 245:3 246:11 260:24 265:21 265:24 284:9 284:10,11 285:20 300:22

308:13 310:15 315:25 323:18 323:19
**surely** 13:4 126:23 143:8 175:21 289:5
**surging** 167:5
**surname** 14:22
**surprise** 322:9
**surprised** 101:13 110:22 229:19 282:8
**surprising** 282:25
**surrender** 142:1
**surrounded** 54:8
**surroundings** 76:25
**survive** 142:7
**survivors** 15:24 104:18
**suspect** 116:7 200:24 214:13 290:16,17 295:5
**suspected** 161:5
**suspects** 211:17
**suspension** 60:23 61:8 273:6,12 304:4

**sustained** 8:24
**swaggins** 294:19,19
**swallow** 142:4
**swastika** 99:20
**sweet** 44:25
**swipe** 103:6,9 264:12
**switch** 119:19
**switches** 196:9
**sword** 142:14
**sworn** 326:5
**syllabus** 136:16
**sympathetic** 284:8
**sympathies** 281:10 322:21
**sympathize** 292:7
**synagogue** 144:1,2 164:2
**synagogues** 163:18
**synonymous** 292:23
**synonyms** 132:12
**synthesized** 212:13
**system** 56:19 61:10 80:5 213:4 220:16 221:19 222:6 226:10 243:3

262:9 302:15

**t**

**t** 50:21,23 157:21,23 158:3 182:7,11 182:13,16 222:9 271:4,6 271:7,8 273:15 310:24
**ta** 96:8
**table** 44:23,23 68:4 262:25 263:1
**tactical** 290:5
**tailor** 69:22
**take** 8:18 9:11 10:4,15 11:16 14:16 21:22 23:14 32:21 34:17 39:24 40:5 42:15 43:23 44:8 50:5,14 56:23 57:7 58:12 64:11 67:23 74:18 78:5 88:19 97:18,20 97:21 112:14 119:18 130:7 136:10,12 137:7 138:4,8 138:9,18 187:20 208:7

212:2 213:25
220:18 230:13
230:17 235:3
246:25 251:12
256:6,10,22
257:23 259:6
262:15,15
263:7 267:10
275:10 278:1
281:17 283:14
284:5 286:21
288:3 289:14
297:18 300:24
301:4 302:7
308:21,23
309:13 312:5
319:12 320:19
322:4 324:2
**taken** 14:21
  18:2 20:13
  79:21 204:15
  204:16 224:4
  243:25 291:8
  319:14 326:3
  326:12 327:9
**takes** 44:19
  78:21 194:18
  239:25 269:7
  291:3 294:2
  324:7
**talented** 284:5
**talk** 24:11 56:7
  78:11,15 89:2
  93:20 108:19

119:4 120:25
130:11 133:16
161:13 171:25
180:24 214:15
220:9 236:25
237:19 242:8
248:4,5,7,8,20
248:24,25
274:5 277:3
287:7,14 305:7
320:22,24
321:7
**talkative** 274:2
**talked** 19:15
  40:24 86:25
  87:21 92:6
  128:14 132:14
  133:24,25
  153:17 215:13
  217:25 233:25
  236:22 242:1
  246:21 277:4,4
  277:5 278:11
  285:4 310:12
  320:21
**talking** 15:2
  20:12 21:1
  28:9 41:1 61:3
  67:21 74:25
  87:2,14,19
  88:5 94:3
  112:11,22
  123:23 131:3
  134:13 158:12

171:3,7 214:2
216:13 224:9
225:7,9,10
228:18 229:5
239:22 241:7
241:10,16,20
241:23 250:13
250:20 264:13
265:18 279:21
280:24 283:2,3
286:3 288:9
304:20 314:3
**talks** 154:18
  288:16 304:14
**tangible** 34:17
  65:6 185:23
**tanya** 280:21
**tardiness**
  165:10
**tardy** 165:8
**target** 102:3
  106:1 173:12
**tasked** 11:6
  87:16 257:12
**taught** 69:5
  98:16 104:10
  117:3 269:4
  270:5
**taunt** 295:1,2
**taunting** 295:1
**teach** 142:20
  154:22,23
  160:2

**teacher** 93:5
**teachers** 276:3
  276:5 314:21
**teaches** 294:6,7
**teaching** 8:14
  10:12 102:22
  134:19 136:18
  160:6 208:5
  256:18
**team** 42:1
  68:20
**tear** 236:25
**tearing** 236:23
**tears** 14:6
  65:12,20 76:9
  236:19,21
**tease** 145:8
**tell** 4:15 15:14
  18:18 22:12
  26:1 40:17
  46:3 51:1
  69:12,13 78:13
  87:6 88:10
  102:17 120:19
  121:20 128:3
  128:10 131:21
  155:21 188:25
  202:24 213:10
  215:4,23,25
  218:17 220:14
  227:21 234:20
  241:15 263:23
  264:6 271:2
  276:1 277:7

| | | | |
|---|---|---|---|
| 284:8 297:20 | **terrible** 21:17 | **tha** 222:9 | 251:3,5,6 |
| 300:9 307:12 | 59:19 142:2 | **thank** 5:16,25 | 252:20 280:9 |
| 312:8 314:13 | 309:17 320:8 | 6:4,7,10,15,18 | 280:11,11,12 |
| 314:20 315:25 | **terribly** 282:8 | 6:22,25 7:11 | 280:12,16 |
| 316:2 | **terrified** 21:23 | 9:10 10:3 | 301:5 316:6 |
| **telling** 40:2 | 164:14 | 12:10,18 25:16 | 322:13 323:2 |
| 60:13 86:19 | **territory** | 25:17 26:4,5 | 324:12,16,17 |
| 87:5 88:23 | 135:14 | 38:12 44:17,25 | 325:7,9 |
| 285:14 308:3 | **terror** 161:25 | 45:1 46:13 | **thanks** 189:13 |
| 323:8 | **terrorist** | 49:12 62:1,11 | 215:2 305:12 |
| **tells** 155:17 | 177:13 181:9 | 69:24 70:18 | **that'd** 28:2 |
| **ten** 187:1 | 280:15 | 71:12,15,16,17 | **theirs** 103:20 |
| **tend** 243:23 | **terrorize** 16:7 | 72:3,6 80:3 | **theme** 129:24 |
| **tended** 198:11 | 17:8 309:14 | 82:21 94:7,9 | **themed** 99:1 |
| 222:3 | **terry** 2:11 3:9 | 96:12 97:13 | **theories** 169:13 |
| **tension** 134:21 | 10:5 256:11 | 98:2 105:8 | 184:23 |
| 134:22 | **test** 249:7 | 107:12,17 | **theory** 98:24 |
| **tenured** 98:11 | **testament** | 119:20,23 | 154:18,24,24 |
| 159:25 280:3,7 | 318:6 | 122:11 137:16 | 154:24 269:2 |
| 280:8 | **tested** 136:20 | 137:19,22 | 317:2 |
| **term** 132:10 | **testified** 268:15 | 139:6 140:4 | **thesis** 127:16 |
| 172:22 217:4 | 323:7 | 144:20 145:20 | 127:24 |
| 292:22,25 | **testify** 152:12 | 145:21 146:17 | **thing** 40:19 |
| 293:1,15,15 | 279:7 | 158:6,24 159:1 | 53:20 55:14 |
| 304:4 311:11 | **testifying** | 159:3,17,19,21 | 95:3 106:13 |
| **terms** 34:19 | 297:10 326:5 | 170:19 172:18 | 116:23 123:9 |
| 47:22 145:12 | **testimony** | 180:12 183:24 | 136:15 154:14 |
| 150:10 207:24 | 32:10 159:24 | 186:18,20,21 | 175:17 196:8 |
| 245:18 269:22 | 161:19,21 | 188:18 191:15 | 196:21 224:13 |
| 272:11,20 | 268:16 269:19 | 192:9 195:18 | 227:4 228:19 |
| 279:18 299:2 | 318:13 | 200:7 202:15 | 236:9 241:1 |
| 303:12 305:16 | **text** 267:5 | 209:5,9,12 | 254:9 260:12 |
| 315:1 323:12 | **texts** 315:6 | 213:7 214:22 | 262:13 272:13 |
| 323:22 | | 247:18 250:25 | 273:10 274:11 |

**[thing - think]**

| | | | |
|---|---|---|---|
| 274:25 276:7 | 259:4 260:5,9 | 108:23 109:15 | 243:3 247:9 |
| 278:25 282:20 | 261:11 262:5 | 112:10,20,22 | 249:18,21,24 |
| 298:2 303:7,13 | 272:25 273:1 | 113:25 115:18 | 250:10,14,21 |
| 303:15 304:16 | 276:4 284:10 | 118:8 119:10 | 252:13 253:2 |
| 309:16,19,20 | 293:12 298:22 | 121:4,16 | 258:13 260:9 |
| 310:13,15 | 304:16 306:24 | 124:18 130:25 | 260:23 262:23 |
| 311:4,5 313:7 | 309:25 310:21 | 135:2,12 136:8 | 264:10,12 |
| 318:5 320:12 | 311:1,2,2 | 138:11,25 | 271:5,14 |
| 320:13 321:1 | 313:9 315:14 | 139:10 142:25 | 273:16,18 |
| 321:10,20 | 315:18 317:2 | 151:17 152:13 | 274:14 275:3 |
| 322:12 323:22 | 319:14,20 | 152:17 153:19 | 275:12 276:16 |
| **things** 12:24 | 321:10 323:11 | 153:22,23 | 278:16 279:12 |
| 20:24 22:7 | **think** 15:17 | 154:1,2 155:1 | 280:4 285:16 |
| 23:25 24:14 | 17:5 18:1,23 | 157:1 158:17 | 286:1,8,14 |
| 28:6 42:13,14 | 20:23 21:9,19 | 158:20,22 | 287:4,11 |
| 50:13 51:8 | 22:9 24:8,24 | 162:10 177:21 | 288:13 293:19 |
| 52:16,17 54:1 | 25:10 30:8,18 | 178:9 182:19 | 293:21,21 |
| 54:18 58:15 | 31:12 34:1,3 | 189:24 190:8 | 294:12,20 |
| 59:21 87:22 | 34:18 37:10 | 191:24 192:1 | 296:10,10 |
| 88:16 91:7,8 | 38:21 41:15,21 | 193:5 194:6,14 | 298:12 300:3 |
| 91:19 92:11 | 43:8 46:4 | 195:15 197:20 | 301:3,22,25 |
| 93:20 105:22 | 47:11,14,15 | 197:22 198:10 | 302:18 304:3 |
| 105:22 115:15 | 50:18 51:25 | 198:12 201:21 | 304:11,14 |
| 154:3 158:17 | 53:11,23 56:7 | 202:10 203:3 | 305:5,6,10 |
| 175:17 176:20 | 57:3,6,9,14,14 | 206:7,10,21,22 | 308:22 310:3,7 |
| 177:4 185:13 | 57:22,23 58:4 | 207:11,19,21 | 310:8,18 |
| 195:19 199:2 | 58:5 64:10 | 208:17,22 | 311:10,11,24 |
| 211:12 223:24 | 65:11 66:20 | 209:16 211:19 | 312:20 313:3 |
| 223:25 228:17 | 69:10,16 79:13 | 215:24 222:2,8 | 314:16 315:12 |
| 228:22 230:1 | 83:23 89:13 | 222:11,14 | 315:13 316:15 |
| 242:24 243:25 | 91:3 92:10 | 224:5,23 | 316:19 317:6,8 |
| 244:5 250:12 | 93:5,10,14,17 | 226:23 227:17 | 318:3,11,13 |
| 250:15,18 | 93:24 95:25 | 228:21 229:21 | 319:15 320:9 |
| 253:16 255:21 | 97:2 103:10 | 235:15,17 | 320:23 321:22 |

322:8 323:7 324:11
**thinker** 41:18
**thinking** 21:4 246:5 291:24 315:9 319:11
**thinks** 18:1 56:3 221:22 279:11 280:15 282:25
**thinly** 140:9 142:15
**third** 12:21 49:11 99:3 264:19
**thought** 16:19 28:20 29:4 30:14 38:23,24 41:18 57:17 63:15,19 64:22 67:10,12 75:11 92:24 93:1,22 102:1,5,14 105:17 110:23 111:9 114:6,8 115:21 129:10 129:24,25 133:11 134:24 153:18 198:4 205:9,9,10 211:13 213:21 219:9 222:8,9 222:9,10,11 230:4 243:7 249:6 258:12 277:22,23,24 281:8,23 285:13 286:7 286:10 299:25 300:3 304:18 304:21 317:7 318:16
**thoughtful** 281:21
**thoughts** 15:15 24:22 34:24 49:16 75:6 200:12 264:12 274:25 298:11 298:12
**thousands** 98:16 105:23 105:24
**threat** 16:12,25 17:7,12 28:22 29:25 39:1 58:6 59:19 64:8 103:10 110:10,12 114:7,9,12,16 114:18,25 120:14 121:17 123:1,4 124:14 124:16 125:6 125:15,16 131:4 135:6 142:16,19 144:12,13 146:2 148:11 148:17 149:23 149:24,25 167:25 170:11 210:4 249:25 273:1 276:11 278:19,23 279:12 287:5 299:8 311:18 312:2
**threaten** 54:12 114:1 134:24 214:19 281:7 286:9 290:8 316:14
**threatened** 22:17 52:24 63:9 64:6,13 66:16 120:21 121:11,13 123:19 145:23 148:25 158:23 161:24 170:17 200:20,24 201:1 214:19 219:18 239:8 249:5,10,13,14 249:17 272:2 272:18
**threatening** 7:16 8:3 16:5 17:20,23 18:11 24:5,20 25:1 30:18 31:8 33:15 50:15 51:19 52:18 64:12 104:15 130:2,8 140:15 149:6 150:11 151:21,25 152:24 153:3 157:20,25 158:2 167:15 182:6,18 185:19 191:8 195:14,16 267:24 271:23 271:24
**threats** 8:25 10:24 13:6,7 16:20 17:2 26:22 29:22 33:3 34:21 54:13 67:10 70:16 98:19 106:7,14,17 110:8 113:22 120:11,19 140:10 144:10 144:14 147:24 149:9,11 197:5 240:3 257:5 268:22 279:5
**three** 42:23,24 89:10 98:15 137:23 160:21 160:25 189:24 220:3 266:12

**[three - told]**                                    Page 99

| | | | |
|---|---|---|---|
| 272:9 302:20 | 97:13,19 98:22 | 320:21 321:3 | 24:11 61:15 |
| 303:22 | 98:25 99:3 | 323:3 324:12 | 71:7 80:4 |
| **throats** 290:8 | 100:7 102:25 | 324:15 | 100:8 105:18 |
| **thursday** | 104:8 111:15 | **timeline** 27:7,9 | 106:12 107:18 |
| 130:20 143:24 | 112:15 115:1,6 | 27:13,14 28:8 | 107:23 134:21 |
| **tick** 204:5 | 115:10 116:20 | 36:11 | 183:14,20 |
| **tie** 197:16 | 116:24 119:18 | **times** 18:2 | 184:17 226:19 |
| **tied** 57:1 | 123:3,21,22 | 19:25 43:1 | 240:6 243:16 |
| **ties** 295:6 | 137:19,19 | 48:2 50:8 66:1 | 253:17 271:3 |
| **tigert** 5:7 | 138:10 141:19 | 106:11,17 | 283:22 285:6 |
| **time** 4:14 5:9 | 145:2,5 158:9 | 128:10 169:9 | 286:20 305:3 |
| 9:14 12:6,7,25 | 159:1 160:20 | 175:5 181:17 | 311:6 322:18 |
| 13:2,10 14:24 | 161:10 167:4 | 185:6 201:19 | 324:13 |
| 14:25 15:21,23 | 173:25 181:1 | 218:18 222:5 | **today's** 3:7,17 |
| 16:2,10 17:18 | 184:2 186:19 | 222:22 282:13 | 13:18 325:7 |
| 19:13,15,19,23 | 201:17 203:5 | 295:13,20 | **together** 21:24 |
| 20:5,11,13 | 205:15,25 | 319:9 | 95:8 104:5 |
| 22:12 24:6 | 209:8,9 210:23 | **timestamps** | 118:6 139:4 |
| 27:17 29:7 | 214:8 220:9 | 290:13 | 220:4 237:17 |
| 30:10,16,19 | 225:3 227:8,8 | **timing** 94:16 | 238:6,16,17 |
| 36:17 37:1 | 228:1,9,12,24 | **tip** 83:13,16,18 | 239:11 307:21 |
| 43:23 47:11 | 232:2,5 235:24 | 83:19 | **told** 14:7,17 |
| 50:5,11 52:16 | 235:25 236:15 | **tips** 213:22 | 21:13 35:18 |
| 52:22 54:2 | 236:24 238:10 | **tired** 237:1,6,7 | 37:4 51:22 |
| 58:19 62:11,23 | 238:14 239:21 | 237:7,14 | 56:3 68:24 |
| 63:15 64:1,23 | 240:25 241:2,2 | 238:13 | 73:12,21 75:2 |
| 65:10,23 67:14 | 245:3,21 | **title** 72:18 | 75:20 85:24 |
| 68:24 70:11 | 247:13 248:4 | 85:17,20,21 | 88:4,6 90:11 |
| 71:12,12 73:3 | 251:2,3 254:11 | 120:15 | 90:12 96:8 |
| 73:23 74:1 | 259:17 262:24 | **titled** 85:15 | 102:10 111:2,2 |
| 76:6 77:13 | 263:14 265:17 | 121:22 160:4 | 111:3,5 120:20 |
| 79:10,23 81:3 | 277:3 285:6,8 | **today** 3:4 4:3 | 140:19,22 |
| 88:4 93:11 | 294:15 297:22 | 6:17 14:5 | 155:18 196:12 |
| 96:15 97:4,5 | 302:25 309:23 | 16:18 17:15 | 236:18 241:24 |

**[told - true]**                                        Page 100

266:6 273:24
274:7,9 276:3
276:9 277:21
280:20 282:22
298:6,10,10
306:4,14 307:9
307:22 309:8
313:10
**tolerate**  25:15
**tolerated**  34:6
**toll**  21:6 104:3
**ton**  51:7 79:21
**tone**  319:25
**took**  24:3 28:5
39:23 41:25
42:2 61:6,22
81:1 82:14
90:1 102:16
124:17 129:3
188:13,15
222:1 224:18
247:15 262:2
280:4 284:20
290:10,24
294:7 311:24
**tool**  22:13
**top**  9:19 31:19
42:23,24 49:12
91:8 92:22
99:5 108:25
137:22,23
221:5 242:19
263:21 264:14

**topic**  74:20
170:12 226:16
250:9 322:3
**topics**  93:18
167:12 190:16
190:20
**torpedoed**
238:2
**tossed**  288:21
**total**  19:20
**totality**  8:20
10:18 257:1
**totally**  85:19
254:3 266:9
283:23 300:25
**touch**  62:18
136:22 320:25
322:11
**tour**  69:4
**toward**  157:11
**towards**  101:20
107:23 151:6
195:12 199:10
222:3 275:4
308:24 324:8
**town**  16:12
23:8,16 24:8
24:10 74:13,14
74:19,20,22
75:1,4,5 89:3,3
89:10,15 90:1
90:16 91:5,11
96:21,22
116:21 117:11

117:24 165:5
215:4 306:1
309:11
**track**  128:19
246:5
**tracy**  91:16
**tragic**  289:12
**training**  64:19
164:8
**trainings**  15:25
**traitor**  56:15
155:23,24
292:2
**traitors**  155:15
156:21
**transcriber**
327:1
**transcript**
327:3,5
**transcriptionist**
326:7
**transferred**
45:7
**transformed**
99:17
**trash**  237:18
**tree**  164:1
**tremendously**
171:23 172:12
172:13
**trends**  164:10
**trespass**  60:17
144:3,8

**trespassed**  15:1
104:22 132:25
143:24 144:4
168:4,17
244:16,19
272:5,7 273:5
277:5 278:15
279:14 294:21
294:24 298:15
299:11 300:12
300:13 302:25
**trespassing**
59:8,15 279:17
**trial**  226:1,2
**trials**  124:18
**tribe**  169:13
**tribunal**  176:5
**tribunals**  161:1
161:2 173:16
**tried**  22:12
33:5 102:8,22
103:4 133:21
262:6 301:21
**trip**  99:17
**tropes**  169:12
184:23
**trouble**  286:7
296:11
**troubled**
170:11
**troubling**
184:20 190:12
**true**  29:22,25
37:7 53:25

| | | | |
|---|---|---|---|
| 110:12 122:7 | 198:12,16,19 | 150:3,14,17 | 39:6 56:23 |
| 135:10 177:9 | 207:7 210:25 | 156:23,25 | 77:5 112:25 |
| 254:12 268:22 | 215:5,7 216:24 | 157:5,11 | 129:2 153:15 |
| 303:16 306:10 | 217:13,15 | 158:13 170:23 | 171:11 172:2 |
| 326:8 327:5 | 239:4 240:8,16 | 171:4,5,5,5,8 | 224:25 229:22 |
| **truly** 258:22 | 240:20,22 | 171:12 172:1 | 232:12 234:2 |
| **trump** 269:10 | 245:13 247:20 | 172:20 212:19 | 271:20,22,23 |
| 281:15 | 247:21,25 | 218:13 229:20 | 272:14 274:10 |
| **trusted** 51:22 | 261:24 274:20 | 230:7,19,23 | 274:21,23 |
| **truth** 4:15 | 286:6,8,9 | 231:12,18 | 299:16 300:1 |
| 298:7 308:4 | 308:22 309:4 | 232:7,23 | 321:11 |
| **truthfully** | 309:13 313:11 | 233:13 234:4,8 | **twice** 48:5 |
| 119:14 | 317:11,12 | 234:21 236:18 | 64:16 127:7 |
| **try** 46:11 78:8 | 319:2 | 241:25 242:22 | **twist** 262:11 |
| 78:22 100:23 | **tuesday** 61:25 | 271:16,18,21 | **twisted** 262:10 |
| 175:18 177:5 | **turn** 241:1 | 272:18 273:13 | **twisting** 267:7 |
| 208:19 210:19 | 304:8 305:12 | 274:13 282:18 | **twitter** 37:6 |
| 308:23 | 325:10 | 282:19 286:14 | 39:12,13,19,21 |
| **trying** 22:4 | **tweet** 33:24 | 286:25 287:6,7 | 39:23 40:6 |
| 23:16,21 38:10 | 35:21 36:2,7 | 288:12 295:18 | 41:1 107:21 |
| 50:11 73:11 | 37:24 38:25 | 295:22 299:21 | 109:11,20,21 |
| 78:25 92:9,21 | 40:21,23 43:19 | 310:22,23 | 121:16 122:6 |
| 93:18 104:3 | 43:21 52:10 | 311:25 312:24 | 131:25 133:19 |
| 114:1 117:25 | 56:16 58:16 | 312:25 317:20 | 142:22 150:7 |
| 121:4,14 | 65:21 66:2,4,9 | **tweeted** 181:5 | 161:15 173:23 |
| 122:12 135:15 | 67:5,7,11 | 211:24 218:18 | 177:10 180:21 |
| 136:5 143:21 | 68:14 69:25 | 230:10 232:11 | 181:16 185:20 |
| 145:8 146:23 | 75:18 77:25 | 232:13,22 | 210:5 211:3 |
| 152:19 153:1,5 | 108:3 111:25 | 233:18 | 218:9,20 224:5 |
| 153:19 155:8 | 111:25 112:4 | **tweets** 14:4 | 226:25 227:19 |
| 156:8 177:2,5 | 112:18,20,22 | 19:22 24:25 | 227:24 228:2,5 |
| 179:15 193:19 | 112:25 113:5,7 | 25:22 33:25 | 228:13,16,23 |
| 196:1,18 | 123:3 127:21 | 37:6,25 38:8 | 230:2 235:23 |
| 197:21,22 | 143:12 145:24 | 38:18,22 39:2 | 236:3,8,10,15 |

242:12,25
246:16 248:22
274:19 285:7
286:4 290:4
294:2 299:24
313:5,17,24
317:3 320:1
**two** 13:10 16:9
16:13 17:3
26:7 42:23
51:23 61:6,14
100:14 125:21
132:6 135:11
140:10 143:20
143:25 145:14
153:15,16,17
162:8 168:1
197:1 203:8
204:6 215:14
220:2 230:21
254:13 262:2
263:20 266:16
268:11 284:20
284:22 288:12
299:19
**tyler** 51:11
**type** 108:2
113:3 127:4
151:11 226:24
228:3 311:23
**types** 82:16
93:20
**typewriting**
326:6

**typically** 62:2
99:12
**typing** 250:18

**u**

**u.n.** 161:2
**u.s.** 6:12 148:22
160:21,22,22
160:23,24
163:23 164:1
202:2 266:9,16
**uf** 10:7 12:22
56:19 72:16
76:11,19 85:12
98:11,12,15
127:11 140:17
140:20 142:21
144:15 150:17
150:20 153:21
166:11,13,14
177:23 196:25
197:3 256:13
261:19 302:2
303:10 312:19
**uf's** 196:20
263:23
**ufpd** 127:16
143:24 144:4
**uh** 19:12 23:1
26:11 29:24
35:23 36:14
47:19 49:2,6
55:8,11 59:6
61:2,5,16 62:4

62:6,9,24 63:2
65:18 80:22
92:14 95:1
122:3 139:17
188:23 196:7
196:23 202:17
206:6 252:22
264:2 265:23
277:1 289:22
300:16
**ultimate** 36:23
**ultimately**
14:23 73:25
123:20 148:4
213:15 214:1,8
214:12,21
240:24
**un** 176:4
**unable** 33:10
77:6
**unacceptable**
13:6 34:9
**unaffiliated**
266:10
**unambiguously**
270:23,24
**unaware** 262:8
**uncomfortable**
73:24 165:8
200:9 206:14
210:14 211:8
212:14 308:21
**uncomfortably**
248:25

**uncontrollably**
76:12 185:7
**uncool** 226:20
**uncorroborated**
260:4,14
**undated** 36:10
**under** 27:3
29:23 51:10
61:25 108:14
124:9 211:9
216:25 226:10
232:18 246:17
268:22,25
291:17
**underground**
107:8
**underlying**
195:16
**underscore**
140:15
**understand**
13:19 23:23
34:2 41:19
43:10,14 53:12
53:22 54:17
56:24 57:4,17
57:24 63:22
86:12 121:3
126:23 137:6
142:15 151:23
176:19,19
179:8,16
189:16 190:10
200:16 209:3

216:14,16
221:11 245:5
258:12 261:15
279:11 301:3
305:1 306:22
306:23 307:12
308:19 309:23
318:7
**understandable**
283:12
**understanding**
9:5 34:11 35:9
35:12 54:16
108:2 128:18
148:19 151:11
157:5 216:18
217:19 226:24
227:1 307:22
**understands**
24:12 58:6
104:14 225:24
**understood**
14:9 16:10
34:20 53:6
67:9 82:17
141:12 216:20
217:20 228:12
232:2,7 233:8
**undertake**
263:20
**unease** 192:2
**unfit** 219:10,14
**unfolded** 15:22

**unfolds** 21:4,17
**unfortunately**
124:7
**unhappy** 50:12
**unidentified**
119:21
**uniformed**
167:18
**unimpeachable**
181:7
**uninformed**
211:8
**uninvited**
222:23
**united** 59:13
81:23 100:20
141:2 166:5
167:6 169:20
169:23 172:9
174:4 265:20
266:22
**universities**
288:20
**university** 1:1,2
1:7 3:6,11 5:10
6:13 8:8,13,16
8:20 9:7 10:3
10:10,14,18
12:15 39:5
53:25 72:12
75:14 87:10
98:7,13 131:22
140:1 150:18
150:20 159:12

160:1,17 163:7
166:18 168:24
170:8 188:2
208:4 209:22
227:13 256:6
256:10,17,20
256:25 283:13
294:7,8,8,14
301:10 302:15
324:18,20
**unknown** 34:22
73:17
**unlawful** 197:7
**unlocked** 168:7
**unmute** 139:13
**unnerved**
272:4
**unoriginal**
227:9
**unpack** 316:17
**unpopular** 13:2
**unprotected**
120:15 283:10
**unredacted**
239:18
**unsafe** 135:10
135:25
**unsettling**
213:1
**unusually**
167:15
**uob** 10:4 11:6,8
11:12,16,18
256:10 257:12

257:15,18,23
257:25
**uphold** 315:24
**upload** 62:13
205:5
**uploaded**
205:16 206:5
**upset** 13:15
23:12,15,17
24:19 29:5,8
33:6,10 34:5
50:3 53:16
75:23 133:6,10
236:20 237:4
244:17
**upsets** 13:3
**upsetting**
191:14
**upstanders**
174:20
**urgent** 276:22
**usa** 106:12
**use** 30:24 63:10
63:12 64:4
73:13 78:14,15
106:5 117:14
215:21 218:2
228:5 235:22
236:11 263:14
288:24 292:25
293:1,18
**used** 22:13 41:1
105:24 132:5
181:15 231:15

[used - visibly]

235:25 236:8
236:13 294:9
301:12,22
306:17
**user** 266:9
300:7,7
**uses** 311:10
**using** 11:19
121:9 155:13
194:8 258:1
289:16
**usual** 13:14
15:1 165:15
**usually** 171:21
267:12 270:16
292:10
**utilizing** 240:1
**uttering** 172:25
**utterly** 104:8

**v**

**v** 85:16
**vague** 124:14
**valid** 212:16
**validly** 53:15
**valuable** 100:7
**value** 79:14,16
**values** 147:2
**vance** 225:9
**variety** 32:14
69:5
**various** 57:16
120:9

**veiled** 123:1,4
140:9 142:16
**venture** 235:14
**verb** 132:2
293:18
**verbal** 83:20
**versus** 132:11
**veto** 314:24
**vi** 120:15
**vice** 5:5 169:14
**victim** 59:19
**victims** 104:23
**video** 211:5
225:6
**view** 25:11
32:12 33:17
39:1 42:3
59:20 145:10
161:22 182:4
182:20,20
184:17 185:6
190:14 292:24
**viewed** 228:13
**viewpoint**
151:20 319:11
**views** 11:17
26:9,21 34:5
52:2 79:12
91:5 92:7,7
101:15 109:25
109:25 110:1
129:12 145:10
145:12 163:20
254:15,21,24

259:10 281:10
311:17
**vigilant** 78:18
**vigorous** 148:6
**vile** 229:12
**violate** 147:23
**violated** 321:18
**violating** 3:10
8:10 310:17,18
**violation** 4:17
4:22,25 10:7
49:15,19
239:24 256:13
300:4
**violations** 9:6
**violence** 8:2
15:16 16:3
17:3,13,21
21:18 23:19,19
28:24 30:8
74:8 100:17
101:7,20
126:22 127:20
140:9 141:13
141:19 142:18
143:13 144:10
144:12 145:23
150:13 157:3
162:19 167:3
188:10,15,16
189:6,7,11
191:12 192:14
193:16,21
194:6,7,25

195:6 196:2,4
197:4,5,23
199:11,14,17
199:17,24
201:6,15,17
206:16 212:16
228:24 229:11
232:12,16,18
243:6 244:11
246:1 249:23
287:5 290:8
292:14 293:23
294:1,25
299:22 300:2
317:19 322:16
322:20,23
**violent** 15:15
15:15,20 23:20
24:22 144:11
166:20 167:5
174:4 195:16
198:21,23
200:11 238:3
244:10 292:6
293:14
**violently**
211:15
**viral** 115:15
225:6
**virtually**
318:23
**visceral** 65:6
**visibly** 75:23

| | | | |
|---|---|---|---|
| **visited**   175:3 | **wall**   294:21 | 255:12 262:21 | **wants**   18:1 |
| 175:11 | **walls**   162:4 | 263:14,15,15 | 211:18 273:25 |
| **vissugosin** | **wandering** | 264:20 267:16 | 274:14,15 |
| 51:11 | 135:13 | 274:5 275:1 | 277:12 286:1 |
| **vocal**   258:18 | **want**   7:15 9:18 | 278:13 281:17 | **war**   155:13 |
| **vogel**   2:13 5:17 | 9:20 21:19 | 284:5 288:7,14 | 161:6 169:17 |
| **voice**   14:7 | 25:4 31:13,15 | 289:3 299:13 | 181:7 199:23 |
| **voices**   7:5 | 35:20 37:9 | 300:19,22 | **warn**   292:1 |
| **volume**   39:9 | 44:8 45:4 | 301:9 302:19 | **warriors**   47:17 |
| **vote**   297:12 | 46:20 49:15,22 | 302:20,23 | 47:21 48:2,25 |
| **vulnerable** | 52:1 58:8,21 | 313:18 314:22 | **wars**   250:17 |
| 77:2 | 58:24 59:25 | 315:2,15 | **washington** |
| **w** | 65:10,15 70:8 | 318:17,20 | 69:6 177:25 |
| | 70:12 81:8 | 319:13 320:5 | **waste**   238:14 |
| **wait**   178:12,12 | 82:19 84:8 | 320:15 323:19 | **watch**   285:24 |
| 178:12 206:18 | 97:8 99:6,22 | **wanted**   17:5 | **watching** |
| 206:18 | 99:25 101:19 | 32:5 46:11 | 248:20 |
| **waited**   75:23 | 106:1 107:5 | 76:15 88:9 | **water**   159:21 |
| 287:2 | 120:25 124:1,5 | 90:23 103:24 | 164:16 |
| **waiting**   7:7,10 | 125:12 126:21 | 103:25 111:5,8 | **way**   27:8 34:4 |
| 45:4 97:21 | 127:7 128:13 | 111:9 115:16 | 43:15 47:21 |
| 136:11 138:17 | 128:18 136:9 | 115:21,22 | 51:18 60:24 |
| 138:21 139:3 | 136:15 138:20 | 119:5,9 121:21 | 64:9,17 67:2 |
| 139:24 209:18 | 138:21 143:6 | 125:5,14 126:2 | 72:8 79:3 |
| 251:23 299:11 | 147:4 149:12 | 126:21 131:23 | 100:3 101:16 |
| 299:12 312:3 | 150:1 152:2 | 163:12 189:14 | 104:11 105:21 |
| **wake**   310:4 | 170:15 178:21 | 208:1 245:7 | 114:9 125:6,16 |
| **walk**   25:13 | 179:18 183:2,5 | 254:5 281:5,8 | 135:7 139:11 |
| 271:19 272:13 | 187:20 188:22 | 296:15 302:6 | 142:17 152:16 |
| 310:5 | 210:23 223:4 | 316:15 318:16 | 171:19 178:24 |
| **walked**   242:11 | 245:2 246:11 | **wanting**   87:21 | 184:19 187:8 |
| 242:15 | 247:14 249:15 | 129:11,15 | 191:19 204:7 |
| **walking**   25:12 | 252:8 253:12 | 297:10 | 208:22 215:17 |
| 76:18 99:20 | 253:22 254:1 | | 215:18 216:2 |

217:1 223:1
232:2,6 233:16
233:17 242:15
243:7 244:3,9
250:17 253:2,6
253:7 254:19
260:11,18
262:9 267:8
272:24 279:10
286:17 295:25
299:3 300:4
301:2 302:6
315:16,18,25
322:4
**ways** 20:22
106:6 170:4
171:20 185:23
279:21 304:12
**we've** 13:12,13
18:25 26:7
34:3,6 47:9
54:11 64:16
104:18 128:14
151:3 191:2
220:3 223:2
226:18 254:13
318:19 324:13
**wear** 182:10
197:16 271:13
273:14 310:24
**wearing** 99:20
182:7 197:8,11
197:13,17
264:20 271:4,6

**weave** 184:22
**website** 14:22
70:14
**websites**
283:14
**wednesday**
130:20 177:22
193:3 194:2
**week** 14:24
45:22 61:25
75:17 103:7,14
129:8 166:2
205:6,8 230:19
278:4 284:3
287:20,20
312:1
**weekend** 144:2
**weekly** 35:24
**weeks** 14:23
15:18 20:8
75:13 77:9
102:22 162:8
165:19 168:17
247:4 298:5
302:20
**weigh** 187:9
**weighed** 187:6
**weighing**
187:12
**weight** 187:14
**weird** 46:17
229:10 304:25
**welcome** 260:9
260:9 270:2

274:16 321:1
323:4
**went** 15:17
66:5 71:3
90:24 92:4
103:4 123:7
141:4 189:25
207:4 222:22
228:2,3 246:17
271:6 275:15
276:8 286:17
**western** 294:8
**whataboutism**
55:14,20 111:5
**whatsoever**
105:20
**whipped**
228:25
█████████
195:15
█████████ 2:9
4:6 6:5 32:9
187:24 188:4
189:4,20
190:10,19,24
191:6,18 192:9
192:15,21
193:1,5,8,12,23
194:8,11,20
195:1,5,21
196:3,19
197:10,15,19
198:3,7,18,22
199:4,8,13,18

199:22 200:4,7
200:12,19,21
200:23 201:3
201:10,16,22
201:25 202:12
203:1,12,18,21
204:5,10,14,17
204:19,21,23
205:12,20
206:1,6,9,13,21
207:3,11,16,23
209:2,11
█████████
193:17
**white** 5:6 41:2
43:4 56:16
81:23,25 98:24
99:1 101:9,17
104:22 113:16
114:3 118:1
122:24 127:16
127:25 128:8
141:3,23
142:25 155:11
155:16,20,20
156:2,9,15,22
157:10 189:10
191:7,8 200:21
200:23,25
201:4,5,8,12,18
202:4 210:2,21
217:2,7,11
225:16 229:9
233:8,15

| | | | |
|---|---|---|---|
| 235:11 261:20 | **wife** 21:1 | ███████ 6:5 | **wonder** 165:9 |
| 265:13,20,25 | 210:13 224:23 | **wish** 45:20 88:7 | 217:15 316:25 |
| 266:22,24 | **wijeranthne** | 178:17 205:24 | **wonderful** |
| 287:10 288:17 | 2:14 5:20 78:4 | 227:12 264:25 | 284:23 |
| 288:18 291:4,7 | 79:2 144:23 | **witness** 3:24 | **wondering** |
| 291:9,19 | 145:5 170:23 | 6:6,17,24 | 81:17 128:2 |
| **white's** 288:7 | 171:4,9,18 | 12:12 14:5 | 131:5 192:17 |
| 289:3 | 189:14 190:5 | 59:23 72:7 | 195:24 196:6 |
| **whiteness** | 190:13 191:15 | 98:1,3 139:21 | 200:19 221:21 |
| 13:25 40:25 | 305:14,20 | 159:5,9 177:3 | 302:1 |
| 101:11 116:4 | 308:19 310:10 | 182:23,25 | **word** 58:3 |
| 122:22 155:13 | 312:17 314:8 | 183:4,8 187:6 | 67:24 88:9 |
| 155:15 156:24 | 316:5 | 187:24 209:18 | 92:10 114:18 |
| 233:5,15 | **wildfire** 14:12 | 209:21 239:5 | 128:7 194:11 |
| **whites** 25:8 | 162:16 | 252:5 268:16 | 204:15 215:20 |
| 101:11 143:6,8 | **willing** 52:7 | 298:11 326:4 | 230:13,17 |
| 143:10 155:17 | 115:24 125:6 | **witness's** 176:9 | 243:20 249:21 |
| 156:2 169:23 | 202:1 279:7 | 183:9 | 261:7 269:25 |
| 175:22,24 | 305:7 | **witnessed** | 277:24 319:19 |
| 202:3 289:6,8 | **willingness** | 189:2,4 306:8 | **wording** |
| 292:9 | 212:21 | **witnesses** 3:20 | 193:14 234:19 |
| **wholeheartedly** | **win** 292:8 | 3:23 4:3 7:10 | 234:21,22 |
| 259:8 317:19 | **winding** 63:5 | 9:12,13 154:2 | **wordplay** |
| **wholly** 260:1 | **window** 57:12 | 187:10,13 | 122:19 |
| **wide** 29:3 | 137:24 | 250:7 251:17 | **words** 11:2 |
| 54:11,11 | **winep** 178:1 | 290:20 | 17:4,22 30:24 |
| 270:10 | **wing** 279:1,1 | **woke** 116:3 | 33:20 43:16 |
| **widely** 35:8 | **wink** 123:1 | **woman** 264:21 | 53:15 56:16 |
| 63:6 | **winning** 249:5 | 265:8 284:9 | 63:12,17 64:12 |
| **wider** 166:18 | 249:11 | **women** 143:20 | 64:12 76:17 |
| 168:24 | **wipe** 233:19,22 | **won** 83:6 85:18 | 79:7,7,15,16 |
| **widespread** | **wise** 128:19 | 87:25 249:3,9 | 86:13 88:19,20 |
| 168:12 170:19 | **wisely** 263:14 | 284:21 | 107:23 114:23 |
| 174:3 | | | 124:23 129:6 |

132:6 143:7
151:5 154:7
188:9,12
192:16 199:7
202:6 207:7
215:22 217:24
242:10,15
248:15 249:15
253:15 257:8
262:9 280:14
284:4 289:4,25
295:7 319:16
**wore**  76:22
**work**  35:8
49:18 57:4
95:8,17 138:14
144:16 161:4
161:12 171:21
174:11 189:16
189:19 191:16
204:16 205:4
228:17 229:18
270:14 282:3
284:23 288:19
288:19
**worked**  191:20
303:5
**works**  39:13
**workshops**
69:5
**world**  8:5
106:20 167:7
169:24 313:18
314:6

**worldwide**
100:22
**worn**  157:21,22
182:12,15
**worried**  189:12
237:19,22
238:15,23
239:2,10
298:14 315:10
315:12
**worries**  7:9
139:15,15
**worry**  104:5
239:5,14
**worse**  25:8
279:20 286:15
289:10
**worst**  21:4,15
142:2 303:7,13
**worth**  141:10
189:11 283:15
294:22
**wracking**
213:25 238:4
**wrap**  66:25
**wrapped**
136:12
**write**  26:6 27:8
112:19 119:9
121:21 141:4
150:19,22,24
246:4 310:23
**writer**  87:25

**writes**  155:10
266:18 267:21
268:5,18
**writing**  5:4
30:6,20 63:12
85:10 87:24
96:8 119:6
156:3 162:23
174:13 270:17
278:24
**written**  16:6
27:14 28:5
29:17 30:3
52:2 76:16
83:19 96:23
99:14 107:6
113:18,21
144:10 151:25
185:5 259:14
259:19 262:6
266:14 268:10
268:12,17
269:1 277:23
**wrong**  126:2
169:11 181:5
192:22 200:3
249:20 273:11
283:5 308:17
317:18
**wrote**  13:24
30:24 36:11
66:8 74:6
76:18 99:18
122:15 123:6

136:17 141:16
147:21 154:17
157:9 163:11
188:7 189:16
191:21 194:1,3
194:14 258:11
258:15 260:5
274:3 290:21
322:1,10

**x**

**x**  13:21 15:3,13
16:7,11 17:14
17:15 20:10
24:25 36:13
53:8,13 54:6
57:23 67:15
75:19 100:10
100:12 101:3
102:16 105:23
105:24 106:4
106:25 115:9
115:10 142:23
143:4 161:14
162:7,9,23
169:11 171:5,9
175:2,3 218:10
314:25 316:11

**y**

**y**  245:25
249:14 314:25
**yanking**  73:14
**yeah**  9:17,24
18:20 26:2

31:15 38:15,17
44:19 45:12
51:9 55:13
59:25 60:6
61:21 62:22
68:8,16 69:15
70:23 80:3,14
80:14 81:15,16
82:21,22,23
84:3,20,20,20
85:1,4 93:3
94:2,11 95:2
95:10,14 96:4
105:22 112:16
119:1,1,2,6
120:18 121:3,8
122:9,11,11
128:5 129:24
131:19 132:4
135:20 136:14
138:11,15
146:18 149:15
152:6,9 153:6
155:5 156:17
158:15 159:15
180:6 184:7,8
186:25 187:17
190:19,24
192:15 193:9
195:23 196:16
197:19 203:23
204:1,6,14
205:12,23
206:2 209:11

213:5 217:12
221:17 224:7
226:18 228:5
229:16 230:3,5
238:20,23
239:9,9,20
240:12,13
244:14 245:4,4
245:4,9 250:5
250:13,14
252:22 253:7
255:18 260:25
261:2 262:20
262:22 272:15
277:15 281:18
297:5 299:5
300:24 301:25
303:11 305:20
308:8 309:1,12
310:15 311:3
314:6 322:25
**year** 12:21 23:8
36:18 49:25
52:3 89:24
95:7,8 96:1
99:1 162:6
163:25 213:14
229:1 248:3
273:22,25
274:9 276:22
282:23,24
312:10,13
**years** 12:23
13:10 17:3

26:7 51:23
98:12,13,15
99:18 135:11
164:3 166:25
227:7 230:21
254:13 267:19
282:14
**yelled** 73:20
216:9
**yelling** 73:15
250:17
**yep** 193:12
**yesterday**
181:15
**yesterday's**
62:12
**york** 19:25 43:1
66:1 69:6
106:11,17
169:9 211:5
282:13 295:13
295:20
**yorker** 42:25
**younger** 135:5
**yugoslavia**
161:3

**z**

**z** 314:25
**zach** 118:19,22
119:1 120:8
123:6,6 128:15
133:25 294:20
317:1

**zachariah**
118:20
**zachary** 2:8 4:5
6:8 159:6,9,24
299:25
**zap** 276:21
**zionist** 100:19
290:16
**zone** 53:21
**zoom** 4:20 5:13
7:7,10 55:2
61:11 62:3
138:24 252:8
280:22 283:17
283:19,22

# EXHIBIT G



**Division of Student Life**
Dean of Students Office

202 Peabody Hall
PO Box 114075
Gainesville, FL 32611-4075
352-392-1261
352-392-5566 Fax

August 8, 2025

Preston Damsky
Sent electronically to ███████████████

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2024803701

Dear Preston,

I have received notice from the Hearing Body indicating you were involved in conduct including; complaints from numerous students and employees that they fear for their safety such that they do not want to attend classes with you after reading threatening and anti- Semitic public-facing posts on your social media, such as your post in March 2025 that included this statement of your "position on Jews": "Jews must be abolished by any means necessary." This post was followed by an exchange with a professor at the law school who asked you: "Are you saying you would murder me and my family?" On another occasion, a student at the law school complained that you had agreed that your paper for the Originalism and its Critics seminar ended on a call for extralegal violence. These examples represent some, but not all, of your reported disruptive and threating behavior. Your conduct, especially in light of current events in this country and around the world, has created a climate of fear that permeates the law school campus and amounts to a material or substantial disruption of normal University operations.

I was informed the hearing body made the following recommendations regarding responsibility for the below listed section(s) of Regulation 4.040:

**• 4.C Disruptive Conduct General -- Responsible**
4.C Disruptive Conduct: Conduct that is materially or substantially disruptive to the normal operations of the University, or that incites others to do so, in any of the following activities: teaching, learning, research, administrative functions, disciplinary proceedings, other University Activities whether on or off campus, and other authorized activities that take place on campus. In evaluating whether conduct is materially or substantially disruptive, the University may consider the totality of factors, including but not limited to whether there was an intent to prevent the activity or event from continuing to completion and whether the conduct was a sustained and continuous disruption. Disruptive conduct does not include any conduct protected by the First Amendment.

**• 4.K Harassment -- Responsible**
4.K Harassment: Threats, intimidation, Coercion, or any other conduct that places a Reasonable person in fear of physical harm, through words or actions, or objectively disrupts a person's daily activities, including education and employment. Harassment does not include conduct protected by the First Amendment.

After review of the facts found during the course of the hearing and information provided by the Hearing Body, I am adopting the recommendations as listed for the above charges from Regulation 4.040.

In reaching a determination regarding your alleged violations of the Student Conduct Code, specifically section 4.C. Disruptive Conduct, and 4.K. Harassment, I considered the information provided to the University Officials Board, including the statements made by the hearing witnesses: Dean McAlister, Dean Shaw, Professors Lidsky, Hampson, and Kaufman, and students Cooper Whisnant and Scott Jurkowski. I also considered the statements you shared with the Board. There was competent substantial information provided to the hearing body. Information shared during the hearing, as well as through hearing documents, shows without dispute that:

On March 21, 2025, you posted on X that "My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to 'abolish the White race by any means necessary' is what I think must be done with Jews. Jews must be abolished by any means necessary."

On April 1, 2025, Professor Lidsky posted a response query, "Are you saying you would murder me and my family? Is that your position?" and you replied, "Did Ignatiev want Whites murdered? If so, were his words as objectionable as mine? If Ignatiev sought genocide, then surely a genocide of all Whites would be an even greater outrage than a genocide of all Jews, given the far greater number of Whites."

On April 2, 2025, Professor Lidsky replied, "I noticed you didn't say no, but instead resorted to a whataboutism. britannica.com/topic/whataboutism… Yes, his words are despicable, but you implicitly admit yours are, too."

Prior to these X posts, including your exchange with Professor Lidsky, your viewpoints had been shared through your academic work and class discussions and classmates disseminated them to the law school community outside the classroom setting. Your conduct before you disseminated your posts is relevant to the disruption and fear of violence caused by your posts. In Fall 2024, the draft of a seminar paper written by you circulated in the law school. The paper ended on what some read to be a call for racial violence. You wrote in part that "[W]e should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle." Students at the law school were aware of this paper in the Fall of 2024.

You also included violent rhetoric in the conclusion of another paper, writing in part that "The Supreme Court and inferior federal courts have the power to arrest the dispossession of White America. All they must do is substitute bad landmark precedent for good landmark precedent. Failure to do so is not judicial humility, but, at best, judicial surrender in the face of a terrible crime. At worse, it is complicity in that crime. If the People are not granted relief from the government—which includes the judiciary—then, if they are to survive as masters in the land of their ancestors, they must exercise 'their constitutional right to dismember or overthrow' the government. And that will be a process which no deskbound jurist can gleefully look forward to; for it will be a controversy decided not by the careful balance of Justitia's scales, but by the gruesome slashing of her sword." Once again, students at the law school were aware of this paper.

During a "town hall" attended by students and Dean McAlister on January 16, 2025, multiple students expressed concerns about you and their safety. One said that she looked for the exits in any room she was in with you. Although you did not attend the town hall, you and Dean Shaw discussed the concerns

aired at the town hall when you met with her on January 24, 2025.

During the hearing and through hearing documents, witnesses shared impacts to themselves and the law school community from your March and April posts and responses. Dean McAlister explained actions taken by the law school as a result of the posts, the details of which are also included in the hearing documents, pages 36 – 39, including paying for additional police security at a Jewish Law Students event, requesting increased police patrols and cameras, and instituting increased security measures prior to final exams. Dean McAlister, Professor Lidsky, Professor Hampson, and Professor Kaufman detailed impacts to the law school community, including: some students escorted one another to and from classes, some students carried pepper spray, several students cried, many students had their studying disrupted due to concerns from family or loved ones about the situation, some students skipped class or were late to class and did not feel safe disclosing the reason for their lateness or missing class. Some students skipped academic activities, some students left campus, one law school staff member, who had asked to have her photograph taken down from the law school's website because of her Jewish surname, resigned, community members feared going to events on campus, and some students were spooked by loud sounds in the classroom. Members of the law school community reasonably perceived your post as threatening violence to Jews on campus, prompting serious concerns for safety, and causing disruption to the law school, including leading Professor Lidsky to cancel class on April 4th. Professor Hampson stated at the hearing that he "learned that students were actively avoiding registering for classes if [you were] in them." Professor Kaufman stated that you "sowed terror and anguish among Jewish members, students, staff, and faculty of our community, and [you have] massively disrupted our law school's academic community within our law school's walls and beyond in the day-to-day lives of our students, staff, and faculty."

Dean Shaw provided information through documentation and during the hearing about a meeting she had with you early in the spring semester, on January 24, 2025, to address the perception of law school community members regarding your conduct and to put you on notice that numerous members of the law school community feared you and what you might do. Putting you on notice about the fear you stoked within the law school community was one of the main purposes of your meeting with Dean Shaw; this information was corroborated by Dean McAlister. Once you had notice of the fear that permeated the law school community, you recklessly posted on your public facing social media "My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to 'abolish the White race by any means necessary' is what I think must be done with Jews. Jews must be abolished by any means necessary." Reasonable members of the law school community perceived your words as a threat of violence against Jews and a call for violence against Jews. At the hearing, Professor Kaufman stated that "Many members of our law school community, Jews and non-Jews alike, interpreted Mr. Damsky's message to be a concrete, credible call for genocidal violence against Jews, including Jews in our law school community, as well as their families." You knew you had opportunities to quell fears and mitigate impacts to the law school community but refused to clearly state, in plain language, that you did not intend to threaten harm to Professor Lidsky, her family or others in the law school community. As Professor Kaufman noted, "In Mr. Damsky's response to Professor Lidsky, he did not say no."

The Board found the information described above credible and determined that your conduct created a significant disruption to the normal operations of the UF Law School in multiple functions (e.g. teaching, learning, etc.) equating to 4.C Disruptive Conduct. The disruption caused by your X post and exchange with Professor Lidsky was separate and apart from the law school community's reaction to the news of your having been trespassed from campus. Additionally, the Board found that your threatening conduct rose to the level of 4.K Harassment, when said conduct objectively disrupted numerous individuals' daily activities, including their education and employment, at the UF Law School. Therefore, I am accepting the Board's recommendation finding you responsible for violating the above-mentioned sections of the Student Conduct Code, based on the preponderance of information standard.

I have also reviewed the outcome recommendation provided by the University Officials Board and I accept the proposed sanction of expulsion. University Regulation 4.040 is in place to protect the safety and well-being of the campus community. The information provided established, by a preponderance of the information, that you engaged in behavior that significantly impacted the UF Law School operations and its community. In evaluating what sanctions are appropriate for your violation(s), I considered the seriousness of the violation(s) and the impact your behavior had on the UF Law School community. When you became a student at the University of Florida, you agreed to abide by its policies and regulations which promote social and individual responsibility, the safety of the campus community, and an environment conducive to learning. Your behavior violated our Regulation, directly undermined the well-being of our campus community and created a climate not conducive to learning. I will also note that at no time during the Board hearing did you walk back what you said in your X post or express any regret or remorse for the campus disruption and fear of violence caused by your post and subsequent exchange with Professor Lidsky. When you were asked at hearing what you have learned from this educational process and what you would do differently in the future, you said you didn't know. The University of Florida does not tolerate disruptive or threatening behavior towards our students, faculty or staff. Therefore, I find the sanction of Expulsion to be appropriate for your egregious violation of the Student Conduct Code.

Accordingly, you have been given the following sanctions:

**Expulsion**
You are permanently deprived of your opportunity to continue at the University in any status. This case will be forwarded to the University of Florida Police Department and reviewed for consideration of trespass. Should you be trespassed, officers will contact you and inform you of the sanctions placed against you. If you are trespassed, please note that it is your sole responsibility to request the removal of the trespass in order to once again have access to the properties of the University of Florida. A registration hold and conduct overlay will be placed on your record which states: "This transcript reflects only the academic record of the student; this student currently is not in good standing and further information should be requested from the Dean of Students Office. Flag requested by Student Conduct and Conflict Resolution."

Further violations of the Student Conduct Code or Honor Code may result in more severe actions being taken. A record of this incident will be maintained in Student Conduct and Conflict Resolution as outlined in Regulation 4.040. Any appeal of this decision must be made in writing within 10 Class days from the date of this letter (September 4, 2025). Failure to do so will forfeit your right of appeal. The Appeal Request Form can be accessed on our website or here.

Sincerely,

Chris Summerlin, PhD
Dean of Students

CC:   SCCR Team
        Bart Knowles, University of Florida Police Department
        Kristy Sasser, University of Florida Police Department
        Latrell Simmons, University of Florida Police Department

# EXHIBIT H



**Division of Student Life**
Office of the Vice President

PO Box 113250
Gainesville, FL 32611
352-392-1265
352-392-7301 Fax
https://studentlife.ufl.edu/

October 9, 2025

Preston Damsky
Sent electronically to ██████████████

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2024803701

Dear Preston:

An Appeal Panel was convened to review your appeal of the decision made by the University Officials Board (UOB) regarding a finding of responsible for violations of University Regulation 4.040, which were communicated to you via an outcome letter on August 8, 2025.

In accordance with University Regulation 4.040, the Appeal Panel is comprised of a student and two faculty/staff members to review your appeal.

In your appeal, you specified that your appeal was based on the following ground(s) outlined in University Regulation 4.040:

1. The Student's or Student Organization's rights were violated in the Hearing process in a manner which materially affected the outcome of the case.
2. New relevant material or information has been provided that could be sufficient to alter a decision and was unknown by the person making the appeal at the time of the Hearing.
3. The Sanction(s) imposed were not appropriate for the violation, taking into account both prior misconduct and mitigating circumstances.

The Appeal Panel reviewed the record of the hearing and supporting hearing documents, including your appeal narrative. After review, the Appeal Panel has reached the following conclusion:

**Appeal Ground:** The Student's or Student Organization's rights were violated in the Hearing process in a manner which materially affected the outcome of the case.

**Finding:** This claim is **DENIED.**

**Rationale:** In reviewing your comprehensive materials for Appeal Ground I, the Appeal Panel found that several of your arguments connected to the following rights afforded to accused students under UF Regulation 4.040; specifically Student Rights number 1, 9, 10, and 11. However, in all situations the Appeal Panel determined that there was no violation of your rights in a manner which would materially affect the outcome of the case as outlined in UF Regulation 4.040.

Throughout the time leading up to your hearing, and during your hearing, you were afforded the opportunity to access and review all relevant University Policies and procedures related to UF Regulation 4.040. Furthermore, the Appeal Panel finds that the University followed all outlined procedures throughout this process. You were also afforded the opportunity to review all information, including any potential Witnesses, that could be used in the decision-making process, as outlined in the Rights of the Accused Student.

Within your appeal documents, you argue that you were not allowed to develop lines of questioning with the Witnesses who participated in the hearing. In reviewing the recordings of the hearing, the Appeal Panel found that you were given the opportunity to ask questions of all Witnesses, and as well as develop detailed lines of questioning with all Witnesses. You also made an argument regarding a violation of your right to a decision being made based on the preponderance of information standard, however, the Appeal Panel finds that the decision made by the University Officials Board (UOB) was made based on the preponderance of information provided during the hearing.

The Appeal Panel does acknowledge that your charge letter did not include the following language "Disruptive conduct does not include any conduct protected by the First Amendment." However, your charge letter did substantially comply with the University's obligation to provide "Notice of Charges resulting from an alleged violation of the Student Honor Code or the Student Conduct Code" under UF Regulation 4.040(5)(a)2. Your charge letter included the title of each charge, the citations to easily locate the charges within UF Regulation 4.040, text directly from the description of each charge as written in UF Regulation 4.040, and a brief description of the allegations. Additionally, the language you claim was missing from your charge letter was read out loud by the Chair of the UOB during the hearing. The absence of this language from your charge letter does not equate to a violation of your rights, and the Appeal Panel finds that the absence of this language in your charge letter did not materially affect the outcome of your case.

You also argue that the University added a witness after the deadline to submit information and witnesses, and this addition equates to a violation of your rights. However, when you requested additional time to submit your information and witnesses to the Office of Conduct and Conflict Resolution, the University (as the other party) gets additional time to submit information and witnesses. The Appeal Panel finds that, due to both parties being provided with equal time to

submit information, the University's addition of a witness was not a violation of your rights.

The University's conduct process is an educational process, not a legal process. Hearing bodies are not comprised of attorneys or judges; accordingly, case law, questions about case law and legal arguments are not relevant to whether a student violated the conduct code. None of your allegations or arguments surrounding the First Amendment equate to a violation of your rights under UF Regulation 4.040.

The Appeal Panel holds that none of the eighteen student rights outlined in UF Regulation 4.040 were violated in the hearing process in a manner which materially affected the outcome of the case.

**Appeal Ground:** New relevant material or information has been provided that could be sufficient to alter a decision and was unknown by the person making the appeal at the time of the Hearing.

**Finding:** This claim is **DENIED.**

**Rationale:** While you provided new information regarding the identification of the individual who allegedly made a specific statement at the January town hall meeting, knowing the name of the individual who made that particular statement would not have been sufficient to alter the UOB's decision. Additionally, being able to ask that individual questions during the hearing, assuming that they chose to participate in the hearing and answer all questions asked, would not be sufficient to alter the decision.

You also provided a text message communication regarding your meeting with Dean Shaw. While it is debatable whether this information was truly unknown to you at the time of the hearing, the Appeal Panel determined this information would not be sufficient to alter the decision.

**Appeal Ground:** The Sanction(s) imposed were not appropriate for the violation, taking into account both prior misconduct and mitigating circumstances.

**Finding:** This claim is **DENIED.**

**Rationale:** The sanctions were appropriate given the severity of the charges and the finding of responsible for both charges, 4.C Disruptive Conduct and 4.K Harassment.

This decision constitutes the final decision of the University of Florida with respect to this matter. You may seek judicial review of this final University decision pursuant to Florida Rule of Appellate Procedure 9.190, applicable to review of quasi-judicial decisions of an administrative body not subject to the Administrative Procedure Act, by filing a petition for certiorari review within thirty (30) days of the final University decision.

If you have any questions, please feel welcome to contact Student Conduct and Conflict Resolution by email at sccr@ufsa.ufl.edu or by phone at 352-392-1261.


Sincerely,


Heather White, Ed.D
Vice President for Student Life

CC:   Student Conduct and Conflict Resolution
      Chris Summerlin, Dean of Students
      Kristy Sasser, University of Florida Police Department
      James Tyger, Assistant Vice President, Student Life
      Latrell Simmons, University of Florida Police Department
      Scott Summers, University of Florida Police Department