IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

PRESTON DAMSKY,

      Plaintiff,

v.                                          Case No. 1:25-cv-275-AW-MAF

CHRIS SUMMERLIN, in his official
capacity as the Dean of Students of the
University of Florida,

      Defendant.

_____/

## ORDER GRANTING PRELIMINARY INJUNCTION

Preston Damsky was a law student at the University of Florida. But after he posted on X[1] that "Jews must be abolished by any means necessary," the University expelled him. Damsky then sued, arguing his expulsion violated the First Amendment.[2] He also moved for a preliminary injunction requiring the University to reinstate him.

Because the First Amendment protects "even ideas that the overwhelming majority of people might find distasteful or discomforting," *see Virginia v. Black*, 538 U.S. 343, 358 (2003), and because the University has not shown that Damsky's

_____

[1] X is a social media platform that many still call by its former name, Twitter.

[2] The named Defendant is Chris Summerlin, sued in his official capacity as the University of Florida Dean of Students. An official-capacity action against a University official is essentially a suit against the University itself. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). For simplicity, I will refer to the Defendant as the University.

speech constituted a true threat or was otherwise proscribable, this order grants the motion for preliminary injunction.

## I.

The showing necessary for a preliminary injuction is well known. To obtain a preliminary injunction, Damsky had to show (1) a substantial likelihood he will succeed on the merits, (2) that he will suffer irreparable harm without a preliminary injunction, (3) that his threatened injury outweighs harm the injunction may inflict on the University, and (4) that a preliminary injunction would not disserve the public interest. *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Because a preliminary injunction is "an extraordinary and drastic remedy," Damsky had to clearly establish each element. *Id.*

Having carefully considered the parties' written submissions and oral arguments, I conclude Damsky has made a sufficient showing to warrant the relief he seeks.

## II.

Neither side sought an evidentiary hearing, and I conclude none is necessary.[3] The facts, which are largely undisputed, come principally from the parties' affidavits

---

[3] At the initial status conference, both sides stated they wished to proceed on the evidentiary submissions accompanying their papers and that no evidentiary hearing was needed.

and the transcript of the administrative hearing that preceded Damsky's expulsion. What follows are the court's findings for purposes of this order.

Damsky has been a controversial figure at the law school since he enrolled. ECF No. 17-1, Exhibit F (Admin. Hearing Tr. (or "Tr.")) at 13:1-2, 28:8-29:16, 98:21-99:7. He seems to enjoy pushing boundaries and provoking others. He achieved that and more with two seminar papers and one social media exchange that ultimately became the basis for his expulsion. *See* ECF No. 17-1 at 456, 458.

In the fall semester of his second year, Damsky wrote two seminar papers that generally argue the United States was founded as a race-based nation and should be preserved as such. ECF No. 17-2 at 4-7 (excerpts from "American Restoration"), 9-12 (excerpts from "National Constitutionalism"); *see also, e.g.*, *id.* at 4, 11-12. He concluded each paper with what some perceived as extralegal calls to violence. *See* Tr. 188:1-17; ECF No. 17-1 at 455-56. In American Restoration, Damsky offered this view:

> [W]e should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle.

ECF No. 17-2 at 7.

In National Constitutionalism, Damsky went perhaps further:

> The Supreme Court and inferior federal courts have the power to arrest the dispossession of White America. . . . If the People are not granted relief from the government—which includes the judiciary—then, if they are to survive as masters in the land of their ancestors, they must exercise "their revolutionary right to dismember or overthrow" the government. And that will be a process which no deskbound jurist can gleefully look forward to; for it will be a controversy decided not by the careful balance of Justitia's scales, but by the gruesome slashing of her sword.

*Id*. at 11-12 (note omitted).

Neither of Damsky's seminar professors found his language particularly alarming, *see, e.g.*, Tr. 30:9-13, 30:17-21, 277:19-278:3, and both gave him high marks, ECF No. 6 at 2. Still, the papers garnered attention. Many students found them upsetting, and some insisted the law school take action. Tr. 32:25-33:19, 82:23-86:6, 140:16-141:15. The law school refused any discipline, though, concluding the writings did not constitute true threats, were not significantly disruptive, and enjoyed First Amendment protections. Tr. 29:17-30:21, 30:22-31:8. To the law school's Interim Dean, the papers reflected a concerning escalation of Damsky's rhetoric. But in her view, he had not yet crossed a line. Tr. 30:14-21, 31:2-8.

The next semester began, as every semester did, with the Interim Dean's town hall. The town halls have no set agenda, but this one featured significant discussion surrounding Damsky and his writings. Tr. at 74:19-20. Students said they feared

Damsky. One said she "scanned the exits" whenever in a room with him. Tr. at 16:12-16. Another tried to avoid classes with him. *Id.*

After hearing the students' views, the Interim Dean directed a Senior Assistant Dean to speak with Damsky. Although he was not in trouble, the Interim Dean wanted to ensure Damsky understood how the law school community perceived him and how his actions could have "professional consequences." Tr. 24:3-17. The Assistant Dean later said of the meeting that she put Damsky "on notice" that students feared him and that his actions were becoming disruptive. *Id.* 96:16-97:2.[4] Nonetheless, the semester continued without incident—at least until Damsky's March 21 X post:

> My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to "abolish the White race by any means necessary" is what I think must be done with Jews. Jews must be abolished by any means necessary.

ECF No. 17-3 at 4.

This post was immediately available to Damsky's few X followers (Damsky said he has "almost no following," ECF No. 6 at 6), as well as anyone else who happened across his public account. Law student S.J. saw the post and found it upsetting but not, by itself, alarming. Tr. 230:5-10, 230:22-25, 231:10-17. A week

---

[4] Damsky disputes this characterization. He remembers a more casual meeting focused on his career. Tr. 88:15-24. At this stage, the meeting's substance makes no difference. And for now, I accept the Assistant Dean's view.

later, S.J. reported the post to the Interim Dean. *Id.* 35:20-36:9. A few days after that, on April 1, one of the University's Jewish law professors engaged with Damsky on X. Replying to his post, she asked, "Are you saying you would murder me and my family? Is that your position?" ECF No. 17-3 at 4. Damsky offered this in reply:

> Did Ignatiev want Whites murdered? If so, were his words as objectionable as mine? If Ignatiev sought genocide, then surely a genocide of all Whites would be an even greater outrage than a genocide of all Jews, given the far greater number of Whites.

*Id.* The next day, the professor continued to engage:

> I notice you didn't say no, but instead resorted to whataboutism. Yes, his words are despicable, but you implicitly admit yours are, too.

*Id.* at 5 (The professor's post included a link to a Brittanica Encyclopedia article about "whataboutism." *Id.*)

At the time, the professor considered the exchange provocative but not alarming or threatening. Tr. 111:9-18, 121:15-17. Other professors and many students, however, found Damsky's posts *quite* alarming and threatening. Some students were visibly upset, and many came to the Assistant Dean's office crying and describing their fears. Tr. 75:22-76:2. Students feared physical harm, *id.* at 76:12-20, and expressed concern that Damsky might come to school armed, *id.* at 101:21-25.[5] The professor who had engaged with Damsky on X, and who initially

---

[5] The record suggests students' concerns of physical harm flowed from Damsky's rhetoric alone and not from any separate indication that he might be armed

did not feel threatened, later grew afraid of what Damsky might do after she heard from students more familiar with him. Tr. 102:1-23, 123:8-14. She and her husband slept with a baseball bat by the bed. *Id.* at 102:13-23.

Springing into action, the law school increased campus security, began locking doors previously kept unlocked, and provided a police presence at a Jewish Law Students Association event. *See, e.g.*, Tr. 18:17-19:9, 165:23-168:13. Then, on April 2—twelve days after Damsky's first post and one day after his follow-up exchange with the professor—the University suspended Damsky. In doing so, it asserted he "created a material and substantial disruption to the academic operation of the UF College of Law." ECF No. 17-1 at 4-5. The University also trespassed Damsky from campus. Tr. 273:5-7.[6] It later explained it was investigating allegations

---

or violent. *See, e.g.*, Tr. 79:5-17 (Assistant Dean: "I think in general . . . people felt that the value of their humanity was being challenged and that . . . if your value of your humanity is challenged in words, could that become actions?"), 244:4-17, 249:18-22 (Student: "[I]t's not beyond people with your beliefs to do things like shoot up a school," and Damsky is a "fundamentally" dangerous person "based on [his] beliefs"); ECF No. 17-1 at 13 (noting "complaints from numerous students and employees that they fear for their safety . . . after reading threatening and anti-Semitic public-facing posts on your social media").

[6] As some witnesses noted, it is difficult to cleanly separate the effect of Damsky's X posts from the effect of the law school's response to it, including its decision to ban Damsky from campus. One professor testified that, "[o]nce [University Police] trespassed Mr. Damsky from campus and the campus doors were locked, the community was naturally incredibly alarmed." Tr. 144:4-6. (For that reason, the testifying professor "focused [his] comments on what happened between" the fall semester and April 3, 2025, right before the trespass order. *Id.* at

that Damsky incited fear in the law school after posting "antisemitic public facing posts" on social media and wearing "a t-shirt with an antisemitic message, 'From the river to the sea.'" ECF No. 17-1 at 7. Damsky appealed his interim suspension. The University rejected the appeal but allowed Damsky to remain enrolled and complete the semester remotely. ECF No. 17-1 at 10; ECF No. 17-2 at 1-2.

On May 29, after completing its investigation, the University charged Damsky with Student Conduct Code violations. ECF No. 17-1 at 13-14. In the charging document, the University cited Damsky's X posts (his initial March 21 post and his April 1 response to the professor), and his National Constitutionalism paper. ECF No. 17-1 at 13. Those writings represented "some, but not all," of Damsky's "disruptive and threating [sic] behavior." *Id.*

The University cited two sections of the Student Conduct Code:

4.C Disruptive Conduct: Conduct that is materially or substantially disruptive to the normal operations of the University, or that incites others to do so, in any of the following activities: teaching, learning, research, administrative functions, disciplinary proceedings, other University Activities whether on or off campus, and other authorized activities that take place on campus. In evaluating whether conduct is materially or substantially disruptive, the University may consider the totality of factors, including but not limited to whether there was an intent to prevent the activity or event from continuing to completion and whether the conduct was a sustained and continuous disruption.

144:6-8.) Similarly, a student testified that he "wasn't necessarily afraid until [Damsky] got kicked out." *Id*. at 231:16-17. It was then—after Damsky was trespassed—that this student "asked for a locked room during finals because the picture of [Damsky] getting trespassed, [he] looked pretty upset." *Id.* at 244:9-17.

> Disruptive conduct does not include any conduct protected by the First Amendment.
>
> 4.K Harassment: Threats, intimidation, Coercion, or any other conduct that places a Reasonable person in fear of physical harm, through words or actions, or objectively disrupts a person's daily activities, including education and employment. Harassment does not include conduct protected by the First Amendment.

ECF No. 17-1 at 455; *see also id.* at 461 (noting Damsky's charge letter omitted "the following language[:] 'Disruptive conduct does not include any conduct protected by the First Amendment'").

Over the summer, the University Officials Board held a disciplinary hearing. The Board's job was to hear evidence, weigh it, and recommend an outcome. The Board took notice that neither "[d]isruptive conduct" nor "[h]arassment"—as the Student Conduct Code used those terms—includes conduct the First Amendment protects. Tr. at 10:3-11:15. And although the University's initial suspension letter suggested Damsky caused disruption by wearing his "From the river to the sea, Palestine will be free" shirt, the Board's chair advised members to "presume that [Damsky's] speech or expression, using [that] phrase, . . . is protected by the First Amendment." *Id.* at 11:18-21.

At the hearing, several witnesses spoke about Damsky's earlier writings, including the seminar papers the law school previously deemed protected speech. Those papers mattered, the Interim Dean said, because they evidenced a "course of

conduct" and Damsky's awareness that "people felt threatened by [him]." Tr. 52:21-53:9.

Damsky testified too. He said his X posts were critiques of tolerable academic thought and the book, "Race Traitor," in which Professor Noel Ignatiev contended (in Damsky's reading) that the white race should be abolished by any means necessary. Tr. 56:10-18, 288:4-293:23 (Damsky's discussing Ignatiev, who "explicitly disclaims violence"); *see also id.* at 318:12-18 (Damsky's testifying he "knew that [the Jewish professor engaging with him on X] knew that Noel Ignatiev didn't mean murder . . . . I thought her question was in bad faith and I didn't really want to play ball").

But to many witnesses, Damsky's reference to Ignatiev made no difference. The Interim Dean said she did not think it was very relevant because students should not need to "look up . . . what some obscure philosopher or sort of thinker thought in order to understand what you said, which, you know, very clearly stated, 'Jews must be abolished by any means necessary.'" Tr. 41:14-42:2; *but see id*. 150:1-5 (another professor's describing Damsky's first post as somewhat ambiguous given "the reference to Noel Ignatiev").

Following the hearing, the Board recommended expulsion. Dean Chris Summerlin adopted that recommendation and expelled Damsky. *See* ECF No. 17-1 at 455-458. In his letter, Summerlin described Damsky's X posts as threatening and

disruptive. *Id.* at 457. And Summerlin described the seminar papers—the ones the Interim Dean earlier concluded were protected speech—as containing "violent rhetoric" that injected fear into the law school community. ECF No. 17-1 at 456. Summerlin also admonished Damsky for declining to "walk back" what he wrote. *Id.* at 458.

A separate panel rejected Damsky's appeal, and his expulsion became final on October 9.

## III.

Damsky sued on September 14, arguing his expulsion violated the First Amendment. ECF No. 1. Two weeks later, he moved for a preliminary injunction. ECF No. 6. He argues the University disciplined him "based on his social media activity and academic work, which are protected under the First Amendment," *id.* at 2, and he seeks a preliminary injunction allowing him to return to the law school.

As noted above, Damsky has made a sufficient showing on each of the preliminary-injunction factors.

## A.

First, Damsky has shown a substantial likelihood of success on the merits. "[T]he burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). The University does not dispute the fact that it expelled Damsky based on

his speech. Its argument instead is that the First Amendment did not protect that speech. In this circumstance, it is the University's burden to justify its decision to punish Damsky for his speech. *See, e.g.*, *Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Ed.*, --- F.4th ---, 2025 WL 3102072, at *11 (6th Cir. Nov. 6, 2025) (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)).

The University argues Damsky's X posts were not protected because they were either "true threats" or constituted substantially disruptive school-directed threats. ECF No. 17 at 19-35. But the University has not met its burden to show that it could punish Damsky for any of his speech consistent with the First Amendment.

*1.*

"True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection." *Counterman v. Colorado*, 600 U.S. 66, 72 (2023). To constitute a "true threat," a communication must be a "'serious expression[]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Id.* at 74 (quoting *Black*, 538 U.S. at 359). Expressions consistent with discrimination or hatred are still generally protected. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 454, 458, 460-61 (2011) (concluding that various signs, including one that said, "God Hates Fags" "plainly relate[d] to broad issues of interest to society at large" and were protected under the First Amendment—and that "[s]uch speech cannot be restricted simply because it is upsetting or arouses contempt"). For example, the First

12

Amendment would not countenance banning all cross burnings even though it is indisputable that "the burning of a cross is a symbol of hate." *Black*, 538 U.S. at 357 (cleaned up). Even advocacy for the use of force is protected, unless "such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *accord Counterman*, 600 U.S. at 76 (explaining that "'mere advocacy' of illegal acts" is "a kind of speech falling within the First Amendment's core"); *cf. United States v. Bagdasarian*, 652 F.3d 1113, 1119, 1122 & n.9 (9th Cir. 2011) (noting that statements exhorting others to commit violence "at some indefinite future time" do not constitute true threats and will not amount to incitement).[7]

Finally, because "[p]rohibitions on speech have the potential to chill, or deter, speech outside their boundaries," there must be a strong showing before a person can be punished for his speech. *Counterman*, 600 U.S. at 75. "[T]he First Amendment stakes around the definition of 'true threats' are high indeed." *Id.* at 86 (Sotomayor, J., concurring). With this high bar in mind, I conclude Damsky's X posts do not constitute "true threats."

---

[7] Along with true threats of violence, speech intended to incite imminent lawlessness is among the narrow categories of historically unprotected speech. *Counterman*, 600 U.S. at 73-74, 76. At the hearing, the University disclaimed any contention that Damsky's speech constituted incitement.

Read in context, Damsky's statements "do not convey a real possibility that violence will follow." *See Counterman*, 600 U.S. at 74. Even if ostensibly referring to violence, a hyperbolic and coarse expression of political opinion does not necessarily constitute a true threat. Thus, a draft opponent's public announcement that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J.," was protected speech. *Watts v. United States*, 394 U.S. 705, 706-08 (1969). His statement did not, in context, constitute a true threat. *Id.* at 708; *see also id.* (noting that "[t]he language of the political arena . . . is often vituperative, abusive, and inexact" (citation omitted)).

Here, even taking the statement as the University does—"My position on Jews is simple: . . . Jews must be abolished by any means necessary," ECF No. 17 at 21—Damsky offers no indication that he will act on his "position" or do anything at all.[8] He is stating a view—even if a hateful and offensive one. His statement is thus quite unlike those in the true-threat cases the University cites. The threat in *United States v. Ramos* was an individual message sent "to the home address of a Rabbi who had been speaking publicly against antisemitism following a neo-Nazi demonstration at her synagogue." 2024 WL 4335912, at *2 (M.D. Ga. Sept. 27, 2024). The private letter—a "typical means for delivery of threats"—said, among other things, "Use

---

[8] The ellipses are the University's. As Damsky notes, and as discussed more fully below, what the ellipses skip over is important context.

code 'GASTHEJEWS' for 10% off!." *Id.* & n.1. The threat in *United States v. Baker* was unequivocal in target, location, and time: "[A]rmed racists mobs" at the state capitol on Inauguration Day would be met with "every caliber available," and those who were "afraid to die fighting the enemy" were advised to "stay in bed and live." 514 F. Supp. 3d 1369, 1377 (N.D. Fla. 2021). Damsky's posts lacked those characteristic features of personal, targeted imminence.

Moreover, Damsky's post was not simply that "Jews must be abolished by any means necessary." *See supra* n.8. His full statement was this:

> My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to "abolish the White race by any means necessary" is what I think must be done with Jews. Jews must be abolished by any means necessary.

ECF No. 17-3 at 4. Read in context, the post was equating Damsky's view that "Jews must be abolished" to the view of a Harvard professor. This context further undermines any suggestion that the post was a "serious expression" that Damsky would harm others.

The University says the reference to Ignatiev means little because most people are unfamiliar with Ignatiev and because Damsky did not explain that "Ignatiev was not calling for violence." ECF No. 17 at 24. Regardless, Damsky's post expressly conditioned "abolish" and "any means necessary" on "whatever Harvard professor

Noel Ignatiev meant."[9] That makes the University's reference to Black's Law Dictionary, ECF No. 17 at 21 (quoting definition of "Abolish"), inapposite.

Similarly, Damsky's other post—his April 1 response to the professor—was no serious expression of a real intent to harm. The post referenced Noel Ignatiev again and asked rhetorically what he wanted when he wrote about abolishing the white race. Notably, the professor to whom he directed his post did not interpret it as a threat to harm her or her family. Tr. 111:9-18, 121:15-17. In fact, she responded with a witty reference to "whataboutism" and a link to an encyclopedia article.

The University makes much of the fact that when asked if he was saying he would murder the professor and her family, Damsky did not say no. True, but neither did he say yes. He answered the question with a question. The overall context of Damsky's exchange with the professor reveals a perhaps course and crude debate on tolerable academic thought, but it does not express a serious intent to commit violence.

That his posts "came on the heels of his two seminar papers," ECF No. 17 at 21, does not undermine that conclusion either. Even if the papers provide pertinent

---

[9] Tellingly, the witnesses who considered Damsky's reference to Ignatiev (whether or not they agreed with Damsky's interpretation of the author) did not find the March 21 post clearly threatening. *Cf. Watts*, 394 U.S. at 708 (considering the audience's reaction as relevant context); *see, e.g.*, Tr. 149:22-150:5 (professor), 230:22-25, 231:10-17, 232:23-233:6 (student)

context to the X posts, further context is the law school's recognition months earlier that those papers were protected under the First Amendment. And those papers— pure speech—are different than the kind of violent context that sometimes renders an expression a true threat. *See, e.g.*, *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1079 (9th Cir. 2002) (wanted-style posters "acquired currency as a death threat" after three murders); *United States v. Hart*, 212 F.3d 1067, 1069-70, 1072 (8th Cir. 2000) (use of Ryder truck to protest abortion clinic could be viewed as "true threat" because it was the same style truck used in the then-recent and widely reported Oklahoma City bombing).

To be sure, those reading Damsky's words may be justifiably fearful. Some may assume that anyone uttering such commentary is more likely to act violently than someone who does not. *Cf.* Tr. 79:12-17, 249:18-250:2. But that is not the test. The test is whether Damsky's posts constituted a "serious expression" that he *meant* "to commit an act of unlawful violence." *Counterman,* 600 U.S. at 74. Many would not love the idea of attending school with someone who burns crosses, *cf. Black*, 538 U.S. at 366-67, marches in Nazi parades, *cf. Nat'l Socialist Party of Am. v. Vill. Of Skokie*, 432 U.S. 43, 44 (1977), or engages in countless other forms of offensive expression. But "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder*, 562 U.S. at 458 (quoting *Texas v. Johnson,* 491 U.S. 397, 414 (1989)).

The bottom line is that the University has not shown that any of Damsky's speech constituted a "true threat."[10]

*2.*

Next, the University argues that even if the speech did not constitute a true threat, it can nonetheless discipline Damsky for his speech because it was materially disruptive. In *Tinker v. Des Moines Independent Community School District*, the Supreme Court held that a school could regulate student speech that would materially disrupt classwork or invade the rights of others. 393 U.S. 503, 513 (1969). Since *Tinker*, the Supreme Court has recognized that the special characteristics of the school environment allow schools to regulate certain categories of expressions inappropriate for that setting, including, for example, lewd speech and speech promoting drug use. *See Morse v. Frederick*, 551 U.S. 393, 404-05, 408 (2007).

---

[10] One last note on true threats. At the hearing, Damsky suggested *Counterman* imposes a subjective-intent requirement—recklessness—before criminal *or* civil liability can attach for true threats. The University was less sure (*Counterman* was a criminal case) but said it could prevail under an objective or subjective definition. At this stage, I need not decide whether a subjective-intent requirement applies here. Damsky's posts are objectively not true threats, because they are not "serious expressions" of an intent to commit an act of unlawful violence. *Counterman*, 600 U.S. at 74. The point of having a mens rea requirement for certain areas of unprotected speech, *Counterman* explained, is that penalties on speech tend to deter speech that fall "outside their boundaries." *Id.* at 75. So, a mens rea requirement allows some "otherwise proscribable" speech to fall through the cracks of liability (what *Counterman* calls some "breathing room" to account for the "law's uncertainties"), while permitting states and individuals to pursue civil or criminal actions for more serious misconduct. *Id.* at 75-76. As outlined above, however, Damsky's speech was not "otherwise proscribable."

Public schools can regulate such speech even when the same speech would be protected outside of the school setting. *Id.* at 404-05 (noting that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings" (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986))). Relying on this principle, the University argues that its regulation of Damsky's speech was constitutionally permissible.

As a preliminary matter, there is some disagreement about the applicability of *Tinker*'s "more deferential First Amendment standard" in the university setting, where students are not children. *See Speech First v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022). One reason schools can regulate student speech that would be protected outside the school context "is the fact that schools at times stand *in loco parentis, i.e.*, in the place of parents." *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 187 (2021). The University makes no argument, of course, that its role is to stand in as substitute parents for 29-year-old Damsky (or any other law student). So, as the Eleventh Circuit has recognized, "it's not at all clear that *Tinker*'s more lenient standard applies in the university—as opposed to the elementary- and secondary-school—setting." *Cartwright*, 32 F.4th at 1127 n.6; *accord id.* (noting "[t]he caselaw sends mixed signals"). It is true, the Eleventh Circuit further noted, it has applied *Tinker* in a college case, *id.* at 1127 n.6 (citing *Doe v. Valencia Coll.*, 903 F.3d 1220, 1229 (11th Cir. 2018)), although that case involved harassment and

arguably not pure speech, *see Doe*, 903 F.3d at 1230 ("Given Koeppel's persistent harassment as well as the understandable (and intended) anxiety it caused Jane, Valencia reasonably concluded that his conduct invaded her rights."). Nonetheless, for purposes of this order, I will assume *Tinker* does apply. And as explained below, the University has not met its burden even under "*Tinker*'s indulgent framework," *Cartwright*, 32 F.4th at 1127 n.6.

The University relies heavily on *Boim v. Fulton County School District*, in which the Eleventh Circuit upheld a student's suspension based on her speech. 494 F.3d 978, 980-81 (11th Cir. 2007). The speech at issue was a "Dreams" narrative that depicted the student's carrying out a school shooting. *Id.* The school was justified in regulating that speech because it "clearly caused and was reasonably likely to further cause a material and substantial disruption to the 'maintenance of order and decorum' within" the school. *Id.* at 983. Threats in the school context, *Boim* held, are particularly concerning given the "climate of increasing school violence and government oversight, and in light of schools' undisputably compelling interest in acting quickly to prevent violence on school property." *Id.* at 984. Against that backdrop, there "is no First Amendment right allowing a student to knowingly make comments, whether oral or written, that reasonably could be perceived as a threat of school violence, whether general or specific, while on school property during the school day." *Id.* (This is true even for threats that do not meet the "true

threats" definition that would allow regulation outside the school context.) Just as schools have an interest in limiting expression that promotes drug use, they also have an interest in restricting speech reasonably construed as threatening school violence. *Id.* (citing *Morse*, 551 U.S. at 408); *see also Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 390 (5th Cir. 2015) (noting that since *Tinker*, the Supreme Court has carved out "narrow exceptions to the general *Tinker* standard based on certain characteristics, or content, of the speech," including "grave and unique threats to the physical safety of students") (citing *Morse*, 551 U.S. at 425 (Alito, J., concurring)).

Based on *Boim* and these principles, the University argues law school and University officials "all reasonably regarded Damsky's post as threatening violence, particularly against Jews at the law school." ECF No. 17 at 28. And those determinations, the University says, are owed deference.[11]

The United States Supreme Court's decision in *Morse*, from which *Boim* reasons, is instructive here. *See* 551 U.S. at 401-02. In *Morse*, a student displayed a "BONG HiTS 4 JESUS" banner at a school event. *Id.* at 397-98. The Court

---

[11] The University says this reasoning applies, too, to threats delivered off campus. ECF No. 17 at 27 n.8. And I agree that off-campus speech (like Damsky's X posts) is not categorically exempt from school regulation. Indeed, the Supreme Court recently rejected a contrary argument. *See Mahanoy Area Sch. Dist.*, 594 U.S. at 188 (listing "several types of off-campus behavior that may call for school regulation," including "threats aimed at teachers or other students"). Still, several "features of much off-campus speech mean that the leeway the First Amendment grants to schools in light of their special characteristics is diminished." *Id.* at 190.

concluded that the First Amendment allowed a school principal to "restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Id.* at 403. The student insisted the speech was misunderstood. He "claimed 'that the words were just nonsense meant to attract television cameras.'" *Id.* at 401. In rejecting that argument and instead concluding the banner advocated for unlawful drug use, the Court undertook its own interpretation of the speech. The Court's interpretation ultimately squared with the school principal's. But rather than take the principal at her word, the Court assessed whether her reading was "a reasonable one." *Id.* at 401. "Gibberish is surely a possible interpretation of the words on the banner, but it is not the only one, and dismissing the banner as meaningless ignores its undeniable reference to illegal drugs." *Id.* at 402.

It is true as a general matter that school officials are entitled to deference, but courts must still independently determine whether speech is reasonably interpreted as a school-directed threat (*Boim*), or as advocating illegal drug use (*Morse*). That threshold was easily met in *Boim*, because the student vividly described shooting her teacher. It was satisfied, too, in *Morse*, because the banner was reasonably understood to promote drug use. *Cf. Boim*, 494 F.3d at 984 (noting *Morse*'s rationale applies to speech "reasonably construed as a threat of school violence"); *Morse*, 551 U.S. at 422 (Alito, J., concurring) (noting that "a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use"); *Norris*

*on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 24 (1st Cir. 2020) (sticky note on school bathroom mirror "not reasonably viewed as school sponsored"); *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 308-10 (3d Cir. 2013) (noting "[i]t remains the job of judges, nonetheless, to determine whether a reasonable observer could interpret student speech as lewd, profane, vulgar, or offensive").

Here, I cannot agree that an observer would *reasonably* interpret Damsky's posts as threats of violence—much less school-directed threats. Damsky's March 21 X post bears no connection with the school at all. He does not mention the University, its administrators, students, or professors. *Cf. Boim*, 494 F.3d at 983 (noting the student "describes taking a gun into her sixth period classroom and shooting her teacher in front of other students").[12] I also conclude Damsky's March 21 post was not threatening, as that term is commonly used. *See Threat*, *Black's Law Dictionary* (12th ed. 2024) (defining "Threat" as "[a] communicated intent to inflict harm or loss on another" or "[a]n indication of an approaching menace"). As noted above, Damsky expressly conditioned his use of "abolish" and "any means necessary" on "whatever Harvard professor Noel Ignatiev meant." Those phrases in

---

[12] In *Boim*, by comparison, the student not only described shooting her own teacher at her own school but also took the writing to school and "fail[ed] to exercise strict control over the notebook in which it was written, [thus] increas[ing] the likelihood to the point of certainty that the narrative would be seen by others" at the school. 494 F.3d at 985. Thus there was a significant connection between her speech and her school.

a vacuum may suggest violence, but such a reading "ignores" Damsky's "undeniable reference to" Ignatiev. *Morse*, 551 U.S. at 402. Damsky's reference to an academic further undermines any conclusion that he was threatening imminent violence.

Then there is Damsky's April 1 response to the law school professor. First, I reject the argument that the professor's voluntary engagement with Damsky rendered their interaction "school-directed." Second, Damsky's April 1 post is not reasonably perceived as threatening. Damsky proposes two rhetorical questions about what Ignatiev meant, and a conditional statement on the meaning of Ignatiev's words. ("If Ignatiev sought genocide, then surely a genocide of all Whites would be an even greater outrage . . . ."). This is far from the kind of detailed, specific "communicated intent to inflict harm" or "approaching menace" that the court interpreted in *Boim* or that fits within the common understanding of threats.

Without a showing that Damsky's speech constituted a school-directed threat, the University is left without much of a *Tinker* argument. In fact, it has not articulated any other basis under *Tinker* to discipline Damsky for his speech. The entirety of its disruption argument is tied to the purported threat. The University does not argue, for example, that the offensive nature of Damsky's speech or students' strong disagreement with it—even when manifested as an outpouring of students' concern, including crying or anxiety—constitutes the type of "disruption" that would justify

restricting the speech.[13] Nor does it argue any interest in restricting Damsky's speech to "inculcate the habits and manners of civility." *Cf. Scott v. Sch. Bd. of Alachua County*, 324 F.3d 1246 (11th Cir. 2003) (quoting district court and upholding high school principal's policy prohibiting display of Confederate flag on school property). Instead, its *Tinker* argument turns exclusively on its insistence that Damsky's X posts were school-directed threats.

At bottom, schools "have a heavy burden to justify intervention" as "to political . . . speech that occurs outside school or a school program or activity." *Mahanoy Area Sch. Dist.*, 594 U.S. at 190. The University has not met that heavy burden here. *Cf. id.* at 189-90 (noting that "courts must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all").

---

[13] The Second Circuit's reasoning in *Leroy v. Livingston Manor Central School District* is persuasive here. --- F.4th ---, 2025 WL 3029421 (2d Cir. Oct. 30, 2025). There, a high school student's social media post generated community outcry and demonstrations. The court noted, however, *Tinker*'s relevant question is "disorder or disturbance on the part of the" speaker. *Id.* at *8. And tying a speaker's free speech rights "to the reaction that speech garners from upset or angry listeners" cannot be squared with *Tinker* or First Amendment principles. *Id.* I agree. *See also, e.g.*, *Mahanoy Area Sch. Dist.*, 594 U.S. at 205-07 & n.17 (Alito, J., concurring) (noting speech on sensitive subjects like politics and social relations may "disrupt instruction and good order on school premises," but "it is a 'bedrock principle' that speech may not be suppressed simply because it expresses ideas that are 'offensive or disagreeable'").

At this preliminary stage, I conclude Damsky has clearly established a substantial likelihood of success on the merits of his First Amendment claim.

## B.

Next is irreparable harm. Damsky has clearly established irreparable harm in the form of his lost free speech rights. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also, e.g.*, *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) (noting that, "as a necessary legal consequence of" establishing an unconstitutional "direct penalization" of speech, plaintiff established irreparable injury).

The University argues otherwise. It cites *Siegel v. LePore* for the proposition that, in First Amendment cases, "irreparable harm is presumed only if there is 'an imminent likelihood that pure speech will be chilled or prevented altogether.'" ECF No. 17 at 37 (quoting *Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000) (en banc)). And, it says, Damsky has not been chilled and continues to speak out. *Id*. But the University misapprehends the standard. Even if Damsky can continue to speak, the fact remains that he remains unable to attend school because of what he said. That harm is continuing; every day he is being penalized for his speech. And "[d]irect penalization . . . of First Amendment rights constitutes irreparable injury." *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983). That means there is irreparable injury, "regardless of whether actual chill is proved." *Id.* at 1189.

Damsky's harm is irreparable for another reason, too. Because of the Eleventh Amendment, Damsky has no monetary recourse against the University. *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).

Finally, I reject the University's argument that Damsky waited too long to seek injunctive relief. It is generally true that a delay in seeking injunctive relief can undermine a movant's suggestion of irreparable harm. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248-49 (11th Cir. 2016). But here there was no significant delay. The University focuses on the date of the original suspension, but it was not unreasonable for Damsky to wait until further administrative proceedings occurred. And during that process, he was still able to attend school remotely, which is no longer the case. The University provided its expulsion letter in August (ECF No. 17-1 at 455). Damsky sued in September. As a matter of discretion, I conclude Damsky did not wait too long.

## C.

"The last two requirements for a preliminary injunction involve a balancing of the equities between the parties and the public. Where the government is the party opposing the preliminary injunction, its interest and harm—the third and fourth elements—merge with the public interest." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1293 (11th Cir. 2021).

Vindication of First Amendment rights always serves the public interest. *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024). Conversely, the public has no interest in enforcing unconstitutional penalties or restrictions on speech. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). The University, of course, has an interest in maintaining order, but it has no interest in violating the First Amendment to achieve that goal.

The public-interest and balance-of-harms factors favor Damsky.

## IV.

The motion for preliminary injunction (ECF No. 6) is GRANTED. Chris Summerlin, in his official capacity as the Dean of Students at the University of Florida, is enjoined from continuing to take adverse actions against Preston Damsky—including prohibiting him from attending class or visiting campus—based on his writings in his two seminar papers or the X posts referenced in this order. Summerlin must take appropriate steps to return Preston Damsky to normal standing at the University of Florida no later than December 1, 2025. This preliminary injunction will become effective only upon Damsky's posting a bond in the amount of $2,500.[14] The court will separately issue an initial scheduling order. That order

---

[14] The parties' briefs do not address the bond requirement. But I conclude a bond is appropriate. *See* Fed. R. Civ. P. 65(c); *see also Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1301 (11th Cir. 2023) (noting "the amount of the injunction bond—and the choice of whether to set a bond at all—is within the sound

will include a deadline for the parties' Rule 26(f) report, and because it does not

appear there is any significant need for a lengthy discovery period, the parties should

anticipate proceeding to a trial on the merits in the short term.

SO ORDERED on November 24, 2025.

s/ *Allen Winsor*
Chief United States District Judge

discretion of the district court") (cleaned up). Either party may move for a modification of this requirement.