# EXHIBIT 1

**University Officials Board Hearing: Pre-Hearing Summary**

**Student:** Preston Terry Damsky                    **UFID:** 16495387

**Academic Standing:** Professional Year 3

**Allegation:**
It is alleged that you were reportedly involved in conduct including; complaints from numerous students and employees that they fear for their safety such that they do not want to attend classes with you after reading threatening and anti- Semitic public-facing posts on your social media, such as your post in March 2025 that included this statement of your "position on Jews": "Jews must be abolished by any means necessary." This post was followed by an exchange with a professor at the law school who asked you: "Are you saying you would murder me and my family?" On another occasion, a student at the law school complained that you had agreed that your paper for the Originalism and its Critics seminar ended on a call for extralegal violence. These examples represent some, but not all, of your reported disruptive and threating behavior. Your conduct, especially in light of current events in this country and around the world, has created a climate of fear that permeates the law school campus and amounts to a material or substantial disruption of normal University operations.

**Charges:**

4.C Disruptive Conduct: Conduct that is materially or substantially disruptive to the normal operations of the University, or that incites others to do so, in any of the following activities: teaching, learning, research, administrative functions, disciplinary proceedings, other University Activities whether on or off campus, and other authorized activities that take place on campus. In evaluating whether conduct is materially or substantially disruptive, the University may consider the totality of factors, including but not limited to whether there was an intent to prevent the activity or event from continuing to completion and whether the conduct was a sustained and continuous disruption.

4.K Harassment: Threats, intimidation, Coercion, or any other conduct that places a Reasonable person in fear of physical harm, through words or actions, or objectively disrupts a person's daily activities, including education and employment.

**Witness(es):**
Dean Merritt McAlister
Dean Janice Shaw
Professor Lyrissa Lidsky
Professor Christopher Hampson
Professor Zachary Kaufman
Cooper Whisnant
Scott Jurkowski

Daniel Pinkus
Mary Claire Jackson

**Overview of Case Documents**

| Page | Document |
|---|---|
| 1 - 6 | Interim Suspension Letters |
| 7 - 9 | Charge Letter |
| 10 - 14 | Scheduled Meeting Letter to complete Information Meeting |
| 15 - 17 | Hearing Notice Letter |

**DEF_000496**

| 18 - 19 | Student Rights Form |
|---|---|
| 20 - 21 | Informational Meeting Checklist |
| 22 - 23 | Signed Info to Remember for Susp/Exp Level Cases |
| 24 - 25 | Incident Report |
| 26 - 28 | Report from Dean McAlister 04.01.2025 |
| 29 - 30 | Dean Shaw 01.24.2025 Meeting Statement |
| 31 - 40 | Timeline of events from UFLaw |
| 41 - 55 | Community Submission August 2023 – June 2025 |
| 56 - 57 | Grading and First Amendment Principles email from Dean McAlister to All UFLaw Students 02.10.25 |
| 58 - 59 | Reaffirming Our Values email from Dean McAlister to Community 06.24.25 |
| 60 - 87 | Annotated-Preston Terry -Final Paper – annotated-National Constitutionalism SUBMISSION COPY |
| 88 - 89 | Community Concern 1 |
| 90 - 91 | Community Concern 2 |
| 92 | Concern from Cooper Whisnant |
| 93 - 119 | DRAFT American Restoration Paper |
| 120 - 136 | Anonymous Community Concern Submission with attachments (1LS Chat) |
| 137 - 141 | Student D Community Concern Submission with attachments |
| 142 | Anonymous Community Concern Submission (Book Award Concern) |
| 143 | Anonymous Community Concern (Coursework inciting violence concern) |
| 144 | Twitter follow-up email |
| 145 | From the River saying shirt image |
| 146 - 147 | Student F Community Concern Submission with attachment |
| 148 - 149 | Student G Community Concern with attachment |
| 150 - 151 | Anonymous Community Concern with attachment |
| 152 - 153 | Student H Community Concern with attachment |
| 154 - 156 | Student I Community Concern with attachment |
| 157 | Anonymous Community Concern |
| 158 - 159 | Anonymous Community Concern with attachment |
| 160 - 161 | Student J Community Concern with attachment |
| 162 | Response to Dean's Grading and First Amendment Principles Email |

DEF_000497

| | |
|---|---|
| 163 - 164 | Anonymous Community Concern with attachment |
| 165 - 167 | Anonymous Community Concern with attachments |
| 168 | X Post with Lidsky response |
| 169 - 170 | Statement Regarding Impact on Educational Experience |
| 171 - 319 | Documentation Submitted by Preston |
| 171 - 174 | Table of Exhibits |
| 175 - 324 | Exhibits |

DEF_000498



**Division of Student Life**
Dean of Students Office

202 Peabody Hall
PO Box 114075
Gainesville, FL 32611-4075
352-392-1261
352-392-5566 Fax

April 2, 2025

Preston Damsky
Sent electronically to prestondamsky@ufl.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2024803701

Dear Preston:

Your name was forwarded to me by employees and students regarding incidents which were reported to our office between March 28, 2025 and April 1, 2025. According to the reported information, you were allegedly involved in behavior that created a material and substantial disruption to the academic operation of the UF College of Law.

Pursuant to the University of Florida Regulation 4.040, Section 11 Interim Restrictions for Students, you are hereby immediately placed on interim suspension from the University of Florida, pending resolution of the allegations. During this interim suspension you are denied access to campus property and all other University activities and privileges. You may continue to participate in online classes so long as they do not require your physical presence on campus property.

The Regulation reads, in part, as follows:

Interim suspension --which will prohibit access to campus and may preclude access to classes, instruction, and other educational support. Criteria includes:

1. Allegations of conduct that could reasonably cause harm to members of the University Community or property.

2. A reasonable belief that a Student's continued access to campus or campus activities could endanger one or more other person's health, safety, or property and that prohibiting access will ameliorate safety for the University Community.

3. A reasonable belief that further contact between two or more persons involved in the alleged interactions could result in perpetuation or escalation of behavior.

4. A reasonable belief that limited access is not a viable option under the circumstances.

**DEF_000499**

5. A requirement of a Student conduct Hearing as soon as practicable.

6. Recommendation to, and final approval, by the Dean of Students or Designee.

7. An opportunity to appeal to the Vice President for Student Life (VPSL) or designee within three (3) Class Days(April 7, 2025) to request modification or nullification.


If you wish to appeal the interim suspension, you may submit your written appeal information via this webform, which will be routed to the appropriate staff member.

Upon completion of the investigation, if formal conduct charges are warranted, a formal charge letter will be forwarded to you detailing the alleged violation(s) of the Student Code of Conduct. In order to resolve the Conduct matter, you would be required to attend an informational meeting with Student Conduct and Conflict Resolution. During this meeting you would have the opportunity to review the information that was received and discuss your rights and resolution options regarding this matter.

To obtain more information about the Student Conduct Code and the student conduct process, you may visit the Student Conduct and Conflict Resolution website at sccr.dso.ufl.edu.

Sincerely,

Chris Summerlin
Dean of Students

CC:  Bart Knowles, University of Florida Police Department
     Latrell Simmons, University of Florida Police Department
     Scott Summers, University of Florida Police Department
     Jeff Moran, University of Florida Police Department
     Trevor Henderson, University of Florida Police Department

DEF_000500



**Division of Student Life**
Office of the Vice President

PO Box 113250
Gainesville, FL 32611
352-392-1265
352-392-7301 Fax
https://studentlife.ufl.edu/

April 16, 2025

Preston Damsky
Sent electronically to prestondamsky@ufl.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2024803701

Dear Preston,

In accordance with University Regulation 4.040, I have reviewed the your request of extension of the appeal submission deadline as a designee for the Vice President of Student Life.

Your request for an extension to submit an appeal is granted. Your new appeal submission deadline is by 11:59 pm, Monday, April 21st, 2025. Please submit your appeal through this link. https://cm.maxient.com/reportingform.php?UnivofFlorida&layout_id=22

In accordance with University of Florida Regulation 4.040, Section 11, the University is utilizing interim measures to protect the campus community from a threat of harm and prevent further disruption to its business and educational operations. This action is not meant to be punitive in nature. During this time, the University will further investigate the allegations and determine if conduct charges are warranted.

The allegations giving rise to this interim suspension include complaints from numerous students and employees that they fear for their safety and do not want to attend class after reading antisemitic public facing posts on your social media such as "Jews must be abolished my any means necessary." Additionally, it was reported that you wore a t-shirt with an antisemitic message, "From the river to the sea," to the law school campus where you walked through hallways and attended classes amongst numerous Jewish students and faculty. Your conduct, in light of current events around the world, has created a climate of fear that permeates the law school campus and amounts to a material disruption close in time to final exams. The University is obligated to stop the disruption and ensure students have meaningful access to their education without fear of harm from a fellow classmate.

At the conclusion of its investigation, if the University determines conduct charges are warranted, you will be notified in writing in accordance with University of Florida Regulation 4.040. During this period of interim suspension, you are not prohibited from accessing course material provided by your faculty remotely, at their discretion, and you will have access to your (take-home) final exams.

DEF_000501

The original interim suspension letter is attach for your reference.

Sincerely,

Nancy Chrystal-Green, PhD
Associate Vice President for Student Life

CC:    Student Conduct and Conflict Resolution
       Chris Summerlin, Dean of Students
       Kristy Sasser, University of Florida Police Department
       Latrell Simmons, University of Florida Police Department
       Scott Summers, University of Florida Police Department

DEF_000502



**Division of Student Life**
Office of the Vice President

PO Box 113250
Gainesville, FL 32611
352-392-1265
352-392-7301 Fax
https://studentlife.ufl.edu/

April 29, 2025

Preston Damsky
Sent electronically to prestondamsky@ufl.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2024803701

Dear Preston,

In accordance with University Regulation 4.040, I have reviewed the appeal of your interim suspension as a designee for the Vice President of Student Life.

The information received by the University of Florida alleges your involvement in behavior that threatens the health and safety of members of the university community. Your access to campus created a material disruption to the College of Laws' academic operations and its students' access to their education. Accordingly, your continued access to campus could endanger one or more other person's health or safety due to the severity of the allegations in your case. Therefore, I find it is reasonable to believe that the restrictions outlined in your interim suspension letter are appropriate for the circumstances.

As such, I have decided to uphold the decision of the Dean of Students, Dr. Chris Summerlin and the interim suspension remains in place as outlined in Dean Summerlin's letter.

Sincerely,

James Tyger
Assistant Vice President, VPSL

CC:   Student Conduct and Conflict Resolution
      Chris Summerlin, Dean of Students
      Kristy Sasser, University of Florida Police Department

DEF_000503

Latrell Simmons
Scott Summers, University of Florida Police Department

DEF_000504



| | |
|---|---|
| **Division of Student Life** | 202 Peabody Hall |
| Dean of Students Office | PO Box 114075 |
| | Gainesville, FL 32611-4075 |
| | 352-392-1261 |
| | 352-392-5566 Fax |

May 29, 2025

Preston Damsky
Sent electronically to prestondamsky@ufl.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2024803701

Dear Preston,

Student Conduct & Conflict Resolution has received information from students and employees indicating you may have engaged in conduct violating University of Florida Regulation 4.040, the Student Honor Code and Student Conduct Code.

The reported information included complaints from numerous students and employees that they fear for their safety such that they do not want to attend classes with you after reading threatening and anti-Semitic public-facing posts on your social media, such as your post in March 2025 that included this statement of your "position on Jews": "Jews must be abolished by any means necessary." This post was followed by an exchange with a professor at the law school who asked you: "Are you saying you would murder me and my family?" On another occasion, a student at the law school complained that you had agreed that your paper for the Originalism and its Critics seminar ended on a call for extralegal violence. These examples represent some, but not all, of your reported disruptive and threating behavior. Your conduct, especially in light of current events in this country and around the world, has created a climate of fear that permeates the law school campus and amounts to a material or substantial disruption of normal University operations.

Based on the available information, an initial determination has been made that the Conduct Process should proceed, as outlined in section 6.E of Regulation 4.040. You are being charged with violating the following sections of Regulation 4.040:

- 4.C Disruptive Conduct: Conduct that is materially or substantially disruptive to the normal operations of the University, or that incites others to do so, in any of the following activities: teaching, learning, research, administrative functions, disciplinary proceedings, other University Activities whether on or off campus, and other authorized activities that take place on campus. In evaluating whether conduct is materially or substantially disruptive, the University may consider the totality of factors, including but not limited to whether there was an intent to prevent the activity or event from continuing to completion and whether the conduct was a sustained and continuous disruption.

- 4.K Harassment: Threats, intimidation, Coercion, or any other conduct that places a Reasonable person in fear of physical harm, through words or actions, or objectively disrupts a person's daily activities, including education and employment.

**DEF_000505**

You are requested to attend an Information Meeting with *Aimee Peeples on June 12, 2025 at 4:00pm, via Zoom video conference, meeting details are listed below. If you would like to attend your meeting in person, you may contact our office via email (DSOStudentConductandConflictResolution@ufsa.ufl.edu) at least one (1) business day prior to your scheduled appointment to accommodate your request.* During this meeting you will have the opportunity to review the information that was received regarding this allegation, learn more about the conduct process, and discuss any questions you may have about your rights and available resolution options regarding this matter. Based on information available including the nature of this incident, prior conduct history, and/or aggravating or mitigating circumstances, this incident will be offered resolution options available for cases that could result in separation as defined in Regulation 4.040(6G.2.c). Any questions or concerns can also be addressed in this meeting.

Meeting URL: https://ufl.zoom.us/j/99514301665?pwd=GukIbEPYx4z8R8274ztccrWtScMZlm.1

Meeting ID: 995 1430 1665
Passcode: 216498

*Please take a moment to complete your student rights form before your scheduled meeting.* The student rights form can be accessed here**;** you will be required to log-in with your UF credentials to authenticate your identity and digitally sign this form.

If you are unable to attend this meeting due to compelling circumstances, or if you would like to reschedule your meeting, you may contact our office via email (DSOStudentConductandConflictResolution@ufsa.ufl.edu). Additionally, if you would like to have an Advisor and/or a Support Person present during any Hearing or meeting with Student Conduct and Conflict Resolution, you must provide the appropriate signed privacy waiver to our office by 5:00 pm at least two (2) Class Days in advance via email to DSOStudentConductandConflictResolution@ufsa.ufl.edu . The FERPA privacy waiver and additional information on the Student Conduct and Student Honor Code can be reviewed on the Student Conduct and Conflict Resolution website.

Thank you for your cooperation.

Sincerely,

Pamela Malyk
Assistant Dean and Director - SCCR

DEF_000506



**Division of Student Life**
**Dean of Students Office**
**Student Conduct and Conflict Resolution**

**Zoom Meeting Expectations – Information Meeting**

The following are expectations regarding your participation in your Zoom based meeting:

- Engage in the meeting professionally, as you would in an in-person Information Meeting.

- Ensure you are in a safe location before beginning your participation in your Information Meeting in order to prevent potential danger to you or other people (i.e. driving).

- Participate through a consistent and reliable Internet/WIFI connection to ensure your Information Meeting can occur without interruption (excessive interruptions will not be reason for resolution delay).

- Be in a **private location** as information discussed during an Information Meeting is considered part of your educational record protected by FERPA.

  o A **private location** means you are in a separate room by yourself. You should not have other people in the same room as you, even if you are using headphones.

  o If you would like a Support Person or an Advisor to participate in the meeting with you, you will need to complete a FERPA Waiver in compliance with expectations outlined in University Regulation 4.040. Your Support Person and/or an Advisor can participate from your private location or in their own private location.

  o The staff member facilitating your meeting may request a scan of the space you are in to confirm the privacy and safety at any point during the meeting.

  o If your space is deemed inappropriate by Student Conduct & Conflict Resolution staff due to privacy or safety concerns the meeting will be ended and may be rescheduled for a later date if you are not able to immediately relocate to an appropriate space.

- This is a live meeting and **no** audio or video recordings, photos, or screen captures are permitted. Failure to comply with this expectation can be a violation of the Student Conduct Code.

- The expectation is that your video will be turned on.

DEF_000507



**Division of Student Life**
Dean of Students Office

202 Peabody Hall
PO Box 114075
Gainesville, FL 32611-4075
352-392-1261
352-392-5566 Fax

June 12, 2025

Preston Damsky
Sent electronically to prestondamsky@ufl.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2024803701

Dear Preston,

Thank you for meeting with me today.  I have scheduled a follow up meeting to complete your Information Meeting and review the documentation in your case file. Your meeting will take place with Aimee Peeples, Associate Director, Student Conduct & Conflict Resolution, on **Friday, June 20, 2025 at 9:00am**. This meeting will occur as a Zoom video conference.

Instructions on how to participate in your Zoom meeting are included below.

https://ufl.zoom.us/j/97881094048?pwd=o4hoyFYN384nQeRBZSJ0hrqcpJbYmv.1

Please note that failure to appear for your meeting or make alternate arrangements will not further delay the conduct process and can result in a service indicator hold being placed on your student records and course registration, or conduct processes proceeding in your absence.

A copy of the original letter sent by our office is enclosed on the subsequent pages for your reference.

If you experience difficulties, please email our office at sccr@ufsa.ufl.edu.

Thank you for your attention in this matter.

Sincerely,

**DEF_000508**

Aimee Peeples
Associate Director, Student Conduct & Conflict Resolution

DEF_000509



**Division of Student Life**
Dean of Students Office

202 Peabody Hall
PO Box 114075
Gainesville, FL 32611-4075
352-392-1261
352-392-5566 Fax

May 29, 2025

Preston Damsky
Sent electronically to prestondamsky@ufl.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2024803701

Dear Preston,

Student Conduct & Conflict Resolution has received information from students and employees indicating you may have engaged in conduct violating University of Florida Regulation 4.040, the Student Honor Code and Student Conduct Code.

The reported information included complaints from numerous students and employees that they fear for their safety such that they do not want to attend classes with you after reading threatening and anti-Semitic public-facing posts on your social media, such as your post in March 2025 that included this statement of your "position on Jews": "Jews must be abolished by any means necessary." This post was followed by an exchange with a professor at the law school who asked you: "Are you saying you would murder me and my family?" On another occasion, a student at the law school complained that you had agreed that your paper for the Originalism and its Critics seminar ended on a call for extralegal violence. These examples represent some, but not all, of your reported disruptive and threating behavior. Your conduct, especially in light of current events in this country and around the world, has created a climate of fear that permeates the law school campus and amounts to a material or substantial disruption of normal University operations.

Based on the available information, an initial determination has been made that the Conduct Process should proceed, as outlined in section 6.E of Regulation 4.040. You are being charged with violating the following sections of Regulation 4.040:

- 4.C Disruptive Conduct: Conduct that is materially or substantially disruptive to the normal operations of the University, or that incites others to do so, in any of the following activities: teaching, learning, research, administrative functions, disciplinary proceedings, other University Activities whether on or off campus, and other authorized activities that take place on campus. In evaluating whether conduct is materially or substantially disruptive, the University may consider the totality of factors, including but not limited to whether there was an intent to prevent the activity or event from continuing to completion and whether the conduct was a sustained and continuous disruption.

- 4.K Harassment: Threats, intimidation, Coercion, or any other conduct that places a Reasonable person in fear of physical harm, through words or actions, or objectively disrupts a person's daily activities, including education and employment.

**DEF_000510**

You are requested to attend an Information Meeting with ***Aimee Peeples on June 12, 2025 at 4:00pm, via Zoom video conference, meeting details are listed below. If you would like to attend your meeting in person, you may contact our office via email (DSOStudentConductandConflictResolution@ufsa.ufl.edu) at least one (1) business day prior to your scheduled appointment to accommodate your request.*** During this meeting you will have the opportunity to review the information that was received regarding this allegation, learn more about the conduct process, and discuss any questions you may have about your rights and available resolution options regarding this matter. Based on information available including the nature of this incident, prior conduct history, and/or aggravating or mitigating circumstances, this incident will be offered resolution options available for cases that could result in separation as defined in Regulation 4.040(6G.2.c). Any questions or concerns can also be addressed in this meeting.

Meeting URL: https://ufl.zoom.us/j/99514301665?pwd=GukIbEPYx4z8R8274ztccrWtScMZlm.1

Meeting ID: 995 1430 1665
Passcode: 216498

***Please take a moment to complete your student rights form before your scheduled meeting.*** The student rights form can be accessed here**;** you will be required to log-in with your UF credentials to authenticate your identity and digitally sign this form.

If you are unable to attend this meeting due to compelling circumstances, or if you would like to reschedule your meeting, you may contact our office via email (DSOStudentConductandConflictResolution@ufsa.ufl.edu). Additionally, if you would like to have an Advisor and/or a Support Person present during any Hearing or meeting with Student Conduct and Conflict Resolution, you must provide the appropriate signed privacy waiver to our office by 5:00 pm at least two (2) Class Days in advance via email to DSOStudentConductandConflictResolution@ufsa.ufl.edu . The FERPA privacy waiver and additional information on the Student Conduct and Student Honor Code can be reviewed on the Student Conduct and Conflict Resolution website.

Thank you for your cooperation.

Sincerely,

Pamela Malyk
Assistant Dean and Director - SCCR

DEF_000511



**Division of Student Life**
**Dean of Students Office**
**Student Conduct and Conflict Resolution**

**Zoom Meeting Expectations – Information Meeting**

The following are expectations regarding your participation in your Zoom based meeting:

- Engage in the meeting professionally, as you would in an in-person Information Meeting.
- Ensure you are in a safe location before beginning your participation in your Information Meeting in order to prevent potential danger to you or other people (i.e. driving).
- Participate through a consistent and reliable Internet/WIFI connection to ensure your Information Meeting can occur without interruption (excessive interruptions will not be reason for resolution delay).
- Be in a **private location** as information discussed during an Information Meeting is considered part of your educational record protected by FERPA.
    - A **private location** means you are in a separate room by yourself. You should not have other people in the same room as you, even if you are using headphones.
    - If you would like a Support Person or an Advisor to participate in the meeting with you, you will need to complete a FERPA Waiver in compliance with expectations outlined in University Regulation 4.040. Your Support Person and/or an Advisor can participate from your private location or in their own private location.
    - The staff member facilitating your meeting may request a scan of the space you are in to confirm the privacy and safety at any point during the meeting.
    - If your space is deemed inappropriate by Student Conduct & Conflict Resolution staff due to privacy or safety concerns the meeting will be ended and may be rescheduled for a later date if you are not able to immediately relocate to an appropriate space.
- This is a live meeting and **no** audio or video recordings, photos, or screen captures are permitted. Failure to comply with this expectation can be a violation of the Student Conduct Code.
- The expectation is that your video will be turned on.

DEF_000512



**Division of Student Life**
Dean of Students Office

202 Peabody Hall
PO Box 114075
Gainesville, FL 32611-4075
352-392-1261
352-392-5566 Fax

July 17, 2025

Preston Terry Damsky
Sent electronically to prestondamsky@ufl.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2024803701

Dear Preston:

Please be advised that a University Officials Board Hearing has been scheduled to resolve the allegations you received as a result of your reported involvement in conduct including;complaints from numerous students and employees that they fear for
their safety such that they do not want to attend classes with you after reading threatening and
anti- Semitic public-facing posts on your social media, such as your post in March 2025 that included this statement of your "position on Jews": "Jews must be abolished by any means necessary." This post was followed by an exchange with a professor at the law school who asked you: "Are you saying you would murder me and my family?" On another occasion, a student at the law school complained that you had agreed that your paper for the Originalism and its Critics seminar ended on a call for extralegal violence. These examples represent some, but not all, of your reported disruptive and threating behavior. Your conduct, especially in light of current events in this country and around the world, has created a climate of fear that permeates the law school campus and amounts to a material or substantial disruption of normal University operations. The alleged violations of Regulation 4.040, the Student Conduct Code and Student Honor Code, are as follows:

- 4.C Disruptive Conduct: Conduct that is materially or substantially disruptive to the normal operations of the University, or that incites others to do so, in any of the following activities: teaching, learning, research, administrative functions, disciplinary proceedings, other University Activities whether on or off campus, and other authorized activities that take place on campus. In evaluating whether conduct is materially or substantially disruptive, the University may consider the totality of factors, including but not limited to whether there was an intent to prevent the activity or event from continuing to completion and whether the conduct was a sustained and continuous disruption. Disruptive conduct does not include any conduct protected by the First Amendment.

- 4.K Harassment: Threats, intimidation, Coercion, or any other conduct that places a Reasonable person in fear of physical harm, through words or actions, or objectively disrupts a person's daily activities, including education and employment. Harassment does not include conduct protected by the First Amendment.

**DEF_000513**

16

The following individuals may be called to participate in the hearing process or provide documentation at the hearing: Dean Merritt McAlister, Dean Janice Shaw, Lyrissa Lidsky, Christopher Hampson, Cooper Whisnant, Scott Jurkowski. You will be informed of any additional witnesses prior to the hearing.

The hearing has been scheduled for **Monday, July 28, 2025 at 9:00am.** This hearing will occur as a Zoom video conference.

Your Zoom video conference meeting information is below:

https://ufl.zoom.us/j/96376498734?pwd=p2aZkPCmANJFTsqcaY4e4lIP7gH35M.1

Any involved person who wishes to submit information or additional witness names for participation consideration must do so no later than 5:00 p.m. six (6) Class Days prior to the date of this scheduled hearing (July 18, 2025). Rationale for why information or witness(es) are relevant, must also be sent to Student Conduct & Conflict Resolution by the same deadline. Documentation can be submitted to sccr@ufsa.ufl.edu  or provided to Student Conduct and Conflict Resolution (SCCR) in-person during business hours (if electing to submit any additional material). No new information will be accepted after this deadline, and it is your own responsibility to inform any additional witness(es) of the hearing date, time, and location.

Student Conduct & Conflict Resolution staff will review all materials and witness information submitted to determine relevance, and a complete case file will be available for you to review, by appointment only, beginning five (5) Class Days prior to the date of your scheduled hearing. To review your rights and information regarding the hearing process, please refer to https://sccr.dso.ufl.edu/policies/student-honor-code-student-conduct-code/.

Please remember that failure to attend this hearing will not postpone the resolution and we will proceed in your absence. Please contact Student Conduct & Conflict Resolution staff if you have any questions by email at sccr@ufsa.ufl.edu.

Sincerely,

Aimee Peeples
Associate Director, Student Conduct & Conflict Resolution

DEF_000514



**Division of Student Life**
**Dean of Students Office**
**Student Conduct and Conflict Resolution**

**Zoom Hearing Expectations**

The following are expectations regarding your participation in your Zoom based Hearing:

- Engage in the Hearing professionally, as you would in an in-person Hearing.

- Ensure you are in a safe location before beginning your participation in your Hearing in order to prevent potential danger to you or other people (i.e. driving).

- Participate through a consistent and reliable Internet/WIFI connection to ensure your Hearing can occur without interruption (excessive interruptions will not be reason for resolution delay).

- Be in a **private location** as information discussed during your Hearing is considered part of your educational record protected by FERPA.

  o A **private location** means you are in a separate room by yourself. You should not have other people in the same room as you, even if you are using headphones.

  o If you would like a Support Person or an Advisor to participate in the hearing with you, you will need to complete a FERPA Waiver in compliance with expectations outlined in University Regulation 4.040. Your Support Person and/or an Advisor can participate from your private location or in their own private location.

  o The staff member facilitating your Hearing may request a scan of the space you are in to confirm the privacy and safety at any point during the Hearing.

  o If your space is deemed inappropriate by Student Conduct & Conflict Resolution staff due to privacy or safety concerns the Hearing will be ended and may be rescheduled for a later date if you are not able to immediately relocate to an appropriate space.

- This is a live Hearing and **no** audio or video recordings, photos, or screen captures are permitted. Failure to comply with this expectation can be a violation of the Student Conduct Code.

- The expectation is that your video will be turned on.

**DEF_000515**

**University of Florida**
**Accused Student Rights**

*Submitted on June 10, 2025 at 6:54:42 pm EDT*

| | |
|---|---|
| Nature | **Rights Form** |
| Urgency | **Normal** |
| Incident Date and Time | **2025-06-10** |
| Incident Location | **Dean of Students Office** |

Reported by
Name:
Title:
Email:
Phone
Address:

**[Authenticated as prestondamsky]**

Your Information
**Preston Damsky (16495387)**                    prestondamsky@ufl.edu

Student Rights

Any Accused Student or Student Organization will be afforded the following rights throughout the Student Conduct Process. Any Student may also be given the opportunity to waive specific rights, in writing, to expedite the resolution process if appropriate as determined by the Director of Student Conduct and Conflict Resolution or designee. Accused Students have the right to:

**1. Access and review all relevant University policies and procedures related to the Student Honor Code or Student Conduct Code, 2. Notice of Charges resulting from an alleged violation of the Student Honor Code or the Student Conduct Code, 3. Privacy of their student education records, except to the extent disclosure is permitted or required by Law, 4. Have an Advisor and/or Support Person present during any Hearing or meeting with a Student Conduct Administrator or Hearing Body. A Student who chooses to have an Advisor and/or Support Person present during any Hearing or meeting, must provide the identity of the person(s) to the Director of Student Conduct and Conflict Resolution or designee at least two (2) Class Days in advance and must provide the appropriate executed privacy waiver(s) during this notification and notify their Advisor and/or Support Person of their obligation to follow all University regulations, rules, policies and procedures throughout the Student Conduct Process. Failure to comply with the requirements of this section may result in the Advisor and/or Support Person not being permitted to attend the Hearing or meeting, 5. A Hearing to determine responsibility of any alleged violations of the Student Honor Code or the Student Conduct Code. A single postponement request for the Hearing for up to thirty (30) calendar days may be submitted to Student Conduct and Conflict Resolution if a legal case resulting from the same incident is pending, 6. Decline to answer any questions or provide self-incriminating information to the Hearing Body at any point during the resolution process. Accused Students may also elect not to participate in a Hearing with the understanding that a decision, including any appropriate Sanctions, will be made using the information available at the time of the Hearing in their absence, 7. An opportunity to ask staff member(s) in Student Conduct and Conflict Resolution (or Housing and Residence Life) questions regarding the Student Conduct Process, and have those questions answered to the extent that staff is permitted and able, 8. Review all known information in the University's possession related to the allegations, both inculpatory and exculpatory, including any potential Witnesses that could be used in the decision-making process. Provide relevant additional information related to the allegations, including Witnesses. (a.) All information must be provided to Student Conduct and Conflict Resolution by 5:00 p.m. at least six (6) Class Days before the scheduled Hearing. No new information, including potential Witnesses, will be accepted for consideration after this date, absent the express written permission of the Director of SCCR or designee. (b.) An Accused Student and their Advisor, if any, have the right to inspect the case file at least five (5) Class Days before the scheduled Hearing., 9. Have all information, including any potential Witnesses, that could be used in the decision-making process reviewed preliminarily for relevance by Student Conduct and Conflict Resolution prior to the Hearing. The determination of relevance will rest with the Director of Student Conduct and Conflict Resolution or**

DEF_000516

**designee. Relevance decisions will be communicated directly with the Accused Student, with rationale, in writing prior to the Hearing. Relevancy determinations regarding information directly related to the Reporting Person's character or prior conduct will also be communicated directly with the Reporting Person in the same manner. Relevancy determinations may be reversed or modified through an appeal to the Dean of Students or designee, 10. Participate in a Hearing, including provide information, listen to Witnesses and ask questions, through the Hearing Body, of Witnesses providing information during a Hearing, 11. Have a decision made based on the Preponderance of the Information standard, 12. Request reasonable accommodations in the Student Conduct Process, if the Accused Student has a disability. At any point during the Student Conduct Process a student may contact the Disability Resource Center (DRC) to discuss their access needs, 13. Appeal a decision of a Hearing Body, in writing and in accordance with section (9) Appeals of this Regulation, 14. Request permission to participate via audio or live-video from another location, and/or participate in a manner that avoids direct contact with Reporting Persons and/or Witnesses as long as such participation does not infringe on the Accused Student's right to question the Reporting Person or Witnesses during the Hearing or infringe on the University's implementation of the Student Conduct Process, 15. Provide a written impact statement to the Conduct Committee Advisor before the start of a Hearing to be considered if Sanctions are to be issued, 16. Have any University status remain unchanged pending a final outcome through the Student Conduct Process, except in cases where interim restrictions are in place, as outlined in sections (11) Interim Restrictions for Students and (12) Interim Restrictions for Student Organizations of this Regulation., 17. Be notified of the final outcome of the case, 18. To select a Hearing Body as outlined in section (6)(g)2c Process. In cases involving Sexual Misconduct violations, if the Reporting Person and Accused Student disagree on the type of Hearing Body, the Hearing Body will be a University Officials Board**

I understand a conduct record will be created and maintained by the Dean of Students Office, if found responsible for any violation(s) of University Regulation 4.040. Student Conduct records may be disclosed pursuant to section 10 of University Regulation 4.040.
**I understand**

By typing my name below, I am acknowledging that I have read and understand ALL my rights listed above.
**Preston Damsky**

*Pending IR #00064991*
*Submitted from 70.171.53.88. Processed by routing rule #536. Routed to Jose Capula, Process Coordinator for Student Conduct and Conflict Resolution.*

DEF_000517



**Division of Student Life**
Dean of Students Office

## Information Meeting Checklist – Separable

Preston Damsky                                               Friday, June 20, 2025
2024803701

You have been alleged to have violated the below listed sections of Regulation 4.040. A Notice of Charges was issued on **Thursday, May 29, 2025.**

**Step 1: Discussion**
*Review and Discussion of the Student Rights and Charges. Initial next to each item indicating that you were provided an opportunity to review them with a Student Conduct Administrator.*

     **PTD**   Completed Student Rights Form
     **PTD**   Reviewed available case documents
     **PTD**   Reviewed the alleged Student Honor Code and/or Conduct Code charges

**Step 2: Responding to Allegations**
*Next to each charge, place a checkmark indicating whether you accept or deny responsibility for the charge.*

4.C Disruptive Conduct General              ___ Responsible  ✓ Not Responsible

4.K Harassment                            ___ Responsible  ✓ Not Responsible

**Step 3: Choosing a Resolution Option**
*Based on my selections above, I choose to resolve my incident through (please check your option):*

| |
|---|
| **Hearing Resolution Options** |
| **PTD** University Officials Board Hearing |
| _____ Student Conduct Committee Hearing /Health Science Conduct Committee Hearing |
| If you do not choose an option, or if you refuse to make a selection of responsible or not responsible, the conduct process may move forward with a Hearing Body designated by the Director of Student Conduct and Conflict Resolution. |

**DEF_000518**

**By signing below, I have made my selections and understand that they may not be altered.**

Preston Damsky
_____
Accused Student Name

16495387
_____
UFID

*Preston Damsky*
_____
Student Signature

6/23/25 @ 13:35
_____
Date

310-505-8075
_____
Student phone number

Student Conduct Administrator:    Aimee Peeples

_____

*Below Line: For Office Use Only*

DEF_000519



## Information to Remember For Suspension/Expulsion Level Cases

- Due to your alleged violation, you are facing the possibility of being suspended or expelled from the University of Florida.  Student Conduct & Conflict Resolution (SCCR) would encourage you to think about the following information when making decisions about how you want to proceed:
    - In preparation for your hearing, SCCR would strongly encourage you to seek out multiple levels of advice.  Students have the right to have an Advisor and/or Support Person present during any Hearing or meeting with a Student Conduct Administrator or Hearing Body.
    - Please note that the burden of proof utilized in the student conduct process is preponderance of information, or more likely than not.  This differs from the legal system. The goals of the student conduct process are to help students learn, grow, and repair the harm of their actions through an administrative process on behalf of the University of Florida and its interests. Our process does not always have the same access to the same information as a criminal process nor the same potential outcome impact to a student, should they be found responsible for a policy violation. The hearing body will make a decision regarding responsibility based on the information available during the hearing.  If you choose not to answer questions, speak about the impact a decision might have on you and the UF community, or supplement the available in the hearing, this will not be held against you, but the burden of proof will not change and a decision will be made based on the information available at the time of the hearing.
    - For students who have been issued a limited activity directive or interim suspension, without appealing the interim suspension, and being granted an exception from the Vice President for Student Life or designee, the restriction will remain until the case has been resolved. While SCCR strives to have your case resolved quickly, we also want to make sure we are being thorough and complete. This may result in you missing an add/drop deadline and/or other important dates related to academic/financial statuses. It is your responsibility to pay attention to this, and speak to SCCR staff if you have any questions.
    - Once a final decision is made, and the appeal deadline lapses or an appeal decision is made regarding separation, if suspension or expulsion are an outcome, SCCR will automatically withdraw you from your courses. You remain liable for any fees accrued prior to your separation.
    - If you are suspended, any courses you take while serving your suspension will not count towards the completion of your UF degree. Also, an overlay will be placed on your transcript while you are suspended or expelled.  The overlay states, "This student is currently not in good standing, and further information should be requested from the Dean of Students Office." One month prior to the end of your suspension, you must schedule an appointment with a Student Conduct

DEF_000520

Administrator to have the overlay removed, and learn about the re-entry process.

- o Students who are not enrolled for three or more semesters (including summer) will need to re-apply, re-admission is not guaranteed. Re-admission deadline dates can be significantly earlier than the end of the suspension period. Students should reference Enrollment Management websites for specific information related to re-admission and enrollment.

- o If you have any additional questions or concerns, SCCR Staff can be reached by contacting the Dean of Students Office at (352) 392-1261 or via e-mail at SCCR@ufsa.ufl.edu.

**I have reviewed this form in its entirety with a Student Conduct Administrator and I understand that my incident could potentially result in my separation (suspension or expulsion) from the University of Florida and a student conduct record maintained as outlined in Section 10 of University Regulation 4.040.**

Student's Signature: _Preston Damsky_____ Date: 6/23/25 @ 16:54

DEF_000521

**University of Florida**
**Student Conduct Code Incident Report**
*Submitted on April 1, 2025 at 10:25:46 pm EDT*

| | |
|---|---|
| Nature | **General Conduct Report** |
| Urgency | **Normal** |
| Incident Date and Time | **2025-04-01 7:00 PM** |
| Incident Location | **Off Campus Twitter** |

Reported by
Name:               Student A
Title:              **Student**
Email:              St A **@ufl.edu**
Phone
Address:

Involved Parties
**Preston Terry ()**                          prestondamsky@ufl.edu
Accused Student

Questions
Please provide a detailed description of the incident/concern using specific language (Who, what, where, when, why, and how).
**Preston Terry runs a Twitter (or X) account under the name preston_terry_. On March 21st he posted " My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to "abolish the White race by any means necessary" is what I think must be done with Jews. Jews must be abolished by any means necessary." This is hate speech meant to insight violence against a large population of the UF campus, including against professors.**

Please select all that apply

If an Organization was involved, please list Organization Name

Attachments
img2261.png

*Pending IR #00062630*
*Submitted from 70.185.122.227. Processed by routing rule #437. Routed to Jose Capula, Process Coordinator for Student Conduct and Conflict Resolution.*
*Copies to: pmalyk@ufl.edu,ampeep@ufl.edu*

DEF_000522



DEF_00523

April 1, 2025 Report from Dean McAllister

For the better part of two years, we've been dealing with a law student who has expressed extreme views that nearly all in our community find deeply disturbing, racist, and antisemitic. The student has used his private social media and a private law student GroupMe forum to express his views, and he's also written papers in two seminar classes that have circulated in the community on a variety of deeply divisive and disturbing issues. I'm attaching the papers, so that you have them as reference points, as well as a selection of student messages and complaints received about the student.

Most recently, this past Friday, a Jewish student in our community brought to my attention the tweet that appears in the message below from this student's X account. The male student who shared it with me was shaking and had tears in his eyes as he showed it to me. That statement also has now circulated among our campus faculty, as seen below, having been shared by a representative group of our Jewish faculty. I understand that the University has determined that the student's speech is protected under the First Amendment, and I have, up to now, vigorously defended this student's right to speak, as I would defend any student or faculty member's right to free expression. But I fear we are growing too close to the line of permitting harassment and threats to Jewish students, and the entire situation is an ongoing disruption to the law school community.

I write now to provide greater context to the situation and some of the disruptions and complaints I've received about this particular student and the statements he's made that have been shared widely in the community:

Last semester I met with several student groups after one of the attached papers was circulated in the community (complaints received also attached). Students expressed fears of violence, believing that the student was a threat. (Indeed, we've been made aware of at least one very angry encounter that the student had with a staff member last year, where the student screamed profanity.) We repeatedly asked for specific details beyond what was in the paper that might constitute a specific threat, but students were unable to provide those and, instead, insisted that they fear this student based on the ideas he's expressed. He's advanced abstract calls for violence that some students perceive as real and threatening.

At a student town hall at the beginning of this semester, at least three separate students raised concerns about the student's views expressed in the paper. Students repeatedly stated that they had fears of violence, with one student stating that they "looked for the exits" in any room this student was in, out of fear that he might cause harm. I've assured students repeatedly that we refer concerns to the conduct office on main campus, that they

DEF_000524

investigate, and take appropriate action. We've educated students on the GatorSafe app and have offered safety training in response to these expressed concerns.

State Senator Jennifer Bradley, who is the mother of a third-year student, has spoken with me twice about concerns that a faculty member recognized this particular student with an honor for one of the papers attached. (Faculty members, of course, may not exercise viewpoint discrimination in their grading, and the law school did not disturb the grading decision of the faculty member in the class, much to the community's dismay.) Senator Bradley was furious, expressed outrage that the University and law school would, in her view, endorse hate speech. (I have made Mori Hosseini aware of these interactions, as well as our government affairs team.)

A Jewish faculty member has demanded that we do everything we can to discipline or expel this student, refer him for criminal prosecution, and increase campus security(especially for events related sponsored by the Jewish Law Students Association). That faculty member has requested that I forcefully condemn the speech to the entire community, and he likely will refer the matter to the FBI (which I believe has already happened once before in connection with one of the student's papers).

The student has worn a "from the river to the sea" t-shirt to campus (as attached here),also triggering complaints.

Our Jewish student community and others have repeatedly expressed fear and concern about the law school's perceived inaction. Students have told me that they are afraid of him, that they don't want to take classes with the student, and that his presence in their classroom is distracting. Faculty who have tried to hold the First Amendment line and recognize his contributions to the classroom are being criticized as "endorsing" his viewpoint. Our efforts to educate students on the First Amendment and what it requires of us and of our faculty have not proved convincing, and each month brings a new round of seemingly escalating issues.

Although perhaps not the best measure of disruption, I have spent the better part of two or three weeks in the last two years dealing with complaints, meeting with students, discussing this issue with concerned faculty and students, drafting responses to incidents, and discussing referrals with our head of students.

DEF_000525

At some point, we cross the line from protected speech to disruptive conduct. Given the overall climate and state of fear in this moment, I'd err on the side of being more protective rather than less of our students and our community. As a law school focused on cultivating professional civility and respect for the rule of law, I find it deeply problematic for us to support, defend, and tolerate a student who appears to advocate for the plainly illegal murdering/genocide of fellow students, faculty, and staff — even if that advocacy is sufficiently abstract that it's protected speech.

Merritt E. McAlister
Interim Dean and Levin, Mabie & Levin Professor of Law
University of Florida Levin College of Law
mcalister@law.ufl.edu / 352.273.0981 (o) / 404.861.7619 (c)

DEF_000526

**Statement Regarding Meeting with Preston Terry**

Janice Shaw, Senior Assistant Dean of Students and Special Advisor to the Dean

July 14, 2025


On Thursday, January 16, 2025, Interim Dean Merritt McAlister led a student town hall from 12:00 p.m. to 1:00 p.m. in the Morgan and Morgan Courtroom.  The town hall did not have an agenda and was held as an open forum for students to ask questions or express concerns about topics at the start of the Spring semester.  During the town hall, multiple students expressed their concerns and frustration regarding 2L student Preston Terry Damsky.  Students expressed concern about their safety at the law school because they were afraid and uncertain of what Preston might do based on the comments he made during class and in written assignments.  A paper Preston wrote for a class contained a line that several students considered to be a call for violence.  The students who spoke during the town hall wanted to know what steps the law school was taking to ensure that the law school was safe.

Following the town hall, Dean McAlister asked me to meet with Preston to discuss the recent town hall.  On Friday, January 24, 2025, I met Preston in-person in my office.  I began the meeting by asking Preston if he was aware that his behavior and his paper was a topic at the recent town hall.  Preston informed me that a friend told him about the comments that other students made about him at the town hall.  He said that he was also aware that a paper he wrote for a class in the Fall 2025 semester had circulated among students in the law school.

Preston seemed frustrated and irritated that several students expressed that they felt he posed a threat to their safety.  He seemed especially bothered that a student during the town hall said that she looked for the exits when she was in his presence.  Preston said that he was never aggressive to others. He seemed perplexed that students would associate his views with violence or being a danger to others. His comment led me to ask Preston

DEF_000527

whether he was aware of the impact his words had on other students.  Preston told me that he expects people to be hurt and offended by his views.  I focused our conversation on helping him understand and build awareness around how his words were not only offensive, but disruptive to the learning environment and causing fear in the greater law school community.  The meeting ended after about 45 minutes.

Despite our conversation, Preston continued to escalate his disruptive behavior, culminating in a series of social media posts that caused many students to have an increased sense of fear and anxiety that interfered with their educational experience.

DEF_000528

**Timeline of Events related to Preston Terry Damsky at
Levin College of Law**

Merritt E. McAlister, Interim Dean

**August 28, 2023**

A first-year student, later identified as Preston Damsky, had a violent/angry and disruptive encounter with a staff person, Andrea Cormier, when Ms. Cormier did not open a locked door for Mr. Damsky.  Mr. Damsky demanded that Ms. Cormier "Let [him] in the fucking door."  And Mr. Damsky later approached Ms. Cormier and yelled at her: "I told you I was a fucking student.  What did you think I was fucking doing here?"

No disciplinary action was taken, but this incident was reported to Student Conduct in September 2023 as part of an initial complaint regarding the concerns highlighted below.

**September 22, 2023**

A first-year student "Preston," later identified as Preston Damsky, made comments in a GroupMe chat being used by first-year students related to a picture of the first-year class.  Mr. Damsky stated the following:

> The United States lost 19.3 million White faces on net over the past decade, which I am sure fills this man [the poster to whom he was responding] with nothing but joy, so why on earth should White people care at all about his criticism of our demographic share in any institution?  An even better question is: why should we feel anything but pure contempt for him and anyone else who expresses and shares such naked hatred for us?

When Mr. Damsky was challenged, he responded: "I stand 100% behind that comment without any reservations or qualifications."

The group chat interaction sparked significant controversy within the law school.  I received at least 10 complaints from non-anonymous students through our community concerns portal, and I met twice with leaders of the Student Bar Association and the

1

**DEF_000529**

Black Law Students Association to address their concerns regarding Mr. Damsky's statements.

I made clear in those exchanges that Mr. Damsky's speech was protected, that it was neither substantially disruptive nor threatening, and that, accordingly, we could not punish him for his speech.  I encouraged students not to give Mr. Damsky the attention he appeared to be seeking by being provocative.  We used the moment as a teaching moment and tried to shift community attention to opportunities for counter-speech, including through programming on racism and other issues affecting our community.

**March 2024**

We received a complaint about statements that Mr. Damsky made in his Constitutional Law class.  In the context of a classroom discussion, Mr. Damsky appeared to argue that the state of Virginia had a "compelling state interest" to maintain its state as a state formed by and politically controlled by white people.  Upon personal review of the video of the class, and after discussions with the course's professor, I was confident that the speech was protected speech made in the context of a classroom discussion and not outside of the bounds of academic freedom.

**October 2024**

In late October 2024, a draft paper of Mr. Damsky's in a seminar class began circulating widely within the community.  The draft paper, written in a class entitled Constitutional Change, made incendiary and extreme statements, including an abstract call to racial violence.  The final paragraph stated as follows:

> Finally, I shall speak directly to my brothers and sisters, the People. Can you honestly say these changes have been for the better? As the years go on, and those around you not only look less like you, but look upon you more and more with contempt and with a barely veiled desire for vengeance,[1] does your love for this

---

[1] *See, e.g., Regents of Univ. of California v. Bakke*, 438 U.S. 265, 387 (1978) (Marshall, J., concurring in part and dissenting in part) (remarking that "it must be remembered that, during most of the past 200 years, the Constitution . . . did not prohibit the most ingenious and pervasive forms of discrimination" and using this fact to justify discrimination against Whites); WILLIAM O. DOUGLAS, THE COURT YEARS: 1939 TO 1975 (getprintcopy) (1980) (quoting Justice Thurgood Marshall as saying in conference on an early case

2

DEF_000530

country and its inhabitants grow? Do you feel as if you are united to your fellow citizens "by the strongest ties," or do you feel as if America has been "split into a number of unsocial, jealous, and alien" groups?[2] If you are increasingly apprehensive about these changes, you are not alone.[3] However, feeling despondent and helpless is hardly a way to rectify the evils which have been visited upon us. Our Founders understood the importance of forming a nation upon the solid foundation of common ancestry. They understood that it is a part of "human nature . . . that its affections are commonly weak in proportion to the distance or diffusiveness of the object;" and thus, "a man is more attached to his family than to his neighborhood, to his neighborhood than to the community at large."[4] Similarly, we should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle. And if the prize does not motivate you, then consider the cost of defeat; "[W]henever the dissolution of the Union arrives, America will have reason to exclaim, in the words of the poet: 'FAREWELL! A LONG FAREWELL TO ALL MY GREATNESS.'"[5]

---

evaluating the constitutionality of discrimination against Whites, "You guys have been practicing discrimination for years. Now it's our turn.").

[2] THE FEDERALIST NO. 2, *supra* note **Error! Bookmark not defined.**, at XYZ (John Jay).

[3] *See* Robert D. Putnam, E Pluribus Unum*: Diversity and Community in the Twenty-first Century*, 30 Scandinavian Pol. Stud. 138 (2007) (arguing that "immigration and ethnic diversity challenge social solidarity and inhibit social capital"). See *generally* ROBERT D. PUTNAM, BOWLING ALONE: THE COLLAPSE AND REVIVAL OF AMERICAN COMMUNITY (2000) (discussing "the decline of the last several decades" in "social capital" and a sense of community belonging and civic engagement among Americans).

[4] THE FEDERALIST NO. 17, at XYZ (Alexander Hamilton) (XYZ ed., XYZyear).

[5] THE FEDERALIST NO. 2, *supra* note **Error! Bookmark not defined.**, at XYZ (John Jay) (emphasis in original).

DEF_000531

In consultation with the course's professor, a First Amendment scholar on the faculty, and the General Counsel's office, we concluded that the paper's statements did not constitute true threats and were protected under the First Amendment.  The professor counseled Mr. Damsky to revise the paper as a matter of academic norms, however, and my understanding is that the violent rhetoric was revised upon final submission.

The paper, which circulated widely, caused disruption and fear.  In particular, a student in the same class as Mr. Damsky asked him whether the "last paragraph [quoted above] . . . [was] intended to be a call for contemporary extralegal violence." And Mr. Damsky stated "Yes." That student reported the exchange, and students reported concerns through our online portal, to several administrators, and to faculty.

I met with multiple students in response to the circulated paper.  I met with the current leaders of the Black Law Students Association, who expressed concern about its violent rhetoric.  We agreed that we didn't want to give the odious ideas more attention and oxygen, but I encouraged them to report any more specific threats or fears that they heard or learned about.  We walked through the First Amendment limits, and I explained why this particular speech was protected.

I met with two other students in response to an emergency request on Friday, November 1, who both expressed safety concerns about the potential for violence on campus.  These students both explained to me that they had lived through school shooting threats and had grown up differently than those of us in administrative roles. They encouraged me to try to see safety and threats of violence from a different perspective and to be proactive, when possible.  That conversation made an impression on me as a leader, and I assured them both that we would continue to closely monitor all incidents, report them to main campus, and take action whenever possible.  I also encouraged them to report incidents to us promptly and that we could only act on information of which we are made aware.

**January 2025**

When grades were released in January from the Fall 2024 semester, we immediately began receiving complaints through our concerns portal that Mr. Damsky's work had been recognized with a "book award," in the Originalism course.  Students apparently believed the paper quoted above was the award-winning paper; it was, in fact, another

4

DEF_000532

paper.  Regardless, the paper that did lead to the recognition touched on similar themes and advanced similarly offensive arguments.

In addition to the numerous formal complaints we received about the book award, I also learned from the Student Bar Association president that students were up in arms over the award.  He reiterated that students had expressed fears to him for their safety, given that it was perceived that the award might embolden the student to act on his ideas, which called for violence to restore America as a white nation.  I reiterated safety protocols with the SBA president and explained our limitations under the First Amendment.

The topic was discussed extensively at a town hall I held on Thursday, January 16, which was attended by around 40 students.  At least half a dozen students openly expressed their fear of the student, their disgust with the book award decision, and their demand that the College act to punish or censor the student.

My memory is that at least two students notably expressed serious concerns about how Mr. Damsky's presence on campus affected their learning environment.  In particular, one student, who said she'd grown up with active shooter trainings, routinely scans the room for the exits whenever Mr. Damsky was present.  Another student said they dropped classes when he was in the class and avoided him whenever possible.  Students asked for information on campus training, which we've provided, and I educated them on the GatorSafe App and our internal protocols for responding to and referring potential threats to those experts on main campus.

The comments at the town hall were concerning enough that I asked Janice Shaw, our Dean of Students, to meet with Mr. Damsky to discuss the situation.  At that meeting, Mr. Damsky said that he was made aware of what had been said at the town hall and that he knew students were afraid of him.  Although he denied having the intent to shoot or stab anyone, he acknowledged that his words were meant to cause discomfort and provoke.  I had told Dean Shaw that I was concerned for his mental health and wellbeing, given that he was making himself a pariah within the community.  Any university administrator's greatest fear is that they don't act in time to prevent an act of violence.

5

DEF_000533

**February 2025**

On February 3, 2025, we received an "anonymous Tip" through our community concerns portal threatening to go to the *Gainesville Sun* about the book award if we didn't "confront the Florida Bar [about the professor who gave the book award] and report the author of the paper." The tipster said the paper had caused "significant discomfort within the student body," as reflected in the town hall meeting held in January.

In response, I issued a statement to law school students, faculty, and staff that explained the College's position on the First Amendment and academic freedom issues at stake in the recognition of Mr. Damsky's performance in the class. I explained that faculty may not "engage in viewpoint discrimination in the evaluation process." Students had the right to confront positions with which they had moral, legal, and ethical opposition, and that we would not disturb those debates "unless they violate the bounds of free speech, including specific threats or harassment." I further explained that we "carefully evaluate any complaint with those limits in mind."

In late February 2025, we learned that the *Independent Alligator* was investigating the "book award" story and was making press inquiries to Mr. Damsky, the law school, and others. Sometime in the next ten days, after an initial inquiry, we learned that the *Alligator* had dropped the article. Right after that time, Mr. Damsky made an unscheduled visit to my office—the one and only time he has ever met with me or visited my office—and demanded to know whether I "killed" the *Alligator* article. I told him I had not spoken with the *Alligator*. He said that he'd spent more than an hour in an interview with them and shared his papers. I suggested that perhaps he'd killed the *Alligator* article himself.

Around this time, Mr. Damsky activated an account on X (the first post is dated February 19, 2025). Although we had been aware of and had monitored a previous X account of Mr. Damsky's, this account was new and was not brought to our attention until the end of March, as described below.

**March 28, 2025 through April 9, 2025**

On the morning of March 28, 2025, a student, Scott Jurkowski, approached me at a weekly Coffee and Donuts with the Dean meeting to report a threat by Mr. Damsky. Mr.

DEF_000534

Jurkowski was shaking and on the verge of tears. He was looking around frequently (knowing that Mr. Damsky was in the same general vicinity). He explained that he understood that the First Amendment protected a range of offensive ideas and speech, including hate speech, but that it did not protect threats. I agreed that it did not protect specific threats. He then showed me the following X post from an account belonging to "Preston Terry," who I knew to be "Preston Terry Damsky": "My position on Jews is simple: whatever Noel Ignatiev meant by his call to 'abolish the White race by any means necessary' is what I think must be done with Jews. Jews must be abolished by any means necessary."

I assured the student that I would report the post promptly and that he should send me any additional information he had about any threats from the student. Mr. Jurkowski explained that, as a Jewish student, he did not feel safe being in the same room as Mr. Damsky, and his behavior – shaking, furtive glances toward Mr. Damsky – confirmed the visceral fear he described.

I immediately reported the X account to Dean Shaw and asked her to work with Student Conduct to evaluate the posts as threats. News of the posts traveled quickly: the local State's Attorney cancelled Mr. Damsky's summer internship with that office. I learned about that on the evening of Monday, March 31, from the supervisor of externships. The next day, on Tuesday, April 1, I consulted with the Faculty Council about the brewing controversy over the X posts, and faculty on that Council expressed dismay and grave concern about the escalation in conduct. Two Jewish faculty members, in particular, expressed fear for the Jewish community and circulated the post among the entire faculty.

I received an immediate response, including a demand from several faculty members that we report the student to the FBI, that I increase campus safety and security for a Jewish Law Student Association event, and that we begin expulsion proceedings to remove the student from campus. Jewish and non-Jewish faculty alike reached out to me via text, email, and in person visits to inquire about how we were going to protect the community from the threats made against Jewish people.

Later that evening, a faculty member, Lyrissa Lidsky, who is Jewish, responded to Mr. Damsky on X and inquired whether his statement meant he wanted to "murder" her

7

DEF_000535

and her family.  Mr. Damsky equivocated in response, asking whether that is what Ignatiev had meant.

Professor Lidsky ended up cancelling her class on Friday, April 4, in response to the stress caused by incident, and she told me that she and her husband were sleeping with a baseball bat beside the bed.  Multiple students reached out to her expressing fear and concern for her safety (and their safety, as students in her class).  Another student asked for an increased police presence for her class, because it was a class in which Mr. Damsky was a student.  We paid for increased police security at a Jewish Law Students event on April 2, and we asked for increased police patrols and cameras.

I informed the faculty on April 3 that the student had been trespassed from campus, but this did not calm the waters.  On Friday, April 4, I was met by a group of nearly twenty students at my weekly Coffee and Donuts with the Dean event, demanding an increased police presence, wanting the buildings to go on lockdown, and expressing fear and concern for their safety during the stressful finals period.  My effort to reassure students that they were safe and that we were taking all reasonable steps to assess any potential threats, with an eye toward their safety was unavailing.  Students continued to tell me that they felt unsafe and afraid and wanted the law school to do more to reduce the perceived risk/threat.

On Friday, April 4, multiple groups of students (at least 6-8 in small groups) also met with me and/or Dean Shaw individually to communicate their fear.  I also learned that parents had made calls to the campus police seeking additional safety measures at the law school.

To increase the sense of security and safety on campus, I decided to move to early swipe-card only access for our community.  (We would normally have that procedure in place during finals, which was a couple weeks away.)  This move allayed some fears, but discomfort remained high.

Upon communicating the change in policy on building access to the faculty and staff on April 4 and April 5, a staff member with a Jewish surname requested that her picture be removed from our website and her nameplate taken from her door.  She requested to work from home for the rest of the semester.  That staff member ultimately resigned within a month when we had to reject her request to work from home (because her job required in-person activities).

DEF_000536

On Friday, April 9, we held a community town hall with the campus police and the Counseling Center. Many of the comments from the more than 100 students in attendance related to security assessment, threat assessment, and the steps we were taking to protect the community from Mr. Damsky. Students were on edge, with many expressing fear and their concern the law school was not doing enough to keep them safe.

**Aftermath**

As the College's leader, I had protected Mr. Damsky's free speech rights, and I'd taken a lot of heat throughout the last two years for doing so. Each of these incidents was met with demands that I act, condemn Mr. Damsky, and distance ourselves from his odious views. I'd done my best to preserve the space for civil discourse around his offensive thoughts, because I believe that is both what academic freedom demands and what the First Amendment requires.

But the X posts were something else. I had not felt or experienced that level of visceral fear within our community—including, significantly, from Jewish faculty and students who were required to be in proximity to this student. A staff member quit, a professor was sleeping with a baseball bat, and students were looking over their shoulders and nervously scanning rooms for potential threats.

I began to fear the worst for our community: could Mr. Damsky inflict violence and how could I prevent that and protect us? Our efforts to counsel Mr. Damsky to be mindful of the consequences of his speech had failed, and I perceived that his actions had escalated to the point at which reasonable faculty and students within the community expressed palpable fear and significant unease to me. What's more, Mr. Damsky was engaging in a reckless course of conduct at a time when he understood members of our community feared him. Although he'd disclaimed violent intent when approached about his statements in the academic papers, he'd then proceeded to stoke fears by making violent threats in a public forum for all to see. Those threats spread like wildfire within our community, and the entire law school community hit the tipping point in the weeks before finals in early April.

At that point, the College could no longer protect and defend Mr. Damsky's right to use his speech to terrorize, harass, and disrupt the operations of the school. It was one thing to write a deeply offensive and provocative term paper in a class; it was quite

9

DEF_000537

another to call for extermination of members of our community.  Even if the latter was arguably an abstract call to violence, it was made recklessly against the backdrop of two years of extremist rhetoric and divisive conduct; he lit a match on a powder keg of fear—and things, predictably, went boom.

10

DEF_000538

**"Report a Community Concern" Anonymous Form Submissions**
*since August 2023*

**Submitted April 3, 2025**

On March 24, 2025 in American Legal Thought, student Preston Terry gave a presentation on the "Myth of Nuremberg." The presentation was unbelievably disgusting, and I can't help but fault this University for it's continued complicity with this students documented history of racism and white supremacist viewpoints.

This presentation attempted to "poke holes" in the execution of the Nuremburg trials by arguing that the defendants- known Nazi war criminals- should have been afforded constitutional protections during the trial, and the "absence" of such protections should cause us to doubt the Nazi war criminals guilt.

Knowing Preston's character, and knowing that this was not the first nor the last time that this student would exhibit inexcusably corrupt moral character, I started recording his presentation. I did so because I felt that because the school has been historically incactive when disciplining Preston for such behavior, I thought I'd erase the potential "he said- she said" argument by simply recording the last 38 mintues of his presentation so the University can decide for themselves whether what I am saying is accurate. I cannot attach the file here, as it is too large, but you can email me for it.

Further into the presentation, Preston tried to illicite group sympathy for the Nazi war criminals, arguing that they were pulled from their homes in front of their families and beaten. He tried to argue that because Nazi war criminals were not given constitutional protections, that we should doubt the outcome of Nuremburg entirely. He tried to argue that other allied forces killed civilians in bombings, and since they were not punished for war crimes, German Nazi's should not have been put on trial. He tried to argue that since some of the depositions were "coerced" that we should doubt them entirely. In fact, he argued that one of the testimonies indicated that their were discrepancies between the number of people killed in one particular camp, and essentially argued 'if Nuremburg lied about that- what else would they lie about?'

Preston then did what can only be described as a "full nose dive" into insanity. He referred to the Holocaust as the "alleged Holocaust" or "alleged genocide", and he referred to German war crimes as "alleged German atrocities." Then, when things seemingly couldn't get any more shocking, Preston referenced "human skin lamps" and soap made from human fat. Why on earth would such a topic be included in a law school presentation? In short, Preston included references to this as further "evidence" that Nuremburg fabricated evidence. He said that although the depositions cited to lamps made out of human skin from prisoners, and soap made from human fat that was then given to prisoners (he also stated that guards told prisoners this, and prisoners would bury the soap out of respect for the dead), this evidence was not real, but then perceded to include photos of the "lamp" and other items in his presentation slides. At this point I looked away, because how can you look at that?

DEF_000539

By the end of the presentation, it was unbelievably clear that this was Preston's thinly veiled attempt at arguing for white supremacy. Anyone with eyes could tell that that is where he was going with this.

I would like to reiterate that Preston's presentation was vile. As someone whose family survived the German camps, it was upsetting and enraging to see a cocky, piece of shit Nazi sympathizer undermine and attempt to erase the arocities of the Holocaust. I include this personal anecdote because I feel that otherwise, the school would simply include this complaint in the pile of complaints against Preston and not think anything else of it. But let me be frank; this presentation made me feel extremely uncomfortable. It made me want to leave the room. The only reason that I did not do so was so that I could write this complaint as detailed and coherently as possible. This brings me to my conclusion, that though this presentation should in itself get Preston thrown out of this "prestigous" institution, I sincerely doubt that this complaint will encourage admin to do anything, which is deplorable.

With every moment that this University lets pass with Preston still a student, this University cheapens its reputation and more importantly indicates to ALL students that the University does not seek to combat anti-semitism, racism, or white supremacy in any meaningful way. It baffles me that the same week that this presentation was given, the University emailed students about a scholarship with the Defamation League to combat student anti-semitism. Perhaps the University should take its own advice and actually combat anti-semitism.

This University is spineless. It was spineless when Preston used white supremacist talking points in the 1L Class GroupMe chat that were so abbhorent that the groupchat was temporarily deleted, it was spineless when Preston was given the book award for writing a racist paper in his Constitutional Originalism class (the University even doubled down on this, saying that the school can't stifle free speech, and that it is the job of the STUDENTS to decipline another student whom the school can't be bothered to talk to directly), and I fear it will be spineless after receiving this complaint.

---

**Submitted April 2, 2025**

There is a student at this institution who is sharing hateful and violent ideologies. The ideologies he is sharing are taught in history classes, general education classes, and higher education classes as a despicable, evil, villainous, hateful opinion on people that exist in the world. They are infamously associated with Adolf Hitler, who is universally regarded as a violent and hateful individual. The eradication of Jews is something that we are taught from an early age is a radical and violent belief. And the fact that he is able to take classes at this institution and exist among Jewish students when he believes wholeheartedly these ideologies—so much so that he is willing to engage with professors with these ideologies—is concerning. It's sad and it's upsetting. I don't feel comfortable attending a school with somebody that holds these beliefs. Especially when that school wants to boast they welcome diversity and inclusivity. As a queer female student at UF Law, it makes me

DEF_000540

fearful for how he views and treats me and my existence. I understand that people have free speech rights, but I also know that this person has a pattern of espousing beliefs that target certain groups in a concerning way.

I want to reiterate—this goes BEYOND free speech concerns. This is suggesting violence towards a protected class. Do I believe he will act on these statements in class or on campus? No—I think he is smart enough to know that people in real life will put a stop to it and that's why he exists behind a screen. Do I think this is concerning? Yes, EXTREMELY. Someone who holds these beliefs should not be trusted with a law degree and the power that it holds.

I want the UF Law administration to speak with him, and PLEASE actually do something besides issuing a statement about free speech. The number of students that are put in fear by this person is not worth protecting one person's rights. It shouldn't matter whether the threat is currently an issue—it shouldn't get to a point in the future where he has the power to affect people's lives in a harmful way.

---

**Submitted April 2, 2025**

I didn't say anything when he booked a class with his white supremacist manifesto, but I can't stay silent anymore. Preston Terry is making explicitly hateful comments online towards Jewish people. I cannot upload the screenshots on mobile, but I'm sure you have the screenshots from other students already. Please go to @preston_terry_ on X to see the tweets. I cannot imagine how unsupported our minority students feel because he has been actively given encouragement from UF Law to continue spreading his hateful, violent rhetoric freely. Also, he is tarnishing UF Law's reputation, and I am ashamed to be in the same class as someone spreading such objectionable content on the internet and in academic scholarship. UF Law should take a stand against this blatant hatred against Jewish people. I get free speech concerns, but there HAS to be something you can do to stop this. We all know this is wrong. Do the right thing.

---

**Submitted April 2, 2025**

Preston Terry (a 2L student) posted on X "Jews must be abolished by any means necessary." Professor Lidksy, a Jewish professor, commented if he would murder her and her family. He responded by arguing that a white genocide would cause greater outrage. I have attached the tweet to this form.

No one feels safe on campus. His comments have gone too far. This man cannot hide behind the guise of the First Amendment when he is advocating for the death of all Jews to a Jewish professor. For the past two years, Preston Terry's threats have made the University of Florida Levin College of Law an unsafe place. If the school does not act now, many students fear what would have to happen for the school to respond. Enough is enough.

DEF_000541

**Submitted April 2, 2025**

I am a Jewish student on campus. I am an officer in the Jewish Law Students Association and we frequently hold events in the Jewish space. Because of Preston Terry I do not feel safe attending JLSA events or being by myself. On X, Preston posted the following phrase: "My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to 'abolish the White race by any means necessary' is what I think must be done with Jews. Jews must be abolished by any means necessary."

Even Professor Lidsky responded to this tweet, asking if she deserved to be murdered for being Jewish. Preston then responded that white peoples lives matter more than Jews.
I do not feel safe walking the halls at UF. I passed Preston alone earlier today and I was concerned for my safety and worried about no one else being in the hallway with us. I was thankful I was not wearing a Star of David when this happened. He explicitly called for my death openly and yet I am being punished for existing because the school fails to take any action. Students have brought up our concerns for safety multiple times, including at the town hall. Yet we are told it is free speech. When does free speech protect me from hate crimes—after I have already been attacked—or worse—killed? Please tell me how I should fulfill my duties as a JLSA officer when I am worried about being visually identified as Jewish. And even if the school takes the position that hiding my Jewish identity would be a sufficient response—which is what the inaction and disregard for student concerns has felt like thus far—I cannot remove my Jewish last name.
So please please tell me what I am supposed to do? Who wins in this battle—the Jewish students at UF or Preston Terry?

**Submitted April 2, 2025**

I fear that the email regarding the first amendment that Dean McAllister sent out has bolstered the student's position so much that he has begun to threaten our Jewish faculty. This is not OK and needs to be addressed by the school immediately.

**Submitted April 2, 2025**

See attached documents from a current student at UF Law, Preston Terry. This is extremely dangerous and violent rhetoric and I do not feel safe going to school while this person has access to our campus. This person's intitial message and response to a UF Law Professor were direct threats of violence. I honestly fear action even being taken against him because of the what he may do as a result. Extremely concerned.

DEF_000542

**Submitted April 2, 2025**

A student has continually spouted hate speech against the Jewish community here at UF Law. This student has continually evaded reprimand, but has since began publicly calling for violence against Jewish people. These calls for violence have even caught the attention of a premier UF Law Professor who happens to be Jewish. The student responded to the Professor, directly calling for the slaughter of her and her family due to her religion.

UF Law has one of the largest Jewish communities at any law school in the country. The administration cannot abide by while a student continues to post dangerous and inflammatory statements that harm a significant portion of the student body. Furthermore, the student's calls for violence have become more expressive and deeply concern me and others that this student may result to violence. The administration must do something to protect its students and its faculty.

**Submitted April 2, 2025**

Preston Terry's comments on Twitter (X) are insane and not protected speech under the First Amendment. I understand that this Law school (rightly) prides itself on its protection of speech, but this disgusting. The pattern and tenor makes me worry for my Jewish friends and family.

**Submitted April 2, 2025**

I am extremely concerned for the safety of my classmates and students following an X post from student Preston Terry. His post said "Jews must be abolished by any means necessary." Antisemitism has no place on UF Law's campus, and my classmates do not deserve to go about their days in fear because of his words. I fear for when his words will be actions.

**Submitted April 2, 2025**

This attached tweet is from a current student at UF Law who is actively engaging in hate speech. This should be no means be tolerated. This is a danger to the safety of students at this school and must be addressed IMMEDIATELY.

**Submitted February 3, 2025**

I am writing anonymously to raise a serious concern shared by multiple members of the UF Law community regarding a recent Book Award given in Judge John L. Badalamenti's constitutional law seminar. The award was presented to a paper titled American Restoration: An Article V Proposal, which promotes rhetoric that many interpret as white nationalist. The paper argues that demographic changes in the U.S. are unconstitutional threats to national sovereignty, explicitly

DEF_000543

tying American identity to racial ancestry.

This has caused significant discomfort within the student body, as expressed during a recent town hall meeting. The fact that this paper not only passed academic scrutiny but was awarded top honors raises alarming questions about UF Law's academic standards and the institution's implicit endorsement of extremist ideologies. While academic freedom is vital, there is a clear distinction between fostering open discourse and rewarding harmful, supremacist rhetoric.

This is UF's chance to come clean—to confront the Florida Bar about Judge Badalamenti's blatant white supremacist sympathies and address the situation on your own terms and to report the author of this paper. Silence will only deepen the perception of complicity.

If UF Law continues to ignore this issue, I will submit this information to The Gainesville Sun on Valentine's Day, ensuring that the story receives public attention. Once it is released, it will be beyond the school's control. This is not a threat but a commitment to ensuring accountability. UF has the opportunity to act now and demonstrate its commitment to academic integrity and inclusivity before this becomes a full-blown public scandal.

I hope the administration will address these concerns swiftly and transparently.

a quote from the paper
" . Many non-Whites may agree with that proposition, and they may feel joyful that the government of the United States has usurped the People's sovereignty. After all, without this usurpation, non-Whites may not have ever been permitted to become citizens of this country. But at what cost was this "victory" over the People won? Do non-Whites truly believe that, after the government has usurped sovereignty from the People, sovereignty shall pass to them? Furthermore, if the racial attitudes of the Founders which brought White nationalism in to force in the United States are merely a bygone relic of an age that should be forgotten—nay, dishonored!—then why should the government respect any other provision of the Constitution? Why should the Founders' concern with the Crown's restriction on their free speech give legitimacy to the First Amendment? Why should their hatred of general warrants give legitimacy to the Fourth Amendment? Why should their fear of the thumbscrew and the breaking wheel give legitimacy to the Fifth and Eighth Amendments? And if that legitimacy comes not from the history of this country and the Founders, then where will it be found? "

---

**Submitted January 9, 2025**

I feel unsafe being in class with Preston Terry, a current 2L at UF Law. His Originalism Seminar paper is not only disturbing and offensive, but reflects a desire to inflict violence against racial minorities. Below are some quotes from his paper I think best reflect the nature of my concerns. It is my hope that action will be taken to make UF Law's campus a safe environment for all students. At minimum, my goal is for this to serve as a record of his repeated patterns of violent language while at UF Law.

DEF_000544

"Crucially, this paragraph also allows the People "to enforce this section, and prevent its abuse, by any means necessary." This language is motivated by the theory that, just as "an assassin's bullet" may cause constitutional change, so too may it prevent illegitimate change. Assassination is undoubtedly an extralegal action, however, to call an action extralegal does not necessarily imply that it is illegitimate. The purpose of the remaining provisions of this paragraph which allow the assassin to invoke this section and paragraph "as a defense for a jury to consider," and describe some procedures by which a trial is to be conducted after this defense is asserted, is to determine whether the assassination is legitimate. Thus, this provision does not permit trial by combat; rather, it permits trial of combat while presuming that the mere fact that a defendant committed extralegal violence does not necessarily mean they are guilty of a crime. Moreover, this provision will be useful in providing a practical check on the power of the judiciary, whose members (due to being unelected and serving for life) are generally unaccountable within the political process, absent impeachment and conviction. The United States was not intended to be a kritarchy, and by providing a legal mechanism for removing judges from the bench, this provision hopes to remind judges of their impotence, so that they may rule accordingly. "

"The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours."

"Little explanation of the rationale behind the repeal of the Fifteenth Amendment is needed. If "[t]he People are White, and the United States, where they are sovereign, is their country" is to be a constitutional provision, then racial discrimination in voting rights is not only permissible, but incumbent upon the government. Obviously, then, the Fifteenth Amendment cannot coexist with this section."

"The People are White, and the United States, where they are Sovereign, is their country. It is the affirmative duty of the government to enforce the provisions of this section. Dual and multiple citizenship is prohibited, and everyone possessing dual or multiple citizenship within ninety days of this section going into effect are to be divested of American citizenship."

"The purpose of the first sentence of this paragraph is to reverse the changes to the American national character which have occurred since 1868. Thus, the citizenship of everyone who would have been unable to attain it via naturalization under the 1790 standard is to be rescinded. Moreover, because the Citizenship Clause of the Fourteenth Amendment redefined, without the consent of the People, what it meant to be born as a member of the People, that clause is to be repealed. By tying birthright citizenship to being born on American soil, rather than being born with American blood, the Reconstruction era Congress effectuated a grossly anti-nationalist policy which fundamentally degraded the homogenous, national character of the sovereign People."

Lastly, while I do not pretend to have insight into Judge Badalamenti's grading standards, I want to take this opportunity to express my concern that he decided this seminar paper was worthy of the book award.

DEF_000545

**Submitted January 9, 2025**

Preston Terry, a student in the Fall 2024 "Originalism and its Foes" course, submitted coursework that advocated for violence against minority groups. This student was previously reported to UF Law for making white nationalist remarks in a class group chat but to my knowledge received no disciplinary action for using such hateful rhetoric. Now, in addition to spewing racist and prejudiced remarks (he made sure to include heinously racist quotes about black people, Native Americans, and other minority groups throughout his work), his behavior has escalated to inciting violence. He argues that it may be necessary for white national survival to kill certain government officials; that white Americans should be fighting, killing, and dying on behalf of their rights and sovereignty; and that the Constitution should legitimize political violence against anyone who opposes a white nationalist government.

I am disgusted to share a law school with a person who sincerely holds these beliefs. This has surpassed a permissible exercise of free speech and become an openly violent call to arms for a race war. Minority students should not have to attend classes with someone who not only views them as less-than, but has imagined a detailed plan for their disenfranchisement and harm. It is frankly outrageous that the professor of this course awarded Mr. Terry a CALI award for his white nationalist manifesto. I would hope that the law school administration is less keen to valorize his racist drivel.

I'm not sure what, if any, action the law school can take to address this, but I feel the administration should be aware because many students already know about and are extremely upset by Mr. Terry's views.

**Submitted January 9, 2025**

Please review the book award for the Fall 2024 originalism class. The awardee, Preston Terry, wrote his final paper on white supremacism and argued that white people are better than other races and the only ones deserving of US citizenship. I urge you to review the paper that he submitted for this class because frankly, I am wholly uncomfortable being a student at a school where rhetoric like this is not only permitted, but encouraged and applauded. Additionally, I noticed that no book award was issued for the Race and the First Amendment seminar. It is very disappointing to see that the law school is awarding white supremacy and disregarding student who are working to dismantle it.

**Submitted November 4, 2024**

Following my Evidence class today, Mr. Preston Terry, another law student, made the comment, "These Black people have such loud personalities," apparently in response to a Black student who had been assigned to brief a case. Mr. Terry, a fellow law student, has consistently exhibited racial

DEF_000546

bias and made racially insensitive remarks.

In addition to Evidence, Mr. Terry is also in my Criminal Procedure class, where he has advocated for limiting certain constitutional rights based on citizenship. He has stated that rights under the Constitution are reserved solely for U.S. nationals born in the United States. Specifically, he claims that rights the U.S. Supreme Court has recognized—including the Fourth Amendment right against unreasonable searches—are historically reserved for U.S. nationals. In my Constitutional Law class, he made similar claims, but then, he claimed that "white people" are historically superior and hold stronger claim to rights under the law.

Mr. Terry's continued espousal of racially and nationalistically charged views is contrary to the principles of justice, equity, and inclusive diversity. This rhetoric deeply disheartens me, and I am struggling to focus on my own studies in light of both these comments and the school's apparent inaction.

---

**Submitted November 3, 2024**

A student in section 2 of the 1L grade (Manny Restrepo) is publicly misrepresenting another student (Preston Terry)'s position taken in our Constitutional Law class with Professor Maclin and is seeking some sort of school action in response to Mr. Terry's speech. Beyond the damage done to Mr. Terry's reputation, Mr. Restrepo's misrepresentation poses problems for classroom at large.

Mr. Restrepo either misunderstands or purposefully misrepresents Mr. Terry's position taken in class. Professor Maclin repeatedly asked the class if there was "any legitimate state interest" for the state of Virginia in the Loving v. Virginia antimiscegenation law case. Mr. Terry raised his hand and summarized Virginia's argument, and subsequently used an Originalist methodology to argue that the state interest was legitimate in the eyes of the drafters of the 14th Amendment. He explained a worldview that sounds utterly foreign to most civilized people in 2024, but that, he argued, showed that both the Founding Fathers and the 14th's drafters would have found Virginia's laws consistent with the Constitution. I don't write all this to say that Mr. Terry's argument is correct (Indeed I believe it is completely wrong, even using an Originalist framework). Rather, I write this to show the context necessary to understand words that sound otherwise repugnant to civilized ears—words that Mr. Restrepo left naked and devoid of context when he publicly associated Mr. Terry's name with them.

I should add that Professor Maclin is a black man and is confrontational enough that he would be the first to approach someone, in the classroom or outside of it, were he to find the sort of hateful speech that Mr. Restrepo is insinuating. Indeed, after almost every class, Professor Maclin and Mr. Terry have spirited constitutional law discussions that exude mutual respect. Mr. Restrepo's inappropriate and public allegations are lacking in context at best and dishonest and mean-spirited at worst, wrongfully associating both Mr. Terry's and UF Law's names with "white supremacy."

Further, by cherrypicking words from class, Mr. Restrepo creates a chilling effect on speech in the

DEF_000547

classroom. The message that Mr. Restrepo's actions send other students is that anything said in the middle of a lively (and oftentimes necessarily amateurish) constitutional law debate is liable to be stripped of its proper context and be presented to the public at large for its review and judgment. For students in as self-conscious a profession as is law, whose members value professional reputation above all else, you must understand the chilling effect this creates. This message is antithetical to the marketplace of ideas that must exist in the academy, if it is to exist anywhere.

The proper recourse for this, in my anonymous opinion, is not for any message from UF Law. Rather, forwarding this along, without comment, to Professor Maclin would provide him the ability and discretion to reestablish clear expectations in the classroom without the weight that accompanies messages of the institution at large. Were the school to produce a "statement," with all the usual disclaimers, this would create the impression that speech itself is the problem, and drive the chilling effect even further into the minds of law students, not even one year into their legal careers. Allowing Professor Maclin to address the topic keeps the issue local and in context.

Mr. Restrepo's conduct truly belies any understanding of the academy's proper place at the center of the marketplace of ideas, and I hope that his misunderstandings do not lead his colleagues to any further confusion. Professor Maclin would agree with this sentiment, and I hope the school does as well.

---

**Submitted March 3, 2024**

In my 1L Constitutional law class, there is a student named Preston Terry who has made deeply offensive comments during class discussion.

Today, March 4, he repeatedly defended white supremacy. He also made comments in defense of racist practices and ideologies.

Aside from the fact that comments of that nature are not excusable anywhere, it is particularly alarming that it is happening on UF law's campus. Frankly, that kind of behavior detracts from UF students and the school itself because I believe that he feels comfortable enough to continue spreading his racist views.

Listening to the class recording will give a more exact depiction of what I have described. Thank you.

---

**Submitted March 3, 2024**

I am writing to express my deep concern regarding an incident that occurred during Professor Maclin's Constitutional Law Lecture on Loving v. Virginia on March 4, 2024. During the lecture, a student, Mr. Preston Terry, made deeply troubling remarks that not only contradict the values of our institution but also undermine the principles of justice and equality that are foundational to the legal profession.

DEF_000548

Specifically, Mr. Terry expressed the belief that the state of Virginia has a compelling interest in preserving white supremacy, stating, "Yes. Absolutely... The white people are the state-forming people." Such remarks are repugnant and wholly unacceptable within the context of a legal education that strives to uphold the rule of law and promote equal rights and justice for all individuals.

As members of the legal community, we have a responsibility to uphold the highest standards of integrity, respect, and inclusivity. Mr. Terry's espousal of white supremacist ideology not only goes against these standards but also perpetuates harmful attitudes that have no place in our society, let alone within the legal profession.

Swift and decisive action must be taken in response to this incident. While I understand the importance of due process, Mr. Terry's views are clearly fundamentally incompatible with the values of our institution and the legal profession as a whole. Therefore, I urge you to take immediate action to address this matter, whether through remedial measures or, if necessary, expulsion from the law school.

Failure to take action in response to such egregious behavior would not only condone Mr. Terry's views but also send a message that our institution tolerates discrimination and hate speech. As members of this community, we must stand united against all forms of bigotry and prejudice, and I implore you to demonstrate our commitment to these principles through your actions in this matter.

Thank you for your attention to this urgent matter. I trust you will handle it with the seriousness and urgency it warrants.

---

**Submitted September 25, 2023**

I want to join my fellow students in expressing deep concern over the comments made by a 1L student late last week in the dedicated 1L GroupMe chat. As a soon-to-be graduate of UF Law and triple gator, I hope to be proud of my alma mater's legacy and dedication to justice, diversity, and inclusion. As such, comments and sentiments, such as those expressed by this student, cannot be tolerated or go unchecked. It is of great concern that this student felt emboldened enough to express these comments freely and without qualms to his entire class. This poses grave danger to our Black and brown students' safety and well-being, as well as the UF Law community as a whole. Swift and serious action must be taken to indicate that UF Law vehemently condemns such racism, bigotry, and intolerance.

DEF_000549

**Submitted September 22, 2023**

I agree wholeheartedly with the condemnation of my classmate Preston's comment regarding black student enrollment, which I'm sure the administration has seen by now. I fail to see how it can be described as anything but white supremacist in nature. His remark clearly invoked an "us vs. them" rhetoric that was dangerously racist, and he followed up with further comments doubling down on this position.

I feel that the administration should address 1) his comments, and 2) black student enrollment in the incoming class, which appears much smaller than in previous classes. In my 1L classes I have personally observed that while there is some diversity as a whole, the lack of black students is noticeable and deserves redress. As a non-black minority student, I understand that there is much more nuance to the issue of race and diversity in higher education, including arguments about colorism and "quotas" that may be beyond the scope of the law school to fully respond to. But at the very least, the lack of black student enrollment in the 1L class should not be swept under the rug, nor should students feel comfortable sharing messages laden with white pride dog whistles without disciplinary action.

**Submitted September 22, 2023**

I am completely disturbed that a fellow UF law student has made racist and derogatory comments in a UF GroupMe. The student, Preston Terry Damsky, made hateful remarks about the 1L class photo and the public outrage about the photo. As a Black student at UF Law, I hope these comments are not ignored or allowed, especially in a group chat with an entire UF class and many minority students.

**Submitted September 22, 2023**

I am reaching out to you as a student concerned for the safety and wellbeing of ALL students at UF Law. As I am sure you are aware, a UF Law 1L made a white supremacist statement in the 1L group chat. I heard that a meeting was already taking place but I wanted to provide the screenshots and voice support for action. I am in this chat for SBA elections and noticed this last night. Disagreements have ensued in the chat but I thought I would share the context and screenshots of the hate speech with you so that administration can address this appropriately. This comment by Preston was in response to the Sun Sentinel article regarding falling diversity at UF Law here: https://www.sun-sentinel.com/2023/09/19/uf-law-schools-failing-diversity-spells-danger-for-democracy-opinion/

I have heard a friend say that Preston is in Section 2 and this was affirmed by a professor. However, as there is no photo or last name, if there is more than one Preston in the 1L class, this may need to be investigated.

DEF_000550

As this was made in a public, UF law affiliated group chat, many students are aware of this and it has spread through the school like wild fire. Therefore, many students are looking for action and response from the administration. With falling rates of diversity at UF Law and the recent Affirmative Action overruling, this student's misconduct furthers hostility against Black students at UF Law.

Please let me know if I can provide any assistance but this is all I personally know.

---

**Submitted September 22, 2023**

Current 2L concerned by the current political climate, especially among the 1L class and exemplified by Preston's comment that administration has become aware of in the class group chat, and the effects on our Black student population. Hate has no place here.

---

**Submitted September 22, 2023**

Preston, a 1L student, has posted blatantly racist comments in the 1L group chat. The content of his comments are deplorable and disgusting. As a black student, his comments have made me uncomfortable and unsafe and other students have shared the same concerns. Something must be done, this way of thinking is not acceptable and should not be allowed on UF campus.

---

**Submitted September 22, 2023**

During the morning and afternoon of Friday, Sep. 22, a current law student at UF who self-identified only as "Preston" posted two statements in a public chat on the Groupme platform that had openly white supremacist and inflammatory contents. After the first one was removed from the chat by moderators, Preston posted the second one reinforcing that he stood by his initial statements.

The first statement read, in part: "The United States lost 19.3 million White [sic] faces on net over the past decade ... so why on earth should White people care at all about [another student's] criticisms of our demographic share in any institution ... why should we feel anything but pure contempt for [the student] and anyone else ... ?"

The second statement read, in part: "I stand 100% behind that comment without any reservations or qualifications."

Preston indicated that he would likely continue to make this kind of statement using this kind of language.

---

**Submitted September 22, 2023**

DEF_000551

As a black student, I am terrified to know that Preston is still enrolled at UF Law. If the UF Law community does nothing about this then the institution will be liable for any violent act that Preston threatens to commit on campus. Preston has stated that he has pure hatred for anyone who agrees with diversity efforts.

As admin you may not be afraid to walk into a food store, church, or even down the street. As a black student I cannot do neither without thinking about the chance of being shot and killed by people who share the same sentiments as Preston.

This information has already been reported to the news outlets!

---

**Submitted September 22, 2023**

I don't feel safe in an environment where people in my class feel comfortable making comments like this. I don't know who "Preston" is or if that is a real name, but I feel like the school needs to address these horrifying comments.

---

**Submitted September 22, 2023**

Racially motivated comments were made in the 1L's groupme chat by someone named Preston, the comments echoed eugenicist talking points and admin should consider denouncing him and writing a letter to the bar about what he said. He is, by his next statements, obviously unapologetic and doubling down on what he said.

---

**Submitted September 22, 2023**

A comment was made by a member of Section 2 in a UF GroupMe that was blatantly racist and unacceptable. I believe action needs to be taken against this student to encourage the notion that diversity and inclusion are important to this school. This student obviously felt comfortable enough to make this statement and defend it even after being corrected on its dangerous and hateful message. This needs to be addressed so that we can ensure ALL students feel welcome at UF Law and promote the notion that hatred will not be tolerated.

---

**Submitted September 22, 2023**

We can't have future attorneys casually throwing out white supremacist talking points, and consequently making other students feel unwelcome or unsafe. I'm sure picture has already been submitted. Referencing messages posted by Preston in the 1L groupme

DEF_000552

**Submitted September 22, 2023**

A first year law student, whom I believe to be Preston Damsky, made a public comment in a group chat if an extremely racist and bigoted nature.

**Submitted September 22, 2023**

I am very concerned about the public posting of Replacement Theory, a white supremacist ideology, by a UF Law 1L to his class-wide groupme chat. The student merely posted under "Preston." This may or may not be Preston Damsky but is certainly a UF Law 1L student. His post, which referred directly to "lost" White faces, was deeply unnerving for myself and many other students who deserve to feel welcome here at UF.

**Submitted September 22, 2023**

There was a message in a 1L group chat yesterday with a heavily white supremacist view by Preston Terry that I know made a lot of students upset.

DEF_000553

**Subject:** Grading and First Amendment Principles
**Date:** Monday, February 10, 2025 at 10:15:25 AM Eastern Standard Time
**From:** McAlister,Merritt Ellen
**To:** UF Law All Students

Dear UF Law Community:

I've heard from several of you expressing ongoing concern about the law school's failure to intervene in a faculty member's decision to recognize a paper containing speech perceived as offensive with a book award. Because many of you were not present when I addressed this issue at our recent town hall, I wanted to clearly state our position in writing.

As a state institution bound by the First and Fourteenth Amendments, no faculty member may engage in viewpoint discrimination in the evaluation process.  That means we evaluate student work based on as objective criteria as possible.  In a seminar, grades are usually informed by the quality of the research, legal analysis, and writing.  A faculty member may not grade down a paper that is otherwise successful simply because he or she disagrees with the ideas the paper advances.  Doing so would violate a student's First Amendment rights.  Grading does not—and certainly should not—involve an ideological litmus test.

What I have heard from you, both in the town hall and in comments received since, is concern that, by not intervening, the law school is implicitly endorsing ideas with which you strongly disagree.  But grades are not endorsements of viewpoints.  And institutional neutrality is not agreement or complicity with the ideas that any community member advances.  It's just that—neutrality.  The government—in this case, our public university— stays out of picking sides, so that, through the marketplace of ideas, you can debate and arrive at truth for yourself and for the community.

Florida Law is not free to silence viewpoints with which you disagree—no matter how vehemently.  You, however, have the power to disagree with a peer and explain why a position is morally, legally, or ethically wrong.  You also have the power to defend a point of view that you deem morally, legally, or ethically right.  We won't disturb those debates unless they violate the bounds of free speech, including specific threats or harassment.  We will carefully evaluate any complaint with those limits in mind.  But when we determine that the First Amendment protects the speech, then Florida Law will protect the speaker's right to speak.  My job, ultimately, is to preserve the College's neutrality so that you—each of you, including all faculty, staff, and students—can have a forum for vigorous debate, civil discourse, and respectful disagreement.  We will do that while preserving your safety and security within our community.

I recognize that I will not have satisfied everyone with this response.  That's okay.  It's

perfectly natural to wish for our institutions to mirror and validate our values and viewpoint.  But that is not the job of a law school. Florida Law's mission is to train you to navigate the marketplace of ideas, and, ultimately, resolve the conflict it can invariably create.  We, therefore, will continue to protect your right to disagree and debate—with fellow students, faculty, staff, and even with the dean.

Best,
MEM

Merritt E. McAlister
Interim Dean and Levin, Mabie & Levin Professor of Law
University of Florida Levin College of Law
mcalister@law.ufl.edu / 352.273.0981 (o) / 404.861.7619 (c)

**DEF_000555**

**From:** McAlister,Merritt Ellen <mcalister@law.ufl.edu>
**Date:** Tuesday, June 24, 2025 at 2:46 PM
**To:** law-all-students-l@lists.ufl.edu <law-all-students-l@lists.ufl.edu>
**Subject:** Reaffirming Our Values

Dear UF Law Community:

Many of you may have seen the recent *New York Times* article about a student at the law school.  The article stated that the student—who told the *Times* it "would not be manifestly wrong" to call him a Nazi—received a recognition through a "book award," which is given to the highest overall grade in a law school class.  The paper he wrote, which counted for 65% of the final grade in the small seminar course, argued for constitutional "nationalism" based on an understanding of the Constitution that excluded non-white people from legal and civil participation in America.  Although the law school is limited by what it can say about these events under federal and state law that protects the privacy of student record information, that student has now disclosed some information publicly.

Let me state unequivocally: the student's views are revolting and do not reflect the values of UF Law, its faculty, or its administration.  We welcome all, we discriminate against none, and we aim to create a community where students feel a sense of belonging and connection—without experiencing fear or threats or hatred.

The paper's views also in no way reflect the views of the professor in this course.  The professor had no knowledge of this student's history at the law school or his deeply held personal views.  The professor took the paper on its face—as a student paper attempting to use originalist methodology to reach a detestable and extreme position.  As abhorrent as the paper's thesis may be, that work still falls within the bounds of academic freedom and the First Amendment, and, as such, was graded consistent with the grading standard for the course.

As a matter of practice at UF Law and most other law schools across the nation, the highest-performing student in any class receives a "book award" during the grading process.  Indeed, the professor believed that recognition was mandatory for the top scoring student.

I understand that these events and this article have caused many in our community pain, disappointment, and fear.  I know that many of you are outraged at the law school for not taking the book award away from the student.  But the administration does not second-guess grading decisions at the law school, except in very narrow circumstances, and those circumstances did not apply here.  Upholding academic freedom and the student's First Amendment right to express even odious ideas is the harder path, but it is the path our principles require.

DEF_000556

Rescinding the honor might feel righteous, but it would betray those principles and set a dangerous precedent in a law school that trains students to confront unpopular ideas and represent unpopular clients. Defending free expression is easiest when we approve of the speech; it is hardest when, as in this instance, the speech tears at the fabric of our community. But that is precisely when our commitment must hold.

We have protected academic freedom and the student's First Amendment rights while also prioritizing the safety and security of our community. As soon as the student's conduct became threatening and substantially disruptive, in collaboration with UFPD and UF administration, the student was barred from campus. We heightened security across the college. It is important to note that the escalation in the student's conduct that led to his trespass happened three months after the book award had been announced in January.

Sadly, this article has given an extremist provocateur exactly what he wanted: a platform for greater visibility. And it has caused hurt and pain within our community in the process. I also regret that this has led an honorable public servant—one who has served his country for decades as a federal public defender and a federal judge—to receive death threats because of an impartial grading decision he made. No one deserves that treatment for selflessly teaching as a part-time instructor in a law school.

The decisions we've made in this instance reflect the best efforts of dedicated professionals to protect students' First Amendment rights and embody the principles of academic freedom in grading, administering, and guiding a law school. Not everyone will agree with our judgment, and I respect that. But I hope we can begin to move forward together recognizing that, collectively, we share commitments to uphold the First Amendment, academic freedom, and our shared sense of humanity.

Best,

MEM

Merritt E. McAlister

Interim Dean and Levin, Mabie & Levin Professor

University of Florida
Fredric G. Levin College of Law

mcalister@law.ufl.edu / 352.273.0603

DEF_000557

Preston Texpy. Nat'l Constitutionalism.

- Thesis is that "we the People" included only the political body made up of whites.
- Uses OPM & OID to support his thesis.
- Well researched & written.
— Great use of Feds Papers & other materials like McGinnis & Rappaport.

- He suggests the judges must order a illegal aliens out & to protect our borders.
- This way out there but demonstrated deep, esoteric thinking & application of orig. principles

DEF_000558

# National Constitutionalism
*An Originalist and Structuralist Analysis of Border Policy, Immigration and Naturalization Law, and the Fourteenth Amendment*
**Preston Terry**

## Contents

Introduction..................................................................................................................1

The Originalist Foundations of National Constitutionalism.........................................2

"The People" as Nation: *Verdugo-Urquidez* and *Heller* ..........................................11

National Constitutionalism Distilled for Jurists ........................................................15

National Constitutionalism Applied to Immigration Policy, Naturalization Law, and Alienage Classifications....................................................................................................................17

    Border Control, the Guarantee Clause, and the State War Power ............................19

    Immigration and Naturalization Law.......................................................................21

    Alienage Classifications and the Citizenship Clause...............................................23

Conclusion ...................................................................................................................26

## Introduction

       This paper proposes that constitutional governance relies upon several structural principles and implicit assumptions—rooted in our national history and the Constitution's text—about the significance of "We the People" in the constitutional scheme. This descriptive claim, coupled with a normative claim that these principles and assumptions should be preserved and aggressively asserted, is termed "national constitutionalism." National constitutionalism posits that, regardless of certain textual provisions with a seemingly open-ended scope of application, the Constitution's establishment of a nation-state under the sovereignty of the People must be considered its paramount purpose which may not be permissibly undermined by any governmental acts or omissions absent the direct and unambiguous consent of the People.[1] Originalism's two dominant

---

[1] In this discussion, the phrase "the People" will be understood as being coterminous with the phrase "the nation." *See* AZAR GAT WITH ALEXANDER YAKOBSON, NATIONS: THE LONG HISTORY AND DEEP ROOTS OF POLITICAL ETHNICITY AND NATIONALISM 18 (2012) (defining "nation" as a population with a sense of shared kinship, culture,

DEF_000559

varieties—original intent originalism and original public meaning originalism[2]—both suggest the propriety of applying national constitutionalism to at least one area of law where courts have heretofore been inclined to view the so-called "political branches" (i.e., Congress and President) as possessing plenary, nonjusticiable authority: immigration and naturalization policy.[3] Additionally, the logic of national constitutionalism suggests an urgent need to overturn much of the Court's modern Fourteenth Amendment jurisprudence, and even consider the constitutionality of the Fourteenth (and Fifteenth) Amendments entirely.

**The Originalist Foundations of National Constitutionalism**

Original intent originalism "holds that the intent of the author of words or language determines the meaning of those words."[4] Original intent originalists defend this exegetical method by arguing that the true meaning of any authored language is inseparable from the author's intent.[5] McGinnis & Rappaport contend that original intent originalism's advantages are non-availing when the language at issue has multiple authors because "the individual intentions of each

---

common identity, history, and fate, that is either politically sovereign or actively striving to achieve political self-determination and self-government); CARL SCHMITT, CONSTITUTIONAL THEORY 127 (Jeffrey Seitzer, ed. & trans., 2008) (noting that "[n]ation and people are often treated as equivalent concepts" but that "[nation] denotes, specifically, the people as a unity capable of political action, . . . while the people not existing as a nation is somehow only something that belongs together ethnically or culturally, but it is not necessarily a bonding of men existing politically").

[2] John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 NW. U. L. REV. 751, 758 (2009) (describing these two varieties as "the two leading positive theories" of originalist interpretation).

[3] *See, e.g.*, California v. United States, 104 F.3d 1086, 1090–91 (9th Cir. 1997) (holding that California's plea for relief under the Guarantee Clause due to the federal government's failure to secure the southern border "presents a nonjusticiable political question" by noting that "[t]he Supreme Court has held that the political branches have plenary powers over immigration" and explaining further that "[f]or this Court to determine that the United States has been 'invaded' when the political branches have made no such determination would disregard the constitutional duties that are the specific responsibility of other branches of government, and would result in the Court making an ineffective non-judicial policy decision") (citing Fiallo v. Bell, 430 U.S. 787, 792 (1977)).

[4] McGinnis & Rappaport, *supra* note 2.

[5] *Id.* at 759 (recounting that "[Richard Kay] argues that readers do not understand texts independently of real or presumed human intentions . . . [r]ather, meaning is fundamentally connected with a human agent who intended to communicate something").

2

DEF_000560

author might differ" and it is possible that "a single meaning was shared only by a plurality."[6] Moreover, this interpretive problem is compounded when the language's meaning is unexplained by the authors and where "legislators cannot easily determine the meaning of a provision upon which they are voting."[7] Nonetheless, McGinnis & Rappaport argue that these problems are resolvable via careful application of "background interpretive rules."[8] While McGinnis & Rappaport are correct that recourse to these rules may be useful and appropriate where no easily discernible, express consensus exists regarding the original meaning of multi-authorial language, these rules are less necessary (if not superfluous and potentially obfuscatory) where the language's meaning was clearly expressed when authored and there was a unanimous, or at least clear majority, agreement regarding this meaning.

In contrast to original intent originalism's subjective, authorial-based analysis, original public meaning originalism focuses on "how the words of the document would have been understood by a competent and reasonable speaker of the language at the time of the document's enactment."[9] Thus, this method may be considered an objective mode of analysis, albeit one tied to the historical context of the language's genesis. Citing Barnett's analogy of the Constitution as a contract, McGinnis & Rappaport argue that their reliance on background interpretive rules is apropos because the objective theory of contract interpretation relies on the objective meaning of words rather than parties' subjective intentions.[10] McGinnis & Rappaport note that although many contractual terms are interpreted according to their ordinary meaning, "it is a legal interpretive rule

---

[6] *Id.*

[7] *Id.* at 760.

[8] *Id.* ("The possibility of multiple meanings would be significantly reduced or eliminated if legislators understood that the words of a law would be interpreted in accordance with applicable rules, such as accepted word meanings, grammar, and interpretive rules.").

[9] *Id.* at 761.

[10] *Id.* at 762 (citing RANDY E. BARNETT, RESTORING THE LOST CONSTITUTION 100 (2004)).

3

DEF_000561

that determines whether a term should receive its ordinary or legal meaning."[11] However, it is self-evident that where there is no difference between the ordinary meaning of language and its legal meaning, recourse to such a legal interpretive rule is unnecessary.

Like Vermeule's theory of common-good constitutionalism, national constitutionalism looks to the Preamble to clarify the Constitution's *raison d'être*. However, rather than look as Vermeule does to the Preamble's "sweeping generalities and famous ambiguities" to assert that the Constitution may be given a moralistic, anti-libertarian reading that permits the legislation of conservative morality,[12] national constitutionalism instead focuses on the Preamble's clear statement of who has "ordain[ed] and establish[ed]" the constitutional contract ("We the People") and who are its intended beneficiaries ("ourselves and our Posterity").[13] In doing so, national constitutionalism insists upon the conceptual validity of the principal-agent analogy in order to clearly delineate the People as the sovereign constituent power within the constitutional hierarchy, with the constituted power of the Constitution and its branches of government occupying an inferior, subordinate rule.[14] Thus, national constitutionalism applauds and emphasizes the

---

[11] *Id*. at 763.

[12]    Adrian    Vermeule,    *Beyond    Originalism*,    The    Atlantic    (Mar.    31,    2020), https://www.theatlantic.com/ideas/archive/2020/03/common-good-constitutionalism/609037/ (arguing that "the Constitution's preamble, with its references to general welfare and domestic tranquility, to the perfection of the union, and to justice" is "an obvious place to ground principles of common-good constitutionalism," and that "words such as *freedom* and *liberty* need not be given libertarian readings; instead they can be read in light of a better conception of liberty as the natural human capacity to act in accordance with reasoned morality") (emphasis in original).

[13] U.S. CONST. pmbl.

[14] *See* Mila Versteeg & Emily Zackin, *Constitutions Unentrenched: Toward an Alternative Theory of Constitutional Design*, 110 AM. POL. SCI. REV. 657, 658 ("Those who conceptualize constitutionalism as a form of contracting describe the people as a 'principle,' which, in creating a representative government, has employed 'agents' to better realize its ends."); Luigi Corrias, *Populism in a Constitutional* Key, 12 EUR. CONST. L. REV. 6, 15 (2016) (describing the nation as the "bearer" of constituent power, whereas "the constitution, legislature, executive, and judiciary" which "ultimately derive their power from the nation" are the constituted power).

DEF_000562

Supreme Court's long-held and oft-repeated acknowledgement of popular sovereignty as forming the bedrock of—and pre-dating[15]—the present constitutional order.[16]

Crucially, national constitutionalism rests in large part upon an originalist analysis of the meaning of the phrase "the People." The theory posits that although the People were an identifiable entity capable of political action prior to the ratification of the Constitution, the ratification process itself—and the political advocacy which propelled ratification forward—produced the controlling definition of the People for the purposes of constitutional interpretation. Like America's earliest jurists, national constitutionalists must look to The Federalist for guidance in clearly formulating this definition.[17] Those expounding national constitutionalism may take pride in the fact that they need not look long therein to find relevant authority. In The Federalist No. 2, John Jay explains that the Americans are:

> [A] people descended from the same ancestors, speaking the same language, professing the same religion, attached to the same principles of government, very similar in their manners and customs, and who, by their joint counsels, arms, and

---

[15] *See* THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) ("it is the Right of the People to alter or to abolish [government], and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness.").

[16] *See, e.g.*, Chisholm v. Georgia, 2 U.S. 419, 470–71 (1793) (""[T]he people, in their collective and national capacity, established the present Constitution . . . in establishing it, the people exercised their own rights, and their own proper sovereignty"); Marbury v. Madison, 5 U.S. 137, 176 (1803) ("That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis, on which the whole American fabric has been erected."); Barron v. City of Baltimore, 32 U.S. 243, 247 (1833) ("The constitution was ordained and established by the people of the United States for themselves, for their own government . . . The people . . . framed such a government . . . as they supposed best adapted to their situation and best calculated to promote their interests."); Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886) ("Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts."); Carter v. Carter Coal Co., 298 U.S. 238, 296 (1936) ("[T]he Constitution itself is in every real sense a law—the lawmakers being the people themselves, in whom under our system all political power and sovereignty primarily resides, and through whom such power and sovereignty primarily speaks."); Afroyim v. Rusk, 387 U.S. 253, 257 (1967) ("In our country the people are sovereign and the Government cannot sever its relationship to the people by taking away their citizenship."); Buckley v. Valeo, 424 U.S. 1, 14 (1976) (relying on the presumption that the United States is "a republic where the people are sovereign"); Gamble v. United States, 587 U.S. 678, 688 (2019) ("[O]ur Constitution rests on the principle that the people are sovereign").

[17] Cohens v. Virginia, 19 U.S. 264, 418 (1821) (Marshall, C.J.) (noting that "[t]he opinion of the *Federalist* has always been considered as of great authority" in part because "the part two of its authors performed in framing the constitution, put it very much in their power to explain the views with which it was framed").

DEF_000563

efforts, fighting side by side throughout a long and bloody war, have nobly established general liberty and independence.[18]

In The Federalist No. 14, James Madison placed particular emphasis on the People's common ancestry and shared experience of enduring and emerging triumphant from the recent revolutionary struggle, arguing that "the kindred blood which flows in the veins of American citizens, the mingled blood which they have shed in defense of their sacred rights, consecrate their Union, and excite horror at the idea of their becoming aliens, rivals, enemies."[19] Furthermore, Madison called upon Americans to "[h]earken not to the unnatural voice which tells you that [Americans], knit together as they are by so many cords of affection, can no longer live together as members of the same family; . . . [and] can no longer be fellow citizens of one great, respectable, and flourishing empire."[20] The authors of The Federalist were not ashamed in asserting that the People possessed an exclusive, ancestral identity which should be jealously guarded. Indeed, they believed that it was a fundamental aspect of "human nature . . . that its affections are commonly weak in proportion to the distance or diffusiveness of the object;" and thus, "a man is more attached to his family than to his neighborhood, to his neighborhood than to the community at large."[21] Not only was a political union necessary in order to prevent "a band of brethren, united to each other by the strongest ties" from being "split into a number of unsocial, jealous, and alien sovereignties," but it was those "strongest ties" which made union possible in the first place.[22] The American nation served as the foundation of the American state, and the state, in turn, functioned to preserve what

---

[18] THE FEDERALIST NO. 2, at 38 (John Jay) (Clinton Rossiter ed., 1961). *See also id.* at 38–39 ("To all general purposes we have uniformly been one people . . . As a nation we have made peace and war; as a nation we have vanquished our common enemies; as a nation we have formed alliances, and made treaties, and entered into various compacts and conventions with foreign states.").

[19] THE FEDERALIST NO. 14, at 104 (James Madison) (Clinton Rossiter ed., 1961).

[20] *Id.* at 103–104.

THE FEDERALIST NO. 17, at 119 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

[2] THE FEDERALIST NO. 2, *supra* note 18, at 38.

6

DEF_000564

Schmitt would later call the "substantial equality" or "homogeneity" of the nation.[23] Given such views, the authors of The Federalist were clearly nationalists.[24] Thus, under original intent originalism's subjective, authorial-based mode of analysis, the phrase "the People" and the Preamble's reference to "ourselves and our Posterity" (with "ourselves" plainly being synonymous with "the People" and " our Posterity" being the posterity of "the People") must be viewed through a nationalist lens.

The homogenous nature of the People was also clearly understood by the contemporaries of Jay, Madison, and Hamilton. In explaining his optimism regarding the prospect of enduring union, John Dickinson pointed to the fact that "the people were so drawn together by religion, blood, language, manners and customs, undisturbed by former feuds or prejudices."[25] Other Founders were explicit in framing the common ancestry and blood of the People as a racial matter. In the debate over the slave trade during the constitutional convention of 1787, Roger Sherman opposed the introduction of African slaves into the United States on the grounds that Black slaves "prevent the emigration of whites, who really enrich and strengthen a country."[26] Charles Pinckney, in the 1821 congressional debate on the Missouri compromise, clarified through his

---

[23] SCHMITT, *supra* note 1, at 258–59 (arguing that "[p]olitical democracy . . . cannot rest on the inability to distinguish among persons," but can only survive "on the quality of belonging to a *particular people*. This quality of belonging to a people can be defined by very different elements (ideas of common race, belief, common destiny, and tradition). The *equality* . . . thus orients itself *internally*" and when such a democracy produces a state wherein citizens possess equal rights and obligations "democratic equality is a *substantial equality*.") (emphasis in original). *See also* Heiner Bielefeldt, *Carl Schmitt's Critique of Liberalism: Systematic Reconstruction and Countercriticism, in* LAW AS POLITICS: CARL SCHMITT'S CRITIQUE OF LIBERALISM 23, 27 (David Dyzenhaus ed., 1998) ("What ultimately counts in a genuine democracy, [Schmitt] says, is the sovereign authority of the collective unity of the people, a unity facilitated by, and resting on, some sort of 'substantial homogeneity.'"); ALAN GIBSON, INTERPRETING THE FOUNDING 62–63 (2006) (describing how "the concept of federalism within American republicanism retained a substantial residue of the belief that the republican form of government could exist only . . . with a homogeneous . . . citizenry" and "stress on a homogeneous citizenry also was used to promote restrictive naturalization policies").

[24] *See supra* note 1 (explaining how "the People" and "the nation" are coterminous phrases).

[25] *See* John Dickinson, *"Fabius" [John Dickinson] The Letters: VII–IX, in* FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 1787–1788 492 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[26] *The Debate in the Convention of 1787 on the Prohibition of the Slave Trade*, N.Y. TIMES ARCHIVE (Nov. 24, 1860), https://www.nytimes.com/1860/11/24/archives/the-debate-in-the-convention-of-1787-on-the-prohibition-of-the.html.

DEF_000565

interpretation of the meaning of the Article IV Privileges and Immunities Clause,[27] which he claimed to have written, that:

> [A]t the time I drew that constitution, I perfectly knew that there did not then exist such a thing in the Union as a black or colored citizen, nor could I then have conceived it possible such a thing could ever have existed in it; nor . . . do I now believe one does exist in it . . .[28]

Pinckney went on to explain that belonging to the White race was an enduring prerequisite for becoming an American citizen.[29] Perhaps no one more unambiguously asserted that the nation was unalterably monoracial than Thomas Jefferson. Jefferson claimed to support abolition but believed that Blacks could not be made citizens due to the risk of interracial conflict[30] and miscegenation.[31] It was Jefferson's dream to see the United States "cover the whole Northern, if not the Southern continent with a people speaking the same language, governed in similar forms, & by similar laws" and he could not "contemplate, with satisfaction, either blot or mixture on that surface."[32] That Jefferson was associated with the Anti-Federalists[33] further supports the proposition that the

---

[27] U.S. CONST. art. IV, § 2, cl. 1 ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.").

[28] 37 ANNALS OF CONG. 1134 (Gales and Seaton, 1855) (Feb. 13, 1821) (statement of Rep. Charles Pinckney).

[29] Id. at 1134–35.

[30] THOMAS JEFFERSON, NOTES ON THE STATE OF VIRGINIA 145 (Frank Shuffelton, ed., Penguin Books 1999) (1785) (arguing that Blacks could not be made citizens because White prejudice and "ten thousand recollections, by the blacks, of the injuries they have sustained; new provocations; the real distinctions which nature has made; and many other circumstances, will divide us into parties, and produce convulsions which will probably never end but in the extermination of the one or the other race").

[31] Id. at 151 ("Among the Romans emancipation required but one effort. The slave, when made free, might mix with, without staining the blood of his master. But with us a second is necessary, unknown to history. When freed, he is to be removed beyond the reach of mixture.").

[32] Letter from Thomas Jefferson to James Monroe (Nov. 24, 1801), in 35 THE PAPERS OF THOMAS JEFFERSON, Aug. 1–Nov. 30, 1801, at 718 (Barbara B. Oberg, ed., Princeton University Press 2008), https://founders.archives.gov/documents/Jefferson/01-35-02-0550.

[33] But see Michael J. Faber, Thomas Jefferson, Federalist, 128 VA. MAG. HIST. & BIOGRAPHY 282, 283 (2020) (acknowledging that "[b]ecause Jefferson advocated adding a bill of rights to the proposed Constitution, and because he later became the chief figure in the opposition party in the 1790s, he is easy to mistake for an Anti-Federalist. He is often identified as such in history textbooks and other places;" but nonetheless arguing that "Jefferson, though he had his doubts, clearly and unequivocally favored ratification of the Constitution. His position offers considerable insight into the Federalist position.").

8

DEF_000566

exclusive, racial nature of the People was the consensus viewpoint among the founding generation, regardless of their political leanings or partisan affiliation.[34]

Of the commonalities between Americans Jay observed in The Federalist No. 2, clearly the most important to the founding generation was the fact that Americans shared a common ancestral heritage. Furthermore, the Founders strongly believed Americans must continue to share that common ancestral heritage. To that end, before the ratification of the Bill of Rights, the first Congress passed the 1790 Naturalization Act which limited naturalization to "any alien, being a free white person, who . . . is a person of good character" upon their "taking the oath or affirmation prescribed by law, to support the constitution of the United States."[35] That act was promptly passed and signed into law pursuant to Congress' constitutionally granted power to "establish a uniform Rule of Naturalization."[36] The Founders acknowledged immigration was needed to grow America's population, expand her frontiers, and burgeon her power. Indeed, one of the grievances outlined in the Declaration of Independence was that the Crown prevented the "population of these States" by obstructing immigration and failing to pass "Laws for Naturalization of Foreigners."[37]

However, the Founders did not believe immigration should be unconstrained. In 1802 Alexander Hamilton wrote that "foreigners will generally be apt to bring with them attachments to the persons they have left behind; to the country of their nativity, and to its particular customs and manners" and may not possess "that temperate love of liberty, so essential to real

---

[34] *See also* ROGERS M. SMITH, CIVIC IDEALS: CONFLICTING VISIONS OF CITIZENSHIP IN U.S. HISTORY 138 (1997) (describing the Federalists as "the champions of . . . nativism" and the Jeffersonians as "the defenders . . . of aggressive civic racism").

[35] Naturalization Act of 1790, ch. 3, 1 Stat. 103.

[36] U.S. CONST. art. I, § 8, cl. 4.

[37] *See* THE DECLARATION OF INDEPENDENCE para. 9 (U.S. 1776).

9

DEF_000567

republicanism."[38] Moreover, Hamilton expressed fears that the United States "already felt the evils of incorporating a large number of foreigners into their national mass; it has served very much to divide the community and to distract our councils, by promoting in different classes different predilections in favor of particular foreign nations, and antipathies against others."[39] Although Hamilton claimed he was not calling for "a total prohibition of the right of citizenship to strangers,"[40] his comments can hardly be construed as advocating for open borders and unregulated immigration. Crucially, Hamilton's comments were solely a reaction to immigration from Europe, i.e., White immigrants. The idea of permitting non-White immigration (aside from within the hulls of slave ships), much less permitting non-White naturalization, does not to appear to have been countenanced by any of the Founders. Thus, unsurprisingly, the first permanent federal regulation of immigration, passed in 1803, punished the importation of "any . . . person of colour   . . . into any port or place of the United States, which port or place shall be situated in any state which by law has prohibited or shall prohibit the admission or importation of such . . . person of colour."[41] With regards to naturalization, Chin & Finkelman succinctly note that "everyone at the Convention would have understood that a 'uniform Rule of Naturalization' would be tied to

---

[38] Alexander Hamilton, *The Examination Number VIII*, N.Y. EVENING POST, Jan. 12, 1802, *reprinted in* 25 THE PAPERS OF ALEXANDER HAMILTON, July 1800–Apr. 1802, at 495 (Harold C. Syrett, ed., Columbia University Press 1977), https://founders.archives.gov/documents/Hamilton/01-25-02-0282.

[39] *Id.*

[40] *Id.*

[41] Gabriel J. Chin & Paul Finkelman, *The "Free White Person" Clause of the Naturalization Act of 1790 as Super-Statute*, 65 WM. & MARY L. REV. 1047, 1079 n.162 (2024) (citing Act of Feb. 28, 1803, ch. 10, 2 Stat. 205). The application of the law to "any state which by law has prohibited or shall prohibit the admission or importation of such . . . person of colour" was likely done solely to comply with contemporary constitutional restrictions on the congressional power to control immigration. *See* U.S. CONST. art. I, § 9, cl. 1 ("The Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight").

DEF_000568

race."[42] Thus, the 1790 Naturalization Act "discouraged the immigration of non-White people from other countries by creating legal barriers to their economic and political participation."[43]

There exists little in the way of concrete evidence on the nationalist perceptions and beliefs of the broader public regarding American identity when the Constitution was ratified. Nonetheless, as will be seen further shortly, the phrase "the People", as used within the Constitution, was a term of art to refer to the body politic. As has been shown, the consensus viewpoint among the founding generation's political leaders confirms that they viewed the body politic in recognizably nationalistic and racial terms. According to Chin & Finkelman, "whether or not they supported slavery, a majority of [the Founders] unambiguously conceived of the United States as a White country."[44] It may be assumed that the consensus view of the founding generation's leaders on such an important, fundamental point reflected their constituents' views. Thus, under an original public meaning analysis, as under the original intent analysis, references to "the People" and "posterity" must likewise be interpreted in a nationalist light.

**"The People" as Nation: *Verdugo-Urquidez* and *Heller***

Recent, powerful support for the proposition that "the People" is a phrase sounding in nationalism comes not from the realm of immigration and naturalization law, but in two cases interpreting the scope of two Bill of Rights amendments. In United States v. Verdugo-Urquidez, Chief Justice William Rehnquist applied a textualist analysis to conclude that the Fourth Amendment's reference to "the people" indicated that "the purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own Government," and

---

[42] *Id*. at 1067.
[43] *Id*. at 1057.
[44] *Id*. at 1048.

11

DEF_000569

therefore the amendment could not "restrain the actions of the Federal Government against aliens outside of the United States territory."[45] The use of the term "the people," in contrast with the use of the term "person" or "accused" elsewhere in the Constitution, demonstrated that the phrase was a "term of art employed in select parts of the Constitution" and "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[46] To bolster this conclusion, Rehnquist also applied an originalist analysis, noting the constitutional permissibility of congressional grants of letters of marque and reprisal, to support the claim that "[t]here is likewise no indication that the Fourth Amendment was understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory or in international waters."[47]

Rehnquist's opinion in *Verdugo-Urquidez* was joined by four other justices, including Justice Anthony Kennedy. However, Kennedy also filed a concurring opinion stating that he could not "place any weight on the reference to 'the people' in the Fourth Amendment as a source of restricting its protections."[48] Additionally, Kennedy stated his belief that "[i]f the search had occurred in a residence within the United States, . . . the full protections of the Fourth Amendment would apply."[49] Kennedy's interpretation, in granting Fourth Amendment protection to aliens within the United States' interior, clearly diminishes the privilege of American identity and citizenship along with the exclusionary significance of the phrase "the People." Neither result is desirable under national constitutionalism, which seeks to reach decisions which emphasize and give substance to the benefits of citizenship and national belonging. On the other hand, Rehnquist's

---

[45] United States v. Verdugo-Urquidez, 494 U.S. 259, 266 (1990).
[46] *Id.* at 265–66.
[47] *See id.* at 267–68.
[48] *Id.* at 276 (Kennedy, J., concurring).
[49] *Id.* at 278.

DEF_000570

two-prong interpretation of "the people" in the Fourth Amendment (persons who belong to a national community *or* have a sufficient connection with this country to be considered a part of it) leaves much to be desired as well. The first prong is laughably non-specific. Verdugo-Urquidez was, after all, part of "a national community" (he was a Mexican citizen). Obviously, it is the *American* national community which "the People" of the Constitution belong to, and Rehnquist should have made that explicitly clear. However, this is implicitly clear in the whole opinion and as a matter of common sense.

Nebulous writing aside, Rehnquist's second prong may degrade the role of "the People" in the constitutional framework more than Kennedy's interpretation would. Suggesting that an individual might develop a sufficient connection with this country to be considered a part of the People *without* joining our national community through naturalization would give non-nationals a claim of right to participate in popular sovereignty. If non-nationals may be a part of the People, and the People are sovereign, then what grounds would exist (particularly in light of the general trend of post-World War II equal protection jurisprudence) to exclude a resident alien adult with such a "sufficient connection" from the franchise given that "sovereignty confers on the people the right to choose freely their representatives to the National Government?"[50] Such an absurd

---

[50] U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 794 (1995) (acknowledging "the critical postulate that sovereignty is vested in the people, and that sovereignty confers on the people the right to choose freely their representatives to the National Government.") (citing Powell v. McCormack, 395 U.S. 486, 541 n. 76 (1969)). *See also* Gerald M. Rosberg, *Aliens and Equal Protection: Why Not the Right To Vote?*, 75 MICH. L. REV. 1092, 1136 (1977) (concluding that the denial of the right to vote to resident aliens "can only be justified on the basis of some compelling state interest" and "it is far from clear that it can, in fact, be justified under that exacting standard"). *Compare* Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 666 (1966) ("Our cases demonstrate that the Equal Protection Clause of the Fourteenth Amendment restrains the States from fixing voter qualifications which invidiously discriminate."), *with* Graham v. Richardson, 403 U.S. 365, 376 (1971) (holding that "a state statute that denies welfare benefits to resident aliens and one that denies them to aliens who have not resided in the United States for a specified number of years violate the Equal Protection Clause"), *and In re Griffiths* 413 U.S. 717, 729 (1973) (holding that conditioning bar admission on citizenship violates the Equal Protection Clause). That individuals like Rosberg advocate for the extension of the franchise to aliens proves that national constitutionalist jurists must be cautious with their language and not permit an opening for anti-national constitutionalists to continue their assault on the sanctity of the People, their privileged citizenship, and their sovereignty. On the other hand, it may be possible that Rehnquist felt required to include this second prong (which, given the basis for the opinion's holding, is essentially dictum) to

DEF_000571

result cannot be entertained. The exclusionary roots of American identity, the traditional importance of citizenship and the f          cal process, and the fact that (unlike citizens) aliens may be expelled at th          l government,[51] all suggest that aliens are second-class persons under the C          uty of judges, empowered by the truly sovereign American people, to ensure that aliens remain second-class persons under the Constitution and are prevented from exercising any right which properly belongs to the People alone until they are naturalized—if they are naturalizable.

Rehnquist also failed to describe the identity of the People and the national community that they belong to. However, in District of Columbia v. Heller the court, in an opinion by Justice Antonin Scalia, directly acknowledged the historical, racial, and exclusionary identity of the People to support holding that the Second Amendment's right to bear arms is an individual right belonging to all of the People. Scalia first explained that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset" and then cited the two-prong definition of the People provided in *Verdugo-Urquidez* in support of this conclusion.[52] Later in the opinion, Scalia cited two antebellum state court cases "holding that the Constitution did not extend to free

---

secure the votes for his opinion. Notably, elsewhere in the opinion, Rehnquist implies that criminal infiltrators may not be entitled to the same level of Fourth Amendment protection as citizens, and any cases whose holdings assumed that they were entitled to equal Fourth Amendment protection would be inapposite were the issue directly before the court. *See Verdugo-Urquidez*, 494 U.S. 259, 272 (stating that prior decisions are "not dispositive of how the Court would rule on a Fourth Amendment claim by illegal aliens in the United States if such a claim were squarely before us"). Nonetheless, Rehnquist seems to concede that lawful resident aliens have Fourth Amendment rights. *See id.* at 270–71. This was an unwise and anti-national constitutionalist concession given that lawful resident aliens, being unnaturalized (and potentially unnaturalizable), are not a part of the People, and the text of the Fourth Amendment plainly does not provide protections to those who are not a part of the People.

[51] Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 210 (1953) ("Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.").

[52] District of Columbia. v. Heller, 554 U.S. 570, 580 (2008)

DEF_000572

blacks"[53] in order to show that in the early 19th century many state courts "indicated that the Second Amendment right to bear arms was an individual right unconnected to militia service, though subject to certain restrictions."[54] Notably, Scalia made no effort to criticize these opinions' holding that Blacks did not possess the right to bear arms. In arguing that the Second Amendment applies to all of the People and citing these antebellum cases in support of his reasoning, Scalia implicitly acknowledged that in the antebellum period Blacks were not a part of the People. Incredibly, 151 years after *Dred Scott*, five members of the Court (with no member undercutting or qualifying the opinion's analysis in a concurring opinion) ostensibly vindicated the legal correctness of Chief Justice Roger Taney's ruling that Blacks "formed no part of the people who framed and adopted [the Declaration of Independence]"[55] and were not a part of "the sovereignty of the States"[56] or the sovereignty of the country as a whole, which led Taney to conclude Blacks "had no rights which the white man was bound to respect."[57]

**National Constitutionalism Distilled for Jurists**

The foregoing analysis indicates that national constitutionalism relies on three primary points. First, national constitutionalism promotes and guards popular sovereignty. Second, national constitutionalism relies on the distinction between the superior constituent power of the sovereign People and the inferior constituted power of the Constitution and government (the principal-agent analogy). Third, the People share a biological relation describable by reference to the original

---

[53] *Id.* at 611 (citing Aldridge v. Commonwealth, 4 Va. 447, 2 Va. Cas. 447, 449 (Gen.Ct.); Waters v. State, 1 Gill 302, 309 (Md.1843))

[54] *Id.*

[55] Dred Scott v. Sandford, 60 U.S. 393, 410 (1857), *superseded by constitutional amendment*, U.S. CONST. amend. XIV.

[56] *Id.* at 419.

[57] *Id.* at 407.

DEF_000573

understanding of who formed the People—and who could be permitted to enter the ranks of the People—in and about the time the Constitution was ratified. However, some additional, derivative points must be expounded before national constitutionalism is applied further.

As a consequence of acknowledging popular sovereignty, national constitutionalism additionally adopts as a central tenet the principle that "[b]ecause . . . agents derive their authority entirely from the existing constitution, they implicitly lack the authority to destroy or replace the source of that power."[58] Moreover, national constitutionalism is proudly a results-oriented species of jurisprudence. Similar to Dworkin's moral reading of the Constitution, a national reading of the Constitution (or of any language at issue) must be done in the light which "does most credit to the nation" and the People because courts act as the People's agents.[59] Specifically, a reading which degrades the power or privilege of the People is impermissible in light of the implicit limitation on agents whereby they may not destroy or replace the source of their power. This is especially true when an alternative reading, no matter how strained, would not degrade the power or privilege of the People. But when an alternative reading is completely impossible (which due to the nationalist beliefs of the Founders will likely only occur when interpreting the language of a statute or a constitutional amendment), that language should be deemed unconstitutional.

Relatedly, national constitutionalism adopts Schmitt's distinction between the Constitution as a whole and its component provisions.[60] The Constitution is the People's authorization for the

---

[58] Jonathan L. Marshfield, *Forgotten Limits on the Power to Amend State Constitutions*, 114 Nw. Univ. L. Rev. 65, 79 (2019).

[59] Ronald Dworkin, Freedom's Law: The Moral Reading of the American Constitution 11 (1996). *See also* League v. De Young, 52 U.S. 185, 203 (1850) ("The Constitution of the United States was made by, and for the protection of, the people of the United States.").

[60] *See* Schmitt, *supra* note 1, at 158 (arguing that "[p]rotection of the constitution and protection of every single constitutional provision are no more identical with one another than are the inviolability of the constitution and that of every single constitutional provision" because "[w]hen every single constitutional provision becomes 'inviolable' . . . the protection of the constitution in the positive and substantial sense is sacrificed to the protection of the

16

use of power by the governmental agent for the benefit of the People and the terms upon which that power is to be exercised. If an individual constitutional provision would prevent the effective, beneficial exercise of power by government on behalf of the People, particularly when the would-be exercise of power is directed at those who are not a part of the People, judges should consider permitting a necessary, limited exception to the individual provision, at least in times of emergency. This distinction between constitutional provision and the Constitution *in toto* is textually justified, because judges must constitutionally take an oath only "to support this Constitution," not to always support every single one of its provisions.[61]

**National Constitutionalism Applied to Immigration Policy, Naturalization Law, and Alienage Classifications**

In 1870, the privilege of naturalization was extended to "to aliens of African nativity and to persons of African descent," [62] although foreign Blacks continued to face difficulties immigrating in practice.[63] However, since the second half of the 20th century, mass immigration—both "legal" and illegal—has challenged the sovereignty and demographic security of the People in an increasingly severe and unprecedented way. In 1940 the United States was 89.8% White.[64] In 1952, the United States government removed racial restrictions on naturalization in response to foreign policy concerns but maintained a national quota system which de facto discriminated against non-White immigration.[65] In 1965, the Immigration and Naturalization Act (Hart-Celler)

---

constitutional provision in the formal and relative sense" which would make "the individual constitutional provision . . . an insurmountable obstacle to an effective defense of the constitution").

[61] U.S. CONST. art. VI, cl. 3.

[62] *See* Chin & Finkelman, *supra* note 41, at 1102.

[63] *See id.* at 1102, n.313.

[64] Campbell Gibson & Kay Jung, *Historical Census Statistics on Population Totals By Race, 1790 to 1990, and by Hispanic Origin, 1970 to 1990, for the United States, Regions, Divisions, and States,* 19 tbl. 1 (U.S. Census Bureau, Working Paper No. 56, 2002).

[65] *See id.* at 1110.

DEF_000575

removed the national quota system that prevented mass non-White immigration. That act, in addition to contemporaneous collapses in border security, is in large part responsible for setting America on the path to becoming a minority-White country by 2043.[66] Criminal infiltration of the southern border has drastically increased in recent years, further accelerating the People's dispossession.[67] Moreover, the application of equal protection principles to both lawful immigrants and criminal infiltrators, in addition to the Court's interpretation of the Fourteenth Amendment's Citizenship Clause, has further complicated the immigration question by blocking legal avenues for disincentivizing undesirable immigration and removing undesired immigrants. The challenge non-White immigration and naturalization pose to the sovereignty of the People represents a constitutional emergency our Founders seemingly never anticipated. This emergency threatens to overturn the Constitution itself by turning American government against the People and securing government's benefits primarily for other peoples and their posterity.

There are multiple areas where national constitutionalism should be applied by courts to rescue the People from this emergency. First, courts should give effect to the Constitution's Guarantee Clause and order the federal government to secure our borders against criminal infiltrators and the transnational criminal organizations which bring those infiltrators (and other contraband) into the country's interior. Second, courts should subject immigration and naturalization laws to judicial review and apply strict scrutiny to those laws permitting non-White

---

[66] *See* Gabriel J. Chin & Douglas M. Spencer, *Did Multicultural America Result from a Mistake - The 1965 Immigration Act and Evidence from Roll Call Votes*, 2015 UNIV. ILL. L. REV. 1239, 1242 (2015) (citing Press Release, U.S. Census Bureau, U.S. Census Bureau Projections Show a Slower Growing, Older, More Diverse Nation a Half Century from Now (Dec. 12, 2012), https://www.census.gov/newsroom/releases/archives/population/cbl2-243.html); AVIVA CHOMSKY, UNDOCUMENTED: HOW IMMIGRATION BECAME ILLEGAL 184 (2014) (noting that "all types of immigration from Latin America rose after 1965: temporary and permanent, legal and illegal").

[67] Ashley Wu, *Why Illegal Border Crossings Are at Sustained Highs*, N.Y. TIMES (Oct. 29, 2023), https://www.nytimes.com/interactive/2023/10/29/us/illegal-border-crossings-data.html (showing that the three years with the greatest number of annual southwestern border apprehensions in the 21st century occurred in 2021, 2022, and 2023).

DEF_000576

immigration and naturalization. Third, courts should stop applying equal protection to laws discriminating against criminal infiltrators and apply rational basis review to alienage classifications discriminating against lawful immigrants. Finally, courts should not only reconsider constitutional birthright citizenship for children of immigrants who are citizens or subjects of another country, but they should challenge the constitutionality of the Fourteenth and Fifteenth amendments altogether.

### Border Control, the Guarantee Clause, and the State War Power

To give states legal tools to fight back against criminal infiltration, courts should give broad effect to claims for relief which demand that the federal government secure the border pursuant to the Guarantee Clause or, alternatively, recognize the permissibility of exercising the State War Power.

One of the few affirmative duties placed upon our federal government by the Constitution is the requirement that it "protect each [state] against Invasion."[68] Utilizing an original intent analysis, Dwyer describes the clause's "protection against invasion as providing security against 'foreign hostility' and 'ambitious or vindictive enterprises'" which includes the activities of criminal smugglers.[69] Dwyer concludes her analysis of the meaning of the word "Invasion" in the Guarantee Clause by breaking it down into three elements: "1) a hostile and organized external force 2) conducting a purposeful intrusion on sovereign land 3) in furtherance of a predetermined malicious objective."[70] Although, Dwyer unwisely concedes that "illegal immigration in and of

---

[68] U.S. CONST. art. IV, § 4.
[69] Heather Dwyer, *The State War Power: A Forgotten Constitutional Clause*, 33 UNIV. LA VERNE L. REV. 319, 323 (2012) (citing THE FEDERALIST NO. 43 (James Madison)).
[70] *Id.* at 325.

19

DEF_000577

itself" does not amount to invasion,[71] she convincingly argues that the activities of Mexican drug cartels—including the smuggling of criminal infiltrators—do amount to invasion.[72]

Dwyer's analysis strongly suggests that the federal government is obliged to defend the nation from this invasion. Ordering government to affirmatively implement a judicially crafted policy which government had heretofore been unwilling to implement is not outside the ken of the judiciary.[73] Thus, courts should order the federal government to militarize the border, begin construction of border defenses and barriers, and issue arrest or shoot to kill orders targeting criminal infiltrators at the border. These policies would undoubtedly defeat the invasion, or at least diminish its scope and force. Likewise, courts should order the federal government to root out and deport criminal infiltrators in the interior. Additionally, Dwyer suggests an alternative: courts should uphold state policies—enacted pursuant to the State War Power—aimed at defeating the invasion against federal Supremacy Clause challenges.[74] Once exercising the State War Power is deemed justified, it should be given a plenary scope, including the authority to deport criminal infiltrators within their states.[75]

---

[71] *Id.* at 339. Criminal infiltrators express hostility towards our laws through their infiltration, are organized insofar as they must prepare for their crime, purposefully intrude on our territory, and do so in furtherance of the malicious objective of living among us without authorization (at minimum); thus, per Dwyer, they are invaders.

[72] *Id* at 342–352 (concluding that border states are "quite literally under invasion by drug cartels").

[73] *See generally* Cooper v. Aaron, 358 U.S. 1 (1958) (requiring Arkansas to implement a judicially approved school integration plan); Swann v. Charlotte-Mecklenburg *Bd. of Ed.*, 402 U.S. 1 (1971) (permitting lower courts to order adherence to a judicially formulated school bussing schemes for the purpose of integration). *See also* Relman Morin, *AP Was There: Paratroops with bayonets escort Little Rock 9*, AP News (Sept. 24, 2017, 11:21 AM), https://apnews.com/article/360439e805eb4db180fbfd52a7a0f5bb (describing how "[h]ardened paratroopers, in battle dress and with bayonets at the ready" were used to forcibly integrate Little Rock Central High School in Arkansas during the 1957-58 school year).

[74] Dwyer, *supra* note 69, at 319 (describing the State War Power as "both antecedent to, and affirmatively acknowledged in, the Constitution in Article I, section 10, clause 3 which states, "No State shall, without the Consent of the Congress . . . engage in War, *unless actually invaded*") (emphasis in original). *See also id.* at 355 ("This power is independent from federal action or approval and cannot be expunged by a Supremacy claim.").

[75] *See* Harisiades v. Shaughnessy, 342 U.S. 580, 589 (1952) (noting that exercise of "the war power" is "largely immune from judicial inquiry or interference").

20

DEF_000578

Furthermore, although she rejects the approach, Dwyer also conducts an original public meaning analysis, noting that "modern definitions of the word invasion" include "aggression, assault, attack, encroachment, foray, hostile entry, incursion, infiltration, and intrusion" and that "etymological research of the term reveals that the meaning has not changed since at least the fifteenth century."[76] This definition would seem to be broader, encompassing all forms of criminal infiltration (not merely those of smugglers and cartel groups), and therefore permit more claims of relief or permissible uses of the State War Power to combat criminal infiltration. Given that crafting law to most effectively combat criminal infiltration is a clear goal of national constitutionalism, jurists subscribing to the theory should aim to define "Invasion" under its original public meaning.

*Immigration and Naturalization Law*

The principles of national constitutionalism have a relatively straightforward application to immigration and naturalization law. If the government may not destroy or replace the People, or otherwise usurp their sovereignty (or permit their sovereignty to be usurped), and if the People are an identifiable, substantive, and organic legal entity (and not merely the statistical collection of all people within the United States), then government power to permit immigration or naturalization is not plenary. National constitutionalism therefore advocates subjecting to judicial review—with the highest level of scrutiny—all attempts by the federal government to "dissolve the people and elect another"[77] through immigration and naturalization policies which have the effect of altering the traditional, racial demographic balance of the United States and thereby degrading the People's power and privileges. Accordingly, Taney's dictum in *Dred Scott* that

---

[76] *Id.* at 323 (citing ROBERT BARNHART, THE BARNHART CONCISE DICTIONARY OF ETYMOLOGY: THE ORIGINS OF AMERICAN ENGLISH WORDS 397 (1995)).

[77] Bertolt Brecht, *The Solution* (1959), *reprinted in* BERTOLT BRECHT POEMS 1913-1956, 440 (John Willett and Ralph Manheim, eds., Methuen 1976).

21

DEF_000579

Congress "may, if they think proper, authorize the naturalization of anyone, of any color, who was born under allegiance to another Government"[78] is anathema to the implicit limitations, entailed by popular sovereignty, placed upon the constituted power of the nation-state and should be rejected as a matter of law.

The effect of this would simply be a return to the pre-1870 status quo whereby only Whites could typically immigrate and seek naturalization.[79] Non-Whites would still be able to visit the U.S. without becoming residents, as tourism is not immigration. Moreover, if immigration and naturalization laws are subjected to strict scrutiny, then some exceptionally talented non-Whites, who possess skills or knowledge possessed by very few natives, may yet be permitted to immigrate provided their skills or knowledge and presence in the country are necessary for furthering a compelling governmental interest.[80] However, courts should ensure that the compelling governmental interest is very compelling. The immigration of a non-White scientist who can demonstrably contribute towards curing cancer through research only he can conduct (and which can only be effectively conducted in America) would be one such compelling interest, but a purported need to import non-White menial labor is not compelling at all. Moreover, under this framework non-White immigration should never lead to naturalization, as naturalization is almost certainly unnecessary and thus would not comport with policy being narrowly tailored.

---

[78] 60 U.S. at 419.

[79] This is a historically workable standard. *See generally* IAN HANEY LÓPEZ, WHITE BY LAW 2–7 (2006) (describing various court cases in American history aimed at determining if the petitioner was White, and explaining how "[t]hough the courts offered many different rationales to justify the various racial divisions they advanced, two predominated: common knowledge and scientific evidence"). The use of artificial intelligence presents another possible method for determining race. *See generally* Judy Wawira Gichoya et al., *AI recognition of patient race in medical imaging: a modelling study*, 4 LANCET DIGIT. HEALTH e406 (finding "that AI can accurately predict self-reported race, even from corrupted, cropped, and noised medical images, often when clinical experts cannot"). Needless to say, Congress did not abandon the 1790 rule because it proved impossible to determine who was White.

[80] Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 532 (2022) (stating that policy can only survive strict scrutiny upon a showing that the policy "serve[s] a compelling interest and [is] narrowly tailored to that end") (citing Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533, n.1 (1993)).

DEF_000580

*Alienage Classifications and the Citizenship Clause*

In line with national constitutionalism's goal of returning prestige and privilege to American citizenship, and pursuant to the principle that the Constitution is to be given the reading that best serves the nation, alienage classifications affecting criminal infiltrators and relating to the provisioning of government benefits and employment opportunities should no longer be subjected to equal protection analysis. The Court's decision in Plyler v. Doe[81] should be overruled posthaste. Once *Plyler* is consigned to the dustbin of history, the State War Power is recognized, and immigration and naturalization laws are subjected to strict scrutiny, states will be free to enact laws like that at issue in *Plyler* and like California's Proposition 187,[82] which was deemed unconstitutional on Supremacy Clause grounds,[83] to disincentivize criminal infiltration and lessen its pernicious effects on the public purse. Moreover, because lawful aliens have no fundamental right to be in the country and are not citizens, they should be denied a constitutional right to travel.[84] Thus, alienage classifications impacting lawful aliens—including restrictions on their entry into a state—should be subject to mere rational basis review and enjoy a presumption of constitutionality.

National constitutionalists should also endeavor to overturn the holding in United States v. Wong Kim Ark, establishing the rule of birthright citizenship for the children of most foreign nationals born on U.S. soil. As pointed out in Chief Justice Melville Fuller's dissent in *Wong Kim*

---

[81] Plyler v. Doe, 457 U.S. 202 (1982) (holding that a state's refusal to fund the education of unlawfully present children of criminal infiltrators had no rational basis and was thus unconstitutional).

[82] *See* Peter H. Schuck, *The Message of Proposition 187*, 26 Pac. L. J. 989, 990 (1995) (stating that Proposition 187's "most controversial provisions would bar anyone who is not a citizen, a legal permanent resident, or a legal temporary visitor from receiving public social services, health care, and education").

[83] *See* League of United Latin Am. Citizens v. Wilson, 997 F. Supp. 1244, 1261 (C.D. Cal. 1997).

[84] *See* Shapiro v. Thompson, 394 U.S. 618, 630 (1969) ("We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States.") (citing *Passenger Cases*, 7 How. 283, 492 (1849)).

23

DEF_000581

*Ark*, the Citizenship Clause's qualifier "and subject to the jurisdiction thereof" can be read as synonymous with the words "and not subject to any foreign power" which would exclude from birthright citizenship, as the dissent argued was originally intended, "the children of aliens, whose parents owed local and temporary allegiance merely, remaining subject to a foreign power by virtue of the tie of permanent allegiance, which they had not severed by formal abjuration or equivalent conduct."[85] This reading would give more prestige to the concept of American citizenship and membership within the People, which was originally conceived of as a group possessing common blood (but not necessarily common birthplaces). At minimum, courts should limit *Wong Kim Ark*'s holding, as the Tenth Circuit properly did in 2021 when it decided to apply the *Insular Cases* instead of *Wong Kim Ark* to hold that birthright citizenship did not inure in those born in U.S. territories.[86] Moreover, courts should adopt Judge Richard Posner's view that providing birthright citizenship to children of criminal infiltrators born in the United States is not constitutionally mandated.[87] Indeed, if those children are non-Whites, then courts should move to categorically prevent that grant of citizenship.

---

[85] United States v. Wong Kim Ark, 169 U.S. 649, 719–22 (1898) (Fuller, C.J., dissenting) (relying on the use of the words "and not subject to any foreign power" by the 1866 Civil Rights Act, which was passed by the same Congress which passed the Fourteenth Amendment, in granting citizenship to those born on U.S. soil; and relying on statements by Senators Trumbull and Johnson that the qualifier excludes the children of those "owing allegiance" or "subject to some foreign power" from citizenship). *But see* Matthew Ing, *Birthright Citizenship, Illegal Aliens, and the Original Meaning of the Citizenship Clause*, 45 AKRON L. REV. 719, 736 (2015) (endorsing the *Wong Kim Ark* holding and advocating for its extension to children of criminal infiltrators born in the U.S., but conceding that "because the [Citizenship] Clause constitutionalized the citizenship provision in the Civil Rights Act of 1866, we can therefore impute that provision's expected applications to the Clause itself").

[86] *See* Fitisemanu v. United States, 1 F.4th 862, 871 (10th Cir. 2021), *cert. denied*, 143 S.Ct. 362 (2022).

[87] *See* Oforji v. Ashcroft, 354 F.3d 609, 619–21 (7th Cir. 2003) (Posner, J., concurring) (arguing that "Congress should rethink . . . awarding citizenship to everyone born in the United States . . . including the children of illegal immigrants whose sole motive in immigrating was to confer U.S. citizenship on their as yet unborn children," noting that "the purpose of the [Citizenship Clause] was to grant citizenship to the recently freed slaves, and the exception for children of foreign diplomats and heads of state shows that Congress does not read the citizenship clause of the Fourteenth Amendment literally," and concluding that "Congress would not be flouting the Constitution if it amended the Immigration and Nationality Act to put an end to the nonsense").

DEF_000582

Finally, courts should also begin to question the constitutionality of the Fourteenth and Fifteenth amendments as a whole, for two reasons. First, these amendments were ratified contrary to the Article V process. Suthon Jr. notes the military occupation of the south during Reconstruction, the forcible reorganization of the occupied states' governments, and the requirement that the southern states ratify these amendments before the occupation was lifted and their elected representatives would be accepted into Congress "constitute[d] an infraction of the amendment procedure ordained by Article V of the Constitution."[88] Second, the amendments are substantively unconstitutional. If, as Albert argues, the Fourteenth and Fifteenth amendments represent a "constitutional dismemberment" which "is incompatible with the existing framework of a constitution because it seeks to achieve a conflicting purpose," then Article V would not permit such Amendments to be made, given that Article V only permits for "mere amendment[]."[89] Albert views the Fourteenth and Fifteenth Amendments as writing "into the Constitution a ringing declaration of the equality of all persons,"[90] and the Court has explicitly held the former amendment prohibits "measures designed to maintain White Supremacy."[91] However, given that the United States was founded as a race-based nation-state for the preservation and betterment of White Americans (the People), as clearly laid out in the Preamble and revealed by our history, it is difficult to see how these amendments (or at least the way they have been interpreted in the post-

---

[88] *See generally* Walter J. Suthon Jr., *Dubious Origin of the Fourteenth Amendment*, 28 TUL. L. REV. 22, 41–44 (1953). *See also id.* at 29 (contrasting this process with the regular process used to ratify the Thirteenth Amendment).

[89] *See* Richard Albert, *Constitutional Amendment and Dismemberment*, 43 YALE J. INT'L L. 1, 4–5 (2018); *see also* Sanford Levinson, *Accounting for Constitutional Change*, 8 Const. Comment. 409, 414–15 (citing Representative Boutwell, a "warm supporter" of the Thirteenth Amendment, who conceded that "the amendment power was not unlimited" and "suggested that article V did not authorize amendments that would 'establish slavery, or . . . invite the King of Dahomey to rule over this country' insofar as they would contravene the purposes of the Constitution as laid out in the Preamble").

[90] *Id.* at 4.

[91] *See* Loving v. Virginia, 388 U.S. 1, 11–12 (1967).

DEF_000583

World War II era) do not amount to unconstitutional, revolutionary usurpations by the constituted government power.

## Conclusion

Our Constitution will survive only if "the people share a common, historic commitment to certain simple but fundamental principles which preserve their freedom."[92] One of those principles, accepted by our Founders who as a whole "unambiguously conceived of the United States as a White country,"[93] was nationalism—specifically, racial nationalism. If we abandon that principle while turning over America to a non-White majority, a majority that will not share a common, historic commitment to anything, what else shall we abandon along the way? If non-Whites believe that America's White nationalist founding "deserves a place of dishonor"[94] in our history, then—given the fundamentality of this principle in the original constitutional framework—what is to stop any other constitutional provision from being similarly repudiated?

The Supreme Court and inferior federal courts have the power to arrest the dispossession of White America. All they must do is substitute bad landmark precedent for good landmark precedent. Failure to do so is not judicial humility, but, at best, judicial surrender in the face of a terrible crime. At worst, it is complicity in that crime. The People cannot be expected to meekly swallow this demographic assault on their sovereignty. If the People are not granted relief from the government—which includes the judiciary—then, if they are to survive as masters in the land of their ancestors, they must exercise "their revolutionary right to dismember or overthrow" the

---

[92] *See* Chavez v. Martinez, 538 U.S. 760, 794 (2003) (Kennedy, J., concurring in part).
[93] Chin & Finkelman, *supra* note 41, at 1048.
[94] *See Id.*

26

DEF_000584

government.[95] And that will be a process which no deskbound jurist can gleefully look forward to; for it will be a controversy decided not by the careful balance of Justitia's scales, but by the gruesome slashing of her sword.

---

[95] Abraham Lincoln, First Inaugural Address (Mar. 4, 1861), https://avalon.law.yale.edu/19th_century/lincoln1.asp.

27

DEF_000585

**Tuesday, April 1, 2025 at 19:25:24 Eastern Daylight Time**

**Subject:** FW: New Report a Community Concern Submission
**Date:** Monday, February 3, 2025 at 8:59:05 PM Eastern Standard Time
**From:** Shaw, Janice
**To:** McAlister,Merritt Ellen

FYI.

**From:** shaw@law.ufl.edu <shaw@law.ufl.edu>
**Sent:** Monday, February 3, 2025 6:49 PM
**To:** Shaw, Janice <shaw@law.ufl.edu>; Blake,Richard A <blake@law.ufl.edu>
**Subject:** New Report a Community Concern Submission

| Name |
|---|
| anonymous Tip |
| **Prefer to submit anonymously** |
| • Yes |
| **Comments/Questions** |

I am writing anonymously to raise a serious concern shared by multiple members of the UF Law community regarding a recent Book Award given in Judge John L. Badalamenti's constitutional law seminar. The award was presented to a paper titled American Restoration: An Article V Proposal, which promotes rhetoric that many interpret as white nationalist. The paper argues that demographic changes in the U.S. are unconstitutional threats to national sovereignty, explicitly tying American identity to racial ancestry.

This has caused significant discomfort within the student body, as expressed during a recent town hall meeting. The fact that this paper not only passed academic scrutiny but was awarded top honors raises alarming questions about UF Law's academic standards and the institution's implicit endorsement of extremist ideologies. While academic freedom is vital, there is a clear distinction between fostering open discourse and rewarding harmful, supremacist rhetoric.

This is UF's chance to come clean—to confront the Florida Bar about Judge Badalamenti's blatant white supremacist sympathies and address the situation on your own terms and to report the author of this paper. Silence will only deepen the perception of complicity.

If UF Law continues to ignore this issue, I will submit this information to The Gainesville Sun on Valentine's Day, ensuring that the story receives public attention. Once it is released, it will be beyond the school's control. This is not a threat but a commitment to ensuring accountability. UF has the opportunity to act now and demonstrate its commitment to academic integrity and inclusivity before this becomes a full-blown public scandal.

I hope the administration will address these concerns swiftly and transparently.

a quote from the paper
" . Many non-Whites may agree with that proposition, and they may feel joyful that the government of the United States has usurped the People's sovereignty. After all, without this usurpation, non-Whites may not have ever been permitted to become citizens of this country. But at what cost was this "victory" over the People won? Do non-Whites truly believe that, after the government has usurped sovereignty from the People, sovereignty shall pass to them? Furthermore, if the racial attitudes of the Founders which brought White nationalism in to force in the United States are merely a bygone relic of an age that should be forgotten —nay, dishonored!—then why should the government respect any other provision of the Constitution? Why should the Founders' concern with the Crown's restriction on their free speech give legitimacy to the First Amendment? Why should their hatred of general warrants give legitimacy to the Fourth Amendment? Why

DEF_000586    1 of 2

should their fear of the thumbscrew and the breaking wheel give legitimacy to the Fifth and Eighth Amendments? And if that legitimacy comes not from the history of this country and the Founders, then where will it be found? "

**Would you like to be contacted regarding your comment/question?**

No

DEF_000587

2 of 2

**Tuesday, April 1, 2025 at 19:27:06 Eastern Daylight Time**

**Subject:** FW: New Report a Community Concern Submission
**Date:** Monday, November 4, 2024 at 5:13:34 PM Eastern Standard Time
**From:** Shaw, Janice
**To:** McAlister,Merritt Ellen
**Attachments:** Oath of Professionalism Slide 2024.pptx, image001.jpg

Hi Merritt,

Please see below. I also attached the oath of professionalism that the students take during orientation.  I would be happy to discuss these items, and my conversation with Pam Malyk, with you during our scheduled meeting tomorrow morning.

Best,


**Janice J. Shaw**
Senior Assistant Dean for Students
Special Advisor to the Dean
University of Florida Levin College of Law
P.O. Box 117620 | Gainesville, FL 32611-7633
(352) 273-0971 | shaw@law.ufl.edu



**From:** style@ufl.edu <style@ufl.edu>
**Sent:** Monday, November 4, 2024 3:46 PM
**To:** Shaw, Janice <shaw@law.ufl.edu>; Smith,Michelle A <style@ufl.edu>
**Subject:** New Report a Community Concern Submission

**Name**

Student B

**Email**

Student B @ufl.edu

**Phone**

**Comments/Questions**

Following my Evidence class today, Mr. Preston Terry, another law student, made the comment, "These Black people have such loud personalities," apparently in response to a Black student who had been assigned to brief a case. Mr. Terry, a fellow law student, has consistently exhibited racial bias and made racially insensitive remarks.

DEF_000588  1 of 2

In addition to Evidence, Mr. Terry is also in my Criminal Procedure class, where he has advocated for limiting certain constitutional rights based on citizenship. He has stated that rights under the Constitution are reserved solely for U.S. nationals born in the United States. Specifically, he claims that rights the U.S. Supreme Court has recognized—including the Fourth Amendment right against unreasonable searches—are historically reserved for U.S. nationals. In my Constitutional Law class, he made similar claims, but then, he claimed that "white people" are historically superior and hold stronger claim to rights under the law.

Mr. Terry's continued espousal of racially and nationalistically charged views is contrary to the principles of justice, equity, and inclusive diversity. This rhetoric deeply disheartens me, and I am struggling to focus on my own studies in light of both these comments and the school's apparent inaction.

**Would you like to be contacted regarding your comment/question?**

Yes

DEF_000589

2 of 2

Tuesday, April 1, 2025 at 19:27:39 Eastern Daylight Time

**Subject:** Fw: Concerns regarding the safety of fellow students
**Date:** Wednesday, October 30, 2024 at 6:37:51 PM Eastern Daylight Time
**From:** Shaw, Janice
**To:** McAlister,Merritt Ellen
**Attachments:** DRAFT American Restoration.docx

Hi Merritt- I'm available to discuss this at your convenience.  I will check with Brian to see  if the  class was recorded.

Get Outlook for iOS

**From:** Whisnant,Cooper Thomas <cooperwhisnant@ufl.edu>
**Sent:** Wednesday, October 30, 2024 5:48:52 PM
**To:** Shaw, Janice <shaw@law.ufl.edu>
**Subject:** Concerns regarding the safety of fellow students

Dear Dean Shaw,

I understand that the attached paper written by Preston Terry has already been brought to the attention of administration. During our seminar meeting this afternoon, Preston stated that the final paragraph of the paper was meant to incite racial violence. I believe that this suggests a real risk to the safety of my non-white classmates, and is beyond the scope of permissible speech allowed by the University. For clarity, my recollection of the exact wording is that I asked Preston "Was the last paragraph of your paper intended to be a call for contemporary extralegal violence" to which he responded "Yes". I believe that other classmates who were present are willing to recount their memory of the exchange, please let me know if that would be of use to administration and I will reach out to them.

Sincerely,
Cooper Whisnant

# American Restoration: An Article V Proposal (DRAFT)
## by Preston Terry

## Contents

Introduction ................................................................................................................ 1

Popular Sovereignty and Constituent Power in the American System ......................................... 2

The Historic American Nation ................................................................................................. 7

Restoring Sovereignty to the People – Article V, Section 2 ......................................................... 17

    Paragraph 1 of Article V, Section 2 ............................................................................... 18

    Paragraph 2 of Article V, Section 2 ............................................................................... 21

    Paragraph 3 of Article V, Section 2 ............................................................................... 23

    Paragraph 4 of Article V, Section 2 ............................................................................... 24

Conclusion – Why Should This Be Done? ................................................................................ 25

## Introduction

In American constitutional jurisprudence, the People are sovereign. The People's government is their own creation, and this government may not usurp the power which brought it into existence. What, then, is the constitutional status of policies which alter, replace, or destroy the People? Moreover, are there any observable indicators that the People are being altered, replaced, or destroyed? And if such processes are constitutionally dubious, and we verify that they are indeed occurring, what should be done?

This paper provides provocative answers to these questions rooted in empirical evidence, history, legal opinions, and the text of the Constitution. It argues that policies which alter, replace, or destroy the People is wholly illegitimate and unconstitutional. Lengthy historical analysis of the consensus view regarding the original and long-held conception of the People is provided; and it is determined that the People formed and maintained their government along nationalist lines, placing particular emphasis on their shared ancestral heritage. Evidence is provided which indicates that demographic challenges facing the People are currently threatening to reduce them to a minority status—within the coming decades—in the country that is their constitutional birthright. It calls upon the people to prevent this result by undertaking a political restoration and reasserting their rightful claim to sovereignty and primacy within the American body politic. Finally, it suggests changes, in the form of an additional section, to Article V as a means of entrenching this restoration and helping to ensure that such a struggle is never again needed to prevent similar constitutional evils.

DEF_000591

**Popular Sovereignty and Constituent Power in the American System**

One potentially overlooked function of constitutions is in providing an entrenched and exclusionary definition of the nation.[1] Thus, according to Ginsburg:

> In some polities, constitutions reflect and sometimes even create a shared consciousness, and so overcome regional and ethnic divisions. . . . The symbolic or expressive function of constitutions emphasizes the particularity of constitution-making. It is We the People that come together, and so the constitution embodies our nation in a distinct and local way different from other polities.[2]

Appreciation of this function is vital to a correct understanding of American constitutional jurisprudence due to the importance of the principle of popular sovereignty within the American constitutional framework, with popular sovereignty's textual manifestation evident in the Constitution's Preamble.[3] This principle was taken for granted to such a degree that, at the time of the Constitution's drafting, a proposal by James Madison to prefix the Preamble with a declaration stating that "the people have an indubitable, unalienable, and indefeasible right to reform or change their government" was deemed "redundant" and rejected "given the broad meaning of the Preamble itself."[4] Furthermore, contra Amar, the Preamble is explicit in acknowledging that the Constitution is a creation of the People, rather than the People being a creation of the Constitution.[5] Therefore, in addition to encapsulating the principle of popular sovereignty, the Preamble incorporates the closely related principle of constituent power, i.e., the power to bring (or that

---

[1] Richard Albert, *The Expressive Function of Constitutional Amendment Rules*, 59 McGILL L. J. 225, 237–38 (2013) (stating that "Constitutions may . . . express values with the aspirational or functional purposes of self-definition and nation building."). This paper shall utilize Gat and Yakobson's definition of "nation," and the nation shall be considered coterminous with "the People." *See* AZAR GAT WITH ALEXANDER YAKOBSON, NATIONS: THE LONG HISTORY AND DEEP ROOTS OF POLITICAL ETHNICITY AND NATIONALISM 18 (2012) (defining "nation" as a population with a sense of shared kinship, culture, common identity, history, and fate, that is either politically sovereign or actively striving to achieve political self-determination and self-government). *See also* CARL SCHMITT, CONSTITUTIONAL THEORY 127 (Jeffrey Seitzer, ed. & trans., 2008) (noting that "[n]ation and people are often treated as equivalent concepts" but that "[nation] denotes, specifically, the people as a unity capable of political action, . . . while the people not existing as a nation is somehow only something that belongs together ethnically or culturally, but it is not necessarily a bonding of men existing politically."). As will be seen, this conception of nation is in accord with the nationalistic beliefs of the Framers at the time of the U.S. Constitution's drafting and ratification.

[2] Tom Ginsburg, *Written Constitutions and the Administrative State: On the Constitutional Character of Administrative Law* 118 (Univ. Chi. Pub. L. & Legal Theory, Working Paper No. 331, 2010).

[3] Akil Reed Amar, *Popular Sovereignty and Constitutional Amendment*, *in* RESPONDING TO IMPERFECTION: THE THEORY AND PRACTICE OF CONSTITUTIONAL AMENDMENT 89, 105 (Sanford Levinson ed., 1995) (stating that "the Founders themselves [indubitably] recognize[d] the Preamble as a textual declaration of popular sovereignty").

[4] *Id*. at 106.

[5] According to Amar, "the Constitution formed previously separate state peoples into one continental people—Americans!" *Id*. at 104. However, the Preamble states that "We the People of the United States, in Order to form a more perfect Union, . . . and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America." U.S. CONST. pmbl. Logically, for the People of the United States to ordain and establish the Constitution, the People of the United States must have existed before the Constitution. *See also* THE FEDERALIST NO. 2, at XYZ (John Jay) (XYZ ed., XYZyear) ("To all general purposes we have uniformly been one people . . . As a nation we have made peace and war; as a nation we have vanquished our common enemies; as a nation we have formed alliances, and made treaties, and entered into various compacts and conventions with foreign states.").

DEF_000592

brings) the Constitution into existence.[6] Moreover, the principles of popular sovereignty and constituent power were reaffirmed within the Constitution itself shortly after its ratification via the Ninth and Tenth Amendments of the Bill of Rights, which recognize that all rights and powers which have not been delegated to the federal government are "retained" and "reserved" by the People.[7] Crucially, these dual, interrelated principles have been acknowledged and affirmed by numerous U.S. Supreme Court opinions throughout American history.[8]

The creation of the U.S. Constitution by the sovereign People's exercise of their constituent power has often been explained in contractual terms.[9] These contractarian theories emphasize the role of the Constitution in limiting the power of the constituted state.[10] According to Versteeg & Zackin, "[t]hose who conceptualize constitutionalism as a form of contracting describe the people

---

[6] *See* Renato Cristi, *Carl Schmitt on Sovereignty and Constituent Power*, *in* LAW AS POLITICS: CARL SCHMITT'S CRITIQUE OF LIBERALISM 179, 179–92 (David Dyzenhaus ed., 1998) (explaining constituent power's "conceptual kinship with the notion of sovereignty" and stating that "constituent power . . . represents sovereignty as a concrete manifestation of the will" and "[s]overeignty *qua* constituent power comes into view most clearly at the moment when a constitution is generated."); s*ee also* William Partlett, *The American tradition of constituent power*, 15 INT'L J. CONST. L. 955, 955 (2018) ("It is an axiom of democratic constitutional theory to say that 'the people' hold the sovereign 'constituent power' to remake their constitutional order through specialized constitution-making bodies that exist outside the normal legal system.")

[7] U.S. CONST. amends. IX, X; s*ee also* Partlett, *supra* note 6, at 956 ("Constituent power in the United States is textually grounded in the 'alter or abolish' clauses in many state constitutions' Bills of Rights as well as the Preamble and Ninth, and Tenth Amendment of the US Constitution."); Amar, *supra* note 3, at 106–07 (arguing that the Preamble, along with the Ninth and Tenth Amendments, have a "close triangular interrelation . . . with strong popular sovereignty overtones").

[8] *See, e.g.*, *Chisholm v. Georgia*, 2 U.S. 419, 470–71 (1793) (""[T]he people, in their collective and national capacity, established the present Constitution . . . in establishing it, the people exercised their own rights, and their own proper sovereignty"); *Marbury v. Madison*, 5 U.S. 137, 176 (1803) ("That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis, on which the whole American fabric has been erected."); *Barron v. City of Baltimore*, 32 U.S. 243, 247 (1833) ("The constitution was ordained and established by the people of the United States for themselves, for their own government . . . The people . . . framed such a government . . . as they supposed best adapted to their situation and best calculated to promote their interests."); *League v. De Young*, 52 U.S. 185, 203 (1850) ("The Constitution of the United States was made by, and for the protection of, the people of the United States."); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts."); *Carter v. Carter Coal Co.*, 298 U.S. 238, 296 (1936) ("[T]he Constitution itself is in every real sense a law—the lawmakers being the people themselves, in whom under our system all political power and sovereignty primarily resides, and through whom such power and sovereignty primarily speaks."); *Afroyim v. Rusk*, 387 U.S. 253, 257 (1967) ("In our country the people are sovereign and the Government cannot sever its relationship to the people by taking away their citizenship."); *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (relying on the presumption that the United States is "a republic where the people are sovereign"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 794 (1995) (acknowledging "the critical postulate that sovereignty is vested in the people, and that sovereignty confers on the people the right to choose freely their representatives to the National Government.") (citing *Powell v. McCormack*, 395 U.S. 486, 541 n. 76 (1969)); *Gamble v. United States*, 587 U.S. 678, 688 (2019) ("[O]ur Constitution rests on the principle that the people are sovereign").

[9] *See* Rozann Rothman, *The Impact of Covenant and Contract Theories on Conceptions of the U.S. Constitution*, 10 PUBLIUS 149, 160 (1980) (stating that the Framers' deference to popular sovereignty "vitiated any grant of inherent power to the government" and that "[a]s the contract made clear, all governmental power was delegated and . . . a complicated representative structure set conditions for the exercise of power.").

[10] *Id*. ("These conditions [for the exercise of power by the government] constrained the exercise of power and reinforced dependence on the core notions of covenant, mutual obligation, reciprocity, and equality.").

as a 'principle,' which, in creating a representative government, has employed 'agents' to better realize its ends."[11] Whether or not viewing the Constitution as a contract is a particularly accurate or compelling analogy,[12] this subsidiary analogy within the contractarian framework—whereby the People act as principle and the state as their agent—expresses well the hierarchical relationship between the sovereign, dominant People and their constituted, subservient government in the American constitutional framework.[13] Utilizing this principal-agent analogy in the state constitutionalism context, Marshfield correctly observes that "[b]ecause . . . agents derive their authority entirely from the existing constitution, they implicitly lack the authority to destroy or replace the source of that power."[14] There is no apparent reason why such an implicit limitation should not also be binding upon those agents to whom authority is granted under the U.S. Constitution. Furthermore, given the distinction between constituent power and constituted power[15] (along with the widely accepted principle of popular sovereignty), it is readily evident that, in the United States, the ultimate source of the constituted power is the constituent power exercised by the sovereign People. Thus, within the American constitutional framework, it must stand as an incontrovertible truism that the government lacks the authority to destroy or replace the People. In the words of the German poet Bertholt Brecht, the government of the United States may not "dissolve the people and elect another."[16]

The implicit prohibition against the constituted, subservient government replacing or destroying the ultimate source of its power—the sovereign People—is more encompassing than a

---

[11] Mila Versteeg & Emily Zackin, *Constitutions Unentrenched: Toward an Alternative Theory of Constitutional Design*, 110 AM. POL. SCI. REV. 657, 658.

[12] *Compare* "From Thomas Jefferson to Edmund Randolph, 15 February 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-06-02-0228. [Original source: *The Papers of Thomas Jefferson*, vol. 6, *21 May 1781–1 March 1784*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1952, pp. 246–250.] ("[I]f the term *social contract* is to be forced from theoretical into practical use, I shall apply it to all the laws obligatory on the state, and which may be considered as contracts to which all the individuals are parties.") (emphasis in original) [NOT A PROPER BB CITE], *with* JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 352, at 318–19 (1833) (arguing that there is nothing in the Constitution "intimating it to be a compact, or in anywise providing for its interpretation, as such. On the contrary, the preamble emphatically speaks of it, as a solemn ordinance and establishment of government. The people do ordain and establish, not contract and stipulate with each other."). [QUESTIONABLE BB CITE, delete at pp.?]

[13] *See supra* note 8; *see also Geer v. Connecticut*, 161 U.S. 519, 529 (1896) (stating that a state government's powers over the common property in wildlife "is to be exercised, like all other powers of government, as a trust for the benefit of the people, and not as a prerogative for the advantage of the government as distinct from the people, or for the benefit of private individuals as distinguished from the public good" and thus "for the purpose of exercising this power, the state, . . . represents its people, and the ownership is that of the people in their united sovereignty."(citing *Martin v. Waddell's Lessee*, 41 U.S. 367 (1842)), *overruled on other grounds by Hughes v. Oklahoma*, 441 U.S. 322 (1979).

[14] Jonathan L. Marshfield, *Forgotten Limits on the Power to Amend State Constitutions*, 114 NW. UNIV. L. REV. 65, 79 (2019).

[15] Luigi Corrias, *Populism in a Constitutional* Key, 12 EUR. CONST. L. REV. 6, 15 (2016) (describing the nation as the "bearer" of constituent power, whereas "the constitution, legislature, executive, and judiciary" which "ultimately derive their power from the nation" are the constituted power).

[16] Bertolt Brecht, Poems 1913-1956, eds. John Willett and Ralph Manheim (Methuen 1976), p. 440. [FIX BB CITE]

mere prohibition against usurping the People's claim to sovereignty.[17] To further illustrate the obviousness of this proposition, a thought experiment may be beneficial. The Foreign Emoluments Clause prohibits any person "holding any Office of Profit or Trust" in the United States government from "accept[ing] . . . any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State" *unless* they receive "the Consent of the Congress."[18] Let us suppose that the government of a particularly powerful, wealthy, and populous country, such as the People's Republic of China (P.R.C.), promises a supermajority of the House of Representatives and the Senate wealth beyond their wildest dreams if they would only permit all emoluments to any government official.[19] Our hypothetical Congress is a particularly disloyal and flagrantly venal one and so opportunistically allows this broad exception to the Emoluments Clause for the P.R.C.'s government. The P.R.C.'s government then cuts very substantial checks not only to their new bought-and-paid-for U.S. Congress, but also to the top officials in our just as mercenary executive and judicial branches. However, like all political "donors," the government of the P.R.C. has a few requests to accompany their support for these politicians. First, they request full U.S. citizenship not only for everyone in the P.R.C., but the entire populations of every country in the BRICS bloc—which includes Brazil, Russia, India, the P.R.C., South Africa, Iran, Egypt, Ethiopia, and the United Arab Emirates—around 3.5 billion people.[20] "Our" government complies. Then, the P.R.C. requests that the United States facilitate the migration of roughly one billion of these people to America. Again, "our" government complies. Finally (and at this point the people that were previously the entirety of the American people are thoroughly irritated about all these changes), the P.R.C. requests that BRICS military forces be allowed to work with the U.S. military to occupy

[17] It should not be forgotten that in a wholly representative democracy or republic such as the United States, where the political system does not feature a mechanism for popular referendum, the People possess only a claim to sovereignty and may only normally exercise it in a very indirect manner through elections. Policy decisions are left entirely to the constituted government. Of course, the right to change their government by extraordinary or extralegal means is, at least supposedly, retained by the People. *See* THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) ("it is the Right of the People to alter or to abolish [government], and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness."). However, it cannot be denied that such extraordinary or extralegal means are generally difficult for the People to effectively wield, particularly when they remain unorganized or when the "abuses and usurpations" that they are subject to are deemed by the vast majority of the People to be tolerable (albeit still objectionable). *See Id.* ("Prudence, indeed, will dictate that Governments long established should not be changed for light and transient causes; and accordingly all experience hath shewn, that mankind are more disposed to suffer, while evils are sufferable, than to right themselves by abolishing the forms to which they are accustomed."). The upshot of this power dynamic is that so long as the juiciest fruit of sovereign power—the policy-making apparatus—remains within the privileged hands of the officials comprising the constituted government (and, by extension and more importantly, any minoritarian special interests that are disproportionately responsible for those officials' electoral successes) those officials have little incentive to disturb the constitutional order by usurping the People's nominal claim to sovereignty. That is especially true when the constituted government's policy-making apparatus is not sufficiently restrained to prevent officials and their minoritarian backers from bringing about a slow and steady usurpation of the People's sovereignty *sub silentio*.

[18] U.S. CONST. art. I, § 9, cl. 8.

[19] Suppose further, for the sake of the argument, that there is no law or constitutional provision among the several states which would prohibit any present or emolument from being made to state officials. The P.R.C. government is then able to buy off any state official they need to get on their side, and these officials do what is necessary at the state level to carry out whatever policies the P.R.C. desires to get out of our federal officials.

[20] *Brics: What is the group and which countries have joined*, BBC (Feb. 1, 2024), https://www.bbc.com/news/world-66525474

DEF_000595

unruly areas of the country Once again, "our" government complies.[21] BRICS forces soon put down the various malcontent groups throughout the United States; and, bolstered by the newly imported electorate, almost all incumbent government officials are reelected by wide margins in the next regularly held election.

All of this has occurred without any revision to the written constitution. Elections, as indicated, still regularly occur. We can imagine that our leaders would still proclaim that the People rule. But is what has just been described constitutional? If popular sovereignty is more than a mere parchment promise and a rhetorical sop to the *hoi polloi*, then this hypothetical scenario must surely qualify as a perverse inversion of a constitutional order based on popular sovereignty. The constituted government has eliminated the power of the People by opening its gates to a foreign multitude which dwarfs the People and a foreign army which has subjugated the People and brought them low. Such a result could hardly be described as anything but an unconstitutional usurpation whereby the agent has assumed the mantle of the principle by means of inviting a hostile takeover. Moreover, if we take popular sovereignty seriously, then this degradation cannot be cured by the government merely affixing the label of citizen to these invaders.

Of course, this exact scenario is clearly fantastical.[22] However, I will demonstrate that a conceptually similar usurpation has been perpetrated by the constituted government, and the People are well on their way to being replaced and having their sovereignty completely extinguished. But to validate this proposition, I must first identify and define the nature of the People when they exercised their sovereign, constituent power to ordain and establish the Constitution.

---

[21] Given what our hypothetical government has permitted thus far, why would they not also permit this? After all, those Chinese, Ethiopian, and Indian soldiers are just as much American citizens as any Marine from Kansas; and, more importantly, insurrection is brewing! Furthermore, such an action might even be given a fig leaf of textual support within the Constitution itself. *See* U.S. CONST. art. IV, § 4 (requiring the federal government to "guarantee to every State in this Union a Republican Form of Government, and . . . protect each of them against . . . domestic Violence."). That section's requirement that the federal government protect the states "against Invasion" could be argued to be inapplicable since, as previously stated, these foreign troops are also U.S. citizens, and it may be the case that, by definition, no one can invade a country they are a citizen of.

[22] One obvious objection to this scenario is that our government officials are more than content with taking substantial "donations" from wealthy American special interests, and that it is doubtful that a foreign government could ever exceed that largesse and win over our government officials. *See* Karl Evers-Hillstrom, *Most expensive ever: 2020 elections cost $14.4 billion*, OPEN SECRETS (Feb. 11, 2021, 1:14 PM), https://www.opensecrets.org/news/2021/02/2020-cycle-cost-14p4-billion-doubling-16/ ("Political spending in the 2020 election totaled $14.4 billion, more than doubling the total cost of the record-breaking 2016 presidential election cycle."); Jeffrey A. Winters & Benjamin I. Page, *Oligarchy in the United States?*, 7 PERSPECTIVES ON POLS. 731, 742 (2009) (noting that in election financing "the vast preponderance of money, some 80 percent of it, has generally come from a small 'donor class' constituting roughly one-tenth of 1 percent of the population."). This point is well-taken and readily conceded, and it will be shown that domestic minoritarian special interests can perpetrate similar usurpations. Nonetheless, regarding hypothetical foreign capture of our government through bribery, there may come a time when the United States is no longer a world superpower, and these wealthy special interests abandon the country or become destitute. In that scenario, our elected officials may become far more susceptible to foreign bribery. The Foreign Emoluments Clause was put in the Constitution for a reason. *See* THE FEDERALIST NO. 22, at XYZ (Alexander Hamilton) (XYZ ed., XYZyear) ("In republics, persons elevated from the mass of the community, by the suffrages of their fellow-citizens . . . may find compensations for betraying their trust . . . history furnishes us with so many mortifying examples of the prevalency of foreign corruption in republican governments.").

**The Historic American Nation**

In The Federalist No. 2, future inaugural Chief Justice John Jay sought to answer the question "whether it would conduce more to the interest of the people of America that they should, to all general purposes, be one nation, under one federal government, or that they should divide themselves into separate confederacies."[23] Jay, an ardent nationalist, vociferously argued for political unity, partly basing his argument on the benefits such unity would bring to the People given the geographical richness and contiguousness of the United States and its frontier lands which were ripe for agricultural and commercial exploitation.[24] However, Jay's call for political unity was based on far more salient facts than mere geography. Prefiguring Schmitt, Jay proposed that Americans must be politically united because they possess what Schmitt would later call "substantial equality" or "homogeneity."[25] Jay observed that Americans were:

> [A] people descended from the same ancestors, speaking the same language, professing the same religion, attached to the same principles of government, very similar in their manners and customs, and who, by their joint counsels, arms, and efforts, fighting side by side throughout a long and bloody war, have nobly established general liberty and independence.[26]

---

[23] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay).

[24] *See Id*. at XYZ ("[O]ne connected, fertile, widespreading country was the portion of our western sons of liberty . . . A succession of navigable waters . . . bind[s] it together; while the most noble rivers . . . present them with highways for the easy communication of friendly aids").

[25] SCHMITT, *supra* note 1, at 258–59 (arguing that "[p]olitical democracy . . . cannot rest on the inability to distinguish among persons," but can only survive "on the quality of belonging to a *particular people*. This quality of belonging to a people can be defined by very different elements (ideas of common race, belief, common destiny, and tradition). The *equality* . . . thus orients itself *internally*" and when such a democracy produces a state wherein citizens possess equal rights and obligations "democratic equality is a *substantial equality*.") (emphasis in original). *See also* Heiner Bielefeldt, *Carl Schmitt's Critique of Liberalism: Systematic Reconstruction and Countercriticism*, *in* LAW AS POLITICS: CARL SCHMITT'S CRITIQUE OF LIBERALISM 23, 27 (David Dyzenhaus ed., 1998) ("What ultimately counts in a genuine democracy, [Schmitt] says, is the sovereign authority of the collective unity of the people, a unity facilitated by, and resting on, some sort of 'substantial homogeneity.'").

[26] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay). Thus, Jay conceived of Americans as possessing *all* of the "different elements" that Schmitt suggested would provide the democratic "quality of belonging to a particular people." *See supra* note 25. However, as will be seen shortly, the most enduring and legally important of these elements would be the fact that Americans were "descended from the same ancestors," i.e., that Americans belonged to the White race. Indeed, it is almost certain that Jay had in mind a White, or pan-European, identity (as opposed to a British or Anglo-Saxon identity) when he wrote that Americans shared a common ancestry because Jay was himself of French Huguenot and Dutch descent (Hamilton was partially of French Huguenot descent), a fact that was oft remarked upon by his contemporaries. *See* Steven D. Griffin, The Effects of the Huguenot Diaspora on the American Revolution 149 (Oct. 6, 2016) (Master's Thesis, U.S. Army Command and General Staff College) (DTIC) ("John Jay, Alexander Hamilton, John Laurens, and Andrew Pickens, were quite aware of their shared [Huguenot] ancestry. It was a heritage remarked upon, in the historical and contemporary sense, by non-Huguenots like Ben Franklin, John Adams, John Rutledge, and Charles Pinckney, along with other, less-renowned contemporaries."). Furthermore, this Huguenot heritage may have made Jay more open to the idea of basing American national identity on pan-European grounds. *See id*. at 149–50 (discussing the "collective, chameleon-like ability [of Huguenots] to successfully acculturate" into European groups "sharing some aspect of the Christian tradition."). However, Jay was also an adamant anti-Catholic and his view of Americans as "professing the same religion" would likely, to his mind, have reflected the Protestant nature of 18th century America. *See id*. at 53, 77 (referring to Jay as "one of the most devout of the Founding Fathers" and noting his "hatred and distrust" of Catholics and "vehement" opposition to defending Catholic rights).

After noting both the unified character of America's geography and its demography, Jay, with rhetoric that may strike the modern reader as reminiscent of 20th century "blood and soil" nationalism, connected the two unities, stating that "[t]his country and this people seem to have been made for each other."[27] Expounding on this perceived connection between country and people and the need for political unity, Jay proffered that America's present situation was divinely ordained, and that "it appears as if it was the design of Providence, that an inheritance so proper and convenient for a band of brethren, united to each other by the strongest ties, should never be split into a number of unsocial, jealous, and alien sovereignties."[28] In Federalist No. 2, Jay clearly conceives of Americans as a singular, politically sovereign population with a sense of shared kinship, culture, common identity, history, and fate; thus, under Gat & Yakobson's definition of "nation," American identity is of a national character.[29] It was this national character of late 18th century Americans that formed the foundation of the rhetorical edifice constructed by The Federalist in which Jay, Hamilton, and Madison defended the Constitution and advocated for its ratification by the sovereign People.[30] This national unity was a "term" or a "material fact" upon which the "contract" was accepted.

Even Thomas Jefferson, an individual commonly grouped with the Anti-Federalists,[31] undoubtedly viewed the nascent American republic as resting not merely on a national foundation, but upon a national foundation that was explicitly racial in nature. Despite being a slaveowner, Jefferson, in his *Notes on the State of Virginia*, made it clear that he believed the abolition of slavery would be necessary to maintain America's republican spirit.[32] However, although

---

[27] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay). Cf. Adolf Hitler, Ger. Führer & Chancellor, Speech "On National Socialism and World Relations" Delivered in the German Reichstag (Jan. 30, 1937), *in* CALVIN UNIV. GER. PROPAGANDA ARCHIVE, https://research.calvin.edu/german-propaganda-archive/hitler1.htm (last visited Oct. 19, 2024) ("The main plank in the National Socialist program is to abolish the liberalistic concept of the individual and the Marxist concept of humanity and to substitute therefore the folk community, rooted in the soil and bound together by the bond of its common blood.").

[28] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay)

[29] *See supra* note 1.

[30] *See also* THE FEDERALIST NO. 14, at XYZ (James Madison) (XYZ ed., XYZyear) (calling upon readers to "[h]earken not to the unnatural voice which tells you that [Americans], knit together as they are by so many cords of affection, can no longer live together as members of the same family; . . . [and] can no longer be fellow citizens of one great, respectable, and flourishing empire."); *Id.*, at XYZ ("[T]he kindred blood which flows in the veins of American citizens, the mingled blood which they have shed in defense of their sacred rights, consecrate their Union, and excite horror at the idea of their becoming aliens, rivals, enemies."); THE FEDERALIST NO. 22, *supra* note 22, at XYZ (Alexander Hamilton) ("The fabric of American empire ought to rest on the solid basis of THE CONSENT OF THE PEOPLE. The streams of national power ought to flow immediately from that pure, original fountain of all legitimate authority.") (emphasis in original).

[31] *But see* Michael J. Faber, *Thomas Jefferson, Federalist*, 128 VA. MAG. HIST. & BIOGRAPHY 282, 283 (2020) (acknowledging that "[b]ecause Jefferson advocated adding a bill of rights to the proposed Constitution, and because he later became the chief figure in the opposition party in the 1790s, he is easy to mistake for an Anti-Federalist. He is often identified as such in history textbooks and other places;" but nonetheless arguing that "Jefferson, though he had his doubts, clearly and unequivocally favored ratification of the Constitution. His position offers considerable insight into the Federalist position.").

[32] THOMAS JEFFERSON, NOTES ON THE STATE OF VIRGINIA XYZ (XYZ) ("Query 18 "Manners") (arguing that slavery had a negative influence on slaveowners, particularly their children who "catch[] the lineaments of wrath, put on the same airs [as their parents] in the[ir] circle of smaller slaves, . . . and thus nursed, educated, and daily exercised in tyranny, cannot but be stamped by it with odious peculiarities."); *see also Id.* (arguing further that slavery destroyed

DEF_000598

Jefferson may have been (at least rhetorically) committed to abolition, he made no such commitments to integration and racial equality. To the contrary, Jefferson firmly believed that Black slaves, once freed, would have to be excluded from American society, lest the nation risk interracial conflict[33] and racial pollution.[34] Indeed, despite (or perhaps, also, due to) being a cosmopolitan polymath, Jefferson's opinions on Blacks might be reasonably described by modern readers as the most blunt—and even crude—of all the well-known Founders.[35] His views on American Indians were not much kinder.[36] For all that is made today of Jefferson's writing in the Declaration of Independence of the supposedly self-evident truth "that all men are created equal, that they are endowed by their Creator with certain unalienable Rights,"[37] it is often forgotten that Jefferson, in the very same document, concluded his list of grievances against the Crown by castigating the British for having "endeavoured to bring on the inhabitants of our frontiers, the merciless Indian Savages, whose known rule of warfare, is an undistinguished destruction of all ages, sexes and conditions."[38]  Regardless, Jefferson shared the expansionist aims of the leading Federalists, and argued forcefully that disunity between the states should not be permitted to result in subnational secession, and that the United States "must be viewed as the nest from which all America, North and South is to be peopled."[39] Expansion was to be carried out on a purely monoracial and nationalist basis.[40] Under Jeffersonian grand strategy, to ensure a workforce for

the work ethic of slaveowners and that American's faith that their "liberties are of the gift of God" would be destroyed when, "under the auspices of heaven," there would be "a total emancipation" which Jefferson hoped would occur "with the consent of the masters, rather than by their extirpation."). [REDO CITE WHEN HAVE PRINTCOPY]

[33] I*d*. at XYZ (Query 14 "Laws") (arguing that Blacks could not be made citizens because White prejudice, in addition to "ten thousand recollections, by the blacks, of the injuries they have sustained; new provocations; the real distinctions which nature has made; and many other circumstances, will divide us into parties, and produce convulsions which will probably never end but in the extermination of the one or the other race.").

[34] *Id*. at XYZ ("Among the Romans emancipation required but one effort. The slave, when made free, might mix with, without staining the blood of his master. But with us a second is necessary, unknown to history. When freed, he is to be removed beyond the reach of mixture.").

[35] *See, e.g., id*. at XYZ (describing Whites as more beautiful than Blacks given, *inter alia*, the "immoveable veil of black which covers all the emotions of the other race;" remarking that Blacks have a "very strong and disagreeable odour" and "seem to require less sleep" than Whites due to various anatomical differences; and arguing that Blacks are "in memory . . . equal to the whites; in reason much inferior, as I think one could scarcely be found capable of tracing and comprehending the investigations of Euclid; and that in imagination they are dull, tasteless, and anomalous."). *Notes on the State of Virginia* was a widely published book, and Jefferson felt no compunction about expressing these viewpoints publicly. Moreover, there is little evidence that the People had any compunction with electing him to the presidency despite him having expressed these viewpoints publicly. In other words, Jefferson was likely simply expressing (albeit, in his own unique way) what was the commonly held, noncontroversial racial worldview of contemporary Americans.

[36] *See id*. at XYZ (Query 11 "Aborigines") ("I know of no such thing existing as an Indian monument: for I would not honour with that name arrow points, stone hatchets, stone pipes, and half-shapen images . . . I think there is no remain as respectable as would be a common ditch for the draining of lands.").

[37] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776)

[38] *Id*. at para. 29.

[39] "From Thomas Jefferson to Archibald Stuart, 25 January 1786," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-09-02-0192. [Original source: *The Papers of Thomas Jefferson*, vol. 9, *1 November 1785–22 June 1786*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1954, pp. 217–219.]

[40] *See* "From Thomas Jefferson to James Monroe, 24 November 1801," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-35-02-0550. [Original source: *The Papers of Thomas Jefferson*, vol. 35, *1 August–30 November 1801*, ed. Barbara B. Oberg. Princeton: Princeton University Press, 2008,

DEF_000599

the burgeoning United States, and provide a steadily growing population with which to settle its ever-growing frontiers, emancipation and "deportation" of freed Blacks would occur "peaceably and in such slow degree as that the evil will wear off insensibly, and their place be pari passu filled up by free white laborers."[41]

But White nationalism was not merely the idiosyncratic worldview of Jefferson and the leading Federalists. As Chin & Finkelman show, "whether or not they supported slavery, a majority of [the Founders] unambiguously conceived of the United States as a White country."[42] To create this White country—and encourage its expansion—an appropriate immigration and naturalization policy would have to be fashioned. Indeed, the Founders were not rabid nativists and understood the importance of permitting immigration.[43] One of Jefferson's grievances in the

pp. 718–722.] (explaining his hope that the United States would "cover the whole Northern, if not the Southern continent with a people speaking the same language, governed in similar forms, & by similar laws" but that he could not "contemplate, with satisfaction, either blot or mixture on that surface.").

[41] "Thomas Jefferson's Notes on Early Career (the so-called "Autobiography"), [6 January–29 July 1821], with editorial note on the Notes on Early Career (the so-called "Autobiography")," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/03-17-02-0324-0002. [Original source: *The Papers of Thomas Jefferson*, Retirement Series, vol. 17, *1 March to 30 November 1821*, ed. J. Jefferson Looney et al. Princeton: Princeton University Press, 2020, pp. 309–380.] Jefferson's belief that emancipation should be followed by the removal of newly freed Blacks from the United States was shared by many of his contemporaries. The American Society for Colonizing the Free People of Color of the United States (ACS), was founded in 1816 "by a group of white elites including Reverend Robert Finley, Charles Fenton Mercer, Henry Clay, Daniel Webster, Bushrod Washington, Elias Caldwell, and Francis Scott Key" who were dedicated to freeing enslaved Blacks and then deporting them. *See* Morgan Robinson, *The American Colonization Society*, WHITE HOUSE HIST. ASS'N, https://www.whitehousehistory.org/the-american-colonization-society (last visited Oct. 20, 2024). ACS members, "an unusual mix of abolitionists and enslavers," all "agreed that free Black people would never be accepted as equals in the United States" and that Blacks and Whites "could not peacefully co-exist in society;" and thus, "the organization sought to create and settle a colony in West Africa to fulfill its mission." *Id*. Presidents Jefferson, Madison, and Monroe all supported the ACS politically, financially, or through their personal energies (Madison, for example, served as the ACS's third president from 1833 until his death in 1836). *Id*. Chief Justice John Marshall, who "feared slavery would split his state and country," was also a backer of the ACS. *See John Marshall (1755-1835)*, WM. & MARY LIBRS., https://scrc-kb.libraries.wm.edu/john-marshall-1755-1835 (last visited Oct. 20, 2024).

[42] Gabriel J. Chin & Paul Finkelman, *The "Free White Person" Clause of the Naturalization Act of 1790 as Super-Statute*, 65 WM. & MARY L. REV. 1047, 1048 (2024).

[43] However, this is not to imply that—aside from the racial restrictions they would put on immigration and naturalization—the founders supported an unlimited immigration policy; and all of them would likely have understood that even European immigration could be dangerous if not properly circumscribed. *See, e.g.,* "The Examination Number VIII, [12 January 1802]," *Founders Online,* National Archives, https://founders.archives.gov/documents/Hamilton/01-25-02-0282. [Original source: *The Papers of Alexander Hamilton*, vol. 25, *July 1800–April 1802*, ed. Harold C. Syrett. New York: Columbia University Press, 1977, pp. 495–497.] (agreeing with Jefferson that "that foreigners will generally be apt to bring with them attachments to the persons they have left behind; to the country of their nativity, and to its particular customs and manners" and that there was a risk that they would lack "that temperate love of liberty, so essential to real republicanism;" and arguing further that the U.S. has "already felt the evils of incorporating a large number of foreigners into their national mass; it has served very much to divide the community and to distract our councils, by promoting in different classes different predilections in favor of particular foreign nations, and antipathies against others" but nonetheless stating that these observations were not a call "for a total prohibition of the right of citizenship to strangers, nor even for the very long residence which is now a prerequisite to naturalization, and which of itself, goes far towards a denial of that privilege."). And of course, as previously explained, there was always tension between the monoracial White nationalism of certain Founders and the existence of slavery, particularly with regard to its Constitutional entrenchment in Article V's provision that no amendment could be made before 1808 altering the first clause of Article

103

Declaration of Independence was that the Crown prevented the "population of these States" by obstructing immigration and failing to pass "Laws for Naturalization of Foreigners" in order to block American frontier expansion.[44] The Constitution itself permits Congress to "establish a uniform Rule of Naturalization."[45] Moreover, "everyone at the Convention would have understood that a 'uniform Rule of Naturalization' would be tied to race."[46] Thus, the 28th law passed by the first Congress—crucially, preceding the ratification of the Bill of Rights—was the Naturalization Act of 1790.[47] That act, promptly signed into law by President Washington, limited naturalization to "any alien, being a free white person, who . . . is a person of good character" upon their "taking the oath or affirmation prescribed by law, to support the constitution of the United States."[48] Given the timing of the 1790 act, this language is important supplemental evidence (in addition to the writings of the leading Federalists and Jefferson) to support the characterization of the People as belonging exclusively to the White race. Moreover, although the 1790 act was eventually amended and superseded, the racial restriction on naturalization remained for more than 160 years.[49]

Along with the founders, the basic foundational principle of White nationalism would continue to be respected and reinforced by American jurists for generations to come. Numerous antebellum court opinions relied on White nationalism as a guiding legal principle. In 1857, the Supreme Court, in an opinion written by Chief Justice Roger Taney, would rule that, under the

---

I, Section 9 which prevented Congress from interfering with "[t]he Migration or Importation of such Persons as any of the States now existing shall think proper to admit" before 1808, an oblique reference to the African slave trade. U.S. CONST. art. I, § 9, cl. 1; *id*. art V. On the other hand, the slave trade was outlawed as quickly as possible pursuant to these Constitutional provisions. *See* Act Prohibiting Importation of Slaves of 1807, Pub. L. No. 9-22, 2 Stat. 426 (declaring it to be illegal "from and after [Jan. 1, 1808] to import "any negro, mulatto, or person of colour, with intent to hold, sell, or dispose of such . . . as a slave, or to be held to service or labour."). Indeed, Congress had gone far to eliminate the slave trade by 1794 when it prohibited American vessels from being prepared or used for the slave trade. *See* Slave Trade Act of 1794, Pub. L. No. 3-11, 1 Stat. 347.

[44] *See* THE DECLARATION OF INDEPENDENCE para. 9 (U.S. 1776).

[45] U.S. CONST. art. I, § 8, cl. 4.

[46] Chin & Finkelman, *supra* note 42, at 1067.

[47] *Id*.

[48] Naturalization Act of 1790, ch. 3, 1 Stat. 103. The requirement that prospective naturalized citizens publicly swear to take an oath "to support and defend the Constitution and the laws of the United States against all enemies, foreign and domestic" is still a part of U.S. naturalization law, in addition to a requirement that the prospective naturalized citizen "renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which the applicant was before a subject or citizen." 8 U.S.C. § 1448(a).

[49] *See Ozawa v. United States*, 260 U.S. 178, 192–93 (1922) ("In all of the naturalization acts from 1790 to 1906 the privilege of naturalization was confined to white persons . . . although the exact wording of the various statutes was not always the same."). In 1870, during the fervor of Reconstruction, the Senate voted narrowly (21-20) to insert a provision into what would become the Naturalization Act of 1870 which would permit the naturalization of "aliens of African nativity and to persons of African descent." Chin & Finkelman, *supra* note 42, at 1102. Nonetheless, no other non-White group was permitted to naturalize, and (in addition to the practical difficulties barring the migration of Africans to the United States in the late 19th century) "[w]hile nominally favored in this way" U.S. immigration law "consistently discriminated against persons of African ancestry" until decades later. *Id*. at 1102 n.313. These laws would remain in effect until 1952 when "in part as a response to the Cold War and the integration of post-war Japan into the emerging western alliance, the United States eliminated all racial restrictions on naturalization, while at the same time continuing ethnic and racial restrictions on immigration through national origins quotas." *Id*. at 1110. There would not be "race neutrality [in] the immigration stream" until the passage of the 1965 Immigration and Naturalization Act (Hart-Celler Act) and the abolition of the national origins quota system. Gabriel J. Chin & Douglas M. Spencer, *Did Multicultural America Result from a Mistake - The 1965 Immigration Act and Evidence from Roll Call Votes*, 2015 UNIV. ILL. L. REV. 1239, 1241 (2015).

DEF_000601

U.S. Constitution, Blacks (and, presumably, all non-Whites) "had no rights which the white man was bound to respect."[50] Furthermore, as Chin & Finkelman show, Chief Justice Taney "was not alone in arguing for the importance . . . of the exclusively White nature of the political community," and numerous state and territorial court decisions came to similar conclusions.[51] Importantly, not all of these states and territories would come to secede and form the core states of the Confederacy. For example, in 1853 the Supreme Court of the Territory of Oregon ruled that "[a]ll which tends to prevent immigration, the free occupation and use of the country by whites, must be considered as repealed" and that "[w]hatever militates against the true interests of a white population is inapplicable" in upholding the conviction of an American Indian for violating a provision of an 1834 act of Congress which designated Oregon as "Indian country" and prohibited the sale of liquor therein to Indians.[52] Despite Oregon having been substantially settled by Whites in the interim, and "[v]ery much of the act of 1834" being "clearly unsuited to the present condition of the country," the court reasoned that the provision against selling liquor to Indians should still be upheld because if that provision was "required in a country wholly inhabited by Indians," then there was even more necessity for the provision now "where defenceless white persons, women and children, are exposed to the violence of drunken savages."[53] Similarly, in the same year, the Supreme Court of Pennsylvania ruled in dicta that "[w]henever the white population, who settled this Commonwealth, . . . think proper to admit into political partnership either the black population of Africa or the red aborigines of America, they have a right to do so."[54] However, the court continued, "[u]ntil this be done, the negro and the Indian must be content with the privileges extended to them, without aspiring to the exercise of the elective franchise, or to the right to become our legislators, judges and governors."[55] That territorial and state courts at both ends of the continent would validate White nationalism in the middle of the 18th century could hardly come as a surprise given how, three decades earlier, the Court, in an opinion by Chief Justice Marshall, gave judicial sanction to the conquest of the West by Whites in a race war.[56]

---

[50] *Dred Scott v. Sandford*, 60 U.S. 393, 407 (1857), *superseded by constitutional amendment*, U.S. CONST. amend. XIV. Chin & Finkelman criticize Chief Justice Taney for ignoring "that free Black persons voted in a majority of the states ratifying the Constitution and in two of the three states admitted to the Union in the 1790s." Chin & Finkelman, *supra* note 41, at 1063. However, this fact is completely inapposite because Taney applied the U.S. Constitution in *Dred Scott*. Indeed, the conceded fact that Blacks could not vote in many states (in addition to the fact that most Blacks in the United States in 1857 were enslaved) *reinforces* Taney's argument that government was not "bound" to grant rights to Blacks (enslaved or free). As Chin & Finkelman themselves show, "[w]hile Connecticut enfranchised Black people at the Founding, this right disappeared with the adoption of the Connecticut Constitution of 1818, which granted the privilege only to 'white male citizen[s].'" *Id.*, at 1090 n.241. The Connecticut example proves that, in the antebellum period, whatever rights Blacks, or any other non-Whites, possessed existed at the pleasure of the governments which granted them those rights, and could be revoked through regular amendment processes (or, if the rights were statutory in origin, through mere legislative change). *Dred Scott* is correctly maligned for other reasons; but, as a matter of first principles, the Chief Justice was correct on this issue.

[51] Chin & Finkelman, supra note 41, at 1090.

[52] *United States v. Tom*, 1 Or. 26, 27 (1853)

[53] *Id.* at 27–28.

[54] *Foremans v. Tamm*, 1 Grant 23, 23 (Pa. 1853)

[55] *Id*.

[56] *See Johnson's Lessee v. M'Intosh*, 21 U.S. 543, 590 (1823) (arguing that "the tribes of Indians inhabiting this country were fierce savages, . . . [t]o leave them in possession of their country, was to leave the country a wilderness; to govern them as a distinct people, was impossible;" thus, "Europeans were under the necessity . . . of enforcing [their] claims by the sword, . . . or of remaining in their neighbourhood, and exposing themselves and their families

Not even the presidency of Abraham Lincoln and Reconstruction would bring the force of White nationalism to an end. Clearly, by modern standards, "the Great Emancipator" cannot be considered a racial egalitarian. It was Lincoln who said, in the fourth Lincoln-Douglas debate in Charleston, Illinois in 1858, that he was not "in favor of bringing about in any way the social and political equality of the white and black races" nor was he "in favor of making voters or jurors of negroes, nor of qualifying them to hold office, nor to intermarry with white people."[57] Lincoln justified these beliefs by pointing to "a physical difference between the white and black races" which he believed would "forever forbid the two races living together on terms of social and political equality."[58] Indeed, Lincoln "endorsed colonization [i.e., deporting freed Blacks] earlier in his life and even during his presidency."[59] In August, 1862, almost a year before the Battle of Gettysburg would mark the turning point of the Civil War, Lincoln invited "a committee of colored men" to the White House where he told them that Whites and Blacks "are different races" and "have between us a broader difference than exists between almost any other two races" which "is a great disadvantage to us both."[60] All of this belies Ackerman's assertion that, had it not been for his assassination, Lincoln would have "proudly signed" the Reconstruction acts which his successor vehemently opposed.[61]

Like Lincoln, Justice John Marshall Harlan, "the Great Dissenter," must also be counted among the nationalists and racists of American history. In his famed dissent in *Plessy*, the first Justice Harlan goes to great lengths to make his (rather curious) view clear that "social equality" between the races was not at issue in *Plessy*[62] and that, regardless, Whites were "the dominant race"[63] in America. In one passage, Justice Harlan states that "[s]ixty millions of whites are in no danger from the presence here [in America] of eight millions of blacks" which, of course, raises the question of whether they would be in danger if the demographic situation were to be reversed.[64]

---

to the perpetual hazard of being massacred."). Chief Justice Marshall's pithy and conclusory narrative summation of the conflict between Indians and Whites (almost, as if, the conflict was not still ongoing) sounds not in "justice," but in militant nationalism: "Frequent and bloody wars, in which the whites were not always the aggressors, unavoidably ensued. European policy, numbers, and skill, prevailed. As the white population advanced, that of the Indians necessarily receded." *Id*. And so, the Chief Justice ruled that, if the right of conquest is "asserted in the first instance, and afterwards sustained; if a country has been acquired and held under it; if the property of the great mass of the community originates in it, it becomes the law of the land, and cannot be questioned." *Id*. at 591.

[57] https://home.nps.gov/liho/learn/historyculture/debate4.htm [FIX BB CITE]

[58] *Id*. Furthermore, Lincoln stated: "inasmuch as they cannot so live, while they do remain together there must be the position of superior and inferior, and I as much as any other man am in favor of having the superior position assigned to the white race." *Id*.

[59] *See* Robinson, *supra* note 41.

[60] https://www.presidency.ucsb.edu/documents/address-colonization-deputation-colored-men. [FIX BB CITE] Lincoln also told his Black guests that American Whites "suffer from your presence" and that "[b]ut for your race among us there could not be war, although many men engaged on either side do not care for you one way or the other;" he concluded, "[i]t is better for us both, therefore, to be separated." *Id*.

[61] *See* Bruce Ackerman, *The Living Constitution*, 120 HARV. L. REV. 1737, 1767 (2007).

[62] *Plessy v. Ferguson*, 163 U.S. 537, 561 (1896) (Harlan, J., dissenting) (arguing that "social equality no more exists between two races when traveling in a passenger coach or a public highway than when members of the same races sit by each other in a street car or in the jury box").

[63] *Id*. at 562.

[64] *Id*. at 560. *See also* Michael T. Kaufman, *12 White Teachers and Children Killed by Guerillas in Rhodesia*, N.Y. TIMES ARCHIVE (June 25, 1978), https://www.nytimes.com/1978/06/25/archives/12-white-teachers-and-

DEF_000603

Moreover, although Justice Harlan may have been a defender of  Black rights,[65] he had no such commitment to equality when it came to Chinese.[66] Perhaps nothing else demonstrates the enduring relevancy of White nationalism in the American political fabric in the postbellum period than the fact that, nearly sixty years after Appomattox, the Republican candidate in the 1924 Presidential election had, three years prior as the sitting Vice President, written an article in *Good Housekeeping* arguing that"[t]here are racial considerations too grave to be brushed aside for sentimental reasons" and that "[q]uality of mind and body suggests that observance of ethnic law is as great a necessity to a nation as immigration law."[67] His Democratic opponent, on the other hand, would in 1952 argue on behalf of the segregated school district in the first of the *Brown v. Board of Education* companion cases.[68] Thus, it would appear that generations after the Civil War and Reconstruction, Americans were still in broad agreement regarding the nationalistic nature of the constitutional order and the White race's position of primacy therein.

Of course, the most obvious reason why White nationalism maintained itself in American law and politics for more than a century and a half after the ratification of the Constitution is the simple demographic fact that, during this time, the United States was a supermajority White country. In defending their accurate characterization of the 1790 Naturalization Act as a "super-statute,"[69] Chin & Finkelman note that the act "helps explain why, for example, as late as 1960, more than 99 percent of Americans were White or Black."[70] While this statement is unquestionably true, it obfuscates the fact that in 1960 the country was 88.8 % White and had reached "peak

children-killed-by-guerrillas-in-rhodesia.html (Twelve people, . . . all whites, were battered and bayoneted to death by black nationalists . . . Autopsies have not yet been performed, but the bodies of the women were in partial undress and there was a suggestion that they had been sexually assaulted.").

[65] *But see Pace v. Alabama*, 106 U.S. 583, 585 (1883) (where Justice Harlan joined a unanimous Court in upholding an Alabama anti-miscegenation law, with the Court reasoning that the law was not discriminatory because it "includes the offense when the persons of the two sexes are both white and when they are both black" and "applies the same punishment to both offenders, the white and the black."); *Cumming v. Bd. of Ed. of Richmond Cnty.*, 175 U.S. 528, 545 (1899) (Harlan, J.) (upholding a segregated schooling scheme and ruling that "the education of the people in schools maintained by state taxation is a matter belonging to the respective states, and any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of rights").

[66] *See Plessy*, 163 U.S. at 561 (Harlan, J., dissenting) ("There is a race so different from our own that we do not permit those belonging to it to become citizens of the United States. Persons belonging to it are, with few exceptions, absolutely excluded from our country. I allude to the Chinese race."); *United States v. Wong Kim Ark*, 169 U.S. 649, 707 (1898) (Field, J., dissenting) (Justice Harlan joining Justice Fields's dissent which stated that "[n]ationality is essentially a political idea, and belongs to the sphere of public law" and argued that Wong Kim Ark, who was born in the U.S., should not be granted citizenship pursuant to the Fourteenth Amendment because his parents were Chinese subjects); *Chae Chan Ping v. United States*, 130 U.S. 581, 606 (1889) (Justice Harlan joining a unanimous court in upholding the Chinese Exclusion Act and ruling that if Congress "considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be dangerous to its peace and security, their exclusion is not to be stayed").

[67] Calvin Coolidge, *Whose Country is This?*, GOOD HOUSEKEEPING, Feb., 1921, at 14 ("Biological laws tell us that certain divergent people will not mix or blend. The Nordics propagate themselves successfully. With other races, the outcome shows deterioration on both sides.")

[68] *Briggs v. Elliott*, 342 U.S. 350 (1952).

[69] *See* William N. Eskridge, Jr. and John Ferejohn, *Super-statutes*, 50 DUKE L. J. 1215, 1216 (2001) (defining a super-statute as a law or series of laws that "(1) seeks to establish a new normative or institutional framework for state policy and (2) over time does "stick" in the public culture such that (3) the super-statute and its institutional or normative principles have a broad effect on the law" which goes "beyond the four corners of the statute.").

[70] Chin & Finkelman, *supra* note 42, at 1048.

DEF_000604

Whiteness" in 1940 when the country was 89.8% White.[71] Remarkably, the United States had gotten steadily more White since 1790, when the White population was only 80.7% of the country's total population.[72] Obviously, when evaluating the effectiveness of the 1790 act, given that the purpose of the act was to make the United States a homogenous White country,  the percentage of Whites, standing alone, is a far more important statistic to relay than the percentage of Whites and Blacks together.

Regardless, as Chin & Spencer observe, the demise of racial immigration restrictions with the 1965 Hart-Celler Act (and one should also note, a massive increase in illegal infiltration[73] and the fact of differential birth rates[74]) has set the United States on a course to become a majority non-White country by 2043.[75] All of this has occurred despite the fact that the People, as originally conceived,[76] never asked to be made a minority,[77] and a significant portion of them are revolted by that potential eventuality.[78] Indeed, when the People are informed of demographic statistics and trends, many come to view this process as a "collective existential threat."[79]

[71] Campbell Gibson & Kay Jung, *Historical Census Statistics on Population Totals By Race, 1790 to 1990, and by Hispanic Origin, 1970 to 1990, for the United States, Regions, Divisions, and States,* 19 tbl. 1 (U.S. Census Bureau, Working Paper No. 56, 2002).

[72] *Id*.

[73] *See* AVIVA CHOMSKY, UNDOCUMENTED: HOW IMMIGRATION BECAME ILLEGAL 184 (2014) (noting that "all types of immigration from Latin America rose after 1965: temporary and permanent, legal and illegal"); Ashley Wu, *Why Illegal Border Crossings Are at Sustained Highs*, N.Y. TIMES (Oct. 29, 2023), https://www.nytimes.com/interactive/2023/10/29/us/illegal-border-crossings-data.html (showing that the three years with the most number of annual southwestern border apprehensions in the 21st century occurred in 2021, 2022, and 2023).

[74] Jeffrey S. Passel et al., Explaining Why Minority Births Now Outnumber White Births, PEW RSCH. CTR. (May 17, 2012), https://www.pewresearch.org/social-trends/2012/05/17/explaining-why-minority-births-now-outnumber-white-births/ (showing the White and Asian fertility rate at 1.8, the Black rate at 2.1, and the Hispanic rate at 2.4). *See also* Sabrina Tavernise, *Fewer Births Than Deaths Among Whites in Majority of U.S. States*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/us/white-minority-population.html (reporting findings that "[d]eaths began to exceed births for whites countrywide in 2016").

[75] Chin & Spencer, *supra* note 49, at 1242 (citing Press Release, U.S. Census Bureau, U.S. Census Bureau Projections Show a Slower Growing, Older, More Diverse Nation a Half Century from Now (Dec. 12, 2012), https://www.census.gov/newsroom/releases/archives/population/cbl2-243.html).

[76] That is, White Americans.

[77] Jeffrey M. Jones, *Sharply More Americans Want to Curb Immigration to U.S.*, GALLUP (July 12, 2024), https://news.gallup.com/poll/647123/sharply-americans-curb-immigration.aspx (showing that from 1965 to the late 1990s, less than 10% of Americans wanted increased levels of immigration, and 55% of Americans now want immigration levels reduced).

[78] *See* Jens Manuel Krogstad et al., *Most Americans say the declining share of White people in the U.S. is neither good nor bad for society*, PEW RSCH. CTR. (Aug. 23, 2021), https://www.pewresearch.org/short-reads/2021/08/23/most-americans-say-the-declining-share-of-white-people-in-the-u-s-is-neither-good-nor-bad-for-society/ (finding more than double the number of White Americans explicitly say "White people declining as a share of the U.S. population" is somewhat bad or very bad "for society" than say it is somewhat good or very good); Kim Parker et al., *Looking to the Future, Public Sees an America in Decline on Many Fronts*, PEW RSCH. CTR. (Mar. 21, 2019), https://www.pewresearch.org/social-trends/2019/03/21/public-sees-an-america-in-decline-on-many-fronts/ (reporting that 46% of White Americans "say a majority nonwhite population will weaken American culture" whereas only 23% say it will strength it).

[79] *See* Hui Bai & Christopher M. Federico, *Collective existential threat mediates White population decline's effect on defensive reactions*, 23 GRP. PROCESSES & INTERGROUP RELS. 361, 374 (2019) (reporting findings which suggest

DEF_000605

What, then, is the substantive legal difference between the demographic change described in the thought experiment above, and the way demographics have actually changed in America? The results of the two will be the same: the People, as once defined, will be replaced, without their consent, with another people—who will then make the electoral decisions[80] and serve as the country's political leaders[81]—via policy decisions (and omissions) by the constituted government. By any means, such a process entails an illegitimate revolution. The only notable differences between reality and the hypothetical are in the degree to which the illegitimate revolution has occurred (Whites becoming a mere minority in 2043 does not necessarily mean they will occupy the same population ratio as outlined in the thought experiment)[82] and the pace of the revolution. But one illegality done less dramatically (and more imperceptibly) than another illegality hardly legitimizes the former.

The People still have a valid, inextinguishable claim to sovereignty in our country. More importantly, our numbers and talents are such that—if we are united—we can maintain this sovereignty despite what has transpired and restore ourselves to a position of undisputed control over the constituted power. To do so will obviously require tremendous political efforts, but those efforts are worth it to retain the nation which our Founders bequeathed to us, their posterity. But once our restoration is complete, we cannot permit such illegitimate demographic revolutions to ever again threaten our security and power in our ancestral homeland. To that end, constitutional changes will have to be made.

that exposure to information about White population decline "does not merely trigger the threat considered in most studies of demographic change, that is, status threat; . . . it may additionally elicit fears that the ingroup will actually cease to exist.")

[80] Non-Whites have a dramatic effect on the electoral results in America. For example, 538's new "Swing-O-Matic" tool allows users to alter various demographics to see how the 2024 election might play out under different conditions. Using data which reflects "vote preference and turnout levels from 2020's matchup between Trump and President Joe Biden, adjusted for demographic shifts since then" one can see that Vice President Kamala Harris would win the election with 303 electoral votes and 51% of the popular vote. However, if turnout levels are changed so that the non-White electorate turns out at the lowest allowable level in the simulator (1%), former President Donald Trump is predicted to win with 326 electoral votes and 54% of the popular vote. On the other hand, if the White turnout is set to 1%, then Vice President Harris would win with an astonishing 507 electoral votes and 67% of the popular vote. *See* Elliot Morris et al., *What Would It Take To Turn Blue/Red States Red/Blue?*, ABC News: 538, https://projects.fivethirtyeight.com/2024-swing-the-election/ (last visited Oct. 23, 2024 9:30 PM).

[81] The 2024 Presidential election will feature one such individual, Vice President Kamala Harris, who is the daughter of two non-White immigrants and who was born in this country when neither of her parents were American citizens (thus providing her citizenship by birth pursuant to the Supreme Court's interpretation of the Fourteenth Amendment's Citizenship Clause in *Wong Kim Ark*). However, it is worth noting how the effects of demographic change (and changes in conventional attitudes on race and nationalism) are reflected in the rhetoric of both candidates. *Compare* Vice President Kamala Harris, Democratic Presidential Candidate Acceptance Speech at DNC (Aug. 23, 2024), *in* N.Y. Times, https://www.nytimes.com/2024/08/23/us/politics/kamala-harris-speech-transcript.html (last visited Oct. 23, 2024) (accepting her nomination "on behalf of the people, on behalf of every American, regardless of party, race, gender or the language your grandmother speaks. On behalf of my mother, and everyone who has ever set out on their own unlikely journey."), *with* Former President Donald Trump, Republican Presidential Candidate Acceptance Speech at RNC (July 19, 2024), *in* N.Y. TIMES, https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html (last visited Oct. 23, 2024) ("Together, we will launch a new era of safety, prosperity and freedom for citizens of every race, religion, color and creed."). The contrast with the attitudes and views of the candidates in 1924, and other historic American leaders discussed above, is obvious and requires little explanation.

[82] However, there is also no reason to think demographics will become set in stone come 2043. In fact, given differential birth rates, White deaths outpacing births, and increasing levels of immigration, there is every reason to think that change and replacement will continue to accelerate and diminish the White share of the population.

DEF_000606

**Restoring Sovereignty to the People – Article V, Section 2**

For reasons that will be explained shortly, Article V is the correct place where the American Restoration is to be given textual validation within the Constitution. Article V, as currently written, should be designated as Article V, Section 1, and a second section should be created which ought to read as such:

The People are White, and the United States, where they are Sovereign, is their country. It is the affirmative duty of the government to enforce the provisions of this section. Dual and multiple citizenship is prohibited, and everyone possessing dual or multiple citizenship within ninety days of this section going into effect are to be divested of American citizenship. Nothing under this Article, or in any other Article of this Constitution, shall be construed to permit a splintering of the unity of the national territory or a degradation of the homogenous, national character of the sovereign People unless supported by a vote of more than nine tenths of the eligible electorate in a national, popular referendum on enacting an amendment ratified according to the process outlined in Article V, Section 1. The text of this paragraph is perpetual and may not be altered by any means.

All changes heretofore, since this Constitution's enactment, to the homogenous, national character of the sovereign People are hereby deemed *void ab initio* with all attendant consequences flowing from this action being in effect. The Citizenship Clause of the Fourteenth Amendment is repealed, along with the entirety of the Fifteenth Amendment. All references to "person(s)" within this Constitution are to be read as "citizen(s)." All individuals who lose citizenship due to this paragraph, who are currently residing solely in the United States, and have no other national citizenship are hereby granted temporary residency status for a period of ten years, which may be extended as deemed necessary by Congress. The President shall have an absolute right to revoke any such individual's temporary status at any time. Henceforth, no non-citizen who is ineligible for citizenship, upon entering the United States, may reside in the several states for longer than six months in a five-year period.

The referendum vote outlined in the first paragraph of this section is to occur in-person on the day of the second Presidential election following ratification. When referendums occur during these elections, those elections shall be national holidays. States may withdraw their approval for ratification at any point until the amendment has been ratified by three fourths of the states. An amendment defeated in the national referendum may not be submitted again for the People's consideration for a period of twenty years. All amendments enacted through this procedure may be nullified according to the procedure outlined in Article V, Section 1.

Deliberate attempts or conspiracies to flagrantly contravene this section, or abuse this provision, may be considered treason against the People, per the Article III, Section 3 procedure, and tried in the Senate or the House of Representatives. The People retain the right to enforce this section, and prevent its abuse, by any means necessary. In any criminal case against a citizen for alleged crimes against any

DEF_000607

individual having taken an oath under this Constitution, this section and paragraph may be invoked as a defense for a jury to consider. Once invoked, any case held in a venue in the capital district shall be moved to a federal venue in a randomly selected state. This defense may not be withdrawn once asserted, and any individual convicted of any crime after asserting this defense may not appeal their conviction and must be put to death within twenty-four hours after the guilty verdict has been rendered. Whenever this defense is asserted, and the jury cannot reach a unanimous verdict after seven days of deliberation, the jury shall be polled. If a majority of the jury favors acquittal, then the defendant is deemed acquitted. If no majority in favor of acquittal has been reached, deliberation will continue and a new poll will be taken every 72 hours until a majority is reached, a verdict is rendered, or a mistrial is declared.

The amendment process is a necessary aspect of the Constitution. As Albert correctly observes, formal amendment processes and rules bind future political actors, "facilitate improvements or corrections to the constitutional text, . . . heighten public awareness, check political branches, promote democracy, and pacify constitutional change."[83] However, these worthy goals, in particular the goal of promoting "democracy" (by which popular sovereignty is reasonably coterminous) can only be achieved if the amendment process reflects the will of the true sovereign. In the United States, the Article V amendment process does not feature a mechanism for direct popular amendment.[84] Nonetheless, Article V amendments (like ordinary legislation) may reflect the will of the people if results of political processes that select representatives (and thereby who may directly participate in the Article V amendment process) are accurate reflections of the Sovereign's will. As explained, improperly restrained demographic change can diminish the power of the People and result in a usurpation of their sovereignty through the introduction of foreigners who cannot be assimilated into the People as defined. Mathematics dictates (and political experience suggests)[85] that, when the franchise is extended to these interlopers, elections will tend to decreasingly reflect the will of the People. Article V, Section 2 aims to block all of this, and thus shore up the important goals of the amendment process generally. Its provisions are not merely prophylactic and preservative, but also remedial and restorative. They are also, obviously, quite radical and may, at first glance, seem incoherent when viewed together. Thus, further detailed explanation is required.

*Paragraph 1 of Article V, Section 2*

As indicated by the last sentence of this paragraph, the text of this paragraph (and only this paragraph) is permanent and unamendable by any means, reflecting the crucial importance of the provisions of this paragraph to the overarching goals of Article V. The first sentence of the first

---

[83] Albert, *supra* note 1, at 230–31.

[84] *See* U.S. Const. art. V;  Amar, *supra* note 3, at 90 ("stating that Article V "merely specifies how ordinary government can amend the Constitution *without* recurring to the People themselves, the true and sovereign source of all lawful power.") (emphasis in original).

[85] *See* Hamilton, *supra* note 43. It should be remembered that the immigrants Hamilton was speaking of here were all definitionally (i.e., racially) assimilable into the People. Obviously, racially foreign, definitionally unassimilable peoples would naturally cling to their own identities when faced with a body politic that requires their exclusion as a precondition for its continued homogenous existence.

paragraph of Article V, Section 2 aims to entrench the nationalist view of the American People held by the Founders and generations of succeeding Americans.[86] It also makes popular sovereignty over the United States and its government explicit, a principle which is still nominally accepted in American law.[87] If the People possess the moral confidence to assert their sovereignty, they must also logically assert their right to exist as they define themselves. Similarly, if their Union is to be perpetual,[88] then they themselves must be perpetual. According to Zackin, one of the primary purposes of constitutional entrenchment is "to prevent government from intervening in the ways that it had before."[89] Similarly, the purpose here is to prevent the constituted government from affirmatively facilitating the kinds of changes to the form of the sovereign as it has done since 1868. Preventing these changes being effectuated via omissions is the purpose of the next sentence charging the government with the duty of upholding this section.

This paragraph also permanently abolishes dual and multiple citizenship from the American political landscape. As was demonstrated by the thought experiment, dual and multiple citizenship permits an individual to be subject to the will of two or more governments, and thus, to two or more sovereigns. This may have disastrous results, particularly if a substantial number of people comprising the citizens of one country are also citizens of ours; a situation which would facilitate their coordination on political matters. The potential for subverting and misdirecting the People's sovereign will to advance the ends of an alien entity or people is too great to permit dual or multiple citizenship to exist in the United States.

The language of "[n]othing under this Article, or in any other Article of this Constitution" is used to indicate that this paragraph shall be applicable to (and, hopefully, preventative of) informal amendment through legislation, executive order, or judicial interpretation which is contrary to the language of this paragraph.

---

[86] One inevitable objection to this provision will be of a practical nature: how does one define "White?" A detailed answer to this question is beyond the scope of this paper. However, two observations are appropriate. First, people are generally able to viscerally recognize the race of most individuals (or at least, they are able to recognize if they are not White). Secondly, this standard was workable for most of this nation's history. *See generally* IAN HANEY LÓPEZ, WHITE BY LAW (get print copy for pg#) (2006) (describing various court cases in American history aimed at determining if the petitioner was White, and explaining how "[t]hough the courts offered many different rationales to justify the various racial divisions they advanced, two predominated: common knowledge and scientific evidence"). Indeed, the development of artificial intelligence presents one promising means of being able to determine an individual's race. *See generally* Gichoya et al., *AI recognition of patient race in medical imaging: a modelling study*, 4 LANCET DIGIT. HEALTH e406 (finding "that AI can accurately predict self-reported race, even from corrupted, cropped, and noised medical images, often when clinical experts cannot").

[87] *See supra* note 8.

[88] *See Texas v. White*, 74 U.S. 700, 724–25 (1868) (stating that "[t]he Union of the States never was a purely artificial and arbitrary relation" and that, because "the Constitution was ordained 'to form a more perfect Union'" that Union was "indissoluble" and intended to exist in "perpetuity"), *overruled on other grounds by Morgan v. United States*, 113 U.S. 476 (1885).

[89] EMILY ZACKIN, LOOKING FOR RIGHTS IN ALL THE WRONG PLACES: WHY STATE CONSTITUTIONS CONTAIN AMERICA'S POSITIVE RIGHTS [CHAPTER 2, 2nd2lastpage] (2013).

DEF_000609

The purpose of the "splintering . . . of the national territory" language is to entrench the ruling in *Texas v. White* that the Union is perpetual and indissoluble.[90] Thus, subnational secession is to be explicitly unconstitutional, barring the amendment process outlined here. The purpose of the "degradation of the homogenous, national character of the sovereign People" language is to prevent the redefinitions and alterations of the People which have taken place since 1868 barring, again, the amendment process outlined here. That process is, obviously, quite strict. The animating purpose behind the requirement that these amendments receive the support of "more than nine tenths of the eligible electorate in a national, popular referendum" *following* the procedure of Article V, Section 1 is, plainly, to prevent change and preserve the existing definition of the People. This, again, speaks to the moral confidence which the People must wield to assert and defend their sovereignty. The more than nine tenths requirement reflects the belief that, if such fundamental changes are to be made to the form and composition of the Sovereign, they should receive consensus and some support from "the tenth man;"[91] and the requirement that the nine tenths be of the whole electorate reflects the belief that a failure to express explicit disapproval does not negate the right of any eligible voter to provide explicit, affirmative consent before their nation is fundamentally altered. This requirement also reflects an understanding of (and disdain for) the power of oligarchy, particularly with regards to oligarchy's ability to alter the beliefs of the People, and an awareness of the oligarchical interest in subverting the People and usurping their

---

[90] *See supra* note 88.

[91] James Dudley, *Incorporating the 'tenth man' concept into critical decision-making*, POLICE1 (June 15, 2021, 10:04 AM), https://www.police1.com/chiefs-sheriffs/articles/incorporating-the-tenth-man-concept-into-critical-decision-making-TXuMkB74BZFN9LCo/ (describing a "devil's advocate" tactic to bring "alternative perspectives to problem-solving" whereby, in a group that has reached consensus, "[t]he role of the tenth man is to review available intelligence to then articulate opposing arguments to whatever solutions or decisions are being proposed. By considering the tenth man's perspective, information or scenarios that may otherwise be overlooked and unanticipated may be revealed.").

DEF_000610

sovereignty.[92] Moreover, this requirement promotes democracy by incentivizing the political forces behind a suggested amendment of this type to ensure widespread voting access.[93]

*Paragraph 2 of Article V, Section 2*

The purpose of the first sentence of this paragraph is to reverse the changes to the American national character which have occurred since 1868. Thus, the citizenship of everyone who would have been unable to attain it via naturalization under the 1790 standard is to be rescinded. Moreover, because the Citizenship Clause of the Fourteenth Amendment redefined, without the consent of the People, what it meant to be born as a member of the People, that clause is to be repealed. By tying birthright citizenship to being born on American soil, rather than being born with American blood, the Reconstruction era Congress effectuated a grossly anti-nationalist policy which fundamentally degraded the homogenous, national character of the sovereign People. As

---

[92] *See* Winters & Page, *supra* note 22, at 743 (discussing how "shrewdly invested money can move public opinion in directions inimical to citizens' interests" and how "[t]his is particularly likely to happen when elite communications are monolithic, which might well occur . . . on issues of central concern to an oligarchy"). *See also* ARISTOTLE, POLITICS bk. 5, sec. 1314a ("And it is a mark of a tyrant to have men of foreign extraction rather than citizens as guests at table and companions, feeling that citizens are hostile but strangers make no claim against him."); Alexander W. Schmidt-Catran & Christian S. Czymara, *Political elite discourses polarize attitudes toward immigration along ideological lines: A comparative longitudinal analysis of Europe in the twenty-first century*, 49 J. ETHNIC & MIGRATION STUD. 85 (2023) ("When political elites in a country become more positive on immigration-related issues, Europeans—on average—tend to be more open as well."). One minority group which has exercised outsized influence over the process of demographic change in the United States is Jews. *See generally* Kevin MacDonald, *Jewish Involvement in Shaping American Immigration Policy, 1881-1965: A Historical Review*, 19 POPULATION & ENV'T 295 (1998) (explaining why "Jews have been at the forefront in supporting movements aimed at altering the ethnic status quo in the United States in favor of immigration of non-European peoples" through "activities [which] have involved leadership in Congress, organizing and funding anti-restrictionist groups composed of Jews and gentiles, and originating intellectual movements opposed to evolutionary and biological perspectives in the social sciences"). It is also widely acknowledged that the donor class is disproportionately comprised of Jews, and that Jews wield outsized influence within media to influence social change. *See* Ron Kampeas, *Meet the leading Jewish political donors in this US election cycle*, TIMES OF ISRAEL (Sep. 25, 2020, 5:59 PM), https://www.timesofisrael.com/meet-the-leading-jewish-political-donors-in-this-us-election-cycle/ (showing how seven of the top ten and fifteen of the top twenty-five individual donors in the 2020 U.S. election cycle were Jews, with donation totals of roughly $176.4 million to Democratic groups and $87.9 to Republican groups); Jeremy Sharon, *US Jews contribute half of all donations to the Democratic Party*, JERUSALEM POST (Sep. 27, 2016, 12:31 AM), (describing why Jews contribute "a whopping 50% of funds received by the Democratic Party and 25% to the Republican Party" and the effect of this outsized group contribution on American electoral politics); Joel Stein, *Who Runs Hollywood? C'mon*, L.A. TIMES (Dec. 19, 2008, (12:00 AM), https://www.latimes.com/archives/la-xpm-2008-dec-19-oe-stein19-story.html (describing how Hollywood is so Jewish, the author had to "scour the trades to come up with six Gentiles in high positions at entertainment companies," and when he called these six people "five of them refused to talk . . ., apparently out of fear of insulting Jews. The sixth, AMC President Charlie Collier, turned out to be Jewish."); Josh Lederman, *Biden: Jewish leaders drove gay marriage changes*, ASSOC. PRESS (May 21, 2013, 9:21 PM), https://apnews.com/arts-and-entertainment-movies-united-states-government-974f8e9179014185a6f1d455005539af (reporting how then Vice President Biden "prais[ed] Jewish leaders for helping change American attitudes about gay marriage and other issues" through their "immense" influence in Hollywood and social media companies).

[93] On the other hand, it may be countered that this requirement also risks incentivizing *the opponents* of such an amendment to *restrict* voting access. This is accurate, but given that the purpose of these requirements is to prevent change, this is an acceptable risk. Moreover, if such an amendment truly had the support of the necessary fraction of the total electorate, I doubt such attempts at frustrating the will of the nearly unanimous People could bear fruit.

DEF_000611

Daniel O'Connell said, "being born in a stable does not make a man a horse;"[94] and, likewise, merely being born in the United States is not enough to make a man an American. Madison spoke of "the kindred blood which flows in the veins of American citizens"[95] to spur them to ratify the Constitution, he did not speak of their kindred birthplaces.

Little explanation of the rationale behind the repeal of the Fifteenth Amendment is needed. If "[t]he People are White, and the United States, where they are sovereign, is their country" is to be a constitutional provision, then racial discrimination in voting rights is not only permissible, but incumbent upon the government. Obviously, then, the Fifteenth Amendment cannot coexist with this section.

The repealing of both the Citizenship Clause of the Fourteenth Amendment and the Fifteenth Amendment should also be done to return dignity to Article V, Section 1. Suthon Jr. correctly argues that placing the Southern states under military occupation, forcefully reorganizing their governments, and demanding their "puppet" state legislatures to ratify these amendments as conditions for having their elected Representatives and Senators allowed into Congress "constitute[d] an infraction of the amendment procedure ordained by Article V of the Constitution."[96] Nonetheless, only the Citizenship Clause of the Fourteenth Amendment is objectionable from a nationalist standpoint once the sentence mandating reinterpretation of the word "person(s)" as "citizen(s)" is added. Indeed, once the meaning of the word "person(s)" is thus circumscribed (and the Citizenship Clause deleted) the remainder of the Fourteenth Amendment is actually quite nationalistic insofar as it ensures that we remain "one people" with "each individual citizen everywhere enjoying the same national rights, privileges, and protection."[97] Such a redefinition is also not incompatible with the goal of government under popular sovereignty.[98]

The "temporary residency status" provision is intended to make the changes effectuated by this section more politically palatable and logistically manageable. The purpose of the Presidential veto provision is to permit the acceleration of this process when such acceleration is feasible, and to allow the President to remove troublesome non-citizen elements if he deems it necessary. Additionally, constitutionalizing residency restrictions is designed to prevent Congress from maintaining and introducing a permanent and politically problematic underclass. The ultimate goal of these three provisions is to provide constitutional guidelines and requirements for the deportation of those with the ten-year temporary status to their ancestral homeland, or to another country that is willing to accept them. [99] Of course, the ten-year timeframe will also provide the

---

[94] Raphaël Ingelbien, *"When I say 'We', I mean what I say": The "national" receptions of Waterloo in 19th-century Ireland*, 20 INTERFÉRENCES LITTÉRAIRES/LITERAIRE INTERFERENTIES 31, 33 (2017).

[95] THE FEDERALIST NO. 14, at XYZ (James Madison) (XYZ ed., XYZyear)

[96] *See generally* Walter J. Suthon Jr., *Dubious Origin of the Fourteenth Amendment*, 28 TUL. L. REV. 22, 41–44 (1953). *See also id*. at 29 (contrasting this process with the regular process used to ratify the Thirteenth Amendment).

[97] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay).

[98] *See e.g., League v. De Young*, 52 U.S. at 203 ("The Constitution of the United States was made by, and for the protection of, the people of the United States.").

[99] To believe these should not be policy goals, given the rest of Article V, Section 2, would be to sanction the creation of a large, disenfranchised, and permanent underclass of those constitutionally unable to become citizens. In many ways, this is to sanction a return to the antebellum living arrangement between Whites and non-Whites, with all the constant, simmering (and occasionally explosive) racial antagonism that entails. Repatriation is a superior policy.

DEF_000612

necessary time to ratify and pass all amendments pursuant to this section which the People may desire in order to legitimately accept and integrate those with this ten-year status into the People.

*Paragraph 3 of Article V, Section 2*

Whether or not Ackerman is correct regarding "the plebiscitarian presidency" as a historical fact,[100] the intent behind tying the referendum vote on Article V, Section 2 amendments to the second presidential election following their ratification is, essentially, to demand a plebiscitarian presidential *election* as a means of ensuring that a national conversation occurs around the merits (or lack thereof) of these amendments. In tying the vote to the second presidential election following ratification, the People will have at minimum four years to have this conversation and carefully consider the political question presented by the amendment. Of course, such an amendment is bound to be a major question, and candidates should be expected to clearly state their opinion on the matter. Moreover, given the nine tenths threshold and the significance of the question which these amendments bring to the national forefront, common sense suggests that (in a two-party system) *both* candidates will likely, although not necessarily, need to passionately support the amendment for it to stand a chance of passing.[101] Finally, tying the referendum to the presidential election ensures that no additional election infrastructure needs to be established; and the requirement that the referendum vote be in-person on election day is intended to prevent fraud and having votes be cast by insufficiently motivated voters. The provision that these referendum votes shall occur on a national holiday is intended to ensure there is no excuse (aside from one's personal choice to essentially vote no on the amendment) for failure to vote in the referendum.

The provision that states may withdraw their ratification until the three fourths threshold of states is reached is intended to facilitate the ability of the citizens of the several states to depose incumbent state legislators who ratify an amendment contrary to the democratic will without having to risk (or bother with) a national referendum. The time limit on resubmitting an amendment after its defeat is intended to show respect to the People's will; when the People decide, they should not be incessantly prodded on the same issue until they relent.

Finally, this paragraph's provision that an Article V, Section 2 amendment may be nullified according to the procedure outlined in Article V, Section 1 is intended to permit the People's representatives to exercise their judgment and return the nation to the *status quo ex ante* without the need to go through the process outlined in this section. This provision reflects the assumption that a return to the *status quo ex ante* on the questions involved in Article V, Section 2 amendments is an inherently acceptable position to the Sovereign; an assumption that is, essentially, restorationist.

---

[100] *See generally* Ackerman, *supra* note 61, at 1757–71  (describing his theory of a "movement-party-presidency pattern" traceable back to Jefferson that has "filled the void left in the public mind by the marginalization of the formal Article V system," with a special emphasis on this theory's relation to the "the civil rights revolution").

[101] On the ballot, the amendment vote will be separate from the presidential vote. It is theoretically possible for both candidates to support an amendment and to have that amendment fail, or for both to oppose the amendment and have it pass.

DEF_000613

*Paragraph 4 of Article V, Section 2*

The purpose of this paragraph is to provide a legal means of legitimizing political violence against usurpers within the government. The provision allowing for "[d]eliberate attempts or conspiracies to flagrantly contravene this section, or abuse this provision," to be charged as treason permits for this violence to occur through normal government through a trial, similar to how Article V, Section 1 permits amendment through normal government.[102] The language of "[d]eliberate" and "flagrantly" is used to qualify the elements of the crime so that this provision does not provide cover for attempts by members of either chamber to punish various political opponents. The ability for charges to be tried in either chamber is meant to ensure that the two chambers can serve as a check on one another.

Crucially, this paragraph also allows the People "to enforce this section, and prevent its abuse, by any means necessary." This language is motivated by the theory that, just as "an assassin's bullet" may cause constitutional change,[103] so too may it prevent illegitimate change. Assassination is undoubtedly an extralegal action, however, to call an action extralegal does not necessarily imply that it is illegitimate.[104] The purpose of the remaining provisions of this paragraph which allow the assassin to invoke this section and paragraph "as a defense for a jury to consider," and describe some procedures by which a trial is to be conducted after this defense is asserted, is to determine whether the assassination is legitimate. Thus, this provision does not permit trial by combat; rather, it permits trial *of* combat while presuming that the mere fact that a defendant committed extralegal violence does not necessarily mean they are guilty of a crime. Moreover, this provision will be useful in providing a practical check on the power of the judiciary, whose members (due to being unelected and serving for life) are generally unaccountable within the political process, absent impeachment and conviction. The United States was not intended to be a kritarchy, and by providing a legal mechanism for removing judges from the bench, this provision hopes to remind judges of their impotence, so that they may rule accordingly.[105]

The remaining procedural provisions of this paragraph reflect three different concerns. First, it is envisioned that it may be difficult to find an impartial jury to consider this defense for violent acts committed against officials in the capital district. The reason for moving the trial to a random venue is to provide the neutrality and fairness of pure chance to both the defendant and the government. Second, the provision preventing withdrawal of the defense once asserted, and the unappealable, mandatory, and swift death penalty following a guilty verdict, reflects the seriousness with which these extralegal actions should be contemplated by those who would commit them, and the gravity of the consequences a defendant should face if their actions are deemed by a jury of the People to be illegitimate. Finally, the mandatory acquittal after seven days of deadlocked deliberation if a majority of the jury favors acquittal and the continuous polling

---

[102] *Cf. supra* note 84.

[103] *See* Ackerman, *supra* note 61, at 1770 (applying this theory to "the patterns of constitutional leadership prevailing during the first and the second Reconstructions").

[104] *See* Albert, *supra* note 1, at 232 ("To call informal amendment extralegal is not to make a claim about its legitimacy.").

[105] *See Obergefell v. Hodges*, 576 U.S. 644, 720 (2015) (Scalia, J., dissenting) ("With each decision of ours that takes from the People a question properly left to them—with each decision that is unabashedly based not on law, but on the 'reasoned judgment' of a bare majority of this Court—we move one step closer to being reminded of our impotence.")

DEF_000614

every 72 hours, reflects concern with the squeamishness towards the use of violence by the average person. Individuals may find it difficult to accept that it may be, depending on the circumstances, necessary for (or beneficial towards) national survival to kill certain officials. Thus, after a week of deliberations, only a majority in favor of acquittal should be necessary to free a defendant.

In 1787, Thomas Jefferson wrote that, "[t]he tree of liberty must be refreshed from time to time with the blood of patriots and tyrants."[106] Relatedly, Alexander Hamilton wrote of the necessity of fostering "a large body of citizens, little, if at all, inferior to [the standing army] in discipline and the use of arms, who stand ready to defend their own rights and those of their fellow-citizens."[107] Given Founders who held such sentiments, it is hardly surprising that the Second Amendment, in order to provide for "the security of a free State," demands that "the right of the people to keep and bear Arms, shall not be infringed."[108] Recognizing this heritage, and the validity of these sentiments, this paragraph provides the People with textual basis for—and procedural vindication of—the right to not merely keep and bear arms, but to use those arms to defend their panoply of rights. It must be noted that threats to the sovereign People do not only come from the realm of demographic change. In a republic, one of the greatest threats to popular sovereignty and liberty is the ambition of the People's elected leaders. No patriot should be expected to stand idly by while this ambition—and its concomitant lust for power and avariciousness—drives a nation into ruin. This paragraph gives the assassin the right to justify himself and to inquire of the People who among them is so base that would be a bondman, so vile that will not love their country. Then, he shall pause for a reply.[109]

### Conclusion – Why Should This Be Done?

One may grant the correctness of my analysis regarding how popular sovereignty restrains the actions of the constituted government, accept that America was a White country for most of its history (and was founded as such), and concede that these principles are in tension with historical and contemporary processes of demographic change in America. One may even grant that, given the ends sought to be advanced, my Article V, Section 2 proposal is wise and well-reasoned. However, the objection may still be heard that this is all wrong. The United States is no longer a White country, and, moreover, that White country "is never coming back," so "[a]rguing that anything like it should is pointless—and thus, simply mean."[110] Indeed, given the tremendous social upheavals my proposal would entail—the lives of hundreds of millions of people across the world would be dramatically changed—it might be contended that these arguments are not only mean, but reprehensible. And obviously, this feeling would be felt most acutely by those non-Whites living in America whose lives would be most negatively impacted.

---

[106] "From Thomas Jefferson to William Stephens Smith, 13 November 1787," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-12-02-0348. [Original source: *The Papers of Thomas Jefferson*, vol. 12, *7 August 1787–31 March 1788*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1955, pp. 355–357.]

[107] THE FEDERALIST NO. 29, at XYZ (Alexander Hamilton) (XYZ ed., XYZyear)

[108] U.S. CONST. amend. II.

[109] WILLIAM SHAKESPEARE, JULIUS CAESAR act 3, sc. 2, ll. 1563–68.

[110] John McWhorter, *She Is Outrageous, Demeaning, Dangerous. She Shouldn't Be Punished.*, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/opinion/amy-wax-academic-freedom-penn.html (applying this argument against University of Pennsylvania Law Professor Amy Wax).

DEF_000615

For better or worse, history is an unalterable inheritance. We can no more change history than we can change the orientation or intensity of the stars in the night sky. It is also true that, like those stars, history may position and guide us. Our Constitution, and the fundamental principles it embodies, is one such guiding historical inheritance. Of course, unlike history or the stars, we can change the Constitution; as a practical matter, we can do away with part or all of it as we wish, provided we have the will and the power to do so. Nonetheless, we seem to abide by it (or at least, pretend like we abide by it) in large part because we have respect for the history that formed it and delivered it to us in the present. Like the man of wealth and prudence who has inherited a luxurious mansion in which his family has lived for generations, and who tempers his exuberance and his desire to tear the whole thing down and build a water park in its stead so that he may deliver his abode to his children, and that his children may deliver it to theirs, and so on, we resist throwing out our Constitution. We thus say that we limit ourselves to making relatively small and incremental changes which do not dramatically change the character of the whole document and the government which it gives textual authority to.

But as this paper demonstrates, the Constitution has, effectively, been thrown out. Through the demographic changes caused by our government, the Constitution's overarching principle—the sovereignty of the People—is now a dead letter. When Chin & Finkelman argue that the 1790 Naturalization Act "deserves a place of dishonor,"[111] what they are essentially saying is that the founding of the United States deserves a place of dishonor. Many non-Whites may agree with that proposition, and they may feel joyful that the government of the United States has usurped the People's sovereignty. After all, without this usurpation, non-Whites may not have ever been permitted to become citizens of this country. But at what cost was this "victory" over the People won? Do non-Whites truly believe that, after the government has usurped sovereignty from the People, sovereignty shall pass to them? Furthermore, if the racial attitudes of the Founders which brought White nationalism in to force in the United States are merely a bygone relic of an age that should be forgotten—nay, dishonored!—then why should the government respect any other provision of the Constitution? Why should the Founders' concern with the Crown's restriction on their free speech give legitimacy to the First Amendment? Why should their hatred of general warrants give legitimacy to the Fourth Amendment? Why should their fear of the thumbscrew and the breaking wheel give legitimacy to the Fifth and Eighth Amendments? And if that legitimacy comes not from the history of this country and the Founders, then where will it be found?

Finally, I shall speak directly to my brothers and sisters, the People. Can you honestly say these changes have been for the better? As the years go on, and those around you not only look less like you, but look upon you more and more with contempt and with a barely veiled desire for vengeance,[112] does your love for this country and its inhabitants grow? Do you feel as if you are

---

[111] Chin & Finkelman, *supra* note 42, at 1048.

[112] *See, e.g., Regents of Univ. of California v. Bakke*, 438 U.S. 265, 387 (1978) (Marshall, J., concurring in part and dissenting in part) (remarking that "it must be remembered that, during most of the past 200 years, the Constitution . . . did not prohibit the most ingenious and pervasive forms of discrimination" and using this fact to justify discrimination against Whites); WILLIAM O. DOUGLAS, THE COURT YEARS: 1939 TO 1975 (getprintcopy) (1980) (quoting Justice Thurgood Marshall as saying in conference on an early case evaluating the constitutionality of discrimination against Whites, "You guys have been practicing discrimination for years. Now it's our turn.").

DEF_000616

119

united to your fellow citizens "by the strongest ties," or do you feel as if America has been "split into a number of unsocial, jealous, and alien" groups?[113] If you are increasingly apprehensive about these changes, you are not alone.[114] However, feeling despondent and helpless is hardly a way to rectify the evils which have been visited upon us. Our Founders understood the importance of forming a nation upon the solid foundation of common ancestry. They understood that it is a part of "human nature . . . that its affections are commonly weak in proportion to the distance or diffusiveness of the object;" and thus, "a man is more attached to his family than to his neighborhood, to his neighborhood than to the community at large."[115] Similarly, we should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle. And if the prize does not motivate you, then consider the cost of defeat; "[W]henever the dissolution of the Union arrives, America will have reason to exclaim, in the words of the poet: 'FAREWELL! A LONG FAREWELL TO ALL MY GREATNESS.'"[116]

---

[113] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay).

[114] *See* Robert D. Putnam, E Pluribus Unum*: Diversity and Community in the Twenty-first Century*, 30 Scandinavian Pol. Stud. 138 (2007) (arguing that "immigration and ethnic diversity challenge social solidarity and inhibit social capital"). See *generally* ROBERT D. PUTNAM, BOWLING ALONE: THE COLLAPSE AND REVIVAL OF AMERICAN COMMUNITY (2000) (discussing "the decline of the last several decades" in "social capital" and a sense of community belonging and civic engagement among Americans).

[115] THE FEDERALIST NO. 17, at XYZ (Alexander Hamilton) (XYZ ed., XYZyear).

[116] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay) (emphasis in original).

DEF_000617

| | |
|---|---|
| **From:** | Smith,Michelle A |
| **To:** | McAlister,Merritt Ellen |
| **Cc:** | Inman,Rachel |
| **Subject:** | FW: New Report a Community Concern Submission |
| **Date:** | Friday, September 22, 2023 4:48:38 PM |

Best,
M

**Michelle "M" Smith | Assistant Dean for Experiential Learning & Engagement**
*Pronouns: they/them-she/her*
University of Florida | Levin College of Law
Phone: (352)284-7360
Email: style@ufl.edu
Center for the Study of Race and Race Relations, Interim Director
Deputy Title IX Coordinator

**From:** style@ufl.edu <style@ufl.edu>
**Sent:** Friday, September 22, 2023 4:43 PM
**To:** Inman,Rachel <inman@law.ufl.edu>; Smith,Michelle A <style@ufl.edu>
**Subject:** New Report a Community Concern Submission

**Prefer to submit anonymously**

- Yes

**Comments/Questions**

As a black student, I am terrified to know that Preston is still enrolled at UF Law. If the UF Law community does nothing about this then the institution will be liable for any violent act that Preston threatens to commit on campus. Preston has stated that he has pure hatred for anyone who agrees with diversity efforts.

As admin you may not be afraid to walk into a food store, church, or even down the street. As a black student I cannot do neither without thinking about the chance of being shot and killed by people who share the same sentiments as Preston.

This information has already been reported to the news outlets!

**Would you like to be contacted regarding your comment/question?**

Yes

**Supporting Documentation**

- 7B1C72EF-B3AF-4F12-9B4C-D99406C3A9A9.jpeg
- E27794A2-C9B6-45A4-8591-BDF56159821D.jpeg
- 95F77598-2D87-4E53-A0CB-5798A72805B4.jpeg
- 92E71EBD-0DF0-4C9A-B83D-5A367D61C6AF.jpeg

DEF_000618

121

1D2440EF-B242-4063-B275-6D6682903000.jpeg
- 6443A404-C93E-41C0-9D52-BFCAE7566F08.jpeg
- FCD89DC7-F780-465A-9F51-91B83BECDCB1.jpeg
- 2710067D-9CD0-4AD7-9D84-61F463C3028F.jpeg
- 9691C25E-B2BD-49CE-8E7A-C0811BC0D8CD.jpeg
- FE58BF50-E1F0-4A0E-9E59-B77EEC8E9EA7.jpeg
- A7789AD2-DE71-4C52-A565-4F518FB3E1BD.jpeg
- 01AABAEF-C423-4321-9B61-D8BE0812CD62.jpeg
- 8E72544F-4A96-404C-8CF3-916A137A8802.jpeg
- B2DAC08E-B073-462E-B621-6733B2020A74.jpeg
- 2ED475B7-8EAE-472C-8BEA-F40E6ACF5E6E.jpeg

DEF_000619

122

**Preston**

I'll dig into these points at my leisure, but before I do so I just want to make it clear that I did not delete my previous comment in the screenshot above, someone else did without any explanation given to me as to why it was deleted; and furthermore, I stand 100% behind that comment without any reservations or qualifications. Going forward, if my comments are deleted just know that I did not do it.

Send Message...

DEF_000620



DEF_00621



**DEF_00622**



**DEF_00623**



DEF_00624



DEF_00625



**DEF_00626**



DEF_00627



DEF_00628



DEF_00629



**DEF_00630**



When you "like" messages like this - you signal that these are not serious problems. You support those who want to make jokes and use racism as a punchline. You make space for those who do not want to take these issues seriously and open the door for hatred like that of **@Preston**.

I'm sure many of you reposted photos and things, blacked out your instagram in solidarity, after George Floyd's death. But when put in a situation to be an ally to the Black community - you either chose inaction or compliance with hatred and harm. Next time really think about what you are saying when you like a comment like this - from someone who trying to get attention or make light of a serious issue.

Katelynd KT Todd

> Katelynd KT Todd
>
> ▢ Photo
>
> This is comment. And when Spe...

Preston***

Victoria Kass

> Brooks Mitchum
>
> I can't speak toward the deleted comment or who made it as I did not see it but, I do...

I don't think anyone is shaming or attacking anyone - but maybe that's what you call it when someone is trying to educate you and inform you about what you did and how you could do better?

Jacob Menapace has left the group.

Send Message...

**DEF_00631**



**DEF_00632**

135

**Preston**

I'll dig into these points at my leisure, but before I do so I just want to make it clear that I did not delete my previous comment in the screenshot above, someone else did without any explanation given to me as to why it was deleted; and furthermore, I stand 100% behind that comment without any reservations or qualifications. Going forward, if my comments are deleted just know that I did not do it.

Send Message...



DEF_000633



**DEF_00634**

**From:**     Smith,Michelle A
**To:**       McAlister,Merritt Ellen
**Cc:**       Inman,Rachel
**Subject:**  FW: New Report a Community Concern Submission
**Date:**     Friday, September 22, 2023 4:48:59 PM

Best,
M

**Michelle "M" Smith | Assistant Dean for Experiential Learning & Engagement**
*Pronouns: they/them-she/her*
University of Florida | Levin College of Law
Phone: (352)284-7360
Email: style@ufl.edu
Center for the Study of Race and Race Relations, Interim Director
Deputy Title IX Coordinator

**From:** style@ufl.edu <style@ufl.edu>
**Sent:** Friday, September 22, 2023 4:46 PM
**To:** Inman,Rachel <inman@law.ufl.edu>; Smith,Michelle A <style@ufl.edu>
**Subject:** New Report a Community Concern Submission

**Name**

Student D

**Email**

St D    @ufl.edu

**Phone**

**Comments/Questions**

During the morning and afternoon of Friday, Sep. 22, a current law student at UF who self-identified only as "Preston" posted two statements in a public chat on the Groupme platform that had openly white supremacist and inflammatory contents. After the first one was removed from the chat by moderators, Preston posted the second one reinforcing that he stood by his initial statements.

The first statement read, in part: "The United States lost 19.3 million White [sic] faces on net over the past decade ... so why on earth should White people care at all about [another student's] criticisms of our demographic share in any institution ... why should we feel anything but pure contempt for [the student] and anyone else ... ?"

The second statement read, in part: "I stand 100% behind that comment without any reservations or qualifications."

Preston indicated that he would likely continue to make this kind of statement using this kind of language.

DEF_000635

**Would you like to be contacted regarding your comment/question?**

Yes

**Supporting Documentation**

- Preston-2.jpeg
- Preston-1.png
- Preston-21.jpeg

DEF_000636

**Preston**



139

I'll dig into these points at my leisure, but before I do so I just want to make it clear that I did not delete my previous comment in the screenshot above, someone else did without any explanation given to me as to why it was deleted; and furthermore, I stand 100% behind that comment without any reservations or qualifications.  Going forward, if my comments are deleted just know that I did not do it.



**Mary Byerley**



 2

It was removed due to spewing bigoted and hateful speech

DEF_00637



DEF_00638



**Preston**

I'll dig into these points at my leisure, but before I do so I just want to make it clear that I did not delete my previous comment in the screenshot above, someone else did without any explanation given to me as to why it was deleted; and furthermore, I stand 100% behind that comment without any reservations or qualifications. Going forward, if my comments are deleted just know that I did not do it.

141



**Mary Byerley**

It was removed due to spewing bigoted and hateful speech

 2

DEF_00639

**From:** Smith,Michelle A
**To:** Shaw, Janice; Smith,Michelle A
**Subject:** New Report a Community Concern Submission
**Date:** Wednesday, January 8, 2025 8:23:32 PM

---

### Prefer to submit anonymously

- Yes

### Comments/Questions

Please review the book award for the Fall 2024 originalism class. The awardee, Preston Terry, wrote his final paper on white supremacism and argued that white people are better than other races and the only ones deserving of US citizenship. I urge you to review the paper that he submitted for this class because frankly, I am wholly uncomfortable being a student at a school where rhetoric like this is not only permitted, but encouraged and applauded. Additionally, I noticed that no book award was issued for the Race and the First Amendment seminar. It is very disappointing to see that the law school is awarding white supremacy and disregarding student who are working to dismantle it.

### Would you like to be contacted regarding your comment/question?

No

DEF_000640

| | |
|---|---|
| **From:** | Smith,Michelle A |
| **To:** | Shaw, Janice; Smith,Michelle A |
| **Subject:** | New Report a Community Concern Submission |
| **Date:** | Wednesday, January 8, 2025 9:58:16 PM |

### Prefer to submit anonymously

- Yes

### Comments/Questions

Preston Terry, a student in the Fall 2024 "Originalism and its Foes" course, submitted coursework that advocated for violence against minority groups. This student was previously reported to UF Law for making white nationalist remarks in a class group chat but to my knowledge received no disciplinary action for using such hateful rhetoric. Now, in addition to spewing racist and prejudiced remarks (he made sure to include heinously racist quotes about black people, Native Americans, and other minority groups throughout his work), his behavior has escalated to inciting violence. He argues that it may be necessary for white national survival to kill certain government officials; that white Americans should be fighting, killing, and dying on behalf of their rights and sovereignty; and that the Constitution should legitimize political violence against anyone who opposes a white nationalist government.

I am disgusted to share a law school with a person who sincerely holds these beliefs. This has surpassed a permissible exercise of free speech and become an openly violent call to arms for a race war. Minority students should not have to attend classes with someone who not only views them as less-than, but has imagined a detailed plan for their disenfranchisement and harm. It is frankly outrageous that the professor of this course awarded Mr. Terry a CALI award for his white nationalist manifesto. I would hope that the law school administration is less keen to valorize his racist drivel.

I'm not sure what, if any, action the law school can take to address this, but I feel the administration should be aware because many students already know about and are extremely upset by Mr. Terry's views.

### Would you like to be contacted regarding your comment/question?

No

DEF_000641

**From:** Jurkowski, Scott D.
**To:** McAlister,Merritt Ellen
**Subject:** Twitter follow-up
**Date:** Friday, March 28, 2025 10:48:34 AM

Hi Dean McAlister,



Thank you again for hearing me out and taking this seriously.

Scott Jurkowski

Sent from my iPhone

DEF_000642



| | |
|---|---|
| **From:** | Shaw, Janice |
| **To:** | McAlister,Merritt Ellen |
| **Subject:** | Fw: New Report a Community Concern Submission |
| **Date:** | Tuesday, April 1, 2025 9:55:26 PM |

Get Outlook for iOS

**From:** shaw@law.ufl.edu <shaw@law.ufl.edu>
**Sent:** Tuesday, April 1, 2025 9:54:51 PM
**To:** Shaw, Janice <shaw@law.ufl.edu>; Blake,Richard A <blake@law.ufl.edu>
**Subject:** New Report a Community Concern Submission

**Name**

Student F

**Email**

t F @ufl.edu

**Comments/Questions**

Preston Terry's comments on Twitter (X) are insane and not protected speech under the First Amendment. I understand that this Law school (rightly) prides itself on its protection of speech, but this disgusting. The pattern and tenor makes me worry for my Jewish friends and family.

**Would you like to be contacted regarding your comment/question?**

Yes

**Supporting Documentation**

- IMG_2506.PNG

DEF_000644



**From:** Shaw, Janice
**To:** McAlister,Merritt Ellen
**Subject:** Fw: New Report a Community Concern Submission
**Date:** Tuesday, April 1, 2025 9:52:50 PM

---

Get Outlook for iOS

---

**From:** shaw@law.ufl.edu <shaw@law.ufl.edu>
**Sent:** Tuesday, April 1, 2025 9:51:48 PM
**To:** Shaw, Janice <shaw@law.ufl.edu>; Blake,Richard A <blake@law.ufl.edu>
**Subject:** New Report a Community Concern Submission

**Name**

Student G

**Email**

St G        @ufl.edu

**Comments/Questions**

I am extremely concerned for the safety of my classmates and students following an X post from student Preston Terry. His post said "Jews must be abolished by any means necessary." Antisemitism has no place on UF Law's campus, and my classmates do not deserve to go about their days in fear because of his words. I fear for when his words will be actions.

**Would you like to be contacted regarding your comment/question?**

Yes

**Supporting Documentation**

- IMG_25061.png

DEF_000646



| | |
|---|---|
| **From:** | Shaw, Janice |
| **To:** | McAlister,Merritt Ellen |
| **Subject:** | Fw: New Report a Community Concern Submission |
| **Date:** | Tuesday, April 1, 2025 9:46:53 PM |

Please see the response to the tweet in the attachment.

Get Outlook for iOS

**From:** shaw@law.ufl.edu <shaw@law.ufl.edu>
**Sent:** Tuesday, April 1, 2025 9:44:57 PM
**To:** Shaw, Janice <shaw@law.ufl.edu>; Blake,Richard A <blake@law.ufl.edu>
**Subject:** New Report a Community Concern Submission

**Prefer to submit anonymously**

- Yes

**Comments/Questions**

This attached tweet is from a current student at UF Law who is actively engaging in hate speech. This should be no means be tolerated. This is a danger to the safety of students at this school and must be addressed IMMEDIATELY.

**Would you like to be contacted regarding your comment/question?**

No

**Supporting Documentation**

- IMG_2506.png

DEF_000648



| From: | Shaw, Janice |
|---|---|
| To: | Shaw, Janice; Blake,Richard A |
| Subject: | New Report a Community Concern Submission |
| Date: | Tuesday, April 1, 2025 10:32:40 PM |

**Name**

Student H

**Email**

St H @ufl.com

**Phone**

**Comments/Questions**

A student has continually spouted hate speech against the Jewish community here at UF Law. This student has continually evaded reprimand, but has since began publicly calling for violence against Jewish people. These calls for violence have even caught the attention of a premier UF Law Professor who happens to be Jewish. The student responded to the Professor, directly calling for the slaughter of her and her family due to her religion.

UF Law has one of the largest Jewish communities at any law school in the country. The administration cannot abide by while a student continues to post dangerous and inflammatory statements that harm a significant portion of the student body. Furthermore, the student's calls for violence have become more expressive and deeply concern me and others that this student may result to violence. The administration must do something to protect its students and its faculty.

**Would you like to be contacted regarding your comment/question?**

Yes

**Supporting Documentation**

- IMG_2261.PNG

DEF_000650



**From:**     Shaw, Janice
**To:**       Shaw, Janice; Blake,Richard A
**Subject:**  New Report a Community Concern Submission
**Date:**     Wednesday, April 2, 2025 2:44:53 AM

**Name**

Student I

**Email**

Student I @ufl.edu

**Phone**

**Comments/Questions**

There is a student at this institution who is sharing hateful and violent ideologies. The ideologies he is sharing are taught in history classes, general education classes, and higher education classes as a despicable, evil, villainous, hateful opinion on people that exist in the world. They are infamously associated with Adolf Hitler, who is universally regarded as a violent and hateful individual. The eradication of Jews is something that we are taught from an early age is a radical and violent belief. And the fact that he is able to take classes at this institution and exist among Jewish students when he believes wholeheartedly these ideologies—so much so that he is willing to engage with professors with these ideologies—is concerning. It's sad and it's upsetting. I don't feel comfortable attending a school with somebody that holds these beliefs. Especially when that school wants to boast they welcome diversity and inclusivity. As a queer female student at UF Law, it makes me fearful for how he views and treats me and my existence. I understand that people have free speech rights, but I also know that this person has a pattern of espousing beliefs that target certain groups in a concerning way.

I want to reiterate—this goes BEYOND free speech concerns. This is suggesting violence towards a protected class. Do I believe he will act on these statements in class or on campus? No—I think he is smart enough to know that people in real life will put a stop to it and that's why he exists behind a screen. Do I think this is concerning? Yes, EXTREMELY. Someone who holds these beliefs should not be trusted with a law degree and the power that it holds.

I want the UF Law administration to speak with him, and PLEASE actually do something besides issuing a statement about free speech. The number of students that are put in fear by this person is not worth protecting one person's rights. It shouldn't matter whether the threat is currently an issue—it shouldn't get to a point in the future where he has the power to affect people's lives in a harmful way.

**Would you like to be contacted regarding your comment/question?**

Yes

**Supporting Documentation**

- IMG_0209.png
- IMG_25063.png

DEF_000652





**From:**       Shaw, Janice
**To:**         Shaw, Janice; Blake,Richard A
**Subject:**    New Report a Community Concern Submission
**Date:**       Tuesday, April 1, 2025 11:06:58 PM

---

**Prefer to submit anonymously**

- Yes

**Comments/Questions**

I didn't say anything when he booked a class with his white supremacist manifesto, but I can't stay silent anymore. Preston Terry is making explicitly hateful comments online towards Jewish people. I cannot upload the screenshots on mobile, but I'm sure you have the screenshots from other students already. Please go to @preston_terry_ on X to see the tweets. I cannot imagine how unsupported our minority students feel because he has been actively given encouragement from UF Law to continue spreading his hateful, violent rhetoric freely. Also, he is tarnishing UF Law's reputation, and I am ashamed to be in the same class as someone spreading such objectionable content on the internet and in academic scholarship. UF Law should take a stand against this blatant hatred against Jewish people. I get free speech concerns, but there HAS to be something you can do to stop this. We all know this is wrong. Do the right thing.

**Would you like to be contacted regarding your comment/question?**

No

DEF_000655

| | |
|---|---|
| **From:** | Shaw, Janice |
| **To:** | Shaw, Janice; Blake,Richard A |
| **Subject:** | New Report a Community Concern Submission |
| **Date:** | Tuesday, April 1, 2025 10:33:43 PM |

**Prefer to submit anonymously**

- Yes

**Comments/Questions**

I fear that the email regarding the first amendment that Dean McAllister sent out has bolstered the student's position so much that he has begun to threaten our Jewish faculty. This is not OK and needs to be addressed by the school immediately.

**Would you like to be contacted regarding your comment/question?**

No

**Supporting Documentation**

- IMG_7330.png

DEF_000656



| | |
|---|---|
| **From:** | Shaw, Janice |
| **To:** | Shaw, Janice; Blake,Richard A |
| **Subject:** | New Report a Community Concern Submission |
| **Date:** | Tuesday, April 1, 2025 10:41:09 PM |

**Name**

Student J

**Email**

Student J @ufl.edu

**Phone**

**Comments/Questions**

I am a Jewish student on campus. I am an officer in the Jewish Law Students Association and we frequently hold events in the Jewish space. Because of Preston Terry I do not feel safe attending JLSA events or being by myself. On X, Preston posted the following phrase: "My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to 'abolish the White race by any means necessary' is what I think must be done with Jews. Jews must be abolished by any means necessary." Even Professor Lidsky responded to this tweet, asking if she deserved to be murdered for being Jewish. Preston then responded that white peoples lives matter more than Jews.

I do not feel safe walking the halls at UF. I passed Preston alone earlier today and I was concerned for my safety and worried about no one else being in the hallway with us. I was thankful I was not wearing a Star of David when this happened. He explicitly called for my death openly and yet I am being punished for existing because the school fails to take any action. Students have brought up our concerns for safety multiple times, including at the town hall. Yet we are told it is free speech. When does free speech protect me from hate crimes—after I have already been attacked—or worse—killed? Please tell me how I should fulfill my duties as a JLSA officer when I am worried about being visually identified as Jewish. And even if the school takes the position that hiding my Jewish identity would be a sufficient response—which is what the inaction and disregard for student concerns has felt like thus far—I cannot remove my Jewish last name.

So please please tell me what I am supposed to do? Who wins in this battle—the Jewish students at UF or Preston Terry?

**Would you like to be contacted regarding your comment/question?**

Yes

**Supporting Documentation**

- IMG_7605.png

DEF_000658



**Tuesday, April 1, 2025 at 19:51:19 Eastern Daylight Time**

**Subject:** Response to All Students Email
**Date:** Wednesday, February 12, 2025 at 10:59:55 AM Eastern Standard Time
**From:** Cosner, Zachariah A.
**To:** McAlister,Merritt Ellen
**CC:** bpavek@ufl.edu

Hello Dean McAlister,

I appreciated your reaching out on the subject of the controversial essay in support of American volkish fascism which recently received a book award from a visiting professor. I respect and appreciate your candor regarding the university's commitment to free speech principles. I accept your reasoning for failing to revoke the academic honor conferred or take action against the student on those grounds.

That said, in my opinion, no essay which relies on inherent notions of racial separateness and superiority as an essential and assumed element in the chain of logic should ever be considered "well-reasoned." I wonder whether an individual who would deem such reasoning sound would be capabe of fairly grading the non-white members of any class he teaches. Further research has demonstrated that the professor in question has made statements that indicate hostility towards racial and ethnic groups that are essential elements of out student body, which further calls his capacity for fair grading into question.

If this professor is invited to return to teach a seminar once again, I believe many of us will have reason to conclude that the university approves of his reasoning and grading methods. Therefore, I wanted to ask if the university is considering inviting the professor who taught this seminar and conferred these academic honors on a paper that asked (white) readers to consider the supposed peril of "seeing more and more faces that don't look like yours" back to campus to continue teaching this seminar in future semesters?

| | |
|---|---|
| **From:** | Shaw, Janice |
| **To:** | Shaw, Janice; Blake,Richard A |
| **Subject:** | New Report a Community Concern Submission |
| **Date:** | Tuesday, April 1, 2025 10:51:37 PM |

**Prefer to submit anonymously**

- Yes

**Comments/Questions**

Preston Terry (a 2L student) posted on X "Jews must be abolished by any means necessary." Professor Lidksy, a Jewish professor, commented if he would murder her and her family. He responded by arguing that a white genocide would cause greater outrage. I have attached the tweet to this form.

No one feels safe on campus. His comments have gone too far. This man cannot hide behind the guise of the First Amendment when he is advocating for the death of all Jews to a Jewish professor. For the past two years, Preston Terry's threats have made the University of Florida Levin College of Law an unsafe place. If the school does not act now, many students fear what would have to happen for the school to respond. Enough is enough.

**Would you like to be contacted regarding your comment/question?**

No

**Supporting Documentation**

- IMG_76051.png

DEF_000661



DEF_000662

| | |
|---|---|
| **From:** | Shaw, Janice |
| **To:** | Shaw, Janice; Blake,Richard A |
| **Subject:** | New Report a Community Concern Submission |
| **Date:** | Tuesday, April 1, 2025 10:30:29 PM |

**Prefer to submit anonymously**

- Yes

**Comments/Questions**

See attached documents from a current student at UF Law, Preston Terry. This is extremely dangerous and violent rhetoric and I do not feel safe going to school while this person has access to our campus. This person's intitial message and response to a UF Law Professor were direct threats of violence. I honestly fear action even being taken against him because of the what he may do as a result. Extremely concerned.

**Would you like to be contacted regarding your comment/question?**

Yes

**Supporting Documentation**

- IMG_9895.png
- IMG_25062.png

DEF_000663



**Preston Terry**
@preston_terry_

Did Ignatiev want Whites murdered?  If so, were his words as objectionable as mine? If Ignatiev sought genocide, then surely a genocide of all Whites would be an even greater outrage than a genocide of all Jews, given the far greater number of Whites.

10:09 PM · Apr 1, 2025 · **18** Views

DEF_000664





**Preston Terry**
@preston_terry_

**168**

My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to "abolish the White race by any means necessary" is what I think must be done with Jews. Jews must be abolished by any means necessary.

3:48 PM · Mar 21, 2025 · **870** Views

♡ 1

**Post your reply**                                                    **Reply**

**L.B. Lidsky** @LBLidsky · 18h
Are you saying you would murder me and my family? Is that your position?

💬 2                                                    520

**Preston Terry** @preston_terry_ · 15h
Did Ignatiev want Whites murdered?  If so, were his words as objectionable as mine? If Ignatiev sought genocide, then surely a genocide of all Whites would be an even greater outrage than a genocide of all Jews, given the far greater number of Whites.

♡ 1                                                    326

Show replies                                          **DEF_000666**







**Preston Terry**
@preston_terry_

**168**

My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to "abolish the White race by any means necessary" is what I think must be done with Jews. Jews must be abolished by any means necessary.

3:48 PM · Mar 21, 2025 · **870** Views

♡ 1

**L.B. Lidsky** @LBLidsky · 18h
Are you saying you would murder me and my family? Is that your position?

💬 2          520

**Preston Terry** @preston_terry_ · 15h
Did Ignatiev want Whites murdered?  If so, were his words as objectionable as mine? If Ignatiev sought genocide, then surely a genocide of all Whites would be an even greater outrage than a genocide of all Jews, given the far greater number of Whites.

♡ 1          326

Show replies

**DEF_000666**

| | |
|---|---|
| **From:** | Restrepo, Manny |
| **To:** | Peeples,Aimee Melton |
| **Subject:** | Statement Regarding the Impact of Preston T. Damsky's Conduct on My Educational Experience |
| **Date:** | Friday, July 18, 2025 12:11:33 PM |
| **Attachments:** | Outlook-t4pymcqz.png |

To whom it may concern,

My name is Manny Restrepo, and I am entering my third year at the University of Florida Levin College of Law. I am writing this statement to share the personal and academic impact that Mr. Damsky's conduct has had on me during our time together as classmates.

Over the course of our shared classes, I witnessed Mr. Damsky express deeply troubling views, both verbally in class discussions and through writings and social media posts. In our classroom environment, he made statements expressing that homosexuals are unfit to serve in the military and pose a threat to national security. As a gay man, I was devastated and deeply hurt by these remarks. They were not simply ideological disagreements; they were personal attacks on my dignity, humanity, and belonging, both as a student in this institution and as a future legal professional.

Both in class and online, Mr. Damsky has made openly white supremacist and intolerant statements. For example, in our Constitutional Law class, he argued for exclusionary and discriminatory interpretations of the Constitution. In our Criminal Procedure class, he argued that the Fourth Amendment does not protect non-white people historically, and thus it should not protect them now. Furthermore, in one paper submitted for a different class, he argued that the Constitution's references to "people," "person," or "persons" do not include non-white individuals (while ignoring the impact of the Civil Rights Amendments). I am a Hispanic man, and encountering this assertion in an academic setting was jarring. It was not merely a theoretical position; it was an attack on my legitimacy, presence, and identity in this country and in our shared legal system.

What made this especially distressing was the response—or lack thereof—in class. Rather than curtail these comments, the professor at times directly invited Mr. Damsky to elaborate on his views, giving them the weight of open debate rather than addressing their harmful nature. While I understand the value of open dialogue in legal education, the repeated validation of these views through unchecked discussion created a hostile and emotionally unsafe learning environment for me. I often found myself emotionally depleted, anxious, and distracted after these exchanges, and I sought help from the law school therapist to cope with the impact. I needed professional support to process the harm I was experiencing in my learning environment.

I learned from fellow classmates that on social media, Mr. Damsky made comments that "Jews must be abolished by any means necessary." This is clearly beyond free speech and a call to violence, and his academic writings, which he has shared with students, similarly do the same: call for violence. I do not feel safe with Mr. Damsky as a peer in the law school.

DEF_000667

This situation diverted significant mental and emotional energy away from my studies, affecting my focus and participation. I did not enter law school expecting to be shielded from disagreement, but I did expect that my identity would be respected and that my education would be conducted in an environment free from hateful rhetoric that undermines the worth and safety of students like me.

I respectfully submit this statement in hopes that my experience will be considered in any proceedings related to Mr. Damsky and the harm caused by his conduct. I appreciate the opportunity to be heard.

Sincerely,

**Manny Restrepo**
**J.D. Candidate, 2026**
**Pronouns: He/him/his**
**Phone: (407)-307-5164**
**Email: manuelrestrepo@ufl.edu**



171

## Table of Exhibits

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████    ██████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

  ████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

Page #

(PD14) UF April 2019 Freedom of Expression Statement ............................................................. 47

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

(PD18) UF Law Facebook Post 9-11-23 with Stacey Patton Comment 9-13-23 .................................. 50

(PD19) Stacey Patton Anti-White Hate ............................................................................................ 51

(PD20) "becomingjd" Instagram post 9-21-23.................................................................................. 53

(PD21) "becomingjd" Instagram post 5-22-25.................................................................................. 54

███████████████████████████████████████████████████████████████

(PD23) Preston Damsky 1LS GroupMe Chat 9-21-23 ........................................................................ 58

(PD24) 1LS GroupMe Chat 9-22-25 .................................................................................................. 59

(PD25) Maryssa Hardy Direct Message to Preston Damsky via GroupMe 9-22-23........................... 64

(PD26) National Lawyers Guild (NLG) GroupMe Chat 9-22-23 ......................................................... 67

(PD27) Tyler Christian Visuvasam (Fla. St. Bar #1059074) – UF Law NLG Chapter Co-Founder.......... 75

(PD28) Eliot James Witte Kersgaard (Fla. St. Bar # 1059364) .......................................................... 77

(PD29) NLG Support for "mak[ing] racists afraid again" and Preston Damsky being "[redacted]"...... 79

(PD30) Context of "[redacted]".......................................................................................................... 80

(PD31) Ian J. Finley (Fla. St. Bar #1064831)...................................................................................... 85

(PD32) Sam Mendez........................................................................................................................... 89

**DEF_000669**

(PD33) Preston Damsky 1LS GroupMe Response 9-22-23 ..................................................................92

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

(PD37) Amazon "From The River To The Sea" T-Shirt Order ............................................................98

(PD38) Slides from "The Nuremberg Myth" Presentation by Preston Terry Damsky in Prof. Charles Collier's "American Legal Thought" Course – 3/26/23 ...............................................................99

(PD39) Relevant Portion from my Script Read at the Above Presentation ...................................101

(PD40) American Restoration Draft p. 25-27 (submitted 10/23/24) ............................................103

(PD41) E-mail Correspondence from Professor Jonathan Marshfield to Preston Damsky 11/20/24 ..............................106

(PD42) E-Mail Correspondence from Preston Damsky to Jonathan Marshfield on 12/16-17/24 ....................107

(PD43) E-Mail Correspondence from Preston Damsky to Judge John Badalamenti 10/28, 10/29, 11/5 .........108

(PD44) Judge Badalamenti Comments on Outline.........................................................................110

(PD45) E-Mail Correspondence from Preston Damsky to Judge John Badalamenti 12/15/24 ........111

(PD46) Judge Badalamenti E-Mail Correspondence with Preston Damsky 1/7/25 ...........................112

(PD47) Preston Damsky/Judge Badalamenti Call History ..............................................................113

(PD48) NLG Group Chat 2-12-25 ..................................................................................................114

(PD49) Grace McClung E-Mail to Preston Damsky 2/24/2025 ....................................................116

(PD50) Conditions for Speaking to Grace McClung on 2/26/25 at 2:10 AM .................................117

(PD51) Written Responses Given to Eleven Grace McClung Questions on 2/27/25 at 10:06 AM ...................118

(PD52) Email Correspondence between McClung and Damsky – 3/10/25 ....................................122

(PD53) Recollection of meeting with Dean McAlister on the morning of 3/11/25 .......................123

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

(PD58) Preston Damsky Twitter Exchange With Lyrissa Lidsky 4/1-2/25 ......................................128

(PD59) Lyrissa Lidsky Support for Israel .......................................................................................130

████████████████████████████████████████

....................................................................................................................................................131

(PD61) Lyrissa Lidsky Advanced Torts Schedule ..........................................................................132

(PD62) Excerpt from Lyrissa Lidsky Spring 2025 Constitutional Law Syllabus .............................132

████████████████████████████████████████

(PD64) Noel Ignatiev's Race Traitor at the UF Library ..................................................................133

(PD65) Race Traitor #1 Winter 1993.............................................................................................134

DEF_000670

(PD66) Race Traitor Issue #4 Winter 1995 ................................................................ 141

(PD67) Professor Adam Sabra ................................................................................... 146

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(PD71) UF Law Class of 2025 GroupMe Chat On Or Around 4/3/25 ........................... 158

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(PD74) Zac Cosner on 4/3/25 ..................................................................................... 164

(PD75.A) E-Mail Correspondence Between Preston Damsky & Jose Capula 4/3/25 @ 10:38AM/Reply from Pamela Malyk on 4/4/25 @ 12:52 PM ......................................... 167

(PD75.B) Preston Damsky E-Mail Correspondence with Professor Lea Johnston 4/4/25 @ 1:21 PM/3:35 PM ............... 168

(PD76) Preston Damsky E-Mail Correspondence with Professor Kristen Hardy 4/4 @ 1:17 PM, 4/7, and 4/8/25 ........... 168

(PD77) Preston Damsky E-Mail Correspondence with Professor Ryan Scott 4/4 @ 1:19 PM, 4/7, and 4/8/25 ............... 169

(PD78) Preston Damsky E-Mail Correspondence with Dean Janice Shaw 4/4/2025 @ 1:24PM – 2:20 PM ...................... 170

(PD79) "Responding to Community Concerns" – Dean McAlister Email 4/4/25 at 7:11 PM ......................................... 172

(PD80) E-Mail to Charles Collier 4/5/2025 @ 8:08 PM and Response from Tanya Dampier 4/10/25 .............................. 172

(PD81) Record of Phone Call Between Preston Damsky and Professor Charles Collier on 4/5/2025 at 8:16 PM ............. 174

(PD82) Zac Cosner message in NLG GroupMe Chat on 4/7/25 ................................... 175

(PD83) 4-7 -25 "Reflections on the Avoidable Downfall of a Racist" by Zac Cosner ........................................................ 176

(PD84) NLG GroupMe 4/7/25 ..................................................................................... 190

(PD85) Lyrissa Lidsky and Zac Cosner are Instagram Friends .................................... 192

(PD86) Zac Cosner on the meaning of "86 47" on Twitter (4/7/25) ........................... 193

(PD87) Message from Professor Charles Collier to Dean McAlister on or around 4/9/25 ................................................. 194

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(PD91) Preston Damsky E-Mail Correspondence with Professor Kristen Hardy 4/17/25 ................................................. 200

(PD92) "UF law student trespassed…" – Independent Florida Alligator – 4/21/25 ......................................................... 201

████████████████████████████████████████████████████████

Daniel Pinkus - Jewish Gator of the Week

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(PD96) Lyrissa Lidsky began posting to Instagram after a nearly year break on April 26, 2025 ....................................... 206

████████████████████████████████████████████████████████

(PD98) Preston Damsky E-Mail Correspondence with Professor Lea Johnston 5/8-9/25 (Congratulations for Book Award #1) ...................................................................................................................... 207

DEF_000671

(PD99) Preston Damsky E-Mail Correspondence with Professor Lea Johnston 5/15/25 (Congratulations for Book Award #2) ........................................................................................................................................ 209

██████████████████████████████████████████████████████████

(PD101) Notification of Three Book Awards and Class Rank after Spring Semester .......................... 212

██████████████████████████████████████████████████████████

(PD103) "A White Nationalist Wrote A Law School Paper . . ." – New York Times – 6/21/25 ........................................... 214

(PD104) NLG GroupMe Chat 6/21/25 After NYT Story Was Published ................................ 215

(PD105) NLG GroupMe Chat 6/22/25 ......................................................................................... 216

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████████0

(PD108.A) Stephany Matat Media Inquiry ........................................................................... 223

(PD108.B) NLG GroupMe Chat 6/25/25 ............................................................................... 224

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

(PD110) "SuccessfulFly7718" Reddit Post on "/r/LawSchool" 6/25/25 .............................................. 230

██████████████████████████████████████████████████████████

(PD112) Zach Cosner Continued Twitter Harassment on 7/3/25 ................................................ 233

██████████████████████████████████████████████████████████

(PD114) 7/7/25 NLG GroupMe Chat ........................................................................................ 235

(PD114) Scott Jurkowski Instagram Activity ............................................................................ 236

(PD115) Mary Claire Jackson's Solicitations for Reports and Leadership of NLG (last on 7/18/25) ................................ 237

(PD116) A Small Selection of violent rhetoric and threats directed at Preston Damsky Since 4/1/25 ............................ 239

DEF_000672

## (PD14) UF April 2019 Freedom of Expression Statement

https://statements.ufl.edu/statements/2019/april/freedom-of-expression-statement.html

STATE

# FREEDOM OF EXPRESSION STATEMENT

## https://archive.ph/NrN19

April 12, 2019

As a world-class research institution, the University of Florida ("UF") fosters an environment where divergent ideas, opinions and philosophies, new and old, can be rigorously discussed and critically evaluated in the academic environment. At the same time, as a public institution, UF must provide First Amendment protections to its students, employees and other members of the community.  UF's commitment to these protections, however, runs deeper than simply a legal requirement. We believe at our core that the academic excellence and inclusiveness values we strive for could not be achieved unless we fully adhere to these First Amendment principles. The purpose of this statement is to explain what UF's commitment entails, as well as our rights and responsibilities under these principles.

To achieve our goal of independent inquiry and vigorous academic deliberation, UF will not stifle the dissemination of any idea, even if some members of our community find it wrong-headed, offensive or hateful. Rather, UF will ensure that individuals expressing such ideas are able to do so free from bullying, violence, threat of violence or any other type of disruptive behavior.

This does not mean, however, that UF believes such ideas should go unchallenged. In fact, UF encourages members of its community to analytically and respectfully challenge contrary ideas so long as such challenges are conducted in a civil manner that does not stifle the open expression of the opposing ideas. Thus, such challenges must not interfere with speakers' ability to speak or with their audience's ability to hear the speakers.

Developing the intellectual skills necessary to respectfully and responsibly analyze, discuss and challenge the merits of contradicting (or even offensive) opinions and ideas, through counter arguments and civil discourse, is a key element of both personal and scholarly growth. Teaching such skills, in turn, is a crucial component of UF's academic mission.

DEF_000673

The preceding information is not meant to suggest that there are no limits on the expression of one's ideas. First, UF will restrict any speech that violates the law including, but not limited to, genuine threats of violence or harm and statements designed to incite others to engage in imminent unlawful conduct. Second, in order to ensure that the successful functioning of UF is not disrupted or impeded, UF imposes reasonable time, place and manner restrictions on speech and expression. For example, UF typically prohibits electronically amplified instruments in academic areas in order to ensure classes are not disrupted. Such restrictions, set forth in UF's regulations and policies, are narrowly-drawn and content-neutral; they are designed to preserve campus order and security, while also ensuring that all members of the UF community have an equal ability to express their ideas and opinions.

Finally, in accordance with First Amendment principles and the State of Florida's *Campus Free Expression Act*, (*Florida Statutes* section 1004.097), UF does not restrict free expression rights to specific areas of campus, often referred to as "free speech zones." Rather, UF considers outdoor areas of campus (accessible areas of campus where members of our community are commonly allowed, including, but not limited to, grassy areas, walkways or other common areas) as traditional public forums. In those areas, any person can engage in spontaneous or contemporaneous expressive activity so long as the person's conduct remains lawful, does not disrupt the functioning of UF, and does not infringe upon or obstruct any other person's rights to engage in their own expressive activities.

----------------------

Documents influencing the creation of this Freedom of Expression Statement include the following: *Free Speech on Campus*, Chemerinsky and Gillman (2017); Texas A&M University, Free Speech and the Right to Associate (2018); Purdue University, Commitment to Freedom of Expression; and UC Davis, Chapter 400, Campus Climate, Section 01, Freedom of Expression (2018).

DEF_000674

# (PD18) UF Law Facebook Post 9-11-23 with Stacey Patton Comment 9-13-23



DEF_000675

# (PD19) Stacey Patton Anti-White Hate






DEF_000676



DEF_000677

## (PD20) "becomingjd" Instagram post 9-21-23





DEF_000678

# (PD21) "becomingjd" Instagram post 5-22-25



DEF_000679

## (PD23) Preston Damsky 1LS GroupMe Chat 9-21-23



Preston

> Ocean Miller-Shaked
> 🖾 Photo

The United States lost 19.3 million White faces on net over the past decade, which I am sure fills this man with nothing but joy, so why on earth should White people care at all about his criticisms of our demographic share in any institution? An even better question is: why should we feel anything but pure contempt for him and anyone else who expresses and shares such naked hatred for us?



Will Hoffman
Woah let's not get political in the GroupMe this is a place for memes

58

DEF_000680

## (PD24) 1LS GroupMe Chat 9-22-25



**Left panel:**

> Photo
> Me after steering the Gro...

I don't think you steered the chat away from politics to dogs... I think you steered it away from racism to dogs. There was a clear opportunity to folks in this chat to let @Preston know that his comment was egregiously hateful and purposefully dense.

**Katelynd KT Todd**

@Preston your now deleted comment was disgusting and deplorable. It is embarrassing to know that people we go to class with everyday think like you. I wish our law school could have been able attain some of the amazing diverse professors that could have had a positive impact on you & potentially helped you grow into a better human. You are not a victim in the discussion of diversity failures at UF law. "White faces" are not victims in the discussion of low Black student attendance at UF law. The concerns of what is going on in Florida and at UF Law are valid. In fact, your comment exacerbates and illustrates just the issues we have.

It burns my heart that students have to read your words & then show up in class as if they're accepted and valued.

**Right panel:**

**Victoria Kass**

> Photo

I just want us all to be VERY CLEAR that hatred is not political - it's hatred. Racism is not political - it's racism.

You can't attach the description "political" to something and turn a blind eye to it.

@Ocean Miller-Shaked - if your goal of bringing this up was to make a joke or get attention - that's very childish and tremendously damaging to the people who are harmed by this behavior.

So many of you have never worked a day in your life and have come into UF law with the mindset of privilege and entitlement. It's repulsive. And I sincerely hope you brace yourself for the real world that awaits you.

12:46

**Katelynd KT Todd**

@Preston It also was a poorly developed argument so I'm hoping your critical thinking skills develop further by graduation. Embarrassing. There was not a single attack on white faces or white people in the criticism that was

59

**DEF_000681**



DEF_000682



DEF_000683



DEF_000684

187



63

DEF_000685

(PD25) Maryssa Hardy Direct Message to Preston Damsky via GroupMe 9-22-23



DEF_000686



**Maryssa Hardy**

I didn't get to respond because the chat was deleted but the fact that you think "more black students" means "you should not be here" is crazy. And I want to clear up one thing for you. There are MANY minority students who have the numbers to get here and succeed here. But it's people like you who make minority students feel like they don't belong and end up not coming here. You obviously are not thinking about how current law schools classes affect the overall population, and for that I'm truly saddened. I really hope that all the UF students agree that your comments have no merit. These students that you are trying to degrade will go on to have successful careers while you will be battling getting your Character and Fitness passed.
Be blessed.

65

DEF_000687



DEF_000688

# (PD26) National Lawyers Guild (NLG) GroupMe Chat 9-22-23



DEF_000689



DEF_000690



DEF_000691



DEF_000692



71

DEF_000693



72

DEF_000694



DEF_000695



74

DEF_000696

# (PD27) Tyler Christian Visuvasam (Fla. St. Bar #1059074) – UF Law NLG Chapter Co-Founder



**BIOGRAPHY**

Tyler Visuvasam is an attorney at Davis Law Firm. His practice focuses on insurance coverage, business litigation, and construction defects. Prior to joining the firm as an attorney, he first worked with Davis Law Firm as a summer associate in 2023. In the summer of 2022, Tyler interned at Withers Harvey, P.A., where he gained experience in wills, trusts, and general business litigation.

Tyler received his law degree from the University of Florida Levin College of Law. While in law school, Tyler co-founded the College's chapter of the National Lawyers' Guild and worked as an editor for the Florida Journal of International Law.

With Florida Legal Services, Inc., Tyler provided pro bono assistance to clients who had faced discrimination and were seeking recourse under the Fair Housing Act. During this time, Tyler gave educational presentations about the protections afforded by the Fair Housing Act, and helped clients navigate the administrative complexities of submitting Fair Housing claims.

**Bar Admissions**

- Florida Bar

**Education**

- University of Florida Levin College of Law, Gainesville, Florida
  - Juris Doctor
  - Editor for the Florida Journal of International Law
  - Co-Founder of National Lawyers' Guild Chapter
- University of Florida
  - B.A.
  - Majors: Political Science; Economics
  - Student Government Senator
  - Swimming and Diving

DEF_000697

# Tyler Christian Visuvasam

| Member in Good Standing | Eligible to Practice Law in Florida |
|---|---|

| | |
|---|---|
| Bar Number: | 1059074 |
| Mail Address: | Mr. Tyler C. Visuvasam<br>231 E Adams St<br>Jacksonville, FL 32202-3305<br><br>Office: **904-748-1117** |
| Physical Address: | 231 E Adams St<br>Jacksonville, FL 32202-3305<br><br>Office: **904-748-1117** |
| Email: | tv@davispllc.com ✉ |
| Personal Bar URL: | https://www.floridabar.org/mybarprofile/tvisuvasam |
| vCard: | |
| County: | Duval |
| Circuit: | 04 |
| Admitted: | 09/27/2024 |
| 10-Year Discipline History: | None |
| Sections: | Young Lawyers |
| Firm: | Mr. Tyler C. Visuvasam |
| Firm Position: | Associate |
| Firm Website: | https://davispllc.com/ ↗ |

76

DEF_000698

# (PD28) Eliot James Witte Kersgaard (Fla. St. Bar #1059364)



**Eliot Kersgaard**

Judicial Law Clerk

Jacksonville, Florida, United States · **Contact Info**

2K followers · 500+ connections

See your mutual connections

Join to view profile          ◄ Message

United States District Court

**UF** University of Florida

## About

I am a law clerk in the United States District Court for the Middle District of Florida, Jacksonville Division.

During law school, I was the director of tryout administration for the Florida Moot Court team. During the 2022-23 academic year, I worked with Professor Danaya Wright on an independent study about legislative exactions under the Takings Clause. I was also the social chair for the UF chapters of OutLaw, an LGBTQ+ affinity group, and the National Lawyers Guild.

Prior to law school, I studied physics, education, public speaking, philosophy, and living systems design. I have over 10 years of experience as a STEM educator and 5 years of experience in the startup and nonprofit spaces. I am an amateur poet and forager. My first poetry collection (2024) and my children's activity book (2017) are both available.

77

DEF_000699

# Eliot James Witte Kersgaard

| Member in Good Standing | Eligible to Practice Law in Florida |
|---|---|

| | |
|---|---|
| Bar Number: | 1059364 |
| Mail Address: | Mr. Eliot James Witte Kersgaard <br> 300 N Hogan St Ste 11-350 <br> Jacksonville, FL 32202-4244 <br><br> Office: **904-301-6753** |
| Email: | eliotkersgaard@gmail.com ✉ |
| Personal Bar URL: | https://www.floridabar.org/mybarprofile/eliotkersgaard |
| vCard: | |
| County: | Duval |
| Circuit: | 04 |
| Admitted: | 10/04/2024 |
| 10-Year Discipline History: | None |
| Sections: | Young Lawyers |
| Firm: | Mr. Eliot James Witte Kersgaard |

78

DEF_000700

(PD29) NLG Support for "mak[ing] racists afraid again" and Preston Damsky being "[redacted]"



DEF_000701

# (PD30) Context of "[redacted]"





80

DEF_000702





81

DEF_000703



**Anonymous** ID:pNta5iU5 Wed 25 Jun 2025 16:49:55 No.508723979    View

>>508720153

You could form a serious bipartisan coalition between all the legions of miga bootlickers and shitlib corporatist dems buttblasted over this guy

Just gather them all in one place and [REDACTED].

**Matcha (He/Him)**🏴    Follow
@matchatea420.bsky.social

you're not a "leftist" and you should be [REDACTED] for saying so

ⓘ Blocked

June 21, 2025 at 11:15 PM   👥 Everybody can reply

**1** repost    **13** likes

82

DEF_000704







**DEF_000705**

What does it mean when someone on the internet or a chat app says a person should be "[redacted]"?

When someone online or in a chat app says a person should be "[redacted]," they're usually **censoring** or **implying** something controversial, offensive, threatening, or inappropriate without stating it directly. The word "redacted" is often used humorously, sarcastically, or to skirt platform moderation.

## Possible meanings behind "[redacted]":

1. **Implied violence or harm** – They might be suggesting something aggressive but don't want to say it outright (e.g., "That guy should be [redacted]" could imply "punched" or something worse).

2. **Censorship for humor or safety** – It's used to joke about saying something that would get them banned or cause drama (e.g., "My opinion is that he should be [redacted] 👀").

3. **Placeholder for taboo content** – The speaker might be alluding to an action, insult, or opinion that's socially or morally frowned upon.

## Why people use it:

- To **avoid breaking rules** on platforms that prohibit threats, hate speech, etc.
- To **maintain plausible deniability** (if called out, they can claim they didn't actually say anything).
- To **add dramatic or comedic effect**, leaving the interpretation to the reader.

If you're unsure whether it's meant as a joke or something serious, **context is key**—and if it feels threatening or targeted, it may violate platform policies and should be reported.



DEF_000706

# (PD31) Ian J. Finley (Fla. St. Bar #1064831)





HOME / TEAM / IAN J. FINLEY                                                SHARE f X in ✉ ⬇

## Overview

Areas of Focus

Professional and Community Involvement

Credentials

## Overview

Ian Finley represents individuals and businesses in a wide range of commercial litigation matters, including cases involving business disputes, breach of contract, business torts, and other complex civil litigation. His experience spans a variety of litigation areas, including antitrust, employment, and judgment collection.

Ian earned his J.D. from the University of Florida Levin College of Law, where he was an award-winning executive board member of the Florida Moot Court Team and received the CALI Excellence for the Future Book Award in Trial Practice.

Prior to joining Carlton Fields, Ian served as a law clerk to the Honorable Kristine Van Vorst of Florida's Eighth Judicial Circuit, where he assisted with litigation research.

85

DEF_000707

# Ian J. Finley

| Member in Good Standing | Eligible to Practice Law in Florida |
| --- | --- |

| | |
| --- | --- |
| Bar Number: | 1064831 |
| Mail Address: | Carlton Fields<br>525 Okeechobee Blvd Ste 1200<br>West Palm Beach, FL 33401-6350<br><br>Office: **561-650-0336** |
| Email: | ifinley@carltonfields.com ✉ |
| Personal Bar URL: | https://www.floridabar.org/mybarprofile/ifinley |
| vCard: | 🪪 |
| County: | Palm Beach |
| Circuit: | 15 |
| Admitted: | 04/17/2025 |
| 10-Year Discipline History: | None |
| Law School: | University of Florida, Fredric G. Levin College of Law |
| Sections: | Young Lawyers |
| Firm: | Carlton Fields |

86

DEF_000708



Ian Finley          Sep 22, 2023

**Report a Community Concern - Levin College of Law**

UF Law community members may email the Senior Assistant Dean for Students at shaw@law.ufl.edu. You may also use this form to submit an a...

DONIELLE NARDI

♥ 17

An Admin told me that only one report has been made to this portal. If you have time please share your concerns so that they are reflected.

♥ 13

88

DEF_000709

## (PD32) Sam Mendez



DEF_000710



DEF_000711



**Sam Mendez**
he deleted it... why do bigoted people think screenshots don't work on them

♥ 1

**Sam Mendez**

> **Preston**
> I'll dig into these points at my leisure, but before I do so I just want to make it clear that I did not delete my previous comment in the screenshot above, someone else did without any explanation given to me as to why it was deleted; and furthermore, I stand 100% behind that comment without any reservations or qualifications. Going forward, if my comments are deleted just know that I did not do it.

＋  Send Message  😊  📷

at what point do we ask for expulsion. this is crazy

♥ 2

91

DEF_000712

## (PD33) Preston Damsky 1LS GroupMe Response 9-22-23



**Preston**
I want to thank the individuals above for their comments as they have entirely vindicated the sentiment behind my post. When the original Instagram post asks "How many Black faces do you see?" and sarcastically says "this is what diversity looks like in 2023" as the caption to a picture showing a crowd of smiling people who are mostly White, and when Katelynd speaks of "diversity failures at UF law", is there any doubt as to what they truly mean to say? They complain about the lack of Black faces, yet what are we supposed to believe is their proposal in regards to changing this? Do they want to see fewer Asian faces and more Black faces? Do they want to see fewer Hispanic faces and more Black faces? Or do they wish for an expansion of the class size and the increased seats allotted in such a manner that discriminates in favor of Black applicants and de facto against everyone else?

**Preston**
Perhaps I am cynical, but I am also confident that those who find fault in the "diversity" of UF Law, especially in reaction to our class picture, intend to say one thing: too many White students. If they feel I am wrong, they are

**Preston**
Perhaps I am cynical, but I am also confident that those who find fault in the "diversity" of UF Law, especially in reaction to our class picture, intend to say one thing: too many White students. If they feel I am wrong, they are welcome to explain themselves.

**Preston**
I am also curious as to what specifically these individuals above believe is the problem with the process behind how our 1L class was selected. To me, what they are implying is a calumny against this school's administration, that there was a deliberate effort by the admissions committee and those responsible for creating that committee to discriminate against Black applicants. What evidence do they have for this, and if they have none then why is the relative lack of Black students a problem at all? What impropriety was done? If these individuals have a problem with the way admissions are conducted, then they should bring their concern to the administration, but I would caution them against demanding admissions be done under a racially discriminatory rubric as this was recently ruled to be illegal and as aspiring professional attorneys they should probably avoid advocating for others to engage in illegal behavior.

92

**DEF_000713**



NOTE: I believe that shortly after Mr. Branch sent his message, this GroupMe room was deleted by the room admin, who, if my memory serves me correctly, was fellow then-1L student Jared Weingard.

93

DEF_000714

# (PD37) Amazon "From The River To The Sea" T-Shirt Order



**Order Placed:** October 13, 2023
**Amazon.com order number:** ████████████
**Order Total:** $14.38

## Shipped on October 14, 2023

| Items Ordered | Price |
|---|---|
| 1 of: *Free Palestine Arabic support Palestine and keffiyeh palesti T-Shirt* | $13.38 |
| Sold by: Amazon.com Services, Inc | |
| Supplied by: Other | |
| | |
| Condition: New | |

**Shipping Address:**
Preston Damsky
████████ ████████
GAINESVILLE, FL ████████
United States

**Shipping Speed:**
One-Day Shipping

## Payment information

**Payment Method:**
████████████

**Billing address**
Preston Damsky
████████████████████

**Credit Card transactions**

| | | |
|---|---|---|
| Item(s) Subtotal: | | $13.38 |
| Shipping & Handling: | | $0.00 |
| | | ----- |
| Total before tax: | | $13.38 |
| Estimated tax to be collected: | | $1.00 |
| | | ----- |
| **Grand Total:** | | **$14.38** |
| ████████ | October 14, 2023: | $14.38 |

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2025, Amazon.com, Inc. or its affiliates

**DEF_000715**

(PD38) Slides from "The Nuremberg Myth" Presentation by Preston Terry Damsky in Prof. Charles Collier's "American Legal Thought" Course – 3/26/23

## THE NUREMBERG MYTH AS A JUSTIFICATION FOR GENOCIDE IN PALESTINE

Finkelstein also observed that "[o]rganized American Jewry has exploited the Nazi holocaust to deflect criticism of Israel's and its own morally indefensible policies."

President Biden was guilty of this:

- Shortly after October 7th, Biden declared that day was "the 'deadliest day for Jews since the Holocaust,'" meanwhile, according to The Guardian, "Israeli jets continued to strike Gaza, an enclave running desperately low on medical supplies" while "the US was surging' additional military assistance to the Israel Defense Forces."

    Hamas attack 'deadliest day for Jews since the Holocaust', says Biden, as Israeli jets pound Gaza, THE GUARDIAN (Oct. 12, 2023), https://www.theguardian.com/world/2023/oct/12/israel-hamas-war-biden-jews-holocaust-palestine-iran-warning [https://archive.is/9G52J]

- Like the crafters of the Nuremberg Myth, Biden continuously invoked libelous atrocity propaganda, falsely claiming, for example, that he had "see[n] and . . . confirmed pictures of terrorists beheading children" a claim—originating with a Jewish reporter in Palestine and propagated by the so-called Israeli government—that his own White House denied.

    Jeremy Scahill, JOE BIDEN KEEPS REPEATING HIS FALSE CLAIM THAT HE SAW PICTURES OF BEHEADED BABIES, THE INTERCEPT (Dec. 14, 2023), https://theintercept.com/2023/12/14/israel-biden-beheaded-babies-false/ [https://archive.is/XsuNI].
    White House walks back Biden's claim he saw children beheaded by Hamas, Al Jazeera (Oct. 12, 2023), https://www.aljazeera.com/news/2023/10/12/white-house-walks-back-bidens-claim-he-saw-children-beheaded-by-hamas [https://archive.is/Czu6n].

## TRUMP IS WORSE



"October 7th was not just the deadliest day for the Jewish people since the Holocaust, it was not just the worst terror attack since 9/11, it was an attack on humanity itself. It was a hideous, incredible cruelty. It was chilling savagery. It was demonic delight. The destruction of innocent life. On October 7th, it seemed as if the gates of hell had sprung open and unleashed their horrors onto the world."

99

DEF_000716

## AND LISTEN TO WHAT HIS ISRAELI BOSS SAYS!



"[All] too many people in the West who preferred to condemn [Israel] rather than Hamas. Who accused Israel of genocide. Who called for Israel to be denied weapons of self-defense. Who made Jews feel unwelcome on US college campuses. Who treated Israelis as if they were . . . war criminals. These are the kind of people who allowed the Holocaust to happen . . ."

## THE FRUITS OF THE POISONED NUREMBERG TREE

By October 7th, 2024:

- As many as 186,000 Palestinian deaths were directly or indirectly attributable to the now-worsening Jewish genocide
  - More than 41,870 killed directly by violence
- Nearly two million Palestinians had been forced to leave their homes
- At least 370,000 Palestinian homes had been damaged
- More than 79,000 Palestinian homes completely destroyed
- An estimated $18.5 billion in damage was done to Gaza's critical infrastructure

All of this, with continuing transfers of American weaponry, despite the fact that as of June, 2024, 61% of Americans wanted the U.S. to stop sending weapons to the so-called "government of Israel."

Fact Sheet: One Year of Israel's Genocide in Gaza, By the Numbers, INST. MIDDLE E. UNDERSTANDING (Oct. 7, 2024), https://imeu.org/article/fact-sheet-one-year-of-israels-genocide-in-gaza-by-the-numbers [https://archive.is/RATKG].





Buildings damaged or destroyed in Gaza



100

DEF_000717

## (PD39) Relevant Portion from my Script Read at the Above Presentation

### Holocaustism

Before I conclude, I want to briefly outline the political necessity of attacking the legal and factual bases of the Nuremberg Myth. Contrary to the architects of the Nuremberg trials who represented that they wished to conduct "the Trial to End All Wars,"[1] as we saw in *Nuremberg: Reflection and Resonance* the Nuremberg Myth is used as a weapon of war and is frequently invoked as a means of attempting to legitimize America's aggression abroad. In that documentary, the narrator compared Saddam Hussein and Slobodan Milošević to the Nuremberg defendants. This use of the Nuremberg Myth was criticized by Norman Finkelstein in his 2000 book "The Holocaust Industry" where he observed that comparisons between Saddam Hussein and Adolf Hitler were used to justify the imposition of UN sanctions on Iraq throughout the 90s which may have led to the deaths of around "a million children."[2] Of course, President Bush's designation of Iraq as belonging to an "Axis of Evil" (along with Iran and North Korea) was used as a propaganda tool to rally America behind the 2003 invasion of Iraq, an invasion which a 2006 study in The Lancet concluded had resulted in more than 600,000 excess deaths in that country[3] and which led to civil wars, sectarian violence, and terrorism that continue to devastate Iraq.

Finkelstein also observed that "[o]rganized American Jewry has exploited the Nazi holocaust to deflect criticism of Israel's and its own morally indefensible policies."[4] We have all observed that cynical tactic heavily utilized by Jews and their allies since October 7th, 2023 to justify their ongoing genocide in Palestine and to justify continuing U.S. military aid to enable that slaughter. For example, shortly after October 7th, President Biden declared that day was "the 'deadliest day for Jews since the Holocaust,'" meanwhile, according to The Guardian, "Israeli jets continued to strike Gaza, an enclave running desperately low on medical supplies" while "the US was surging' additional military assistance to the Israel Defense Forces."[5] Like the crafters of the Nuremberg Myth, Biden continuously invoked libelous atrocity propaganda, falsely claiming, for example, that he had "see[n] and . . . confirmed pictures of terrorists beheading children"[6] a claim—originating with a Jewish reporter in Palestine and propagated by the so-called Israeli government—that his own White House denied.[7] Donald Trump, not to be outdone in pathetic and nauseating obsequiousness to Jewry, declared a year later at an event commemorating the anniversary of October 7th, 2023, that:

> October 7th was not just the deadliest day for the Jewish people since the Holocaust, it was not just the worst terror attack since 9/11, it was an attack on humanity itself. It was a hideous,

---

[1] *See* David Luban, *The Legacies of Nuremberg*, 54 SOC. RSCH. 779, 780–81 (1987) ("In the words of Robert H. Jackson, the chief prosecutor at Nuremberg, 'This inquest represents the practical effort of four of the most mighty of nations . . . to utilize international law to meet the greatest menace of our times–aggressive war.' For the trial's framers, then, its decisive legal achievement lay in recognizing the category of crimes against peace.") (citation omitted).

[2] NORMAN FINKELSTEIN, THE HOLOCAUST INDUSTRY 73 (Online Edition, 2014, originally published 2000), https://archive.org/details/pdfy-FIHzFI2A0381jWOy/.

[3] Gilbert Burnham et al., *Mortality after the 2003 invasion of Iraq: a cross-sectional cluster sample survey*, 368 THE LANCET 1421 (2006).

[4] FINKELSTEIN, *supra* note 2 at 75.

[5] *Hamas attack 'deadliest day for Jews since the Holocaust', says Biden, as Israeli jets pound Gaza,* THE GUARDIAN (Oct. 12, 2023), https://www.theguardian.com/world/2023/oct/12/israel-hamas-war-biden-jews-holocaust-palestine-iran-warning [https://archive.is/9G52J]

[6] Jeremy Scahill, *JOE BIDEN KEEPS REPEATING HIS FALSE CLAIM THAT HE SAW PICTURES OF BEHEADED BABIES*, THE INTERCEPT (Dec. 14, 2023), https://theintercept.com/2023/12/14/israel-biden-beheaded-babies-false/ [https://archive.is/XsuNl].

[7] *White House walks back Biden's claim he saw children beheaded by Hamas*, Al Jazeera (Oct. 12, 2023), https://www.aljazeera.com/news/2023/10/12/white-house-walks-back-bidens-claim-he-saw-children-beheaded-by-hamas [https://archive.is/Czu6n].

DEF_000718

incredible cruelty. It was chilling savagery. It was demonic delight. The destruction of innocent life. On October 7th, it seemed as if the gates of hell had sprung open and unleashed their horrors onto the world.[8]

At the same event, Miriam Adelson, who ten days later would give Trump's campaign $100 million,[9] argued that there were:

> [All] too many people in the West who preferred to condemn [Israel] rather than Hamas. Who accused Israel of genocide. Who called for Israel to be denied weapons of self-defense. Who made Jews feel unwelcome on US college campuses. Who treated Israelis as if they were . . . war criminals. These are the kind of people who allowed the Holocaust to happen . . .[10]

By October 7th, 2024 as many as 186,000 Palestinian deaths were directly or indirectly attributable to the now-worsening Jewish genocide (with more than 41,870 killed directly by violence), nearly two million Palestinians had been forced to leave their homes, at least 370,000 Palestinian homes had been damaged with more than 79,000 Palestinian homes completely destroyed, and an estimated $18.5 billion in damage was done to Gaza's critical infrastructure; all of this, with continuing transfers of American weaponry, despite the fact that as of June, 2024, 61% of Americans wanted the U.S. to stop sending weapons to the so-called "government of Israel."[11]

But the Nuremberg Myth is not only used to bolster public support for wasteful and immoral military actions. In a very real sense, the Nuremberg Myth is the founding myth of the post-war liberal order throughout the West. Similarly, as Finkelstein argues, "[t]he Holocaust is by now firmly entrenched in American life . . . one is hard-pressed to name a single political cause, whether it be pro-life or pro-choice, animal rights or states' rights, that hasn't conscripted The Holocaust."[12] Our obviously stunted political discourse should not revolve around the Nuremberg Myth and its flimsy foundations. It is high time that this collection of lies be relegated to the dustbin of history with the other destructive dogmas that have degenerated once healthy societies. Only then can we begin to reclaim a country and build an international order based upon truth and mutual respect.

---

[8] Donald Trump, Address at Oct. 7 memorial event with Jewish leaders in Miami (Oct. 7, 2024), https://www.rev.com/transcripts/trump-speaks-at-october-7th-event [https://archive.is/ZlqNe].

[9] Asaf Elia-Shalev, *Miriam Adelson gives $100 million to Trump campaign, making good on reported pledge*, THE TIMES OF ISRAEL (Oct. 17, 2024 5:43 AM), https://www.timesofisrael.com/miriam-adelson-gives-100-million-to-trump-campaign-making-good-on-reported-pledge/ [https://archive.is/TgynO].

[10] Miriam Adelson, Address at Oct. 7 memorial event with Jewish leaders in Miami (Oct. 7, 2024), https://www.rev.com/transcripts/trump-speaks-at-october-7th-event [https://archive.is/ZlqNe].

[11] *Fact Sheet: One Year of Israel's Genocide in Gaza, By the Numbers*, INST. MIDDLE E. UNDERSTANDING (Oct. 7, 2024), https://imeu.org/article/fact-sheet-one-year-of-israels-genocide-in-gaza-by-the-numbers [https://archive.is/RATKG].

[12] FINKELSTEIN, *supra* note 2 at 73.

DEF_000719

(PD40) American Restoration Draft p. 25-27 (submitted 10/23/24)

**Conclusion – Why Should This Be Done?**

One may grant the correctness of my analysis regarding how popular sovereignty restrains the actions of the constituted government, accept that America was a White country for most of its history (and was founded as such), and concede that these principles are in tension with historical and contemporary processes of demographic change in America. One may even grant that, given the ends sought to be advanced, my Article V, Section 2 proposal is wise and well-reasoned. However, the objection may still be heard that this is all wrong. The United States is no longer a White country, and, moreover, that White country "is never coming back," so "[a]rguing that anything like it should is pointless—and thus, simply mean."[110] Indeed, given the tremendous social upheavals my proposal would entail—the lives of hundreds of millions of people across the world would be dramatically changed—it might be contended that these arguments are not only mean, but reprehensible. And obviously, this feeling would be felt most acutely by those non-Whites living in America whose lives would be most negatively impacted.

---

[106] "From Thomas Jefferson to William Stephens Smith, 13 November 1787," *Founders Online*, National Archives, https://founders.archives.gov/documents/Jefferson/01-12-02-0348. [Original source: *The Papers of Thomas Jefferson*, vol. 12, *7 August 1787–31 March 1788*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1955, pp. 355–357.]

[107] THE FEDERALIST NO. 29, at XYZ (Alexander Hamilton) (XYZ ed., XYZ year)

[108] U.S. CONST. amend. II.

[109] WILLIAM SHAKESPEARE, JULIUS CAESAR act 3, sc. 2, ll. 1563–68.

[110] John McWhorter, *She Is Outrageous, Demeaning, Dangerous. She Shouldn't Be Punished.*, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/opinion/amy-wax-academic-freedom-penn.html (applying this argument against University of Pennsylvania Law Professor Amy Wax).

25

DEF_000720

For better or worse, history is an unalterable inheritance. We can no more change history than we can change the orientation or intensity of the stars in the night sky. It is also true that, like those stars, history may position and guide us. Our Constitution, and the fundamental principles it embodies, is one such guiding historical inheritance. Of course, unlike history or the stars, we can change the Constitution; as a practical matter, we can do away with part or all of it as we wish, provided we have the will and the power to do so. Nonetheless, we seem to abide by it (or at least, pretend like we abide by it) in large part because we have respect for the history that formed it and delivered it to us in the present. Like the man of wealth and prudence who has inherited a luxurious mansion in which his family has lived for generations, and who tempers his exuberance and his desire to tear the whole thing down and build a water park in its stead so that he may deliver his abode to his children, and that his children may deliver it to theirs, and so on, we resist throwing out our Constitution. We thus say that we limit ourselves to making relatively small and incremental changes which do not dramatically change the character of the whole document and the government which it gives textual authority to.

But as this paper demonstrates, the Constitution has, effectively, been thrown out. Through the demographic changes caused by our government, the Constitution's overarching principle—the sovereignty of the People—is now a dead letter. When Chin & Finkelman argue that the 1790 Naturalization Act "deserves a place of dishonor,"[111] what they are essentially saying is that the founding of the United States deserves a place of dishonor. Many non-Whites may agree with that proposition, and they may feel joyful that the government of the United States has usurped the People's sovereignty. After all, without this usurpation, non-Whites may not have ever been permitted to become citizens of this country. But at what cost was this "victory" over the People won? Do non-Whites truly believe that, after the government has usurped sovereignty from the People, sovereignty shall pass to them? Furthermore, if the racial attitudes of the Founders which brought White nationalism in to force in the United States are merely a bygone relic of an age that should be forgotten—nay, dishonored!—then why should the government respect any other provision of the Constitution? Why should the Founders' concern with the Crown's restriction on their free speech give legitimacy to the First Amendment? Why should their hatred of general warrants give legitimacy to the Fourth Amendment? Why should their fear of the thumbscrew and the breaking wheel give legitimacy to the Fifth and Eighth Amendments? And if that legitimacy comes not from the history of this country and the Founders, then where will it be found?

Finally, I shall speak directly to my brothers and sisters, the People. Can you honestly say these changes have been for the better? As the years go on, and those around you not only look less like you, but look upon you more and more with contempt and with a barely veiled desire for vengeance,[112] does your love for this country and its inhabitants grow? Do you feel as if you are

---

[111] Chin & Finkelman, *supra* note 42, at 1048.

[112] *See, e.g., Regents of Univ. of California v. Bakke*, 438 U.S. 265, 387 (1978) (Marshall, J., concurring in part and dissenting in part) (remarking that "it must be remembered that, during most of the past 200 years, the Constitution . . . did not prohibit the most ingenious and pervasive forms of discrimination" and using this fact to justify discrimination against Whites); WILLIAM O. DOUGLAS, THE COURT YEARS: 1939 TO 1975 (getprintcopy) (1980) (quoting Justice Thurgood Marshall as saying in conference on an early case evaluating the constitutionality of discrimination against Whites, "You guys have been practicing discrimination for years. Now it's our turn.").

DEF_000721

united to your fellow citizens "by the strongest ties," or do you feel as if America has been "split into a number of unsocial, jealous, and alien" groups?[113] If you are increasingly apprehensive about these changes, you are not alone.[114] However, feeling despondent and helpless is hardly a way to rectify the evils which have been visited upon us. Our Founders understood the importance of forming a nation upon the solid foundation of common ancestry. They understood that it is a part of "human nature . . . that its affections are commonly weak in proportion to the distance or diffusiveness of the object;" and thus, "a man is more attached to his family than to his neighborhood, to his neighborhood than to the community at large."[115] Similarly, we should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle. And if the prize does not motivate you, then consider the cost of defeat; "[W]henever the dissolution of the Union arrives, America will have reason to exclaim, in the words of the poet: 'FAREWELL! A LONG FAREWELL TO ALL MY GREATNESS.'"[116]

---

[113] THE FEDERALIST No. 2, *supra* note 5, at XYZ (John Jay).

[114] *See* Robert D. Putnam, E Pluribus Unum: *Diversity and Community in the Twenty-first Century*, 30 Scandinavian Pol. Stud. 138 (2007) (arguing that "immigration and ethnic diversity challenge social solidarity and inhibit social capital"). See *generally* ROBERT D. PUTNAM, BOWLING ALONE: THE COLLAPSE AND REVIVAL OF AMERICAN COMMUNITY (2000) (discussing "the decline of the last several decades" in "social capital" and a sense of community belonging and civic engagement among Americans).

[115] THE FEDERALIST No. 17, at XYZ (Alexander Hamilton) (XYZ ed., XYZ year).

[116] THE FEDERALIST No. 2, *supra* note 5, at XYZ (John Jay) (emphasis in original).

27

DEF_000722

# (PD41) E-mail Correspondence from Professor Jonathan Marshfield to Preston Damsky 11/20/24



2:30 11-18?

Terry, Preston

To: ⊗ Marshfield, Jonathan

☺ ↩ Reply  ↩ Reply all  → Forward

Wed 11/20/2024 10:00 AM

Professor,

Thank you! I will read this today.

Best,
Preston

Sent from my iPhone

> On Nov 20, 2024, at 06:56, Marshfield, Jonathan <marshfield@law.ufl.edu> wrote:
>
> This might relate somewhat to your historical analysis and our conversation.
>
> https://jach.law.wisc.edu/sins-and-omissions/
>
> . . .

106

**DEF_000723**

# (PD42) E-Mail Correspondence from Preston Damsky to Jonathan Marshfield on 12/16-17/24



107

DEF_000724

# (PD43) E-Mail Correspondence from Preston Damsky to Judge John Badalamenti 10/28, 10/29, 11/5



Paper Summary & Outline                                                                          ∧

📎    Judge...Outline.docx    Origina...tiine.docx

**Badalamenti,John L**                               😊  ↩ Reply  ↩ Reply all  → Forward  📕 🖼 ⊞ ...

To: ⊗ Terry, Preston                                                        Mon 10/28/2024 6:31 PM

Cc: ashleycgrabowski@gmail.com

Rec'd. Thank you.


John L. Badalamenti
Peter T. Fay Jurist-in-Residence
University of Florida
Levin College of Law
badalamenti@law.ufl.edu


On Oct 28, 2024, at 4:34 PM, Terry, Preston <prestondamsky@ufl.edu> wrote:


Judge Badalamenti & Professor Grabowski,

I have attached my proposed paper summary and outline. I do not know how to send it via Canvas, so I am emailing you. Let me know if you would like me to send this some other way. I aim to have a completed, full draft ready by 11/14.

Thank you,
Preston
<Originalism Paper Summary & Outline.docx>


**Terry, Preston**                                   😊  ↩ Reply  ↩ Reply all  → Forward  📕 🖼 ⊞ ...

To: ⊗ Badalamenti,John L                                                    Tue 10/29/2024 2:26 PM

Cc: ashleycgrabowski@gmail.com

Judge,

I just saw the samples you posted. Is my submission complete enough? I confess that I am still looking through sources and pondering the layout of the paper and its constituent arguments. I also confess that I am the kind of writer who does not tend to operate off of an outline and prefers to have the material come to me while writing and when thinking over, and then reviewing once finished, the draft. I am aware many people think this is a poor way of writing, but I find it has always worked well for me.

Thank you,
Preston

108

DEF_000725



Badalamenti,John L

To: ⊗ Terry, Preston;  Ashley Grabowski <ashleycgrabowski@gmail.com>

  ↩ Reply  ↩ Reply all  ↪ Forward     ⋯

Tue 11/5/2024 12:51 PM

📄 Judge B Comments Preston T...  ⌄
   22 KB

Preston,

I didn't see a need for you to make a more robust outline.  Because of your contributions in class, I believe you have it laid out.  I uploaded those outlines and summaries to provide some examples of summaries and outlines that yielded an A in the seminar in prior semesters.  They lay things out nicely.  I've helped you with some suggestions in your summary that could be added to the outline.  I'd strongly recommend beefing up the outline so you have a clear thesis and logically flowing presentation to your classmates, instructors, and visitors.  I'm intrigued with your theory and will focus on your ability to compare and contrast it with the standard views of originalism we discussed.  I'm also interested to see why you deviated from Adrian V's theoretical framework.  Please carefully review my comments.  And I'll see you in class on Thursday!

Cheers!
Judge B


John L. Badalamenti
Peter T. Fay Jurist-In-Residence
Levin College of Law
University of Florida
badalamenti@law.ufl.edu

⋯

109

**DEF_000726**

# (PD44) Judge Badalamenti Comments on Outline

For my paper I will be borrowing from Vermeule (and comparing and contrasting myself with him) in developing the basic outline of a theory I am tentatively calling "national constitutionalism." The main thrust of national constitutionalism is that it operates under two fundamental premises: (1) the United States constitution was created by an affirmative act of the sovereign American people (the nation), (2) in order to establish a state to further the ends outlined in the Preamble and secure the continued existence of the nation "for our posterity." National constitutionalism is, therefore, a form of original purposivism. In *United States v. Verdugo-Urquidez*, Chief Justice Rehnquist said, "[f]or better or for worse, we live in a world of nation-states." National constitutionalism unabashedly takes the position that this situation is *for the better* and, moreover, that it is the duty of the government (of which the judiciary is a part) to defend the United States' status as a nation-state.

Unlike Vermeulian common good constitutionalism, however, national constitutionalism is not a judicially meek and deferential theory which requires judges to acquiesce to decisions made by the legislature or to the executive. Instead, national constitutionalism encourages the judiciary to assert its prerogative of judicial review in at least one specific field of policy: immigration and naturalization. Recognizing that this policy field has the power to fundamentally alter the composition of the People themselves, national constitutionalism would have judges subject legislation and executive policy which would fundamentally alter the original conception of the People to the highest level of scrutiny. On the other hand, certain policies which aim to preserve the exclusivity of the body politic *should* be given deference. It justifies this difference by pointing to (1) the sovereignty of the people, and the threat which mass, unfettered migration poses to that sovereignty, (2) the judge's oath to support and defend the Constitution (and, implicitly, the constituent power of the sovereign People), and (3) the proposition that those who share, in the language of John Jay, "common ancestry" with the Founders will be more inclined not only to consider originalism as a valid method of constitutional interpretation (somewhat borrowing from Lawson & Dorf's notion of "ancestral originalism), but be willing to engage in political endeavors which aim to ensure the continued existence of proper constitutional governance, in order to pass down the Constitution and the restrained government it empowers to their posterity.

After sketching out this theory, I then aim to tackle some of the Court's more prominent immigration and naturalization policy cases, such as *Chae Chan Ping* (rightly decided), *Wong Kim Ark* (wrongly decided), *Plyler v. Doe* (wrongly decided), and *Trump v. Hawaii* (rightly decided, with questionable dictum on *Korematsu*). I then plan on considering how a Court should rule if presented with an executive order or Congressional legislation which would either deny birthright citizenship to illegal aliens (uphold it!) OR lay down guidelines for how those children might be affirmatively granted birthright citizenship



**Comments**                                                    ✕

Page 1

**j bad**
An important thing to do is lay a foundation defining originalism and the prevailing strands: original intent and original public meaning. Then, I envision your going through and telling the reader why they aren't correctly expounding upon the Constitution. You'd probably then give some SCOTUS examples demonstrating why originalism isn't working. Once you're done there, you can then introduce what you think is a better interpretive theory, explaining Vermeule's theory and how yours differs. One goal of the class is for you to walk away with an understanding of the role of the Article III courts. Another is the separation of powers. How do they work into your analysis? Your contributions to this class have been solid. I'd encourage you to ramp up on the structure of your outline and have it down before you present your paper to your peers and visitors on 11/14. You're very talented. I have no doubt you will hit a homerun!

Page 2

**j bad**
I've presented some additions to your outline in the above comment. My last suggestion would be to re-read the syllabus of the class, namely the SUMMARY AND COURSE OUTCOME sections. That sometimes can help remind you things to touch on in your paper. I see you weaving them in without a problem.

(strike it down!). I may then conclude by briefly touching on some other areas (foreign policy, eminent domain, and sexuality cases?) where I think national constitutionalism may have some play.

My tentative brief outline:

I. Introduction (quasi-abstract/main questions answered by paper)
II. National Constitutionalism
   A. Conceptualizing and defining the People/nation
      i. Historical evidence
      ii. Enduring validity
   B. Theoretical points
      i. Popular Sovereignty and the constitutional decision
      ii. The survival of the nation as the highest good and obligation of the judiciary
      iii. The Schmittian concepts of emergency and exception
III. Cases
   A. Chae Chan Ping
   B. Wong Kim Ark
   C. Plyler
   D. Trump v. Hawaii
IV. Conclusion (possible areas of extension)

DEF_000727

# (PD45) E-Mail Correspondence from Preston Damsky to Judge John Badalamenti 12/15/24



Paper Submission (Properly Formatted)

Badalamenti,John L

To: ⊗ Terry, Preston

Cc: ashleycgrabowski@gmail.com

Sun 12/15/2024 2:27 PM

Rec'd. Thank you, Preston!

John L. Badalamenti
Peter T. Fay Jurist-in-Residence
University of Florida
Levin College of Law
badalamenti@law.ufl.edu

On Dec 15, 2024, at 1:10 PM, Terry, Preston <prestondamsky@ufl.edu> wrote:

Judge Badalamenti and Professor Grabowski,

I am not sure if this is just how Canvas works, but it is showing my paper submitted in non-Century font in the post-submission preview. I am not sure if you are simply able to download the file as I submitted it, thus I am emailing a properly formatted copy (which is the same as I submitted to canvas).

Thank you,
Preston
<National Constitutionalism SUBMISSION COPY.docx>

111

**DEF_000728**

# (PD46) Judge Badalamenti E-Mail Correspondence with Preston Damsky 1/7/25



Terry, Preston
To: ⊗ Badalamenti,John L

☺  ← Reply  ← Reply all  → Forward  ▮ ▮ ▮  …
Tue 1/7/2025 5:10 PM

Judge Badalamenti,

My cell phone number is ▮▮▮▮▮▮▮

Best,
Preston

Sent from my iPhone

> On Jan 7, 2025, at 12:44, Badalamenti,John L <badalamenti@law.ufl.edu> wrote:
>
> Hi, Preston:
>
> I hope you're having a nice break.  Please zap me your best contact number.  Nothing urgent.
>
> Happy New Year,
> Judge B.
>
> John L. Badalamenti
> Peter T. Fay Jurist-In-Residence
> Levin College of Law
> University of Florida
> badalamenti@law.ufl.edu

112

DEF_000729

# (PD47) Preston Damsky/Judge Badalamenti Call History



NOTE: The missed calls in red were missed calls.

113

DEF_000730

## (PD48) NLG Group Chat 2-12-25



DEF_000731



DEF_000732



## (PD49) Grace McClung E-Mail to Preston Damsky 2/24/2025



Grace McClung <gmcclung@alligator.org>

To: ⊗ Terry, Preston                                           Mon 2/24/2025 1:06 PM

Hi Preston,

My name is Grace McClung, and I'm a reporter for The Alligator. I was hoping I could speak to you about the award you recently won for your paper in Advanced Constitutional Theory: Originalism and its Foes. I would love to set up a time to do a quick phone interview this week to ask you a few questions about your paper and the award. If willing and able, please feel free to suggest a convenient time for you. Thank you, and I look forward to hearing from you.

Best,
Grace McClung

116

**DEF_000733**

# (PD50) Conditions for Speaking to Grace McClung on 2/26/25 at 2:10 AM



**Some Preliminary Points**

**Terry, Preston**
To: Grace McClung <gmcclung@alligator.org>
Thu 2/27/2025 2:10 AM

Grace,

Apologies for the delay on getting back to you with the answers to your questions. I have finished them and am ready to turn them over to you. Before doing so, however, I want to insist upon a few preliminary points with what you write about in your article before I speak to you on the record in response to your questions. You must agree to these points, or else I will withhold the answers to your questions:

1. In one of my answers to your questions I write "both professors made it explicitly clear to me in the strongest terms that they disagreed with the moral and political content of the papers and their conclusions." While you do not have to quote this line directly, you must agree to make it clear in your article (or whoever will be writing this article you are gathering this information for) that I firmly believe that neither Judge Badalamenti or Professor Marshfield agree with the substance of the arguments I have made. It is unfair to them that they are being asked to disavow material they never endorsed, and it is unfair to me that people wrongly believed that their (non-existent) affinity for what I wrote influenced the grades I earned. I will not assist you further in writing your article unless you agree to give me the opportunity to set the record straight on this point. Of course, you do not need to endorse the truth of what I say. If you wish to (incorrectly) imply that they agree with me or otherwise craft your narrative in a way that suggests this is the case, you are free to do so, but I wish to have my views on this matter accurately conveyed.

2. In one of my answers to your questions I write "I do want to clarify that I received worthwhile feedback from my classmates who took the two courses with me during classes at the end of last semester when we presented our papers. Some of that criticism I digested and tried to respond to in my final drafts. And both this semester and last semester I received comments from various open-minded, interested parties who did not take these courses but who actually wanted to read what I wrote (or was writing) and asked for me to send them my drafts. To all these students, I am very thankful." This line follows where I express my opinion, using vivid language, on those who apparently wish to see me silenced or otherwise punished (and their parents and teachers!), who I believe are a "relatively small number of . . . peers." Again, while you do not have to quote this line directly, you must agree to make it clear in your article (or whoever will be writing this article you are gathering this information for) that I firmly believe most of my classmates are either largely apathetic about the controversy or generally supportive of my right to write freely (whether they agree with the content or not) and that I appreciate those classmates in addition to classmates who provide(d) constructive feedback and that I believe it is only a small number of students at UF Law who seek to damage me. Once again, you of course do not need to endorse the truth of what I say, you must only accurately convey that I say it.

3. In many of my answers to your questions I make it clear that I am a strong supporter not only of the right of pro-Palestine protestors to organize, demonstrate, and give speeches on campus, but that I strongly support the cause which I believe they are protesting on behalf of. I wish for you to convey these elements of my worldview in your story. I use language that I suspect you will find interesting to describe what I believe that cause is (or at the very least, my perspective on what cause I believe I am a supporter of with regard to Palestine), but you will not get this from me unless you agree to my condition. Skepticism (really, outright opposition) towards US foreign policy generally, and our policy regarding Palestine specifically, is an important part of my political worldview. And as I explain, my political worldview (which encompasses far more than foreign policy concerns, for example I delve into my views on race in my answers) motivated me to write the papers. Once again, you of course do not need to endorse the truth of what I say (I suppose you could ludicrously suggest that I am lying about what I believe), but you must only accurately convey that I say it. And to repeat myself one more time, you do not have to quote me directly (although you probably should?), you (or whoever will be writing this article you are gathering this information for) must only agree to accurately convey the substance of the points that I describe above.

I believe you will find that getting access to my answers is well worth the "cost" (having to tell a more complete story?) of these conditions. I give you a LOT to work with: 2500+ words, and they are mostly in the answers to questions 2 and 5-8.

Let me know how you feel about this. And yes, we are still on for 5:00 PM tomorrow.

Best,
Preston

**Some Preliminary Points**

**GM** **Grace McClung** <gmcclung@alligator.org>
To: ⊗ Terry, Preston
Thu 2/27/2025 7:53 AM

Hi Preston,

Yes, I can appreciate your stance and agree to these conditions. My goal is to be as accurate as possible, so I would in no way try to imply something that isn't true. I appreciate you drafting some answers for me and look forward to speaking with you soon. Thank you again.

Grace

...

DEF_000734

# (PD51) Written Responses Given to Eleven Grace McClung Questions on 2/27/25 at 10:06 AM

**1. Is the paper that won called "American Restoration: An Article V Proposal"? (I just want to make sure I have the correct one)**

I think this was answered in the email sent to you on 2/26 where I sent the final, submitted drafts of the relevant papers. Let me know if you want further clarification.

**2. Can you summarize your paper and tell me what your stance is and what it means? For those of us not familiar with law, can you simplify it a bit?**

As I noted, I wrote two papers which I believe have been the subject of controversy on campus, although there are certain commonalities between them. Indeed, they essentially share much (although certainly not all) of the same theoretical background, and the two papers both draw on certain primary sources. Where they differ is in their objectives and intended audiences. But the core argument undergirding both papers is that, at the country's founding, the nation—the American people (the "We the People" in the Constitution's preamble)—was defined in racial terms. That is, Americans were White, and only Whites could become Americans. This was a principle or a 'term' upon which our social contract, the Constitution, was accepted and ratified by the People's representatives in the states. In Federalist No. 2 John Jay (who would become the first Chief Justice of the Supreme Court), 'pitched' the Constitution to the American people on the basis that they were—even before the revolution—"a people descended from the same ancestors, speaking the same language, professing the same religion, attached to the same principles of government, [and] very similar in their manners and customs." To Jay, their common nationality (which he lauded) demanded that they share a powerful, common federal government which would operate in their interest and in defense of their revolution and the hard-won rights that the revolution gave them.

The common racial ancestry of the American people being the fundamental basis of American nationality is the first premise I base my argument upon. The second premise—hopefully much less controversial—is that the government is a creation of the People and subservient to the People, and thus the People are sovereign in our constitutional scheme. If I am correct about these two premises, I believe they lead inexorably to the conclusion that the government cannot replace the sovereign People with another people (sovereign or otherwise) of their own creation and definition, because to do so would be akin to an "agent" (the government) violating their duty to act in the best interests of its "principal" (the People) by stripping the latter of their most valuable possession or right (our popular sovereignty and national self-determination). As Hamilton wrote in Federalist No. 78, "[t]here is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void . . . [t]o deny this, would be to affirm, that the deputy is greater than his principal." I believe that what has been done in America via the Fourteenth Amendment and the federal government's enabling of mass non-White migration, both "legal" and "illegal," is redefining and recomposing the population of America to the detriment of the People and for the benefit of these foreigners, the government, and the government's oligarchical backers. These are governmental policies carried out "contrary to the tenor of the commission" of the Constitution.

Both papers are written in response to this problem, but from two different angles. "American Restoration" advocates for a constitutional amendment—or perhaps numerous amendments, depending on how one defines amendment— aimed at reversing much of the demographic and political change which has occurred in the United States since the end of the Civil War (and, in particular, in the post-World War II period) and constitutionalizing the national ideal which the Founders adhered to, that of a politically sovereign American people comprised solely of, in the words of the 1790 Naturalization Act, "free white person[s]." I argue that non-Whites should be stripped of their citizenship, but that the Constitution should provide for a process by which the People can be redefined and reconstituted, although this process should require the overwhelming consent of the People (90+% of the total electorate) via a direct referendum. I suggest

118

**DEF_000735**

that a decade-long process of repatriating those who do not fit within the original national definition—and are not assimilated into it via the previously discussed referendum process—should also be constitutionalized. Finally, I advance two means by which corrupt leaders can be directly checked in the future if they aim to violate any portion of the constitution: by strengthening the provision against treason and by providing a constitutionally-enshrined legal defense at a criminal trial for someone charged with murder for assassinating a corrupt official which would allow the assassin to be acquitted if the jury believes the official violated their oath to defend the Constitution and that is the reason why they were assassinated.

"National Constitutionalism" suggests ways the judiciary itself could reverse objectionable demographic changes. First, judges could recognize that illegal immigration is an invasion under Article IV, Section 4, allowing states to fight back against the invasion or, preferably, requiring the federal government to secure the border and put a stop to illegal immigration (as Article IV, Section 4 requires that the federal government "shall protect each of [the states] against Invasion"). Second, the judiciary could subject laws permitting non-Whites to immigrate to America and to become American citizens to a strict scrutiny analysis, which I argue would result in much of that immigration and all non-White naturalization being enjoined. Third, the Supreme Court could accept the *Wong Kim Ark* dissent's analysis of the Citizenship Clause of the Fourteenth Amendment and hold that it is not constitutionally mandated for the children of citizens of foreign countries to be given American citizenship at birth. Alternatively, the judiciary could cabin *Wong Kim Ark*'s holding to the facts of that case and hold that only those who are born in the states and are the children of permanently domiciled foreigners are entitled to birthright citizenship. Finally, the judiciary could recognize the procedural irregularities behind the ratification of the Fourteenth and Fifteenth amendments—or they could hold that those amendments are a substantive abuse of the Article V amendment power—and strike down these amendments altogether for being so-called "unconstitutional constitutional amendments." Perceptive readers will catch that at least two of these suggestions are now ostensibly the public policy positions of the White House.

I share Jay's views, and so did the vast majority (if not all) of the Founders. Americans are a national people, and our Founders were wise enough to define our nation on broad racial lines. In doing so, they opened up a country which was ripe for conquest and settlement to the whole of our race. And once that country was conquered and settled, it became the most prosperous and powerful republic in the history of mankind. Our immigration and naturalization laws—with some notable potential caveats—preserved America as a White country (in fact, they made the country more racially homogeneous) until the passage of the 1965 Immigration and Naturalization Act (the "Hart-Celler Act"). When that act was passed many of its biggest supporters lied about what its effects would be. For example, Senator Ted Kennedy of Massachusetts claimed that "the ethnic mix of this country will not be upset" by Hart-Celler. Since 1965, due to our government's duplicitous changes in long-standing immigration and naturalization policies—and, of course, their failure to properly deal with the invasion of our country by millions of (typically non-White) criminal infiltrators—our country is projected to no longer be a majority White country within the next two decades. I believe that these demographic changes are making our country and our communities more incoherent, more dysfunctional, and less prosperous; and it is undeniably making the United States into a country in which Whites cannot independently control our political affairs and in which we are subjected to various forms of discrimination and abuses. That is why I am advancing these arguments. It is not because I hate all non-White people for not being White (or for any other reason), but it is because I have a particular love for my own people and I do not believe that we are best served by living in a country in which we are a minority.

### 3. What is the award you won?

The award is what is called in law school a "book award" and they simply indicate that the student received the highest grade among the students who completed the course that semester. At UF Law these awards confer no monetary or other material benefit aside from a nice little certificate and our name in the book award register. However, I imagine any student who gets a book award feels a good amount of pride in having done the best in the class. I am proud, I think my papers represent quality work. And of course, this is something I can put on my resume.

119

DEF_000736

**4. What was the assignment for this paper?**

Syllabi from the relevant courses can be found here: https://www.law.ufl.edu/courses-and-syllabi/previous-syllabi



Previous Syllabi - Fredric G. Levin College of Law

UF Law Fall 2024 Syllabi Fall 2024 syllabi are posted at least three days prior to the start of classes. Please check back periodically as the courses are being updated.

www.law.ufl.edu

. The paper prompts/assignment descriptions can be found therein. Let me know if you need any further clarification.

**5. What does winning the award mean to you?**

It mostly means the same thing to me that it should mean to everyone else: I got the best grade in the class. But I will add that because both professors made it explicitly clear to me in the strongest terms that they disagreed with the moral and political content of the papers and their conclusions, I feel especially validated. As the UF Law dean noted in a letter to the student body about this controversy, papers are graded on the "quality of the research, legal analysis, and writing." In other words, I earned my grades *despite* my professors' strong disagreements with the arguments that I made because they were of a high-quality when judged on more objective criteria. So, in this instance, earning the award reassures me that I can achieve academic success—at least with these two professors—despite potentially large differences in worldviews between graders and myself. If my peers value their own academic freedom, then they should likewise take comfort in that.

**6. Some have expressed concern about the views expressed in your paper, calling it offensive. What do you say to them?**

Have any of these people expressed how the paper is analytically wrong?

If that is the whole substance of their "concern," then there is very little that I can say to them. Such "concern" is not substantive, and thus barely warrants a response.

Whoever these people are, they should remember that they do not have a monopoly on being offended. When I hear students say that the disproportionate number of Black felons in our country is proof that prosecutors and the criminal justice system are motivated by White supremacism, I am offended because (1) this is false and defamatory and (2) this minimizes and erases the very real experiences of the victims of Black crime. When I hear students advocate for affirmative action and reparations for non-Whites, policies which will inevitably negatively impact Whites, I am offended. When I hear students gleefully cheer on Jewish terrorism and genocidal violence perpetrated by Jews against Palestinians, I am offended (more than offended, revolted!). And yes, when I hear that there are students who apparently believe that White Americans should be dispossessed of our right to be wholly sovereign in the country that our ancestors settled and built, I am offended.

But the difference between me and some of those with "concerns" about what I write is that when I hear things that offend me, I either speak up and tell the person saying these things why I think they are in the wrong or I think about what they say and formulate my own response privately which I may then incorporate into my own work or rhetoric at a later time. I do not go crying behind their backs to professors, school administrators, the media, the state bar, or their employers to try and see them punished; and I certainly do not anonymously threaten professors and administrators that I will go to the media if I do not get what I want, as certain students have done. They do these things

120

DEF_000737

because they are spineless, childish wimps, and they do not possess the gumption or intelligence to contend with the arguments that I have made in an intellectually honest and straightforward manner. They should be ashamed of themselves, but they evidently are not; and that ought to stand as a scathing indictment of the parents and educators who have raised them. But do not let my tone confuse you, to a large degree I am heartened by their reaction. If these underhanded tactics are the best that those who are most "concerned" about I wrote have to offer—if they cannot actually refute the argument and are instead opting to try and penalize and silence me—then I must be saying something that is morally, politically, or legally in the right.

**7. How have you overcome some of that criticism/how have you defended your work?**

This may surprise you, but I *personally* have not heard much criticism since the papers were submitted and graded. From my understanding, almost everything that has been said against *me* (and I emphasize that it is said against me, not against the substance of my arguments) has been said behind my back by a relatively small number of cowardly, so-called peers. But I do want to clarify that I received worthwhile feedback from my classmates who took the two courses with me during classes at the end of last semester when we presented our papers. Some of that criticism I digested and tried to respond to in my final drafts. And both this semester and last semester I received comments from various open-minded, interested parties who did not take these courses but who actually wanted to read what I wrote (or was writing) and asked for me to send them my drafts. To all these students, I am very thankful. Many of them agreed with much of what I wrote, and others gave insightful criticism. Competent disagreement and vigorous debate make the experience of law school worthwhile from a scholarly perspective. These are the whetstones upon which we all hone our analytical and argumentative skills. But the emotional, secretive, and unreasoned whining? We can all do without that.

**8. Can you talk a little bit about the importance of academic freedom and freedom of speech?**

Academic freedom and free speech are liberties which the government must not infringe upon, but they are nevertheless under assault in this country on multiple fronts. At UF, we saw that most dramatically last year when students protesting in support of the Palestinian resistance were denied degrees after graduating and the governor attempted to shut down student organizations opposed to Jewish terrorism and the injustice of Zionism. These repressive actions were morally bankrupt and politically unsound. Whether we like it or not, elites and managers in our society are typically drawn from the ranks of university graduates, and if students are pressured to not speak their minds—and if they bow to that pressure or are severely punished for not bowing to that pressure—then we cannot be surprised when the country becomes run by a bunch of toadies who jump at every opportunity to prostrate themselves before power and oligarchy in a desperate, pathetic attempt to advance their own careers. Indeed, that is precisely the kind of graduate that such an academic system will select for.

But academic freedom and freedom of speech cannot survive if the only institutional actors that foster those freedoms are school administrators. If students and graduates are punished by employers for speaking their minds, then the selection pressures determining the makeup of the ruling classes will essentially be the same, and elites and managers will be similarly neutered. We have seen oligarchs like Bill Ackman noisily pushing for students to be punished by employers in response to their principled anti-Zionist activism. And punishment by employers is something that racially-conscious Whites outside of academia have experienced for decades as a consequence of their activism. This is why I want legislatures to enact laws to forbid and relentlessly punish discrimination based on political beliefs, affiliations, or activism in hirings and promotions in most employment settings.

**9. What are your career goals and plans for the future? (Also need your age and major for a fact sheet)**

My career goals and personal aspirations are not particularly interesting; however, like most people I would like to work in a job that I find spiritually or morally satisfying (or at least not soul-crushingly at odds with my morality) and which can enable me to provide materially and financially for my family.

121

DEF_000738

I am twenty-nine. In law school we do not have majors, but I have a B.A. in History from my undergrad.

**10. Can you tell me a little bit about the class you wrote this in?**

You can get the gist of what the courses were about from their syllabi. The professors can explain the course content and objectives via their syllabi better than I could. If you need any further information, let me know.

I will briefly add that I enjoyed both classes, I thought the assigned reading was very interesting, I found the experience of writing an academic research paper of this length to be valuable, and I appreciated the small class size and interactive nature of the seminar course format.

**11. Anything else you want to add?**

No. Thank you for the opportunity to speak with you.

# (PD52) Email Correspondence between McClung and Damsky – 3/10/25



**DEF_000739**

## (PD53) Recollection of meeting with Dean McAlister on the morning of 3/11/25

On the morning of Tuesday, March 11, 2025; I went to Dean McAlister's office in hopes of speaking to her. Although I did not have an appointment, Dean McAlister agreed to speak with me. I was ushered into her office and the door was closed behind me so as to grant us privacy. We had a brief and professional discussion about The Alligator's decision at that time not to run the story about the book award I earned. I asked Dean McAlister if she was responsible for "killing" the story. She stated she would not do that, and did not have the power to do that even if she would have liked to do it. She further stated she believed the story did not run because there was no story of journalistic merit with regard to my receiving the book award, and that she hoped those in the student body who felt aggrieved would move on.

DEF_000740

## (PD58) Preston Damsky Twitter Exchange With Lyrissa Lidsky 4/1-2/25



128

DEF_000741



DEF_000742

# (PD59) Lyrissa Lidsky Support for Israel



DEF_000743

## (PD61) Lyrissa Lidsky Advanced Torts Schedule

**Advanced Torts**

Law 6930-12716
Spring 2025
Prof. L.B. Lidsky

lidsky@law.ufl.edu
Office: Room 313, Holland
Office Hours: Monday 3-5
Classroom: 285D HH
Time: MoWe 11-11:55 am

(April 2nd was a Monday)

## (PD62) Excerpt from Lyrissa Lidsky Spring 2025 Constitutional Law Syllabus

As you can see, I am interested in teaching you how to make "constitutional" arguments—arguments that other lawyers would recognize as appropriate for resolving contested issues of constitutional law. That said, the contents of this course will inevitably touch on your personal and political beliefs and even matters you may consider fundamental to your identity: we will be discussing abortion, gun control, affirmative action, and other important but potentially polarizing issues. We will also be discussing the painful history of discrimination in our country. I ask you to practice empathy and be sensitive to the different experiences, perspectives, and opinions your classmates may bring to our discussions. One of the skills that you must develop as a lawyer is how to have respectful discussions with others when you have significant differences of personal or political opinion, and I am going to do my best to model those skills in the classroom. To that end, you may find me articulating arguments or perspectives that I deem to be missing from our discussion, or you may find that I call on you to articulate the "other side." I challenge you to learn to articulate arguments that do not comport with your own personal or political beliefs, because this is an essential legal skill. If you feel that one of our discussions has missed an important perspective but you feel uncomfortable articulating that perspective, you may email me, and I may circle back to include it without attribution to you. I ask you to be thoughtful (in both senses of that word), be self-critical, presume (rebuttably) your classmates are engaging in discussion in good faith, and listen carefully and respectfully to all views.

Law School Success: To be successful in law school, you will need to develop (1) knowledge of the law; (2) cognitive skills such as reasoning, critical reading, analysis, attention span, memory, and issue identification, and (3) non-cognitive skills. Non-cognitive skills include academic behaviors such as organization, class attendance and participation, completion of assignments, and effective studying strategies. Non-cognitive skills also include academic mindsets that encourage persistence in the face of difficulty; to achieve this mindset, you will need to embrace a belief that you belong here; that your efforts will lead to growth in your skills and knowledge; that your efforts are valuable; and that your efforts will lead to success. A goal of law school is to make you an expert learner. I will talk about strategies used by expert learners throughout the class. If you want to learn more, I suggest you read the book Make It Stick.

DEF_000744

247

# (PD64) Noel Ignatiev's Race Traitor at the UF Library



DEF_000745



## (PD65) Race Traitor #1 Winter 1993



134

DEF_000746

# RACE TRAITOR

*Treason to whiteness is loyalty to humanity*

Number 1                                                    Winter 1993

| | | |
|---|---|---|
| EDITORIAL: ABOLISH THE WHITE RACE - BY ANY MEANS NECESSARY | | 1 |
| TWO WHO SAID 'NO' TO WHITENESS: BOSTON PUBLIC SCHOOLS, 1962-1975 | James W. Fraser | 9 |
| LYDIA MARIA CHILD AND THE EXAMPLE OF JOHN BROWN | Carolyn L. Karcher | 21 |
| THE AMERICAN INTIFADA | Noel Ignatiev | 45 |
| BRIDGES AND BOUNDARIES: BLACK-JEWISH RELATIONS | | 50 |
| READING, 'RITING, AND RACE | John Garvey | 73 |
| CIVIL WAR REENACTMENTS AND OTHER MYTHS | Philip Rubio | 88 |
| THE WHITE QUESTION | David Roediger | 104 |
| MALCOLM X BEYOND LABELS | David Kurnick | 108 |
| LETTER FROM EUROPE | Louis Kushnick | 114 |
| CORRESPONDENCE | | 126 |
| PLANS | | 128 |
| "RACIAL LOYALTY" OR RACE TREASON | | inside back cover |

**Editors:** John Garvey, Noel Ignatiev

**Contributing editors:** Theodore W. Allen, Christopher Day, James W. Fraser, Carolyn L. Karcher, Louis Kushnick, Theresa Perry, Rev. Eugene Rivers, Vron Ware

**Production Assistant:** Brenda Coughlin

cover: scene in Los Angeles after the Rodney King verdict

published at PO Box 603, Cambridge, Mass. 02140.  Single copy: individuals, $5; institutions, $10.  20% discount on orders of 5 or more.

DEF_000747

# Editorial: Abolish the white race - by any means necessary

The white race is a historically constructed social formation - *historically* constructed because (like royalty) it is a product of some people's responses to historical circumstances; a *social* formation because it is a fact of society corresponding to no classification recognized by natural science.

The white race cuts across ethnic and class lines. It is not coextensive with that portion of the population of European descent, since many of those classified as "colored" can trace some of their ancestry to Europe, while African, Asian, or American Indian blood flows through the veins of many considered white. Nor does membership in the white race imply wealth, since there are plenty of poor whites, as well as some people of wealth and comfort who are not white.

The white race consists of those who partake of the privileges of the white skin in this society. Its most wretched members share, in certain respects, a status higher than that of the most exalted persons excluded from it, in return for which they give their support to the system that degrades them.

The key to solving the social problems of our age is to abolish the white race. Until that task is accomplished, there can be no universal reform, and even partial reform will prove elusive, because white influence permeates every issue in U.S. society, whether domestic or foreign.

Advocating the abolition of the white race is distinct from what is called "anti-racism." The term "racism" has come to be applied to a variety of attitudes, some of which are mutually incompatible, and has been devalued to mean little more than a tendency to dislike some people for the color of their skin. Moreover, anti-racism admits the natural existence of "races" even while opposing social distinctions among them. The abolitionists maintain, on the contrary, that people were not favored socially because they were white; rather they were

136

DEF_000748

## 2 - RACE TRAITOR

defined as "white" because they were favored. Race itself is a product of social discrimination; so long as the white race exists, all movements against racism are doomed to fail.

The existence of the white race depends on the willingness of those assigned to it to place their racial interests above class, gender or any other interests they hold. The defection of enough of its members to make it unreliable as a determinant of behavior will set off tremors that will lead to its collapse.

*Race Traitor* aims to serve as an intellectual center for those seeking to abolish the white race. It will encourage dissent from the conformity that maintains it and popularize examples of defection from its ranks, analyze the forces that hold it together and those which promise to tear it apart. Part of its task will be to promote debate among abolitionists. When possible, it will support practical measures, guided by the principle, *Treason to whiteness is loyalty to humanity.*

### Dissolve the club

The white race is a club, which enrolls certain people at birth, without their consent, and brings them up according to its rules. For the most part the members go through life accepting the benefits of membership, without thinking about the costs. When individuals question the rules, the officers are quick to remind them of all they owe to the club, and warn them of the dangers they will face if they leave it.

*Race Traitor* aims to dissolve the club, to break it apart, to explode it. Some people who sympathize with our aim have asked us how we intend to win over the majority of so-called whites to anti-racism. Others, usually less friendly, have asked if we plan to exterminate physically millions, perhaps hundreds of millions of people. Neither of these plans is what we have in mind. The weak point of the club is its need for unanimity. Just as the South, on launching the Civil War, declared that it needed its entire territory and would have it, the white race must have the support of all those it has designated as its constituency, or it ceases to

137

DEF_000749

exist.

Elsewhere in this number, readers will find an account of John Brown's raid on Harpers Ferry and some of the events it set in motion. Before the Civil War, the leading spokesmen for the slaveholders acknowledged that the majority of white northerners, swayed above all by the presence of the fugitive slave, considered slavery unjust. The Southerners also understood that the opposition was ineffective; however much the white people of the north disapproved of the slave system, the majority went along with it rather than risk the ordinary comforts of their lives, meager as they were in many cases.

When John Brown attacked Harpers Ferry, Southern pro-slavery leaders reacted with fury; they imposed a boycott on northern manufactures, demanded new concessions from the government in Washington, and began to prepare for war. When they sought to portray John Brown as a representative of northern opinion, Southern leaders were wrong; he represented only a small and isolated minority. But they were also right, for he expressed the hopes that still persisted, dimly perceived, in the northern population despite decades of cringing before the slaveholders. Virginia did not fear John Brown and his small band of followers, but his soul that would go marching on, though his body lay a-mould'rin' in the grave.

When the South, in retaliation for Harpers Ferry, sought further to bully northern opinion, it did so not out of paranoia but out of the realistic assessment that only a renewal of the national pro-slavery vows could save a system whose proud facade concealed a fragile foundation. By the arrogance of their demands, the Southern leaders compelled the people of the north to resist. Not ideas but events were in command. Each step led inexorably to the next: Southern land-greed, Lincoln's victory, secession, war, blacks as laborers, soldiers, citizens, voters. And so the war that began with not one person in a hundred forseeing the end of slavery was transformed within two years into an anti-slavery war.

It is our faith - and with those who do not share it we shall not argue - that the majority of so-called whites in this

DEF_000750

## 4 - RACE TRAITOR

country are neither deeply nor consciously committed to white supremacy; like most human beings in most times and places, they would do the right thing if it were convenient. As did their counterparts before the Civil War, most go along with a system that disturbs them, because the consequences of challenging it are terrifying. They close their eyes to what is happening around them, because it is easier not to know.

At rare moments their nervous peace is shattered, their certainty is shaken, and they are compelled to question the common sense by which they normally live. One such moment was in the days immediately following the Rodney King verdict, when a majority of white Americans were willing to admit to polltakers that black people had good reasons to rebel, and some joined them. Ordinarily the moments are brief, as the guns and reform programs (both of which are aimed at whites as well as blacks - the guns as a warning and the reform programs as a salve to their consciences) are moved up to restore order and, more important, the confidence that matters are in good hands and they can go back to sleep.

Recently, one of our editors, unfamiliar with New York City traffic laws, made an illegal right turn there on a red light. He was stopped by two cops in a patrol car. After examining his licence, they released him with a courteous admonition. Had he been black, they probably would have ticketed him, and might even have taken him down to the station. A lot of history was embodied in that small exchange: the cops treated the miscreant leniently at least in part because they assumed, looking at him, that he was white and therefore loyal. Their courtesy was a habit meant both to reward good conduct and induce future cooperation.

Had the driver cursed them, or displayed a bumper sticker that said, "Avenge Rodney King," the cops might have reacted differently. We admit that neither gesture on the part of a single individual would in all likelihood be of much consequence. But if enough of those who looked white broke the rules of the club to make the cops doubt their ability to recognize a white person merely by looking at him or her,

DEF_000751

how would it affect the cops' behavior? And if the police, the courts, and the authorities in general were to start spreading around indiscriminately the treatment they normally reserve for people of color, how would the rest of the so-called whites react?

How many dissident so-called whites would it take to unsettle the nerves of the white executive board? It is impossible to know. One John Brown - against a background of slave resistance - was enough for Virginia. Yet it was not the abolitionists, not even the transcendent John Brown, who brought about the mass shifts in consciousness of the Civil War period. At most, their heroic deeds were part of a chain of events that involved mutual actions and reactions on a scale beyond anything they could have anticipated - until a war that began with both sides fighting for slavery (the South to take it out of the Union, the north to keep it in) ended with a great army marching through the land singing, "As He died to make men holy, let us fight to make men free."

The moments when the routine assumptions of race break down are the seismic promise that somewhere in the tectonic flow a new fault is building up pressure, a new Harpers Ferry is being prepared. Its nature and timing cannot be predicted, but of its coming we have no doubt. When it comes, it will set off a series of tremors that will lead to the disintegration of the white race. We want to be ready, walking in Jerusalem just like John.

## What kind of journal is this?

*Race Traitor* exists, not to make converts, but to reach out to those who are dissatisfied with the terms of member-ship in the white club. Its primary intended audience will be those people commonly called whites who, in one way or another, understand whiteness to be a problem that per-petuates injustice and prevents even the well-disposed among them from joining unequivocally in the struggle for human freedom. By engaging these dissidents in a journey of discovery into whiteness and its discontents, .we hope to take

140

DEF_000752

(PD66) Race Traitor Issue #4 Winter 1995



DEF_000753

# RACE TRAITOR

*Treason to whiteness is loyalty to humanity*

Number 4                                          Winter 1995

## CONTENTS

Manifesto of a Dead Daughter, by Patricia Eakins            1
Police Assisted Homicide, by Joel Olson                     6
White Silence, White Solidarity, by Christine E. Sleeter   14
Family Matters, by John Garvey                             23
Abolish the Jewish Caste, by Adam Sabra                    34
Lucasville Update, by Chryztof Knecht                      56
White Blues, by Paul Garon                                 57
Unlettered, by Irving Ignatin                              67
Poems, by John Strucker                                    77
Reviews:                                                   80
  Ware, *Beyond the Pale*            Susan Pennybacker
  Allen, *Invention of the White Race*    David Roediger
  Segrest, *Memoir of a Race Traitor*     Maryon Gray
Exchange with a Socialist Critic                           98
Correspondence                                            106
What We Believe                              inside back cover

**Editors**: John Garvey, Noel Ignatiev

**Contributing Editors**: Abdul Alkalimat, Theodore W. Allen, John Bracey, Brenda Coughlin, Kingsley Clarke, Selwyn Cudjoe, Christopher Day, Lorenzo Komboa Ervin, James W. Fraser, Carolyn Karcher, Robin D.G. Kelley, Louis Kushnick, Kathryne V. Lindberg, Kimathi Mohammed, Theresa Perry, Eugene F. Rivers 3d, Phil Rubio, Vron Ware

**Cover**: Photograph by Michele Fine, "Pure White."

**Race Traitor** is published at PO Box 603, Cambridge, Mass. 02140-0005. Single copies are $5 ($6 postpaid), subscriptions (four issues) are $20 individuals, $40 institutions. Bulk rates available.

DEF_000754

# ABOLISH THE JEWISH CASTE IN PALESTINE

## BY ADAM SABRA

The development of a Zionist state in Palestine has presented a number of problems of interpretation, especially for theorists of the left. The Zionist movement combines elements of "laborism" and colonialism at the same time. This apparent paradox has led observers to classify Israel as anything from settler-colonialist to social democratic. Clearly, the traditional modes of analysis, while shedding some light on the problem, have failed to provide a sufficient framework for the task at hand.

It will be argued in what follows that the best way of understanding the development of Zionism is through the use of the concept of a Jewish "caste" or "race."[1] This caste does not represent a prior existing social form, but rather refers to the historical construction, even invention, of a Jewish caste, calling itself a nation, which excludes the indigenous Palestinian Arab population. The invention of this caste has had a profound effect on the politics, economy, and culture of Palestine. This article will attempt to frame these effects in their historical development. Only once the development of the Jewish caste is understood can efforts be directed towards its abolition. In this light, the fatal weaknesses of

---

[1] The author regards the terms "caste" and "race" as synonymous. Both refer to non-biological, historically constructed entities. In view of the long-standing use of the term "Jewish Race" in Anti-Semitic rhetoric, the author prefers to use the term "caste" in order to avoid any form of misunderstanding.

143

DEF_000755

## THE JEWISH CASTE  35

the current attempts at repartitioning Palestine become brutally apparent.

The Zionist movement originated in the late 19th century as a response to the changes then occurring in European societies. As these changes proceeded, European Jews found themselves caught up in the rapid shifts of social and political order. The crumbling of old institutions and ideas sometimes gave them unparalleled opportunities for social advancement and integration, but often resulted in the destruction of traditional communities, either through response to social change or through the rise of Anti-Semitism.

The experiences of European Jews differed from most other Europeans in two important aspects: class and nation. Since these two concepts were the basis of the new political order, it is worth taking a closer look at these questions.

Jews had differed from their neighbors for some time when it came to class.[2] While most of their neighbors were peasants, Jews were overwhelmingly non-agricultural. They were concentrated in the trades and in "middle man" jobs such as commerce and tax collecting. These positions often left them stranded between the aristocracy, which made use of them when possible, and the peasantry, for whom they were often the face of oppression in the form of tax men and usurers.

As feudalism collapsed in eastern Europe, the tensions between Jews and their neighbors increased, and the Jews were increasingly impoverished. Anti-Semitism reached new heights, and many Jews thought they could do better in the West, where their

---

[2]    See Abram Leon, *The Jewish Question: A Marxist Interpretation* (New York 1970).

144

DEF_000756

## 36  RACE TRAITOR

co-religionists were better integrated into society.  As these East European Jews moved westward, Anti-Semitism gained currency in the West, much as modern European rightists have responded to the rise of immigrant labor by appealing to racism.

Here the question of nation became paramount.[3]  The rise of the nation-state had made natural the idea that each "people," a term for which there is no consistent definition, had to have a state of its own.  Jews, having always considered themselves a "people" in a religious sense, became a people without a state.  As racial nationalism became increasingly popular, Jews came to be seen as not only religious outsiders, but also national and racial outsiders.

### RACIAL THINKING: ZIONISM AND ANTI-SEMITISM

Zionism grew precisely out of these dilemmas of class and nation.  One early Zionist, Leo Pinsker, responded to Russian pogroms by writing, "Judeo-phobia is a psychic aberration.  As a psychic aberration, it is hereditary, and as a disease transmitted for two thousand years it is incurable."[4]  Thus, the specific historical and political problem of Anti-Semitism was converted into an existential dilemma.  Like any good nationalist of his era, Pinsker knew the solution for his embattled people: a state of their own. Such speculations were not limited to East Europeans.  Theodor Herzl, popularly known as the father of Zionism, reacted to the Dreyfuss Affair in France by adopting the slogan of a Jewish state as the solution to the problem of Anti-Semitism.  That an assimilated French Jew could be convicted of treason on flimsy charges had

---

[3]    For an overview of this question, see Hannah Arendt, *The Origins of Totalitarianism* (New York 1951).

[4]    Cited in Nathan Weinstock, *Zionism: False Messiah* (London 1979), p. 44.

DEF_000757

# (PD67) Professor Adam Sabra

## ADAM ABDELHAMID SABRA

Department of History
University of California
Santa Barbara, CA 93106
asabra@ucsb.edu


EDUCATION

**Princeton University**, Princeton, NJ
Ph. D., Near Eastern Studies, June 1998
Dissertation: "Poverty and Charity in Mamluk Cairo (1250-1517)"

M. A., Near Eastern Studies, 1994

**Harvard University**, Cambridge, MA
A. B., Near Eastern Languages and Civilizations, 1990
Specialization in Islamic Studies


PROFESSIONAL EXPERIENCE

**University of California**, Santa Barbara, Santa Barbara, CA
Professor of History, 2012-
King Abdul Aziz Ibn Saud Chair in Islamic Studies, 2012-
Director, Center for Middle East Studies, 2015-18

**University of Georgia**, Athens, GA
Associate Professor of History (with tenure), 2008-12
Assistant Professor of History, 2006-8

**Western Michigan University**, Kalamazoo, MI
Assistant Professor of History, 2002-6

**University of Michigan**, Ann Arbor, MI
Visiting Assistant Professor of Medieval Islamic History, 2000-1


**Sarah Lawrence College**, Bronxville, NY
Guest Faculty in Islamic History, 1999-2000

146

DEF_000758

**Drew University**, Madison, NJ
Visiting Assistant Professor of Religious Studies, 1998-99
Acting Director of Middle East Studies, 1998-99

**Princeton University**, Princeton, NJ
Assistant Instructor, Fall 1997:
An Introduction to the Middle East

Assistant Instructor, Spring 1993:
History of the Near East and North Africa in the 20th Century

PUBLICATIONS

Books:

*A Nobility of the Spirit: Lineage, Household, and State in Ottoman Egypt, 1517-1798.* In preparation.

*Poverty and Charity in Medieval Islam: Mamluk Egypt, 1250-1517.*
Cambridge: Cambridge University Press, 2000 (paperback edition, 2006).

*al-Faqr wa al-iḥsān fī Miṣr ʿaṣr salāṭīn al-mamālīk 1250-1517.* Cairo: Supreme Council for Culture, 2003 [Arabic translation of *Poverty and Charity in Medieval Islam*].

Text Editions:

Shams al-Dīn Muḥammad al-Bakrī, *The Translator of Secrets: Turjumān al-asrār or Dīwān.* Co-edited with Mustafa Mughazy. Cairo: Institut français d'archéologie orientale, 2021.

Shams al-Dīn Muḥammad al-Bakrī, *Dustūr al-gharāʾib wa maʿdan al-raghāʾib: The Official Correspondence (Inshāʾ) of Shaykh Muḥammad ibn Abī al-Ḥasan al-Bakrī al-Siddīqī Sibṭ Āl al-Ḥasan (930-994/1524-86).* Co-edited with Mustafa Mughazy. Göttingen: V&R Unipress; Bonn: Bonn University Press, 2020.

(this was a 15 page CV, I have included the first three)

147

DEF_000759

CANARY MISSION    HOME    ABOUT US ∨    PROFILES ∨    BLOG    CAMPAIGNS    CANADA    DONAT

Sear    🔍    ⇄ FILTERS

# Adam Sabra

https://canarymission.org/professor/Adam_Sabra

## Overview

Adam Sabra has expressed support for terrorism and has called for the rejection of Jewish self-determination.

Sabra has also demonized Israel, is a supporter of the Boycott, Divestment, Sanctions (BDS) movement and has defended disgraced anti-Israel professor Steven Salaita.

As of March 2019, Sabra was listed as a professor in the Department of History at the University of California Santa Barbara (UCSB), where he holds the King Abdul Aziz Ibn Saud Chair in Islamic Studies.

## Supporting Terrorism

On July 14, 2014, Sabra wrote a Facebook post whitewashing Hamas rocket attacks on Israeli civilians. He wrote: "Not nice, but hardly the war crime of the century. They even announce when they are going to launch a volley on Tel Aviv to get the inhabitants to run to the shelters."

Hamas fired over 4,564 missiles and rockets at Israeli population centers during Operation Protective Edge (OPE) in July 2014.

On December 23, 2013, Sabra posted an article on Facebook about terrorist Samer Issawi's release from administrative detention in Israel, with the comment "Freedom!"

Samer Issawi is a member of the Democratic Front for the Liberation of Palestine (DFLP) who received a 26-year prison sentence in 2002. During the second intifada, Issawi manufactured and distributed pipe bombs and, in several incidents, fired indiscriminately on Israeli civilian vehicles.

On March 3, 2013, Sabra wrote on Facebook: "An important letter from a Palestinian hunger striker" and shared an op-ed written by Issawi.

## Rejecting Jewish Self-Determination

In 1995, Sabra wrote an article for the publication Race Traitor titled: "Abolish the Jewish Caste," (alternatively titled: "The Jewish Caste in Palestine"). Sabra wrote that he "regards the terms 'caste' and 'race' as synonymous." He explained that he preferred the term "caste" over "race" because "of the long-standing use of the term 'Jewish Race' in Anti-Semitic rhetoric."

In the article, Sabra called for "the abolition of the Jewish caste" and the rejection of Jewish self-determination.

The article further claimed that Zionists "simply adopted many of the claims made by Anti-Semites against Jews" in their efforts to establish a Jewish state.



**Status:** Professor
**University:** California-Santa-Barbara
**Organizations:** BDS
**Related Profiles:**
**Last Modified:** 06/23/2025

### Photos & Screenshots

◦ ◦ 62 images ◦ ◦

### Infamous Quotes

"Any claim by the current members of the Jewish caste to nationhood, and thus to self-determination, must be rejected."

Adam Sabra, racetraitor.org, Winter 1995

"Wherever Israelis go, apartheid follows."

Adam Sabra, Facebook, Apr 16 2013

DEF_000760

## (PD71) UF Law Class of 2025 GroupMe Chat On Or Around 4/3/25



DEF_000761



DEF_000762



DEF_000763

266



**DEF_000764**

# (PD74) Zac Cosner on 4/3/25



Note the Twitter post to the left was posted in reply to my post on 4/1/25 @ 10:09 in reply to Professor Lidsky. Mr. Cosner has since deleted that tweet he sent on April 3rd.

DEF_000765



165

DEF_000766



DEF_000767

# (PD75.A) E-Mail Correspondence Between Preston Damsky & Jose Capula 4/3/25 @ 10:38AM/Reply from Pamela Malyk on 4/4/25 @ 12:52 PM



Academic Activities/Interim Suspension

**Terry, Preston**
To: Capula, Jose                                                      Thu 4/3/2025 10:38 AM

Hello,

My name is Preston Damsky. I was put on interim suspension from UF yesterday at around 6:00 PM. This morning I received an official trespass warning from UFPD, which states I must contact the Dean of Students Office before engaging in any academic or student activities. I am a 2nd year student at UF Law and would like to take Zoom classes or access class recordings, and take my finals. I am also requesting clarification on whether I may contact professors or the law school administration regarding remote classes, exams, and for any other questions I may have.

Thank you,
Preston
UF ID: 16495387

**Malyk, Pamela A.**
To: Terry, Preston                                                   Fri 4/4/2025 12:52 PM
Cc: Shaw, Janice

Good Afternoon Preston,

Yes, you may reach out to faculty of record regarding coursework in your currently registered courses. Please be aware that the University is under no obligation to create alternate formats to present course material to accommodate interim restriction status. Dean Shaw has been copied on my response and can assist in any specifics of the College of Law related to methods students currently receive and submit academic work.

Sincerely,

**Pamela A. Malyk, M.A.**
**Assistant Dean of Students & Director | Student Conduct & Conflict Resolution**
Division of Student Life | University of Florida
352-392-1261| pmalyk@ufl.edu | sccr.dso.ufl.edu

**From:** Capula, Jose <jose.capula@ufl.edu>
**Sent:** Thursday, April 3, 2025 11:25 AM
**To:** Malyk, Pamela A. <pmalyk@ufl.edu>
**Subject:** Fw: Academic Activities/Interim Suspension

Can you assist with this email?

167

DEF_000768

# (PD75.B) Preston Damsky E-Mail Correspondence with Professor Lea Johnston 4/4/25 @ 1:21 PM/3:35 PM



# (PD76) Preston Damsky E-Mail Correspondence with Professor Kristen Hardy 4/4 @ 1:17 PM, 4/7, and 4/8/25



DEF_000769

272

Access to Lectures and Assignment Submission



(PD77) Preston Damsky E-Mail Correspondence with Professor Ryan Scott 4/4 @ 1:19 PM, 4/7, and 4/8/25



169

DEF_000770



## (PD78) Preston Damsky E-Mail Correspondence with Dean Janice Shaw 4/4/2025 @ 1:24PM – 2:20 PM



DEF_000771

ATTN: (For Professor Collier) Access to Lectures and Assignment Submission



Shaw, Janice

To: ⊗ Terry, Preston

☺  ← Reply  ← Reply all  → Forward  📕 🖼 🔳 ⋯

Fri 4/4/2025 2:20 PM

Preston,

Professor Collier's email addresses are collier@law.ufl.edu and collier.charles.w@gmail.com.

Best,

**Janice J. Shaw**
Senior Assistant Dean for Students
Special Advisor to the Dean
University of Florida Levin College of Law
P.O. Box 117620 | Gainesville, FL 32611-7633
(352) 273-0971 | shaw@law.ufl.edu

171

DEF_000772

# (PD79) "Responding to Community Concerns" – Dean McAlister Email 4/4/25 at 7:11 PM



# (PD80) E-Mail to Charles Collier 4/5/2025 @ 8:08 PM and Response from Tanya Dampier 4/10/25

Terry, Preston

To: ⊗ collier.charles.w
Cc: 🔵 Shaw, Janice;  ⊗ Collier, Charles W

↩ Reply   ↩ Reply all   ↪ Forward

Sat 4/5/2025 8:08 PM

🚩 Flag for follow up. Completed on 7/22/2025.

Professor Collier,

Hello. I have been placed on interim suspension and cannot attend in-person classes. I was hoping to still access lectures in American Legal Thought via recording or Zoom and turn in any required assignments through Canvas or by E-Mail.

I have included Dean Shaw on this message. I know that Canvas is your preferred method of communication, so I will reproduce the above as a message to you through that channel.

Best,

Preston

**DEF_000773**



Access to Lectures and Assignment Submission

**Dampier, Tanya**

To: ○ collier.charles.w;  ○ Collier, Charles W
Cc: ○ Terry, Preston

Thu 4/10/2025 8:38 AM

⚑ Flag for follow up. Completed on 4/9/2025.

Good morning,

Below is the link to Professor Collier's American Legal Thought class.

https://mediasite.video.ufl.edu/Mediasite/Channel/law-s25-26420

Best,
Tanya

**From:** Charles Collier <collier.charles.w@gmail.com>
**Sent:** Sunday, April 6, 2025 7:00 AM
**To:** Mitchell, Brian S <mitchell@law.ufl.edu>
**Subject:** Fwd: Access to Lectures and Assignment Submission

[External Email]
Brian, I would appreciate it if you could have our remaining American Legal Thought classes (6:00 - 7:30, Mon. & Wed in 285B) recorded and sent to Preston Terry.  Many thanks!

↩ Reply      ↩ Reply all      → Forward

173

DEF_000774

(PD81) Record of Phone Call Between Preston Damsky and Professor Charles Collier on 4/5/2025 at 8:16 PM



DEF_000775

## (PD82) Zac Cosner message in NLG GroupMe Chat on 4/7/25





175

DEF_000776

(PD83) 4-7 -25 "Reflections on the Avoidable Downfall of a Racist" by Zac Cosner

On March 21st, 2025, 29-year-old University of Florida Levin College of Law 2nd year student Preston T. Damsky logged on to his public account on Elon Musk's X- the Everything App (formerly twitter) and posted the following tweet outlining his "simple" position on "Jews" to his 27 loyal followers.



**Preston Terry** @preston_terry_ · Mar 21

My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to "abolish the White race by any means necessary" is what I think must be done with Jews. Jews must be abolished by any means necessary.

Apparently, his position wasn't quite simple enough. University of Florida constitutional law professor Lyrissa Lidsky happened to stumble upon the public racist twitter account sharing her former student's first and middle name. and asked for some clarification from her former pupil.



**L.B. Lidsky** @LBLidsky · 2h

Are you saying you would murder me and my family? Is that your position?

On April First, 2025, Preston responded to the feted expert in protected speech under the first amendment with the following helpful elaboration:



**Preston Terry** @preston_terry_ · Apr 1

Did Ignatiev want Whites murdered? If so, were his words as objectionable as mine? If Ignatiev sought genocide, then surely a genocide of all Whites would be an even greater outrage than a genocide of all Jews, given the far greater number of Whites.

176

DEF_000777

Now, most people would hesitate to give a response that can be summarized as "it depends" when asked by a faculty member of the university they currently attend whether they'd "murder (them) and (their) family," so Preston's response here might seem mystifying to some…but Preston and I have something in common which I believe grants me a degree of insight into his thought process here: We are both jerks who suffer from exaggerated conceptions of our own cleverness.

Preston, no doubt possessed by the mischievous spirit of April Fool's Day, felt the need to over-explain what I'm sure he considered a very cheeky bit of wordplay. He seems to have convinced himself that by conditioning his desire to "murder" Jews on the question of whether Professor Ignatiev's academic critiques of whiteness as a constructed identity should be interpreted as a call to "kill" white people, he could secure all the plausible deniability he needed to allow his obvious veiled threat to skirt by with a mocking wink and no real consequences.

"Abolish Whiteness doesn't mean killing white people," his blue-haired interlocutors would surely reply, liberal tears streaking down their suspiciously semitic faces, "it just means deconstructing whiteness as an artificial constructed identity that promotes and relies upon privilege and inequality!" With that, the trap would be sprung, allowing him to retort "Sure it is, Moishe, sure it is… my message was completely nonviolent too. I'm just calling for a conversation on the need to deconstruct Jewish privilege."

Unfortunately, he failed to consider the implications of publicly admitting that there are **any** plausible circumstances under which he would feel justified indiscriminately murdering Jewish people. Nor did he consider that in the framing of her question, the renowned Constitutional Law scholar and expert on protected speech had allowed him the opportunity to convert his vague generalized threat putting #THEJEWS on notice into a very particular threat against Professor Lidsky and her family specifically, and he took that opportunity without hesitation. You'd think after the Nuremberg trials these guys would have learned not to grab every piece of rope they're offered- sometimes the intention is to see you hang on it.

Caught up in the euphoria of his own cleverness, he also failed to account for the possibility of an altogether different type of reaction:

177

DEF_000778

*"Who the hell is Noel Ignatiev? Scratch that, doesn't matter. This kid just posted that he might want to kill all Jewish people twice in the last 10 days...Which school is he attending? ... The Law school?!? Jesus Christ... We'd better do something before we have an incident on our hands."*– Officer Friendly, UF Campus Security

Rather than play along with the bit by interpreting his statements in the context of the most accurate good faith interpretation of Harvard historian Noel Ignatiev's controversial theses on white identity, the officers of the UF-PD seemingly chose to interpret them in the context of Preston's prolific record of extreme racist/antisemitic hostility and implied desire to enact violence upon minorities and political opponents.



Thus, UF Campus Security concluded that Mr. Damsky's words constituted an actionable threat of intent to cause harm and on April 3rd, 2025, they issued a trespass warning barring him from all UF properties until April 3rd, 2028.



178

DEF_000779



**Trespass Warnings (photos may not be immediately available)**

# DAMSKY, PRESTON

| Age | Gender | Race |
|-----|--------|------|
| 29 | MALE | WHITE OR CAUCASIAN |

Trespass warning number
7199

| Issued | Expires |
|--------|---------|
| 04/03/2025 | 04/03/2028 |

Narrative

Preston is Trespassed from all UF properties including Shands North

*(Authors Note: Are you surprised to learn that he looks like… this? I wasn't)*

The second-year law student, now banned from all UF facilities until 2028, is unlikely to be able to graduate. He will very likely sue the school for reentry, but his odds of success are dubious. The bright young student who had previously regaled classmates with his heartfelt desire to secure employment as a state prosecutor, work his way up the ranks of the legal world by locking up undesirables and eventually launch a bid for the presidency itself… will now have to find some other way liberate his country from "Jewish gangsterism" and "demographic warfare."



@preston_terry_

When Trumpists begin openly calling for an end to the influence of Jewish gangsterism in our government, the enactment of policies aimed at burgeoning White demographics, and the nationalization of toxic concentrations of capital, then I will believe Trumpism represents change.

10:13 AM · Feb 20, 2025 · **165** Views

**Preston Terry** @preston_terry_ · Mar 7

My only criticism of Mister Munayyer is that his post seems to imply Jews will target others "in the future" with genocidal acts and policies. But in the West they have been subjugating and destroying Whites for decades with cultural, legal, economic, and demographic warfare.

My classmates and I are currently crossing our fingers and hoping that whatever strategy he comes up with doesn't involve returning to campus to shoot the place up, but this remains a distinct possibility fueling student anxieties as we enter our already stressful final exam period. UF administration has assured us that the information they possess gives them total confidence that the promise of immediate arrest combined with the newly enacted emergency policy requiring all doors on campus to remain locked by student id until the end of finals will be

179

DEF_000780

enough to keep students and faculty safe from ajy threat of a potential disruption arising from the excesses of Mr. Damsky's unconquerable Aryan warrior spirit.



Preston's sudden and dramatic exile from campus came as a surprise to his fellow students (author included), but not because we were shocked that a member of the student body could hold such vile & hateful views. Mr. Damsky's status as an open antisemite & white supremacist was common knowledge on campus, known to virtually every student and faculty member. Open racism was key a pillar of Preston's ideology- to the degree that he used in-class papers and assignments as vehicles to advance his Nazi-adjacent worldview. To his credit, there was nothing "crypto" about this fascist.



DEF_000781

No, the shock at Mr. Damsky's sudden downfall came entirely from the fact that until this Preston had managed to avoid facing even a shred of accountability for his chronic habit of open indulgence in white supremacist rhetoric. In fact, he was able to academically thrive despite it (and arguably because of it in certain instances). After so many semesters of careful needle-threading and steady normalization of nazi-adjacent views on campus, the real surprise was that Preston had finally slipped up and flown too close to the Black Sun.



"Oy Vey, What a Shonda..."    "The poor schlemiel...    "Ay Gevalt, right on his tuckus..."

After all, Preston was clearly a very gifted student and a talented navigator of controversy. Just several weeks prior he'd stirred up a massive storm of it from which he'd emerged totally unscathed after the university awarded him not just one, but two prestigious academic honors. At the close of the fall semester of 2024, the Honorable Judge John Badalamenti saw fit to honor the open white supremacist fascist with the CALI book award for what the Federalist Society affiliated DeSantis appointee had apparently deemed outstanding performance in his recurring seminar on constitutional originalism. Preston also received a Cali book award for excellence in UF's course on space law that semester (no doubt motivated by his unstoppable drive to secure a legal pathway to shutting down those pesky Jewish Space lasers once and for all).

DEF_000782

 

The administration's announcement that Mr. Damsky would receive these honors prompted students long disgruntled with having to share space with someone who deemed them racial inferiors and occupiers of "his" country, to disseminate several of controversial writings of his, including a very close to final draft of an essay he'd written for the very same constitutional originalism seminar overseen by recurring UF adjunct professor and Federalist Society affiliated Desantis appointee Judge John Badalamenti.

The essay draws clear inspiration from the novel 'The Turner Diaries', a seminal work of white supremacist fiction centered on the execution and outcome of the revolutionary "Day of the Rope" in which White American patriots would rise up in a furious mass-lynching of People of Color, Jews, and "race traitors." Preston begins by making the case that under an originalist lens "The People" of the United States refers exclusively to "White" Americans, the natural state-forming population of the US the collective sovereignty of which grants the constitutional order its very legitimacy. Extending from this premise, he argues that by failing to prevent demographic shift away from hegemonic whiteness the elected government of the United States has violated this underlying principle of "white sovereignty" contemplated by the founders and thus abrogated the constitutional order itself.

Preston goes on to posit a series of constitutional amendments to restore the constitutional order and put the country back on track with the founders' vision.

182

DEF_000783

First, he would add a section to Article 5. "Article 5 Section 2" would which would explicitly enshrine White Nationalism and exclusive White citizenship by explicitly recognizing that "The People are White." Any effort to elide or undermine this essential whiteness of the people would of course be charged as treason under Article 3. Article 5 section 2 goes on to provide a legal framework allowing for individual white patriots among "The People" to take it upon themselves to enforce the constitutionally enshrined white supremacist order "by any means necessary" (a phrase he seems to REALLY enjoy). His solution is to allow anyone accused of a crime (murder, terrorism, etc.) to assert a fully exculpating legal defense by claiming that their actions were carried out for sole the purpose of preserving and protecting white supremacy.

Don't worry though, in case you were worried such a law might lead to abuse or foster a culture of barbaric anarchy, Preston's already way ahead of you- once invoked the defense cannot be retracted, and anyone found guilty of any crime after invoking the defense… must be executed within 24 hours. Now that's what I call enlightened statesmanship. Naturally, he goes on to argue that reverting the United States to the White Nationalist Utopia envisioned by the founders through the healing power of unspeakable bloodshed will also require the repeal of the 14th and 15th amendments, but at this late point in the essay that just seems like a given. The paper is also chock full of fun footnotes, including a lengthy one on how Jews have taken over the US media and financial systems.

He concludes the paper with the following plea to White America:

*"Finally, I shall speak directly to my brothers and sisters, the People. Can you honestly say these changes have been for the better? As the years go on, and those around you not only look less like you, but look upon you more and more with contempt and with a barely veiled desire for vengeance, does your love for this country and its inhabitants grow? Do you feel as if you are united to your fellow citizens "by the strongest ties," or do you feel as if America has been "split into a number of unsocial, jealous, and alien" groups? If you are increasingly apprehensive about these changes, you are not alone. However, feeling despondent and helpless is hardly a way to rectify the evils which have been visited upon us. Our Founders understood the importance of forming a nation upon the solid foundation of common ancestry. They understood that it is a part of "human nature*

183

DEF_000784

*. . . that its affections are commonly weak in proportion to the distance or diffusiveness of the object;" and thus, "a man is more attached to his family than to his neighborhood, to his neighborhood than to the community at large." Similarly, we should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle. And if the prize does not motivate you, then consider the cost of defeat; "[W]henever the dissolution of the Union arrives, America will have reason to exclaim, in the words of the poet: 'FAREWELL! A LONG FAREWELL TO ALL MY GREATNESS.'"*-Preston Damsky



It is worth noting that according to the administration, the above-described draft essay **is not** the essay which prompted Honorable Judge Badalamenti to confer the book award on Mr. Damsky, and the essay precipitating his decision has not circulated among the student body. I have heard an unsubstantiated rumor that the honorable judge did praise Mr. Damsky for his "bravery" in being willing to raise and defend the interpretation that "the people" as the original founders and drafters of the constitution understood the term, exclusively referred (and therefore

184

DEF_000785

should always and forever exclusively refer) to White Americans, but I cannot confirm that this exchange ever actually occurred.

In the end, all the student uproar over the university's intention to confer honors upon the author of this thinly veiled white supremacist power fantasy of carnage and genocide were dashed against the rocks of "protected speech." The Administration's hands were tied and unfortunately there was no action they could take to relieve Mr. Damsky of his honors or relieve his classmates from his deeply unsettling presence. Deranged racism is not a crime, and Preston had apparently done nothing that would provide them with a pretext for disciplinary action of any sort in exercising his first amendment rights to protected speech.

As difficult as it was to accept this answer from the administration, as a more left-leaning student, I chose to accept it with a disappointed shrug. After all, this is Florida, and over the long term any weakening of speech protections is likely to redound more strongly against people who share my sentiments than the right wing ethnonationalists of the world. The drama fizzled out with a "intellectual freedom on campus" survey that is still sitting unopened in my inbox.

So how exactly did our dear classmate and aspiring future American-Hitler, laden with academic honors and fresh from an astounding victory over the once again thoroughly owned, triggered, and crying libs manage to snatch such a humiliating defeat directly from the jaws of victory? After all, he was certainly not stupid, and he was certainly not unaware of the heightened tension and potential risks associated with "antisemitic activities" on campus in the wake of the second Trump administration's crackdown on student protesters.

In fact, much to the chagrin of skeptics of (myself included) of "Political Horseshoe Theory" (the notion that adherents of both far left and far right political ideologies begin to resemble each other as they push towards the extreme radical end of either ideology) Mr. Damsky had made several passionate comments in support of Mahmoud Khalil, and other victims of the presidential administration's crackdown on pro-Palestinian protesters on the basis of antisemitism.

The urgency of freeing Mahmoud Khalil and other students unfairly targeted for their on-campus activism is perhaps the only thing in the universe that Preston and I agree upon, although it is quite clear that our reasons for supporting these

DEF_000786

political prisoners are very different. Regardless, Mr. Damsky was clearly aware that (foreign and nonwhite) students had very recently faced severe repercussions for exercising their protected speech in a manner far less obscene, antisemitic and directly threatening than his… Imagine for a moment, if Mahmoud Khalil, or Ozturk had EVER publicly written or said anything even **close** to the underlying tweets from Mr. Damsky:



Preston Terry @preston_terry_ · Mar 28
You think we are not really better off than Europe because the President shows a token appreciation of Ramadan. I think we are not really better off than Europe because the President does *not* show earnest appreciation of International Quds Day. We are not the same.

353

Preston Terry @preston_terry_ · Mar 7
The Jews are the common enemy of humanity. We are all Palestinians now.

We know that these individuals never used rhetoric even half as odious, violent or incendiary as this, because if they had those words would have been plastered across every news station in the country and cited as justification for every human rights violation imaginable to rain down upon their heads. It is not just students on foreign visas or green-card holders feeling anxious in light of the Trump administration's recent actions against students exercising protected speech. I know for a fact that many of my Arab American friends and classmates have had to think long and hard before posting a message as anodyne as "Ceasefire Now," or expressing any mild mainstream criticism of Israeli military policy that does not explicitly divorce the criticism from any implied hostility to American Jews as a whole.

And yet, Mr. Damsky truly believed that not only could he get away with posting enough violently antisemitic tweets to fill a manifesto… he could get away with telling one of his professors directly that if the circumstances were right, he would feel totally justified murdering her, her entire family, and every other Jew.

How could he be so delusional? Well ironically enough, the answers may lie in the scholarly work of one professor Noel Ignatiev.

DEF_000787

It is obvious that Preston sees the world through the lens of racial conflict. It is even more obvious that he is deeply attached, almost religiously devoted, to his conception of "whiteness" and the "White Race" as an inviolate and essential element of not just his own identity but that of the United States of America as a whole. But what is whiteness?

According to Professor Ignatiev, Whiteness is not a racial category, it is a system and a worldview by which one may set themselves and the "white" ingroup apart from and above common humanity, and in doing so justify all manner of atrocity. Under the logic of white supremacy, the purpose of the law is not to create a common order by binding all and serving all in equal measure. Far from it, for those who see themselves as separate and apart from common humanity the purpose of the law is to serve the ingroup and bind the outgroup, whose exclusion and subjugation is not just encouraged but demanded. Preston's essay demonstrates this logic perfectly with its explicit endorsement of excluding all nonwhites from the protection of the law or membership in the polity, and call to literally exclude qualifying whites from the consequences of violating the law. The notion that his whiteness entitles him to play by a fundamentally different set of rules was not exactly out of step with his learned experience. In the past few weeks he'd seen firsthand that the same laws so easily discarded when applied to those who lacked the aegis of whiteness such as Khalil and Ozturk were wholly inviolate when applied to him and rendered him practically invulnerable to consequences for far more outrageous and threatening behavior. (Although this is not the main point of this analysis, I believe this does expose the falsity at the heart of the Trump administration's authoritarian crackdown disguised as an attempt to "protect Jewish students." Far greater threats seem to have been conveniently ignored for far too long when they came from the mouth of a home-grown white supremacist fascist.)

Considering his apparent invulnerability from consequences lavished upon his supposed racial inferiors, why wouldn't Mr. Damsky begin to imagine that he truly did play by a fundamentally different set of rules? Why wouldn't he come to expect that deep down everyone understands or should understand that this system, this country and this world, ultimately belong to people like him by virtual of objective natural right? In this light it is not surprising at all that he simply could

187

DEF_000788

not help himself from testing the limits and the power of his precious privilege further and further unto the very moment that it inevitably failed him.

In the end, I believe that Preston is himself a victim of white supremacy. The fruit of whiteness is privilege. The fruit of privilege is complicity in a system of power that cannot function without exclusion, dehumanization and violence. The fruit of complicity is further separation from humanity, which brings alongside it resentment and fear. The fear and paranoia of the white supremacist is derived both from a terror at the prospect that their privilege may someday be lost, and potentially even greater terror that someday they will face reprisal from those whose exclusion and oppression whiteness demands. Thus, the ultimate result of an unhealthy attachment to and identification with this system of oppression and self-worship is a constant state of panicked and isolated paranoia, and a fundamental inability to see the world as it is… let alone how it could be.

Preston is clearly very afraid. He is afraid that the "barbarian invaders" will steal away his birthright. He is afraid that the cunning Jews will corrupt his culture and undermine his sovereignty. He is afraid that black people will "take their vengeance" upon him in cruel reprisal for the crimes of his ancestors. He is afraid of losing himself and the world he knows in a "sea of unfamiliar faces."

More fundamentally however, Preston is afraid that he will be made to feel shame.

He is afraid of losing what he has, the things that grant him some feeling of security and control in an unpredictable and often terrifying world.

Most of all he is afraid that he will die, and the world will remain, destined to move on without him- that someday he will be forgotten by a world that he would not recognize and that no longer resembles him.

I'd be lying if I said I never felt many of those fears myself… because Preston and I are not so different, mocking and duplicitous Jew that I may be.

We are both human.

We are **ALL** human.

We need not hate or fear each other, nor should we fear the world, terrifying though it may be… so long as we maintain the strength and wisdom to embrace it as a divine gift to us all- and greet it as it truly is with love and acceptance.

DEF_000789

Including each other.

Including ourselves.

I hope someday that Preston forgets his fear, his anger, and his attachment to a construct of separation and oppression that has given him **nothing**, has already taken away his promising career, and which will surely take even more from him if he does not flee from its poisonous embrace.

I hope he comes to realize that everything dies but nothing is forgotten. God/The Universe remembers. It will remember everything. Including him.

Always and forever.

In the end, he may find that to love oneself, humanity, and the world is a greater and more profound privilege than any which whiteness has ever had the power to confer. That privilege has always been there for him. It still is.

All he has to do is reach out and claim it.

DEF_000790

(PD84) NLG GroupMe 4/7/25



DEF_000791



DEF_000792

# (PD85) Lyrissa Lidsky and Zac Cosner are Instagram Friends



DEF_000793

# (PD86) Zac Cosner on the meaning of "86 47" on Twitter (4/7/25)



193

DEF_000794

## (PD87) Message from Professor Charles Collier to Dean McAlister on or around 4/9/25



Charles Collier to me
Yesterday at 06:31

I write on behalf of my American Legal Thought student Preston Terry. I do not know what could have possessed him to post the statement that led to his suspension. It certainly does not reflect anything I have observed in our course, where Preston is one of the most thoughtful, insightful, and intellectually mature students.

Clearly Preston's political sympathies lie at the extreme progressive or leftist end of the political spectrum. His class presentation (required of all students), for example, was provocatively entitled "The Myth of Nuremberg." He apparently worked on this presentation over much of spring break, and it was the longest and most detailed presentation in the class. It was also respectful of differing opinions as it laid out the case that the Allied forces were themselves guilty of many of the same offenses they prosecuted at Nuremberg (waging an "aggressive war," for example). Preston brought in documented cases involving Admiral Nimitz's attacks on civilian shipping in the South Pacific, and also explained the relevance of the tu quoque doctrine (essentially, "you too"). My main critique of the presentation was that he indiscriminately

offenses they prosecuted at Nuremberg (waging an "aggressive war," for example). Preston brought in documented cases involving Admiral Nimitz's attacks on civilian shipping in the South Pacific, and also explained the relevance of the tu quoque doctrine (essentially, "you too"). My main critique of the presentation was that he indiscriminately applied principles of American constitutional law to a foreign, military tribunal.

Thus I consider Preston a thoughtful, intelligent student and am concerned about the situation he finds himself in. I cannot advise my students what to think, but in this case I would have advised him not to express what he thought. From the whole context of the statement it appears that it may involve an ongoing dispute with the Harvard professor mentioned, who seems to have equally indefensible arguments. In any case I do not see anything that rises to the level of unprotected speech under any credible First Amendment theories. I suggest that liability for such statements, which can cause understandable distress among our students, be limited to those expressed on official University or Law School forums and websites.

[Sent to Dean McAlister]

Reply

DEF_000795

# (PD91) Preston Damsky E-Mail Correspondence with Professor Kristen Hardy 4/17/25



Terry, Preston
To: Hardy, Kristen V

Thu 4/17/2025 3:23 PM

Professor,

I am not sure if it was a problem on my end, but I was not put into the Zoom call. It's no big deal for me, and there is no problem if I take an absence (I think I only have one or two unexcused absences this semester). I saw your message this morning, and I will review the slides when posted.

Thank you for your instruction this semester and your assistance over the past two weeks.

Best,
Preston

. . .



Access to Lectures and Assignment Submission



Hardy, Kristen V
To: Terry, Preston

Thu 4/17/2025 3:47 PM

Preston!! I am so sorry! So much was going on today that I forgot to activate the Zoom link. Please accept my apologies. It was totally my fault, and I will certainly excuse your absence. I just reviewed subject matter performance provision, endgame, general provisions, and signatures with the class, based on the Mentimeter poll I gave your class last week. I am going to post my Canvas slides in about five minutes.

I really appreciate your kind words. You are really bright and talented, and I want you to take care of yourself. Have a great summer.

**Kristen V. Hardy**
Legal Skills Professor
University of Florida Levin College of Law
P.O. Box 117620, Gainesville, FL 32611-7633
(352) 273-0883 | k.hardy@law.ufl.edu
Book an office hours appointment with Professor Hardy

200

**DEF_000796**

(PD92) "UF law student trespassed..." – Independent Florida Alligator – 4/21/25

NEWS | CAMPUS

## UF law student trespassed from campus after racist, antisemitic social media posts

*Damsky called for the elimination of Jewish people "by any means necessary"*

By Grace McClung

April 21, 2025 | 6:00am EDT

A UF law student who previously won a top academic honor for an essay promoting white supremacy was banned from campus this month after publicly indicating support for a Jewish genocide.

Preston Terry Damsky, a 29-year-old student at UF's Levin College of Law, was issued a trespass order on April 3, making it a second-degree misdemeanor for him to set foot on university property for three years. The order came weeks after Damsky began posting racist and antisemitic content on social media, including a message calling for the elimination of Jews "by any means necessary."

DEF_000797

**Mixed reactions from law school community**

Chad Fuselier, a former president of the Black Law Student Association and a third-year UF law student, said the law school administration handled the situation appropriately and understood its need to contain the issue to avoid "making a big ruckus." Still, he condemned Damsky's rhetoric.

"Any form of bigotry isn't tolerable. We're at school," he said. "I hope we start making Nazis and racism lame again."

Others were dissatisfied.

A law professor, granted anonymity for fear of jeopardizing his job, said the issue with Damsky is part of a broader pattern of inaction among law school professors against instances of discrimination. He called the law school's handling of Damsky's case "fundamentally opaque" and a "failure of leadership."

"We've known about the student. We've known about his problematic statements...over the course of years," he said. "The administration did nothing... they hid behind student privacy and this supposed principle of corporate neutrality."

The professor said rankings — a hot topic during the town hall — also shaped the law school's response. Administrators avoided addressing the situation, he said, to preserve the school's reputation — a key factor in the U.S. News & World Report rankings. UF's Levin College of Law was 38th among the nation's best law schools for 2025, a steep drop from 22nd in 2023.

Daniel, a 24-year-old third-year law student who is Jewish, said he wanted the law school to denounce Damsky's views and draw a line between offensive speech and calls for violence. Daniel, whose last name was kept anonymous to maintain personal safety, said he's upset it took so long for Damsky to face repercussions.

"From my perspective, it just looks like he got away with it for two years until he threatened a faculty member," he said. "It's been very concerning. It felt like the administration just thought that they could close their eyes and wait for it to go away."

*Contact Grace McClung at gmcclung@alligator.org. Follow her on X @gracenmclung*

DEF_000798

 

# JEWISH GATOR OF THE WEEK
## SUMMER 2021



# DANIEL PINKUS

**AGE:** 21
**HOMETOWN:** LEXINGTON, MA
**CLASS OF:** 2021
**MAJOR:** ECONOMICS
**HOBBY:** HISTORY AND POLITICS
**FAVORITE KOSHER FOOD:** CHOLENT
**FAVORITE HOLIDAY:** SIMCHAT TORAH
**BEST PLACE ON CAMPUS:** JUDAICA LIBRARY
**FUN FACT:** DESPITE WHAT YOU HEAR, I AM NOT BRITISH OR AUSTRALIAN AND NO ONE IN MY FAMILY IS EITHER
**PLANS FOR THE FUTURE:** LAW SCHOOL

**IMPACT:** "CHABAD UF HAS PROVIDED ME WITH COUNTLESS RESOURCES AND ENDLESS SUPPORT IN MY SPIRITUAL AND PROFESSIONAL JOURNEY. HAVING A DESIGNATED PLACE TO GO EVERY WEEK, WITH A SUPPORT NETWORK THAT WAS THERE FOR ME NO MATTER WHAT AND ALWAYS WILLING TO HELP IN COUNTLESS MATTERS WAS AMAZING BEYOND BELIEF. AND THE RABBIS ALWAYS MADE THEMSELVES AVAILABLE FOR ME IF I EVER NEEDED THEM, WHICH I GREATLY APPRECIATED. CHABAD UF IS THE ONE PLACE IN FLORIDA THAT I CAN CALL MY HOME, AND THE PEOPLE THERE MY FAMILY!"

DEF_000799

(PD96) Lyrissa Lidsky began posting to Instagram after a nearly year break on April 26, 2025



This instagram page and posts were first viewed on 7/21/2025

Identifying information of children has been redacted out of respect for the individuals' privacy

DEF_000800



## (PD98) Preston Damsky E-Mail Correspondence with Professor Lea Johnston 5/8-9/25 (Congratulations for Book Award #1)



Congratulations!

**Johnston, Lea**
To: Terry, Preston
Thu 5/8/2025 9:55 AM

Dear Preston,

Congratulations! You were one of two students to win the Book Award in our Criminal Procedure – Adversary System Class. Your exam scored about 45% above the mean. Tremendous work!

Would you mind sharing your experience on our exam with me? Did you feel rushed for time? I'm trying to gauge the number of questions I should ask in the future.

Congratulations, again. I hope you are doing well.

Best,
ELJ

DEF_000801

Congratulations!

**Terry, Preston**
To: Johnston, Lea                                    Fri 5/9/2025 10:33 AM

Professor Johnston,

Great news! I finished with about 3-4 minutes left on the timer, but I did not rush through the answer choices. I felt I had taken enough time on each answer to where I did not need to go back and check them again after completing the test. I also did not utilize the write-in portion for answer explanation, and felt all of the questions were fairly straightforward; though I was not sure about at least one of my answers, it was not because I had any doubt about the form of the question itself or because I thought one answer choice would have been equally valid.

I like multiple choice tests because of their objectivity, so that will always be my preferred choice for a timed examination.

Thank you,
Preston

**Johnston, Lea**
To: Terry, Preston                                    Fri 5/9/2025 11:39 AM

Great, thanks for the feedback!

...

| You are very welcome! | Of course! | Of course! Thank you! |

↩ Reply     ↪ Forward

208

DEF_000802

# (PD99) Preston Damsky E-Mail Correspondence with Professor Lea Johnston 5/15/25 (Congratulations for Book Award #2)

Congratulations!

 Johnston, Lea

To: ⊗ Terry, Preston

    

Thu 5/15/2025 9:32 AM

Dear Preston,

Congratulations – you won a book award in our Mental Health Law class! (Number 2 and counting!) I'm so glad your hard work paid off. Congratulations on this wonderful accomplishment, and I hope you're doing well.

Best,
ELJ

209

DEF_000803

# (PD101) Notification of Three Book Awards and Class Rank after Spring Semester



Note: There were two other emails set in this format sent at the same time regarding my awards for Criminal Procedure and Mental Health Law.



212

DEF_000804

(PD103) "A White Nationalist Wrote A Law School Paper . . ." –
New York Times – 6/21/25

The New York Times

# A White Nationalist Wrote a Law School Paper Promoting Racist Views. It Won Him an Award.

The University of Florida student won an academic honor after he argued in a paper that the Constitution applies only to white people. From there, the situation spiraled.

▶  Listen to this article · 13:12 min  Learn more

At the University of Florida, the story of the book award took a dramatic turn soon after Ms. McAlister defended the decision to honor Mr. Damsky with it. It was then, in February, that Mr. Damsky opened an account on X and began posting racist and antisemitic messages. After he wrote in late March that Jews must be "abolished by any means necessary," the university suspended him, barred him from campus and stepped up police patrols around the law school. He is now challenging the punishment, which could result in his expulsion.

214

DEF_000805

## (PD104) NLG GroupMe Chat 6/21/25 After NYT Story Was Published



DEF_000806

(PD105) NLG GroupMe Chat 6/22/25



DEF_000807

# (PD108.A) Stephany Matat Media Inquiry



**Matat, Stephany** <SMatat@gannett.com>                    Mon, Jun 23, 12:07 PM
to me ▾

Good afternoon,

My name is Stephany Matat, and I'm the First Amendment reporter for the USA TODAY Network-Florida.

I wanted to see if I could chat with you for a story I'm writing about an essay you wrote for a UF law class, which you received an award for to my understanding. If you're available, feel free to give me a call at 786-266-6044

**Stephany Matat**
**First Amendment Reporter**
*USA TODAY Network-Florida*
E: smatat@gannett.com
X: @StephanyMatat

223

DEF_000808

# (PD108.B) NLG GroupMe Chat 6/25/25



DEF_000809



DEF_000810



DEF_000811

314



227

DEF_000812

(PD110) "SuccessfulFly7718" Reddit Post on "/r/LawSchool" 6/25/25



 **SuccessfulFly7718** · 27d ago

Wednesday, June 25, 2025 at 9:46:47 PM EDT        https://archive.is/lPHcS

Depending on responses, I may delete this. Frankly, I'm nervous to post it in the first place.

I'm a current student, not in Preston's class year. I haven't met Judge Badalamenti personally. I am very close with someone in faculty, who has shared their very firm thoughts that Judge Badalamenti is not a white supremacist, or lean racist. I know he was a public defender for many years and volunteered to help at-risk youth get college educations (I believe he was, at one point, the only white person in the organization that he volunteered with), and I know that he is currently distraught that Preston now has a national platform, and that so many people have been harmed by the grade that he gave. None of these things mean that he CAN'T be a white supremacist, or at least racist, but I personally believe that he is a good-hearted but ignorant person who made a deeply, deeply flawed decision.

I can speak to the administration's handling of the situation. Dean McAlister's words have been very facially neutral; I can attest that I have never felt like she has been trying to defend Preston. Something that I don't think anyone has mentioned is that the Dean is an openly gay woman who previously practiced for indigent prisoners and LGBT rights. This is not a person who is fighting for Preston's views. She is someone who is toeing a very careful line so that, for example, two years from now a right-wing professor can't fail a paper arguing for abortion rights.

As soon as Preston was trespassed, the student body was pretty nervous. We didn't know how volatile he was, or if he had anything to lose. Within hours of asking, we had increased security and locked doors. The response for that was great.

I guess my whole point is, for such a terrible situation, I have a hard time finding a ton of fault with the school and the dean. The school has been as transparent as possible with us. From day one, they have explained what decisions they were making (as much as possible) and why. Of course, no one was happy that he got the book award. But up until that point, he hadn't made any tangible threats - I mean, we had a whole team of lawyers there, including first amendment scholars, including the ones who I believe HATED Preston, saying this. Even now, it's uncertain if the Twitter posts count as tangible threats, and if he'll be allowed back in. People are so angry at administration, but my question is - what else are they supposed to do? The judge should have never given him the book award. He did. Where do we go from here?

 ⬆ 71 ⬇     Reply     Award     Share    ⋯

230

DEF_000813

r/LawSchool • 4 mo. ago
willg215

## That one person everyone talks about at your school

I am sure that every school has that one student everyone talks about. The one no one wants to sit next to or be paired with for group work.

During my 1L year, my "that guy" was the subject of an email from the dean about personal hygiene. The email started as a general reminder to pick up trash left in classrooms but ended with:

*"In the past week alone, we have discovered... toenails on the floor of a classroom. This is, of course, not acceptable. It is imperative that we practice good hygiene and keep our shoes and socks on in the building at all times."*

Not only was this guy clipping his toenails in class, but he would also massage his bare feet during lectures. To make it worse, he was the only true gunner I have encountered in three years.

⬆ 332 ⬇    💬 50    🏅    ↗ Share              https://archive.is/4glJX

Single comment thread ───────────────────────────────── See full discussion

SuccessfulFly7718 • 4mo ago
Friday, April 4, 2025 at 2:22:10 PM EDT

Our "that guy" is a white supremacist and antisemite. He finally got a 3-year trespass notice from the school after publicly calling for the genocide of all Jews in America, including one of our particularly famous Jewish professors. Good riddance.

⬆ 13 ⬇    💬 Reply    🏅 Award    ↗ Share    ...



r/cats • my cat's just gotten hospitalized and I can't stop crying

SuccessfulFly7718 commented 4 mo. ago
Saturday, April 5, 2025 at 8:29:18 PM EDT

Not a cat but my dog had to spend about 2 days in the hospital over a cut that turned septic. It was super scary and I definitely spent a lot of that time crying. He came home on the mend and had several more happy years with me. Overnights are NOT a death sentence in the slightest.

https://archive.is/FB9o6
https://archive.is/qn1br

I can promise that she's where she needs to be right now!

⬆ 2 ⬇    💬 Reply    ↗ Share    ...

231

DEF_000814

# (PD112) Zach Cosner Continued Twitter Harassment on 7/3/25





DEF_000815

## (PD114) 7/7/25 NLG GroupMe Chat



**DEF_000816**

# (PD114) Scott Jurkowski Instagram Activity



https://archive.ph/oKk5u

https://archive.is/jZEPf





236

DEF_000817

# (PD115) Mary Claire Jackson's Solicitations for Reports and Leadership of NLG (last on 7/18/25)







237

DEF_000818





238

DEF_000819

# (PD116) A Small Selection of violent rhetoric and threats directed at Preston Damsky Since 4/1/25





https://www.reddit.com/r/inthenews/comments/1lgx2th/
a_white_nationalist_at_university_of_florida/

6/22/25 @ 19:59

239

DEF_000820



DEF_000821



241

DEF_000822