# EXHIBIT 16

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


PRESTON DAMSKY,

             Plaintiff,

   -vs-                          No.:  1:25-cv-00275-AW-MAF

CHRIS SUMMERLIN, in his official
capacity as Dean of Students of the
University of Florida,

             Defendant.
_____

                    Deposition of
                **PRESTON TERRY DAMSKY**

           Taken on behalf of Defendant

                    Pursuant to
    Notice of Deposition of Plaintiff Preston Damsky


    DATE TAKEN:  Thursday, February 5, 2026

    TIME:        10:00 a.m. to 2:44 p.m.

    PLACE:       By Zoom Videoconference


       Examination of the witness taken before:

                 Renee B. Farhat
           Registered Professional Reporter
               reneef904@gmail.com
                 (904) 434-5835

A P P E A R A N C E S


                    **ANTHONY F. SABATINI, Esquire**
                    **GAVIN B. ROLLINS, Esquire**

                         Sabatini Law Firm, P.A.

                         1601 East 1st Avenue
                         Mount Dora, Florida  32757
                         anthony@sabatinilegal.com
                         gavin@sabatinilegal.com

                         appearing on behalf of Plaintiff.



                    **H. CHRISTOPHER BARTOLOMUCCI, Esquire**
                    **JUSTIN A. MILLER, Esquire**

                         Schaerr Jaffe LLP

                         1717 K Street NW, Suite 900
                         Washington, DC  20006
                         cbartolomucci@schaerr-jaffe.com
                         jmiller@schaerr-jaffe.com

   -and-

                    **BRANDE S. SMITH, Esquire**

                         Office of General Counsel
                         University of Florida

                         300 SW 13th Street
                         123 Tigert Hall
                         Gainesville, Florida  32611
                         brande@ufl.edu

                         appearing on behalf of Defendant.

I N D E X

WITNESS                                                    PAGE

**PRESTON TERRY DAMSKY**

   Direct Examination by Mr. Bartolomucci. . . .    4


                          - - -



                   DEFENDANT'S EXHIBITS

Number          Description          For Identification

   1          Notice of Deposition                    8

   2          American Restoration Draft             26

   3          American Restoration                   31

   4          National Constitutionalism             35

   5          Email from Terry to Ramos              41

   6          Photo                                  49

   7          X Post, 3/21/25                        56

   8          NY Times Article                       82

   9          Email Re Reaffirming My Rights         86

  10          Litigation Hold Letter                 90

  11          X Posts, 3/7/25-1/27/26                94


                          - - -

**PRESTON TERRY DAMSKY,**

having been produced and first duly sworn as a witness on behalf of Defendant, and after responding "Yes" to the oath, testified as follows:

DIRECT EXAMINATION

BY MR. BARTOLOMUCCI:

Q   Good morning, Mr. Damsky.  Could you please state your full name for the record.

A   My name is Preston Terry Damsky.

MR. BARTOLOMUCCI:  Court Reporter, did you catch that?  It was a little bit garbled on my end.

THE COURT REPORTER:  Yes, I did.

THE WITNESS:  Sorry.

THE COURT REPORTER:  It's Preston Terry Damsky.

MR. BARTOLOMUCCI:  Okay, great.

BY MR. BARTOLOMUCCI:

Q   So, Mr. Damsky, my name is Chris Bartolomucci, and I represent the defendant, Chris Summerlin in this case.  We're here to take your deposition today.

Before we begin, I want to lay out some ground rules for you.  First, if I ask a question and you don't understand it, you know, please let me

know and I'll try to rephrase it or clarify it;
okay?

    A    Yes.

    Q    Second, the court reporter can't make a
record if we talk over each other.  So I will ask
you to wait until I finish a question before you
start answering it; all right?

    A    Yes.

    Q    And I will let you finish an answer before I
ask another one.

         Third, your answers need to be oral.  The
court reporter can't take down a head nod or the
like; okay?

    A    Yes.

    Q    Fourth, if you need to take a break at any
point, please say so, and we should be able to
accommodate that.

         Fifth, you may hear your lawyer object to
some of my questions.  If he does that, you still
need to answer the question unless he specifically
instructs you not to answer; okay?

    A    Yes.

    Q    Okay.  With that, I think we can begin.

         Mr. Damsky, do you understand that you are
being deposed today in the case of Preston Damsky

versus Chris Summerlin, a case pending in the U.S. District Court for the Northern District of Florida?

A   Yes, I do.

Q   And are you the plaintiff in that case?

A   Yes, I am.

Q   Are you being represented by counsel?

A   Yes, I am.

Q   Who is representing you?

A   Mr. Sabatini, his law firm.

Q   So you're under oath today.  I know you've spent more than two years in law school.  So do you know what it means to give testimony under oath?

A   Generally speaking, I believe yes.

Q   Do you understand that you're legally required to tell the truth in this deposition today?

A   I do.

Q   Are you today on any medication or under the influence of any substance that could affect your ability to understand my questions or that could affect your ability to answer questions fully and truthfully?

A   I do not believe so.

Q   This is a remote deposition using Zoom.  You and I are not in the same room.  So let me ask you:

Where are you today?

A    I'm in my living room in my apartment.

Q    Is anyone present with you today?

A    Assuming dogs don't count, no.

Q    Other than your dog, no one is present with you?

A    No.  The room is empty.

Q    Okay.  If you ever need to, you know, attend to the dogs' needs, please let us know.  We want to be good to our animal friends.

Do you have any papers or notes with you today that you plan to refer to?

A    I do not.

Q    Did you receive perhaps from your lawyer a notice of deposition?

A    Yes.

MR. BARTOLOMUCCI:  Okay.  Let's go ahead and put that up and make it an exhibit.

MS. SABATINI:  Are you waiting on us?

MR. BARTOLOMUCCI:  I'm waiting for Justin.  I think he's working on it.

MS. SABATINI:  Oh, sorry, Justin.  I didn't mean to rush you.  I just wanted to make sure I wasn't expected to put it up or something.

MR. MILLER:  (Publishing document.)

BY MR. BARTOLOMUCCI:

Q    Okay.  Are you able to see that, Mr. Damsky?

A    I'm able to see -- yeah.

Q    Is that the notice of deposition you received?

A    I believe so, yes.

MR. BARTOLOMUCCI:  Court reporter, can we mark that as Exhibit 1?

(Defendant's Exhibit No. 1 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q    Mr. Damsky, did you do anything to prepare for the deposition today?

A    I spoke with my attorney briefly.  But aside from that, no.

MR. BARTOLOMUCCI:  Justin, I think we can take down Exhibit 1.  Thank you.

BY MR. BARTOLOMUCCI:

Q    Other than speaking with your lawyer -- and I'm not going to ask you about the substance of your conversation with him.  But other than speaking with your lawyer, did you speak with anyone else to prepare for the deposition?

A    No.

Q    And did you review any documents in

preparation for the deposition?

A    I briefly looked at what you just sent us about 38 minutes ago.  But no.

Q    What is your date of birth?

A    January 8th, 1996.

THE COURT REPORTER:  Did you say '96?

THE WITNESS:  Yes, ma'am.

BY MR. BARTOLOMUCCI:

Q    So help me with the math.  How old does that make you today?

A    30 and some change.

Q    And where in the country did you grow up?

A    Los Angeles, California.

Q    Did you live in the LA area most of your life?

A    Yeah.  I'm from Carson, California.  That's the only place I've ever lived.

Q    And you lived there until --

A    Aside from when I went to college.  Sorry.

Q    So you lived in that part of California until you went to college?

A    Yeah.  And then I moved to Santa Barbara for a few years.  That's also in California.  And then came back around Covid, and moved out again in 2023 to come to Gainesville.

Q   Are you married or single?

A   I am not married.  Yeah, so...

Q   Have you ever been married?

A   I have not.

Q   Where did you go to high school?  What was the name of your high school?

A   Torrance High School.

Q   And where did you go to college?

A   University of California, Santa Barbara.

Q   So when you were at UC Santa Barbara, what was your major?

A   History.

Q   Was there any particular focus to your study of history?

A   I don't believe so.  Medieval, early modern, Europe, and the Near East.  But I also (unintelligible).

THE COURT REPORTER:  I'm sorry.  Is it lagging on anyone else's?

MR. BARTOLOMUCCI:  Yeah.  I'm having a little trouble hearing the witness as well.

THE WITNESS:  Sorry.

THE COURT REPORTER:  I feel like your signal is going in and out.

THE WITNESS:  Is it better now?

THE COURT REPORTER:  Yes.  It just lags a little bit here and there.

THE WITNESS:  I'm not sure what I can do to make that better.

THE COURT REPORTER:  Can you repeat your answer about your studies?

THE WITNESS:  Yes, ma'am.  So as I said, I was a history major.  I think probably the bulk of my classes concerned the medieval and early modern periods, particularly in Europe and the Near East, specifically like the Ottoman Empire.  But I also took classes on other eras and places and other fields.  I took a lot of earth science, geology classes to study natural history as well.

BY MR. BARTOLOMUCCI:

Q   While you were in college, did you belong to any student organizations?

A   I don't believe so.  I don't believe so.

Q   Were you ever disciplined while you were in college?

A   No.

Q   Now, after college, did you go straight to law school, or did you take some time off in between?

A   I took some time off.

Q    What year did you graduate from college?

A    I believe it was 2018.

Q    And when did you enroll in law school?

A    Well, I started in 2023.  I don't know exactly when I accepted and when I was enrolled. But I started in August of 2023.

Q    So am I right that there was about a five-year period between your graduation from college and the start of law school?

A    That sounds about right.

Q    And what did you do in that five-year period?

A    I mostly worked, lived life.

Q    Where were you living in that period, that five-year period?

A    I lived for two years in Santa Barbara, until Covid hit, and then I moved back home in Carson.

Q    And did you have full-time employment in that period?

A    No.  I mean, it vacillated.

Q    Well, whether it was full time or part time, what jobs, if any, did you have in that period?

A    I had a bunch.  The biggest one was I worked at a company that shipped, like, art and furniture around the country, personal effects, that kind of thing.

Q   Did you work for --

A   I held that job from, I believe -- I think I worked for some restaurants.  I don't exactly remember.  I kind of bounced around.

Q   Were you seeking full-time employment in that period?

A   Yeah.  And I had it for a while.  Covid kind of messed up the hours that I got.  That's partly why I moved back home, to work remotely.

Q   And what job was it that you had for a time as a full-time employee?

A   That job with the shipping company, I would say.

Q   Do you remember the name of that company?

A   It was called Pack and Post.

Q   Pack and Post?

A   Yeah.

Q   When did you start thinking about going to law school?

A   I -- I forget exactly when.

Q   What made you decide to go to law school?

A   I couldn't say specifically.

Q   Can you remember what attracted you to law school in that period before you actually got to law school?

A   Well, I took the LSAT, and I got a good enough score to get a full-tuition scholarship.  So I figured, once that happened, I was -- I wouldn't say obligated, but it seemed the sensible career decision to make.

Q   And why did you decide to attend the University of Florida law school?

A   They were the highest-ranked school that gave me a full-tuition scholarship.  And I think the weather was better too.

Q   When you came to law school, what did you want to do with a law degree?

A   I wasn't entirely sure, but it kind of seemed to be progressing in a way to try and work in a prosecutor's office or some kind of government work.

Q   Did you ever want to work in a law firm and make a lot of money?

A   I wasn't particularly concerned with the amount of money that I made so long as I could (unintelligible).

THE COURT REPORTER:  So long as what?

THE WITNESS:  I'm sorry.  Can you say that again?

THE COURT REPORTER:  You said so long as what?

THE WITNESS:  So long as I could pay my bills.

BY MR. BARTOLOMUCCI:

Q   Did you ever think that working as a lawyer in private practice in a private law firm would be your career path?

A   I mean, I anticipated it possibly being so at some point in time.

Q   So you said you wanted to be a prosecutor; right?

A   Yes, sir.

Q   And why were you interested in becoming a prosecutor?

A   It seemed like a fairly noble career path. And in terms of skills as an attorney, I felt it would make me a good litigator.

Q   But timing-wise, you enrolled at UF Law in the fall of 2023; is that right?

A   You said the fall of 2023?

Q   Yes.  That's what I said.  Is that the right date?

A   I believe so, yes.  That was certainly when it started.

Q   And in law school, did you join any student organizations?

A    I don't know necessarily what it means to "join," but I attended some meetings of some organizations.  I -- but I don't know necessarily if I was joined.  The only thing that I paid dues for was the Student Bar Society.

Q    Do you regard yourself as having been a member of any student organizations other than the Bar Society?

A    No, not really.

Q    So help me with this:  About how many students in total attend UF Law School?

A    I can't say for sure.  I know that there were about 200 in my class.  Assuming that there are three classes, that would seem to be 600.

But I know that there are also -- is also a LL.M. program, and I don't know what else they offer.  In terms of the JD program, I believe it's about 600.

Q    So the time that you've been in law school, did you reside in the same place the entire time?

A    Yeah, where I am right now.

Q    Okay.  And where do you reside?

A    I live in off-campus apartments.

Q    And setting aside your dog, do you have any roommates?

A    I do not.

Q    How far do you live from the UF campus?

A    If there's no red lights, about -- and we'll assume that I'm following the speed limit, about three to five minutes.

Q    So would you typically drive yourself to school to go to class?

A    Typically.  Sometimes I biked.

Q    When was the last time you were physically present on the UF campus?

A    I last recall for one day after they revoked the trespass.  I don't know the exact date.  It was -- it was shortly after they revoked the trespass, which was the day that I posted bond for the preliminary injunction.  I went back and returned some books to the UF library and also picked some up.  I haven't been back there since.

Q    So during the period that you were subject to the trespass notice, did you ever go to the UF campus?

A    I don't believe so.

Q    Have you ever been deposed before, Mr. Damsky?

A    I don't -- no.

Q    Have you ever given any kind of testimony

under oath before?

A    I think the -- I think we took an oath at the disciplinary hearing.

Q    Is that the only time you can recall being under oath?  And I'm not saying you were under oath at the hearing, but --

A    Yeah.

Q    Other than that, you can't remember ever being under oath before today?

A    No, I can't recall any other time.  I went to court over a traffic ticket one time, and I think they swore us all in as a group.  But aside from that -- I didn't give testimony there, from what I can recall.

Q    Have you ever been fired from a job?

A    Yeah.

Q    Could you tell us about that?

A    It's been a few -- I lost a job at Domino's Pizza for speeding.  I lost one at a restaurant for not being prepared during a rush period.  And then I lost one at a dog kennel for taking a dog outside of the room to walk around because it was kind of not calm, which was I guess a violation of the policy. It's been a while for all of those.  I don't think -- I haven't been fired from a job since,

what, 2018, 2019.

Q   Other than this case, have you ever been a plaintiff in a lawsuit before?

A   Not a named plaintiff.  I believe I've been in some class actions, but...

Q   Have you ever been sued?

A   No.

Q   Have you ever been convicted of any crime?

A   No.  I mean -- no, I don't think so.  Like I said, I've been to court over a traffic ticket, but it was -- I don't believe it was a criminal infraction.

Q   Okay.  Setting aside traffic matters or, you know, moving violations, have you ever been convicted of any other sort of offense?

A   No, absolutely not.

Q   And I'll just remind you.  Let's try not to talk over each other.  I'll try to let you finish before I speak, and make sure that you do the same when I'm speaking; okay?  It will just be easier for the court reporter.

Have you ever been charged with any crime?

A   No.

Q   Have you ever been arrested?

A   No.

Q    Have you ever been questioned by law enforcement?

A    Putting aside moving violations, no.

Q    Have you ever received a subpoena?

A    Not to my knowledge.

Q    All right.  So let's talk about your time at University of Florida law school.  When you came to UF Law as a 1L, was a class photo taken?

A    I believe so, yes.

Q    And when did that happen?

A    I want to say it was in either the orientation week or the first week of school.  I don't recall precisely the date.

Q    And were you in the photo yourself?

A    Yeah.  I think I'm -- I think I was in, like, the back or something.  I don't know.

Q    Now, do you know what a GroupMe is?

A    Yeah.

Q    What is a GroupMe?  Just tell us briefly.

A    I think it's just a chat-room-type messaging app.

Q    And did there come a time when someone in a GroupMe commented on the demographics of your law school class as shown in the class photo?

A    Well, I don't know -- the event that I

believe you're referring to, the person didn't comment about the demographics.  They posted a screenshot of an Instagram post which commented on the demographics.

Q   I see.  Could you tell us about that?

A   Yeah.  I -- from what I recall, the person said something to the effect of, "Is this what diversity looks" -- when I say "the person," I mean the person on Instagram, who, to the best of my knowledge, was not a UF law student.

They said something to the effect of, "Is this what diversity looks like in 2023?"  And said something about smiling faces or white faces.  I don't recall.

Q   Did the person who made that comment talk about the lack of black faces in your UF Law class?

A   I think that was the implication.  I can't remember if they said it specifically.

From what I recall, the person is somebody who helps students get into law school, helps them write -- what do you call them -- like, your Statement of Intent, I guess.  I forget exactly what it's called.

Q   And did you yourself react to that commenter with a comment of your own?

A    Yeah.

Q    What did you say on the GroupMe?

A    Well, I believe the exact screenshot is out there, but basically I expressed kind of dismay that that would be how we were looked at.

Q    Well, I've jotted down what I think you said, so let me read that to you, and you tell me if I've got it right.

I think the post said, quote, The United States lost 19.3 million white faces on net over the past decade, which I am sure fills this man with nothing but joy.  So why on earth should white people care at all about his criticism of our demographic share in any institution?  An even better question is:  Why should we feel anything but pure contempt for him and anyone else who expresses and shares such naked hatred for us, end quote.

Does that sound like what you said on the GroupMe?

A    Yes, sir.

Q    So based on that comment, you didn't really care if there were few, if any, black students at UF Law; right?

A    I don't -- I don't care if there are a few or more than a few or many.  No, that's not -- to the

best of my knowledge, UF doesn't accept or deny people on the basis of race, as that is the law in this country.

Q   Is it fair to say that you got riled up by the comment of someone who did care about the number of black students at the law school?

A   I don't know about "riled up," but it was -- I disagreed with the opinion expressed.

Q   Did the opinion make you mad?

A   I don't -- I don't know about "mad."  It's a fairly common opinion in the United States, so I wouldn't say that it made me mad.  I just felt that it was incorrect.

Q   Now, during your 1L year, did there come a time when you were locked out of a university building on campus and someone inside the building saw you trying to get in but wouldn't help you get in?

A   I don't really remember that.  Since it was said to have happened, nobody talked to me about it until the disciplinary hearing, was when it was brought up.  I never -- I was never spoken to about it, so I don't really recall the details.

Q   Do you remember that some such event actually happened?

A    Not really.

Q    If someone said that it did happen, do you have any reason to doubt that it did?

A    Based on the information that's been provided, I don't recall anything like that.  So, I mean, yes.

Q    Now, in your complaint, you allege that in the fall of 2024 you wrote two seminar papers which were the subject of controversy at UF Law; is that correct?

A    Yes, sir.

Q    And, again, in your complaint, you allege that the seminar papers had argued that the United States was founded as a race-based nation state; is that correct?

A    Yes.

Q    Can you tell us what you mean when you say that the United States was founded as a race-based nation state?

A    I mean, it's expressed I think better in the papers than I can do for you today.  But the general idea is that at founding and for 150-plus years afterwards, it was generally considered to be a requirement of citizenship -- I'm sorry, a requirement of naturalization, if not citizenship in

general, putting aside the 14th Amendment, that you have to be a white person to become a citizen of the United States.

Q    And is it your view that in America today citizenship should be reserved for members of the white race?

A    I think that's the law in a constitutional sense, but obviously don't -- people don't agree with that and that is not current precedent or statutory law.

Q    Now, when you say that the United States was founded as a race-based nation state for whites, is that what people mean when they refer to a white nationalism?

A    I think that concept encompasses far more beliefs, so no.  But it falls under that umbrella, I guess.  So both yes and no.  I'm sorry if that's a confusing answer.

Q    Well, let me ask you it this way:  I mean, do you regard yourself as a white nationalist?

A    I think that's fair to say, yes.

Q    And what would you say are your beliefs that make it fair to call you a white nationalist?

A    Well, I guess you could say the beliefs in my paper are also normative beliefs.  So not only do I

think that that is the law, I think that should be the law.

Q   Now, the two seminar papers that we've talked about a little bit, was one of those called American Restoration:  An Article V Proposal?

A   Yeah, that was the first one that I wrote.

MR. BARTOLOMUCCI:  All right.  Justin, let's put that on the screen.  And let's put the draft version of that paper on the screen as Exhibit 2.

MR. MILLER:  (Publishing document.)

(Defendant's Exhibit No. 2 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q   Mr. Damsky, do you recognize what's on the screen now?

A   Yes.

Q   And what is that?

A   Well, it appears to be the draft of the paper that we were just discussing.

Q   When did you write this draft?

A   I believe it was sometime in October.  I might have started it in September.  I'm not sure.

Q   And we're talking about 2024; correct?

A   Yes.  My apologies.

Q   What was the name of the class you were

taking for which you wrote the American Restoration paper?

A   I believe it was called Constitutional Change.

Q   And who was the professor who taught that class?

A   I believe his full name is Jonathan Marshfield.

Q   What was the Constitutional Change class all about?

A   The general procedural requirements for changing the Constitution, for constitutions generally, including national constitutions and state constitutions.

It's also a comparative class, so comparing different countries to the United States.

And then kind of more jurisprudential or, I guess, philosophy-of-law questions about what it means to change the constitution, what distinguishes an amendment from a revolutionary change, how constitutional change is carried out formally and extralegally, and that sort of thing.

Q   Now, it's a fairly long paper, but what would you say was the thesis of your American Restoration paper?

A   I mean, it's probably best encompassed in the introduction.  I don't -- it has multiple -- I mean, it discusses the ideas of the popular sovereignty.  It proposes a kind of formal amendment to Article V.  It makes normative arguments.  There's probably not one specific thesis, but...

Q   Did you share this draft of the paper with Professor Marshfield?

A   It was shared as a requirement in a -- in what's called a Canvas page, which is a -- it's a way of coordinating classroom instruction.  It was shared with Professor Marshfield and the rest of the class for review.  Everybody was required to share their drafts with the whole class for review.  I want to say there were about 6 to 12 other students.  I don't recall exactly.  I don't really know or remember who they all were.

Q   And did you say that was called Canvas, C-a-n-v-a-s-s?

A   One S.

Q   One S?

A   Yes, sir.

Q   Now, let's take a look at pages 26 and 27 in this draft.

Do you see the last paragraph of this draft,

Mr. Damsky?

A    You mean on page 26?

Q    Starting on page 26, yes.

A    Yes, I do.

Q    And the first sentence there says, quote, Finally, I shall speak directly to my brothers and sisters, the people, end quote.

Do you see that?

A    Yes, sir.

Q    And later on in the draft on page -- this is on page 27, you went on to write, quote, Similarly, we should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty.  The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle.

Did I read that correctly?

A    I believe so.

Q    And you wrote those words?

A    I did.

Q    Now, in the passage I just read, you seem to

be saying that white Americans may need to fight, kill, and die to take back what is rightfully theirs.  Is that a fair reading?

A   That is one -- I mean -- yeah.  I mean, in broad strokes, yes, that is sometimes what is required for political change as the -- as a revolutionary experience.

Q   And as you were writing that, did you personally intend to do what you can to seize back what rightfully belongs to white Americans?

A   Can you explain further?

Q   Let me ask it a different way.  You said that -- you talked about the need to "seize back what is rightfully ours."  Is that something you planned to do yourself?

A   I mean, I consider myself to be a political actor.  If you're asking -- or an aspiring one at least.

If you're asking if I intended to commit some sort of act of revolutionary violence or was planning to do so, the answer would be no.

Q   Were there any other ways in which you thought you might seize back what rightfully belongs to white Americans?

A   Well, it's my hope because I'm a fairly

comforted child of the 21st century that all political change could be achieved through relatively nonviolent means.

I only say "relatively" because as I at one point I believe made the point that politics is kind of inherently or at least implicitly a violent endeavor.  You know, the law is -- requires violence in order to be upheld as a -- at least as a last resort.

Does that answer your question?

Q    That's fine.

MR. BARTOLOMUCCI:  Let's put up as our next exhibit, which I think will be Exhibit 3, the final version of this same paper.

MR. MILLER:  (Publishing document.)

(Defendant's Exhibit No. 3 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q    Do you recognize this as the final version of your paper, Mr. Damsky?

A    I'm sorry.  Can you scroll up real quick?

Actually, in essence, yes.  This isn't the copy -- this is -- I'm assuming this is the copy you got from -- that I posted on Archive.org.  This would not be the copy that I turned in, but

textually I believe everything is pretty much the same. I don't recall making many adjustments in the interim.

The only reason I know it's not the copy that I turned in is because for law school papers, you're generally required to double-space them. And, frankly, I think double-spacing looks very childish and annoying. So I believe when I uploaded it to Archive I set it to single-space type.

Q   Now, if we could go to the last page of this paper, I notice that this version of the paper omits what was the final paragraph of the draft that we looked at. Am I right about that, Mr. Damsky?

A   I don't really know. I mean, I made that in the interim. I don't know how much it omits and how much it kept.

Q   Well, the draft we looked at had a paragraph at the end that started, "Finally, I shall speak directly to my brothers and sisters, the people"; right?

A   Yeah, okay.

Q   That paragraph is not in this version; correct?

A   I don't -- I don't know how much of that paragraph -- I don't believe I kept that passage.

33

On reflection, it sounded a little in- -- not inappropriate in -- it seemed out of place.  It seemed a little bit too polemical.  So I believe I may have...

Q    And do you believe that you cut that paragraph out of the version that you submitted --

A    Again, I don't -- oh, sorry.

Q    -- that you submitted as the final version for your class?

A    Again, I don't know how much of what I kept in that paragraph.  I might have moved it around.  But I don't know.  I mean, you could -- there might be sentences or phrases that I kept in, but I don't know how much of -- what I took out.

Q    Now, you said that the draft was shared with members of the class.  And, again, you said that was to facilitate feedback on the draft; right?

A    That was my understanding, yes.

Q    Did you get feedback from the other students in the class on the draft?

A    Yeah.

Q    And what kind of feedback did they give you?

A    I mean, I can't recall specifics.  I was -- I think the general thrust was contending with whether my definition of "the people" was proper.

Basically, in broad strokes, whether that included kind of a national sense or whether it was more a general idea of "the people" being everybody that lived in the United States or subject to its laws.

Q   Do you recall any commentary from your peers on the language in the draft about "The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours"?

A   I don't -- yes, because of -- it was brought up again at the hearing from one of the students who was in the class.  So yes.  I don't know exactly what he asked.  I seem to recall him asking whether or not this was like an exhortation to revolutionary activity.  And I was somewhat unclear on the question.  But I don't recall exactly what was said or exactly what answer I gave.

Q   Did he ask you whether the paper was making a call for extralegal violence?

A   I seem to recall him asking whether or not it was a call for revolution.  Whether or not a revolution encompasses extralegal violence, I'm not sure.  I mean, these were kind of the issues -- when I said that the class was about sort of jurisprudence as well, like, this idea of what is a

revolution in the constitutional sense was -- we spent a significant amount of time in class discussing that and how revolutionary changes could be accomplished extralegally, which is to say outside of the formal bounds of the amendment process outlined in the Constitution.  That was also a matter of significant discussion over the weeks.

Q    And what was your answer when he asked you whether the paper was making a call for a revolution or extralegal violence?

A    Well, I think I answered in general that it was definitely a call for political change.  And when he asked you know, "Is it violence," I believe I gave roughly the same answer that I gave to you just a short time back, where I said that politics is kind of inherently or implicitly a violent endeavor.  And that's kind of all I remember.

MR. BARTOLOMUCCI:  All right, Justin.  Let's take down that paper and let's put up as our next exhibit the National Constitutionalism papers.

I think this will be Exhibit 4.

MR. MILLER:  (Publishing document.)

(Defendant's Exhibit No. 4 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q   Do you recognize this paper, Mr. Damsky?

A   Well, as with the last one you showed me, I believe this is the copy that I uploaded to Archive around June or July.  I forget exactly when.

And as I said previously, I believe this is more or less the copy that I submitted as a final copy aside from the fact that I set the typeface to single-space.  I might have -- I might have corrected some minor typographical errors, but in substance, it's identical to the best of my knowledge.

Q   And this too was a paper you wrote for a class in the fall of 2024?

A   Yeah.

Q   What class was that, if you remember?

A   I believe the title of the class was called Originalism and Its Foes.  I think that might be the kind of appended title.  I forget exactly the precise name of the question -- of the class, but it was taught by Judge Badalamenti.

Q   And can you tell us what the thesis of this paper is?

A   This one is, I think, more -- well, it also has multiple theses.  It kind of rediscusses the general theme of the United States being a nation

state, but sort of cabins the analysis and expands on it to the founding era itself.

And then it suggests kind of ways of analyzing court decisions that might come before a judge, which the professor, the judge in the class, said we should kind of do as a kind of general guide to what he liked.

Q   Now, if we could look at the last paragraph, which is on page 20, I believe, of this paper.

Now, Mr. Damsky, you've written, quote, The Supreme Court and inferior federal courts have the power to arrest the dispossession of white America, end quote.

Do you see that?

A   I see what you've highlighted, yes.

Q   And the paragraph goes on to say, quote, If the people are not granted relief from the government, which includes the judiciary, then if they are to survive as masters in the land of their ancestors, they must exercise their revolutionary right to dismember or overthrow the government.  And that will be a process which no desk-bound jurist can gleefully look forward to, for it will be a controversy decided not by the careful balance of Justitia's scales, but by the gruesome slashing of

her sword, end quote.

Did I read that correctly?

A    Yes.

Q    And you wrote that?

A    I did.

Q    Now, I read the concluding paragraph of your paper to say that if general judges do not preserve America the white nation, then the white people of this country will have to dismember or overthrow the government, including the judiciary, by a force of arms.

Is that a fair reading?

A    Well, not entirely.

Q    What's wrong with that opinion?

A    Well, I mean, they wouldn't necessarily have to.  They could simply acquiesce to the changes. And it wouldn't just be the judiciary that required that.  It would be the whole government, of which the judiciary is a part.

The kind of general idea is -- and I believe the quote that I cited for "dismember or overthrow," I believe that's a citation to the inaugural address of Abraham Lincoln.

But generally the idea is if people -- if governments are obstinate and not giving people a

policy choice that they want that is of fundamental importance, then the only solution once the political process has failed is kind of the revolutionary activity exercised by the founding generation.

Q    And such revolutionary activity entails violence or the use of armed force; correct?

A    I wouldn't necessarily say so.  Civil disobedience is possible.  I think it probably entails generally a -- if not a flouting of laws -- so, for example, one source of revolutionary activity could be like a tax protest, a general strike, a legality of those under positive law.  I don't really know exactly what -- I mean, you have to pay your taxes.  I'm not sure if you necessarily have to work.

So it wouldn't necessarily entail violence. It would entail activities outside of the standard UF quarrel process.  There is such a thing as bloodless revolution, which is kind of what I'm trying to say.

Q    Now, was this paper shared with the other students in your class in the way that your other paper was?

A    I actually -- from what I recall, I do not

believe that it was.  Now, we had to give -- so when -- but when I say that, the distinction I'm drawing here is for the Constitutional Change class, we had to upload a copy to Canvas and we had to give a presentation on it.

For this class, I do not believe that we had to upload a copy to Canvas.  I think we might have had to email it to the professor or the TA.  I think I might have emailed it to the professor before I turned it in.  I'm not sure about that, though. That might not be accurate.

But I did have to give a presentation on it. And my presentation consisted broadly of just reading the paper.  I think I truncated certain parts because we were on a time limit.  But I did present it orally.

Q   And in connection with your presenting it to other students in the class, did they receive a copy of it?

A   I don't remember.  I may have handed out a second copy for it to be passed around while I was doing the presentation.  And I may have collected that.  I'm not entirely sure.  I might have just handed it to the judge so he could follow along. I'm not entirely sure.  But there was no -- I am

pretty confident I did not provide an electronic copy.

Q   Did you tell any other students that they could distribute this paper?

A   Not at the time.  Although, once -- two or three months afterwards, some students asked me if they could get a copy of it, some students that were broadly friends of mine.  And I think I did say, like, "Oh, if you want to show this to somebody else, you can."

At that point I think it had kind of -- well, because I was aware that -- well, you go ahead.

Q   Have you finished your answer?

A   Yeah.

MR. BARTOLOMUCCI:  Okay.  Let's put up Exhibit 5, the email that Mr. Damsky sent.

MR. MILLER:  (Publishing document.)

(Defendant's Exhibit No. 5 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q   Are you able to see that, Mr. Damsky?

A   Yeah.  This is what I was referring to.

Q   Do you recognize this?

A   I mean, I -- it's not something that's kept -- committed to memory, but, yeah, I believe

this is an email I sent to a student who asked if he could see the paper.

Q    The addressee of this email, was he a student in the class, the Originalism class?

A    He was not, from what I recall.  I do not believe he was.

Q    Is he someone who was in your law school class?

A    Yeah, he was in my section for -- he's in my -- like, he's in the same graduating year and he was in my section, which is kind of a group that you stick together with in your first year of law school.

Q    And it looks like your email attached a copy of the paper.  And you told him, "Feel free to send to any interested parties"; is that right?

A    That is what it says, yes.

Q    Now, did there come a time during your 2L year when you had a meeting with Dean Janice Shaw?

A    I think there were two times that that happened.  Yes.

Q    And when did those two meetings take place?

A    I don't recall the exact dates.  I want to say the first one happened in the first semester and the second one happened at the beginning,

relatively, of the second semester.

Q    Did the first meeting happen in the fall of 2024?

A    Yeah, that's the first semester.

Q    And what was the nature of that meeting?

A    I didn't take minutes, but I seem to recall it being about my plans for the summer.  She is the career -- my understanding of her position is that she's the Dean of Students, but she's also the -- she also works in the -- I believe it's called the Office of Career and Professional Development.  And she's my career adviser pers- -- like, she's assigned to me.  Somebody else was originally, but they left the school, and I chose her as the backup.

Q    And the second meeting, did that happen in January of 2025?

A    That sounds correct.

Q    With respect to that second meeting, did she ask you to come meet with her?

A    I want to say she asked me to come meet with her both times.  So yes.

Q    Did the second meeting happen soon after the dean of the law school had conducted a town hall meeting for the law school?

A    I think it happened the same month.  I don't

know what shortly means, but yes, that seems fair to say.

Q    Now, did the dean of the law school have, you know, town hall meetings from time to time?

A    I've never been, but my understanding is she has them once or twice a semester as a regular matter.  Yeah.

Q    And from the name "town hall," I gather that, you know, all of the law school students would be invited and the dean would make some remarks and then be available to answer questions.

Is that your understanding of what basically happens?

A    I've never been, but what you're saying sounds reasonable.  I know for a fact we're not required to go.  And that's why I've never been, because I've never really had concerns.

Q    The second time that you met with Dean Shaw, did she tell you why she wanted to meet with you?

A    I think -- I think I asked her, you know, "What are we meeting about?"

And she might have responded that it had to do with the town hall.  I'm not sure.  I didn't really find out fully until I was there.

Q    Did you meet with her in her office or

someplace else?

A    Both -- I believe it was her office both times, yes.

Q    Do you recall how long the second meeting lasted?

A    30 minutes, an hour.  I don't know.

Q    Did Dean Shaw at the second meeting bring up the topic of the town hall that had happened earlier that month?

A    Yeah, I -- yeah.

Q    Did she tell you that you personally were a topic of conversation at the town hall?

A    I believe so.

Q    And what did she tell you about how you came up in the town hall?

A    Well, I'm not sure if she told me anything or if she asked me what I had heard.

But my recollection of it was that we had -- there was a concurrence that a student said that they didn't like my paper.  I don't recall specifically what was said.

Q    Which paper are you referring to?

A    That's a good question because I don't really know.  Kind of thinking about it logically, since I don't believe at that point anybody aside from the

judge had physically read the paper that I submitted for the Originalism class, I believe it was referring to the Constitutional Change paper, which -- I mean, I don't think I'm speculating here; I think it's kind of proven -- was spread around by someone or someones in that class after I shared it over Canvas because they had the file.

Q   Now, did you say that other people told you about the town hall before you met with Dean Shaw?

A   Yeah.  I think -- I mean, I don't exactly remember who, but a few people had told me that a student -- I don't know if they told me a student or students exactly.  But, yeah, I mean, I got a rough idea of what was said.

Q   And what was your understanding of what was said?

A   I mean, I don't -- at some point, the general gist of what I got was that students didn't like the papers, which is an overall kind of thing.  And then one student said she, like, looked for the exits whenever I was around.  And then that was actually the only thing that I had known at the time, I believe.  At that time I believe I was only made aware of kind of one student.  But through this whole process, I guess there were two.  I don't know

exactly when I learned all these facts, but...

Q   When you say that students didn't like your paper, what about the paper didn't they like?

A   I don't know.  The content, I would assume, or the viewpoint.  I'm guessing it wasn't my choice of font.

Q   Did Dean Shaw tell you at the meeting that students at the town hall had said they didn't want to take classes with you?

A   I don't know if she said that in the meeting.

Q   Did she tell you that students at the town hall said that they were afraid of you?

A   Well, I think that was kind -- I don't know if she used those exact words, but -- I believe -- I believe if she asked me -- I seem to recall her kind of saying, "Well, what did you hear?"

        And I had heard about the whole, "Oh, I look for the exits," or whatever.

        And I think that sort of -- I mean, I don't know -- again, I don't know if she used that phrase, but that was generally sort of kind of the meaning behind what that phrase means.

Q   Well, let's move to another topic.  Did there come a time when you started wearing on the UF campus a shirt saying "from the river to the sea,

Palestine will be free"?

A    Yes, sir.  I've also worn it other places too.

Q    And approximately when did you start wearing that shirt on campus?

A    October/November of 2023.

Q    And in terms of timing, the Hamas attack in Israel had occurred on October 7, 2023; right?

A    I believe that's common knowledge, yes.

Q    So do you start wearing that shirt after the Hamas attack?

A    Yes.  Not necessarily directly in response to that, but more so in response to people -- people objecting to the use of the phrase as some sort of illegal activity, as was being discussed at the time, I believe, in European countries.  Britain and Germany spring to mind.

Q    How many times would you say you wore that T-shirt while on the UF campus?

A    I don't know.  Maybe -- maybe -- I really don't know.  Maybe ten, maybe more, maybe less.  I think I wore it, like, once every two to four weeks, maybe.  I don't know.

Q    What does that phrase mean to you, "from the river to the sea, Palestine will be free"?

A   I believe -- my understanding is that it encompasses a call for a sovereign Palestinian state from the Jordan River -- the West Bank of the Jordan River to the Mediterranean Sea --

Q   Did you wear that shirt --

A   -- encompassing --

Q   I'm sorry.

A   Just, yeah, the territory being former Mandatory Palestine.

Q   Did you wear that shirt on campus because you wanted other students to see you wearing it?

A   Well, I didn't want them to see me naked.  I don't know.  Yes, I mean, I guess.

Q   I think we have a photo we can introduce as Exhibit 6.

MR. BARTOLOMUCCI:  Justin, can you put that up?

MR. MILLER:  (Publishing document.)

(Defendant's Exhibit No. 6 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q   Mr. Damsky, is this a photo of you in the T-shirt we've been talking about?

A   It appears to be.  I'll have you note I didn't post this.  It was taken without my

knowledge.  But, yes, that appears to be me.

Q    And are you on the UF Law campus in this photo?

A    Yeah.  I believe that's what they call the News Annex.  I think I'm watching, I don't know, Fox News, CNN, or MSNBC.  That's what they always have on on three separate TVs.

Q    Out of curiosity, where did you get this shirt?

A    Amazon.

Q    When you wore this shirt on campus, did it occur to you that some of your Jewish classmates might be alarmed that you were wearing it?

A    No.  I only -- I seem to vaguely recall some people telling me it was a cool shirt.  But nobody ever told me that they didn't like it or that it was alarming, as you say.

So, no, it didn't occur to me.  I expect or at least expected all of my classmates to be, you know, mature.

Q    Now, you started wearing this shirt after the October 7 attacks in Israel by Hamas.  Did you think those attacks were justified?

A    Yeah.

Q    You believe Hamas was justified in killing

the Jews and Israelis in that incident?

A   Well, my understanding is that Israel is generally at war with the Palestinian people and have been since before 1948.  So in war, one is allowed to -- with some reservations, depending on your opinion of national law and international law, one is allowed to attack the enemy, if not obliged. So, yes, I believe it was justified.

Q   And is it your view that in war it's ethical to attack and kill civilians?

A   I don't know.  It depends on the circumstances.  I'm not sure if that necessarily happened on October 7th.  I don't know exactly the details.  The response from the Israeli government in terms of how many people were killed and how they were killed has been fairly opaque.

My understanding also is that all Israelis are, if not -- well, all Israelis are -- sorry.  All adult Jewish Israelis are, if not active members of the military, de facto reservists.  Whether or not that makes them legitimate targets of war depends on one's opinion.

Certainly I don't think the United States has ever outright said that attacks on civilian are unlawful.  The history of World War II and Vietnam

kind of belied that assertion.

MR. BARTOLOMUCCI:  Okay.  I think we can put down that exhibit, Justin.

BY MR. BARTOLOMUCCI:

Q   Now let's talk about your social media usage. You have an account on the social media platform known as X; is that correct?

A   Yeah.

Q   And X used to be known as Twitter; right?

A   Yes.

Q   I think a lot of people still call it Twitter.

How long have you had an account on X, or Twitter?

A   This one I believe has been up since February of 2025.

Q   When you say "this one," are you telling me that you had a different account previously?

A   Yeah.  I had another one which I deleted in December of 2024, which I think I started up in June.

Q   So you opened an account in June of 2024 and closed it in December of 2024; is that what you're saying?

A   June, July, May.  Yeah, I don't know.  I

think it was June.  I'm not entirely sure.  I can't go back and look.  But I kind of started to watch the news around the 2024 election.  I think Twitter is a pretty good -- well, I mean, I don't know. It's an okay news aggregator.  So I used it for that, and I also made some posts.

Q   Why did you close that account?

A   If you mean in December, I don't know.  It was getting -- it was getting to be a little bit of a time sink.  And, I don't know, the discourse around it seemed kind of childish at the time.  I was waiting to see what the Trump administration would do.  And, I don't know, it just didn't seem particularly rewarding to have the account then.

Q   Now, the handle on your current account seems to be @preston_terry; is that correct?

A   I think there's a second underscore after the Terry.  But, yeah, that's correct.

Q   How about the other account, the one that was closed in December?  What was your Twitter handle on that one?

A   I think it was the same thing minus the second underscore.  For some reason it wouldn't let me add the second under- -- or add -- it said the username was taken, I think, the first time, even

though the account doesn't exist.  I don't know.
But, yeah, they're functionally the same.

Q    So did you have any Twitter or X account
prior to that one that you opened in June or July of
2024?

A    I -- I don't recall.

Q    Do you have any other social media accounts?

A    None that I post on.  I think I have a
Facebook under my name.  I don't think I've used it
in years.

Q    How about Instagram?

A    I might have an account to look at things,
but I have never -- I've never posted on Instagram.

Q    And LinkedIn?

A    No, I don't have a LinkedIn.

Q    So your current X account, what do you use
that for?

A    Like I said, it's a news aggregator.  I'll
look at people's posts.  I make my own posts.  I
watch the videos that it sends me of cute dogs.  I
don't know.  Kind of what people generally use
Twitter for.

Q    So you don't seem to use Twitter to post
pictures of vacations or meals you've had; is that
fair?

A    No, I do not.

Q    But it seems you post a lot about topics like white nationalism, Israel, Jews; is that correct?

A    I would say in general my Twitter is kind of -- my posting on Twitter is concerned with my political beliefs, that's correct.

Q    And I guess I would say you seem to be fairly active in terms of your own posting.  Is that fair to say?

A    That's a relative thing.  I think I post probably on average two or three times a day.  For most people -- some people post, you know, a hundred-plus times a day.  So I don't -- I actually would not say that I'm pretty active, at least in terms of my posting.

I confess to the sin of sometimes -- I believe it's called doomscrolling, where you watch the videos that it sends you.  But I don't post terribly often, in my opinion.

Q    Well, let's talk about your March 21, 2025, post on X, the one in which you wrote that "Jews must be abolished by any means necessary."

MR. BARTOLOMUCCI:  Justin, are you able to call that up as Exhibit 7?

MR. MILLER:  (Publishing document.)

(Defendant's Exhibit No. 7 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q   Can you see that, Mr. Damsky?

A   Yep.

Q   And so is this -- at the top of this, is this a post you wrote on -- and posted on March 21, 2025?

A   That's what it says and that's what I recall, yes.

Q   Where were you when you posted this?

A   I think I was either at home or at the gym.

Q   Do you think you might have posted this from the gymnasium?

A   Yeah, an off-campus gym.  But, yeah.  I don't even know if UF's gym was open.

Q   Now, am I right that this is a public post in the sense that any X user could have gone to your account and seen it?

A   I believe that's correct.

Q   Did anyone else help you write this post?

A   Nobody helps me with my Twitter posts.  So no.

Q   And before you posted it, did you discuss it with anyone else?

A   No, I don't believe so.

Q   Could I get you to read into the record the first post at the top of the chain?

A   Sure.  It says -- you mean the one at the -- yeah, okay.

"My position on Jews is simple:  Whatever Harvard Professor Noel Ignatiev meant by his call to 'abolish the white race by any means necessary'" -- that part is in quotes -- "is what I think must be done with Jews.  Jews must be abolished by any means necessary."

Q   So what inspired you to post that?

A   I don't exactly remember.  I think I had seen something discussing the idea that the Irish weren't considered white and became white.  And that's kind of a -- it's a thesis, at least in my mind, associated with Ignatiev.  He wrote a book called How the Irish Became White.  And so I was thinking about him.

Q   And do you recall if you conceived this post on March 21st or earlier than that?

A   Yeah, no.  I think it was on the 21st.

Q   Did you expect that your post would get some views?

A   Yes, I guess.  But I didn't have a ton of followers at the time, so not many.  If any -- yeah.

I mean, I don't -- like you said, it's a public Twitter, so some people are probably down to view it.  But I didn't expect it to go viral or anything like that.

Q   Now, someone could view your post without being a follower of yours; right?

A   That's my understanding of how Twitter works. I mean, I know I can view other people's posts when I don't follow them.  So yes.  I'm not sure exactly how easy it is to view it if you don't have an account, but...

Q   So you put this post out into the world on X. Did you hope that people would read it?

A   Well, you know, I think generally I hope people will read everything I write that I distribute publicly.  People generally want to get the widest possible audience for their public speech as they can.

So, yeah, I would say that's fair, that I hoped it would get views.  I mean, but as I said -- but no more or less than any other post that I make.

Q   Did you expect that your post would attract comments?

A   Based on prior experience on the app at the time, not realistically, no.

Q   Did you hope that people would comment on it?

A   Well, I guess I hoped people would agree. Like I said, I hoped people would see and agree with everything that I publicly talk about.  Whether or not I wanted them to comment, I don't -- unless it's to say, like, "Yeah, right on," then no.  But people are free to disagree.

Q   Now, in March of 2025 when you posted this, did you know that some students at the law school were monitoring your posts and taking screenshots of them?

A   I -- I had heard a rumor that a student had taken screenshots of my other account, the one that I deleted in December, but I had no idea that anybody was, like, actively following me on this one or was taking screenshots or anything like that.

And, again, it was only a rumor.  People say a lot of things at UF.  I couldn't say that I even knew that.  I hadn't seen any screenshots at the time.  At least I don't recall seeing any, so...

Q   Well, when you say you heard a rumor, did someone tell you that there was a student who was monitoring your posts and screenshotting them?

A   Again, I think the substance of what I was told -- and I don't even really remember who told

me -- was that screenshots from the other account had -- people had seen them.  But I don't really know.  Like I said, I don't know -- I was not told that anybody was currently looking at my Twitter.

Q   Well, let's set aside screenshotting for now. You knew that -- you had heard, at least, that a student was monitoring your X account; is that true?

A   Like I said, no.  In terms of, like, active monitoring, no, I didn't really know that anybody was looking at it.  That's my recollection of what I knew at the time.  I mean, obviously, I know that that was not true now, but...

Q   But you said that you had heard that someone was monitoring the account; correct?

A   Again, no.  I had not heard that -- I was not aware at the time that anything that I posted would be seen by a student who was, like, surreptitiously monitoring my account or anything like that.  I mean, I had no idea of that at the time.

Q   Well, I'm not sure you answered the question. In March of 2025, you had heard that someone was keeping tabs on your account; true or false?

A   False.

Q   And did you later come to learn that, in fact, one or more students were monitoring your

account?

A    Well, yeah.  My understanding is that's how this whole thing got started.

Q    When would you say you first learned that fact?

A    When I first had, like, absolute certainty of it was -- I mean, I -- I guess when I got suspended. Or -- well, I guess at that time, I'm not sure if I knew it was a student.  But certainly by the time that we went through the disciplinary process and I asked people questions and they said, "Yes, we were looking at your Twitter account," I knew it at that time.

Q    Well, I didn't ask you about absolute certainty.  When did you have reason to believe that other law students were monitoring your X account?

A    Well, definitely by the time that I got suspended, I think.  It was kind of -- I mean, I assumed that it had kind of gone around by that point.

I mean, obviously I knew at some point. Professor -- the professor underneath my -- the reply post here, that they had come to find it.  I don't know when they had.  I don't know if they were actually, say, monitoring me.  But yeah.

Q    So are you saying that you had no idea before you were suspended that any other law students were watching your Twitter account?

A    Yeah, I didn't know that.  Yeah.

Q    Now, after you posted on March 21st, did you communicate with any students at UF about your post?

A    I don't recall.  I think I've spoken to somebody or some people, like, in person about it after I got suspended.  I don't know if I spoke to anybody in the interim period.

Q    So between March 21 and your suspension, you don't remember speaking with any other students at UF Law about the post?

A    No, I don't recall.

Q    And you have the same answer as to electronic communications with other students?

A    Yeah, I don't recall.

Q    So between March 21 and your suspension, did you communicate with any professors at the law school about your post?

A    What was the second date, the suspension?

Q    Yes.

A    Yeah.  I think I talked to -- because I had lost my internship for the summer on April 1st, which I recall being the day before I got suspended.

So I went into a professor's office that was in charge of the internship, like, probably -- because it was at the local prosecutor's office.  And I asked her -- it was a pretty friendly conversation.

I asked her, "Hey, do you know why I just got this email saying that my internship would not go forward during the summer?"

And she said, "Well, it had to do with some post about abolishing the Jews or something like that."

Q   And who was that professor that you met with?

A   It was Professor Wolking.  I'm not exactly -- W-o-l-k-i-n-g, I believe is how it's spelled.

Q   Now, after your March 21st post, did you communicate with any individuals who are not connected to the law school about the post?

A   I mean, I definitely talked to my mom about it a few times.  I think I've spoken to a girlfriend, maybe some other friends too.  I don't recall anything specifically.

Q   What do you remember saying to your mom or your girlfriend?

A   Well, just this -- well, you know, "This is why" -- well, by -- well, obviously on April 2nd I kind of assumed that this was part of the reason why

I got suspended.  I mean, they didn't say.

So I don't know any, like, conversation.  I can't recall the specifics of what I said after April 2nd and up until April -- I want to say it was the 16th when they actually gave me, like, "Oh, here's what you specifically did."  By that time I knew that it was over the post.  So I think I said -- you know, just explained, "This is why I got suspended."

Q   Other than your mom and your girlfriend, were there other individuals you spoke to about the March 21 post?

A   I mean, I don't recall.  I don't recall specifics.

Q   Now, at the top of your post next to your name, you've got what I think is called an avatar. Is that the right term?

A   Yeah.  I think that's what you would call it.

Q   And am I right that that avatar is the character known as Rorschach?

A   Yeah, I believe that's correct.  Well, I mean -- yes.

Q   And is he a character from the Watchmen books and movies?

A   I think it's from the comic book.  Yeah.

Q   So you chose that as your avatar; right?  X didn't assign that to you?

A   No.  I chose it.

Q   You know, would I be right to say that the character Rorschach is a violent right-wing vigilante?

A   I don't -- I don't know.  Certainly I think he's considered to be, like, a super hero.  I don't know if he's right wing.  Actually, I don't even know if he's considered to be a super hero.  I don't know.  It's a --

Q   Is he a vigilante?

A   -- character from a comic book.

Q   Is he a vigilante?

A   I don't -- I think that might be the case.  Yeah.

Q   Is he violent?

A   I think he punches people in the comic book.  So yeah.

Q   Does he kill people too?

A   I don't know if he kills anybody.  He might.  I'm not sure.  I think he might -- I think he might kill a character that feeds a child to dogs or something along those lines.  I think that's the only time you might see him kill somebody.  I

haven't read the comic book since I was in high school, so I don't really remember.

Q   Did you watch the movie they made of it?

A   I've seen it once or twice.  I haven't seen it in a long time.  But, yes, I have.

Q   Now, this March 21 post that we've been talking about, it's still on your X account; right?

A   I believe so, yeah.

Q   You've never taken it down?

A   No.

Q   Have you ever taken down any of your posts or content since March 21?

A   Not -- I don't think, like, permanently.  I mean, I don't recall.  Sometimes if I've taken something down, usually the reason is -- to the best of my knowledge, the only reason is I'll go back and read something shortly after I posted, and I realize I made a very stupid typo, and I get embarrassed of it.  So I copy the post again, delete it, and then fix the typo, and then repost it.

Q   So other than circumstances like that, have you permanently taken down any posts since March 21?

A   I don't recall.  It's possible.  I don't really recall any specifics.

Q   Do you recall retweeting your March 21 post,

you know, after that date?

A    Well, not to be obstreperous, but the answer I think to that is strictly no.  I believe I quote-tweeted it, which is basically when you retweet it, but you add, like, kind of a comment through retweeting.  I do remember doing that sometime in I want to say June or July.

Q    So is it fair to say you republished the original post with some additional commentary?

A    So the way that it works is that when you quote-tweet something, the main, like, message that you're trying to get across is above kind of a link in a box to the original message.  So it's not so much that it's republished so much that it's, like, linked to, if that makes sense.

Q    When you did that in June or whenever it was, someone who saw what you did in June would also see the original post from March 21; right?

A    At least part of it.  I think sometimes Twitter, if the message is kind of long -- I mean, I don't know really know how Twitter works, you know, details physically.  It could be truncated.  But you would see, I think, the majority of it.  Especially for this post, because it's less than the 280 characters that I think is the limit, I think you

would see all of it.  I don't know exactly.  You would certainly be able to click on the box or touch the box and see the original in full.

Q   Now, part of what you say in the post is that, quote, Jews must be abolished by any means necessary, end quote.  Is that correct?

A   That is the last sentence, yes.

Q   Do you think the world would be a better place if there were no Jews in it?

A   Well, yes, I think the world would be a better place if the identity known as Judaism ceased to exist.  And, therefore, I think in a very real sense there would be no Jews in it, much in the same way that if there -- if nobody called themself a communist, there wouldn't be communists in the world, if that makes sense.  Whether -- yeah.

Q   Would UF Law be a better institution if it had no Jewish law students?

A   I don't know what would make UF Law better or worse.

Q   Well, I'm asking you:  If there were no Jewish law students at UF Law, would the school be better than it is now?

A   I don't know.  That's kind of -- that requires me to kind of speculate and judge the

merits of each student that's currently there who is self-identifiably Jewish.  I like some of my Jewish classmates, so I couldn't say if the answer is yes or no.  I mean, I don't know.

Q    All right.  So --

A    I guess it would also depend on -- okay.

Q    No.  I want you to finish.

A    I said I guess that would also depend on, you know, who, like, took their place, I mean, so I don't really know.

Certainly I would say the fact that some of my classmates are Jewish isn't really -- I mean, at least before all this, it wasn't really a concern of mine at school.

Q    So as you sit here today, you're not able to say one way or the other if UF Law would be a better institution if it had no Jewish students?

A    Yeah.  I mean, I couldn't really say that.  I don't really -- again, I haven't really thought deeply about what would make UF Law a better institution.

I don't know if the fact that there are -- I mean, to speculate briefly, I think UF Law would be a better institution if it helped students learn the law better, and I can't say yes or no that having no

Jewish students would help students learn the law better.

Q    Let's say you woke up one morning and every Jewish student at UF Law had ceased to exist as a living person.  Would you be pleased by that?

A    Well, frankly, sir, if every Jew blinked out of existence, that would question -- that would raise very serious existential questions about how the laws of nature work.  So, no, that would probably be pretty distressing to me, if any group of people just blinked out of existence.

Q    If someone came on the UF Law campus and murdered every Jewish student at the law school, would you grieve for them?

A    Would I grieve for them?  I mean, if somebody -- if somebody committed a terrorist attack at UF Law, I would be pretty distressed regardless of who they targeted.

So would I grieve for them?  I mean, certainly I could say this:  On March 21st, nobody at UF Law had done anything that would ever make me want to see them hurt or otherwise, you know, harmed.  And since then, I would still say that, yes, I would be -- I would be somewhat alarmed if somebody killed a bunch of my classmates, which --

Jewish or not.

Like I said, there are students at UF Law who are Jewish who I am, if not friends with, are friendly with and value their contribution to the classroom especially.

So, yeah, I would be -- whether or not I would grieve, I don't know, but I wouldn't like it.

MR. BARTOLOMUCCI:  Let's go off the record for a minute.

(Brief break from 11:54 a.m. to 12:17 p.m.)

MR. BARTOLOMUCCI:  All right.  So back on the record.

BY MR. BARTOLOMUCCI:

Q   Mr. Damsky, when we left off, we were talking about your March 21 post on X.  And sometime after you posted, Professor Lyrissa Lidsky responded to your post; right?

A   Yes, sir.

Q   And when did she do that?

A   I believe it was on the night of April 1st. I'm not entirely sure at what time.  That seems to be what I recall.

Q   And when did you see her post?

A   I think right around then.  I don't know exactly how long it took me to see it after she

replied.

Q   And after she posted, you replied to her post; right?

A   Yes, sir.

Q   And when did you do that?

A   I think it was the same night that she -- she replied.

Q   Now, tell us who Lyrissa Lidsky is.

A   I believe she's a professor at UF Law.

Q   Did you know who she was when she responded to your post?

A   Yes.  I knew she was a professor.  I assumed this was the same person.  I never really interacted with her, though.  But, yeah.

Q   Did you know she was Jewish when she replied to your post?

A   Well, that seemed to be the import of what she was saying.  She seemed to be implying that she was.  I don't really know if that's accurate.  I mean, I took her on her word, I guess.

Q   But her initial comment was, quote, Are you saying you would murder me and my family?  Is that your position, end quote.

From that, you inferred that she was Jewish; right?

A    Yeah.  I -- yes.

Q    And what was your reaction when you saw that post from her?

A    I thought it was silly.

Q    You thought it was silly?

A    Yeah.  I didn't -- I thought it was a -- kind of a dishonest framing of what I said, or at least a -- not a fully informed response to what I said.

Q    Now, when you saw her post, you must have realized that your original March 21 post had reached the law school community; right?

A    I had assumed that was the case beforehand, at least when Professor -- by the time -- when Professor Wolking told me that the tweet had something to do with me losing my internship, I had sort of assumed by then.  Certainly it had reached Professor Wolking, so I...

Q    So you were notified about the internship before you got the post from Lidsky?

A    Yeah.  It happened sometime that morning, pretty early.  I don't remember exactly when, but...

Q    Did it surprise you that a law professor had read your post and reacted to it?

A    Yeah.  I think that's fair to say.  I don't know necessarily surprised.  I certainly wasn't

expecting her to respond.

Q   Now, on the screen, I think we can see your reply to her post.  Could you read that into the record for us?

A   Sure.  It says, "Did Ignatiev want whites murdered?  If so, were his words as objectionable as mine?  If Ignatiev sought genocide, then surely a genocide of all whites would be an even greater outrage than a genocide of all Jews, given the far greater number of whites."

Q   Now, can we agree that you didn't directly answer her questions?

A   I don't know if I can say that.  Certainly I didn't respond "yes," if that's what you're asking.

Q   You also didn't respond "no," did you?

A   I think it's kind of implicit that I was saying no.  People, when they assert a belief, generally they don't kind of imply that it's objectionable.  So I think it's fair to say that I knew from my response -- when I was applying for my response, the answer was no because I knew that Ignatiev didn't -- said pitifully that -- you know, I would not refer to my beliefs as objectionable.  I believe what I believe.  And I think other people should too, so...

Q   Now, sometimes lawyers say that a text will expressly say something.  Are you familiar with that convention?

A   I am not.

Q   You've never read an opinion or other piece of legal writing where the author has said, you know, "This statute or text expressly provides so-and-so"?

A   Could you give me an example?

Q   No.  Let's not bother with that.

I guess what I want to ask you is:  You didn't directly say, "No, I'm not saying I would murder you and your family"; correct?

A   That text does not appear in my response, correct.

Q   Now, she had not said anything about genocide in her post, but you did in your reply.  Why did you bring the topic of genocide into the conversation?

A   Well, she didn't explicitly say anything about genocide, but I inferred that was kind of how she interpreted my post.

My understanding is that genocide is a mass murder of a group.  Given that I never mentioned Professor Lidsky in the first post, I sort of assumed, basically, she would -- she was asking,

"Would you genocide me and my family" or "Would you" -- sorry, "Would you murder me and my family as part of a genocide against Jews?"  I think that was kind of the unsaid part.  Otherwise, it doesn't really make sense.  I think that's what she was saying.

So I would not say that I introduced the discussion of genocide.  I think she did by asking if I would murder her.

Q    And what is your definition of genocide?

A    Well, I did just say a mass murder of a group.  I believe the -- its kind of specific legal definition is -- under, like, the United Nations' conventions of whatever is the destruction of a group in whole or in part.

Q    Now, part of your answer was "surely a genocide of all whites would be an even greater outrage than a genocide of all Jews, given the far greater number of whites."

When you wrote that, did you believe that was true?

A    Well, again, kind of confining the meaning of genocide to a mass killing, my understanding is that there are more people in the world that fit under the umbrella of white than fit under the umbrella of

Jews. And, therefore, I kind of generally believe that it's worse to kill more people than less people. And obviously it's bad to kill people in general, but killing 100 people is certainly worse than killing one.

Q   And how is that responsive to her question when she wasn't asking about killing whites? She just said, you know, "Would you murder me and my family?" So why did you start talking about a genocide of all whites?

A   Well, again, because if you're interpreting the phrase "abolish X by any means necessary" as a call to genocide, then I am kind of asking her -- I'm asking her a different question. I mean, if you're asking me is it responsive in, like, a kind of way that I would answer a question in a law school class, I suppose it's not. But it seems -- I mean, we were having a discussion. I don't know.

I mean, I didn't -- I didn't -- I didn't look at her as my professor at the time. She has never been my professor, so I didn't think I had to answer her question precisely, if that makes sense.

MR. BARTOLOMUCCI:   Well, let's take down the post, Justin. Thank you.

BY MR. BARTOLOMUCCI:

Q   Now, are you aware, Mr. Damsky, of an organization known as FIRE, capital F, capital I, capital R, capital E?

A   Yes.

Q   And what is FIRE?

A   I think it stands for the Foundation For Individual Rights and Expression.  I think.  They're a free-speech organization, I think is what they do primarily.

Q   Now, at some point they reached out to the university about your case; right?

A   Yes, I believe so.

Q   And how did that come to be?

A   I asked them if they could do anything to help me.

Q   Did you ask them to represent you?

A   I don't know if I ever explicitly did, but it was kind of implicit in the -- in the request.

Q   But they did not --

A   They --

Q   Sorry, go ahead.

A   No, no.  You're good.  Sorry.

Q   Okay.  FIRE does not, in fact, represent you in this case; right?

A   No, I don't believe so.

Q   Did you reach out to the ACLU?

A   I don't recall if I reached out to them or if they reached out to me.

Q   Did you speak with someone at the ACLU?

A   I think I did at one point.  I think I spoke to somebody from the Florida branch of the ACLU.

Q   But the ACLU does not represent you; correct?

A   Not to my knowledge.

Q   Did you ask them to?

A   Again, I think I asked them -- you know, generally, the thrust of the request was, "Hey, is there anything you can do to help me?"

Q   Did you speak with any other organizations -- you know, not counting Mr. Sabatini's law firm, did you speak with any other organizations about whether they could help you?

A   I don't recall.

Q   Now, in July of 2025, you participated in a student conduct hearing before the University Officials Board; right?

A   Yes, sir.

Q   And you testified at that hearing?

A   I spoke.  You had mentioned earlier, you know, you weren't sure if it was testimony.  And I don't know if it was testimony.  We were told to

tell the truth.  And I spoke and was asked a few questions by the members of the University Officials Board.

Q   Did you tell the truth at the student conduct hearing?

A   Yes, sir.

Q   And was all of your testimony at the student conduct hearing the truth?

A   I mean, I believe so.  I don't recall everything that I said, but, yes, I believe that I spoke the truth.  I was asked to, and I swore that I would.

Q   All right.  Let's talk about the New York Times article.

In June of 2025, the New York Times published an article that in large part was about you; is that correct?

A   Yes, I believe so.

Q   Did you give an interview to the Times?

A   I spoke with one of the reporters, yes.

Q   Do you remember who the reporter was?

A   I believe his name was Richard Fausset.

Q   How many times did you speak with the reporter?

A   I don't recall.  At least once.

Q   Did you trade emails with him?

A   I -- I mean, yeah.  He emailed me, and I emailed him back.  I don't know how many times we emailed.

Q   Were those emails just scheduling or logistical, or did you discuss substance in those emails?

A   No.  I believe they were all scheduling, you know, "How do you want to talk to me," and that kind of thing.

Q   How long did the reporter interview you?

A   I don't -- I couldn't say for sure total.

Q   After the article came out, did you complain to the reporter or to the Times about anything they had published?

A   Not privately.  I believe I said publicly at one point that, you know, they didn't talk about certain aspects of the case.  But I never -- I never followed up with them.  (Unintelligible).

THE COURT REPORTER:  What was the end of your answer?

THE WITNESS:  I said I never really followed up with them.  I didn't think it would be fruitful.

MR. BARTOLOMUCCI:  Let's go ahead and put up

as Exhibit 8 a copy of the Times article.

MR. MILLER:  (Publishing document.)

(Defendant's Exhibit No. 8 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q   Do you recognize this as the New York Times article we've been talking about?

A   Yeah, I believe that's it.  I've got no reason to think otherwise.

Q   Now, on the first page near the bottom of the page, the article says that, quote, Mr. Damsky, who in an interview said that referring to him as a Nazi, sub-quote, would not be manifestly wrong, end quote.

Do you see that?

A   Yes, I see.  It's the very last chunk -- last small paragraph/sentence.  Yeah.

Q   And did you, in fact, say to the reporter that referring to you as a Nazi "would not be manifestly wrong"?

A   I believe -- again, I didn't take minutes.  I think this happened over the phone.

But I believe he asked me, "Are you a Nazi?"

And I said, "Well, I can understand" -- I mean, generally speaking, I said, "I could

understand why you would think that.  It obviously wouldn't be manifestly wrong to call me that in the way it might be to call me, like, a neoliberal or something."

But I told him, you know, I didn't belong to any Nazi organizations, and I certainly wasn't a member of the long-defunct National Socialist German Workers' Party.  But I am a nationalist, and I have economic beliefs that could be classified as socialist.  So in the literal sense, it does apply.  And, also, I have what people could reasonably understand as broadly anti-Semitic views.

So I didn't really object to it, but I believe the words "it would not be manifestly wrong" did come out of my mouth.

Q   Now, the Times article also says that, quote, Mr. Damsky said that his ideas were well formed before he started law school, shaped by reading authors like Sam Francis, a white nationalist, and Richard Lynn, who argued for white racial superiority and eugenics, end quote.

Is that a fair statement by the Times?

A   I don't believe that is how I characterized those authors.  My understanding of Sam Francis is he is a self-proclaimed conservative or

paleoconservative who wrote for the National Review and then wrote for other publications.

And with respect to Richard Lynn, I don't know if I ever called him a eugenicist or somebody who advocated for -- what does it say here?  However you put it -- white racial supremacy.

My understanding of Richard Lynn is that he writes about racial differences as a statistical matter in -- I mean, most controversially is in intelligence or IQ, but also in other respects.  He is a scientist, at least that's how he classifies himself.  I'm sure many people object to that.

But -- and I think with respect to Mr. Lynn specifically, I said that I had read his stuff, but that wasn't necessarily why I held my beliefs.  I'm not really a, quote/unquote, scientific racist.  But I do believe we discussed those authors, yes.

Q   So have any other authors besides Francis or Lynn shaped your views on white nationalism?

A   I mean, every -- I mean, all -- yes.  Broadly, yes.

Q   Are you able to name any that have informed your views as much as the writings of Francis or Lynn?

A   Well, some of them have informed my views in

the negative, by which I mean to say, like, I have read authors and come to disagree with them, and that has honed my world view.

One of those would be -- well, Ignatiev, for example.  There are others.  I mean, I read a lot of people.  There's no one I can really pick out expressly.

Q   Now, the Times also wrote on -- this is on page 3 of the article.  They quote you as saying, "You know, I'm not, like, a psychopathic ax murderer."

Is that something you told the Times reporter?

A   I think so.  I think the context of that statement was he asked me, you know, "Should people be afraid of you?"

And I said, "No.  I just have my beliefs. I'm not a crazy person."  And I think I used that as an example.

Q   Did you worry that denying you're a psychopathic ax murderer might send the wrong message to readers of this story?

A   Sorry.  Your question is did I worry that denying being a psychopathic ax murderer would send, you said, the wrong message?

Q   Yeah.  What I mean is if you say, "Well, I'm not a psychopathic ax murderer," could that cause a reader to worry that what you're -- that, you know, you're protesting too much?

A   I would hope that nobody thinks that I'm a psychopathic ax murderer.  For the record, I have never murdered somebody with an ax in a state of psychopathy or otherwise.  I don't even own an ax.  So no.  It's kind of just an expression, you know.

MR. BARTOLOMUCCI:  All right.  Let's take down the article, Justin.

BY MR. BARTOLOMUCCI:

Q   Now, did there come a time when you sent a document to Dean McAlister, Dean Summerlin, and others with the subject line "reaffirming my rights"?

A   Yes, I believe I did.

MR. BARTOLOMUCCI:  Let's put that up, Justin, as Exhibit 9.

MR. MILLER:  (Publishing document.)

(Defendant's Exhibit No. 9 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q   Is this the document you wrote, Mr. Damsky?

A   I -- I don't -- I haven't looked at it since

I sent it.  Probably.

Q    Do you --

A    I would assume.

Q    I'm sorry.

Do you recognize it?

A    Yeah.  I think that's it.  I mean, I don't know.  Yeah.  I mean, I think that's it.  I haven't reviewed it carefully.

THE COURT REPORTER:  I'm sorry.  You cut out.

THE WITNESS:  I said I think that's it.  I haven't reviewed it carefully, like I said, since I sent it, but...

BY MR. BARTOLOMUCCI:

Q    And who did you send this to?

A    Well, it says Dean McAlister, Dean Summerlin, and I carbon copied Janice Shaw, Aimee Peeples, and Brande Smith.

Q    Did you email it to each of those people?

A    Well, I think it was sent in one go, you know, with a carbon copy type of thing.  But, yes, I'm assuming all of them got it if I put in their email addresses correctly.

Q    Do you remember when you sent this?

A    I think shortly before the hearing happened.  I don't -- I don't recall the exact date.  It

says -- it says July 21st.  I don't -- that sounds right.

Q    July 21st, 2025?

A    Yes, sir.  That's what is says.  I'm not sure if that's correct.  But I have no reason to doubt that that's correct.

Q    Now, if we could look at page 4.  This is a long document.  We won't parse the whole thing.

But on page 4, you've written, "In truth, I suspect even my Twitter activity is not even why we are here.  I suspect the real reason is simply that many people at the law school just do not like me. Too bad," exclamation point, end quote.

Is that something you wrote in this document?

A    That's what it said.  And I'm the only person who wrote this.  So, yes, I would assume that's the case.

Q    Do you believe that many people at the law school don't like you?

A    I think everybody believes that.  I mean, even Dean McAlister suggested that at the hearing. So yes.

Q    Why do you think many people at the law school don't like you?

A    Because they disagree with my political

views.

Q   Do you care what your classmates think about you?

A   Yeah.  Actually, I do.  I would prefer to be -- I mean, I don't know if "liked" -- I would prefer not to be disliked.  But the fact that people dislike me for my political views isn't really going to affect how I go about compiling or expounding them.

Q   Do you think University of Florida initiated the student conduct process because many people at the law school don't like you?

A   I certainly think that if people at the law school didn't like -- or liked me -- if everybody at the law school liked me or were just apathetic, we would not be here today.  Yes.

Q   Now, on the next page, on page 5, you wrote that -- quote, Moreover, because I am an indigent plaintiff, I may have to share my story with the public in order to fundraise, end quote.

Have you done any fundraising?

A   I have not.

Q   Have you attempted to?

A   I have not.  I would prefer not to.

MR. BARTOLOMUCCI:  Let's put up as Exhibit 10

the litigation hold letter.

MR. MILLER:  (Publishing document.)

(Defendant's Exhibit No. 10 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q   Are you able to see that, Mr. Damsky?

A   Yes, sir.

Q   Do you recognize what this is?

A   I do.

Q   Okay.  And what is it?

A    It's basically a letter that I sent before I sent in my exhibits to the school for the disciplinary hearing because these people were either mentioned in the exhibits or were tangentially related to the case in some capacity. Basically saying, "Hey, you know, there might be a lawsuit over there.  Please don't delete anything."

Q   And the "to" line is addressed to Dean Merritt McAlister and Dean Chris Summerlin; right?

A    That is what it says.  Yes.

Q    And then there's a CC, and there -- you know, it looks like there are dozens of people listed; correct?

A   Yes, sir.

Q   Did you actually send it to all the people

listed in the CC block?

A   I don't know.  I think some of -- some of the emails -- I tried to.  I think some of the email addresses that I found came back as non-delivered. I forget who that was.  I didn't really follow up too much.  But I tried sending it to these people.

Q   Including a sitting federal judge?

A   Well, I mean, he was my professor.  But, yes, that's the only reason that I sent it to him.

MR. BARTOLOMUCCI:  Justin, I think we've lost the exhibit.

There we go.

BY MR. BARTOLOMUCCI:

Q   Did you send this letter to the chief assistant public defender?

A   He was also my professor for a class called Trial Practice.  I sent it to everybody who had ever taught me, was one of the groups of people.  So him being one of these people, I sent it to him.

Q   And it looks like you sent it to some people from the State Attorney's Office; is that right?

A   The woman that was resp- -- I forgot her name.  Stephanie Klugh.  I see it right now.  And then -- she was my point of contact for the internship and the -- well, I don't know how much

she had to do with the clinic opportunity in the fall that I also kind of lost as a consequence of losing the internship.  And then State Attorney Kramer, who was the person that emailed me telling me that I had lost the internship.

Q   And when did you apply for the internship we're talking about?

A   January 2025, I think.  Either January or February.  I'm not sure.  That would be -- that would be for the summer internship.

And I believe I applied to the clinic internship, which is -- I mean, I think it's fair to call it that -- the prosecutor's clinic in March of 2025, I want to say.

Q   And you were initially accepted for that internship?

A   Both of them, yes.

Q   Okay.  And then at some point the offer was rescinded; is that correct?

A   Yeah, that's fair.  I think the exact words that State Attorney Kramer used was "it would not be approved."

Q   Okay.  And you understood that to mean that the offer was no longer good?

A   Yeah.  I understand it -- I understood it to

mean that I wouldn't be working there that summer.

Q    And you spoke directly with the state attorney?

A    He sent me an email.

Q    And did he --

A    I didn't respond.

Q    I see.

Did he explain why the offer was no longer good?

A    He actually did not.  He just said it was up to his, I believe -- I believe he said "sole discretion."  But he didn't give a reason why he was exercising that discretion.

Q    And did you say you received this news on -- was it April 1st?

A    Yeah.  I think that's correct.

Q    Now, since March 21st, have you also had communications with the Florida Bar?

A    Yeah.  They sent me -- they wanted -- I forget when they initiated it.  I think it was in April.  They wanted just to get progress updates on my -- my trespassing and the disciplinary proceedings and all that.

Q    And have you been updating them on developments in the matter?

A    Up until I got expelled.  And then they basically said, "Your application to the Bar is on hold until you are reaccepted."

So I don't know exactly when that was.  I think it was October.  But, yeah, I kept them updated up until then.

Q    And did they explain why your application was on hold?

A    Because I'd gotten expelled.  I mean, I can't join the Bar until I get the degree.  So, I mean, that was kind of the point.  That's how I remember it.

Q    Now, if you complete your degree and if you were to go into private practice, do you think you could ever represent a Jewish person as a client?

A    Yeah, absolutely.

Q    Well, let's look at some of your other social media posts.

MR. BARTOLOMUCCI:  Justin, let's bring up these posts as Exhibit 11.

MR. MILLER:  (Publishing document.)

(Defendant's Exhibit No. 11 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q    Are you able to see the exhibit, Mr. Damsky?

A   Are you referring to -- I'm seeing what's on the screen now, and it appears to be mine.  Yes.

Q   Okay.  So this first post appears to be a post from you on your X account on March 7, 2025. And you've written, quote, The Jews are the common enemy of humanity.  We are all Palestinians now, end quote.

Did you post that on your X account?

A   I'm assuming that you have faithfully screenshotted it, so I will say yes.

Q   Do you, in fact, believe that Jews are the common enemy of humanity?

A   Well, I believe the phrase itself comes from -- the reason that phrase is in my head comes from either First or Second Thessalonians by St. Paul.

I believe that Jewish political aspirations present a common threat to humanity, that's correct. Whether or not every single Jew falls under that umbrella, almost certainly not.  But that is what I said.

Q   And what you said was, "The Jews are the common enemy of humanity."

And sitting here today, do you believe that to be true?

A    As I -- I mean, I think my last answer -- I would just repeat that.  So what I just said to you, do I still believe that?  Yes.

Q    Well, my question is more specific.  Do you believe that the Jews are the common enemy of humanity?

A    I am no more -- I am no less objectionable to Jews as a political grouping than I was on March 7th, 2025.  So that would be --

Q    But, again, do you believe what you wrote in this post?

A    That is what I believe that I wrote in this post, so the answer is yes.

Q    Since this post was on March 7, this was just two weeks before you wrote the March 21 post about "Jews must be abolished by any means necessary"; correct?

A    Yeah, 14 days.  21 minus 4.  Yeah.

Q    Now, let's --

MR. BARTOLOMUCCI:  Justin, if you could scroll down a little bit, I want to see the bottom of this page.

BY MR. BARTOLOMUCCI:

Q    There's another post from you.  Do you see that one, Mr. Damsky?

A    Yeah.  I believe that's a -- kind of a secondary reply with the chain of the post.  So I'm adding on additional information there.

Q    And there you've written, quote, But in the West, they have been subjugating and destroying whites for decades with cultural, legal, economic, and demographic warfare, end quote.

Is that a comment about Jews?

A    Yeah, organized -- organized Jewish power, I would say.  That's how I view it.  It's certainly not an individual effort unconnected to the goals of their group.

Q    But is that --

A    But I don't think (unintelligible).

THE COURT REPORTER:  I'm sorry.  Repeat that.

THE WITNESS:  I think I just said that it is not really an individual effort so much as it is kind of an organized party or factional effort.

BY MR. BARTOLOMUCCI:

Q    But the sentence I've read, do you believe that to be true, what you wrote?

A    I believe the Jews have played a significant role in the cultural, legal, economic, and demographic problems that I think plague the United States and the West in general, yes.

Q   And so it's your view that Jews have been subjugating and destroying whites for decades; right?

A   Yeah, that's what it says.  Yeah.

BY MR. BARTOLOMUCCI:

Q   All right.  Let's go to the next post.  This is a March 9, 2025, post.  Do you remember this post?

A   I mean, no, but I see it in front of me right now.  Yes.

Q   I mean, I'm going to show you several of these posts.  And, you know, rather than ask you every time, you know, "Is this one of your posts," could you tell me if you have any reason to believe what I show you is not one of your posts?

A   Absolutely, sir.  Yes.

Q   Okay.  So this post says, quote, There will never be peace in the Middle East until the war on terror is won and Israel is abolished, end quote.

      Do you see that?

A   I do.

Q   And do you believe Israel should be abolished?

A   I believe that the world would be a better place if Israel as a state no longer existed.  So

that is -- yeah.

Q   All right.  Let's go to the next post.  This one is from May 9th -- I'm sorry, May 23, 2025.  You seem to be reacting to someone else who commented, "Free Palestine is just today's version of heil Hitler."  And then your response is, "Free Palestine."

Have I got that right so far?

A   Well, sir, I don't believe that's someone else.  That is Benjamin Netanyahu, the prime minister of Israel.

But, yes, that is what I'm reacting to.

Q   Okay.  So Netanyahu said that, and then your response was, "Free Palestine"?

A   That's correct.

Q   Now, correct me if I'm wrong, but you seem to be saying if "Free Palestine" is the same as "Heil Hitler," you're fine with saying "Free Palestine"?

A   Yeah.  I'm not going to let Benjamin Netanyahu to -- as far as I remember -- I'm not sure if he's still facing this.  But at the time, I believe he was an indicted war criminal.  I'm not going to let him determine the bounds of my political speech.  So yes.

Q   All right.  Let's go to the next one.  This

is another May 23rd post.

MR. BARTOLOMUCCI:  Oh, I'm sorry, a little further, Justin.  Page 4.  Correct.  Good.

BY MR. BARTOLOMUCCI:

Q    Now, this post contains a reference to, quote, a tribe of foreign criminals and butchers of humanity.

Are you talking about Jews in that language?

A    Well, given that I'm quote-tweeting the response to the prior -- or a follow-up reply to the prior tweet, I think it's kind of more fair to read it as Israelis.  But in honesty, I very rarely make pains to separate those two concepts.  Israel is the (unintelligible).

THE COURT REPORTER:  I'm sorry.  The end cut out.

THE WITNESS:  I said -- sorry.  I'm sorry.  Can you say what is unclear?

THE COURT REPORTER:  You said "Israel is the," and then it cut out.

THE WITNESS:  Yes.  I said Israel is the Jewish state, self-proclaimed.  They have a law about that.  So I don't go through great pains to kind of separate those things in my discourse.

BY MR. BARTOLOMUCCI:

Q   So are you saying that, as you conceive of it, Jews and Israel are interchangeable?

A   Not only how I conceive it, but how many Jews conceive of it.  But I take their word for it, yes.

Q   Okay.  So based on this post, you believe Israel or Jews to be a tribe of foreign criminals and butchers of humanity?

A   I think that fairly accurately describes the conduct of the Jewish state since -- since October 7th at the latest.  I mean, in my opinion, long before, but certainly since October 7th, 2023.

MR. BARTOLOMUCCI:  All right.  Justin, let's go to page 5.

BY MR. BARTOLOMUCCI:

Q   This is a May 27, 2025, post.

MR. BARTOLOMUCCI:  If you would go down a little further, please, Justin.

BY MR. BARTOLOMUCCI:

Q   So, Mr. Damsky, I see you saying, "Jews are demonstrating actions consistent with a guilty mind. They understand the moral value of their evil; yet, they intentionally persist."

Do you remember writing that?

A   No.  But, again, I will take it for -- take it as -- I don't believe that that is something that

I did not write, if that's what you're asking.

Q   The reference to the "moral value of their evil," what did you mean there?

A   Looking back on it, perhaps it's kind of awkwardly stated.  But, basically, I'm stating that Jews understand that they're doing wrong, as I said. That's how I would read that.

Q   And not just wrong, but what you characterize as "evil"?

A   I mean, I think they're synonymous.  But, sure, that is the word that I used, "evil."

MR. BARTOLOMUCCI:  Let's go to page 6, Justin.

And down a little bit.

BY MR. BARTOLOMUCCI:

Q   Here you're written, quote, It is correct to vilify Jews for being a tribe of rootless, child-killing vice merchants.

Did I read that correctly?

A   That appears to be what it says.

Q   So do you believe that Jews should be vilified for being a tribe of ruthless, child-killing vice merchants?

A   Well, I think that describes many Jews' behavior.  Certainly Israel has killed a lot of

kids.  And many Jewish fortunes -- the ones that come to mind right off the top of my head are the Bronfman fortune, who are the owners of the Seagrams corporation, and the Sackler family, the owners of Purdue Pharma.  I think they can be reasonably described as vice merchants, yeah.

MR. BARTOLOMUCCI:  Let's go to page 7, Justin.

BY MR. BARTOLOMUCCI:

Q   This is a June 25 post, or string of posts. Down at the bottom -- there we go.  I think this is what I had in mind when I asked you before whether you had ever retweeted your March 21 post.  And you called it something else.  What did you call it?

A   I'm sorry.  I'm actually not sure what you're referring to.  Would you say it again?

Q   See the post at the bottom, "My position on Jews is simple"?

A   I -- well, I wrote here, "And so that you have all the information, here is a link to the tweet, which in addition to my wearing of a pro-Palestine T-shirt, formed the basis for my suspension."

And then I -- oh, you're referring to -- I called it a quote-tweet, I believe is how the --

Q   Yes.

A   -- how the website refers to it when you put -- you see in the middle right next to the heart?  When you click on that, it offers you the opportunity to retweet it, which it basically just posts again to your wall.

Or you can quote-tweet it, which is what I did here, where you add the comment above the actual post itself.

Q   Okay.  So the correct terminology is that on June 25, you quote-tweeted the post from March 21; is that right?

A   Yes, sir.

Q   And on June 25, you were serving your interim suspension at that time; right?

A   Well, I was under interim suspension.  I believe your client or some of their employees told me that it's not correct to do -- that the interim suspension isn't a punitive measure.  So I don't think it would be accurate to say I was serving it, but I was under the interim suspension, yes.

Q   On June 25, you were -- the interim suspension was in effect?

A   Yes, sir.

MR. BARTOLOMUCCI:  Okay.  Justin, let's go to

the next one.

BY MR. BARTOLOMUCCI:

Q   Now, this is a June 28 post.  Mr. Damsky, it's kind of long and I'm losing my voice, so could I have you read this one into the record for us?

A   Oh, sure.  I said on June 28th, "The past three months have been very difficult, but I am grateful for the support and encouragement given over the past week.  Thank you.

"This process was meant to punish and silence me, but that has backfired.  Many more people than I ever hoped to reach have now been exposed to the arguments I present in my paper.  Most gratifyingly, these arguments have very often been well-received, even in quarters that are not inclined towards being sympathetic to nationalist theory.

"I have not been silenced.  Both my resolve and my ideas have been amplified.  And I will never be silent until there is no further need to speak."

Q   Do you feel the same way today?

A   I don't -- in what respect?  I think I expressed a few ideas in there.  To what exactly are you referring to?

Q   The entire post.  Do you --

A   Well -- sorry.

Q   Do you have the same views now that you expressed in that post?

A   Maybe not exactly with respect to everything. If you could -- like I said, there's a few ideas. If you could, like, single one out.

Q   Well, how about the notion that you have not been silenced and you will never be silent.  Is that still your attitude?

A   Well, nobody has come to my home and prevented me from being able to speak publicly on Twitter or anywhere else aside from, I guess, on UF's campus, which is pretty significant to me.

I think I've been punished for speaking out. I think I'm still being punished for speaking out.

But in a strict sense, no, I have not been silenced.  I am still able to express opinions publicly, but, again, subject to the fact that I am currently being punished for having expressed that. But the punishment has not gone so far as to make me -- as to force me to stop.  I haven't been imprisoned, for example.

Q   In the second paragraph, there's the statement that "This process was meant to punish and silence me."  When you say "this process," are you referring to the student conduct process at UF?

A   No.   I think just generally the -- what I felt -- I mean, I told you just a little bit ago that your -- I've been told that the interim suspension isn't punitive.  I disagree.  I think it is punitive.

By "the process," I think I just mean the interim suspension and, yeah, like, the ongoing -- the ongoing kind of disciplinary process in general. Everything that has happened since -- well, with respect to the school since April 2nd.

MR. BARTOLOMUCCI:  Okay, Justin.  Let's go to the next one.

BY MR. BARTOLOMUCCI:

Q   This next post, which is from July 13, actually goes for three pages, the pages numbered 9, 10, and 11.  It's a long post.

MR. BARTOLOMUCCI:  If we could look at page 11, Justin.

Up a little bit more.

There we go.

BY MR. BARTOLOMUCCI:

Q   At the bottom of the first long paragraph there, it says, "If we love our people, we must hate Israel, for nothing threatens the existence of our people more than the Jewish gangster entity."

Do you see that?

A    Yeah, I do.

Q    So do you personally hate Israel?

A    Yeah.  Like I said, I think Israel would be better off not existing.  Or, I'm sorry, I think the world would be better off if Israel no longer existed.  I do not -- I do not like Israel, and it is accurate to say that I hate it.

Q    And the term "Jewish gangster entity," you're referring to Israel?

A    I am.

Q    Now, do you hate Jews the same way?  I think you told me earlier that Jews and Israel are kind of interchangeable in your mind.

A    Not necessarily on an individual basis.  I mean, as I said to you, I actually get along fairly well with some of my Jewish classmates.  So, no, not on an individual basis.

But I think in the sense that Jews operate collectively for Jewish interests and above all, at least with respect to this post, Zionism, then, yeah, I think support for Israel is bad for the United States.  So I don't like people that do bad things in my country.

Q    So am I right that just as you hate Israel,

you hate Jews as a collect- -- as a collective, even if not, you know, individual Jews that you may know?

A    I hate them as an organized political force, in much the same way that you might hate the Communist Party or the Republican Party, but you wouldn't hate your Republican uncle or something like that.

MR. BARTOLOMUCCI:  Okay, Justin.  Let's go to No. 12.  If you could bring it up to the top.

BY MR. BARTOLOMUCCI:

Q    This is a July 20, 2025, post.  I think in this post you refer to yourself as an anti-Semite. Do you see that?

A    Yes.

Q    And is that something you embrace?  Are you an anti-Semite?

A    I don't run from the accusation, and I think it's reasonably fair.  Like I said, I oppose organized Jewry.  If that's what it means to be an anti-Semite, then I 100 percent fit the definition.

Q    Well, how do you define the term "anti-Semite"?

A    Many people define it different ways.  I think for me personally, if I were to say "This person is an anti-Semite" -- and, again, obviously I

don't mean it as a pejorative like others may.

I would say that being an anti-Semite encapsulates being an opponent of organized Jewry to some extent.

I would say, for example, that the people who claim not to be anti-Semites but say that their objection is just with Israel actually are anti-Semites because Israel -- the existence of the state of Israel, Zionism, at least to me, seems to be one of the core, if not the core political objectives of Jews as an organized political force.

MR. BARTOLOMUCCI:  Let's go to page 13.

BY MR. BARTOLOMUCCI:

Q   So this is an August 15, 2025, post.  You've written that "We should give munitions to the Palestinians so that they can cast off the Jewish gangster entity."

And you go on to say that if that does not work, the U.S. military should attack Israel directly.

Is that a fair reading?

A   Yes, sir, with the qualification that the "we" referenced in the first sentence is a reference to the United States government.  For example, what's been done with -- to give an example, it's

probably the most obvious, like Ukraine, how we've armed Ukraine, I think that that should have been done.  We should have done that to the Palestinians.

And I think in much the same way that we intervened, at least ostensibly, to protect the Kuwaitis in Operation Desert Storm, I think that also should have been done with regard to the Palestinians.

MR. BARTOLOMUCCI:  Let's go to page 14.

BY MR. BARTOLOMUCCI:

Q   So this is a September 23, 2025, post.

MR. BARTOLOMUCCI:  You can stop there, Justin.

BY MR. BARTOLOMUCCI:

Q   There's a sentence -- actually, two sentences that read, quote, On the other hand, the Jew is a corrupter.  His way of conflict entails the unmitigated degradation and destruction of our race, end quote.

Do you see that?

A   Yeah.  It's the third sentence down, I think, in the post.  But it's the one right before the last one.

Q   And what you've written there, do you believe that to be true?

A    Yeah.   I mean, I wrote it, so yes, with the qualification here that, again, like -- and this is sort of me, I guess, thumbing my nose at my kind of general understanding of how -- Jews object to this, but the -- we're used to the phrase "the Jew" as a -- what's called a collective singular.  So it refers to the group as a whole, the group as a collective whole, if that makes sense, in much the same way that I've been explaining it to you for the last 20 minutes or so.

MR. BARTOLOMUCCI:  All right.  Let's go to page 15.  If you could just capture the top there, too, Justin.  I mean, scroll down a little bit.  I wanted to get the date of the post.

BY MR. BARTOLOMUCCI:

Q    So this is a post from October 7, 2025.  So it's the two-year anniversary of the Hamas attacks in 2023.  Up at the top --

MR. BARTOLOMUCCI:  Justin, if you could go there.

BY MR. BARTOLOMUCCI:

Q    -- Mr. Damsky, you've written, "10/7 is not just about freeing Palestine.  It is about freeing our minds.  Celebrate and learn," exclamation point.

Did you write that?

A    Yeah.  So what I'm referring to -- I did write that.  And so what I'm referring to there is -- as you see in the picture, the White House is walking back President Biden's claim that he saw -- I believe the number was 40 beheaded children.

What I'm referencing there is -- I'm essentially saying that after October 7th, we saw a lot of what's called atrocity propaganda, lies about things that Hamas did:  like, for example, the claim that they beheaded 40 babies that was on camera and all that.  To my mind, there's no knowledge -- there's no evidence to that.

And, basically, I'm drawing a parallel here between what I think is a lot of the atrocity propaganda that was put out in World War II, which is kind of a follow-up to a lot of the atrocity propaganda put out in World War I.

And I'm saying that I think what we've seen since 10/7/23 in our lifetimes has been kind of conclusive proof that -- well, Jews, the United States government, however you want to kind of formulate it here, use atrocity propaganda to denigrate their enemies, that they morally delegitimize them.  And I think we've seen also how that's just utter -- the claims don't hold up to

scrutiny.

You know, most Americans weren't alive back in World War II, so they can't really -- they have no frame of reference for that time period beyond what the history books tell them.  And I'm kind of saying here that people should be more skeptical about what they've been told in history and what they're told today.

Q   Now, your post includes the comment "celebrate and learn."  Were you saying that the -- 10/7 should be celebrated?

A   Well, as I said, I think, you know, before we took a break, I do think the 10/7 attacks were morally legitimate, at least as a general matter.  I mean, whether or not certain, you know, not nice things happened during the 10/7 attacks, maybe.  I don't really know.  It's war.  I think 10/7 was an act of resistance and a justifiable act of resistance.  I think when the oppressed underdog throws off an occupying power that is equal, I think that's a good thing.  And I think it's a good thing when in doing so they kind of show the lies upon which that power rests.

Q   So just so I'm clear on this, you were saying that the 10/7 attacks should be celebrated?

A   Yeah, and, again, in much the same way that any kind of occupied group who is oppressed, when they throw off the occupiers, I think that's legitimate.

I mean, I would go -- to sort of draw another sort of parallel, I don't think there's really any difference morally between what Hamas did on October 7th and what the United States did at Lexington and Concord.

Q   So is it fair for me to take that as a yes, you do think 10/7 should be celebrated?

A   Yeah, that's what I -- that's what I said in the thing.

MR. BARTOLOMUCCI:  Let's go to page 16, Justin.

BY MR. BARTOLOMUCCI:

Q   This is a post from November 6, 2025.  You're talking about the so-called Unite the Right rally that occurred in Charlottesville.  And you say that the attendees -- the Unite the Right attendees, quote, risked injury, financial ruin, imprisonment, and death to protest against the erasure of white history and white genocide in this country.

Is that still a correct statement of your views?

A   Yeah.

Q   And am I right that the Unite the Right rally was a rally of white nationalists and white supremacists?

A   Well, I think white nationalists and white supremacists were there.  I wasn't at Unite the Right.  I was living in California.

My understanding is that the goal behind the Unite the Right rally is -- and unsurprisingly it's in its name -- to unite these various factions in the right towards a common goal.

At the time it was actually, my understanding, kind of a pro-Trump thing.  But they were explicitly protesting the removal of the Robert E. Lee statue in Lee Park.

So, yeah, I believe white nationalists -- I don't know if anybody referred to themselves as white supremacists there.  But I think certainly some people did refer to themselves as white nationalists.  They were there.  That's correct.  But so were some libertarian groups, Republican groups.

Like I said, it was a fairly diverse thing in terms of the political -- the right-wing political tendencies expressed at the rally.  That's my

understanding.  Again, I wasn't there.

Q   So is it fair to say in this post you were expressing support for the Unite the Right rally-goers?

A   Yeah, as a general matter of -- I mean, I don't -- like I said, because it was kind of a diverse thing, I mean, I don't necessarily agree with everybody there on everything.  But, yeah, as a general matter, I think Unite the Right was good.

I mean, obviously it ended pretty tragically.  I don't like how it ended.  I don't -- at the same point, when I say that, I don't think the individual who used -- was driving the car that killed that woman, I don't think he intended to do that.  But he's been convicted.  I disagree with that conviction.

But, yeah, my understanding is that, researching it, the Unite the Right rally-goers by and large followed the law.  And I generally agree with the cause of not destroying the Lee statue.  I think that was wrong.

MR. BARTOLOMUCCI:  Let's go to page 17, Justin.

BY MR. BARTOLOMUCCI:

Q   This is a November 18, 2025, post.  You're

reacting here to a post about Adolf Hitler.  And there's a photo of Hitler.  And your comment is short.  You say "wise man."

You're referring to Hitler there?

A    Well, I am referring specifically to -- the comment says, "Hitler boasted about National Socialist education teaching every German to identify first and foremost as a Germans" -- I mean, that's a typo, but, "as a Germans and nothing else. Everything else, including one's religious affiliation as Catholic or Protestant, takes a back seat to this."

Generally speaking -- now, the image that I posted under me saying "wise man," I forget the artist there.  It's a very famous set of wood prints that you'll see in just about every history textbook on the period.  I believe it's called the Horrors of War.  It's by, I want to say, a Frenchman.

And the Horrors of War is a series of wood prints showing how terrible the Thirty Years' War, which ran from 1618 to 1648, were.  I believe this wood print specifically is called, like, Sacking of the Monastery or something like that.

And, basically, what I'm drawing attention to here is, historically, religious disputes amongst

Europeans -- of course, amongst almost everybody in the world, but specifically amongst Europeans in the early modern period produced a lot of bloodshed that I don't think was -- I mean, to the extent that they actually centered on sort of doctrinal religious disputes, I don't think it's great to tell people "because you have a doctrinal and sectarian religious dispute with them."

So I think -- I think in sort of bringing about nationalism, German nationalism, that united Protestants and Catholic Germans in a singular cause and made them put aside these political differences and obviated the potential for future religious conflict, I mean, that's great.

The Thirty Years' War was one of the most terrible events in European history.  So to the extent that modern European leaders reduced religious disputes I think is wise.

Q   Well, going back to your comment here, "wise man," do you think Hitler was a wise man?

A   Like I said, in this respect, certainly.  In general, I certainly admire certain things about Hitler.  I think the most admirable thing about Hitler is how he rose from basically nothingness, like anonymity, to rule over a country.

Now, is Hitler the most successful leader of all time?  Obviously not.  He lost World War II, and he ended up committing suicide.  So that was certainly -- that certainly is not anything to emulate.  But, of course, you know, I don't necessarily believe that he potentially had much of a choice in engaging in World War II.

Like I said, in general, I think there's a lot to admire about Hitler.  And I think, for example, as I think we've indicated in these tweets, I'm not a particularly big believer in the idea that he intentionally set out to murder 6 million people or that he did so at all.  So I'm what is commonly referred to as a "Holocaust denier."

So I don't -- when I say "wise man," it's certainly not any endorsement of the Holocaust, which, again, I don't really think happened.

But, yeah, like I said, I admire Hitler.  I admire a lot of world leaders, including, you know, many American presidents.

Q   Do you believe Hitler had a policy that sought the mass murder of Jews?

A   Again, no.  I'm a Holocaust denier.  I think that's -- well, I think primarily that is what I call atrocity propaganda.  I think it originated

during World War II, but I think it took on a new form after the war to kind of justify the allies' decision at Yalta and various other places to give over half of Europe to the Soviet Union.

I think that's kind of primarily why the narrative took off as it did, to sort of justify the American decision to ally with the Soviet Union, which, of course, became our enemy shortly -- or at least our rival shortly after the war.

But, yeah, no, I don't believe that Hitler had a policy to kill millions of people.  And, again, I don't believe that Germany did that at all, policy or no policy.

Q    Did Germany have a policy of putting Jews in concentration camps?

A    That it did, yes.

Q    And is Hitler responsible for that policy?

A    My understanding of the laws of National Socialist Germany is that Hitler was ultimately responsible for everything, being the leader of Germany.  I don't know if he ordered it.  I don't really know specifically what role he played in putting Jews into concentration camps.  But the decision to put Jews in concentration camps, as I understand it, was done for more or less the same

kind of reasons that the United States put the Japanese into internment camps in the West Coast, which was that Jews were viewed as a potential piaculum within Germany, and in order to prevent sabotage or anything like that, they would have to be confined to the camps for the duration of the war.

But I don't believe that in putting them into the camps they ever intended to kill them en masse or that they did.  Certainly many Jews died in the camps, but I think that's more of a function of the kind of privation in general that Germany was subjected to from blockade and aerial bombardment.

You know, I'm not sure how much you know about the Boer War, but in the early 20th Century, the British put Boers, or Afrikaners, the kind of Dutch people in South Africa, into concentration camps.  And, of course, at the time, Britain was the world's foremost empire with trade spanning across the globe.  Certainly no inability -- or certainly the best inability of any state at the time to kind of manage supply lines.  And despite the fact that they were winning the Boer War, many Boers ended up starving in concentration camps.  And I don't think anybody contends that policy was intentional.  It

was just unfortunately a logistical -- a very bad logistical consequence of what happened.

Q   Well, you said earlier that there were some things about Hitler that you admired.  Is the policy on putting Jews in concentration camps something that you admire?

A   No, not -- that certainly wouldn't be on the top of my list.  I think, like I said, the policy to put Jews in the concentration camps was ultimately an exigency that resulted from the war.

Of course, I don't really think Hitler wanted a World War II.  I think Hitler never intended to engage in protracted conflict with either -- well, certainly not with the Western powers.  I think it's pretty indisputable that he sought to avoid conflict with Britain and France and didn't want America to come into the war, which he did end up declaring war on America.  But I think he -- that was never his goal.  I don't think he ever expected to conquer America.  It's possible that at some point he did intend on waging war against the Soviet Union.  I don't know exactly what the plan was there.

But, no, I don't think Hitler ever -- when Hitler took power in 1933, I don't think he was thinking at that point that one day we are going to

put the Jews in camps.  I don't think that was his intended policy.

MR. BARTOLOMUCCI:  Let's go to page 18.

BY MR. BARTOLOMUCCI:

Q   This is a November 20, 2025, post.  In this post, you talk about how the, quote, mass internment of Jews in North America, end quote, may be required to destroy the Jewish gangster entity.

Is that a fair reading?

A   Yeah, I think that's what I say here.

Q   And if the mass internment of Jews in North America is required to defeat Israel, you're fine with that; right?

A   In much the same way that many Americans were fine with the internment of Japanese or ultimately viewed it as a necessary consequence of needing to defeat them, then yes.

I -- when our country sets out to fight a war with a country, I think we should do more or less everything it takes to succeed in that war.  But I think we should only take that step of declaring war when it becomes absolutely necessary.  I think it may be in the case of Israel.

Now, if Israel were, of course, to voluntarily denuclearize and seek some sort of

negotiated settlement with the Palestinians and the Arabs that the Arabs and Palestinians can live with, then that would be ideal.  I would prefer to accomplish everything with diplomacy first.

I don't like war.  I don't -- I don't really -- I wouldn't even consider myself to be a militarist.  I find, for example, the kind of Robert Heinlein's Starship Troopers to be a little bit silly.  So I don't really glorify militarism, but I understand that armies and warfare is a reality and is a political necessity.

So does that answer your question?

Q    I think it does.  Thank you.

MR. BARTOLOMUCCI:  Let's go ahead and go to the next page, page 19.

BY MR. BARTOLOMUCCI:

Q    This is a December 4 post.  Is this a post about your expulsion from UF?

A    Broadly speaking, yes.  I think specifically what the -- what I'm responding to is an official at the DOJ commenting upon a -- this organization, StopAntisemitism, which I believe is run by one person.

And they're not actually talking exact- -- well, they are talking about the expulsion.

Obviously it's there.  But I believe it's about the preliminary injunction that was issued in this case.

But, yes, it is broadly about the dispute that we're currently here about.

Q   And I want to draw your attention to the part of your post where you said, quote, Unfortunately, it is also not at all mind-blowing that Jews and their collaborators would continue to demand and conduct the persecution of those with viewpoints that they disagree with, end quote.

Do you see that?

A   Yes, sir.

Q   Now, in relation to your expulsion from UF, do you believe that Jews and their collaborators have persecuted you?

A   Yes.  Certainly I think -- my understanding of that post that I'm seeing in front of me right now, what I'm replying to, is that you have -- Liora Rez is the person -- I don't know her -- actually, I think that's her nickname.  But this StopAntisemitism account is basically saying, implicitly at least, that I should be expelled.

So, yeah, I mean, that's kind of what I'm responding to there.  Certainly there's been advocacy.  I mean, that much is undeniable.

MR. BARTOLOMUCCI:  All right.  Let's go to page 20.

BY MR. BARTOLOMUCCI:

Q   This is a December 12, 2025, post.  It finishes with the line, quote, Justice demands that Israel ends.  It has no right to a future, end quote.

Is that something you believe sitting here today?

A   I mean, I -- look, I just told you, for example, that if the Arabs were to come -- the Palestinians were to come to a negotiated settlement with Israel that they were satisfied with, it would not be my place to insist that they were wrong.

Now, I may question whether or not they came to that settlement freely.  I mean, obviously tremendous pressure is put on them.

But from my perspective, if I were a Palestinian -- and from where I sit generally as somebody who is not a Palestinian, yes, I think that Israel should be brought to an end.  I think hiding its criminality has indicated that Israel no longer has a right to exist among the family of nations, in much the same way, for example, that many people thought the same about National Socialist Germany or

Imperial Japan.

Q   Did you have anything else?  I just want to make sure you gave your full answer.

A   No.  Yeah, my apologies.  Yes, that is it. Sorry.

MR. BARTOLOMUCCI:  All right.  Let's go to page 21.

BY MR. BARTOLOMUCCI:

Q   This is a post from December 14, 2025.  The last sentence of your post reads, quote, Jews know why they're hated, end quote.

Do you still believe that?

A   Well, this is in response to the Bondi Beach shooting, which I don't actually know all that much about what the investigation has revealed.

But shortly after that occurred, people were saying that phrases like "Globalize the Intifada" should be banned in Australia.  And from what I recall, this was before any sort of indication about what the motives of the shooters were.

Jews -- Jewish commentators, like, for example here Dr. Eli David, he seemed to be assuming that the shooters had to have been motivated by revenge for -- as I say here, "a motive of revenge for the genocide of Palestine."

Now, since that -- so based on that alone, yeah, I think they assumed that the Bondi Beach attack was a consequence for what they had done in Palestine.  That's why he says, "We must remove the phrase 'Globalize the Inti-'" -- that's why he's implying that the phrase "Globalize the Intifada" should be at least, you know, pushed back on, if not outright banned.

Since then, I've -- the Australia government has said that the shooters were motivated by love of Isis, which is -- from my understanding is very separate from the struggle in Palestine.  So I don't -- I don't really know why the shooters did it.

But, yeah, I do believe the Jews suspect that they are hated in large part because of what they've done in Palestine.

Q   And do you believe that hating Jews is fair and justified?

A   In much the same way that you would hate any other criminal organization.

You know, I'm from LA.  I never met many of these people, but historically LA has been kind of subject to gang violence by the Crips and the Bloods.  If I were to say, you know, "It's good to

hate the Crips and the Bloods," that would seem to be -- or if somebody were to say that, that would seem to me to be a legitimate phrase or a legitimate position to hold.

Q   So is that a yes, that it's fair and justified to hate Jews?

A   Yeah, as a collective party faction that's responsible for the things that Jews seem to be kind of singularly focused on doing, like Zionism, then, yeah, I think so.

Now, is it -- would I hate Jews for -- do I think it's okay to hate Jews, for example, for the same kind of reason that an Isis fighter would hate Jews, which is just sort of a fundamentalist kind of crazed, in my mind, version of Islam?  No.  I'm not a -- I'm not a Muslim radical.  So I don't hate Jews for the reason that an Isis fighter might.  But I do think it's justified to be at least highly critical of Jews.

I don't intend to concern myself with, you know, being seen as a hater so long as hatred -- as long as hatred is rational, I think it's always acceptable to have hatred of something evil.

Q   And for your own reasons, you think it's rational to hate Jews as a collective?

A    As a collective political force, yeah, absolutely.

I don't -- when a Jewish baby comes out of its mother's womb, I don't hate the baby.  But when I see, for example, Benjamin Netanyahu justifying what I believe are crimes on behalf of his nation, I certainly dislike that very strongly.  And, yes, I would say that I hate it.  And I would say that that hatred is rational.

MR. BARTOLOMUCCI:  Let's go to No. 22, page 22.

BY MR. BARTOLOMUCCI:

Q    This is a December 14, 2025, post.  It says in part, quote, If you are someone who simply speaks critically and truthfully about this evil system, Jews will do everything they can to destroy your life.  They will obstruct your ability to earn a living and provide for your family.  They will ruin your life with civil litigation and weaponize the criminal law to throw you in prison.  They will threaten to kill you.  They will physically attack you.  And they will even kill you.

Did I read that correctly?

A    Well, there's one little thing at the end.  But, yes, you read most of it fully.  Yeah.

Q   Now, were you thinking at least in part about your own experiences when you wrote this?

A   Yeah.  But, I mean, as -- I mean, of course.

But as I indicate here at the very end, the part that "They will even kill you," and then I add parenthetically, "Rest in peace Alex Odeh," in case you're not aware, Alex Odeh -- I believe the organization was called the Arab-American Civil Rights Foundation, something along those lines.  I'm sure that's not it exactly.  But Alex Odeh was an American citizen living in, I believe, Los Angeles, who was killed in a terrorist attack by the Jewish Defense League.

Now, certainly I do not believe that I've been subject to the same persecution Alex Odeh has.  Jews have not yet sent a bomb in the mail to my home.  And I hope that they do not.

Q   Well, part of what you wrote is that "Jews will do everything they can to destroy your life."  Do you believe that Jews are doing everything they can to destroy your life personally?

A   No.  Like I said, you know, I think -- well, "everything they can," perhaps that was put -- kind of an inexact statement.  They'll do everything that I think they think is appropriate.

Like I said, if they were to do everything that they could, I think that Jewish organizations like the JDL -- which to my -- although, I'm not sure if they were ever proven to have committed the attack on Alex Odeh, but I think that's kind of the accepted historical fact.

Like, they could send a bomb to my house. They haven't done it yet. So they haven't done everything they can. But I think they've done a lot.

I think for sure that Jewish organizations or Jewish individuals who claim to represent Jews certainly have advocated for me being expelled. You just saw the tweet by StopAntisemitism. I mean, that seems to be one example.

MR. BARTOLOMUCCI: Let's go to page 23.

BY MR. BARTOLOMUCCI:

Q This is a December 18, 2025, tweet. Down toward the bottom, second to last paragraph, you've written, quote, It is misleading to even call Israel a state. Israel is the Jewish gangster entity in occupied Palestine. It is the pirate headquarters for global organized Jewish crime. It pays honest heed to no internationally recognized political or ethical norms. Its sole organizing and driving

principle being the extension of Jewish supremacy over the entire world, end quote.

Is it fair to say that that sums up your position on Israel and Jews generally?

A   Like I said, with Israel, yeah.  I mean, I don't know -- certainly not every Jew is a -- at least even a vocal supporter of Israel.  But from what I understand, at least in America, the vast majority are, something along 90 to 95 percent.  So that's pretty damn close to a consensus in my mind.

But, yes, with respect to Israel, that certainly is my opinion on the -- as I indicate here, the so-called state of Israel.

MR. BARTOLOMUCCI:  Let's go to page 24.

BY MR. BARTOLOMUCCI:

Q   So this is a December 19, 2025, post.  And this is a post in which you are reacting to someone else's post about a photo of a man reading a copy of Hitler's Mein Kampf on the subway; right?

A   Yes, sir.

Q   And you make kind of a joke about what is horrendous is that this guy should be reading the Thomas Dalton translation of Mein Kampf; right?

A   Yes, sir.

Q   And have you personally read the Thomas

Dalton translation?

A   I've read parts of it.  Mein Kampf is fairly long, and, frankly, I don't think -- from my understanding of the basic contours of Hitler's political life from a historical perspective, I don't really think Mein Kampf has a lot of value in kind of shedding light on the politics of National Socialist Germany.  I mean, he wrote the book in prison surrounded by two of his -- I believe it was Emil Maurice and Rudolf Hess.

So I don't really -- I wouldn't recommend really to anybody that -- like, I wouldn't say that anybody absolutely has to read Mein Kampf to come to the correct political views in life.  I haven't read the whole thing.

But I think if you were to read Mein Kampf -- my understanding, Thomas Dalton translated Mein Kampf in response to the fact that most of the translations that you will find of Mein Kampf in English have a lot of extra information tacked on.

I think the ADLs put out a copy of Mein Kampf that basically puts footnotes on every little passage that Hitler says to provide context and kind of just, you know, attack the whole message.

And I think if you're going to read a primary

source, you should probably do it without that sort of stuff in it.  That's just kind of my opinion about the best way of studying history.

Q   Other than the Dalton translation, have you read parts of any other translation?

A   I can't really recall, ma'am -- sir.  Sorry.

MR. BARTOLOMUCCI:  Okay.  Let's go to page 25.

BY MR. BARTOLOMUCCI:

Q   This is a December 23, 2025, post.  It looks like you're quoting someone else's comment that "Palestine is full of low-IQ, violent, and morally backwards people."

And your comment and reaction to that is, quote, True, Palestine is full of Jews, end quote.

Is that what you wrote?

A   Yes.

Q   And do you believe Jews are low-IQ, violent, and morally backwards people?

A   Definitely certainly the ones -- most of the ones in Israel, yeah.  To the extent that -- to the extent that Jews in America support Jews in Israel, I think that reflects rather poorly on them.

But, yeah.  No.  I mean, Israelis -- I think with respect to Jews, I certainly think Israelis are

kind of the, so to speak -- well, I was going to say the cream of the crop, but that's not really the right analogy that I'm -- kind of the anti cream of the crop, if you understand what I'm saying.

Q   Is the IQ of Jews in Israel different than the IQ of Jews in America?

A   You know, I haven't really looked into it specifically.  Frankly, this tweet is kind of just me pushing back on what Jeremy Kauffman is saying.

But from my understanding, the ethnic makeup of Jews in Israel is significantly different. There's more Mizrahi Jews in Israel than there are in America.  I've been told there's an IQ difference.  I don't really know how accurate that is.  I don't really know much about Jewish IQ.

That kind of wasn't really exactly what I was saying there.  I was saying that to the extent that anybody in Palestine, which of course I view properly Palestine as the former territory of Mandatory Palestine.  If anybody in Palestine is low-IQ, violent, morally backwards as a people, that is not the Palestinian Jews.  It would be Israelis, however you want call it.

Q   Well, after you wrote "Palestine is full of Jews," you added the comment "for now."

What did you mean by that?

A    Well, I hope that my political program succeeds and that Israel is -- no longer exists as a state.  Whether or not -- what happens to Jews when Israel no longer becomes a state, I have no idea.

Look, Jews, I do believe that it is true -- I'm not an archeologist or an expert on political history, but my understanding is that Jews used to live in Israel, and there have been times when they were kicked out of Israel or became minorities in Israel or something along those lines.

So, you know, I hope that the dominant position of Jews in Mandatory Palestine as exemplified or kind of crystallized in the political entity known as Israel is brought to an end.

MR. BARTOLOMUCCI:  Let's go to page 26.

BY MR. BARTOLOMUCCI:

Q    This is a post from earlier this year, January 2, 2026.  Last line of your post is, quote, Jews are hated by whites and non-whites because of the evil that Jews do.

Does that statement apply to Jews in America?

A    Well, the poster -- and I can't see the full content of what I'm replying to in this.  But he says, "For decades, the most consistent left-leaning

group in the U.S. has been Jews.  Faculty teaching" -- so I have -- from what I understand -- I think this was a fairly lengthy post.

From what I understand and from what I can recall and sort of where I'm leaning here, the substance of the post that I am replying to is essentially asserting that opposition to what many commentators I think might believe are viewed as bias and anti-Semitism in the United States has been driven by immigration, specifically the immigration of Muslims into the United States.

That might be part of it.  Certainly the number of Muslims in this country is higher than it was 100 years ago.  But I don't think that that is nearly the fully correct position.  I think rising anti-Semitism in the United States, especially since October 7th, 2023, is responsive to the actions of the Israel government.

And then your question was does that apply to Jews in the United States.  Well, I think that to the extent that there is rising anti-Semitism against Jews in the United States, whether it's distinct or related to rising anti-Semitism against Jews in Israel, I think that, yeah, that is largely because of American Jews' support for Israel.

And other things too, but I think certainly the kind of -- the story that most Americans -- the reason that most Americans -- the reason this has kind of been a topic of discussion in the social space for the past two-plus years has been because -- largely because of the actions of Israel.

There are other things too.  I mentioned to you, for example, the Sackler family, Purdue Pharma. Certainly many Americans view the Sackler family as a Jewish family, and they think that their, I mean, I guess at best, recklessness in putting out these opiates that killed a lot of people is at least in part due to the fact that they are Jewish.

I haven't looked into that situation very much.  All I know, for example, is that the Sackler family does have fairly close ties to Israel.  There used to be a wing in a Tel Aviv university named after the Sackler family.

So it's not just -- it's not just the 10/7 stuff and all the things that have happened since 2023, but I do think that that's a big part of it. I think that people react -- people have anti-Semitic beliefs in reaction to what Jews do.

This was basically the thesis of a book called Esau's Tears by an academic known as Albert

Lindemann, who actually used to teach at UC Santa Barbara. And he basically makes the argument that anti-Semitism, its ebbs and its flows are basically a reaction to the way that groups perceive the Jews act. It's not just kind of, you know, out of nowhere one day people just started hating Jews. It's people reacting to what they see Jews do.

Q   And you believe it's fair and justified for people to hate Jews because of the, quote/unquote, evil that they do?

A   To the extent that they are correct in analyzing that evil. For example, if somebody were to come to me and say, "I hate Jews. I'm anti-Semite," I would ask them, "Well, why is that the case?"

If they were to say, "Well, Jews are the conduit through which the reptile people are enslaving humanity," I would think that that is crazy because I don't think the Jews are the conduit through which the reptile people, who I don't think exist, are enslaving humanity.

So the extent -- like I said, to the extent that people's reactions to Jews are rational or supported by evidence, true evidence, I think that, yeah, it's absolutely valid to view them with

contempt or hatred or however you want to formulate it to a post.

MR. BARTOLOMUCCI:  Let's go to page 27.

BY MR. BARTOLOMUCCI:

Q   So this is a post from not very long ago, January 25th, 2026.  This is a pretty long post.  Is it fair to say that this is a post on why you think revolution is needed in the United States?

A   I don't know.  I'd have to read the whole thing.  I mean, I know you said it wasn't very long ago, but I don't exactly recall everything that I posted here.

What I am remembering -- hold on --

Q   Well, you wrote this not even two weeks ago. Do you remember this?

A   I remember the -- like, I'm recognizing what I'm seeing.  I just don't recall exactly all the arguments that I made.

From what I recall, it's not so much revolution, but certainly this is why we need to -- this is kind of the basis of why we need to formulate a plan for political change.  You know, I think I said creating a country -- in general, I think the idea was creating a country that exists and serves our interests.

I mean, I think, broadly speaking, that's kind of the point of all politics.  All politics, at least motivated by a sense of the common good, is to form a state that exists for the common good of -- that exists to serve the interests of the people.

Like you said, it is fairly lengthy, so I'm not -- I'm not entirely sure what your -- what you're questioning me about here.

Q   Well, let's look at paragraph w.  Quote, Our constitution has failed us.  We owe America nothing. We could not serve it even if we desired to serve it.  It cannot even be bargained with, for it repays every bargain with betrayal.  The United States of America has perished, end quote.

Can you expand on that thought?

A   I mean, yeah.  It's sort of implying there, like, I don't think the United States as a political entity exists to serve the American people.  I think we've been betrayed by our leaders and they've failed us.

I can't speculate, but from my understanding, this is sort of a common sentiment among all groups of politically active Americans.  They deeply felt dissatisfaction with the direction this country has taken and that it is currently taking.

Q   Well, let's go down to the fourth paragraph. And this is part of why I thought you were really talking about revolution here.  There's the line that, quote, Revolution must be won in our lifetimes or not at all.  Our rapidly deteriorating social situation is not a problem that can be responsibly left for future generations to fix.

Do you remember writing that?

A   I do.  So what I'm kind of referring to here, like it says in the first sentence -- or, I'm sorry, the second sentence there, I say, "But one of the first steps is clear.  We must genuinely abandon the entrenched bipartisan political spectacle offered to us by the empire."  That is to say by the American ruling class.

So what I kind of wrote this about -- I mean, perhaps I'm -- I think this is accurate.  Part of my -- part of my politics is really this idea that both parties have failed the American people.  We really need to stop putting our hope in Democrat and Republican politics as a means of saving us.

And when I speak here of revolution, again, as I've said before, that includes kind of a bloodless revolution.

Ideally, my hope is that we will have a rise

in this country, a third party for a -- a party that isn't the Republican or Democratic Party, that shares, broadly speaking, my political ideals and what I believe to be the political ideals of millions of other Americans, and that that party will achieve success, ideally electorally, but however it comes about, and will kind of set things right for this country.

Again, I would hope that this country doesn't dissolve into a civil war or anything like that. I think the idea that America be convulsed by civil war when it's filled with as many weapons, conventional and nuclear, that it is would just have disastrous consequences for not just the American people but the whole human race.

But I also think that America existing as it does under the leadership that it does will likely have similar disastrous consequences for the entire human race. I see ourselves as -- on the road to annihilation through a very ill-thought-out domestic and foreign policy.

MR. BARTOLOMUCCI: Well, let's go ahead to our last page, which is No. 28.

BY MR. BARTOLOMUCCI:

Q   This is a post from last month, January 27,

2026.   The first sentence of the post is, quote, The Holocaust is a myth that facilitate Judeo-American genocide, war, and repression, end quote.

And the last paragraph is a single sentence that reads, quote, The actual victims of the so-called Holocaust amount to much more than 6 million people, but none of them are Jews, end quote.

So is this reflective of your views as a Holocaust denier?

A    Yeah.   But as I said, I don't -- right.   As I said, I don't think that the Holocaust happened in terms of there being an explicit plan to kill millions of Jews.

I think the real impact of the Holocaust -- what you might call the mainstream Holocaust narrative on world history hasn't been the fact that any Jews were killed or weren't killed during World War II, but has been the fact that this narrative kind of serves as a means of the U.S. justifying -- and not just the U.S., but many other countries -- I mean, the Soviet Union justifies its existence in large part based on the Holocaust.   I mean, they were -- they were probably more impactful in putting the narrative out than even the United

States was -- but in having these countries justify their existence and justifying their foreign policy.

To my mind two examples that stick out -- well, the first one didn't really happen in my lifetime, but certainly the second one did.

Two examples that stick out over the past 30 to 40 years have been the attack on the government of Slobodan Miloševic in Serbia.  He was kind of viewed as a Second Coming of Hitler.  And then I seem to recall many things -- the same things being said about Saddam Hussein.

Essentially, from my perspective, whenever the U.S. wants to overthrow an enemy or wage war on an enemy, the first thing they always do is say, "Oh, this person is just like Hitler, and therefore, if we don't stop them, they're going to kill millions of people."

So I don't think the Holocaust has to do with understanding that there is a universal value which is human good and that we all need to respect each and everyone's humanity.

I think the Holocaust is in large part a propaganda weapon of war.  The Holocaust is meant to wage war, not to prevent it.

Q   As a Holocaust denier, do you deny that

millions of Jews were killed during World War II?

A   I genuinely don't know the numbers.  I haven't looked into it.  Certainly many did die of starvation disease, but it's my understanding from, you know, the facts that I have or just the way that I understand the historical record is that Germans by and large sought to minimize those consequences of Jewish internment in the concentration camps.

Again, I don't know how many died.  I don't know how many died in general in theatres of war versus in camps.

My understanding of the Holocaust -- my sort of positions advanced by Holocaust denial are kind of, you know, there weren't gas chambers.  I don't really believe that there were gas chambers in which Jews were killed en masse.  And I don't believe that there was any policy aside from gas chambers that killed Jews en masse.

But my -- I refer to myself as a Holocaust denier.  I think that's accurate.  My main sort of point -- I'm not really -- it's a vague intellectual curiosity of mine.  My sort of position is just in most of Europe and in many places outside of Europe, people aren't allowed to deny the Holocaust, question the numbers or the means.  They'll go to

prison.

So my position isn't so much Holocaust denial.  Although, I do deny the Holocaust.  That's true.  My position is more encouraging people to be, for lack of a better phrase, Holocaust skeptical, because I don't think that you can in an intellectually honest way believe in the veracity of a historical narrative when in the places that the narrative is said -- well, the places that the narrative describes that the events in question took place is where it's illegal to question those events.

So that's really more so my position.  I don't really do the whole arguments about the numbers or means or anything like that.  I leave it to people that are more interested in that.  But I think people should look into that.  I mean, like I said, Holocaust skepticism is sort of what I promote.  Though, I am a denier.

MS. SABATINI:  Can I request a break?  I've got to take a break.  We've been going a while.  Is that cool?

MR. BARTOLOMUCCI:  Can I just ask one more question?

MS. SABATINI:  Keep going.  Just sometime in

the next five minutes.

MR. BARTOLOMUCCI:  And then I was going to propose a break too.  Let me just ask one question since we're -- while we're on this.

BY MR. BARTOLOMUCCI:

Q   So is it fair to say that you deny or you don't believe that millions of Jews were intentionally killed by Nazi Germany during World War II?

A   Yeah, that's correct.  And I don't even push back -- I push back against that not only because I don't believe that it happened -- it would be one thing if it didn't happen -- whether or not it happened or not was inconsequential either morally or historically.  I believe it is consequential.  I believe the idea of nationalism would be greatly morally less tenable -- it would less morally tenable to hold nationalist beliefs or nationalist socialist beliefs if the Holocaust had happened.  I think -- at the very least, I think most people would see it that way.

And that's not the only reason I deny it.  I deny it because I generally don't believe that it happened.

But I think that it would be morally wrong

had it happened.  So that is partially, like, why I concern myself with the Holocaust as a narrative.

MR. BARTOLOMUCCI:  Thank you.  Let's go off the record and then take a break.

(Brief break from 2:19 p.m. to 2:40 p.m.)

BY MR. BARTOLOMUCCI:

Q   Okay.  We're back on the record.  I just have one or two more questions, Mr. Damsky, and then I'll let you go.

Have your views on Jews changed since March 21st, 2025?

A   I don't -- I don't know.  Not in any way that I -- springs to mind.

Q   So it's fair to say that your views on March 21 are the same as your views today?

A   Yeah, roughly.  I mean, I still believe the things that I said in the tweets as I've explained the tweets' meaning.  Yeah.

MR. BARTOLOMUCCI:  Okay. Well, thank you.  I don't have any other questions at this time.

MS. SABATINI:  No questions from the plaintiff's counsel.  That will be the end.  Thank you.

(Discussion held off the record regarding reading or waiving.)

(Witness excused.)

(At 2:44 p.m., the taking of the above

deposition was concluded.)

- - -

C E R T I F I C A T E    O F    O A T H

STATE OF FLORIDA    )

COUNTY OF DUVAL     )


        I, Renee B. Farhat, Registered Professional Reporter, Notary Public, State of Florida, certify that **PRESTON TERRY DAMSKY** appeared via Zoom videoconference before me on the 5th of February, 2026, and was duly sworn.

        WITNESS my hand and official seal this 15th day of February, 2026.




                        _____
                        RENEE B. FARHAT
                        Notary Public State of Florida
                        My Commission No. HH 406972
                        Expires:  June 5, 2027






                                Personally Known_____
                        OR Produced Identification____xx____
                    Type of Identification Produced____DL____

C E R T I F I C A T E

STATE OF FLORIDA   )

COUNTY OF DUVAL    )


I, Renee B. Farhat, Registered Professional Reporter, certify that I was authorized to and did stenographically report the deposition of **PRESTON TERRY DAMSKY**; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 15th day of February, 2026.


_____
RENEE B. FARHAT, RPR

Preston Terry Damsky
c/o anthonly@sabatinilegal.com

February 15, 2026

RE: Preston Damsky v. Chris Summerlin, in his
    official capacity as Dean of students of the
    University of Florida
    (2/5/26; Preston Terry Damsky)


    The above-referenced transcript is available for
review.

    The witness should read the testimony to
verify its accuracy.  If there are any changes,
the witness should note those with the reason
on the attached Errata Sheet.

    The witness should, please, date and sign the
Errata Sheet and e-mail it to the deposing attorney,
as well as to Renee B. Farhat, RPR, at
reneef904@gmail.com, and copies will be e-mailed to
all ordering parties.

    It is suggested that the completed errata be
returned 30 days from receipt of testimony, as
considered reasonable under Federal rules*, however,
there is no Florida statute to this regard.

    If the witness fails to do so, the transcript
may be used as if signed.


    Yours,



    Renee B. Farhat, RPR




*Federal Civil Procedure Rule 30(e)/Florida Civil
Procedure Rule 1.310(e).

RE: Preston Damsky v. Chris Summerlin, in his
    official capacity as Dean of students of the
    University of Florida
    (2/5/26; Preston Terry Damsky)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.


_____    _____
     PRESTON TERRY DAMSKY                        DATE

| **'** | **2** | **25th** [1] - 142:6 | **600** [2] - 16:14, 16:18 | **accepted** [3] - 12:5, 92:15, 133:6 |
|---|---|---|---|---|
| **'96** [1] - 9:6 | **2** [4] - 3:11, 26:9, 26:11, 138:19 | **26** [5] - 3:11, 28:23, 29:2, 29:3, 138:16 | **7** | **accommodate** [1] - 5:17 |
| **'abolish** [1] - 57:7 | **2/5/26** [2] - 155:5, 156:2 | **27** [5] - 28:23, 29:11, 101:15, 142:3, 145:25 | **7** [9] - 3:16, 48:8, 50:22, 55:24, 56:1, 95:4, 96:14, 103:7, 112:16 | **accomplish** [1] - 125:4 |
| **'Globalize** [1] - 129:5 | **20** [5] - 37:9, 109:11, 112:10, 124:5, 127:2 | **28** [2] - 105:3, 145:23 | | **accomplished** [1] - 35:4 |
| **1** | **200** [1] - 16:13 | **280** [1] - 67:24 | **7th** [7] - 51:13, 96:9, 101:10, 101:11, 113:7, 115:8, 139:17 | **account** [28] - 52:6, 52:13, 52:18, 52:22, 53:7, 53:14, 53:15, 53:19, 54:1, 54:3, 54:12, 54:16, 56:18, 58:11, 59:13, 60:1, 60:7, 60:14, 60:18, 60:22, 61:1, 61:12, 61:16, 62:3, 66:7, 95:4, 95:8, 126:21 |
| **1** [4] - 3:10, 8:8, 8:9, 8:17 | **20006** [1] - 2:14 | **28th** [1] - 105:6 | | |
| **1.310(e)** [1] - 155:24 | **2018** [2] - 12:2, 19:1 | **2:19** [1] - 151:5 | **8** | |
| **10** [4] - 3:19, 89:25, 90:3, 107:16 | **2019** [1] - 19:1 | **2:40** [1] - 151:5 | **8** [4] - 3:10, 3:17, 82:1, 82:3 | |
| **10/7** [8] - 112:22, 114:11, 114:13, 114:16, 114:17, 114:25, 115:11, 140:19 | **2023** [12] - 9:24, 12:4, 12:6, 15:18, 15:19, 21:12, 48:6, 48:8, 101:11, 112:18, 139:17, 140:21 | **2:44** [2] - 1:16, 152:2 | **82** [1] - 3:17 | |
| | | **2nd** [3] - 63:24, 64:4, 107:10 | **86** [1] - 3:18 | |
| | | | **8th** [1] - 9:5 | **accounts** [1] - 54:7 |
| **10/7/23** [1] - 113:19 | **2024** [9] - 24:8, 26:23, 36:13, 43:3, 52:20, 52:22, 52:23, 53:3, 54:5 | **3** | | **accuracy** [1] - 155:8 |
| **100** [3] - 77:4, 109:20, 139:14 | | **3** [4] - 3:12, 31:13, 31:16, 85:9 | **9** | **accurate** [7] - 40:11, 72:19, 104:20, 108:8, 137:14, 144:17, 148:20 |
| **10:00** [1] - 1:16 | **2025** [30] - 43:16, 52:16, 55:20, 56:7, 59:8, 60:21, 79:18, 80:15, 88:3, 92:8, 92:14, 95:4, 96:9, 98:7, 99:3, 101:15, 109:11, 110:14, 111:11, 112:16, 115:17, 117:25, 124:5, 127:4, 128:9, 131:13, 133:18, 134:16, 136:10, 151:11 | **3/21/25** [1] - 3:16 | **9** [5] - 3:18, 86:19, 86:21, 98:7, 107:15 | |
| **11** [5] - 3:20, 94:20, 94:22, 107:16, 107:18 | | **3/7/25-1/27/26** [1] - 3:20 | **90** [2] - 3:19, 134:9 | **accurately** [1] - 101:8 |
| | | **30** [4] - 9:11, 45:6, 147:6, 155:14 | **900** [1] - 2:13 | **accusation** [1] - 109:17 |
| **11:54** [1] - 71:10 | | **30(e)/Florida** [1] - 155:23 | **904** [1] - 1:21 | **achieve** [1] - 145:6 |
| **12** [3] - 28:15, 109:9, 127:4 | | | **94** [1] - 3:20 | **achieved** [1] - 31:2 |
| | | **300** [1] - 2:19 | **95** [1] - 134:9 | **ACLU** [4] - 79:1, 79:4, 79:6, 79:7 |
| **123** [1] - 2:20 | | **31** [1] - 3:12 | **9th** [1] - 99:3 | |
| **12:17** [1] - 71:10 | | **32611** [1] - 2:20 | | **acquiesce** [1] - 38:16 |
| **13** [2] - 107:14, 110:12 | | **32757** [1] - 2:6 | **A** | **act** [4] - 30:20, 114:18, 141:5 |
| **13th** [1] - 2:19 | | **35** [1] - 3:13 | | |
| **14** [4] - 96:18, 111:9, 128:9, 131:13 | **2026** [8] - 1:15, 138:19, 142:6, 146:1, 153:10, 153:12, 154:18, 155:2 | **38** [1] - 9:3 | **a.m** [2] - 1:16, 71:10 | **action** [2] - 154:16, 154:17 |
| | | | **abandon** [1] - 144:12 | |
| **14th** [1] - 25:1 | | **4** | **ability** [3] - 6:20, 6:21, 131:17 | **actions** [4] - 19:5, 101:20, 139:17, 140:6 |
| **15** [3] - 110:14, 112:12, 155:2 | | **4** [9] - 3:4, 3:13, 35:21, 35:23, 88:7, 88:9, 96:18, 100:3, 125:17 | **able** [12] - 5:16, 8:2, 8:3, 41:21, 55:23, 68:2, 69:15, 84:22, 90:6, 94:25, 106:10, 106:16 | **active** [5] - 51:19, 55:8, 55:14, 60:8, 143:23 |
| **150-plus** [1] - 24:22 | **2027** [1] - 153:18 | | | |
| **15th** [2] - 153:11, 154:18 | **20th** [1] - 122:15 | **40** [3] - 113:5, 113:10, 147:7 | | **actively** [1] - 59:15 |
| **16** [1] - 115:14 | **21** [18] - 55:20, 56:7, 62:11, 62:18, 64:12, 66:6, 66:12, 66:22, 66:25, 67:18, 71:15, 73:10, 96:15, 96:18, 103:13, 104:11, 128:7, 151:15 | **406972** [1] - 153:17 | **abolish** [1] - 77:12 | **activities** [1] - 39:18 |
| **1601** [1] - 2:6 | | **41** [1] - 3:14 | **abolished** [6] - 55:22, 57:9, 68:5, 96:16, 98:19, 98:23 | **activity** [6] - 34:15, 39:4, 39:6, 39:12, 48:15, 88:10 |
| **1618** [1] - 118:21 | | **434-5835** [1] - 1:21 | | |
| **1648** [1] - 118:21 | | **49** [1] - 3:15 | **abolishing** [1] - 63:9 | **actor** [1] - 30:17 |
| **16th** [1] - 64:5 | | | **above-referenced** [1] - 155:6 | **actual** [2] - 104:8, 146:5 |
| **17** [1] - 117:22 | | **5** | | |
| **1717** [1] - 2:13 | **21st** [10] - 31:1, 57:20, 57:21, 62:5, 63:14, 70:20, 88:1, 88:3, 93:17, 151:11 | **5** [7] - 1:15, 3:14, 41:16, 41:18, 89:17, 101:13, 153:18 | **Abraham** [1] - 38:23 | **add** [5] - 53:24, 67:5, 104:8, 132:5 |
| **18** [3] - 117:25, 124:3, 133:18 | | | **absolute** [2] - 61:6, 61:14 | **added** [1] - 137:25 |
| | | **56** [1] - 3:16 | **absolutely** [7] - 19:16, 94:16, 98:16, 124:22, 131:2, 135:13, 141:25 | **adding** [1] - 97:3 |
| **19** [2] - 125:15, 134:16 | **22** [2] - 131:10, 131:11 | **5th** [1] - 153:9 | | **addition** [1] - 103:21 |
| **19.3** [1] - 22:10 | **23** [4] - 99:3, 111:11, 133:16, 136:10 | | | **additional** [2] - 67:9, 97:3 |
| **1933** [1] - 123:24 | | **6** | **academic** [1] - 140:25 | |
| **1948** [1] - 51:4 | **23rd** [1] - 100:1 | **6** [8] - 3:15, 28:15, 49:15, 49:19, 102:12, 115:17, 120:12, 146:7 | **accept** [1] - 23:1 | **address** [1] - 38:22 |
| **1996** [1] - 9:5 | **24** [1] - 134:14 | | **acceptable** [1] - 130:23 | **addressed** [1] - 90:18 |
| **1:25-cv-00275-AW-MAF** [1] - 1:6 | **25** [5] - 103:10, 104:11, 104:14, 104:22, 136:8 | | | **addressee** [1] - 42:3 |
| **1L** [2] - 20:8, 23:14 | | | | |
| **1st** [4] - 2:6, 62:24, 71:20, 93:15 | | | | |

**addresses** [2] - 87:22, 91:4
**adjustments** [1] - 32:2
**ADLs** [1] - 135:21
**administration** [1] - 53:12
**admirable** [1] - 119:23
**admire** [5] - 119:22, 120:9, 120:18, 120:19, 123:6
**admired** [1] - 123:4
**Adolf** [1] - 118:1
**adult** [1] - 51:19
**advanced** [1] - 148:13
**adviser** [1] - 43:12
**advocacy** [1] - 126:25
**advocated** [2] - 84:5, 133:13
**aerial** [1] - 122:13
**affect** [3] - 6:19, 6:21, 89:8
**affiliation** [1] - 118:11
**afraid** [2] - 47:12, 85:16
**Africa** [1] - 122:17
**Afrikaners** [1] - 122:16
**afterwards** [2] - 24:23, 41:6
**aggregator** [2] - 53:5, 54:18
**ago** [6] - 9:3, 107:2, 139:14, 142:5, 142:11, 142:14
**agree** [6] - 25:8, 59:2, 59:3, 74:11, 117:7, 117:19
**ahead** [6] - 7:17, 41:12, 78:21, 81:25, 125:14, 145:22
**Aimee** [1] - 87:16
**alarmed** [2] - 50:13, 70:24
**alarming** [1] - 50:17
**Albert** [1] - 140:25
**Alex** [5] - 132:6, 132:7, 132:10, 132:15, 133:5
**alive** [1] - 114:2
**allege** [2] - 24:7, 24:12
**allies'** [1] - 121:2
**allowed** [3] - 51:5, 51:7, 148:24
**ally** [1] - 121:7
**almost** [2] - 95:20, 119:1
**alone** [1] - 129:1
**Amazon** [1] - 50:10
**Amendment** [1] - 25:1
**amendment** [3] -

27:20, 28:4, 35:5
**America** [18] - 25:4, 29:19, 37:12, 38:8, 123:16, 123:18, 123:20, 124:7, 124:12, 134:8, 136:22, 137:6, 137:13, 138:22, 143:10, 143:14, 145:11, 145:16
**American** [15] - 3:11, 3:12, 26:4, 27:1, 27:24, 120:20, 121:7, 132:8, 132:11, 139:25, 143:18, 144:14, 144:19, 145:14, 146:2
**Americans** [11] - 29:14, 30:1, 30:10, 30:24, 114:2, 124:14, 140:2, 140:3, 140:9, 143:23, 145:5
**amount** [3] - 14:19, 35:2, 146:6
**amplified** [1] - 105:18
**analogy** [1] - 137:3
**analysis** [1] - 37:1
**analyzing** [2] - 37:4, 141:12
**ancestors** [1] - 37:20
**Angeles** [2] - 9:13, 132:11
**animal** [1] - 7:10
**Annex** [1] - 50:5
**annihilation** [1] - 145:20
**anniversary** [1] - 112:17
**annoying** [1] - 32:8
**anonymity** [1] - 119:25
**answer** [26] - 5:9, 5:20, 5:21, 6:21, 11:6, 25:18, 30:21, 31:10, 34:17, 35:8, 35:14, 41:13, 44:11, 62:15, 67:2, 69:3, 74:12, 74:21, 76:16, 77:16, 77:21, 81:21, 96:1, 96:13, 125:12, 128:3
**answered** [2] - 35:11, 60:20
**answering** [1] - 5:7
**answers** [1] - 5:11
**anthonly@ sabatinilegal.com** [1] - 155:1

**ANTHONY** [1] - 2:3
**anthony@ sabatinilegal.com** [1] - 2:7
**anti** [17] - 83:12, 109:12, 109:16, 109:20, 109:22, 109:25, 110:2, 110:6, 110:8, 137:3, 139:9, 139:16, 139:21, 139:23, 140:23, 141:3, 141:14
**anti-Semite** [7] - 109:12, 109:16, 109:20, 109:22, 109:25, 110:2, 141:14
**anti-Semites** [2] - 110:6, 110:8
**anti-Semitic** [2] - 83:12, 140:23
**anti-Semitism** [5] - 139:9, 139:16, 139:21, 139:23, 141:3
**anticipated** [1] - 15:7
**apartment** [1] - 7:2
**apartments** [1] - 16:23
**apathetic** [1] - 89:15
**apologies** [2] - 26:24, 128:4
**app** [2] - 20:21, 58:24
**appear** [1] - 75:14
**appeared** [1] - 153:8
**appearing** [2] - 2:8, 2:22
**appended** [1] - 36:18
**application** [2] - 94:2, 94:7
**applied** [1] - 92:11
**apply** [4] - 83:10, 92:6, 138:22, 139:19
**applying** [1] - 74:20
**appropriate** [1] - 132:25
**approved** [1] - 92:22
**April** [8] - 62:24, 63:24, 64:4, 71:20, 93:15, 93:21, 107:10
**Arab** [1] - 132:8
**Arab-American** [1] - 132:8
**Arabs** [3] - 125:2, 127:11
**archeologist** [1] - 138:7
**Archive** [2] - 32:9, 36:3
**Archive.org** [1] -

31:24
**area** [1] - 9:14
**argued** [2] - 24:13, 83:20
**argument** [1] - 141:2
**arguments** [5] - 28:5, 105:13, 105:14, 142:18, 149:14
**armed** [2] - 39:7, 111:2
**armies** [1] - 125:10
**arms** [1] - 38:11
**arrest** [1] - 37:12
**arrested** [1] - 19:24
**art** [1] - 12:23
**article** [9] - 80:14, 80:16, 81:13, 82:1, 82:7, 82:11, 83:16, 85:9, 86:11
**Article** [3] - 3:17, 26:5, 28:4
**artist** [1] - 118:15
**aside** [13] - 8:14, 9:19, 16:24, 18:12, 19:13, 20:3, 25:1, 36:7, 45:25, 60:5, 106:11, 119:12, 148:17
**aspects** [1] - 81:18
**aspirations** [1] - 95:17
**aspiring** [1] - 30:17
**assert** [1] - 74:17
**asserting** [1] - 139:7
**assertion** [1] - 52:1
**assign** [1] - 65:2
**assigned** [1] - 43:13
**assistant** [1] - 91:15
**associated** [1] - 57:16
**assume** [4] - 17:4, 47:4, 87:3, 88:16
**assumed** [7] - 61:19, 63:25, 72:12, 73:12, 73:16, 75:25, 129:2
**assuming** [6] - 7:4, 16:13, 31:23, 87:21, 95:9, 128:22
**atrocity** [5] - 113:8, 113:14, 113:16, 113:22, 120:25
**attached** [3] - 29:12, 42:14, 155:9
**attack** [12] - 48:7, 48:11, 51:7, 51:10, 70:16, 110:19, 129:3, 131:21, 132:12, 133:5, 135:24, 147:7
**attacks** [7] - 50:22, 50:23, 51:24, 112:17, 114:13, 114:16, 114:25

**attempted** [1] - 89:23
**attend** [3] - 7:8, 14:6, 16:11
**attended** [1] - 16:2
**attendees** [2] - 115:20
**attention** [2] - 118:24, 126:5
**attitude** [1] - 106:8
**attorney** [5] - 8:14, 15:15, 93:3, 154:13, 155:11
**Attorney** [2] - 92:3, 92:21
**Attorney's** [1] - 91:21
**attorneys** [1] - 154:15
**attract** [1] - 58:22
**attracted** [1] - 13:23
**audience** [1] - 58:17
**August** [2] - 12:6, 110:14
**Australia** [2] - 128:18, 129:9
**author** [1] - 75:6
**authorized** [1] - 154:7
**authors** [5] - 83:19, 83:24, 84:17, 84:18, 85:2
**available** [2] - 44:11, 155:6
**avatar** [3] - 64:16, 64:19, 65:1
**Avenue** [1] - 2:6
**average** [1] - 55:11
**Aviv** [1] - 140:17
**avoid** [1] - 123:15
**aware** [5] - 41:12, 46:24, 60:16, 78:1, 132:7
**awkwardly** [1] - 102:5
**ax** [7] - 85:10, 85:21, 85:24, 86:2, 86:6, 86:7, 86:8

**B**

**babies** [1] - 113:10
**baby** [2] - 131:3, 131:4
**backfired** [1] - 105:11
**backup** [1] - 43:14
**backwards** [3] - 136:13, 136:19, 137:21
**bad** [5] - 77:3, 88:13, 108:22, 108:23, 123:1
**Badalamenti** [1] - 36:20
**balance** [1] - 37:24
**Bank** [1] - 49:3
**banned** [2] - 128:18,

129:8
**Bar** [5] - 16:5, 16:8, 93:18, 94:2, 94:10
**Barbara** [5] - 9:22, 10:9, 10:10, 12:15, 141:2
**bargain** [1] - 143:13
**bargained** [1] - 143:12
**BARTOLOMUCCI** [113] - 2:11, 4:6, 4:10, 4:17, 4:18, 7:17, 7:20, 8:1, 8:7, 8:11, 8:16, 8:18, 9:8, 10:20, 11:15, 15:3, 26:7, 26:13, 31:12, 31:18, 35:18, 35:25, 41:15, 41:20, 49:16, 49:21, 52:2, 52:4, 55:23, 56:3, 71:8, 71:11, 71:13, 77:23, 77:25, 81:25, 82:5, 86:10, 86:12, 86:18, 86:23, 87:13, 89:25, 90:5, 91:10, 91:13, 94:19, 94:24, 96:20, 96:23, 97:19, 98:5, 100:2, 100:4, 100:25, 101:12, 101:14, 101:16, 101:18, 102:12, 102:15, 103:7, 103:9, 104:25, 105:2, 107:11, 107:13, 107:17, 107:21, 109:8, 109:10, 110:12, 110:13, 111:9, 111:10, 111:12, 111:14, 112:11, 112:15, 112:19, 112:21, 115:14, 115:16, 117:22, 117:24, 124:3, 124:4, 125:14, 125:16, 127:1, 127:3, 128:6, 128:8, 131:10, 131:12, 133:16, 133:17, 134:14, 134:15, 136:7, 136:9, 138:16, 138:17, 142:3, 142:4, 145:22, 145:24, 149:23, 150:2, 150:5, 151:3, 151:6, 151:19
**Bartolomucci** [2] - 3:4, 4:20
**based** [9] - 22:21, 24:4, 24:14, 24:18, 25:12, 58:24, 101:5, 129:1, 146:23
**basic** [1] - 135:4
**basis** [5] - 23:2, 103:22, 108:15, 108:18, 142:21
**Beach** [2] - 128:13, 129:2
**became** [3] - 57:14, 121:8, 138:10
**Became** [1] - 57:17
**become** [1] - 25:2
**becomes** [2] - 124:22, 138:5
**becoming** [1] - 15:12
**beforehand** [1] - 73:12
**begin** [2] - 4:23, 5:23
**beginning** [1] - 42:25
**behalf** [6] - 1:12, 2:8, 2:22, 4:3, 29:15, 131:6
**behavior** [1] - 102:25
**beheaded** [2] - 113:5, 113:10
**behind** [2] - 47:22, 116:8
**belied** [1] - 52:1
**belief** [1] - 74:17
**beliefs** [12] - 25:16, 25:22, 25:24, 25:25, 55:6, 74:23, 83:9, 84:15, 85:17, 140:23, 150:18, 150:19
**believer** [1] - 120:11
**believes** [1] - 88:20
**belong** [2] - 11:16, 83:5
**belongs** [2] - 30:10, 30:23
**Benjamin** [3] - 99:10, 99:19, 131:5
**best** [8] - 21:9, 23:1, 28:1, 36:10, 66:15, 122:21, 136:3, 140:11
**betrayal** [1] - 143:13
**betrayed** [1] - 143:19
**better** [19] - 10:25, 11:4, 14:10, 22:15, 24:20, 68:8, 68:11, 68:17, 68:19, 68:23, 69:16, 69:20, 69:24, 69:25, 70:2, 98:24, 108:5, 108:6, 149:5
**between** [6] - 11:24, 12:8, 62:11, 62:18, 113:14, 115:7
**beyond** [1] - 114:4

**bias** [1] - 139:9
**Biden's** [1] - 113:4
**big** [2] - 120:11, 140:21
**biggest** [1] - 12:22
**biked** [1] - 17:8
**bills** [1] - 15:2
**bipartisan** [1] - 144:13
**birth** [1] - 9:4
**bit** [11] - 4:11, 11:2, 26:4, 33:3, 53:9, 96:21, 102:14, 107:2, 107:19, 112:14, 125:8
**black** [3] - 21:16, 22:22, 23:6
**blinked** [2] - 70:6, 70:11
**block** [1] - 91:1
**blockade** [1] - 122:13
**bloodless** [2] - 39:20, 144:24
**Bloods** [2] - 129:25, 130:1
**bloodshed** [1] - 119:3
**blowing** [1] - 126:7
**Board** [2] - 79:20, 80:3
**boasted** [1] - 118:6
**Boer** [2] - 122:15, 122:23
**Boers** [2] - 122:16, 122:23
**bomb** [2] - 132:16, 133:7
**bombardment** [1] - 122:13
**bond** [1] - 17:14
**Bondi** [2] - 128:13, 129:2
**book** [7] - 57:16, 64:25, 65:13, 65:18, 66:1, 135:8, 140:24
**books** [3] - 17:16, 64:23, 114:5
**bother** [1] - 75:10
**bottom** [6] - 82:10, 96:22, 103:11, 103:17, 107:22, 133:19
**bounced** [1] - 13:4
**bound** [1] - 37:22
**bounds** [2] - 35:5, 99:23
**box** [3] - 67:13, 68:2, 68:3
**branch** [1] - 79:6
**BRANDE** [1] - 2:17
**Brande** [1] - 87:17
**brande@ufl.edu** [1] - 2:21

**break** [8] - 5:15, 71:10, 114:13, 149:20, 149:21, 150:3, 151:4, 151:5
**Brief** [2] - 71:10, 151:5
**briefly** [4] - 8:14, 9:2, 20:19, 69:23
**bring** [4] - 45:7, 75:18, 94:19, 109:9
**bringing** [1] - 119:9
**Britain** [3] - 48:16, 122:18, 123:16
**British** [1] - 122:16
**broad** [2] - 30:5, 34:1
**broadly** [8] - 40:13, 41:8, 83:12, 84:21, 125:19, 126:3, 143:1, 145:3
**Bronfman** [1] - 103:3
**brothers** [2] - 29:6, 32:19
**brought** [4] - 23:22, 34:10, 127:21, 138:15
**building** [2] - 23:16
**bulk** [1] - 11:8
**bunch** [2] - 12:22, 70:25
**but..** [7] - 19:5, 28:6, 47:1, 58:11, 60:12, 73:21, 87:12
**butchers** [2] - 100:6, 101:7
**BY** [57] - 4:6, 4:18, 8:1, 8:11, 8:18, 9:8, 11:15, 15:3, 26:13, 31:18, 35:25, 41:20, 49:21, 52:4, 56:3, 71:13, 77:25, 82:5, 86:12, 86:23, 87:13, 90:5, 91:13, 94:24, 96:23, 97:19, 98:5, 100:4, 100:25, 101:14, 101:18, 102:15, 103:9, 105:2, 107:13, 107:21, 109:10, 110:13, 111:10, 111:14, 112:15, 112:21, 115:16, 117:24, 124:4, 125:16, 127:3, 128:8, 131:12, 133:17, 134:15, 136:9, 138:17, 142:4, 145:24, 150:5, 151:6

**C**

**c/o** [1] - 155:1
**cabins** [1] - 37:1
**California** [6] - 9:13, 9:16, 9:20, 9:23, 10:9, 116:7
**calm** [1] - 18:23
**camera** [1] - 113:10
**camps** [14] - 121:15, 121:23, 121:24, 122:2, 122:6, 122:9, 122:11, 122:18, 122:24, 123:5, 123:9, 124:1, 148:8, 148:11
**campus** [14] - 16:23, 17:2, 17:10, 17:20, 23:16, 47:25, 48:5, 48:19, 49:10, 50:2, 50:11, 56:14, 70:12, 106:12
**cannot** [3] - 29:18, 34:8, 143:12
**Canvas** [5] - 28:10, 28:18, 40:4, 40:7, 46:7
**CANVASS** [1] - 28:19
**capacity** [4] - 1:7, 90:15, 155:4, 156:1
**capital** [4] - 78:2, 78:3
**capture** [1] - 112:12
**car** [1] - 117:13
**carbon** [2] - 87:16, 87:20
**care** [5] - 22:13, 22:22, 22:24, 23:5, 89:2
**career** [5] - 14:4, 15:6, 15:14, 43:8, 43:12
**Career** [1] - 43:11
**careful** [1] - 37:24
**carefully** [2] - 87:8, 87:11
**carried** [1] - 27:21
**Carson** [2] - 9:16, 12:16
**case** [16] - 4:21, 5:25, 6:1, 6:5, 19:2, 65:15, 73:12, 78:11, 78:24, 81:18, 88:17, 90:15, 124:23, 126:2, 132:6, 141:15
**cast** [1] - 110:16
**catch** [1] - 4:11
**Catholic** [2] - 118:11, 119:11
**cbartolomucci@ schaerr** [1] - 2:14
**cbartolomucci@ schaerr-jaffe.com**

[1] - 2:14
**CC** [2] - 90:21, 91:1
**ceased** [2] - 68:11, 70:4
**celebrate** [2] - 112:24, 114:10
**celebrated** [3] - 114:11, 114:25, 115:11
**centered** [1] - 119:5
**century** [1] - 31:1
**Century** [1] - 122:15
**certain** [4] - 40:14, 81:18, 114:15, 119:22
**certainly** [43] - 15:22, 51:23, 61:9, 65:7, 68:2, 69:11, 70:20, 73:16, 73:25, 74:13, 77:4, 83:6, 89:13, 95:20, 97:10, 101:11, 102:25, 116:18, 119:21, 119:22, 120:4, 120:16, 122:10, 122:20, 123:7, 123:14, 126:16, 126:24, 131:7, 132:14, 133:13, 134:6, 134:12, 136:20, 136:25, 139:12, 140:1, 140:9, 142:20, 147:5, 148:3
**certainty** [2] - 61:6, 61:15
**certify** [3] - 153:7, 154:7, 154:12
**chain** [2] - 57:2, 97:2
**chambers** [3] - 148:14, 148:15, 148:17
**change** [8] - 9:11, 27:19, 27:20, 27:21, 30:6, 31:2, 35:12, 142:22
**Change** [4] - 27:4, 27:9, 40:3, 46:3
**CHANGE** [5] - 156:5, 156:8, 156:11, 156:14, 156:17
**changed** [1] - 151:10
**changes** [3] - 35:3, 38:16, 155:8
**changing** [1] - 27:12
**character** [5] - 64:20, 64:23, 65:5, 65:13, 65:23
**characterize** [1] - 102:8

**characterized** [1] - 83:23
**characters** [1] - 67:25
**charge** [1] - 63:2
**charged** [1] - 19:22
**Charlottesville** [1] - 115:19
**chat** [1] - 20:20
**chat-room-type** [1] - 20:20
**chief** [1] - 91:14
**child** [4] - 31:1, 65:23, 102:18, 102:23
**child-killing** [2] - 102:18, 102:23
**childish** [2] - 32:7, 53:11
**children** [1] - 113:5
**choice** [3] - 39:1, 47:5, 120:7
**chose** [3] - 43:14, 65:1, 65:3
**CHRIS** [1] - 1:7
**Chris** [6] - 4:19, 4:20, 6:1, 90:19, 155:3, 156:1
**CHRISTOPHER** [1] - 2:11
**chunk** [1] - 82:16
**circumstances** [2] - 51:12, 66:21
**citation** [1] - 38:22
**cited** [1] - 38:21
**citizen** [2] - 25:2, 132:11
**citizenship** [3] - 24:24, 24:25, 25:5
**civil** [4] - 39:8, 131:19, 145:10, 145:11
**Civil** [3] - 132:8, 155:23
**civilian** [1] - 51:24
**civilians** [1] - 51:10
**claim** [4] - 110:6, 113:4, 113:9, 133:12
**claims** [1] - 113:25
**clarify** [1] - 5:1
**class** [36] - 16:13, 17:7, 19:5, 20:8, 20:24, 21:16, 26:25, 27:6, 27:9, 27:15, 28:13, 28:14, 33:9, 33:16, 33:20, 34:12, 34:24, 35:2, 36:13, 36:15, 36:16, 36:19, 37:5, 39:23, 40:3, 40:6, 40:18, 42:4, 42:8, 46:2, 46:6, 77:17, 91:16, 144:15
**classes** [5] - 11:9,

11:12, 11:14, 16:14, 47:9
**classified** [1] - 83:9
**classifies** [1] - 84:11
**classmates** [7] - 50:12, 50:19, 69:3, 69:12, 70:25, 89:2, 108:17
**classroom** [2] - 28:11, 71:5
**clear** [2] - 114:24, 144:12
**click** [2] - 68:2, 104:4
**client** [2] - 94:15, 104:17
**clinic** [3] - 92:1, 92:11, 92:13
**close** [3] - 53:7, 134:10, 140:16
**closed** [2] - 52:23, 53:20
**CNN** [1] - 50:6
**Coast** [1] - 122:2
**collaborators** [2] - 126:8, 126:14
**collect** [1] - 109:1
**collected** [1] - 40:22
**collective** [6] - 109:1, 112:6, 112:8, 130:7, 130:25, 131:1
**collectively** [1] - 108:20
**college** [8] - 9:19, 9:21, 10:8, 11:16, 11:20, 11:22, 12:1, 12:9
**comforted** [1] - 31:1
**comic** [4] - 64:25, 65:13, 65:18, 66:1
**Coming** [1] - 147:9
**comment** [18] - 21:2, 21:15, 21:25, 22:21, 23:5, 59:1, 59:5, 67:5, 72:21, 97:8, 104:8, 114:9, 118:2, 118:6, 119:19, 136:11, 136:14, 137:25
**commentary** [2] - 34:5, 67:9
**commentators** [2] - 128:21, 139:8
**commented** [3] - 20:23, 21:3, 99:4
**commenter** [1] - 21:24
**commenting** [1] - 125:21
**comments** [1] - 58:23
**Commission** [1] - 153:17

**commit** [1] - 30:19
**committed** [3] - 41:25, 70:16, 133:4
**committing** [1] - 120:3
**common** [12] - 23:11, 29:13, 48:9, 95:5, 95:12, 95:18, 95:23, 96:5, 116:11, 143:3, 143:4, 143:22
**commonly** [1] - 120:13
**communicate** [3] - 62:6, 62:19, 63:15
**communications** [2] - 62:16, 93:18
**communist** [1] - 68:15
**Communist** [1] - 109:5
**communists** [1] - 68:15
**community** [1] - 73:11
**company** [3] - 12:23, 13:12, 13:14
**comparative** [1] - 27:15
**comparing** [1] - 27:15
**compiling** [1] - 89:8
**complain** [1] - 81:13
**complaint** [2] - 24:7, 24:12
**complete** [2] - 94:13, 154:11
**completed** [1] - 155:13
**conceive** [3] - 101:1, 101:3, 101:4
**conceived** [1] - 57:19
**concentration** [8] - 121:15, 121:23, 121:24, 122:17, 122:24, 123:5, 123:9, 148:8
**concept** [1] - 25:15
**concepts** [1] - 100:13
**concern** [3] - 69:13, 130:20, 151:2
**concerned** [3] - 11:9, 14:18, 55:5
**concerns** [1] - 44:17
**concluded** [1] - 152:3
**concluding** [1] - 38:6
**conclusive** [1] - 113:20
**Concord** [1] - 115:9
**concurrence** [1] - 45:19
**conduct** [7] - 79:19, 80:4, 80:8, 89:11, 101:9, 106:25, 126:9
**conducted** [1] - 43:23

**conduit** [2] - 141:17, 141:19
**confess** [1] - 55:16
**confident** [1] - 41:1
**confined** [1] - 122:6
**confining** [1] - 76:22
**conflict** [4] - 111:17, 119:14, 123:13, 123:15
**confusing** [1] - 25:18
**connected** [2] - 63:16, 154:15
**connection** [1] - 40:17
**conquer** [1] - 123:19
**consensus** [1] - 134:10
**consequence** [4] - 92:2, 123:2, 124:16, 129:3
**consequences** [3] - 145:14, 145:18, 148:7
**consequential** [1] - 150:15
**conservative** [1] - 83:25
**consider** [2] - 30:16, 125:6
**considered** [5] - 24:23, 57:14, 65:8, 65:10, 155:14
**consisted** [1] - 40:13
**consistent** [2] - 101:20, 138:25
**Constitution** [2] - 27:12, 35:6
**constitution** [2] - 27:19, 143:10
**constitutional** [3] - 25:7, 27:21, 35:1
**Constitutional** [4] - 27:3, 27:9, 40:3, 46:3
**Constitutionalism** [2] - 3:13, 35:20
**constitutions** [3] - 27:12, 27:13, 27:14
**contact** [1] - 91:24
**contains** [1] - 100:5
**contempt** [2] - 22:16, 142:1
**contending** [1] - 33:24
**contends** [1] - 122:25
**content** [3] - 47:4, 66:12, 138:24
**context** [2] - 85:14, 135:23
**continue** [1] - 126:8
**contours** [1] - 135:4
**contribution** [1] - 71:4

**controversially** [1] - 84:9
**controversy** [2] - 24:9, 37:24
**convention** [1] - 75:3
**conventional** [1] - 145:13
**conventions** [1] - 76:14
**conversation** [5] - 8:21, 45:12, 63:4, 64:2, 75:18
**convicted** [3] - 19:8, 19:15, 117:15
**conviction** [1] - 117:16
**convulsed** [1] - 145:11
**cool** [2] - 50:15, 149:22
**coordinating** [1] - 28:11
**copied** [1] - 87:16
**copies** [1] - 155:12
**copy** [19] - 31:23, 31:25, 32:4, 36:3, 36:6, 36:7, 40:4, 40:7, 40:18, 40:21, 41:2, 41:7, 42:14, 66:19, 82:1, 87:20, 134:18, 135:21
**core** [2] - 110:10
**corporation** [1] - 103:4
**correct** [38] - 24:10, 24:15, 26:23, 32:23, 39:7, 43:17, 52:7, 53:16, 53:18, 55:3, 55:6, 56:19, 60:14, 64:21, 68:6, 75:13, 75:15, 79:7, 80:17, 88:5, 88:6, 90:23, 92:19, 93:16, 95:18, 96:17, 99:15, 99:16, 100:3, 102:16, 104:10, 104:18, 115:24, 116:20, 135:14, 139:15, 141:11, 150:10
**corrected** [1] - 36:9
**correctly** [5] - 29:21, 38:2, 87:22, 102:19, 131:23
**corrupter** [1] - 111:17
**Counsel** [1] - 2:18
**counsel** [4] - 6:7, 151:22, 154:13, 154:15
**count** [1] - 7:4
**counting** [1] - 79:14

**countries** [4] - 27:16, 48:16, 146:22, 147:1
**country** [16] - 9:12, 12:24, 23:3, 38:9, 108:24, 115:23, 119:25, 124:18, 124:19, 139:13, 142:23, 142:24, 143:24, 145:1, 145:8, 145:9
**COUNTY** [2] - 153:4, 154:4
**course** [8] - 119:1, 120:5, 121:8, 122:18, 123:11, 124:24, 132:3, 137:18
**Court** [3] - 4:10, 6:2, 37:11
**court** [7] - 5:4, 5:12, 8:7, 18:11, 19:10, 19:21, 37:4
**COURT** [15] - 1:1, 4:13, 4:15, 9:6, 10:18, 10:23, 11:1, 11:5, 14:21, 14:24, 81:20, 87:9, 97:15, 100:15, 100:19
**courts** [1] - 37:11
**Covid** [3] - 9:24, 12:16, 13:7
**crazed** [1] - 130:15
**crazy** [2] - 85:18, 141:19
**cream** [2] - 137:2, 137:3
**creating** [2] - 142:23, 142:24
**crime** [3] - 19:8, 19:22, 133:23
**crimes** [1] - 131:6
**criminal** [4] - 19:11, 99:22, 129:21, 131:20
**criminality** [1] - 127:22
**criminals** [2] - 100:6, 101:6
**Crips** [2] - 129:24, 130:1
**critical** [1] - 130:18
**critically** [1] - 131:15
**criticism** [1] - 22:13
**crop** [2] - 137:2, 137:4
**crystallized** [1] - 138:14
**cultural** [2] - 97:6, 97:23
**curiosity** [2] - 50:8, 148:22

**current** [3] - 25:9, 53:15, 54:16
**cut** [4] - 33:5, 87:9, 100:15, 100:20
**cute** [1] - 54:20

**D**

**Dalton** [4] - 134:23, 135:1, 135:17, 136:4
**damn** [1] - 134:10
**DAMSKY** [7] - 1:4, 1:11, 3:3, 4:1, 153:8, 154:9, 156:24
**Damsky** [37] - 1:13, 4:7, 4:9, 4:16, 4:19, 5:24, 5:25, 8:2, 8:12, 17:23, 26:14, 29:1, 31:20, 32:13, 36:1, 37:10, 41:16, 41:21, 49:22, 56:4, 71:14, 78:1, 82:11, 83:17, 86:24, 90:6, 94:25, 96:25, 101:19, 105:3, 112:22, 151:8, 155:1, 155:3, 155:5, 156:1, 156:2
**date** [9] - 9:4, 15:21, 17:12, 20:13, 62:21, 67:1, 87:25, 112:14, 155:10
**DATE** [2] - 1:15, 156:24
**Dated** [1] - 154:18
**dates** [1] - 42:23
**David** [1] - 128:22
**days** [2] - 96:18, 155:14
**DC** [1] - 2:14
**de** [1] - 51:20
**Dean** [16] - 1:7, 42:19, 43:9, 44:18, 45:7, 46:9, 47:7, 86:14, 87:15, 88:21, 90:18, 90:19, 155:4, 156:1
**dean** [3] - 43:23, 44:3, 44:10
**death** [1] - 115:22
**decade** [1] - 22:11
**decades** [3] - 97:6, 98:2, 138:25
**December** [12] - 52:20, 52:23, 53:8, 53:20, 59:14, 125:17, 127:4, 128:9, 131:13, 133:18, 134:16, 136:10
**decide** [2] - 13:21, 14:6

**decided** [1] - 37:24
**decision** [4] - 14:5, 121:3, 121:7, 121:24
**decisions** [1] - 37:4
**declare** [1] - 156:21
**declaring** [2] - 123:17, 124:21
**deeply** [2] - 69:20, 143:23
**defeat** [2] - 124:12, 124:17
**Defendant** [4] - 1:9, 1:12, 2:22, 4:3
**defendant** [1] - 4:20
**DEFENDANT'S** [1] - 3:8
**Defendant's** [8] - 26:11, 31:16, 49:19, 56:1, 82:3, 86:21, 90:3, 94:22
**defendant's** [3] - 8:9, 35:23, 41:18
**defender** [1] - 91:15
**Defense** [1] - 132:13
**define** [2] - 109:21, 109:23
**definitely** [4] - 35:12, 61:17, 63:17, 136:20
**definition** [4] - 33:25, 76:10, 76:13, 109:20
**defunct** [1] - 83:7
**degradation** [1] - 111:18
**degree** [3] - 14:12, 94:10, 94:13
**delegitimize** [1] - 113:24
**delete** [2] - 66:19, 90:17
**deleted** [2] - 52:19, 59:14
**delivered** [1] - 91:4
**demand** [1] - 126:8
**demands** [1] - 127:5
**Democrat** [1] - 144:20
**Democratic** [1] - 145:2
**demographic** [3] - 22:14, 97:7, 97:24
**demographics** [3] - 20:23, 21:2, 21:4
**demonstrating** [1] - 101:20
**denial** [2] - 148:13, 149:3
**denier** [6] - 120:14, 120:23, 146:10, 147:25, 148:20, 149:19
**denigrate** [1] - 113:23
**denuclearize** [1] -

124:25
**deny** [7] - 23:1, 147:25, 148:24, 149:3, 150:6, 150:22, 150:23
**denying** [2] - 85:20, 85:24
**deposed** [2] - 5:25, 17:22
**deposing** [1] - 155:11
**Deposition** [3] - 1:10, 1:13, 3:10
**deposition** [10] - 4:22, 6:16, 6:24, 7:15, 8:4, 8:13, 8:23, 9:1, 152:3, 154:8
**described** [1] - 103:6
**describes** [3] - 101:8, 102:24, 149:10
**Description** [1] - 3:9
**Desert** [1] - 111:6
**desired** [1] - 143:11
**desk** [1] - 37:22
**desk-bound** [1] - 37:22
**despite** [1] - 122:22
**destroy** [4] - 124:8, 131:16, 132:19, 132:21
**destroying** [3] - 97:5, 98:2, 117:20
**destruction** [2] - 76:14, 111:18
**details** [3] - 23:23, 51:14, 67:22
**deteriorating** [1] - 144:5
**determine** [1] - 99:23
**Development** [1] - 43:11
**developments** [1] - 93:25
**die** [2] - 30:2, 148:3
**died** [3] - 122:10, 148:9, 148:10
**difference** [2] - 115:7, 137:14
**differences** [2] - 84:8, 119:12
**different** [7] - 27:16, 30:12, 52:18, 77:14, 109:23, 137:5, 137:11
**difficult** [1] - 105:7
**diplomacy** [1] - 125:4
**Direct** [1] - 3:4
**DIRECT** [1] - 4:5
**direction** [1] - 143:24
**directly** [7] - 29:6, 32:19, 48:12, 74:11,

75:12, 93:2, 110:20
**disagree** [6] - 59:7, 85:2, 88:25, 107:4, 117:15, 126:10
**disagreed** [1] - 23:8
**disastrous** [2] - 145:14, 145:18
**disciplinary** [6] - 18:3, 23:21, 61:10, 90:13, 93:22, 107:8
**disciplined** [1] - 11:19
**discourse** [2] - 53:10, 100:24
**discretion** [2] - 93:12, 93:13
**discuss** [2] - 56:23, 81:6
**discussed** [2] - 48:15, 84:17
**discusses** [1] - 28:3
**discussing** [3] - 26:19, 35:3, 57:13
**discussion** [4] - 35:7, 76:8, 77:18, 140:4
**Discussion** [1] - 151:24
**disease** [1] - 148:4
**dishonest** [1] - 73:7
**dislike** [2] - 89:7, 131:7
**disliked** [1] - 89:6
**dismay** [1] - 22:4
**dismember** [3] - 37:21, 38:9, 38:21
**disobedience** [1] - 39:9
**dispossession** [1] - 37:12
**dispute** [2] - 119:8, 126:3
**disputes** [3] - 118:25, 119:6, 119:18
**dissatisfaction** [1] - 143:24
**dissolve** [1] - 145:10
**distinct** [1] - 139:23
**distinction** [1] - 40:2
**distinguishes** [1] - 27:19
**distressed** [1] - 70:17
**distressing** [1] - 70:10
**distribute** [2] - 41:4, 58:16
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 6:2
**diverse** [2] - 116:23, 117:7
**diversity** [2] - 21:8, 21:12
**DIVISION** [1] - 1:2

**doctrinal** [2] - 119:5, 119:7
**document** [16] - 7:25, 26:10, 31:15, 35:22, 41:17, 49:18, 55:25, 82:2, 86:14, 86:20, 86:24, 88:8, 88:14, 90:2, 94:21, 156:21
**documents** [1] - 8:25
**dog** [4] - 7:5, 16:24, 18:21
**dogs** [3] - 7:4, 54:20, 65:23
**dogs'** [1] - 7:9
**DOJ** [1] - 125:21
**domestic** [1] - 145:20
**dominant** [1] - 138:12
**Domino's** [1] - 18:18
**done** [13] - 57:9, 70:21, 89:21, 110:25, 111:3, 111:7, 121:25, 129:3, 129:17, 133:8, 133:9
**doomscrolling** [1] - 55:17
**Dora** [1] - 2:6
**double** [2] - 32:6, 32:7
**double-space** [1] - 32:6
**double-spacing** [1] - 32:7
**doubt** [2] - 24:3, 88:5
**down** [20] - 5:12, 8:17, 22:6, 35:19, 52:3, 58:2, 66:9, 66:11, 66:15, 66:22, 77:23, 86:11, 96:21, 101:16, 102:14, 103:11, 111:21, 112:13, 133:18, 144:1
**dozens** [1] - 90:22
**Dr** [1] - 128:22
**draft** [13] - 26:8, 26:18, 26:20, 28:7, 28:24, 28:25, 29:10, 32:12, 32:17, 33:15, 33:17, 33:20, 34:6
**Draft** [1] - 3:11
**drafts** [1] - 28:14
**draw** [2] - 115:5, 126:5
**drawing** [3] - 40:3, 113:13, 118:24
**drive** [1] - 17:6
**driven** [1] - 139:10
**driving** [2] - 117:13, 133:25
**due** [2] - 29:19, 140:13
**dues** [1] - 16:4

**duly** [2] - 4:2, 153:10
**duration** [1] - 122:6
**during** [10] - 17:18, 18:20, 23:14, 42:18, 63:7, 114:16, 121:1, 146:18, 148:1, 150:8
**Dutch** [1] - 122:17
**DUVAL** [2] - 153:4, 154:4
**dying** [1] - 29:15

## E

**e-mail** [1] - 155:11
**e-mailed** [1] - 155:12
**early** [5] - 10:15, 11:9, 73:21, 119:3, 122:15
**earn** [1] - 131:17
**earth** [2] - 11:13, 22:12
**easier** [1] - 19:20
**East** [4] - 2:6, 10:16, 11:11, 98:18
**easy** [1] - 58:10
**ebbs** [1] - 141:3
**economic** [3] - 83:9, 97:6, 97:23
**education** [1] - 118:7
**effect** [3] - 21:7, 21:11, 104:23
**effects** [1] - 12:24
**effort** [3] - 97:11, 97:17, 97:18
**either** [7] - 20:11, 56:11, 90:14, 92:8, 95:15, 123:13, 150:14
**election** [1] - 53:3
**electorally** [1] - 145:6
**electronic** [2] - 41:1, 62:15
**Eli** [1] - 128:22
**Email** [2] - 3:14, 3:18
**email** [10] - 40:8, 41:16, 42:1, 42:3, 42:14, 63:6, 87:18, 87:22, 91:3, 93:4
**emailed** [5] - 40:9, 81:2, 81:3, 81:4, 92:4
**emails** [4] - 81:1, 81:5, 81:7, 91:3
**embarrassed** [1] - 66:18
**embrace** [1] - 109:15
**Emil** [1] - 135:10
**empire** [2] - 122:19, 144:14
**Empire** [1] - 11:11
**employee** [3] - 13:11,

154:13, 154:14
**employees** [1] - 104:17
**employment** [2] - 12:17, 13:5
**empty** [1] - 7:7
**emulate** [1] - 120:5
**en** [3] - 122:9, 148:16, 148:18
**encapsulates** [1] - 110:3
**encompassed** [1] - 28:1
**encompasses** [3] - 25:15, 34:22, 49:2
**encompassing** [1] - 49:6
**encouragement** [1] - 105:8
**encouraging** [1] - 149:4
**end** [33] - 4:12, 22:17, 29:7, 32:18, 37:13, 38:1, 68:6, 72:23, 81:20, 82:13, 83:21, 88:13, 89:20, 95:6, 97:7, 98:19, 100:15, 111:19, 123:17, 124:7, 126:10, 127:6, 127:21, 128:11, 131:24, 132:4, 134:2, 136:15, 138:15, 143:14, 146:3, 146:7, 151:22
**endeavor** [2] - 31:7, 35:17
**ended** [4] - 117:10, 117:11, 120:3, 122:23
**endorsement** [1] - 120:16
**ends** [1] - 127:6
**enemies** [1] - 113:23
**enemy** [8] - 51:7, 95:6, 95:12, 95:23, 96:5, 121:8, 147:13, 147:14
**enforcement** [1] - 20:2
**engage** [1] - 123:13
**engaging** [1] - 120:7
**English** [1] - 135:20
**enroll** [1] - 12:3
**enrolled** [2] - 12:5, 15:17
**enslaving** [2] - 141:18, 141:21
**entail** [2] - 39:17, 39:18
**entails** [3] - 39:6,

39:10, 111:17
**entire** [4] - 16:20, 105:24, 134:2, 145:18
**entirely** [7] - 14:13, 38:13, 40:23, 40:25, 53:1, 71:21, 143:7
**entity** [7] - 107:25, 108:9, 110:17, 124:8, 133:21, 138:15, 143:18
**entrenched** [1] - 144:13
**equal** [1] - 114:20
**era** [1] - 37:2
**eras** [1] - 11:12
**erasure** [1] - 115:22
**Errata** [2] - 155:9, 155:11
**errata** [1] - 155:13
**errors** [1] - 36:9
**Esau's** [1] - 140:25
**especially** [3] - 67:23, 71:5, 139:16
**Esquire** [5] - 2:3, 2:4, 2:11, 2:11, 2:17
**essence** [1] - 31:22
**essentially** [3] - 113:7, 139:7, 147:12
**ethical** [2] - 51:9, 133:25
**ethnic** [1] - 137:10
**eugenicist** [1] - 84:4
**eugenics** [1] - 83:21
**Europe** [5] - 10:16, 11:10, 121:4, 148:23
**European** [3] - 48:16, 119:16, 119:17
**Europeans** [2] - 119:1, 119:2
**event** [2] - 20:25, 23:24
**events** [3] - 119:16, 149:10, 149:12
**evidence** [3] - 113:12, 141:24
**evil** [9] - 101:21, 102:3, 102:9, 102:11, 130:23, 131:15, 138:21, 141:10, 141:12
**exact** [7] - 17:12, 22:3, 42:23, 47:14, 87:25, 92:20, 125:24
**exactly** [29] - 12:5, 13:3, 13:20, 21:22, 28:16, 34:12, 34:16, 34:17, 36:4, 36:18, 39:14, 46:10, 46:13, 47:1, 51:13, 57:12,

58:9, 63:12, 68:1, 71:25, 73:21, 94:4, 105:22, 106:3, 123:22, 132:10, 137:16, 142:11, 142:17
**EXAMINATION** [1] - 4:5
**Examination** [2] - 1:19, 3:4
**example** [20] - 39:11, 75:9, 85:5, 85:19, 106:21, 110:5, 110:24, 110:25, 113:9, 120:10, 125:7, 127:11, 127:24, 128:22, 130:12, 131:5, 133:15, 140:8, 140:15, 141:12
**examples** [2] - 147:3, 147:6
**exclamation** [2] - 88:13, 112:24
**excused** [1] - 152:1
**exemplified** [1] - 138:14
**exercise** [1] - 37:20
**exercised** [1] - 39:4
**exercising** [1] - 93:13
**exhibit** [6] - 7:18, 31:13, 35:20, 52:3, 91:11, 94:25
**Exhibit** [23] - 8:8, 8:9, 8:17, 26:9, 26:11, 31:13, 31:16, 35:21, 35:23, 41:16, 41:18, 49:15, 49:19, 55:24, 56:1, 82:1, 82:3, 86:19, 86:21, 89:25, 90:3, 94:20, 94:22
**exhibits** [2] - 90:12, 90:14
**EXHIBITS** [1] - 3:8
**exhortation** [1] - 34:14
**exigency** [1] - 123:10
**exist** [5] - 54:1, 68:12, 70:4, 127:23, 141:21
**existed** [2] - 98:25, 108:7
**existence** [6] - 70:7, 70:11, 107:24, 110:8, 146:23, 147:2
**existential** [1] - 70:8
**existing** [2] - 108:5, 145:16
**exists** [5] - 138:3, 142:24, 143:4, 143:5, 143:18

**exits** [2] - 46:20, 47:18
**expand** [1] - 143:15
**expands** [1] - 37:1
**expect** [4] - 50:18, 57:22, 58:3, 58:22
**expected** [3] - 7:24, 50:19, 123:19
**expecting** [1] - 74:1
**expelled** [4] - 94:1, 94:9, 126:22, 133:13
**experience** [2] - 30:7, 58:24
**experiences** [1] - 132:2
**expert** [1] - 138:7
**Expires** [1] - 153:18
**explain** [3] - 30:11, 93:8, 94:7
**explained** [2] - 64:8, 151:17
**explaining** [1] - 112:9
**explicit** [1] - 146:13
**explicitly** [3] - 75:19, 78:17, 116:14
**exposed** [1] - 105:12
**expounding** [1] - 89:8
**express** [1] - 106:16
**expressed** [7] - 22:4, 23:8, 24:20, 105:22, 106:2, 106:18, 116:25
**expresses** [1] - 22:16
**expressing** [1] - 117:3
**Expression** [1] - 78:7
**expression** [1] - 86:9
**expressly** [3] - 75:2, 75:7, 85:7
**expulsion** [3] - 125:18, 125:25, 126:13
**extension** [1] - 134:1
**extent** [10] - 110:4, 119:4, 119:17, 136:21, 136:22, 137:17, 139:21, 141:11, 141:22
**extra** [1] - 135:20
**extralegal** [3] - 34:19, 34:22, 35:10
**extralegally** [2] - 27:22, 35:4

**F**

**Facebook** [1] - 54:9
**faces** [4] - 21:13, 21:16, 22:10
**facilitate** [2] - 33:17, 146:2
**facing** [1] - 99:21

**fact** [17] - 36:7, 44:15, 60:25, 61:5, 69:11, 69:22, 78:23, 82:18, 89:6, 95:11, 106:17, 122:22, 133:6, 135:18, 140:13, 146:17, 146:19
**faction** [1] - 130:7
**factional** [1] - 97:18
**factions** [1] - 116:10
**facto** [1] - 51:20
**facts** [3] - 47:1, 148:5, 156:21
**faculty** [1] - 139:1
**failed** [4] - 39:3, 143:10, 143:20, 144:19
**fails** [1] - 155:16
**fair** [28] - 23:4, 25:21, 25:23, 30:3, 38:12, 44:1, 54:25, 55:8, 58:19, 67:8, 73:24, 74:19, 83:22, 92:12, 92:20, 100:11, 109:18, 110:21, 115:10, 117:2, 124:9, 129:18, 130:5, 134:3, 141:8, 142:7, 150:6, 151:14
**fairly** [13] - 15:14, 23:11, 27:23, 30:25, 51:16, 55:7, 101:8, 108:16, 116:23, 135:2, 139:3, 140:16, 143:6
**faithfully** [1] - 95:9
**fall** [6] - 15:18, 15:19, 24:8, 36:13, 43:2, 92:2
**falls** [2] - 25:16, 95:19
**false** [2] - 60:22, 60:23
**familiar** [1] - 75:2
**family** [13] - 72:22, 75:13, 76:1, 76:2, 77:9, 103:4, 127:23, 131:18, 140:8, 140:9, 140:10, 140:16, 140:18
**famous** [1] - 118:15
**far** [7] - 17:2, 25:15, 74:9, 76:18, 99:8, 99:20, 106:19
**FARHAT** [2] - 153:16, 154:20
**Farhat** [5] - 1:20, 153:6, 154:6, 155:11, 155:20
**Fausset** [1] - 80:22
**February** [7] - 1:15, 52:15, 92:9, 153:9,

153:12, 154:18, 155:2
**federal** [2] - 37:11, 91:7
**Federal** [2] - 155:14, 155:23
**feedback** [3] - 33:17, 33:19, 33:22
**feeds** [1] - 65:23
**felt** [4] - 15:15, 23:12, 107:2, 143:23
**few** [10] - 9:23, 18:18, 22:22, 22:24, 22:25, 46:11, 63:18, 80:1, 105:22, 106:4
**fields** [1] - 11:13
**fifth** [1] - 5:18
**fight** [2] - 30:1, 124:18
**fighter** [2] - 130:13, 130:17
**fighting** [1] - 29:15
**figured** [1] - 14:3
**file** [1] - 46:7
**filled** [1] - 145:12
**fills** [1] - 22:11
**final** [5] - 31:14, 31:19, 32:12, 33:8, 36:6
**Finally** [2] - 29:6, 32:18
**financial** [1] - 115:21
**financially** [1] - 154:16
**fine** [4] - 31:11, 99:18, 124:12, 124:15
**finish** [4] - 5:6, 5:9, 19:18, 69:7
**finished** [1] - 41:13
**finishes** [1] - 127:5
**FIRE** [3] - 78:2, 78:5, 78:23
**fired** [2] - 18:15, 18:25
**firm** [4] - 6:10, 14:16, 15:5, 79:14
**Firm** [1] - 2:5
**First** [1] - 95:15
**first** [26] - 4:2, 4:24, 20:12, 26:6, 29:5, 42:12, 42:24, 43:2, 43:4, 53:25, 57:2, 61:4, 61:6, 75:24, 82:10, 95:3, 107:22, 110:23, 118:8, 125:4, 144:10, 144:12, 146:1, 147:4, 147:14
**fit** [3] - 76:24, 76:25, 109:20
**five** [5] - 12:8, 12:11, 12:14, 17:5, 150:1
**five-year** [3] - 12:8, 12:11, 12:14

**fix** [2] - 66:20, 144:7
**FLORIDA** [3] - 1:1, 153:3, 154:3
**Florida** [15] - 1:8, 2:6, 2:18, 2:20, 6:3, 14:7, 20:7, 79:6, 89:10, 93:18, 153:7, 153:17, 155:4, 155:15, 156:2
**flouting** [1] - 39:10
**flows** [1] - 141:3
**focus** [1] - 10:13
**focused** [1] - 130:9
**Foes** [1] - 36:17
**follow** [5] - 40:24, 58:9, 91:5, 100:10, 113:16
**follow-up** [2] - 100:10, 113:16
**followed** [3] - 81:19, 81:22, 117:19
**follower** [1] - 58:6
**followers** [1] - 57:25
**following** [2] - 17:4, 59:15
**follows** [1] - 4:4
**font** [1] - 47:6
**footnotes** [1] - 135:22
**force** [6] - 38:10, 39:7, 106:20, 109:3, 110:11, 131:1
**foregoing** [1] - 156:21
**foreign** [4] - 100:6, 101:6, 145:21, 147:2
**foremost** [2] - 118:8, 122:19
**forget** [7] - 13:20, 21:22, 36:4, 36:18, 91:5, 93:20, 118:14
**forgot** [1] - 91:22
**form** [2] - 121:2, 143:4
**formal** [2] - 28:4, 35:5
**formally** [1] - 27:21
**formed** [2] - 83:17, 103:22
**former** [2] - 49:8, 137:19
**formulate** [3] - 113:22, 142:1, 142:22
**fortune** [1] - 103:3
**fortunes** [1] - 103:1
**forward** [2] - 37:23, 63:7
**Foundation** [2] - 78:6, 132:9
**founded** [3] - 24:14, 24:18, 25:12
**founding** [4] - 24:22, 29:14, 37:2, 39:4
**four** [1] - 48:22

**fourth** [2] - 5:15, 144:1
**Fox** [1] - 50:5
**frame** [1] - 114:4
**framing** [1] - 73:7
**France** [1] - 123:16
**Francis** [4] - 83:19, 83:24, 84:18, 84:23
**frankly** [4] - 32:7, 70:6, 135:3, 137:8
**free** [5] - 42:15, 48:1, 48:25, 59:7, 78:8
**Free** [5] - 99:5, 99:6, 99:14, 99:17, 99:18
**free-speech** [1] - 78:8
**freeing** [2] - 112:23
**freely** [1] - 127:16
**Frenchman** [1] - 118:18
**friendly** [2] - 63:4, 71:4
**friends** [4] - 7:10, 41:8, 63:19, 71:3
**front** [2] - 98:9, 126:17
**fruitful** [1] - 81:24
**full** [14] - 4:8, 12:17, 12:20, 13:5, 13:11, 14:2, 14:9, 27:7, 68:3, 128:3, 136:12, 136:15, 137:24, 138:23
**full-time** [3] - 12:17, 13:5, 13:11
**full-tuition** [2] - 14:2, 14:9
**fully** [5] - 6:21, 44:24, 73:8, 131:25, 139:15
**function** [1] - 122:11
**functionally** [1] - 54:2
**fundamental** [1] - 39:1
**fundamentalist** [1] - 130:14
**fundraise** [1] - 89:20
**fundraising** [1] - 89:21
**furniture** [1] - 12:23
**future** [3] - 119:13, 127:6, 144:7

**G**

**GAINESVILLE** [1] - 1:2
**Gainesville** [2] - 2:20, 9:25
**gang** [1] - 129:24
**gangster** [5] - 107:25, 108:9, 110:17, 124:8, 133:21
**garbled** [1] - 4:11
**gas** [3] - 148:14,

148:15, 148:17
**gather** [1] - 44:8
**GAVIN** [1] - 2:4
**gavin@sabatinilegal.com** [1] - 2:7
**general** [25] - 24:21, 25:1, 27:11, 33:24, 34:3, 35:11, 36:25, 37:6, 38:7, 38:20, 39:12, 46:17, 55:4, 77:4, 97:25, 107:8, 112:4, 114:14, 117:5, 117:9, 119:22, 120:8, 122:12, 142:23, 148:10
**General** [1] - 2:18
**generally** [21] - 6:14, 24:23, 27:13, 32:6, 38:24, 39:10, 47:21, 51:3, 54:21, 58:14, 58:16, 74:18, 77:1, 79:11, 82:25, 107:1, 117:19, 118:13, 127:19, 134:4, 150:23
**generation** [1] - 39:5
**generations** [2] - 29:14, 144:7
**genocide** [19] - 74:7, 74:8, 74:9, 75:16, 75:18, 75:20, 75:22, 76:1, 76:3, 76:8, 76:10, 76:17, 76:18, 76:23, 77:10, 77:13, 115:23, 128:25, 146:3
**genuinely** [2] - 144:12, 148:2
**geology** [1] - 11:14
**German** [3] - 83:7, 118:7, 119:10
**Germans** [4] - 118:8, 118:9, 119:11, 148:6
**Germany** [10] - 48:17, 121:12, 121:14, 121:19, 121:21, 122:4, 122:12, 127:25, 135:8, 150:8
**girlfriend** [3] - 63:19, 63:22, 64:10
**gist** [1] - 46:18
**given** [6] - 17:25, 74:9, 75:23, 76:18, 100:9, 105:8
**gleefully** [1] - 37:23
**global** [1] - 133:23
**Globalize** [2] - 128:17, 129:6
**globe** [1] - 122:20

**glorify** [1] - 125:9
**goal** [3] - 116:8, 116:11, 123:19
**goals** [1] - 97:11
**goers** [2] - 117:4, 117:18
**government** [11] - 14:15, 37:18, 37:21, 38:10, 38:18, 51:14, 110:24, 113:21, 129:9, 139:18, 147:7
**governments** [1] - 38:25
**graduate** [1] - 12:1
**graduating** [1] - 42:10
**graduation** [1] - 12:8
**granted** [1] - 37:17
**grateful** [1] - 105:8
**gratifyingly** [1] - 105:13
**great** [4] - 4:17, 100:23, 119:6, 119:14
**greater** [4] - 74:8, 74:10, 76:17, 76:19
**greatly** [1] - 150:16
**grieve** [4] - 70:14, 70:15, 70:19, 71:7
**ground** [1] - 4:24
**group** [11] - 18:12, 42:11, 70:10, 75:23, 76:12, 76:15, 97:12, 112:7, 115:2, 139:1
**grouping** [1] - 96:8
**GroupMe** [5] - 20:17, 20:19, 20:23, 22:2, 22:19
**groups** [5] - 91:18, 116:21, 116:22, 141:4, 143:22
**grow** [1] - 9:12
**gruesome** [1] - 37:25
**guess** [19] - 18:23, 21:22, 25:17, 25:24, 27:18, 46:25, 49:13, 55:7, 57:24, 59:2, 61:7, 61:8, 69:6, 69:8, 72:20, 75:11, 106:11, 112:3, 140:11
**guessing** [1] - 47:5
**guide** [1] - 37:6
**guilty** [1] - 101:20
**guy** [1] - 134:22
**gym** [3] - 56:11, 56:14, 56:15
**gymnasium** [1] - 56:13

**H**

**half** [1] - 121:4
**hall** [10] - 43:23, 44:4, 44:8, 44:23, 45:8, 45:12, 45:15, 46:9, 47:8, 47:12
**Hall** [1] - 2:20
**Hamas** [7] - 48:7, 48:11, 50:22, 50:25, 112:17, 113:9, 115:7
**hand** [2] - 111:16, 153:11
**handed** [2] - 40:20, 40:24
**handle** [2] - 53:15, 53:20
**harmed** [1] - 70:23
**Harvard** [1] - 57:6
**hate** [21] - 107:23, 108:3, 108:8, 108:12, 108:25, 109:1, 109:3, 109:4, 109:6, 129:20, 130:1, 130:6, 130:11, 130:12, 130:13, 130:16, 130:25, 131:4, 131:8, 141:9, 141:13
**hated** [3] - 128:11, 129:16, 138:20
**hater** [1] - 130:21
**hating** [2] - 129:18, 141:6
**hatred** [6] - 22:17, 130:21, 130:22, 130:23, 131:9, 142:1
**have..** [1] - 33:4
**head** [3] - 5:12, 95:14, 103:2
**headquarters** [1] - 133:22
**hear** [2] - 5:18, 47:16
**heard** [8] - 45:17, 47:17, 59:12, 59:21, 60:6, 60:13, 60:15, 60:21
**hearing** [12] - 10:21, 18:3, 18:6, 23:21, 34:11, 79:19, 79:22, 80:5, 80:8, 87:24, 88:21, 90:13
**heart** [1] - 104:4
**heed** [1] - 133:24
**heil** [1] - 99:5
**Heil** [1] - 99:17
**Heinlein's** [1] - 125:8
**held** [3] - 13:2, 84:15, 151:24
**help** [8] - 9:9, 16:10,

23:17, 56:20, 70:1, 78:15, 79:12, 79:16
**helped** [1] - 69:24
**helps** [3] - 21:20, 56:21
**hero** [2] - 65:8, 65:10
**Hess** [1] - 135:10
**HH** [1] - 153:17
**hiding** [1] - 127:21
**high** [3] - 10:5, 10:6, 66:1
**High** [1] - 10:7
**higher** [1] - 139:13
**highest** [1] - 14:8
**highest-ranked** [1] - 14:8
**highlighted** [1] - 37:15
**highly** [1] - 130:18
**himself** [1] - 84:12
**historical** [4] - 133:6, 135:5, 148:6, 149:8
**historically** [3] - 118:25, 129:23, 150:15
**history** [13] - 10:12, 10:14, 11:8, 11:14, 51:25, 114:5, 114:7, 115:23, 118:16, 119:16, 136:3, 138:8, 146:17
**hit** [1] - 12:16
**Hitler** [24] - 99:6, 99:18, 118:1, 118:2, 118:4, 118:6, 119:20, 119:23, 119:24, 120:1, 120:9, 120:18, 120:21, 121:10, 121:17, 121:19, 123:4, 123:11, 123:12, 123:23, 123:24, 135:23, 147:9, 147:15
**Hitler's** [2] - 134:19, 135:4
**hold** [7] - 90:1, 94:3, 94:8, 113:25, 130:4, 142:13, 150:18
**Hold** [1] - 3:19
**Holocaust** [24] - 120:14, 120:16, 120:23, 146:2, 146:6, 146:10, 146:12, 146:15, 146:16, 146:23, 147:18, 147:22, 147:23, 147:25, 148:12, 148:13, 148:19, 148:24, 149:2, 149:3, 149:5,

149:18, 150:19, 151:2
**home** [5] - 12:16, 13:9, 56:11, 106:9, 132:17
**honed** [1] - 85:3
**honest** [2] - 133:23, 149:7
**honesty** [1] - 100:12
**hope** [11] - 30:25, 58:13, 58:14, 59:1, 86:5, 132:17, 138:2, 138:12, 144:20, 144:25, 145:9
**hoped** [4] - 58:20, 59:2, 59:3, 105:12
**horrendous** [1] - 134:22
**Horrors** [2] - 118:17, 118:19
**hour** [3] - 29:16, 34:6, 45:6
**hours** [1] - 13:8
**House** [1] - 113:3
**house** [1] - 133:7
**human** [3] - 145:15, 145:19, 147:20
**humanity** [10] - 95:6, 95:12, 95:18, 95:23, 96:6, 100:7, 101:7, 141:18, 141:21, 147:21
**hundred** [1] - 55:13
**hundred-plus** [1] - 55:13
**hurt** [1] - 70:22
**Hussein** [1] - 147:11

### I

**I..** [1] - 73:17
**idea** [16] - 24:22, 34:3, 34:25, 38:20, 38:24, 46:14, 57:13, 59:14, 60:19, 62:1, 120:11, 138:5, 142:24, 144:18, 145:11, 150:16
**ideal** [1] - 125:3
**ideally** [2] - 144:25, 145:6
**ideals** [2] - 145:3, 145:4
**ideas** [5] - 28:3, 83:17, 105:18, 105:22, 106:4
**identical** [1] - 36:10
**identifiably** [1] - 69:2
**Identification** [2] - 3:9, 153:24

**identification** [11] - 8:10, 26:12, 31:17, 35:24, 41:19, 49:20, 56:2, 82:4, 86:22, 90:4, 94:23
**Identification____xx** [1] - 153:24
**identify** [1] - 118:8
**identity** [1] - 68:11
**Ignatiev** [6] - 57:6, 57:16, 74:5, 74:7, 74:22, 85:4
**II** [10] - 51:25, 113:15, 114:3, 120:2, 120:7, 121:1, 123:12, 146:19, 148:1, 150:9
**ill** [1] - 145:20
**ill-thought-out** [1] - 145:20
**illegal** [2] - 48:15, 149:11
**image** [1] - 118:13
**immigration** [2] - 139:10
**impact** [1] - 146:15
**impactful** [1] - 146:24
**Imperial** [1] - 128:1
**implication** [1] - 21:17
**implicit** [2] - 74:16, 78:18
**implicitly** [3] - 31:6, 35:16, 126:22
**imply** [1] - 74:18
**implying** [3] - 72:18, 129:6, 143:16
**import** [1] - 72:17
**importance** [1] - 39:2
**imprisoned** [1] - 106:21
**imprisonment** [1] - 115:21
**inability** [2] - 122:20, 122:21
**inappropriate** [1] - 33:2
**inaugural** [1] - 38:22
**incident** [1] - 51:1
**inclined** [1] - 105:15
**included** [1] - 34:1
**includes** [3] - 37:18, 114:9, 144:23
**including** [5] - 27:13, 38:10, 91:7, 118:10, 120:19
**inconsequential** [1] - 150:14
**incorrect** [1] - 23:13
**indicate** [2] - 132:4, 134:12
**indicated** [2] - 120:10,

127:22
**indication** [1] - 128:19
**indicted** [1] - 99:22
**indigent** [1] - 89:18
**indisputable** [1] - 123:15
**Individual** [1] - 78:7
**individual** [6] - 97:11, 97:17, 108:15, 108:18, 109:2, 117:12
**individuals** [3] - 63:15, 64:11, 133:12
**inexact** [1] - 132:24
**inferior** [1] - 37:11
**inferred** [2] - 72:24, 75:20
**influence** [1] - 6:19
**information** [4] - 24:4, 97:3, 103:20, 135:20
**informed** [3] - 73:8, 84:22, 84:25
**infraction** [1] - 19:12
**inherently** [2] - 31:6, 35:16
**inheritance** [1] - 29:19
**initial** [1] - 72:21
**initiated** [2] - 89:10, 93:20
**injunction** [2] - 17:15, 126:2
**injury** [1] - 115:21
**inside** [1] - 23:16
**insist** [1] - 127:14
**inspired** [1] - 57:11
**Instagram** [4] - 21:3, 21:9, 54:11, 54:13
**institution** [5] - 22:14, 68:17, 69:17, 69:21, 69:24
**instruction** [1] - 28:11
**instructs** [1] - 5:21
**intellectual** [1] - 148:21
**intellectually** [1] - 149:7
**intelligence** [1] - 84:10
**intend** [3] - 30:9, 123:21, 130:20
**intended** [5] - 30:19, 117:14, 122:9, 123:12, 124:2
**Intent** [1] - 21:22
**intentional** [1] - 122:25
**intentionally** [3] - 101:22, 120:12, 150:8
**interacted** [1] - 72:13

**interchangeable** [2] - 101:2, 108:14
**interested** [4] - 15:12, 42:16, 149:16, 154:16
**interests** [3] - 108:20, 142:25, 143:5
**interim** [10] - 32:3, 32:15, 62:10, 104:14, 104:16, 104:18, 104:21, 104:22, 107:3, 107:7
**international** [1] - 51:6
**internationally** [1] - 133:24
**internment** [5] - 122:2, 124:6, 124:11, 124:15, 148:8
**internship** [12] - 62:24, 63:2, 63:6, 73:15, 73:18, 91:25, 92:3, 92:5, 92:6, 92:10, 92:12, 92:16
**interpreted** [1] - 75:21
**interpreting** [1] - 77:11
**intervened** [1] - 111:5
**interview** [3] - 80:19, 81:11, 82:12
**Inti** [1] - 129:5
**Intifada** [2] - 128:17, 129:6
**introduce** [1] - 49:14
**introduced** [1] - 76:7
**introduction** [1] - 28:2
**investigation** [1] - 128:15
**invited** [1] - 44:10
**IQ** [8] - 84:10, 136:12, 136:18, 137:5, 137:6, 137:13, 137:15, 137:21
**Irish** [2] - 57:13, 57:17
**Isis** [3] - 129:11, 130:13, 130:17
**Islam** [1] - 130:15
**Israel** [57] - 48:8, 50:22, 51:2, 55:3, 98:19, 98:22, 98:25, 99:11, 100:13, 100:19, 100:21, 101:2, 101:6, 102:25, 107:24, 108:3, 108:4, 108:6, 108:7, 108:10, 108:13, 108:22, 108:25, 110:7, 110:8, 110:9,

110:19, 124:12, 124:23, 124:24, 127:6, 127:13, 127:21, 127:22, 133:20, 133:21, 134:4, 134:5, 134:7, 134:11, 134:13, 136:21, 136:22, 137:5, 137:11, 137:12, 138:3, 138:5, 138:9, 138:10, 138:11, 138:15, 139:18, 139:24, 139:25, 140:6, 140:16
**Israeli** [1] - 51:14
**Israelis** [8] - 51:1, 51:17, 51:18, 51:19, 100:12, 136:24, 136:25, 137:22
**issued** [1] - 126:2
**issues** [1] - 34:23
**itself** [3] - 37:2, 95:13, 104:9

### J

**Jaffe** [1] - 2:12
**jaffe.com** [2] - 2:14, 2:15
**Janice** [2] - 42:19, 87:16
**January** [7] - 9:5, 43:16, 92:8, 138:19, 142:6, 145:25
**Japan** [1] - 128:1
**Japanese** [2] - 122:2, 124:15
**JD** [1] - 16:17
**JDL** [1] - 133:3
**Jeremy** [1] - 137:9
**Jew** [5] - 70:6, 95:19, 111:16, 112:5, 134:6
**Jewish** [40] - 50:12, 51:19, 68:18, 68:22, 69:2, 69:12, 69:17, 70:1, 70:4, 70:13, 71:1, 71:3, 72:15, 72:24, 94:15, 95:17, 97:9, 100:22, 101:9, 103:1, 107:25, 108:9, 108:17, 108:20, 110:16, 124:8, 128:21, 131:3, 132:12, 133:2, 133:11, 133:12, 133:21, 133:23, 134:1, 137:15, 140:10, 140:13, 148:8

**Jewry** [2] - 109:19, 110:3
**Jews** [110] - 51:1, 55:3, 55:21, 57:5, 57:9, 63:9, 68:5, 68:9, 68:13, 74:9, 76:3, 76:18, 77:1, 95:5, 95:11, 95:22, 96:5, 96:8, 96:16, 97:8, 97:22, 98:1, 100:8, 101:2, 101:3, 101:6, 101:19, 102:6, 102:17, 102:21, 103:18, 108:12, 108:13, 108:19, 109:1, 109:2, 110:11, 112:4, 113:20, 120:22, 121:14, 121:23, 121:24, 122:3, 122:10, 123:5, 123:9, 124:1, 124:7, 124:11, 126:7, 126:14, 128:10, 128:21, 129:15, 129:18, 130:6, 130:8, 130:11, 130:12, 130:14, 130:16, 130:19, 130:25, 131:16, 132:16, 132:18, 132:20, 133:12, 134:4, 136:15, 136:18, 136:22, 136:25, 137:5, 137:6, 137:11, 137:12, 137:22, 137:25, 138:4, 138:6, 138:8, 138:13, 138:20, 138:21, 138:22, 139:1, 139:20, 139:22, 139:24, 140:23, 141:5, 141:6, 141:7, 141:9, 141:13, 141:16, 141:19, 141:23, 146:7, 146:14, 146:18, 148:1, 148:16, 148:18, 150:7, 151:10
**Jews'** [2] - 102:24, 139:25
**jmiller@schaerr** [1] - 2:15
**jmiller@schaerr-jaffe.com** [1] - 2:15
**job** [6] - 13:2, 13:10, 13:12, 18:15, 18:18, 18:25

**jobs** [1] - 12:21
**join** [3] - 15:24, 16:2, 94:10
**joined** [1] - 16:4
**joke** [1] - 134:21
**Jonathan** [1] - 27:7
**Jordan** [2] - 49:3
**jotted** [1] - 22:6
**joy** [1] - 22:12
**Judaism** [1] - 68:11
**Judeo** [1] - 146:2
**Judeo-American** [1] - 146:2
**Judge** [1] - 36:20
**judge** [6] - 37:5, 40:24, 46:1, 68:25, 91:7
**judges** [1] - 38:7
**judiciary** [4] - 37:18, 38:10, 38:17, 38:19
**July** [9] - 36:4, 52:25, 54:4, 67:7, 79:18, 88:1, 88:3, 107:14, 109:11
**June** [17] - 36:4, 52:21, 52:22, 52:25, 53:1, 54:4, 67:7, 67:16, 67:17, 80:15, 103:10, 104:11, 104:14, 104:22, 105:3, 105:6, 153:18
**jurisprudence** [1] - 34:25
**jurisprudential** [1] - 27:17
**jurist** [1] - 37:22
**Justice** [1] - 127:5
**justifiable** [1] - 114:18
**justified** [7] - 50:23, 50:25, 51:8, 129:19, 130:6, 130:18, 141:8
**justifies** [1] - 146:22
**justify** [3] - 121:2, 121:6, 147:1
**justifying** [3] - 131:5, 146:21, 147:2
**Justin** [28] - 7:20, 7:22, 8:16, 26:7, 35:18, 49:16, 52:3, 55:23, 77:24, 86:11, 86:18, 91:10, 94:19, 96:20, 100:3, 101:12, 101:17, 102:13, 103:8, 104:25, 107:11, 107:18, 109:8, 111:13, 112:13, 112:19, 115:15, 117:23
**JUSTIN** [1] - 2:11

**Justitia's** [1] - 37:25

## K

**Kampf** [9] - 134:19, 134:23, 135:2, 135:6, 135:13, 135:16, 135:18, 135:19, 135:21
**Kauffman** [1] - 137:9
**keep** [1] - 149:25
**keeping** [1] - 60:22
**kennel** [1] - 18:21
**kept** [6] - 32:16, 32:25, 33:10, 33:13, 41:25, 94:5
**kicked** [1] - 138:10
**kids** [1] - 103:1
**kill** [14] - 30:2, 51:10, 65:20, 65:23, 65:25, 77:2, 77:3, 121:11, 122:9, 131:21, 131:22, 132:5, 146:13, 147:16
**killed** [13] - 51:15, 51:16, 70:25, 102:25, 117:13, 132:12, 140:12, 146:18, 148:1, 148:16, 148:18, 150:8
**killing** [8] - 29:15, 50:25, 76:23, 77:4, 77:5, 77:7, 102:18, 102:23
**kills** [1] - 65:21
**kind** [114] - 12:24, 13:4, 13:7, 14:13, 14:15, 17:25, 18:22, 22:4, 27:17, 28:4, 31:5, 33:22, 34:2, 34:23, 35:16, 35:17, 36:18, 36:24, 37:3, 37:6, 38:20, 39:3, 39:20, 41:11, 42:11, 45:24, 46:5, 46:19, 46:24, 47:13, 47:15, 47:21, 52:1, 53:2, 53:11, 54:21, 55:4, 57:14, 61:18, 61:19, 63:25, 67:5, 67:12, 67:20, 68:24, 68:25, 73:6, 74:16, 74:18, 75:20, 76:4, 76:12, 76:22, 77:1, 77:13, 77:15, 78:18, 81:9, 86:9, 92:2, 94:11, 97:1, 97:18, 100:11, 100:24, 102:4, 105:4, 107:8,

108:13, 112:3, 113:16, 113:19, 113:21, 114:5, 114:22, 115:2, 116:13, 117:6, 121:2, 121:5, 122:1, 122:12, 122:16, 122:21, 125:7, 126:23, 129:23, 130:8, 130:13, 130:14, 132:23, 133:5, 134:21, 135:7, 135:23, 136:2, 137:1, 137:3, 137:8, 137:16, 138:14, 140:2, 140:4, 141:5, 142:21, 143:2, 144:9, 144:16, 144:23, 145:7, 146:20, 147:8, 148:13
**Klugh** [1] - 91:23
**knowledge** [9] - 20:5, 21:10, 23:1, 36:11, 48:9, 50:1, 66:16, 79:8, 113:11
**known** [8] - 46:22, 52:7, 52:9, 64:20, 68:11, 78:2, 138:15, 140:25
**Known** [1] - 153:23
**Kramer** [2] - 92:4, 92:21
**Kuwaitis** [1] - 111:6

## L

**LA** [3] - 9:14, 129:22, 129:23
**lack** [2] - 21:16, 149:5
**lagging** [1] - 10:19
**lags** [1] - 11:1
**land** [2] - 29:19, 37:19
**language** [2] - 34:6, 100:8
**large** [6] - 80:16, 117:19, 129:16, 146:23, 147:22, 148:7
**largely** [2] - 139:24, 140:6
**last** [19] - 17:9, 17:11, 28:25, 31:8, 32:10, 36:2, 37:8, 68:7, 82:16, 96:1, 111:22, 112:10, 128:10, 133:19, 138:19, 145:23, 145:25, 146:4

**lasted** [1] - 45:5
**late** [2] - 29:16, 34:7
**latest** [1] - 101:10
**law** [63] - 6:10, 6:12, 11:23, 12:3, 12:9, 13:19, 13:21, 13:23, 13:24, 14:7, 14:11, 14:12, 14:16, 15:5, 15:24, 16:19, 20:1, 20:7, 20:23, 21:10, 21:20, 23:2, 23:6, 25:7, 25:10, 26:1, 26:2, 27:18, 31:7, 32:5, 39:13, 42:7, 42:12, 43:23, 43:24, 44:3, 44:9, 51:6, 59:9, 61:16, 62:2, 62:19, 63:16, 68:18, 68:22, 69:25, 70:1, 70:13, 73:11, 73:22, 77:16, 79:14, 83:18, 88:12, 88:18, 88:23, 89:12, 89:13, 89:15, 100:22, 117:19, 131:20
**Law** [21] - 2:5, 15:17, 16:11, 20:8, 21:16, 22:23, 24:9, 50:2, 62:13, 68:17, 68:19, 68:22, 69:16, 69:20, 69:23, 70:4, 70:12, 70:17, 70:21, 71:2, 72:9
**laws** [4] - 34:4, 39:10, 70:9, 121:18
**lawsuit** [2] - 19:3, 90:17
**lawyer** [5] - 5:18, 7:14, 8:19, 8:22, 15:4
**lawyers** [1] - 75:1
**lay** [1] - 4:23
**leader** [2] - 120:1, 121:20
**leaders** [3] - 119:17, 120:19, 143:19
**leadership** [1] - 145:17
**League** [1] - 132:13
**leaning** [2] - 138:25, 139:5
**learn** [5] - 60:24, 69:24, 70:1, 112:24, 114:10
**learned** [2] - 47:1, 61:4
**least** [28] - 30:18, 31:6, 31:8, 50:19, 55:14, 57:15, 59:20, 60:6, 67:19, 69:13, 73:7, 73:13, 80:25,

84:11, 108:21, 110:9, 111:5, 114:14, 121:9, 126:22, 129:7, 130:18, 132:1, 134:7, 134:8, 140:12, 143:3, 150:20
**leave** [1] - 149:15
**Lee** [3] - 116:15, 117:20
**left** [4] - 43:14, 71:14, 138:25, 144:7
**left-leaning** [1] - 138:25
**legal** [4] - 75:6, 76:12, 97:6, 97:23
**legality** [1] - 39:13
**legally** [1] - 6:15
**legitimate** [5] - 51:21, 114:14, 115:4, 130:3
**lengthy** [2] - 139:3, 143:6
**less** [10] - 36:6, 48:21, 58:21, 67:24, 77:2, 96:7, 121:25, 124:19, 150:17
**letter** [3] - 90:1, 90:11, 91:14
**Letter** [1] - 3:19
**Lexington** [1] - 115:9
**libertarian** [1] - 116:21
**library** [1] - 17:16
**Lidsky** [4] - 71:16, 72:8, 73:19, 75:24
**lies** [2] - 113:8, 114:22
**life** [8] - 9:15, 12:12, 131:17, 131:19, 132:19, 132:21, 135:5, 135:14
**lifetime** [1] - 147:5
**lifetimes** [2] - 113:19, 144:4
**light** [1] - 135:7
**lights** [1] - 17:3
**likely** [1] - 145:17
**limit** [3] - 17:4, 40:15, 67:25
**Lincoln** [1] - 38:23
**Lindemann** [1] - 141:1
**LINE** [5] - 156:5, 156:8, 156:11, 156:14, 156:17
**line** [5] - 86:15, 90:18, 127:5, 138:19, 144:3
**lines** [4] - 65:24, 122:22, 132:9, 138:11
**link** [2] - 67:12, 103:20
**linked** [1] - 67:15

**LinkedIn** [2] - 54:14, 54:15
**Liora** [1] - 126:18
**list** [1] - 123:8
**listed** [2] - 90:22, 91:1
**literal** [1] - 83:10
**litigation** [2] - 90:1, 131:19
**Litigation** [1] - 3:19
**litigator** [1] - 15:16
**live** [5] - 9:14, 16:23, 17:2, 125:2, 138:9
**lived** [6] - 9:17, 9:18, 9:20, 12:12, 12:15, 34:4
**living** [6] - 7:2, 12:13, 70:5, 116:7, 131:18, 132:11
**LL.M** [1] - 16:16
**LLP** [1] - 2:12
**local** [1] - 63:3
**locked** [1] - 23:15
**logically** [1] - 45:24
**logistical** [3] - 81:6, 123:1, 123:2
**long-defunct** [1] - 83:7
**look** [15] - 28:23, 37:8, 37:23, 47:17, 53:2, 54:12, 54:19, 77:19, 88:7, 94:17, 107:17, 127:10, 138:6, 143:9, 149:17
**looked** [9] - 9:2, 22:5, 32:13, 32:17, 46:20, 86:25, 137:7, 140:14, 148:3
**looking** [4] - 60:4, 60:10, 61:12, 102:4
**looks** [7] - 21:8, 21:12, 32:7, 42:14, 90:22, 91:20, 136:10
**Los** [2] - 9:13, 132:11
**losing** [3] - 73:15, 92:3, 105:4
**lost** [9] - 18:18, 18:19, 18:21, 22:10, 62:24, 91:10, 92:2, 92:5, 120:2
**love** [2] - 107:23, 129:10
**low** [3] - 136:12, 136:18, 137:21
**low-IQ** [3] - 136:12, 136:18, 137:21
**LSAT** [1] - 14:1
**Lynn** [6] - 83:20, 84:3, 84:7, 84:13, 84:19, 84:24
**Lyrissa** [2] - 71:16,

72:8

## M

**ma'am** [3] - 9:7, 11:7, 136:6
**mad** [3] - 23:9, 23:10, 23:12
**mail** [2] - 132:16, 155:11
**mailed** [1] - 155:12
**main** [2] - 67:11, 148:20
**mainstream** [1] - 146:16
**major** [2] - 10:11, 11:8
**majority** [2] - 67:23, 134:9
**makeup** [1] - 137:10
**man** [7] - 22:11, 118:3, 118:14, 119:20, 120:15, 134:18
**manage** [1] - 122:22
**Mandatory** [3] - 49:9, 137:20, 138:13
**manifestly** [4] - 82:13, 82:20, 83:2, 83:14
**March** [29] - 55:20, 56:7, 57:20, 59:8, 60:21, 62:5, 62:11, 62:18, 63:14, 64:12, 66:6, 66:12, 66:22, 66:25, 67:18, 70:20, 71:15, 73:10, 92:13, 93:17, 95:4, 96:9, 96:14, 96:15, 98:7, 103:13, 104:11, 151:11, 151:15
**mark** [1] - 8:8
**marked** [11] - 8:9, 26:11, 31:16, 35:23, 41:18, 49:19, 56:1, 82:3, 86:21, 90:3, 94:22
**married** [3] - 10:1, 10:2, 10:3
**Marshfield** [3] - 27:8, 28:8, 28:12
**mass** [6] - 75:22, 76:11, 76:23, 120:22, 124:6, 124:11
**masse** [3] - 122:9, 148:16, 148:18
**masters** [1] - 37:19
**math** [1] - 9:9
**matter** [7] - 35:7, 44:7, 84:9, 93:25, 114:14, 117:5, 117:9
**matters** [1] - 19:13

**mature** [1] - 50:20
**Maurice** [1] - 135:10
**McAlister** [4] - 86:14, 87:15, 88:21, 90:19
**meals** [1] - 54:24
**mean** [117] - 7:23, 12:19, 15:7, 19:9, 21:8, 24:6, 24:17, 24:20, 25:13, 25:19, 28:1, 28:2, 29:2, 30:4, 30:16, 32:14, 33:12, 33:23, 34:23, 38:15, 39:14, 41:24, 46:4, 46:10, 46:13, 46:17, 47:19, 48:24, 49:13, 53:4, 53:8, 57:3, 58:1, 58:8, 58:20, 60:11, 60:19, 61:7, 61:18, 61:21, 63:17, 64:1, 64:13, 64:22, 66:14, 67:20, 69:4, 69:9, 69:12, 69:18, 69:23, 70:15, 70:19, 72:20, 77:14, 77:18, 77:19, 80:9, 81:2, 82:25, 84:9, 84:20, 85:1, 85:5, 86:1, 87:6, 87:7, 88:20, 89:5, 91:8, 92:12, 92:23, 93:1, 94:9, 94:10, 96:1, 98:9, 98:11, 101:10, 102:3, 102:10, 107:2, 107:6, 108:16, 110:1, 112:1, 112:13, 114:15, 115:5, 117:5, 117:7, 117:10, 118:8, 119:4, 119:14, 126:23, 126:25, 127:10, 127:16, 132:3, 133:14, 134:5, 135:8, 136:24, 138:1, 140:10, 142:10, 143:1, 143:16, 144:16, 146:22, 146:24, 149:17, 151:16
**meaning** [3] - 47:21, 76:22, 151:18
**means** [17] - 6:13, 16:1, 27:19, 31:3, 44:1, 47:22, 55:22, 57:7, 57:9, 68:5, 77:12, 96:16, 109:19, 144:21, 146:20, 148:25, 149:15

**meant** [4] - 57:6, 105:10, 106:23, 147:23
**measure** [1] - 104:19
**media** [4] - 52:5, 52:6, 54:7, 94:18
**medication** [1] - 6:18
**medieval** [2] - 10:15, 11:9
**Mediterranean** [1] - 49:4
**meet** [4] - 43:19, 43:20, 44:19, 44:25
**meeting** [12] - 42:19, 43:2, 43:5, 43:15, 43:18, 43:22, 43:24, 44:21, 45:4, 45:7, 47:7, 47:10
**meetings** [3] - 16:2, 42:22, 44:4
**Mein** [9] - 134:19, 134:23, 135:2, 135:6, 135:13, 135:16, 135:17, 135:19, 135:21
**member** [2] - 16:7, 83:7
**members** [4] - 25:5, 33:16, 51:19, 80:2
**memory** [1] - 41:25
**mentioned** [4] - 75:23, 79:23, 90:14, 140:7
**merchants** [3] - 102:18, 102:23, 103:6
**merits** [1] - 69:1
**Merritt** [1] - 90:19
**message** [6] - 67:11, 67:13, 67:20, 85:22, 85:25, 135:24
**messaging** [1] - 20:20
**messed** [1] - 13:8
**met** [4] - 44:18, 46:9, 63:11, 129:22
**middle** [1] - 104:3
**Middle** [1] - 98:18
**might** [29] - 26:22, 30:23, 33:11, 33:12, 36:8, 36:17, 37:4, 40:7, 40:9, 40:11, 40:23, 44:22, 50:13, 54:12, 56:12, 65:15, 65:21, 65:22, 65:25, 83:3, 85:21, 90:16, 109:4, 130:17, 139:8, 139:12, 146:16
**militarism** [1] - 125:9
**militarist** [1] - 125:7
**military** [2] - 51:20,

110:19
**MILLER** [12] - 2:11, 7:25, 26:10, 31:15, 35:22, 41:17, 49:18, 55:25, 82:2, 86:20, 90:2, 94:21
**million** [3] - 22:10, 120:12, 146:7
**millions** [6] - 121:11, 145:5, 146:14, 147:17, 148:1, 150:7
**Miloševic** [1] - 147:8
**mind** [12] - 48:17, 57:15, 101:20, 103:2, 103:12, 108:14, 113:11, 126:7, 130:15, 134:10, 147:3, 151:13
**mind-blowing** [1] - 126:7
**minds** [1] - 112:24
**mine** [5] - 41:8, 69:14, 74:7, 95:2, 148:22
**minimize** [1] - 148:7
**minister** [1] - 99:11
**minor** [1] - 36:9
**minorities** [1] - 138:10
**minus** [2] - 53:22, 96:18
**minute** [1] - 71:9
**minutes** [7] - 9:3, 17:5, 43:6, 45:6, 82:21, 112:10, 150:1
**misleading** [1] - 133:20
**Mizrahi** [1] - 137:12
**modern** [4] - 10:15, 11:10, 119:3, 119:17
**mom** [3] - 63:17, 63:21, 64:10
**Monastery** [1] - 118:23
**money** [2] - 14:17, 14:19
**monitoring** [9] - 59:10, 59:23, 60:7, 60:9, 60:14, 60:18, 60:25, 61:16, 61:25
**month** [3] - 43:25, 45:9, 145:25
**months** [2] - 41:6, 105:7
**moral** [2] - 101:21, 102:2
**morally** [10] - 113:23, 114:14, 115:7, 136:12, 136:19, 137:21, 150:14, 150:17, 150:25

**Moreover** [1] - 89:18
**morning** [3] - 4:7, 70:3, 73:20
**most** [17] - 9:14, 55:12, 84:9, 105:13, 111:1, 114:2, 119:15, 119:23, 120:1, 131:25, 135:18, 136:20, 138:25, 140:2, 140:3, 148:23, 150:20
**mostly** [1] - 12:12
**mother's** [1] - 131:4
**motivated** [3] - 128:23, 129:10, 143:3
**motive** [1] - 128:24
**motives** [1] - 128:20
**Mount** [1] - 2:6
**mouth** [1] - 83:15
**move** [1] - 47:23
**moved** [5] - 9:22, 9:24, 12:16, 13:9, 33:11
**movie** [1] - 66:3
**movies** [1] - 64:24
**moving** [2] - 19:14, 20:3
**MR** [123] - 4:6, 4:10, 4:17, 4:18, 7:17, 7:20, 7:25, 8:1, 8:7, 8:11, 8:16, 8:18, 9:8, 10:20, 11:15, 15:3, 26:7, 26:10, 26:13, 31:12, 31:15, 31:18, 35:18, 35:22, 35:25, 41:15, 41:17, 41:20, 49:16, 49:18, 49:21, 52:2, 52:4, 55:23, 55:25, 56:3, 71:8, 71:11, 71:13, 77:23, 77:25, 81:25, 82:2, 82:5, 86:10, 86:12, 86:18, 86:20, 86:23, 87:13, 89:25, 90:2, 90:5, 91:10, 91:13, 94:19, 94:21, 94:24, 96:20, 96:23, 97:19, 98:5, 100:2, 100:4, 100:25, 101:12, 101:14, 101:16, 101:18, 102:12, 102:15, 103:7, 103:9, 104:25, 105:2, 107:11, 107:13, 107:17, 107:21, 109:8, 109:10, 110:12, 110:13, 111:9,

111:10, 111:12, 111:14, 112:11, 112:15, 112:19, 112:21, 115:14, 115:16, 117:22, 117:24, 124:3, 124:4, 125:14, 125:16, 127:1, 127:3, 128:6, 128:8, 131:10, 131:12, 133:16, 133:17, 134:14, 134:15, 136:7, 136:9, 138:16, 138:17, 142:3, 142:4, 145:22, 145:24, 149:23, 150:2, 150:5, 151:3, 151:6, 151:19
**MS** [5] - 7:19, 7:22, 149:20, 149:25, 151:21
**MSNBC** [1] - 50:6
**multiple** [2] - 28:2, 36:24
**munitions** [1] - 110:15
**murder** [9] - 72:22, 75:13, 75:23, 76:2, 76:9, 76:11, 77:8, 120:12, 120:22
**murdered** [3] - 70:13, 74:6, 86:7
**murderer** [5] - 85:11, 85:21, 85:24, 86:2, 86:6
**Muslim** [1] - 130:16
**Muslims** [2] - 139:11, 139:13
**must** [11] - 37:20, 55:22, 57:8, 57:9, 68:5, 73:9, 96:16, 107:23, 129:4, 144:4, 144:12
**myth** [1] - 146:2

# N

**naked** [2] - 22:17, 49:12
**name** [15] - 4:8, 4:9, 4:19, 10:6, 13:14, 26:25, 27:7, 36:19, 44:8, 54:9, 64:16, 80:22, 84:22, 91:23, 116:10
**named** [2] - 19:4, 140:17
**narrative** [8] - 121:6, 146:17, 146:20, 146:25, 149:8,

149:9, 149:10, 151:2
**nation** [6] - 24:14, 24:19, 25:12, 36:25, 38:8, 131:6
**National** [8] - 3:13, 35:20, 83:7, 84:1, 118:6, 121:18, 127:25, 135:7
**national** [3] - 27:13, 34:2, 51:6
**nationalism** [6] - 25:14, 55:3, 84:19, 119:10, 150:16
**nationalist** [7] - 25:20, 25:23, 83:8, 83:19, 105:16, 150:18
**nationalists** [4] - 116:3, 116:5, 116:16, 116:20
**nations** [1] - 127:23
**Nations'** [1] - 76:13
**natural** [1] - 11:14
**naturalization** [1] - 24:25
**nature** [2] - 43:5, 70:9
**Nazi** [5] - 82:13, 82:19, 82:23, 83:6, 150:8
**Near** [2] - 10:16, 11:11
**near** [1] - 82:10
**nearly** [1] - 139:15
**necessarily** [13] - 16:1, 16:3, 38:15, 39:8, 39:15, 39:17, 48:12, 51:12, 73:25, 84:15, 108:15, 117:7, 120:6
**necessary** [7] - 55:22, 57:10, 68:6, 77:12, 96:16, 124:16, 124:22
**necessary'** [1] - 57:7
**necessity** [1] - 125:11
**need** [11] - 5:11, 5:15, 5:20, 7:8, 30:1, 30:13, 105:19, 142:20, 142:21, 144:20, 147:20
**needed** [1] - 142:8
**needing** [1] - 124:16
**needs** [1] - 7:9
**negative** [1] - 85:1
**negotiated** [2] - 125:1, 127:12
**neoliberal** [1] - 83:3
**net** [1] - 22:10
**Netanyahu** [4] - 99:10, 99:13, 99:20, 131:5
**neutered** [2] - 29:17, 34:8
**never** [23] - 23:22,

44:5, 44:14, 44:16, 44:17, 54:13, 66:9, 72:13, 75:5, 75:23, 77:20, 81:18, 81:22, 86:7, 98:18, 105:18, 106:7, 123:12, 123:18, 129:22
**new** [1] - 121:1
**New** [3] - 80:13, 80:15, 82:6
**news** [4] - 53:3, 53:5, 54:18, 93:14
**News** [2] - 50:5, 50:6
**next** [13] - 31:12, 35:19, 64:15, 89:17, 98:6, 99:2, 99:25, 104:3, 105:1, 107:12, 107:14, 125:15, 150:1
**nice** [1] - 114:15
**nickname** [1] - 126:20
**night** [2] - 71:20, 72:6
**noble** [1] - 15:14
**nobody** [7] - 23:20, 50:15, 56:21, 68:14, 70:20, 86:5, 106:9
**Noel** [1] - 57:6
**non** [2] - 91:4, 138:20
**non-delivered** [1] - 91:4
**non-whites** [1] - 138:20
**none** [2] - 54:8, 146:7
**nonviolent** [1] - 31:3
**normative** [2] - 25:25, 28:5
**norms** [1] - 133:25
**North** [2] - 124:7, 124:11
**NORTHERN** [1] - 1:1
**Northern** [1] - 6:2
**nose** [1] - 112:3
**Notary** [2] - 153:7, 153:17
**note** [2] - 49:24, 155:9
**notes** [2] - 7:11, 154:11
**nothing** [4] - 22:12, 107:24, 118:9, 143:10
**nothingness** [1] - 119:24
**notice** [4] - 7:15, 8:4, 17:19, 32:11
**Notice** [2] - 1:13, 3:10
**notified** [1] - 73:18
**notion** [1] - 106:6
**November** [3] - 115:17, 117:25, 124:5

**nowhere** [1] - 141:6
**nuclear** [1] - 145:13
**Number** [1] - 3:9
**number** [5] - 23:5, 74:10, 76:19, 113:5, 139:13
**numbered** [1] - 107:15
**numbers** [3] - 148:2, 148:25, 149:15
**NW** [1] - 2:13
**NY** [1] - 3:17

# O

**oath** [8] - 4:4, 6:11, 6:13, 18:1, 18:2, 18:5, 18:9
**object** [4] - 5:18, 83:13, 84:12, 112:4
**objecting** [1] - 48:14
**objection** [1] - 110:7
**objectionable** [4] - 74:6, 74:19, 74:23, 96:7
**objectives** [1] - 110:11
**obligated** [1] - 14:4
**obliged** [1] - 51:7
**obstinate** [1] - 38:25
**obstreperous** [1] - 67:2
**obstruct** [1] - 131:17
**obviated** [1] - 119:13
**obvious** [1] - 111:1
**obviously** [11] - 25:8, 60:11, 61:21, 63:24, 77:3, 83:1, 109:25, 117:10, 120:2, 126:1, 127:16
**occupied** [2] - 115:2, 133:22
**occupiers** [1] - 115:3
**occupying** [1] - 114:20
**occur** [2] - 50:12, 50:18
**occurred** [3] - 48:8, 115:19, 128:16
**October** [11] - 26:21, 48:8, 50:22, 51:13, 94:5, 101:10, 101:11, 112:16, 113:7, 115:8, 139:17
**October/November** [1] - 48:6
**Odeh** [5] - 132:6, 132:7, 132:10, 132:15, 133:5
**OF** [5] - 1:1, 153:3, 153:4, 154:3, 154:4
**off-campus** [2] -

16:23, 56:14
**offense** [1] - 19:15
**offer** [4] - 16:17, 92:18, 92:24, 93:8
**offered** [1] - 144:13
**offers** [1] - 104:4
**Office** [3] - 2:18, 43:11, 91:21
**office** [5] - 14:15, 44:25, 45:2, 63:1, 63:3
**official** [5] - 1:7, 125:20, 153:11, 155:4, 156:1
**Officials** [2] - 79:20, 80:2
**often** [2] - 55:19, 105:14
**old** [1] - 9:9
**omits** [2] - 32:11, 32:15
**once** [7] - 14:3, 39:2, 41:5, 44:6, 48:22, 66:4, 80:25
**one** [72] - 5:10, 7:5, 12:22, 17:11, 18:11, 18:19, 18:21, 26:4, 26:6, 28:6, 28:20, 28:21, 30:4, 30:17, 31:4, 34:11, 36:2, 36:23, 39:11, 42:24, 42:25, 46:20, 46:24, 51:4, 51:7, 52:15, 52:17, 52:19, 53:19, 53:21, 54:4, 55:21, 57:3, 59:13, 59:15, 60:25, 69:16, 70:3, 77:5, 79:5, 80:20, 81:17, 85:4, 85:6, 87:19, 91:18, 91:19, 96:25, 98:13, 98:15, 99:3, 99:25, 105:1, 105:5, 106:5, 107:12, 110:10, 111:22, 111:23, 119:15, 123:25, 125:22, 131:24, 133:15, 141:6, 144:11, 147:4, 147:5, 149:23, 150:3, 150:12, 151:8
**one's** [2] - 51:22, 118:10
**ones** [3] - 103:1, 136:20, 136:21
**ongoing** [2] - 107:7, 107:8
**opaque** [1] - 51:16
**open** [1] - 56:15
**opened** [2] - 52:22,

54:4
**operate** [1] - 108:19
**Operation** [1] - 111:6
**opiates** [1] - 140:12
**opinion** [11] - 23:8, 23:9, 23:11, 38:14, 51:6, 51:22, 55:19, 75:5, 101:10, 134:12, 136:2
**opinions** [1] - 106:16
**opponent** [1] - 110:3
**opportunity** [2] - 92:1, 104:5
**oppose** [1] - 109:18
**opposition** [1] - 139:7
**oppressed** [2] - 114:19, 115:2
**OR** [1] - 153:24
**oral** [1] - 5:11
**orally** [1] - 40:16
**order** [3] - 31:8, 89:20, 122:4
**ordered** [1] - 121:21
**ordering** [1] - 155:12
**organization** [5] - 78:2, 78:8, 125:21, 129:21, 132:8
**organizations** [9] - 11:17, 15:25, 16:3, 16:7, 79:13, 79:15, 83:6, 133:2, 133:11
**organized** [8] - 97:9, 97:18, 109:3, 109:19, 110:3, 110:11, 133:23
**organizing** [1] - 133:25
**orientation** [1] - 20:12
**origin** [1] - 29:13
**original** [5] - 67:9, 67:13, 67:18, 68:3, 73:10
**Originalism** [3] - 36:17, 42:4, 46:2
**originally** [1] - 43:13
**originated** [1] - 120:25
**ostensibly** [1] - 111:5
**otherwise** [4] - 70:22, 76:4, 82:9, 86:8
**Ottoman** [1] - 11:11
**ourselves** [1] - 145:19
**outlined** [1] - 35:6
**outnumbered** [2] - 29:17, 34:7
**outrage** [2] - 74:9, 76:18
**outright** [2] - 51:24, 129:8
**outside** [4] - 18:21, 35:5, 39:18, 148:23

**overall** [1] - 46:19
**overthrow** [4] - 37:21, 38:9, 38:21, 147:13
**owe** [1] - 143:10
**own** [6] - 21:25, 54:19, 55:8, 86:8, 130:24, 132:2
**owners** [2] - 103:3, 103:4

# P

**P.A** [1] - 2:5
**p.m** [5] - 1:16, 71:10, 151:5, 152:2
**Pack** [2] - 13:15, 13:16
**page** [37] - 28:10, 29:2, 29:3, 29:10, 29:11, 32:10, 37:9, 82:10, 82:11, 85:9, 88:7, 88:9, 89:17, 96:22, 100:3, 101:13, 102:12, 103:7, 107:18, 110:12, 111:9, 112:12, 115:14, 117:22, 124:3, 125:15, 127:2, 128:7, 131:11, 133:16, 134:14, 136:7, 138:16, 142:3, 145:23
**PAGE** [6] - 3:2, 156:5, 156:8, 156:11, 156:14, 156:17
**pages** [3] - 28:23, 107:15
**paid** [1] - 16:4
**pains** [2] - 100:13, 100:23
**paleoconservative** [1] - 84:1
**Palestine** [23] - 48:1, 48:25, 49:9, 99:5, 99:7, 99:14, 99:17, 99:18, 103:22, 112:23, 128:25, 129:4, 129:12, 129:17, 133:22, 136:12, 136:15, 137:18, 137:19, 137:20, 137:24, 138:13
**Palestinian** [5] - 49:2, 51:3, 127:19, 127:20, 137:22
**Palestinians** [7] - 95:6, 110:16, 111:3, 111:8, 125:1, 125:2, 127:12

**paper** [32] - 25:25, 26:9, 26:18, 27:2, 27:23, 27:25, 28:7, 31:14, 31:20, 32:11, 34:18, 35:9, 35:19, 36:1, 36:12, 36:22, 37:9, 38:7, 39:22, 39:24, 40:14, 41:4, 42:2, 42:15, 45:20, 45:22, 46:1, 46:3, 47:3, 105:13
**papers** [8] - 7:11, 24:8, 24:13, 24:21, 26:3, 32:5, 35:20, 46:19
**paragraph** [16] - 28:25, 32:12, 32:17, 32:22, 32:25, 33:6, 33:11, 37:8, 37:16, 38:6, 106:22, 107:22, 133:19, 143:9, 144:1, 146:4
**paragraph/sentence** [1] - 82:17
**parallel** [2] - 113:13, 115:6
**parenthetically** [1] - 132:6
**Park** [1] - 116:15
**parse** [1] - 88:8
**part** [26] - 9:20, 12:20, 38:19, 57:8, 63:25, 67:19, 68:4, 76:3, 76:4, 76:15, 76:16, 80:16, 126:5, 129:16, 131:14, 132:1, 132:5, 132:18, 139:12, 140:13, 140:21, 144:2, 144:17, 144:18, 146:23, 147:22
**partially** [1] - 151:1
**participated** [1] - 79:18
**particular** [1] - 10:13
**particularly** [4] - 11:10, 14:18, 53:14, 120:11
**parties** [4] - 42:16, 144:19, 154:13, 155:12
**parties'** [1] - 154:15
**partly** [1] - 13:8
**parts** [3] - 40:15, 135:2, 136:5
**Party** [4] - 83:8, 109:5, 145:2
**party** [5] - 97:18, 130:7, 145:1, 145:5

**passage** [3] - 29:25, 32:25, 135:23
**passed** [1] - 40:21
**past** [5] - 22:11, 105:6, 105:9, 140:5, 147:6
**path** [2] - 15:6, 15:14
**Paul** [1] - 95:16
**pay** [2] - 15:1, 39:15
**pays** [1] - 133:23
**peace** [2] - 98:18, 132:6
**Peeples** [1] - 87:16
**peers** [1] - 34:5
**pejorative** [1] - 110:1
**penalties** [1] - 156:21
**pending** [1] - 6:1
**people** [100] - 22:13, 23:2, 25:8, 25:13, 29:7, 32:19, 33:25, 34:3, 37:17, 38:8, 38:24, 38:25, 46:8, 46:11, 48:13, 50:15, 51:3, 51:15, 52:11, 54:21, 55:12, 58:2, 58:13, 58:15, 58:16, 59:1, 59:2, 59:3, 59:6, 59:17, 60:2, 61:11, 62:8, 65:18, 65:20, 70:11, 74:17, 74:24, 76:24, 77:2, 77:3, 77:4, 83:11, 84:12, 85:6, 85:15, 87:18, 88:12, 88:18, 88:23, 89:6, 89:11, 89:13, 90:13, 90:22, 90:25, 91:6, 91:18, 91:19, 91:20, 105:11, 107:23, 107:25, 108:23, 109:23, 110:5, 114:6, 116:19, 119:6, 120:12, 121:11, 122:17, 127:24, 128:16, 129:23, 136:13, 136:19, 137:21, 140:12, 140:22, 141:6, 141:7, 141:9, 141:17, 141:20, 143:5, 143:18, 144:19, 145:15, 146:7, 147:17, 148:24, 149:4, 149:16, 149:17, 150:20
**people's** [3] - 54:19, 58:8, 141:23
**perceive** [1] - 141:4
**percent** [2] - 109:20, 134:9

**perhaps** [4] - 7:14, 102:4, 132:23, 144:17
**period** [14] - 12:8, 12:11, 12:13, 12:14, 12:18, 12:21, 13:6, 13:24, 17:18, 18:20, 62:10, 114:4, 118:17, 119:3
**periods** [1] - 11:10
**perished** [1] - 143:14
**perjury** [1] - 156:21
**permanently** [2] - 66:13, 66:22
**pers** [1] - 43:12
**persecuted** [1] - 126:15
**persecution** [2] - 126:9, 132:15
**persist** [1] - 101:22
**person** [18] - 21:1, 21:6, 21:8, 21:9, 21:15, 21:19, 25:2, 62:8, 70:5, 72:13, 85:18, 88:15, 92:4, 94:15, 109:25, 125:23, 126:19, 147:15
**personal** [1] - 12:24
**Personally** [1] - 153:23
**personally** [6] - 30:9, 45:11, 108:3, 109:24, 132:21, 134:25
**perspective** [3] - 127:18, 135:5, 147:12
**Pharma** [2] - 103:5, 140:8
**philosophy** [1] - 27:18
**philosophy-of-law** [1] - 27:18
**phone** [1] - 82:22
**photo** [8] - 20:8, 20:14, 20:24, 49:14, 49:22, 50:3, 118:2, 134:18
**Photo** [1] - 3:15
**phrase** [12] - 47:20, 47:22, 48:14, 48:24, 77:12, 95:13, 95:14, 112:5, 129:5, 129:6, 130:3, 149:5
**phrases** [2] - 33:13, 128:17
**physically** [4] - 17:9, 46:1, 67:22, 131:21
**piaculum** [1] - 122:4
**pick** [1] - 85:6

**picked** [1] - 17:17
**picture** [1] - 113:3
**pictures** [1] - 54:24
**piece** [1] - 75:5
**pirate** [1] - 133:22
**pitifully** [1] - 74:22
**Pizza** [1] - 18:19
**PLACE** [1] - 1:17
**place** [10] - 9:17, 16:20, 33:2, 42:22, 68:9, 68:11, 69:9, 98:25, 127:14, 149:11
**places** [6] - 11:12, 48:2, 121:3, 148:23, 149:8, 149:9
**plague** [1] - 97:24
**plaintiff** [4] - 6:5, 19:3, 19:4, 89:19
**Plaintiff** [3] - 1:5, 1:13, 2:8
**plaintiff's** [1] - 151:22
**plan** [4] - 7:12, 123:22, 142:22, 146:13
**planned** [1] - 30:15
**planning** [1] - 30:21
**plans** [1] - 43:7
**platform** [1] - 52:6
**played** [2] - 97:22, 121:22
**pleased** [1] - 70:5
**plus** [2] - 55:13, 140:5
**point** [22] - 5:16, 15:8, 31:5, 41:11, 45:25, 46:17, 61:20, 61:21, 78:10, 79:5, 81:17, 88:13, 91:24, 92:18, 94:11, 112:24, 117:12, 123:20, 123:25, 143:2, 148:21
**polemical** [1] - 33:3
**policy** [15] - 18:23, 39:1, 120:21, 121:11, 121:13, 121:14, 121:17, 122:25, 123:4, 123:8, 124:2, 145:21, 147:2, 148:17
**political** [30] - 30:6, 30:16, 31:2, 35:12, 39:3, 55:6, 88:25, 89:7, 95:17, 96:8, 99:24, 109:3, 110:10, 110:11, 116:24, 119:12, 125:11, 131:1, 133:24, 135:5, 135:14, 138:2,

138:7, 138:14, 142:22, 143:17, 144:13, 145:3, 145:4
**politically** [1] - 143:23
**politics** [7] - 31:5, 35:15, 135:7, 143:2, 144:18, 144:21
**poorly** [1] - 136:23
**popular** [1] - 28:3
**position** [12] - 43:8, 57:5, 72:23, 103:17, 130:4, 134:4, 138:13, 139:15, 148:22, 149:2, 149:4, 149:13
**positions** [1] - 148:13
**positive** [1] - 39:13
**possible** [4] - 39:9, 58:17, 66:23, 123:20
**possibly** [1] - 15:7
**post** [119] - 21:3, 22:9, 49:25, 54:8, 54:23, 55:2, 55:10, 55:12, 55:18, 55:21, 56:7, 56:16, 56:20, 57:2, 57:11, 57:19, 57:22, 58:5, 58:12, 58:21, 58:22, 61:23, 62:6, 62:13, 62:20, 63:9, 63:14, 63:16, 64:7, 64:12, 64:15, 66:6, 66:19, 66:25, 67:9, 67:18, 67:24, 68:4, 71:15, 71:17, 71:23, 72:3, 72:11, 72:16, 73:3, 73:9, 73:10, 73:19, 73:23, 74:3, 75:17, 75:21, 75:24, 77:24, 95:3, 95:4, 95:8, 96:11, 96:13, 96:14, 96:15, 96:24, 97:2, 98:6, 98:7, 98:8, 98:17, 99:2, 100:1, 100:5, 101:5, 101:15, 103:10, 103:13, 103:17, 104:9, 104:11, 105:3, 105:24, 106:2, 107:14, 107:16, 108:21, 109:11, 109:12, 110:14, 111:11, 111:22, 112:14, 112:16, 114:9, 115:17, 117:2, 117:25, 118:1, 124:5, 124:6, 125:17, 126:6, 126:17, 127:4, 128:9, 128:10,

131:13, 134:16, 134:17, 134:18, 136:10, 138:18, 138:19, 139:3, 139:6, 142:2, 142:5, 142:6, 142:7, 145:25, 146:1
**Post** [3] - 3:16, 13:15, 13:16
**posted** [16] - 17:14, 21:2, 31:24, 54:13, 56:7, 56:10, 56:12, 56:23, 59:8, 60:16, 62:5, 66:17, 71:16, 72:2, 118:14, 142:12
**poster** [1] - 138:23
**posting** [3] - 55:5, 55:8, 55:15
**posts** [16] - 53:6, 54:19, 56:21, 58:8, 59:10, 59:23, 66:11, 66:22, 94:18, 94:20, 98:12, 98:13, 98:15, 103:10, 104:6
**Posts** [1] - 3:20
**potential** [2] - 119:13, 122:3
**potentially** [1] - 120:6
**power** [5] - 37:12, 97:9, 114:20, 114:23, 123:24
**powers** [1] - 123:14
**practice** [2] - 15:5, 94:14
**Practice** [1] - 91:17
**precedent** [1] - 25:9
**precise** [1] - 36:19
**precisely** [2] - 20:13, 77:22
**prefer** [4] - 89:4, 89:6, 89:24, 125:3
**preliminary** [2] - 17:15, 126:2
**preparation** [1] - 9:1
**prepare** [2] - 8:12, 8:23
**prepared** [1] - 18:20
**present** [6] - 7:3, 7:5, 17:10, 40:16, 95:18, 105:13
**presentation** [4] - 40:5, 40:12, 40:13, 40:22
**presenting** [1] - 40:17
**preserve** [1] - 38:7
**President** [1] - 113:4
**presidents** [1] - 120:20
**pressure** [1] - 127:17
**PRESTON** [7] - 1:4,

1:11, 3:3, 4:1, 153:8, 154:8, 156:24
**Preston** [9] - 1:13, 4:9, 4:15, 5:25, 155:1, 155:3, 155:5, 156:1, 156:2
**preston_terry** [1] - 53:16
**pretty** [13] - 32:1, 41:1, 53:4, 55:14, 63:4, 70:10, 70:17, 73:21, 106:12, 117:10, 123:15, 134:10, 142:6
**prevent** [2] - 122:4, 147:24
**prevented** [1] - 106:10
**previously** [2] - 36:5, 52:18
**primarily** [3] - 78:9, 120:24, 121:5
**primary** [1] - 135:25
**prime** [1] - 99:10
**principle** [1] - 134:1
**print** [1] - 118:22
**prints** [2] - 118:15, 118:20
**prison** [3] - 131:20, 135:9, 149:1
**private** [3] - 15:5, 94:14
**privately** [1] - 81:16
**privation** [1] - 122:12
**pro** [2] - 103:22, 116:13
**pro-Palestine** [1] - 103:22
**pro-Trump** [1] - 116:13
**problem** [1] - 144:6
**problems** [1] - 97:24
**procedural** [1] - 27:11
**Procedure** [2] - 155:23, 155:24
**proceedings** [1] - 93:23
**process** [13] - 35:6, 37:22, 39:3, 39:19, 46:25, 61:10, 89:11, 105:10, 106:23, 106:24, 106:25, 107:6, 107:8
**proclaimed** [2] - 83:25, 100:22
**produced** [2] - 4:2, 119:3
**Produced** [1] - 153:24
**Produced_____DL** [1] - 153:24
**Professional** [4] -

1:20, 43:11, 153:6, 154:6
**Professor** [9] - 28:8, 28:12, 57:6, 63:12, 71:16, 73:13, 73:14, 73:17, 75:24
**professor** [14] - 27:5, 37:5, 40:8, 40:9, 61:22, 63:11, 72:9, 72:12, 73:22, 77:20, 77:21, 91:8, 91:16
**professor's** [1] - 63:1
**professors** [1] - 62:19
**program** [3] - 16:16, 16:17, 138:2
**progress** [1] - 93:21
**progressing** [1] - 14:14
**promote** [1] - 149:19
**proof** [1] - 113:20
**propaganda** [6] - 113:8, 113:15, 113:17, 113:22, 120:25, 147:23
**proper** [1] - 33:25
**properly** [1] - 137:19
**Proposal** [1] - 26:5
**propose** [1] - 150:3
**proposes** [1] - 28:4
**prosecutor** [2] - 15:9, 15:13
**prosecutor's** [3] - 14:15, 63:3, 92:13
**protect** [1] - 111:5
**protest** [2] - 39:12, 115:22
**Protestant** [1] - 118:11
**Protestants** [1] - 119:11
**protesting** [2] - 86:4, 116:14
**protracted** [1] - 123:13
**proven** [2] - 46:5, 133:4
**provide** [3] - 41:1, 131:18, 135:23
**provided** [1] - 24:5
**provides** [1] - 75:7
**psychopathic** [5] - 85:10, 85:21, 85:24, 86:2, 86:6
**psychopathy** [1] - 86:8
**public** [5] - 56:16, 58:1, 58:17, 89:20, 91:15
**Public** [2] - 153:7, 153:17

**publications** [1] - 84:2
**publicly** [5] - 58:16, 59:4, 81:16, 106:10, 106:17
**published** [2] - 80:15, 81:15
**publishing** [9] - 26:10, 31:15, 35:22, 41:17, 49:18, 55:25, 82:2, 90:2, 94:21
**Publishing** [2] - 7:25, 86:20
**punches** [1] - 65:18
**punish** [2] - 105:10, 106:23
**punished** [3] - 106:13, 106:14, 106:18
**punishment** [1] - 106:19
**punitive** [3] - 104:19, 107:4, 107:5
**Purdue** [2] - 103:5, 140:8
**pure** [1] - 22:16
**Pursuant** [1] - 1:13
**push** [2] - 150:10, 150:11
**pushed** [1] - 129:7
**pushing** [1] - 137:9
**put** [27] - 7:18, 7:24, 26:8, 31:12, 35:19, 41:15, 49:16, 52:2, 58:12, 81:25, 84:6, 86:18, 87:21, 89:25, 104:3, 113:15, 113:17, 119:12, 121:24, 122:1, 122:16, 123:9, 124:1, 127:17, 132:23, 135:21
**puts** [1] - 135:22
**putting** [9] - 20:3, 25:1, 121:14, 121:23, 122:8, 123:5, 140:11, 144:20, 146:25

**Q**

**qualification** [2] - 110:22, 112:2
**quarrel** [1] - 39:19
**quarters** [1] - 105:15
**questioned** [1] - 20:1
**questioning** [1] - 143:8
**questions** [12] - 5:19, 6:20, 6:21, 27:18, 44:11, 61:11, 70:8, 74:12, 80:2, 151:8,

151:20, 151:21
**quick** [1] - 31:21
**quote** [61] - 22:9, 22:17, 29:5, 29:7, 29:11, 37:10, 37:13, 37:16, 38:1, 38:21, 67:4, 67:11, 68:5, 68:6, 72:21, 72:23, 82:11, 82:13, 82:14, 83:16, 83:21, 85:9, 88:13, 89:18, 89:20, 95:5, 95:7, 97:4, 97:7, 98:17, 98:19, 100:6, 100:9, 102:16, 103:25, 104:7, 104:11, 111:16, 111:19, 115:21, 124:6, 124:7, 126:6, 126:10, 127:5, 127:7, 128:10, 128:11, 131:14, 133:20, 134:2, 136:15, 138:19, 143:9, 143:14, 144:4, 146:1, 146:3, 146:5, 146:8
**quote-tweet** [3] - 67:11, 103:25, 104:7
**quote-tweeted** [2] - 67:4, 104:11
**quote-tweeting** [1] - 100:9
**quote/unquote** [2] - 84:16, 141:9
**quotes** [1] - 57:8
**quoting** [1] - 136:11

**R**

**race** [9] - 23:2, 24:14, 24:18, 25:6, 25:12, 57:7, 111:18, 145:15, 145:19
**race-based** [3] - 24:14, 24:18, 25:12
**racial** [4] - 29:13, 83:20, 84:6, 84:8
**racist** [1] - 84:16
**radical** [1] - 130:16
**raise** [1] - 70:8
**rally** [7] - 115:18, 116:2, 116:3, 116:9, 116:25, 117:4, 117:18
**rally-goers** [2] - 117:4, 117:18
**Ramos** [1] - 3:14
**ran** [1] - 118:21
**ranked** [1] - 14:8

**rapidly** [1] - 144:5
**rarely** [1] - 100:12
**rather** [2] - 98:12, 136:23
**rational** [4] - 130:22, 130:25, 131:9, 141:23
**Re** [1] - 3:18
**RE** [2] - 155:3, 156:1
**reaccepted** [1] - 94:3
**reach** [2] - 79:1, 105:12
**reached** [5] - 73:11, 73:16, 78:10, 79:2, 79:3
**react** [2] - 21:24, 140:22
**reacted** [1] - 73:23
**reacting** [5] - 99:4, 99:12, 118:1, 134:17, 141:7
**reaction** [4] - 73:2, 136:14, 140:23, 141:4
**reactions** [1] - 141:23
**read** [35] - 22:7, 29:21, 29:25, 38:2, 38:6, 46:1, 57:1, 58:13, 58:15, 66:1, 66:17, 73:23, 74:3, 75:5, 84:14, 85:2, 85:5, 97:20, 100:11, 102:7, 102:19, 105:5, 111:16, 131:23, 131:25, 134:25, 135:2, 135:13, 135:14, 135:16, 135:25, 136:5, 142:9, 155:8, 156:21
**reader** [1] - 86:3
**readers** [1] - 85:22
**reading** [9] - 30:3, 38:12, 40:14, 83:18, 110:21, 124:9, 134:18, 134:22, 151:25
**reads** [2] - 128:10, 146:5
**Reaffirming** [1] - 3:18
**reaffirming** [1] - 86:15
**real** [4] - 31:21, 68:12, 88:11, 146:15
**realistically** [1] - 58:25
**reality** [1] - 125:10
**realize** [1] - 66:17
**realized** [1] - 73:10
**really** [60] - 16:9, 22:21, 23:19, 23:23, 24:1, 28:16, 32:14,

39:14, 44:17, 44:24, 45:23, 48:20, 59:25, 60:2, 60:9, 66:2, 66:24, 67:21, 69:10, 69:12, 69:13, 69:18, 69:19, 72:13, 72:19, 76:5, 81:22, 83:13, 84:16, 85:6, 89:7, 91:5, 97:17, 114:3, 114:17, 115:6, 120:17, 121:22, 123:11, 125:6, 125:9, 129:13, 135:6, 135:11, 135:12, 136:6, 137:2, 137:7, 137:14, 137:15, 137:16, 144:2, 144:18, 144:20, 147:4, 148:15, 148:21, 149:13, 149:14

**reason** [20] - 24:3, 32:4, 53:23, 61:15, 63:25, 66:15, 66:16, 82:9, 88:5, 88:11, 91:9, 93:12, 95:14, 98:14, 130:13, 130:17, 140:3, 150:22, 155:9

**REASON** [5] - 156:7, 156:10, 156:13, 156:16, 156:19

**reasonable** [2] - 44:15, 155:14

**reasonably** [3] - 83:11, 103:5, 109:18

**reasons** [2] - 122:1, 130:24

**receipt** [1] - 155:14

**receive** [2] - 7:14, 40:18

**received** [4] - 8:5, 20:4, 93:14, 105:14

**recklessness** [1] - 140:11

**recognize** [7] - 26:14, 31:19, 36:1, 41:23, 82:6, 87:5, 90:8

**recognized** [1] - 133:24

**recognizing** [1] - 142:16

**recollection** [2] - 45:18, 60:10

**recommend** [1] - 135:11

**record** [13] - 4:8, 5:5, 57:1, 71:8, 71:12, 74:4, 86:6, 105:5,

148:6, 151:4, 151:7, 151:24, 154:11

**red** [1] - 17:3

**rediscusses** [1] - 36:24

**reduced** [1] - 119:17

**refer** [6] - 7:12, 25:13, 74:23, 109:12, 116:19, 148:19

**reference** [4] - 100:5, 102:2, 110:23, 114:4

**referenced** [2] - 110:23, 155:6

**referencing** [1] - 113:6

**referred** [2] - 116:17, 120:14

**referring** [17] - 21:1, 41:22, 45:22, 46:3, 82:12, 82:19, 95:1, 103:16, 103:24, 105:23, 106:25, 108:10, 113:1, 113:2, 118:4, 118:5, 144:9

**refers** [2] - 104:2, 112:7

**reflection** [1] - 33:1

**reflective** [1] - 146:9

**reflects** [1] - 136:23

**regard** [4] - 16:6, 25:20, 111:7, 155:15

**regarding** [1] - 151:24

**regardless** [1] - 70:17

**Registered** [3] - 1:20, 153:6, 154:6

**regular** [1] - 44:6

**related** [2] - 90:15, 139:23

**relation** [1] - 126:13

**relative** [3] - 55:10, 154:12, 154:14

**relatively** [3] - 31:3, 31:4, 43:1

**relief** [1] - 37:17

**religious** [6] - 118:10, 118:25, 119:5, 119:8, 119:13, 119:18

**remarks** [1] - 44:10

**remember** [28] - 13:4, 13:14, 13:23, 18:8, 21:18, 23:19, 23:24, 28:17, 35:17, 36:15, 40:20, 46:11, 57:12, 59:25, 62:12, 63:21, 66:2, 67:6, 73:21, 80:21, 87:23, 94:11, 98:7, 99:20, 101:23, 142:15, 142:16, 144:8

**remembering** [1] - 142:13

**remind** [1] - 19:17

**remote** [1] - 6:24

**remotely** [1] - 13:9

**removal** [1] - 116:14

**remove** [1] - 129:4

**RENEE** [2] - 153:16, 154:20

**Renee** [5] - 1:20, 153:6, 154:6, 155:11, 155:20

**reneef904@gmail. com** [2] - 1:21, 155:12

**repays** [1] - 143:12

**repeat** [3] - 11:5, 96:2, 97:15

**rephrase** [1] - 5:1

**replied** [4] - 72:1, 72:2, 72:7, 72:15

**reply** [5] - 61:23, 74:3, 75:17, 97:2, 100:10

**replying** [3] - 126:18, 138:24, 139:6

**report** [1] - 154:8

**REPORTER** [14] - 4:13, 4:15, 9:6, 10:18, 10:23, 11:1, 11:5, 14:21, 14:24, 81:20, 87:9, 97:15, 100:15, 100:19

**Reporter** [4] - 1:20, 4:10, 153:7, 154:7

**reporter** [10] - 5:4, 5:12, 8:7, 19:21, 80:21, 80:24, 81:11, 81:14, 82:18, 85:13

**reporters** [1] - 80:20

**repost** [1] - 66:20

**represent** [6] - 4:20, 78:16, 78:23, 79:7, 94:15, 133:12

**represented** [1] - 6:7

**representing** [1] - 6:9

**repression** [1] - 146:3

**reptile** [2] - 141:17, 141:20

**Republican** [5] - 109:5, 109:6, 116:21, 144:21, 145:2

**republished** [2] - 67:8, 67:14

**request** [3] - 78:18, 79:11, 149:20

**requested** [1] - 154:10

**required** [8] - 6:16, 28:13, 30:6, 32:6, 38:17, 44:16, 124:7,

124:12

**requirement** [3] - 24:24, 24:25, 28:9

**requirements** [1] - 27:11

**requires** [2] - 31:7, 68:25

**rescinded** [1] - 92:19

**researching** [1] - 117:18

**reservations** [1] - 51:5

**reserved** [1] - 25:5

**reservists** [1] - 51:20

**reside** [2] - 16:20, 16:22

**resistance** [2] - 114:18, 114:19

**resolve** [1] - 105:17

**resort** [1] - 31:9

**resp** [1] - 91:22

**respect** [11] - 43:18, 84:3, 84:13, 105:21, 106:3, 107:10, 108:21, 119:21, 134:11, 136:25, 147:20

**respects** [1] - 84:10

**respond** [4] - 74:1, 74:14, 74:15, 93:6

**responded** [3] - 44:22, 71:16, 72:10

**responding** [3] - 4:3, 125:20, 126:24

**response** [12] - 48:12, 48:13, 51:14, 73:8, 74:20, 74:21, 75:14, 99:6, 99:14, 100:10, 128:13, 135:18

**responsible** [3] - 121:17, 121:20, 130:8

**responsibly** [1] - 144:6

**responsive** [3] - 77:6, 77:15, 139:17

**rest** [1] - 28:12

**Rest** [1] - 132:6

**restaurant** [1] - 18:19

**restaurants** [1] - 13:3

**Restoration** [5] - 3:11, 3:12, 26:5, 27:1, 27:24

**rests** [1] - 114:23

**resulted** [1] - 123:10

**returned** [2] - 17:16, 155:14

**retweet** [2] - 67:5, 104:5

**retweeted** [1] - 103:13

**retweeting** [2] - 66:25,

67:6

**revealed** [1] - 128:15

**revenge** [2] - 128:24

**Review** [1] - 84:1

**review** [5] - 8:25, 28:13, 28:14, 154:9, 155:7

**reviewed** [2] - 87:8, 87:11

**revoked** [2] - 17:11, 17:13

**Revolution** [1] - 144:4

**revolution** [10] - 34:21, 34:22, 35:1, 35:9, 39:20, 142:8, 142:20, 144:3, 144:22, 144:24

**revolutionary** [9] - 27:20, 30:7, 30:20, 34:14, 35:3, 37:20, 39:4, 39:6, 39:11

**rewarding** [1] - 53:14

**Rez** [1] - 126:19

**Richard** [4] - 80:22, 83:20, 84:3, 84:7

**right-wing** [2] - 65:5, 116:24

**rightfully** [6] - 29:18, 30:2, 30:10, 30:14, 30:23, 34:9

**Rights** [3] - 3:18, 78:7, 132:9

**rights** [2] - 29:16, 86:16

**riled** [2] - 23:4, 23:7

**rise** [1] - 144:25

**rising** [3] - 139:15, 139:21, 139:23

**risked** [1] - 115:21

**rival** [1] - 121:9

**river** [2] - 47:25, 48:25

**River** [2] - 49:3, 49:4

**road** [1] - 145:19

**Robert** [2] - 116:14, 125:7

**role** [2] - 97:23, 121:22

**ROLLINS** [1] - 2:4

**room** [5] - 6:25, 7:2, 7:7, 18:22, 20:20

**roommates** [1] - 16:25

**rootless** [1] - 102:17

**Rorschach** [2] - 64:20, 65:5

**rose** [1] - 119:24

**rough** [1] - 46:13

**roughly** [2] - 35:14, 151:16

**RPR** [3] - 154:20, 155:11, 155:20

**Rudolf** [1] - 135:10
**ruin** [2] - 115:21, 131:18
**Rule** [2] - 155:23, 155:24
**rule** [1] - 119:25
**rules** [2] - 4:24, 155:14
**ruling** [1] - 144:15
**rumor** [3] - 59:12, 59:17, 59:21
**run** [2] - 109:17, 125:22
**rush** [2] - 7:23, 18:20
**ruthless** [1] - 102:22

## S

**SABATINI** [6] - 2:3, 7:19, 7:22, 149:20, 149:25, 151:21
**Sabatini** [2] - 2:5, 6:10
**Sabatini's** [1] - 79:14
**sabotage** [1] - 122:5
**Sacking** [1] - 118:22
**Sackler** [5] - 103:4, 140:8, 140:9, 140:15, 140:18
**Saddam** [1] - 147:11
**Sam** [2] - 83:19, 83:24
**Santa** [5] - 9:22, 10:9, 10:10, 12:15, 141:2
**satisfied** [1] - 127:13
**saving** [1] - 144:21
**saw** [7] - 23:17, 67:17, 73:2, 73:9, 113:4, 113:7, 133:14
**scales** [1] - 37:25
**Schaerr** [1] - 2:12
**scheduling** [2] - 81:5, 81:8
**scholarship** [2] - 14:2, 14:9
**School** [2] - 10:7, 16:11
**school** [47] - 6:12, 10:5, 10:6, 11:23, 12:3, 12:9, 13:19, 13:21, 13:24, 13:25, 14:7, 14:8, 14:11, 15:24, 16:19, 17:7, 20:7, 20:12, 20:24, 21:20, 23:6, 32:5, 42:7, 42:13, 43:14, 43:23, 43:24, 44:3, 44:9, 59:9, 62:20, 63:16, 66:2, 68:22, 69:14, 70:13, 73:11, 77:17, 83:18, 88:12, 88:19, 88:24, 89:12,

89:14, 89:15, 90:12, 107:10
**science** [1] - 11:13
**scientific** [1] - 84:16
**scientist** [1] - 84:11
**score** [1] - 14:2
**screen** [5] - 26:8, 26:9, 26:15, 74:2, 95:2
**screenshot** [2] - 21:3, 22:3
**screenshots** [5] - 59:10, 59:13, 59:16, 59:19, 60:1
**screenshotted** [1] - 95:10
**screenshotting** [2] - 59:23, 60:5
**scroll** [3] - 31:21, 96:21, 112:13
**scrutiny** [1] - 114:1
**sea** [2] - 47:25, 48:25
**Sea** [1] - 49:4
**Seagrams** [1] - 103:3
**seal** [1] - 153:11
**seat** [1] - 118:12
**second** [18] - 5:4, 40:21, 42:25, 43:1, 43:15, 43:18, 43:22, 44:18, 45:4, 45:7, 53:17, 53:23, 53:24, 62:21, 106:22, 133:19, 144:11, 147:5
**Second** [2] - 95:15, 147:9
**secondary** [1] - 97:2
**sectarian** [1] - 119:7
**section** [2] - 42:9, 42:11
**see** [47] - 8:2, 8:3, 21:5, 28:25, 29:8, 37:14, 37:15, 41:21, 42:2, 49:11, 49:12, 53:12, 56:4, 59:3, 65:25, 67:17, 67:23, 68:1, 68:3, 70:22, 71:23, 71:25, 74:2, 82:15, 82:16, 90:6, 91:23, 93:7, 94:25, 96:21, 96:24, 98:9, 98:20, 101:19, 103:17, 104:3, 108:1, 109:13, 111:20, 113:3, 118:16, 126:11, 131:5, 138:23, 141:7, 145:19, 150:21
**seeing** [4] - 59:20,

95:1, 126:17, 142:17
**seek** [1] - 124:25
**seeking** [1] - 13:5
**seem** [16] - 16:14, 29:25, 34:13, 34:20, 43:6, 47:15, 50:14, 53:13, 54:23, 55:7, 99:4, 99:16, 130:1, 130:3, 130:8, 147:10
**seize** [5] - 29:18, 30:9, 30:13, 30:23, 34:8
**self** [3] - 69:2, 83:25, 100:22
**self-identifiably** [1] - 69:2
**self-proclaimed** [2] - 83:25, 100:22
**semester** [4] - 42:24, 43:1, 43:4, 44:6
**seminar** [3] - 24:8, 24:13, 26:3
**Semite** [7] - 109:12, 109:16, 109:20, 109:22, 109:25, 110:2, 141:14
**Semites** [2] - 110:6, 110:8
**Semitic** [2] - 83:12, 140:23
**Semitism** [5] - 139:9, 139:16, 139:21, 139:23, 141:3
**send** [7] - 42:15, 85:21, 85:24, 87:14, 90:25, 91:14, 133:7
**sending** [1] - 91:6
**sends** [2] - 54:20, 55:18
**sense** [14] - 25:8, 34:2, 35:1, 56:17, 67:15, 68:13, 68:16, 76:5, 77:22, 83:10, 106:15, 108:19, 112:8, 143:3
**sensible** [1] - 14:4
**sent** [17] - 9:2, 41:16, 42:1, 86:13, 87:1, 87:12, 87:19, 87:23, 90:11, 90:12, 91:9, 91:17, 91:19, 91:20, 93:4, 93:19, 132:16
**sentence** [11] - 29:5, 68:7, 97:20, 110:23, 111:15, 111:21, 128:10, 144:10, 144:11, 146:1, 146:4
**sentences** [2] - 33:13, 111:15
**sentiment** [1] - 143:22
**separate** [4] - 50:7,

100:13, 100:24, 129:12
**September** [2] - 26:22, 111:11
**Serbia** [1] - 147:8
**series** [1] - 118:19
**serious** [1] - 70:8
**serve** [4] - 143:5, 143:11, 143:18
**serves** [2] - 142:25, 146:20
**serving** [2] - 104:14, 104:20
**set** [6] - 32:9, 36:7, 60:5, 118:15, 120:12, 145:7
**sets** [1] - 124:18
**setting** [2] - 16:24, 19:13
**settlement** [3] - 125:1, 127:12, 127:16
**several** [1] - 98:11
**shall** [2] - 29:6, 32:18
**shame** [1] - 29:12
**shaped** [2] - 83:18, 84:19
**share** [5] - 22:14, 28:7, 28:13, 29:13, 89:19
**shared** [5] - 28:9, 28:12, 33:15, 39:22, 46:6
**shares** [2] - 22:17, 145:3
**Shaw** [6] - 42:19, 44:18, 45:7, 46:9, 47:7, 87:16
**shedding** [1] - 135:7
**Sheet** [2] - 155:9, 155:11
**shipped** [1] - 12:23
**shipping** [1] - 13:12
**shirt** [12] - 47:25, 48:5, 48:10, 48:19, 49:5, 49:10, 49:23, 50:9, 50:11, 50:15, 50:21, 103:22
**shooters** [4] - 128:20, 128:23, 129:10, 129:13
**shooting** [1] - 128:14
**short** [2] - 35:15, 118:3
**shortly** [7] - 17:13, 44:1, 66:17, 87:24, 121:8, 121:9, 128:16
**show** [4] - 41:9, 98:11, 98:15, 114:22
**showed** [1] - 36:2
**showing** [1] - 118:20

**shown** [1] - 20:24
**sign** [1] - 155:10
**signal** [1] - 10:23
**signed** [1] - 155:16
**significant** [4] - 35:2, 35:7, 97:22, 106:12
**significantly** [1] - 137:11
**silence** [2] - 105:10, 106:24
**silenced** [3] - 105:17, 106:7, 106:16
**silent** [2] - 105:19, 106:7
**silly** [3] - 73:4, 73:5, 125:9
**similar** [1] - 145:18
**Similarly** [1] - 29:11
**simple** [2] - 57:5, 103:18
**simply** [3] - 38:16, 88:11, 131:14
**sin** [1] - 55:16
**single** [6] - 10:1, 32:9, 36:8, 95:19, 106:5, 146:4
**single-space** [2] - 32:9, 36:8
**singular** [2] - 112:6, 119:11
**singularly** [1] - 130:9
**sink** [1] - 53:10
**sisters** [2] - 29:7, 32:19
**sit** [2] - 69:15, 127:19
**sitting** [3] - 91:7, 95:24, 127:8
**situation** [2] - 140:14, 144:6
**skeptical** [2] - 114:6, 149:5
**skepticism** [1] - 149:18
**skills** [1] - 15:15
**slashing** [1] - 37:25
**Slobodan** [1] - 147:8
**small** [1] - 82:17
**smiling** [1] - 21:13
**SMITH** [1] - 2:17
**Smith** [1] - 87:17
**so-and-so** [1] - 75:8
**so-called** [3] - 115:18, 134:13, 146:6
**so..** [3] - 10:2, 59:20, 74:25
**social** [6] - 52:5, 52:6, 54:7, 94:17, 140:4, 144:5
**Socialist** [5] - 83:7, 118:7, 121:19,

127:25, 135:8
**socialist** [2] - 83:10, 150:19
**Society** [2] - 16:5, 16:8
**sole** [2] - 93:11, 133:25
**solution** [1] - 39:2
**someone** [18] - 20:22, 23:5, 23:16, 24:2, 42:7, 46:6, 58:5, 59:22, 60:13, 60:21, 67:17, 70:12, 79:4, 99:4, 99:9, 131:14, 134:17, 136:11
**someplace** [1] - 45:1
**sometime** [5] - 26:21, 67:7, 71:15, 73:20, 149:25
**sometimes** [6] - 17:8, 30:5, 55:16, 66:14, 67:19, 75:1
**somewhat** [2] - 34:15, 70:24
**soon** [1] - 43:22
**sorry** [30] - 4:14, 7:22, 9:19, 10:18, 10:22, 14:22, 24:24, 25:17, 31:21, 33:7, 49:7, 51:18, 76:2, 78:21, 78:22, 85:23, 87:4, 87:9, 97:15, 99:3, 100:2, 100:15, 100:17, 103:15, 105:25, 108:5, 128:5, 136:6, 144:10
**sort** [27] - 19:15, 27:22, 30:20, 34:24, 37:1, 47:19, 47:21, 48:14, 73:16, 75:24, 112:3, 115:5, 115:6, 119:5, 119:9, 121:6, 124:25, 128:19, 130:14, 136:1, 139:5, 143:16, 143:22, 148:12, 148:20, 148:22, 149:18
**sought** [4] - 74:7, 120:22, 123:15, 148:7
**sound** [1] - 22:18
**sounded** [1] - 33:1
**sounds** [4] - 12:10, 43:17, 44:15, 88:1
**source** [2] - 39:11, 136:1
**South** [1] - 122:17
**sovereign** [1] - 49:2
**sovereignty** [2] - 28:3,

29:16
**Soviet** [4] - 121:4, 121:7, 123:21, 146:22
**space** [4] - 32:6, 32:9, 36:8, 140:5
**spacing** [1] - 32:7
**spanning** [1] - 122:19
**speaking** [12] - 6:14, 8:19, 8:21, 19:20, 62:12, 82:25, 106:13, 106:14, 118:13, 125:19, 143:1, 145:3
**speaks** [1] - 131:14
**specific** [3] - 28:6, 76:12, 96:4
**specifically** [15] - 5:20, 11:11, 13:22, 21:18, 45:21, 63:20, 64:6, 84:14, 118:5, 118:22, 119:2, 121:22, 125:19, 137:8, 139:10
**specifics** [4] - 33:23, 64:3, 64:14, 66:24
**spectacle** [1] - 144:13
**speculate** [3] - 68:25, 69:23, 143:21
**speculating** [1] - 46:4
**speech** [3] - 58:17, 78:8, 99:24
**speed** [1] - 17:4
**speeding** [1] - 18:19
**spelled** [1] - 63:13
**spent** [2] - 6:12, 35:2
**spoken** [3] - 23:22, 62:7, 63:18
**spread** [1] - 46:5
**spring** [1] - 48:17
**springs** [1] - 151:13
**St** [1] - 95:16
**standard** [1] - 39:18
**stands** [1] - 78:6
**Starship** [1] - 125:8
**start** [6] - 5:7, 12:9, 13:18, 48:4, 48:10, 77:9
**started** [12] - 12:4, 12:6, 15:23, 26:22, 32:18, 47:24, 50:21, 52:20, 53:2, 61:3, 83:18, 141:6
**starting** [1] - 29:3
**starvation** [1] - 148:4
**starving** [1] - 122:24
**state** [19] - 4:8, 24:14, 24:19, 25:12, 27:14, 37:1, 49:2, 86:7, 93:2, 98:25, 100:22,

101:9, 110:9, 122:21, 133:21, 134:13, 138:4, 138:5, 143:4
**STATE** [2] - 153:3, 154:3
**State** [5] - 91:21, 92:3, 92:21, 153:7, 153:17
**Statement** [1] - 21:22
**statement** [6] - 83:22, 85:15, 106:23, 115:24, 132:24, 138:22
**States** [25] - 22:10, 23:11, 24:14, 24:18, 25:3, 25:11, 27:16, 34:4, 36:25, 51:23, 97:25, 108:23, 110:24, 113:21, 115:8, 122:1, 139:9, 139:11, 139:16, 139:20, 139:22, 142:8, 143:13, 143:17, 147:1
**STATES** [1] - 1:1
**stating** [1] - 102:5
**statistical** [1] - 84:8
**statue** [2] - 116:15, 117:20
**statute** [2] - 75:7, 155:15
**statutory** [1] - 25:10
**stenographic** [1] - 154:11
**stenographically** [1] - 154:8
**step** [1] - 124:21
**Stephanie** [1] - 91:23
**steps** [1] - 144:12
**stick** [3] - 42:12, 147:3, 147:6
**still** [12] - 5:19, 52:11, 66:7, 70:23, 96:3, 99:21, 106:8, 106:14, 106:16, 115:24, 128:12, 151:16
**stop** [4] - 106:20, 111:12, 144:20, 147:16
**StopAntisemitism** [3] - 125:22, 126:21, 133:14
**Storm** [1] - 111:6
**story** [3] - 85:22, 89:19, 140:2
**straight** [1] - 11:22
**strangers** [1] - 29:15
**Street** [2] - 2:13, 2:19
**strict** [1] - 106:15

**strictly** [1] - 67:3
**strike** [1] - 39:13
**string** [1] - 103:10
**strokes** [2] - 30:5, 34:1
**strongly** [1] - 131:7
**struggle** [2] - 29:20, 129:12
**Student** [1] - 16:5
**student** [24] - 11:17, 15:24, 16:7, 21:10, 42:1, 42:3, 45:19, 46:12, 46:20, 46:24, 59:12, 59:22, 60:7, 60:17, 61:9, 69:1, 70:4, 70:13, 79:19, 80:4, 80:7, 89:11, 106:25
**students** [35] - 16:11, 21:20, 22:22, 23:6, 28:15, 33:19, 34:11, 39:23, 40:18, 41:3, 41:6, 41:7, 44:9, 46:13, 46:18, 47:2, 47:8, 47:11, 49:11, 59:9, 60:25, 61:16, 62:2, 62:6, 62:12, 62:16, 68:18, 68:22, 69:17, 69:24, 70:1, 71:2, 155:4, 156:1
**Students** [2] - 1:7, 43:9
**studies** [1] - 11:6
**study** [2] - 10:13, 11:14
**studying** [1] - 136:3
**stuff** [3] - 84:14, 136:2, 140:20
**stupid** [1] - 66:18
**sub** [1] - 82:13
**sub-quote** [1] - 82:13
**subject** [7] - 17:18, 24:9, 34:4, 86:15, 106:17, 129:24, 132:15
**subjected** [1] - 122:13
**subjugating** [2] - 97:5, 98:2
**submitted** [4] - 33:6, 33:8, 36:6, 46:1
**subpoena** [1] - 20:4
**substance** [6] - 6:19, 8:20, 36:10, 59:24, 81:6, 139:6
**subway** [1] - 134:19
**succeed** [1] - 124:20
**succeeds** [1] - 138:3
**success** [1] - 145:6
**successful** [1] - 120:1
**sued** [1] - 19:6

**suggested** [2] - 88:21, 155:13
**suggests** [1] - 37:3
**suicide** [1] - 120:3
**Suite** [1] - 2:13
**summer** [5] - 43:7, 62:24, 63:7, 92:10, 93:1
**SUMMERLIN** [1] - 1:7
**Summerlin** [7] - 4:21, 6:1, 86:14, 87:15, 90:19, 155:3, 156:1
**sums** [1] - 134:3
**super** [2] - 65:8, 65:10
**superiority** [1] - 83:21
**supply** [1] - 122:22
**support** [5] - 105:8, 108:22, 117:3, 136:22, 139:25
**supported** [1] - 141:24
**supporter** [1] - 134:7
**suppose** [1] - 77:17
**supremacists** [3] - 116:4, 116:6, 116:18
**supremacy** [2] - 84:6, 134:1
**Supreme** [1] - 37:11
**surely** [2] - 74:7, 76:16
**surprise** [1] - 73:22
**surprised** [1] - 73:25
**surreptitiously** [1] - 60:17
**surrounded** [1] - 135:9
**survive** [1] - 37:19
**suspect** [3] - 88:10, 88:11, 129:15
**suspended** [7] - 61:7, 61:18, 62:2, 62:9, 62:25, 64:1, 64:9
**suspension** [11] - 62:11, 62:18, 62:21, 103:23, 104:15, 104:16, 104:19, 104:21, 104:23, 107:4, 107:7
**SW** [1] - 2:19
**sword** [1] - 38:1
**swore** [2] - 18:12, 80:11
**sworn** [2] - 4:2, 153:10
**sympathetic** [1] - 105:16
**synonymous** [1] - 102:10
**system** [1] - 131:15

**T**

**T-shirt** [3] - 48:19, 49:23, 103:22
**TA** [1] - 40:8
**tabs** [1] - 60:22
**tacked** [1] - 135:20
**TAKEN** [1] - 1:15
**tangentially** [1] - 90:15
**targeted** [1] - 70:18
**targets** [1] - 51:21
**taught** [3] - 27:5, 36:20, 91:18
**tax** [1] - 39:12
**taxes** [1] - 39:15
**teach** [1] - 141:1
**teaching** [2] - 118:7, 139:2
**Tears** [1] - 140:25
**Tel** [1] - 140:17
**ten** [1] - 48:21
**tenable** [2] - 150:17, 150:18
**tendencies** [1] - 116:25
**term** [3] - 64:17, 108:9, 109:21
**terminology** [1] - 104:10
**terms** [9] - 15:15, 16:17, 48:7, 51:15, 55:8, 55:15, 60:8, 116:24, 146:13
**terrible** [2] - 118:20, 119:16
**terribly** [1] - 55:19
**territory** [2] - 49:8, 137:19
**terror** [1] - 98:19
**terrorist** [2] - 70:16, 132:12
**TERRY** [6] - 1:11, 3:3, 4:1, 153:8, 154:9, 156:24
**Terry** [7] - 3:14, 4:9, 4:15, 53:18, 155:1, 155:5, 156:2
**testified** [2] - 4:4, 79:22
**testimony** [8] - 6:13, 17:25, 18:13, 79:24, 79:25, 80:7, 155:8, 155:14
**text** [3] - 75:1, 75:7, 75:14
**textbook** [1] - 118:16
**textually** [1] - 32:1
**THE** [27] - 4:13, 4:14, 4:15, 9:6, 9:7, 10:18,

10:22, 10:23, 10:25, 11:1, 11:3, 11:5, 11:7, 14:21, 14:22, 14:24, 15:1, 81:20, 81:22, 87:9, 87:10, 97:15, 97:16, 100:15, 100:17, 100:19, 100:21
**theatres** [1] - 148:10
**theirs** [1] - 30:3
**theme** [1] - 36:25
**themself** [1] - 68:14
**themselves** [2] - 116:17, 116:19
**theory** [1] - 105:16
**therefore** [3] - 68:12, 77:1, 147:15
**theses** [1] - 36:24
**thesis** [5] - 27:24, 28:6, 36:21, 57:15, 140:24
**Thessalonians** [1] - 95:15
**they've** [4] - 114:7, 129:16, 133:9, 143:19
**thinking** [5] - 13:18, 45:24, 57:17, 123:25, 132:1
**thinks** [1] - 86:5
**third** [3] - 5:11, 111:21, 145:1
**Thirty** [2] - 118:20, 119:15
**Thomas** [3] - 134:23, 134:25, 135:17
**threat** [1] - 95:18
**threaten** [1] - 131:21
**threatens** [1] - 107:24
**three** [7] - 16:14, 17:5, 41:6, 50:7, 55:11, 105:7, 107:15
**throw** [2] - 115:3, 131:20
**throws** [1] - 114:20
**thrust** [2] - 33:24, 79:11
**thumbing** [1] - 112:3
**Thursday** [1] - 1:15
**ticket** [2] - 18:11, 19:10
**ties** [1] - 140:16
**Tigert** [1] - 2:20
**TIME** [1] - 1:16
**timing** [2] - 15:17, 48:7
**timing-wise** [1] - 15:17
**title** [2] - 36:16, 36:18
**today** [20] - 4:22, 5:25,

6:11, 6:16, 6:18, 7:1, 7:3, 7:12, 8:13, 9:10, 18:9, 24:21, 25:4, 69:15, 89:16, 95:24, 105:20, 114:8, 127:9, 151:15
**today's** [1] - 99:5
**together** [1] - 42:12
**ton** [1] - 57:24
**took** [14] - 11:12, 11:13, 11:25, 14:1, 18:2, 33:14, 69:9, 71:25, 72:20, 114:13, 121:1, 121:6, 123:24, 149:10
**top** [8] - 56:6, 57:2, 64:15, 103:2, 109:9, 112:12, 112:18, 123:8
**topic** [5] - 45:8, 45:12, 47:23, 75:18, 140:4
**topics** [1] - 55:2
**Torrance** [1] - 10:7
**total** [2] - 16:11, 81:12
**touch** [1] - 68:2
**toward** [1] - 133:19
**towards** [2] - 105:15, 116:11
**town** [10] - 43:23, 44:4, 44:8, 44:23, 45:8, 45:12, 45:15, 46:9, 47:8, 47:11
**trade** [2] - 81:1, 122:19
**traffic** [3] - 18:11, 19:10, 19:13
**tragically** [1] - 117:10
**transcript** [4] - 154:9, 154:10, 155:6, 155:16
**translated** [1] - 135:17
**translation** [4] - 134:23, 135:1, 136:4, 136:5
**translations** [1] - 135:19
**tremendous** [1] - 127:17
**trespass** [3] - 17:12, 17:14, 17:19
**trespassing** [1] - 93:22
**Trial** [1] - 91:17
**tribe** [4] - 100:6, 101:6, 102:17, 102:22
**tried** [2] - 91:3, 91:6
**Troopers** [1] - 125:8
**trouble** [1] - 10:21

**true** [12] - 60:7, 60:12, 60:22, 76:21, 95:25, 97:21, 111:25, 138:6, 141:24, 149:4, 154:10, 156:22
**True** [1] - 136:15
**Trump** [2] - 53:12, 116:13
**truncated** [2] - 40:14, 67:22
**truth** [6] - 6:16, 80:1, 80:4, 80:8, 80:11, 88:9
**truthfully** [2] - 6:22, 131:15
**try** [4] - 5:1, 14:14, 19:17, 19:18
**trying** [3] - 23:17, 39:21, 67:12
**tuition** [2] - 14:2, 14:9
**turned** [3] - 31:25, 32:5, 40:10
**TVs** [1] - 50:7
**tweet** [9] - 67:11, 73:14, 100:11, 103:21, 103:25, 104:7, 133:14, 133:18, 137:8
**tweeted** [2] - 67:4, 104:11
**tweeting** [1] - 100:9
**tweets** [2] - 120:10, 151:17
**tweets'** [1] - 151:18
**twice** [2] - 44:6, 66:4
**Twitter** [20] - 52:9, 52:12, 52:14, 53:3, 53:20, 54:3, 54:22, 54:23, 55:4, 55:5, 56:21, 58:2, 58:7, 60:4, 61:12, 62:3, 67:20, 67:21, 88:10, 106:11
**two** [20] - 6:12, 12:15, 24:8, 26:3, 41:5, 42:20, 42:22, 46:25, 48:22, 55:11, 96:15, 100:13, 111:15, 112:17, 135:9, 140:5, 142:14, 147:3, 147:6, 151:8
**two-plus** [1] - 140:5
**two-year** [1] - 112:17
**Type** [1] - 153:24
**type** [3] - 20:20, 32:9, 87:20
**typeface** [1] - 36:7
**typically** [2] - 17:6, 17:8

**typo** [3] - 66:18, 66:20, 118:9
**typographical** [1] - 36:9

**U**

**U.S** [6] - 6:2, 110:19, 139:1, 146:20, 146:21, 147:13
**UC** [2] - 10:10, 141:1
**UF** [34] - 15:17, 16:11, 17:2, 17:10, 17:16, 17:19, 20:8, 21:10, 21:16, 22:23, 23:1, 24:9, 39:19, 47:24, 48:19, 50:2, 59:18, 62:6, 62:13, 68:17, 68:19, 68:22, 69:16, 69:20, 69:23, 70:4, 70:12, 70:17, 70:21, 71:2, 72:9, 106:25, 125:18, 126:13
**UF's** [2] - 56:15, 106:12
**Ukraine** [2] - 111:1, 111:2
**ultimately** [3] - 121:19, 123:9, 124:15
**umbrella** [4] - 25:16, 76:25, 95:20
**uncle** [1] - 109:6
**unclear** [2] - 34:15, 100:18
**unconnected** [1] - 97:11
**undeniable** [1] - 126:25
**under** [20] - 6:11, 6:13, 6:18, 18:1, 18:5, 18:9, 25:16, 39:13, 53:24, 54:9, 76:13, 76:24, 76:25, 95:19, 104:16, 104:21, 118:14, 145:17, 155:14
**Under** [1] - 156:21
**underdog** [1] - 114:19
**underneath** [1] - 61:22
**underscore** [2] - 53:17, 53:23
**understood** [2] - 92:23, 92:25
**unfortunately** [1] - 123:1
**Unfortunately** [1] - 126:6
**unintelligible)** [5] -

10:17, 14:20, 81:19, 97:14, 100:14
**Union** [4] - 121:4, 121:7, 123:21, 146:22
**Unite** [8] - 115:18, 115:20, 116:2, 116:6, 116:9, 117:3, 117:9, 117:18
**unite** [1] - 116:10
**UNITED** [1] - 1:1
**united** [1] - 119:10
**United** [26] - 22:9, 23:11, 24:13, 24:18, 25:3, 25:11, 27:16, 34:4, 36:25, 51:23, 76:13, 97:24, 108:23, 110:24, 113:20, 115:8, 122:1, 139:9, 139:11, 139:16, 139:20, 139:22, 142:8, 143:13, 143:17, 146:25
**universal** [1] - 147:19
**university** [4] - 10:9, 23:15, 78:11, 140:17
**University** [9] - 1:8, 2:18, 14:7, 20:7, 79:19, 80:2, 89:10, 155:4, 156:2
**unlawful** [1] - 51:25
**unless** [2] - 5:20, 59:5
**unmitigated** [1] - 111:18
**unsaid** [1] - 76:4
**unsurprisingly** [1] - 116:9
**up** [41] - 7:18, 7:24, 9:12, 13:8, 17:17, 23:4, 23:7, 23:22, 31:12, 31:21, 34:11, 35:19, 41:15, 45:7, 45:15, 49:17, 52:15, 52:20, 55:24, 64:4, 70:3, 81:19, 81:23, 81:25, 86:18, 89:25, 91:5, 93:10, 94:1, 94:6, 94:19, 100:10, 107:19, 109:9, 112:18, 113:16, 113:25, 120:3, 122:23, 123:17, 134:3
**updated** [1] - 94:6
**updates** [1] - 93:21
**updating** [1] - 93:24
**upheld** [1] - 31:8
**upload** [2] - 40:4, 40:7
**uploaded** [2] - 32:8,

36:3
**usage** [1] - 52:5
**user** [1] - 56:17
**username** [1] - 53:25
**utter** [1] - 113:25

## V

**vacations** [1] - 54:24
**vacillated** [1] - 12:19
**vague** [1] - 148:21
**vaguely** [1] - 50:14
**valid** [1] - 141:25
**value** [5] - 71:4, 101:21, 102:2, 135:6, 147:19
**various** [2] - 116:10, 121:3
**vast** [1] - 134:8
**veracity** [1] - 149:7
**verify** [1] - 155:8
**version** [9] - 26:9, 31:14, 31:19, 32:11, 32:22, 33:6, 33:8, 99:5, 130:15
**versus** [2] - 6:1, 148:11
**via** [1] - 153:8
**vice** [3] - 102:18, 102:23, 103:6
**victims** [1] - 146:5
**Videoconference** [1] - 1:17
**videoconference** [1] - 153:9
**videos** [2] - 54:20, 55:18
**Vietnam** [1] - 51:25
**view** [12] - 25:4, 51:9, 58:2, 58:5, 58:8, 58:10, 85:3, 97:10, 98:1, 137:18, 140:9, 141:25
**viewed** [4] - 122:3, 124:16, 139:8, 147:9
**viewpoint** [1] - 47:5
**viewpoints** [1] - 126:9
**views** [15] - 57:23, 58:20, 83:12, 84:19, 84:23, 84:25, 89:1, 89:7, 106:1, 115:25, 135:14, 146:9, 151:10, 151:14, 151:15
**vigilante** [3] - 65:6, 65:12, 65:14
**vilified** [1] - 102:22
**vilify** [1] - 102:17
**violation** [1] - 18:23
**violations** [2] - 19:14,

20:3
**violence** [9] - 30:20, 31:7, 34:19, 34:22, 35:10, 35:13, 39:7, 39:17, 129:24
**violent** [7] - 31:6, 35:16, 65:5, 65:17, 136:12, 136:18, 137:21
**viral** [1] - 58:3
**vocal** [1] - 134:7
**voice** [1] - 105:4
**voluntarily** [1] - 124:25
**vs** [1] - 1:6

## W

**wage** [2] - 147:13, 147:24
**waging** [1] - 123:21
**wait** [1] - 5:6
**waiting** [3] - 7:19, 7:20, 53:12
**waiving** [1] - 151:25
**walk** [1] - 18:22
**walking** [1] - 113:4
**wall** [1] - 104:6
**wants** [1] - 147:13
**war** [25] - 51:3, 51:4, 51:9, 51:21, 98:18, 99:22, 114:17, 121:2, 121:9, 122:7, 123:10, 123:17, 123:21, 124:18, 124:20, 124:21, 125:5, 145:10, 145:12, 146:3, 147:13, 147:23, 147:24, 148:10
**War** [17] - 51:25, 113:15, 113:17, 114:3, 118:18, 118:19, 118:20, 119:15, 120:2, 120:7, 121:1, 122:15, 122:23, 123:12, 146:19, 148:1, 150:9
**warfare** [2] - 97:7, 125:10
**Washington** [1] - 2:14
**watch** [4] - 53:2, 54:20, 55:17, 66:3
**watching** [2] - 50:5, 62:3
**Watchmen** [1] - 64:23
**ways** [3] - 30:22, 37:3, 109:23
**weapon** [1] - 147:23

**weaponize** [1] - 131:19
**weapons** [1] - 145:12
**wear** [2] - 49:5, 49:10
**wearing** [7] - 47:24, 48:4, 48:10, 49:11, 50:13, 50:21, 103:21
**weather** [1] - 14:10
**website** [1] - 104:2
**week** [3] - 20:12, 105:9
**weeks** [4] - 35:7, 48:22, 96:15, 142:14
**well-received** [1] - 105:14
**West** [4] - 49:3, 97:5, 97:25, 122:2
**Western** [1] - 123:14
**white** [32] - 21:13, 22:10, 22:12, 25:2, 25:6, 25:13, 25:20, 25:23, 30:1, 30:10, 30:24, 37:12, 38:8, 55:3, 57:7, 57:14, 76:25, 83:19, 83:20, 84:6, 84:19, 115:22, 115:23, 116:3, 116:5, 116:16, 116:18, 116:19
**White** [2] - 57:17, 113:3
**whites** [12] - 25:12, 74:5, 74:8, 74:10, 76:17, 76:19, 77:7, 77:10, 97:6, 98:2, 138:20
**whole** [14] - 28:14, 38:18, 46:25, 47:17, 61:3, 76:15, 88:8, 112:7, 112:8, 135:15, 135:24, 142:9, 145:15, 149:14
**widest** [1] - 58:17
**wing** [4] - 65:5, 65:9, 116:24, 140:17
**winning** [1] - 122:23
**wise** [7] - 15:17, 118:3, 118:14, 119:18, 119:19, 119:20, 120:15
**WITNESS** [15] - 3:2, 4:14, 9:7, 10:22, 10:25, 11:3, 11:7, 14:22, 15:1, 81:22, 87:10, 97:16, 100:17, 100:21, 153:11
**Witness** [1] - 152:1
**witness** [7] - 1:19, 4:3,

10:21, 155:8, 155:9, 155:10, 155:16
**woke** [1] - 70:3
**Wolking** [3] - 63:12, 73:14, 73:17
**WOLKING** [1] - 63:13
**woman** [2] - 91:22, 117:14
**womb** [1] - 131:4
**won** [2] - 98:19, 144:4
**wood** [3] - 118:15, 118:19, 118:22
**word** [3] - 72:20, 101:4, 102:11
**words** [5] - 29:23, 47:14, 74:6, 83:14, 92:20
**wore** [3] - 48:18, 48:22, 50:11
**Workers'** [1] - 83:8
**works** [4] - 43:10, 58:7, 67:10, 67:21
**World** [11] - 51:25, 113:15, 113:17, 114:3, 120:2, 120:7, 121:1, 123:12, 146:19, 148:1, 150:8
**world** [12] - 58:12, 68:8, 68:10, 68:16, 76:24, 85:3, 98:24, 108:6, 119:2, 120:19, 134:2, 146:17
**world's** [1] - 122:19
**worn** [1] - 48:2
**worry** [3] - 85:20, 85:23, 86:3
**worse** [3] - 68:20, 77:2, 77:4
**worth** [1] - 29:19
**write** [8] - 21:21, 26:20, 29:11, 56:20, 58:15, 102:1, 112:25, 113:2
**writes** [1] - 84:8
**writing** [4] - 30:8, 75:6, 101:23, 144:8
**writings** [1] - 84:23
**written** [9] - 37:10, 88:9, 95:5, 97:4, 102:16, 110:15, 111:24, 112:22, 133:20
**wrote** [30] - 24:8, 26:6, 27:1, 29:23, 36:12, 38:4, 55:21, 56:7, 57:16, 76:20, 84:1, 84:2, 85:8, 86:24, 88:14, 88:16, 89:17, 96:10, 96:12, 96:15,

97:21, 103:19,
112:1, 132:2,
132:18, 135:8,
136:16, 137:24,
142:14, 144:16

## Y

**Yalta** [1] - 121:3
**year** [10] - 12:1, 12:8,
12:11, 12:14, 23:14,
42:10, 42:12, 42:19,
112:17, 138:18
**years** [8] - 6:12, 9:23,
12:15, 24:22, 54:10,
139:14, 140:5, 147:7
**Years'** [2] - 118:20,
119:15
**York** [3] - 80:13,
80:15, 82:6
**yourself** [7] - 16:6,
17:6, 20:14, 21:24,
25:20, 30:15, 109:12

## Z

**Zionism** [3] - 108:21,
110:9, 130:9
**Zoom** [3] - 1:17, 6:24,
153:8

**EXHIBIT**

**Dft's Ex 2**

exhibitsticker.com

# American Restoration: An Article V Proposal (DRAFT)
**by Preston Terry**

## Contents

Introduction .................................................................................................................. 1

Popular Sovereignty and Constituent Power in the American System ........................... 2

The Historic American Nation ....................................................................................... 7

Restoring Sovereignty to the People – Article V, Section 2 ......................................... 17

    Paragraph 1 of Article V, Section 2 ......................................................................... 18

    Paragraph 2 of Article V, Section 2 ......................................................................... 21

    Paragraph 3 of Article V, Section 2 ......................................................................... 23

    Paragraph 4 of Article V, Section 2 ......................................................................... 24

Conclusion – Why Should This Be Done? .................................................................... 25

## Introduction

In American constitutional jurisprudence, the People are sovereign. The People's government is their own creation, and this government may not usurp the power which brought it into existence. What, then, is the constitutional status of policies which alter, replace, or destroy the People? Moreover, are there any observable indicators that the People are being altered, replaced, or destroyed? And if such processes are constitutionally dubious, and we verify that they are indeed occurring, what should be done?

This paper provides provocative answers to these questions rooted in empirical evidence, history, legal opinions, and the text of the Constitution. It argues that policies which alter, replace, or destroy the People is wholly illegitimate and unconstitutional. Lengthy historical analysis of the consensus view regarding the original and long-held conception of the People is provided; and it is determined that the People formed and maintained their government along nationalist lines, placing particular emphasis on their shared ancestral heritage. Evidence is provided which indicates that demographic challenges facing the People are currently threatening to reduce them to a minority status—within the coming decades—in the country that is their constitutional birthright. It calls upon the people to prevent this result by undertaking a political restoration and reasserting their rightful claim to sovereignty and primacy within the American body politic. Finally, it suggests changes, in the form of an additional section, to Article V as a means of entrenching this restoration and helping to ensure that such a struggle is never again needed to prevent similar constitutional evils.

**Popular Sovereignty and Constituent Power in the American System**

One potentially overlooked function of constitutions is in providing an entrenched and exclusionary definition of the nation.[1] Thus, according to Ginsburg:

> In some polities, constitutions reflect and sometimes even create a shared consciousness, and so overcome regional and ethnic divisions. . . . The symbolic or expressive function of constitutions emphasizes the particularity of constitution-making. It is We the People that come together, and so the constitution embodies our nation in a distinct and local way different from other polities.[2]

Appreciation of this function is vital to a correct understanding of American constitutional jurisprudence due to the importance of the principle of popular sovereignty within the American constitutional framework, with popular sovereignty's textual manifestation evident in the Constitution's Preamble.[3] This principle was taken for granted to such a degree that, at the time of the Constitution's drafting, a proposal by James Madison to prefix the Preamble with a declaration stating that "the people have an indubitable, unalienable, and indefeasible right to reform or change their government" was deemed "redundant" and rejected "given the broad meaning of the Preamble itself."[4] Furthermore, contra Amar, the Preamble is explicit in acknowledging that the Constitution is a creation of the People, rather than the People being a creation of the Constitution.[5] Therefore, in addition to encapsulating the principle of popular sovereignty, the Preamble incorporates the closely related principle of constituent power, i.e., the power to bring (or that

---

[1] Richard Albert, *The Expressive Function of Constitutional Amendment Rules*, 59 MCGILL L. J. 225, 237–38 (2013) (stating that "Constitutions may . . . express values with the aspirational or functional purposes of self-definition and nation building."). This paper shall utilize Gat and Yakobson's definition of "nation," and the nation shall be considered coterminous with "the People." *See* AZAR GAT WITH ALEXANDER YAKOBSON, NATIONS: THE LONG HISTORY AND DEEP ROOTS OF POLITICAL ETHNICITY AND NATIONALISM 18 (2012) (defining "nation" as a population with a sense of shared kinship, culture, common identity, history, and fate, that is either politically sovereign or actively striving to achieve political self-determination and self-government). *See also* CARL SCHMITT, CONSTITUTIONAL THEORY 127 (Jeffrey Seitzer, ed. & trans., 2008) (noting that "[n]ation and people are often treated as equivalent concepts" but that "[nation] denotes, specifically, the people as a unity capable of political action, . . . while the people not existing as a nation is somehow only something that belongs together ethnically or culturally, but it is not necessarily a bonding of men existing politically."). As will be seen, this conception of nation is in accord with the nationalistic beliefs of the Framers at the time of the U.S. Constitution's drafting and ratification.

[2] Tom Ginsburg, *Written Constitutions and the Administrative State: On the Constitutional Character of Administrative Law* 118 (Univ. Chi. Pub. L. & Legal Theory, Working Paper No. 331, 2010).

[3] Akil Reed Amar, *Popular Sovereignty and Constitutional Amendment*, *in* RESPONDING TO IMPERFECTION: THE THEORY AND PRACTICE OF CONSTITUTIONAL AMENDMENT 89, 105 (Sanford Levinson ed., 1995) (stating that "the Founders themselves [indubitably] recognize[d] the Preamble as a textual declaration of popular sovereignty").

[4] *Id*. at 106.

[5] According to Amar, "the Constitution formed previously separate state peoples into one continental people—Americans!" *Id*. at 104. However, the Preamble states that "We the People of the United States, in Order to form a more perfect Union, . . . and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America." U.S. CONST. pmbl. Logically, for the People of the United States to ordain and establish the Constitution, the People of the United States must have existed before the Constitution. *See also* THE FEDERALIST NO. 2, at XYZ (John Jay) (XYZ ed., XYZyear) ("To all general purposes we have uniformly been one people . . . As a nation we have made peace and war; as a nation we have vanquished our common enemies; as a nation we have formed alliances, and made treaties, and entered into various compacts and conventions with foreign states.").

2

brings) the Constitution into existence.[6] Moreover, the principles of popular sovereignty and constituent power were reaffirmed within the Constitution itself shortly after its ratification via the Ninth and Tenth Amendments of the Bill of Rights, which recognize that all rights and powers which have not been delegated to the federal government are "retained" and "reserved" by the People.[7] Crucially, these dual, interrelated principles have been acknowledged and affirmed by numerous U.S. Supreme Court opinions throughout American history.[8]

The creation of the U.S. Constitution by the sovereign People's exercise of their constituent power has often been explained in contractual terms.[9] These contractarian theories emphasize the role of the Constitution in limiting the power of the constituted state.[10] According to Versteeg & Zackin, "[t]hose who conceptualize constitutionalism as a form of contracting describe the people

---

[6] *See* Renato Cristi, *Carl Schmitt on Sovereignty and Constituent Power*, in LAW AS POLITICS: CARL SCHMITT'S CRITIQUE OF LIBERALISM 179, 179–92 (David Dyzenhaus ed., 1998) (explaining constituent power's "conceptual kinship with the notion of sovereignty" and stating that "constituent power . . . represents sovereignty as a concrete manifestation of the will" and "[s]overeignty *qua* constituent power comes into view most clearly at the moment when a constitution is generated."); s*ee also* William Partlett, *The American tradition of constituent power*, 15 INT'L J. CONST. L. 955, 955 (2018) ("It is an axiom of democratic constitutional theory to say that 'the people' hold the sovereign 'constituent power' to remake their constitutional order through specialized constitution-making bodies that exist outside the normal legal system.")

[7] U.S. CONST. amends. IX, X; s*ee also* Partlett, *supra* note 6, at 956 ("Constituent power in the United States is textually grounded in the 'alter or abolish' clauses in many state constitutions' Bills of Rights as well as the Preamble and Ninth, and Tenth Amendment of the US Constitution."); Amar, *supra* note 3, at 106–07 (arguing that the Preamble, along with the Ninth and Tenth Amendments, have a "close triangular interrelation . . . with strong popular sovereignty overtones").

[8] *See, e.g.*, *Chisholm v. Georgia*, 2 U.S. 419, 470–71 (1793) (""[T]he people, in their collective and national capacity, established the present Constitution . . . in establishing it, the people exercised their own rights, and their own proper sovereignty"); *Marbury v. Madison*, 5 U.S. 137, 176 (1803) ("That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis, on which the whole American fabric has been erected."); *Barron v. City of Baltimore*, 32 U.S. 243, 247 (1833) ("The constitution was ordained and established by the people of the United States for themselves, for their own government . . . The people . . . framed such a government . . . as they supposed best adapted to their situation and best calculated to promote their interests."); *League v. De Young*, 52 U.S. 185, 203 (1850) ("The Constitution of the United States was made by, and for the protection of, the people of the United States."); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts."); *Carter v. Carter Coal Co.*, 298 U.S. 238, 296 (1936) ("[T]he Constitution itself is in every real sense a law—the lawmakers being the people themselves, in whom under our system all political power and sovereignty primarily resides, and through whom such power and sovereignty primarily speaks."); *Afroyim v. Rusk*, 387 U.S. 253, 257 (1967) ("In our country the people are sovereign and the Government cannot sever its relationship to the people by taking away their citizenship."); *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (relying on the presumption that the United States is "a republic where the people are sovereign"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 794 (1995) (acknowledging "the critical postulate that sovereignty is vested in the people, and that sovereignty confers on the people the right to choose freely their representatives to the National Government.") (citing *Powell v. McCormack*, 395 U.S. 486, 541 n. 76 (1969)); *Gamble v. United States*, 587 U.S. 678, 688 (2019) ("[O]ur Constitution rests on the principle that the people are sovereign").

[9] *See* Rozann Rothman, *The Impact of Covenant and Contract Theories on Conceptions of the U.S. Constitution*, 10 PUBLIUS 149, 160 (1980) (stating that the Framers' deference to popular sovereignty "vitiated any grant of inherent power to the government" and that "[a]s the contract made clear, all governmental power was delegated and . . . a complicated representative structure set conditions for the exercise of power.").

[10] *Id*. ("These conditions [for the exercise of power by the government] constrained the exercise of power and reinforced dependence on the core notions of covenant, mutual obligation, reciprocity, and equality.").

3

as a 'principle,' which, in creating a representative government, has employed 'agents' to better realize its ends."[11] Whether or not viewing the Constitution as a contract is a particularly accurate or compelling analogy,[12] this subsidiary analogy within the contractarian framework—whereby the People act as principle and the state as their agent—expresses well the hierarchical relationship between the sovereign, dominant People and their constituted, subservient government in the American constitutional framework.[13] Utilizing this principal-agent analogy in the state constitutionalism context, Marshfield correctly observes that "[b]ecause . . . agents derive their authority entirely from the existing constitution, they implicitly lack the authority to destroy or replace the source of that power."[14] There is no apparent reason why such an implicit limitation should not also be binding upon those agents to whom authority is granted under the U.S. Constitution. Furthermore, given the distinction between constituent power and constituted power[15] (along with the widely accepted principle of popular sovereignty), it is readily evident that, in the United States, the ultimate source of the constituted power is the constituent power exercised by the sovereign People. Thus, within the American constitutional framework, it must stand as an incontrovertible truism that the government lacks the authority to destroy or replace the People. In the words of the German poet Bertholt Brecht, the government of the United States may not "dissolve the people and elect another."[16]

The implicit prohibition against the constituted, subservient government replacing or destroying the ultimate source of its power—the sovereign People—is more encompassing than a

---

[11] Mila Versteeg & Emily Zackin, *Constitutions Unentrenched: Toward an Alternative Theory of Constitutional Design*, 110 AM. POL. SCI. REV. 657, 658.

[12] *Compare* "From Thomas Jefferson to Edmund Randolph, 15 February 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-06-02-0228. [Original source: *The Papers of Thomas Jefferson*, vol. 6, *21 May 1781–1 March 1784*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1952, pp. 246–250.] ("[I]f the term *social contract* is to be forced from theoretical into practical use, I shall apply it to all the laws obligatory on the state, and which may be considered as contracts to which all the individuals are parties.") (emphasis in original) [NOT A PROPER BB CITE], *with* JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 352, at 318–19 (1833) (arguing that there is nothing in the Constitution "intimating it to be a compact, or in anywise providing for its interpretation, as such. On the contrary, the preamble emphatically speaks of it, as a solemn ordinance and establishment of government. The people do ordain and establish, not contract and stipulate with each other."). [QUESTIONABLE BB CITE, delete at pp.?]

[13] *See supra* note 8; *see also Geer v. Connecticut*, 161 U.S. 519, 529 (1896) (stating that a state government's powers over the common property in wildlife "is to be exercised, like all other powers of government, as a trust for the benefit of the people, and not as a prerogative for the advantage of the government as distinct from the people, or for the benefit of private individuals as distinguished from the public good" and thus "for the purpose of exercising this power, the state, . . . represents its people, and the ownership is that of the people in their united sovereignty."(citing *Martin v. Waddell's Lessee*, 41 U.S. 367 (1842)), *overruled on other grounds by Hughes v. Oklahoma*, 441 U.S. 322 (1979).

[14] Jonathan L. Marshfield, *Forgotten Limits on the Power to Amend State Constitutions*, 114 NW. UNIV. L. REV. 65, 79 (2019).

[15] Luigi Corrias, *Populism in a Constitutional* Key, 12 EUR. CONST. L. REV. 6, 15 (2016) (describing the nation as the "bearer" of constituent power, whereas "the constitution, legislature, executive, and judiciary" which "ultimately derive their power from the nation" are the constituted power).

[16] Bertolt Brecht, Poems 1913-1956, eds. John Willett and Ralph Manheim (Methuen 1976), p. 440. [FIX BB CITE]

4

mere prohibition against usurping the People's claim to sovereignty.[17] To further illustrate the obviousness of this proposition, a thought experiment may be beneficial. The Foreign Emoluments Clause prohibits any person "holding any Office of Profit or Trust" in the United States government from "accept[ing] . . . any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State" *unless* they receive "the Consent of the Congress."[18] Let us suppose that the government of a particularly powerful, wealthy, and populous country, such as the People's Republic of China (P.R.C.), promises a supermajority of the House of Representatives and the Senate wealth beyond their wildest dreams if they would only permit all emoluments to any government official.[19] Our hypothetical Congress is a particularly disloyal and flagrantly venal one and so opportunistically allows this broad exception to the Emoluments Clause for the P.R.C.'s government. The P.R.C.'s government then cuts very substantial checks not only to their new bought-and-paid-for U.S. Congress, but also to the top officials in our just as mercenary executive and judicial branches. However, like all political "donors," the government of the P.R.C. has a few requests to accompany their support for these politicians. First, they request full U.S. citizenship not only for everyone in the P.R.C., but the entire populations of every country in the BRICS bloc—which includes Brazil, Russia, India, the P.R.C., South Africa, Iran, Egypt, Ethiopia, and the United Arab Emirates—around 3.5 billion people.[20] "Our" government complies. Then, the P.R.C. requests that the United States facilitate the migration of roughly one billion of these people to America. Again, "our" government complies. Finally (and at this point the people that were previously the entirety of the American people are thoroughly irritated about all these changes), the P.R.C. requests that BRICS military forces be allowed to work with the U.S. military to occupy

---

[17] It should not be forgotten that in a wholly representative democracy or republic such as the United States, where the political system does not feature a mechanism for popular referendum, the People possess only a claim to sovereignty and may only normally exercise it in a very indirect manner through elections. Policy decisions are left entirely to the constituted government. Of course, the right to change their government by extraordinary or extralegal means is, at least supposedly, retained by the People. *See* THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) ("it is the Right of the People to alter or to abolish [government], and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness."). However, it cannot be denied that such extraordinary or extralegal means are generally difficult for the People to effectively wield, particularly when they remain unorganized or when the "abuses and usurpations" that they are subject to are deemed by the vast majority of the People to be tolerable (albeit still objectionable). *See Id*. ("Prudence, indeed, will dictate that Governments long established should not be changed for light and transient causes; and accordingly all experience hath shewn, that mankind are more disposed to suffer, while evils are sufferable, than to right themselves by abolishing the forms to which they are accustomed."). The upshot of this power dynamic is that so long as the juiciest fruit of sovereign power—the policy-making apparatus—remains within the privileged hands of the officials comprising the constituted government (and, by extension and more importantly, any minoritarian special interests that are disproportionately responsible for those officials' electoral successes) those officials have little incentive to disturb the constitutional order by usurping the People's nominal claim to sovereignty. That is especially true when the constituted government's policy-making apparatus is not sufficiently restrained to prevent officials and their minoritarian backers from bringing about a slow and steady usurpation of the People's sovereignty *sub silentio*.

[18] U.S. CONST. art. I, § 9, cl. 8.

[19] Suppose further, for the sake of the argument, that there is no law or constitutional provision among the several states which would prohibit any present or emolument from being made to state officials. The P.R.C. government is then able to buy off any state official they need to get on their side, and these officials do what is necessary at the state level to carry out whatever policies the P.R.C. desires to get out of our federal officials.

[20] *Brics: What is the group and which countries have joined*, BBC (Feb. 1, 2024), https://www.bbc.com/news/world-66525474

unruly areas of the country Once again, "our" government complies.[21] BRICS forces soon put down the various malcontent groups throughout the United States; and, bolstered by the newly imported electorate, almost all incumbent government officials are reelected by wide margins in the next regularly held election.

All of this has occurred without any revision to the written constitution. Elections, as indicated, still regularly occur. We can imagine that our leaders would still proclaim that the People rule. But is what has just been described constitutional? If popular sovereignty is more than a mere parchment promise and a rhetorical sop to the *hoi polloi*, then this hypothetical scenario must surely qualify as a perverse inversion of a constitutional order based on popular sovereignty. The constituted government has eliminated the power of the People by opening its gates to a foreign multitude which dwarfs the People and a foreign army which has subjugated the People and brought them low. Such a result could hardly be described as anything but an unconstitutional usurpation whereby the agent has assumed the mantle of the principle by means of inviting a hostile takeover. Moreover, if we take popular sovereignty seriously, then this degradation cannot be cured by the government merely affixing the label of citizen to these invaders.

Of course, this exact scenario is clearly fantastical.[22] However, I will demonstrate that a conceptually similar usurpation has been perpetrated by the constituted government, and the People are well on their way to being replaced and having their sovereignty completely extinguished. But to validate this proposition, I must first identify and define the nature of the People when they exercised their sovereign, constituent power to ordain and establish the Constitution.

---

[21] Given what our hypothetical government has permitted thus far, why would they not also permit this? After all, those Chinese, Ethiopian, and Indian soldiers are just as much American citizens as any Marine from Kansas; and, more importantly, insurrection is brewing! Furthermore, such an action might even be given a fig leaf of textual support within the Constitution itself. *See* U.S. CONST. art. IV, § 4 (requiring the federal government to "guarantee to every State in this Union a Republican Form of Government, and . . . protect each of them against . . . domestic Violence."). That section's requirement that the federal government protect the states "against Invasion" could be argued to be inapplicable since, as previously stated, these foreign troops are also U.S. citizens, and it may be the case that, by definition, no one can invade a country they are a citizen of.

[22] One obvious objection to this scenario is that our government officials are more than content with taking substantial "donations" from wealthy American special interests, and that it is doubtful that a foreign government could ever exceed that largesse and win over our government officials. *See* Karl Evers-Hillstrom, *Most expensive ever: 2020 elections cost $14.4 billion*, OPEN SECRETS (Feb. 11, 2021, 1:14 PM), https://www.opensecrets.org/news/2021/02/2020-cycle-cost-14p4-billion-doubling-16/ ("Political spending in the 2020 election totaled $14.4 billion, more than doubling the total cost of the record-breaking 2016 presidential election cycle."); Jeffrey A. Winters & Benjamin I. Page, *Oligarchy in the United States?*, 7 PERSPECTIVES ON POLS. 731, 742 (2009) (noting that in election financing "the vast preponderance of money, some 80 percent of it, has generally come from a small 'donor class' constituting roughly one-tenth of 1 percent of the population."). This point is well-taken and readily conceded, and it will be shown that domestic minoritarian special interests can perpetrate similar usurpations. Nonetheless, regarding hypothetical foreign capture of our government through bribery, there may come a time when the United States is no longer a world superpower, and these wealthy special interests abandon the country or become destitute. In that scenario, our elected officials may become far more susceptible to foreign bribery. The Foreign Emoluments Clause was put in the Constitution for a reason. *See* THE FEDERALIST NO. 22, at XYZ (Alexander Hamilton) (XYZ ed., XYZyear) ("In republics, persons elevated from the mass of the community, by the suffrages of their fellow-citizens . . . may find compensations for betraying their trust . . . history furnishes us with so many mortifying examples of the prevalency of foreign corruption in republican governments.").

6

**The Historic American Nation**

In The Federalist No. 2, future inaugural Chief Justice John Jay sought to answer the question "whether it would conduce more to the interest of the people of America that they should, to all general purposes, be one nation, under one federal government, or that they should divide themselves into separate confederacies."[23] Jay, an ardent nationalist, vociferously argued for political unity, partly basing his argument on the benefits such unity would bring to the People given the geographical richness and contiguousness of the United States and its frontier lands which were ripe for agricultural and commercial exploitation.[24] However, Jay's call for political unity was based on far more salient facts than mere geography. Prefiguring Schmitt, Jay proposed that Americans must be politically united because they possess what Schmitt would later call "substantial equality" or "homogeneity."[25] Jay observed that Americans were:

> [A] people descended from the same ancestors, speaking the same language, professing the same religion, attached to the same principles of government, very similar in their manners and customs, and who, by their joint counsels, arms, and efforts, fighting side by side throughout a long and bloody war, have nobly established general liberty and independence.[26]

---

[23] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay).

[24] *See Id*. at XYZ ("[O]ne connected, fertile, widespreading country was the portion of our western sons of liberty . . . A succession of navigable waters . . . bind[s] it together; while the most noble rivers . . . present them with highways for the easy communication of friendly aids").

[25] SCHMITT, *supra* note 1, at 258–59 (arguing that "[p]olitical democracy . . . cannot rest on the inability to distinguish among persons," but can only survive "on the quality of belonging to a *particular people*. This quality of belonging to a people can be defined by very different elements (ideas of common race, belief, common destiny, and tradition). The *equality* . . . thus orients itself *internally*" and when such a democracy produces a state wherein citizens possess equal rights and obligations "democratic equality is a *substantial equality*.") (emphasis in original). *See also* Heiner Bielefeldt, *Carl Schmitt's Critique of Liberalism: Systematic Reconstruction and Countercriticism*, *in* LAW AS POLITICS: CARL SCHMITT'S CRITIQUE OF LIBERALISM 23, 27 (David Dyzenhaus ed., 1998) ("What ultimately counts in a genuine democracy, [Schmitt] says, is the sovereign authority of the collective unity of the people, a unity facilitated by, and resting on, some sort of 'substantial homogeneity.'").

[26] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay). Thus, Jay conceived of Americans as possessing *all* of the "different elements" that Schmitt suggested would provide the democratic "quality of belonging to a particular people." *See supra* note 25. However, as will be seen shortly, the most enduring and legally important of these elements would be the fact that Americans were "descended from the same ancestors," i.e., that Americans belonged to the White race. Indeed, it is almost certain that Jay had in mind a White, or pan-European, identity (as opposed to a British or Anglo-Saxon identity) when he wrote that Americans shared a common ancestry because Jay was himself of French Huguenot and Dutch descent (Hamilton was partially of French Huguenot descent), a fact that was oft remarked upon by his contemporaries. *See* Steven D. Griffin, The Effects of the Huguenot Diaspora on the American Revolution 149 (Oct. 6, 2016) (Master's Thesis, U.S. Army Command and General Staff College) (DTIC) ("John Jay, Alexander Hamilton, John Laurens, and Andrew Pickens, were quite aware of their shared [Huguenot] ancestry. It was a heritage remarked upon, in the historical and contemporary sense, by non-Huguenots like Ben Franklin, John Adams, John Rutledge, and Charles Pinckney, along with other, less-renowned contemporaries."). Furthermore, this Huguenot heritage may have made Jay more open to the idea of basing American national identity on pan-European grounds. *See id*. at 149–50 (discussing the "collective, chameleon-like ability [of Huguenots] to successfully acculturate" into European groups "sharing some aspect of the Christian tradition."). However, Jay was also an adamant anti-Catholic and his view of Americans as "professing the same religion" would likely, to his mind, have reflected the Protestant nature of 18th century America. *See id*. at 53, 77 (referring to Jay as "one of the most devout of the Founding Fathers" and noting his "hatred and distrust" of Catholics and "vehement" opposition to defending Catholic rights).

7

After noting both the unified character of America's geography and its demography, Jay, with rhetoric that may strike the modern reader as reminiscent of 20th century "blood and soil" nationalism, connected the two unities, stating that "[t]his country and this people seem to have been made for each other."[27] Expounding on this perceived connection between country and people and the need for political unity, Jay proffered that America's present situation was divinely ordained, and that "it appears as if it was the design of Providence, that an inheritance so proper and convenient for a band of brethren, united to each other by the strongest ties, should never be split into a number of unsocial, jealous, and alien sovereignties."[28] In Federalist No. 2, Jay clearly conceives of Americans as a singular, politically sovereign population with a sense of shared kinship, culture, common identity, history, and fate; thus, under Gat & Yakobson's definition of "nation," American identity is of a national character.[29] It was this national character of late 18th century Americans that formed the foundation of the rhetorical edifice constructed by The Federalist in which Jay, Hamilton, and Madison defended the Constitution and advocated for its ratification by the sovereign People.[30] This national unity was a "term" or a "material fact" upon which the "contract" was accepted.

Even Thomas Jefferson, an individual commonly grouped with the Anti-Federalists,[31] undoubtedly viewed the nascent American republic as resting not merely on a national foundation, but upon a national foundation that was explicitly racial in nature. Despite being a slaveowner, Jefferson, in his *Notes on the State of Virginia*, made it clear that he believed the abolition of slavery would be necessary to maintain America's republican spirit.[32] However, although

---

[27] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay). Cf. Adolf Hitler, Ger. Führer & Chancellor, Speech "On National Socialism and World Relations" Delivered in the German Reichstag (Jan. 30, 1937), *in* CALVIN UNIV. GER. PROPAGANDA ARCHIVE, https://research.calvin.edu/german-propaganda-archive/hitler1.htm (last visited Oct. 19, 2024) ("The main plank in the National Socialist program is to abolish the liberalistic concept of the individual and the Marxist concept of humanity and to substitute therefore the folk community, rooted in the soil and bound together by the bond of its common blood.").

[28] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay)

[29] *See supra* note 1.

[30] *See also* THE FEDERALIST NO. 14, at XYZ (James Madison) (XYZ ed., XYZyear) (calling upon readers to "[h]earken not to the unnatural voice which tells you that [Americans], knit together as they are by so many cords of affection, can no longer live together as members of the same family; . . . [and] can no longer be fellow citizens of one great, respectable, and flourishing empire."); *Id*., at XYZ ("[T]he kindred blood which flows in the veins of American citizens, the mingled blood which they have shed in defense of their sacred rights, consecrate their Union, and excite horror at the idea of their becoming aliens, rivals, enemies."); THE FEDERALIST NO. 22, *supra* note 22, at XYZ (Alexander Hamilton) ("The fabric of American empire ought to rest on the solid basis of THE CONSENT OF THE PEOPLE. The streams of national power ought to flow immediately from that pure, original fountain of all legitimate authority.") (emphasis in original).

[31] *But see* Michael J. Faber, *Thomas Jefferson, Federalist*, 128 VA. MAG. HIST. & BIOGRAPHY 282, 283 (2020) (acknowledging that "[b]ecause Jefferson advocated adding a bill of rights to the proposed Constitution, and because he later became the chief figure in the opposition party in the 1790s, he is easy to mistake for an Anti-Federalist. He is often identified as such in history textbooks and other places;" but nonetheless arguing that "Jefferson, though he had his doubts, clearly and unequivocally favored ratification of the Constitution. His position offers considerable insight into the Federalist position.").

[32] THOMAS JEFFERSON, NOTES ON THE STATE OF VIRGINIA XYZ (XYZ) ("Query 18 "Manners") (arguing that slavery had a negative influence on slaveowners, particularly their children who "catch[] the lineaments of wrath, put on the same airs [as their parents] in the[ir] circle of smaller slaves, . . . and thus nursed, educated, and daily exercised in tyranny, cannot but be stamped by it with odious peculiarities."); *see also Id*. (arguing further that slavery destroyed

Jefferson may have been (at least rhetorically) committed to abolition, he made no such commitments to integration and racial equality. To the contrary, Jefferson firmly believed that Black slaves, once freed, would have to be excluded from American society, lest the nation risk interracial conflict[33] and racial pollution.[34] Indeed, despite (or perhaps, also, due to) being a cosmopolitan polymath, Jefferson's opinions on Blacks might be reasonably described by modern readers as the most blunt—and even crude—of all the well-known Founders.[35] His views on American Indians were not much kinder.[36] For all that is made today of Jefferson's writing in the Declaration of Independence of the supposedly self-evident truth "that all men are created equal, that they are endowed by their Creator with certain unalienable Rights,"[37] it is often forgotten that Jefferson, in the very same document, concluded his list of grievances against the Crown by castigating the British for having "endeavoured to bring on the inhabitants of our frontiers, the merciless Indian Savages, whose known rule of warfare, is an undistinguished destruction of all ages, sexes and conditions."[38]  Regardless, Jefferson shared the expansionist aims of the leading Federalists, and argued forcefully that disunity between the states should not be permitted to result in subnational secession, and that the United States "must be viewed as the nest from which all America, North and South is to be peopled."[39] Expansion was to be carried out on a purely monoracial and nationalist basis.[40] Under Jeffersonian grand strategy, to ensure a workforce for

the work ethic of slaveowners and that American's faith that their "liberties are of the gift of God" would be destroyed when, "under the auspices of heaven," there would be "a total emancipation" which Jefferson hoped would occur "with the consent of the masters, rather than by their extirpation."). [REDO CITE WHEN HAVE PRINTCOPY]

[33] I*d*. at XYZ (Query 14 "Laws") (arguing that Blacks could not be made citizens because White prejudice, in addition to "ten thousand recollections, by the blacks, of the injuries they have sustained; new provocations; the real distinctions which nature has made; and many other circumstances, will divide us into parties, and produce convulsions which will probably never end but in the extermination of the one or the other race.").

[34] *Id*. at XYZ ("Among the Romans emancipation required but one effort. The slave, when made free, might mix with, without staining the blood of his master. But with us a second is necessary, unknown to history. When freed, he is to be removed beyond the reach of mixture.").

[35] *See, e.g., id*. at XYZ (describing Whites as more beautiful than Blacks given, *inter alia*, the "immoveable veil of black which covers all the emotions of the other race;" remarking that Blacks have a "very strong and disagreeable odour" and "seem to require less sleep" than Whites due to various anatomical differences; and arguing that Blacks are "in memory . . . equal to the whites; in reason much inferior, as I think one could scarcely be found capable of tracing and comprehending the investigations of Euclid; and that in imagination they are dull, tasteless, and anomalous."). *Notes on the State of Virginia* was a widely published book, and Jefferson felt no compunction about expressing these viewpoints publicly. Moreover, there is little evidence that the People had any compunction with electing him to the presidency despite him having expressed these viewpoints publicly. In other words, Jefferson was likely simply expressing (albeit, in his own unique way) what was the commonly held, noncontroversial racial worldview of contemporary Americans.

[36] *See id*. at XYZ (Query 11 "Aborigines") ("I know of no such thing existing as an Indian monument: for I would not honour with that name arrow points, stone hatchets, stone pipes, and half-shapen images . . . I think there is no remain as respectable as would be a common ditch for the draining of lands.").

[37] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776)

[38] *Id*. at para. 29.

[39] "From Thomas Jefferson to Archibald Stuart, 25 January 1786," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-09-02-0192. [Original source: *The Papers of Thomas Jefferson*, vol. 9, *1 November 1785–22 June 1786*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1954, pp. 217–219.]

[40] *See* "From Thomas Jefferson to James Monroe, 24 November 1801," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-35-02-0550. [Original source: *The Papers of Thomas Jefferson*, vol. 35, *1 August–30 November 1801*, ed. Barbara B. Oberg. Princeton: Princeton University Press, 2008,

the burgeoning United States, and provide a steadily growing population with which to settle its ever-growing frontiers, emancipation and "deportation" of freed Blacks would occur "peaceably and in such slow degree as that the evil will wear off insensibly, and their place be pari passu filled up by free white laborers."[41]

But White nationalism was not merely the idiosyncratic worldview of Jefferson and the leading Federalists. As Chin & Finkelman show, "whether or not they supported slavery, a majority of [the Founders] unambiguously conceived of the United States as a White country."[42] To create this White country—and encourage its expansion—an appropriate immigration and naturalization policy would have to be fashioned. Indeed, the Founders were not rabid nativists and understood the importance of permitting immigration.[43] One of Jefferson's grievances in the

pp. 718–722.] (explaining his hope that the United States would "cover the whole Northern, if not the Southern continent with a people speaking the same language, governed in similar forms, & by similar laws" but that he could not "contemplate, with satisfaction, either blot or mixture on that surface.").

[41] "Thomas Jefferson's Notes on Early Career (the so-called "Autobiography"), [6 January–29 July 1821], with editorial note on the Notes on Early Career (the so-called "Autobiography")," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/03-17-02-0324-0002. [Original source: *The Papers of Thomas Jefferson*, Retirement Series, vol. 17, *1 March to 30 November 1821*, ed. J. Jefferson Looney et al. Princeton: Princeton University Press, 2020, pp. 309–380.] Jefferson's belief that emancipation should be followed by the removal of newly freed Blacks from the United States was shared by many of his contemporaries. The American Society for Colonizing the Free People of Color of the United States (ACS), was founded in 1816 "by a group of white elites including Reverend Robert Finley, Charles Fenton Mercer, Henry Clay, Daniel Webster, Bushrod Washington, Elias Caldwell, and Francis Scott Key" who were dedicated to freeing enslaved Blacks and then deporting them. *See* Morgan Robinson, *The American Colonization Society*, WHITE HOUSE HIST. ASS'N, https://www.whitehousehistory.org/the-american-colonization-society (last visited Oct. 20, 2024). ACS members, "an unusual mix of abolitionists and enslavers," all "agreed that free Black people would never be accepted as equals in the United States" and that Blacks and Whites "could not peacefully co-exist in society;" and thus, "the organization sought to create and settle a colony in West Africa to fulfill its mission." *Id*. Presidents Jefferson, Madison, and Monroe all supported the ACS politically, financially, or through their personal energies (Madison, for example, served as the ACS's third president from 1833 until his death in 1836). *Id*. Chief Justice John Marshall, who "feared slavery would split his state and country," was also a backer of the ACS. *See John Marshall (1755-1835)*, WM. & MARY LIBRS., https://scrc-kb.libraries.wm.edu/john-marshall-1755-1835 (last visited Oct. 20, 2024).

[42] Gabriel J. Chin & Paul Finkelman, *The "Free White Person" Clause of the Naturalization Act of 1790 as Super-Statute*, 65 WM. & MARY L. REV. 1047, 1048 (2024).

[43] However, this is not to imply that—aside from the racial restrictions they would put on immigration and naturalization—the founders supported an unlimited immigration policy; and all of them would likely have understood that even European immigration could be dangerous if not properly circumscribed. *See, e.g.,* "The Examination Number VIII, [12 January 1802]," *Founders Online,* National Archives, https://founders.archives.gov/documents/Hamilton/01-25-02-0282. [Original source: *The Papers of Alexander Hamilton*, vol. 25, *July 1800–April 1802*, ed. Harold C. Syrett. New York: Columbia University Press, 1977, pp. 495–497.] (agreeing with Jefferson that "that foreigners will generally be apt to bring with them attachments to the persons they have left behind; to the country of their nativity, and to its particular customs and manners" and that there was a risk that they would lack "that temperate love of liberty, so essential to real republicanism;" and arguing further that the U.S. has "already felt the evils of incorporating a large number of foreigners into their national mass; it has served very much to divide the community and to distract our councils, by promoting in different classes different predilections in favor of particular foreign nations, and antipathies against others" but nonetheless stating that these observations were not a call "for a total prohibition of the right of citizenship to strangers, nor even for the very long residence which is now a prerequisite to naturalization, and which of itself, goes far towards a denial of that privilege."). And of course, as previously explained, there was always tension between the monoracial White nationalism of certain Founders and the existence of slavery, particularly with regard to its Constitutional entrenchment in Article V's provision that no amendment could be made before 1808 altering the first clause of Article

Declaration of Independence was that the Crown prevented the "population of these States" by obstructing immigration and failing to pass "Laws for Naturalization of Foreigners" in order to block American frontier expansion.[44] The Constitution itself permits Congress to "establish a uniform Rule of Naturalization."[45] Moreover, "everyone at the Convention would have understood that a 'uniform Rule of Naturalization' would be tied to race."[46] Thus, the 28th law passed by the first Congress—crucially, preceding the ratification of the Bill of Rights—was the Naturalization Act of 1790.[47] That act, promptly signed into law by President Washington, limited naturalization to "any alien, being a free white person, who . . . is a person of good character" upon their "taking the oath or affirmation prescribed by law, to support the constitution of the United States."[48] Given the timing of the 1790 act, this language is important supplemental evidence (in addition to the writings of the leading Federalists and Jefferson) to support the characterization of the People as belonging exclusively to the White race. Moreover, although the 1790 act was eventually amended and superseded, the racial restriction on naturalization remained for more than 160 years.[49]

Along with the founders, the basic foundational principle of White nationalism would continue to be respected and reinforced by American jurists for generations to come. Numerous antebellum court opinions relied on White nationalism as a guiding legal principle. In 1857, the Supreme Court, in an opinion written by Chief Justice Roger Taney, would rule that, under the

---

I, Section 9 which prevented Congress from interfering with "[t]he Migration or Importation of such Persons as any of the States now existing shall think proper to admit" before 1808, an oblique reference to the African slave trade. U.S. CONST. art. I, § 9, cl. 1; *id*. art V. On the other hand, the slave trade was outlawed as quickly as possible pursuant to these Constitutional provisions. *See* Act Prohibiting Importation of Slaves of 1807, Pub. L. No. 9-22, 2 Stat. 426 (declaring it to be illegal "from and after [Jan. 1, 1808] to import "any negro, mulatto, or person of colour, with intent to hold, sell, or dispose of such . . . as a slave, or to be held to service or labour."). Indeed, Congress had gone far to eliminate the slave trade by 1794 when it prohibited American vessels from being prepared or used for the slave trade. *See* Slave Trade Act of 1794, Pub. L. No. 3-11, 1 Stat. 347.

[44] *See* THE DECLARATION OF INDEPENDENCE para. 9 (U.S. 1776).

[45] U.S. CONST. art. I, § 8, cl. 4.

[46] Chin & Finkelman, *supra* note 42, at 1067.

[47] *Id*.

[48] Naturalization Act of 1790, ch. 3, 1 Stat. 103. The requirement that prospective naturalized citizens publicly swear to take an oath "to support and defend the Constitution and the laws of the United States against all enemies, foreign and domestic" is still a part of U.S. naturalization law, in addition to a requirement that the prospective naturalized citizen "renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which the applicant was before a subject or citizen." 8 U.S.C. § 1448(a).

[49] *See Ozawa v. United States*, 260 U.S. 178, 192–93 (1922) ("In all of the naturalization acts from 1790 to 1906 the privilege of naturalization was confined to white persons . . . although the exact wording of the various statutes was not always the same."). In 1870, during the fervor of Reconstruction, the Senate voted narrowly (21-20) to insert a provision into what would become the Naturalization Act of 1870 which would permit the naturalization of "aliens of African nativity and to persons of African descent." Chin & Finkelman, *supra* note 42, at 1102. Nonetheless, no other non-White group was permitted to naturalize, and (in addition to the practical difficulties barring the migration of Africans to the United States in the late 19th century) "[w]hile nominally favored in this way" U.S. immigration law "consistently discriminated against persons of African ancestry" until decades later. *Id*. at 1102 n.313. These laws would remain in effect until 1952 when "in part as a response to the Cold War and the integration of post-war Japan into the emerging western alliance, the United States eliminated all racial restrictions on naturalization, while at the same time continuing ethnic and racial restrictions on immigration through national origins quotas." *Id*. at 1110. There would not be "race neutrality [in] the immigration stream" until the passage of the 1965 Immigration and Naturalization Act (Hart-Celler Act) and the abolition of the national origins quota system. Gabriel J. Chin & Douglas M. Spencer, *Did Multicultural America Result from a Mistake - The 1965 Immigration Act and Evidence from Roll Call Votes*, 2015 UNIV. ILL. L. REV. 1239, 1241 (2015).

U.S. Constitution, Blacks (and, presumably, all non-Whites) "had no rights which the white man was bound to respect."[50] Furthermore, as Chin & Finkelman show, Chief Justice Taney "was not alone in arguing for the importance . . . of the exclusively White nature of the political community," and numerous state and territorial court decisions came to similar conclusions.[51] Importantly, not all of these states and territories would come to secede and form the core states of the Confederacy. For example, in 1853 the Supreme Court of the Territory of Oregon ruled that "[a]ll which tends to prevent immigration, the free occupation and use of the country by whites, must be considered as repealed" and that "[w]hatever militates against the true interests of a white population is inapplicable" in upholding the conviction of an American Indian for violating a provision of an 1834 act of Congress which designated Oregon as "Indian country" and prohibited the sale of liquor therein to Indians.[52] Despite Oregon having been substantially settled by Whites in the interim, and "[v]ery much of the act of 1834" being "clearly unsuited to the present condition of the country," the court reasoned that the provision against selling liquor to Indians should still be upheld because if that provision was "required in a country wholly inhabited by Indians," then there was even more necessity for the provision now "where defenceless white persons, women and children, are exposed to the violence of drunken savages."[53] Similarly, in the same year, the Supreme Court of Pennsylvania ruled in dicta that "[w]henever the white population, who settled this Commonwealth, . . . think proper to admit into political partnership either the black population of Africa or the red aborigines of America, they have a right to do so."[54] However, the court continued, "[u]ntil this be done, the negro and the Indian must be content with the privileges extended to them, without aspiring to the exercise of the elective franchise, or to the right to become our legislators, judges and governors."[55] That territorial and state courts at both ends of the continent would validate White nationalism in the middle of the 18th century could hardly come as a surprise given how, three decades earlier, the Court, in an opinion by Chief Justice Marshall, gave judicial sanction to the conquest of the West by Whites in a race war.[56]

---

[50] *Dred Scott v. Sandford*, 60 U.S. 393, 407 (1857), *superseded by constitutional amendment*, U.S. CONST. amend. XIV. Chin & Finkelman criticize Chief Justice Taney for ignoring "that free Black persons voted in a majority of the states ratifying the Constitution and in two of the three states admitted to the Union in the 1790s." Chin & Finkelman, *supra* note 41, at 1063. However, this fact is completely inapposite because Taney applied the U.S. Constitution in *Dred Scott*. Indeed, the conceded fact that Blacks could not vote in many states (in addition to the fact that most Blacks in the United States in 1857 were enslaved) *reinforces* Taney's argument that government was not "bound" to grant rights to Blacks (enslaved or free). As Chin & Finkelman themselves show, "[w]hile Connecticut enfranchised Black people at the Founding, this right disappeared with the adoption of the Connecticut Constitution of 1818, which granted the privilege only to 'white male citizen[s].'" *Id.*, at 1090 n.241. The Connecticut example proves that, in the antebellum period, whatever rights Blacks, or any other non-Whites, possessed existed at the pleasure of the governments which granted them those rights, and could be revoked through regular amendment processes (or, if the rights were statutory in origin, through mere legislative change). *Dred Scott* is correctly maligned for other reasons; but, as a matter of first principles, the Chief Justice was correct on this issue.

[51] Chin & Finkelman, supra note 41, at 1090.

[52] *United States v. Tom*, 1 Or. 26, 27 (1853)

[53] *Id.* at 27–28.

[54] *Foremans v. Tamm*, 1 Grant 23, 23 (Pa. 1853)

[55] *Id*.

[56] *See Johnson's Lessee v. M'Intosh*, 21 U.S. 543, 590 (1823) (arguing that "the tribes of Indians inhabiting this country were fierce savages, . . . [t]o leave them in possession of their country, was to leave the country a wilderness; to govern them as a distinct people, was impossible;" thus, "Europeans were under the necessity . . . of enforcing [their] claims by the sword, . . . or of remaining in their neighbourhood, and exposing themselves and their families

Not even the presidency of Abraham Lincoln and Reconstruction would bring the force of White nationalism to an end. Clearly, by modern standards, "the Great Emancipator" cannot be considered a racial egalitarian. It was Lincoln who said, in the fourth Lincoln-Douglas debate in Charleston, Illinois in 1858, that he was not "in favor of bringing about in any way the social and political equality of the white and black races" nor was he "in favor of making voters or jurors of negroes, nor of qualifying them to hold office, nor to intermarry with white people."[57] Lincoln justified these beliefs by pointing to "a physical difference between the white and black races" which he believed would "forever forbid the two races living together on terms of social and political equality."[58] Indeed, Lincoln "endorsed colonization [i.e., deporting freed Blacks] earlier in his life and even during his presidency."[59] In August, 1862, almost a year before the Battle of Gettysburg would mark the turning point of the Civil War, Lincoln invited "a committee of colored men" to the White House where he told them that Whites and Blacks "are different races" and "have between us a broader difference than exists between almost any other two races" which "is a great disadvantage to us both."[60] All of this belies Ackerman's assertion that, had it not been for his assassination, Lincoln would have "proudly signed" the Reconstruction acts which his successor vehemently opposed.[61]

Like Lincoln, Justice John Marshall Harlan, "the Great Dissenter," must also be counted among the nationalists and racists of American history. In his famed dissent in *Plessy*, the first Justice Harlan goes to great lengths to make his (rather curious) view clear that "social equality" between the races was not at issue in *Plessy*[62] and that, regardless, Whites were "the dominant race"[63] in America. In one passage, Justice Harlan states that "[s]ixty millions of whites are in no danger from the presence here [in America] of eight millions of blacks" which, of course, raises the question of whether they would be in danger if the demographic situation were to be reversed.[64]

---

to the perpetual hazard of being massacred."). Chief Justice Marshall's pithy and conclusory narrative summation of the conflict between Indians and Whites (almost, as if, the conflict was not still ongoing) sounds not in "justice," but in militant nationalism: "Frequent and bloody wars, in which the whites were not always the aggressors, unavoidably ensued. European policy, numbers, and skill, prevailed. As the white population advanced, that of the Indians necessarily receded." *Id*. And so, the Chief Justice ruled that, if the right of conquest is "asserted in the first instance, and afterwards sustained; if a country has been acquired and held under it; if the property of the great mass of the community originates in it, it becomes the law of the land, and cannot be questioned." *Id*. at 591.

[57] https://home.nps.gov/liho/learn/historyculture/debate4.htm [FIX BB CITE]

[58] *Id*. Furthermore, Lincoln stated: "inasmuch as they cannot so live, while they do remain together there must be the position of superior and inferior, and I as much as any other man am in favor of having the superior position assigned to the white race." *Id*.

[59] *See* Robinson, *supra* note 41.

[60] https://www.presidency.ucsb.edu/documents/address-colonization-deputation-colored-men. [FIX BB CITE] Lincoln also told his Black guests that American Whites "suffer from your presence" and that "[b]ut for your race among us there could not be war, although many men engaged on either side do not care for you one way or the other;" he concluded, "[i]t is better for us both, therefore, to be separated." *Id*.

[61] *See* Bruce Ackerman, *The Living Constitution*, 120 HARV. L. REV. 1737, 1767 (2007).

[62] *Plessy v. Ferguson*, 163 U.S. 537, 561 (1896) (Harlan, J., dissenting) (arguing that "social equality no more exists between two races when traveling in a passenger coach or a public highway than when members of the same races sit by each other in a street car or in the jury box").

[63] *Id*. at 562.

[64] *Id*. at 560. *See also* Michael T. Kaufman, *12 White Teachers and Children Killed by Guerillas in Rhodesia*, N.Y. TIMES ARCHIVE (June 25, 1978), https://www.nytimes.com/1978/06/25/archives/12-white-teachers-and-

Moreover, although Justice Harlan may have been a defender of Black rights,[65] he had no such commitment to equality when it came to Chinese.[66] Perhaps nothing else demonstrates the enduring relevancy of White nationalism in the American political fabric in the postbellum period than the fact that, nearly sixty years after Appomattox, the Republican candidate in the 1924 Presidential election had, three years prior as the sitting Vice President, written an article in *Good Housekeeping* arguing that"[t]here are racial considerations too grave to be brushed aside for sentimental reasons" and that "[q]uality of mind and body suggests that observance of ethnic law is as great a necessity to a nation as immigration law."[67] His Democratic opponent, on the other hand, would in 1952 argue on behalf of the segregated school district in the first of the *Brown v. Board of Education* companion cases.[68] Thus, it would appear that generations after the Civil War and Reconstruction, Americans were still in broad agreement regarding the nationalistic nature of the constitutional order and the White race's position of primacy therein.

Of course, the most obvious reason why White nationalism maintained itself in American law and politics for more than a century and a half after the ratification of the Constitution is the simple demographic fact that, during this time, the United States was a supermajority White country. In defending their accurate characterization of the 1790 Naturalization Act as a "super-statute,"[69] Chin & Finkelman note that the act "helps explain why, for example, as late as 1960, more than 99 percent of Americans were White or Black."[70] While this statement is unquestionably true, it obfuscates the fact that in 1960 the country was 88.8 % White and had reached "peak

---

children-killed-by-guerrillas-in-rhodesia.html (Twelve people, . . . all whites, were battered and bayoneted to death by black nationalists . . . Autopsies have not yet been performed, but the bodies of the women were in partial undress and there was a suggestion that they had been sexually assaulted.").

[65] *But see Pace v. Alabama*, 106 U.S. 583, 585 (1883) (where Justice Harlan joined a unanimous Court in upholding an Alabama anti-miscegenation law, with the Court reasoning that the law was not discriminatory because it "includes the offense when the persons of the two sexes are both white and when they are both black" and "applies the same punishment to both offenders, the white and the black."); *Cumming v. Bd. of Ed. of Richmond Cnty.*, 175 U.S. 528, 545 (1899) (Harlan, J.) (upholding a segregated schooling scheme and ruling that "the education of the people in schools maintained by state taxation is a matter belonging to the respective states, and any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of rights").

[66] *See Plessy*, 163 U.S. at 561 (Harlan, J., dissenting) ("There is a race so different from our own that we do not permit those belonging to it to become citizens of the United States. Persons belonging to it are, with few exceptions, absolutely excluded from our country. I allude to the Chinese race."); *United States v. Wong Kim Ark*, 169 U.S. 649, 707 (1898) (Field, J., dissenting) (Justice Harlan joining Justice Fields's dissent which stated that "[n]ationality is essentially a political idea, and belongs to the sphere of public law" and argued that Wong Kim Ark, who was born in the U.S., should not be granted citizenship pursuant to the Fourteenth Amendment because his parents were Chinese subjects); *Chae Chan Ping v. United States*, 130 U.S. 581, 606 (1889) (Justice Harlan joining a unanimous court in upholding the Chinese Exclusion Act and ruling that if Congress "considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be dangerous to its peace and security, their exclusion is not to be stayed").

[67] Calvin Coolidge, *Whose Country is This?*, GOOD HOUSEKEEPING, Feb., 1921, at 14 ("Biological laws tell us that certain divergent people will not mix or blend. The Nordics propagate themselves successfully. With other races, the outcome shows deterioration on both sides.")

[68] *Briggs v. Elliott*, 342 U.S. 350 (1952).

[69] *See* William N. Eskridge, Jr. and John Ferejohn, *Super-statutes*, 50 DUKE L. J. 1215, 1216 (2001) (defining a super-statute as a law or series of laws that "(1) seeks to establish a new normative or institutional framework for state policy and (2) over time does "stick" in the public culture such that (3) the super-statute and its institutional or normative principles have a broad effect on the law" which goes "beyond the four corners of the statute.").

[70] Chin & Finkelman, *supra* note 42, at 1048.

14

Whiteness" in 1940 when the country was 89.8% White.[71] Remarkably, the United States had gotten steadily more White since 1790, when the White population was only 80.7% of the country's total population.[72] Obviously, when evaluating the effectiveness of the 1790 act, given that the purpose of the act was to make the United States a homogenous White country, the percentage of Whites, standing alone, is a far more important statistic to relay than the percentage of Whites and Blacks together.

Regardless, as Chin & Spencer observe, the demise of racial immigration restrictions with the 1965 Hart-Celler Act (and one should also note, a massive increase in illegal infiltration[73] and the fact of differential birth rates[74]) has set the United States on a course to become a majority non-White country by 2043.[75] All of this has occurred despite the fact that the People, as originally conceived,[76] never asked to be made a minority,[77] and a significant portion of them are revolted by that potential eventuality.[78] Indeed, when the People are informed of demographic statistics and trends, many come to view this process as a "collective existential threat."[79]

---

[71] Campbell Gibson & Kay Jung, *Historical Census Statistics on Population Totals By Race, 1790 to 1990, and by Hispanic Origin, 1970 to 1990, for the United States, Regions, Divisions, and States,* 19 tbl. 1 (U.S. Census Bureau, Working Paper No. 56, 2002).

[72] *Id.*

[73] *See* AVIVA CHOMSKY, UNDOCUMENTED: HOW IMMIGRATION BECAME ILLEGAL 184 (2014) (noting that "all types of immigration from Latin America rose after 1965: temporary and permanent, legal and illegal"); Ashley Wu, *Why Illegal Border Crossings Are at Sustained Highs*, N.Y. TIMES (Oct. 29, 2023), https://www.nytimes.com/interactive/2023/10/29/us/illegal-border-crossings-data.html (showing that the three years with the most number of annual southwestern border apprehensions in the 21st century occurred in 2021, 2022, and 2023).

[74] Jeffrey S. Passel et al., Explaining Why Minority Births Now Outnumber White Births, PEW RSCH. CTR. (May 17, 2012), https://www.pewresearch.org/social-trends/2012/05/17/explaining-why-minority-births-now-outnumber-white-births/ (showing the White and Asian fertility rate at 1.8, the Black rate at 2.1, and the Hispanic rate at 2.4). *See also* Sabrina Tavernise, *Fewer Births Than Deaths Among Whites in Majority of U.S. States*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/us/white-minority-population.html (reporting findings that "[d]eaths began to exceed births for whites countrywide in 2016").

[75] Chin & Spencer, *supra* note 49, at 1242 (citing Press Release, U.S. Census Bureau, U.S. Census Bureau Projections Show a Slower Growing, Older, More Diverse Nation a Half Century from Now (Dec. 12, 2012), https://www.census.gov/newsroom/releases/archives/population/cb12-243.html).

[76] That is, White Americans.

[77] Jeffrey M. Jones, *Sharply More Americans Want to Curb Immigration to U.S.*, GALLUP (July 12, 2024), https://news.gallup.com/poll/647123/sharply-americans-curb-immigration.aspx (showing that from 1965 to the late 1990s, less than 10% of Americans wanted increased levels of immigration, and 55% of Americans now want immigration levels reduced).

[78] *See* Jens Manuel Krogstad et al., *Most Americans say the declining share of White people in the U.S. is neither good nor bad for society*, PEW RSCH. CTR. (Aug. 23, 2021), https://www.pewresearch.org/short-reads/2021/08/23/most-americans-say-the-declining-share-of-white-people-in-the-u-s-is-neither-good-nor-bad-for-society/ (finding more than double the number of White Americans explicitly say "White people declining as a share of the U.S. population" is somewhat bad or very bad "for society" than say it is somewhat good or very good); Kim Parker et al., *Looking to the Future, Public Sees an America in Decline on Many Fronts*, PEW RSCH. CTR. (Mar. 21, 2019), https://www.pewresearch.org/social-trends/2019/03/21/public-sees-an-america-in-decline-on-many-fronts/ (reporting that 46% of White Americans "say a majority nonwhite population will weaken American culture" whereas only 23% say it will strength it).

[79] *See* Hui Bai & Christopher M. Federico, *Collective existential threat mediates White population decline's effect on defensive reactions*, 23 GRP. PROCESSES & INTERGROUP RELS. 361, 374 (2019) (reporting findings which suggest

What, then, is the substantive legal difference between the demographic change described in the thought experiment above, and the way demographics have actually changed in America? The results of the two will be the same: the People, as once defined, will be replaced, without their consent, with another people—who will then make the electoral decisions[80] and serve as the country's political leaders[81]—via policy decisions (and omissions) by the constituted government. By any means, such a process entails an illegitimate revolution. The only notable differences between reality and the hypothetical are in the degree to which the illegitimate revolution has occurred (Whites becoming a mere minority in 2043 does not necessarily mean they will occupy the same population ratio as outlined in the thought experiment)[82] and the pace of the revolution. But one illegality done less dramatically (and more imperceptibly) than another illegality hardly legitimizes the former.

The People still have a valid, inextinguishable claim to sovereignty in our country. More importantly, our numbers and talents are such that—if we are united—we can maintain this sovereignty despite what has transpired and restore ourselves to a position of undisputed control over the constituted power. To do so will obviously require tremendous political efforts, but those efforts are worth it to retain the nation which our Founders bequeathed to us, their posterity. But once our restoration is complete, we cannot permit such illegitimate demographic revolutions to ever again threaten our security and power in our ancestral homeland. To that end, constitutional changes will have to be made.

---

that exposure to information about White population decline "does not merely trigger the threat considered in most studies of demographic change, that is, status threat; . . . it may additionally elicit fears that the ingroup will actually cease to exist.")

[80] Non-Whites have a dramatic effect on the electoral results in America. For example, 538's new "Swing-O-Matic" tool allows users to alter various demographics to see how the 2024 election might play out under different conditions. Using data which reflects "vote preference and turnout levels from 2020's matchup between Trump and President Joe Biden, adjusted for demographic shifts since then" one can see that Vice President Kamala Harris would win the election with 303 electoral votes and 51% of the popular vote. However, if turnout levels are changed so that the non-White electorate turns out at the lowest allowable level in the simulator (1%), former President Donald Trump is predicted to win with 326 electoral votes and 54% of the popular vote. On the other hand, if the White turnout is set to 1%, then Vice President Harris would win with an astonishing 507 electoral votes and 67% of the popular vote. *See* Elliot Morris et al., *What Would It Take To Turn Blue/Red States Red/Blue?*, ABC News: 538, https://projects.fivethirtyeight.com/2024-swing-the-election/ (last visited Oct. 23, 2024 9:30 PM).

[81] The 2024 Presidential election will feature one such individual, Vice President Kamala Harris, who is the daughter of two non-White immigrants and who was born in this country when neither of her parents were American citizens (thus providing her citizenship by birth pursuant to the Supreme Court's interpretation of the Fourteenth Amendment's Citizenship Clause in *Wong Kim Ark*). However, it is worth noting how the effects of demographic change (and changes in conventional attitudes on race and nationalism) are reflected in the rhetoric of both candidates. *Compare* Vice President Kamala Harris, Democratic Presidential Candidate Acceptance Speech at DNC (Aug. 23, 2024), *in* N.Y. Times, https://www.nytimes.com/2024/08/23/us/politics/kamala-harris-speech-transcript.html (last visited Oct. 23, 2024) (accepting her nomination "on behalf of the people, on behalf of every American, regardless of party, race, gender or the language your grandmother speaks. On behalf of my mother, and everyone who has ever set out on their own unlikely journey."), *with* Former President Donald Trump, Republican Presidential Candidate Acceptance Speech at RNC (July 19, 2024), *in* N.Y. TIMES, https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html (last visited Oct. 23, 2024) ("Together, we will launch a new era of safety, prosperity and freedom for citizens of every race, religion, color and creed."). The contrast with the attitudes and views of the candidates in 1924, and other historic American leaders discussed above, is obvious and requires little explanation.

[82] However, there is also no reason to think demographics will become set in stone come 2043. In fact, given differential birth rates, White deaths outpacing births, and increasing levels of immigration, there is every reason to think that change and replacement will continue to accelerate and diminish the White share of the population.

16

**Restoring Sovereignty to the People – Article V, Section 2**

For reasons that will be explained shortly, Article V is the correct place where the American Restoration is to be given textual validation within the Constitution. Article V, as currently written, should be designated as Article V, Section 1, and a second section should be created which ought to read as such:

The People are White, and the United States, where they are Sovereign, is their country. It is the affirmative duty of the government to enforce the provisions of this section. Dual and multiple citizenship is prohibited, and everyone possessing dual or multiple citizenship within ninety days of this section going into effect are to be divested of American citizenship. Nothing under this Article, or in any other Article of this Constitution, shall be construed to permit a splintering of the unity of the national territory or a degradation of the homogenous, national character of the sovereign People unless supported by a vote of more than nine tenths of the eligible electorate in a national, popular referendum on enacting an amendment ratified according to the process outlined in Article V, Section 1. The text of this paragraph is perpetual and may not be altered by any means.

All changes heretofore, since this Constitution's enactment, to the homogenous, national character of the sovereign People are hereby deemed *void ab initio* with all attendant consequences flowing from this action being in effect. The Citizenship Clause of the Fourteenth Amendment is repealed, along with the entirety of the Fifteenth Amendment. All references to "person(s)" within this Constitution are to be read as "citizen(s)." All individuals who lose citizenship due to this paragraph, who are currently residing solely in the United States, and have no other national citizenship are hereby granted temporary residency status for a period of ten years, which may be extended as deemed necessary by Congress. The President shall have an absolute right to revoke any such individual's temporary status at any time. Henceforth, no non-citizen who is ineligible for citizenship, upon entering the United States, may reside in the several states for longer than six months in a five-year period.

The referendum vote outlined in the first paragraph of this section is to occur in-person on the day of the second Presidential election following ratification. When referendums occur during these elections, those elections shall be national holidays. States may withdraw their approval for ratification at any point until the amendment has been ratified by three fourths of the states. An amendment defeated in the national referendum may not be submitted again for the People's consideration for a period of twenty years. All amendments enacted through this procedure may be nullified according to the procedure outlined in Article V, Section 1.

Deliberate attempts or conspiracies to flagrantly contravene this section, or abuse this provision, may be considered treason against the People, per the Article III, Section 3 procedure, and tried in the Senate or the House of Representatives. The People retain the right to enforce this section, and prevent its abuse, by any means necessary. In any criminal case against a citizen for alleged crimes against any

individual having taken an oath under this Constitution, this section and paragraph may be invoked as a defense for a jury to consider. Once invoked, any case held in a venue in the capital district shall be moved to a federal venue in a randomly selected state. This defense may not be withdrawn once asserted, and any individual convicted of any crime after asserting this defense may not appeal their conviction and must be put to death within twenty-four hours after the guilty verdict has been rendered. Whenever this defense is asserted, and the jury cannot reach a unanimous verdict after seven days of deliberation, the jury shall be polled. If a majority of the jury favors acquittal, then the defendant is deemed acquitted. If no majority in favor of acquittal has been reached, deliberation will continue and a new poll will be taken every 72 hours until a majority is reached, a verdict is rendered, or a mistrial is declared.

The amendment process is a necessary aspect of the Constitution. As Albert correctly observes, formal amendment processes and rules bind future political actors, "facilitate improvements or corrections to the constitutional text, . . . heighten public awareness, check political branches, promote democracy, and pacify constitutional change."[83] However, these worthy goals, in particular the goal of promoting "democracy" (by which popular sovereignty is reasonably coterminous) can only be achieved if the amendment process reflects the will of the true sovereign. In the United States, the Article V amendment process does not feature a mechanism for direct popular amendment.[84] Nonetheless, Article V amendments (like ordinary legislation) may reflect the will of the people if results of political processes that select representatives (and thereby who may directly participate in the Article V amendment process) are accurate reflections of the Sovereign's will. As explained, improperly restrained demographic change can diminish the power of the People and result in a usurpation of their sovereignty through the introduction of foreigners who cannot be assimilated into the People as defined. Mathematics dictates (and political experience suggests)[85] that, when the franchise is extended to these interlopers, elections will tend to decreasingly reflect the will of the People. Article V, Section 2 aims to block all of this, and thus shore up the important goals of the amendment process generally. Its provisions are not merely prophylactic and preservative, but also remedial and restorative. They are also, obviously, quite radical and may, at first glance, seem incoherent when viewed together. Thus, further detailed explanation is required.

*Paragraph 1 of Article V, Section 2*

As indicated by the last sentence of this paragraph, the text of this paragraph (and only this paragraph) is permanent and unamendable by any means, reflecting the crucial importance of the provisions of this paragraph to the overarching goals of Article V. The first sentence of the first

---

[83] Albert, *supra* note 1, at 230–31.

[84] *See* U.S. Const. art. V;  Amar, *supra* note 3, at 90 ("stating that Article V "merely specifies how ordinary government can amend the Constitution *without* recurring to the People themselves, the true and sovereign source of all lawful power.") (emphasis in original).

[85] *See* Hamilton, *supra* note 43. It should be remembered that the immigrants Hamilton was speaking of here were all definitionally (i.e., racially) assimilable into the People. Obviously, racially foreign, definitionally unassimilable peoples would naturally cling to their own identities when faced with a body politic that requires their exclusion as a precondition for its continued homogenous existence.

paragraph of Article V, Section 2 aims to entrench the nationalist view of the American People held by the Founders and generations of succeeding Americans.[86] It also makes popular sovereignty over the United States and its government explicit, a principle which is still nominally accepted in American law.[87] If the People possess the moral confidence to assert their sovereignty, they must also logically assert their right to exist as they define themselves. Similarly, if their Union is to be perpetual,[88] then they themselves must be perpetual. According to Zackin, one of the primary purposes of constitutional entrenchment is "to prevent government from intervening in the ways that it had before."[89] Similarly, the purpose here is to prevent the constituted government from affirmatively facilitating the kinds of changes to the form of the sovereign as it has done since 1868. Preventing these changes being effectuated via omissions is the purpose of the next sentence charging the government with the duty of upholding this section.

This paragraph also permanently abolishes dual and multiple citizenship from the American political landscape. As was demonstrated by the thought experiment, dual and multiple citizenship permits an individual to be subject to the will of two or more governments, and thus, to two or more sovereigns. This may have disastrous results, particularly if a substantial number of people comprising the citizens of one country are also citizens of ours; a situation which would facilitate their coordination on political matters. The potential for subverting and misdirecting the People's sovereign will to advance the ends of an alien entity or people is too great to permit dual or multiple citizenship to exist in the United States.

The language of "[n]othing under this Article, or in any other Article of this Constitution" is used to indicate that this paragraph shall be applicable to (and, hopefully, preventative of) informal amendment through legislation, executive order, or judicial interpretation which is contrary to the language of this paragraph.

---

[86] One inevitable objection to this provision will be of a practical nature: how does one define "White?" A detailed answer to this question is beyond the scope of this paper. However, two observations are appropriate. First, people are generally able to viscerally recognize the race of most individuals (or at least, they are able to recognize if they are not White). Secondly, this standard was workable for most of this nation's history. *See generally* IAN HANEY LÓPEZ, WHITE BY LAW (get print copy for pg#) (2006) (describing various court cases in American history aimed at determining if the petitioner was White, and explaining how "[t]hough the courts offered many different rationales to justify the various racial divisions they advanced, two predominated: common knowledge and scientific evidence"). Indeed, the development of artificial intelligence presents one promising means of being able to determine an individual's race. *See generally* Gichoya et al., *AI recognition of patient race in medical imaging: a modelling study*, 4 LANCET DIGIT. HEALTH e406 (finding "that AI can accurately predict self-reported race, even from corrupted, cropped, and noised medical images, often when clinical experts cannot").

[87] *See supra* note 8.

[88] *See Texas v. White*, 74 U.S. 700, 724–25 (1868) (stating that "[t]he Union of the States never was a purely artificial and arbitrary relation" and that, because "the Constitution was ordained 'to form a more perfect Union'" that Union was "indissoluble" and intended to exist in "perpetuity"), *overruled on other grounds by Morgan v. United States*, 113 U.S. 476 (1885).

[89] EMILY ZACKIN, LOOKING FOR RIGHTS IN ALL THE WRONG PLACES: WHY STATE CONSTITUTIONS CONTAIN AMERICA'S POSITIVE RIGHTS [CHAPTER 2, 2nd2lastpage] (2013).

The purpose of the "splintering . . . of the national territory" language is to entrench the ruling in *Texas v. White* that the Union is perpetual and indissoluble.[90] Thus, subnational secession is to be explicitly unconstitutional, barring the amendment process outlined here. The purpose of the "degradation of the homogenous, national character of the sovereign People" language is to prevent the redefinitions and alterations of the People which have taken place since 1868 barring, again, the amendment process outlined here. That process is, obviously, quite strict. The animating purpose behind the requirement that these amendments receive the support of "more than nine tenths of the eligible electorate in a national, popular referendum" *following* the procedure of Article V, Section 1 is, plainly, to prevent change and preserve the existing definition of the People. This, again, speaks to the moral confidence which the People must wield to assert and defend their sovereignty. The more than nine tenths requirement reflects the belief that, if such fundamental changes are to be made to the form and composition of the Sovereign, they should receive consensus and some support from "the tenth man;"[91] and the requirement that the nine tenths be of the whole electorate reflects the belief that a failure to express explicit disapproval does not negate the right of any eligible voter to provide explicit, affirmative consent before their nation is fundamentally altered. This requirement also reflects an understanding of (and disdain for) the power of oligarchy, particularly with regards to oligarchy's ability to alter the beliefs of the People, and an awareness of the oligarchical interest in subverting the People and usurping their

---

[90] *See supra* note 88.

[91] James Dudley, *Incorporating the 'tenth man' concept into critical decision-making*, POLICE1 (June 15, 2021, 10:04 AM), https://www.police1.com/chiefs-sheriffs/articles/incorporating-the-tenth-man-concept-into-critical-decision-making-TXuMkB74BZFN9LCo/ (describing a "devil's advocate" tactic to bring "alternative perspectives to problem-solving" whereby, in a group that has reached consensus, "[t]he role of the tenth man is to review available intelligence to then articulate opposing arguments to whatever solutions or decisions are being proposed. By considering the tenth man's perspective, information or scenarios that may otherwise be overlooked and unanticipated may be revealed.").

20

sovereignty.[92] Moreover, this requirement promotes democracy by incentivizing the political forces behind a suggested amendment of this type to ensure widespread voting access.[93]

*Paragraph 2 of Article V, Section 2*

The purpose of the first sentence of this paragraph is to reverse the changes to the American national character which have occurred since 1868. Thus, the citizenship of everyone who would have been unable to attain it via naturalization under the 1790 standard is to be rescinded. Moreover, because the Citizenship Clause of the Fourteenth Amendment redefined, without the consent of the People, what it meant to be born as a member of the People, that clause is to be repealed. By tying birthright citizenship to being born on American soil, rather than being born with American blood, the Reconstruction era Congress effectuated a grossly anti-nationalist policy which fundamentally degraded the homogenous, national character of the sovereign People. As

---

[92] *See* Winters & Page, *supra* note 22, at 743 (discussing how "shrewdly invested money can move public opinion in directions inimical to citizens' interests" and how "[t]his is particularly likely to happen when elite communications are monolithic, which might well occur . . . on issues of central concern to an oligarchy"). *See also* ARISTOTLE, POLITICS bk. 5, sec. 1314a ("And it is a mark of a tyrant to have men of foreign extraction rather than citizens as guests at table and companions, feeling that citizens are hostile but strangers make no claim against him."); Alexander W. Schmidt-Catran & Christian S. Czymara, *Political elite discourses polarize attitudes toward immigration along ideological lines: A comparative longitudinal analysis of Europe in the twenty-first century*, 49 J. ETHNIC & MIGRATION STUD. 85 (2023) ("When political elites in a country become more positive on immigration-related issues, Europeans—on average—tend to be more open as well."). One minority group which has exercised outsized influence over the process of demographic change in the United States is Jews. *See generally* Kevin MacDonald, *Jewish Involvement in Shaping American Immigration Policy, 1881-1965: A Historical Review*, 19 POPULATION & ENV'T 295 (1998) (explaining why "Jews have been at the forefront in supporting movements aimed at altering the ethnic status quo in the United States in favor of immigration of non-European peoples" through "activities [which] have involved leadership in Congress, organizing and funding anti-restrictionist groups composed of Jews and gentiles, and originating intellectual movements opposed to evolutionary and biological perspectives in the social sciences"). It is also widely acknowledged that the donor class is disproportionately comprised of Jews, and that Jews wield outsized influence within media to influence social change. *See* Ron Kampeas, *Meet the leading Jewish political donors in this US election cycle*, TIMES OF ISRAEL (Sep. 25, 2020, 5:59 PM), https://www.timesofisrael.com/meet-the-leading-jewish-political-donors-in-this-us-election-cycle/ (showing how seven of the top ten and fifteen of the top twenty-five individual donors in the 2020 U.S. election cycle were Jews, with donation totals of roughly $176.4 million to Democratic groups and $87.9 to Republican groups); Jeremy Sharon, *US Jews contribute half of all donations to the Democratic Party*, JERUSALEM POST (Sep. 27, 2016, 12:31 AM), (describing why Jews contribute "a whopping 50% of funds received by the Democratic Party and 25% to the Republican Party" and the effect of this outsized group contribution on American electoral politics); Joel Stein, *Who Runs Hollywood? C'mon*, L.A. TIMES (Dec. 19, 2008, (12:00 AM), https://www.latimes.com/archives/la-xpm-2008-dec-19-oe-stein19-story.html (describing how Hollywood is so Jewish, the author had to "scour the trades to come up with six Gentiles in high positions at entertainment companies," and when he called these six people "five of them refused to talk . . ., apparently out of fear of insulting Jews. The sixth, AMC President Charlie Collier, turned out to be Jewish."); Josh Lederman, *Biden: Jewish leaders drove gay marriage changes*, ASSOC. PRESS (May 21, 2013, 9:21 PM), https://apnews.com/arts-and-entertainment-movies-united-states-government-974f8e9179014185a6f1d455005539af (reporting how then Vice President Biden "prais[ed] Jewish leaders for helping change American attitudes about gay marriage and other issues" through their "immense" influence in Hollywood and social media companies).

[93] On the other hand, it may be countered that this requirement also risks incentivizing *the opponents* of such an amendment to *restrict* voting access. This is accurate, but given that the purpose of these requirements is to prevent change, this is an acceptable risk. Moreover, if such an amendment truly had the support of the necessary fraction of the total electorate, I doubt such attempts at frustrating the will of the nearly unanimous People could bear fruit.

21

Daniel O'Connell said, "being born in a stable does not make a man a horse;"[94] and, likewise, merely being born in the United States is not enough to make a man an American. Madison spoke of "the kindred blood which flows in the veins of American citizens"[95] to spur them to ratify the Constitution, he did not speak of their kindred birthplaces.

Little explanation of the rationale behind the repeal of the Fifteenth Amendment is needed. If "[t]he People are White, and the United States, where they are sovereign, is their country" is to be a constitutional provision, then racial discrimination in voting rights is not only permissible, but incumbent upon the government. Obviously, then, the Fifteenth Amendment cannot coexist with this section.

The repealing of both the Citizenship Clause of the Fourteenth Amendment and the Fifteenth Amendment should also be done to return dignity to Article V, Section 1. Suthon Jr. correctly argues that placing the Southern states under military occupation, forcefully reorganizing their governments, and demanding their "puppet" state legislatures to ratify these amendments as conditions for having their elected Representatives and Senators allowed into Congress "constitute[d] an infraction of the amendment procedure ordained by Article V of the Constitution."[96] Nonetheless, only the Citizenship Clause of the Fourteenth Amendment is objectionable from a nationalist standpoint once the sentence mandating reinterpretation of the word "person(s)" as "citizen(s)" is added. Indeed, once the meaning of the word "person(s)" is thus circumscribed (and the Citizenship Clause deleted) the remainder of the Fourteenth Amendment is actually quite nationalistic insofar as it ensures that we remain "one people" with "each individual citizen everywhere enjoying the same national rights, privileges, and protection."[97] Such a redefinition is also not incompatible with the goal of government under popular sovereignty.[98]

The "temporary residency status" provision is intended to make the changes effectuated by this section more politically palatable and logistically manageable. The purpose of the Presidential veto provision is to permit the acceleration of this process when such acceleration is feasible, and to allow the President to remove troublesome non-citizen elements if he deems it necessary. Additionally, constitutionalizing residency restrictions is designed to prevent Congress from maintaining and introducing a permanent and politically problematic underclass. The ultimate goal of these three provisions is to provide constitutional guidelines and requirements for the deportation of those with the ten-year temporary status to their ancestral homeland, or to another country that is willing to accept them. [99] Of course, the ten-year timeframe will also provide the

---

[94] Raphaël Ingelbien, *"When I say 'We', I mean what I say": The "national" receptions of Waterloo in 19th-century Ireland*, 20 INTERFÉRENCES LITTÉRAIRES/LITERAIRE INTERFERENTIES 31, 33 (2017).

[95] THE FEDERALIST NO. 14, at XYZ (James Madison) (XYZ ed., XYZyear)

[96] *See generally* Walter J. Suthon Jr., *Dubious Origin of the Fourteenth Amendment*, 28 TUL. L. REV. 22, 41–44 (1953). *See also id*. at 29 (contrasting this process with the regular process used to ratify the Thirteenth Amendment).

[97] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay).

[98] *See e.g., League v. De Young*, 52 U.S. at 203 ("The Constitution of the United States was made by, and for the protection of, the people of the United States.").

[99] To believe these should not be policy goals, given the rest of Article V, Section 2, would be to sanction the creation of a large, disenfranchised, and permanent underclass of those constitutionally unable to become citizens. In many ways, this is to sanction a return to the antebellum living arrangement between Whites and non-Whites, with all the constant, simmering (and occasionally explosive) racial antagonism that entails. Repatriation is a superior policy.

necessary time to ratify and pass all amendments pursuant to this section which the People may desire in order to legitimately accept and integrate those with this ten-year status into the People.

*Paragraph 3 of Article V, Section 2*

Whether or not Ackerman is correct regarding "the plebiscitarian presidency" as a historical fact,[100] the intent behind tying the referendum vote on Article V, Section 2 amendments to the second presidential election following their ratification is, essentially, to demand a plebiscitarian presidential *election* as a means of ensuring that a national conversation occurs around the merits (or lack thereof) of these amendments. In tying the vote to the second presidential election following ratification, the People will have at minimum four years to have this conversation and carefully consider the political question presented by the amendment. Of course, such an amendment is bound to be a major question, and candidates should be expected to clearly state their opinion on the matter. Moreover, given the nine tenths threshold and the significance of the question which these amendments bring to the national forefront, common sense suggests that (in a two-party system) *both* candidates will likely, although not necessarily, need to passionately support the amendment for it to stand a chance of passing.[101] Finally, tying the referendum to the presidential election ensures that no additional election infrastructure needs to be established; and the requirement that the referendum vote be in-person on election day is intended to prevent fraud and having votes be cast by insufficiently motivated voters. The provision that these referendum votes shall occur on a national holiday is intended to ensure there is no excuse (aside from one's personal choice to essentially vote no on the amendment) for failure to vote in the referendum.

The provision that states may withdraw their ratification until the three fourths threshold of states is reached is intended to facilitate the ability of the citizens of the several states to depose incumbent state legislators who ratify an amendment contrary to the democratic will without having to risk (or bother with) a national referendum. The time limit on resubmitting an amendment after its defeat is intended to show respect to the People's will; when the People decide, they should not be incessantly prodded on the same issue until they relent.

Finally, this paragraph's provision that an Article V, Section 2 amendment may be nullified according to the procedure outlined in Article V, Section 1 is intended to permit the People's representatives to exercise their judgment and return the nation to the *status quo ex ante* without the need to go through the process outlined in this section. This provision reflects the assumption that a return to the *status quo ex ante* on the questions involved in Article V, Section 2 amendments is an inherently acceptable position to the Sovereign; an assumption that is, essentially, restorationist.

---

[100] *See generally* Ackerman, *supra* note 61, at 1757–71 (describing his theory of a "movement-party-presidency pattern" traceable back to Jefferson that has "filled the void left in the public mind by the marginalization of the formal Article V system," with a special emphasis on this theory's relation to the "the civil rights revolution").

[101] On the ballot, the amendment vote will be separate from the presidential vote. It is theoretically possible for both candidates to support an amendment and to have that amendment fail, or for both to oppose the amendment and have it pass.

*Paragraph 4 of Article V, Section 2*

The purpose of this paragraph is to provide a legal means of legitimizing political violence against usurpers within the government. The provision allowing for "[d]eliberate attempts or conspiracies to flagrantly contravene this section, or abuse this provision," to be charged as treason permits for this violence to occur through normal government through a trial, similar to how Article V, Section 1 permits amendment through normal government.[102] The language of "[d]eliberate" and "flagrantly" is used to qualify the elements of the crime so that this provision does not provide cover for attempts by members of either chamber to punish various political opponents. The ability for charges to be tried in either chamber is meant to ensure that the two chambers can serve as a check on one another.

Crucially, this paragraph also allows the People "to enforce this section, and prevent its abuse, by any means necessary." This language is motivated by the theory that, just as "an assassin's bullet" may cause constitutional change,[103] so too may it prevent illegitimate change. Assassination is undoubtedly an extralegal action, however, to call an action extralegal does not necessarily imply that it is illegitimate.[104] The purpose of the remaining provisions of this paragraph which allow the assassin to invoke this section and paragraph "as a defense for a jury to consider," and describe some procedures by which a trial is to be conducted after this defense is asserted, is to determine whether the assassination is legitimate. Thus, this provision does not permit trial by combat; rather, it permits trial *of* combat while presuming that the mere fact that a defendant committed extralegal violence does not necessarily mean they are guilty of a crime. Moreover, this provision will be useful in providing a practical check on the power of the judiciary, whose members (due to being unelected and serving for life) are generally unaccountable within the political process, absent impeachment and conviction. The United States was not intended to be a kritarchy, and by providing a legal mechanism for removing judges from the bench, this provision hopes to remind judges of their impotence, so that they may rule accordingly.[105]

The remaining procedural provisions of this paragraph reflect three different concerns. First, it is envisioned that it may be difficult to find an impartial jury to consider this defense for violent acts committed against officials in the capital district. The reason for moving the trial to a random venue is to provide the neutrality and fairness of pure chance to both the defendant and the government. Second, the provision preventing withdrawal of the defense once asserted, and the unappealable, mandatory, and swift death penalty following a guilty verdict, reflects the seriousness with which these extralegal actions should be contemplated by those who would commit them, and the gravity of the consequences a defendant should face if their actions are deemed by a jury of the People to be illegitimate. Finally, the mandatory acquittal after seven days of deadlocked deliberation if a majority of the jury favors acquittal and the continuous polling

---

[102] *Cf. supra* note 84.

[103] *See* Ackerman, *supra* note 61, at 1770 (applying this theory to "the patterns of constitutional leadership prevailing during the first and the second Reconstructions").

[104] *See* Albert, *supra* note 1, at 232 ("To call informal amendment extralegal is not to make a claim about its legitimacy.").

[105] *See Obergefell v. Hodges*, 576 U.S. 644, 720 (2015) (Scalia, J., dissenting) ("With each decision of ours that takes from the People a question properly left to them—with each decision that is unabashedly based not on law, but on the 'reasoned judgment' of a bare majority of this Court—we move one step closer to being reminded of our impotence.")

24

every 72 hours, reflects concern with the squeamishness towards the use of violence by the average person. Individuals may find it difficult to accept that it may be, depending on the circumstances, necessary for (or beneficial towards) national survival to kill certain officials. Thus, after a week of deliberations, only a majority in favor of acquittal should be necessary to free a defendant.

In 1787, Thomas Jefferson wrote that, "[t]he tree of liberty must be refreshed from time to time with the blood of patriots and tyrants."[106] Relatedly, Alexander Hamilton wrote of the necessity of fostering "a large body of citizens, little, if at all, inferior to [the standing army] in discipline and the use of arms, who stand ready to defend their own rights and those of their fellow-citizens."[107] Given Founders who held such sentiments, it is hardly surprising that the Second Amendment, in order to provide for "the security of a free State," demands that "the right of the people to keep and bear Arms, shall not be infringed."[108] Recognizing this heritage, and the validity of these sentiments, this paragraph provides the People with textual basis for—and procedural vindication of—the right to not merely keep and bear arms, but to use those arms to defend their panoply of rights. It must be noted that threats to the sovereign People do not only come from the realm of demographic change. In a republic, one of the greatest threats to popular sovereignty and liberty is the ambition of the People's elected leaders. No patriot should be expected to stand idly by while this ambition—and its concomitant lust for power and avariciousness—drives a nation into ruin. This paragraph gives the assassin the right to justify himself and to inquire of the People who among them is so base that would be a bondman, so vile that will not love their country. Then, he shall pause for a reply.[109]

**Conclusion – Why Should This Be Done?**

One may grant the correctness of my analysis regarding how popular sovereignty restrains the actions of the constituted government, accept that America was a White country for most of its history (and was founded as such), and concede that these principles are in tension with historical and contemporary processes of demographic change in America. One may even grant that, given the ends sought to be advanced, my Article V, Section 2 proposal is wise and well-reasoned. However, the objection may still be heard that this is all wrong. The United States is no longer a White country, and, moreover, that White country "is never coming back," so "[a]rguing that anything like it should is pointless—and thus, simply mean."[110] Indeed, given the tremendous social upheavals my proposal would entail—the lives of hundreds of millions of people across the world would be dramatically changed—it might be contended that these arguments are not only mean, but reprehensible. And obviously, this feeling would be felt most acutely by those non-Whites living in America whose lives would be most negatively impacted.

---

[106] "From Thomas Jefferson to William Stephens Smith, 13 November 1787," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-12-02-0348. [Original source: *The Papers of Thomas Jefferson*, vol. 12, *7 August 1787–31 March 1788*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1955, pp. 355–357.]

[107] THE FEDERALIST NO. 29, at XYZ (Alexander Hamilton) (XYZ ed., XYZyear)

[108] U.S. CONST. amend. II.

[109] WILLIAM SHAKESPEARE, JULIUS CAESAR act 3, sc. 2, ll. 1563–68.

[110] John McWhorter, *She Is Outrageous, Demeaning, Dangerous. She Shouldn't Be Punished.*, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/opinion/amy-wax-academic-freedom-penn.html (applying this argument against University of Pennsylvania Law Professor Amy Wax).

For better or worse, history is an unalterable inheritance. We can no more change history than we can change the orientation or intensity of the stars in the night sky. It is also true that, like those stars, history may position and guide us. Our Constitution, and the fundamental principles it embodies, is one such guiding historical inheritance. Of course, unlike history or the stars, we can change the Constitution; as a practical matter, we can do away with part or all of it as we wish, provided we have the will and the power to do so. Nonetheless, we seem to abide by it (or at least, pretend like we abide by it) in large part because we have respect for the history that formed it and delivered it to us in the present. Like the man of wealth and prudence who has inherited a luxurious mansion in which his family has lived for generations, and who tempers his exuberance and his desire to tear the whole thing down and build a water park in its stead so that he may deliver his abode to his children, and that his children may deliver it to theirs, and so on, we resist throwing out our Constitution. We thus say that we limit ourselves to making relatively small and incremental changes which do not dramatically change the character of the whole document and the government which it gives textual authority to.

But as this paper demonstrates, the Constitution has, effectively, been thrown out. Through the demographic changes caused by our government, the Constitution's overarching principle—the sovereignty of the People—is now a dead letter. When Chin & Finkelman argue that the 1790 Naturalization Act "deserves a place of dishonor,"[111] what they are essentially saying is that the founding of the United States deserves a place of dishonor. Many non-Whites may agree with that proposition, and they may feel joyful that the government of the United States has usurped the People's sovereignty. After all, without this usurpation, non-Whites may not have ever been permitted to become citizens of this country. But at what cost was this "victory" over the People won? Do non-Whites truly believe that, after the government has usurped sovereignty from the People, sovereignty shall pass to them? Furthermore, if the racial attitudes of the Founders which brought White nationalism in to force in the United States are merely a bygone relic of an age that should be forgotten—nay, dishonored!—then why should the government respect any other provision of the Constitution? Why should the Founders' concern with the Crown's restriction on their free speech give legitimacy to the First Amendment? Why should their hatred of general warrants give legitimacy to the Fourth Amendment? Why should their fear of the thumbscrew and the breaking wheel give legitimacy to the Fifth and Eighth Amendments? And if that legitimacy comes not from the history of this country and the Founders, then where will it be found?

Finally, I shall speak directly to my brothers and sisters, the People. Can you honestly say these changes have been for the better? As the years go on, and those around you not only look less like you, but look upon you more and more with contempt and with a barely veiled desire for vengeance,[112] does your love for this country and its inhabitants grow? Do you feel as if you are

---

[111] Chin & Finkelman, *supra* note 42, at 1048.

[112] *See, e.g., Regents of Univ. of California v. Bakke*, 438 U.S. 265, 387 (1978) (Marshall, J., concurring in part and dissenting in part) (remarking that "it must be remembered that, during most of the past 200 years, the Constitution . . . did not prohibit the most ingenious and pervasive forms of discrimination" and using this fact to justify discrimination against Whites); WILLIAM O. DOUGLAS, THE COURT YEARS: 1939 TO 1975 (getprintcopy) (1980) (quoting Justice Thurgood Marshall as saying in conference on an early case evaluating the constitutionality of discrimination against Whites, "You guys have been practicing discrimination for years. Now it's our turn.").

26

united to your fellow citizens "by the strongest ties," or do you feel as if America has been "split into a number of unsocial, jealous, and alien" groups?[113] If you are increasingly apprehensive about these changes, you are not alone.[114] However, feeling despondent and helpless is hardly a way to rectify the evils which have been visited upon us. Our Founders understood the importance of forming a nation upon the solid foundation of common ancestry. They understood that it is a part of "human nature . . . that its affections are commonly weak in proportion to the distance or diffusiveness of the object;" and thus, "a man is more attached to his family than to his neighborhood, to his neighborhood than to the community at large."[115] Similarly, we should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle. And if the prize does not motivate you, then consider the cost of defeat; "[W]henever the dissolution of the Union arrives, America will have reason to exclaim, in the words of the poet: 'FAREWELL! A LONG FAREWELL TO ALL MY GREATNESS.'"[116]

---

[113] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay).

[114] *See* Robert D. Putnam, E Pluribus Unum*: Diversity and Community in the Twenty-first Century*, 30 Scandinavian Pol. Stud. 138 (2007) (arguing that "immigration and ethnic diversity challenge social solidarity and inhibit social capital"). See *generally* ROBERT D. PUTNAM, BOWLING ALONE: THE COLLAPSE AND REVIVAL OF AMERICAN COMMUNITY (2000) (discussing "the decline of the last several decades" in "social capital" and a sense of community belonging and civic engagement among Americans).

[115] THE FEDERALIST NO. 17, at XYZ (Alexander Hamilton) (XYZ ed., XYZyear).

[116] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay) (emphasis in original).

EXHIBIT

Dft's Ex 3

# American Restoration: An Article V Proposal
**Preston Terry Damsky**

# Contents

Introduction ...................................................................................................................... 1

Popular Sovereignty and Constituent Power in the American System........................................ 2

The Historic American Nation ................................................................................................ 6

Restoring Sovereignty to the People – Article V, Section 2 ...................................................... 15

    Paragraph 1 of Article V, Section 2 ................................................................................... 17

    Paragraph 2 of Article V, Section 2 ................................................................................... 19

    Paragraph 3 of Article V, Section 2 ................................................................................... 21

    Paragraph 4 of Article V, Section 2 ................................................................................... 21

Conclusion........................................................................................................................... 23

## Introduction

In American constitutional jurisprudence, the People are sovereign. The People ordained and established government, and government may not usurp the power which brought it into existence. What, then, is the constitutional status of government policies which alter, replace, or destroy the People? Moreover, are there any observable indicators that the People are being altered, replaced, or destroyed? And if such processes are constitutionally dubious, and are occurring, what should be done?

This paper answers these questions using empirical evidence, history, legal opinions, and the Constitution's text. It argues that policies which alter, replace, or destroy the People are wholly illegitimate and unconstitutional. Lengthy historical analysis of the long-held, consensus view regarding the original conception of the People is provided; and it is determined that the People formed and maintained their government along nationalist lines, placing particular emphasis on their shared ancestral heritage. Evidence is provided which indicates that demographic policies are currently threatening to reduce the People to a minority status—within the coming decades—in the country that is their constitutional birthright. It suggests the People may prevent this result by undertaking a political restoration and reasserting their rightful claim to sovereignty and primacy within the American body politic. Finally, it proposes changes to Article V, in the form of an additional section, as a means of entrenching this restoration and helping to ensure that such a struggle is never again needed to prevent similar constitutional evils.

**Popular Sovereignty and Constituent Power in the American System**

One potentially overlooked function of constitutions is in entrenching an exclusionary definition of the nation.[1] Thus, according to Ginsburg:

> In some polities, constitutions reflect and sometimes even create a shared consciousness, and so overcome regional and ethnic divisions. . . . The symbolic or expressive function of constitutions emphasizes the particularity of constitution-making. It is We the People that come together, and so the constitution embodies our nation in a distinct and local way different from other polities.[2]

Understanding this function is required to correctly understand American constitutional jurisprudence due to the importance of popular sovereignty within the American constitutional framework.[3] This principle was taken for granted to such a degree that, at the time of the Constitution's drafting, a proposal by James Madison to prefix the Preamble with a declaration stating that "the people have an indubitable, unalienable, and indefeasible right to reform or change their government" was deemed "redundant" and rejected "given the broad meaning of the Preamble itself."[4] Furthermore, contra Amar, the Preamble explicitly acknowledges that the Constitution is the People's creation, rather than the People being a creation of the Constitution.[5] Therefore, in addition to encapsulating the principle of popular sovereignty, the Preamble incorporates the closely related principle of constituent power, i.e., the power to bring (or that brings) the Constitution into existence.[6] Moreover, the principles of popular sovereignty and

---

[1] Richard Albert, *The Expressive Function of Constitutional Amendment Rules*, 59 McGILL L. J. 225, 237–38 (2013) (stating that "Constitutions may . . . express values with the aspirational or functional purposes of self-definition and nation building."). This paper utilizes Gat and Yakobson's definition of "nation," and considers the nation to be coterminous with "the People." *See* AZAR GAT WITH ALEXANDER YAKOBSON, NATIONS: THE LONG HISTORY AND DEEP ROOTS OF POLITICAL ETHNICITY AND NATIONALISM 18 (2012) (defining "nation" as a population with a sense of shared kinship, culture, common identity, history, and fate, that is either politically sovereign or actively striving to achieve political self-determination and self-government). *See also* CARL SCHMITT, CONSTITUTIONAL THEORY 127 (Jeffrey Seitzer, ed. & trans., 2008) (noting that "[n]ation and people are often treated as equivalent concepts" but that "[nation] denotes, specifically, the people as a unity capable of political action, . . . while the people not existing as a nation is somehow only something that belongs together ethnically or culturally, but it is not necessarily a bonding of men existing politically.").

[2] Tom Ginsburg, *Written Constitutions and the Administrative State: On the Constitutional Character of Administrative Law* 118 (Univ. Chi. Pub. L. & Legal Theory, Working Paper No. 331, 2010).

[3] Akil Reed Amar, *Popular Sovereignty and Constitutional Amendment*, *in* RESPONDING TO IMPERFECTION: THE THEORY AND PRACTICE OF CONSTITUTIONAL AMENDMENT 89, 105 (Sanford Levinson ed., 1995) (stating that "the Founders themselves [indubitably] recognize[d] the Preamble as a textual declaration of popular sovereignty").

[4] *Id*. at 106.

[5] According to Amar, "the Constitution formed previously separate state peoples into one continental people—Americans!" *Id*. at 104. However, the Preamble declares "We the People of the United States, in Order to form a more perfect Union, . . . and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America." U.S. CONST. pmbl. If the People inaugurated the Constitution, the People must have existed before the Constitution. *See also* THE FEDERALIST NO. 2, at 38 (John Jay) (Clinton Rossiter ed., 1961) ("To all general purposes we have uniformly been one people").

[6] *See generally* Renato Cristi, *Carl Schmitt on Sovereignty and Constituent Power*, *in* LAW AS POLITICS: CARL SCHMITT'S CRITIQUE OF LIBERALISM 179, 179–92 (David Dyzenhaus ed., 1998) (explaining constituent power's "conceptual kinship with the notion of sovereignty"). S*ee also* William Partlett, *The American tradition of constituent power*, 15 INT'L J. CONST. L. 955, 955 (2018) ("It is an axiom of democratic constitutional theory to say that 'the

constituent power were immediately reaffirmed after ratification via the Ninth and Tenth Amendments, which recognize that all rights and powers which have not been delegated to the federal government are "retained" and "reserved" by the People.[7] Moreover, these dual, interrelated principles have been consistently affirmed by the U.S. Supreme Court.[8]

The sovereign People's creation of the Constitution through the exercise of their constituent power has been explained in contractual terms.[9] These contractarian theories emphasize the Constitution's role in limiting the power of the constituted state.[10] According to Versteeg & Zackin, "[t]hose who conceptualize constitutionalism as a form of contracting describe the people as a 'principle,' which, in creating a representative government, has employed 'agents' to better realize its ends."[11] Whether or not viewing the Constitution as a contract is a particularly apt analogy,[12] this subsidiary principle-agent analogy properly expresses the hierarchical relationship between the sovereign, dominant People and their constituted, subservient

---

people' hold the sovereign 'constituent power' to remake their constitutional order through specialized constitution-making bodies that exist outside the normal legal system.")

[7] U.S. CONST. amends. IX, X; s*ee also* Partlett, *supra* note 6, at 956 ("Constituent power in the United States is textually grounded in . . . the Preamble, Ninth, and Tenth Amendment of the US Constitution."); Amar, *supra* note 3, at 106–07.

[8] *See, e.g.*, Chisholm v. Georgia, 2 U.S. 419, 470–71 (1793) (""[T]he people, in their collective and national capacity, established the present Constitution . . . in establishing it, the people exercised their own rights, and their own proper sovereignty"); Marbury v. Madison, 5 U.S. 137, 176 (1803) ("That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis, on which the whole American fabric has been erected."); Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886) ("Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts."); Carter v. Carter Coal Co., 298 U.S. 238, 296 (1936) ("[T]he Constitution itself is in every real sense a law—the lawmakers being the people themselves, in whom under our system all political power and sovereignty primarily resides, and through whom such power and sovereignty primarily speaks."); Afroyim v. Rusk, 387 U.S. 253, 257 (1967) ("In our country the people are sovereign and the Government cannot sever its relationship to the people by taking away their citizenship."); Buckley v. Valeo, 424 U.S. 1, 14 (1976) (relying on the presumption that the United States is "a republic where the people are sovereign"); U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 794 (1995) (acknowledging "the critical postulate that sovereignty is vested in the people, and that sovereignty confers on the people the right to choose freely their representatives to the National Government.") (citing Powell v. McCormack, 395 U.S. 486, 541 n. 76 (1969)); Gamble v. United States, 587 U.S. 678, 688 (2019) ("[O]ur Constitution rests on the principle that the people are sovereign").

[9] *See* Rozann Rothman, *The Impact of Covenant and Contract Theories on Conceptions of the U.S. Constitution*, 10 PUBLIUS 149, 160 (1980) (stating that the Founders' deference to popular sovereignty "vitiated any grant of inherent power to the government" and that "[a]s the contract made clear, all governmental power was delegated and . . . a complicated representative structure set conditions for the exercise of power.").

[10] *Id*. ("These conditions [for the exercise of power by the government] constrained the exercise of power and reinforced dependence on the core notions of covenant, mutual obligation, reciprocity, and equality.").

[11] Mila Versteeg & Emily Zackin, *Constitutions Unentrenched: Toward an Alternative Theory of Constitutional Design*, 110 AM. POL. SCI. REV. 657, 658.

[12] *Compare* Letter from Thomas Jefferson to Edmund Randolph (Feb. 15, 1783) *in* 6 THE PAPERS OF THOMAS JEFFERSON, May 21, 1781–Mar. 1, 1784, at 246 (Julian P. Boyd, ed., Princeton University Press 1952), https://founders.archives.gov/documents/Jefferson/01-06-02-0228 ("[I]f the term *social contract* is to be forced from theoretical into practical use, I shall apply it to all the laws obligatory on the state, and which may be considered as contracts to which all the individuals are parties.") (emphasis in original), *with* JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 352 (1833) (arguing that there is nothing in the Constitution "intimating it to be a compact, or in anywise providing for its interpretation, as such.").

3

government.[13] Utilizing this principal-agent analogy in the state constitutionalism context, Marshfield observes that "[b]ecause . . . agents derive their authority entirely from the existing constitution, they implicitly lack the authority to destroy or replace the source of that power."[14] There is no apparent reason why this implicit limitation should not also bind those agents to whom authority is granted under the U.S. Constitution. Furthermore, given the distinction between constituent power and constituted power[15] (along with the foundational principle of popular sovereignty), the ultimate source of the constituted power is the sovereign People's constituent power. Thus, it stands as an incontrovertible truism that the government lacks the authority to destroy or replace the People and may not "dissolve the people and elect another."[16]

The implicit prohibition against the constituted, subservient government replacing or destroying the ultimate source of its power—the sovereign People—is more encompassing than a mere prohibition against usurping the People's claim to sovereignty.[17] To further illustrate the obviousness of this proposition, a thought experiment may be beneficial. The Foreign Emoluments Clause prohibits any person "holding any Office of Profit or Trust" in the United States government from "accept[ing] . . . any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State" *unless* they receive "the Consent of the Congress."[18] Let us suppose that the government of a powerful, wealthy, and populous country, such as the People's Republic of China (P.R.C.), promises a supermajority of Congress wealth beyond their wildest

---

[13] *See supra* note 8. *See also* Geer v. Connecticut, 161 U.S. 519, 529 (1896) (stating that a state government's powers over the common property in wildlife "is to be exercised, like all other powers of government, as a trust for the benefit of the people, and not as a prerogative for the advantage of the government as distinct from the people," and thus "for the purpose of exercising this power, the state, . . . represents its people, and the ownership is that of the people in their united sovereignty."(citing Martin v. Waddell's Lessee, 41 U.S. 367 (1842)), *overruled on other grounds by Hughes v. Oklahoma*, 441 U.S. 322 (1979).

[14] Jonathan L. Marshfield, *Forgotten Limits on the Power to Amend State Constitutions*, 114 NW. UNIV. L. REV. 65, 79 (2019).

[15] Luigi Corrias, *Populism in a Constitutional* Key, 12 EUR. CONST. L. REV. 6, 15 (2016) (describing the nation as the "bearer" of constituent power, whereas "the constitution, legislature, executive, and judiciary" which "ultimately derive their power from the nation" are the constituted power).

[16] Bertolt Brecht, *The Solution* (1959), *reprinted in* BERTOLT BRECHT POEMS 1913-1956, 440 (John Willett and Ralph Manheim, eds., Methuen 1976).

[17] In a republic such as the United States, where the political system does not feature a popular referendum mechanism, the People possess only a claim to sovereignty and may only normally exercise it in a very indirect manner through elections. Policy decisions are delegated to the constituted government. Of course, the right to change their government by extraordinary or extralegal means is retained by the People. *See* THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) ("it is the Right of the People to alter or to abolish [government], and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness."). However, it is undeniable that revolutionary means are generally difficult for the People to effectively wield, particularly when they remain unorganized or when the "abuses and usurpations" that they are subject to are deemed by the vast majority of the People to be tolerable (albeit still objectionable). *See id.* ("[A]ll experience hath shewn, that mankind are more disposed to suffer, while evils are sufferable, than to right themselves by abolishing the forms to which they are accustomed."). The upshot of this power dynamic is that so long as the juiciest fruit of political power—the policy-making apparatus—remains within the privileged hands of the constituted government's officials (and, by extension and more importantly, any minoritarian special interests that are disproportionately responsible for those officials' electoral successes), those officials have little incentive to disturb the constitutional order by disputing the People's nominal claim to sovereignty. That is especially true when the constituted government's policy-making apparatus is not restrained to prevent officials and their minoritarian backers from bringing about a slow and steady usurpation of the People's sovereignty *sub silentio*.

[18] U.S. CONST. art. I, § 9, cl. 8.

dreams if they would only permit all emoluments to any government official. Our hypothetical Congress is a particularly disloyal and flagrantly venal one and so opportunistically permits this exception. The P.R.C.'s government then cuts very substantial checks not only to their new bought-and-paid-for Congress, but also to top officials in our just as mercenary executive and judicial branches. However, like all political "donors," the P.R.C. has a few requests to accompany their support for "our" leaders. First, they request full U.S. citizenship not only for P.R.C. citizens, but for the entire population of the BRICS bloc—which includes Brazil, Russia, India, the P.R.C., South Africa, Iran, Egypt, Ethiopia, and the United Arab Emirates—around 3.5 billion people.[19] "Our" government complies. Then, the P.R.C. requests that the United States facilitate the migration of roughly one billion of these people to America. Again, "our" government complies. Finally (and at this point the people that were previously the entirety of the American people are thoroughly irritated by these changes), the P.R.C. requests that BRICS military forces be allowed to work with the U.S. military to occupy unruly areas of the country. Once again, "our" government complies.[20] BRICS forces soon neutralize the various malcontent groups throughout the country; and, bolstered by the newly imported electorate, almost all incumbent government officials are reelected.

All this has occurred without any revision to the written constitution. Elections, as indicated, still regularly occur. We can imagine that our leaders would still proclaim that the People rule. But is what has just been described constitutional? If popular sovereignty is more than a mere parchment promise and a rhetorical sop to the *hoi polloi*, then this hypothetical scenario must surely qualify as a perverse inversion of a constitutional order based on popular sovereignty. The constituted government has eliminated the power of the People by opening its gates to a foreign multitude which dwarfs the People and a foreign army which has subjugated the People. Such a result could hardly be described as anything but an unconstitutional usurpation whereby the agent has assumed the principle's authority by inviting a hostile takeover. Moreover, if we take popular sovereignty seriously, then this degradation cannot be cured by the government merely affixing the label of citizen to these invaders.

Of course, this exact scenario is clearly fantastical.[21] However, a conceptually similar usurpation has been perpetrated by the constituted government, and the People are well on their

---

[19] *Brics: What is the group and which countries have joined*, BBC (Feb. 1, 2024), https://www.bbc.com/news/world-66525474.

[20] Given what our hypothetical government has permitted thus far, why would they not also permit this? After all, those Chinese, Ethiopian, and Indian soldiers are just as much American citizens as any Marine born in the U.S.; and, more importantly, insurrection is brewing! Furthermore, such an action might even be given a fig leaf of textual support within the Constitution itself. *See* U.S. CONST. art. IV, § 4 (requiring the federal government to "guarantee to every State in this Union a Republican Form of Government, and . . . protect each of them against . . . domestic Violence."). That section's requirement that the federal government protect the states "against Invasion" could be argued to be inapplicable since, as previously stated, these foreign troops are also U.S. citizens, and it may be the case that, by definition, no one can invade a country they are a citizen of.

[21] *But see* Karl Evers-Hillstrom, *Most expensive ever: 2020 elections cost $14.4 billion*, OPEN SECRETS (Feb. 11, 2021, 1:14 PM), https://www.opensecrets.org/news/2021/02/2020-cycle-cost-14p4-billion-doubling-16/ ("Political spending in the 2020 election totaled $14.4 billion, more than doubling the total cost of the record-breaking 2016 presidential election cycle."); Jeffrey A. Winters & Benjamin I. Page, *Oligarchy in the United States?*, 7 PERSPECTIVES ON POLS. 731, 742 (2009) (noting that in election financing "the vast preponderance of money, some 80 percent of it, has generally come from a small 'donor class' constituting roughly one-tenth of 1 percent of the population"). It will

way to being replaced and having their sovereignty extinguished. To validate this proposition, the nature of the People when they exercised their sovereign, constituent power to ordain and establish the Constitution must be explained.

**The Historic American Nation**

In The Federalist No. 2, future inaugural Chief Justice John Jay sought to answer the question "whether it would conduce more to the interest of the people of America that they should, to all general purposes, be one nation, under one federal government, or that they should divide themselves into separate confederacies."[22] Jay, an ardent nationalist, vociferously argued for political unity, partly basing his argument on the benefits such unity would bring to the People given the geographical richness and contiguousness of the United States and its frontier lands which were ripe for agricultural and commercial exploitation.[23] However, Jay's call for political unity was based on far more salient facts than mere geography. Prefiguring Schmitt, Jay proposed that Americans must be politically united because they possessed what Schmitt would later call "substantial equality" or "homogeneity."[24] Jay observed that Americans were:

> [A] people descended from the same ancestors, speaking the same language, professing the same religion, attached to the same principles of government, very similar in their manners and customs, and who, by their joint counsels, arms, and efforts, fighting side by side throughout a long and bloody war, have nobly established general liberty and independence.[25]

---

be shown that domestic minoritarian special interests are currently perpetrating similar usurpations. Furthermore, there may come a time when the United States is no longer a world superpower, and wealthy special interests abandon the country or become destitute. In that scenario, our elected officials may become far more susceptible to foreign bribery. The Foreign Emoluments Clause is in the Constitution for a reason. *See* THE FEDERALIST NO. 22, at 149 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("[H]istory furnishes us with so many mortifying examples of the prevalency of foreign corruption in republican governments.").

[22] THE FEDERALIST NO. 2, *supra* note 5, at 37.

[23] *See id*. at 38.

[24] SCHMITT, *supra* note 1, at 258–59 (arguing that "[p]olitical democracy . . . cannot rest on the inability to distinguish among persons," but can only survive "on the quality of belonging to a *particular people*. This quality of belonging to a people can be defined by very different elements (ideas of common race, belief, common destiny, and tradition). The *equality* . . . thus orients itself *internally*" and when democracy produces a state wherein citizens possess equal rights and obligations "democratic equality is a *substantial equaility*.") (emphasis in original). *See also* Heiner Bielefeldt, *Carl Schmitt's Critique of Liberalism: Systematic Reconstruction and Countercriticism*, *in* LAW AS POLITICS: CARL SCHMITT'S CRITIQUE OF LIBERALISM 23, 27 (David Dyzenhaus ed., 1998) ("What ultimately counts in a genuine democracy, [Schmitt] says, is the sovereign authority of the collective unity of the people, a unity facilitated by . . . 'substantial homogeneity.'").

[25] THE FEDERALIST NO. 2, *supra* note 5. Thus, Jay conceived of Americans as possessing *all* of the "different elements" that Schmitt suggested would provide the democratic "quality of belonging to a particular people." *See supra* note 24. However, as will be seen shortly, the most enduring and legally important of these elements would be the fact that Americans were "descended from the same ancestors," i.e., that Americans belonged to the White race. Indeed, it is almost certain that Jay had in mind a White, or pan-European, identity (as opposed to a British or Anglo-Saxon identity) when he wrote that Americans shared a common ancestry because Jay was himself of French Huguenot and Dutch descent (Hamilton was also partially of French Huguenot descent), a fact that was oft remarked upon by his contemporaries. *See* Steven D. Griffin, The Effects of the Huguenot Diaspora on the American Revolution 149 (Oct. 6, 2016) (Master's Thesis, U.S. Army Command and General Staff College) (DTIC). Furthermore, this Huguenot heritage may have made Jay more open to the idea of basing American national identity on pan-European grounds.

6

After noting the unified character of America's geography and demography, Jay, with rhetoric that may strike the modern reader as reminiscent of 20th century "blood and soil" nationalism, connected the two unities, stating that "[t]his country and this people seem to have been made for each other."[26] Jay proffered further that America's present situation was divinely ordained, and that "it appears as if it was the design of Providence, that an inheritance so proper and convenient for a band of brethren, united to each other by the strongest ties, should never be split into a number of unsocial, jealous, and alien sovereignties."[27] In The Federalist No. 2, Jay clearly conceives of Americans as a unified, politically sovereign population with a sense of shared kinship, culture, common identity, history, and fate; thus, under Gat & Yakobson's definition of "nation," American identity is of a national character.[28] It was this national character that formed the foundation of the rhetorical edifice through which Jay, Hamilton, and Madison defended the Constitution and advocated for its ratification by the sovereign People.[29] National unity was a "term" or a "material fact" upon which the "contract" was accepted by the People.

Even Thomas Jefferson, an individual commonly grouped with the Anti-Federalists,[30] undoubtedly viewed the nascent American republic as resting not merely on a national foundation, but upon a national foundation that was racial in nature. Despite being a slaveowner, Jefferson, in his *Notes on the State of Virginia*, clarified his belief that abolition was necessary to maintain America's republican spirit.[31] However, although Jefferson may have been (at least rhetorically) committed to abolition, he made no such commitments to integration and racial equality. To the contrary, Jefferson firmly believed that Black slaves, once freed, would have to be excluded from American society, lest the nation risk interracial conflict[32] and miscegenation.[33] Indeed, Jefferson's opinions on Blacks might be reasonably described as the most blunt—and even crude—of all the

---

*See id*. at 149–50 (discussing the "collective, chameleon-like ability [of Huguenots] to successfully acculturate" into European groups).

[26] THE FEDERALIST NO. 2, *supra* note 5. Cf. Adolf Hitler, Speech "On National Socialism and World Relations" Delivered in the German Reichstag (Jan. 30, 1937), *in* CALVIN UNIV. GER. PROPAGANDA ARCHIVE, https://research.calvin.edu/german-propaganda-archive/hitler1.htm (last visited Oct. 19, 2024) (declaring that "[t]he main plank in the National Socialist program" is to establish a "folk community, rooted in the soil and bound together by the bond of its common blood.").

[27] THE FEDERALIST NO. 2, *supra* note 5.

[28] *See supra* note 1.

[29] *See also* THE FEDERALIST NO. 14, at 103–04 (James Madison) (Clinton Rossiter ed., 1961) (framing Americans as "members of the same family" who must "be fellow citizens of one great, respectable, and flourishing empire."); THE FEDERALIST NO. 22, *supra* note 21, at 152 ("The fabric of American empire ought to rest on the solid basis of THE CONSENT OF THE PEOPLE. The streams of national power ought to flow immediately from that pure, original fountain of all legitimate authority.") (emphasis in original).

[30] *But see* Michael J. Faber, *Thomas Jefferson, Federalist*, 128 VA. MAG. HIST. & BIOGRAPHY 282, 283 (2020) (acknowledging that Jefferson "is easy to mistake for an Anti-Federalist," but nonetheless arguing that he "clearly and unequivocally favored ratification of the Constitution" and "offers considerable insight into the Federalist position.").

[31] THOMAS JEFFERSON, NOTES ON THE STATE OF VIRGINIA 168–69 (Frank Shuffelton, ed., Penguin Books 1999) (1785).

[32] I*d*. at 145 (arguing that if Blacks were made citizens, then racial differences "will divide us into parties, and produce convulsions which will probably never end but in the extermination of the one or the other race.").

[33] *Id*. at 151 ("Among the Romans emancipation required but one effort. The slave, when made free, might mix with, without staining the blood of his master. But with us a second is necessary, unknown to history. When freed, he is to be removed beyond the reach of mixture.").

well-known Founders.[34] His views on American Indians were not much kinder.[35] For all that is made today of Jefferson's writing in the Declaration of Independence of the supposedly self-evident truth "that all men are created equal, that they are endowed by their Creator with certain unalienable Rights,"[36] it is often forgotten that Jefferson, in the very same document, concluded his list of grievances against the Crown by castigating the British for having "endeavoured to bring on the inhabitants of our frontiers, the merciless Indian Savages, whose known rule of warfare, is an undistinguished destruction of all ages, sexes and conditions."[37]  Regardless, Jefferson shared the leading Federalists' expansionist aims, and argued forcefully that disunity between the states should not be permitted to result in subnational secession, and that the United States "must be viewed as the nest from which all America, North and South is to be peopled."[38] Expansion was to be carried out on a purely monoracial and nationalist basis.[39] Under Jeffersonian grand strategy, to ensure a workforce for the burgeoning United States, and provide a steadily growing population with which to settle its ever-growing frontiers, emancipation and "deportation" of freed Blacks would occur "peaceably and in such slow degree as that the evil will wear off insensibly, and their place be pari passu filled up by free white laborers."[40]

---

[34] *See, e.g., id*. at 145–51 (discussing perceived aesthetic, sensory, emotional, artistic and intellectual inferiorities of Blacks). *Notes on the State of Virginia* was a widely published book, and Jefferson felt no compunction about expressing these viewpoints publicly. Moreover, there is little evidence that contemporaries had any compunction with electing him to the presidency despite him publicly expressing these viewpoints. In other words, Jefferson was likely simply expressing the commonly held, noncontroversial racial worldview of contemporary Americans.

[35] *See id*. at 103–04 ("I know of no such thing existing as an Indian monument: for I would not honour with that name arrow points, stone hatchets, stone pipes, and half-shapen images . . . I think there is no remain as respectable as would be a common ditch for the draining of lands.").

[36] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776)

[37] *Id*. at para. 29.

[38] Letter from Thomas Jefferson to Archibald Stuart (Jan. 25, 1786), *in* 9 THE PAPERS OF THOMAS JEFFERSON, Nov. 1, 1785–June 22, 1786, at 217 (Julian P. Boyd, ed., Princeton University Press 1954),  https://founders.archives.gov/documents/Jefferson/01-09-02-0192.

[39] *See* Letter from Thomas Jefferson to James Monroe (Nov. 24, 1801), *in* 35 THE PAPERS OF THOMAS JEFFERSON, Aug. 1–Nov. 30, 1801, at 718 (Barbara B. Oberg, ed., Princeton University Press 2008), https://founders.archives.gov/documents/Jefferson/01-35-02-0550 (wherein Jefferson expresses desire that the country would "cover the whole Northern, if not the Southern continent with a people speaking the same language, governed in similar forms, & by similar laws" but writing that he could not "contemplate, with satisfaction, either blot or mixture on that surface").

[40] Thomas Jefferson, *Notes on Early Career (the so-called "Autobiography")* (Jan. 6–July 29, 1821), *in* 17 THE PAPERS OF THOMAS JEFFERSON, Retirement Series Mar. 1–Nov. 30, 1821, at 309 (J. Jefferson Looney et al., eds., Princeton University Press 2020), https://founders.archives.gov/documents/Jefferson/03-17-02-0324-0002. Jefferson's belief that emancipation should be followed by the removal of newly freed Blacks from the United States was shared by many of his contemporaries. The American Society for Colonizing the Free People of Color of the United States (ACS), was founded in 1816 "by a group of white elites including Reverend Robert Finley, Charles Fenton Mercer, Henry Clay, Daniel Webster, Bushrod Washington, Elias Caldwell, and Francis Scott Key" who were dedicated to freeing enslaved Blacks and then deporting them. *See* Morgan Robinson, *The American Colonization Society*, WHITE HOUSE HIST. ASS'N, https://www.whitehousehistory.org/the-american-colonization-society (last visited Oct. 20, 2024). ACS members, "an unusual mix of abolitionists and enslavers," all "agreed that free Black people would never be accepted as equals in the United States" and that Blacks and Whites "could not peacefully co-exist in society;" and thus, "the organization sought to create and settle a colony in West Africa to fulfill its mission." *Id*. Presidents Jefferson, Madison, and Monroe all supported the ACS politically, financially, or through their personal energies (Madison, for example, served as the ACS's third president from 1833 until his death in 1836). *Id*. Chief Justice John Marshall, who "feared slavery would split his state and country," was also a backer of the ACS. *See John*

But White nationalism was not merely the idiosyncratic worldview of Jefferson and the leading Federalists. As Chin & Finkelman show, "whether or not they supported slavery, a majority of [the Founders] unambiguously conceived of the United States as a White country."[41] To create this White country—and encourage its expansion—an appropriate immigration and naturalization policy was fashioned. Importantly, the Founders were not rabid nativists and understood the importance of permitting immigration.[42] One of Jefferson's grievances in the Declaration of Independence was that the Crown prevented the "population of these States" by obstructing immigration and failing to pass "Laws for Naturalization of Foreigners" in order to block American frontier expansion.[43] The Constitution itself permits Congress to "establish a uniform Rule of Naturalization."[44] Moreover, "everyone at the Convention would have understood that a 'uniform Rule of Naturalization' would be tied to race."[45] Thus, the 28th law passed by the first Congress—crucially, preceding the ratification of the Bill of Rights—was the Naturalization Act of 1790.[46] That act, promptly signed into law by President George Washington, limited naturalization to "any alien, being a free white person, who . . . is a person of good character" upon their "taking the oath or affirmation prescribed by law, to support the constitution of the United States."[47] Given the timing of the 1790 act, the Founders agreement that naturalization—the process by which foreigners could join the ranks of the People—should be the privilege of Whites only is important supplemental evidence (in addition to the writings of the leading Federalists and Jefferson) to support the characterization of "the People" referenced in the Preamble as belonging exclusively to the White race. At the very least, this history strongly suggests the Founders believed it was incumbent upon the constituted government to ensure that the White share of the population be preserved and grown. Moreover, although the 1790 act was eventually amended and superseded, the racial restriction on naturalization remained for more than 160 years.[48]

---

*Marshall (1755-1835)*, WM. & MARY LIBRS., https://scrc-kb.libraries.wm.edu/john-marshall-1755-1835 (last visited Oct. 20, 2024).

[41] Gabriel J. Chin & Paul Finkelman, *The "Free White Person" Clause of the Naturalization Act of 1790 as Super-Statute*, 65 WM. & MARY L. REV. 1047, 1048 (2024).

[42] However, this is not to imply that—aside from the racial restrictions—the Founders supported an unregulated immigration policy. Most, if not all, of the Founders would likely have understood that even European immigration could be dangerous if not properly circumscribed. *See, e.g.,* Alexander Hamilton, *The Examination Number VIII*, N.Y. EVENING POST, Jan. 12, 1802, *reprinted in* 25 THE PAPERS OF ALEXANDER HAMILTON, July 1800–Apr. 1802, at 495 (Harold C. Syrett, ed., Columbia University Press 1977), https://founders.archives.gov/documents/Hamilton/01-25-02-0282 (agreeing with Jefferson that "that foreigners will generally be apt to bring with them attachments to the persons they have left behind; to the country of their nativity, and to its particular customs and manners" and that there was a risk that they would lack "that temperate love of liberty, so essential to real republicanism;" and arguing further that the U.S. has "already felt the evils of incorporating a large number of foreigners into their national mass; it has served very much to divide the community and to distract our councils, by promoting in different classes different predilections in favor of particular foreign nations, and antipathies against others" but nonetheless stating that these observations were not a call "for a total prohibition of the right of citizenship to strangers, nor even for the very long residence which is now a prerequisite to naturalization, and which of itself, goes far towards a denial of that privilege").

[43] *See* THE DECLARATION OF INDEPENDENCE para. 9 (U.S. 1776).

[44] U.S. CONST. art. I, § 8, cl. 4.

[45] Chin & Finkelman, *supra* note 41, at 1067.

[46] *Id*.

[47] Naturalization Act of 1790, ch. 3, 1 Stat. 103.

[48] *See* Ozawa v. United States, 260 U.S. 178, 192–93 (1922) ("In all of the naturalization acts from 1790 to 1906 the privilege of naturalization was confined to white persons . . . although the exact wording of the various statutes was not always the same."). In 1870, during the fervor of Reconstruction, the Senate voted narrowly (21-20) to insert

Along with the Founders, the basic foundational principle of White nationalism would continue to be respected and reinforced by American jurists for generations to come. Numerous antebellum court opinions relied on White nationalism as a guiding legal principle. In 1857, the Supreme Court, in an opinion written by Chief Justice Roger Taney, would rule that, under the U.S. Constitution, Blacks (and, presumably, all non-Whites) "had no rights which the white man was bound to respect."[49] Furthermore, as Chin & Finkelman show, Chief Justice Taney "was not alone in arguing for the importance . . . of the exclusively White nature of the political community," and numerous state and territorial court decisions came to similar conclusions.[50] Importantly, not all of these states and territories seceded and formed the core states of the Confederacy. For example, in 1853 the Supreme Court of the Territory of Oregon ruled that "[w]hatever militates against the true interests of a white population is inapplicable" in upholding the conviction of an American Indian for violating a provision of an 1834 act of Congress which designated Oregon as "Indian country" and prohibited the sale of liquor therein to Indians.[51] Despite Oregon having been substantially settled by Whites in the interim, and "[v]ery much of the act of 1834" being "clearly unsuited to the present condition of the country," the court reasoned that the provision against selling liquor to Indians should still be upheld because if that provision was "required in a country wholly inhabited by Indians," then there was even more necessity for the provision "where defenceless white persons, women and children, are exposed to the violence of drunken savages."[52] Similarly, in the same year, the Supreme Court of Pennsylvania opined in dicta that "[w]henever the white population, who settled this Commonwealth, . . . think proper to admit into political partnership either the black population of Africa or the red aborigines of America, they have a

---

a provision into what would become the Naturalization Act of 1870 which would permit the naturalization of "aliens of African nativity and to persons of African descent." Chin & Finkelman, *supra* note 41, at 1102. Nonetheless, no other non-White group was permitted to naturalize, and (in addition to the practical difficulties barring the migration of Africans to the United States in the late 19th century) "[w]hile nominally favored in this way" U.S. immigration law "consistently discriminated against persons of African ancestry" until decades later. *Id*. at 1102 n.313. These laws would remain in effect until 1952 when "in part as a response to the Cold War and the integration of post-war Japan into the emerging western alliance, the United States eliminated all racial restrictions on naturalization, while at the same time continuing ethnic and racial restrictions on immigration through national origins quotas." *Id*. at 1110. There would not be "race neutrality [in] the immigration stream" until the passage of the 1965 Immigration and Naturalization Act (Hart-Celler Act) and the abolition of the national origins quota system. Gabriel J. Chin & Douglas M. Spencer, *Did Multicultural America Result from a Mistake - The 1965 Immigration Act and Evidence from Roll Call Votes*, 2015 UNIV. ILL. L. REV. 1239, 1241 (2015).

[49] Dred Scott v. Sandford, 60 U.S. 393, 407 (1857), *superseded by constitutional amendment*, U.S. CONST. amend. XIV. Chin & Finkelman criticize Chief Justice Taney for ignoring "that free Black persons voted in a majority of the states ratifying the Constitution and in two of the three states admitted to the Union in the 1790s." Chin & Finkelman, *supra* note 41, at 1063. However, this fact is completely inapposite because Taney applied the U.S. Constitution in *Dred Scott*. Indeed, the conceded fact that Blacks could not vote in many states (in addition to the fact that most Blacks in the United States in 1857 were enslaved) *reinforces* Taney's argument that government was not "bound" to grant rights to Blacks (enslaved or free). As Chin & Finkelman themselves show, "[w]hile Connecticut enfranchised Black people at the Founding, this right disappeared with the adoption of the Connecticut Constitution of 1818, which granted the privilege only to 'white male citizen[s].'" *Id*., at 1090 n.241. The Connecticut example proves that, in the antebellum period, whatever rights Blacks, or any other non-Whites, possessed existed at the pleasure of the governments which granted them those rights, and could be revoked through regular amendment processes (or, if the rights were statutory in origin, through mere legislative change).

[50] Chin & Finkelman, supra note 41, at 1090.

[51] United States v. Tom, 1 Or. 26, 27 (1853).

[52] *Id.* at 27–28.

right to do so."[53] However, the court continued, "[u]ntil this be done, the negro and the Indian must be content with the privileges extended to them, without aspiring to the exercise of the elective franchise, or to the right to become our legislators, judges and governors."[54] The validation of White nationalism by territorial and state courts at both ends of the continent in the middle of the 18th century is unsurprising given how, three decades earlier, the Court, in an opinion by Chief Justice Marshall, gave judicial sanction to the conquest of the West by Whites in a race war.[55]

Not even the presidency of Abraham Lincoln and Reconstruction would bring White nationalism to an end. In fact, by modern standards, "the Great Emancipator" cannot be considered a racial egalitarian. It was Lincoln who said, in the fourth Lincoln-Douglas debate in Charleston, Illinois in 1858, that he was not "in favor of bringing about in any way the social and political equality of the white and black races" nor was he "in favor of making voters or jurors of negroes, nor of qualifying them to hold office, nor to intermarry with white people."[56] Lincoln justified these beliefs by pointing to "a physical difference between the white and black races" which he believed would "forever forbid the two races living together on terms of social and political equality."[57] Indeed, Lincoln "endorsed colonization [i.e., deporting freed Blacks] earlier in his life and even during his presidency."[58] In August, 1862, almost a year before the Battle of Gettysburg would mark the turning point of the Civil War, Lincoln invited "a committee of colored men" to the White House where he told them that Whites and Blacks "are different races" and "have between us a broader difference than exists between almost any other two races" which "is a great disadvantage to us both."[59] All of this belies Ackerman's assertion that, had it not been for his assassination, Lincoln would have "proudly signed" the Reconstruction acts his successor vehemently opposed.[60]

Like Lincoln, Justice John Marshall Harlan, "the Great Dissenter," must also be counted among the nationalists and racists of American history. In his famed dissent in *Plessy*, the first Justice Harlan goes to great lengths to make his (rather curious) view clear that "social equality"

---

[53] Foremans v. Tamm, 1 Grant 23, 23 (Pa. 1853).

[54] *Id.*

[55] *See generally* Johnson's Lessee v. M'Intosh, 21 U.S. 543, 590 (1823) (arguing that "the tribes of Indians inhabiting this country were fierce savages, . . . [t]o leave them in possession of their country, was to leave the country a wilderness; to govern them as a distinct people, was impossible;" and thus, "Europeans were under the necessity . . . of enforcing [their] claims by the sword, . . . or of remaining in their neighbourhood, and exposing themselves and their families to the perpetual hazard of being massacred").

[56] Abraham Lincoln, *Fourth Debate: Charleston, Illinois* (Sept. 18, 1858), *in* Mark E. Neely Jr., THE ABRAHAM LINCOLN ENCYCLOPEDIA (Da Capo Press 1982), https://home.nps.gov/liho/learn/historyculture/debate4.htm.

[57] *Id.* ("[I]nasmuch as they cannot so live, while they do remain together there must be the position of superior and inferior, and I as much as any other man am in favor of having the superior position assigned to the white race.")

[58] *See* Robinson, *supra* note 40.

[59] Abraham Lincoln, Address on Colonization to a Deputation of Colored Men (Aug. 14, 1862), *in* THE AMERICAN PRESIDENCY PROJECT, https://www.presidency.ucsb.edu/documents/address-colonization-deputation-colored-men (last visited Dec. 15, 2024). Lincoln also told his Black guests that American Whites "suffer from your presence" and that "[b]ut for your race among us there could not be war, although many men engaged on either side do not care for you one way or the other;" he concluded, "[i]t is better for us both, therefore, to be separated." *Id.*

[60] *See* Bruce Ackerman, *The Living Constitution*, 120 HARV. L. REV. 1737, 1767 (2007).

11

between the races was not at issue in *Plessy*[61] and that, regardless, Whites were "the dominant race"[62] in America. In one passage, Justice Harlan states that "[s]ixty millions of whites are in no danger from the presence here [in America] of eight millions of blacks" which, of course, raises the question of whether they would be in danger if the demographic situation were to be reversed.[63] Moreover, although Justice Harlan may have been a defender of certain Black rights,[64] he had no such commitment to equality when it came to Chinese.[65] Perhaps nothing else demonstrates the enduring relevancy of White nationalism in the American political fabric in the postbellum period than the fact that, nearly sixty years post-Appomattox, the Republican candidate in the 1924 Presidential election had, three years prior as the sitting Vice President, written an article in *Good Housekeeping* arguing that"[t]here are racial considerations too grave to be brushed aside for sentimental reasons" and that "[q]uality of mind and body suggests that observance of ethnic law is as great a necessity to a nation as immigration law."[66] His Democratic opponent, on the other hand, would in 1952 argue on behalf of the segregated school district in the first of the Brown v. Board of Education companion cases.[67] Thus, it would appear that generations after the Civil War and Reconstruction, Americans remained in broad agreement regarding the nationalistic nature of the constitutional order and the White race's position of primacy therein.

Of course, the most obvious reason why White nationalism maintained itself in American law and politics for more than a century and a half after ratification is the simple demographic fact that the United States was a supermajority White country. In defending their accurate characterization of the 1790 Naturalization Act as a "super-statute,"[68] Chin & Finkelman note that the act "helps explain why, for example, as late as 1960, more than 99 percent of Americans were

---

[61] Plessy v. Ferguson, 163 U.S. 537, 561 (1896) (Harlan, J., dissenting) (arguing that "social equality no more exists between two races when traveling in a passenger coach or a public highway than when members of the same races sit by each other in a street car or in the jury box").

[62] *Id*. at 562.

[63] *Id*. at 560.

[64] *But see* Pace v. Alabama, 106 U.S. 583, 585 (1883) (where Justice Harlan joined a unanimous Court in upholding an Alabama anti-miscegenation law); Cumming v. Bd. of Ed. of Richmond Cnty., 175 U.S. 528, 545 (1899) (opinion by Harlan, J.) (upholding a segregated schooling scheme and ruling that "any interference on the part of Federal authority with the management of [state] schools cannot be justified except in the case of a clear and unmistakable disregard of rights").

[65] *See Plessy*, 163 U.S. at 561 (Harlan, J., dissenting) ("There is a race so different from our own that we do not permit those belonging to it to become citizens of the United States. Persons belonging to it are, with few exceptions, absolutely excluded from our country. I allude to the Chinese race."); United States v. Wong Kim Ark, 169 U.S. 649, 707 (1898) (Fuller, C.J., dissenting) (Justice Harlan joining Justice Fuller's dissent which stated that "[n]ationality is essentially a political idea, and belongs to the sphere of public law" and argued that Wong Kim Ark, who was born in the U.S., should not be granted citizenship pursuant to the Fourteenth Amendment because his parents were Chinese subjects); Chae Chan Ping v. United States, 130 U.S. 581, 606 (1889) (Justice Harlan joining a unanimous court in upholding the Chinese Exclusion Act).

[66] Calvin Coolidge, *Whose Country is This?*, GOOD HOUSEKEEPING, Feb., 1921, at 14 ("Biological laws tell us that certain divergent people will not mix or blend. The Nordics propagate themselves successfully. With other races, the outcome shows deterioration on both sides.")

[67] Briggs v. Elliott, 342 U.S. 350 (1952).

[68] *See* William N. Eskridge, Jr. and John Ferejohn, *Super-statutes*, 50 DUKE L. J. 1215, 1216 (2001) (defining a super-statute as a law or series of laws that "(1) seeks to establish a new normative or institutional framework for state policy and (2) over time does "stick" in the public culture such that (3) the super-statute and its institutional or normative principles have a broad effect on the law" which goes "beyond the four corners of the statute.").

White or Black."[69] While this statement is true, it obfuscates the fact that in 1960 the country was 88.8 % White and had reached "peak Whiteness" in 1940 when the country was 89.8% White.[70] Remarkably, the United States became steadily more White after 1790, when the White population was only 80.7% of the country's total population.[71] Obviously, when evaluating the effectiveness of the 1790 act, given that the act's purpose was to make (or keep) the United States a homogenous White country,  the percentage of Whites, standing alone, is a far more important statistic to relay than the percentage of Whites and Blacks together.

Regardless, as Chin & Spencer observe, the demise of racial immigration restrictions with the 1965 Hart-Celler Act (and one should also note, a massive increase in illegal infiltration[72] and the fact of differential birth rates[73]) has set the United States on a course to become a majority non-White country by 2043.[74] All of this has occurred despite the fact that the People, as originally conceived,[75] never asked to be made a minority,[76] and a significant portion of them are revolted

---

[69] Chin & Finkelman, *supra* note 41, at 1048.

[70] Campbell Gibson & Kay Jung, *Historical Census Statistics on Population Totals By Race, 1790 to 1990, and by Hispanic Origin, 1970 to 1990, for the United States, Regions, Divisions, and States,* 19 tbl. 1 (U.S. Census Bureau, Working Paper No. 56, 2002).

[71] *Id*.

[72] *See* AVIVA CHOMSKY, UNDOCUMENTED: HOW IMMIGRATION BECAME ILLEGAL 184 (2014) (noting that "all types of immigration from Latin America rose after 1965: temporary and permanent, legal and illegal"); Ashley Wu, *Why Illegal Border Crossings Are at Sustained Highs*, N.Y. TIMES (Oct. 29, 2023), https://www.nytimes.com/interactive/2023/10/29/us/illegal-border-crossings-data.html (showing that the three years with the greatest number of annual southwestern border apprehensions in the 21st century occurred in 2021, 2022, and 2023).

[73] Jeffrey S. Passel et al., Explaining Why Minority Births Now Outnumber White Births, PEW RSCH. CTR. (May 17, 2012), https://www.pewresearch.org/social-trends/2012/05/17/explaining-why-minority-births-now-outnumber-white-births/ (showing the White and Asian fertility rate at 1.8, the Black rate at 2.1, and the Hispanic rate at 2.4). *See also* Sabrina Tavernise, *Fewer Births Than Deaths Among Whites in Majority of U.S. States*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/us/white-minority-population.html (reporting findings that "[d]eaths began to exceed births for whites countrywide in 2016").

[74] Chin & Spencer, *supra* note 48, at 1242 (citing Press Release, U.S. Census Bureau, U.S. Census Bureau Projections Show a Slower Growing, Older, More Diverse Nation a Half Century from Now (Dec. 12, 2012), https://www.census.gov/newsroom/releases/archives/population/cbl2-243.html).

[75] That is, White Americans.

[76] Jeffrey M. Jones, *Sharply More Americans Want to Curb Immigration to U.S.*, GALLUP (July 12, 2024), https://news.gallup.com/poll/647123/sharply-americans-curb-immigration.aspx (showing that from 1965 to the late 1990s, less than 10% of Americans wanted increased levels of immigration, and 55% of Americans now want immigration levels reduced).

13

by that potential eventuality.[77] Indeed, when the People are informed of demographic statistics and trends, many come to view this process as a "collective existential threat."[78]

What, then, is the substantive legal difference between the demographic change described in the thought experiment above, and the way demographics have actually changed in America? The results of the two will be the same: the People, as once defined, will be replaced, without their consent, with another people—who will then make the electoral decisions[79] and serve as the country's political leaders[80]—via policy decisions (and omissions) by the constituted government. By any means, such a process entails an illegitimate revolution. The only notable differences between reality and the hypothetical are in the degree to which the illegitimate revolution has occurred (Whites becoming a mere minority in 2043 does not necessarily mean they will occupy the same population ratio as outlined in the thought experiment)[81] and the pace of the revolution.

[77] *See* Jens Manuel Krogstad et al., *Most Americans say the declining share of White people in the U.S. is neither good nor bad for society*, PEW RSCH. CTR. (Aug. 23, 2021), https://www.pewresearch.org/short-reads/2021/08/23/most-americans-say-the-declining-share-of-white-people-in-the-u-s-is-neither-good-nor-bad-for-society/ (finding more than double the number of White Americans explicitly say "White people declining as a share of the U.S. population" is somewhat bad or very bad "for society" than say it is somewhat good or very good); Kim Parker et al., *Looking to the Future, Public Sees an America in Decline on Many Fronts*, PEW RSCH. CTR. (Mar. 21, 2019), https://www.pewresearch.org/social-trends/2019/03/21/public-sees-an-america-in-decline-on-many-fronts/ (reporting that 46% of White Americans "say a majority nonwhite population will weaken American culture" whereas only 23% say it will strength it).

[78] *See* Hui Bai & Christopher M. Federico, *Collective existential threat mediates White population decline's effect on defensive reactions*, 23 GRP. PROCESSES & INTERGROUP RELS. 361, 374 (2019) (reporting findings suggesting that exposure by Whites to information about White population decline "does not merely trigger the threat considered in most studies of demographic change, that is, status threat; . . . it may additionally elicit fears that the ingroup will actually cease to exist").

[79] Non-Whites have a dramatic effect on the electoral results in America. 538's new "Swing-O-Matic" tool allows users to alter various demographics to see how the 2024 election might play out under different conditions. Using data which reflects "vote preference and turnout levels from 2020's matchup between Trump and President Joe Biden, adjusted for demographic shifts since then" one can see that Vice President Kamala Harris would win the election with 303 electoral votes and 51% of the popular vote. However, if turnout levels are changed so that the non-White electorate turns out at the lowest allowable level in the simulator (1%), former President Donald Trump is predicted to win with 326 electoral votes and 54% of the popular vote. On the other hand, if the White turnout is set to 1%, then Vice President Harris would win with an astonishing 507 electoral votes and 67% of the popular vote. *See* Elliot Morris et al., *What Would It Take To Turn Blue/Red States Red/Blue?*, ABC News: 538, https://projects.fivethirtyeight.com/2024-swing-the-election/ (last visited Oct. 23, 2024 9:30 PM).

[80] The 2024 Presidential election featured one such individual, Vice President Kamala Harris, who is the daughter of two non-White immigrants and who was born in this country when neither of her parents were American citizens. However, it is more important to note how the effects of demographic change (and changes in conventional attitudes on race and nationalism) were reflected in the rhetoric of both candidates. *Compare* Vice President Kamala Harris, Democratic Presidential Candidate Acceptance Speech at DNC (Aug. 23, 2024), *in* N.Y. Times, https://www.nytimes.com/2024/08/23/us/politics/kamala-harris-speech-transcript.html (last visited Oct. 23, 2024) (accepting her nomination "on behalf of the people, on behalf of every American, regardless of party, race, gender or the language your grandmother speaks. On behalf of my mother, and everyone who has ever set out on their own unlikely journey."), *with* Former President Donald Trump, Republican Presidential Candidate Acceptance Speech at RNC (July 19, 2024), *in* N.Y. TIMES, https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html (last visited Oct. 23, 2024) ("Together, we will launch a new era of safety, prosperity and freedom for citizens of every race, religion, color and creed."). The contrast with the attitudes and views of the candidates in 1924, and other historic American leaders discussed above, is obvious and requires little explanation.

[81] However, there is also no reason to think demographics will become crystallized in 2043. Given differential birth rates, White deaths outpacing births, and increasing levels of immigration, demographic change and replacement will likely continue to accelerate and diminish the White share of the population after 2043.

But one illegality done less dramatically (and more imperceptibly) than another illegality hardly legitimizes the former.

The People still have a valid, inextinguishable claim to sovereignty in our country. More importantly, our numbers and talents are such that—if we are united—we can maintain this sovereignty despite what has transpired and restore ourselves to a position of undisputed control over the constituted power. To do so will obviously require tremendous political efforts, but those efforts are worth it to retain the nation which our Founders bequeathed to us, their posterity. But once this restoration is complete, illegitimate demographic revolutions cannot be permitted to ever again threaten our security and power in our ancestral homeland. To that end, constitutional changes will have to be made.

**Restoring Sovereignty to the People – Article V, Section 2**

Article V is the proper place for the American Restoration to be given textual validation within the Constitution. Article V, as currently written, should be designated as Article V, Section 1, and a second section should be created which ought to read as such:

> The People are White, and the United States, where they are Sovereign, is their country. It is the affirmative duty of the government to enforce the provisions of this section. Dual and multiple citizenship is prohibited, and everyone possessing dual or multiple citizenship within ninety days of this section going into effect are to be divested of American citizenship. Nothing under this Article, or in any other Article of this Constitution, shall be construed to permit a splintering of the unity of the national territory or a degradation of the homogenous, national character of the sovereign People unless supported by a vote of more than nine tenths of the eligible electorate in a national, popular referendum on enacting an amendment ratified according to the process outlined in Article V, Section 1. The text of this paragraph is perpetual and may not be altered by any means.

> All changes heretofore, since this Constitution's enactment, to the homogenous, national character of the sovereign People are hereby deemed *void ab initio* with all attendant consequences flowing from this action being in effect. The Citizenship Clause of the Fourteenth Amendment is repealed, along with the entirety of the Fifteenth Amendment. All references to "person(s)" within this Constitution are to be read as "citizen(s)." All individuals who lose citizenship due to this paragraph, who are currently residing solely in the United States, and have no other national citizenship are hereby granted temporary residency status for a period of ten years, which may be extended as deemed necessary by Congress. The President shall have an absolute right to revoke any such individual's temporary status at any time. Henceforth, no non-citizen who is ineligible for citizenship, upon entering the United States, may reside in the several states for longer than six months in a five-year period.

> The referendum vote outlined in the first paragraph of this section is to occur in-person on the day of the second Presidential election following ratification. When referendums occur during these elections, those elections shall be national holidays.

15

States may withdraw their approval for ratification at any point until the amendment has been ratified by three fourths of the states. An amendment defeated in the national referendum may not be submitted again for the People's consideration for a period of twenty years. All amendments enacted through this procedure may be nullified according to the procedure outlined in Article V, Section 1.

Deliberate attempts or conspiracies to flagrantly contravene this section, or abuse this provision, may be considered treason against the People, per the Article III, Section 3 procedure, and tried in the Senate or the House of Representatives. The People retain the right to enforce this section, and prevent its abuse, by any means necessary. In any criminal case against a citizen for alleged crimes against any individual having taken an oath under this Constitution, this section and paragraph may be invoked as a defense for a jury to consider. Once invoked, any case held in a venue in the capital district shall be moved to a federal venue in a randomly selected state. This defense may not be withdrawn once asserted, and any individual convicted of any crime after asserting this defense may not appeal their conviction and must be put to death within twenty-four hours after the guilty verdict has been rendered. Whenever this defense is asserted, and the jury cannot reach a unanimous verdict after seven days of deliberation, the jury shall be polled. If a majority of the jury favors acquittal, then the defendant is deemed acquitted. If no majority in favor of acquittal has been reached, deliberation will continue and a new poll will be taken every 72 hours until a majority is reached, a verdict is rendered, or a mistrial is declared.

The amendment process is a necessary aspect of the Constitution. As Albert correctly observes, formal amendment processes and rules bind future political actors, "facilitate improvements or corrections to the constitutional text, . . . heighten public awareness, check political branches, promote democracy, and pacify constitutional change."[82] However, these worthy goals, in particular the goal of promoting "democracy" (by which popular sovereignty is reasonably coterminous), can only be achieved if the amendment process reflects the will of the sovereign People. In the United States, the Article V amendment process does not feature a mechanism for direct popular amendment.[83] Nonetheless, Article V amendments (like ordinary legislation) may reflect the will of the People if the political processes that select representatives (and thereby who may directly participate in the Article V amendment process) accurately reflect their preferences. As explained, improperly restrained demographic change can diminish the power of the People and result in a usurpation of their sovereignty through the introduction of foreigners who cannot be assimilated into the People as defined. Mathematics dictates (and political experience suggests)[84] that, when the franchise is extended to these interlopers, elections will tend to decreasingly reflect the will of the People. Article V, Section 2 aims to block all of this, and thus shore up the important goals of the amendment process generally. Its provisions are not merely

---

[82] Albert, *supra* note 1, at 230–31.

[83] *See* U.S. Const. art. V; Amar, *supra* note 3, at 90.

[84] *See* Hamilton, *supra* note 42. It should be remembered that the immigrants Hamilton was speaking of here were all legally (i.e., racially) assimilable into the People. Obviously, racially foreign, legally unassimilable peoples would naturally cling to their own identities when faced with a body politic that requires their exclusion as a precondition for its continued homogenous existence.

prophylactic and preservative, but also remedial and restorative. They are also, obviously, quite radical and may, at first glance, seem incoherent. Thus, further detailed explanation is required.

*Paragraph 1 of Article V, Section 2*

As indicated by the last sentence of this paragraph, the text of this paragraph (and only this paragraph) is permanent and unamendable by any means, reflecting the crucial importance of the provisions of this paragraph to the overarching goals of Article V. The first sentence of the first paragraph of Article V, Section 2 aims to entrench the nationalist view of the American People held by the Founders and generations of succeeding Americans.[85] It also makes popular sovereignty over the United States and its government explicit, a principle which is still nominally accepted in American law.[86] If the People possess the moral confidence to assert their sovereignty, they must also logically assert their right to exist as they define themselves. Similarly, if their Union is to be perpetual,[87] then they themselves must be perpetual. According to Zackin, one of the primary purposes of constitutional entrenchment is "to prevent government from intervening in the ways that it had before."[88] Similarly, the purpose here is to prevent the constituted government from affirmatively facilitating the kinds of changes to the form of the sovereign as it has done since 1868. Preventing these changes being effectuated via omissions is the purpose of the next sentence charging the government with the duty of upholding this section.

This paragraph also permanently abolishes dual and multiple citizenship from the American political landscape. As was demonstrated by the thought experiment, dual and multiple citizenship permits an individual to be subject to the will of two or more governments, and thus, to two or more sovereigns. This may have disastrous results, particularly if a substantial number of people comprising the citizens of one country are also citizens of ours; a situation which would facilitate their coordination on political matters. The potential for subverting and misdirecting the People's sovereign will to advance the ends of an alien entity or people is too great to permit dual or multiple citizenship to exist in the United States.

---

[85] One inevitable objection to this provision will be of a practical nature: how does one define "White?" A detailed answer to this question is beyond the scope of this paper. However, two observations are appropriate. First, it is assumed that people are generally able to viscerally recognize the race of most individuals (or at least, they can recognize if they are not White). Secondly, this standard was workable for most of this nation's history. *See generally* IAN HANEY LOPEZ, WHITE BY LAW 2–7 (2006) (describing various court cases aimed at determining if the petitioner was White, and explaining how "[t]hough the courts offered many different rationales to justify the various racial divisions they advanced, two predominated: common knowledge and scientific evidence"). Additionally, the development of artificial intelligence presents one promising means of being able to determine an individual's race. *See generally* Judy Wawira Gichoya et al., *AI recognition of patient race in medical imaging: a modelling study*, 4 LANCET DIGIT. HEALTH e406 (finding "that AI can accurately predict self-reported race, even from corrupted, cropped, and noised medical images, often when clinical experts cannot").

[86] *See supra* note 8.

[87] *See* Texas v. White, 74 U.S. 700, 724–25 (1868) (stating that "[t]he Union of the States never was a purely artificial and arbitrary relation" and that, because "the Constitution was ordained 'to form a more perfect Union'" that Union was "indissoluble" and intended to exist in "perpetuity"), *overruled on other grounds by* Morgan v. United States, 113 U.S. 476 (1885).

[88] EMILY ZACKIN, LOOKING FOR RIGHTS IN ALL THE WRONG PLACES: WHY STATE CONSTITUTIONS CONTAIN AMERICA'S POSITIVE RIGHTS 34 (2013).

17

The language of "[n]othing under this Article, or in any other Article of this Constitution" is used to indicate that this paragraph shall be applicable to (and, hopefully, preventative of) informal amendment through legislation, executive order, or judicial interpretation which is contrary to the language of this paragraph.

The purpose of the "splintering . . . of the national territory" language is to entrench the ruling in Texas v. White that the Union is perpetual and indissoluble.[89] Thus, subnational secession is made explicitly unconstitutional, barring the amendment process outlined here. The purpose of the "degradation of the homogenous, national character of the sovereign People" language is to prevent the redefinitions and alterations of the People which have taken place since 1868 barring, again, the amendment process outlined here. That process is, obviously, quite strict. The animating purpose behind the requirement that these amendments receive the support of "more than nine tenths of the eligible electorate in a national, popular referendum" *following* the procedure of Article V, Section 1 is to prevent change and preserve the existing definition of the People. This, again, speaks to the moral confidence which the People must wield to assert and defend their sovereignty. The more than nine tenths requirement reflects the belief that, if such fundamental changes are to be made to the form and composition of the Sovereign, they should receive consensus and some support from "the tenth man;"[90] and the requirement that the nine tenths be of the whole electorate reflects the belief that a failure to explicitly express disapproval does not negate the right of any eligible voter to provide affirmative consent before their nation is fundamentally altered. This requirement also reflects an understanding of (and disdain for) the power of oligarchy, particularly with regards to oligarchy's ability to alter the beliefs of the People, and an awareness of the oligarchical interest in subverting the People and usurping their

---

[89] *See supra* note 87.

[90] James Dudley, *Incorporating the 'tenth man' concept into critical decision-making*, POLICE1 (June 15, 2021, 10:04 AM), https://www.police1.com/chiefs-sheriffs/articles/incorporating-the-tenth-man-concept-into-critical-decision-making-TXuMkB74BZFN9LCo/ (describing a "devil's advocate" tactic to bring "alternative perspectives to problem-solving" whereby, in a group that has reached consensus, "[t]he role of the tenth man is to review available intelligence to then articulate opposing arguments to whatever solutions or decisions are being proposed. By considering the tenth man's perspective, information or scenarios that may otherwise be overlooked and unanticipated may be revealed.").

sovereignty.[91] Moreover, this requirement promotes democracy by incentivizing the political forces behind a suggested amendment of this type to ensure widespread voting access.[92]

*Paragraph 2 of Article V, Section 2*

The purpose of the first sentence of this paragraph is to reverse the changes to the American national character which have occurred since 1868. Thus, the citizenship of everyone who would have been unable to attain it via naturalization under the 1790 standard is to be rescinded. Moreover, because the Citizenship Clause of the Fourteenth Amendment redefined, without the consent of the People, what it meant to be born as a member of the People, that clause is to be repealed. By tying birthright citizenship to being born on American soil, rather than being born with American blood, the Reconstruction era Congress effectuated a grossly anti-nationalist policy which fundamentally degraded the homogenous, national character of the sovereign People. As Daniel O'Connell said, "being born in a stable does not make a man a horse;"[93] and, likewise,

_____

[91] *See* Winters & Page, *supra* note 21, at 743 (discussing how "shrewdly invested money can move public opinion in directions inimical to citizens' interests" and how "[t]his is particularly likely to happen when elite communications are monolithic, which might well occur . . . on issues of central concern to an oligarchy"). *See also* ARISTOTLE, POLITICS bk. 5, sec. 1314a ("And it is a mark of a tyrant to have men of foreign extraction rather than citizens as guests at table and companions, feeling that citizens are hostile but strangers make no claim against him."); Alexander W. Schmidt-Catran & Christian S. Czymara, *Political elite discourses polarize attitudes toward immigration along ideological lines: A comparative longitudinal analysis of Europe in the twenty-first century*, 49 J. ETHNIC & MIGRATION STUD. 85 (2023) ("When political elites in a country become more positive on immigration-related issues, Europeans—on average—tend to be more open as well."). One minority group that has exercised outsized influence over the process of demographic change in the United States is its Jewish community. *See generally* Kevin MacDonald, *Jewish Involvement in Shaping American Immigration Policy, 1881-1965: A Historical Review*, 19 POPULATION & ENV'T 295 (1998) (explaining why "Jews have been at the forefront in supporting movements aimed at altering the ethnic status quo in the United States in favor of immigration of non-European peoples" through "activities [which] have involved leadership in Congress, organizing and funding anti-restrictionist groups composed of Jews and gentiles, and originating intellectual movements opposed to evolutionary and biological perspectives in the social sciences"). It is also widely acknowledged that the donor class is disproportionately comprised of Jews, and that Jews wield outsized influence within media to influence social change. *See* Ron Kampeas, *Meet the leading Jewish political donors in this US election cycle*, TIMES OF ISRAEL (Sept. 25, 2020, 5:59 PM), https://www.timesofisrael.com/meet-the-leading-jewish-political-donors-in-this-us-election-cycle/ (showing how seven of the top ten and fifteen of the top twenty-five individual donors in the 2020 U.S. election cycle were Jews, with donation totals of roughly $176.4 million to Democratic groups and $87.9 million to Republican groups); Jeremy Sharon, *US Jews contribute half of all donations to the Democratic Party*, JERUSALEM POST (Sept. 27, 2016, 12:31 AM), (describing why Jews contribute "a whopping 50% of funds received by the Democratic Party and 25% to the Republican Party"); Joel Stein, *Who Runs Hollywood? C'mon*, L.A. TIMES (Dec. 19, 2008, (12:00 AM), https://www.latimes.com/archives/la-xpm-2008-dec-19-oe-stein19-story.html (describing how the author had to "scour the trades" of Hollywood "to come up with six Gentiles in high positions at entertainment companies," and when he called these six people "five of them refused to talk . . ., apparently out of fear of insulting Jews. The sixth, AMC President Charlie Collier, turned out to be Jewish."); Josh Lederman, *Biden: Jewish leaders drove gay marriage changes*, ASSOC. PRESS (May 21, 2013, 9:21 PM), https://apnews.com/arts-and-entertainment-movies-united-states-government-974f8e9179014185a6f1d455005539af (reporting how then Vice President Biden "prais[ed] Jewish leaders for helping change American attitudes about gay marriage and other issues" through their "immense" influence in Hollywood and social media companies).

[92] On the other hand, it may be countered that this requirement also risks incentivizing *the opponents* of such an amendment to *restrict* voting access. This is accurate, but given that the purpose of these requirements is to prevent change, this is an acceptable risk. Moreover, if such an amendment truly had the support of the necessary fraction of the total electorate, I doubt such attempts at frustrating the will of the nearly unanimous People could bear fruit.

[93] Raphaël Ingelbien, *"When I say 'We', I mean what I say": The "national" receptions of Waterloo in 19th-century Ireland*, 20 INTERFÉRENCES LITTÉRAIRES/LITERAIRE INTERFERENTIES 31, 33 (2017).

merely being born in the United States is not enough to make a man an American. Madison spoke of "the kindred blood which flows in the veins of American citizens"[94] to spur them to ratify the Constitution, he did not speak of their kindred birthplaces.

Little explanation of the rationale behind the repeal of the Fifteenth Amendment is needed. If "[t]he People are White, and the United States, where they are sovereign, is their country" is to be a constitutional provision, then racial discrimination in voting rights is not only permissible, but incumbent upon the government. Obviously then, the Fifteenth Amendment cannot coexist with this section.

The repealing of both the Citizenship Clause of the Fourteenth Amendment and the Fifteenth Amendment should also be done to return dignity to Article V, Section 1. Suthon Jr. convincingly argues that placing the Southern states under military occupation, forcefully reorganizing their governments, and demanding their "puppet" state legislatures to ratify these amendments as conditions for having their elected Representatives and Senators allowed into Congress "constitute[d] an infraction of the amendment procedure ordained by Article V of the Constitution."[95] Nonetheless, only the Citizenship Clause of the Fourteenth Amendment is objectionable from a nationalist standpoint once the sentence mandating reinterpretation of the word "person(s)" as "citizen(s)" is added. Indeed, once the meaning of the word "person(s)" is thus circumscribed (and the Citizenship Clause deleted) the remainder of the Fourteenth Amendment is actually quite nationalistic insofar as it ensures that we remain "one people" with "each individual citizen everywhere enjoying the same national rights, privileges, and protection."[96] Such a redefinition is also not incompatible with the goal of government under popular sovereignty.[97]

The "temporary residency status" provision is intended to make the changes effectuated by this section more politically palatable and logistically manageable. The purpose of the Presidential veto provision is to permit the acceleration of this process when such acceleration is feasible, and to allow the President to remove troublesome non-citizen elements if he deems it necessary. Additionally, constitutionalizing residency restrictions is designed to prevent Congress from maintaining and introducing a permanent and politically problematic underclass. The ultimate goal of these three provisions is to provide constitutional guidelines and requirements for the deportation of those with the ten-year temporary status to their ancestral homeland, or to another country that is willing to accept them. [98] Of course, the ten-year timeframe will also provide the necessary time to ratify and pass all amendments pursuant to this section which the People may desire in order to legitimately accept and integrate those with this ten-year status into the People.

---

[94] THE FEDERALIST NO. 14, *supra* note 29, at 104.

[95] *See generally* Walter J. Suthon Jr., *Dubious Origin of the Fourteenth Amendment*, 28 TUL. L. REV. 22, 41–44 (1953). *See also id*. at 29 (contrasting this process with the regular process used to ratify the Thirteenth Amendment).

[96] THE FEDERALIST NO. 2, *supra* note 5, at 38–39.

[97] *See e.g.,* League v. De Young, 52 U.S. 185, 203 (1850) ("The Constitution of the United States was made by, and for the protection of, the people of the United States.").

[98] To believe these should not be policy goals, given the rest of Article V, Section 2, would be to sanction the creation of a large, disenfranchised, and permanent underclass of those constitutionally unable to become citizens. In many ways, this is to sanction a return to the antebellum living arrangement between Whites and non-Whites, with all the constant, simmering (and occasionally explosive) racial antagonism that entails. Repatriation is a superior policy.

*Paragraph 3 of Article V, Section 2*

Whether or not Ackerman is correct regarding "the plebiscitarian presidency" as a historical fact,[99] the intent behind tying the referendum vote on Article V, Section 2 amendments to the second presidential election following their ratification is, essentially, to demand a plebiscitarian presidential *election* to ensure a national conversation occurs around the merits (or lack thereof) of these amendments. In tying the vote to the second presidential election following ratification, the People will have four years at minimum to have this conversation and carefully consider the political question presented by the amendment. Of course, such an amendment is bound to be a major question, and candidates will be expected to clearly state their opinion on the matter. Moreover, given the nine tenths threshold and the significance of the question which these amendments bring to the national forefront, common sense suggests that (in a two-party system) *both* candidates will likely, although not necessarily, need to passionately support the amendment for it to pass.[100] Finally, tying the referendum to the presidential election ensures that no additional election infrastructure needs to be established; and the requirement that the referendum vote be in-person on election day is intended to prevent fraud and having votes be cast by insufficiently motivated voters. The provision that these referendum votes shall occur on a national holiday is intended to ensure there is no excuse (aside from one's personal choice to essentially vote no on the amendment) for failure to vote in the referendum.

The provision that states may withdraw their ratification until the three fourths threshold of states is reached is intended to permit the citizens of the several states to depose incumbent state legislators who ratify an amendment contrary to the democratic will without also having to risk (or bother with) a national referendum. The time limit on resubmitting an amendment after its defeat is intended to show respect to the People's will; when the People decide, they should not be incessantly prodded on the same issue until they relent.

Finally, this paragraph's provision that an Article V, Section 2 amendment may be nullified according to the procedure outlined in Article V, Section 1 is intended to permit the People's representatives to exercise their judgment and return the nation to the *status quo ante* without the need to go through the process outlined in this section. This provision reflects the assumption that a return to the *status quo ante* on the questions involved in Article V, Section 2 amendments is an inherently acceptable position to the Sovereign. This is an assumption that is essentially restorationist.

*Paragraph 4 of Article V, Section 2*

The purpose of this paragraph is to provide a legal means of legitimizing political violence against usurpers within the government. The provision allowing for "[d]eliberate attempts or conspiracies to flagrantly contravene this section, or abuse this provision," to be charged as treason permits for this violence to occur through normal government through a trial, similar to how Article

---

[99] *See generally* Ackerman, *supra* note 60, at 1757–71 (describing his theory of a "movement-party-presidency pattern" traceable back to Jefferson that has "filled the void left in the public mind by the marginalization of the formal Article V system," with a special emphasis on this theory's relation to the "the civil rights revolution").

[100] On the ballot, the amendment vote will be separate from the presidential vote. It is theoretically possible for both candidates to support an amendment and to have that amendment fail, or for both to oppose the amendment and have it pass.

21

V, Section 1 permits amendment through normal government.[101] The language of "[d]eliberate" and "flagrantly" is used to qualify the elements of the crime so that this provision does not provide cover for attempts by members of either chamber to punish various political opponents. The ability for charges to be tried in either chamber is meant to ensure that the chambers can serve as a check on one another.

Crucially, this paragraph also allows the People "to enforce this section, and prevent its abuse, by any means necessary." This language is motivated by the theory that, just as "an assassin's bullet" may cause constitutional change,[102] so too may it prevent illegitimate change. Assassination is undoubtedly an extralegal action, however, to call an action extralegal does not necessarily imply that it is illegitimate.[103] The purpose of the remaining provisions of this paragraph which allow the assassin to invoke this section and paragraph "as a defense for a jury to consider," and describe some procedures by which a trial is to be conducted after this defense is asserted, is to determine whether the assassination is legitimate. Thus, this provision does not permit trial by combat; rather, it permits trial *of* combat while presuming that the mere fact that a defendant committed extralegal violence does not necessarily mean they are guilty of a crime. Moreover, this provision will be useful in providing a practical check on the power of the judiciary, whose members (due to being unelected and serving for life) are generally unaccountable within the political process, absent impeachment and conviction. The United States was not intended to be a kritarchy, and by providing a legal mechanism for removing judges from the bench, this provision hopes to remind judges of their impotence, so that they may rule accordingly.[104]

The remaining procedural provisions of this paragraph reflect three different concerns. First, it is envisioned that it may be difficult to find an impartial jury to consider this defense for violent acts committed against officials in the capital district. The reason for moving the trial to a random venue is to provide the neutrality and fairness of pure chance to both the defendant and the government. Second, the provision preventing withdrawal of the defense once asserted, and the unappealable, mandatory, and swift death penalty following a guilty verdict, reflects the seriousness with which these extralegal actions should be contemplated by those who would commit them, and the gravity of the consequences a defendant should face if their actions are deemed illegitimate by a jury of the People. Finally, the mandatory acquittal after seven days of deadlocked deliberation if a majority of the jury favors acquittal and the continuous polling every 72 hours, reflects concern with the squeamishness towards the use of violence by the average person. Individuals may find it difficult to accept that it may be, depending on the circumstances, necessary for (or beneficial towards) national survival to kill certain officials. Thus, after a week of deliberations, only a majority in favor of acquittal should be necessary to free a defendant.

---

[101] *Cf. supra* note 83.

[102] Ackerman, *supra* note 60, at 1770.

[103] *See* Albert, *supra* note 1, at 232 ("To call informal amendment extralegal is not to make a claim about its legitimacy.").

[104] *See* Obergefell v. Hodges, 576 U.S. 644, 720 (2015) (Scalia, J., dissenting) ("With each decision of ours that takes from the People a question properly left to them—with each decision that is unabashedly based not on law, but on the 'reasoned judgment' of a bare majority of this Court—we move one step closer to being reminded of our impotence.")

22

In 1787, Thomas Jefferson wrote that, "[t]he tree of liberty must be refreshed from time to time with the blood of patriots and tyrants."[105] Relatedly, Alexander Hamilton wrote of the necessity of fostering "a large body of citizens, little, if at all, inferior to [the standing army] in discipline and the use of arms, who stand ready to defend their own rights and those of their fellow-citizens."[106] Given Founders who held such sentiments, it is hardly surprising that the Second Amendment, in order to provide for "the security of a free State," demands that "the right of the people to keep and bear Arms, shall not be infringed."[107] Recognizing this heritage, and the validity of these sentiments, this paragraph provides the People with textual basis for—and procedural vindication of—the right to not merely keep and bear arms, but to use those arms to defend their panoply of rights. Threats to the sovereign People do not only come from the realm of demographic change. In a republic, one of the greatest threats to popular sovereignty and liberty is the ambition of the People's elected leaders. No patriot should be expected to stand idly by while this ambition—and its concomitant avariciousness and lust for power—drives a nation into ruin. This paragraph gives the assassin the right to justify himself and to inquire of the People who among them is so base that would be a bondman, so vile that will not love their country. Then, he shall pause for a reply.[108]

## Conclusion

One potential objection to these arguments and proposals is that the historical narrative upon which they rely was always a historical fiction. It may be convincingly argued that the People were never a homogeneous mass,[109] or that they did not act in a recognizably sovereign capacity to create the Constitution.[110] However, these arguments, as accurate as they may be as a matter of history, are irrelevant for legal purposes. Although the homogeneity of the early United States or the genuine sovereignty of the People, may have been a historical fiction, the ratification of the Constitution—done through a political process which appealed to these assumptions to garner support—made these assumptions, fictitious or otherwise, binding. If these historical assumptions were (or are) fictions, then ratification transformed them into *legal fictions*.

For better or worse, history is an unalterable inheritance. We can no more change history than we can change the orientation or intensity of the stars in the night sky. It is also true that, like those stars, history may position and guide us. Our Constitution, and the fundamental principles it embodies, is one such guiding historical inheritance. However, unlike history or the stars, we can change the Constitution; as a practical matter, we can do away with part or all of it as we wish, provided we have the will and the power to do so. Nonetheless, we seem to abide by it (or at least,

---

[105] Letter from Thomas Jefferson to William Stephens Smith (Nov. 13, 1787), *in* 12 THE PAPERS OF THOMAS JEFFERSON, Aug. 7, 1787–Mar. 31, 1788, at 355 (Julian P. Boyd, ed., Princeton University Press 1955), https://founders.archives.gov/documents/Jefferson/01-12-02-0348.

[106] THE FEDERALIST NO. 29, at 185 (Alexander Hamilton) (Clinton Rossiter ed., 1961)

[107] U.S. CONST. amend. II.

[108] WILLIAM SHAKESPEARE, JULIUS CAESAR act 3, sc. 2, ll. 1563–68.

[109] Sanford Levinson, *Federalist No. 2*, SLATE (Nov. 24, 2015 10:02 AM), https://www.slate.com/articles/news_and_politics/history/2015/11/the_federalist_papers_federalist_no_2_and_the_immigration_debate.html (arguing that, as a matter of "historical truth," Jay's statements in Federalist No. 2 that Americans were a homogeneous nation amount to "utter fatuity").

[110] *See generally* CHARLES BEARD, AN ECONOMIC INTERPRETATION OF THE CONSTITUTION OF THE UNITED STATES (1913) (arguing that the Constitution was the self-interested creation of an elite economic class).

pretend like we abide by it) in large part because we have respect for the history that formed it and delivered it to us in the present. Like the man of wealth and prudence who has inherited a luxurious mansion in which his family has lived for generations, and who tempers his exuberance and his desire to tear the whole thing down and build something else in its stead so that he may deliver his abode to his descendants, we resist throwing out our Constitution. We thus say that we limit ourselves to making relatively small and incremental changes which do not dramatically change the character of the whole document and the government which it gives authority to.

But as this paper demonstrates, the Constitution has effectively been thrown out. Through the demographic and constitutional changes effected by our government, the Constitution's overarching principle—the sovereignty of the People (as once understood)—is now a dead letter. When Chin & Finkelman argue that the 1790 Naturalization Act "deserves a place of dishonor,"[111] what they are essentially saying is that the founding of the United States deserves a place of dishonor. Many non-Whites may agree with that proposition, and they may feel joyful that the government of the United States has usurped the People's sovereignty. After all, without this usurpation, non-Whites may not have ever been permitted to become citizens of this country. But what extraneous costs will come from this change? If the government has usurped sovereignty from the People and reconstituted them into a new people, will sovereignty pass to that new people? Furthermore, if the racial attitudes of the Founders which brought White nationalism in to force in the United States are merely a bygone relic of an age that should be forgotten—nay, dishonored!—then why should the government respect any other provision or structural principle of the Constitution? Why should the Founders' concern with the Crown's restriction on their free speech give legitimacy to the First Amendment? Why should their hatred of general warrants give legitimacy to the Fourth Amendment? Why should their fear of the thumbscrew and the breaking wheel give legitimacy to the Fifth and Eighth Amendments? And if that legitimacy comes not from the history of this country and the Founders, then where will it be found? At minimum, those who seek to uphold the current constitutional order should acknowledge that a usurpation has occurred. Only when honesty is forthcoming on this crucial matter can the new people in America begin to determine the extents to which this usurpation has gone (and will go), and begin to trust that this usurpation will only go so far.

---

[111] Chin & Finkelman, *supra* note 41, at 1048.

24

EXHIBIT

Dft's Ex 4

exhibitsticker.com

# National Constitutionalism
*An Originalist and Structuralist Analysis of Border Policy, Immigration and Naturalization Law, and the Fourteenth Amendment*
Preston Terry Damsky

## Contents

Introduction .......................................................................................................... 1

The Originalist Foundations of National Constitutionalism ................................. 2

"The People" as Nation: *Verdugo-Urquidez* and *Heller*............................................ 9

National Constitutionalism Distilled for Jurists...................................................12

National Constitutionalism Applied to Immigration Policy, Naturalization Law, and Alienage Classifications ......................................................................................13

   Border Control, the Guarantee Clause, and the State War Power ....................................14

   Immigration and Naturalization Law ..................................................................16

   Alienage Classifications and the Citizenship Clause.........................................17

Conclusion ..........................................................................................................19

## Introduction

This paper proposes that constitutional governance relies upon several structural principles and implicit assumptions—rooted in our national history and the Constitution's text—about the significance of "We the People" in the constitutional scheme. This descriptive claim, coupled with a normative claim that these principles and assumptions should be preserved and aggressively asserted, is termed "national constitutionalism." National constitutionalism posits that, regardless of certain textual provisions with a seemingly open-ended scope of application, the Constitution's establishment of a nation-state under the sovereignty of the People must be considered its paramount purpose which may not be permissibly undermined by any governmental acts or omissions absent the direct and unambiguous consent of the People.[1] Originalism's two dominant varieties—original

---

[1] In this discussion, the phrase "the People" will be understood as being coterminous with the phrase "the nation." *See* AZAR GAT WITH ALEXANDER YAKOBSON, NATIONS: THE LONG HISTORY AND DEEP ROOTS OF POLITICAL ETHNICITY AND NATIONALISM 18 (2012) (defining "nation" as a population with a sense of shared kinship, culture, common identity, history, and fate, that is either politically sovereign or actively striving to achieve political self-determination and self-government); CARL SCHMITT, CONSTITUTIONAL THEORY 127 (Jeffrey Seitzer, ed. & trans., 2008) (noting that "[n]ation and people are often treated as equivalent concepts" but that "[nation] denotes, specifically, the people as a unity capable of political action, . . . while the people not existing as a nation is somehow only something that belongs together ethnically or culturally, but it is not necessarily a bonding of men existing politically").

intent originalism and original public meaning originalism[2]—both suggest the propriety of applying national constitutionalism to at least one area of law where courts have heretofore been inclined to view the so-called "political branches" (i.e., Congress and President) as possessing plenary, nonjusticiable authority: immigration and naturalization policy.[3] Additionally, the logic of national constitutionalism suggests an urgent need to overturn much of the Court's modern Fourteenth Amendment jurisprudence, and even consider the constitutionality of the Fourteenth (and Fifteenth) Amendments entirely.

## The Originalist Foundations of National Constitutionalism

Original intent originalism "holds that the intent of the author of words or language determines the meaning of those words."[4] Original intent originalists defend this exegetical method by arguing that the true meaning of any authored language is inseparable from the author's intent.[5] McGinnis & Rappaport contend that original intent originalism's advantages are non-availing when the language at issue has multiple authors because "the individual intentions of each author might differ" and it is possible that "a single meaning was shared only by a plurality."[6] Moreover, this interpretive problem is compounded when the language's meaning is unexplained by the authors and where "legislators cannot easily determine the meaning of a provision upon which they are voting."[7] Nonetheless, McGinnis & Rappaport argue that these problems are resolvable via careful application of "background interpretive rules."[8] While McGinnis & Rappaport are correct that recourse to these rules may be useful and appropriate where no easily discernible, express consensus exists regarding the original meaning of multi-authorial language,

---

[2] John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 NW. U. L. REV. 751, 758 (2009) (describing these two varieties as "the two leading positive theories" of originalist interpretation).

[3] *See, e.g.*, California v. United States, 104 F.3d 1086, 1090–91 (9th Cir. 1997) (holding that California's plea for relief under the Guarantee Clause due to the federal government's failure to secure the southern border "presents a nonjusticiable political question" by noting that "[t]he Supreme Court has held that the political branches have plenary powers over immigration" and explaining further that "[f]or this Court to determine that the United States has been 'invaded' when the political branches have made no such determination would disregard the constitutional duties that are the specific responsibility of other branches of government, and would result in the Court making an ineffective non-judicial policy decision") (citing Fiallo v. Bell, 430 U.S. 787, 792 (1977)).

[4] McGinnis & Rappaport, *supra* note 2.

[5] *Id.* at 759 (recounting that "[Richard Kay] argues that readers do not understand texts independently of real or presumed human intentions . . . [r]ather, meaning is fundamentally connected with a human agent who intended to communicate something").

[6] *Id.*

[7] *Id.* at 760.

[8] *Id.* ("The possibility of multiple meanings would be significantly reduced or eliminated if legislators understood that the words of a law would be interpreted in accordance with applicable rules, such as accepted word meanings, grammar, and interpretive rules.").

these rules are less necessary (if not superfluous and potentially obfuscatory) where the language's meaning was clearly expressed when authored and there was a unanimous, or at least clear majority, agreement regarding this meaning.

In contrast to original intent originalism's subjective, authorial-based analysis, original public meaning originalism focuses on "how the words of the document would have been understood by a competent and reasonable speaker of the language at the time of the document's enactment."[9] Thus, this method may be considered an objective mode of analysis, albeit one tied to the historical context of the language's genesis. Citing Barnett's analogy of the Constitution as a contract, McGinnis & Rappaport argue that their reliance on background interpretive rules is apropos because the objective theory of contract interpretation relies on the objective meaning of words rather than parties' subjective intentions.[10] McGinnis & Rappaport note that although many contractual terms are interpreted according to their ordinary meaning, "it is a legal interpretive rule that determines whether a term should receive its ordinary or legal meaning."[11] However, it is self-evident that where there is no difference between the ordinary meaning of language and its legal meaning, recourse to such a legal interpretive rule is unnecessary.

Like Vermeule's theory of common-good constitutionalism, national constitutionalism looks to the Preamble to clarify the Constitution's *raison d'être*. However, rather than look as Vermeule does to the Preamble's "sweeping generalities and famous ambiguities" to assert that the Constitution may be given a moralistic, anti-libertarian reading that permits the legislation of conservative morality,[12] national constitutionalism instead focuses on the Preamble's clear statement of who has "ordain[ed] and establish[ed]" the constitutional contract ("We the People") and who are its intended beneficiaries ("ourselves and our Posterity").[13] In doing so, national constitutionalism insists upon the conceptual validity of the principal-agent analogy in order to clearly delineate the People as the sovereign constituent power within the constitutional hierarchy, with the constituted power of the Constitution and its branches of government occupying an inferior, subordinate rule.[14] Thus,

---

[9] *Id.* at 761.

[10] *Id.* at 762 (citing RANDY E. BARNETT, RESTORING THE LOST CONSTITUTION 100 (2004)).

[11] *Id.* at 763.

[12] Adrian Vermeule, *Beyond Originalism*, The Atlantic (Mar. 31, 2020), https://www.theatlantic.com/ideas/archive/2020/03/common-good-constitutionalism/609037/ (arguing that "the Constitution's preamble, with its references to general welfare and domestic tranquility, to the perfection of the union, and to justice" is "an obvious place to ground principles of common-good constitutionalism," and that "words such as *freedom* and *liberty* need not be given libertarian readings; instead they can be read in light of a better conception of liberty as the natural human capacity to act in accordance with reasoned morality") (emphasis in original).

[13] U.S. CONST. pmbl.

[14] *See* Mila Versteeg & Emily Zackin, *Constitutions Unentrenched: Toward an Alternative Theory of Constitutional Design*, 110 AM. POL. SCI. REV. 657, 658 ("Those who conceptualize constitutionalism as a form of contracting describe the people as a 'principle,' which, in creating a representative government, has employed 'agents' to better realize its ends."); Luigi Corrias, *Populism in a Constitutional* Key, 12 EUR. CONST. L. REV. 6, 15 (2016) (describing the nation as the "bearer" of

national constitutionalism applauds and emphasizes the Supreme Court's long-held and oft-repeated acknowledgement of popular sovereignty as forming the bedrock of—and pre-dating[15]—the present constitutional order.[16]

Crucially, national constitutionalism rests in large part upon an originalist analysis of the meaning of the phrase "the People." The theory posits that although the People were an identifiable entity capable of political action prior to the ratification of the Constitution, the ratification process itself—and the political advocacy which propelled ratification forward—produced the controlling definition of the People for the purposes of constitutional interpretation. Like America's earliest jurists, national constitutionalists must look to The Federalist for guidance in clearly formulating this definition.[17] Those expounding national constitutionalism may take pride in the fact that they need not look long therein to find relevant authority. In The Federalist No. 2, John Jay explains that the Americans are:

> [A] people descended from the same ancestors, speaking the same language, professing the same religion, attached to the same principles of government, very similar in their manners and customs, and who, by their joint counsels, arms, and efforts, fighting side by side throughout

constituent power, whereas "the constitution, legislature, executive, and judiciary" which "ultimately derive their power from the nation" are the constituted power).

[15] *See* THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) ("it is the Right of the People to alter or to abolish [government], and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness.").

[16] *See, e.g.*, Chisholm v. Georgia, 2 U.S. 419, 470–71 (1793) (""[T]he people, in their collective and national capacity, established the present Constitution . . . in establishing it, the people exercised their own rights, and their own proper sovereignty"); Marbury v. Madison, 5 U.S. 137, 176 (1803) ("That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis, on which the whole American fabric has been erected."); Barron v. City of Baltimore, 32 U.S. 243, 247 (1833) ("The constitution was ordained and established by the people of the United States for themselves, for their own government . . . The people . . . framed such a government . . . as they supposed best adapted to their situation and best calculated to promote their interests."); Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886) ("Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts."); Carter v. Carter Coal Co., 298 U.S. 238, 296 (1936) ("[T]he Constitution itself is in every real sense a law—the lawmakers being the people themselves, in whom under our system all political power and sovereignty primarily resides, and through whom such power and sovereignty primarily speaks."); Afroyim v. Rusk, 387 U.S. 253, 257 (1967) ("In our country the people are sovereign and the Government cannot sever its relationship to the people by taking away their citizenship."); Buckley v. Valeo, 424 U.S. 1, 14 (1976) (relying on the presumption that the United States is "a republic where the people are sovereign"); Gamble v. United States, 587 U.S. 678, 688 (2019) ("[O]ur Constitution rests on the principle that the people are sovereign").

[17] Cohens v. Virginia, 19 U.S. 264, 418 (1821) (Marshall, C.J.) (noting that "[t]he opinion of the *Federalist* has always been considered as of great authority" in part because "the part two of its authors performed in framing the constitution, put it very much in their power to explain the views with which it was framed").

4

a long and bloody war, have nobly established general liberty and independence.[18]

In The Federalist No. 14, James Madison placed particular emphasis on the People's common ancestry and shared experience of enduring and emerging triumphant from the recent revolutionary struggle, arguing that "the kindred blood which flows in the veins of American citizens, the mingled blood which they have shed in defense of their sacred rights, consecrate their Union, and excite horror at the idea of their becoming aliens, rivals, enemies."[19] Furthermore, Madison called upon Americans to "[h]earken not to the unnatural voice which tells you that [Americans], knit together as they are by so many cords of affection, can no longer live together as members of the same family;   . . . [and] can no longer be fellow citizens of one great, respectable, and flourishing empire."[20] The authors of The Federalist were not ashamed in asserting that the People possessed an exclusive, ancestral identity which should be jealously guarded. Indeed, they believed that it was a fundamental aspect of "human nature . . . that its affections are commonly weak in proportion to the distance or diffusiveness of the object;" and thus, "a man is more attached to his family than to his neighborhood, to his neighborhood than to the community at large."[21] Not only was a political union necessary in order to prevent "a band of brethren, united to each other by the strongest ties" from being "split into a number of unsocial, jealous, and alien sovereignties," but it was those "strongest ties" which made union possible in the first place.[22] The American nation served as the foundation of the American state, and the state, in turn, functioned to preserve what Schmitt would later call the "substantial equality" or "homogeneity" of the nation.[23] Given such views, the authors of The

---

[18] THE FEDERALIST NO. 2, at 38 (John Jay) (Clinton Rossiter ed., 1961). *See also id.* at 38–39 ("To all general purposes we have uniformly been one people . . . As a nation we have made peace and war; as a nation we have vanquished our common enemies; as a nation we have formed alliances, and made treaties, and entered into various compacts and conventions with foreign states.").

[19] THE FEDERALIST NO. 14, at 104 (James Madison) (Clinton Rossiter ed., 1961).

[20] *Id.* at 103–104.

[21] THE FEDERALIST NO. 17, at 119 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

[22] THE FEDERALIST NO. 2, *supra* note 18, at 38.

[23] SCHMITT, *supra* note 1, at 258–59 (arguing that "[p]olitical democracy . . . cannot rest on the inability to distinguish among persons," but can only survive "on the quality of belonging to a *particular people*. This quality of belonging to a people can be defined by very different elements (ideas of common race, belief, common destiny, and tradition). The *equality* . . . thus orients itself *internally*" and when such a democracy produces a state wherein citizens possess equal rights and obligations "democratic equality is a *substantial equality*.") (emphasis in original). *See also* Heiner Bielefeldt, *Carl Schmitt's Critique of Liberalism: Systematic Reconstruction and Countercriticism, in* LAW AS POLITICS: CARL SCHMITT'S CRITIQUE OF LIBERALISM 23, 27 (David Dyzenhaus ed., 1998) ("What ultimately counts in a genuine democracy, [Schmitt] says, is the sovereign authority of the collective unity of the people, a unity facilitated by, and resting on, some sort of 'substantial homogeneity.'"); ALAN GIBSON, INTERPRETING THE FOUNDING 62–63 (2006) (describing how "the concept of federalism within American republicanism retained a substantial residue of the belief that the republican form of government could exist only . . . with a homogeneous . . . citizenry" and "stress on a homogeneous citizenry also was used to promote restrictive naturalization policies").

Federalist were clearly nationalists.[24] Thus, under original intent originalism's subjective, authorial-based mode of analysis, the phrase "the People" and the Preamble's reference to "ourselves and our Posterity" (with "ourselves" plainly being synonymous with "the People" and " our Posterity" being the posterity of "the People") must be viewed through a nationalist lens.

The homogenous nature of the People was also clearly understood by the contemporaries of Jay, Madison, and Hamilton. In explaining his optimism regarding the prospect of enduring union, John Dickinson pointed to the fact that "the people were so drawn together by religion, blood, language, manners and customs, undisturbed by former feuds or prejudices."[25] Other Founders were explicit in framing the common ancestry and blood of the People as a racial matter. In the debate over the slave trade during the constitutional convention of 1787, Roger Sherman opposed the introduction of African slaves into the United States on the grounds that Black slaves "prevent the emigration of whites, who really enrich and strengthen a country."[26] Charles Pinckney, in the 1821 congressional debate on the Missouri compromise, clarified through his interpretation of the meaning of the Article IV Privileges and Immunities Clause,[27] which he claimed to have written, that:

> [A]t the time I drew that constitution, I perfectly knew that there did not then exist such a thing in the Union as a black or colored citizen, nor could I then have conceived it possible such a thing could ever have existed in it; nor . . . do I now believe one does exist in it . . .[28]

Pinckney went on to explain that belonging to the White race was an enduring prerequisite for becoming an American citizen.[29] Perhaps no one more unambiguously asserted that the nation was unalterably monoracial than Thomas Jefferson. Jefferson claimed to support abolition but believed that Blacks could not

---

[24] *See supra* note 1 (explaining how "the People" and "the nation" are coterminous phrases).

[25] *See* John Dickinson, *"Fabius" [John Dickinson] The Letters: VII–IX, in* FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 1787–1788 492 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[26] *The Debate in the Convention of 1787 on the Prohibition of the Slave Trade*, N.Y. TIMES ARCHIVE (Nov. 24, 1860), https://www.nytimes.com/1860/11/24/archives/the-debate-in-the-convention-of-1787-on-the-prohibition-of-the.html.

[27] U.S. CONST. art. IV, § 2, cl. 1 ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.").

[28] 37 ANNALS OF CONG. 1134 (Gales and Seaton, 1855) (Feb. 13, 1821) (statement of Rep. Charles Pinckney).

[29] *Id.* at 1134–35.

be made citizens due to the risk of interracial conflict[30] and miscegenation.[31] It was Jefferson's dream to see the United States "cover the whole Northern, if not the Southern continent with a people speaking the same language, governed in similar forms, & by similar laws" and he could not "contemplate, with satisfaction, either blot or mixture on that surface."[32] That Jefferson was associated with the Anti-Federalists[33] further supports the proposition that the exclusive, racial nature of the People was the consensus viewpoint among the founding generation, regardless of their political leanings or partisan affiliation.[34]

Of the commonalities between Americans Jay observed in The Federalist No. 2, clearly the most important to the founding generation was the fact that Americans shared a common ancestral heritage. Furthermore, the Founders strongly believed Americans must continue to share that common ancestral heritage. To that end, before the ratification of the Bill of Rights, the first Congress passed the 1790 Naturalization Act which limited naturalization to "any alien, being a free white person, who . . . is a person of good character" upon their "taking the oath or affirmation prescribed by law, to support the constitution of the United States."[35] That act was promptly passed and signed into law pursuant to Congress' constitutionally granted power to "establish a uniform Rule of Naturalization."[36] The Founders acknowledged immigration was needed to grow America's population, expand her frontiers, and burgeon her power. Indeed, one of the grievances outlined in the Declaration of Independence was that the Crown prevented the "population of

---

[30] THOMAS JEFFERSON, NOTES ON THE STATE OF VIRGINIA 145 (Frank Shuffelton, ed., Penguin Books 1999) (1785) (arguing that Blacks could not be made citizens because White prejudice and "ten thousand recollections, by the blacks, of the injuries they have sustained; new provocations; the real distinctions which nature has made; and many other circumstances, will divide us into parties, and produce convulsions which will probably never end but in the extermination of the one or the other race").

[31] Id. at 151 ("Among the Romans emancipation required but one effort. The slave, when made free, might mix with, without staining the blood of his master. But with us a second is necessary, unknown to history. When freed, he is to be removed beyond the reach of mixture.").

[32] Letter from Thomas Jefferson to James Monroe (Nov. 24, 1801), in 35 THE PAPERS OF THOMAS JEFFERSON, Aug. 1–Nov. 30, 1801, at 718 (Barbara B. Oberg, ed., Princeton University Press 2008), https://founders.archives.gov/documents/Jefferson/01-35-02-0550.

[33] But see Michael J. Faber, Thomas Jefferson, Federalist, 128 VA. MAG. HIST. & BIOGRAPHY 282, 283 (2020) (acknowledging that "[b]ecause Jefferson advocated adding a bill of rights to the proposed Constitution, and because he later became the chief figure in the opposition party in the 1790s, he is easy to mistake for an Anti-Federalist. He is often identified as such in history textbooks and other places;" but nonetheless arguing that "Jefferson, though he had his doubts, clearly and unequivocally favored ratification of the Constitution. His position offers considerable insight into the Federalist position.").

[34] See also ROGERS M. SMITH, CIVIC IDEALS: CONFLICTING VISIONS OF CITIZENSHIP IN U.S. HISTORY 138 (1997) (describing the Federalists as "the champions of . . . nativism" and the Jeffersonians as "the defenders . . . of aggressive civic racism").

[35] Naturalization Act of 1790, ch. 3, 1 Stat. 103.

[36] U.S. CONST. art. I, § 8, cl. 4.

these States" by obstructing immigration and failing to pass "Laws for Naturalization of Foreigners."[37]

However, the Founders did not believe immigration should be unconstrained. In 1802 Alexander Hamilton wrote that "foreigners will generally be apt to bring with them attachments to the persons they have left behind; to the country of their nativity, and to its particular customs and manners" and may not possess "that temperate love of liberty, so essential to real republicanism."[38] Moreover, Hamilton expressed fears that the United States "already felt the evils of incorporating a large number of foreigners into their national mass; it has served very much to divide the community and to distract our councils, by promoting in different classes different predilections in favor of particular foreign nations, and antipathies against others."[39] Although Hamilton claimed he was not calling for "a total prohibition of the right of citizenship to strangers,"[40] his comments can hardly be construed as advocating for open borders and unregulated immigration. Crucially, Hamilton's comments were solely a reaction to immigration from Europe, i.e., White immigrants. The idea of permitting non-White immigration (aside from within the hulls of slave ships), much less permitting non-White naturalization, does not to appear to have been countenanced by any of the Founders. Thus, unsurprisingly, the first permanent federal regulation of immigration, passed in 1803, punished the importation of "any . . . person of colour   . . . into any port or place of the United States, which port or place shall be situated in any state which by law has prohibited or shall prohibit the admission or importation of such . . . person of colour."[41] With regards to naturalization, Chin & Finkelman succinctly note that "everyone at the Convention would have understood that a 'uniform Rule of Naturalization' would be tied to race."[42] Thus, the 1790 Naturalization Act "discouraged the immigration of non-White people from other countries by creating legal barriers to their economic and political participation."[43]

---

[37] *See* THE DECLARATION OF INDEPENDENCE para. 9 (U.S. 1776).

[38] Alexander Hamilton, *The Examination Number VIII*, N.Y. EVENING POST, Jan. 12, 1802, *reprinted in* 25 THE PAPERS OF ALEXANDER HAMILTON, July 1800–Apr. 1802, at 495 (Harold C. Syrett, ed., Columbia University Press 1977), https://founders.archives.gov/documents/Hamilton/01-25-02-0282.

[39] *Id.*

[40] *Id.*

[41] Gabriel J. Chin & Paul Finkelman, *The "Free White Person" Clause of the Naturalization Act of 1790 as Super-Statute*, 65 WM. & MARY L. REV. 1047, 1079 n.162 (2024) (citing Act of Feb. 28, 1803, ch. 10, 2 Stat. 205). The application of the law to "any state which by law has prohibited or shall prohibit the admission or importation of such . . . person of colour" was likely done solely to comply with contemporary constitutional restrictions on the congressional power to control immigration. *See* U.S. CONST. art. I, § 9, cl. 1 ("The Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight").

[42] *Id.* at 1067.

[43] *Id.* at 1057.

There exists little in the way of concrete evidence on the nationalist perceptions and beliefs of the broader public regarding American identity when the Constitution was ratified. Nonetheless, as will be seen further shortly, the phrase "the People", as used within the Constitution, was a term of art to refer to the body politic. As has been shown, the consensus viewpoint among the founding generation's political leaders confirms that they viewed the body politic in recognizably nationalistic and racial terms. According to Chin & Finkelman, "whether or not they supported slavery, a majority of [the Founders] unambiguously conceived of the United States as a White country."[44] It may be assumed that the consensus view of the founding generation's leaders on such an important, fundamental point reflected their constituents' views. Thus, under an original public meaning analysis, as under the original intent analysis, references to "the People" and "posterity" must likewise be interpreted in a nationalist light.

### "The People" as Nation: *Verdugo-Urquidez* and *Heller*

Recent, powerful support for the proposition that "the People" is a phrase sounding in nationalism comes not from the realm of immigration and naturalization law, but in two cases interpreting the scope of two Bill of Rights amendments. In United States v. Verdugo-Urquidez, Chief Justice William Rehnquist applied a textualist analysis to conclude that the Fourth Amendment's reference to "the people" indicated that "the purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own Government," and therefore the amendment could not "restrain the actions of the Federal Government against aliens outside of the United States territory."[45] The use of the term "the people," in contrast with the use of the term "person" or "accused" elsewhere in the Constitution, demonstrated that the phrase was a "term of art employed in select parts of the Constitution" and "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[46] To bolster this conclusion, Rehnquist also applied an originalist analysis, noting the constitutional permissibility of congressional grants of letters of marque and reprisal, to support the claim that "[t]here is likewise no indication that the Fourth Amendment was understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory or in international waters."[47]

Rehnquist's opinion in *Verdugo-Urquidez* was joined by four other justices, including Justice Anthony Kennedy. However, Kennedy also filed a concurring opinion stating that he could not "place any weight on the reference to 'the people' in

---

[44] *Id.* at 1048.

[45] United States v. Verdugo-Urquidez, 494 U.S. 259, 266 (1990).

[46] *Id.* at 265–66.

[47] *See id.* at 267–68.

the Fourth Amendment as a source of restricting its protections."[48] Additionally, Kennedy stated his belief that "[i]f the search had occurred in a residence within the United States, . . . the full protections of the Fourth Amendment would apply."[49] Kennedy's interpretation, in granting Fourth Amendment protection to aliens within the United States' interior, clearly diminishes the privilege of American identity and citizenship along with the exclusionary significance of the phrase "the People." Neither result is desirable under national constitutionalism, which seeks to reach decisions which emphasize and give substance to the benefits of citizenship and national belonging. On the other hand, Rehnquist's two-prong interpretation of "the people" in the Fourth Amendment (persons who belong to a national community *or* have a sufficient connection with this country to be considered a part of it) leaves much to be desired as well. The first prong is laughably non-specific. Verdugo-Urquidez was, after all, part of "a national community" (he was a Mexican citizen). Obviously, it is the *American* national community which "the People" of the Constitution belong to, and Rehnquist should have made that explicitly clear. However, this is implicitly clear in the whole opinion and as a matter of common sense.

Nebulous writing aside, Rehnquist's second prong may degrade the role of "the People" in the constitutional framework more than Kennedy's interpretation would. Suggesting that an individual might develop a sufficient connection with this country to be considered a part of the People *without* joining our national community through naturalization would give non-nationals a claim of right to participate in popular sovereignty. If non-nationals may be a part of the People, and the People are sovereign, then what grounds would exist (particularly in light of the general trend of post-World War II equal protection jurisprudence) to exclude a resident alien adult with such a "sufficient connection" from the franchise given that "sovereignty confers on the people the right to choose freely their representatives to the National Government?"[50] Such an absurd result cannot be entertained. The exclusionary roots

---

[48] *Id.* at 276 (Kennedy, J., concurring).

[49] *Id.* at 278.

[50] U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 794 (1995) (acknowledging "the critical postulate that sovereignty is vested in the people, and that sovereignty confers on the people the right to choose freely their representatives to the National Government.") (citing Powell v. McCormack, 395 U.S. 486, 541 n. 76 (1969)). *See also* Gerald M. Rosberg, *Aliens and Equal Protection: Why Not the Right To Vote?*, 75 MICH. L. REV. 1092, 1136 (1977) (concluding that the denial of the right to vote to resident aliens "can only be justified on the basis of some compelling state interest" and "it is far from clear that it can, in fact, be justified under that exacting standard"). *Compare* Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 666 (1966) ("Our cases demonstrate that the Equal Protection Clause of the Fourteenth Amendment restrains the States from fixing voter qualifications which invidiously discriminate."*), with* Graham v. Richardson, 403 U.S. 365, 376 (1971) (holding that "a state statute that denies welfare benefits to resident aliens and one that denies them to aliens who have not resided in the United States for a specified number of years violate the Equal Protection Clause"), *and In re Griffiths* 413 U.S. 717, 729 (1973) (holding that conditioning bar admission on citizenship violates the Equal Protection Clause). That individuals like Rosberg advocate for the extension of the franchise to aliens proves that national constitutionalist jurists must be cautious with their language and not permit an opening for anti-national constitutionalists to continue their assault on the sanctity of the

10

of American identity, the traditional importance of citizenship and the franchise in our political process, and the fact that (unlike citizens) aliens may be expelled at the whim of the federal government,[51] all suggest that aliens are second-class persons under the Constitution. It is the duty of judges, empowered by the truly sovereign American people, to ensure that aliens remain second-class persons under the Constitution and are prevented from exercising any right which properly belongs to the People alone until they are naturalized—if they are naturalizable.

Rehnquist also failed to describe the identity of the People and the national community that they belong to. However, in District of Columbia v. Heller the Court, in an opinion by Justice Antonin Scalia, directly acknowledged the historical, racial, and exclusionary identity of the People to support holding that the Second Amendment's right to bear arms is an individual right belonging to all of the People. Scalia first explained that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset" and then cited the two-prong definition of the People provided in *Verdugo-Urquidez* in support of this conclusion.[52] Later in the opinion, Scalia cited two antebellum state court cases "holding that the Constitution did not extend to free blacks"[53] in order to show that in the early 19th century many state courts "indicated that the Second Amendment right to bear arms was an individual right unconnected to militia service, though subject to certain restrictions."[54] Notably, Scalia made no effort to criticize these opinions' holding that Blacks did not possess the right to bear arms. In arguing that the Second Amendment applies to all of the People and citing these antebellum cases in support of his reasoning, Scalia implicitly acknowledged that in the antebellum period Blacks were not a part of the People. Incredibly, 151 years after *Dred Scott*, five members of the Court (with no member undercutting or qualifying the opinion's analysis in a

---

People, their privileged citizenship, and their sovereignty. On the other hand, it may be possible that Rehnquist felt required to include this second prong (which, given the basis for the opinion's holding, is essentially dictum) to secure the votes for his opinion. Notably, elsewhere in the opinion, Rehnquist implies that criminal infiltrators may not be entitled to the same level of Fourth Amendment protection as citizens, and any cases whose holdings assumed that they were entitled to equal Fourth Amendment protection would be inapposite were the issue directly before the court. *See Verdugo-Urquidez*, 494 U.S. 259, 272 (stating that prior decisions are "not dispositive of how the Court would rule on a Fourth Amendment claim by illegal aliens in the United States if such a claim were squarely before us"). Nonetheless, Rehnquist seems to concede that lawful resident aliens have Fourth Amendment rights. *See id.* at 270–71. This was an unwise and anti-national constitutionalist concession given that lawful resident aliens, being unnaturalized (and potentially unnaturalizable), are not a part of the People, and the text of the Fourth Amendment plainly does not provide protections to those who are not a part of the People.

[51] Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 210 (1953) ("Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.").

[52] District of Columbia. v. Heller, 554 U.S. 570, 580 (2008)

[53] *Id.* at 611 (citing Aldridge v. Commonwealth, 4 Va. 447, 2 Va. Cas. 447, 449 (Gen.Ct.); Waters v. State, 1 Gill 302, 309 (Md.1843))

[54] *Id.*

concurring opinion) ostensibly vindicated the legal correctness of Chief Justice Roger Taney's ruling that Blacks "formed no part of the people who framed and adopted [the Declaration of Independence]"[55] and were not a part of "the sovereignty of the States"[56] or the sovereignty of the country as a whole, which led Taney to conclude Blacks "had no rights which the white man was bound to respect."[57]

### National Constitutionalism Distilled for Jurists

The foregoing analysis indicates that national constitutionalism relies on three primary points. First, national constitutionalism promotes and guards popular sovereignty. Second, national constitutionalism relies on the distinction between the superior constituent power of the sovereign People and the inferior constituted power of the Constitution and government (the principal-agent analogy). Third, the People share a biological relation describable by reference to the original understanding of who formed the People—and who could be permitted to enter the ranks of the People—in and about the time the Constitution was ratified. However, some additional, derivative points must be expounded before national constitutionalism is applied further.

As a consequence of acknowledging popular sovereignty, national constitutionalism additionally adopts as a central tenet the principle that "[b]ecause . . . agents derive their authority entirely from the existing constitution, they implicitly lack the authority to destroy or replace the source of that power."[58] Moreover, national constitutionalism is proudly a results-oriented species of jurisprudence. Similar to Dworkin's moral reading of the Constitution, a national reading of the Constitution (or of any language at issue) must be done in the light which "does most credit to the nation" and the People because courts act as the People's agents.[59] Specifically, a reading which degrades the power or privilege of the People is impermissible in light of the implicit limitation on agents whereby they may not destroy or replace the source of their power. This is especially true when an alternative reading, no matter how strained, would not degrade the power or privilege of the People. But when an alternative reading is completely impossible (which due to the nationalist beliefs of the Founders will likely only occur when interpreting the language of a statute or a constitutional amendment), that language should be deemed unconstitutional.

---

[55] Dred Scott v. Sandford, 60 U.S. 393, 410 (1857), *superseded by constitutional amendment*, U.S. CONST. amend. XIV.

[56] *Id.* at 419.

[57] *Id.* at 407.

[58] Jonathan L. Marshfield, *Forgotten Limits on the Power to Amend State Constitutions*, 114 NW. UNIV. L. REV. 65, 79 (2019).

[59] RONALD DWORKIN, FREEDOM'S LAW: THE MORAL READING OF THE AMERICAN CONSTITUTION 11 (1996). *See also* League v. De Young, 52 U.S. 185, 203 (1850) ("The Constitution of the United States was made by, and for the protection of, the people of the United States.").

Relatedly, national constitutionalism adopts Schmitt's distinction between the Constitution as a whole and its component provisions.[60] The Constitution is the People's authorization for the use of power by the governmental agent for the benefit of the People and the terms upon which that power is to be exercised. If an individual constitutional provision would prevent the effective, beneficial exercise of power by government on behalf of the People, particularly when the would-be exercise of power is directed at those who are not a part of the People, judges should consider permitting a necessary, limited exception to the individual provision, at least in times of emergency. This distinction between constitutional provision and the Constitution *in toto* is textually justified, because judges must constitutionally take an oath only "to support this Constitution," not to always support every single one of its provisions.[61]

## National Constitutionalism Applied to Immigration Policy, Naturalization Law, and Alienage Classifications

In 1870, the privilege of naturalization was extended to "to aliens of African nativity and to persons of African descent," [62] although foreign Blacks continued to face difficulties immigrating in practice.[63] However, since the second half of the 20th century, mass immigration—both "legal" and illegal—has challenged the sovereignty and demographic security of the People in an increasingly severe and unprecedented way. In 1940 the United States was 89.8% White.[64] In 1952, the United States government removed racial restrictions on naturalization in response to foreign policy concerns but maintained a national quota system which de facto discriminated against non-White immigration.[65] In 1965, the Immigration and Naturalization Act (Hart-Celler) removed the national quota system that prevented mass non-White immigration. That act, in addition to contemporaneous collapses in border security, is in large part responsible for setting America on the path to becoming a minority-White country by 2043.[66] Criminal infiltration of the southern border has drastically

---

[60] *See* SCHMITT, *supra* note 1, at 158 (arguing that "[p]rotection of the constitution and protection of every single constitutional provision are no more identical with one another than are the inviolability of the constitution and that of every single constitutional provision" because "[w]hen every single constitutional provision becomes 'inviolable' . . . the protection of the constitution in the positive and substantial sense is sacrificed to the protection of the constitutional provision in the formal and relative sense" which would make "the individual constitutional provision . . . an insurmountable obstacle to an effective defense of the constitution").

[61] U.S. CONST. art. VI, cl. 3.

[62] *See* Chin & Finkelman, *supra* note 41, at 1102.

[63] *See id.* at 1102, n.313.

[64] Campbell Gibson & Kay Jung, *Historical Census Statistics on Population Totals By Race, 1790 to 1990, and by Hispanic Origin, 1970 to 1990, for the United States, Regions, Divisions, and States,* 19 tbl. 1 (U.S. Census Bureau, Working Paper No. 56, 2002).

[65] *See id.* at 1110.

[66] *See* Gabriel J. Chin & Douglas M. Spencer, *Did Multicultural America Result from a Mistake - The 1965 Immigration Act and Evidence from Roll Call Votes*, 2015 UNIV. ILL. L. REV. 1239, 1242 (2015) (citing Press Release, U.S. Census Bureau, U.S. Census Bureau Projections Show a Slower

increased in recent years, further accelerating the People's dispossession.[67] Moreover, the application of equal protection principles to both lawful immigrants and criminal infiltrators, in addition to the Court's interpretation of the Fourteenth Amendment's Citizenship Clause, has further complicated the immigration question by blocking legal avenues for disincentivizing undesirable immigration and removing undesired immigrants. The challenge non-White immigration and naturalization pose to the sovereignty of the People represents a constitutional emergency our Founders seemingly never anticipated. This emergency threatens to overturn the Constitution itself by turning American government against the People and securing government's benefits primarily for other peoples and their posterity.

There are multiple areas where national constitutionalism should be applied by courts to rescue the People from this emergency. First, courts should give effect to the Constitution's Guarantee Clause and order the federal government to secure our borders against criminal infiltrators and the transnational criminal organizations which bring those infiltrators (and other contraband) into the country's interior. Second, courts should subject immigration and naturalization laws to judicial review and apply strict scrutiny to those laws permitting non-White immigration and naturalization. Third, courts should stop applying equal protection to laws discriminating against criminal infiltrators and apply rational basis review to alienage classifications discriminating against lawful immigrants. Finally, courts should not only reconsider constitutional birthright citizenship for children of immigrants who are citizens or subjects of another country, but they should challenge the constitutionality of the Fourteenth and Fifteenth amendments altogether.

### Border Control, the Guarantee Clause, and the State War Power

To give states legal tools to fight back against criminal infiltration, courts should give broad effect to claims for relief which demand that the federal government secure the border pursuant to the Guarantee Clause or, alternatively, recognize the permissibility of exercising the State War Power.

One of the few affirmative duties placed upon our federal government by the Constitution is the requirement that it "protect each [state] against Invasion."[68] Utilizing an original intent analysis, Dwyer describes the clause's "protection against invasion as providing security against 'foreign hostility' and 'ambitious or vindictive

---

Growing, Older, More Diverse Nation a Half Century from Now (Dec. 12, 2012), https://www.census.gov/newsroom/releases/archives/population/cbl2-243.html); AVIVA CHOMSKY, UNDOCUMENTED: HOW IMMIGRATION BECAME ILLEGAL 184 (2014) (noting that "all types of immigration from Latin America rose after 1965: temporary and permanent, legal and illegal").

[67] Ashley Wu, *Why Illegal Border Crossings Are at Sustained Highs*, N.Y. TIMES (Oct. 29, 2023), https://www.nytimes.com/interactive/2023/10/29/us/illegal-border-crossings-data.html (showing that the three years with the greatest number of annual southwestern border apprehensions in the 21st century occurred in 2021, 2022, and 2023).

[68] U.S. CONST. art. IV, § 4.

enterprises'" which includes the activities of criminal smugglers.[69] Dwyer concludes her analysis of the meaning of the word "Invasion" in the Guarantee Clause by breaking it down into three elements: "1) a hostile and organized external force 2) conducting a purposeful intrusion on sovereign land 3) in furtherance of a predetermined malicious objective."[70] Although, Dwyer unwisely concedes that "illegal immigration in and of itself" does not amount to invasion,[71] she convincingly argues that the activities of Mexican drug cartels—including the smuggling of criminal infiltrators—do amount to invasion.[72]

Dwyer's analysis strongly suggests that the federal government is obliged to defend the nation from this invasion. Ordering government to affirmatively implement a judicially crafted policy which government had heretofore been unwilling to implement is not outside the ken of the judiciary.[73] Thus, courts should order the federal government to militarize the border, begin construction of border defenses and barriers, and issue arrest or shoot to kill orders targeting criminal infiltrators at the border. These policies would undoubtedly defeat the invasion, or at least diminish its scope and force. Likewise, courts should order the federal government to root out and deport criminal infiltrators in the interior. Additionally, Dwyer suggests an alternative: courts should uphold state policies—enacted pursuant to the State War Power—aimed at defeating the invasion against federal Supremacy Clause challenges.[74] Once exercising the State War Power is deemed justified, it should be given a plenary scope, including the authority to deport criminal infiltrators within their states.[75]

---

[69] Heather Dwyer, *The State War Power: A Forgotten Constitutional Clause*, 33 UNIV. LA VERNE L. REV. 319, 323 (2012) (citing THE FEDERALIST NO. 43 (James Madison)).

[70] *Id.* at 325.

[71] *Id.* at 339. Criminal infiltrators express hostility towards our laws through their infiltration, are organized insofar as they must prepare for their crime, purposefully intrude on our territory, and do so in furtherance of the malicious objective of living among us without authorization (at minimum); thus, per Dwyer, they are invaders.

[72] *Id* at 342–352 (concluding that border states are "quite literally under invasion by drug cartels").

[73] *See generally* Cooper v. Aaron, 358 U.S. 1 (1958) (requiring Arkansas to implement a judicially approved school integration plan); Swann v. Charlotte-Mecklenburg *Bd. of Ed.*, 402 U.S. 1 (1971) (permitting lower courts to order adherence to a judicially formulated school bussing schemes for the purpose of integration). *See also* Relman Morin, *AP Was There: Paratroops with bayonets escort Little Rock 9*, AP News (Sept. 24, 2017, 11:21 AM), https://apnews.com/article/360439e805eb4db180fbfd52a7a0f5bb (describing how "[h]ardened paratroopers, in battle dress and with bayonets at the ready" were used to forcibly integrate Little Rock Central High School in Arkansas during the 1957-58 school year).

[74] Dwyer, *supra* note 69, at 319 (describing the State War Power as "both antecedent to, and affirmatively acknowledged in, the Constitution in Article I, section 10, clause 3 which states, "No State shall, without the Consent of the Congress . . . engage in War, *unless actually invaded*") (emphasis in original). *See also id.* at 355 ("This power is independent from federal action or approval and cannot be expunged by a Supremacy claim.").

[75] *See* Harisiades v. Shaughnessy, 342 U.S. 580, 589 (1952) (noting that exercise of "the war power" is "largely immune from judicial inquiry or interference").

Furthermore, although she rejects the approach, Dwyer also conducts an original public meaning analysis, noting that "modern definitions of the word invasion" include "aggression, assault, attack, encroachment, foray, hostile entry, incursion, infiltration, and intrusion" and that "etymological research of the term reveals that the meaning has not changed since at least the fifteenth century."[76] This definition would seem to be broader, encompassing all forms of criminal infiltration (not merely those of smugglers and cartel groups), and therefore permit more claims of relief or permissible uses of the State War Power to combat criminal infiltration. Given that crafting law to most effectively combat criminal infiltration is a clear goal of national constitutionalism, jurists subscribing to the theory should aim to define "Invasion" under its original public meaning.

### Immigration and Naturalization Law

The principles of national constitutionalism have a relatively straightforward application to immigration and naturalization law. If the government may not destroy or replace the People, or otherwise usurp their sovereignty (or permit their sovereignty to be usurped), and if the People are an identifiable, substantive, and organic legal entity (and not merely the statistical collection of all people within the United States), then government power to permit immigration or naturalization is not plenary. National constitutionalism therefore advocates subjecting to judicial review—with the highest level of scrutiny—all attempts by the federal government to "dissolve the people and elect another"[77] through immigration and naturalization policies which have the effect of altering the traditional, racial demographic balance of the United States and thereby degrading the People's power and privileges. Accordingly, Taney's dictum in *Dred Scott* that Congress "may, if they think proper, authorize the naturalization of anyone, of any color, who was born under allegiance to another Government"[78] is anathema to the implicit limitations, entailed by popular sovereignty, placed upon the constituted power of the nation-state and should be rejected as a matter of law.

The effect of this would simply be a return to the pre-1870 status quo whereby only Whites could typically immigrate and seek naturalization.[79] Non-Whites would

---

[76] *Id.* at 323 (citing ROBERT BARNHART, THE BARNHART CONCISE DICTIONARY OF ETYMOLOGY: THE ORIGINS OF AMERICAN ENGLISH WORDS 397 (1995)).

[77] Bertolt Brecht, *The Solution* (1959), *reprinted in* BERTOLT BRECHT POEMS 1913-1956, 440 (John Willett and Ralph Manheim, eds., Methuen 1976).

[78] 60 U.S. at 419.

[79] This is a historically workable standard. *See generally* IAN HANEY LÓPEZ, WHITE BY LAW 2–7 (2006) (describing various court cases in American history aimed at determining if the petitioner was White, and explaining how "[t]hough the courts offered many different rationales to justify the various racial divisions they advanced, two predominated: common knowledge and scientific evidence"). The use of artificial intelligence presents another possible method for determining race. *See generally* Judy Wawira Gichoya et al., *AI recognition of patient race in medical imaging: a modelling study*, 4 LANCET DIGIT. HEALTH e406 (finding "that AI can accurately predict self-reported race, even from corrupted, cropped, and noised medical images, often when clinical experts cannot"). Needless to say, Congress did not abandon the 1790 rule because it proved impossible to determine who was White.

16

still be able to visit the U.S. without becoming residents, as tourism is not immigration. Moreover, if immigration and naturalization laws are subjected to strict scrutiny, then some exceptionally talented non-Whites, who possess skills or knowledge possessed by very few natives, may yet be permitted to immigrate provided their skills or knowledge and presence in the country are necessary for furthering a compelling governmental interest.[80] However, courts should ensure that the compelling governmental interest is very compelling. The immigration of a non-White scientist who can demonstrably contribute towards curing cancer through research only he can conduct (and which can only be effectively conducted in America) would be one such compelling interest, but a purported need to import non-White menial labor is not compelling at all. Moreover, under this framework non-White immigration should never lead to naturalization, as naturalization is almost certainly unnecessary and thus would not comport with policy being narrowly tailored.

### Alienage Classifications and the Citizenship Clause

In line with national constitutionalism's goal of returning prestige and privilege to American citizenship, and pursuant to the principle that the Constitution is to be given the reading that best serves the nation, alienage classifications affecting criminal infiltrators and relating to the provisioning of government benefits and employment opportunities should no longer be subjected to equal protection analysis. The Court's decision in Plyler v. Doe[81] should be overruled posthaste. Once *Plyler* is consigned to the dustbin of history, the State War Power is recognized, and immigration and naturalization laws are subjected to strict scrutiny, states will be free to enact laws like that at issue in *Plyler* and like California's Proposition 187,[82] which was deemed unconstitutional on Supremacy Clause grounds,[83] to disincentivize criminal infiltration and lessen its pernicious effects on the public purse. Moreover, because lawful aliens have no fundamental right to be in the country and are not citizens, they should be denied a constitutional right to travel.[84] Thus, alienage classifications impacting lawful aliens—including restrictions on their entry

---

[80] Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 532 (2022) (stating that policy can only survive strict scrutiny upon a showing that the policy "serve[s] a compelling interest and [is] narrowly tailored to that end") (citing Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533, n.1 (1993)).

[81] Plyler v. Doe, 457 U.S. 202 (1982) (holding that a state's refusal to fund the education of unlawfully present children of criminal infiltrators had no rational basis and was thus unconstitutional).

[82] *See* Peter H. Schuck, *The Message of Proposition 187*, 26 PAC. L. J. 989, 990 (1995) (stating that Proposition 187's "most controversial provisions would bar anyone who is not a citizen, a legal permanent resident, or a legal temporary visitor from receiving public social services, health care, and education").

[83] *See* League of United Latin Am. Citizens v. Wilson, 997 F. Supp. 1244, 1261 (C.D. Cal. 1997).

[84] *See* Shapiro v. Thompson, 394 U.S. 618, 630 (1969) ("We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States.") (citing *Passenger Cases*, 7 How. 283, 492 (1849)).

17

into a state—should be subject to mere rational basis review and enjoy a presumption of constitutionality.

National constitutionalists should also endeavor to overturn the holding in United States v. Wong Kim Ark, establishing the rule of birthright citizenship for the children of most foreign nationals born on U.S. soil. As pointed out in Chief Justice Melville Fuller's dissent in *Wong Kim Ark*, the Citizenship Clause's qualifier "and subject to the jurisdiction thereof" can be read as synonymous with the words "and not subject to any foreign power" which would exclude from birthright citizenship, as the dissent argued was originally intended, "the children of aliens, whose parents owed local and temporary allegiance merely, remaining subject to a foreign power by virtue of the tie of permanent allegiance, which they had not severed by formal abjuration or equivalent conduct."[85] This reading would give more prestige to the concept of American citizenship and membership within the People, which was originally conceived of as a group possessing common blood (but not necessarily common birthplaces). At minimum, courts should limit *Wong Kim Ark*'s holding, as the Tenth Circuit properly did in 2021 when it decided to apply the *Insular Cases* instead of *Wong Kim Ark* to hold that birthright citizenship did not inure in those born in U.S. territories.[86] Moreover, courts should adopt Judge Richard Posner's view that providing birthright citizenship to children of criminal infiltrators born in the United States is not constitutionally mandated.[87] Indeed, if those children are non-Whites, then courts should move to categorically prevent that grant of citizenship.

Finally, courts should also begin to question the constitutionality of the Fourteenth and Fifteenth amendments as a whole, for two reasons. First, these amendments were ratified contrary to the Article V process. Suthon Jr. notes the military occupation of the south during Reconstruction, the forcible reorganization of

---

[85] United States v. Wong Kim Ark, 169 U.S. 649, 719–22 (1898) (Fuller, C.J., dissenting) (relying on the use of the words "and not subject to any foreign power" by the 1866 Civil Rights Act, which was passed by the same Congress which passed the Fourteenth Amendment, in granting citizenship to those born on U.S. soil; and relying on statements by Senators Trumbull and Johnson that the qualifier excludes the children of those "owing allegiance" or "subject to some foreign power" from citizenship). *But see* Matthew Ing, *Birthright Citizenship, Illegal Aliens, and the Original Meaning of the Citizenship Clause*, 45 AKRON L. REV. 719, 736 (2015) (endorsing the *Wong Kim Ark* holding and advocating for its extension to children of criminal infiltrators born in the U.S., but conceding that "because the [Citizenship] Clause constitutionalized the citizenship provision in the Civil Rights Act of 1866, we can therefore impute that provision's expected applications to the Clause itself").

[86] *See* Fitisemanu v. United States, 1 F.4th 862, 871 (10th Cir. 2021), *cert. denied*, 143 S.Ct. 362 (2022).

[87] *See* Oforji v. Ashcroft, 354 F.3d 609, 619–21 (7th Cir. 2003) (Posner, J., concurring) (arguing that "Congress should rethink . . . awarding citizenship to everyone born in the United States . . . including the children of illegal immigrants whose sole motive in immigrating was to confer U.S. citizenship on their as yet unborn children," noting that "the purpose of the [Citizenship Clause] was to grant citizenship to the recently freed slaves, and the exception for children of foreign diplomats and heads of state shows that Congress does not read the citizenship clause of the Fourteenth Amendment literally," and concluding that "Congress would not be flouting the Constitution if it amended the Immigration and Nationality Act to put an end to the nonsense").

18

the occupied states' governments, and the requirement that the southern states ratify these amendments before the occupation was lifted and their elected representatives would be accepted into Congress "constitute[d] an infraction of the amendment procedure ordained by Article V of the Constitution."[88] Second, the amendments are substantively unconstitutional. If, as Albert argues, the Fourteenth and Fifteenth amendments represent a "constitutional dismemberment" which "is incompatible with the existing framework of a constitution because it seeks to achieve a conflicting purpose," then Article V would not permit such Amendments to be made, given that Article V only permits for "mere amendment[]."[89] Albert views the Fourteenth and Fifteenth Amendments as writing "into the Constitution a ringing declaration of the equality of all persons,"[90] and the Court has explicitly held the former amendment prohibits "measures designed to maintain White Supremacy."[91] However, given that the United States was founded as a race-based nation-state for the preservation and betterment of White Americans (the People), as clearly laid out in the Preamble and revealed by our history, it is difficult to see how these amendments (or at least the way they have been interpreted in the post-World War II era) do not amount to unconstitutional, revolutionary usurpations by the constituted government power.

## Conclusion

Our Constitution will survive only if "the people share a common, historic commitment to certain simple but fundamental principles which preserve their freedom."[92] One of those principles, accepted by our Founders who as a whole "unambiguously conceived of the United States as a White country,"[93] was nationalism—specifically, racial nationalism. If we abandon that principle while turning over America to a non-White majority, a majority that will not share a common, historic commitment to anything, what else shall we abandon along the way? If non-Whites believe that America's White nationalist founding "deserves a place of dishonor"[94] in our history, then—given the fundamentality of this principle

---

[88] *See generally* Walter J. Suthon Jr., *Dubious Origin of the Fourteenth Amendment*, 28 TUL. L. REV. 22, 41–44 (1953). *See also id.* at 29 (contrasting this process with the regular process used to ratify the Thirteenth Amendment).

[89] *See* Richard Albert, *Constitutional Amendment and Dismemberment*, 43 YALE J. INT'L L. 1, 4–5 (2018); *see also* Sanford Levinson, *Accounting for Constitutional Change*, 8 Const. Comment. 409, 414–15 (citing Representative Boutwell, a "warm supporter" of the Thirteenth Amendment, who conceded that "the amendment power was not unlimited" and "suggested that article V did not authorize amendments that would 'establish slavery, or . . . invite the King of Dahomey to rule over this country' insofar as they would contravene the purposes of the Constitution as laid out in the Preamble").

[90] *Id.* at 4.

[91] *See* Loving v. Virginia, 388 U.S. 1, 11–12 (1967).

[92] *See* Chavez v. Martinez, 538 U.S. 760, 794 (2003) (Kennedy, J., concurring in part).

[93] Chin & Finkelman, *supra* note 41, at 1048.

[94] *See Id.*

in the original constitutional framework—what is to stop any other constitutional provision from being similarly repudiated?

The Supreme Court and inferior federal courts have the power to arrest the dispossession of White America. All they must do is substitute bad landmark precedent for good landmark precedent. Failure to do so is not judicial humility, but, at best, judicial surrender in the face of a terrible crime. At worst, it is complicity in that crime. The People cannot be expected to meekly swallow this demographic assault on their sovereignty. If the People are not granted relief from the government—which includes the judiciary—then, if they are to survive as masters in the land of their ancestors, they must exercise "their revolutionary right to dismember or overthrow" the government.[95] And that will be a process which no deskbound jurist can gleefully look forward to; for it will be a controversy decided not by the careful balance of Justitia's scales, but by the gruesome slashing of her sword.

---

[95] Abraham    Lincoln,    First    Inaugural    Address    (Mar.    4,    1861), https://avalon.law.yale.edu/19th_century/lincoln1.asp.

20

**EXHIBIT**

**Dft's Ex 5**

exhibitsticker.com

**Subject:** National Constitutionalism
**Date:** Monday, February 10, 2025 at 12:18:05 PM Eastern Standard Time
**From:** Terry, Preston
**To:** Ramos,Osiris,Jr
**Attachments:** National Constitutionalism SUBMISSION COPY.docx

Feel free to send to any interested parties.

Best,
Preston

1 of 1

**EXHIBIT**

**Dft's Ex 6**

exhibitsticker.com







Case 1:25-cv-00275-AW-MAF    Document 73-16    Filed 03/06/26    Page 254 of 296

6/21/25, 12:31 PM                    A White Nationalist at University of Florida Wrote a Paper Promoting Racist Views. It Won Him an Award. - The New York Times

# *A White Nationalist Wrote a Law School Paper Promoting Racist Views. It Won Him an Award.*

The University of Florida student won an academic honor after he argued in a paper that the Constitution applies only to white people. From there, the situation spiraled.



**Listen to this article · 13:12 min**   Learn more

**By Richard Fausset**
Reporting from Gainesville, Fla.

June 21, 2025, 5:00 a.m. ET

Preston Damsky is a law student at the University of Florida. He is also a white nationalist and antisemite. Last fall, he took a seminar taught by a federal judge on "originalism," the legal theory favored by many conservatives that seeks to interpret the Constitution based on its meaning when it was adopted.

In his capstone paper for the class, Mr. Damsky argued that the framers had intended for the phrase "We the People," in the Constitution's preamble, to refer exclusively to white people. From there, he argued for the removal of voting rights protections for nonwhites, and for the issuance of shoot-to-kill orders against "criminal infiltrators at the border."

Turning over the country to "a nonwhite majority," Mr. Damsky wrote, would constitute a "terrible crime." White people, he warned, "cannot be expected to meekly swallow this demographic assault on their sovereignty."

At the end of the semester, Mr. Damsky, 29, was given the "book award," which designated him as the best student in the class. According to the syllabus, the capstone counted the most toward final grades.

The Trump-nominated judge who taught the class, John L. Badalamenti, declined to comment for this article, and does not appear to have publicly discussed why he chose Mr. Damsky for the award.

That left some students and faculty members at the law school, considered Florida's most prestigious, to wonder, and to worry: What merit could the judge have seen in it?

The granting of the award set off months of turmoil on the law school campus. Its interim dean, Merritt McAlister, defended the decision earlier this year, citing Mr. Damsky's free speech rights and arguing that professors must not engage in "viewpoint discrimination."

Ms. McAlister, in an email to the law school community, also invoked "institutional neutrality," an increasingly popular policy among college administrators. It instructs schools not to take public positions on hot-button issues.

But the question of how officials should respond to Mr. Damsky — who, in an interview, said that referring to him as a Nazi "would not be manifestly wrong" — is not merely academic.



After Mr. Damsky posted on X that Jews must be "abolished by any means necessary," the university suspended him, barred him from campus and stepped up police patrols around the law school. Jacob Langston for The New York Times

Well beyond the classroom, bigoted and extremist views are on the rise and vying for mainstream acceptance, raising questions about whether principles of neutrality and free-speech rights are proper and adequate responses to the threats.

X, the social media platform owned by Elon Musk, recently allowed millions of people to view Kanye West's new song saluting Hitler when other platforms removed it. Vice President JD Vance criticized European governments' efforts to ostracize far-right political parties, on the grounds that doing so violates principles of free speech.

At the University of Florida, the story of the book award took a dramatic turn soon after Ms. McAlister defended the decision to honor Mr. Damsky with it. It was then, in February, that Mr. Damsky opened an account on X and began posting racist and antisemitic messages. After he wrote in late March that Jews must be "abolished by any means necessary," the university suspended him, barred him from campus and stepped up police patrols around the law school. He is now challenging the punishment, which could result in his expulsion.

Mr. Damsky's hateful posts drew shock and fear in some corners of the university. According to Hillel International, the university has the largest number of Jewish undergraduate students in the country. Its student body is 48 percent white, 22 percent Hispanic, 10 percent Asian and 5 percent Black, according to school data.

A spokesman for the university declined to answer questions related to this article or to make any administrators available for interviews. But in emails to Mr. Damsky obtained by The New York Times, university officials wrote that his posts had made numerous students fear for their safety. The officials also cited another student's claim that Mr. Damsky had described his paper as concluding "on a call for extralegal violence," which Mr. Damsky denies.

In an interview, Mr. Damsky said that he belonged to no organization or group, and that he did not pose a physical threat to anyone. He said he was being unfairly targeted for sharing his ideas, and blithely shrugged off the criticism. The disciplinary measures he faces could result in expulsion. He said he planned to fight them vigorously.

"You know," he said, "I'm not, like, a psychopathic ax murderer."

Mr. Damsky said his ideas were well formed before he started law school, shaped by reading authors like Sam Francis, a white nationalist, and Richard Lynn, who argued for white racial superiority and eugenics.

He grew up around Los Angeles and studied history at the University of California, Santa Barbara; he wanted to become a prosecutor, he said, after watching progressive-minded California prosecutors adopt policies that he believed were soft on crime.

Many law students learned about his extremism last fall, when a draft of a paper he wrote for a different class was passed among students and faculty members. Mr. Damsky, who just completed his second year of law school, assumes that a fellow student shared it with others. Like his paper for the originalism seminar, it also argued the Constitution was written exclusively for white people. It went on to suggest that nonwhites should be stripped of voting rights and given 10 years to move to another country.

In January, Carliss Chatman, an associate law professor at Southern Methodist University, began a stint as a visiting scholar at the school. It was not long, she said, before a number of Black and Jewish students came to her with concerns about Mr. Damsky.



Carliss Chatman, an associate law professor at Southern Methodist University, began a stint as a visiting scholar at the school in January. "I just find it fascinating that this student can write an article, a series of articles that are essentially manifestoes, and that's free speech," she said.  Desiree Rios for The New York Times

Ms. Chatman was struck, in part, by her own experiences at the school in contrast to Mr. Damsky's award. She had proposed teaching a class during her time there called "Race, Entrepreneurship and Inequality." But administrators at the law school changed the name to "Entrepreneurship," she said, before listing it in the course catalog.

She attributed the change to Florida lawmakers' crackdown on diversity-oriented language and themes in public education, a push that preceded the Trump administration's broader war on progressive ideology.

"I just find it fascinating that this student can write an article, a series of articles that are essentially manifestoes, and that's free speech," Ms. Chatman said, referring to Mr. Damsky, "but my class can't be called 'Race, Entrepreneurship and Inequality.'"

As the spring semester got underway, word spread that Mr. Damsky had won the book award in Judge Badalamenti's originalism seminar.

Mr. Damsky's paper includes arguments similar to those recently adopted by the Trump administration, including a call to "reconsider" birthright citizenship, and an assertion that "aliens remain second-class persons under the Constitution."

It also argues that courts should challenge the constitutionality of the 14th Amendment, which ensures birthright citizenship, due process and equal protection under the law, and the 15th Amendment, which protects the right to vote for nonwhite citizens.

Mr. Damsky concluded the paper by raising the specter of revolutionary action if the steps he recommended toward forging a white ethno-state were not taken. "The People cannot be expected to meekly swallow this demographic assault on their sovereignty," he wrote, adding that if the courts did not act to ensure a white country, the matter would be decided "not by the careful balance of Justitia's scales, but by the gruesome slashing of her sword."

Ms. Chatman called Mr. Damsky's arguments "anti-intellectual" and absurd: "We fought a whole Civil War that freed slaves and said 'We The People' now means everyone."

But it was the granting of the award that galled her the most.

"We should not be giving awards to things that advocate for white supremacy and white power," she said, adding that she believed the award had "emboldened" Mr. Damsky to begin posting the racist and antisemitic comments on social media.



Mr. Damsky said he was scheduled to attend a disciplinary hearing on June 20.   Jacob Langston for The New York Times

Mr. Damsky's argument that at least some of the framers meant for the Constitution to apply only to white people is by no means a new one. Evan D. Bernick, an associate law professor at Northern Illinois University, notes that the argument can be found in the Ku Klux Klan's founding organizational documents from the late 1860s.

Among originalists, though, this interpretation has been widely rejected. Instead, conservatives have argued that much of the text of the Constitution "tilts toward liberty" for all, said Jonathan Gienapp, an associate professor of history and law at Stanford. They also note that the post-Civil War amendments guaranteeing rights to nonwhite people "washed away whatever racial taint" there was in the original document.

While Mr. Damsky's papers were written in a formal style consistent with legal scholarship, his social media posts have been blunt, crass and ugly. A critic of Israel's war in Gaza, he argued in one post that President Trump and Secretary of State Marco Rubio were "controlled by Jews," whom he called "the common enemy of humanity." In posts about Guatemalan illegal immigrants, he said that "invaders" should be "done away with by any means necessary." He lamented the "self-flagellatory mind-set" of modern-day Germans, noting their failure to revere Hitler.

Judge Badalamenti, who sits on the U.S. District Court for the Middle District of Florida, was one of two instructors of the class in which Mr. Damsky won the award. A member of the conservative Federalist Society, he has earned praise from both liberals and conservatives over the course of his career. The class was co-taught by Ashley Grabowski, a lawyer and Federal District Court clerk who, like the judge, is an adjunct professor at the law school.

Ms. Grabowski did not respond to a request for comment.

Mr. Damsky said he assumed that it was the judge who graded his paper. He also said that the judge "is not a white nationalist."

"Don't get me wrong," he added. "I would prefer it if he was."

Students took their complaints to Ms. McAlister, the interim dean. She addressed the granting of the award to Mr. Damsky in at least two town-hall-style meetings, according to an email she wrote to students and an article in The Independent Florida Alligator, the student newspaper. In the February email, the dean wrote that the law school, as a public institution, was bound by the First and 14th Amendments, meaning that no faculty member may "grade down a paper that is otherwise successful simply because he or she disagrees with the ideas the paper advances."

Institutional neutrality, she wrote in her email, "is not agreement or complicity with the ideas that any community member advances."

"It's just that — neutrality," she added. "The government — in this case, our public university — stays out of picking sides, so that, through the marketplace of ideas, you can debate and arrive at truth for yourself and for the community."

Some at the law school agree with her stance. In an interview, John F. Stinneford, a professor at the university, said that it would be "academic misconduct" for a law professor who opposed abortion to give a lower grade to a well-argued paper advocating abortion rights.



John F. Stinneford, a professor at the university, said he supported the idea of "institutional neutrality," which instructs schools not to take public positions on hot-button issues.  Jacob Langston for The New York Times

If it were a good paper, he said, "you should put aside your moral qualms and give it an A."

A number of students disagree, but several declined to be interviewed on the record for fear that criticizing the school, or a sitting federal judge, would harm their future job prospects.

One former student, who graduated in May, had his post-graduation job offer rescinded by a large law firm when he told them he had spoken to The New York Times for this article, criticizing Mr. Damsky's paper and Judge Badalamenti for granting him the award. The student asked not to be identified for fear of jeopardizing other job offers.

Before his suspension, Mr. Damsky had been offered a summer internship in the local prosecutor's office. But in early April, the prosecutor, Brian Kramer, the state attorney for the Eighth Judicial Circuit of Florida, rescinded the offer.

"You could imagine," Mr. Kramer said in an interview, that "having someone in your office who espouses those kinds of beliefs would cause significant mistrust in the fairness of prosecutions."

**Richard Fausset**, based in Atlanta, writes about the American South, focusing on politics, culture, race, poverty and criminal justice.



**EXHIBIT**

**Dft's Ex 9**

To: Dean Merritt McAlister, Dean Chris Summerlin

CC: Dean Janice Shaw, Miss Aimee Peeples, Miss Brande Smith

Subject: Reaffirming My Rights

Dean McAlister and Dean Summerlin,

By now you may have seen the litigation hold letter I have sent in anticipation of future litigation to many individuals I believe may possess relevant evidence. These individuals were not randomly selected, and their inclusion in the letter was in good faith. Please carefully consider the implications of this.

Respect for the law and my rights necessitates that you immediately cease and desist your oppression of me which is wholly in response to the lawful exercise of my constitutional rights.

These are the relevant facts:

Moving chronologically, your first complaint against me relates to a discussion over the app "GroupMe" which occurred over around twenty-four hours beginning on September 21, 2023.  In response to public criticism of the 2026 UF Law class's racial demographics (ostensibly revealed via our class photograph taken at orientation), a shared Instagram post by user "becomingjd" featuring our class photograph captioned "HOW MANY BLACK FACES DO YOU SEE?" at the top with a link to an article by Taonga Leslie in the post description, and one student's apparent expression of shame for having been in the front row of that photograph, I stated:

> "The United States lost 19.3 million White faces on net over the past decade, which I am sure fills this man with nothing but joy. So why on earth should we feel anything but pure contempt for him and anyone else who shares and expresses such naked hatred for us?"

A lengthier response to criticism of this message was given on September 22, 2023. I will not recapitulate that response here as it is my present understanding that you have the logs via screenshot. Suffice it to say, I did not insult, threaten, or otherwise harass anyone. Nor did I disrupt classroom instruction or other school activities. I merely expressed my opinion—in an off-campus forum—that the law school did not racially discriminate in selecting the 2026 class, and that we had nothing to feel ashamed about. This core speech (in defense of the conduct and dignity of the school and its administration!) was entirely protected under the First Amendment, which would explain why you did not punish me for it at the time. But now you are dredging up this almost two-year-old event as a way of justifying your oppression and retaliation against me for the exercise of my constitutional rights. This is patently unlawful, and absurd on its face. Crucially, despite having reports of this event for well over a year, you did not use it to justify my placement on interim suspension. I did not become aware of your possession of and desire to introduce this evidence until June 20, 2025.

This "incident" is a complete non-starter for your case, and the only thing demonstrated by its inclusion is the unserious, hair-trigger threshold with which some students will claim to fear for their safety, which here was clearly apropos of exactly nothing. These people have been crying wolf for nearly two years, malingering and abusing the reporting system not out of *fear*, but out of *spite*. You are still taking them at their word in a rush to coddle them. If you do not stop 'falling for it,' it will become increasingly clear that it is also you who are abusing this process out of spite.

Your next complaint against me is my wearing of a t-shirt that reads "From The River To The Sea, Palestine Will Be Free." I began occasionally wearing this shirt around October or November of 2023. As an initial matter, this is plainly protected expression; and this is the conduct and expression which most

1

closely matches the facts of *Tinker* (except here, to my benefit, the conduct and expression is occurring in a graduate school setting where you stand *in loco parentis* over no one). Moreover, under 4.040(6)(c)(1.)(a.) "No Student may be Charged with a violation of the Student Conduct Code if the incident was reported to the University more than one (1) year after the alleged violation occurred, absent extenuating circumstances." It is unclear what extenuating circumstances might be present here. It is also unclear when this "incident" was reported. From what I gathered from your information hearing there was no report discussing the t-shirt (I am, of course, operating off recollection and notes given your irrational refusal to provide a copy of the evidence file, even though I must provide you with copies of my evidence). There was merely an unauthorized, undated photograph of me wearing the t-shirt.

Moreover, regardless of one's interpretation of the phrase, no one could reasonably interpret "From The River To The Sea, Palestine Will Be Free" to be a threat to the "health, safety, or property" of anyone in "the University Community." At last check, Gainesville does not lie between the Jordan River and the Mediterranean Sea, nor is it considered to be a part of Palestine. Nor has there been any allegation that my choice of clothing disrupted classroom instruction or any other school activities. Take heed, if you continue in your unlawful retaliation against me, I promise that you will soon discover, to your great embarrassment and the discrediting of your case, just how much the law school community not only does not support you on this point of contention, but apparently strenuously disagrees with you. And it is a very important point of contention! Your letter of April 16, 2025 specifically cites the wearing of the t-shirt to justify my interim suspension. This allegation was included for a reason, and you should consult once more with Miss Brande Smith on why the school felt it necessary to refer to my choice of clothing. I have been told by many attorneys that the theory undergirding your decision to prosecute my shirt is novel. Even journalists express disbelief at your desire to punish me for a t-shirt, and are shocked once I show them the evidence. After this letter, I am hoping you will reconsider whether defending this absurdity is in the best interests of the law school community, a community I am still a part of, I intend to remain a part of, and I value.

Furthermore, you are charging me for my Fall 2024 semester seminar papers. I say papers in the plural because, in your July 17, 2025 correspondence, you copied from your May 29, 2025 correspondence in saying "a student at the law school complained that you had agreed that your paper for the Originalism and its Critics seminar ended on a call for extralegal violence." First, the seminar is called "Originalism and its Foes;" but more importantly, given the witness you are calling to support this charge and my recollection of a prior interaction with him, the class an alleged agreement took place in was a different seminar course called "Constitutional Change" taught by Professor Jonathan Marshfield. Your typographical error and conflation of the two courses is indicative of your sloppy work throughout this whole endeavor. This negligence is evinced beginning with your April 16th letter where you misquoted a tweet of mine (in addition to stripping it of its vital context) and going into your May 29, 2025 letter where you failed to mention in your listing of regulations 4.C & 4.K that these regulations "do[] not include conduct protected by the First Amendment." Certainly, that qualification of the regulation is extremely important! Were you aware of this part of the regulation when you charged me? Did you appreciate it?

In fairness, you eventually fixed both errors, however the latter was only fixed after I brought it to your attention on June 20, 2025. Regardless, your conflation of these papers also indicates that you truly also desire to punish me for my book award earning paper in the class taught by the Honorable Judge John L. Badalamenti in large part, I presume, because you feel it has embarrassed you (or else why would this seminar course have even been on your radar?). However, your embarrassment over my academic success does not justify my persecution. I would like to call both Judge Badalamenti and Professor Marshfield as

2

witnesses in this matter. If you permit me to interview the judge and the professor, I believe they will agree that my writings were neither harassing nor disruptive. Indeed, this was already conceded by Dean McAlister in her February 10, 2025 email to the law school, and by Dean Shaw in a private meeting I had with her in her office on January 24, 2025 where she told me both of my papers had been reviewed by the school's First Amendment scholars (and herself personally) and found to be entirely protected. I assume these concessions are why this "incident" was also not used to justify my interim suspension. So why is it being brought into this student conduct process? Regardless, the witness you are calling to provide testimony relating to this "incident" will not aid your case. As I recall, there was no alleged agreement between myself and this student, and the student admitted he objected to what I specifically said primarily because of the broader ideas advanced in the paper. If you punish me for this, you will be giving legal effect to this student's selective, ideological disagreement. That is textbook viewpoint discrimination, and it cannot stand.

These three "incidents" never should have been the subject of this conduct process. But, in a way, it is to my strategic benefit that they are. They indicate your total lack of faith in punishing me solely for why we are truly here: my tweet on March 21, 2025.

At the outset, the tweet in its full context is clearly not a call to violence. Read the first article in the first issue of Ignatiev's *Race Traitor* (it is available for checking-out and quick download via the UF library system!) which is where the language I referenced in that tweet first appears. Given that I explicitly tied the meaning of "abolish" to what Ignatiev meant, it is very important that you evaluate what he said before you rush to judgment about the meaning of what I said. If you do not want to read Ignatiev directly, you could also educate yourself through some of his many glowing obituaries. See, e.g., Neil Genzlinger, *Noel Ignatiev, 78, Persistent Voice Against White Privilege, Dies*, New York Times, Nov. 14, 2019 ("But, as Dr. Ignatiev always felt compelled to point out, he was not advocating some sort of mass extermination, just a change in presumptions."). For the importance of looking at context when evaluating if online expression is protected, see generally Lyrissa Barnett Lidsky & Linda Riedemann Norbut, *#I🔫U: Considering the Context of Online Threats*, 106 Cal. L. Rev. 1885 (2018). Even if you do interpret what I said as a call for violence, the law is still on my side. See Lyrissa Barnett Lidsky, *Incendiary Speech and Social Media*, 44 Tex. Tech L. Rev. 1, 13 (2011) (noting that the First Amendment protects speech that might be perceived as "completely despicable," including speech that might be perceived as calling for ethnic cleansing or genocide and that uses racial slurs) (citing Brandenburg v. Ohio, 395 U.S. 444, 446 n.1. (1969)).

Additionally, the university's April 12, 2019 "Freedom of Expression Statement" makes clear UF's commitment to "foster[ing] an environment where divergent ideas, opinions and philosophies, new and old, can be rigorously discussed and critically evaluated in the academic environment" and that UF will only restrict speech that violates the law, such as "genuine threats of violence or harm and statements designed to incite others to engage in imminent unlawful conduct" or speech that violates the school's "reasonable time, place and manner restrictions on speech and expression." My tweet is perfectly legal, and violates no time, place, and manner restriction because it occurred during Spring break, off-campus, and on my social media account.

It might also be enlightening for you to look at the fourth issue of *Race Traitor* in an article called "Abolish the Jewish Caste in Palestine" (again, available at the library and via download) where the author states that he regards the terms 'caste' and 'race' as synonymous, and which advances a largely normative argument that "[o]nly once the development of the Jewish caste is understood can efforts be directed towards its abolition." I do not entirely agree with this author's analysis, but my broader intended point regarding the similarity of our language still stands. I also think it is rather important to note that the

3

author of that article was quoted in the New York Times obituary above, and was my professor at UCSB. His letter of recommendation to get me into law school was put at the top of my stack of letters of recommendation when I applied to UF Law. It is outrageous that you are punishing me for protected expression that is in the relevant respects similar to the writings of a man whose recommendation in part influenced your decision to admit me into the school.

Perhaps worst of all, you claim to be doing this because of "current events in this country and around the world." Is the school's actual position here that, due to the public outcry and extreme unpopularity of the ongoing genocide in Palestine, First Amendment protections ought to be temporarily throttled to lessen the global piling on? That in the legal landscape of a pre-October 7th world, my tweet wouldn't have exceeded some invisible, fluctuating threshold reactive to how aggrieved one particular group feels? If so, this is nonsense. My First Amendment rights do not rise and fall in response to events 6,000 miles away in the Middle East, nor based on the political temperature in the United States, nor depending on the relative sensitivity of any specific group of students at a given time. If anything, the protection of core speech is most essential especially when political divides are at their most contentious.

Do you disagree with my analysis? Please, for all of our sakes you ought to first ask yourself how much money and prestige you are willing to risk by betting that my position will be found invalid in the forums that will ultimately matter the most.

It is also untenable to argue that my ignoring Professor Lidsky's question and instead directing two clarifying questions back to her could ever be considered threatening. My First Amendment rights do not hinge on my willingness to engage directly with bad faith, loaded questions. Besides, Professor Lidsky did not interpret my response to her questions as a threat. From my notes it does not appear that you have her final Twitter response to me in the casefile you briefly showed me, so I will include it in this letter. Her final response is not one you would expect from a reasonable person just threatened with murder, it is the response of someone engaging in *argumentum ad logicam*. Ask yourself why she deleted her Twitter account and the evidence of her unsolicited engagement with me. Those who spoil evidence never do so because they are confident the evidence supports their position, and Professor Lidsky was certainly aware that litigation might result from what she was doing and would later do.

In truth, I suspect even my Twitter activity is not even why we are here. I suspect the real reason is simply that many people at the law school just do not like me. Too bad! I look forward to spending the next year contributing to the development of these people by helping to give them direct experience in how to endure having strong disagreements with your colleagues.

So now you have much of the basic outline of my factual and legal defense to your charges. I hope most of this was at least somewhat predictable, or else you really have not thought this through; but I understand if this information has not reached you in as complete a manner as it is being presented to you now. Nonetheless, I am sharing my position with you because I have no reason to hold my cards close to my chest, unlike the school which does not wish to share with me its basic arguments or provide me with copies of the evidence that it seeks to introduce.

But that is not all I am willing to show you, and there is much more information I do want to hold in reserve, at least for now.

**PLEASE READ THIS VERY CAREFULLY:**

Because of my trespassing from campus, the Florida State Bar has taken tremendous interest in this student conduct process. They have instructed me that I am required to share with them our

correspondence, which presumably includes this letter and any future letters of a similar nature. I have no idea what their obligations are if they find or come to suspect—through the contents of the evidence I share with you and then them—potentially illegal conduct or conduct which violates various professional obligations or responsibilities, but I believe I have information which might tend to indicate such malfeasance has occurred. Furthermore, I believe this information may implicate students, graduates, faculty, and staff in various kinds of misconduct. I have become aware of certain facts which I genuinely hope the recipients of this letter are not at all aware of. Put simply, this is the kind of information that unfortunately may make the school look very bad. I do not want the school to look bad. When the school looks bad, I suffer. This is of course because my fortunes are in large part tied to the continued fortunes of the school. And given that the misconduct is primarily, if not solely, directed at me, I do not think I have any sort of duty to share it at this time, either with the Florida State Bar or with the public. Thus, I would prefer not to share this information with you at this time while I am under an obligation to share it with the Florida State Bar.

All I want to do at the present time is graduate from UF Law in May 2026. I have no desire to bring any legal action until that time. But if I am prevented from attending class, I will have no choice but to seek legal redress in the courts. And if I must seek redress in the courts, I will have to put the full facts of this case on the public record, and my attorneys will be obligated to seek out as much information as is possible—and that still exists—via discovery. Moreover, because I am an indigent plaintiff, I may have to share my story with the public in order to fundraise.

Given these facts, the dire situation we now find ourselves in, and the short timeframe you have provided me to give you the evidence I would like to introduce at the scheduled student conduct hearing, I expect that by 4:00 PM Wednesday (7/23/25) you will provide me a letter stating the following:

- That you shall not pursue conduct charges based on these "incidents" any further, either now or at any other point in the future.

- That considering the information I am presenting to you now, you have determined conduct charges should not have been brought and placing me on interim suspension was inappropriate.

- That you are immediately ending my interim suspension and terminating your trespass order.

- That a representative or representatives of the school will meet with me and one or two of my representatives to discuss ways in which we can ensure the coming school year will not be met with any further disruption to my learning, how my safety can be ensured, and how my trust in the school can be restored.

I would hope that letter would mark the resolution of the conduct process, at which point my obligation to share my correspondence with the school to the Florida State Bar would presumably cease.

I do not plan on giving up until I have achieved success, or until I have exhausted all my legal remedies. My goal is to leave this town once I have my law degree in hand. Until then, I am not going anywhere. Everything that has happened since April 1, 2025 has tested my resolve—indeed this has been either the second or third most traumatic event in my life—but it has also tempered my resolve. My continued dedication and unwavering spirit, despite your assault on my rights, should have been clear to you after Spring semester concluded. But you should now have no doubt. I believe that up until this point the conduct of the school has, at minimum, involved reckless or callous indifference to my federally protected rights. Continued persecution of me after this letter would fully validate that belief. And if you fail to grant me the remedy I am requesting in this letter, after the next letter it will be clear that your

5

conduct not only involves reckless or callous indifference to my federally protected rights, but that your conduct is motivated by evil motive or intent. I understand you can continue in the immediate future to make life incredibly difficult and frustrating for me even though my expression is protected; but at some point, your obstinacy will do you in. Save us all the trouble and end this.

Sincerely,

*Preston Damsky*

Preston Terry Damsky

P.S.: Nothing in this letter should be construed as a waiver of any rights, including the rights to provide evidence to the school by Wednesday, July 23rd at 5:00 PM or further review case file information, per email correspondence from Miss Aimee Peeples on 7/17/25 at 5:58 PM.



**EXHIBIT**

**Dft's Ex 10**

Date: 7-21-2025

To: Dean Merritt McAlister, Dean Chris Summerlin

CC: Esteban Alvarez III, Montserrat Arguello, Professor Gia Arney, The Honorable Judge John Badalamenti, Professor Jane Bambauer, Sarah Barsoum, Benjamin Bartlett, Richard Blake, Caroline Bradley, Rodrigo Braga, Devin Branch, Professor Annie Brett, Mary Byerley, Professor Juan Caballero, Jenna Callison, Professor Clay Calvert, Jose Capula, Lauren Cates, Reese Catherwood, Professor Carliss Chatman, Nancy Chrystal-Green, Professor Judy Clausen, Professor Charles Collier, Professor Julian Cook, Zachariah Cosner, Steven Cutler, Tanya Dampier, Dana Dammar, Manoach Deliscar, Professor Donna Erez-Navot, Austin Esposito, Ian Finley, Katelynd Todd Fitzpatrick, Chad Fuselier, Liam Gillis, Chief Assistant Public Defender Canaan Goldman, Professor Ashley Grabowski, Professor Christopher Hampson, Lindsay Hanson, Matthew Hanuman, Professor Kristen Hardy, Maryssa Hardy, Mary Hathcock, Professor Thomas Hawkins, Patrick Healy, William Hoffman, Dean Rachel Inman, D'errica Jackson, Mary Claire Jackson, Sherry Johnson, Professor Lea Johnston, Professor Rachael L. Jones, Scott Jurkowski, Mason Kanigowski, Kaysha Kapadia, Victoria Kass, Eliot J.W. Kersgaard, Dean Khan, Assistant State Attorney Stephanie Klugh, State Attorney Brian Kramer, Professor Tyler Lattimore, Nicole La Roque, Professor Elizabeth Lear, Professor Lyrissa Lidsky, James Lochrie, Sabrina Lopez, Dean Charlene Luke, Shrivathsan Margam S, Professor Tracey Maclin, Pamela Malyk, Professor Jonathan Marshfield, Professor Timothy McLendon, Sam Mendez, Leida Mercado, Isaac Miller, Dean Brian Mitchell, Dean Peter Molk, Hillary Moran, Professor Lars Noah, Devki Pancholi, Aimee Peeples, Daniel Pinkus, Manny Restrepo, Professor Lorelei Ritchie, Matthew Robinson, Mary Rosado, Christopher Salazar, Alyssa Schefke, Titus Scheid, Professor Ryan Scott, Dean Janice Shaw, Angela Silva, Dean Whitney Smith, Professor John Stinneford, Professor Maru Smith-Opabola, Joyce Stebbins, Professor Stacey Steinberg, Kelly Tackett, Tyler Thorne, Marcela Tordin, Bijan Toulabi, James Tyger, Tyler Visuvasam, Aja Walker, Jared Weingard, Jacob Wellens, Professor Derek Wheeler, Cooper Whisnant, Professor Sarah Wolking, Jonathan Yorkowitz, Annasimmon Zakhary

Subject: Litigation Hold Letter

Attention Recipient:

Preston Terry Damsky hereby notifies you to preserve all electronically stored information, copies and backup, as defined by Rule 34 of the Federal Rules of Civil Procedure, along with any paper files or other physical documents you maintain, that are relevant to potential future litigation involving Mr. Damsky, the University of Florida, or other parties broadly concerning Mr. Damsky's suspension from the University of Florida on April 2nd, 2025, the ongoing student conduct and disciplinary process related to that suspension, and any other litigation relating to Mr. Damsky which you might reasonably foresee.

Mr. Damsky may be seeking in discovery electronic data in your custody and control that is relevant to future litigation, including without limitation emails and other information contained on your computer systems and any electronic storage systems.

Mr. Damsky considers these electronic data and paper files to be valuable and irreplaceable sources of discoverable information in this matter. Mr. Damsky places you on notice to preserve all documents regarding Mr. Damsky including, but not limited to, documents, recorded discussions, and correspondence related to Mr. Damsky's on-campus and off-campus activities while a student at the University of Florida; documents, recorded discussions, and correspondence related to Mr. Damsky and the University of Florida Student Honor Code and Student Conduct Code or the "Report A Community Concern" function at law.ufl.edu; documents, recorded discussions, and correspondence relating to Mr. Damsky's admission to a state bar; documents, recorded discussions, and correspondence relating to Mr. Damsky's academic, employment, or internship opportunities; and all other documents, recorded discussions, and correspondence relating to Mr. Damsky which might be reasonably viewed as relevant to the potential litigation and matters discussed above. This request includes potentially relevant documents, recorded discussions, and correspondence involving individuals or groups not named as recipients to this letter, including those not affiliated with the University of Florida. This request is not limited by any specific time frame and should be considered on-going after your receipt of this letter.

Additionally, Mr. Damsky places you on notice not to allow or solicit the deletion of any electronic communications, such as emails, text messages, or messages sent via messaging apps (e.g., "WhatsApp" or "GroupMe"), or the destruction of any physical media or paper documentation relating to Mr. Damsky. Mr. Damsky has a good faith reason to believe that certain relevant documents or electronic data have been deleted by parties named as recipients in this letter when it was reasonably foreseeable that those relevant documents or electronic data would be pertinent to potential future litigation those parties might reasonably have expected to be a part of at the time such deletion was believed to have occurred. Mr. Damsky may seek available spoliation sanctions for any violations of your duty to preserve.

Nothing in this letter should be construed as a waiver of any right or a release from any duty.

Thank you,

*Preston Damsky*

Preston Terry Damsky

EXHIBIT

Dft's Ex 11

exhibitsticker.com

**March 7, 2025, 7:49 AM**

**https://x.com/preston_terry_/status/1897992886525771851**



← **Post**

**Preston Damsky** ✓
@preston_terry_

The Jews are the common enemy of humanity. We are all Palestinians now.

> 🎖 **Yousef Munayyer** ✓  @YousefMunayyer · Mar 6, 2025
>
> Another reminder that Palestine is the canary in the coal mine of authoritarianism and repression. The bombs they drop in Palestine won't stay there. The laws that target Palestine won't stop there. The tech tools they abuse won't be limited to there. x.com/axios/status/1...

7:49 AM · Mar 7, 2025 · **966** Views

💬 1          ↻          ♡ 1          🔖          ⬆

**Preston Damsky** ✓ @preston_terry_ · Mar 7, 2025
My only criticism of Mister Munayyer is that his post seems to imply Jews will target others *in the future* with genocidal acts and policies. But in the West they have been subjugating and destroying Whites for decades with cultural, legal, economic, and demographic warfare.

💬          ↻          ♡          �📊 562          🔖 ⬆

1

**March 9, 2025, 11:02 AM**

**https://x.com/preston_terry_/status/1898751331575214457**



**May 23, 2025, 1:54 AM**
**https://x.com/preston_terry_/status/1925792447080137121**



**May 23, 2025, 2:08 AM**

**https://x.com/preston_terry_/status/1925795989199151278**



2:08 AM · May 23, 2025 · **855** Views

**4**

**May 27, 2025, 12:10 PM**

**https://x.com/preston_terry_/status/1927397017724060154**



**June 9, 2025, 9:46 AM**

**https://x.com/preston_terry_/status/1932071745608896854**



**June 25, 2025, 6:50 PM**

**https://x.com/preston_terry_/status/1938006879008891384**



**June 28, 2025, 12:36 PM**
**https://x.com/preston_terry_/status/1938999938370678913**

8



Post

**Preston Damsky** ✓
@preston_terry_

The past three months have been very difficult, but I am grateful for the support and encouragement given over the past week. Thank you!

This process was meant to punish and silence me. But that has backfired. Many more people than I ever hoped to reach have now been exposed to the arguments I present in my paper. Most gratifyingly, these arguments have very often been well-received, even in quarters that are not inclined towards being sympathetic to nationalist theory.

I have not been silenced, both my resolve and my ideas have been amplified. And I will never be silent until there is no further need to speak.

12:36 PM · Jun 28, 2025 · **8,864** Views

14       ↑↓ 27       ♡ 278       🔖 6

8

**July 13, 2025, 10:13 AM**

**https://x.com/preston_terry_/status/1944399860381126667**



← **Post**

 **Preston Damsky** ✓
@preston_terry_

Tucker Carlson is largely correct here about the nature of what Jeffrey Epstein did and why he did it. But he concludes that, nonetheless, "Israel is a great country that deserves our support." Respectfully, that is revolting nonsense!

If Epstein was running an Israeli blackmail operation based around the sexual abuse of girls, no decent person could genuinely believe the Jewish gangster entity in occupied Palestine is "great" or "deserves our support."

Let us be clear: Epstein's blackmail serves as a means to an end, not the end itself.

The end is Jewish control of American politics.

The end is Jewish parasitism of our civilization.

The end is the Iraq War.

The end is the destabilization of Lebanon, Libya, and Syria, and our involvement in the "Arab Spring."

The end is the illegal bombing of Iran.

The end is Palestinian genocide.

The end is White genocide.

The end is the continuity of a system that has murdered millions of people and cost billions of people an untold amount of suffering, all in service to the protection of a criminal enterprise that would otherwise be swiftly annihilated.

So ultimately, Carlson could not be more incorrect. Israel is not great, and Israel does not deserve our support. The fact of the matter is that the Zionist cause is an evil one. The only end to this conflict must be complete and total surrender by those who support Jewish terror. Rightly or wrongly, we nuked the Japanese twice to get unconditional surrender. But that certainly needs to be the same here. There is something deeply wrong with a culture that would utilize organized rape as a means of attaining genocidal ends, and it needs to be defeated.

The entity does not deserve our support, it deserves our hostility.

Carlson seems to be worried about being branded a "hater." But that is a fear grounded in weakness and lack of confidence. It is a childish hang-up. And moreover, Carlson, as a father, must certainly have an

**10**

The entity does not deserve our support, it deserves our hostility.

Carlson seems to be worried about being branded a "hater." But that is a fear grounded in weakness and lack of confidence. It is a childish hang-up. And moreover, Carlson, as a father, must certainly have an instinctual grasp of why this is the case. Indeed, hatred is a necessary corollary of compassion and love. Without a deadly hate of that which threatens what we love, love is an empty word; it is a catchword for cowards. If we love our people, we must hate Israel, for nothing threatens the existence of our people more than the Jewish gangster entity.

God willing, we are at an inflection point in our history. Will we excise the tumor of Israel, or will we remain in captive servility to the most terrible organization of scoundrels in the history of mankind? If we remain afraid of doing what we must, then we will stay enslaved. But if we choose the path of love, which is the same as the path of unrelenting warfare, we will soon be victorious over the evil of Israel; and we will have taken the necessary first step towards achieving peace and prosperity for all nations.



Kai Schwemmer ✓ 🔴 @KaiSchwemmer · Jul 12, 2025

Tucker and Kirk are both speaking as if there's 15 shotguns ready to blow their heads smooth off from off stage if they say anything wrong.

Watch again

0:00

10:13 AM · Jul 13, 2025 · **5,261** Views

○ 3          ⟳ 12          ♡ 71          🔖 8          ⬆

Relevant⌄                              View quotes ›

**11**

**July 20, 2025, 11:17 PM**

**https://x.com/preston_terry_/status/1947133757628039638**



**August 15, 2025, 4:32 PM**
**https://x.com/preston_terry_/status/1956453964297412703**



4:32 PM · Aug 15, 2025 · **956** Views

**13**

**September 23, 2025, 12:47 PM**

**https://x.com/preston_terry_/status/1970530464126406787**

← **Post**

 **Preston Damsky** ✓
@preston_terry_                                    ⌀ ···

If it was necessary for Jews to ethnically cleanse and genocide Europeans in order to advance their gangster entity in occupied Palestine, they would gleefully do so. As a matter of historical fact, Jews often calculated these crimes were necessary and then diligently went to work soliciting, procuring, and committing them. Worse still, their primary method of bringing about the slaughter is corrupting our leaders and turning us against ourselves. The same strategy they used to bring about the carnage of the Marne has been used to foment the tragedy of Mariupol.

Muslims, for all their past hostility towards Europeans (immense) and all their current antipathy towards Whites (wildly over-exaggerated), do not behave this way. Unlike the Jew, the Muslim is primarily a conqueror; and his preferred way of conflict involves direct action. There is nobility in this, not only for the Muslim, but for those who oppose him.

On the other hand, the Jew is a corrupter. His way of conflict entails the unmitigated degradation and destruction of our race.

There is no equating the threat of the two, either in scope or in kind. Any man of influence who seriously entertains such an exercise is doing you a great disservice.

12:47 PM · Sep 23, 2025 · **273** Views

💬          ⟲          ♡ 3          🔖 2          ⬆️

**14**

**October 7, 2025, 5:34 PM**
**https://x.com/preston_terry_/status/1975676078355022078**



**Nov. 6, 2025, 12:06 PM**

**https://x.com/preston_terry_/status/1986480398809841814**



← **Post**

**Preston Damsky** ✔
@preston_terry_

Khalil is a civil rights icon. The man risked deportation (and murder by Jews upon returning to the Middle East) in order to speak truth to power in the imperial heart of darkness. The only comparable people in my lifetime are the Unite The Right attendees in Charlottesville who risked injury, financial ruin, imprisonment, and death to protest against the erasure of White history and White genocide in this country.

> **Olivia Reingold** ✔ @Olivia_Reingold · Nov 5, 2025
> I went to Mahmoud Khalil's "welcome home" celebration near Columbia. The important thing to note is that among leftists, he is not just revered:
>
> He is considered a civil rights icon. x.com/DianaforQueens...

12:06 PM · Nov 6, 2025 · **1,807** Views

○          ♡ 4          ♡ 22          🔖 2          ⬆

**16**

**Nov. 18, 2025, 6:06 PM**

**https://x.com/preston_terry_/status/1990919545498788049**



**Nov. 20, 2025, 4:55 PM**

**https://x.com/preston_terry_/status/1991626575658492193**



**18**

**Dec. 4, 2025, 11:25 PM**

**https://x.com/preston_terry_/status/1996797949108502764**



**Dec. 12, 2025, 10:25 PM**

**https://x.com/preston_terry_/status/1999681938421170558**



**<u>Dec. 14, 2025, 12:55 PM</u>**

**<u>https://x.com/preston_terry_/status/2000263320952254785</u>**



**Dec. 14, 2025, 4:59 PM**

**https://x.com/preston_terry_/status/2000339805712851346**



← **Post**

**Preston Damsky** ✓
@preston_terry_

These so-called "dissidents" who claim to be opponents of Jewish power yet publicly signal their sympathy towards Jews when anti-Jewish blowback occurs are revolting and wormlike. Putting to the side the way Jews behave generally that is so highly objectionable, how do they treat you personally? If you are someone who simply speaks critically and truthfully about this evil system, Jews will do everything they can to destroy your life. They will obstruct your ability to earn a living and provide for your family, they will ruin your life with civil litigation and weaponize the criminal law to throw you in prison, they will threaten to kill you, they will physically attack you, and they will even kill you (rest in peace, Alex Odeh).

You can keep your dignity and self-respect or you can commiserate with people who want you, your family, and your people brought low, enslaved, and exterminated. But you surely cannot do both!

5:59 PM · Dec 14, 2025 · **1,429** Views

💬 2        🔁 12        ♡ 60        🔖 4        ⬆️

**22**

**Dec. 18, 2025, 9:32 AM**

**https://x.com/preston_terry_/status/2001661735749459987**



← Post

**Preston Damsky** ✓
@preston_terry_

'Israel' is not an ethnostate, or at the least it is certainly not a "great example" of one.

Unlike the greatest example of an ethnostate, National Socialist Germany, 'Israel' not only celebrates and encourages the existence of its ethnic diaspora, it relies on it to exist.

Moreover, 'Israel' does not seek to attain ethnic homogeneity and self-sufficiency within its own territory, opting instead to create a rapidly growing slave class (comprised not only of Arabs, but also of other migrant populations from around the world) to exploit both economically and sexually. This burgeoning slave class now threatens the dominant demographic position of the Jews.

In large part because of the above, it is not accurate to say that 'Israel' has a "clear ruling class," unless you are simply defining that class as "Jews." Israeli politics have been characterized by partisan instability which has only temporarily abated due to the need for intra-Jewish solidarity during the acceleration of the Jewish genocide of Palestinians after 10/7. Prior to 10/7, the Likud party recently had to engage in various politically incoherent power sharing arrangements, aligning itself at different times with Arabs, so-called "moderates," and the neo-Kahanists. And of course, it is not always clear where power lies between the nominal leadership of 'Israel' and global Jewry as a whole when the interests of the two groups are not in total alignment. Indeed, given the dependence of the former on the latter, there is reason to believe the nominal leadership of 'Israel' is the junior partner, or at least does not act entirely unconstrained.

But above all, the hostile, imperial, parasitic, and criminal relationship of 'Israel' with the entire Gentile world has marked it out as a moral and political pariah. It is misleading to even call 'Israel' a state. Israel is the Jewish gangster entity in occupied Palestine. It is the pirate headquarters for global organized Jewish crime. It pays honest heed to no internationally recognized political or ethical norms, its sole organizing and driving principle being the extension of Jewish supremacy over the entire world.

'Israel' is nothing to emulate, it is everything we should seek to rid ourselves of. Its downfall will be looked back on as an unmitigated good in the annals of world history.

> 🦆 **Duck Brown, failed M.A. (Cambridge)** @DuckBrownIR · Dec 17, 2025
> Replying to @captive_dreamer and @doctor_rahmeh
> Really hate this low IQ brown anti-semitism. Israel is a great example of an ethnostate with clear ruling class. The only problem is that this is denied to USA, UK, Ireland, Canada, Australia, Estonia, etc.

9:32 AM · Dec 18, 2025 · **2,095** Views



💬 1        ↻ 16        ♡ 55        🔖 12        ↑

**23**

**Dec. 19, 2025, 10:47 AM**

**https://x.com/preston_terry_/status/2002042999002341470**



**24**

**Dec. 23, 2025, 1:34 AM**

**https://x.com/preston_terry_/status/2003353539347927395**



**Jan. 2, 2026, 1:29 PM**

**https://x.com/preston_terry_/status/2007157319134756945**



**Jan. 25, 2026, 11:49 am**

**https://x.com/preston_terry_/status/2015467062441787707**

← Post

**Preston Damsky** ✓
@preston_terry_

It is not enough to say that the Trump administration is not fulfilling its mandate to return demographic sanity to this country; the more important truth is that for eighty years the federal government has not only failed to perform its duty to ensure our country remains *our* country, it has seemingly done everything it could do to give away our birthright to foreign peoples and tribes which we cannot hope to thrivingly coexist with for long.

Our government has been an unfaithful agent of the People. Our Constitution has failed us. We owe America nothing, we could not serve it even if we desired to serve it. It cannot even be bargained with, for it repays every bargain with betrayal. The United States of America has perished. All that remains is the rotting husk of a mongrelized, incongruous empire that never should have been, lorded over by an unworthy class of plutocrats whose growing inadequacy is exceeded only by an ever-expanding capacity for vice and willingness to rule through terrorism.

Our task—our only task—is to organize to a sufficient degree so that we can salvage a viable nation-state from America's ruins. We must build a state that is capable of raising up a once-great people in a competitive and potentially dangerous world. A state built upon a sustainable, equitable, and humane mode of production. A state bound together by a truly beautiful and fulfilling culture, and a shared sense of common destiny. A state grounded in laws which derive not from accidents of history or arbitrary whims, but from ancient, well-considered ethics.

It must be understood that this will be an arduous process, and that success is most certainly not guaranteed. But one of the first steps is clear: we must genuinely abandon the entrenched bipartisan political spectacle offered to us by the empire. We must do everything we can to denigrate and spoil the perverse comedy of American politics for all those who are invested in it. Our people need to be convinced not only that revolution cannot be won through the winding dead-ends kept open by the exploiter class, but also that revolution must be won in our lifetimes, or not at all. Our rapidly deteriorating social situation is not a problem that can be responsibly left for future generations to fix. Given present realities, our children could only be expected to inherit even less favorable circumstances should we fail.

Is this a grand proposition? Certainly. But it is our obligation to recover a sovereign existence for our people. Servility is a way of life for dogs and cattle, not men. And we are failing at being men. We have not yet put aside petty distractions and cultivated the personal virtue and group discipline necessary to accomplish the great tasks required to achieve our liberation. A nobler people would have taken these steps long ago, and an even nobler people would have been more guarded so as to guarantee these steps never would have needed to be taken in the first place. But we are not yet such a noble people. And until we recognize that, we cannot hope to ever become such a noble people.

11:49 AM · Jan 25, 2026 · **828** Views

○          ↻ 4          ♡ 19          🔖 6          ⬆

**27**

**Jan. 27, 2026, 7:24 PM**

**https://x.com/preston_terry_/status/2016306302075421087**



**28**