# EXHIBIT 17

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

CASE NO.:  1:25-cv-275-AW-MAF

PRESTON DAMSKY, a law student
at the University of Florida
Levin College of Law,

**CERTIFIED COPY**

    Plaintiff,

vs.

CHRIS SUMMERLIN, in his official
capacity as the Dean of Students
of the University of Florida,

    Defendant.

_____/

VIDEO TELECONFERENCING DEPOSITION OF:

DEAN MERRITT McALISTER

DATE TAKEN:   February 9, 2026

TIME:         Beginning at 10:03 A.M.
              Concluding at 11:10 A.M.

LOCATION:     All parties remotely via Zoom

REPORTER:     Evelyn M. Andrews, RPR, RMR
              Certified Professional Court Reporter
              and Notary Public, State of Florida at
              Large

TAKEN BY:     The Plaintiff
              Pursuant to Notice

JASKO COURT REPORTING SERVICES, INC.
352-250-7345

2

APPEARANCES:


 On Behalf of the Plaintiff:

     ANTHONY F. SABATINI, ESQUIRE (VIA ZOOM)
     SABATINI LAW FIRM, P.A.
     1601 East First Avenue
     Mount Dora, Florida  32757
     352-455-2928
     anthony@sabatinilegal.com



On Behalf of the Defendant:


     H. CHRISTOPHER BARTOLOMUCCI, ESQUIRE (VIA ZOOM)
     SCHAERR|JAFFE LLP
     1717 K Street NW, Suite 900
     Washington, DC 20006
     (202) 787-1060
     cbartolomucci@schaerr-jaffe.com

               and

     BRANDE SCHWARTZ SMITH, ESQUIRE (VIA ZOOM)
     SHAYNE ASHLEY THOMAS, ESQUIRE (VIA ZOOM)
     UNIVERSITY OF FLORIDA OFFICE OF THE GENERAL COUNSEL
     PO Box 113125
     Gainesville, Florida  32611-3125
     352-392-1358
     brande@ufl.edu
     sthomas777@ufl.edu

3

INDEX

WITNESS                                                      PAGE

DEAN MERRITT McALISTER
        Direct Examination by Mr. Sabatini                     4


CERTIFICATE OF OATH                                           48

COURT REPORTER'S CERTIFICATE                                  49

ERRATA SHEET                                                  50

SIGNATURE LETTER                                              51




                        - - - - -

                    NO EXHIBITS MARKED

                        - - - - -




                S T I P U L A T I O N S

        It is hereby stipulated and agreed by and

between counsel for the respective parties and the

deponent that the reading and signing of the deposition

be reserved.

4

P R O C E E D I N G S

- - - - -

Video teleconferencing deposition taken before

Evelyn Andrews, Registered Professional Reporter and

Notary Public in and for the State of Florida at Large,

in the above cause.

- - - - -

THE COURT REPORTER:  Do you solemnly swear to

tell the truth, the whole truth, and nothing but the

truth, so help you God?

THE WITNESS:  I do.

- - - - -

DEAN MERRITT McALISTER,

having been first duly sworn, was examined and testified

under oath as follows:

DIRECT EXAMINATION

BY MR. SABATINI:

Q.  Good morning, Dean.  How are you doing?

A.  Good morning.  How are you, Mr. Sabatini?

Q.  Good.  I'm trying -- I don't want this to be
too long, because I know Mondays are busy days and you
got the law school and everything, so I don't want to,
you know, obviously go too long, but I'll just get right
into it in terms of the timeline and everything.

What was the -- do you remember the -- recall

the exact day that the University decided upon suspending Mr. Damsky?

A.    So I -- that's not a decision that I'm responsible for, so I don't know the exact date that the University took action.

Q.    Okay.

A.    I know when I referred the matter, but I don't know the exact date that the University took action, so.

Q.    Okay.  Well, let's talk about that.

So when exactly do you recall referring the matter?

A.    Sure.  I made a referral to via Janice Shaw, the Assistant Dean for students, on Friday, March 28th.

Q.    Okay.  And then what was the format or how did that reference or -- how did that reference take place?

A.    So she would have called someone in student conduct to begin the process.  And that, that would have begun a process at that point in time.

Q.    Okay.  And then what were the -- what or to what effect were the words that you used to make the reference?  Was it that, this needs to be reviewed; or was it a specific result that you were trying to articulate to them, that you would like to see done?

A.    Sure.

6

So we had a Teams call that morning after a student had alerted me to the tweets.  I referred that matter to Dean Shaw and asked her to proceed with letting the student conduct office know about it.  And that was the -- that was the first step in the process.

Okay.  And which student was it?

A.    It was Mr. Scott Jurkowski.

Q.    Okay.  And then are the Team calls generally recorded or unrecorded?

A.    No, they're not recorded.

Q.    And then what was your next communication with the Dean's office or any of their employees after that, the next sequential communication?

A.    So my memory of the next sequential communication was that there was another communication on April 1st when I wrote a report for the office, the student conduct office.

Q.    Okay.  And then after that, I'm just going to kind of go sequentially.

So you submitted the report, and then what happened after that, in terms of your interaction with the student affairs office?

A.    Right.

So that was, that was my direct -- hold on, let

7

me just -- I'm double-checking on a calendar, just so I can't get my dates wrong.

So on April 1st, that was my communication with sort of central administrators. There were conversations the next day on April 2nd. And then, you know, by that point in time the process had begun informal on the evening of April 1st and continued through on April 2nd; but I -- that's not a process that the law school is directly in after there is, you know, a report made.

Q. Okay. And then what happened after that? I'm just going to kind of go --

A. Sure.

Q. -- sequentially.

A. So after there were communications back and forth via phone on April 2nd. The evening of April 2nd I became aware that the University is going to proceed with some measure of discipline, which then gets -- the next day on Thursday, April 3rd, I was informed that there was a notice of trespass submitted --

Q. Okay.

A. -- or filed.

Q. And then when did the suspension occur, same day?

A. That, I believe it all happened there on

8

April 3rd; but I will say that, you know, there should be documents in the record that confirm that, but everything was happening that week.

Q.   And then we're going to kind of go back.

So it's your understanding that the University's decision to go forward with discipline, whether it be trespass, suspension, expulsion, was -- was it based upon your report or is that only one of several documents that they reviewed in coming to that conclusion that that was the appropriate punishment?

A.   I am -- I wasn't the decision-maker, so you would have to know -- you would have to ask them, but I can tell you that I submitted a report.

Q.   Got it.

Did your report -- I can't recall if I have a copy.  Obviously I can get it later.

But did that call for making a recommendation, or that you were making a recommendation you thought there was a certain punishment that would be most appropriate?

A.   No.

Q.   Okay.  What about trespass?

A.   No.  None of those are my call.

Q.   Okay.  Not even interim measures is what I'm getting at.  There wasn't anything like something needs

9

to be done right now temporarily?

A.   There was an ask for help and dealing with a difficult situation; but the type of help is beyond my power.

Q.   Okay.  Did the report, did you write it in regard to the concept of substantial disruption or any kind of legal concept?  Were you measuring your report or basing your report around whether you thought the occurrence, you know, around Mr. Damsky, hit some sort of legal threshold?

MR. BARTOLOMUCCI:  Form, compound.

Go ahead, Dean.

MR. SABATINI:  I'll narrow it down.  Let me just say it again.

BY MR. SABATINI:

Q.   When you wrote the report, were you doing it with the idea of substantial disruption in your mind?  Was that the concept that you were holding forth in your mind when you were writing it?

A.   To the best of my memory, I don't remember exactly what I was thinking at the time.

What I can tell you is that I know that the experience we were having, I was concerned, very concerned both about substantial disruption as well as the meaning of the tweets themselves.  So both were

concerning to me and were part of what had prompted my report.

Q.   And going more broadly here, do you believe that Mr. Damsky's tweets, behavior, words, that they constituted or resulted in a substantial disruption on the campus?

A.   Yes.

Q.   Okay.  And I'll start again very broadly.

How would you measure that?  How would you measure what a substantial disruption is on the campus?

A.   Well, I mean, one -- one way is through the amount of -- the amount of sort of student and faculty complaints, concerns, requests for police and other protection.  That was one very immediate way.

On the other hand, you know, Mr. Damsky was known to me, and there had been any number that students had felt strongly about --

THE COURT REPORTER:  Excuse me, I'm sorry, could you repeat that?  You froze for a minute on my end.  Mr. Damsky was known to me and there had been any number of --

A.   -- past incidents that had caused some measure of disruption in the sense that students were upset, or wanted to talk about what was going on or wanted the law school to punish him in some way.  And, you know, we had

11

had those conversations.

This was different in a variety of ways, both in terms of the intensity of the response among students, and faculty in particular, and ultimately staff.

And that escalated, both the intensity, the number of complaints, the urgency of them, all of those were significant compared to the history of handling extreme comments from Mr. Damsky that had happened over, you know, the course of almost two years.

MR. SABATINI:  And other than his communications with Professor Lidsky, which, I assume, we can assume that into evidence, Chris?  I mean, we don't need to go through all the tweets if you're fine with it.  I think everyone understands the timeline of the tweets.

BY MR. SABATINI:

Q.  Other than his response to her, do you know of any comments directly made by Mr. Damsky to any student on campus?  Are you aware of any comments he's made to a student on the campus?

A.  I mean, that's a very broad question.  I'm sure he's made tons of comments to students on campus.

Q.  No, no.  I meant personal recollections.

Are you aware in your report any conversations or statements he made directly to any students that you

12

have knowledge of? Obviously, he did communicate with them.

A. My report did not reference any particular communications to particular students. But there had been, you know, any number of incidents that had happened that I would say are communications with students either in the classroom, outside the classroom. There were other issues that had come up in two years, yes.

Q. Okay. Let me get back to sort of measuring what we call a substantial disruption.

So how many, roughly how many students are at UF Law right now?

It was about 800, 900 when I was there and I know it's less now.

A. We have 650 J.D. students.

Q. Are we aware of any students who missed class or were late to class based on Mr. Damsky's tweets or communications?

A. Yes. That was told to me by at least one professor.

Q. Do we have a number for that?

A. I can't give you a number.

Q. Okay. Do you recall the name of the professor?

13

A.   Zachary Kaufman testified to this.  He's the head of the Jewish Law Students Association.

Q.   Okay.  He did testify.

So if I go back to the transcript, I can get the numbers from him, correct?

A.   He did testify, so you should review that, yeah.

Q.   I did, but it's just, you know, it was earlier in the case --

A.   Sure.

Q.   -- and here we are today.

Any other professors told you a number?

A.   So I know that Professor Lidsky shared that she had a number of students who were afraid to come to her class, in particular, after the exchange of tweets.

You know, there were at least two students who expressed concern to me at a town hall in January, this was before the tweets, but had expressed general concern about Mr. Damsky's presence on campus and the effect he had.  And that was two out of -- I think in that meeting they were maybe 40 students at the town hall.  So a significant, you know, number, given that there were two that felt, you know, compelled to speak.

But, again, we weren't -- we weren't tracking

numbers, we were trying to deal with what was, you know, a crisis at the time within the law school.

Q.   Okay.  Do you believe that Mr. Damsky made any true threats?

MR. BARTOLOMUCCI:  Legal conclusion.

A.   So I'm not a First Amendment expert.  This is not an area where I practice or regularly teach.

I was very concerned with how the statements would be received within a very large Jewish community. And they certainly -- any number of our Jewish faculty members, in particular, who talked to me, who can get ahold of me very quickly, felt threatened by the statements, yes.

BY MR. SABATINI:

Q.   Okay.  So just to be clear, though.  It's, if somebody felt threatened, that's the standard for truth rep, in your mind?  Just curious, as administrator.

I mean, the question is:  Was it a threat and it's a reasonable apprehension of fear, etcetera? That's the standard for truth rep for you as an administrator?

MR. BARTOLOMUCCI:  Anthony, I think the witness is not here today to, you know, opine on the law.  And she's here to share, you know, the facts

that she knows, but she's not sitting as an expert witness. So I think, you know, we'll be better off if we not ask her to, you know, state legal conclusions or address --

MR. SABATINI: Sure. But it's a unique case in the sense that the legal conclusions of the Law Dean, obviously, I think were the essential -- (Zoom interruption.) They're part of the rapport which led to the discipline. So I'm only probing as to what legal standard I think was being used in the report. That's all. I mean, it's still fact. It's a fact. It's sentiments of law presented as fact.

MR. BARTOLOMUCCI: Well, I don't think it's a fact in evidence that a legal standard was used in --

MR. SABATINI: That's what we're seeking to -- yeah, I mean, that's obviously what I'm seeking to explore.

Was there -- was the report that UF based its discipline on based upon certain legal conclusions that were made? I mean, that's it. But I mean, it's only a few questions and you can object, that's fine, but, and we're just going to go a little further and that's it.

16

BY MR. SABATINI:

Q.   The question I had then is, okay, so you had reports that some students had missed class from two professors, is that correct, two professors?

A.   So, I mean, at some point in time, yes, I became aware that students were missing class or late to class or concerned about attending class, yes.

Q.   Okay.  And do you -- you talked about some of the other incidents on campus apart from his statements or speech.  What were those?

A.   Well, there was a whole history of different kinds of interactions between Mr. Damsky and the community.  Do you want me to -- what would you like for me to address in particular?

Q.   Which ones are relevant?  I'm just curious which ones you found to be relevant?

A.   Well, you know, the first incident which put Mr. Damsky on my radar was an interaction that he had with a staff member shortly after he arrived on campus as a new first-year law student where he -- the building was locked and he was very frustrated that he couldn't enter into the building and he was carrying books.  And the staff member saw him; and he demanded that she open the fucking door for him.  And he rattled the door.  And she did not recognize him because he was a new student.  And

our policy is not to allow someone, you know, into campus if they don't have the swipe card and they're not recognized. So she did what she was supposed to do and turned away.

Once he got into campus through the door, he sought the staff member out, and berated her in front of others. And that was the first time he got on my radar as someone who had had a very disruptive and aggressive interaction with a staff member.

Q. Okay. Any other relevant behavior that was included in your report?

A. So, again, the next time Mr. Damsky gets on my radar was an interaction with first-year students in a social media, private social media post called a GroupMe chat. And he made comments there that were very upsetting to a number of students that get reported to me.

And we took a close look then at the statements and had meetings with the students about them, multiple meetings with students. You know, that was sort of the next interaction.

There was another -- there was another incident that happened also in his first year involving statements in a classroom. And I remember watching the video of the class and making an assessment then that the statements

were protected.

I offer this to say that, you know, there was a whole history of interactions where his speech and conduct, depending on the issue, was reported to us, and we reviewed each incident and took it seriously.

Any number of times we also reached out to the folks on main campus for guidance on student conduct and other issues.  So this was an on-going situation for, you know, more than a year-and-a-half where there were a number of referrals and conversations that ultimately culminated in, you know, a written report from me to main campus when it reached a point where it was beyond our ability to manage the disruption.

Q.   What was the point that it was beyond your ability to manage?

A.   It was after the tweets.  That was -- that was the -- that was, I think, you know, from my perspective it was both a fire storm.  I had faculty who were wanting us to report the student to the FBI, wanting increased police patrols and presence, were afraid to come to campus and be physically here.

I had another faculty member talk about wanting to purchase a gun so that they could be safe coming to and from the law school.

It was a strong reaction to messages that were

19

perceived by many.  And, you know, I think I, in particular, took the faculty reaction significantly, because faculty have dealt with a lot of, you know, extreme views.  That's part of their job.

This had a very different and very personal effect for many members of our community.  And so that was beyond what I thought any individual student had the right to do as part of exercising his or her First Amendment rights.

Q.   Have you spoken to any of the members of the UF Board of Trustees about this incident?

A.   What do you mean by "this incident"?

Q.   About Mr. Damsky, or any of the behavior, statements, or controversy surrounding Mr. Damsky?

A.   Yes.

Q.   Who?

A.   I've spoken with Chairman Hosseini, who I speak with not infrequently; Rahul Patel, who is the vice chair of the board who's our alum; and maybe Richard Cole; but mostly Mr. Hosseini and Mr. Patel.

Q.   What was your first communication with Mr. Mori Hosseini?

A.   Oh, about this?

Q.   About this, yes, ma'am.

A.   Sometime after the book award.

20

Q.   Was that March?

A.   It was -- it was before March.

Q.   So but it was 2025?

A.   Yes.

Q.   What was -- what were the -- what was the nature of that conversation?

A.   So it was to give them a heads-up that this was brewing and was something that, you know, was concerning. The book award was an issue that was getting internal attention at The Alligator and other press.  And so my job is to let the board know about anything like that that's coming up that could be sensitive.

Q.   Okay.  What was his reaction to that?

A.   I don't recall in particular.  He generally, you know, some version of, you know, we have -- we have the law school's back.  So it was more just a heads-up.

Q.   Okay.  And then what was your next communication with him after that?

A.   I mean, I don't recall.  I talk with -- I talk with him, you know, fairly regularly, so I don't recall specifically when there was another communication of this versus something else.

Q.   Are most of your communications in phone call or other formats?

21

A.    Yeah, phone call.

Q.    Okay.  And did he take an interest in the Damsky situation?

A.    Not particularly.

Q.    Okay.  Did he give you any opinion at any of the stages of it, in terms of the book award, then the suspension --

A.    No.

Q.    -- trespass, later expulsion?

A.    No.

Q.    Okay.  Did he require any information from you?

A.    No.

Q.    Did he keep you apprised as to what UF might do or choose to do later down the road regarding it?

A.    No.

Q.    Okay.  Did he give you any information at all or any opinions at all regarding it; or was he just on the receiving side?

A.    I don't recall any opinion.  It was, again, you know, it was information sharing on my part, just like you would manage up any boss, right?  I talked to the provost.  I talked to the president.  I was managing up. So I was giving him information so that he was not unaware of what was happening; but there was no -- no

guidance or direction from him.

Q.   What about other members of the Board of Trustees, were there any guidance given?

A.   No.  No guidance with respect to how to handle the situation -- like how to -- like whether to discipline or otherwise, no.

This was, again, it's -- it was my -- it was a desire to make sure they were aware of PR issues that could come down the road, given that The Alligator had looked into the situation.

Q.   Did any other members of the Board of Trustees inquire for information or opinions from you?  I mean, did anybody reach out to you and say, what's going on; what's an update with this?

A.   No.

Q.   Did the New York Times communicate with you about any of this situation, the Damsky situation?

A.   There was -- I mean, they reached out to the University and to a variety of folks.  There were communications back and forth through our strategic communications office.

Q.   Okay.  That I do know.  I just didn't know if there was more than that.

Did anybody in the position of influence with either the Board of Trustees for UF or the State

23

University, State University Board system, did any of them give you advice or opinions or direction regarding the Damsky controversy?

MR. BARTOLOMUCCI:  Object to the form.

THE WITNESS:  Can you --

MR. BARTOLOMUCCI:  Go ahead, Dean.

THE WITNESS:  Yeah, can you --

MR. SABATINI:  Is it compound?  Is it, compound, is that it?

MR. BARTOLOMUCCI:  I think some of what you asked was vague, but I'll let you --

MR. SABATINI:  Okay.  I'll be more specific. I'll just break it down.

BY MR. SABATINI:

Q.   So did anyone associated with the State Board of Trustees, the State University Board of Governors, I apologize, the State University Board of Governors, did any of them reach out to you with their opinions on the matter?

A.   At the State University Board of Governors level?  No.

Q.   Anyone from the State University Board, did they inquire with you or communicate with you in the last 12 months at all on this matter, any of the members?

A.   They're -- I've, you know, the only Board of

24

Governors member that I speak to is Tim Cerio, and we probably said something about this, but it was nothing specific. There's been no direction, guidance, you know. Again, there was no direction or guidance from anyone at the Board of Trustees or the Board of Governors level with respect to this.

Q.   Okay.  What about the governor's office?

A.   No.

Q.   Not chief of staff, assistant chief of staff, deputy governor --

A.   No.

Q.   -- no one from the governor whatsoever --

A.   No.

Q.   -- in the last 12 months?

A.   No.

Q.   What has the University of Florida government relations team, or consultants, attorneys, all the people in law with just general government relations and external affairs for UF, or UF law school, how many of them have you had conversation with, anyone specifically?

A.   I mean, I talk with the government relations team not infrequently, so.

Q.   Well, specific to the Damsky controversies.

A.   There was nothing -- there was -- the only time I recall specifically talking with anyone in the

government relations office was after the book award; and I heard from a current parent who was also a state senator and I passed that information along to them.

Q. Okay. So that State Senator is Jennifer Bradley, correct?

A. Yes.

Q. Have you communicated with her, other than that immediate conversation after that book award, have you communicated with her regarding the Damsky controversy at any -- at any time since the book award?

A. Yes. There was -- I mean, I've seen her a variety of times since then because she -- her daughter graduated and other things. But there was at least one communication with her right around the time of the tweet after -- after Mr. Damsky had been trespassed where I reached out to her because I was aware that she had called, I believe it was, Professor Lidsky; and I followed up with her just to check in and see if she had anything she wanted to discuss with me.

Q. What's your knowledge of that communication? Was it the state senator that reached out to the professor first, or was it the professor reached out to the state senator?

A. You'd have to -- I don't -- again, it was not a communication to me. I will say -- I can say that I

26

reached out to her affirmatively after we -- after I heard that she was in touch with a faculty member, because we had been previously -- we had previously discussed Mr. Damsky; and I affirmatively reached out to her and just wanted to see if she had any questions.  And she responded and indicated that she was pleased with the increased security measures at the law school, and that was the extent of the interaction.

Q.   What were her comments on the discipline against Mr. Damsky?

A.   She said nothing about that.

Q.   And did you communicate any information -- you said that you indicated your willingness to answer any questions that she had.

Did you communicate any other information to her at that time?

A.   No.  I just checked in with her and wanted to make myself available if she had questions that I could answer within, you know, the scope of the limits.  And she just responded via email and said that she was pleased that we had increased security.

Q.   Okay.

A.   But, again, that entire interaction happened after, you know, after Mr. Damsky was suspended and trespassed.  So all -- this is, again, this is sort of

after decisions had already happened.

Q.   Okay.  And it's your opinion that the decision to trespass Mr. Damsky was made independent of your opinions and your actions, aside from what was in the report?  You submitted the report and then all of the --

A.   Yes.

Q.   -- official actions at the University was at that point --

A.   Yes.

Q.   -- I guess you could call it, above, above and beyond?  It was just totally segregated?

A.   Yes.  What I can -- yes.  I submitted the report on April 1, and the University made decisions by, you know, sometime on either late April 2nd or April 3rd; and I wasn't involved in those decisions in the sense that I'm not a decision-maker.  I can't -- I can't effect a trespass or a suspension.  All of that was a decision that the University made based on information that I had provided them.

MR. SABATINI:  Okay.  I'm just going to take a five-minute break and review a couple things and just a little bit longer.  After that we'll be done. Just a quick five-minute break.  I'm going to turn my camera off, and if you guys don't need anything, I will be right back in five.

28

THE WITNESS:  Okay.

(A recess was had.)

BY MR. SABATINI:

Q.  The T-shirt that Mr. Damsky wore, did that T-shirt cause a substantial disruption, the Palestinian -- the pro Palestine T-shirt?

A.  The T-shirt on its own, I do not think so.

Q.  Okay.  At the time he was wearing it, did it -- I mean, how many -- were students even aware of this T-shirt or was it causing a stir on the campus?

A.  Someone took a picture of it, so someone was aware of it, yes.

Q.  Okay.  But technically, the law school, he is -- I mean, there's no issue with wearing that T-shirt, is there, a legal issue?

A.  At least not --

MR. BARTOLOMUCCI:  Objection to the question.  Legal conclusion.

THE COURT REPORTER:  Wait a minute.

MR. BARTOLOMUCCI:  Legal conclusion.  Go ahead.

THE COURT REPORTER:  Would you please repeat the -- you were both talking at the same time.  Repeat the objection?

MR. SABATINI:  I'll rephrase.

MR. BARTOLOMUCCI:  I think I said, objection,

calls for a legal conclusion.

MR. SABATINI: Sure. I'll just rephrase. I'll retract that question.

BY MR. SABATINI:

Q. That wearing the T-shirt itself is not an infraction per the Student Code of Conduct or any other regulation or rule on the campus, is it?

A. Unless the T-shirt would cause a substantial and material disruption. And I'm not -- I was -- I'm not aware of that at that time for that particular T-shirt.

Q. Okay. And, again, I'm just going on your personal memory, personal recollection.

How many times did he wear the T-shirt, do you think?

A. I am -- I am not aware. I never saw him with a T-shirt, so I'm not aware of how many times he wore it.

Q. Okay. How many students had knowledge of his interaction with the staff member when the door was locked and he had his books in his hands and he got angry and cursed? Do you know how many people were aware of that?

A. I don't know.

Q. Shifting over to the book award that Judge Badalamenti gave him the award for. Did you read that paper?

30

A.   Yes.

Q.   You read the whole thing?

A.   Yes.

Q.   Okay.  How many times?

A.   Once or twice.

Q.   How would you rate the paper?

A.   I can't grade a paper absent some context, right?  So grading decisions are graded on a curve and I would have to know how the other students did, etcetera.

Q.   Are you aware of the criteria or the sort of rubric that Judge Badalamenti or a professor in a similar class would use?  Is it stylistic?  Is it substantive?  I'm just curious how they start the analysis of what's good and bad?

A.   It's up to each individual faculty member how they grade a paper.

Q.   I agree.  I mean, that's my history, that's my memory.

     But in this specific context, did the University have any understanding of what Judge Badalamenti, or a professor who would have signed up to teach that class, that they would have used?

A.   Other than what is sort of the general -- I, actually, I'm not sure whether there's specific guidance

that's given in the faculty manual or otherwise, I should say. But this is a matter that's squarely within sort of academic freedom and the classroom management for a faculty member. So there's not a particular constraint on how grading happens.

Q. Gotcha.

Those papers are public, correct, I mean, afterwards?

A. Uh-uh, no.

Q. And if you don't know, it's fine.

But how did Mr. Damsky's paper become a public item of interest?

A. So there were two papers. One paper -- one paper that was in another class, my understanding is, was a draft of the paper was circulated among the class for discussion, and someone from within that class shared it more broadly.

With respect to the paper that obtained the book award, I don't believe that paper circulated until after the book award. I'm not sure how it circulated. I do know that Mr. Damsky shared it with at least some students and with The Alligator, the student newspaper.

Q. Let me ask you this then: If the papers had not been written, and the T-shirt incident had not happened, and the kicking of the door had not happened,

32

if the tweets were the only item of interest in this controversy, would that have been enough to prompt you to write the report to submit to the University calling for extra, extra help?

MR. BARTOLOMUCCI: Object to the form, hypothetical.

A. I mean, you're asking me to speculate on a counterfactual. The series of events were the ones that happened. So I can't speak to what would have happened if there hadn't been this long history of, you know, challenges with Mr. Damsky.

Q. Were any of those events I just listed, I believe there's four, him wearing a T-shirt, him kicking a door, him making the tweets, and him writing these provocative papers, were any of them substantial disruption in themselves, to create substantial disruption in themselves on the campus?

A. So I would say the -- you know, I certainly think that the tweets -- and the papers got close. They were -- there was a lot of discussions, fear, anxiety, concern about the papers. And certainly the tweets, you know, on their own I think caused a lot of concern within the community, given the large Jewish community.

So, you know, it's possible that judging sort of those individual incidents on their own would be a

33

substantial disruption.

I certainly did not make -- while I had been in touch with the student conduct folks about, you know, sort of every incident, you know, what happened with the tweets was the greatest of all of the prior incidents, even combined.

Q.   And your understanding of the tweets, is it that you believe that Mr. Damsky was announcing that he himself was going to abolish all Jewish people, or was he saying something different?  Was it a personalized statement?

A.   I certainly felt like it could be read and understood that way.

Q.   That he, himself, would kill all Jewish people?

A.   That he was advocating that.  And whether he -- you know, I don't know whether he's capable of or has the means to do something like that, but I certainly felt that it would have been reasonable for members of our community to take the tweets that way.

Q.   Okay.  And let's see.

In your three-year tenure, I think it's three, three-and-a-half years, have you had any other political statements come to your attention by students that caused disruption on the campus, even if it wasn't a substantial

34

disruption?

A. I cannot think of any other incidents that do not involve Mr. Damsky where, you know, students brought concerns to us about student speech and conduct issues.

Q. And were you aware of any professor or student who, within -- I mean, what's your memory of the gap of time that Professor Lidsky responded to his tweet versus when he actually made that tweet? Do you recall the gap in time?

A. Yeah, it was not -- there was some gap between the tweet, as I recall, occurred on a -- I think it was March 21. I first learned about it on March 28th. And I think Professor Lidski's response to him was sometime shortly after March 28th, but it was not -- there was a little gap.

Q. Okay. Well, I'm looking at tweets. Looks like March 21st for his tweet. Lidski's response was April 1st. So that would be 12 -- 11, 11 days --

A. Uh-huh.

Q. -- 10, 11 days.

Did you speak to Professor Lidsky in that 11-day period before she responded?

So you became aware on the 28th. At any time on the 28th, 29th or 30th or even the 1st, did you speak to Professor Lidsky about the tweet?

35

MR. BARTOLOMUCCI: Objection, compound.

A. I --

MR. BARTOLOMUCCI: Sorry. Go ahead.

MR. SABATINI: I'll rephrase.

BY MR. SABATINI:

Q. Did you speak to Professor Lidsky about Damsky or anything related to the Damsky controversy between April 20 -- I'm sorry, March 28th and the 1st of April?

A. Yes. There was -- not specifically with her but there were conversations where she was a part of a group of folks that we discussed the tweets, yes.

Q. What were those conversations?

A. So there was a meeting with the faculty counsel, which is a representative group of the faculty, where we discussed the tweets --

Q. And what was --

A. -- and she's on that.

Q. Among what views were expressed? What was she saying?

A. I don't recall what she said in particular. I mostly shared information with the faculty counsel so that they were aware that we were looking into the tweets and we'd reported them to main campus. And this was part of a routine information sharing that I have with -- as

part of shared governance, we had discussed Mr. Damsky before with that group of individuals.

Q.   What -- at what point did you make that report to main campus?  This isn't the substantive report, was it?

A.   No, you're right.  This is the initial -- so as I described, there was an initial report on the 28th through Janice Shaw; and then there was the subsequent report on April 1st.  So I was communicating in between that span of time to let the faculty counsel know that we were looking into this.

Q.   Did Professor Lidsky tell you at that meeting that she felt threatened at that early stage?

A.   I do not recall any statements from her about, you know, any personal reaction to the tweet at that point in time.

Q.   What -- what opinions or information did she provide at the meeting?

A.   I don't recall what her personal opinions were, so I wouldn't want to describe them inaccurately.

Q.   Do you recall any word she used or expression she made at the meeting?

A.   I recall an overall sentiment that I don't know that I could attribute to her that the -- that everyone -- there were only a handful, there are only

five members of this group -- felt that the tweets were very concerning.

Q.   Who else is on that group, the faculty advisory counsel?

A.   So at that time I believe it was -- it was Professor Lidsky, Jon Marshfield, Lea Johnston, Stacey Steinberg and I forget who the fifth person was.  It was -- I forget who the fifth person was.  There was a changeover at some point in time, so I don't remember who's the fifth person.  The fifth person now is someone named Sylvia Mendez, but I'm not sure if she was on it at that time.

Q.   Were any decisions made at the meeting?

A.   No, they have no -- that's not a decision-making body.  It's just part of me sharing information about things that are happening at the law school and, you know, getting input.  It's not a decision-making body.

Q.   And then, do you find it -- is it unusual or is it unorthodox for Professor Lidsky to then go from the meeting on April 1st, sending a reply tweet to the student on their personal account?  I mean, did that strike you as unusual in any way?

A.   To engage with a student on Twitter?  I mean, not necessarily.  A lot of faculty have Twitter

38

accounts.

Q.    Well, it does seem like she's sort of proding him or baiting him, no?

MR. BARTOLOMUCCI:  Object to the form.

MR. SABATINI:  And what's the form objection specifically?  Is it vague, vagueness?

MR. BARTOLOMUCCI:  I think you're leading the witness.

THE WITNESS:  I don't -- I can't characterize what she's doing.  I'm not in Professor Lidski's head.

BY MR. SABATINI:

Q.    Is it your opinion that his response to her response, so this is his second tweet, his tweet where he goes on and extends his, I guess you could call it an argument, do you believe that -- do you believe that she, I mean, had she -- let me rephrase.

Was she -- did she express that she was already interpreting this as a threat at this time period to you, that this was a threat, the original tweet?

A.    I don't -- I don't recall if she spoke in those terms.  I think that she, like everyone in that committee, were very concerned about the communications, and as was I, about what was being communicated.  So I don't recall her specifically saying, you know, what her

judgment was at that time.

Q. Did she make you aware that she was interacting and communicating with the student after the faculty advisory committee meeting?

A. No.

Q. So you never learned of these tweets and responses until the disciplinary hearing, or what other stage?

A. You asked if she made me aware. She did not.

Q. Okay.

A. But I was -- I was, you know, I was viewing his Twitter feed, so.

Q. Okay. You didn't follow his account, though, correct?

A. No, but you don't have to follow someone --

Q. Sure.

A. -- to view it.

Q. What was the early stages of her following, on the 28th of March when she first became aware of the tweets?

A. I'm sorry, what was the question?

Q. What was the date, rough date that you started monitoring his account --

A. Yeah.

Q. -- not following, but monitoring it, was it the

40

28th of March?

A.    Yes, yes.

Q.    How frequently would you do it?

A.    During that period of time, probably several times a day.

Q.    Okay.  When did you stop viewing it?

A.    I mean, I still view it on occasion.  Not as frequently, but I viewed it regularly since I learned of the account.

Q.    You're not a follower of the account, correct?

A.    I am not.

Q.    Okay.  And then so what, what's the sort of what we usually call tickler device, how do you remind yourself to check once in a while, like once a week, twice a week; or how do you, like, remind yourself to check?

A.    I'm not the world's best social media user, but I, usually in the evening as I'm winding down, I'll pull up X and check through, and he's somebody who I've, you know, he's kind of at the top, because I've searched for him before.  And so I just, you know, click on it periodically.  I don't have a --

Q.    As he's in recent searches (crosstalk) --

A.    Yeah.

Q.   -- you'll -- just by bringing up the search bar --

A.   Yeah.

Q.   -- it generates automatically?

A.   Yes.  Yeah.

Q.   And then of course he had a very low following at this time, correct?

A.   That was -- I believe that was true at that time, yes.

Q.   Okay.  Do you think that his Twitter posts or Twitter usage, that they were closer in effect to like a diary?  I mean, I'm just curious how you understand how he was using his Twitter?  I mean, it didn't seem like anybody was following him or looking at his tweets.

Who was he gearing it towards?

A.   I mean, that's a question for him.  I have no idea who he's gearing it towards.  You know, I certainly was paying attention and I think other members of the community were paying attention, even if they weren't following him.

MR. SABATINI:  Okay.  I'm going to take just a two-minute break and then probably one or two more questions, and then we'll be finished.  Thank you very much.  Just a second.

42

THE WITNESS:  Sure.

(A recess was had.)

MR. SABATINI:  Just a few more.

BY MR. SABATINI:

Q.    Have you been monitoring other campuses in terms of student protests, opinions or expressions posted October 7th?  What I mean is, the controversy about how students have reacted to October 7th, the killing, massacre in Israel and/or actions about Senator Israel (sic) since then and the generated controversy around it and all the student actions surrounding it?  Have you been monitoring or watching what other universities or law schools have done in that regard?

A.    I'm not sure I would call it monitoring, but I pay attention to news about things in higher Ed and, you know, those issues.  So I'm certainly generally aware of events on campus communities and how administrations have reacted to those.

Q.    Have there been any similar events at UF or -- well, UF law school that you can recall?

MR. BARTOLOMUCCI:  Similar to what, Anthony?

BY MR. SABATINI:

Q.    Similar in style as a protest or controversy.

I mean, what I'm -- to be more specific, any kind of actions by students then prompt the interest and

actions of the University and how to deal with it?  Are you aware of anything like that happening at UF law school?

A.    Not during my tenure.  This has been the most -- the single most significantly disruptive event.

Q.    Okay.  Are you aware of the student who faced arrest at UF for protesting against Israel in the last few years?  Are you aware of an undergrad who did that?

A.    It vaguely rings a bell but I don't know anything.  It's an undergrad, so I'm not particularly involved in that.

Q.    And have you spoken to any University administrators or Board of Trustees or any person in the position of authority at UF about how to react or respond to controversies related to Israel or a Jewish identity?

A.    I'm not aware of any specific conversations about Israel or Jewish identity, but if that's your question.

If your question is, do I talk with folks about how to respond to difficult situations and things like that, then it's certainly part of the conversation that we would have with, you know, campus authorities.

Q.    Do you recall the communications that former UF President Ben Sasse put out to the University or to

44

the public regarding October 7th or its student protests?

A.    I recall at least some of those communications, vaguely.  I read them at the time, yeah.

Q.    Okay.  But as it stands today and throughout the Damsky controversy, do you ever remember being influenced or acting in regard to either Ben Sasse or any other authority's figure -- figure's opinion on the matter?

A.    No.  There has been no one, whether it's at UF, Board of Trustees, governor, no one has told me, you know, when to file a report, what to do and how to manage the situation.  This has been something that I have dealt with with our campus officials that are responsible for student process.  There's been no political or other direction about how to resolve this particular issue.

Q.    How many times have you spoke to Dean Summerlin, Chris Summerlin about the matter?

A.    Directly?  I don't know that we've directly spoken about this.  Once I make the referral, it's in their hands, that they are being that office.

Q.    Got it.

So you don't recall any communications you had directly with Dean Summerlin?

45

A.   I do not recall any direct communications with him.  I think he may have been on, you know, one, like a, you know, a call at some point, but I think that was after the disciplinary process was concluded.

Q.   Is it your understanding that he had final authority on the discipline matter?

A.   My -- the process, he has the -- he can issue the -- you know, there's an appeals -- there's a hearing board that makes a recommendation.  He then either adopts or disagrees with that recommendation.  Then there's an appeal process.

So my understanding, from the University's position, is that the process is not complete until the appeal is done, which runs through the student life office and the vice-president had their way; but he's certainly a part of that chain of circumstances.

Q.   Were you aware, or did they communicate with you other options for how they would discipline Mr. Damsky, or did you on -- so when you learned of the expulsion, did you learn about it at the same time everybody else did?

MR. BARTOLOMUCCI:  Objection, compound.  Do you want to --

MR. SABATINI:  I'm going to reject the first question.

46

BY MR. SABATINI:

Q.   When you learned of the expulsion, did you learn about it at the same time the public did and Mr. Damsky, or did you get prior notice?

A.   Well, the public doesn't learn about it because it's a protected piece of information.

But I -- I don't recall exactly.  I don't know when he learned about it, so it's hard for me to answer whether I learned about it at the same time or not.

But what I can say is that my participation was solely as a witness in the process.  I was a witness in the hearing.  I was not otherwise involved in any kind of decision process, so I was only told about decisions after they had been reached.

MR. SABATINI:  Okay.  That's all I have for questions.  Thank you very much.

THE WITNESS:  Okay.

MR. SABATINI:  Have a good week and I'll be at UF at the Peak Conference on Friday, so the environmental one, so maybe I'll see you there.

THE WITNESS:  I will be there to do a welcome, as is my duty.

THE COURT REPORTER:  Do you want to order the transcript?

MR. BARTOLOMUCCI:  But before that, can I just

say for the record, that I have no questions for the witness.

MR. SABATINI: Oh, sorry, Chris.

THE COURT REPORTER: Do you want to order the transcript?

MR. SABATINI: Yes, I'll take a copy.

THE COURT REPORTER: Regular delivery?

MR. SABATINI: Regular, please. Thank you. But you don't have to drive over here, just whatever you want to do.

MR. BARTOLOMUCCI: And same for the Defendant.

THE COURT REPORTER: You want a copy?

MR. BARTOLOMUCCI: Yes.

THE COURT REPORTER: Read or waive?

MR. BARTOLOMUCCI: Oh, Dean, do you want to review the transcript and make any necessary corrections that you see?

THE WITNESS: It feels like I should as a lawyer, I don't know, just to be accurate. I don't know.

MR. BARTOLOMUCCI: We'll read.

THE WITNESS: We'll read. Okay.

(The video teleconferencing deposition was concluded at 11:10 a.m.)

Dean Merritt McAlister - February 09, 2026

48

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF LAKE

I, EVELYN M. ANDREWS, RPR, RMR, Notary Public, State of Florida, certify that DEAN MERRITT McALISTER appeared before me via Zoom on February 9, 2026, and was duly sworn.

Signed this 20th day of February, 2026.

_____
EVELYN M. ANDREWS
Notary Public - State of Florida
Commission No.:  HH 359981
Expires:  March 25, 2027

Notary Public State of Florida
Evelyn M Andrews
My Commission  HH 359981
Expires 3/25/2027

49

CERTIFICATE OF REPORTER


STATE OF FLORIDA
COUNTY OF LAKE


I, EVELYN M. ANDREWS, RPR, RMR, Notary Public, State of Florida, HEREBY CERTIFY THAT I was authorized to and did stenographically report the deposition of DEAN MERRITT McALISTER; that a review of the transcript was requested; and that the foregoing transcript, pages 4 through 47, is a true and accurate record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, or employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.


DATED this 20th day of February, 2026


_____
EVELYN M. ANDREWS, RPR, RMR

50

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT  ENTER CHANGES

IN RE:  Preston Damsky, etc., vs. Chris Summerlin, etc.
CASE NO:  1:25-cv-275-AW-MAF
DATE:  02/9/2026
DEPONENT:  DEAN MERRITT McALISTER

PAGE  LINE  CORRECTION & REASON
_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

       Under penalties of perjury, I declare that I have
       read the foregoing document and that the facts
       stated are true.


       _____
       DATE                   DEAN MERRITT McALISTER

51

February 20, 2026

DEAN MERRITT McALISTER
c/o BRANDE SCHWARTZ SMITH, ESQUIRE
UNIVERSITY OF FLORIDA OFFICE OF THE GENERAL COUNSEL
PO Box 113125
Gainesville, Florida  32611-3125

In Re:  February 9, 2026 deposition of DEAN MERRITT McALISTER

Dear Ma'ams:

        The transcript of the above-referenced proceeding has been prepared and is being provided to your office for review by the witness.

        It is suggested that the review of this transcript be completed within 30 days of your receipt of this letter, as considered reasonable under the Federal Rules*; however, there is no Florida Statute to this regard.

        The original of this transcript has been forwarded to the ordering party and your errata, once received, will be forwarded to all ordering parties for inclusion in the transcript.

                              Sincerely,

                              Evelyn M. Andrews, RPR, RMR
                              Jasko Court Reporting

cc:  Anthony Sabatini, Esquire


Waiver:

I,_____, hereby waive the reading & signing of my deposition transcript.


_____   _____
Deponent Signature                     Date

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310 (e)

Dean Merritt McAlister - February 09, 2026

**1**

**1** 27:13
**10** 34:20
**11** 34:18,20
**11-day** 34:22
**11:10** 47:25
**12** 23:24 24:14 34:18
**1st** 6:17 7:3,7 34:18,24 35:8 36:9 37:21

**2**

**20** 35:8
**2025** 20:3
**21** 34:12
**21st** 34:17
**28th** 5:13 34:12,14,23,24 35:8 36:7 39:19 40:1
**29th** 34:24
**2nd** 7:5,8,16 27:14

**3**

**30th** 34:24
**3rd** 7:19 8:1 27:14

**4**

**40** 13:22

**6**

**650** 12:16

**7**

**7th** 42:7,8 44:1

**8**

**800** 12:14

**9**

**900** 12:14

**A**

**a.m.** 47:25
**ability** 18:13,15
**abolish** 33:9
**absent** 30:7
**academic** 31:3
**account** 37:22 39:13,23 40:9,10
**accounts** 38:1
**accurate** 47:20
**acting** 44:7
**action** 5:5,8
**actions** 27:4,7 42:9,11, 25 43:1
**address** 15:4 16:14
**administrations** 42:17
**administrator** 14:18,22
**administrators** 7:4 43:13
**adopts** 45:9
**advice** 23:2
**advisory** 37:3 39:4
**advocating** 33:16
**affairs** 6:23 24:19
**affirmatively** 26:1,4
**afraid** 13:14 18:20
**aggressive** 17:8
**agree** 30:18

**ahead** 9:12 23:6 28:20 35:3
**ahold** 14:12
**alerted** 6:2
**Alligator** 20:10 22:9 31:22
**alum** 19:19
**Amendment** 14:6 19:9
**amount** 10:12
**analysis** 30:14
**and/or** 42:9
**Andrews** 4:4
**angry** 29:19
**announcing** 33:8
**Anthony** 14:23 42:21
**anxiety** 32:20
**apologize** 23:17
**appeal** 45:11,14
**appeals** 45:8
**apprehension** 14:20
**apprised** 21:14
**April** 6:17 7:3,5,7,8,16, 19 8:1 27:13,14 34:18 35:8,9 36:9 37:21
**area** 14:7
**argument** 38:16
**arrest** 43:7
**arrived** 16:19
**articulate** 5:24
**assessment** 17:25
**assistant** 5:13 24:9
**Association** 13:2
**assume** 11:12
**attending** 16:7
**attention** 20:10 33:24 41:19,20 42:15

**attorneys** 24:17
**attribute** 36:24
**authorities** 43:23
**authority** 43:14 45:6
**authority's** 44:8
**automatically** 41:4
**award** 19:25 20:9 21:6 25:1,8,10 29:23,24 31:19,20
**aware** 7:17 11:19,24 12:17 16:6 22:8 25:16 28:9,12 29:10,15,16,20 30:11 34:5,23 35:23 39:2,9,19 42:16 43:2,6,8, 17 45:17

**B**

**back** 7:15 8:4 12:10 13:4 20:16 22:20 27:25
**bad** 30:15
**Badalamenti** 29:24 30:12,22
**baiting** 38:3
**bar** 41:2
**BARTOLOMUCCI** 9:11 14:5,23 15:14 23:4,6,10 28:17,20,25 32:5 35:1,3 38:4,7 42:21 45:22 46:25 47:11,14,16,22
**based** 8:8 12:18 15:20, 21 27:18
**basing** 9:8
**begin** 5:18
**begun** 5:19 7:6
**behavior** 10:4 17:10 19:13
**bell** 43:9
**Ben** 43:25 44:7
**berated** 17:6

Dean Merritt McAlister - February 09, 2026

**bit** 27:22

**board** 19:11,19 20:11 22:2,11,25 23:1,15,16, 17,20,22,25 24:5 43:13 44:11 45:9

**body** 37:15,18

**book** 19:25 20:9 21:6 25:1,8,10 29:23 31:19,20

**books** 16:22 29:19

**boss** 21:22

**Bradley** 25:5

**break** 23:13 27:21,23 41:23

**brewing** 20:8

**bringing** 41:1

**broad** 11:21

**broadly** 10:3,8 31:17

**brought** 34:3

**building** 16:20,22

**busy** 4:21

---

**C**

---

**calendar** 7:1

**call** 6:1 8:17,23 12:11 20:24 21:1 27:10 38:15 40:14 42:14 45:3

**called** 5:17 17:14 25:17

**calling** 32:3

**calls** 6:9 29:1

**camera** 27:24

**campus** 10:6,10 11:19, 20,22 13:20 16:9,19 17:1,5 18:7,12,21 28:10 29:7 32:17 33:25 35:24 36:4 42:17 43:23 44:14

**campuses** 42:5

**capable** 33:17

**card** 17:2

**carrying** 16:22

**case** 13:9 15:5

**caused** 10:22 32:22 33:24

**causing** 28:10

**central** 7:4

**Cerio** 24:1

**chain** 45:16

**chair** 19:18

**Chairman** 19:17

**challenges** 32:11

**changeover** 37:9

**characterize** 38:9

**chat** 17:15

**check** 25:18 40:15,17,20

**checked** 26:17

**chief** 24:9

**choose** 21:15

**Chris** 11:12 44:19 47:3

**circulated** 31:15,19,20

**circumstances** 45:16

**class** 12:17,18 13:15 16:3,6,7 17:25 30:13,23 31:14,15,16

**classroom** 12:7 17:24 31:3

**clear** 14:15

**click** 40:22

**close** 17:18 32:19

**closer** 41:11

**Code** 29:6

**Cole** 19:19

**combined** 33:6

**comments** 11:8,18,19, 22 17:15 26:9

**committee** 38:23 39:4

**communicate** 12:1 22:16 23:23 26:12,15 45:17

**communicated** 25:7,9 38:24

**communicating** 36:9 39:3

**communication** 6:12, 14,16 7:3 19:21 20:19,22 25:14,20,25

**communications** 7:15 11:11 12:4,6,19 20:24 22:20,21 38:23 43:24 44:3,24 45:1

**communities** 42:17

**community** 14:9 16:13 19:6 32:23 33:20 41:20

**compared** 11:7

**compelled** 13:24

**complaints** 10:13 11:6

**complete** 45:13

**compound** 9:11 23:8,9 35:1 45:22

**concept** 9:6,7,18

**concern** 13:18,19 32:21,22

**concerned** 9:23,24 14:8 16:7 38:23

**concerns** 10:13 34:4

**concluded** 45:4 47:25

**conclusion** 8:9 14:5 28:18,20 29:1

**conclusions** 15:4,6,21

**conduct** 5:18 6:4,18 18:4,7 29:6 33:3 34:4

**Conference** 46:19

**confirm** 8:2

**constituted** 10:5

**constraint** 31:4

**consultants** 24:17

**context** 30:7,20

**continued** 7:7

**controversies** 24:23 43:15

**controversy** 19:14 23:3 25:9 32:2 35:7 42:7,10, 23 44:6

**conversation** 20:6 24:20 25:8 43:22

**conversations** 7:5 11:1,24 18:10 35:11,13 43:17

**copy** 8:16 47:6,13

**correct** 13:5 16:4 25:5 31:7 39:14 40:11 41:7

**corrections** 47:18

**counsel** 35:15,22 36:10 37:4

**counterfactual** 32:8

**couple** 27:21

**COURT** 4:8 10:18 28:19, 21 46:23 47:4,7,13,15

**create** 32:16

**crisis** 14:2

**criteria** 30:11

**crosstalk** 40:24

**culminated** 18:11

**curious** 14:17 16:15 30:14 41:12

**current** 25:2

**cursed** 29:20

**curve** 30:8

---

**D**

---

**Damsky** 5:2 9:9 10:15, 20 11:8,18 14:3 16:12,18 17:12 19:13,14 21:3 22:17 23:3 24:23 25:9,15

Dean Merritt McAlister - February 09, 2026

26:4,10,24 27:3 28:4
31:21 32:11 33:8 34:3
35:7 36:1 44:6 45:19
46:4

**Damsky's** 10:4 12:18
13:20 31:11

**date** 5:4,8 39:22

**dates** 7:2

**daughter** 25:12

**day** 5:1 7:5,19,24 40:5

**days** 4:21 34:18,20

**deal** 14:1 43:1

**dealing** 9:2

**dealt** 19:3 44:14

**Dean** 4:13,18 5:13 6:3
9:12 15:7 23:6 44:18,25
47:16

**Dean's** 6:13

**decided** 5:1

**decision** 5:3 8:6 27:2,17
46:13

**decision-maker** 8:11
27:16

**decision-making**
37:15,18

**decisions** 27:1,13,15
30:8 37:13 46:13

**Defendant** 47:12

**delivery** 47:7

**demanded** 16:23

**depending** 18:4

**deposition** 4:3 47:24

**deputy** 24:10

**describe** 36:20

**desire** 22:8

**device** 40:14

**diary** 41:12

**difficult** 9:3 43:21

**direct** 4:16 6:25 45:1

**direction** 22:1 23:2
24:3,4 44:16

**directly** 7:9 11:18,25
44:20,25

**disagrees** 45:10

**disciplinary** 39:7 45:4

**discipline** 7:18 8:6
15:9,21 22:6 26:9 45:6,
18

**discuss** 25:19

**discussed** 26:4 35:12,
16 36:1

**discussion** 31:16

**discussions** 32:20

**disruption** 9:6,17,24
10:5,10,23 12:11 18:13
28:5 29:9 32:16,17 33:1,
25 34:1

**disruptive** 17:8 43:5

**documents** 8:2,9

**door** 16:24 17:5 29:18
31:25 32:14

**double-checking** 7:1

**draft** 31:15

**drive** 47:9

**duly** 4:14

**duty** 46:22

---

### E

**earlier** 13:8

**early** 36:13 39:18

**Ed** 42:15

**effect** 5:21 13:20 19:6
27:16 41:11

**email** 26:20

**employees** 6:13

**end** 10:20

**engage** 37:24

**enter** 16:21

**entire** 26:23

**environmental** 46:20

**escalated** 11:5

**essential** 15:7

**etcetera** 14:20 30:10

**Evelyn** 4:4

**evening** 7:7,16 40:19

**event** 43:5

**events** 32:8,12 42:17,19

**evidence** 11:12 15:15

**exact** 5:1,4,8

**EXAMINATION** 4:16

**examined** 4:14

**exchange** 13:15

**Excuse** 10:18

**exercising** 19:8

**experience** 9:23

**expert** 14:6 15:1

**explore** 15:19

**express** 38:18

**expressed** 13:18,19
35:19

**expression** 36:21

**expressions** 42:6

**expulsion** 8:7 21:9
45:20 46:2

**extends** 38:15

**extent** 26:8

**external** 24:19

**extra** 32:4

**extreme** 11:8 19:4

---

### F

**faced** 43:6

**fact** 15:11,12,13,15

**facts** 14:25

**faculty** 10:12 11:4 14:10
18:18,22 19:2,3 26:2
30:16 31:1,4 35:14,15,22
36:10 37:3,25 39:3

**fairly** 20:21

**FBI** 18:19

**fear** 14:20 32:20

**feed** 39:12

**feels** 47:19

**felt** 10:17 13:24 14:12,16
33:12,18 36:13 37:1

**figure** 44:8

**figure's** 44:8

**file** 44:12

**filed** 7:22

**final** 45:5

**find** 37:19

**fine** 11:14 15:24 31:10

**finished** 41:24

**fire** 18:18

**first-year** 16:20 17:13

**five-minute** 27:21,23

**Florida** 4:5 24:16

**folks** 18:7 22:19 33:3
35:12 43:20

**follow** 39:13,15

**follower** 40:10

**forget** 37:7,8

**form** 9:11 23:4 32:5
38:4,5

**format** 5:14

Dean Merritt McAlister - February 09, 2026

**formats** 20:25

**forward** 8:6

**found** 16:16

**freedom** 31:3

**frequently** 40:3,8

**Friday** 5:13 46:19

**front** 17:6

**froze** 10:19

**frustrated** 16:21

**fucking** 16:24

--- G ---

**gap** 34:6,8,10,15

**gave** 29:24

**gearing** 41:16,18

**general** 13:19 24:18 30:24

**generally** 6:9 20:14 42:16

**generated** 42:10

**generates** 41:4

**give** 12:23 20:7 21:5,17 23:2

**giving** 21:24

**God** 4:10

**good** 4:18,19,20 30:15 46:18

**Gotcha** 31:6

**governance** 36:1

**government** 24:16,18, 21 25:1

**governor** 24:10,12 44:11

**governor's** 24:7

**Governors** 23:16,17,20 24:1,5

**grade** 30:7,17

**graded** 30:8

**grading** 30:8 31:5

**graduated** 25:13

**greatest** 33:5

**group** 35:12,15 36:2 37:1,3

**Groupme** 17:14

**guess** 27:10 38:15

**guidance** 18:7 22:1,3,4 24:3,4 30:25

**gun** 18:23

**guys** 27:24

--- H ---

**hall** 13:18,22

**hand** 10:15

**handful** 36:25

**handle** 22:4

**handling** 11:7

**hands** 29:19 44:22

**happened** 6:22 7:11,25 11:8 12:6 17:23 26:23 27:1 31:25 32:9 33:4

**happening** 8:3 21:25 37:16 43:2

**hard** 46:8

**head** 13:2 38:11

**heads-up** 20:7,17

**heard** 25:2 26:2

**hearing** 39:7 45:8 46:12

**higher** 42:15

**history** 11:7 16:11 18:3 30:18 32:10

**hit** 9:9

**hold** 6:25

**holding** 9:18

**Hosseini** 19:17,20,22

**hypothetical** 32:6

--- I ---

**idea** 9:17 41:18

**identity** 43:16,18

**inaccurately** 36:20

**incident** 16:17 17:22 18:5 19:11,12 31:24 33:4

**incidents** 10:22 12:5 16:9 32:25 33:5 34:2

**included** 17:11

**increased** 18:19 26:7, 21

**independent** 27:3

**individual** 19:7 30:16 32:25

**individuals** 36:2

**influence** 22:24

**influenced** 44:7

**informal** 7:7

**information** 21:11,17, 21,24 22:12 25:3 26:12, 15 27:18 35:22,25 36:17 37:16 46:6

**informed** 7:19

**infraction** 29:6

**infrequently** 19:18 24:22

**initial** 36:6,7

**input** 37:17

**inquire** 22:12 23:23

**intensity** 11:3,5

**interacting** 39:2

**interaction** 6:22 16:18 17:9,13,21 26:8,23 29:18

**interactions** 16:12 18:3

**interest** 21:2 31:12 32:1 42:25

**interim** 8:24

**internal** 20:9

**interpreting** 38:19

**interruption** 15:8

**involve** 34:3

**involved** 27:15 43:11 46:12

**involving** 17:23

**Israel** 42:9 43:7,15,18

**issue** 18:4 20:9 28:14,15 44:17 45:7

**issues** 12:8 18:8 22:8 34:4 42:16

**item** 31:12 32:1

--- J ---

**J.D.** 12:16

**Janice** 5:12 36:8

**January** 13:18

**Jennifer** 25:4

**Jewish** 13:2 14:9,10 32:23 33:9,14 43:15,18

**job** 19:4 20:11

**Johnston** 37:6

**Jon** 37:6

**Judge** 29:23 30:12,21

**judging** 32:24

**judgment** 39:1

**Jurkowski** 6:8

--- K ---

**Kaufman** 13:1

**kicking** 31:25 32:13

**kill** 33:14

Dean Merritt McAlister - February 09, 2026

**killing** 42:8

**kind** 6:20 7:12 8:4 9:7 40:21 42:25 46:12

**kinds** 16:12

**knowledge** 12:1 25:20 29:17

**L**

**large** 4:5 14:9 32:23

**late** 12:18 16:6 27:14

**law** 4:22 7:9 10:24 12:13 13:2 14:2,25 15:6,12 16:20 18:24 20:16 24:18, 19 26:7 28:13 37:16 42:13,20 43:2

**lawyer** 47:20

**Lea** 37:6

**leading** 38:7

**learn** 45:20 46:3,5

**learned** 34:12 39:6 40:8 45:19 46:2,8,9

**led** 15:9

**legal** 9:7,10 14:5 15:3,6, 10,15,21 28:15,18,20 29:1

**letting** 6:4

**level** 23:21 24:5

**Lidski's** 34:13,17 38:10

**Lidsky** 11:11 13:13 25:17 34:7,21,25 35:6 36:12 37:6,20

**life** 45:14

**limits** 26:19

**listed** 32:12

**locked** 16:21 29:19

**long** 4:21,23 32:10

**longer** 27:22

**looked** 22:10

**lot** 19:3 32:20,22 37:25

**low** 41:6

**M**

**made** 5:12 7:10 11:18, 19,22,25 14:3 15:22 17:15 27:3,13,18 34:8 36:22 37:13 39:9

**main** 18:7,11 35:24 36:4

**make** 5:21 22:8 26:18 33:2 36:3 39:2 44:21 47:17

**makes** 45:9

**making** 8:17,18 17:25 32:14

**manage** 18:13,15 21:22 44:13

**management** 31:3

**managing** 21:23

**manual** 31:1

**March** 5:13 20:1,2 34:12,14,17 35:8 39:19 40:1

**Marshfield** 37:6

**massacre** 42:9

**material** 29:9

**matter** 5:7,11 6:3 23:19, 24 31:2 44:9,19 45:6

**Mcalister** 4:13

**meaning** 9:25

**means** 33:18

**meant** 11:23

**measure** 7:18 10:9,10, 22

**measures** 8:24 26:7

**measuring** 9:7 12:10

**media** 17:14 40:18

**meeting** 13:21 35:14 36:12,18,22 37:13,21

39:4

**meetings** 17:19,20

**member** 16:19,23 17:6, 9 18:22 24:1 26:2 29:18 30:16 31:4

**members** 14:11 19:6,10 22:2,11 23:24 33:19 37:1 41:19

**memory** 6:15 9:20 29:12 30:19 34:6

**Mendez** 37:11

**MERRITT** 4:13

**messages** 18:25

**mind** 9:17,19 14:17

**minute** 10:19 28:19

**missed** 12:17 16:3

**missing** 16:6

**Mondays** 4:21

**monitoring** 39:23,25 42:5,12,14

**months** 23:24 24:14

**Mori** 19:21

**morning** 4:18,19 6:1

**multiple** 17:19

**N**

**named** 37:11

**narrow** 9:13

**nature** 20:6

**necessarily** 37:25

**news** 42:15

**newspaper** 31:22

**Notary** 4:5

**notice** 7:20 46:4

**number** 10:16,21 11:6 12:5,22,23 13:12,14,23 14:10 17:16 18:6,10

**numbers** 13:5 14:1

**O**

**oath** 4:15

**object** 15:23 23:4 32:5 38:4

**objection** 28:17,23,25 35:1 38:5 45:22

**obtained** 31:18

**occasion** 40:7

**occur** 7:23

**occurred** 34:11

**occurrence** 9:9

**October** 42:7,8 44:1

**offer** 18:2

**office** 6:4,13,17,18,23 22:21 24:7 25:1 44:22 45:15

**official** 27:7

**officials** 44:14

**on-going** 18:8

**open** 16:23

**opine** 14:24

**opinion** 21:5,20 27:2 38:13 44:8

**opinions** 21:18 22:12 23:2,18 27:4 36:17,19 42:6

**options** 45:18

**order** 46:23 47:4

**original** 38:20

**P**

**Palestine** 28:6

**Palestinian** 28:6

**paper** 29:25 30:6,7,17 31:11,13,14,15,18,19

Dean Merritt McAlister - February 09, 2026

papers 31:7,13,23 32:15,19,21

parent 25:2

part 10:1 15:8 19:4,8 21:21 35:11,24 36:1 37:15 43:22 45:16

participation 46:10

passed 25:3

past 10:22

Patel 19:18,20

patrols 18:20

pay 42:15

paying 41:19,20

Peak 46:19

people 24:17 29:20 33:9,15

perceived 19:1

period 34:22 38:19 40:4

periodically 40:23

person 37:7,8,10 43:13

personal 11:23 19:5 29:12 36:15,19 37:22

personalized 33:10

perspective 18:17

phone 7:16 20:24 21:1

physically 18:21

picture 28:11

piece 46:6

place 5:16

pleased 26:6,21

point 5:19 7:6 16:5 18:12,14 27:8 36:3,16 37:9 45:3

police 10:13 18:20

policy 17:1

political 33:23 44:16

position 22:24 43:14

45:13

post 17:14

posted 42:6

posts 41:10

power 9:4

PR 22:8

practice 14:7

presence 13:20 18:20

presented 15:12

president 21:23 43:25

press 20:10

previously 26:3

prior 33:5 46:4

private 17:14

pro 28:6

probing 15:9

proceed 6:3 7:17

process 5:18,19 6:6 7:6, 8 44:15 45:4,7,11,13 46:11,13

proding 38:2

Professional 4:4

professor 11:11 12:21, 25 13:13 25:17,22 30:12, 22 34:5,7,13,21,25 35:6 36:12 37:6,20 38:10

professors 13:12 16:4

prompt 32:2 42:25

prompted 10:1

protected 18:1 46:6

protection 10:14

protest 42:23

protesting 43:7

protests 42:6 44:2

provide 36:18

provided 27:19

provocative 32:15

provost 21:23

public 4:5 31:7,11 44:1 46:3,5

pull 40:19

punish 10:25

punishment 8:10,19

purchase 18:23

put 16:17 43:25

---

**Q**

question 11:21 14:19 16:2 28:17 29:3 39:21 41:17 43:19,20 45:25

questions 15:23 26:5, 14,18 41:24 46:16 47:1

quick 27:23

quickly 14:12

---

**R**

radar 16:18 17:7,13

Rahul 19:18

rapport 15:8

rate 30:6

rattled 16:24

reach 22:13 23:18

reached 18:6,12 22:18 25:16,21,22 26:1,4 46:14

react 43:14

reacted 42:8,18

reaction 18:25 19:2 20:13 36:15

read 29:24 30:2 33:12 44:4 47:15,22,23

reasonable 14:20 33:19

recall 4:25 5:10 8:15 12:24 20:14,20,21 21:20

24:25 34:8,11 35:21 36:14,19,21,23 38:21,25 42:20 43:24 44:3,24 45:1 46:7

received 14:9

receiving 21:19

recent 40:24

recess 28:2 42:2

recognize 16:25

recognized 17:3

recollection 29:12

recollections 11:23

recommendation 8:17, 18 45:9,10

record 8:2 47:1

recorded 6:10,11

reference 5:15,22 12:3

referral 5:12 44:21

referrals 18:10

referred 5:7 6:2

referring 5:10

regard 9:6 42:13 44:7

Registered 4:4

Regular 47:7,8

regularly 14:7 20:21 40:8

regulation 29:7

reject 45:24

related 35:7 43:15

relations 24:17,18,21 25:1

relevant 16:15,16 17:10

remember 4:25 9:20 17:24 37:9 44:6

remind 40:14,16

rep 14:17,21

repeat 10:19 28:21,23

Dean Merritt McAlister - February 09, 2026

**rephrase** 28:24 29:2 35:4 38:17

**reply** 37:21

**report** 6:17,21 7:10 8:8, 13,15 9:5,7,8,16 10:2 11:24 12:3 15:11,20 17:11 18:11,19 27:5,13 32:3 36:3,4,7,9 44:12

**reported** 17:16 18:4 35:24

**Reporter** 4:4,8 10:18 28:19,21 46:23 47:4,7, 13,15

**reports** 16:3

**representative** 35:15

**requests** 10:13

**require** 21:11

**resolve** 44:16

**respect** 22:4 24:6 31:18

**respond** 43:14,21

**responded** 26:6,20 34:7,22

**response** 11:3,17 34:13,17 38:13,14

**responses** 39:7

**responsible** 5:4 44:15

**result** 5:23

**resulted** 10:5

**retract** 29:3

**review** 13:6 27:21 47:17

**reviewed** 5:22 8:9 18:5

**Richard** 19:19

**rights** 19:9

**rings** 43:9

**road** 21:15 22:9

**rough** 39:22

**roughly** 12:12

**routine** 35:25

**rubric** 30:12

**rule** 29:7

**runs** 45:14

---

**S**

**Sabatini** 4:17,19 9:13, 15 11:10,16 14:14 15:5, 17 16:1 23:8,12,14 27:20 28:3,24 29:2,4 35:4,5 38:5,12 41:22 42:3,4,22 45:24 46:1,15,18 47:3,6, 8

**safe** 18:23

**Sasse** 43:25 44:7

**school** 4:22 7:9 10:25 14:2 18:24 24:19 26:7 28:13 37:17 42:20 43:3

**school's** 20:16

**schools** 42:13

**scope** 26:19

**Scott** 6:8

**search** 41:1

**searched** 40:21

**searches** 40:24

**security** 26:7,21

**seeking** 15:17,18

**segregated** 27:11

**senator** 25:3,4,21,23 42:9

**sending** 37:21

**sense** 10:23 15:6 27:15

**sensitive** 20:12

**sentiment** 36:23

**sentiments** 15:12

**sequential** 6:14,15

**sequentially** 6:20 7:14

**series** 32:8

**share** 14:25

**shared** 13:13 31:16,21 35:22 36:1

**sharing** 21:21 35:25 37:15

**Shaw** 5:12 6:3 36:8

**Shifting** 29:23

**shortly** 16:19 34:14

**sic** 42:10

**side** 21:19

**signed** 30:22

**significant** 11:7 13:23

**significantly** 19:2 43:5

**similar** 30:12 42:19,21, 23

**single** 43:5

**sitting** 15:1

**situation** 9:3 18:8 21:3 22:5,10,17 44:13

**situations** 43:21

**social** 17:14 40:18

**solely** 46:11

**solemnly** 4:8

**sort** 7:4 9:9 10:12 12:10 17:20 26:25 30:11,24 31:2 32:24 33:4 38:2 40:13

**sought** 17:6

**span** 36:10

**speak** 13:24 19:17 24:1 32:9 34:21,24 35:6

**specific** 5:23 23:12 24:3,23 30:20,25 42:24 43:17

**specifically** 20:22 24:20,25 35:10 38:6,25

**speculate** 32:7

**speech** 16:10 18:3 34:4

**spoke** 38:21 44:18

**spoken** 19:10,17 43:12 44:21

**squarely** 31:2

**Stacey** 37:6

**staff** 11:4 16:19,23 17:6, 9 24:9 29:18

**stage** 36:13 39:8

**stages** 21:6 39:18

**standard** 14:16,21 15:10,15

**stands** 44:5

**start** 10:8 30:14

**started** 39:22

**state** 4:5 15:3 22:25 23:1,15,16,17,20,22 25:2,4,21,23

**statement** 33:11

**statements** 11:25 14:8, 13 16:9 17:18,23,25 19:14 33:24 36:14

**Steinberg** 37:7

**step** 6:5

**stir** 28:10

**stop** 40:6

**storm** 18:18

**strategic** 22:20

**strike** 37:23

**strong** 18:25

**strongly** 10:17

**student** 5:17 6:2,4,7,18, 23 10:12 11:18,20 16:20, 25 18:7,19 19:7 29:6 31:22 33:3 34:4,5 37:22, 24 39:3 42:6,11 43:6 44:1,15 45:14

**students** 5:13 10:16,23 11:3,22,25 12:4,7,12,16, 17 13:2,14,17,22 16:3,6 17:13,16,19,20 28:9

Dean Merritt McAlister - February 09, 2026

29:17 30:9 31:22 33:24 34:3 42:8,25

**style** 42:23

**stylistic** 30:13

**submit** 32:3

**submitted** 6:21 7:20 8:13 27:5,12

**subsequent** 36:8

**substantial** 9:6,17,24 10:5,10 12:11 28:5 29:8 32:15,16 33:1,25

**substantive** 30:13 36:4

**Summerlin** 44:19,25

**supposed** 17:3

**surrounding** 19:14 42:11

**suspended** 26:24

**suspending** 5:1

**suspension** 7:23 8:7 21:7 27:17

**swear** 4:8

**swipe** 17:2

**sworn** 4:14

**Sylvia** 37:11

**system** 23:1

---

**T**

**T-SHIRT** 28:4,5,6,7,10, 14 29:5,8,10,13,16 31:24 32:13

**talk** 5:9 10:24 18:22 20:20 24:21 43:20

**talked** 14:11 16:8 21:22, 23

**talking** 24:25 28:22

**teach** 14:7 30:23

**team** 6:9 24:17,22

**Teams** 6:1

**technically** 28:13

**teleconferencing** 4:3 47:24

**temporarily** 9:1

**tenure** 33:22 43:4

**terms** 4:24 6:22 11:3 21:6 38:22 42:6

**testified** 4:14 13:1

**testify** 13:3,6

**thing** 30:2

**things** 25:13 27:21 37:16 42:15 43:21

**thinking** 9:21

**thought** 8:18 9:8 19:7

**threat** 14:19 38:19,20

**threatened** 14:12,16 36:13

**threats** 14:4

**three-and-a-half** 33:23

**three-year** 33:22

**threshold** 9:10

**Thursday** 7:19

**tickler** 40:14

**Tim** 24:1

**time** 5:19 7:6 9:21 14:2 16:5 17:7,12 24:24 25:10,14 26:16 28:8,22 29:10 34:7,9,23 36:10,16 37:5,9,12 38:19 39:1 40:4 41:7,9 44:4 45:20 46:3,9

**timeline** 4:24 11:15

**times** 18:6 22:16 25:12 29:13,16 30:4 40:5 44:18

**today** 13:11 14:24 44:5

**told** 12:20 13:12 44:11 46:13

**tons** 11:22

**top** 40:21

**totally** 27:11

**touch** 26:2 33:3

**town** 13:18,22

**tracking** 13:25

**transcript** 13:4 46:24 47:5,17

**trespass** 7:20 8:7,22 21:9 27:3,17

**trespassed** 25:15 26:25

**true** 14:4 41:8

**Trustees** 19:11 22:3,11, 25 23:16 24:5 43:13 44:11

**truth** 4:9,10 14:17,21

**turn** 27:23

**turned** 17:4

**tweet** 25:14 34:7,8,11, 17,25 36:15 37:21 38:14, 20

**tweets** 6:2 9:25 10:4 11:13,15 12:18 13:16,19 18:16 32:1,14,19,21 33:5,7,20 34:16 35:12, 16,23 37:1 39:6,20 41:15

**Twitter** 37:24,25 39:12 41:10,11,13

**two-minute** 41:23

**type** 9:3

---

**U**

**UF** 12:13 15:20 19:11 21:14 22:25 24:19 42:19, 20 43:2,7,14,25 44:10 46:19

**Uh-huh** 34:19

**Uh-uh** 31:9

**ultimately** 11:4 18:10

**unaware** 21:25

**undergrad** 43:8,10

**understand** 41:12

**understanding** 8:5 30:21 31:14 33:7 45:5,12

**understands** 11:14

**understood** 33:13

**unique** 15:5

**universities** 42:12

**University** 5:1,5,8 7:17 22:19 23:1,16,17,20,22 24:16 27:7,13,18 30:21 32:3 43:1,12,25

**University's** 8:6 45:12

**unorthodox** 37:20

**unrecorded** 6:10

**unusual** 37:19,23

**update** 22:14

**upset** 10:23

**upsetting** 17:16

**urgency** 11:6

**usage** 41:11

**user** 40:18

---

**V**

**vague** 23:11 38:6

**vaguely** 43:9 44:4

**vagueness** 38:6

**variety** 11:2 22:19 25:12

**version** 20:15

**versus** 20:23 34:7

**vice** 19:18

**vice-president** 45:15

**video** 4:3 17:24 47:24

**view** 39:17 40:7

**viewed** 40:8

**viewing** 39:11 40:6

---

Dean Merritt McAlister - February 09, 2026

**views** 19:4 35:19

### W

**Wait** 28:19

**waive** 47:15

**wanted** 10:24 25:19 26:5,17

**wanting** 18:18,19,22

**watching** 17:24 42:12

**ways** 11:2

**wear** 29:13

**wearing** 28:8,14 29:5 32:13

**week** 8:3 40:15,16 46:18

**whatsoever** 24:12

**willingness** 26:13

**winding** 40:19

**word** 36:21

**words** 5:21 10:4

**wore** 28:4 29:16

**world's** 40:18

**write** 9:5 32:3

**writing** 9:19 32:14

**written** 18:11 31:24

**wrong** 7:2

**wrote** 6:17 9:16

### Y

**year** 17:23

**year-and-a-half** 18:9

**years** 11:9 12:8 33:23 43:8

**York** 22:16

### Z

**Zachary** 13:1

**zoom** 15:7