# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# GAINESVILLE DIVISION

PRESTON DAMSKY,

*Plaintiff*,

v.

CHRIS SUMMERLIN, in his official
capacity as Dean of Students of the
University of Florida,

*Defendant*.

No.: 1:25-cv-00275-AW-MAF

# DEFENDANT'S TRIAL BRIEF

Case 1:25-cv-00275-AW-MAF   Document 92   Filed 04/27/26   Page 2 of 21

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ...................................................................................................... 1

ISSUES FOR TRIAL ................................................................................................. 1

BACKGROUND ........................................................................................................ 1

    A.    Case Summary ............................................................................................ 1

    B.    Procedural History ..................................................................................... 5

ARGUMENT ............................................................................................................. 6

    I.    Damsky's Posts Substantially Disrupted School Operations and Interfered With the Rights of Other Students, Faculty and Staff Members. ................................................................................................... 7

    II.    The Evidence Will Show Damsky Made a True Threat. ......................... 10

    III.    Damsky's Counterarguments Will Fail as a Matter of Law. ................... 13

        A.    "Ignatiev context" does not neutralize violent advocacy ............... 13

        B.    Off-campus and online speech remains regulable with a campus nexus. ................................................................................. 14

        C.    The disruption doctrine is not a "heckler's veto." ......................... 14

        D.    Plaintiff's self-serving declaration lacks weight against comprehensive disruption evidence. .............................................. 15

CONCLUSION ........................................................................................................ 16

CERTIFICATION PURSUANT TO LOCAL RULE 7.1(F) ................................... 17

CERTIFICATE OF SERVICE ................................................................................ 17

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Boim v. Fulton Cnty. Sch. Dist.*,
    494 F.3d 978 (11th Cir. 2007) ...........................................................................7, 8

*Counterman v. Colorado*,
    600 U.S. 66 (2023) ................................................................................. 10, 11, 12

*Damsky v. Summerlin*,
    No. 25- 14171, 2026 WL 75122 (11th Cir. Jan. 8, 2026) ........................... *passim*

*Doe v. Valencia College*,
    903 F.3d 1220 (11th Cir. 2018) ......................................................................8, 14

*Healy v. James*,
    408 U.S. 169 (1972) ..............................................................................................8

*Kansans for Const. Freedom v. Kobach*,
    789 F. Supp. 3d 1062 (D. Kan. 2025) .................................................................12

*King v. Frazier*,
    77 F.3d 1361 (Fed. Cir. 1996) ............................................................................12

*Morse v. Frederick*,
    551 U.S. 393 (2007) ..............................................................................................8

*Papish v. Bd. of Curators of Univ. of Mo.*,
    410 U.S. 667 (1973) ..............................................................................................8

*Sealed Pl. 1 v. Front*,
    No. 3:22-cv-00670, 2024 WL 1395477 (E.D. Va. Mar. 31, 2024) .....................12

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ..................................................................................... 14, 15

*Texas v. Johnson*,
    491 U.S. 397 (1989) ..................................................................................... 14, 15

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ..............................................................................................7

*Virginia v. Black*,
    538 U.S. 343 (2003) ............................................................................................10

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ..............................................................................................8

**Rules**

Fed. R. Evid. 403 ................................................................................................16

Fed. R. Evid. 801 ......................................................................................... 15, 16

Fed. R. Evid. 802 ................................................................................................16

Fed. R. Evid. 803 ................................................................................................16

Fed. R. Evid. 804 ................................................................................................16

**INTRODUCTION**

Defendant Chris Summerlin, in his official capacity as the Dean of Students of the University of Florida (together, the "University"), submits this trial brief to summarize the governing legal standards, key arguments, and anticipated evidence supporting the University's actions under the First Amendment and its Student Conduct Code. The trial evidence will show that the discipline imposed on Plaintiff Preston Damsky based on his public posts did not violate the First Amendment, both because the posts were reasonably interpreted as advocating and threatening violence against Jews and because they materially and substantially disrupted UF Law's operations and interfered with the rights of other students and faculty and staff members.

**ISSUES FOR TRIAL**

1.    Did the University reasonably interpret Damsky's posts as threatening or promoting violence directed at members of the UF Law community?

2.    Did Damsky's posts cause a material and substantial disruption to the University's campus operations and interfere with the rights of other students and faculty and staff members?

**BACKGROUND**

**A.    Case Summary**

The evidence will show that Plaintiff Preston Damsky engaged in a sustained pattern of disruptive and escalating conduct at the University of Florida Levin

College of Law ("UF Law"), culminating in public statements reasonably perceived as threats of violence that materially disrupted the law school's operations and the educational environment.

Beginning in Fall 2023, during his first year of law school, Damsky engaged in aggressive and disruptive behavior toward University staff and students. The evidence will show that, in one early incident, Damsky banged on and kicked a locked door, yelled profanities at a staff member, and later confronted her in a manner that left employees feeling afraid for their safety. Around the same time, Damsky posted inflammatory and racially charged messages in a class GroupMe chat, contributing to such disruption that the group was ultimately shut down.

The evidence will further show that Damsky's conduct escalated during the 2024 academic year. In seminar papers, he advocated for preserving the United States as a white nation-state and endorsed "extralegal violence" to achieve that goal. Classmates, faculty, and staff members interpreted these writings as calls for contemporary racial violence and raised concerns about safety. Students began avoiding Damsky, expressing fear that he posed a security risk. Despite these concerns, the University did not discipline Damsky at that time, concluding that his statements—though disturbing—remained within the bounds of protected academic expression.

2

The evidence will show that University officials continued to tolerate Damsky's speech, even as complaints mounted, and took steps to protect his expressive rights. But by early 2025, Damsky was on notice that members of the law school community feared him. At a January 2025 town hall, students expressed "palpable fear," with some avoiding classes or scanning rooms for exits when he was present. Dean Janice Shaw met with Damsky and informed him directly that students were afraid he might engage in violence.

Despite that notice, in March 2025, Damsky posted publicly on social media that "My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to 'abolish the White race by any means necessary' is what I think must be done with Jews. Jews must be abolished by any means necessary." The evidence will show that this statement, viewed in context with his prior conduct and advocacy for violence, caused immediate and widespread alarm within the law school community. When a law professor directly asked Damsky whether he was advocating murder of her and her family, he did not say no or disavow violence. Instead, he referenced genocide, further heightening concern.

The evidence will show that Damsky's posts triggered severe and concrete disruption at the law school, particularly during the critical period leading up to final exams. Students, faculty, and staff members reasonably perceived the statements as threats. As a result:

3

- Students, faculty, and staff members reported fear for their safety, with some avoiding campus, skipping classes, or altering schedules to avoid Damsky.

- A student requested to take final exams in a locked room out of fear.

- Students reported difficulty concentrating on exams and studying, and some stated their academic performance suffered.

- Faculty members canceled classes, considered moving courses online, and expressed fear for themselves and their families.

- One professor slept with a baseball bat for protection.

- A staff member requested removal of her name from the school website due to fear and later resigned.

- The administration diverted substantial time and resources—over 120 hours by Interim Dean Merritt McAlister alone—to address the crisis.

The evidence will also show that the University implemented heightened security measures in direct response to Damsky's statements. These included increased police presence, restricted building access, security at student events, and additional surveillance measures, all at financial and operational cost.

In light of these events, the University placed Damsky on interim suspension in April 2025 and charged him with violating the Student Conduct Code, including provisions prohibiting disruptive conduct and harassment. The evidence will show that these provisions expressly exclude constitutionally protected speech and were

4

applied only after Damsky's conduct crossed the line into threatening and materially disruptive behavior.

At a full student conduct hearing in July 2025, multiple witnesses—including administrators, faculty, and students—testified that Damsky's statements were understood as threats and caused widespread fear and disruption. As at the hearing, the evidence here will show that Damsky was aware his statements were being closely monitored and that members of the community feared him, yet he declined to clarify or retract his statements and expressed no remorse.

Following the hearing, the University determined that Damsky had engaged in disruptive conduct and harassment and imposed expulsion as a sanction. That decision was upheld on administrative appeal.

The evidence will thus demonstrate that the University acted only after a prolonged pattern of escalating conduct culminated in statements reasonably perceived as threats, which caused substantial disruption to the law school's educational mission and the safety and well-being of its community.

## B.    Procedural History

On September 14, 2025, Damsky filed his one-count Complaint. Doc. 1. He then moved for a preliminary injunction. Doc. 6. UF moved to dismiss the Complaint. Doc. 11. This Court dismissed Damsky's claim for damages but otherwise denied UF's motion. Doc. 45.

This Court granted a preliminary injunction. Doc. 38. It stayed the injunction temporarily so that UF could seek a stay from the Eleventh Circuit. Doc. 47. The Eleventh Circuit granted a stay pending appeal. *See Damsky v. Summerlin*, No. 25-14171, 2026 WL 75122 (11th Cir. Jan. 8, 2026). The motions panel ruled that "Damsky's speech was likely not protected by the First Amendment" because "his statements were reasonably interpreted as a call for extralegal violence that caused a serious disruption to other students' educational experiences and the school's ability to provide its services." *Id.* at *1. Briefing in the Eleventh Circuit appeal concluded on April 15, 2026.

## ARGUMENT

At the conclusion of trial, Damsky's First Amendment claim will fail for two independent reasons. First, the evidence will show that his posts were reasonably interpreted as threatening or promoting violence and in fact caused severe, concrete disruption to the law school's operations and the rights of other students—bringing this case squarely within the rule of *Tinker* and its application by the Eleventh Circuit in this case. Second, the evidence will establish that Damsky's statements independently qualify as unprotected true threats, given their objective content and the surrounding context, including his prior conduct and his response to a direct inquiry about violence. Finally, Damsky's anticipated defenses—including his reliance on Ignatiev, his off-campus posting, his invocation of a "heckler's veto,"

6

and his attempt to discount the campus disruption with inadmissible hearsay—fail

as a matter of law and are contradicted by the full evidentiary record. That record

will confirm the Eleventh Circuit's preliminary assessment that the University acted

only after speech reasonably perceived as threatening caused extraordinary

disruption and safety concerns.

I.    **Damsky's Posts Substantially Disrupted School Operations and Interfered With the Rights of Other Students, Faculty and Staff Members.**

The evidence at trial will show that Damsky's posts caused concrete

disruptions and interfered with the rights of other students and faculty and staff

members. The Eleventh Circuit has held in this case that the "The First Amendment

does not protect student speech that 'materially disrupts classwork or involves

substantial disorder or invasion of the rights of others.'" *Damsky*, 2026 WL 75122,

at *2 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509, 513

(1969)). In "[a]pplying *Tinker*," the Eleventh Circuit has "held that there 'is no First

Amendment right allowing a student to knowingly make comments, whether oral or

written, that reasonably could be perceived as a threat of school violence, whether

general or specific, while on school property during the school day.'" *Id*. (quoting

*Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 984 (11th Cir. 2007)).

During this analysis, "[w]hether the speaker intended to cause a material

disruption is irrelevant; instead, courts ask whether a reasonable interpretation of the

7

speech caused a material disruption of classwork or substantial disorder." *Id*. (citing *Morse v. Frederick*, 551 U.S. 393, 401 (2007), and *Boim*, 494 F.3d at 985). Under *Morse*, "a school may 'restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use.'" *Id*. at *4 (quoting *Morse*, 551 U.S. at 403). "Like the school in *Morse*," a school "is permitted to punish" a student for making statements "reasonably viewed as promoting illegal activity," such as "murdering Jews." *Id*.

The Supreme Court's cases confirm that *Tinker* applies to colleges and universities, *Healy v. James*, 408 U.S. 169, 184, 189 (1972); *Widmar v. Vincent*, 454 U.S. 263, 267 n.5, 277 (1981), and graduate schools, *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 667–68 & n.3, 669–70 & n.6 (1973) (per curiam). The Eleventh Circuit, too, "in a published decision, has applied *Tinker* in the higher education context." *Damsky*, 2026 WL 75122, at *2 n.4 (citing *Doe v. Valencia College*, 903 F.3d 1220, 1229–31 (11th Cir. 2018)). The motions panel applied *Tinker* in this case, confirming that it applies in the "university setting" and to a "graduate student" such as Damsky. *Id*. The Court noted that, "when we applied *Tinker* in the university setting in *Valencia College* we did not apply a different standard than we apply in the primary school context." *Id*.

The evidence at trial will confirm the motions panel's finding that "there is strong evidence that Damsky's speech created a substantial disruption of the

8

school's activities. And the disruption in this case—a credible fear of targeted violence—is one of the most severe disruptions imaginable." *Id.* at *5. This evidence will show that because of Damsky's posts, students and faculty stayed off campus; students skipped or arrived late to class; students had difficulty concentrating on preparing for and taking their finals; students avoided registering for classes with Damsky; a student requested to take finals in a locked room; UF Law restricted building access, increased police patrols and security cameras, and paid for police presence at a Jewish Law Student Association event; a professor cancelled class and slept with a baseball bat; a staff member sought removal of her name and image from the university website and later resigned; and Interim Dean Merritt McAlister spent upwards of 120 hours addressing the fallout.

This evidence will include Damsky's posts; testimony from persons with first-hand knowledge of the disruption to the school; and "Damsky's prior statements," including his two seminar papers and his aggressive encounter with a UF Law staff member, that "provide context to his posts." *Damsky*, 2026 WL 75122, at *3 n.8. As the motions panel determined, Damsky's "past statements are relevant because they inform how UF and its community would reasonably interpret his current X posts." *Id*.

This evidence will satisfy both reasons the Eleventh Circuit gave for why Damsky's posts likely caused a substantial disruption: "First, UF students, faculty,

9

and staff could reasonably interpret Damsky's posts as threatening violence on UF's campus, which sparked community safety concerns." *Id.* at *3. "Second, the UF community could reasonably interpret Damsky's posts as promoting extralegal violence, and schools can regulate at least some speech that calls for illegal conduct." *Id*. Thus, the deciding question will be whether "UF students, faculty, and staff could reasonably interpret Damsky's posts as threatening violence on UF's campus" or "promoting extralegal violence[.]" *Id.* It is not necessary for the University to show that "the *only* reasonable interpretation of Damsky's speech is that it threatened violence, nor is that what [the Eleventh Circuit's] caselaw requires for UF to regulate Damsky's speech." *Id*. at *3 n.6. The University will meet that standard.

## II.   The Evidence Will Show Damsky Made a True Threat.

The evidence will also show an independent reason why Damsky's expulsion was permissible: his posts were a true threat under First Amendment caselaw. The First Amendment does not protect "[t]rue threats of violence." *Counterman v. Colorado*, 600 U.S. 66, 72 (2023). "True threats are serious expressions conveying that a speaker means to commit an act of unlawful violence." *Id*. at 74 (cleaned up). A true threat may be conveyed "to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). "And a statement can count as such a threat based solely on its objective content." *Counterman*, 600 U.S. at 72. "The speaker need not actually intend to carry out the threat." *Black*, 538 U.S. at 359–60.

"Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat[.]" *Counterman*, 600 U.S. at 74. "The existence of a threat depends not on the mental state of the author, but on what the statement conveys to the person on the other end." *Id.* (cleaned up).

The evidence will show that when Damsky published his "position" on "what [he] think[s] must be done with Jews," namely, that "Jews must be abolished by any means necessary," Doc. 73-16 at pdf p. 252 (P. Damsky Dep. Ex. 7 at 1), he made that threat not in jest or in an unserious way. It was objectively a "serious expression" that conveyed to many in the UF Law community that he meant to "commit an act of unlawful violence." *Counterman*, 600 U.S. at 74 (cleaned up). It makes no difference whether he intended his post to be seen as a threat. *See id.* And the UF Law community reasonably considered his posts to be a true threat based on his past statements and behavior at UF Law.

The evidence will further show that the UF Law community reasonably considered Damsky to be confirming his threat based on his exchange with Professor Lidsky. When she asked, "Are you saying you would murder me and my family? Is that your position?," he did not say no but instead offered the chilling reply that "surely a genocide of all Whites" would be worse than "a genocide of all Jews." Doc. 73-16 at pdf p. 252 (P. Damsky Dep. Ex. 7 at 1).

11

A true threat in a civil case does not require a showing of *mens rea*. The University agrees with the many courts that have held that a *mens rea* requirement should not be "improperly borrowed … from criminal law and interjected" into a civil case. *King v. Frazier*, 77 F.3d 1361, 1363 (Fed. Cir. 1996); *Kansans for Const. Freedom v. Kobach*, 789 F. Supp. 3d 1062, 1081 (D. Kan. 2025) ("*Counterman*—a criminal liability case—never holds that proof of mental state is required for civil liability."); *Sealed Pl. 1 v. Front*, No. 3:22-cv-00670, 2024 WL 1395477, at *29 (E.D. Va. Mar. 31, 2024) ("*Counterman* [is] inapplicable in this civil lawsuit with no criminal statute at issue.").

Even if *mens rea* were required, the evidence will show that Damsky had the requisite mental state of recklessness. He "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman*, 600 U.S. at 69. The evidence showing Damsky's recklessness will include testimony from Dean Shaw that she advised him in their January meeting that other students feared him. And before Damsky replied to Lidsky's message, he knew his internship had been taken away because of his March 21st post. Further, Lidsky's message put him on notice that his post was being perceived as a threat by the UF Law community. Yet instead of disavowing violence, he amplified his threat by raising the specter of "a genocide of all Jews" in his reply to Lidsky. Doc. 73-16 at pdf

12

p. 252 (P. Damsky Dep. Ex. 7 at 1). This evidence will be sufficient to show that Damsky made a true threat.

## III.   Damsky's Counterarguments Will Fail as a Matter of Law.

Damsky will likely offer several counterarguments that already failed as a matter of law before the Eleventh Circuit motions panel and will be even weaker on the fully developed record here.

### A.   "Ignatiev context" does not neutralize violent advocacy.

Damsky will likely argue that his reference to Ignatiev insulates his posts from scrutiny. But the question here is how "a reasonable reader," would interpret his posts, "particularly members of the UF community who were aware of Damsky's prior statements and actions," and whether that person "could still understand his post as a call for violence." *Damsky*, 2026 WL 75122, at *3. Even so, Damsky's efforts to shield himself with Ignatiev's rhetoric will fail. The evidence will show that the University does not condone what Ignatiev said, and that had he been a professor, he very well could have been disciplined for making statements that were reasonably interpreted as threatening and disruptive. In any event, Damsky didn't directly adopt Ignatiev's language. He changed Ignatiev's call for the abolition of "Whiteness" not to a call to abolish "Jewishness," but a call to abolish *Jews*, as Dean McAlister will testify. And Damsky's continued posts show his hatred for Jews, not merely "Jewishness."

**B.     Off-campus and online speech remains regulable with a campus nexus.**

Damsky will likely argue that the University cannot discipline him for his posts because they were made off-campus while he was on Spring Break. But the Eleventh Circuit has held that "*Tinker* does not foreclose a school from regulating all off-campus conduct." *Valencia College*, 903 F.3d at 1231. In that case, the school was not "powerless to do anything about [a student's] misbehavior," even if "he did it all while he was off campus" during "the break between summer and fall classes." *Id*. So too here. The Eleventh Circuit recognized that "[t]he fact that Damsky's speech occurred online instead of on campus does not mean that UF cannot regulate the speech, particularly because there was a connection between his posts and UF." *Damsky*, 2026 WL 75122, at *4.

The evidence will confirm the Eleventh Circuit's ruling that "Damsky's posts were sufficiently connected to UF." *Id*. That evidence will show that Damsky knew UF community members viewed his posts and perceived him as a threat; the exchange directly involved a UF Law professor; and the posts necessarily encompassed UF's Jewish students, faculty, and staff members.

**C.     The disruption doctrine is not a "heckler's veto."**

The "heckler's veto" as described in *Texas v. Johnson*, 491 U.S. 397 (1989), and *Snyder v. Phelps*, 562 U.S. 443 (2011), does not apply to a case like this one involving threats or disruptions related to violence. In *Texas v. Johnson*, "[n]o one

14

was physically injured or threatened with injury" in the flag burning incident at issue. 491 U.S. at 399. Several people merely "testified that they had been seriously offended." *Id.* The second case involved only "emotional injuries." *Snyder*, 562 U.S. at 449–50. There was "no violence" and the picketers "did not … disrupt th[e] funeral" they were picketing. *Id.* at 449–50, 460. In contrast here, the evidence will show that Damsky posted threatening language that was reasonably interpreted to be targeting a specific group for violence. It will further show that Damsky was not silenced due to audience disagreement—indeed, the University bent over backward to defend his speech in the face of withering opposition and disagreement until he crossed the line and posted statements that the University interpreted to be objectively threatening communications that raised reasonable safety concerns. The evidence will show concrete operational and safety disruptions, resource reallocations, and interference with students' rights and academic progress, far beyond offense or disagreement.

### D. Plaintiff's self-serving declaration lacks weight against comprehensive disruption evidence.

Damsky will likely attempt to testify that no substantial disruption occurred—based on unnamed student communications. That testimony is inadmissible hearsay. *See* Fed. R. Evid. 801(c). What other students allegedly told Plaintiff are out-of-court statements, and he would be offering those statements for the truth of the matter asserted—i.e., that no disruption occurred on campus, etc. *Id.* No hearsay exception

15

applies. *See* Fed. R. Evid. 801(d), 803, 804. Thus, the "[h]earsay is not admissible." Fed. R. Evid. 802. And even if it were not hearsay, it would be inadmissible under Rule 403, because the probative value of the testimony would be substantially outweighed by the dangers of unfair prejudice, confusing the issues, and misleading the jury. *See* Fed. R. Evid. 403. This Court should grant the University's motion *in limine* to exclude this evidence.

## CONCLUSION

This Court should dismiss Plaintiff's claims and enter judgment in favor of the Defendant.

Respectfully submitted,

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci
Justin A. Miller*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com
jmiller@schaerr-jaffe.com
*Admitted *pro hac vice*

*Counsel for Defendant*

Dated: April 27, 2026

16

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(F)

Pursuant to Local Rule 7.1(F), I certify that the foregoing memorandum complies with the Court's word limit because according to the word processing program used to prepare this memorandum, the document contains 3,569 words, excluding those portions exempted under the Rules.

/s/ *H. Christopher Bartolomucci*
H. Christopher Bartolomucci

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I certify that on April 27, 2026, I caused the foregoing Defendant's Trial Brief to be filed with the Clerk of Court, and thereby served on all parties to this matter via the Court's CM/ECF filing system.

/s/ *H. Christopher Bartolomucci*
H. Christopher Bartolomucci

*Counsel for Defendant*

17