# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF FLORIDA

GAINESVILLE DIVISION


PRESTON DAMSKY,

     Plaintiff,

v.                    No.: 1:25-cv-00275-AW-MAF

CHRIS SUMMERLIN, in his official capacity as Dean of

Students of the University of Florida,

     Defendant.


VIDEOTAPED DEPOSITION OF

MERRITT E. MCALISTER


TAKEN ON

FRIDAY, MAY 22, 2026

10:14 A.M.


TIGERT HALL

300 SOUTHWEST 13TH STREET

GAINESVILLE, FLORIDA  32611

NAEGELI
DEPOSITION & TRIAL

COURT REPORTING
LEGAL VIDEOGRAPHY
REMOTE DEPOSITIONS
TRIAL PRESENTATION
LEGAL TRANSCRIPTION
COPYING AND SCANNING
LANGUAGE INTERPRETERS

Nationwide

(800) 528 - 3335
NAEGELIUSA.COM



NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

MERRITT MCALISTER                May 22, 2026                            2
96541

APPEARANCES


Appearing on behalf of the Plaintiff:

ANTHONY F. SABATINI, ESQUIRE (via Zoom)

Sabatini Law Firm PA

1601 East First Avenue

Mount Dora, Florida 32757

(352) 455-2928

anthony@sabatinilegal.com


Appearing on behalf of the Defendant:

H. CHRISTOPHER BARTOLOMUCCI, ESQUIRE

JUSTIN A. MILLER, ESQUIRE

Schaerr Jaffe LLP

1717 K Street Northwest, Suite 900

Washington D.C.  20006

(202) 787-1060

cbartolomucci@schaerr-jaffe.com

jmiller@schaerr-jaffe.com

APPEARANCES CONTINUED

Appearing on behalf of the Defendant:

BRANDE S. SMITH, ESQUIRE (via Zoom)

DownsAaron PLLC

200 South Orange Avenue, Suite 2250

Orlando, Florida  32801

(407) 349-3949

brande.smith@downsaaron.com


- AND -


SHAYNE A. THOMAS, ESQUIRE

University of Florida

Office of General Counsel

PO Box 113125

Gainesville, Florida  32611

(352) 392-1358

sthomas7777@ufl.edu


Also Present:

Jess Bryan, Naegeli Technician

MERRITT MCALISTER                  May 22, 2026                            4
96541

EXAMINATION INDEX

                                                          PAGE


EXAMINATION BY MR. BARTOLOMUCCI                              8

EXAMINATION BY MR. SABATINI                                97

FURTHER EXAMINATION BY MR. BARTOLOMUCCI         146

MERRITT MCALISTER                May 22, 2026                          5
96541

EXHIBIT INDEX

EXHIBIT NO.                                                     PAGE


    1    3.21.25 Damsky Post & Exchange          10
         with Lidsky

    2    Statement on 8.28.23 Incident           14

    3    McAlister Report 4.1.25                 16
         (DEF524-526)

    4    Timeline of Events (DEF529-538)         17

    5    Student Complaint 9.22.23 (DEF635)      20

    6    Excerpts from "American                 23
         Restoration" [DEF000591, 616-17]

    7    Whisnant Email 10.30.24 (DEF590)        28

    8    Excerpts from "National                 32
         Constitutionalism" [DEF000559-60,
         584-85]

    9    Report a Community Concern              35
         (DEF539)

   10    Damsky Posts Fall 2024 (DEF5055-56)     36

  10A    DEF_001233-DEF_001234-1                 51

   11    Shaw Emails to McAlister 4.1.25         63
         (DEF644, 646, 648)

   12    Shaw Email 4.1.25 (DEF650)              72

   13    Lidsky Email 4.3.25 (DEF5265)           73

NAEGELI    (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

MERRITT MCALISTER                 May 22, 2026                        6
96541

EXHIBIT INDEX

EXHIBIT                                              PAGE


   14     Shaw Emails to McAlister                   76

           4.4.25 (DEF5266)

   15     Johnson & McAlister Emails                 79

           (DEF1397)

   16     Knowles Email 4.2.25 (DEF4075)             83

   17     McAlister Emails 4.4.25                    87

           (DEF1414-15)

   P1     TEXTS                                      119

   P2     TEXTS                                      119

NAEGELI   (800) 528-3335
DEPOSITION & TRIAL   NAEGELIUSA.COM

MERRITT MCALISTER                    May 22, 2026                        7
96541

VIDEOTAPED DEPOSITION OF

MERRITT E. MCALISTER

TAKEN ON

FRIDAY, MAY 22, 2026

10:14 A.M.


THE VIDEOGRAPHER:  We are on the record. The time is now 10:14 in the morning.  The date is May 22nd of 2026.  This is the beginning of the deposition of Merritt E. McAlister.  The case caption is Damsky versus Summerlin.

Will Counsel introduce yourselves and state who you represent?

MR. BARTOLOMUCCI:  Yes.  This is Christopher Bartolomucci, and I represent the defendant, Summerlin.

MR. SABATINI:  Anthony Sabatini for plaintiff Preston Damsky.

THE VIDEOGRAPHER:  Thank you.

MR. MILLER:  Justin Miller for defendant.

MS. SMITH:  Brande Smith for defendant.

THE VIDEOGRAPHER:  The court reporter will now swear in the witness.

THE REPORTER:  Ms. McAlister, please raise your right hand.  Do you affirm under penalty of

perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

MS. MCALISTER:  I do.

THE REPORTER:  Thank you.

Counsel, you may proceed.

MERRITT E. MCALISTER, having been first duly affirmed to tell the truth, was examined and testified as follows:

EXAMINATION

BY MR. BARTOLOMUCCI:

Q.    Good morning, Dean McAlister.

A.    Morning.

Q.    Could you please state your full name for the record?

A.    Merritt Ellen McAlister.

Q.    As you know, we're recording your testimony today in the case of Damsky versus Summerlin for use at trial.  We know each other.  My name is Chris Bartolomucci, counsel for the defendant.  Today is May 22nd, 2026.  We're in Gainesville, Florida, in the Office of General Counsel of the University of Florida.

Counsel for the plaintiff is participating remotely, that would be Anthony Sabatini.

MERRITT MCALISTER                    May 22, 2026                         9
96541

Anthony, are you able to see and hear us okay?

MR. SABATINI:  Yes.

MR. BARTOLOMUCCI:  Okay.  I'm sure you'll let us know if that ever stops being true.

BY MR. BARTOLOMUCCI:

Q.   So, Dean, what is your current role at the University of Florida, and how long have you been in that role?

A.   I am the interim dean of the Levin College of Law.  I've been in that role since June 1st, 2023.  I am also a tenured faculty member on the law school faculty.

Q.   What was your role at UF before you became interim dean?

A.   I was an associate professor.  I've been a professor at UF since August of 2018.  I was an assistant professor and then an associate professor on the faculty before becoming interim dean in 2023.

Q.   Could you briefly describe your legal education and legal employment history before you joined the UF Law faculty?

A.   Sure.  I graduated from the University of Georgia Law School.  I'm from Atlanta and attended Georgia for law school.  After graduating I clerked

on the U.S. Court of Appeals for the Eleventh Circuit for Judge R. Lanier Anderson, III.  I then worked at King and Spalding for a little bit before clerking at the U.S. Supreme Court for Justice John Paul Stevens.

I then returned to King and Spalding where I had an appellate practice.  I made partner in 2014 before leaving the firm to become an academic in 2018.

Q.    Are you aware of a law student named Preston Terry Damsky?

A.    I am.

Q.    Now, we're here to talk about some social media posts or tweets that Mr. Damsky published in March and April of 2025.  Are you aware of those posts?

A.    Yes.

Q.    Well, let's look at our first exhibit, Exhibit 1, which I think is being put on the -- the screen.  You have a copy --

A.    Mm-hmm.

Q.    -- in front of you.

(WHEREUPON, Exhibit 1 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q.    All right.  So Exhibit 1, can you identify that?

A.    Yes.  It is a post on X that Mr. Damsky wrote on March 21st, 2025.

Q.    And so the original post is March 21st, 2025.

A.    Yes, March.

Q.    Correct?  And are there subsequent posts on other days?

A.    Yes, there are other -- there are other response reply tweets to the original post.

Q.    And is there another person who joined the discussion of the post?

A.    Yes, Professor Lidsky, Lyrissa Lidsky is also included in the post.

Q.    Is she a professor at UF Law School?

A.    Yes.  She's a constitutional law professor who's been on the faculty for many years.

Q.    Do you know what the date of her first post in this chain is?

A.    It's not listed, but it was -- I know it was on April 1st.

Q.    Well, before we dive into the posts, I want to ask you about some events that came before the post to give some -- some context for them.

So let me take you back in time to March and April of 2025.  In that time period, how long had you been dealing with -- with issues relating to Mr. Damsky in your capacity as dean?

A.   So Mr. Damsky came on my radar very shortly after he arrived on campus in August of 2023, so for, you know, essentially his entire law school career.

Q.   In August of 2023 when Mr. Damsky was a 1L, are you aware of an incident involving an encounter between Mr. Damsky and a law school staff member that involved a locked door?

A.   Yes, I am.  His -- yes, I --

Q.   Please tell us about that.

A.   Sure.  So the staff member, Andrea Cormier, reported an incident to her supervisor who is Dean Janice Shaw, who at the time oversaw Career Services.  And the incident as it was relayed to me is that a student, or an individual, we didn't know he was a student at the time, had approached a door that was locked.

At the law school, we have swipe card access for entrance into the doors; was carrying something, approached the door, tried to get in but could not.  The staff member Andrea saw the person,

MERRITT MCALISTER                    May 22, 2026                          13
96541

did not recognize him so didn't let him in, which is our policy.

If the door is on swipe card access, we don't -- we don't let folks in that, you know, we don't identify as being a UF Law student or personnel. And so then got -- he got sort of belligerent, cursed at her, said something like let me in the fucking door, and banged on it.

She -- she left, and he ended up getting in somehow, and then approached her, found her, and sort of berated her, saying why didn't you let me in the fucking door, I -- I saw -- you knew I was a fucking student. He was carrying books, and so this gets relayed to me as a concerning incident where a student, who then we were able to identify the individual student as Mr. Damsky, had had a very aggressive encounter with a staff member.

Q.   **Mr. Damsky was the person banging on the door --**

A.   Yes.

Q.   **-- and using profanity?**

A.   Yes, yes. He was identified as -- as Mr. Damsky.

Q.   **Dean, if you would look at Exhibit 2 in -- in your stack.**

MERRITT MCALISTER                May 22, 2026                         14
96541

A.    Yes.

Q.    And we'll put that on the -- on the video screen as well.  For the record, this is document 73-4 at pages 5, 6, and 7.

A.    Mm-hmm.

(WHEREUPON, Exhibit 2 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q.    Do you recognize this document?

A.    I do.

Q.    What is it?

A.    It is a statement from Ms. Cormier regarding the incident.

Q.    And you've seen this document before today?

A.    I have.

Q.    Okay.  Did -- did Ms. Cormier write -- I'm sorry, strike that.

After the two-page statement --

A.    Mm-hmm.

Q.    -- there's a third page.  What are we looking at there?

A.    This is a Teams chat between Janice Shaw who was Ms. Cormier's supervisor, and Ms. Cormier.

Q.    And is -- is this chat from the -- the

MERRITT MCALISTER                 May 22, 2026                        15
96541

date of the incident?

A.   Yes, it is from the date of the incident.

Q.   And Ms. Cormier, was she describing the incident to Dean Shaw?

A.   Yeah, she was -- she was telling her supervisor about the incident and her concerns, that it -- it scared her.

Q.   About halfway down the chat, did Ms. Cormier write that, quote, a student was banging on the door and cursing at me to let him in.  It scared me a little bit?

A.   Yes.

Q.   Did she also write below that, quote, three female students who were studying in the BG left because of how uncomfortable they were, end quote.

A.   Yes.

Q.   And what -- what is the BG?

A.   It's Bruton-Geer Hall, which is a student space that he was trying to enter.  It's where -- it's near where her office is.

Q.   So that's a -- that's a building on campus.

A.   It's a building, yes.

Q.   On campus.

MERRITT MCALISTER                May 22, 2026                        16
96541

A.    Yes.

Q.    All right.  Let's -- let's have you look at Exhibit 3, Dean, and we'll put Exhibit 3 up on the screen.

(WHEREUPON, Exhibit 3 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q.    For the record this document has Bates numbers 524, 525, and 526.  Can you tell us what this document is?

A.    This is a report that I wrote to begin a Student Conduct process at the University of Florida related to Mr. Damsky.

Q.    Is it fair to say it's a summary of -- of what you knew about Mr. Damsky to that point, and why you wanted to initiate the Student Conduct process?

A.    Yes.  Yes, it's a summary of -- of -- a high-level summary of -- of incidents that had happened with Mr. Damsky since he had arrived on campus that I was completing to initiate a Student Conduct proceeding.

Q.    And with respect to the incident we've just been talking about, the -- the Andrea Cormier incident, is -- is that referenced in paragraph 4

where it -- it states, quote, we've been made aware of at least one very angry encounter that the student had with a staff member last year where the student screamed profanity, end quote?

A.   Yes.

Q.   That's a reference to the encounter with Ms. Cormier?

A.   It is.

Q.   All right.  Let's look at Exhibit 4, which has Bates numbers 529 through 538.

(WHEREUPON, Exhibit 4 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q.   Can you tell us what this document is, Dean?

A.   Yes.  This is a timeline of events that I wrote that describes all of the issues related to Mr. Damsky that I had dealt with while interim dean at the law school.

Q.   And -- and for what purpose did you prepare this timeline?

A.   I prepared this for the Student Conduct hearing that was last summer.

Q.   And so was this submitted as part of the Student Conduct process?

MERRITT MCALISTER                May 22, 2026                        18
96541

A.   I believe so, yes.

Q.   Just to wrap things up on the -- on the Andrea Cormier matter, could you read the first paragraph that you wrote under the heading August 28, 2023?

A.   A first-year student later identified as Preston Damsky had a violence/angry and disruptive encounter with a staff person, Andrea Cormier, when Ms. Cormier did not open a locked door for Mr. Damsky.  Mr. Damsky demanded that Ms. Cormier let -- quote, let him in the fucking door.

And Mr. Damsky later approached Ms. Cormier and yelled at her, I told you I was a fucking student, why did you -- what did you think I was fucking doing here.

Q.   And -- and that was your understanding of -- of the -- the nuts and bolts of the incident?

A.   Yes.

Q.   Okay.  Now, the next paragraph of your timeline talks about a GroupMe chat in September of 2023, does it not?

A.   Yes.

Q.   And was there a controversy in September 2023 about comments Mr. Damsky had made in -- in a GroupMe chat?

A.    Yes, there was.

Q.    **Could you tell us about that?**

A.    So we started getting student complaints. We have a student concern -- concerns portal where anyone can report anything that's going on on campus that's of concern.  And I learned that there were comments that Mr. Damsky had made that -- well, initially I learned that it was a -- a Preston who was in the 1L class had made on this group forum that were getting a lot of students very upset.

The comments were in response to a picture and a news article I believe that had circulated, that was a picture of the 1L class that he was a member of, and the discussion was generally about diversity issues related to the class, perception that the class was not diverse enough, and there was a conversation around what diversity means, that Mr. Damsky added comments to that had really upset a number of the students when were on the -- the thread.

Q.    **And are Mr. Damsky's comments quoted in your timeline --**

A.    Yes.

Q.    **-- in Exhibit 4?**

A.    Yes.

MERRITT MCALISTER                May 22, 2026                          20
96541

Q.   What -- would you read into the record what Mr. Damsky's comment was?

A.   The United States lost 19.3 million white faces on net over the past decade, which I am sure fills this man, and I -- the poster to whom he was made -- he was responding is -- is a parenthetical that I added -- with nothing but joy.  So why on earth would white people care at all about his criticism of our demographic share in any institution?  An even better question is, why should we feel anything but pure contempt for him and anyone else who expresses and shares such naked hatred for us.

Q.   Now, did students at the law school complain about Mr. Damsky's comment in the GroupMe chat?

A.   Yes, we got a lot of complaints about this from -- through the Concerns portal, students wanting to meet to discuss, very offensive, racist comments.

Q.   Well, speaking of the Concerns portal, let's take a look at Exhibit 5, and we'll put that on the screen.

A.   Yes.

(WHEREUPON, Exhibit 5 was marked for

MERRITT MCALISTER                May 22, 2026                          21
96541

identification.)

BY MR. BARTOLOMUCCI:

Q.   Now, this -- this appears at the top to be an email from Michelle Smith to you.  Is -- is that what this is?

A.   Yes.

Q.   And does it attach a complaint received through the portal?

A.   Yes, it does.

Q.   Okay.  So tell us about that.

A.   So this is an example of one of the complaints that we received in response to the -- the GroupMe post, and it's from a -- a student. It's -- it was -- the portal automatically sends messages to some folks who were -- at the time were involved in student life, student affairs, and then they were sending it to me to put it on my radar.

Q.   So you were aware of this complaint in the September 2023 period.

A.   Yes, they sent it to me right after it was received.

Q.   Did you meet with student groups to discuss the GroupMe controversy?

A.   Absolutely.  I met with some -- some students individually, but especially there were

multiple meetings with representatives of the Student Bar Association, which is sort of our -- our -- functionally our student government, as well as the Black Law Students Association.

Q. Did any students want Mr. Damsky to be punished or disciplined somehow because of his comments?

A. Many students wanted him punished. We -- they wanted the law school to be -- to condemn the speech. They wanted -- they wanted a response and action from the law school to, you know, send -- send a clear signal that we didn't agree and that he, you know, his views were not tolerated here.

Q. And -- and what were your views on the question of whether any punishment or discipline should be meted out?

A. I -- I explained to students many times that I did not think that was appropriate, that this was First Amendment protected speech. Even if deeply offensive and concerning to -- to many students in the community, and we had treated it as a learning opportunity to talk about what the First Amendment is and -- and why we tolerate even very deeply offensive speech.

You know, I -- I think I felt at the time

that students were, you know, they were being very sensitive and I understood, it was offensive to them, but it was not actionable in my view and was not appropriate for punishment.  That, you know, there was a conversation happening both at the law school and nationally around DEI, and this was -- this was part of that.

Q.   Well, let's fast forward a year to the fall of 2024.  I suppose Preston is a 2L --

A.   Mm-hmm.

Q.   -- at that point; is that right?

A.   Yes.

Q.   Now, did a controversy in the fall of 2024 arise over a -- a draft of a seminar paper that Mr. Damsky had written?

A.   Yes, it did.

Q.   Okay.  So let's put up on the screen and have you look at Exhibit 6, which I'll identify as an excerpt of a -- of a -- of a draft article, so the -- the exhibit consists of Bates numbers 591, 616, and 617.

(WHEREUPON, Exhibit 6 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q.   Can you tell us what Exhibit 6 is?

MERRITT MCALISTER                May 22, 2026                          24
96541

A.    So this is a -- a draft of a paper called American Restoration, an Article V Proposal.  It indicates it's a draft by Mr. Damsky.  It was submitted to a class called Constitutional Change that was a seminar class, for discussion in the class.

Q.    Now, I -- I note that the -- the author, the by line actually says Preston Terry.  Is that another name by which Mr. Damsky goes --

A.    Yes.  It's --

Q.    -- to your knowledge?

A.    -- my understanding that might be his middle name.  He often goes by Preston Terry instead of Damsky.

Q.    Okay.  But his -- his full name as we've said is Preston Terry Damsky --

A.    Yes.

Q.    -- is that right?  Okay.  Now, why -- if this paper was -- was controversial, why was that and how did it -- how did it become a controversy?

A.    So I received this paper from many different people.  It -- it circulated widely within the community.  I received it from faculty, from students.  I -- I think I even got a copy of it from a outside email address outside of the law school.

And -- and people in particular were very concerned by a call to violence at the end of the paper. There's a -- a paragraph that's very unusual for an academic paper that is a call for vengeance, for -- for violence against to sort of restore white America.

And this was, you know, arguing that, you know, America's no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we were -- are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours.

And, you know, it was a -- a call to arms for those who want to preserve the nation as a -- as a white nation. And a number of students felt very concerned about that language, and raised serious questions with the law school about it.

**Q. Now, you just read a portion of the paper that appears on page -- Bates page 617.**

A. Yes.

**Q. And isn't it in fact introduced by a sentence that says, quote, similarly we should feel no shame about feeling attached to those with whom we share a common racial origin, end quote.**

A. Yes.

Q.   So to the extent that this was a call for arms, it was on behalf of white America?  Is that how you read this?

A.   Yes.  I read it as a call to arms at, you know, his -- I've read a number of his writings and he's very focused on sort of restoring the nation as a white nation, and this was a call to action for -- I -- I read it as potentially even sort of if -- if it could not be accomplished through legal means, through violent means.

Q.   So how did other students at the law school become aware of a draft paper that -- by Mr. Damsky?

A.   So I -- I -- I think students, because the draft was part of the -- the class process was to discuss drafts and so they were circulated internally.  I think students were very alarmed. Some students in the class were very alarmed by that -- especially that final paragraph and started circulating it.

You know, Mr. Damsky was someone that, because of the prior incident with the GroupMe chat and other things, a lot of folks were very aware of him and I think as soon as this paragraph was read folks started circulating it as another example of

-- well, I think not even another example, but a -- an escalation in the rhetoric he was using around white nationalism and racial identity, and a -- a call to violence and so as a result the paper started spreading so students outside of the class sent it to others, sent it to faculty, and that it got -- it got on my radar pretty quickly.

**Q.    In response to the controversy, did you meet with students who were upset or concerned about the paper?**

A.    I did.

**Q.    Could you tell us about those meetings?**

A.    So I -- I remember several meetings.  I remember meeting with -- with some members of the Black Law Student Association but also some other students who were in Mr. Damsky's year, 3Ls, well, they were 2L students at the time, second year students.

They were very concerned that this was an escalation of language compared to what had been, you know, had happened in his first year, and in particular the -- the violent rhetoric, the violent language, the -- the call to arms.

I remember distinctly a meeting I had come back early from an event and students wanted to meet

and -- and -- and I remember in that meeting that one of the students had pressed on me that, you know, I may not fully appreciate what, you know, violent rhetoric like this might mean for students, that -- that I had not grown up in a time of gun violence and gun threats, and that -- and -- and campus police shootings, and that -- that -- you know, sort of impressing on me to take very seriously the language in this paper as a warning sign and sort of helping to understand why the community was so upset and afraid once this paper started circulating, so that -- that was the -- sort of the tenor of those conversations.

Q.   Now, let's put up on the screen and -- and talk about the next exhibit, Exhibit 7.

(WHEREUPON, Exhibit 7 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q.   And -- and for the record this has Bates number 590.  This appears to be at the top an email forwarded to you on October 30, 2024 --

A.   Yes.

Q.    -- and then attaching an email from another person.  Could -- could you just identify this document and tell us what it is.

A.   So this is an example of another complaint and concern we had related to this paper.  The subject is a -- concerns regarding the safety of fellow students.  It was sent to Dean Shaw who was the senior assistant dean for students at the time, and it was about the -- the paper that Mr. Damsky wrote.

**Q.   And -- and the writer of the email to Dean Shaw, did he have a conversation with Mr. Damsky that he then describes in his email?**

A.   So I'm -- I'm pretty sure that Mr. -- the -- the author of the email is Cooper Whisnant, and I'm -- I'm pretty sure that he was a student in the class of Constitutional Change and he had confronted Mr. Damsky in the class that was discussing the paper about the nature of the paper and what he was attempting to accomplish, so the -- this is -- he's capturing and describing a conversation that they had in the classroom during the seminar paper.

**Q.   Now, I -- I see in the email in the second sentence that Mr. Whisnant has written, quote, during our seminar meeting this afternoon Preston stated that the final paragraph of the paper was meant to incite racial violence.  Did I read that correctly?**

MERRITT MCALISTER                    May 22, 2026                    30
96541

A.    Yes.

Q.    And then two more sentences down the email writer has written, quote, for clarity my recollection of the exact wording is that I asked Preston, was the last paragraph of your paper intended to be a call for contemporary extra-legal violence, to which he responded, yes, end quote. Did I -- did I read that correctly?

A.    Yes.

Q.    So did you once again face calls to discipline Mr. Damsky over this seminar paper?

A.    I did.

Q.    And where did you come down on that?

A.    So I took a hard look at the paper.  I read through the paper.  I talked with the professor who taught the class, Professor Jonathan Marshfield. We shared the paper with Professor Lidsky actually because she's our First Amendment expert on the faculty.

We thought that the -- the language was, you know, highly unprofessional, inappropriate for academic project, but not likely violative, not likely a -- a true threat, not likely violative of the First Amendment because it was, you know, it was in a footnoted academic project.  It was an early

draft.

We concluded that the best step forward was that the professor who had a good relationship with Mr. Damsky thought that he could sort of, you know, redirect him and -- and help him understand that this was not appropriate for an academic work, and since it was a draft to edit it and make sure that the -- the final product met professional standards.

So we -- we did not, you know, did not discipline him, concluded that the speech was likely protected although I think, you know, in our view getting much closer to the line in terms of violent rhetoric and -- and threatening language, but that because of the early draft nature of the project, that it was appropriate to wait until we saw what the final paper is.

And my understanding is the final paper did not have that language in it.

Q.   So we've been talking about a seminar paper in October of 2024.

A.   Mm-hmm.

Q.   The next semester.  In the spring of 2025, was there controversy over a second seminar paper written by Mr. Damsky?

A.    There was.

Q.    So why don't we have you look at Exhibit 8, and we'll put that on the screen.

(WHEREUPON, Exhibit 8 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q.    This has -- this consists of Bates numbers 559, 560, 584, and 585.  Can you tell us what Exhibit 8 is, Dean?

A.    Yes, it is a final paper that was written, it's called National Constitutionalism.  It was written in an originalism seminar that was taught in the fall of 2024, but ended up getting circulated the -- the next semester in the spring.

Q.    And for the record, who is the author of this paper?

A.    It's Preston Terry, but Mr. Damsky.

Q.    And did this paper, like the prior seminar paper, attract controversy?

A.    It did, although I think initially the controversy mostly stemmed from the fact that it received a -- a book award which is a recognition for the top grade in the class, but once the paper was shared, it similarly caused a lot of concern.

Q.    What was the basis for the concern?

MERRITT MCALISTER                May 22, 2026                              33
96541

A.    So I -- it is -- it is -- it has similar themes, this paper has similar themes to the one we just discussed.  I think in particular there's -- there's additional sort of violent -- violent calls, in particular a call I think for if judges do not act to restore a white -- to restore white America, that the -- the -- I guess Justitia's scales would turn into her gruesome slashing sword.

There's a sense that, again, for, you know, sort of violent uprising if the goals of white nationalism were not accomplished through legal means, which the paper sort of advocates that judges should interpret the Fourteenth Amendment in a way -- or not the Fourteenth Amendment, but interpret the Constitution in a way that frankly ignores the Fourteenth Amendment but -- but restores the nation as a white nation that does not allow for non-white immigration.

Q.    And in particular, are you referring to the concluding paragraph spanning pages 584 and 585 --

A.    Yes.

Q.    -- of the document?

A.    Yes.

Q.    Okay.  And once again, there were student

MERRITT MCALISTER                May 22, 2026                    34
96541

complaints about this paper; is that true?

A.    Yes, about -- about the -- the rhetoric, about the book award, about sort of endorsing his viewpoint.

Q.    Were -- were there calls to discipline Mr. Damsky, and if so what did you do about that?

A.    There were calls to discipline him.  There were in particular calls to reject, so overrule the decision to give him a book award and to take that away from him.

Again, although, you know, I was very concerned about what was, you know, sort of an advocate -- advocacy of violence, we concluded that in the context of a seminar paper, that this was a First Amendment protected work, that I would not as a matter of academic freedom take any action against Mr. Damsky nor did I take the book award away.

And that was a fairly controversial decision within the law school that got a lot of folks upset, but I -- I felt that, you know, we -- we had to tolerate this speech and that there was, in the context especially of sort of an academic work.  It's footnoted, et cetera, that we would have to tolerate it.

Q.    While we are on the topic of student

complaints, let's have you look at Exhibit 9, which has Bates numbers 539 through 553.

(WHEREUPON, Exhibit 9 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q.    Can you tell us what this document is?

A.    So this is a compendium I think of -- is one way to describe it, of all of the complaints that we received through our Student of Concerns portal during -- sort of during the time leading up until Mr. Damsky's suspension and trespass from campus, so it's -- it -- I don't know, 14 or so pages of anonymized complaints that we had received through that portal.

Q.    And -- and did you say that this was compiled as part of the Student Conduct process?

A.    Yes.

Q.    Okay.  In the wake of the seminar papers, do you know if anything other law students were monitoring Mr. Damsky's social media accounts?

A.    I do.  I think, you know, Mr. Damsky was on a lot of students' radar for all of these different incidents that had, you know, gotten widespread attention within the community, and so, you know, I was personally aware of an account.  We

were -- we were looking at an account in his first year.

I think he changed accounts, but I think, you know, student -- students were -- were looking at accounts.  The administration had been looking at accounts.  We were all kind of watching and keeping an eye out for what Mr. Damsky was -- was doing and saying.

Q.   Okay.  Let's have you look at Exhibit 10, Bates numbers 5055 and 5056, and I apologize for how small the --

A.   I didn't bring my reading glasses, so.

Q.   Yeah, well, luckily I -- I read it with a magnifying glass and took some notes, so I --

A.   Okay.

Q.   -- I should be able to help out here.  But tell me if I'm wrong, but is -- is this an email that you ultimately received that embeds some social media posts by Mr. Damsky in 2024?

A.   Yes.  So this was -- it's dated November 8th and this was right after the -- the seminar paper, the first seminar paper controversy started brewing, like late October, so this was -- this was part of that but received some -- this is an email that was sent ultimately to me but initially to --

MERRITT MCALISTER                May 22, 2026                        37
96541

to Dean Lopez who's one of our student deans, about -- about Mr. Terry's tweets.

Q.    So did you receive and read this email on or about November 8, 2024?

A.    I did, yes.

Q.    And the -- the -- the email at the bottom that's being forwarded, is -- is that from someone named Scott Jurkowski?

A.    It is.

Q.    And who -- who is Scott Jurkowski?

A.    He's a student -- well, now he -- he's a graduate, but he was a -- a student who was in Mr. Damsky's class.  He was in the -- the same class year that Mr. Damsky was.

Q.    And he was forwarding some of these social media posts, right?

A.    Yes.

Q.    Okay.  Let me read some of these posts for the record since they're -- they're kind of hard to read.  One of them says, quote, we have no need for Rube Goldberg executions.  You either put the condemned in front of a firing squad or, if you believe that ignorance of the eminency of the act is more humane, lead them into a room where they are dispatched from behind with a single bullet to the

MERRITT MCALISTER                May 22, 2026                          38
96541

head, end quote.

Did I read that correctly?

A.    You did.

Q.    The next one says, quote, are they at their highest currently?  Given how disproportionately unhealthy, ignorant, criminal, and all around morally depraved black America is at the moment, I sure hope not, end quote.

Did I read that correctly?

A.    Yes.

Q.    The next one includes the statement, quote, it should be illegal to have non-white immigrants in this country at all.  We do not need racially foreign aliens pushing whites out of our industry, corrupting our political process, endangering our communities, and colonizing our homelands, end quote.

Did I read that one correctly?

A.    Yes.

Q.    Just one more.  Quote, the vast majority of prisoners deserve to be in prison or executed. They are utterly reprehensible people whose crimes are often incomprehensibly evil to the average law-abiding citizen, end quote.

Did I read that one correctly?

A.    Yes.

Q.    **Were you aware of or did you see other social media posts by Mr. Damsky posted in 2024?**

A.    So I -- I started -- I mean, I -- I received a bunch of -- I saw these and I received a bunch more around the time that Mr. Damsky, the -- the tweets that ultimately were part of the final straw here, but -- but, you know, Mr. Jurkowski who's the student who sent this has also sent me some.  I personally would check on his social media account, you know, periodically.  I didn't follow him, but I would check on it periodically.  So yes, I've seen, you know, much of his social media presence.

Q.    **Does the University of Florida have something called a Threat Assessment Team?**

A.    We do.

Q.    **And can you tell us what the Threat Assessment Team is and what its function is?**

A.    So my understanding is that it's a -- it's a team of folks who may -- a part of the Dean of Students office for the university.  It's not a -- it's not a law school thing, it's a university run group, but it's the Dean of Students office, the UF Police Department, the General Counsel's office,

MERRITT MCALISTER                    May 22, 2026                              40
96541

that all work together, meet to -- to talk about and assess threats to the campus to ensure our safety, so concerns about students, faculty, staff, other visitors.  Any -- any time we're worried about some kind of threat to the community safety, the -- the group meets regularly to protect the folks here on campus.

**Q.   Did there come a time when Mr. Damsky was reported to the Threat Assessment Team?**

A.   So I -- I reported Mr. Damsky.  The first time I spoke with someone in the Student Conduct office.  It was a woman named Pam Malyk who's no longer at the university but was part of the Threat Assessment Team.

I reported Mr. Damsky in September of '23 to her after the GroupMe chat.  I reported both that, the GroupMe chat, it's the sort of -- the white nationalist rhetoric, as well as our concerns about the incident with the door at that time, so I put that on Ms. Malyk's radar.

She indicated I believe that they would sort of, I don't know, open a file, start -- start reviewing his work pretty regularly because of the -- the way the Threat Assessment Team works.  You're sort of on the radar and -- and they're -- they're

monitored.

So at that point in time that was -- that was -- the first time that it gets reported to Threat Assessment, you know, I don't -- like I'm not on Threat Assessment so I don't report it directly, but -- but that -- there's -- that's one of the processes.

And then every sort of subsequent incident I would share, either I would share with another member of the Threat Assessment Team usually through the General Counsel's office or Dean Shaw would report to -- back to the Student Conduct office on main campus, usually through Pam Malyk.

Q.   **So you said you -- you did that in 2023 --**

A.   That was the first time.

Q.   **Okay.  Was there a second time?**

A.   There were -- I -- I mean, there were multiple -- basically every time there was sort of an incident that -- that bubbled up.  So I -- I definitely remember sending the paper that we talked about, the draft paper, the American Restoration paper, that was sent to the General Counsel's office with the understanding that it would be shared with the Threat Assessment Team.

So it's an ongoing process, right, once

you have someone that is on the radar, there's kind of a file and it keeps, you know, new information comes to light and -- and that group discusses it.

So I -- I know I communicated the paper by the time the -- the most recent tweets, the tweets at the end of March, those get reported back both directly to Pam and also to the General Counsel's office.

Q.   Shifting to a new topic, Dean, do you have a practice of holding Town Hall meetings with students at the law school?

A.   I do.

Q.   Could you tell us about that practice?

A.   Sure.  Every -- at the beginning of every semester I have a Town Hall where I -- I invite students to come.  They can ask anything they want. I give them some food.  It's meant to be sort of a check-in and a chance to hear what's on their mind and answer questions.  It's an effort at transparency and openness.

Q.   Did you hold such a Town Hall meeting in January of 2025?

A.   I did.

Q.   Was Mr. Damsky a topic of conversation at that Town Hall?

MERRITT MCALISTER                May 22, 2026                              43
96541

A.   He was.  There were multiple comments about Mr. Damsky at the Town Hall.

Q.   **What were those comments, if you remember?**

A.   So this was on the heels of the second paper.  This was on the heels of the book award and the, you know, the paper circulating within the community.

I think initially students thought that Mr. Damsky had received the book award for the paper that had circulated very widely that had that call to violence in the -- the final paragraph.  And so a lot of students were very upset.

I -- I would say that the comments were -- fall into sort of two buckets.  One was, you know, frustration and upsetness that the law school wasn't taking action against Mr. Damsky, including taking the book award away, some kind of punishment.

And then the second line of feedback or questions or concerns was really about campus safety and worries about Mr. Damsky in particular.  I remember a -- students -- a student very clearly indicated that she was afraid of him and that she scanned the -- scanned the exit doors, like if she was in a room where he was, she would make sure she knew where the doors were to exit a room, which I --

I interpreted as meaning that she was worried that he might engage in violence himself and that she was nervous about that and wanted to be prepared in the way that one would in a, you know, active shooter situation.

And then another student expressed a lot of -- expressed sort of reluctance to take classes with him, and -- and not wanting to engage with him or sort of have to -- have to deal with his viewpoints and -- and his -- his -- the risk that she felt in being around him.

So -- so those -- those comments came through as well as sort of just general concern that we needed to do something or punish him in some way.

Q.  Did any student comment that if they learned Mr. Damsky had enrolled in a class they were enrolled in, they would drop the class?

A.  Yes, that was said.  That -- yeah, that's what I was referring to, right.  So a student -- a student indicated that she -- she would not take a class with him in it.

Q.  Now, after the Town Hall, did you ask your Dean of Students to -- to do something?

A.  I did.  I was concerned, one, that, you know, he -- Mr. Damsky was not at the Town Hall so I

-- and it's usually for a Town Hall to have -- to talk about a student like that.  That -- that's never happened.  This -- this is the only incident where, you know, an individual student has identified and discussed, and it was concerning.

It was very concerning to me that students felt, you know, I had heard before, it's not the first time that I had heard that people were afraid of Mr. Damsky, but I thought -- I wanted to make sure that he understood that -- that people were afraid of him, and that, you know, we -- from my perception, having sort of dealt with a number of complaints about Mr. Damsky and I think initially I thought that, you know, some of this was sensitivity to, you know, a little overreaction.

I -- I was -- I was feeling that as the -- as, you know, his intensity and the -- as things got more sort of real and threatening, that the community was responding in a more real and threatening way, and so I was worried about that as an escalation.

And I had asked our Dean of Students, Janice Shaw, to talk with Mr. Damsky actually after the paper had circulated, so I think it was in sort of late October, early November, I had asked her to

-- to talk with him and sort of start building a relationship, because my worry was that we were going to need to intervene at some point, and -- and I wanted us to have a relationship with him, because I had actually never spoken with him, and I didn't want to bring him in myself because it felt like that would be punitive in some way.

And so -- so -- so after the Town Hall -- I give that as context. So after the Town Hall, I had Dean Shaw follow up with him, because she had already developed that relationship, and I wanted her to, in particular, make sure that he was aware that he was discussed and that concerns were raised about him as a -- as a threat and that other students feared him.

And so she -- I understand she brought him in to have that conversation.

**Q.   Now, we will hear from Dean Shaw at -- at the trial, but do you have an understanding of -- of how that meeting went?**

A.   My understanding is that -- that it was a, you know, constructive meeting, that he was already aware. I think he knew why he was being called in and that he was already aware of what had been said at the Town Hall. And so I don't think he was

surprised that we wanted to talk to him.

Q.    Now, after all that background, let's resume our discussion about the -- the posts at issue, okay?  In March and April of 2025 --

A.    Mm-hmm.

Q.    -- so a couple months after the Town Hall, did Mr. Damsky publish something that, in your mind, crossed a line?

A.    It did.

Q.    What did he do?

A.    So I -- I was at a -- a student had shared with me -- I mean, we had -- I -- admittedly I wasn't watching his Twitter account like daily, but a student gave me a copy or showed me a copy, and then later sent me a copy of a tweet that he had made, that in the context it was -- when it was shared with me originally it was sort of like a, you know, I understand you defended Mr. Damsky and his speech, you know, do you think this is -- this is different, and he shows it to me.

And my initial reaction was that it was very different.  It was -- so it was a tweet that felt like an, you know, a call -- a direct call for violence against a community, against the Jewish community, and the student who -- who shared it with

me was Jewish.

And so it -- it immediately felt like a much clearer direct escalation in the violent threats that he had started making.

Q.    Let me get the timeline straight.

A.    Yeah.

Q.    So the post we're talking about was from March 21, 2025, right?

A.    Yes.

Q.    And a week later on March 28, did you hold one of your Coffee and Donuts with the Dean?

A.    Yeah, so I was -- I -- I hold a weekly event where students can show up and have coffee and donuts and bagels, and -- and chat, and I'm -- I'm there every week that I'm in town.  So it's a time where students know that if they have a concern informally they can -- they can find me.

And it was at that that a student, Scott Jurkowski, showed me the tweet.  The tweet had happened on a Friday that was part of spring break, so it happened the Friday before.  It was a week old at that point in time, but we were on spring break, and I didn't hold Town Hall during -- or didn't hold the Coffee and Donuts when student aren't there.

So this was the first, sort of, time I'd

MERRITT MCALISTER                May 22, 2026                        49
96541

had a space to meet with students, and he showed it to me that next week.

Q.    So at the Coffee and Donuts he showed you the tweet.

A.    Yes.

Q.    He told you about it.  Can you -- and this is Mr. Jurkowski, right?

A.    Yes.

Q.    Can you describe his demeanor at the time he was informing you about the tweet?

A.    So he was very upset.  He was, I mean, I could -- it felt like he was -- his -- his eyes were red and sort of glistening.  It felt like he was on the verge of tears.  He was emotional like a little shaking, nervous.

Mr. Damsky was actually in the room at the time.  It was a big -- I mean, it's -- this is a -- it's in the Commons of the law school so it's a big space that students gather in.  So I wasn't sure if it was, you know, he was nervous just because Mr. Damsky was there.

You know, he was very emotional.  He says, you know, I'm -- I'm -- I'm Jewish and -- and he's making, you know, he wants me dead.  That was sort of the -- the urgency, and he felt like this is

MERRITT MCALISTER                  May 22, 2026                        50
96541

different, like this is a threat.

And I looked at it and I said it is different, you know, having -- having seen a lot of his writing, I felt like this was a much -- a director, you know, it was also in the context of, you know, all that's happening for the Jewish community.

It -- it felt very personal to -- certainly to Mr. Jurkowski. I'm not myself Jewish, but I could feel his -- I could feel his intensity in that moment, and I was very concerned.

**Q. Could you tell us about the Jewish community both at UF Law School and at the University of Florida as a whole?**

A. So we have one of the largest, I think if not the largest Jewish communities at the University of Florida of any school in the country, and the law school's, you know, similarly a very large, very active Jewish community.

So Mr. Jurkowski was Jewish. We have a number of very active and engaged Jewish faculty and students, and the Jewish Law Students Association is a very big part of campus life. So, you know, it -- it is a big part of, I think, what makes UF Law the community it is, the Jewish community.

Q.    I'm going to show you another exhibit. It's not in your stacks.  This one's --

A.    Mm-hmm.

Q.    -- out of order.  I'm going to have this one -- we're going to call this one Exhibit 10A.

A.    Okay.

Q.    Okay?  It's got Bates numbers 1233 and 1234.

A.    Mm-hmm.

(WHEREUPON, Exhibit 10A was marked for identification.)

MR. BARTOLOMUCCI:  Justin, are you able to pull that -- that exhibit up?  This is the -- the March 28 email.

MR. MILLER:  Give me just -- just a minute.

BY MR. BARTOLOMUCCI:

Q.    Okay.  Well, I know that Mr. Sabatini has -- has a copy of this, so why don't we --

A.    Okay.

Q.    -- proceed slowly while -- while Justin --

A.    Sure.

Q.    -- puts that on the screen.  But, Dean, can you tell us what this document is, this 10A?

A.    So this is an email that Janice Shaw,

MERRITT MCALISTER                    May 22, 2026                        52
96541

Senior Assistant Dean for Students, sent to Pam Malyk at my direction, which is reporting the tweets to Pam Malyk, the -- who is in the Conduct office.

So it's -- it's -- it's sending a message, so it's Scott Jurkowski had sent me -- this is all after Mr. Jurkowski reported to me at the Coffee and Donuts. So Coffee and Donuts lasts from 10 to 11. The original time stamp is 10:48 on the message that Jurkowski sends to me where he includes all -- he has a -- like a Dropbox for a bunch of screenshots of the Twitter account as well as an attachment specifically of the -- the most, you know, most threatening of the tweets.

And -- and so I send that to Janice right after I received it, and then I remember I called -- Janice Shaw and I had a Teams call as soon as Coffee and Donuts ended at 11, and I directed her to send it to Pam Malyk, which she did right away.

Q. So if I have this right, on the same day at the Coffee and Donuts at which Mr. Jurkowski showed you the post --

A. Yes.

Q. -- he then -- he then emails you, attaches a copy of the March 21 post. Right so far?

A. Yes.

MERRITT MCALISTER                    May 22, 2026                        53
96541

Q.   And then he also includes in his email a hyperlink to a -- a collection of -- of other posts by -- by Mr. Damsky --

A.   Yes.

Q.   -- is that the --

A.   Yes.

Q.   -- long and the short of it?

A.   Yes.

Q.   Okay.  And -- and now we have the document on the screen.

A.   Okay.

Q.   So that's 10A, Bates number is 1233 to 12 -- 1234.  That is all I wanted to -- to ask --

A.   Okay.

Q.   -- about that.  So let me -- let me ask you this, Dean.  Upon seeing Mr. Damsky's post of -- of March 21, what was your reaction to it?

A.   I was immediately concerned.  I mean, I -- it was -- it felt, you know, I mean, I had spent a lot of time reading Mr. Damsky's writing and dealing with student concerns and complaints, and this felt -- I don't know, it felt visceral in a way.

     It felt scary, you know, I -- I -- you know, Mr. Jurkowski read it as a threat and I thought that was a reasonable sort of reaction that,

MERRITT MCALISTER                May 22, 2026                    54
96541

you know, someone saying that Jews must be abolished by any means necessary, it felt deeply personal to him.

I -- I understood why if it was very threaten. I -- I didn't, you know, he's -- Mr. Damsky had called for violence in any number of writings, and there was something about actually being on a social media that -- that actually made it worse to me because it wasn't like an academic footnoted article.

It was like a -- it -- it just felt like it was like he was talking directly to the community, and that -- that scared me. I was scared, and I knew immediately that it was something much more urgent to deal with, and we dealt with it right away.

**Q. When you say it felt like he was talking to the community, what community are you talking about?**

A. Well, to -- to us. I mean, I -- I think it's hard to understand, but -- but, you know, he was somebody who had been so much a part of what the law school was talking about and thinking about for, you know, almost two years, that -- and it always felt like he was just trying to like -- he was

trying to, you know, provoke, and -- and cause outrage and -- and all of this.

And so, you know, this message in particular to our Jewish community at that time, I mean even though it was, you know, it was on X and other people could see it, but -- but we were all watching Mr. Damsky. And so it felt very personal to -- to us because it was so -- just so offensive and -- and -- and violent and extreme and scary.

I mean, I, you know, we were living -- we are still living in a time in our world where, you know, there's violence against Jewish community and -- and that was, you know, it was a little just -- it was just a little scary to see that someone within our community was -- was -- at least advocating similar violence within our community.

Q. Was this a -- the March 21st post --

A. Yes.

Q. -- was it a public post?

A. It was public.

Q. So you -- so why --

A. I pulled it up on my own phone at the time, yeah.

Q. So you didn't have to be a -- a follower of Mr. Damsky's to see the post?

A.    No.

Q.    Did -- did you think that UF law students including or especially Jewish UF law students could view that post as a -- as a threat of violence?

A.    I did, I -- certainly Mr. Jurkowski felt that way and I thought it was -- it was -- I understood why he felt that way.  It was -- it was a very direct statement that Jews must be abolished by any means necessary.  I, you know, he -- he also talks about this guy, Noel Ignatiev, who I did not know but -- but, you know, that -- that last line, you know, it's -- it's -- it -- it was scary.

Q.    Now, as distinct from whether it was a threat of violence, do you believe that the post promoted illegal violence?

A.    I -- I mean, that was -- that was -- you know, I mean, at different -- yes.  At different times, you know, whether Mr. Damsky himself, you know, intended to carry out any -- any kind of threat, I was always worried about how other people might read what he said and, you know, that he -- that -- that other people that, you know, I didn't -- weren't even on my radar might be, you know, I don't know, I don't want to say radicalized, but might be sort of emboldened by -- by what he was

saying to -- to carry out some kind of heinous act.

Q.   So after you were alerted to the March 21 post a week after that -- that date, what did you do?

A.   So I -- I mean, we immediately -- I immediately sent it to -- to Dean Shaw who had been, you know, dealing with Mr. Damsky, you know.  She's the one who had met with him multiple times, and we had talked, you know, at length about our concerns and -- and also, you know, the -- the conclusions we had reached at different times that this speech was still protected.

But she and I both felt, I think, that this was very different and so we immediately began a process of reporting it to -- to General Counsel's office, to the Student Conduct office, and, you know, I started engaging with the university, with the main campus on this as well as other senior leaders within the -- the law school.

Q.   And the things that you did, did they ultimately result in the Student Conduct process that Mr. Damsky went through?

A.   They did.

Q.   Do you have, at the law school, something called a -- a Faculty Council?

MERRITT MCALISTER                  May 22, 2026                          58
96541

A.    Yes.

Q.    What is the Faculty Council?

A.    So it's a group of elected faculty who represent the faculty as a part of shared governance in any university, you know, administrators and faculty are meant to work together and -- and have information sharing and advice, and, you know, openness and transparency.

And so they represent the faculty, and I meet with them monthly, just monthly on sort of a regular basis, and then any time there's something special, to keep them abreast of things that are going on and get advice and -- and guidance and work on issues within the law school.

Q.    Did you advise the Faculty Council about the March 21 post?

A.    I did, because we had discussed Mr. Damsky multiple times because like, especially after the -- we discussed him at -- with the GroupMe chat, but then also when the paper circulated that had been discussed, and so this was another part of that.

And so we talked then about the post.  I had learned, this was -- I believe this was on -- this was Tuesday April 1st, and the night before I had gotten a call from another faculty member about

MERRITT MCALISTER                May 22, 2026                    59
96541

-- that he had lost an internship because of the -- the tweets, like they were starting to sort of get out.

And so I -- I knew that this was about to -- this was sort of, you know, it was bubbling it. It was -- it was, you know, we had -- like I said, we'd been through a number of these so in particular on the Faculty Council at the time were several faculty members who had taught Mr. Damsky, so in particular I found that helpful to -- to keep them abreast because they knew him better than I did.

So I -- I shared about the tweets and we -- we talked about it at the Faculty Council meeting.

Q.   Are -- are there Jewish faculty members on the council?

A.   There are.

Q.   What was their reaction to the post?

A.   Everyone on the Faculty Council was deeply concerned about the tweets, I think.  Some -- some felt very clearly that this had crossed the line. We had -- again, we had been engaged in, you know, conversations about him so there was a sense that this was very different than everything that had happened before.  And the Jewish faculty members in

MERRITT MCALISTER                May 22, 2026                          60
96541

particular were I think very alarmed about the --
the tweets.

Q.   Did news of Mr. Damsky's March 21st post spread to students on campus, and if so how quickly did that happen?

A.   So I -- I -- I -- I mean, I don't know exactly.  I don't have insight into all the ways that students sort of spread stuff, but I do know at least that on -- on April 1st, the -- a copy of the tweets -- a copy of the tweet, the main -- the main tweet, was sent by a group of Jewish faculty members to the rest of the faculty.

And at that point in time my -- my sense is that it spread very widely, that certainly there were the -- I think it was sent by three Jewish faculty members and at least one of them was the head of the Jewish Law Students Association -- or the faculty advisor of the Jewish Law Students Association -- Association, so I think it's -- it is -- it starts spreading pretty widely at that point in time.  Like all -- all in sort of one, sort of, I don't know, four or five-hour chunk.

Q.   Would you say that by April 1st the -- the main tweet, the March 21st post, was well known --

A.   Yes.

Q.    -- among students and --

A.    Yes.

Q.    -- and faculty members?

A.    Yes.

Q.    And did staff members also learn about the post?

A.    Yes.  I think everybody was -- was -- there was -- there were a lot of discussion about the -- the tweet on campus.  It was not -- I -- as far as I know, I did not directly send it to the staff.

Q.    Did you meet with the faculty advisor to the Jewish Law Students Association?

A.    Yes, I did that evening on -- on April 1st.

Q.    And what was the nature of that discussion?

A.    So it was -- it was -- so it was in the evening.  I was still on campus.  He was on campus too.  I went up to -- to see him and he was very upset, demanded immediate action.  He was -- demanded a police presence.  He was very concerned about -- this is Professor Kaufman.

He was very concerned that he had an event that he was doing that week for the Jewish Law

MERRITT MCALISTER                May 22, 2026                         62
96541

Students Association, and he wanted increased police presence, which we were already working on.  He -- he was -- he wanted us to report it to the police, to the FBI, you know.

He -- he was -- expressed, you know, fear for his family.  His wife teaches at the law school as well, and, you know, he was just -- he was very upset.

Q.   Did he tell you how students were reacting to the post?

A.   He did.  He -- he said that students had -- students were reaching out to him expressing their fear, worried about coming to campus, you know, worried about, you know, being in a space with him and -- and it was -- it was really just a call to the -- that, you know, of all the things we had dealt with, there was a sense that, you know, this really crossed the line.

Q.   Did students submit through the online portal complaints about Mr. Damsky's March 21 post?

A.   They did.  They started, you know, sort of all -- all that evening on April 1st.

Q.   Well, let's look at a few of those.  Let's -- this is Exhibit 11 --

A.   Mm-hmm.

MERRITT MCALISTER                    May 22, 2026                         63
96541

Q.   -- which consists of Bates numbers 644,
646, and 648.

(WHEREUPON, Exhibit 11 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q.   So can you tell us what Exhibit 11 is?

A.   So this is a -- a message that was sent through the Community Concerns portal that -- from a -- from a student to the law school letting them know about concerns.

Q.   And each of these three Community Concerns was forwarded to you by -- by Dean Shaw, correct?

A.   Yes.

Q.   So you -- you saw these on -- on or about April 1st?

A.   I saw them all on -- yes, on or about April 1st.

Q.   Well, could I have you read for the record the -- the comments that are made?  Let's start with the comment on -- on doc 644.  What does that say?

A.   Preston Terry's comments on Twitter X are insane and not protected speech under the First Amendment.  I understand that this law school rightly prides itself on its protection of speech, but this is disgusting.  The pattern and tenor makes

me worry for my Jewish friends and family.

Q.   Okay.  Let's have you read the second one.  This is doc 646.

A.   I am extremely concerned for the safety of my classmates and students following an X post from student Preston Terry.  His post said Jews must be abolished by any means necessary.  Antisemitism has no place on UF Law's campus, and my classmates do not deserve to go about their days in fear because of his words.  I fear for when his words will be actions.

Q.   And finally the -- the comment on doc 648, if you would.

A.   This attached tweet is from a current student at UF Law who is actively engaging in hate speech.  This should be by no means tolerated.  This is a danger to the safety of students at the school and must be addressed immediately.

Q.   And are -- are these comments consistent with other complaints you heard from students, whether written or oral?

A.   Yes.

Q.   Did -- did these comments come in the context of -- of events in the nation involving school shootings or antisemitism?  Could you just

give us the broader context at the time?

A.    Yeah.  I think, I mean, of course, I mean, there had been, you know, acts of -- acts of violence against the Jewish community that had happened, you know, sort of contemporaneous with -- with what was happening here.

This was obviously all after October 7th and the -- the backlash and the antisemitic backlash to those -- to the ongoing conflict in -- in that region, and, you know, as well as just fears around school shooting.

I mean, the -- Florida State incident, shooting on Florida State's campus happened like a week or two after this, you know.  There's -- there's been, you know, there's -- it's just, you know, I think everyone, unfortunately, right, is in a heightened state of alert around issues like, you know, these kinds of threats and -- and -- and fear for the community.

And it certainly was, you know, part of my mind.  I -- I had, you know, students had raised concerns in response to some of the other events and I had not, you know, I think initially I -- I did feel like, ah, there, you know, they may be overreacting.

But, you know, this felt -- this felt very different, and partly because of the context, part -- because of the moment where, you know, the Jewish community was under threat, and -- and I -- I -- I didn't know how far it might go.

**Q. Did the -- did the nature of the student complaints indicate that they viewed the post as being, you know, aimed at the UF community?**

A. Yes. I -- I certainly think that the, you know, in part because they circulated, in part because he was someone who was on -- on their radar, that they were watching, if you will, which, you know, I -- I guess, you know, I had always encouraged students that if they saw something that they needed to tell me, right.

I don't -- I don't -- I can't watch everything. We don't -- we aren't watching everything. There's stuff that student hear and know about that, you know, doesn't -- isn't always on our radar.

So students had been encouraged, you know, at every time there were issues that were coming up within the community around, you know, Mr. Damsky, I would always say, you know, I would explain sort of free speech rules and why we would tolerate --

tolerate it, but that there were lines and that students should be -- and know, including Mr. Damsky, that if a line were crossed we would respond.

And so I think everyone was kind of -- I don't know, watching, waiting, worried that he -- he might go too far. And so yes, I think -- I think that in part because of how much attention was on him individually, and then, you know, then the tweets circulate and all of that, and it -- it does feel I think very personal for the students.

Q.   Well, let's talk a little bit about the exchange with Professor Lidsky. So the original post is on March 21, and after that did Mr. Damsky have an exchange with a law professor, Lyrissa Lidsky, on -- on the X account?

A.   Yes. Yes, he did.

Q.   And -- and did Professor Lidsky post something on April 1st?

A.   She did.

Q.   And -- and what did she say in that post?

A.   She said, are you saying you would murder me and my family, is that your position.

Q.   And did Mr. Damsky respond to that?

A.   He did.

MERRITT MCALISTER                May 22, 2026                        68
96541

Q.   What did he say in response?

A.   He said, did Ignatiev want whites murdered.  If so, were his words as objectionable as mine.  If Ignatiev sought genocide, then surely a genocide of all whites would be even greater outrage then a genocide of all Jews given the far greater number of whites.

Q.   **To your mind, is there anything noteworthy about Mr. Damsky's response to Professor Lidsky?**

A.   Well, you know, I -- I guess I was sort of -- I mean, I remember seeing this that -- that evening.  I was sort of surprised that he didn't just say of course not, like I -- I don't want, you know, I -- I don't want you or your family murdered.

But, you know, I mean, Mr. Damsky is -- he's intellectualized this, right.  He's trying to -- this is the whole discussion about intellect, you know, Noel Ignatiev and all of that, and so he kind of, you know, he was -- he's resorting back to what -- whatever Ignatiev meant, and, you know, and I thought it was sort of odd that he like starts talking about genocide.

I mean, that was not -- to me, that -- that confirmed that when he was, you know, if there was any ambiguity about what does it mean for Jews

MERRITT MCALISTER                     May 22, 2026                          69
96541

must be abolished by any means necessary, when he starts talking about genocide, I, you know, I -- that's hard not to conclude that he's at least meaning that he is advocating for genocide.

Q.   Do you think that Mr. Damsky's reply to Professor Lidsky can be seen as a threat of violence toward the UF community?

A.   Well, I -- I think, you know, if he were not aware of students sort of paying attention to him or that the community was paying attention to what he's saying, I think, you know, Professor Lidsky is a very -- very known within the community, I think he -- he, you know, it's pretty clear now that we were paying attention.

And so I think the response is, you know, is one where he's -- he certainly knows that people are -- are looking at this.

Q.   And it surprised --

A.   Within the law school.

Q.   It surprised you that he didn't just say no, of course I'm not talking about murdering you or your family.

A.   I mean, I -- I -- I -- yeah, I mean, I thought this was a -- I mean, that was the easy response is to say no, I -- this is an intellectual

debate about, you know, Jewishness or what --
whatever, about, you know, some -- something that --
that made it clear that, you know, he wasn't
actually calling for violence.

But I, you know, I think he's -- he's been
given a few different opportunities within the law
school to disclaim an intent of violence and, you
know, he's -- he -- he doesn't take it.  I mean, he
didn't take it before the seminar paper.

**Q.   Let me ask you a devil's advocate sort of question here.  Wasn't Damsky just talking about Noel Ignatiev's views on -- on whiteness as a social construct and -- and applying that to Jewishness as a concept?**

A.   I mean, I thought that's maybe what, you
know, I -- because I didn't -- I -- I will admit
that I -- I didn't know who Noel Ignatiev was before
I saw the tweet, so I did look up some of his work
and, I mean, I didn't read it but I sort of looked
up enough to kind of have an understanding.

And I -- I -- that would be what I would
have -- that would have been my analogy is that like
if you're talking about sort of deconstructing or
destroying or abolishing whiteness as a category,
it's sort of a critical race theory kind of concept,

then the analogy in my mind was to Jewishness, right.

The category or the -- the identity of Jewishness was the problem, but that's -- that's not the way he's using it here, at least not the way I would have expected him to.

Q.   So just a couple more questions about the -- about this exchange.  There's one more post by Professor Lidsky --

A.   Mm-hmm.

Q.   -- after that, and she says, quote, I notice you didn't say no.  Do you see that?

A.   Yes.

Q.   So it wasn't lost on her that -- the fact that he didn't say no, I'm not saying I would murder you and your family.

A.   Right.

Q.   And then does the chain end there or are there any further responses by Mr. Damsky?

A.   I believe the chain ends there.

Q.   So that was the end of it.

A.   That was the end of it.

Q.   Okay.  Let's talk about the reaction to the exchange with Professor Lidsky.  Did students complain about what Mr. Damsky had said in -- in

reply to Professor Lidsky's post?

A.   Yes, I think -- I think if -- the way I would describe it is that, you know, if they were generally afraid for themselves or the Jewish community before then, now they were very afraid specifically for Professor Lidsky and worried that she had made herself a target.

Q.   Let's look at Exhibit 12.  This is -- it's got Bates number 650.

(WHEREUPON, Exhibit 12 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q.   Can you tell us what this is?

A.   So this was a -- this was another student concern submission that we received later that -- on April 1st.

Q.   And do you tell us the -- the substance of the concern?

A.   Yeah, it's specifically now about -- it's about Professor Lidsky and the fact that he was now engaging with her, and that it had caught her attention, so.

Q.   Would you mind reading the -- the final sentence of the first paragraph in the comment section?

MERRITT MCALISTER                    May 22, 2026                           73
96541

A.    So the student responded to the professor, referring to Lidsky, directly calling for the slaughter of her and her family due to her religion.

Q.    Thank you.  So let's -- let's look at the next exhibit, Exhibit 13, Bates number 5265.

(WHEREUPON, Exhibit 13 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q.    Could you tell us what this is?

A.    So this is a message that was sent to Professor Lidsky from a student in her class --

Q.    And then --

A.    -- that was sent to me.

Q.    And then Professor Lidsky forwarded it, the student's comment to -- email to you, correct?

A.    Yes.

Q.    And could you read for the record what -- what that student wrote to Professor Lidsky?

A.    Hi, Professor Lidsky.  I'm sorry for what is happening right now.  I'm a little concerned about your safety with the comments that were made by a student.  I just became aware of what happened. I wanted to know if class Monday and maybe Wednesday too would be moved to a different room, or online, for safety.  Do you know what safety precautions the

MERRITT MCALISTER                May 22, 2026                       74
96541

school is taking?  I'm also Jewish and the comments made me -- made are very scary.  I hope you are -- you stay safe.

Q.   Now, these -- these complaints and concerns we've been looking at in the last few exhibits are all between April 1 and April 3, correct?

A.   Yes.

Q.   At -- at that point was it -- had Mr. Damsky been trespassed or was it known that he was trespassed by -- by April 3?

A.   So sometime on April 3 it would have been known.  I don't know exactly if it was before -- it was sometime in the afternoon of April 3.  So at the time the student sent this message it may not have been known.

Q.   So was it -- is it fair to say that there was a student and faculty reaction to the Damsky posts and the Lidsky exchange before the trespassing occurred?

A.   Yes, yes.  A lot -- everything we've been talking about happened before, you know, the -- I knew that the process -- we were working through the process to try to address the concerns, but I don't -- the community did not at that time.

Q.   And -- and again, when -- when was the trespass announced to the community?

A.   It was -- I would have to find the exact email, but there would have been an email on April 3rd.  So he was trespassed on April 3rd, Thursday April 3rd, and at some point that day I shared the information -- not with the whole community, but at least with the students -- sorry, with the faculty, which we had -- that's sort of our protocol to -- to let faculty and staff know just because a trespassed student needs to be identified, and we have to call police if -- if the student were to come back to campus.

Q.   To your knowledge, did Professor Lidsky eventually become concerned for her own safety in -- in the wake of the exchange with Mr. Damsky?

A.   Yes.  You know, I think, as she and I talked about this a fair amount that week and, you know, I think initially, even when she sent her tweet, I don't think she was that worried, but I think -- I think she became more alarmed, just as I had, frankly, as more students told me their concerns and sort of their -- their private concerns as the sort of increase of the number of students who were reaching out to her to check on her and to

MERRITT MCALISTER                    May 22, 2026                        76
96541

say, you know, we're worried and we're scared and, you know, he's -- he's scary, I think that heightened her own fears.

So sort of over -- over the course of the week, given sort of, you know, the volume of student concern and the number of students who had expressed worries to her about him, she became much more alarmed.

I mean, she confided in me that she and her husband were sleeping with a baseball bat out of -- out of fear.

Q. Let's look at Exhibit 14, Bates number 5266.

(WHEREUPON, Exhibit 14 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q. Can you tell us what this is?

A. Yes. This is a message that Dean Shaw sends to me that records a conversation that -- that a staff member at the time, Richard Blake, had had with Professor Lidsky.

Q. And -- and Mr. Blake is sharing with Dean Shaw and then -- then shared with you some concerns that Professor Lidsky had at the time, correct?

A. Yes.

Q.   And -- and this -- this -- the first email here is dated April 4th; is that right?

A.   Yes.

Q.   So I -- I'm not going to ask you to read the whole thing, but can you sort of share the -- the nature of Professor Lidsky's concerns as reflected in this document?

A.   So it's a -- it concerns about campus safety, so whether we were going to lock the doors and try to make sure that the campus was secure, that she, you know, it explains what I just described.

She wasn't fearful at first, but the sort of volume of student concerns had -- had made her more alarmed that, you know, she was conscious of having sort of herself like in a room scanning and worrying when the doors opened that, you know, she was worried he was going to come through the door, and that students had asked her to change her classroom and -- and date and times from something that wasn't publicly posted to increase security for her own class.

Q.   Did she -- did Professor Lidsky ever cancel a class in the wake of the post?

A.   She did.  My understanding is she canceled

MERRITT MCALISTER                    May 22, 2026                              78
96541

that Monday class that was after all of this.  And, you know, I should say, I -- she's -- she's a very senior faculty member.  She's been teaching for over 30 years and was a dean at a -- a former law -- at another law school, so you know, I took her concerns -- we might talk about what I ultimately did for safety, but I took her concerns very seriously.

Q.   So this -- this Exhibit 14 that we've been looking at, would you view this as an example of the -- and a summary of some of the disruptive effects of -- of the posts?

A.   I would.

Q.   Now, did the exchange with Professor Lidsky, like the original post, also spread through the campus?

A.   Yes.

Q.   In -- in April of 2025, did you have meetings and conversations about both the original post and the exchange with Lidsky?

A.   Yes, it was -- I mean, it was sort of all anyone was talking about for certainly that period of -- of time.

Q.   Did faculty members express to you a fear for their safety or the safety of their families?

A.   Yes, Jewish faculty members, in

particular, but also faculty members of color.

Q.   Were any faculty members concerned about the security of their -- their classrooms?

A.   Yes.

Q.   Can you tell us a bit about that?

A.   So I -- there was at least one faculty member who had reached out specifically asking for a police presence in -- in her classroom because Mr. Damsky was supposed to be a student in the class. He was registered.  This was after he was trespassed, but that they were having a guest speaker who was Jewish.

Q.   Let's look at Exhibit 15.

A.   Mm-hmm.

(WHEREUPON, Exhibit 15 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q.   This is Bates number 1397.  Can you tell us what this is?

A.   Yes.  This is a message from Professor Lea Johnston who was teaching a mental health law class, and that at least one of the students in her class had worried about safety issues in the class because Mr. Damsky was there and there was a Jewish visitor to class.

MERRITT MCALISTER                    May 22, 2026                          80
96541

Q.    And this is a message from Professor Johnston to you, correct?

A.    Yes.

Q.    On April 4?

A.    Yes.  And she was asking for a security person to come.

Q.    Did any staff members at the law school have a reaction to the post that you recall?

A.    Yes.  There was a staff member who asked -- who asked us to remove her name from the website.  She had a Jewish surname.  She also took her own placard down from her door.  She -- she asked permission to work from home for a period of time, at least through the end of the semester.

She was not -- she does not have a role that would allow that.  Her role was really a -- a campus student-facing.  She needed to be present on campus in the -- she was managing events, and so we -- we denied that request ultimately and she -- she quit shortly thereafter.

Q.    Did you grant the request to take her name and picture off your website?

A.    I did.  I did.

Q.    Okay.  And do you attribute her requests to her fearful reaction to the Damsky posts?

MERRITT MCALISTER                    May 22, 2026                    81
96541

A.    I do.

Q.    Did you as dean make any changes with respect to the deployment of campus police officers in the wake of the Damsky posts?

A.    I did.  We had -- initially we had, you know, sometime that week -- before he was even trespassed we had increased patrols on campus, you know, asking for there to be an increased police presence.  Not uniformed police presence.  We didn't want -- it's always a -- it's -- it's tricky.  If you -- if you have uniformed officers show up it tends to alarm everyone, and so you don't want to cause unnecessary alarm.

We did have a uniformed officer show up for the -- the Jewish Law Students Association event that was that week.  We thought that was particularly important because of the nature of the event, but otherwise we had -- cameras had been relocated to the law school area so we could monitor the campus, and then there was an increased police presence.

Frankly there -- there still is on our part of campus.  We -- we regularly have a police vehicle that's parked at the law school.

Q.    Did you make any changes with respect to

police patrols at the law school?

A.   Yes, we increased police patrols in that area.  There's a -- there's at least a --

MR. SABATINI:  Why don't we -- it's been almost two hours.  Why don't we just take a quick break, Chris?  It's been almost two hours.

MR. BARTOLOMUCCI:  Yeah, we -- sure.

MR. SABATINI:  Okay?

MR. BARTOLOMUCCI:  Sure, we -- we can take a break.

MR. SABATINI:  It's been a while.  Let's do a quick break, thanks.

THE VIDEOGRAPHER:  All right, please stand by.  The time is 11:42 a.m. and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are on the record. The time is 11:49 a.m.

BY MR. BARTOLOMUCCI:

Q.   Okay, Dean, we're back on the record after a short break.

A.   Mm-hmm.

Q.   And we're nearing the end of the direct examination.  I think when we left off you were talking about police patrols --

MERRITT MCALISTER                May 22, 2026                        83
96541

A.    Mm-hmm.

Q.    -- at the law school.  Do you want to just cover that again?

A.    Sure.  We -- we increased police patrols that week in response to -- to the -- the -- the tweets and the -- the -- the threat.  We -- so -- so that -- that happened sort of behind the scenes.  We also had a uniformed officer who was present for at least the Jewish Law Students event.

There was a camera that was stationed in -- outside of a law school parking lot, sort of on campus to monitor comings and goings of the campus.  So that began then, and -- and frankly has continued to today.  We still have -- we frequently have the camera there and we also have a -- a police officer increase patrols on that part of campus, officers usually stationed at -- at the law school.

Q.    And do you have other security cameras in use as well?

A.    So the ones that -- we don't have anything that the law school monitors.  It's what -- what the UFPD monitors.

Q.    Let's look at Exhibit 16, Bates number 4075.

(WHEREUPON, Exhibit 16 was marked for

identification.)

BY MR. BARTOLOMUCCI:

**Q.    Are you able to identify this document, describe it for us?**

A.    So this is a document related to the Jewish Law Students event that I described where the UF Police Department is confirming that they will have a -- a police presence there for that event, which was the week that all of this broke on campus.

**Q.    And the email on top, who is that from?**

A.    It's from the chief of police for the university police department.

**Q.    And that's Bart Knowles?**

A.    Bart Knowles.

**Q.    Okay.  Did you activate any other campus security measures after the posts?**

A.    So I did.  I -- I was initially reluctant to do more.  I didn't want -- because Mr. Damsky had been trespassed, I didn't want to unnecessarily alarm the community.  I think it's always a delicate balance where you -- you don't want people to think that if -- like if we had an increased police presence that was a uniformed and -- I think for some of these people that -- that makes -- that increases anxiety.

They worry then that that means that, you know, there's some threat that we aren't telling them about, but both sort of the volume of -- of student concerns, Professor Lidsky's concern, there was a group of students who met with me that Friday during this week that waited for me at the Coffee and Donuts with the Dean, who sort of, you know, were really demanding that the law school do more than just remove him from campus, that they were still very afraid and did not feel safe on campus even though he had been trespassed.

And so I -- I ultimately decided to move to swipe card access for the buildings.  I was reluctant to do it initially, but I think, you know, I -- I -- in listening to students and faculty, Jewish students in particular because that was not my, you know, as -- not as a Jewish person myself, there was a intensity and a fear that was very specific to that community that I think I -- I had underappreciated, but in context decided that I needed to take more steps and precautions, and -- and the younger students who were very worried about -- we had a -- we still had a Parkland survivor who was on our campus, you know.

There was -- there was just a lot of fear,

MERRITT MCALISTER                May 22, 2026                              86
96541

and -- and I didn't -- I didn't, you know, I hadn't always fully understood that, so -- so I did decide to move to swipe card access to increase safety, a sense of state for the community.

And we did that ultimately on -- late on the day on Friday.  So basically our doors go to swipe card Friday at 5 anyway, so we just -- once it went to swipe card access that Friday at 5, which would have been I think this was April 4th, we just kept it on.

And it's -- frankly it's -- it stayed on since.

Q.   Just so the record's clear --

A.   Yeah.

Q.   -- can you tell us what you mean by swipe card access?

A.   So you -- you have to have a -- a UF -- a GatorOne ID to enter the building.  And so you either have to have it on your phone or swipe your GatorOne card and to get into the building, they're -- they're otherwise locked.

Q.   When Mr. Damsky was trespassed, did his swipe card access end?

A.   It did.

Q.   Let's look at our last exhibit, Exhibit

17.   It's Bates 1414 and 1415.

(WHEREUPON, Exhibit 17 was marked for identification.)

BY MR. BARTOLOMUCCI:

Q.   Can you tell us what this is?

A.   This is -- this is a message -- so after I moved to swipe card access I needed to let everybody know, because that was a -- that was a change in protocol.  And so this is a message that I -- originally is a message that I had sent to -- to everybody.

It's -- it's -- I'm sending a message first to the students to explain.  I was very worried about -- I didn't want the students to think that like I was keeping information from them or that there was some kind of threat that they didn't know that I wasn't sharing that, you know, beyond the tweets themselves and so I was trying to communicate that, you know, everything was -- was going to be okay.

And then I realized that I needed to send it to the staff because I had not communicated that to the staff, so I send it then to the staff the next day.  And then there's a message between me and the head of our facilities department explaining

what we're going to do on the protocol with the --
the doors.

Q.    I'm going to have just a few more questions for you.

A.    Mm-hmm.

MR. BARTOLOMUCCI:  But before I do that, since we're at the end of our exhibits, I want the record to reflect that I am formally moving the admission of those exhibits.

The parties have already stipulated to each other's exhibits, but just for belt and suspender's reasons, I want to -- I want to move their admission.

Anthony, I don't know if you want to -- I don't know if you have any objection to the admission of these exhibits or not, or if you want to talk about that now or save it for the trial, but I thought I'd throw it to you in case you wanted to say something about these exhibits.

MR. SABATINI:  These are all the exhibits we've already stipulated to, correct?

MR. BARTOLOMUCCI:  That's correct, with the exception of -- of 10A, that -- that last email, the -- the Scott Jurkowski email to the -- to the dean on March 28, that -- that was produced to you

MERRITT MCALISTER                 May 22, 2026                        89
96541

but I -- I think that is not on our stip list, but everything else is.

MR. SABATINI:  Well, I do not object to anything except for the one you mentioned, 10A, because I need to re-review it.  We can deal with it at the trial.

MR. BARTOLOMUCCI:  Okay, very -- very well.

BY MR. BARTOLOMUCCI:

**Q.   So again, Dean, just to -- just a few more questions.  Are you able to tell us how much time you spent dealing with Mr. Damsky and the issues he generated while he was at the law school?**

A.   I mean, I -- I -- I don't have to bill -- bill my time anymore since I'm not a practicing lawyer, but, you know, I -- this is the -- probably the single most consuming series of events of the three years I've been a dean.  I think, you know, probably five or six weeks, a month of -- of just solid time spent on this if you added it all up.

You know, there -- there basically really wasn't a week where we weren't sort of thinking or monitoring or, you know, sort of talking with or sort of dealing with some of the fallout of some of this, and it's -- it's been, you know, enormously

time consuming and very it difficult.

I -- it's not, you know, it's not an area I know a lot about. I don't, you know, you get these jobs and I, you know, I'm not an expert in student psychology. I -- I don't know how to evaluate threats and, you know, how to make sure that I'm keeping our community safe, but it, you know, it has caused sleepless nights and a lot of anxiety for me personally, but it's -- it's been a very consuming series of events.

Q. Am I right that the time you spent on Damsky issues was not time you could spend on other law school business?

A. Absolutely.

Q. Am I also right that there was a school shooting at another Florida university not long after the Damsky posts?

A. Yeah, I think within like a week or two after that. I mean, I think, you know, I -- the worst nightmare I think of any school administrator is -- is something like that happening, and I, you know, that had been in the back of my mind from the very beginning with Mr. Damsky, you know.

The -- the incident with the door, which, you know, I think some students had observed and

certainly the staff was aware of -- of that, you know, from back in August, but I had always worried and wondered and was not sure, you know, how Mr. Damsky might respond to any particular incident.

And so, you know, the worst fear of any administrator is that you were -- that something, you know, an atrocity, something awful might happen within your community, and to know that there were signs, you know, warnings, and I -- I -- you know, I couldn't help but take some of these things as -- as warnings.

I mean, it was persistent and repeated, calls for violence, and, you know, as much as I had spent hours talking with students and trying to calm them, you know, this hit a point where there was really nothing that I could say to -- to -- to allay the fears that -- that I accepted as very -- very real and true for students, especially our Jewish community that was living through a very, very difficult time in the world.

And I think, you know, it was a -- incredibly challenging to figure out exactly how to respond in a way that kept people calm but also took very seriously the possibility of something unbelievably awful happening on my -- on our campus.

MERRITT MCALISTER                    May 22, 2026                          92
96541

And it's, you know, I take -- how could I, you know, look in the eyes of a parent or a faculty member if, you know, knowing that I had some ability to protect our campus and I had failed, not knowing exactly what, you know, what -- what anyone is capable of doing, but all that you have is, you know, conduct and behavior and escalation over time that leads you to be in a really tough spot of do you -- do you act to protect.

And, you know, it -- it was just very clear to me the moment I got that tweet from Mr. Jurkowski that if I did nothing in this moment, I was, you know, we were in a bad spot.

**Q.   Now, the school that had the other school shooting, what -- what Florida university was that?**

A.   It was Florida State University which is just down the -- just down the way from us.

THE REPORTER:  And I'm sorry for the interruption, just for the record, can you please restate the question, and then the witness can answer?

BY MR. BARTOLOMUCCI:

**Q.   I think I said the -- the other school at which there was a school shooting, what -- what -- what school was -- was that?**

**NAEGELI** | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

A.    It was Florida State.

**Q.    So you got into this somewhat already, but as dean do you have to take seriously threats of school violence?**

A.    Absolutely.  I mean, I -- that is the -- I mean, you know, I -- like, I -- I mean, I -- I mean, I think I've mentioned a few times I didn't grow up with the kind of training that I think our -- our students have.  I don't -- I don't know.

I've gone to training.  We've had some at the law school, you know, and I've -- but I -- you know, they are -- they have lived in a different world than I grew up in in terms of fears of violence in schools, and, you know, it's why we have a Threat Assessment Team, right.

It's why we do things to protect our campus.  It is the single greatest fear of any person who has, you know, is in this sort of chain of -- of authority to make decisions about what happens on a community and in a college campus.

And so, you know, yes, it is -- it is a scary, scary moment to be in a place where, you know, you're not sure, you know.  I -- it sort of doesn't matter whether I think Mr. Damsky is capable of it, it's like, but everybody is afraid of like

MERRITT MCALISTER                    May 22, 2026                         94
96541

whether he could be.

And you never really know until something awful happens, like at Florida State. I mean, my understanding is that individual had -- had made statements that were very concerning to people, and you don't know until something is too late.

So the -- so the issue is, when do you act to protect a community, and, you know, I -- I felt very strongly that that moment was then. Not only was it, you know, it -- had the threats escalated and felt much more personal and targeted to our community, but it was also the case that it was causing just some measure of chaos within the law school that I couldn't have.

We were about to head into finals. I couldn't have people just not showing up for finals, not showing up for classes, not -- not engaging in the ordinary work of, you know, being a law student. And it -- it hit that point, and we had tolerated a whole lot up until then that had been difficult as well, but that was a moment of it just -- it was very different.

Q. Last question for you, Dean. What happens if you as dean do nothing after a student says something suggestive of violence, and then a school

MERRITT MCALISTER                    May 22, 2026                        95
96541

shooting occurs?

A.    I mean, I -- I can't even -- I can't even fathom what -- what happens.  I mean, I, you know, certainly, I don't know.  I mean, I could not certainly continue my job, but -- but you know, at a -- I -- I don't even know how you go on from that if you were in a position to stop something, or knew -- knew enough to have red flags and have warnings and didn't do -- didn't take action.

I mean, that's -- that's a, you know, I don't know how an individual recovers from that.  I don't know how a community recovers from that.  I don't know how you look anyone in the eye, a parent, a community member, if you saw that and -- and didn't do anything.

And so, you know, and I -- like I've said, I'm not a trained, you know, I -- I am not trained but I know my community and I knew the urgent calls I was hearing.  They felt different.  We had -- I had listened to a lot of people talk about Mr. Damsky for a long time.

I had spent a lot of time with his writings and his -- his -- his work, and I -- this -- this was not something we could navigate and stay as a law school, and -- and tolerate a threat like

MERRITT MCALISTER                May 22, 2026                        96
96541

this within a community that has the large Jewish population that we have that, you know, was -- was already on edge from events in the world.

Q.    I hope you'll give me one more question. You said you were familiar with his writing, so I -- I just remembered one question I wanted to ask you earlier.

Did there come a time when you were familiar with or learned about a post by Mr. Damsky on March 7, 2025?  So before the posted issue, a post that said, quote, the Jews are the common enemy of humanity, end quote.  Did you know about that post?

A.    Yeah, I -- so I looked at all of his -- right after Mr. Jurkowski gave me, you know, his Twitter handle, you know, I looked at everything and that had been posted not too long ago or -- but not too long before the -- the other post.

So I saw a lot of, I mean, you know, it -- we -- we've spent a lot of time, to your question, right, focused on one tweet.  And it's, you know, it's not just about one tweet.  It's -- that was the sort of culminating event, but it was a whole history of things and, you know, that was part of it.

NAEGELI  (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

MERRITT MCALISTER                    May 22, 2026                          97
96541

It -- it was clear that Mr. Damsky, whether, you know, he personally wants to carry out violence, he would, you know, he intends for there to be some kind of violent overthrow and that -- that is a scary thing.

MR. BARTOLOMUCCI:  Thank you.  No -- no further questions.

EXAMINATION

BY MR. SABATINI:

Q.   Good afternoon, Dean.

A.   Good afternoon, Mr. Sabatini.

Q.   It is noon now.  What's Andrea Cormier, what's her position again?

A.   She is -- she's no longer with the law school but at the time I believe her title was Assistant Director of Recruiting.  She worked in the Career Services office.

Q.   What was she doing when Damsky approached the door?

A.   So we would have been having on-campus interviews or employers who were there, and she was -- she was in charge of, you know, managing the process of on-campus interviews.  So she would have been in the space to great employers and coordinate the day for folks being there to interview our

MERRITT MCALISTER                May 22, 2026                              98
96541

students.  She was just inside the building and saw him, yeah.

Q.   And she saw him walking up with law books, correct?

THE VIDEOGRAPHER:  I'm sorry, I need to interrupt for a brief second.  I'm going to make a decision to place a microphone, so we can hear Mr. Sabatini better.

MR. SABATINI:  Perfect.

THE VIDEOGRAPHER:  Yes.

MR. SABATINI:  Let me know when you're ready.

THE VIDEOGRAPHER:  One second.

THE REPORTER:  Can we go off the record?

THE VIDEOGRAPHER:  Yes.  The time is 12:08 p.m. and we're off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are on the record and the time is 12:09 p.m.

MR. SABATINI:  Thanks.  Okay.

BY MR. SABATINI:

Q.   You testified she -- she saw Mr. Damsky walking up to the door with a set of law books?

A.   I -- yes, I believe that's -- that is -- there were law books, yes.

MERRITT MCALISTER                    May 22, 2026                         99
96541

Q.   Okay.  And he was banging on the door for it to open.  And what exactly did she do when he did that?  She just sat there, staring?

A.   She -- she was concerned about the -- the banging and -- and she did -- she did leave -- our policy is that if you don't recognize someone, you're not supposed to let them in.  So she did not let him in.

Q.   Did she make motion or gesture anything to him, or she just stood there with a look, a blank look?

A.   I don't -- I don't know, you know.  She -- she was -- it was reported to me, but my understanding is that, at least the way he approached, and he was banging and rattling, scared her, and so she did leave.

Q.   Okay.  And then so he came in, and one thing that caught me off guard.  You testified that his words to her were violent.  How were they violent?  How was he being violent at that time?

A.   So I -- if I said violent, I -- aggressive, you know.  Banging and saying something like, you know, why didn't you let me in the fucking door.  Aggressive would be one way to think about them.

MERRITT MCALISTER                    May 22, 2026                        100
96541

Q.    Okay.  But certainly not violent.  He did not say or do something violent, did he?

A.    Banging around a door, I, you know, I think that's, you know, it was certainly banging around the door.  It scared her, so I was relaying that.

Q.    But certainly if a student is knocking on the door, you can call it banging or let's say call it very, very loudly knocking, in order to gain entry, that itself is not a violent act, is it?

A.    I don't think that -- I mean, this is something who's worked at the law school for a while.  I don't think knocking on the door is what she's talking about.

Q.    Is the knocking itself the -- was it him knocking on the door that caused the substantial material disruption on the campus?

A.    I'm sorry.  I don't follow your question.

Q.    Did his knocking on the door cause a substantial or material disruption on the campus?

A.    No, I -- I don't think we're suggesting that this particular incident -- we talked about this as an incident that, you know, had happened, that I was aware of in terms of a -- what I would describe as not a typical reaction to a frustrating

event.

Meaning that, you know, a door is locked and you can't get in.  This was a extreme response to a -- a frustration.  That's -- that was how I received it at the time.

Q.    And it's extreme because he used the F word, correct?  That's your testimony?

A.    Both that he was -- yes, he was -- he was agitated.  He used the -- he used the F word multiple times.  He was banging and startling her. I believe she -- there were even people who left the space because of the aggression that was being displayed.

Q.    So other people saw him banging on the door with law books in his hands and --

A.    Believe there were -- so I -- as I recall from the -- her exchange and her reporting this to - - to Dean Shaw was that there were others who were in the -- inside the room who observed this and also did not let him in.

Multiple people were -- it was not a typical interaction.  I mean, we, you know, he was responding in a heightened, more aggressive state to the frustration of not being able to enter the room, the building.

Q. Are -- is the average -- what -- what month was this again?

A. This was in August. This was, you know, only a few weeks after school had started.

Q. Okay. And he's a 1L, correct?

A. Right. So he was not recognized. Normally if, you know, I -- I -- you know, if Ms. Cormier had recognized someone she probably would have let them in, but that's, you know, this is -- our general protocol is if, you know, if you don't recognize someone that you're supposed to not, you know, open the door for someone. It defeats the point of having security if you just open the door for anyone.

Q. What -- is it -- in your professional experience, is it normal for 1L students at the law school to be stressed or flustered by their -- the amount of stress in their life on campus.

Q. I -- usually more around finals time than just, you know, at the very beginning of school. People, I don't know, the cycle of -- of life, people in the beginning tend to be feeling sort of optimistic. By finals time, absolutely students are pretty stressed.

A. And so clearly it's -- it would not be an

MERRITT MCALISTER                   May 22, 2026                        103
96541

appropriate punishment for Mr. Damsky to face expulsion or suspension for knocking loudly on a glass door, and then using the F word?

A. He is not -- he did not face expulsion or suspension for that.

Q. Correct. But just want to be sure, that's not a -- a punishment that a student generally would face for that act, correct?

A. Correct. Might they have had some kind of -- if, you know, we might have addressed it in some ways, but not -- but not that.

Q. Clearly this event has absolutely nothing to do with the future post he made regarding Israel or Jews.

A. I wouldn't say that. I think part of what I understand the question here to be is how does a school respond to threatening posts. And part of understanding our response is -- is everything that we knew, that I knew, that the community knew about that individual's behavior and experience on campus.

Q. Did Mr. Damsky ever say or do something disruptive in the classroom?

A. There were report of incidents where, you know, other students got upset about things that he had said in the classroom, but, you know, those were

managed as classroom issues.

**Q.   Did -- so other than this instance of him using the F word and banging on the door in order for it to open so he could gain entry, was there any other allegedly disruptive event that occurred based on his speech or actions on the campus?**

A.   In terms of like, I mean, I guess I would -- I would call all of the fallout over, you know, his -- his papers and other things.  I -- I don't -- those are all happening sort of part of our campus.

They all caused some measure of disruption and upset.  I think the question is just how much do you tolerate.  I mean, look, when people say -- say things and threaten and -- and use violent rhetoric, it causes people to be alarmed.  The issue is, how much of that does one tolerate, and, you know, in this -- and without sort of interfering with the learning of others.

And so, you know, this is a whole series of events.  So I -- I don't look at it as that, you know, he was -- he was engaging in things that every time caused some measure of disruption, you know, but most of that we -- we were able to navigate and tolerate until -- until it was -- was too much.

**Q.   Okay.  So I think the answer, tell me if**

MERRITT MCALISTER                    May 22, 2026                              105
96541

I'm wrong, is nothing.  He's -- he physically never said or did anything on the campus to disrupt the campus other than knock on the door and use the F word when he was a 1L?

A.   I don't agree with that.  I don't agree with what you're saying that he physically did nothing on campus.  Like, I -- I -- all of the speech that we've talked about engaged in some way with our campus.

Q.   Okay.  Let's move to the next part of your testimony.  I think you testified that he made a post about -- I think it was specifically about judicial punishment of execution.  Did he talk about execution at some point in time?

A.   I'm not sure.  That -- I mean, the post --

Q.   Did he bring up -- did he bring up a firing -- firing squads at some point in time?

A.   We -- we discussed a -- a tweet that involved bullets to the head and a -- and execution, yes.

Q.   Are you aware that five United States states do in fact have firing squad as an authorized death penalty method?

A.   I -- I'm not a death penalty expert, but I will -- I will believe you.

NAEGELI  (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

Q.   Okay.  And are you aware that in Florida there's been legislation introduced to bring back the firing squad method?

A.   Sure.

Q.   Okay.

A.   I -- I mean, I'm not aware of that but I have no reason -- no basis to disagree with you.

Q.   Do you know where he was when he discussed the firing squad via Twitter or X?

A.   No.

Q.   Okay.  You brought up a student that claimed that based on his -- let's just say based on him, requested not to take any classes with him.  Is that a student who believed that he had made a threat?

A.   I -- it was at least a -- I mean, I don't know what the -- I didn't ask the student what the student personally believed so I can't speak to that, but it was certainly a student who felt afraid.  That was what I -- I took that to mean, did not want to be in the same space as Mr. Damsky.

Q.   Well, you say the same space.  There's no record of that student withdrawing from the university or the law school, is there?

A.   Right, but a -- a classroom is a -- a

MERRITT MCALISTER                May 22, 2026                        107
96541

captive space where you don't have a -- a choice. You have to be there.

Q.   Well, isn't it more reasonable to believe or interpret from that request that she just preferred not to be around him versus actually feeling actual threatened?  I mean, wouldn't a student actually want to leave the university if they thought someone was going to shoot them versus just using a different classroom?

A.   I can only speak to how I interpreted it, and I certainly understood in the moment for her, she was expressing fear.  Multiple students expressed, in that incident at the Town Hall, fear of Mr. Damsky and what he might do.

Q.   Well, what -- what inquiry or what process did you or the -- the law school use to disclose the possibility, or I guess separate the possibility that she simply just didn't like his offensive viewpoints?

I mean, you seem to believe it's purely based on fear.  How do you know it just wasn't, this is a student who doesn't want to be around another student who has highly offensive viewpoints?

What was the inquiry that you used or process you used to -- to -- to separate and to come

to the idea that it was just based on fear, not unpleasant -- a displeasure being around offensive viewpoints?

A.    So, you know, there wasn't like a quote-unquote process.  This was -- I'm testifying and discussing sort of the, you know, several years worth of complaints.  And I -- I had absolutely received complaints from students that where it was -- it was clear to me that it was about, you know, they didn't like him.

They didn't like his viewpoints.  They didn't like what he was saying, and -- and, you know, and that was certainly in the beginning in response to the GroupMe chat.  That -- that's the way I understood it and I thought, you know, at times students were overreacting.  And I even had conversations where it was, you know, they are -- you are giving a provocateur what he wants.

And so, you know, I put those in a different bucket than, you know, there was a change in tone after the paper circulated in the fall of '24 that had much clearer violent calls.  There was, you know, a much more --

Q.    I would -- if I could, reorient you.  I don't want to move to strike, and I -- I feel like

we're kind of moving a different question -- direction than the question.

The question simply was, was there a process at that time to inquire whether that student was actually in reasonable fear of her life or if she just had a slight preference to be around -- away from somebody with highly offensive viewpoints.

A.   I was answering your question, Mr. Sabatini, and trying to explain the -- I put -- there was not a quote-unquote process.  I -- I don't know what that would mean exactly.  We were fielding and responding to a group of comments, concerns that were raised in all sorts of ways about Mr. Damsky.

I put that in a bucket of students having real concern for him in terms of their own safety, and what we did in response to that was make sure that Mr. Damsky was aware that whether that's when he intended to communicate or not, that that's how he was being received in our community.

Q.   Did that student in fact end up taking a class with Mr. Damsky?

A.   I do not know the answer to that, but there's also times where students sort of have to. There are required classes and other things.

Q.   Mr. Damsky took advantage of a lot of the

MERRITT MCALISTER                May 22, 2026                         110
96541

online classes at University of Florida Law School,
didn't he?

A.   I -- I don't know what you mean by took
advantage of.  I'm not familiar with his schedule.
I don't know -- he was taking classes online during
the period in which he was interim suspended.

Q.   How many -- well, okay, in the interim
suspension.  What -- what about previously, do you
know how many online classes he took?

A.   We don't have very many online classes,
so, you know, certainly there aren't any classes as
a first-year student they're on.

Q.   I --

A.   I don't have a schedule.

Q.   So when -- I believe you testified that,
you know, him being on the campus was a disruption.
I mean, how often was he on the campus?  How many
hours a day did Mr. Damsky actually spend on the
campus?

A.   I don't think I testified that his being
on campus was a disruption.  I think I testified
that his, you know, that -- that the fallout and the
presence of his -- I mean, he was not on campus
after -- the fallout from the tweets, that that was
-- that was disruptive.

And -- and certainly because he was -- we thankfully moved quickly, he was not on campus. Should he return to the campus because of how concerned students were about, you know, the threat that he -- the threats that he has made.  That absolutely would continue to cause a disruption, you know.

All of this caused a disruption, right. His -- his tweets, the student fear, the increased police presence, the security worries.  All of that was causing a disruption, and -- it, you know, if he is physically there, I think it gets worse, but he didn't need to be there to have caused the disruption.

It was how the community responded, because of the --

**Q.   But you don't actually -- you don't actually believe that Mr. Damsky actually made a threat, do you?**

A.   I do.  It -- I -- that is -- that is a -- a reasonable way to read and interpret the -- the tweet.

**Q.   Okay.  What about subjectively, do you believe it was a threat?**

A.   I don't think it matters what my -- I

mean, I don't -- I don't know -- I don't know Mr. Damsky particularly well to assess what he was subjectively intending.

Q.   Okay.  Are you aware that when Mr. Damsky was expelled that several students at the law school, they weren't relieved because they were relieved from fear, but in fact they were rejoicing and using comedy and laughing about the fact that he was expelled.  Are you aware of this?

A.   I -- I -- I mean, no one shared that with me.  I have seen in the Student Conduct process, I saw some posts that I guess some -- some social media or chat between students on campus where they -- they do -- they did seem to celebrate Mr. Damsky's not being present on campus.

But I was not made aware of that at the time.  I -- I saw that as part of the Student Conduct process.

Q.   Okay.  And are you aware -- you're aware of jokes being made and laughing regarding his expulsion, correct?

A.   I am not aware of -- I mean, I don't know exactly what that means.  I certainly -- I have no -- I have no firsthand knowledge of anyone joking about anything related to this.  It was not -- it

was not a laughing matter in my office or anywhere around my office.  So I -- I have no knowledge of that.

If there were private communications between students involving that, you know, it's not something that I have personally seen.

Q.   Okay.  So I'm going to show you an exhibit that I've sent to co-counsel -- or I'm sorry -- opposing counsel, regarding -- actually, let's see.

My screen -- my screen share is up, right? Are you guys looking at me or are you looking at my screen?

THE REPORTER:  We can see your screen.  We can see your whole computer screen though.

MR. SABATINI:  Okay, that's fine.

THE DEPONENT:  And I can't -- I can't read that if it's for me to be able --

MR. BARTOLOMUCCI:  It -- it's too small, Anthony, to --

MR. SABATINI:  No, that's fine, I'll zoom in.

BY MR. SABATINI:

Q.   So you can see that this is a -- a screen -- does this appear to you to be a -- a screenshot of a text message?

A.    I guess, yeah, it...

Q.    Okay.  And the title of the group here, it does in fact say UF Law Class of 2025, correct?

A.    Okay.  I can see that, sort of, yeah.

Q.    And the first comment, tell me if I'm wrong on this, I'm just asking to confirm.  The first looks to be a student saying:  It may be because he said to Lidsky --  referring to Damsky. If anybody sees Lidsky, ask her.

Are you familiar -- have you seen this picture, or at least this group text?  Has this ever been shown to you either in discovery or in any kind of evidence for your -- for any purpose related to Mr. Damsky?

A.    I -- some of this -- so you had asked about expulsion and I -- some of this looks like it may be something that I had seen in the Student Conduct process.  It -- maybe in response to his trespass.

Like I think he -- I remember that Mr. Damsky showed me some stuff.  I hadn't seen it before then.  I haven't seen it since, but this may be part of what he showed at that time.

Q.    Okay.  And here is a student, tell me if you think this is what it accurately says:  Kinda

MERRITT MCALISTER                May 22, 2026                            115
96541

crazy he gets trespassed for tweets on his personal account but not for papers submitted at school.

I'm not sure if you've seen this.  Have you seen this image before?

A.    I have a hard time seeing it.  It looks like there's a video or something?  Is that what that is?

Q.    Yeah, it's a video depicting the once-director or administrator of the coalition to restabilize Iraq, Paul Bremer, when he announced that Saddam Hussein was caught.  So he says, we got him.

And so this is a video, I'm not going to bore you with playing it, where he says "we got him," and this was posted the --

A.    Mm-hmm.

Q.    -- Damsky got in trouble.  So, I mean, to you does this seem more like somebody relieved from imminent fear or does this more look like celebrating the comical fact of celebrating the fact that somebody was punished?

There -- I will note for the record there are five emojis of laughing on the video when Damsky was expelled.  I mean, did the university analyze this for context of whether there were students who

were actually afraid of him, or if this is somebody that the students actually were just wanting to punish him for having unpopular views?

A.   So, again, none of this was made available to me until I -- until sometime later in the Student Conduct process.  I -- I don't remember if this was specifically shown to me, but I -- I remember seeing some messages that were similar in the Student Conduct process.

Again, not shared to me before or, you know, in any way, you know, contemporaneous, but, you know, I -- it is clear that there are some students who are celebrating that.  I got to tell you, I heard from a whole lot of students who were still -- who were afraid, who demanded increased security presence.

You know, both can be true at the same time, that there are students who experience real fear around these -- these events and these issues. You're -- you're -- you're pulling out a handful of comments from, you know, five members of a community that has 650 members.

Q.   My -- my follow-up question would be, did you ever come to believe or was it ever presented to you that the students who claimed to you and to the

and to the law school, that Damsky was in fact a threat, actually just had political views that were opposite him and were very offended by his views, and came up with a process for which they could actually try to punish him by presenting that they were afraid of his being on the campus in order to get the result of an expulsion or suspension?

Did you ever learn anything regarding that?  Did that ever come into your knowledge?

A.   I -- I -- what you're describing sounds like some kind of conspiracy.  Something like that was never brought to my attention and regardless, my actions were taken based on, you know, not just what students were saying, but also faculty and, you know, staff concerns.

So, you know, they -- whatever students this -- this handful of students may have been doing, you know, there was a much broader reaction from a number of -- of folks beyond the -- beyond even the student population.

Q.   Okay.  Do you see this screenshot from what looks to be either a group chat or a student chat here?  It says NLG Main chat.  Do you see this clearly?

A.   I -- I don't see it clearly, but I -- I --

I see a date, 6/25/25 is -- is -- that is clear.  I see Scott Jurkowski's name but I can't read necessarily what it says.

Q.  Ask Scott -- you see Scott Jurkowski, and tell me if this is an accurate depiction of the words underneath his post.  He posts a picture related to an article Damsky and he says, quote:  I didn't know what a good outcome of this would be when it all started, but this has to count as one possibility.

Now, my question to you simply is, if Mr. Jurkowski was really afraid of Damsky, and his goal was to just separate himself from Mr. Damsky so that way he doesn't have to face a potential threat, physical threat, why would he be celebrating so happily here that Mr. Damsky, off campus, far away, many miles from the campus, was denied the -- an internship at State Attorney's office?

Why do you think that is?

A.  I -- I don't -- I don't want to speculate for how -- what Mr. Jurkowski's state of mind is. All I can say is that my interactions with Mr. Jurkowski, I experienced -- I observed in him real fear multiple times, including related to being afraid of, you know, even participating as a witness

and -- and other things.

So I, you know, I -- you know, I -- I don't know what he's saying in terms of like this small group of students who, you know, he may have had -- trying to sort of communicate with his friends about issues that had concerned him for sure.

MR. SABATINI:  Okay.  I would move to admit both of these tweets, which have been provided to opposing counsel, as Exhibit 1 and 2 for plaintiff.

(WHEREUPON, Plaintiff's Exhibit P1 and Plaintiff's Exhibit P2 were marked for identification.)

MR. BARTOLOMUCCI:  So, Anthony, as in the case of 10A, I don't think these documents were on your -- your list, so let's reserve decision and discuss that later.

MR. SABATINI:  Yeah, we'll reserve discussing it and, you know, potentially they have to be part of rebuttal evidence with Mr. Damsky, but in any case, you know, we'll talk about it later. Appreciate it.

BY MR. SABATINI:

Q.   Okay.  So actually just to sort of finish

up that theme there, did the -- knowing very full well that young people with a variety of different political differences and opinions are offended to find that other students have very different opinions and views, was there any inquiry made by University of Florida Law School to gauge the actual sincerity of this accusation of a credible threat that Mr. Damsky made?

Was there any attempt to see if the students themselves were just simply looking to punish him for having highly offensive views?

A.    I mean, yes, in the sense that I had been dealing with -- and I was -- I was of course aware that there was political disagreement with Mr. Damsky from the beginning.  So I had been fielding that and discussing that with students for, you know, almost two years.

Including with students who, you know, were -- I -- I knew were not politically aligned with Mr. Damsky, and were, you know, politically opposed to him.  And we'd had conversations about that, so, you know, I -- I've taken a lot of heat for defending Mr. Damsky's right to speak.

And, you know, and I was very aware that there was political opposition and that at times

MERRITT MCALISTER                May 22, 2026                              121
96541

there was overreaction, right.  Students feel that, you know, words are violence and all of that, and I -- I was sensitive to that.

I do think, and I felt sincerely, that what happened by -- by the time, you know, I become aware of what's going on in March, you know, it wasn't just -- it wasn't just Mr. Jurkowski's response, it wasn't just, you know, other students' response, it was a collective response from, you know, a whole community.

It included faculty.  It -- it was -- it was, you know, I -- I had never had a faculty member ask me to report a student to the police, or to post a police officer outside of their classroom.  Like that was, you know, that -- that's not about students reacting or disagreeing with, you know, Mr. Damsky's political views.  That was something different.

Q.   Okay.  The -- let's see, moving right along.

THE REPORTER:  Repeat that?

BY MR. SABATINI:

Q.   The student -- the student that made the -- the post of the Paul Bremer quote, we got him, his name was Donovan.  Did you ever speak to Donevan

Mallard?

A.   I believe I taught him, but I -- I don't remember ever speaking to him individually.  About this.

Q.   Okay.  The University of Florida police did in fact review the language and came to the position that there was in fact no threat, correct?

A.   I am -- I do not know what -- I -- he was not arrested, if that's the question.  But obviously there was a Student Conduct proceeding.  So, you know, it's -- it's -- it's not as clearcut as that.

Q.   Did -- do you have any knowledge that there was ever probable cause for a threatening statement made by university police or any other agency?

A.   I -- I am not privy to what the, you know, police agency or department did.

Q.   Young -- students -- students in their 20s who attend prestigious universities often are users of Twitter or X, correct?  X?

A.   Sure.

Q.   So clearly these students that were making these complaints would have been obviously familiar with clips from commentators from the far right like Nick Fuentes and folks like that that say shocking

and offensive things.  I mean, that's reasonable to believe, isn't it?

A.  I mean, I -- well, I guess.  I hadn't heard of Nick Fuentes until, I don't know, not that long ago, so I -- I don't --

Q.  Well, what --

A.  I -- sorry?

Q.  What -- just, what was the time frame for you, you know, he's not -- well, put it this way, when did you first see a clip, offensive clip by him or at least hear about it?

A.  I don't know, probably sometime in the last year or so.

Q.  And obviously you're algorithm isn't oriented in a way that you would be seeing clips like that on a regular basis, correct?

A.  I -- presumably.  I'm not an -- I don't know how the algorithm works.

Q.  But the -- but it's reasonable believe that these students have been acquainted with views similar to Mr. Damsky's, wouldn't it?  I mean, is it really -- are the students saying this is the first time they've ever seen views like Mr. Damsky's, that they're totally unique and original, or that they're familiar with views like this in -- in other

contexts?

A.   I'm -- I'm -- you know, I'm sure that there are students who are familiar with, you know, white nationalism and antisemitism.

Q.   Okay.  But it -- yeah, I mean, reasonably -- it's reasonable to believe that they have access to those views.  Those views are being presented to them in some way based on the fact that we live in an online culture, correct?

A.   Sure.

Q.   Okay.  Was Mr. Noel Ignatiev, was he advocating violence in his post?

A.   Well, I don't think he posted -- I -- I'm not -- you know, his academic writings I am not --

Q.   Not a post.  Let me rephrase that so that way it's clear for the record.  Was Professor Noel Ignatiev advocating violence in his writings, previous writings?

A.   I -- I would not want to comment on what his writings are about.  I have not -- I have only a passing familiarity with them, and I -- so I -- I can't speak to what his -- his academic work said.

Q.   Okay.  So I'll rephrase that.  You don't have a reason to believe he was advocating violence with -- based on your present knowledge and

understanding of him as an individual?  You said you did -- you did testify you were familiar with some of his work.

You don't believe he was actually literally advocating violence even with the -- the limited exposure you've had to his work, correct?

A.  I -- I mean, I -- I believed it was, at least my understanding was it was a categorical objection to the concept of whiteness.  That was how I understood his work.

Q.  And of course the concept itself this Mr. Ignatiev was talking about, did he ever advocate, in your -- only in your knowledge, you know, your specific knowledge special experience, did he ever advocate using violence against the concept?

A.  Again, I don't have enough knowledge of his work to answer that question.

Q.  Okay.  Isn't it true that the students and faculty who advocated or stated that Mr. Damsky called for the expulsion of all -- all Jews, that in fact were actually clipping his quote?  They were misquoting his tweet?  They were -- they were taking only a piece of it?

A.  I -- I mean, for sure, the tweet has been clipped in different ways.  I, you know, I was

MERRITT MCALISTER                May 22, 2026                          126
96541

familiar from the beginning with the entire -- the entire quote, you know.  It -- it obviously has that context as well as a pretty decisive statement that Jews must be abolished by any means necessary, as well as the sort of follow-on dialogue with Professor Lidsky.

So, you know, I -- it is -- there's a lot to it, and I think, yes, sometimes it gets -- it gets truncated to just the one sentence.

Q.   Okay.  Do you recall any students saying or in written form submitting to UF that they believed that the entire quote itself was offensive?

Did any student -- phrased another way, did any student say, Mr. Preston Damsky said that my position on Jews is simple, whatever Harvard professor Noel Ignatiev meant by his call to quote, abolish the white race by any means necessary, is what I think must be done with Jews.  Jews must be abolished by anything that -- any means necessary.

Did anybody ever actually quote the whole thing in their complaints or in their discussions?

A.   Several -- several of the complaints that we received through the portal attached the -- a copy of the tweet to them, so, you know, the whole thing was there.

MERRITT MCALISTER                May 22, 2026                              127
96541

Q.   Okay.  What was the time period difference between Preston Damsky's tweet and when Professor Lidsky saw it?

A.   So I don't -- I -- you'd have to ask her when she first saw it, but I -- I mean, she first tweeted back at him on April 1st and the tweet happened on March 21st.

Q.   So let's talk about that.  So when -- when Professor Lidsky tweeted to him, are you saying you would murder me and my family, is that your position; she was trolling him, wasn't she?

A.   I -- I have no idea what Professor Lidsky's intent was.  You'd have to talk to her.

Q.   Really?  You don't think that's important to know before the decision was made to expel him, what her intent was?

A.   We were already in -- we were already involved in reviewing and take -- and assessing whether there should be Student Conduct proceedings even before she tweeted.

Q.   Was she in fact baiting or trolling him?

A.   I think she was seeking clarity on what he meant, and I think there was an opportunity there for him to give clarity or for him not to.

Q.   Okay.  So you believe that the reason she

MERRITT MCALISTER                    May 22, 2026                         128
96541

sent this tweet was simply for clarity?

A.   I have no reason not to think that.  I mean, I -- you know, I -- she and I did not discuss the tweet or her even engaging with him, so, you know, I -- she did that on her own and, you know, the way I read it was she was, you know, she was trying to understand, are you -- are you actually trying to, you know, are you actually calling for violence, is that what you're saying, to -- to actually murder someone.

And, you know, whether you describe that as trolling or baiting, she's trying to, you know, pin down what he means by what he's saying.

Q.   So this follow-up tweet when he replies, and then she says:  I notice you didn't say no, but instead resorted to what about-ism, and then used a hyperlink from the Encyclopedia Britannica, and then follows up it by saying:  Yes, his words are despicable.  You implicitly admit yours are too.

Was this done for the point of inquiry or was this statement made for a different purpose other than clarity in an inquiry?

A.   I mean, I -- I -- I -- I don't, like I said, this is her own statement.  You would have to -- her state of mind, which is how I understand your

question, I -- you know, I'm not privy to.

I -- I understood her as responding and pointing out that, you know, that -- that he was not refuting the idea that he was calling for violence against a group of people that included Professor Lidsky and her family.

Q.    Okay.  So in an off campus, private X tweet where a professor who doesn't follow him comes into his comment section and starts asking questions to him, did he have any obligation at any time to say what he did or didn't meant, to this professor?

A.    So I -- I don't know -- I mean, obligation?  I'm not sure what --

Q.    What I --

A.    -- what that means.  I mean, he's --

Q.    I mean --

A.    -- engaging with her.

Q.    But your -- but your basis for punishing him is how he responded.

A.    It's the entirety of things.  It's the disruption.  It's the engagement.  It's the threats.  All of that is part of the basis for the university's action.  He -- he, you know, I -- I think that at -- at a minimum he's aware that the community is looking at this, that a faculty member

MERRITT MCALISTER                May 22, 2026                          130
96541

is concerned, and, you know, should he have clarified?

If he did not actually mean violence, should he have clarified that?  Absolutely.  I think that we wouldn't be here probably if he -- if he had of clarified that he -- he did not intend that.

I mean, I don't know for sure, but that's a different scenario than what -- what happened.

Q.   Did -- Mr. Damsky has never been charged with a crime before, correct?

A.   I have no awareness of his criminal history or not.

Q.   Okay.  And he in fact was going to work at the State Attorney's office, correct?  His 2L summer?

A.   I believe he had secured an internship.

Q.   Okay.  Is it reasonable to believe that a student who won book awards at a prestigious university, was going to work at the State Attorney's office prosecuting criminal statutes, using criminal statutes, was in fact actually going to commit a violent crime on the campus?  Is it really reasonable to believe that?

A.   I -- I do not -- I -- you know, he -- he lost that internship because of this situation and

the tweet itself, which gave that office very significant concern.

So I, you know, I guess I can't answer that. I mean, I think they made a decision that -- that he was not someone who should be a -- a prosecutor.

Q. But you understand that the difference, the legal difference as you do, of course as the dean of a law school, that under Pickering-Connick, and as a law student, it's very, very, very different legal standard of whether he could be expelled from a campus for unpopular speech versus denied employment or -- or have his employment taken away, correct?

A. I -- there are different legal standards for all of these things, yes, but -- and I'm not, you know, obviously -- I'm just -- I'm just pointing out that I don't think we should make any kind of assumptions about the fact that he, at one point in time, was able to secure an internship at our local State Attorney's office, that works very closely with the law school.

Q. Let's talk about actual substantial and material disruption of the campus. What is it, in your eyes? What does it look like? What is it?

A.   I -- it is, I mean, it is -- it is this. It is the fact that, you know, we were entirely consumed with dealing with student concerns, complaints, faculty concerns, complaints, about safety and security for the community in response to the -- the tweets.

It was, you know, a request to increase police presence.  It was expenses related to paying for increased police presence on campus, and, you know, we -- we paid for a uniformed officer to be there.

It was, you know, I mean, one measures just the volume of hours I spent doing this and not doing other things.  It was, you know, any time a student feels like they can't come to class because of this, or it's a canceled class.

It's all -- all of those things contribute --

Q.   Let's --

A.   -- to disruption.

Q.   Let's talk about that.  How many actual --

THE REPORTER:  Sorry, sorry, Counsel.  One at a time for the record, and please restate what you just said.  Thank you.

BY MR. SABATINI:

Q.    Let's talk about that.  How many actual classes were canceled because of his speech?

A.    I am aware of one class being canceled.

Q.    And what class was that?

A.    It was Professor Lidsky's Constitutional Law class.

Q.    Interesting.  So Professor Lidsky canceled a class.  When did she cancel that class?

A.    It was -- I believe it was the Monday of, like, April 7th.

Q.    Who was in that class?  Was Damsky in that class?

A.    No.

Q.    Okay.  So Damsky's not in the class.  She has this exchange over spring break when he's not on campus, and then she canceled the class.  What were the grounds for her canceling that class?

A.    So she had the exchange with him not over spring break.  I mean, it was -- it was the week before.  So her students were still very concerned. I mean, I -- we -- I think we talked about it on the other -- on the direct testimony that, you know, students had asked her if she was going to move the class.

And -- and, you know, I think she was

having -- a lot of students had reached out to her and put her in a state of some fear.  She had increased stress and there was, you know, student concern.  So I think all of that came together for her to cancel the class.

Q.    And she's communicating with the students about her -- her issue with this -- this student, Damsky, correct?  She's talking frequently with students about him, right?

A.    You know, you would have to talk to her, but yes, my understanding is that she -- that a number of students had -- had spoken with her about the situation that week.

Q.    Organically they just knew that Mr. Damsky made this tweet, they just happened to know, correct?  That's your testimony?

A.    Well, it was widely circulating within the community, so people were discussing it.  They -- students have lots of ways of sharing information, so, you know, it was -- certainly she was communicating with lots of students and with faculty, and -- and sometimes with me --

Q.    Highly --

A.    -- and other administrators--

Q.    Highly --

THE REPORTER:  Can you repeat --

MR. SABATINI:  -- offensive viewpoints are circulated more often, aren't they?

THE REPORTER:  Can you repeat that, Counsel?

BY MR. SABATINI:

**Q.   A highly offensive viewpoint is more likely to be circulated than a non-offensive viewpoint, correct?**

A.   Yes, and threatening language is more -- offensive and threatening language is even more likely to be circulated.

**Q.   So Lidsky is talking with these students. She's going back and forth with them.  She knows what the First Amendment is.  You don't think she had an incentive in canceling the class to try to further your legal theory of a substantial material disruption to the campus?  A class that he wasn't in?**

A.   You know, Professor Lidsky is a very experienced scholar, administrator.  She's not easily rattled.  We never discussed it.  I -- I, you know, I think it was a genuine -- she was having a genuine challenge with this issue.  So I have no reason to think that she was anything other than

sincere in what she did.

Q.    And she's also a pretty well known political advocate who had events for the Barack Obama campaign and rented classrooms at the law school, did she not?

A.    I have no knowledge about that, but you know, I -- like I said, that's -- that's -- that was before my time, and all I can say is that, you know, she and I did not discuss, you know, canceling her class, whether she should.

It was -- it -- you know, all of the actions she took here were on her own and, you know, you should ask her questions about what was in her own mind and her own experience.

Q.    Okay.  But your position as the University of Florida should not have actually taken note of the fact that you have a professor who's going to students' Twitter pages who have no followers, 20 followers, going into their comments, provoking and arguing with them about their far right views, and then turning around and canceling the class without the administration's permission, and then turning around and claiming that that itself is the substantial material disruption caused by the student on the same campus?

I mean, how could the Court possibly believe -- how could any Court possibly believe that that is an organic phenomenon?  It was clearly created by her, was it not?

A.   Not agree with you.  And also that's certainly not the only disruptive act that happened in connection with this.  We've identified that is one of the many things that happened as fallout from the -- the tweets.

Q.   And -- and in fact, was the defense legal position, defensive position of the University Law School, to go back and sort of skim through and pick through, and try to find various actions or opinions of Mr. Damsky in order to bolster them into one large package for this Court to argue that he's a disruptive -- substantially disruptive and violent person, isn't it?

That was all a legal strategy, wasn't it?

A.   No.  It's -- it's the reality.  I mean, he was, you know, I've been -- I've been living with him for -- for several years and living with all of the -- the things that happened here on campus related to him.

And, you know, it -- it -- there -- there was a lot here.  There was a lot of build-up and

knowledge before this, you know, you know, we -- the -- the tweets themselves, and so, you know, it's -- it's not a strategy.  It's just -- it's -- it's the story of what happened.

It's a story of what I understood at the time, you know, we started the response.

Q.   Well, how many other professors other than Professor Lidsky are going into the comments of accounts, student accounts they don't follow, in order to provoke debate?  Can you name another of the 50 or so professors at UF Law that -- that have done this other than Professor Lidsky?

A.   I -- I -- you -- you know, I don't even know how many faculty have Twitter accounts.  It's not, you know, not everybody has a Twitter account, not everybody uses it, so I, you know, it's not -- this is -- if -- if you're asking is this a singular, like this whole series of things a singular event?  It -- it -- you know, this is not an everyday occurrence.

And it's not an everyday occurrence that you have a student who makes threats like this, and I think the -- Professor Lidsky was alarmed, other Jewish faculty members were alarmed, and they were trying to understand, is this a real, you know, are

we in trouble, are we at risk.

Q.    **So your testimony is the only class to be canceled or interrupted, you can correct me if I'm wrong, was Professor Lidsky, the provocateur in this case, who unilaterally canceled her own class, which did not have Mr. Damsky in it, correct?**

A.    So I -- what I will say is I'm not aware -- no one has to report a cancellation of a class, so I -- I don't know if there were other classes that were interrupted in some way, meaning that, you know, whether you took class time out to talk about it, or you know, students felt like they couldn't come to class.

I am aware that there were students who told faculty members that they were afraid to come to campus or come to class.  I also consider that to be a disruption.  We don't --

Q.    **So --**

A.    We don't, like, record that.  People don't have to tell us that they're not there or for what reason, so it's -- it's difficult -- this one I happen to know about because Professor Lidsky shared it with me, but I'm -- I don't -- you know, we don't normally record all of this information.

Q.    **Okay.  Let's talk about operational**

MERRITT MCALISTER                    May 22, 2026                        140
96541

interference.  I heard you -- interference.  I heard you testify about extra things that the law school did.  We did these extra things because of Mr. -- Mr. Damsky's views or statements.

What -- what stopped happening?  What -- what was interfered?  What were the things associated with the law school that were supposed to take place that didn't because Mr. Damsky spoke on his own Twitter account?

A.    So we didn't -- there was nothing that I'm aware of that was canceled per se other than what we've talked about, you know.  We did -- we -- we thought it was important to -- we discussed I think, thought about canceling the Jewish Law Students event, but instead proceeded with, you know, increased security.  So we did continue to, you know, provide security and continued that event.

You know, I -- I -- I take it that some students, because they provided that information both to professors and to our administrators, did not feel comfortable coming to campus and so therefore stayed away.  So that's something that's not happening, whether they're not attending class or they're not taking advantage of the campus facilities.

MERRITT MCALISTER                May 22, 2026                          141
96541

So, you know, that's -- I -- you know, what -- if -- if what you're asking for, did we -- did we cancel something, you know, we did not cancel anything in response to this.  We increased police presence and engagement.  We went to, you know increased security, all of that to try to ensure that we could continue doing business as usual.

Q.  **My last question would simply be this. Isn't it reasonable to believe, isn't it certain, completely certain that if 50 or 60 students matriculated next semester into UF Law School who had extremely right wing, far right views, very far right views, no threats, just -- just very far right extremist views, that there's going to be some disruption on the campus as a necessity?**

**That's just going to happen, correct, based on the proximity of students with opposite political views on the campus?  No matter what, there's -- no matter what you do, the university is going to deal with a level of disruption just by people who have these views and knowledge of those views?**

A.  I -- I mean, that's hard to answer.  I mean, we have -- I mean, I'm -- I'm proud of the fact that we have a wide range of viewpoints on our

MERRITT MCALISTER                    May 22, 2026                         142
96541

campus, and we've tried very hard to protect and create space for disagreement while hopefully maintaining civility.

I -- if -- if those 50 or 60 students start threatening and -- and calling for violence, then sure, the same kind of thing will happen, but, you know, like I've said I think, you know, multiple times, we tolerated disruptions related to Mr. Damsky's speech multiple times.

This was in a different register.  This was a different set of events.  This was a specific call to violence that -- that felt very targeted to many members of our community, and that was different.

Q.   So I heard, your testimony in my opinion is that the only class that was canceled was a class canceled by the professor that trolled and provoked, in my words, not yours -- but trolled and provoked Mr. Damsky, that none of the regular and predicted or foreseeable operations of the law school were interfered, and that some students who expressed preferences either not to take classes with him or to be physically away from him are the extent of the actual disruption, correct?

A.   I -- well, I don't know that I agree with

none of the operations were disrupted in the sense that, like, I would say my own personal week was certainly disrupted in the sense that I all of the sudden -- I mean, this was a fire that consumed everything that week.

You know, so I -- you know, it's -- I -- I don't think it's fair to say that like nothing happened other than that a class was canceled.  I -- that's just not the reality of living on campus that week, you know.

Students were consumed with talking about it, you know.  We -- we tried our best to, you know, continue to do the things that law schools do, but I -- it is not an accurate statement to say that that's the only effect, administratively or in terms of how the students reacted and responded, or the faculty reacted and responded.

Q.   But in terms of just future time and effort, you would have to use quite a bit of time and effort just to keep the peace and keep things moving and flowing, and keep tension from arising, whether there was no threats or not.  Just people with opposite political views, you're constantly having to console, have meetings, bagels and coffee, put out messaging, et cetera, just because there

MERRITT MCALISTER                    May 22, 2026                              144
96541

could be friction, for protected views, right?

If somebody did get up there and say, only white people should be able to vote.  Highly offensive view, you know, something like that, but obviously protected.  You're going to have to use a lot of time and effort to deal with what comes from that protected speech, would you not?

A.   Sometimes yeah, and that -- that -- some -- some measure -- I certainly -- I think, you know, there is a -- there is a window of yes, that's -- that is part of the job.  I agree with you, and in fact that sort of had been the job up until the point where, you know, this tipped the scales.

But I had never had any faculty member ask me to make a report of a student to the FBI or the police, or to have, you know, police presence in a classroom or police presence for events.  Like, that was different.  That was not -- I have never spent time, you know, talking and engaging with the police department about this, and meeting with them about security, right.

All of that, that is in a stratosphere beyond what the ordinary sort of just navigating life as a dean, is.

Q.   Okay.  My last question is simply this.

The -- when Donald Trump won the presidency in 2016, Dean Rosenbury put out a very long and detailed email explaining that no one had anything to worry about, and that couches were being ordered for the law school called Comfort Couches and Conversation Couches.

It came to an enormous expense at the law school.  They were installed to encourage conversation and -- and comfort on the campus.

Under the standard you described, would the college Republicans or law school Republicans, as Professor Willis refers to them, would they have been -- could they have been disciplined for a substantial material disruption of the campus because of the expense of the couches, because it took so much time for the dean to write that email, et cetera, under the legal standard you described?

A.   I -- it -- you know, I wasn't at the law school in 2016 so I really don't -- I have no knowledge as to what -- what happened or what, you know, what any of that involved.  I can't comment.

MR. SABATINI:  No further -- no further questions.

MR. BARTOLOMUCCI:  Let's take a five-minute comfort break and go off the record before we

do redirect.

MR. SABATINI:  Thank you.

THE VIDEOGRAPHER:  Please stand by.  The time is 1:07 p.m.  We're off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We're on the record. The time is 1:12 p.m.

FURTHER EXAMINATION

BY MR. BARTOLOMUCCI:

**Q.   All right, Dean, I just have a -- just a handful of questions for you on -- on redirect.**

**With respect to the -- the Andrea Cormier locked door incident, after Mr. Damsky banged on the door, was trying to get in, did he not have a -- a further encounter with Ms. Cormier?**

A.   Yes, he did.  It was -- yes.  He -- he then found her once he was inside and, you know, angrily approached her and wanted to know why she hadn't opened the fucking door for her -- for him, and that didn't he under -- didn't he (sic) know she (sic) was a -- a -- a -- a student, and, you know, again used expletives and seemed very angry.

**Q.   And to your knowledge, she did not at that point know who he was, correct?**

A.   I -- she -- she didn't -- I mean, she did

MERRITT MCALISTER                May 22, 2026                            147
96541

not know who he -- right.  She didn't have a relation -- he was a knew student.  I think she -- I don't know if she had identified him as, you know, Preston by then, but she -- she certainly did not know anything about him at the time.

Q.   So it wasn't just a student banging on a locked door, right?

A.   It -- right.  It was -- it was the whole interchange where, you know, he responded very aggressively to a situation that was, you know, a frustration.

Q.   And do you think it -- it qualifies as aggressive when he got in her face after being in the building and said, you know, didn't you know I was a fucking student, why didn't you let -- why didn't you open the fucking door?

A.   Yeah, the whole -- the whole scenario, both the frustration of not being let in and the then approaching her thereafter was all aggressive and, you know, certainly not a typical interaction with a student.

Q.   All right.  Different topic.  Do you have any reason to believe that any faculty member who said that they viewed the Damsky posts as threatening, did so based on opposition to Mr.

MERRITT MCALISTER                May 22, 2026                          148
96541

Damsky's political views?

A.   No, I have no knowledge of that.

Q.   Was everything we've discussed today, and by everything I mean the door incident, the GroupMe chat, the two seminar papers, the -- the prior tweets like the March 7 tweet that the Jews are the common enemy of humanity, all of that, was all of that considered by the administration and students and faculty as contact -- context when they later interpreted and assessed the posts at issue?

A.   Yes, I -- I think, you know, my assessment is that many members of the community, faculty, students, understood the history of events here.  He was somebody who was very well known to many of us, and all of this was sort of leading up to and part of how the community understood and reacted to the tweets.

Q.   And -- and you personally had knowledge of all of those things --

A.   Yes.

Q.   -- is that right?

A.   Yes.  I had been involved, you know, from the first moment to knowing about, you know, his interaction with Ms. Cormier through to that -- to that day, and having looked at all of his writings

on social media and, you know, his writings for -- for the school.  I knew about all of it.

Q.    **And is it fair to say that you, in consultation with others at the law school and university, made the decision to initiate the Student Conduct process?**

A.    Yes.  I -- I consulted folks in our student office who were also familiar with the whole history of things, and, you know, we discussed with some with the faculty counsel who had been involved and knew of the whole history of things.

So yes, all of that is part of, you know, an ongoing situation that was -- everybody was sort of aware of the full -- the full history.

MR. BARTOLOMUCCI:  No further questions.

MR. SABATINI:  Nothing -- no double redirect or however you want to describe it.  I mean, I don't have any redirect, so, yeah, I'm good.  So I guess we're done.

MR. BARTOLOMUCCI:  I think we're done.

THE DEPONENT:  Thank you.  Sorry, go ahead.  Oh, I just want to thank you all for accommodating my -- my schedule, so thank you.

MR. BARTOLOMUCCI:  Thank you for being

MERRITT MCALISTER                    May 22, 2026                    150
96541

here, Dean.

MR. SABATINI:  Enjoy your vacation.

THE DEPONENT:  Thank you.

THE VIDEOGRAPHER:  Please stand by.  This is the end of the deposition of Merritt E. McAlister.  The court reporter will now take the orders for the transcript.

THE REPORTER:  Mr. Bartolomucci, would you like the original?

MR. BARTOLOMUCCI:  What -- transcript? Yes, of course.

THE REPORTER:  Okay.  Mr. Sabatini, a copy?

MR. SABATINI:  Yes, please.

THE REPORTER:  And then, Ms. Thomas?

Ms. Smith, a copy?

MR. BARTOLOMUCCI:  She's with me.

THE REPORTER:  Perfect.

MS. SMITH:  All good.  I'll share.

THE REPORTER:  Thank you.

MS. SMITH:  Thanks.

THE VIDEOGRAPHER:  So Mr. Bartolomucci is getting -- is getting the video of today's deposition.  Will anyone else like a copy of today's video?

MERRITT MCALISTER                May 22, 2026                    151
96541

MR. SABATINI:  Oh, video, no.  I just need the copy of the transcript.  Actually, Chris, are we actually putting the video in, or are we?

MR. BARTOLOMUCCI:  Yeah, I -- I -- I -- you know, I'm planning to have --

MR. SABATINI:  I'm fine either way.  I don't --

MR. BARTOLOMUCCI:  -- the judge observe.

MR. SABATINI:  Sounds good.

THE REPORTER:  Could you restate that, Mr. Sabatini?

MR. SABATINI:  I said I'm fine either way. I didn't know we were putting the video out.  I thought we were just putting the transcript in. That's fine.

MR. BARTOLOMUCCI:  Do -- do we need to still be on the record, or can we go off the record?

THE VIDEOGRAPHER:  Okay.  Just for the record, no one else requested a copy of the video, of today's video?

MR. SABATINI:  I'll take the video.

THE VIDEOGRAPHER:  Okay, and that's Mr. Sabatini?

MR. SABATINI:  Sure.

THE VIDEOGRAPHER:  Has requested a copy of

the video, perfect.

Okay.  The time is 1:18 p.m. and we are off the record.

(WHEREUPON, the videotaped deposition of MERRITT E. MCALISTER was concluded at 1:18 p.m.)

CERTIFICATE

I, the undersigned Jose DeLeon, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the video recording of the deposition of Merritt McAlister, in the above captioned matter on the 22nd day of May, 2026, taken at the location of 300 SW 13th St, Gainsville, FL 32611  .

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.



Jose DeLeon

CERTIFICATE


I, Jennifer Cotton, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.


I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.


IN WITNESS HEREOF, I have hereunto set my hand this 24th of May, 2026.

Jennifer Cotton, CER No. 4280

NAEGELI    (800) 528-3335
DEPOSITION & TRIAL  |  NAEGELIUSA.COM

MERRITT MCALISTER                May 22, 2026                          155
96541

CORRECTION SHEET

Deposition of: Merritt McAlister   Date: 05/22/2026

Regarding: Damsky vs Summerlin

Reporter: Cotton  /  Breezee

_____

Please make all corrections, changes or

clarifications to your testimony on this sheet,

showing page and line number.  If there are no

changes, write "none" across the page.  Sign this

sheet on the line provided.

Page   Line   Reason for Change

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

          Signature:  _____

                    Merritt McAlister

Email to: Production@NaegeliUSA.com

MERRITT MCALISTER                    May 22, 2026                         156
96541

DECLARATION

Deposition of: Merritt Mcalister     Date: 05/22/2026

Regarding: PRESTON DAMSKY vs CHRIS SUMMERLIN

Reporter:  Jennifer Cotton

_____


I declare under penalty of perjury the following to be

true:


I have read my deposition and the same is true and

accurate save and except for any corrections as made

by me on the Correction Sheet herein.


Signed at _____, _____

on the _____ day of _____, 20____.






                    Signature: _____

                              Merritt Mcalister

Email to: Production@NaegeliUSA.com

## Exhibits

**EX001 3.21. 25 Damsky Post & Exchange with Lidsky**  10:19,23 11:1 119:10

**EX002 Statement on 8.28. 23 Incident**  13:24 14:6

**EX003 McAlister Report 4.1.25 (DEF524-526)**  16:3,5

**EX004 Timeline of Events (DEF529-538)**  17:9,11 19:24

**EX005 Student Complaint 9.22.23 (DEF635)**  20:22,25

**EX006 Excerpts from "American Restoration" (DEF000591, 616-17)**  23:18,22,25

**EX007 Whisnant Email 10.30.24 (DEF590)**  28:15,16

**EX008 Excerpts from "National Constitutionalism" (DEF000559-60, 584-85)**  32:2,3,4, 9

**EX009 Report a Community Concern (DEF539)**  35:1, 3

**EX010 Damsky Posts Fall 2024 (DEF5055-56)**  36:9

**EX10A DEF_001233-DEF_001234-1**  51:5,10

**EX011 Shaw Emails to McAlister 4.1.25 (DEF644, 646, 648)**  62:24 63:3,6

**EX012 Shaw Email 4.1.25 (DEF650)**  72:8,10

**EX013 Lidsky Email 4.3.25 (DEF5265)**  73:5,6

**EX014 Shaw Emails to McAlister 4.4.25 (DEF5266)**  76:12,14 78:8

**EX015 Johnson & McAlister Emails (DEF1397)**  79:13, 15

**EX016 Knowles Email 4.2.25 (DEF4075)**  83:23, 25

**EX017 McAlister Emails 4.4.25 (DEF1414-15)**  86:25 87:1,2

**EX0P1 TEXTS**  119:12

**EX0P2 TEXTS**  119:13

---

## 1

**1**  10:19,23 11:1 74:6 119:10

**10**  36:9 52:7

**10:14**  7:5,8

**10:48**  52:8

**10A**  51:5,10,24 53:12 88:23 89:4 119:16

**11**  52:7,17 62:24 63:3,6

**11:42**  82:14

**11:49**  82:18

**12**  53:12 72:8,10

**1233**  51:7 53:12

**1234**  51:8 53:13

**12:08**  98:15

**12:09**  98:19

**13**  73:5,6

**1397**  79:18

**14**  35:12 76:12,14 78:8

**1414**  87:1

**1415**  87:1

**15**  79:13,15

**16**  83:23,25

**17**  87:1,2

**19.3**  20:3

**1:07**  146:4

**1:12**  146:7

**1:18**  152:2

**1L**  12:10 19:9,13 102:5,16 105:4

**1st**  9:11 11:22 58:24 60:9,23 61:15 62:22 63:15,17 67:19 72:16 127:6

---

## 2

**2**  13:24 14:6 119:10

**20**  136:18

**2014**  10:7

**2016**  145:1,19

**2018**  9:17 10:9

**2023**  9:12,19 12:7,9 18:5,21,24 21:19 41:14

**2024**  23:9,13 28:21 31:21 32:13 36:19 37:4 39:3

**2025**  10:15 11:4,6 12:2 31:23 42:22 47:4 48:8 78:17 96:10 114:3

**2026**  7:4,9 8:21

**20s**  122:18

**21**  48:8 52:24 53:17 57:2 58:16 62:20 67:14

**21st**  11:4,5 55:17 60:3,24 127:7

**22**  7:4

**22nd**  7:9 8:21

**23** 40:15

**24** 108:22

**28** 18:5 48:10 51:14 88:25

**2L** 23:9 27:17 130:14

**3**

**3** 16:3,5 74:6,11, 12,14

**30** 28:21 78:4

**3ls** 27:16

**3rd** 75:5,6

**4**

**4** 16:25 17:9,11 19:24 80:4

**4075** 83:24

**4th** 77:2 86:9

**5**

**5** 14:4 20:22,25 86:7,8

**50** 138:11 141:10 142:4

**5055** 36:10

**5056** 36:10

**524** 16:9

**525** 16:9

**526** 16:9

**5265** 73:5

**5266** 76:13

**529** 17:10

**538** 17:10

**539** 35:2

**553** 35:2

**559** 32:8

**560** 32:8

**584** 32:8 33:20

**585** 32:8 33:20

**590** 28:20

**591** 23:20

**6**

**6** 14:4 23:18,22, 25

**6/25/25** 118:1

**60** 141:10 142:4

**616** 23:21

**617** 23:21 25:19

**644** 63:1,20

**646** 63:2 64:3

**648** 63:2 64:12

**650** 72:9 116:22

**7**

**7** 14:4 28:15,16 96:10 148:6

**73-4** 14:4

**7th** 65:7 133:10

**8**

**8** 32:3,4,9 37:4

**8th** 36:21

**9**

**9** 35:1,3

**A**

**a.m.** 7:5 82:14,18

**abiding** 38:24

**ability** 92:3

**abolish** 126:17

**abolished** 54:1 56:8 64:7 69:1 126:4,19

**abolishing** 70:24

**about-ism** 128:16

**abreast** 58:12 59:11

**absolutely** 21:24 90:14 93:5 102:23 103:12 108:7 111:6 130:4

**academic** 10:8 25:4 30:22,25 31:6 34:16,22 54:9 124:14,22

**accepted** 91:17

**access** 12:23 13:3 85:13 86:3, 8,16,23 87:7 124:6

**accommodating** 149:24

**accomplish** 29:17

**accomplished** 26:9 33:11

**account** 35:25 36:1 39:11 47:13 52:11 67:16 115:2 138:15 140:9

**accounts** 35:20 36:3,5,6 138:9,14

**accurate** 118:5 143:14

**accurately** 114:25

**accusation** 120:7

**acquainted** 123:20

**act** 33:6 37:23 57:1 92:9 94:7 100:10 103:8 137:6

**action** 22:11 26:7 34:16 43:16 61:21 95:9 129:23

**actionable** 23:3

**actions** 64:11 104:6 117:13 136:12 137:13

**activate** 84:15

**active** 44:4 50:19, 21

**actively** 64:15

**acts** 65:3

**actual** 107:6 120:6 131:23 132:21 133:1 142:24

**added** 19:18 20:7 89:20

**additional** 33:4

**address** 24:25 74:24

**addressed** 64:18 103:10

**administration** 36:5 148:8

**administration's** 136:22

**administratively** 143:15

**administrator** 90:20 91:6 115:9 135:21

**administrators** 58:5 140:20

**administrators--** 134:24

**admission** 88:9, 13,16

**admit** 70:16 119:9 128:19

**admittedly** 47:12

**advantage** 109:25 110:4 140:24

**advice** 58:7,13

**advise** 58:15

**advisor** 60:18 61:12

**advocacy** 34:13

**advocate** 34:13 70:10 125:12,15 136:3

**advocated** 125:19

**advocates** 33:12

**advocating** 55:16 69:4 124:12,17, 24 125:5

**affairs** 21:16

**affirm** 7:25

**affirmed** 8:8

**afraid** 28:11 43:22 45:8,11 72:4,5 85:10 93:25 106:20 116:1,15 117:6 118:12,25 139:15

**afternoon** 29:22 74:14 97:10,11

**agency** 122:15,17

**aggression** 101:12

**aggressive** 13:17 99:22,24 101:23 147:13,19

**aggressively** 147:10

**agitated** 101:9

**agree** 22:12 105:5 137:5 142:25 144:11

**ahead** 149:23

**aimed** 66:8

**alarm** 81:12,13 84:20

**alarmed** 26:17,18 60:1 75:21 76:8 77:15 104:15 138:23,24

**alert** 65:17

**alerted** 57:2

**algorithm** 123:14, 18

**aliens** 38:14

**aligned** 120:19

**allay** 91:16

**allegedly** 104:5

**ambiguity** 68:25

**Amendment** 22:19,23 30:18, 24 33:13,14,16 34:15 63:23 135:15

**America** 25:6 26:2 33:6 38:7

**America's** 25:8

**American** 24:2 41:21

**amount** 75:18 102:18

**analogy** 70:22 71:1

**analyze** 115:24

**Anderson** 10:2

**Andrea** 12:15,25 16:24 18:3,8 97:12 146:12

**angrily** 146:18

**angry** 17:2 146:22

**announced** 75:2 115:10

**anonymized** 35:13

**answering** 109:8

**Anthony** 7:17 8:25 9:1 88:14 113:19 119:15

**antisemitic** 65:8

**antisemitism** 64:7,25 124:4

**anxiety** 84:25 90:9

**anymore** 89:15

**apologize** 36:10

**Appeals** 10:1

**appears** 21:3 25:19 28:20

**appellate** 10:7

**applying** 70:13

**approached** 12:20,24 13:10 18:12 97:18 99:15 146:18

**approaching** 147:19

**April** 10:15 11:22 12:2 47:4 58:24 60:9,23 61:14 62:22 63:15,17 67:19 72:16 74:6, 11,12,14 75:4,5,6 77:2 78:17 80:4 86:9 127:6 133:10

**area** 81:19 82:3 90:2

**argue** 137:15

**arguing** 25:7 136:20

MERRITT MCALISTER
96541

May 22, 2026

160

Index: arise..behavior

**arise** 23:14

**arising** 143:21

**arms** 25:13 26:2,4 27:23

**arrested** 122:9

**arrived** 12:6 16:20

**article** 19:12 23:19 24:2 54:10 118:7

**assess** 40:2 112:2

**assessed** 148:10

**assessing** 127:18

**assessment** 39:16,19 40:9,14, 24 41:4,5,10,24 93:15 148:11

**assistant** 9:18 29:5 52:1 97:16

**associate** 9:16,18

**Association** 22:2, 4 27:15 50:22 60:17,19 61:13 62:1 81:15

**assumptions** 131:19

**Atlanta** 9:24

**atrocity** 91:7

**attach** 21:7

**attached** 25:23 64:14 126:23

**attaches** 52:23

**attaching** 28:23

**attachment** 52:11

**attempt** 120:9

**attempting** 29:17

**attend** 122:19

**attended** 9:24

**attending** 140:23

**attention** 35:24 67:8 69:9,10,14 72:22 117:12

**Attorney's** 118:18 130:14,20 131:21

**attract** 32:19

**attribute** 80:24

**August** 9:17 12:6, 9 18:4 91:2 102:3

**author** 24:7 29:12 32:15

**authority** 93:19

**authorized** 105:22

**automatically** 21:14

**average** 38:23 102:1

**award** 32:22 34:3, 9,17 43:5,9,17

**awards** 130:18

**aware** 10:10,15 12:10 17:1 21:18 26:12,23 35:25 39:2 46:12,23,24 69:9 73:22 91:1 100:24 105:21 106:1,6 109:17 112:4,9,16,19,22 120:13,24 121:6 129:24 133:3

139:7,14 140:11 149:14

**awareness** 130:11

**awful** 91:7,25 94:3

— — —

**B**

— — —

**back** 12:1 25:12 27:25 41:12 42:6 68:19 75:12 82:20 90:22 91:2 106:2 127:6 135:14 137:12

**background** 47:2

**backlash** 65:8

**bad** 92:13

**bagels** 48:14 143:24

**baiting** 127:21 128:12

**balance** 84:21

**banged** 13:8 146:13

**banging** 13:18 15:9 99:1,5,15,22 100:3,4,8 101:10, 14 104:3 147:6

**Bar** 22:2

**Barack** 136:3

**Bart** 84:13,14

**Bartolomucci** 7:14,15 8:11,20 9:4,6 10:25 14:8 16:7 17:13 21:2 23:24 28:18 32:6 35:5 51:12,17

63:5 72:12 73:8 76:16 79:17 82:7, 9,19 84:2 87:4 88:6,22 89:7,9 92:22 97:6 113:18 119:15 145:24 146:9 149:15,20,25 150:8,10,17,22 151:4,8,16

**baseball** 76:10

**based** 104:5 106:12 107:21 108:1 117:13 124:8,25 141:17 147:25

**basically** 41:18 86:6 89:21

**basis** 32:25 58:11 106:7 123:16 129:18,22

**bat** 76:10

**Bates** 16:8 17:10 23:20 25:19 28:19 32:7 35:2 36:10 51:7 53:12 63:1 72:9 73:5 76:12 79:18 83:23 87:1

**began** 57:14 83:13

**begin** 16:11

**beginning** 7:9 42:14 90:23 102:20,22 108:13 120:15 126:1

**behalf** 25:9 26:2

**behavior** 92:7 103:20

**believed** 106:14, 18 125:7 126:12

**belligerent** 13:7

**belt** 88:11

**berated** 13:11

**BG** 15:14,18

**big** 49:17,18 50:23,24

**bill** 89:14,15

**bit** 10:3 15:11 67:12 79:5 143:19

**black** 22:4 27:15 38:7

**Blake** 76:20,22

**blank** 99:10

**bolster** 137:14

**bolts** 18:17

**book** 32:22 34:3, 9,17 43:5,9,17 130:18

**books** 13:13 98:3, 23,25 101:15

**bore** 115:14

**bottom** 37:6

**Brande** 7:21

**break** 48:20,22 82:6,10,12,21 133:15,19 145:25

**Bremer** 115:10 121:24

**brewing** 36:23

**briefly** 9:20

**bring** 36:12 46:6 105:16 106:2

**Britannica** 128:17

**broader** 65:1 117:18

**broke** 84:9

**brought** 46:16 106:11 117:12

**Bruton-geer** 15:19

**bubbled** 41:19

**bubbling** 59:5

**bucket** 108:20 109:14

**buckets** 43:14

**build-up** 137:25

**building** 15:22,24 46:1 86:18,20 98:1 101:25 147:14

**buildings** 85:13

**bullet** 37:25

**bullets** 105:19

**bunch** 39:5,6 52:10

**business** 90:13 141:7

**C**

**call** 25:2,4,13 26:1,4,7 27:4,23 30:6 33:5 43:10 47:23 51:5 52:16 58:25 62:15 75:11 100:8 104:8 126:16 142:12

**called** 24:1,4 32:11 39:16 46:23 52:15 54:6 57:25 125:20 145:5

**calling** 70:4 73:2 128:8 129:4 142:5

**calls** 30:10 33:4 34:5,7,8 91:13 95:18 108:22

**calm** 91:14,23

**camera** 83:10,15

**cameras** 81:18 83:18

**campaign** 136:4

**campus** 12:6 15:23,25 16:21 19:5 28:7 35:12 40:2,7 41:13 43:19 50:23 57:18 60:4 61:9, 19 62:13 64:8 65:13 75:13 77:8, 10 78:15 80:17, 18 81:3,7,20,23 83:12,16 84:9,15 85:9,10,24 91:25 92:4 93:17,20 100:17,20 102:18 103:20 104:6,10 105:2,3,7,9 110:16,17,19,21, 23 111:2,3 112:13,15 117:6 118:16,17 129:7 130:22 131:12,24 132:9 133:16 135:18 136:25 137:22 139:16 140:21,24

141:15,18 142:1 143:9 145:9,14

**cancel** 77:24 133:8 134:5 141:3

**canceled** 77:25 132:16 133:2,3,7, 16 139:3,5 140:11 142:16,17 143:8

**canceling** 133:17 135:16 136:9,21 140:14

**cancellation** 139:8

**capable** 92:6 93:24

**capacity** 12:4

**caption** 7:11

**captive** 107:1

**capturing** 29:18

**card** 12:22 13:3 85:13 86:3,7,8, 16,20,23 87:7

**care** 20:8

**career** 12:8,17 97:17

**carry** 56:19 57:1 97:2

**carrying** 12:23 13:13

**case** 7:10 8:18 88:18 94:12 119:16,22 139:5

**categorical** 125:8

**category** 70:24 71:3

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**caught** 72:21 99:18 115:11

**caused** 32:24 90:8 100:16 104:11,22 111:8, 13 136:24

**causing** 94:13 111:11

**celebrate** 112:14

**celebrating** 115:20 116:13 118:15

**cetera** 34:23 143:25 145:17

**chain** 11:20 71:18,20 93:18

**challenge** 135:24

**challenging** 91:22

**chance** 42:18

**change** 24:4 29:14 77:19 87:8 108:20

**changed** 36:3

**chaos** 94:13

**charge** 97:22

**charged** 130:9

**chat** 14:23,25 15:8 18:20,25 20:16 26:22 40:16,17 48:14 58:19 108:14 112:13 117:22,23 148:5

**check** 39:10,12 75:25

**check-in** 42:18

**chief** 84:11

**choice** 107:1

**Chris** 8:20 82:6 151:2

**Christopher** 7:15

**chunk** 60:22

**Circuit** 10:2

**circulate** 67:10

**circulated** 19:12 24:22 26:16 32:13 43:10 45:24 58:20 66:10 108:21 135:3,8,12

**circulating** 26:20, 25 28:12 43:6 134:17

**citizen** 38:24

**civility** 142:3

**claimed** 106:12 116:25

**claiming** 136:23

**clarified** 130:2,4, 6

**clarity** 30:3 127:22,24 128:1, 22

**class** 19:9,13,15, 16 24:4,5,6 26:15,18 27:5 29:14,15 30:16 32:23 37:13 44:16,17,21 73:11,23 77:22, 24 78:1 79:9,21, 22,23,25 109:21

114:3 132:15,16 133:3,4,6,8,11, 12,14,16,17,24 134:5 135:16,18 136:10,21 139:2, 5,8,11,13,16 140:23 142:16 143:8

**classes** 44:7 94:17 106:13 109:24 110:1,5,9, 10,11 133:2 139:9 142:22

**classmates** 64:5, 8

**classroom** 29:19 77:20 79:8 103:22,25 104:1 106:25 107:9 121:14 144:17

**classrooms** 79:3 136:4

**clear** 22:12 69:13 70:3 86:13 92:11 97:1 108:9 116:12 118:1 124:16

**clearcut** 122:11

**clearer** 48:3 108:22

**clerked** 9:25

**clerking** 10:4

**clip** 123:10

**clipped** 125:25

**clipping** 125:21

**clips** 122:24 123:15

**closely** 131:21

**closer** 31:13

**co-counsel** 113:8

**coalition** 115:9

**coffee** 48:11,13, 24 49:3 52:6,7, 16,20 85:6 143:24

**collection** 53:2

**collective** 121:9

**college** 9:10 93:20 145:11

**colonizing** 38:16

**color** 79:1

**comedy** 112:8

**comfort** 145:5,9, 25

**comfortable** 140:21

**comical** 115:20

**comings** 83:12

**comment** 20:2,15 44:15 63:20 64:12 72:24 73:15 114:5 124:19 129:9 145:21

**commentators** 122:24

**comments** 18:24 19:7,11,18,21 20:20 22:7 43:1, 3,13 44:12 63:19, 21 64:19,23 73:21 74:1 109:12 116:21 136:19 138:8

**commit** 130:22

**common** 25:24 96:11 148:7

**Commons** 49:18

**communicate** 87:19 109:18 119:5

**communicated** 42:4 87:22

**communicating** 134:6,21

**communications** 113:4

**communities** 38:16 50:16

**community** 22:21 24:23 28:11 35:24 40:5 43:7 45:19 47:24,25 50:7,13,19,25 54:13,18 55:4,12, 15,16 63:8,11 65:4,19 66:4,8,23 69:7,10,12 72:5 74:25 75:2,7 84:20 85:19 86:4 90:7 91:8,19 93:20 94:8,12 95:12,14,18 96:1 103:19 109:19 111:15 116:21 121:10 129:25 132:5 134:18 142:13 148:12,16

**compared** 27:20

**compendium** 35:7

**compiled** 35:16

**complain** 20:15 71:25

**complaint** 21:7, 18 29:1

**complaints** 19:3 20:17 21:12 34:1 35:1,8,13 45:13 53:21 62:20 64:20 66:7 74:4 108:7,8 122:23 126:21,22 132:4

**completely** 141:10

**completing** 16:21

**computer** 113:14

**concept** 70:14,25 125:9,11,15

**concern** 19:4,6 29:2 32:24,25 44:13 48:16 72:15,18 76:6 85:4 109:15 131:2 134:4

**concerned** 25:2, 16 27:9,19 34:12 44:24 50:11 53:18 59:20 61:22,24 64:4 73:20 75:15 79:2 99:4 111:4 119:6 130:1 133:20

**concerns** 15:6 19:4 20:18,21 29:3 35:9 40:3,18 43:19 46:13 53:21 57:9 63:8, 10,11 65:22 74:5, 24 75:23 76:23 77:6,8,14 78:5,7 85:4 109:12

117:15 132:3,4

**conclude** 69:3

**concluded** 31:2, 11 34:13

**concluding** 33:20

**conclusions** 57:10

**condemn** 22:9

**condemned** 37:22

**conduct** 16:12, 16,22 17:22,25 35:16 40:11 41:12 52:3 57:16, 21 92:7 112:11, 18 114:18 116:6, 9 122:10 127:19 149:6

**confided** 76:9

**confirm** 114:6

**confirmed** 68:24

**confirming** 84:7

**conflict** 65:9

**confronted** 29:14

**connection** 137:7

**conscious** 77:15

**considered** 148:8

**consistent** 64:19

**consists** 23:20 32:7 63:1

**console** 143:24

**conspiracy** 117:11

**constantly** 143:23

**Constitution** 33:15

**constitutional** 11:17 24:4 29:14 133:5

**Constitutionalism** 32:11

**construct** 70:13

**constructive** 46:22

**consultation** 149:4

**consulted** 149:7

**consumed** 132:3 143:4,11

**consuming** 89:17 90:1,10

**contact** 148:9

**contemporaneou s** 65:5 116:11

**contemporary** 30:6

**contempt** 20:11

**context** 11:25 34:14,22 46:9 47:16 50:5 64:24 65:1 66:2 85:20 115:25 126:3 148:9

**contexts** 124:1

**continue** 95:5 111:6 140:16 141:7 143:13

**continued** 83:13 140:17

**contribute** 132:17

**controversial** 24:19 34:18

**controversy** 18:23 21:23 23:13 24:20 27:8 31:24 32:19,21 36:22

**conversation** 19:17 23:5 29:9, 18 42:24 46:17 76:19 145:5,9

**conversations** 28:13 59:23 78:18 108:17 120:21

**Cooper** 29:12

**coordinate** 97:24

**copy** 10:20 24:24 47:14,15 51:19 52:24 60:9,10 126:24 150:13, 16,24 151:2,19, 25

**Cormier** 12:16 14:12,17,24 15:3, 9 16:24 17:7 18:3,8,9,10,13 97:12 102:8 146:12,15 148:24

**Cormier's** 14:24

**correct** 11:8 63:12 73:15 74:7 76:24 80:2 88:21, 22 98:4 101:7 102:5 103:6,8,9 112:21 114:3 122:7,20 123:16 124:9 125:6 130:10,14 131:14 134:8,16 135:9

139:3,6 141:16 142:24 146:24

**correctly** 29:25 30:8 38:2,9,18,25

**corrupting** 38:15

**couches** 145:4,5, 6,15

**council** 57:25 58:2,15 59:8,13, 16,19

**counsel** 7:12 8:6, 20,23,24 113:9 119:10 132:22 135:5 149:10

**Counsel's** 39:25 41:11,22 42:7 57:15

**count** 118:9

**country** 38:13 50:17

**couple** 47:6 71:7

**court** 7:22 10:1,4 137:1,2,15 150:6

**cover** 83:3

**crazy** 115:1

**create** 142:2

**created** 137:4

**credible** 120:7

**crime** 130:10,22

**crimes** 38:22

**criminal** 38:6 130:11,20,21

**critical** 70:25

**criticism** 20:9

**crossed** 47:8

59:21 62:18 67:3

**culminating** 96:23

**culture** 124:9

**current** 9:7 64:14

**cursed** 13:7

**cursing** 15:10

**cycle** 102:21

**D**

**daily** 47:13

**Damsky** 7:11,18 8:18 10:11,14 11:3 12:4,5,9,11 13:16,18,23 16:13,15,20 17:18 18:7,10,12, 24 19:7,18 22:5 23:15 24:3,9,14, 16 26:13,21 29:6, 9,15 30:11 31:4, 25 32:17 34:6,17 35:21 36:7,19 37:14 39:3,6 40:8,10,15 42:24 43:2,9,16,20 44:16,25 45:9,13, 23 47:7,18 49:16, 21 53:3 54:6 55:7 56:18 57:7,22 58:17 59:9 66:23 67:3,14,24 68:15 70:11 71:19,25 74:10,18 75:16 79:9,24 80:25 81:4 84:18 86:22 89:12 90:12,17, 23 91:4 93:24 95:21 96:9 97:1, 18 98:22 103:1,

21 106:21 107:14 109:13,17,21,25 110:18 111:18 112:2,4 114:8,14, 21 115:17,23 117:1 118:7,12, 13,16 119:21 120:8,15,20 125:19 126:14 130:9 133:11 134:8,14 137:14 139:6 140:8 142:19 146:13 147:24

**Damsky's** 19:21 20:2,15 27:16 35:11,20 37:13 53:16,20 55:25 60:3 62:20 68:9 69:5 112:15 120:23 121:17 123:21,23 127:2 133:14 140:4 142:9 148:1

**danger** 64:17

**date** 7:8 11:19 15:1,2 57:3 77:20 118:1

**dated** 36:20 77:2

**day** 52:19 75:6 86:6 87:24 97:25 110:18 148:25

**days** 11:9 64:9

**dead** 49:24

**deal** 44:9 54:15 89:5 141:20 144:6

**dealing** 12:3 53:20 57:7 89:12, 24 120:13 132:3

dealt 17:18 45:12 54:15 62:17

dean 8:12 9:7,10, 15,19 12:4,17 13:24 15:4 16:3 17:15,18 29:4,5,8 32:9 37:1 39:21, 24 41:11 42:9 44:23 45:22 46:10,18 48:11 51:23 52:1 53:16 57:6 63:12 76:18, 22 78:4 81:2 82:20 85:7 88:25 89:10,18 93:3 94:23,24 97:10 101:18 131:9 144:24 145:2,16 146:10 150:1

deans 37:1

death 105:23,24

debate 70:1 138:10

decade 20:4

decide 86:2

decided 85:12,20

decision 34:9,19 98:7 119:17 127:15 131:4 149:5

decisions 93:19

decisive 126:3

deconstructing 70:23

deeply 22:20,24 54:2 59:19

defeats 102:12

defendant 7:16,

20,21 8:21

defended 47:18

defending 120:23

defense 137:10

defensive 137:11

DEI 23:6

delicate 84:20

demanded 18:10 61:21,22 116:15

demanding 85:8

demeanor 49:9

demographic 20:9

denied 80:19 118:17 131:13

department 39:25 84:7,12 87:25 122:17 144:20

depicting 115:8

depiction 118:5

deployment 81:3

DEPONENT 113:16 149:22 150:3

deposition 7:1,10 150:5,24

depraved 38:7

describe 9:20 35:8 49:9 72:3 84:4 100:25 128:11 149:17

describes 17:17 29:10

describing 15:3 29:18 117:10

deserve 38:21 64:9

despicable 128:19

destroying 70:24

detailed 145:2

developed 46:11

devil's 70:10

dialogue 126:5

difference 127:1 131:7,8

differences 120:3

difficult 90:1 91:20 94:20 139:21

direct 47:23 48:3 56:8 82:23 133:22

directed 52:17

direction 52:2 109:2

directly 41:5 42:7 54:12 61:10 73:2

director 50:5 97:16 115:9

disagree 106:7

disagreeing 121:16

disagreement 120:14 142:2

discipline 22:15 30:11 31:11 34:5, 7

disciplined 22:6 145:13

disclaim 70:7

disclose 107:16

discovery 114:12

discuss 20:19 21:23 26:16 119:18 128:3 136:9

discussed 33:3 45:5 46:13 58:17, 19,21 105:18 106:8 135:22 140:13 148:3 149:9

discusses 42:3

discussing 29:15 108:6 119:20 120:16 134:18

discussion 11:13 19:14 24:5 47:3 61:8,17 68:17

discussions 126:21

disgusting 63:25

dispatched 37:25

displayed 101:13

displeasure 108:2

disproportionatel y 38:6

disrupt 105:2

disrupted 143:1,3

disruption 100:17,20 104:11,22 110:16,21 111:6, 8,11,14 129:21 131:24 132:20

135:18 136:24 139:17 141:15,20 142:24 145:14

**disruptions** 142:8

**disruptive** 18:7 78:10 103:22 104:5 110:25 137:6,16

**distinct** 56:13

**distinctly** 27:24

**dive** 11:23

**diverse** 19:16

**diversity** 19:15, 17

**doc** 63:20 64:3,12

**document** 14:3,9, 14 16:8,10 17:14 28:25 33:23 35:6 51:24 53:9 77:7 84:3,5

**documents** 119:16

**Donald** 145:1

**Donevan** 121:25

**Donovan** 121:25

**donuts** 48:11,14, 24 49:3 52:7,17, 20 85:7

**door** 12:12,20,24 13:3,8,12,19 15:10 18:9,11 40:19 77:18 80:12 90:24 97:19 98:23 99:1, 24 100:3,5,8,13, 16,19 101:2,15 102:12,13 103:3 104:3 105:3

146:13,14,19 147:7,16 148:4

**doors** 12:23 43:23,25 77:9,17 86:6 88:2

**double** 149:16

**draft** 23:14,19 24:1,3 26:12,15 31:1,7,15 41:21

**drafts** 26:16

**drop** 44:17

**Dropbox** 52:10

**due** 73:3

**duly** 8:7

**dying** 25:9

---

**E**

---

**earlier** 96:7

**early** 27:25 30:25 31:15 45:25

**earth** 20:8

**easily** 135:22

**easy** 69:24

**edge** 96:3

**edit** 31:7

**education** 9:21

**effect** 143:15

**effects** 78:10

**effort** 42:19 143:19,20 144:6

**elected** 58:3

**Eleventh** 10:1

**Ellen** 8:16

**email** 21:4 24:25 28:20,23 29:8,10, 12,20 30:2 36:17, 24 37:3,6 51:14, 25 53:1 73:15 75:4 77:1 84:10 88:23,24 145:3, 16

**emails** 52:23

**embeds** 36:18

**emboldened** 56:25

**eminency** 37:23

**emojis** 115:23

**emotional** 49:14, 22

**employers** 97:21, 24

**employment** 9:21 131:13

**encounter** 12:11 13:17 17:2,6 18:8 146:15

**encourage** 145:8

**encouraged** 66:14,21

**Encyclopedia** 128:17

**end** 15:15 17:4 25:2,24 30:7 38:1,8,17,24 42:6 71:18,21,22 80:14 82:23 86:23 88:7 96:12 109:20 150:5

**endangering** 38:16

**ended** 13:9 32:13 52:17

**endorsing** 34:3

**ends** 71:20

**enemy** 96:11 148:7

**engage** 44:2,8

**engaged** 50:21 59:22 105:8

**engagement** 129:21 141:5

**engaging** 57:17 64:15 72:21 94:17 104:21 128:4 129:17 144:19

**Enjoy** 150:2

**enormous** 145:7

**enormously** 89:25

**enrolled** 44:16,17

**ensure** 40:2 141:6

**enter** 15:20 86:18 101:24

**entire** 12:7 126:1, 2,12

**entirety** 129:20

**entrance** 12:23

**entry** 100:10 104:4

**escalated** 94:10

**escalation** 27:2, 20 45:21 48:3 92:7

**essentially** 12:7

**evaluate** 90:6

**evening** 61:14,19 62:22 68:12

**event** 27:25 48:13 61:24 81:15,18 83:9 84:6,8 96:23 101:1 103:12 104:5 138:19 140:15,17

**events** 11:24 17:16 64:24 65:22 80:18 89:17 90:10 96:3 104:20 116:19 136:3 142:11 144:17 148:13

**eventually** 75:15

**everyday** 138:20, 21

**evidence** 114:13 119:21

**evil** 38:23

**exact** 30:4 75:3

**examination** 8:10 82:24 97:8 146:8

**examined** 8:8

**exception** 88:23

**excerpt** 23:19

**exchange** 67:13, 15 71:8,24 74:19 75:16 78:13,19 101:17 133:15,18

**executed** 38:21

**execution** 105:13,14,19

**executions** 37:21

**exhibit** 10:18,19, 23 11:1 13:24 14:6 16:3,5 17:9, 11 19:24 20:22, 25 23:18,20,22, 25 28:15,16 32:2, 4,9 35:1,3 36:9 51:1,5,10,13 62:24 63:3,6 72:8,10 73:5,6 76:12,14 78:8 79:13,15 83:23, 25 86:25 87:2 113:7 119:10,12, 13

**exhibits** 74:6 88:7,9,11,16,19, 20

**exit** 43:23,25

**expected** 71:6

**expel** 127:15

**expelled** 112:5,9 115:24 131:12

**expense** 145:7,15

**expenses** 132:8

**experience** 102:16 103:20 116:18 125:14 136:14

**experienced** 118:23 135:21

**expert** 30:18 90:4 105:24

**explain** 66:24 87:13 109:9

**explained** 22:17

**explaining** 87:25

145:3

**explains** 77:11

**expletives** 146:22

**exposure** 125:6

**express** 78:23

**expressed** 44:6,7 62:5 76:6 107:13 142:21

**expresses** 20:12

**expressing** 62:12 107:12

**expulsion** 103:2, 4 112:21 114:16 117:7 125:20

**extent** 26:1 142:23

**extra** 140:2,3

**extra-legal** 30:6

**extreme** 55:9 101:3,6

**extremely** 64:4 141:12

**extremist** 141:14

**eye** 36:7 95:13

**eyes** 49:12 92:2 131:25

---

**F**

**face** 30:10 103:1, 4,8 118:14 147:13

**faces** 20:4

**facilities** 87:25 140:25

**fact** 25:21 32:21 71:14 72:20 105:22 109:20 112:7,8 114:3 115:20 117:1 122:6,7 124:8 125:21 127:21 130:13,21 131:19 132:2 136:17 137:10 141:25 144:12

**faculty** 9:12,13, 19,22 11:18 24:23 27:6 30:19 40:3 50:21 57:25 58:2,3,4,6,9,15, 25 59:8,9,13,15, 19,25 60:11,12, 16,18 61:3,12 74:18 75:8,10 78:3,23,25 79:1, 2,6 85:15 92:2 117:14 121:11,12 125:19 129:25 132:4 134:22 138:14,24 139:15 143:17 144:14 147:23 148:9,12 149:10

**failed** 92:4

**fair** 16:14 74:17 75:18 143:7 149:3

**fairly** 34:18

**fall** 23:9,13 32:13 43:14 108:21

**fallout** 89:24 104:8 110:22,24 137:8

**familiar** 96:5,9 110:4 114:10

122:23 123:25 124:3 125:2 126:1 149:8

**familiarity** 124:21

**families** 78:24

**family** 62:6 64:1 67:23 68:14 69:22 71:16 73:3 127:10 129:6

**fast** 23:8

**fathom** 95:3

**FBI** 62:4 144:15

**fear** 62:5,13 64:9, 10 65:18 76:11 78:23 85:18,25 91:5 93:17 107:12,13,21 108:1 109:5 111:9 112:7 115:19 116:19 118:24 134:2

**feared** 46:15

**fearful** 77:13 80:25

**fears** 65:10 76:3 91:17 93:13

**feedback** 43:18

**feel** 20:11 25:22 50:10 65:24 67:11 85:10 108:25 121:1 140:21

**feeling** 25:23 45:16 102:22 107:6

**feels** 132:15

**fellow** 29:4

**felt** 22:25 25:15 34:20 44:11 45:7 46:6 47:23 48:2 49:12,13,25 50:4, 8 53:19,21,22,23 54:2,11,17,25 55:7 56:5,7 57:13 59:21 66:1 94:8, 11 95:19 106:19 121:4 139:12 142:12

**female** 15:14

**fielding** 109:11 120:15

**fighting** 25:8

**figure** 91:22

**file** 40:22 42:2

**fills** 20:5

**final** 26:19 29:23 31:8,17,18 32:10 39:7 43:11 72:23

**finally** 64:12

**finals** 94:15,16 102:19,23

**find** 48:17 75:3 120:4 137:13

**fine** 113:15,20 151:6,12,15

**finish** 119:25

**fire** 143:4

**firing** 37:22 105:17,22 106:3, 9

**firm** 10:8

**first-year** 18:6 110:12

**firsthand** 112:24

**five-** 145:24

**five-hour** 60:22

**flags** 95:8

**Florida** 8:22,23 9:8 16:12 39:15 50:14,17 65:12, 13 90:16 92:15, 16 93:1 94:3 106:1 110:1 120:6 122:5 136:16

**flowing** 143:21

**flustered** 102:17

**focused** 26:6 96:21

**folks** 13:4 21:15 26:23,25 34:20 39:21 40:6 97:25 117:19 122:25 149:7

**follow** 39:11 46:10 100:18 129:8 138:9

**follow-on** 126:5

**follow-up** 116:23 128:14

**follower** 55:24

**followers** 136:18, 19

**food** 42:17

**footnoted** 30:25 34:23 54:10

**foreign** 38:14

**foreseeable** 142:20

**form** 126:11

**formally** 88:8

**forum** 19:9

**forward** 23:8 31:2

**forwarded** 28:21 37:7 63:12 73:14

**forwarding** 37:15

**found** 13:10 59:10 146:17

**Fourteenth** 33:13,14,16

**frame** 123:8

**frankly** 33:15 75:22 81:22 83:13 86:11

**free** 66:25

**freedom** 34:16

**frequently** 83:14 134:8

**friction** 144:1

**Friday** 7:4 48:20, 21 85:5 86:6,7,8

**friends** 64:1 119:6

**front** 10:22 37:22

**frustrating** 100:25

**frustration** 43:15 101:4,24 147:11, 18

**fucking** 13:8,12, 13 18:11,14,15 99:23 146:19 147:15,16

**Fuentes** 122:25 123:4

**full** 8:14 24:15 120:1 149:14

**fully** 28:3 86:2

**function** 39:19

**functionally** 22:3

**future** 103:13 143:18

---

**G**

---

**gain** 100:9 104:4

**Gainesville** 8:22

**gather** 49:19

**Gatorone** 86:18, 20

**gauge** 120:6

**gave** 47:14 96:15 131:1

**general** 8:22 39:25 41:11,22 42:7 44:13 57:15 102:10

**generally** 19:14 72:4 103:7

**generated** 89:13

**genocide** 68:4,5, 6,22 69:2,4

**genuine** 135:23, 24

**Georgia** 9:24,25

**gesture** 99:9

**give** 8:1 11:25 34:9 42:17 46:9 51:15 65:1 96:4 127:24

**giving** 108:18

**glass** 36:14 103:3

**glasses** 36:12

**glistening** 49:13

**goal** 118:12

**goals** 33:10

**goings** 83:12

**Goldberg** 37:21

**good** 8:12 31:3 97:10,11 118:8 149:18 150:19 151:9

**governance** 58:4

**government** 22:3

**grade** 32:23

**graduate** 37:12

**graduated** 9:23

**graduating** 9:25

**grant** 80:21

**great** 97:24

**greater** 68:5,6

**greatest** 93:17

**grew** 93:13

**grounds** 133:17

**group** 19:9 39:24 40:6 42:3 58:3 60:11 85:5 109:12 114:2,11 117:22 119:4 129:5

**Groupme** 18:20, 25 20:15 21:13, 23 26:22 40:16, 17 58:19 108:14 148:4

**groups** 21:22

**grow** 93:7

**grown** 28:5

**gruesome** 33:8

**guard** 99:18

**guess** 33:7 66:13 68:10 104:7 107:17 112:12 114:1 123:3 131:3 149:19

**guest** 79:11

**guidance** 58:13

**gun** 28:5,6

**guy** 56:10

**guys** 113:11

---

**H**

---

**halfway** 15:8

**Hall** 15:19 42:10, 15,21,25 43:2 44:22,25 45:1 46:8,9,25 47:6 48:23 107:13

**hand** 7:25

**handful** 116:20 117:17 146:11

**handle** 96:16

**hands** 101:15

**happen** 60:5 91:7 139:22 141:16 142:6

**happened** 16:20 27:21 45:3 48:20, 21 59:25 65:5,13 73:22 74:22 83:7 100:23 121:5

127:7 130:8 134:15 137:6,8, 22 138:4 143:8 145:20

**happening** 23:5 50:6 65:6 73:20 90:21 91:25 104:10 140:5,23

**happily** 118:16

**hard** 30:14 37:19 54:21 69:3 115:5 141:23 142:1

**Harvard** 126:15

**hate** 64:15

**hatred** 20:13

**head** 38:1 60:17 87:25 94:15 105:19

**heading** 18:4

**health** 79:21

**hear** 9:1 42:18 46:18 66:18 98:7 123:11

**heard** 45:7,8 64:20 116:14 123:4 140:1 142:15

**hearing** 17:23 95:19

**heat** 120:22

**heels** 43:4,5

**heightened** 65:17 76:3 101:23

**heinous** 57:1

**helpful** 59:10

**helping** 28:10

**high-level** 16:19

**highest** 38:5

**highly** 30:21 107:23 109:7 120:11 134:23,25 135:7 144:3

**history** 9:21 96:24 130:12 148:13 149:9,11,14

**hit** 91:15 94:19

**hold** 42:21 48:10,12,23

**holding** 42:10

**home** 80:13

**homelands** 38:17

**hope** 38:8 74:2 96:4

**hour** 25:10

**hours** 82:5,6 91:14 110:18 132:13

**humane** 37:24

**humanity** 96:12 148:7

**husband** 76:10

**Hussein** 115:11

**hyperlink** 53:2 128:17

---

**I**

**ID** 86:18

**idea** 108:1 127:12 129:4

**identification** 10:24 14:7 16:6 17:12 21:1 23:23 28:17 32:5 35:4 51:11 63:4 72:11 73:7 76:15 79:16 84:1 87:3 119:14

**identified** 13:22 18:6 45:5 75:11 137:7 147:3

**identify** 11:1 13:5,15 23:18 28:24 84:3

**identity** 27:3 71:3

**Ignatiev** 56:10 68:2,4,18,20 70:17 124:11,17 125:12 126:16

**Ignatiev's** 70:12

**ignorance** 37:23

**ignorant** 38:6

**ignores** 33:15

**III** 10:2

**illegal** 38:12 56:15

**image** 115:4

**immediately** 48:2 53:18 54:14 57:5,6,14 64:18

**immigrants** 38:13

**immigration** 33:18

**imminent** 115:19

**implicitly** 128:19

**important** 81:17 127:14 140:13

**impressing** 28:8

**inappropriate** 30:21

**incentive** 135:16

**incident** 12:10,16,18 13:14 14:13 15:1,2,4,6 16:23,25 18:17 26:22 40:19 41:8,19 45:3 65:12 90:24 91:4 100:22,23 107:13 146:13 148:4

**incidents** 16:19 35:23 103:23

**incite** 29:24

**included** 11:15 121:11 129:5

**includes** 38:11 52:9 53:1

**including** 43:16 56:3 67:2 118:24 120:18

**incomprehensibly** 38:23

**increase** 75:24 77:21 83:16 86:3 132:7

**increased** 62:1 81:7,8,20 82:2 83:4 84:22 111:9 116:15 132:9 134:3 140:16 141:4,6

**increases** 84:25

**incredibly** 91:22

**individual** 12:19 13:16 45:4 94:4 95:11 125:1

**individual's** 103:20

**individually** 21:25 67:9 122:3

**industry** 38:15

**informally** 48:17

**information** 42:2 58:7 75:7 87:15 134:19 139:24 140:19

**informing** 49:10

**initial** 47:21

**initially** 19:8 32:20 36:25 43:8 45:13 65:23 75:19 81:5 84:17 85:14

**initiate** 16:16,21 149:5

**inquire** 109:4

**inquiry** 107:15,24 120:5 128:20,22

**insane** 63:22

**inside** 98:1 101:19 146:17

**insight** 60:7

**installed** 145:8

**instance** 104:2

**institution** 20:10

**intellect** 68:17

**intellectual** 69:25

**intellectualized** 68:16

**intend** 130:6

**intended** 30:6

56:19 109:18

**intending** 112:3

**intends** 97:3

**intensity** 45:17 50:10 85:18

**intent** 70:7 127:13,16

**interaction** 101:22 147:20 148:24

**interactions** 118:22

**interchange** 147:9

**Interesting** 133:7

**interfered** 140:6 142:21

**interference** 140:1

**interfering** 104:17

**interim** 9:10,15, 19 17:18 110:6,7

**internally** 26:17

**internship** 59:1 118:18 130:16,25 131:20

**interpret** 33:13,14 107:4 111:21

**interpreted** 44:1 107:10 148:10

**interrupt** 98:6

**interrupted** 139:3,10

**interruption** 92:19

**intervene** 46:3

**interview** 97:25

**interviews** 97:21, 23

**introduce** 7:12

**introduced** 25:21 106:2

**invite** 42:15

**involved** 12:12 21:16 105:19 127:18 145:21 148:22 149:10

**involving** 12:10 64:24 113:5

**Iraq** 115:10

**Israel** 103:13

**issue** 47:4 94:7 96:10 104:15 134:7 135:24 148:10

**issues** 12:3 17:17 19:15 58:14 65:17 66:22 79:23 89:12 90:12 104:1 116:19 119:6

**J**

**Janice** 12:17 14:23 45:23 51:25 52:14,16

**January** 42:22

**Jewish** 47:24 48:1 49:23 50:6, 9,12,16,19,20,21, 22,25 55:4,12 56:3 59:15,25

60:11,15,17,18 61:13,25 64:1 65:4 66:3 72:4 74:1 78:25 79:12, 24 80:11 81:15 83:9 84:6 85:16, 17 91:18 96:1 138:24 140:14

**Jewishness** 70:1, 13 71:1,4

**Jews** 54:1 56:8 64:6 68:6,25 96:11 103:14 125:20 126:4,15, 18 148:6

**job** 95:5 144:11, 12

**jobs** 90:4

**John** 10:4

**Johnston** 79:21 80:2

**joined** 9:22 11:12

**jokes** 112:20

**joking** 112:24

**Jonathan** 30:16

**joy** 20:7

**judge** 10:2 151:8

**judges** 33:5,12

**judicial** 105:13

**June** 9:11

**Jurkowski** 37:8, 10 39:8 48:19 49:7 50:9,20 52:5,6,9,20 53:24 56:5 88:24 92:12 96:15 118:4,12, 23

**Jurkowski's** 118:2,21 121:7

**Justice** 10:4

**Justin** 7:20 51:12, 21

**Justitia's** 33:7

**K**

**Kaufman** 61:23

**keeping** 36:6 87:15 90:7

**killing** 25:8

**kind** 36:6 37:19 40:5 42:1 43:17 56:19 57:1 67:5 68:18 70:20,25 87:16 93:8 97:4 103:9 109:1 114:12 117:11 131:18 142:6

**Kinda** 114:25

**kinds** 65:18

**King** 10:3,6

**knew** 13:12 16:15 43:25 46:23 54:14 59:4,11 74:23 95:7,8,18 103:19 120:19 134:14 147:2 149:2,11

**knock** 105:3

**knocking** 100:7, 9,13,15,16,19 103:2

**knowing** 92:3,4 120:1 148:23

**knowledge** 24:11 75:14 112:24 113:2 117:9 122:12 124:25 125:13,14,16 136:6 138:1 141:21 145:20 146:23 148:2,18

**Knowles** 84:13, 14

**L**

**language** 25:16 27:20,23 28:9 30:20 31:14,19 122:6 135:10,11

**Lanier** 10:2

**large** 50:18 96:1 137:15

**largest** 50:15,16

**lasts** 52:7

**late** 25:10 36:23 45:25 86:5 94:6

**laughing** 112:8, 20 113:1 115:23

**law** 9:11,12,22, 24,25 10:10 11:16,17 12:7,11, 22 13:5 17:19 20:14 22:4,9,11 23:5 24:25 25:17 26:11 27:15 34:19 35:19 39:23 42:11 43:15 49:18 50:13,17,22,24 54:23 56:2,3 57:19,24 58:14 60:17,18 61:13,

25 62:6 63:9,23 64:15 67:15 69:19 70:6 78:4,5 79:21 80:7 81:15, 19,24 82:1 83:2, 9,11,17,21 84:6 85:8 89:13 90:13 93:11 94:13,18 95:25 97:14 98:3, 23,25 100:12 101:15 102:16 106:24 107:16 110:1 112:5 114:3 117:1 120:6 131:9,10, 22 133:6 136:4 137:11 138:11 140:2,7,14 141:11 142:20 143:13 145:5,7, 11,18 149:4

**Law's** 64:8

**law-** 38:23

**lawyer** 89:16

**Lea** 79:20

**lead** 37:24

**leaders** 57:19

**leading** 35:10 148:15

**leads** 92:8

**learn** 61:5 117:8

**learned** 19:6,8 44:16 58:23 96:9

**learning** 22:22 104:18

**leave** 99:5,16 107:7

**leaving** 10:8

**left** 13:9 15:15 82:24 101:11

**legal** 9:20,21 26:9 33:11 131:8,11, 15 135:17 137:10,18 145:17

**legislation** 106:2

**length** 57:9

**letting** 63:9

**level** 141:20

**Levin** 9:10

**Lidsky** 11:14 30:17 67:13,16, 18 68:9 69:6,12 71:9,24 72:6,20 73:2,11,14,18,19 74:19 75:14 76:21,24 77:23 78:14,19 114:8,9 126:6 127:3,9 129:6 133:7 135:13,20 138:8, 12,23 139:4,22

**Lidsky's** 72:1 77:6 85:4 127:13 133:5

**life** 21:16 50:23 102:18,21 109:5 144:24

**light** 42:3

**limited** 125:6

**lines** 67:1

**list** 89:1 119:17

**listed** 11:21

**listened** 95:20

**listening** 85:15

**literally** 125:5

**live** 124:8

**lived** 93:12

**living** 55:10,11 91:19 137:20,21 143:9

**local** 131:20

**lock** 77:9

**locked** 12:12,21 18:9 86:21 101:2 146:13 147:7

**long** 9:8 12:2 53:7 90:16 95:21 96:17,18 123:5 145:2

**longer** 40:13 97:14

**looked** 50:2 70:19 96:14,16 148:25

**Lopez** 37:1

**lost** 20:3 59:1 71:14 130:25

**lot** 19:10 20:17 26:23 32:24 34:19 35:22 43:12 44:6 50:3 53:20 61:8 74:21 83:11 85:25 90:3, 8 94:20 95:20,22 96:19,20 109:25 116:14 120:22 126:7 134:1 137:25 144:6

**lots** 134:19,21

**loudly** 100:9 103:2

**luckily** 36:13

**Lyrissa** 11:14 67:15

**M**

**made** 10:7 17:1 18:24 19:7,9 20:6 47:16 54:8 63:19 70:3 72:7 73:21 74:2 77:14 94:4 103:13 105:11 106:14 111:5,18 112:16,20 116:4 120:5,8 121:23 122:14 127:15 128:21 131:4 134:15 149:5

**magnifying** 36:14

**main** 41:13 57:18 60:10,24 117:23

**maintaining** 142:3

**majority** 38:20

**make** 31:7 43:24 45:9 46:12 77:10 81:2,25 90:6 93:19 98:6 99:9 109:16 131:18 144:15

**makes** 50:24 63:25 84:24 138:22

**making** 48:4 49:24 122:22

**Mallard** 122:1

**Malyk** 40:12 41:13 52:2,3,18

**Malyk's** 40:20

**man** 20:5

**managed** 104:1

**managing** 80:18 97:22

**March** 10:15 11:4, 5,7 12:1 42:6 47:4 48:8,10 51:14 52:24 53:17 55:17 57:2 58:16 60:3,24 62:20 67:14 88:25 96:10 121:6 127:7 148:6

**marked** 10:23 14:6 16:5 17:11 20:25 23:22 28:16 32:4 35:3 51:10 63:3 72:10 73:6 76:14 79:15 83:25 87:2 119:13

**Marshfield** 30:16

**material** 100:17, 20 131:24 135:17 136:24 145:14

**matriculated** 141:11

**matter** 18:3 34:16 93:24 113:1 141:18,19

**matters** 111:25

**Mcalister** 7:2,10, 24 8:4,7,12,16 150:6

**meaning** 44:1 69:4 101:2 139:10

**means** 19:17 26:9,10 33:12

54:2 56:9 64:7,16 69:1 85:1 112:23 126:4,17,19 128:13 129:15

**meant** 29:24 42:17 58:6 68:20 126:16 127:23 129:11

**measure** 94:13 104:11,22 144:9

**measures** 84:16 132:12

**media** 10:14 35:20 36:19 37:16 39:3,10,13 54:8 112:13 149:1

**meet** 20:19 21:22 27:9,25 40:1 49:1 58:10 61:12

**meeting** 27:14,24 28:1 29:22 42:21 46:20,22 59:14 144:20

**meetings** 22:1 27:12,13 42:10 78:18 143:24

**meets** 40:6

**member** 9:12 12:12,15,25 13:17 17:3 19:14 41:10 58:25 76:20 78:3 79:7 80:9 92:3 95:14 121:12 129:25 144:14 147:23

**members** 27:14 59:9,15,25 60:11, 16 61:3,5 78:23, 25 79:1,2 80:7

116:21,22 138:24 139:15 142:13 148:12

**mental** 79:21

**mentioned** 89:4 93:7

**Merritt** 7:2,10 8:7, 16 150:5

**message** 52:4,8 55:3 63:7 73:10 74:15 76:18 79:20 80:1 87:6, 9,10,12,24 113:25

**messages** 21:15 116:8

**messaging** 143:25

**met** 21:24 31:8 57:8 85:5

**meted** 22:16

**method** 105:23 106:3

**Michelle** 21:4

**microphone** 98:7

**middle** 24:13

**miles** 118:17

**Miller** 7:20 51:15

**million** 20:3

**mind** 42:18 47:7 65:21 68:8 71:1 72:23 90:22 118:21 128:25 136:14

**mine** 68:4

**minimum** 129:24

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**minute** 51:16 145:25

**misquoting** 125:22

**Mm-hmm** 10:21 14:5,20 23:10 31:22 47:5 51:3,9 62:25 71:10 79:14 82:22 83:1 88:5 115:16

**moment** 38:8 50:11 66:3 92:11, 12 93:22 94:9,21 107:11 148:23

**Monday** 73:23 78:1 133:9

**monitor** 81:19 83:12

**monitored** 41:1

**monitoring** 35:20 89:23

**monitors** 83:21, 22

**month** 89:19 102:2

**monthly** 58:10

**months** 47:6

**morally** 38:7

**morning** 7:8 8:12, 13

**motion** 99:9

**move** 85:12 86:3 88:12 105:10 108:25 119:8 133:23

**moved** 73:24 87:7 111:2

**moving** 88:8 109:1 121:19 143:21

**multiple** 22:1 41:18 43:1 57:8 58:18 101:10,21 107:12 118:24 142:7,9

**murder** 67:22 71:15 127:10 128:10

**murdered** 68:3,14

**murdering** 69:21

---

**N**

**naked** 20:12

**named** 10:10 37:8 40:12

**nation** 25:14,15 26:6,7 33:16,17 64:24

**National** 32:11

**nationalism** 27:3 33:11 124:4

**nationalist** 40:18

**nationally** 23:6

**nature** 29:16 31:15 61:16 66:6 77:6 81:17

**navigate** 95:24 104:23

**navigating** 144:23

**nearing** 82:23

**necessarily** 118:3

**necessity** 141:15

**needed** 44:14 66:15 80:17 85:21 87:7,21

**nervous** 44:3 49:15,20

**net** 20:4

**neutered** 25:11

**news** 19:12 60:3

**Nick** 122:25 123:4

**night** 58:24

**nightmare** 90:20

**nights** 90:8

**NLG** 117:23

**Noel** 56:10 68:18 70:12,17 124:11, 16 126:16

**non-offensive** 135:8

**non-white** 33:17 38:12

**noon** 97:12

**normal** 102:16

**note** 24:7 115:22 136:16

**notes** 36:14

**noteworthy** 68:8

**notice** 71:12 128:15

**November** 36:20 37:4 45:25

**number** 19:19 25:15 26:5 28:20 45:12 50:21 53:12 54:6 59:7

68:7 72:9 73:5 75:24 76:6,12 79:18 83:23 117:19 134:12

**numbers** 16:9 17:10 23:20 32:7 35:2 36:10 51:7 63:1

**nuts** 18:17

---

**O**

**Obama** 136:4

**object** 89:3

**objection** 88:15 125:9

**objectionable** 68:3

**obligation** 129:10,13

**observe** 151:8

**observed** 90:25 101:19 118:23

**occurred** 74:20 104:5

**occurrence** 138:20,21

**occurs** 95:1

**October** 28:21 31:21 36:23 45:25 65:7

**odd** 68:21

**offended** 117:3 120:3

**offensive** 20:19 22:20,24 23:2 55:8 107:18,23

108:2 109:7 120:11 123:1,10 126:12 135:2,7, 11 144:4

**office** 8:22 15:21 39:22,24,25 40:12 41:11,12, 22 42:8 52:3 57:16 97:17 113:1,2 118:18 130:14,20 131:1, 21 149:8

**officer** 81:14 83:8,15 121:14 132:10

**officers** 81:3,11 83:16

**on-campus** 97:20,23

**once-** 115:8

**one's** 51:2

**ongoing** 41:25 65:9 149:13

**online** 62:19 73:24 110:1,5,9, 10 124:9

**open** 18:9 40:22 99:2 102:12,13 104:4 147:16

**opened** 77:17 146:19

**openness** 42:20 58:8

**operational** 139:25

**operations** 142:20 143:1

**opinion** 142:15

**opinions** 120:3,5 137:13

**opportunities** 70:6

**opportunity** 22:22 127:23

**opposed** 120:21

**opposing** 113:9 119:10

**opposite** 117:3 141:17 143:23

**opposition** 120:25 147:25

**optimistic** 102:23

**oral** 64:21

**order** 51:4 100:9 104:3 117:6 137:14 138:10

**ordered** 145:4

**orders** 150:7

**ordinary** 94:18 144:23

**organic** 137:3

**Organically** 134:14

**oriented** 123:15

**origin** 25:24

**original** 11:5,11 52:8 67:13 78:14, 18 123:24 150:9

**originalism** 32:12

**originally** 47:17 87:10

**other's** 88:11

**outcome** 118:8

**outnumbered** 25:11

**outrage** 55:2 68:5

**overreacting** 65:25 108:16

**overreaction** 45:15 121:1

**overrule** 34:8

**oversaw** 12:17

**overthrow** 97:4

---

**P**

---

**p.m.** 98:16,19 146:4,7 152:2

**P1** 119:12

**P2** 119:13

**package** 137:15

**pages** 14:4 33:20 35:13 136:18

**paid** 132:10

**Pam** 40:12 41:13 42:7 52:1,3,18

**paper** 23:14 24:1, 19,21 25:3,4,18 26:12 27:4,10 28:9,11 29:2,6, 16,19,23 30:5,11, 14,15,17 31:17, 18,21,24 32:10, 16,18,19,23 33:2, 12 34:1,14 36:22 41:20,21,22 42:4 43:5,6,9 45:24 58:20 70:9 108:21

**papers** 35:18 104:9 115:2

148:5

**paragraph** 16:25 18:4,19 25:3 26:19,24 29:23 30:5 33:20 43:11 72:24

**parent** 92:2 95:13

**parenthetical** 20:6

**parked** 81:24

**parking** 83:11

**Parkland** 85:23

**part** 17:24 23:7 26:15 35:16 36:24 39:7,21 40:13 48:20 50:23,24 54:22 58:4,21 65:20 66:2,10 67:8 81:23 83:16 96:24 103:15,17 104:10 105:10 112:17 114:23 119:21 129:22 144:11 148:15 149:12

**participating** 8:24 118:25

**parties** 88:10

**partly** 66:2

**partner** 10:7

**passing** 124:21

**past** 20:4

**patrols** 81:7 82:1, 2,25 83:4,16

**pattern** 63:25

**Paul** 10:5 115:10

121:24

**paying** 69:9,10,14
132:8

**peace** 143:20

**penalty** 7:25
105:23,24

**people** 20:8 24:22
25:1 38:22 45:8,
10 55:6 56:20,22
69:16 84:21,24
91:23 94:5,16
95:20 101:11,14,
21 102:21,22
104:13,15 120:2
129:5 134:18
139:19 141:21
143:22 144:3

**perception** 19:15
45:12

**perfect** 98:9
150:18 152:1

**period** 12:2 21:19
78:21 80:13
110:6 127:1

**periodically**
39:11,12

**perjury** 8:1

**permission** 80:13
136:22

**persistent** 91:12

**person** 11:12
12:25 13:18 18:8
28:24 80:6 85:17
93:18 137:17

**personal** 50:8
54:2 55:7 67:11
94:11 115:1
143:2

**personally** 35:25
39:10 90:9 97:2
106:18 113:6
148:18

**personnel** 13:6

**phenomenon**
137:3

**phone** 55:22
86:19

**phrased** 126:13

**physical** 118:15

**physically** 105:1,
6 111:12 142:23

**pick** 137:12

**Pickering-
connick** 131:9

**picture** 19:11,13
80:22 114:11
118:6

**piece** 125:23

**pin** 128:13

**placard** 80:12

**place** 64:8 93:22
98:7 140:8

**plaintiff** 7:18 8:24
119:11

**Plaintiff's** 119:12,
13

**planning** 151:5

**playing** 115:14

**point** 16:15 23:11
41:2 46:3 48:22
60:13,20 74:9
75:6 91:15 94:19
102:13 105:14,17
128:20 131:19

144:13 146:24

**pointing** 129:3
131:17

**police** 28:7 39:25
61:22 62:1,3
75:12 79:8 81:3,
8,9,20,23 82:1,2,
25 83:4,15 84:7,
8,11,12,22
111:10 121:13,14
122:5,14,17
132:8,9 141:4
144:16,17,19

**policy** 13:2 99:6

**political** 38:15
117:2 120:3,14,
25 121:17 136:3
141:18 143:23
148:1

**politically** 120:19,
20

**population** 96:2
117:20

**portal** 19:4 20:18,
21 21:8,14 35:10,
14 62:20 63:8
126:23

**portion** 25:18

**position** 67:23
95:7 97:13 122:7
126:15 127:11
136:15 137:11

**possibility** 91:24
107:17 118:10

**possibly** 137:1,2

**post** 11:3,5,11,13,
15,20,25 21:13
48:7 52:21,24
53:16 55:17,19,

25 56:4,14 57:3
58:16,22 59:18
60:3,24 61:6
62:10,20 64:5,6
66:7 67:14,18,21
71:8 72:1 77:24
78:14,19 80:8
96:9,11,13,18
103:13 105:12,15
118:6 121:13,24
124:12,15

**posted** 39:3
77:21 96:10,17
115:15 124:13

**poster** 20:5

**posts** 10:14,16
11:8,23 36:19
37:16,18 39:3
47:3 53:2 74:19
78:11 80:25 81:4
84:16 90:17
103:17 112:12
118:6 147:24
148:10

**potential** 118:14

**potentially** 26:8
119:20

**practice** 10:7
42:10,13

**practicing** 89:15

**precautions**
73:25 85:21

**predicted** 142:19

**preference** 109:6

**preferences**
142:22

**preferred** 107:5

**prepare** 17:21

**prepared** 17:22 44:3

**presence** 39:14 61:22 62:2 79:8 81:9,21 84:8,23 110:23 111:10 116:16 132:8,9 141:5 144:16,17

**present** 80:17 83:8 112:15 124:25

**presented** 116:24 124:7

**presenting** 117:5

**preserve** 25:14

**presidency** 145:1

**pressed** 28:2

**prestigious** 122:19 130:18

**Preston** 7:18 10:11 18:7 19:8 23:9 24:8,13,16 29:22 30:5 32:17 63:21 64:6 126:14 127:2 147:4

**pretty** 27:7 29:11, 13 40:23 60:20 69:13 102:24 126:3 136:2

**previous** 124:18

**previously** 110:8

**prides** 63:24

**prior** 26:22 32:18 148:5

**prison** 38:21

**prisoners** 38:21

**private** 75:23 113:4 129:7

**privy** 122:16 129:1

**probable** 122:13

**problem** 71:4

**proceed** 8:6 51:21

**proceeded** 140:15

**proceeding** 16:22 122:10

**proceedings** 127:19

**process** 16:12,17 17:25 26:15 35:16 38:15 41:25 57:15,21 74:23,24 97:23 107:15,25 108:5 109:4,10 112:11, 18 114:18 116:6, 9 117:4 149:6

**processes** 41:7

**produced** 88:25

**product** 31:8

**profanity** 13:21 17:4

**professional** 31:8 102:15

**professor** 9:16, 17,18 11:14,16, 17 30:15,16,17 31:3 61:23 67:13, 15,18 68:9 69:6, 11 71:9,24 72:1, 6,20 73:1,11,14, 18,19 75:14

76:21,24 77:6,23 78:13 79:20 80:1 85:4 124:16 126:6,16 127:2,9, 12 129:5,8,11 133:5,7 135:20 136:17 138:8,12, 23 139:4,22 142:17 145:12

**professors** 138:7, 11 140:20

**project** 30:22,25 31:15

**promoted** 56:15

**Proposal** 24:2

**prosecuting** 130:20

**prosecutor** 131:6

**protect** 40:6 92:4, 9 93:16 94:8 142:1

**protected** 22:19 31:12 34:15 57:12 63:22 144:1,5,7

**protection** 63:24

**protocol** 75:9 87:9 88:1 102:10

**proud** 141:24

**provide** 140:17

**provided** 119:9 140:19

**provocateur** 108:18 139:4

**provoke** 55:1 138:10

**provoked** 142:17,

18

**provoking** 136:19

**proximity** 141:17

**psychology** 90:5

**public** 55:19,20

**publicly** 77:21

**publish** 47:7

**published** 10:14

**pull** 51:13

**pulled** 55:22

**pulling** 116:20

**punish** 44:14 116:3 117:5 120:11

**punished** 22:6,8 115:21

**punishing** 129:18

**punishment** 22:15 23:4 43:17 103:1,7 105:13

**punitive** 46:7

**pure** 20:11

**purely** 107:20

**purpose** 17:20 114:13 128:21

**pushing** 38:14

**put** 10:19 14:2 16:3 20:22 21:17 23:17 28:14 32:3 37:21 40:20 108:19 109:9,14 123:9 134:2 143:25 145:2

**puts** 51:23

**putting** 151:3,13, 14

## Q

**qualifies** 147:12

**question** 20:10 22:15 70:11 92:20 94:23 96:4, 6,20 100:18 103:16 104:12 109:1,2,3,8 116:23 118:11 122:9 125:17 129:1 141:8 144:25

**questions** 25:17 42:19 43:19 71:7 88:4 89:11 97:7 129:9 136:13 145:23 146:11 149:15

**quick** 82:5,12

**quickly** 27:7 60:4 111:2

**quit** 80:20

**quote** 15:9,13,16 17:1,4 18:11 25:22,24 29:21 30:3,7 37:20 38:1,4,8,12,17, 20,24 71:11 96:11,12 118:7 121:24 125:21 126:2,12,16,20

**quote-** 108:4

**quote-unquote** 109:10

**quoted** 19:21

## R

**race** 70:25 126:17

**racial** 25:24 27:3 29:24

**racially** 38:14

**racist** 20:19

**radar** 12:5 21:17 27:7 35:22 40:20, 25 42:1 56:23 66:11,20

**radicalized** 56:24

**raise** 7:24

**raised** 25:16 46:13 65:21 109:13

**range** 141:25

**rattled** 135:22

**rattling** 99:15

**re-review** 89:5

**reached** 57:11 79:7 134:1

**reaching** 62:12 75:25

**reacted** 143:16, 17 148:16

**reacting** 62:9 121:16

**reaction** 47:21 53:17,25 59:18 71:23 74:18 80:8, 25 100:25 117:18

**read** 18:3 20:1 25:18 26:3,4,5,8, 24 29:24 30:8,15 36:13 37:3,18,20

38:2,9,18,25 53:24 56:21 63:18 64:2 70:19 73:17 77:4 111:21 113:16 118:2 128:6

**reading** 36:12 53:20 72:23

**ready** 98:12

**real** 45:18,19 91:18 109:15 116:18 118:23 138:25

**reality** 137:19 143:9

**realized** 87:21

**reason** 106:7 124:24 127:25 128:2 135:25 139:21 147:23

**reasonable** 53:25 107:3 109:5 111:21 123:1,19 124:6 130:17,23 141:9

**reasons** 88:12

**rebuttal** 119:21

**recall** 80:8 101:16 126:10

**receive** 37:3

**received** 21:7,12, 21 24:21,23 32:22 35:9,13 36:18,24 39:5 43:9 52:15 72:15 101:5 108:8 109:19 126:23

**recent** 42:5

**recess** 82:16 98:17 146:5

**recognition** 32:22

**recognize** 13:1 14:9 99:6 102:11

**recognized** 102:6,8

**recollection** 30:4

**record** 7:7 8:15 14:3 16:8 20:1 28:19 32:15 37:19 63:18 73:17 82:15,17, 20 88:8 92:19 98:14,16,18 106:23 115:22 124:16 132:23 139:19,24 145:25 146:4,6 151:17, 19 152:3

**record's** 86:13

**recording** 8:17

**records** 76:19

**recovers** 95:11, 12

**Recruiting** 97:16

**red** 49:13 95:8

**redirect** 31:5 146:1,11 149:17, 18

**reference** 17:6

**referenced** 16:25

**referring** 33:19 44:19 73:2 114:8

**refers** 145:12

**reflect** 88:8

**reflected** 77:7

**refuting** 129:4

**region** 65:10

**register** 142:10

**registered** 79:10

**regular** 58:11 123:16 142:19

**regularly** 40:6,23 81:23

**reject** 34:8

**rejoicing** 112:7

**related** 16:13 17:17 19:15 29:2 84:5 112:25 114:13 118:7,24 132:8 137:23 142:8

**relating** 12:3

**relation** 147:2

**relationship** 31:3 46:2,4,11

**relayed** 12:18 13:14

**relaying** 100:5

**relieved** 112:6,7 115:18

**religion** 73:3

**relocated** 81:19

**reluctance** 44:7

**reluctant** 84:17 85:14

**remember** 27:13, 14,24 28:1 41:20 43:3,21 52:15 68:11 114:20 116:6,7 122:3

**remembered** 96:6

**remotely** 8:25

**remove** 80:10 85:9

**rented** 136:4

**reorient** 108:24

**repeat** 121:21 135:1,4

**repeated** 91:12

**rephrase** 124:15, 23

**replies** 128:14

**reply** 11:11 69:5 72:1

**report** 16:11 19:5 41:5,12 62:3 103:23 121:13 139:8 144:15

**reported** 12:16 40:9,10,15,16 41:3 42:6 52:6 99:13

**reporter** 7:22,24 8:5 92:18 98:14 113:13 121:21 132:22 135:1,4 150:6,8,12,15,18, 20 151:10

**reporting** 52:2 57:15 101:17

**reprehensible** 38:22

**represent** 7:13,15 58:4,9

**representatives** 22:1

**Republicans** 145:11

**request** 80:19,21 107:4 132:7

**requested** 106:13 151:19,25

**requests** 80:24

**required** 109:24

**reserve** 119:17, 19

**resorted** 128:16

**resorting** 68:19

**respect** 16:23 81:3,25 146:12

**respond** 67:4,24 91:4,23 103:17

**responded** 30:7 73:1 111:15 129:19 143:16,17 147:9

**responding** 20:6 45:19 101:23 109:12 129:2

**response** 11:11 19:11 21:12 22:10 27:8 65:22 68:1,9 69:15,25 83:5 101:3 103:18 108:14 109:16 114:18 121:8,9 132:5 138:6 141:4

**responses** 71:19

**rest** 60:12

**restabilize** 115:10

**restate** 92:20 132:23 151:10

**Restoration** 24:2 41:21

**restore** 25:5 33:6

**restores** 33:16

**restoring** 26:6

**result** 27:4 57:21 117:7

**resume** 47:3

**return** 111:3

**returned** 10:6

**review** 122:6

**reviewing** 40:23 127:18

**rhetoric** 27:2,22 28:4 31:14 34:2 40:18 104:14

**Richard** 76:20

**rightfully** 25:12

**rightly** 63:24

**rights** 25:9

**risk** 44:10 139:1

**role** 9:7,9,11,14 80:15,16

**room** 37:24 43:24,25 49:16 73:24 77:16 101:19,24

**Rosenbury** 145:2

**Rube** 37:21

**rules** 66:25

**run** 39:23

**S**

**Sabatini** 7:17

8:25 9:3 51:18 82:4,8,11 88:20 89:3 97:9,11 98:8,9,11,20,21 109:9 113:15,20, 22 119:8,19,24 121:22 132:25 135:2,6 145:22 146:2 149:16 150:2,12,14 151:1,6,9,11,12, 21,23,24

**Saddam** 115:11

**safe** 74:3 85:10 90:7

**safety** 29:3 40:2,5 43:19 64:4,17 73:21,25 75:15 77:9 78:7,24 79:23 86:3 109:15 132:5

**sat** 99:3

**save** 88:17

**scales** 33:7 144:13

**scanned** 43:23

**scanning** 77:16

**scared** 15:7,10 54:13,14 76:1 99:15 100:5

**scary** 53:23 55:9, 14 56:12 74:2 76:2 93:22 97:5

**scenario** 130:8 147:17

**scenes** 83:7

**schedule** 110:4, 14 149:24

**scholar** 135:21

**school** 9:13,24,25 11:16 12:8,11,22 17:19 20:14 22:9, 11 23:6 24:25 25:17 26:12 34:19 39:23 42:11 43:15 49:18 50:13,17 54:23 57:19,24 58:14 62:6 63:9, 23 64:17,25 65:11 69:19 70:7 74:1 78:5 80:7 81:19,24 82:1 83:2,11,17,21 85:8 89:13 90:13, 15,20 92:14,23, 24,25 93:4,11 94:14,25 95:25 97:15 100:12 102:4,17,20 103:17 106:24 107:16 110:1 112:6 115:2 117:1 120:6 131:9,22 136:5 137:12 140:2,7 141:11 142:20 145:5,8,11,19 149:2,4

**school's** 50:18

**schools** 93:14 143:13

**Scott** 37:8,10 48:18 52:5 88:24 118:2,4

**screamed** 17:4

**screen** 10:20 14:3 16:4 20:23 23:17 28:14 32:3 51:23

53:10 113:10,12, 13,14,23

**screenshot** 113:24 117:21

**screenshots** 52:10

**section** 72:25 129:9

**secure** 77:10 131:20

**secured** 130:16

**security** 77:21 79:3 80:5 83:18 84:16 102:13 111:10 116:16 132:5 140:16,17 141:6 144:21

**seeking** 127:22

**sees** 114:9

**seize** 25:11

**semester** 31:23 32:14 42:15 80:14 141:11

**seminar** 23:14 24:5 29:19,22 30:11 31:20,24 32:12,18 34:14 35:18 36:21,22 70:9 148:5

**send** 22:11,12 52:14,17 61:10 87:21,23

**sending** 21:17 41:20 52:4 87:12

**sends** 21:14 52:9 76:19

**senior** 29:5 52:1 57:18 78:3

**sense** 33:9 59:23 60:13 62:17 86:4 120:12 143:1,3

**sensitive** 23:2 121:3

**sensitivity** 45:14

**sentence** 25:22 29:21 72:24 126:9

**sentences** 30:2

**separate** 107:17, 25 118:13

**September** 18:20, 23 21:19 40:15

**series** 89:17 90:10 104:19 138:18

**Services** 12:18 97:17

**set** 98:23 142:11

**shaking** 49:15

**shame** 25:23

**share** 20:9 25:24 41:9 77:5 113:10 150:19

**shared** 30:17 32:24 41:23 47:11,17,25 58:4 59:12 75:6 76:23 112:10 116:10 139:22

**shares** 20:12

**sharing** 58:7 76:22 87:17 134:19

**Shaw** 12:17 14:23 15:4 29:4,9 41:11

45:23 46:10,18 51:25 52:16 57:6 63:12 76:18,23 101:18

**Shifting** 42:9

**shocking** 122:25

**shoot** 107:8

**shooter** 44:4

**shooting** 65:11, 13 90:16 92:15, 24 95:1

**shootings** 28:7 64:25

**short** 53:7 82:21

**shortly** 12:6 80:20

**show** 48:13 51:1 81:11,14 113:7

**showed** 47:14 48:19 49:1,3 52:21 114:21,23

**showing** 94:16,17

**shown** 114:12 116:7

**shows** 47:20

**sic** 146:20,21

**sign** 28:10

**signal** 22:12

**significant** 131:2

**signs** 91:9

**similar** 33:1,2 55:16 116:8 123:21

**similarly** 25:22 32:24 50:18

**simple** 126:15

**simply** 107:18 109:3 118:11 120:10 128:1 141:8 144:25

**sincere** 136:1

**sincerely** 121:4

**sincerity** 120:7

**single** 37:25 89:17 93:17

**singular** 138:18, 19

**situation** 44:5 130:25 134:13 147:10 149:13

**skim** 137:12

**slashing** 33:8

**slaughter** 73:3

**sleeping** 76:10

**sleepless** 90:8

**slight** 109:6

**slowly** 51:21

**small** 36:11 113:18 119:4

**Smith** 7:21 21:4 150:16,19,21

**social** 10:13 35:20 36:18 37:15 39:3,10,13 54:8 70:12 112:12 149:1

**solid** 89:20

**sort** 13:6,11 22:2 25:5 26:6,8 28:8, 10,12 31:4 33:4, 10,12 34:3,12,22

35:10 40:17,22, 25 41:8,18 42:17 43:14 44:7,9,13 45:12,18,24 46:1 47:17 48:25 49:13,24 53:25 56:25 58:10 59:2, 5 60:8,21 62:21 65:5 66:24 68:10, 12,21 69:9 70:10, 19,23,25 75:9,23, 24 76:4,5 77:5, 13,16 78:20 83:7, 11 85:3,7 89:22, 23,24 93:18,23 96:23 102:22 104:10,17 108:6 109:23 114:4 119:5,25 126:5 137:12 144:12,23 148:15 149:13

**sorts** 109:13

**sought** 68:4

**sounds** 117:10 151:9

**sovereignty** 25:9

**space** 15:20 49:1, 19 62:14 97:24 101:12 106:21,22 107:1 142:2

**Spalding** 10:3,6

**spanning** 33:20

**speak** 106:18 107:10 120:23 121:25 124:22

**speaker** 79:12

**speaking** 20:21 122:3

**special** 58:12

125:14

**specific** 85:19 125:14 142:11

**specifically** 52:12 72:6,19 79:7 105:12 116:7

**speculate** 118:20

**speech** 22:10,19, 24 31:11 34:21 47:19 57:11 63:22,24 64:16 66:25 104:6 105:8 131:12 133:2 142:9 144:7

**spend** 90:12 110:18

**spent** 53:19 89:12,20 90:11 91:14 95:22 96:20 132:13 144:18

**spoke** 40:11 140:8

**spoken** 46:5 134:12

**spot** 92:8,13

**spread** 60:4,8,14 78:14

**spreading** 27:5 60:20

**spring** 31:23 32:14 48:20,22 133:15,19

**squad** 37:22 105:22 106:3,9

**squads** 105:17

stack 13:25

stacks 51:2

staff 12:11,15,25 13:17 17:3 18:8 40:3 61:5,11 75:10 76:20 80:7, 9 87:22,23 91:1 117:15

stamp 52:8

stand 82:13 146:3 150:4

standard 131:11 145:10,17

standards 31:9 131:15

staring 99:3

start 40:22 46:1 63:19 142:5

started 19:3 26:19,25 27:5 28:12 36:22 39:4 48:4 57:17 62:21 102:4 118:9 138:6

starting 59:2

startling 101:10

starts 60:20 68:21 69:2 129:9

state 7:13 8:14 65:12,17 86:4 92:16 93:1 94:3 101:23 118:18,21 128:25 130:14,19 131:21 134:2

State's 65:13

stated 29:23 125:19

statement 14:12, 19 38:11 56:8 122:14 126:3 128:21,24 143:14

statements 94:5 140:4

states 17:1 20:3 105:21,22

stationed 83:10, 17

statutes 130:20, 21

stay 74:3 95:24

stayed 86:11 140:22

stemmed 32:21

step 31:2

steps 85:21

Stevens 10:5

stip 89:1

stipulated 88:10, 21

stood 99:10

stop 95:7

stopped 140:5

stops 9:5

story 138:4,5

straight 48:5

strangers 25:8

strategy 137:18 138:3

stratosphere 144:22

straw 39:8

stress 102:18 134:3

stressed 102:17, 24

strike 14:18 108:25

strongly 94:9

student 10:10 12:19,20 13:5,13, 15,16 15:9,19 16:12,16,21 17:3, 4,22,25 18:6,14 19:3,4 21:13,16, 22 22:2,3 27:15 29:13 33:25 34:25 35:9,16 36:4 37:1,11,12 39:9 40:11 41:12 43:21 44:6,15,19, 20 45:2,4 47:11, 14,25 48:18,24 53:21 57:16,21 63:9 64:6,15 66:6,18 72:14 73:1,11,18,22 74:15,18 75:11, 12 76:5 77:14 79:9 85:4 90:5 94:18,24 100:7 103:7 106:11,14, 17,18,19,23 107:7,22,23 109:4,20 110:12 111:9 112:11,17 114:7,17,24 116:5,8 117:20, 22 121:13,23 122:10 126:13,14 127:19 130:18 131:10 132:3,15 134:3,7 136:25 138:9,22 144:15

146:21 147:2,6, 15,21 149:6,8

student's 73:15

student-facing 80:17

students 15:14 19:10,19 20:14, 18 21:25 22:4,5, 8,17,21 23:1 24:24 25:15 26:11,14,17,18 27:5,9,16,17,18, 25 28:2,4 29:4,5 35:19 36:4 39:22, 24 40:3 42:11,16 43:8,12,21 44:23 45:6,22 46:15 48:13,16 49:1,19 50:22 52:1 56:2,3 60:4,8,17,18 61:1,13 62:1,9, 11,12,19 64:5,17, 20 65:21 66:14, 21 67:2,11 69:9 71:24 75:8,22,24 76:6 77:19 79:22 81:15 83:9 84:6 85:5,15,16,22 87:13,14 90:25 91:14,18 93:9 98:1 102:16,23 103:24 107:12 108:8,16 109:14, 23 111:4 112:5, 13 113:5 115:25 116:2,13,14,18, 25 117:14,16,17 119:4 120:4,10, 16,18 121:1,16 122:18,22 123:20,22 124:3 125:18 126:10 133:20,23 134:1,

6,9,12,19,21 135:13 139:12,14 140:14,19 141:10,17 142:4, 21 143:11,16 148:8,13

students' 35:22 121:8 136:18

studying 15:14

stuff 60:8 66:18 114:21

subject 29:3

subjectively 111:23 112:3

submission 72:15

submit 62:19

submitted 17:24 24:4 115:2

submitting 126:11

subsequent 11:8 41:8

substance 72:17

substantial 100:16,20 131:23 135:17 136:24 145:14

substantially 137:16

sudden 143:4

suggesting 100:21

suggestive 94:25

summary 16:14, 18,19 78:10

summer 17:23 130:15

Summerlin 7:11, 16 8:19

supervisor 12:16 14:24 15:6

suppose 23:9

supposed 79:9 99:7 102:11 140:7

Supreme 10:4

surely 68:4

surname 80:11

surprised 47:1 68:12 69:18,20

survivor 85:23

suspended 110:6

suspender's 88:12

suspension 35:11 103:2,5 110:8 117:7

swear 7:23

swipe 12:22 13:3 85:13 86:3,7,8, 15,19,23 87:7

sword 33:8

T

taking 43:16 74:1 109:20 110:5 125:22 140:24

talk 10:13 22:22 28:15 40:1 45:2, 23 46:1 47:1 67:12 71:23 78:6

88:17 95:20 105:13 119:22 127:8,13 131:23 132:21 133:1 134:10 139:11,25

talked 30:15 41:20 57:9 58:22 59:13 75:18 100:22 105:8 133:21 140:12

talking 16:24 31:20 48:7 54:12, 17,18,23 68:22 69:2,21 70:11,23 74:22 78:21 82:25 89:23 91:14 100:14 125:12 134:8 135:13 143:11 144:19

talks 18:20 56:10

target 72:7

targeted 94:11 142:12

taught 30:16 32:12 59:9 122:2

teaches 62:6

teaching 78:3 79:21

team 39:16,19,21 40:9,14,24 41:10, 24 93:15

Teams 14:23 52:16

tears 49:14

telling 15:5 85:2

tend 102:22

tenor 28:13 63:25

tension 143:21

tenured 9:12

terms 31:13 93:13 100:24 104:7 109:15 119:3 143:15,18

Terry 10:11 24:8, 13,16 32:17 64:6

Terry's 37:2 63:21

testified 8:9 98:22 99:18 105:11 110:15, 20,21

testify 125:2 140:2

testifying 108:5

testimony 8:1,18 101:7 105:11 133:22 134:16 139:2 142:15

text 113:25 114:11

thankfully 111:2

theme 120:1

themes 33:2

theory 70:25 135:17

thing 39:23 77:5 97:5 99:18 126:21,25 142:6

things 18:2 26:23 45:17 57:20 58:12 62:16 91:10 93:16 96:24 103:24 104:9,14,21 109:24 119:1

123:1 129:20 131:16 132:14,17 137:8,22 138:18 140:2,3,6 143:13,20 148:19 149:9,11

**thinking** 54:23 89:22

**Thomas** 150:15

**thought** 30:20 31:4 43:8 45:9,14 53:25 56:6 68:21 69:24 70:15 81:16 88:18 107:8 108:15 140:13,14 151:14

**thread** 19:20

**threat** 30:23 39:16,18 40:5,9,13,24 41:4,5,10,24 46:14 50:1 53:24 56:4,14,20 66:4 69:6 83:6 85:2 87:16 93:15 95:25 106:15 111:4,19,24 117:2 118:14,15 120:7 122:7

**threaten** 54:5 104:14

**threatened** 107:6

**threatening** 31:14 45:18,20 52:13 103:17 122:13 135:10,11 142:5 147:25

**threats** 28:6 40:2 48:4 65:18 90:6 93:3 94:10 111:5 129:21 138:22

141:13 143:22

**throw** 88:18

**Thursday** 75:5

**time** 7:8 12:1,2,17,20 21:15 22:25 27:17 28:5 29:5 35:10 39:6 40:4,8,11,19 41:2,3,15,16,18 42:5 45:8 48:15,22,25 49:9,17 52:8 53:20 55:4,11,23 58:11 59:8 60:13,21 65:1 66:22 74:15,25 76:20,24 78:22 80:13 82:14,18 89:11,15,20 90:1,11,12 91:20 92:7 95:21,22 96:8,20 97:15 98:15,19 99:20 101:5 102:19,23 104:22 105:14,17 109:4 112:17 114:23 115:5 116:18 121:5 123:8,23 127:1 129:10 131:20 132:14,23 136:8 138:6 139:11 143:18,19 144:6,19 145:16 146:4,7 147:5 152:2

**timeline** 17:16,21 18:20 19:22 48:5

**times** 22:17 56:18 57:8,11 58:18 77:20 93:7 101:10 108:16 109:23 118:24 120:25 142:8,9

**tipped** 144:13

**title** 97:15 114:2

**today** 8:18,21 14:15 83:14 148:3

**today's** 150:23,24 151:20

**told** 18:13 49:6 75:22 139:15

**tolerate** 22:23 34:21,24 66:25 67:1 95:25 104:13,16,24

**tolerated** 22:13 64:16 94:19 142:8

**tone** 108:21

**top** 21:3 28:20 32:23 84:10

**topic** 34:25 42:9,24 147:22

**totally** 123:24

**tough** 92:8

**town** 42:10,15,21,25 43:2 44:22,25 45:1 46:8,9,25 47:6 48:15,23 107:13

**trained** 95:17

**training** 93:8,10

**transcript** 150:7,10 151:2,14

**transparency** 42:20 58:8

**treated** 22:21

**trespass** 35:11

75:2 114:19

**trespassed** 74:10,11 75:5,10 79:11 81:7 84:19 85:11 86:22 115:1

**trespassing** 74:19

**trial** 8:19 46:19 88:17 89:6

**tricky** 81:10

**trolled** 142:17,18

**trolling** 127:11,21 128:12

**trouble** 115:17 139:1

**true** 9:5 30:23 34:1 91:18 116:17 125:18

**Trump** 145:1

**truncated** 126:9

**truth** 8:2,3,8

**Tuesday** 58:24

**turn** 33:8

**turning** 136:21,22

**tweet** 47:15,22 48:19 49:4,10 60:10,11,24 61:9 64:14 70:18 75:20 92:11 96:21,22 105:18 111:22 125:22,24 126:24 127:2,6 128:1,4,14 129:8 131:1 134:15 148:6

**tweeted** 127:6,9,

**NAEGELI**
DEPOSITION & TRIAL    (800) 528-3335
NAEGELIUSA.COM

20

**tweets** 10:14 11:11 37:2 39:7 42:5 52:2,13 59:2,12,20 60:2, 10 67:10 83:6 87:18 110:24 111:9 115:1 119:9 132:6 137:9 138:2 148:6,17

**Twitter** 47:13 52:11 63:21 96:16 106:9 122:20 136:18 138:14,15 140:9

**two-page** 14:19

**typical** 100:25 101:22 147:20

**U**

**U.S.** 10:1,4

**UF** 9:14,17,22 11:16 13:5 39:24 50:13,24 56:2,3 64:8,15 66:8 69:7 84:7 86:17 114:3 126:11 138:11 141:11

**UFPD** 83:22

**ultimately** 36:18, 25 39:7 57:21 78:6 80:19 85:12 86:5

**unbelievably** 91:25

**uncomfortable** 15:15

**underappreciated** 85:20

**underneath** 118:6

**understand** 28:10 31:5 46:16 47:18 54:21 63:23 103:16 128:7,25 131:7 138:25

**understanding** 18:16 24:12 31:18 39:20 41:23 46:19,21 70:20 77:25 94:4 99:14 103:18 125:1,8 134:11

**understood** 23:2 45:10 54:4 56:7 86:2 107:11 108:15 125:10 129:2 138:5 148:13,16

**unhealthy** 38:6

**uniformed** 81:9, 11,14 83:8 84:23 132:10

**unilaterally** 139:5

**unique** 123:24

**United** 20:3 105:21

**universities** 122:19

**university** 8:23 9:8,23 16:12 39:15,22,23 40:13 50:14,16 57:17 58:5 84:12 90:16 92:15,16 106:24 107:7 110:1 115:24

120:6 122:5,14 130:19 136:15 137:11 141:19 149:5

**university's** 129:23

**unnecessarily** 84:19

**unnecessary** 81:13

**unpleasant** 108:2

**unpopular** 116:3 131:12

**unprofessional** 30:21

**unquote** 108:5

**unusual** 25:3

**uprising** 33:10

**upset** 19:10,18 27:9 28:11 34:20 43:12 49:11 61:21 62:8 103:24 104:12

**upsetness** 43:15

**urgency** 49:25

**urgent** 54:15 95:18

**users** 122:19

**usual** 141:7

**utterly** 38:22

**V**

**vacation** 150:2

**variety** 120:2

**vast** 38:20

**vehicle** 81:24

**vengeance** 25:4

**verge** 49:14

**versus** 7:11 8:18 107:5,8 131:12

**video** 14:2 115:6, 8,13,23 150:23, 25 151:1,3,13,19, 20,21 152:1

**view** 23:3 31:12 56:4 78:9 144:4

**viewed** 66:7 147:24

**viewpoint** 34:4 135:7,9

**viewpoints** 44:10 107:19,23 108:3, 11 109:7 135:2 141:25

**views** 22:13,14 70:12 116:3 117:2,3 120:5,11 121:17 123:20, 23,25 124:7 136:20 140:4 141:12,13,14,18, 21,22 143:23 144:1 148:1

**violative** 30:22,23

**violence** 25:2,5 27:4 28:6 29:24 30:7 34:13 43:11 44:2 47:24 54:6 55:12,16 56:4,14, 15 65:4 69:6 70:4,7 91:13 93:4,14 94:25 97:3 121:2 124:12,17,24

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

125:5,15 128:9
129:4 130:3
142:5,12

**violence/angry**
18:7

**violent** 26:10
27:22 28:4 31:13
33:4,10 48:3 55:9
97:4 99:19,20,21
100:1,2,10
104:14 108:22
130:22 137:16

**visceral** 53:22

**visitor** 79:24

**visitors** 40:4

**volume** 76:5
77:14 85:3
132:13

**vote** 144:3

---

**W**

**wait** 31:16

**waited** 85:6

**waiting** 67:6

**wake** 35:18 75:16
77:24 81:4

**walking** 98:3,23

**wanted** 16:16
22:8,9,10 27:25
44:3 45:9 46:4,11
47:1 53:13 62:1,3
73:23 88:18 96:6
146:18

**wanting** 20:19
44:8 116:2

**warning** 28:9

**warnings** 91:9,11
95:8

**watch** 66:16

**watching** 36:6
47:13 55:7 66:12,
17 67:6

**ways** 60:7 103:11
109:13 125:25
134:19

**website** 80:10,22

**Wednesday**
73:23

**week** 48:10,15,21
49:2 57:3 61:25
65:14 75:18 76:5
81:6,16 83:5 84:9
85:6 89:22 90:18
133:19 134:13
143:2,5,10

**weekly** 48:12

**weeks** 89:19
102:4

**Whisnant** 29:12,
21

**white** 20:3,8 25:5,
15 26:2,7 27:3
33:6,10,17 40:18
124:4 126:17
144:3

**whiteness** 70:12,
24 125:9

**whites** 38:14
68:2,5,7

**wide** 141:25

**widely** 24:22
43:10 60:14,20
134:17

**widespread**
35:24

**wife** 62:6

**Willis** 145:12

**window** 144:10

**wing** 141:12

**withdrawing**
106:23

**woman** 40:12

**won** 130:18 145:1

**wondered** 91:3

**word** 101:7,9
103:3 104:3
105:4

**wording** 30:4

**words** 64:10 68:3
99:19 118:6
121:2 128:18
142:18

**work** 31:6 34:15,
23 40:1,23 58:6,
13 70:18 80:13
94:18 95:23
124:22 125:3,6,
10,17 130:13,19

**worked** 10:3
97:16 100:12

**working** 62:2
74:23

**works** 40:24
123:18 131:21

**world** 55:11 91:20
93:13 96:3

**worried** 40:4 44:1
45:20 56:20
62:13,14 67:6
72:6 75:20 76:1

77:18 79:23
85:22 87:14 91:2

**worries** 43:20
76:7 111:10

**worry** 46:2 64:1
85:1 145:3

**worrying** 77:17

**worse** 54:9
111:12

**worst** 90:20 91:5

**worth** 108:7

**wrap** 18:2

**write** 14:17 15:9,
13 145:16

**writer** 29:8 30:3

**writing** 50:4
53:20 96:5

**writings** 26:5
54:7 95:23
124:14,17,18,20
148:25 149:1

**written** 23:15
29:21 30:3 31:25
32:10,12 64:21
126:11

**wrong** 36:17
105:1 114:6
139:4

**wrote** 11:4 16:11
17:17 18:4 29:7
73:18

---

**Y**

**year** 17:3 23:8
27:16,17,21 36:2
37:14 123:13

NAEGELI
DEPOSITION & TRIAL    (800) 528-3335
NAEGELIUSA.COM

**years** 11:18 54:24 78:4 89:18 108:6 120:17 137:21

**yelled** 18:13

**young** 120:2 122:18

**younger** 85:22

---

## Z

**zoom** 113:20

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM