# EXHIBIT B

**EXHIBIT**

Dft's Ex 7



10:18

← **Post** ⊘ •••

**Preston Terry**
@preston_terry_                    **Follow**

My position on Jews is simple: whatever Harvard professor Noel Ignatiev meant by his call to "abolish the White race by any means necessary" is what I think must be done with Jews. Jews must be abolished by any means necessary.

3:48 PM · 3/21/25 · **371** Views

💬 1    ⤴    ♡    🔖    ⬆

**L.B. Lidsky** @LBLidsky · 3h    •••
Are you saying you would murder me and my family? Is that your position?

💬    ⤴    ♡    ㎑ 143    🔖    ⬆

**Preston Terry** @preston_terry_ · 8m    •••
Did Ignatiev want Whites murdered? If so, were his words as objectionable as mine? If Ignatiev sought genocide, then surely a genocide of all Whites would be an even greater outrage than a genocide of all Jews, given the far greater number of Whites.

💬    ⤴    ♡    ㎑ 13    🔖    ⬆

Post your reply

| EXHIBIT | |
|---|---|
| **1** | |
| DEPONENT NAME: | DATE: |
| McAlister, M. | 05/22/2026 |

🏠  🔍  ⊘ GROK  👥  🔔⁹  ✉



**Statement Regarding Incident on August 28, 2023**
Submitted by: Andrea Cormier
Former Assistant Director of Recruiting

To Whom It May Concern,

On August 28, 2023, I was stationed on the second floor of Bruton Geer Commons, seated at the check-in table for on-campus interviews, directly in front of the two double glass doors. The university was scheduled to close at 12:00 PM due to the impending hurricane, but employers were still on campus conducting interviews that morning.

At exactly 9:00 AM, I heard the sound of the building doors locking. I noted it as strange, as I expected the building to remain accessible until noon. We later learned that there had been a system malfunction that caused the building to lock prematurely at 9:00 AM instead of the scheduled 12:00 PM, which meant that no student or staff ID cards were working to access the building.

Shortly after the doors locked, I heard loud banging and a commotion at the opposite end of the commons. I made eye contact with three female students who were studying nearby; they appeared visibly concerned, shook their heads, and began packing their belongings. One of them called out to me, "Don't open the door," before they left the area.

Moments later, an unknown man appeared at the glass doors in front of me. He began aggressively yanking the handle, kicking the door, and pounding on the glass while shouting, "Let me in." I had recently attended a UFPD active assailant training, where we were advised not to open doors during a lockdown or unexplained access restriction, as someone may have triggered a lockdown for safety reasons.

I gestured for the man to use his student ID to tap in. He responded that he didn't have it and escalated his tone, yelling, "Let me in the fucking door." Concerned for my safety and not wanting to escalate the situation further, I shook my head and walked away from the door. The man eventually left.

Shortly after, Daniel Ramos—a student I recognized, dressed in a suit for his scheduled interview—approached the same door. He indicated that his ID wasn't working, and I let him in before immediately closing the door again. I asked if he saw what had happened; although I don't recall the full exchange, I do remember Daniel said I was smart not to let the man in and confirmed he did not recognize him either.

I then went to my coworker Joanna Auchettl's office to inform her of the incident. Together with Joanna and Minnie DeMoura, we sought out Brian Mitchell to see if he knew who the

| EXHIBIT |  |
|---|---|
| **2** |  |
| DEPONENT NAME: McAlister, M. | DATE: 05/22/2026 |

individual was. As we returned to the commons area, the same man who had earlier been at the door approached us from the hallway near the elevator and stairwell.

He walked directly up to me and began yelling. He gestured to his books and said, "I told you I was a fucking student. What did you think I was fucking doing here?" He then walked upstairs to Holland Hall 355, where he had class. We later confirmed the individual was Preston Damsky.

Following the incident, I messaged my supervisor, Janice Shaw, and spoke with her by phone later that day to report what had occurred. Janice later met with Interim Dean Merritt McAllister to share the details. At the time, I was advised that a formal written statement was not necessary. Based on that guidance, I did not document the full incident in writing. I am now providing this written statement in response to a formal request.

Please let me know if any further information is needed or if you would like to follow up.

Sincerely,
**Andrea Cormier**
Former Assistant Director of Recruiting

Enclosures: Screenshots from the Teams conversation





April 1, 2025 Report from Dean McAllister

For the better part of two years, we've been dealing with a law student who has expressed extreme views that nearly all in our community find deeply disturbing, racist, and antisemitic. The student has used his private social media and a private law student GroupMe forum to express his views, and he's also written papers in two seminar classes that have circulated in the community on a variety of deeply divisive and disturbing issues. I'm attaching the papers, so that you have them as reference points, as well as a selection of student messages and complaints received about the student.

Most recently, this past Friday, a Jewish student in our community brought to my attention the tweet that appears in the message below from this student's X account. The male student who shared it with me was shaking and had tears in his eyes as he showed it to me. That statement also has now circulated among our campus faculty, as seen below, having been shared by a representative group of our Jewish faculty. I understand that the University has determined that the student's speech is protected under the First Amendment, and I have, up to now, vigorously defended this student's right to speak, as I would defend any student or faculty member's right to free expression. But I fear we are growing too close to the line of permitting harassment and threats to Jewish students, and the entire situation is an ongoing disruption to the law school community.

I write now to provide greater context to the situation and some of the disruptions and complaints I've received about this particular student and the statements he's made that have been shared widely in the community:

Last semester I met with several student groups after one of the attached papers was circulated in the community (complaints received also attached). Students expressed fears of violence, believing that the student was a threat. (Indeed, we've been made aware of at least one very angry encounter that the student had with a staff member last year, where the student screamed profanity.) We repeatedly asked for specific details beyond what was in the paper that might constitute a specific threat, but students were unable to provide those and, instead, insisted that they fear this student based on the ideas he's expressed. He's advanced abstract calls for violence that some students perceive as real and threatening.

At a student town hall at the beginning of this semester, at least three separate students raised concerns about the student's views expressed in the paper. Students repeatedly stated that they had fears of violence, with one student stating that they "looked for the exits" in any room this student was in, out of fear that he might cause harm. I've assured students repeatedly that we refer concerns to the conduct office on main campus, that they

EXHIBIT

3

DEPONENT NAME:
McAlister, M.

DATE:
05/22/2026

DEF_000524

investigate, and take appropriate action. We've educated students on the GatorSafe app and have offered safety training in response to these expressed concerns.

State Senator Jennifer Bradley, who is the mother of a third-year student, has spoken with me twice about concerns that a faculty member recognized this particular student with an honor for one of the papers attached. (Faculty members, of course, may not exercise viewpoint discrimination in their grading, and the law school did not disturb the grading decision of the faculty member in the class, much to the community's dismay.) Senator Bradley was furious, expressed outrage that the University and law school would, in her view, endorse hate speech. (I have made Mori Hosseini aware of these interactions, as well as our government affairs team.)

A Jewish faculty member has demanded that we do everything we can to discipline or expel this student, refer him for criminal prosecution, and increase campus security(especially for events related sponsored by the Jewish Law Students Association). That faculty member has requested that I forcefully condemn the speech to the entire community, and he likely will refer the matter to the FBI (which I believe has already happened once before in connection with one of the student's papers).

The student has worn a "from the river to the sea" t-shirt to campus (as attached here),also triggering complaints.

Our Jewish student community and others have repeatedly expressed fear and concern about the law school's perceived inaction. Students have told me that they are afraid of him, that they don't want to take classes with the student, and that his presence in their classroom is distracting. Faculty who have tried to hold the First Amendment line and recognize his contributions to the classroom are being criticized as "endorsing" his viewpoint. Our efforts to educate students on the First Amendment and what it requires of us and of our faculty have not proved convincing, and each month brings a new round of seemingly escalating issues.

Although perhaps not the best measure of disruption, I have spent the better part of two or three weeks in the last two years dealing with complaints, meeting with students, discussing this issue with concerned faculty and students, drafting responses to incidents, and discussing referrals with our head of students.

DEF_000525

At some point, we cross the line from protected speech to disruptive conduct. Given the overall climate and state of fear in this moment, I'd err on the side of being more protective rather than less of our students and our community. As a law school focused on cultivating professional civility and respect for the rule of law, I find it deeply problematic for us to support, defend, and tolerate a student who appears to advocate for the plainly illegal murdering/genocide of fellow students, faculty, and staff — even if that advocacy is sufficiently abstract that it's protected speech.

Merritt E. McAlister
Interim Dean and Levin, Mabie & Levin Professor of Law
University of Florida Levin College of Law
mcalister@law.ufl.edu / 352.273.0981 (o) / 404.861.7619 (c)

DEF_000526

## Timeline of Events related to Preston Terry Damsky at
## Levin College of Law

Merritt E. McAlister, Interim Dean

**August 28, 2023**

A first-year student, later identified as Preston Damsky, had a violent/angry and disruptive encounter with a staff person, Andrea Cormier, when Ms. Cormier did not open a locked door for Mr. Damsky. Mr. Damsky demanded that Ms. Cormier "Let [him] in the fucking door." And Mr. Damsky later approached Ms. Cormier and yelled at her: "I told you I was a fucking student. What did you think I was fucking doing here?"

No disciplinary action was taken, but this incident was reported to Student Conduct in September 2023 as part of an initial complaint regarding the concerns highlighted below.

**September 22, 2023**

A first-year student "Preston," later identified as Preston Damsky, made comments in a GroupMe chat being used by first-year students related to a picture of the first-year class. Mr. Damsky stated the following:

> The United States lost 19.3 million White faces on net over the past decade, which I am sure fills this man [the poster to whom he was responding] with nothing but joy, so why on earth should White people care at all about his criticism of our demographic share in any institution? An even better question is: why should we feel anything but pure contempt for him and anyone else who expresses and shares such naked hatred for us?

When Mr. Damsky was challenged, he responded: "I stand 100% behind that comment without any reservations or qualifications."

The group chat interaction sparked significant controversy within the law school. I received at least 10 complaints from non-anonymous students through our community concerns portal, and I met twice with leaders of the Student Bar Association and the

<table>
<tr><td colspan="2" align="center">**EXHIBIT**</td></tr>
<tr><td colspan="2" align="center">4</td></tr>
<tr><td>DEPONENT NAME:<br>McAlister, M.</td><td>DATE:<br>05/22/2026</td></tr>
</table>

1

**DEF_000529**



Black Law Students Association to address their concerns regarding Mr. Damsky's statements.

I made clear in those exchanges that Mr. Damsky's speech was protected, that it was neither substantially disruptive nor threatening, and that, accordingly, we could not punish him for his speech.  I encouraged students not to give Mr. Damsky the attention he appeared to be seeking by being provocative.  We used the moment as a teaching moment and tried to shift community attention to opportunities for counter-speech, including through programming on racism and other issues affecting our community.

**March 2024**

We received a complaint about statements that Mr. Damsky made in his Constitutional Law class.  In the context of a classroom discussion, Mr. Damsky appeared to argue that the state of Virginia had a "compelling state interest" to maintain its state as a state formed by and politically controlled by white people.  Upon personal review of the video of the class, and after discussions with the course's professor, I was confident that the speech was protected speech made in the context of a classroom discussion and not outside of the bounds of academic freedom.

**October 2024**

In late October 2024, a draft paper of Mr. Damsky's in a seminar class began circulating widely within the community.  The draft paper, written in a class entitled Constitutional Change, made incendiary and extreme statements, including an abstract call to racial violence.  The final paragraph stated as follows:

> Finally, I shall speak directly to my brothers and sisters, the People. Can you honestly say these changes have been for the better? As the years go on, and those around you not only look less like you, but look upon you more and more with contempt and with a barely veiled desire for vengeance,[1] does your love for this

---

[1] *See, e.g., Regents of Univ. of California v. Bakke,* 438 U.S. 265, 387 (1978) (Marshall, J., concurring in part and dissenting in part) (remarking that "it must be remembered that, during most of the past 200 years, the Constitution . . . did not prohibit the most ingenious and pervasive forms of discrimination" and using this fact to justify discrimination against Whites); WILLIAM O. DOUGLAS, THE COURT YEARS: 1939 TO 1975 (getprintcopy) (1980) (quoting Justice Thurgood Marshall as saying in conference on an early case

2

DEF_000530

country and its inhabitants grow? Do you feel as if you are united to your fellow citizens "by the strongest ties," or do you feel as if America has been "split into a number of unsocial, jealous, and alien" groups?[2] If you are increasingly apprehensive about these changes, you are not alone.[3] However, feeling despondent and helpless is hardly a way to rectify the evils which have been visited upon us. Our Founders understood the importance of forming a nation upon the solid foundation of common ancestry. They understood that it is a part of "human nature . . . that its affections are commonly weak in proportion to the distance or diffusiveness of the object;" and thus, "a man is more attached to his family than to his neighborhood, to his neighborhood than to the community at large."[4] Similarly, we should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle. And if the prize does not motivate you, then consider the cost of defeat; "[W]henever the dissolution of the Union arrives, America will have reason to exclaim, in the words of the poet: 'FAREWELL! A LONG FAREWELL TO ALL MY GREATNESS.'"[5]

---

evaluating the constitutionality of discrimination against Whites, "You guys have been practicing discrimination for years. Now it's our turn.").

[2] THE FEDERALIST NO. 2, *supra* note **Error! Bookmark not defined.**, at XYZ (John Jay).

[3] *See* Robert D. Putnam, E Pluribus Unum*: Diversity and Community in the Twenty-first Century*, 30 Scandinavian Pol. Stud. 138 (2007) (arguing that "immigration and ethnic diversity challenge social solidarity and inhibit social capital"). See *generally* ROBERT D. PUTNAM, BOWLING ALONE: THE COLLAPSE AND REVIVAL OF AMERICAN COMMUNITY (2000) (discussing "the decline of the last several decades" in "social capital" and a sense of community belonging and civic engagement among Americans).

[4] THE FEDERALIST NO. 17, at XYZ (Alexander Hamilton) (XYZ ed., XYZyear).

[5] THE FEDERALIST NO. 2, *supra* note **Error! Bookmark not defined.**, at XYZ (John Jay) (emphasis in original).

DEF_000531

In consultation with the course's professor, a First Amendment scholar on the faculty, and the General Counsel's office, we concluded that the paper's statements did not constitute true threats and were protected under the First Amendment. The professor counseled Mr. Damsky to revise the paper as a matter of academic norms, however, and my understanding is that the violent rhetoric was revised upon final submission.

The paper, which circulated widely, caused disruption and fear. In particular, a student in the same class as Mr. Damsky asked him whether the "last paragraph [quoted above] . . . [was] intended to be a call for contemporary extralegal violence." And Mr. Damsky stated "Yes." That student reported the exchange, and students reported concerns through our online portal, to several administrators, and to faculty.

I met with multiple students in response to the circulated paper. I met with the current leaders of the Black Law Students Association, who expressed concern about its violent rhetoric. We agreed that we didn't want to give the odious ideas more attention and oxygen, but I encouraged them to report any more specific threats or fears that they heard or learned about. We walked through the First Amendment limits, and I explained why this particular speech was protected.

I met with two other students in response to an emergency request on Friday, November 1, who both expressed safety concerns about the potential for violence on campus. These students both explained to me that they had lived through school shooting threats and had grown up differently than those of us in administrative roles. They encouraged me to try to see safety and threats of violence from a different perspective and to be proactive, when possible. That conversation made an impression on me as a leader, and I assured them both that we would continue to closely monitor all incidents, report them to main campus, and take action whenever possible. I also encouraged them to report incidents to us promptly and that we could only act on information of which we are made aware.

**January 2025**

When grades were released in January from the Fall 2024 semester, we immediately began receiving complaints through our concerns portal that Mr. Damsky's work had been recognized with a "book award," in the Originalism course. Students apparently believed the paper quoted above was the award-winning paper; it was, in fact, another

DEF_000532

paper. Regardless, the paper that did lead to the recognition touched on similar themes and advanced similarly offensive arguments.

In addition to the numerous formal complaints we received about the book award, I also learned from the Student Bar Association president that students were up in arms over the award. He reiterated that students had expressed fears to him for their safety, given that it was perceived that the award might embolden the student to act on his ideas, which called for violence to restore America as a white nation. I reiterated safety protocols with the SBA president and explained our limitations under the First Amendment.

The topic was discussed extensively at a town hall I held on Thursday, January 16, which was attended by around 40 students. At least half a dozen students openly expressed their fear of the student, their disgust with the book award decision, and their demand that the College act to punish or censor the student.

My memory is that at least two students notably expressed serious concerns about how Mr. Damsky's presence on campus affected their learning environment. In particular, one student, who said she'd grown up with active shooter trainings, routinely scans the room for the exits whenever Mr. Damsky was present. Another student said they dropped classes when he was in the class and avoided him whenever possible. Students asked for information on campus training, which we've provided, and I educated them on the GatorSafe App and our internal protocols for responding to and referring potential threats to those experts on main campus.

The comments at the town hall were concerning enough that I asked Janice Shaw, our Dean of Students, to meet with Mr. Damsky to discuss the situation. At that meeting, Mr. Damsky said that he was made aware of what had been said at the town hall and that he knew students were afraid of him. Although he denied having the intent to shoot or stab anyone, he acknowledged that his words were meant to cause discomfort and provoke. I had told Dean Shaw that I was concerned for his mental health and wellbeing, given that he was making himself a pariah within the community. Any university administrator's greatest fear is that they don't act in time to prevent an act of violence.

DEF_000533

**February 2025**

On February 3, 2025, we received an "anonymous Tip" through our community concerns portal threatening to go to the *Gainesville Sun* about the book award if we didn't "confront the Florida Bar [about the professor who gave the book award] and report the author of the paper." The tipster said the paper had caused "significant discomfort within the student body," as reflected in the town hall meeting held in January.

In response, I issued a statement to law school students, faculty, and staff that explained the College's position on the First Amendment and academic freedom issues at stake in the recognition of Mr. Damsky's performance in the class. I explained that faculty may not "engage in viewpoint discrimination in the evaluation process." Students had the right to confront positions with which they had moral, legal, and ethical opposition, and that we would not disturb those debates "unless they violate the bounds of free speech, including specific threats or harassment." I further explained that we "carefully evaluate any complaint with those limits in mind."

In late February 2025, we learned that the *Independent Alligator* was investigating the "book award" story and was making press inquiries to Mr. Damsky, the law school, and others. Sometime in the next ten days, after an initial inquiry, we learned that the *Alligator* had dropped the article. Right after that time, Mr. Damsky made an unscheduled visit to my office—the one and only time he has ever met with me or visited my office—and demanded to know whether I "killed" the *Alligator* article. I told him I had not spoken with the *Alligator*. He said that he'd spent more than an hour in an interview with them and shared his papers. I suggested that perhaps he'd killed the *Alligator* article himself.

Around this time, Mr. Damsky activated an account on X (the first post is dated February 19, 2025). Although we had been aware of and had monitored a previous X account of Mr. Damsky's, this account was new and was not brought to our attention until the end of March, as described below.

**March 28, 2025 through April 9, 2025**

On the morning of March 28, 2025, a student, Scott Jurkowski, approached me at a weekly Coffee and Donuts with the Dean meeting to report a threat by Mr. Damsky. Mr.

6

**DEF_000534**

Jurkowski was shaking and on the verge of tears.  He was looking around frequently (knowing that Mr. Damsky was in the same general vicinity).  He explained that he understood that the First Amendment protected a range of offensive ideas and speech, including hate speech, but that it did not protect threats.  I agreed that it did not protect specific threats.  He then showed me the following X post from an account belonging to "Preston Terry," who I knew to be "Preston Terry Damsky": "My position on Jews is simple: whatever Noel Ignatiev meant by his call to 'abolish the White race by any means necessary' is what I think must be done with Jews.  Jews must be abolished by any means necessary."

I assured the student that I would report the post promptly and that he should send me any additional information he had about any threats from the student.  Mr. Jurkowski explained that, as a Jewish student, he did not feel safe being in the same room as Mr. Damsky, and his behavior – shaking, furtive glances toward Mr. Damsky – confirmed the visceral fear he described.

I immediately reported the X account to Dean Shaw and asked her to work with Student Conduct to evaluate the posts as threats.  News of the posts traveled quickly: the local State's Attorney cancelled Mr. Damsky's summer internship with that office.  I learned about that on the evening of Monday, March 31, from the supervisor of externships.  The next day, on Tuesday, April 1, I consulted with the Faculty Council about the brewing controversy over the X posts, and faculty on that Council expressed dismay and grave concern about the escalation in conduct.  Two Jewish faculty members, in particular, expressed fear for the Jewish community and circulated the post among the entire faculty.

I received an immediate response, including a demand from several faculty members that we report the student to the FBI, that I increase campus safety and security for a Jewish Law Student Association event, and that we begin expulsion proceedings to remove the student from campus.  Jewish and non-Jewish faculty alike reached out to me via text, email, and in person visits to inquire about how we were going to protect the community from the threats made against Jewish people.

Later that evening, a faculty member, Lyrissa Lidsky, who is Jewish, responded to Mr. Damsky on X and inquired whether his statement meant he wanted to "murder" her

7

**DEF_000535**

and her family.  Mr. Damsky equivocated in response, asking whether that is what Ignatiev had meant.

Professor Lidsky ended up cancelling her class on Friday, April 4, in response to the stress caused by incident, and she told me that she and her husband were sleeping with a baseball bat beside the bed.  Multiple students reached out to her expressing fear and concern for her safety (and their safety, as students in her class).  Another student asked for an increased police presence for her class, because it was a class in which Mr. Damsky was a student.  We paid for increased police security at a Jewish Law Students event on April 2, and we asked for increased police patrols and cameras.

I informed the faculty on April 3 that the student had been trespassed from campus, but this did not calm the waters.  On Friday, April 4, I was met by a group of nearly twenty students at my weekly Coffee and Donuts with the Dean event, demanding an increased police presence, wanting the buildings to go on lockdown, and expressing fear and concern for their safety during the stressful finals period.  My effort to reassure students that they were safe and that we were taking all reasonable steps to assess any potential threats, with an eye toward their safety was unavailing.  Students continued to tell me that they felt unsafe and afraid and wanted the law school to do more to reduce the perceived risk/threat.

On Friday, April 4, multiple groups of students (at least 6-8 in small groups) also met with me and/or Dean Shaw individually to communicate their fear.  I also learned that parents had made calls to the campus police seeking additional safety measures at the law school.

To increase the sense of security and safety on campus, I decided to move to early swipe-card only access for our community.  (We would normally have that procedure in place during finals, which was a couple weeks away.)  This move allayed some fears, but discomfort remained high.

Upon communicating the change in policy on building access to the faculty and staff on April 4 and April 5, a staff member with a Jewish surname requested that her picture be removed from our website and her nameplate taken from her door.  She requested to work from home for the rest of the semester.  That staff member ultimately resigned within a month when we had to reject her request to work from home (because her job required in-person activities).

8

DEF_000536

On Friday, April 9, we held a community town hall with the campus police and the Counseling Center. Many of the comments from the more than 100 students in attendance related to security assessment, threat assessment, and the steps we were taking to protect the community from Mr. Damsky. Students were on edge, with many expressing fear and their concern the law school was not doing enough to keep them safe.

**Aftermath**

As the College's leader, I had protected Mr. Damsky's free speech rights, and I'd taken a lot of heat throughout the last two years for doing so. Each of these incidents was met with demands that I act, condemn Mr. Damsky, and distance ourselves from his odious views. I'd done my best to preserve the space for civil discourse around his offensive thoughts, because I believe that is both what academic freedom demands and what the First Amendment requires.

But the X posts were something else. I had not felt or experienced that level of visceral fear within our community—including, significantly, from Jewish faculty and students who were required to be in proximity to this student. A staff member quit, a professor was sleeping with a baseball bat, and students were looking over their shoulders and nervously scanning rooms for potential threats.

I began to fear the worst for our community: could Mr. Damsky inflict violence and how could I prevent that and protect us? Our efforts to counsel Mr. Damsky to be mindful of the consequences of his speech had failed, and I perceived that his actions had escalated to the point at which reasonable faculty and students within the community expressed palpable fear and significant unease to me. What's more, Mr. Damsky was engaging in a reckless course of conduct at a time when he understood members of our community feared him. Although he'd disclaimed violent intent when approached about his statements in the academic papers, he'd then proceeded to stoke fears by making violent threats in a public forum for all to see. Those threats spread like wildfire within our community, and the entire law school community hit the tipping point in the weeks before finals in early April.

At that point, the College could no longer protect and defend Mr. Damsky's right to use his speech to terrorize, harass, and disrupt the operations of the school. It was one thing to write a deeply offensive and provocative term paper in a class; it was quite

9

DEF_000537

another to call for extermination of members of our community.  Even if the latter was arguably an abstract call to violence, it was made recklessly against the backdrop of two years of extremist rhetoric and divisive conduct; he lit a match on a powder keg of fear—and things, predictably, went boom.

10

DEF_000538



| From: | Smith,Michelle A |
|---|---|
| To: | McAlister,Merritt Ellen |
| Cc: | Inman,Rachel |
| Subject: | FW: New Report a Community Concern Submission |
| Date: | Friday, September 22, 2023 4:48:59 PM |

**EXHIBIT**

**5**

| DEPONENT NAME: | DATE: |
|---|---|
| McAlister, M. | 05/22/2026 |

Best,

M

**Michelle "M" Smith | Assistant Dean for Experiential Learning & Engagement**
*Pronouns: they/them-she/her*
University of Florida | Levin College of Law
Phone: (352)284-7360
Email: style@ufl.edu
Center for the Study of Race and Race Relations, Interim Director
Deputy Title IX Coordinator

---

**From:** style@ufl.edu <style@ufl.edu>
**Sent:** Friday, September 22, 2023 4:46 PM
**To:** Inman,Rachel <inman@law.ufl.edu>; Smith,Michelle A <style@ufl.edu>
**Subject:** New Report a Community Concern Submission

| Name |
|---|
|  |

| Email |
|---|
| St D      @ufl.edu |

| Phone |
|---|
| |

**Comments/Questions**

During the morning and afternoon of Friday, Sep. 22, a current law student at UF who self-identified only as "Preston" posted two statements in a public chat on the Groupme platform that had openly white supremacist and inflammatory contents. After the first one was removed from the chat by moderators, Preston posted the second one reinforcing that he stood by his initial statements.

The first statement read, in part: "The United States lost 19.3 million White [sic] faces on net over the past decade ... so why on earth should White people care at all about [another student's] criticisms of our demographic share in any institution ... why should we feel anything but pure contempt for [the student] and anyone else ... ?"

The second statement read, in part: "I stand 100% behind that comment without any reservations or qualifications."

Preston indicated that he would likely continue to make this kind of statement using this kind of language.

**DEF_000635**

# American Restoration: An Article V Proposal (DRAFT)
### by Preston Terry

## Contents

Introduction ................................................................................................................ 1

Popular Sovereignty and Constituent Power in the American System ........................................... 2

The Historic American Nation ................................................................................................ 7

Restoring Sovereignty to the People – Article V, Section 2 ........................................................ 17

    Paragraph 1 of Article V, Section 2 ................................................................................ 18

    Paragraph 2 of Article V, Section 2 ................................................................................ 21

    Paragraph 3 of Article V, Section 2 ................................................................................ 23

    Paragraph 4 of Article V, Section 2 ................................................................................ 24

Conclusion – Why Should This Be Done? ................................................................................ 25

## Introduction

In American constitutional jurisprudence, the People are sovereign. The People's government is their own creation, and this government may not usurp the power which brought it into existence. What, then, is the constitutional status of policies which alter, replace, or destroy the People? Moreover, are there any observable indicators that the People are being altered, replaced, or destroyed? And if such processes are constitutionally dubious, and we verify that they are indeed occurring, what should be done?

This paper provides provocative answers to these questions rooted in empirical evidence, history, legal opinions, and the text of the Constitution. It argues that policies which alter, replace, or destroy the People is wholly illegitimate and unconstitutional. Lengthy historical analysis of the consensus view regarding the original and long-held conception of the People is provided; and it is determined that the People formed and maintained their government along nationalist lines, placing particular emphasis on their shared ancestral heritage. Evidence is provided which indicates that demographic challenges facing the People are currently threatening to reduce them to a minority status—within the coming decades—in the country that is their constitutional birthright. It calls upon the people to prevent this result by undertaking a political restoration and reasserting their rightful claim to sovereignty and primacy within the American body politic. Finally, it suggests changes, in the form of an additional section, to Article V as a means of entrenching this restoration and helping to ensure that such a struggle is never again needed to prevent similar constitutional evils.

**EXHIBIT**

6

DEPONENT NAME: McAlister, M.

DATE: 05/22/2026

DEF_000591

For better or worse, history is an unalterable inheritance. We can no more change history than we can change the orientation or intensity of the stars in the night sky. It is also true that, like those stars, history may position and guide us. Our Constitution, and the fundamental principles it embodies, is one such guiding historical inheritance. Of course, unlike history or the stars, we can change the Constitution; as a practical matter, we can do away with part or all of it as we wish, provided we have the will and the power to do so. Nonetheless, we seem to abide by it (or at least, pretend like we abide by it) in large part because we have respect for the history that formed it and delivered it to us in the present. Like the man of wealth and prudence who has inherited a luxurious mansion in which his family has lived for generations, and who tempers his exuberance and his desire to tear the whole thing down and build a water park in its stead so that he may deliver his abode to his children, and that his children may deliver it to theirs, and so on, we resist throwing out our Constitution. We thus say that we limit ourselves to making relatively small and incremental changes which do not dramatically change the character of the whole document and the government which it gives textual authority to.

But as this paper demonstrates, the Constitution has, effectively, been thrown out. Through the demographic changes caused by our government, the Constitution's overarching principle—the sovereignty of the People—is now a dead letter. When Chin & Finkelman argue that the 1790 Naturalization Act "deserves a place of dishonor,"[111] what they are essentially saying is that the founding of the United States deserves a place of dishonor. Many non-Whites may agree with that proposition, and they may feel joyful that the government of the United States has usurped the People's sovereignty. After all, without this usurpation, non-Whites may not have ever been permitted to become citizens of this country. But at what cost was this "victory" over the People won? Do non-Whites truly believe that, after the government has usurped sovereignty from the People, sovereignty shall pass to them? Furthermore, if the racial attitudes of the Founders which brought White nationalism in to force in the United States are merely a bygone relic of an age that should be forgotten—nay, dishonored!—then why should the government respect any other provision of the Constitution? Why should the Founders' concern with the Crown's restriction on their free speech give legitimacy to the First Amendment? Why should their hatred of general warrants give legitimacy to the Fourth Amendment? Why should their fear of the thumbscrew and the breaking wheel give legitimacy to the Fifth and Eighth Amendments? And if that legitimacy comes not from the history of this country and the Founders, then where will it be found?

Finally, I shall speak directly to my brothers and sisters, the People. Can you honestly say these changes have been for the better? As the years go on, and those around you not only look less like you, but look upon you more and more with contempt and with a barely veiled desire for vengeance,[112] does your love for this country and its inhabitants grow? Do you feel as if you are

---

[111] Chin & Finkelman, *supra* note 42, at 1048.

[112] *See, e.g., Regents of Univ. of California v. Bakke*, 438 U.S. 265, 387 (1978) (Marshall, J., concurring in part and dissenting in part) (remarking that "it must be remembered that, during most of the past 200 years, the Constitution . . . did not prohibit the most ingenious and pervasive forms of discrimination" and using this fact to justify discrimination against Whites); WILLIAM O. DOUGLAS, THE COURT YEARS: 1939 TO 1975 (getprintcopy) (1980) (quoting Justice Thurgood Marshall as saying in conference on an early case evaluating the constitutionality of discrimination against Whites, "You guys have been practicing discrimination for years. Now it's our turn.").

DEF_000616

united to your fellow citizens "by the strongest ties," or do you feel as if America has been "split into a number of unsocial, jealous, and alien" groups?[113] If you are increasingly apprehensive about these changes, you are not alone.[114] However, feeling despondent and helpless is hardly a way to rectify the evils which have been visited upon us. Our Founders understood the importance of forming a nation upon the solid foundation of common ancestry. They understood that it is a part of "human nature . . . that its affections are commonly weak in proportion to the distance or diffusiveness of the object;" and thus, "a man is more attached to his family than to his neighborhood, to his neighborhood than to the community at large."[115] Similarly, we should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle. And if the prize does not motivate you, then consider the cost of defeat; "[W]henever the dissolution of the Union arrives, America will have reason to exclaim, in the words of the poet: 'FAREWELL! A LONG FAREWELL TO ALL MY GREATNESS.'"[116]

---

[113] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay).

[114] *See* Robert D. Putnam, E Pluribus Unum*: Diversity and Community in the Twenty-first Century*, 30 Scandinavian Pol. Stud. 138 (2007) (arguing that "immigration and ethnic diversity challenge social solidarity and inhibit social capital"). See *generally* ROBERT D. PUTNAM, BOWLING ALONE: THE COLLAPSE AND REVIVAL OF AMERICAN COMMUNITY (2000) (discussing "the decline of the last several decades" in "social capital" and a sense of community belonging and civic engagement among Americans).

[115] THE FEDERALIST NO. 17, at XYZ (Alexander Hamilton) (XYZ ed., XYZyear).

[116] THE FEDERALIST NO. 2, *supra* note 5, at XYZ (John Jay) (emphasis in original).

DEF_000617

**Tuesday, April 1, 2025 at 19:27:39 Eastern Daylight Time**

**Subject:** Fw: Concerns regarding the safety of fellow students
**Date:** Wednesday, October 30, 2024 at 6:37:51 PM Eastern Daylight Time
**From:** Shaw, Janice
**To:** McAlister,Merritt Ellen
**Attachments:** DRAFT American Restoration.docx

Hi Merritt- I'm available to discuss this at your convenience.  I will check with Brian to see  if the  class was recorded.

Get Outlook for iOS

**From:** Whisnant,Cooper Thomas <cooperwhisnant@ufl.edu>
**Sent:** Wednesday, October 30, 2024 5:48:52 PM
**To:** Shaw, Janice <shaw@law.ufl.edu>
**Subject:** Concerns regarding the safety of fellow students

Dear Dean Shaw,

I understand that the attached paper written by Preston Terry has already been brought to the attention of administration. During our seminar meeting this afternoon, Preston stated that the final paragraph of the paper was meant to incite racial violence. I believe that this suggests a real risk to the safety of my non-white classmates, and is beyond the scope of permissible speech allowed by the University. For clarity, my recollection of the exact wording is that I asked Preston "Was the last paragraph of your paper intended to be a call for contemporary extralegal violence" to which he responded "Yes". I believe that other classmates who were present are willing to recount their memory of the exchange, please let me know if that would be of use to administration and I will reach out to them.

Sincerely,
Cooper Whisnant

EXHIBIT

7

DEPONENT NAME:
McAlister, M.

DATE:
05/22/2026

DEF_000590

1 of 1

EXHIBIT

8

| DEPONENT NAME: | DATE: |
| --- | --- |
| McAlister, M. | 05/22/2026 |

# National Constitutionalism

*An Originalist and Structuralist Analysis of Border Policy, Immigration and Naturalization Law, and the Fourteenth Amendment*

**Preston Terry**

## Contents

Introduction..............................................................................................................1

The Originalist Foundations of National Constitutionalism.......................................2

"The People" as Nation: *Verdugo-Urquidez* and *Heller* .......................................11

National Constitutionalism Distilled for Jurists ......................................................15

National Constitutionalism Applied to Immigration Policy, Naturalization Law, and Alienage Classifications.........................................................................................................17

    Border Control, the Guarantee Clause, and the State War Power .............................19

    Immigration and Naturalization Law.....................................................................21

    Alienage Classifications and the Citizenship Clause................................................23

Conclusion .............................................................................................................26

## Introduction

This paper proposes that constitutional governance relies upon several structural principles and implicit assumptions—rooted in our national history and the Constitution's text—about the significance of "We the People" in the constitutional scheme. This descriptive claim, coupled with a normative claim that these principles and assumptions should be preserved and aggressively asserted, is termed "national constitutionalism." National constitutionalism posits that, regardless of certain textual provisions with a seemingly open-ended scope of application, the Constitution's establishment of a nation-state under the sovereignty of the People must be considered its paramount purpose which may not be permissibly undermined by any governmental acts or omissions absent the direct and unambiguous consent of the People.[1] Originalism's two dominant

---

[1] In this discussion, the phrase "the People" will be understood as being coterminous with the phrase "the nation." *See* AZAR GAT WITH ALEXANDER YAKOBSON, NATIONS: THE LONG HISTORY AND DEEP ROOTS OF POLITICAL ETHNICITY AND NATIONALISM 18 (2012) (defining "nation" as a population with a sense of shared kinship, culture,

DEF_000559

varieties—original intent originalism and original public meaning originalism[2]—both suggest the propriety of applying national constitutionalism to at least one area of law where courts have heretofore been inclined to view the so-called "political branches" (i.e., Congress and President) as possessing plenary, nonjusticiable authority: immigration and naturalization policy.[3] Additionally, the logic of national constitutionalism suggests an urgent need to overturn much of the Court's modern Fourteenth Amendment jurisprudence, and even consider the constitutionality of the Fourteenth (and Fifteenth) Amendments entirely.

**The Originalist Foundations of National Constitutionalism**

Original intent originalism "holds that the intent of the author of words or language determines the meaning of those words."[4] Original intent originalists defend this exegetical method by arguing that the true meaning of any authored language is inseparable from the author's intent.[5] McGinnis & Rappaport contend that original intent originalism's advantages are non-availing when the language at issue has multiple authors because "the individual intentions of each

---

common identity, history, and fate, that is either politically sovereign or actively striving to achieve political self-determination and self-government); CARL SCHMITT, CONSTITUTIONAL THEORY 127 (Jeffrey Seitzer, ed. & trans., 2008) (noting that "[n]ation and people are often treated as equivalent concepts" but that "[nation] denotes, specifically, the people as a unity capable of political action, . . . while the people not existing as a nation is somehow only something that belongs together ethnically or culturally, but it is not necessarily a bonding of men existing politically").

[2] John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 Nw. U. L. REV. 751, 758 (2009) (describing these two varieties as "the two leading positive theories" of originalist interpretation).

[3] *See, e.g.*, California v. United States, 104 F.3d 1086, 1090–91 (9th Cir. 1997) (holding that California's plea for relief under the Guarantee Clause due to the federal government's failure to secure the southern border "presents a nonjusticiable political question" by noting that "[t]he Supreme Court has held that the political branches have plenary powers over immigration" and explaining further that "[f]or this Court to determine that the United States has been 'invaded' when the political branches have made no such determination would disregard the constitutional duties that are the specific responsibility of other branches of government, and would result in the Court making an ineffective non-judicial policy decision") (citing Fiallo v. Bell, 430 U.S. 787, 792 (1977)).

[4] McGinnis & Rappaport, *supra* note 2.

[5] *Id.* at 759 (recounting that "[Richard Kay] argues that readers do not understand texts independently of real or presumed human intentions . . . [r]ather, meaning is fundamentally connected with a human agent who intended to communicate something").

2

DEF_000560

World War II era) do not amount to unconstitutional, revolutionary usurpations by the constituted government power.

## Conclusion

Our Constitution will survive only if "the people share a common, historic commitment to certain simple but fundamental principles which preserve their freedom."[92] One of those principles, accepted by our Founders who as a whole "unambiguously conceived of the United States as a White country,"[93] was nationalism—specifically, racial nationalism. If we abandon that principle while turning over America to a non-White majority, a majority that will not share a common, historic commitment to anything, what else shall we abandon along the way? If non-Whites believe that America's White nationalist founding "deserves a place of dishonor"[94] in our history, then—given the fundamentality of this principle in the original constitutional framework—what is to stop any other constitutional provision from being similarly repudiated?

The Supreme Court and inferior federal courts have the power to arrest the dispossession of White America. All they must do is substitute bad landmark precedent for good landmark precedent. Failure to do so is not judicial humility, but, at best, judicial surrender in the face of a terrible crime. At worst, it is complicity in that crime. The People cannot be expected to meekly swallow this demographic assault on their sovereignty. If the People are not granted relief from the government—which includes the judiciary—then, if they are to survive as masters in the land of their ancestors, they must exercise "their revolutionary right to dismember or overthrow" the

---

[92] *See* Chavez v. Martinez, 538 U.S. 760, 794 (2003) (Kennedy, J., concurring in part).
[93] Chin & Finkelman, *supra* note 41, at 1048.
[94] *See Id.*

DEF_000584

government.[95] And that will be a process which no deskbound jurist can gleefully look forward to; for it will be a controversy decided not by the careful balance of Justitia's scales, but by the gruesome slashing of her sword.

---

[95] Abraham Lincoln, First Inaugural Address (Mar. 4, 1861), https://avalon.law.yale.edu/19th_century/lincoln1.asp.

27

DEF_000585

**"Report a Community Concern" Anonymous Form Submissions**
*since August 2023*

**Submitted April 3, 2025**

On March 24, 2025 in American Legal Thought, student Preston Terry gave a presentation on the "Myth of Nuremberg." The presentation was unbelievably disgusting, and I can't help but fault this University for it's continued complicity with this students documented history of racism and white supremacist viewpoints.

This presentation attempted to "poke holes" in the execution of the Nuremburg trials by arguing that the defendants- known Nazi war criminals- should have been afforded constitutional protections during the trial, and the "absence" of such protections should cause us to doubt the Nazi war criminals guilt.

Knowing Preston's character, and knowing that this was not the first nor the last time that this student would exhibit inexcusably corrupt moral character, I started recording his presentation. I did so because I felt that because the school has been historically incactive when disciplining Preston for such behavior, I thought I'd erase the potential "he said- she said" argument by simply recording the last 38 mintues of his presentation so the University can decide for themselves whether what I am saying is accurate. I cannot attach the file here, as it is too large, but you can email me for it.

Further into the presentation, Preston tried to illicite group sympathy for the Nazi war criminals, arguing that they were pulled from their homes in front of their families and beaten. He tried to argue that because Nazi war criminals were not given constitutional protections, that we should doubt the outcome of Nuremburg entirely. He tried to argue that other allied forces killed civilians in bombings, and since they were not punished for war crimes, German Nazi's should not have been put on trial. He tried to argue that since some of the depositions were "coerced" that we should doubt them entirely. In fact, he argued that one of the testimonies indicated that their were discrepancies between the number of people killed in one particular camp, and essentially argued 'if Nuremburg lied about that- what else would they lie about?'

Preston then did what can only be described as a "full nose dive" into insanity. He referred to the Holocaust as the "alleged Holocaust" or "alleged genocide", and he referred to German war crimes as "alleged German atrocities." Then, when things seemingly couldn't get any more shocking, Preston referenced "human skin lamps" and soap made from human fat. Why on earth would such a topic be included in a law school presentation? In short, Preston included references to this as further "evidence" that Nuremburg fabricated evidence. He said that although the depositions cited to lamps made out of human skin from prisoners, and soap made from human fat that was then given to prisoners (he also stated that guards told prisoners this, and prisoners would bury the soap out of respect for the dead), this evidence was not real, but then perceded to include photos of the "lamp" and other items in his presentation slides. At this point I looked away, because how can you look at that?

EXHIBIT

9

DEPONENT NAME:
McAlister, M.

DATE:
05/22/2026

DEF_000539

**From:**
**Sent time:** 11/08/2024 02:22:37 PM
**To:** Malyk, Pamela A
**Cc:** McAlister, Merritt Ellen
**Subject:** FW: Screenshots as discussed

Hi Pam,

I hope all is well.  We received the message and the screenshots below regarding law student Preston Terry's X account.  I am forwarding this to you as a follow up to the conversation we had on Monday regarding this student's social media presence.
https://x.com/preston__terry/status/1850973910218785137

Best,

**Janice J. Shaw**
Senior Assistant Dean for Students
Special Advisor to the Dean
University of Florida Levin College of Law
P.O. Box 117620 | Gainesville, FL 32611-7633
(352) 273-0971 | shaw@law.ufl.edu

**UF** | **Levin College of Law**
**UNIVERSITY** *of* **FLORIDA**

**From:** Lopez,Sabrina <lopez@law.ufl.edu>
**Sent:** Friday, November 8, 2024 2:13 PM
**To:** McAlister,Merritt Ellen <mcalister@law.ufl.edu>; Shaw, Janice <shaw@law.ufl.edu>
**Subject:** FW: Screenshots as discussed

fyi

**From:** Jurkowski, Scott D. <sjurkowski@ufl.edu>
**Date:** Friday, November 8, 2024 at 2:12 PM
**To:** Lopez,Sabrina <lopez@law.ufl.edu>
**Subject:** Screenshots as discussed

Hi Dean Lopez,

Here are 33 of the 171 screenshots. These are "some" of the 55 or so that, as I said, speak to his ability to serve as an attorney with any degree of ethics or decency, or in a way that isn't fundamentally dangerous to the public (a large segment of it anyway). He has made it very clear that he plans to become a prosecutor. I do not need to provide any explanation for why that is utterly bone-chilling.

I would suggest that someone in the administration take the time to examine his entire history on just his Twitter page. I have, unfortunately. I am a Jewish member of the LGBTQ community with an Afro-Puerto Rican partner (soon to be spouse). We collectively represent four demographics he openly advocates for extermination or forcible, violent removal from the country, and one he believes should be "excluded from national leadership."

I genuinely don't know what the school is willing or able to do about this. But I personally believe that giving him an effective and literal endorsement by conferring a law degree and endorsing him to any state bar association would be a betrayal of this school's duty to its own credibility, and that of the students who bear its name.

Thanks for your consideration, and I apologize for exposing you to this trash.

Scott Jurkowski

PS: There is another Sabrina Lopez, and I thought I'd selected you but apparently I tapped the other one on accident. I hope that doesn't end up causing any trouble, but ultimately I don't think it would change anything. I've reached out to her to apologize.



EXHIBIT

10

DEPONENT NAME:    DATE:
McAlister, M.    05/22/2026

DEF_005055



DEF_005056

**From:**                                      Shaw, Janice
**Sent time:**                        03/28/2025 11:19:30 AM
**To:**                                       Malyk, Pamela A.
**Subject:**                             Law Student Issue

Hi Pam,

Please see below. A student has taken screenshots that are alleged to be from an X account owned by Preston Terry.  Do you have time for a quick call to discuss this today?

Best,


**Janice J. Shaw**
Senior Assistant Dean for Students
Special Advisor to the Dean
University of Florida Levin College of Law
P.O. Box 117620 | Gainesville, FL 32611-7633
(352) 273-0971 | shaw@law.ufl.edu



---

**From:** McAlister,Merritt Ellen <mcalister@law.ufl.edu>
**Sent:** Friday, March 28, 2025 10:50 AM
**To:** Shaw, Janice <shaw@law.ufl.edu>
**Subject:** Fwd: Twitter follow-up


Merritt E. McAlister
Interim Dean and Levin, Mabie & Levin Professor of Law
University of Florida Levin College of Law
mcalister@law.ufl.edu
352.273.0603


Begin forwarded message:

> **From:** "Jurkowski, Scott D." <sjurkowski@ufl.edu>
> **Date:** March 28, 2025 at 10:48:34 ?AM EDT
> **To:** "McAlister,Merritt Ellen" <mcalister@law.ufl.edu>
> **Subject: Twitter follow-up**
>
> -257 ?
> Hi Dean McAlister,
>
> As discussed, here is a shared folder of all the screenshots I have. I've embedded the most recent one for convenience. This is an unfiltered archive, with statements ranging from just absurd to appalling to a direct indictment of his character and his fitness to practice law, and everything in between. They should be chronologically consistent, but I apologize if they're a bit disjointed. But ultimately that hardly matters.
>
> Thank you again for hearing me out and taking this seriously.
>
> Scott Jurkowski
>
> https://drive.google.com/drive/folders/1-0YZ_Zh3ae8aBfjZedk39rJEtzmU2s8c

| EXHIBIT |  |
| --- | --- |
| **10A** | |
| DEPONENT NAME: | DATE: |
| McAlister, M. | 05/22/2026 |

DEF_001233



Sent from my iPhone

DEF_001234

| | |
|---|---|
| **From:** | Shaw, Janice |
| **To:** | McAlister,Merritt Ellen |
| **Subject:** | Fw: New Report a Community Concern Submission |
| **Date:** | Tuesday, April 1, 2025 9:55:26 PM |

Get Outlook for iOS

**From:** shaw@law.ufl.edu <shaw@law.ufl.edu>
**Sent:** Tuesday, April 1, 2025 9:54:51 PM
**To:** Shaw, Janice <shaw@law.ufl.edu>; Blake,Richard A <blake@law.ufl.edu>
**Subject:** New Report a Community Concern Submission

**Name**

Student F

**Email**

St F @ufl.edu

**Comments/Questions**

Preston Terry's comments on Twitter (X) are insane and not protected speech under the First Amendment. I understand that this Law school (rightly) prides itself on its protection of speech, but this disgusting. The pattern and tenor makes me worry for my Jewish friends and family.

**Would you like to be contacted regarding your comment/question?**

Yes

**Supporting Documentation**

- IMG_2506.PNG

| EXHIBIT | |
|---|---|
| 11 | |
| DEPONENT NAME: McAlister, M. | DATE: 05/22/2026 |

DEF_000644

| From: | Shaw, Janice |
|---|---|
| To: | McAlister,Merritt Ellen |
| Subject: | Fw: New Report a Community Concern Submission |
| Date: | Tuesday, April 1, 2025 9:52:50 PM |

Get Outlook for iOS

**From:** shaw@law.ufl.edu <shaw@law.ufl.edu>
**Sent:** Tuesday, April 1, 2025 9:51:48 PM
**To:** Shaw, Janice <shaw@law.ufl.edu>; Blake,Richard A <blake@law.ufl.edu>
**Subject:** New Report a Community Concern Submission

**Name**

Student G

**Email**

St G    @ufl.edu

**Comments/Questions**

I am extremely concerned for the safety of my classmates and students following an X post from student Preston Terry. His post said "Jews must be abolished by any means necessary." Antisemitism has no place on UF Law's campus, and my classmates do not deserve to go about their days in fear because of his words. I fear for when his words will be actions.

**Would you like to be contacted regarding your comment/question?**

Yes

**Supporting Documentation**

- IMG_25061.png

DEF_000646

**150**

| | |
|---|---|
| **From:** | Shaw, Janice |
| **To:** | McAlister,Merritt Ellen |
| **Subject:** | Fw: New Report a Community Concern Submission |
| **Date:** | Tuesday, April 1, 2025 9:46:53 PM |

Please see the response to the tweet in the attachment.

Get Outlook for iOS

**From:** shaw@law.ufl.edu <shaw@law.ufl.edu>
**Sent:** Tuesday, April 1, 2025 9:44:57 PM
**To:** Shaw, Janice <shaw@law.ufl.edu>; Blake,Richard A <blake@law.ufl.edu>
**Subject:** New Report a Community Concern Submission

**Prefer to submit anonymously**

- Yes

**Comments/Questions**

This attached tweet is from a current student at UF Law who is actively engaging in hate speech. This should be no means be tolerated. This is a danger to the safety of students at this school and must be addressed IMMEDIATELY.

**Would you like to be contacted regarding your comment/question?**

No

**Supporting Documentation**

- IMG_2506.png

DEF_000648

**From:**     Shaw, Janice
**To:**       Shaw, Janice; Blake,Richard A
**Subject:**  New Report a Community Concern Submission
**Date:**     Tuesday, April 1, 2025 10:32:40 PM

---

**Name**

Student H

**Email**

St H @ufl.com

**Phone**

██████████

**Comments/Questions**

A student has continually spouted hate speech against the Jewish community here at UF Law. This student has continually evaded reprimand, but has since began publicly calling for violence against Jewish people. These calls for violence have even caught the attention of a premier UF Law Professor who happens to be Jewish. The student responded to the Professor, directly calling for the slaughter of her and her family due to her religion.

UF Law has one of the largest Jewish communities at any law school in the country. The administration cannot abide by while a student continues to post dangerous and inflammatory statements that harm a significant portion of the student body. Furthermore, the student's calls for violence have become more expressive and deeply concern me and others that this student may result to violence. The administration must do something to protect its students and its faculty.

**Would you like to be contacted regarding your comment/question?**

Yes

**Supporting Documentation**

- IMG_2261.PNG

**EXHIBIT**

**12**

DEPONENT NAME:
McAlister, M.

DATE:
05/22/2026

**DEF_000650**

**From:** Lidsky,Lyrissa

**Sent time:** 04/03/2025 05:05:40 PM

**To:** McAlister,Merritt Ellen <mcalister@law.ufl.edu>

**Subject:** FW: Class Mon/Wed

FYI

Raymond & Miriam Ehrlich Chair in U.S. Constitutional Law
UF Levin College of Law
352-273-0717

**From:** Robinson, Chase M. <crobinson7@ufl.edu>
**Sent:** Thursday, April 3, 2025 3:05 PM
**To:** Lidsky,Lyrissa <lidsky@law.ufl.edu>
**Subject:** Class Mon/Wed

Hi Professor Lidsky,

I am sorry for what is happening right now. I am a little concerned about your safety with the comments that were made by a student, I just became aware of what happened. I wanted to know if class Monday and maybe Wednesday too would be moved to a different room or online for safety? Do you know what safety precautions the school is taking?

I am also Jewish and the comments made are very scary. I hope you stay safe.

Sincerely,
Chase Robinson

**EXHIBIT**

**13**

DEPONENT NAME: McAlister, M.      DATE: 05/22/2026

DEF_005265

| | |
|---|---|
| **From:** | Shaw, Janice |
| **Sent time:** | 04/04/2025 02:22:22 PM |
| **To:** | McAlister,Merritt Ellen <mcalister@law.ufl.edu> |
| **Subject:** | FW: Concerns |

FYI. Richard ran into Lyrissa and she shared her concerns with him.  See below.

**From:** Blake,Richard A <blake@law.ufl.edu>
**Sent:** Friday, April 4, 2025 2:21 PM
**To:** Shaw, Janice <shaw@law.ufl.edu>
**Subject:** Concerns

Good Afternoon Janice,

Sharing a review of concerns Professor Lidsky shared with me in the hallway a few moments ago.

- Asking if consideration could be made to secure the campus doors earlier than exam period to quell the fear amongst students
- Professor Lidsky was not fearful at first, but is now slightly fearful after the amount of students who have reached out to her to share their concerns and interactions with student
- She has found herself looking back at her classroom door during teaching anytime someone enters or leaves the room. She emphasized that this is something she has never done before
- Students have asked her to change her classroom time/location from the published record because they fear she is a target

I shared with Professor Lidksy that I would share this information with you.

Thank you.

Richard

**Richard Blake**
Director for Student Life
University of Florida Levin College of Law
P.O. Box 117620 | Gainesville, FL 32611-7633
(352) 273-0720 | Email: blake@law.ufl.edu



| EXHIBIT | |
|---|---|
| **14** | |
| DEPONENT NAME: | DATE: |
| McAlister, M. | 05/22/2026 |

**DEF_005266**

**From:**          McAlister,Merritt Ellen

**Sent time:**      04/04/2025 08:02:48 AM

**To:**             Johnston, Lea

**Subject:**        Re: Safety concerns in MH law class - today

---

Lea, can you call me this morning? (404.861.7619)


Thanks,

Merritt


Merritt E. McAlister

Interim Dean and Levin, Mabie & Levin Professor of Law

University of Florida Levin College of Law

mcalister@law.ufl.edu

352.273.0603




> On Apr 4, 2025, at 7:19 AM, Johnston, Lea <johnstonl@law.ufl.edu> wrote:

>

> Merritt,

>

> Good morning. Last night one of my mental health law students expressed concern about her safety in my mental health law class today, given that Preston was in that class. Also, two judges will be visiting that class today, one of whom may be Jewish. My class meets from 1:15-2:40 in Holland 285-A. Would it be possible to have a security person nearby?

>

> Best,

> Lea

EXHIBIT

15

DEPONENT NAME:          DATE:

McAlister, M.           05/22/2026

DEF_001397

**From:** Knowles,Bart Carey

**Sent time:** 04/02/2025 10:40:36 AM

**To:** Ash,Kristina M; . BA-UPD Info; . TSS-UPD-DISPATCH; . TSS-UPD-DISPATCH RELIEF; . TSS-UPD-INVESTIGATIONS; O'Ferrell, John T; Moran,Jeffrey D; Simmons,Latrell M

**Subject:** RE: UPD Contact Form

---

Major Sasser will be posting an officer outside of the entrance of the class to monitor.

---

**From:** Ash,Kristina M <kburgin1@ufl.edu>
**Sent:** Wednesday, April 2, 2025 10:26 AM
**To:** . BA-UPD Info <updinfo@admin.ufl.edu>; . TSS-UPD-DISPATCH <UPD-DISPATCH@ad.ufl.edu>; . TSS-UPD-DISPATCH RELIEF <UPD-DISPATCH-RELIEF@ad.ufl.edu>; . TSS-UPD-INVESTIGATIONS <UPD-INVESTIGATIONS@ad.ufl.edu>; O'Ferrell, John T <joferrell@ufl.edu>; Moran,Jeffrey D <jdmoran@UFL.EDU>; Simmons,Latrell M <latrellsimmons@ufl.edu>
**Subject:** RE: UPD Contact Form

Major Sasser forwarded this contact form and requested increased patrols.

Thank you,

*Kristina Ash*

**Asst. Communications Manager**
**University of Florida Police Department**
Phone: (352) 392-2920
Email: kburgin1@ufl.edu



---

**From:** updinfo@admin.ufl.edu <updinfo@admin.ufl.edu>
**Sent:** Wednesday, April 2, 2025 10:00 AM
**To:** . TSS-UPD-DISPATCH <UPD-DISPATCH@ad.ufl.edu>; . TSS-UPD-DISPATCH RELIEF <UPD-DISPATCH-RELIEF@ad.ufl.edu>; . TSS-UPD-INVESTIGATIONS <UPD-INVESTIGATIONS@ad.ufl.edu>; O'Ferrell, John T <joferrell@ufl.edu>; Moran,Jeffrey D <jdmoran@UFL.EDU>; Simmons,Latrell M <latrellsimmons@ufl.edu>
**Subject:** UPD Contact Form

| Name | |
|---|---|
| | Caroline Levine |
| **Contact Email** | |
| | caroline.levine@ufl.edu |
| **Contact Phone** | |
| | (904) 923-2287 |
| **Message** | |
| | A student at the law school recently and explicitly recently posted on X saying (verbatim) "Jews must be abolished by any means necessary." Today, a Jewish professor is supposed to lead a discussion on Israel at the law school. This is a serious safety concern. I am a Jewish student who is an officer of the Jewish Law Students Association (the organization sponsoring this event) and I am afraid to go because I think this student may take violent action. This student, Preston Terry, has been brought up to the law school many times because students were afraid for their safety and admin has done nothing. I have absolute confidence he will show up to today's event because we hosted a similar one earlier in the semester and he showed up. Please please consider taking action about this student. Jewish students are all terrified to walk around the school already because of him, but factoring in an explicitly Jewish event after this message was circulated is a specific, tangible event where we are legitimately concerned for our safety. I heard through the grapevine that this professor, Professor Zachary Kaufman, has already expressed safety concerns to the school. The event is set to take place at noon today at the law school in the Martin levin advocacy center (MLAC 106). Please help us do something before it is too late. |
| **INTERNAL DROPDOWN** | |
| | OPTION A |

**EXHIBIT**

**16**

DEPONENT NAME: McAlister, M.

DATE: 05/22/2026

DEF_004075

| From: | McAlister,Merritt Ellen |
|---|---|
| Sent time: | 04/05/2025 02:07:00 PM |
| To: | Dave Straley |
| Cc: | Mandernach, Joe; Farley, Michael A |
| Subject: | FW: Responding to Community Concerns |

EXHIBIT
17

| DEPONENT NAME: | DATE: |
|---|---|
| McAlister, M. | 05/22/2026 |

Dave, I just wanted to make sure this has been communicated to you: we're going to move to swipe-card access (with only library and welcome center open). We also need to make sure that Preston Terry Damsky's access has been disabled until further notice.

Please don't hesitate to let me know if you have any questions.

Many thanks,
Merritt

---

**From:** McAlister,Merritt Ellen <mcalister@law.ufl.edu>
**Date:** Saturday, April 5, 2025 at 2:05 PM
**To:** . LAW-Staff <LAW-Staff@ad.ufl.edu>
**Subject:** FW: Responding to Community Concerns

Dear Colleagues,

I hope you're having a good weekend. I write to share a message I sent to our students on Friday evening about a significant disruption that has been caused by some social media posts that circulated across the law school campus. Community concern has remained high, and I want to share the additional steps we've taken/are taking to ensure everyone's safety. Please note, as explained below, we will be on swipe-card only access from now through final exams.

Best,
Merritt

Merritt E. McAlister
Interim Dean and Levin, Mabie & Levin Professor of Law
University of Florida
Fredric G. Levin College of Law
mcalister@law.ufl.edu / 352.273.0603

---

**From:** UF Law All Students <LAW-ALL-STUDENTS-L@LISTS.UFL.EDU> on behalf of McAlister,Merritt Ellen <mcalister@law.ufl.edu>
**Date:** Friday, April 4, 2025 at 7:11 PM
**To:** LAW-ALL-STUDENTS-L@LISTS.UFL.EDU <LAW-ALL-STUDENTS-L@LISTS.UFL.EDU>
**Subject:** Responding to Community Concerns

Dear Students,

I know that our normal semester routine—winding down classes, gearing up for finals—has been significantly disrupted by recent widely circulated social media posts. Many of you are rightly feeling deeply offended, angry, and even personally threatened.

The College and the University are working together to ensure that we do everything we can under University regulations and state and federal law to protect our community. To ensure our safety, an individual has been trespassed from campus, and, over the course of the past week, we've had increased police patrols and event security. Additionally, beginning on Monday at 8:00 am, we will begin swipe-card access only for all building entrances, except for the main Library and Welcome Center Entrances. Controlled access to our campus facilities will continue through the end of finals unless we must open campus for a major event (like Admitted Students Day). (Note that routine weekend swipe-card access has already begun as of today at 5:00 pm.)

Additionally, on Wednesday, April 9, at 12pm in the Morgan & Morgan Courtroom (MLAC 106), I will host a town hall with Major Simmons from UFPD and a representative from the UF Counseling Center. Lunch will be provided. Understanding the high degree of fear felt across our campus, we will answer additional questions you may have and offer resources that might help us all move through this difficult time.

Dean Shaw and I are, as always, entirely available to meet with any of you individually; please do not hesitate to reach out. Your safety and security remain my highest priority. I will continue to be vigilant and take steps

DEF_001414

necessary to protect of our community.

I'm hopeful that the weekend will bring you all some much-needed rest and that Gators basketball might offer a bit of positive distraction!

Best,
MEM

Merritt E. McAlister
Interim Dean and Levin, Mabie & Levin Professor of Law
University of Florida Levin College of Law
mcalister@law.ufl.edu / 352.273.0981 (o) / 404.861.7619 (c)

DEF_001415