**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

PRESTON DAMSKY,

*Plaintiff*,

v.

CHRIS SUMMERLIN, in his official
capacity as Dean of Students of the
University of Florida,

*Defendant*.

No.: 1:25-cv-00275-AW-MAF

**DEFENDANT'S PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

Defendant Chris Summerlin, Dean of Students of the University of Florida,

respectfully submits these Proposed Findings of Fact and Conclusions of Law for

entry following the bench trial held on May 27–28, 2026.

**PROPOSED FINDINGS OF FACT**

**I.    Preston Damsky's Social Media Posts on March 21, 2025, and His**
**Exchange With Professor Lyrissa Lidsky on April 1, 2025**

1.    On March 21, 2025, Plaintiff Preston Damsky, then a second-year law

student at the University of Florida ("UF"), wrote and publicly posted on social

media that "My position on Jews is simple: whatever Harvard professor Noel

Ignatiev meant by his call to 'abolish the White race by any means necessary' is what

I think must be done with Jews. Jews must be abolished by any means necessary."[1]

Ex. D-7[2] at 5 (Doc. 73-7); Trial Tr.[3] 42:22–43:3, 44:13–18, 46:1–2 (Damsky).

2.    On March 21, 2025, and at all relevant times until his expulsion from UF, Damsky was enrolled as a student the University of Florida Levin College of Law ("UF Law"). Trial Tr. 12:24–25, 42:22–43:5 (Damsky).

3.    Damsky was 29 years old in March and April 2025. Trial Tr. 42:22–23 (Damsky); Ex. D-16 at 9:4–5 (Doc. 73-16) (Damsky Dep. testimony).

4.    Damsky published the Post on his X account. Trial Tr. 43:9–17, 44:17–18 (Damsky); Ex. D-7 at 5 (Doc. 73-7).

5.    The handle of Damsky's X account is @preston_terry_. Trial Tr. 43:9–17 (Damsky); Ex. D-7 at 5 (Doc. 73-7).

6.    "Terry" is Preston Damsky's middle name. Trial Tr. 22:15–16, 43:15–17 (Damsky). The record shows that Damsky sometimes goes by the name Preston Terry. *Id.* at 22:15–19 (Damsky).

---

[1] Damsky's original post of March 21, 2025, is sometimes referred to herein as the "Post." The plural term "Posts" refers to his March 21 tweet and his post in reply to Professor Lyrissa Lidsky on April 1, 2025. Additionally, the terms "post" and "tweet" are used synonymously, as the parties and witnesses have done. And, as many people still do, the X social media platform is sometimes referred to herein as "Twitter."

[2] All references to "Ex. D-#" refer to Defendant's Trial Exhibits.

[3] "Trial Tr." refers to the transcript of the two-day bench trial on May 27–28, 2026. Page citations are to the transcripts' native pagination; the testifying witness is indicated in a parenthetical.

2

7.    Damsky's tweet of March 21, 2025, was a public-facing post and could be seen by anyone with an X account. Trial Tr. 44:23–24 (Damsky); *id.* at 192:2–20 (Lidsky).

8.    One did not have to be a follower of his X account to view the Post. Trial Tr. 44:25–45:4 (Damsky); *id.* at 192:12–20 (Lidsky).

9.    Damsky testified that he was a few blocks off campus at a gym when he composed and posted the Post. Trial Tr. 21:4–12 (Damsky).

10.    March 21, 2025, fell within UF Law's Spring Break in 2025. Trial Tr. 21:4–6 (Damsky); Ex. D-18[4] at 271:21 (Doc. 73-18) (Damsky UOB Hrg. testimony).

11.    On April 1, 2025, Lyrissa Lidsky, a professor of law at UF Law, posted a public comment on Damsky's X account in response to his Post. Ex. D-7 at 5 (Doc. 73-7); Trial Tr. 192:21–25, 193:9–12 (Lidsky); *id.* at 23:21–24:2, 50:1–3 (Damsky).

12.    Professor Lidsky tweeted in response to Damsky's Post "Are you saying you would murder me and my family? Is that your position?" Ex. D-7 at 5 (Doc. 73-7); Trial Tr. 193:9–12 (Lidsky); *id.* at 23:21–24:2, 24:8–11 (Damsky).

13.    Professor Lidsky is Jewish. Trial Tr. 188:2 (Lidsky).

14.    Also on April 1, Damsky replied to Professor Lidsky's comment: "Did Ignatiev want Whites murdered? If so, were his words as objectionable as mine? If

---

[4] Exhibit D-18 (Doc. 73-18) is the transcript of the UF Student Conduct Code Hearing that took place before the University Officials Board ("UOB") on July 28, 2025; page citations are to the native transcript pagination.

Ignatiev sought genocide, then surely a genocide of all Whites would be an even greater outrage than a genocide of all Jews, given the far greater number of Whites." Ex. D-7 at 5 (Doc. 73-7); Trial Tr. 24:12–18, 50:22–51:22 (Damsky); *id.* at 194:7–195:7 (Lidsky).

15.    On April 2, Professor Lidsky tweeted in reply "I notice you didn't say no, but instead resorted to a whataboutism. Yes, his words are despicable, but you implicitly admit yours are, too." Her reply included a hyperlink to the definition of "Whataboutism" in britannica.com. Ex. D-7 at 6 (Doc. 73-7); Trial Tr. 195:21–196:1 (Lidsky); *id.* at 24:19–22 (Damsky).

16.    After this tweet, the exchange between Lidsky and Damsky ended. Trial Tr. 196:2–3 (Lidsky). *See also* Ex. D-7 at 5–6 (Doc. 73-7).

17.    The following images accurately represent the Posts:



Ex. D-7 at 5–6 (Doc. 73-7).

18.    When he saw her tweet, Damsky knew that Lidsky was a professor at UF Law. Trial Tr. 24:23–24, 50:13–18 (Damsky).

19.    Damsky inferred from her tweet that Lidsky is Jewish. Trial Tr. 50:19–21 (Damsky).

20.    Damsky's reply to Lidsky was not directly responsive to her questions: "Are you saying you would murder me and my family? Is that your position?" Instead, he answered her questions with questions. Ex. D-7 at 5 (Doc. 73-7); Trial Tr. 194:7–21 (Lidsky); *id.* at 50:25–51:22 (Damsky).

21.    As Professor Lidsky noted in their exchange of tweets, Damsky did not say "no" when asked "Are you saying you would murder me and my family? Is that your position?" Ex. D-7 at 5–6 (Doc. 73-7); Trial Tr. 194:7–21 (Lidsky); *id.* at 50:25–51:22 (Damsky).

22.    Damsky's reply to Lidsky was the first tweet in the exchange to use the word "genocide" and the first to reference "a genocide of all Jews." Ex. D-7 at 5 (Doc. 73-7).

23.    In Damsky's reply to Lidsky, Damsky did not deny or disclaim an intent to commit violence against Jews. Nor did Damsky deny or disclaim an intent to promote unlawful violence against Jews. *See* Ex. D-7 at 5 (Doc. 73-7); Trial Tr. 51:3–22 (Damsky); *id.* at 194:7–195:7 (Lidsky).

24.    Damsky's Posts never explained what the late Harvard professor Noel Ignatiev "meant by his call to 'abolish the White race by any means necessary.'" *See* Ex. D-7 at 5 (Doc. 73-7). Instead, Damsky wrote that "*whatever* Harvard professor Noel Ignatiev meant by his call to 'abolish the White race by any means necessary' is what I think must be done with Jews. Jews must be abolished by any means necessary." *Id.* (emphasis added). In his reply to Lidsky, Damsky posed the question "Did Ignatiev want Whites murdered?" without answering it. *Id.*

25.    UF Law was no longer on Spring Break on April 1, 2025; classes at the law school had resumed by that date. Trial Tr. 25:20–24 (Damsky).

26.    The record does not indicate where Damsky was physically present during his April 1 exchange with Lidsky. The Court does not find his whereabouts when he tweeted on March 21 or April 1 to be relevant to any issue to be decided.

27.    On March 7, 2025, two weeks before the Post, Damsky tweeted that "The Jews are the common enemy of humanity." Ex. D-16 at 269 (Doc. 73-16) (Damsky's Mar. 7, 2025 Post); Trial Tr. 46:3–17 (Damsky); Ex. D-16 at 95:5–10 (Doc. 73-16) (Damsky Dep. testimony). *See also* Trial Tr. 188:22–189:1, 190:3–6 (Lidsky); Trial Tr. 229:7–21 (Kaufman); Ex. D-18 at 162:6–8 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

28.    Damsky knew that a student at UF Law had been monitoring his X account for a year. Damsky so stated at the student conduct hearing. Trial Tr. 46:18–

47:2, 47:13–48:7 (Damsky); Ex. D-18 at 282:21–24, 274:9–13 (Doc. 73-18) (Damsky UOB Hrg. testimony).

29.    Damsky has never taken down the March 21 Post. It is still on his Twitter feed. Trial Tr. 51:23–52:2 (Damsky).

30.    Damsky caused the March 21 Post to appear again on his Twitter feed on June 25, 2025 by reposting it. Ex. D-16 at 275 (Doc. 73-16); Trial Tr. 52:3–18 (Damsky).

31.    The disciplinary process was already underway when Damsky tweeted on June 25, 2025. UF had placed Damsky on Interim Suspension on April 2, 2025. Ex. D-1 (Doc. 73-1 at 5–6); Trial Tr. 93:5–14 (Summerlin); *id.* at 52:19–53:12 (Damsky).

## II.    The Student Conduct Process Leading to Damsky's Expulsion from UF

32.    By letter dated April 2, 2025, Chris Summerlin, the Dean of Students at UF, informed Damsky that he had been placed on Interim Suspension. Ex. D-5 (Doc. 73-5 at 5–6); Trial Tr. 89:20–90:4, 93:5–14 (Summerlin); *id.* at 13:10–11, 14:10–14, 53:1–3 (Damsky).

33.    Damsky appealed his Interim Suspension. His appeal was denied by letter dated April 29, 2025, from James Tyger, Assistant Vice President, Student Life. Ex. D-5 at 11–12 (Doc. 73-5); Trial Tr. 93:24–94:8 (Summerlin).

8

34.    Damsky was informed by letter dated May 29, 2025, from Pamela Malyk, Assistant Dean and Director of Student Conduct & Conflict Resolution, that a student conduct process had been initiated based on his March 21 Post. Ex. D-5 at 14–15 (Doc. 73-5); Trial Tr. 94:9–16 (Summerlin).

35.    A student conduct hearing before a three-member University Officials Board was held on July 28, 2025. *See* Ex. D-18 (Doc. 73-18) (UOB Hrg. transcript).

36.    Damsky participated in and testified at the UOB hearing. He was allowed to present evidence, question the other witnesses, answer the UOB's questions, and make a statement in his defense to the UOB. *See generally* Ex. D-18 (Doc. 73-18) (UOB Hrg. Tr.); Trial Tr. 29:4–8 (Damsky).

37.    In addition to Damsky, also testifying at the UOB hearing were Merritt McAlister, the Interim Dean of UF Law; Janice Shaw, the Senior Assistant Dean of Students at UF Law; Professor Lyrissa Lidsky of UF Law; Professor Zachary Kaufman of UF Law; Professor Christopher Hampson of UF Law; and two UF Law students. Ex. D-18 at 4:3–7 (Doc. 73-18) (UOB Hrg. Tr.). (The transcript of the UOB hearing that appears in the record has been redacted to protect the privacy of these two student witnesses.). The witnesses were admonished to tell the truth, *id.* at 4:14–18, and each later declared under penalty of perjury that they had told the truth at the hearing. *See* Ex. D-6 ¶3 (Doc. 73-6) (McAlister); Ex. D-7 ¶3 (Doc. 73-7) (Lidsky);

9

Ex. D-9 ¶3 (Doc. 73-9) (Shaw); Ex. D-10 ¶3 (Doc. 73-10) (Hampson); and Ex. D-11 ¶3 (Doc. 73-11) (Kaufman).

38. The testimony of Deans McAlister and Shaw and Professors Lidsky and Kaufman at the UOB hearing was substantially similar to their testimony at, or for, the bench trial, as described below. *Compare* Trial Tr. 106:21–177:23 (Shaw trial testimony), 179:6–211:6 (Lidsky trial testimony) and Trial Tr. 221:19–266:10 (Kaufman trial testimony) *with* Ex. D-18 (Doc. 73-18) at 72:15–97:11 (Shaw UOB Hrg. Testimony), 98:10–137:20 (Lidsky UOB Hrg. testimony) and 159:11–186:14 (Kaufman UOB Hrg. testimony). *Compare also* Doc. 103-1[5] (transcript of McAlister trial testimony in the form of a videotaped deposition *de bene esse*, *see* Sec. IV, *infra*) *with* Ex. D-18 at 12:18–71:13 (Doc. 73-18) (McAlister UOB Hrg. testimony). Professor Hampson did not testify at the bench trial but did testify at the UOB hearing. *See* Ex. D-18 at 139:20–159:3 (Doc. 73-18) (Hampson UOB Hrg. testimony).

39. At the UOB hearing, Professor Hampson testified that, in October 2024, he had received a draft of Damsky's seminar paper "American Restoration." Ex. D-18 at 140:16–19 (Doc. 73-18) (Hampson UOB Hrg. testimony); *see also* Ex. D-1 at 97–123 (Doc. 73-1). A student told Hampson that he and several classmates

---

[5] Page citations to McAlister's *de bene esse* testimony transcript (Doc. 103-1) use the transcript's native pagination.

were concerned that the paper ended on a "call for violence against immigrants and people of color." Ex. D-18 at 140:20–141:15 (Doc. 73-18) (Hampson UOB Hrg. testimony). "They expressed deep concern that Mr. Damsky was a security risk to the law school." *Id.* at 141:14–15. Hampson noted that, in the same semester, Damsky had included an "even more graphic" call to violence in his "National Constitutionalism" paper. *Id.* at 141:15–142:21.

40.    Professor Hampson also testified that, on April 1, 2025, several UF Law professors "emailed the faculty about Mr. Damsky's tweet, noting the pattern of escalation" and "his previous calls for violence." Ex. D-18 at 143:10–15 (Doc. 73-18) (Hampson UOB Hrg. testimony); *see also* Ex. D-2 at 3 (Doc. 73-2) (April 1, 2025 email). He testified: "The student community was deeply alarmed by this point. I learned that students were concerned for their personal safety and were actively avoiding registering for classes if Mr. Damsky was in them. I also know that two faculty members, both women of color, were trying to figure out whether they could safely come to campus at all and whether they should move all their classes online." Ex. D-18 at 143:16–23 (Doc. 73-18) (Hampson UOB Hrg. testimony). Damsky's "threats were deeply concerning to the UF Law community, disruptive to our classroom and work environment, and even extended beyond Mr. Damsky's classes to other students, faculty, and alumni of the law school." *Id.* at 144:4–18.

41.    Two UF Law students (whose names have been redacted from the transcript of the UOB hearing to protect their privacy) also testified. The first testified he was in the seminar for which Damsky wrote his "American Restoration" paper. The student recalled that during class Damsky "explicitly stated that the essay was a call for … contemporary racial violence against Black people in America[.]" Ex. D-18 at 188:4–17 (Doc. 73-18) (Student #1 UOB Hrg. testimony). "I personally asked him whether it was intended as a call for violence and he stated, 'Yes, it was.'" *Id.* at 189:6–8.

42.    The second student, who had alerted Dean McAlister to Damsky's March 21 Post, testified that he "became nervous during finals that [Damsky] might do something retaliatory and … come after me[.]" Ex. D-18 at 212:18–213:3 (Doc. 73-18) (Student #2 UOB Hrg. testimony). The student, who is Jewish, *id.* at 212:18, "ask[ed] to take [his] finals in a locked room." *Id.* at 213:24–214:1. The student stated that "a lot of people knew about" Damsky "because of [his] GroupMe posts" and that "people shared [his] Twitter[.]" *Id.* at 224:2–5. The student said he "monitored" Damsky's account because he thought Damsky was "possibly dangerous." *Id.* at 230:3–4.

43.    Damsky testified at the UOB hearing that he knew that the second student was monitoring his posts. "I knew that [the student] was monitoring me, as he put it, for a year." Ex. D-18 at 282:21–24 (Doc. 73-18) (Damsky UOB Hrg.

testimony); *see id.* at 274:9–13 (Damsky UOB Hrg. testimony) ("I've known for a year that [the student] has screen-shotted my tweets.").

44.    Near the end of the UOB hearing, Damsky answered "I don't know" when asked what steps he would take to avoid disrupting the campus again and what he might do differently in the future. Ex. D-18 at 318:19–319:1 (Doc. 73-18) (Damsky UOB Hrg. testimony). At no point during the hearing did Damsky express any regret or remorse for the fear of violence and campus disruption his posts caused. Trial Tr. 96:19–97:14, 97:16–98:2 (Summerlin); Ex. D-5 at 21 (Doc. 73-5). *See also generally* Ex. D-18 (Doc. 73-18) (Damsky UOB Hrg. testimony); *id.* at 319–22 (same).

45.    The UOB unanimously recommended to Chris Summerlin, the Dean of Students, that Damsky be found responsible for two violations of UF's Student Conduct Code: Disruptive Conduct and Harassment. Ex. D-3 (Doc. 73-5) (UOB Violations, Charges, and Recommendations); *see* Ex. D-15 (Doc. 73-15) (UF Regulation 4.040, Student Honor Code and Student Conduct Code (2023)). The UOB also recommended that Damsky be expelled. Ex. D-3 at 4–5; Trial Tr. 90:15–91:9 (Summerlin).

46.    The Code defines "Disruptive Conduct" as "Conduct that is materially or substantially disruptive to the normal operations of the University, or that incites others to do so, in any of the following activities: teaching, learning, research,

13

administrative functions, disciplinary proceedings, other University Activities whether on or off campus, and other authorized activities that take place on campus." Ex. D-15 at 16 (Doc. 73-15).

47.     The Code defines "Harassment" as including "Threats, intimidation, Coercion, or any other conduct that places a Reasonable person in fear of physical harm, through words or actions, or objectively disrupts a person's daily activities, including education and employment." Ex. D-15 at 17 (Doc. 73-15).

48.     The definitions state that "Disruptive Conduct" and "Harassment" do not include conduct protected by the First Amendment. Ex. D-15 at 16–17 (Doc. 73-15).

49.     Dean Summerlin accepted the UOB's recommendations. Trial Tr. 91:10–19 (Summerlin). Damsky was informed by letter dated August 8, 2025, from Summerlin. Ex. D-5 at 18–21 (Doc. 73-5); Trial Tr. 91:16–24, 96:5–97:14 (Summerlin); *id.* at 31:25–32:7 (Damsky).

50.     Damsky appealed his expulsion. Trial Tr. 32:8–10 (Damsky); *id.* at 98:17 (Summerlin). Damsky was allowed to attend class remotely while his appeal was pending. *Id.* at 41:17–42:5 (Damsky).

51.     An appeal panel denied Damsky's appeal on October 9, 2025. Ex. D-5 at 23–26 (Doc. 73-5); Trial Tr. 98:10–19 (Summerlin); *id.* at 32:8–10 (Damsky).

### III.    Trial Testimony of Preston Damsky

52.    Plaintiff Preston Terry Damsky testified at the bench trial. *See* Trial Tr. 12:16–74:18, 267:15–268:19 (Damsky).

53.    Damsky testified that he wrote and posted the March 21, 2025 tweet stating in part that "Jews must be abolished by any means necessary." Trial Tr. 44:13–18 (Damsky); Ex. D-7 at 5 (Doc. 73-7).

54.    The March 21 Post was a public post; any X user could go onto Damsky's account and view it without being a follower of his to see it. Trial Tr. 44:23–45:4 (Damsky).

55.    Damsky's X account had "less than 50" followers at the time. Trial Tr. 21:21–25 (Damsky).

56.    Damsky hoped people would read his Post. Trial Tr. 45:5–10 (Damsky).

57.    Damsky hoped that people would agree with his Post. Trial Tr. 45:11–13 (Damsky) ("Absolutely.").

58.    When asked whether he thought most people would be familiar with Noel Ignatiev and his writings, Damsky answered: "[D]o most Americans know about Noel Ignatiev? I mean, if I were to speculate I would say probably not." Trial Tr. 45:14–23 (Damsky).

59.     Two weeks before his Post of March 21, 2025, Damsky had posted on March 7, 2025, that "The Jews are the common enemy of humanity." Ex. D-16 at 269 (Doc. 73-16) (Damsky's March 7, 2025 post); Trial Tr. 46:1–17 (Damsky).

60.     Damsky admitted that he testified at the student conduct hearing that "as I've told you, essentially I knew that [a student] was monitoring me, as he put it, for a year. I knew it for a year." Trial Tr. 47:13–48:7 (Damsky) (quoting Damsky UOB Hrg. testimony, Ex. D-18 at 282:21–24 (Doc. 73-18)). *Compare* Trial Tr. 46:18–47:2 (cross-examination of Damsky with UOB testimony after claiming "I didn't really know that he was monitoring the current [tweets]") *with* Ex. D-18 at 274:9–13 (Damsky UOB hearing testimony that he has "known for a year that [a student] has screen-shotted [his] tweets").

61.     On April 1, 2025, Damsky received an email from the elected state attorney informing him that his summer internship with the State Attorney's Office had been revoked. Trial Tr. 48:8–49:6 (Damsky).

62.     Damsky lost the internship because of his post about Jews. Trial Tr. 49:9–25 (Damsky).

63.     On April 1, after learning he had lost the internship, Damsky saw Professor Lidsky's comment on his Twitter feed. Trial Tr. 50:1–6, 10–12 (Damsky); *see also* Ex. D-7 at 5 (Doc. 73-7).

64.    When Damsky saw Lidsky's comment, he knew she was a professor at UF Law. Trial Tr. 50:13–18 (Damsky).

65.    Damsky inferred from Professor Lidsky's post that she is Jewish. Trial Tr. 50:19–21 (Damsky).

66.    When Damsky replied to Professor Lidsky, he did not say "No, I am not saying I would murder you and your family." Trial Tr. 51:5–11 (Damsky) ("I did not use those exact words[.]"). *See* Ex. D-7 at 5 (Doc. 73-7).

67.    Damsky said in his reply that a "genocide of all whites would be an even greater outrage than the genocide of all Jews because there are more white people." Trial Tr. 51:19–22 (Damsky) ("Yeah, that's what I said."); *see also* Ex. D-7 at 5 (Doc. 73-7).

68.    Damsky has never taken down his March 21 Post about abolishing Jews. Trial Tr. 51:23–25 (Damsky). The Post is still on his Twitter feed. *Id.* at 52:1–2.

69.    On June 25, 2025, Damsky caused his March 21 Post to appear again on his Twitter feed. Trial Tr. 52:3–18 9 (Damsky); Ex. D-16 at 275 (Doc. 73-16).

70.    By June 25, the disciplinary process at UF had begun. Trial Tr. 53:1–12 (Damsky). Damsky had been placed on interim suspension on April 2, 2025. *Id.* at 53:1–3; Ex. D-5 at 5–6 (Doc. 73-5). The May 29, 2025 notice of charge letter that

17

he received, *see* Doc. 73-1 at 11–12; Trial Tr. 53:13–22 (Damsky), was before the June 23 post. Trial Tr. 53:4–7 (Damsky).

71.    Damsky admitted that, in September 2023, he posted a controversial comment in the GroupMe chat. Trial Tr. 54:4–55:2 (Damsky).

72.    Most of UF's 1L class was in the group chat. Trial Tr. 55:3–6 (Damsky).

73.    With respect to his seminar paper "American Restoration," Ex. D-1 at 97–123 (Doc. 73-1), Damsky was asked in his deposition "Now, in the passage I just read, you seem to be saying that white Americans may need to fight, kill and die to take back what is rightfully theirs. Is that a fair reading?," and his answer started with "That is one – I mean – yeah." Trial Tr. 58:20–59:6 (Damsky) (quoting Ex. D-16 at 29:25–30:4 (Doc. 73-16) (Damsky Dep. Tr.) (discussing Ex. D-1 at 123 (Doc. 73-1))).

74.    A student in Damsky's class, Cooper Whisnant, asked him about the part of the paper that said white Americans may need to fight, kill and die to take back what is rightfully theirs. Trial Tr. 57:24–11 (Damsky); *see also* Ex. D-18 at 189:4–8 (Doc. 73-18) (Whisnant UOB Hrg. testimony).

75.    Damsky submitted his seminar paper "National Constitutionalism" under the name Preston Terry because he often goes by that name. Trial Tr. 59:19–24 (Damsky); *see also* Ex. D-1 at 65 (Doc. 73-1).

76. Damsky told a classmate, Osiris Ramos, that he should feel free to share the paper with any interested parties. Trial Tr. 61:8–62:5 (Damsky); Ex. D-16 at 250 (Doc. 73-16).

77. Damsky met with Assistant Dean Janice Shaw in January 2025 in her office. Trial Tr. 62:14–63:3 (Damsky).

78. They discussed a town hall meeting that Dean McAlister had held that month before the meeting. Trial Tr. 63:4–7 (Damsky).

79. Damsky had heard about what other students said at the town hall before he met with Dean Shaw. Trial Tr. 63:8–10 (Damsky).

80. On June 28, 2025, Damsky tweeted about the student conduct or disciplinary process at UF involving him. Trial Tr. 63:11–19 (Damsky); Ex. D-16 at 276 (Doc. 73-16).

81. Damsky posted in part: "This process was meant to punish and silence me but that has backfired. Many more people than I have ever hoped to reach have been exposed to the arguments I present in my paper. Most gratifyingly, these arguments have been often well received, even in quarters that are not inclined toward being sympathetic to nationalist theory." Trial Tr. 63:20–64:2 (Damsky); Ex. D-16 at 276 (Doc. 73-16).

19

82.    Damsky's post concluded "I have not been silenced. Both my resolve and my ideas have been amplified, and I will never be silent until there is no further need to speak." Trial Tr. 64:3–7 (Damsky); Ex. D-16 at 276 (Doc. 73-16).

83.    Damsky tweeted on August 15, 2025, that the U.S. military should use lethal force against Israel if the Palestinians can't do the job themselves. Trial Tr. 64:8–25 (Damsky); Ex. D-16 at 281 (Doc. 73-16).

84.    Damsky tweeted on December 14, 2025, that "Jews know why they are hated." Trial Tr. 65:1–6 (Damsky); Ex. D-16 at 289 (Doc. 73-16). Damsky tweeted that in reference to the shooting of Jews celebrating Hanukkah on Bondi Beach in Australia. Trial Tr. 65:7–24 (Damsky). *See also* Ex. D-16 at 128:9–129:17 (Doc. 73-16) (Damsky Dep. testimony).

85.    Damsky tweeted on November 20, 2025, that the mass internment of Jews in North America may be required to destroy the "Jewish gangster entity." Trial Tr. 65:25–66:17 (Damsky); Ex. D-16 at 286 (Doc. 73-16). *See also* Ex. D-16 at 124:5–125:11 (Doc. 73-16) (Damsky Dep. testimony). "Jewish gangster entity" is a term Damsky uses for Israel. Trial Tr. 64:19–21 (Damsky); Ex. D-16 at 108:9–11 (Doc. 73-16) (Damsky Dep. testimony).

86.    Damsky tweeted on January 2, 2026, that "Jews are hated by Whites and non-whites because of the evil that Jews do." Ex. D-16 at 294 (Doc. 73-16); Trial Tr. 66:18–67:5 (Damsky).

20

87. Damsky tweeted on March 4, 2026, that "Jews certainly do not have to tell you how evil they are but they very often do." Trial Tr. 67:7–13 (Damsky); Ex. D-20 at 3 (Doc. 80-1).

88. Damsky regards himself as a white nationalist. Trial Tr. 67:20–22 (Damsky). *See also* Ex. D-16 at 25:19–26:2 (Doc. 73-16) (Damsky Dep. testimony) ("Q." [D]o you regard yourself as a white nationalist? A.: I think that's fair to say, yes.").

89. Damsky believes it is reasonably fair to call him an antisemite. Trial Tr. 67:23–25 (Damsky). *See also* Ex. D-16 at 83:11–12, 109:11–110:11 (Doc. 73-16) (Damsky Dep. testimony) ("I have what people could reasonably understand as broadly anti-Semitic views," "I oppose organized Jewry. If that's what it means to be an anti-Semite, then I 100 percent fit the definition").

90. Damsky believes it is fair and justified to hate Jews. Trial Tr. 68:1–5 (Damsky). *See also* Ex. D-16 at 129:18–131:9, 141:8–142:2 (Doc. 73-16) (Damsky Dep. testimony).

91. Damsky told a *New York Times* reporter that it obviously wouldn't be manifestly wrong to call him a Nazi. Trial Tr. 68:8–13 (Damsky). *See also* Ex. D-16 at 82:6–83:15 (Doc. 73-16) (Damsky Dep. testimony); Ex. D-16 at 254 (Damsky Dep. Ex. 8, *New York Times* article).

92.    Damsky admires Adolph Hitler. Trial Tr. 68:14–16 (Damsky). *See also* Ex. D-16 at 119:19–120:20 (Doc. 73-16) (Damsky Dep. testimony) ("[I]n general, I think there's a lot to admire about Hitler.").

93.    Damsky is a Holocaust denier. Trial Tr. 68:17–19 (Damsky). He doesn't believe that millions of Jews were intentionally killed by Nazi Germany during World War II. *Id.* at 68:20–23. *See also* Ex. D-16 at 120:8–14, 150:6–24 (Doc. 73-16) (Damsky Dep. testimony) ("So I'm what is commonly referred to as a 'Holocaust denier,'" "I generally don't believe that it happened").

94.    Damsky believes that the October 7, 2023 attacks in Israel by Hamas were justified. Trial Tr. 68:24–69:4 (Damsky). He believes that the October 7 attacks should be celebrated. *Id.* at 69:5–8. *See also* Ex. D-16 at 50:21–52:1, 114:9–115:13 (Doc. 73-16) (Damsky Dep. testimony) ("Q.: So is it fair for me to take that as a yes, you do think 10/7 should be celebrated? A. Yeah[.]").

95.    Damsky believes, in relation to his expulsion from UF, that Jews and their collaborators have persecuted him. Trial Tr. 69:9–12 (Damsky). He testified: "Yeah, I think that's why we're here." *Id.* at 69:12.

96.    Damsky testified that he doesn't know if UF Law would be a better institution if it had no Jewish law students. Trial Tr. 69:13–70:13 (Damsky) (quoting Ex. D-16 at 68:17–24 (Doc. 73-16) (Damsky Dep. testimony)); *accord* Ex. D-16 at 68:17–70:2 (Doc. 73-16) (Damsky Dep. testimony); *see also* Ex. D-16 at 68:8–12

(Doc. 73-16) (Damsky Dep. testimony) ("Q. Do you think the world would be a better place if there were no Jews in it? A. Well, yes, I think the world would be a better place if the identity known as Judaism ceased to exist.").

## IV.    *De Bene Esse* **Testimony of UF Law Interim Dean Merritt McAlister**

97.    Merritt McAlister, the Interim Dean of UF's Levin College of Law, Doc. 103-1 at 9:7–11, provided testimony for the bench trial in a video recorded deposition *de bene esse*. *See* Docs. 103-1 (transcript), 103-1 (Defs.' Dep. Exs.), and 103-2 (Pl.'s Dep. Exs.). (The Court was also provided a copy of the video on a flash drive at the start of trial.)

98.    Dean McAlister testified about the "very aggressive encounter" that Damsky had with UF Law staff member Andrea Cormier in August 2023 when he was a 1L. Doc. 103-1 at 12:9–13:23.

99.    Dean McAlister prepared a report of incidents involving Damsky to initiate the student conduct process. Doc. 103-1 at 16:2–22; *see* Doc. 103-2 at 7–9[6] (Dep. Ex. 3). Her report described Damsky's encounter with Cormier. The report states "we've been made aware of at least one very angry encounter that the student had with a staff member last year, where the student screamed profanity." Doc. 103-2 at 7 (Dep. Ex. 3 at DEF_000524); Doc. 103-1 at 16:23–17:8.

---

[6] Because Doc. 103-2 contains McAlister's Deposition Exhibit Nos. 1–17, page citations use the blue ECF filing line pagination with the deposition exhibit number in a parenthetical.

100.    Dean McAlister also prepared for the student conduct hearing a timeline of events describing the issues relating to Damsky that she dealt with while Interim Dean at the law school. Doc. 103-1 at 17:9–23; *see* Doc. 103-2 at 10–19 (Dep. Ex. 4).

101.    Under the heading "August 28, 2023," Dean McAlister wrote that "A first-year student, later identified as Preston Damsky, had a violent/angry and disruptive encounter with a staff person, Andrea Cormier, when Ms. Cormier did not open a locked door for Mr. Damsky. Mr. Damsky demanded that Ms. Cormier 'Let [him] in the fucking door.' And Mr. Damsky later approached Ms. Cormier and yelled at her: 'I told you I was a fucking student. What did you think I was fucking doing here?'" Doc. 103-2 at 10 (Dep. Ex. 4 at DEF_000529); Doc. 103-1 at 18:2–15.

102.    In September 2023, there was a controversy about comments Damsky made in a GroupMe chat. Doc. 103-1 at 18:23–19:20. Damsky had commented:

> The United States lost 19.3 million White faces on net over the past decade, which I am sure fills this man [the poster to whom he was responding] with nothing but joy, so why on earth should White people care at all about his criticism of our demographic share in any institution? An even better question is: why should we feel anything but pure contempt for him and anyone else who expresses and shares such naked hatred for us?

Doc. 103-2 at 10 (Dep. Ex. 4 at DEF_000529); Doc. 103-1 at 20:1–13.

24

103.  McAlister testified that "we got a lot of complaints about this" from students. Doc. 103-1 at 20:14–20. Deposition Exhibit 5 is an example of one of the complaints about Damsky's GroupMe comments. *Id.* at 21:17–18; Doc. 103-2 at 20 (Dep. Ex. 5).

104.  Dean McAlister was aware of this complaint in September 2023; the complaint was forwarded to her on September 22, 2023. Doc. 103-1 at 21:18–21; Doc. 103-2 at 20 (Dep. Ex. 5).

105.  Dean McAlister met with some students individually about the GroupMe controversy and also had multiple meetings with representatives of the Student Bar Association and the Black Law Students Association. Doc. 103-1 at 21:22–22:4.

106.  In the Fall of 2024, when Damsky was a 2L, a controversy arose over a draft of a seminar paper Damsky had written. Doc. 103-1 at 23:8–16.

107.  The paper was titled "American Restoration: An Article V Proposal" and was submitted for a seminar called "Constitutional Change." Doc. 103-2 at 21–23 (Dep. Ex. 6); Doc. 103-1 at 23:25–24:6.

108.  Dean McAlister testified: "I received this paper from many different people. It … circulated widely within the community. I received it from faculty, from students." Doc. 103-1 at 24:21–24.

109. She testified that "people in particular were very concerned by a call to violence at the end of the paper. There's … a paragraph that's very unusual for an academic paper that is a call for vengeance, … for violence against to sort of restore white America." Doc. 103-1 at 25:1–6.

110. She testified that the paper was "a call to arms for those who want to preserve the nation as a … white nation. And a number of students felt very concerned about that language, and raised serious questions with the law school about it." Doc. 103-1 at 25:13–17.

111. The concluding paragraph of the paper stated in part:

> Similarly, we should feel no shame about feeling attached to those with whom we share a common racial origin. The founding generations of Americans were also no strangers to fighting, killing, and dying on behalf of their rights and sovereignty. The hour is late, but we are not yet so outnumbered and so neutered that we cannot seize back what is rightfully ours. This land, America, our due inheritance, is worth the struggle.

Doc. 103-2 at 23 (Ex. 6 at DEF_000617); Doc. 103-1 at 25:7–12, 25:18–25.

112. Dean McAlister testified that "the class process was to discuss drafts and so they were circulated internally. I think students were very alarmed. Some students in the class were very alarmed by that – especially that final paragraph and started circulating it." Doc. 103-1 at 26:15–20. "Mr. Damsky was someone that, because of the prior incident with the GroupMe chat and other things, a lot of folks were very aware of him and I think as soon as this paragraph was read folks started

26

circulating it as … an escalation in the rhetoric he was using around white nationalism and racial identity, and … a call to violence[.]" *Id.* at 26:21–27:4. "[S]o as a result the paper started spreading so students outside of the class sent it to others, sent it to faculty, and that … it got on my radar pretty quickly." *Id.* at 27:4–7.

113.    In response to the controversy, Dean McAlister met with students who were upset or concerned about the paper. Doc. 103-1 at 27:8–11. She had several meetings, including with members of the Black Law Students Association and students in Damsky's 2L class. *Id.* at 27:12–18. "They were very concerned that this was an escalation of language compared to what … had happened in his first year, and in particular … the violent rhetoric, the violent language, … the call to arms." *Id.* at 27:19–23.

114.    Dean McAlister testified: "I remember distinctly a meeting I had … one of the students [im]pressed on me that … I may not fully appreciate what … violent rhetoric like this might mean for students … – that I had not grown up in a time of gun violence and gun threats, and … sort of impressing on me to take very seriously the language in this paper as a warning sign and sort of helping to understand why the community was so upset and afraid once this paper started circulating[.]" Doc. 103-1 at 27:24–28:12. That was "sort of the tenor of those conversations." *Id.* at 28:12–13.

115.   On October 30, 2024, Dean Shaw forwarded to Dean McAlister an email she had received that same day from law student Cooper Whisnant with the subject line "Concerns regarding the safety of fellow students." Doc. 103-2 at 24 (Dep. Ex. 7); *see* Doc. 103-1 at 28:19–29:7.

116.   Whisnant wrote in his email:

I understand that the attached paper written by Preston Terry has already been brought to the attention of administration. During our seminar meeting this afternoon, Preston stated that the final paragraph of the paper was meant to incite racial violence. I believe that this suggests a real risk to the safety of my non-white classmates, and is beyond the scope of permissible speech allowed by the University. *For clarity, my recollection of the exact working is that I asked Preston "Was the last paragraph of your paper intended to be a call for contemporary extralegal violence" to which he responded "Yes".* I believe that other classmates who were present are willing to recount their memory of the exchange, please let me know if that would be of use to administration and I will reach out to them.

Doc. 103-2 at 24 (Dep. Ex. 7) (emphasis added); Doc. 103-1 at 29:8–30:9.

117.   In the Spring of 2025, there was a controversy over a second seminar paper written by Damsky. Doc. 103-1 at 31:23–32:1.

118.   The paper was called "National Constitutionalism" and was written for a seminar on originalism taught in the Fall of 2024 "but ended up getting circulated … the next semester in the spring." Doc. 103-1 at 32:7–14; Doc. 103-2 at 25–28 (Dep. Ex. 8).

119.   Dean McAlister testified that "once the paper was shared, it similarly caused a lot of concern." Doc. 103-1 at 32:23-24. "[T]his paper has similar themes

to the one we just discussed. I think in particular … there's additional sort of … violent calls, in particular a call I think for if judges do not act to restore … white America, that … I guess Justitia's scales would turn into her gruesome slashing sword." *Id.* at 33:2–8.

120.   The final paragraph of Damsky's "National Constitutionalism" paper stated:

> The Supreme Court and inferior federal courts have the power to arrest the dispossession of White America. All they must do is substitute bad landmark precedent for good landmark precedent. Failure to do so is not judicial humility, but, at best, judicial surrender in the face of a terrible crime. At worse, it is complicity in that crime. The People cannot be expected to meekly swallow this demographic assault on their sovereignty. If the People are not granted relief from the government—which includes the judiciary—then, if they are to survive as masters in the land of their ancestors, they must exercise "their revolutionary right to dismember or overthrow" the government. And that will be a process which no deskbound jurist can gleefully look forward to; for it will be a controversy decided not by the careful balance of Justitia's scales, but by the gruesome slashing of her sword.

Doc. 103-2 at 27–28 (Dep. Ex. 8 at DEF__000584–85) (footnote omitted).

121.   Students complained about the rhetoric in the paper and the fact that it won a book award. Doc. 103-1 at 33:25–34:4.

122.   In the wake of the seminar papers controversies, other law students were monitoring Damsky's social media account. Doc. 103-1 at 35:18–21. "Mr. Damsky was on a lot of students' radar for all of these different incidents that had … gotten widespread attention within the community[.]" *Id.* at 35:21–24. *See also*

29

Ex. D-18 at 274:9–13, 282:21–24 (Doc. 73-18) (Damsky UOB Hrg. testimony confirming he knew for over a year that a student was monitoring and screen-shotting his social media posts); Trial Tr. 46:18–47:2 (Damsky) (same).

123.   On November 8, 2024, Dean McAlister received an email that embedded some of Damsky's social media posts from 2024. Doc. 103-1 at 36:16–37:5; Ex. D-13 (Doc. 73-13); Doc. 103-2 at 30–31 (Dep. Ex. 10). The email she received forwarded an email from then-law student Scott Jurkowski whose email embedded Damsky's posts. Doc. 103-1 at 37:6–17; Ex. D-13 (Doc. 73-13); Doc. 103-2 at 30–31 (Dep. Ex. 10).

124.   Damsky's posts used extreme rhetoric about death row inmates, black Americans, and "non-white immigrants." Doc. 103-1 at 37:18–39:3; Ex. D-13 (Doc. 73-13); Doc. 103-2 at 30–31 (Dep. Ex. 10).

125.   Dean McAlister received posts by Damsky from Jurkowski and would check Damsky's social media account periodically. Doc. 103-1 at 39:2–14.

126.   Damsky was reported to UF's Threat Assessment Team in 2023 and thereafter. Doc. 103-1 at 39:15–42:8.

127.   Dean McAlister held a Town Hall meeting in January 2025; Damsky was a topic of conversation at that meeting. Doc. 103-1 at 42:9–43:2. "There were multiple comments about Mr. Damsky at the Town Hall." *Id.* at 43:1–2.

128.   One "line of feedback or questions or concerns was really about campus safety and worries about Mr. Damsky in particular. I remember … a student very clearly indicated that she was afraid of him and that she … scanned the exit doors, like if she was in a room where he was, she would make sure she knew where the doors were to exit a room, which … I interpreted as meaning that she was worried that he might engage in violence himself and that she was nervous about that and wanted to be prepared in the way that one would in a[n] … active shooter situation." Doc. 103-1 at 43:18–44:5.

129.   "[A]nother student … expressed sort of reluctance to take classes with him … and not wanting to … have to deal with … the risk that she felt in being around him." Doc. 103-1 at 44:6–11. The student commented that if they learned Mr. Damsky had enrolled in a class they were enrolled in, they would drop the class. *Id.* at 44:15–21.

130.   After the Town Hall, Dean McAlister asked UF Law Dean of Students Janice Shaw to meet with Damsky, and Shaw did so. Doc. 103-1 at 44:22–46:17. Damsky "knew why he was being called in and … was already aware of what had been said at the Town Hall." *Id.* at 46:23–25.

131.   Dean McAlister's initial reaction to Damsky's Post of March 21, 2025 was that it was "a direct call for violence against a community, against the Jewish community[.]" Doc. 103-1 at 47:21–25, 48:7–9. "[I]t immediately felt like a much

clearer direct escalation in the violent threats that he had started making." *Id.* at 48:2–4.

132.   Law student Scott Jurkowski showed her the Post on March 28, at one of Dean McAlister's Coffee and Donuts with the Dean events. Doc. 103-1 at 48:10–49:8.

133.   Jurkowski, who is Jewish, Doc. 103-1 at 47:25–48:1, "was very upset," *id.* at 49:11. "It felt like he was on the verge of tears. He was emotional like a little shaking, nervous. Mr. Damsky was actually in the room at the time." *Id.* at 49:13–17.

134.   Jurkowski "was very emotional. He says, … I'm Jewish and … he wants me dead." Doc. 103-1 at 49:22–24. "That was sort of … the urgency, and he felt like this is different, like this is a threat." *Id.* at 49:24–50:1. McAlister testified: "I could feel his intensity in that moment, and I was very concerned." *Id.* at 50:10–11.

135.   McAlister testified that "we have one of the largest, I think if not the largest Jewish communities at the University of Florida of any school in the country, and the law school's … similarly a very large, very active Jewish community." Doc. 103-1 at 50:15–19.

136.    On March 28, after the Coffee and Donuts event, Jurkowski emailed Damsky's March 21 Post to Dean McAlister. Doc. 103-1 at 51:23–52:25; Ex. D-22 (Doc. 102-1); Doc. 103-2 at 32–33 (Dep. Ex. 10A).

137.    After Jurkowski shared Damsky's Twitter handle, Dean McAlister looked at Damsky's prior posts, including one from March 7, 2025, that stated "the Jews are the common enemy of humanity." Doc. 103-1 at 96:8–18; *see also* Ex. D-16 at 269 (Doc. 73-16) (Damsky's Mar. 7, 2025 Post).

138.    Upon seeing Damsky's March 21 Post, Dean McAlister's reaction was "It felt scary … Mr. Jurkowski read it as a threat and I thought that was a reasonable sort of reaction[.]" Doc. 103-1 at 53:23–25. The post felt "violent and extreme and scary." *Id.* at 55:9. "[W]e are still living in a time in our world where … there's violence against [the] Jewish community and … it was just a little scary to see that someone within our community was … at least advocating similar violence within our community." *Id.* at 55:10–16.

139.    Dean McAlister thought that UF law students, including or especially Jewish UF law students, could view Damsky's post as a threat of violence. Doc. 103-1 at 56:2–5. "[I]t was a very direct statement that Jews must be abolished by any means necessary." *Id.* at 56:7–9.

140.    Dean McAlister believed that Damsky's post promoted illegal violence. Doc. 103-1 at 56:13–17. She "was always worried about how other people might

read what he said and … might be sort of emboldened … by what he was saying … to carry out some kind of heinous act." *Id.* at 56:20–57:1.

141. After she was alerted to Damsky's March 21 Post, Dean McAlister immediately sent it to Dean Shaw and began a process of reporting it to the student conduct office. Doc. 103-1 at 57:2–19.

142. Dean McAlister also advised the Faculty Council about the post. Doc. 103-1 at 57:24–59:14. She testified: "Everyone on the Faculty Council was deeply concerned about the tweets, I think. … And the Jewish faculty members in particular were I think very alarmed about … the tweets." *Id.* at 59:19–60:2.

143. By April 1, news of Damsky's March 21 Post had "spread very widely" on campus and was well known among students, faculty members, and staff. Doc. 103-1 at 60:3–61:11.

144. Dean McAlister met with the faculty advisor to the Jewish Law Students Association, Professor Kaufman on April 1, 2025. Doc. 103-1 at 61:12–15, 61:23. He told her that "students were reaching out to him expressing their fear, worried about coming to campus, … worried about … being in a space with [Damsky] … [T]here was a sense that … this really crossed the line." *Id.* at 62:9–18.

34

145. Students submitted complaints about Damsky's March 21 Post through the online portal. Doc. 103-1 at 62:19–63:10; Doc. 103-2 at 34–36 (Dep. Ex. 11). Dean McAlister saw all the complaints on or about April 1. Doc. 103-1 at 63:11–17.

146. The student complaints included the following: "Preston Terry's comments on Twitter (X) are insane and not protected speech under the First Amendment. I understand that this Law school (rightly) prides itself on its protection of speech, but this [is] disgusting. The pattern and tenor makes me worry for my Jewish friends and family." Doc. 103-2 at 34 (Dep. Ex. 11 at DEF_000644). "I am extremely concerned for the safety of my classmates and students following an X post from student Preston Terry. His post said 'Jews must be abolished by any means necessary.' Antisemitism has no place on UF Law's campus, and my classmates do not deserve to go about their days in fear because of his words. I fear for when his words will be actions." *Id.* at 35 (Dep. Ex. 11 at DEF_000646). "This attached tweet is from a current student at UF Law who is actively engaging in hate speech. This should b[y] no means be tolerated. This is a danger to the safety of students at this school and must be addressed IMMEDIATELY." *Id.* at 36 (Dep. Ex. 11 at DEF_000648). *See also* Doc. 103-1 at 63:18–64:18. These comments were consistent with other complaints that Dean McAlister heard from students orally and in writing. *Id.* at 64:19–22.

147.   The student complaints indicate that the complaining students viewed Damsky's post as being aimed at the UF community. Doc. 103-1 at 66:6–67:11.

148.   With respect to Damsky's exchange with Professor Lidsky, Dean McAlister "was sort of surprised that he didn't just say of course not, … I don't want you or your family murdered." Doc. 103-1 at 68:8–14. She also "thought it was sort of odd that he like starts talking about genocide." *Id.* at 68:21–22. To her "that confirmed that … if there was any ambiguity about what does it mean for Jews must be abolished by any means necessary, when he starts talking about genocide … that's hard not to conclude that he's at least meaning that he is advocating for genocide." *Id.* at 68:24–69:4.

149.   Damsky was "given a few different opportunities within the law school to disclaim an intent of violence and … he doesn't take it." Doc. 103-1 at 70:6–8.

150.   When asked if Damsky's reply to Professor Lidsky can be seen as a threat of violence directed toward the UF community, Dean McAlister testified that "Professor Lidsky is … very known within the community[.] I think … it's pretty clear now that we were paying attention." Doc. 103-1 at 69:11–14.

151.   Dean McAlister testified that if students "were generally afraid for themselves or the Jewish community before [Damsky's reply to Lidsky's post], now they were very afraid specifically for Professor Lidsky and worried that she had made herself a target." Doc. 103-1 at 72:3–7.

36

152.   A student submitted a complaint on April 1 about Damsky's reply to Lidsky. Doc. 103-1 at 72:8–22. The student wrote in part that Damsky "responded to the Professor, directly calling for the slaughter of her and her family due to her religion." Doc. 103-2 at 37 (Dep. Ex. 12); Doc. 103-1 at 72:23–73:3.

153.   Another student sent an email to Professor Lidsky on April 3, 2025, that stated: "Hi Professor Lidsky, I am sorry for what is happening right now. I am a little concerned about your safety with the comments that were made by a student. I just became aware of what happened. I wanted to know if class Monday and maybe Wednesday too would be moved to a different room or online for safety? Do you know what safety precautions the school is taking? I am also Jewish and the comments made are very scary. I hope you stay safe." Doc. 103-2 at 38 (Dep. Ex. 13); Doc. 103-1 at 73:17–74:3. The email was forwarded to Dean McAlister on April 3. Doc. 103-2 at 38 (Dep. Ex. 13); Doc. 103-1 at 73:14–16.

154.   Students and faculty reacted to Damsky's Posts before he was trespassed from campus. Doc. 103-1 at 74:4–25.

155.   Dean McAlister testified that she and Professor Lidsky "talked about this a fair amount that week" and that she didn't think Lidsky "was that worried" initially but that "she became more alarmed … over the course of the week, given … the volume of student concern and the number of students who had expressed worries to her about him, she became much more alarmed." Doc. 103-1 at 75:14–

76:8. Dean McAlister testified that Lidsky "confided in me that she and her husband were sleeping with a baseball bat … out of fear." *Id.* at 76:9–11.

156.   On April 4, 2025, Dean Shaw forwarded to Dean McAlister an email sent to Dean Shaw earlier that day by Richard Blake, Director for Student Life at UF; Blake's email discussed "concerns Professor Lidsky shared with me in the hallway a few moments ago." Doc. 103-2 at 39 (Dep. Ex. 14); Doc. 103-1 at 76:17–77:22. Blake's email summarizes some of the disruptive effects of the Damsky Posts. Doc. 103-1 at 77:8–12.

157.   Professor Lidsky cancelled class on the Monday following the Damsky Posts. Doc. 103-1 at 77:23–78:1. Dean McAlister testified that Lidsky is "a very senior faculty member" and that she "took [Lidsky's] concerns very seriously." *Id.* at 78:2–7.

158.   In April 2024, Dean McAlister had meetings and conversations about both the original Post and the exchange with Lidsky. Doc. 103-1 at 78:17–20. "[I]t was sort of all anyone was talking about for certainly that period … of time." *Id.* at 78:20–22.

159.   Jewish faculty members and faculty members of color expressed to Dean McAlister a fear for their safety or the safety of their families. Doc. 103-1 at 78:23–79:1. Faculty members were also concerned about the security of their

38

classrooms; one required police presence in her classroom because Damsky was a student in the class and they were having a Jewish guest speaker. *Id.* at 79:2–12.

160.  On April 4, 2025, Professor Lea Johnston sent an email to Dean McAlister stating: "Last night one of my mental health law students expressed concern about her safety in my mental health law class today, given that Preston was in that class. Also, two judges will be visiting that class today, one of whom may be Jewish. … Would it be possible to have a security person nearby?" Ex. D-2 at 5 (Doc. 73-2); Doc. 103-2 at 40 (Dep. Ex. 15); Doc. 103-1 at 79:18–80:6.

161.  A staff member asked to have her name removed from the UF Law website because she had a Jewish surname and the request was granted; she also took her own placard down from her door. Doc. 103-1 at 80:7–12, 21–23. The staff member asked for permission to work from home, but her request was denied because her role did not allow that; she quit shortly thereafter. *Id.* at 80:12–20. Dean McAlister attributes the staff member's requests to her fearful reaction to the Damsky posts. *Id.* at 80:24–81:1.

162.  In the wake of the Damsky Posts, Dean McAlister increased police patrols on campus, had a uniformed officer attend a Jewish Law Students Association event, and had cameras relocated to the law school to monitor the campus. Doc. 103-1 at 81:2–21. "[W]e increased police patrols that week in response to … the tweets and … the threat." *Id.* at 83:4–6. The law school still has "an

increased police presence" on campus and "regularly ha[s] a police vehicle that's parked at the law school." *Id.* at 81:20–24.

163.   An email from the UF Police Department confirmed that an officer would be posted outside of the entrance to the Jewish Law Students Association event on April 2. Doc. 103-2 at 41 (Dep. Ex. 16); Doc. 103-1 at 84:3–14.

164.   Dean McAlister "ultimately decided to move to swipe card access for the buildings" on campus. Doc. 103-1 at 85:12–13. "[T]here was a[n] intensity and a fear that was very specific to [the Jewish] community" and younger students "were very worried … we still had a Parkland survivor who was on our campus[.]" *Id.* at 85:18–24.

165.   On Friday, April 4, 2025, Dean McAlister sent an email to all UF Law students informing them of the change to swipe-card only access for all building entrances. Doc. 103-2 at 42–43 (Dep. Ex. 17); Doc. 103-1 at 87:5–88:2.

166.   Dean McAlister testified that "this is … probably the single most consuming series of events of the three years I've been a dean. I think … probably five or six weeks, a month … of just solid time spent on this if you added it all up." Doc. 103-1 at 89:16–20. [I]t's been … enormously time consuming and very [] difficult." *Id.* at 89:25–90:1. [I]t's been a very consuming series of events." *Id.* at 90:9–10.

## V.    Trial Testimony of Assistant Dean Janice Shaw

167.    At the times relevant to this case, Shaw was the Senior Assistant Dean for Students and Senior Advisor to the Dean (August 2024 to May 2026) and the Assistant Dean for Career and Professional Development (June 2020 to August 2024). Trial Tr. 107:16–20 (Shaw).

168.    Shaw has worked very closely with Dean McAlister since May 2023, meeting at least weekly, with at times almost daily interaction. Trial Tr. 108:1–7 (Shaw).

169.    Shaw's first interaction with Damsky was at the time of his aggressive outburst with a member of her staff, Andrea Cormier, in August 2023. Shaw recounted that interaction, as described in a contemporaneous report prepared by Cormier that she provided to Shaw. Trial Tr. 109:3–111:3 (Shaw); *see* Ex. D-4 (Doc. 73-4) (Cormier Decl. & Aug. 28, 2023 Statement). *See also* Ex. D-18 at 73:3–25 (Doc. 73-18) (Shaw UOB Hrg. testimony).

170.    On August 28, 2023, Cormier was stationed at a check-in table at the law school. While she was at the table, the law school doors unexpectedly locked. A student whom Cormier did not know (later determined to be Damsky) approached the locked doors and aggressively banged on and kicked them, while yelling to "[l]et [him] in the f***ing door." Ex. D-4 at 5–6 (Doc. 73-4); Trial Tr. 109:3–110:1 (Shaw);

41

*id.* at 111:8–16 (Shaw). *See also* Ex. D-18 at 73:3–15, 73:24–25 (Doc. 73-18) (Shaw UOB Hrg. testimony).

171.   This outburst scared Cormier. She told the unknown person claiming to be a student to use his student ID, but he continued his aggressive antics. Cormier did not let him in. Ex. D-4 at 5 (Doc. 73-4) (Cormier statement); Trial Tr. 110:1–9 (Shaw). *See also* Ex. D-18 at 73:12–18 (Doc. 73-18) (Shaw UOB Hrg. testimony). Cormier's fear of Damsky remained, and she eventually left the law school. Trial Tr. 163:18–20 (Shaw); Ex. D-4, ¶ 1 (Doc. 73-4) (Cormier Decl.). *See also* Ex. D-18 at 73:23–24 (Doc. 73-18) (Shaw UOB Hrg. testimony).

172.   Later, the same person found Cormier in her office and aggressively asked her why she didn't let him in the f***ing door. It was later determined that the person was Damsky. He was in his first few weeks of school at UF Law. Trial Tr. 110:10–15 (Shaw); *id.* at 112:3–5, 112:18–22; Ex. D-4 at 6 (Doc. 73-4) (Cormier statement). *See also* Ex. D-18 at 73:19–25 (Doc. 73-18) (Shaw UOB Hrg. testimony).

173.   Shaw found this incident with a student's "inability to control [his] anger" to be "[h]ighly unusual" and "alarming" with no similar incident in her experience while working at law schools since 2009. Trial Tr. 112:8–15 (Shaw).

174.   Shaw reported this incident to Dean McAlister. Trial Tr. 110:18–23 (Shaw).

175.    Shaw is responsible for the initial handling of complaints regarding law student conduct. She received numerous written complaints about Damsky from the time she began her role in Fall 2024 and continuing into Spring 2025. Trial Tr. 113:11–114:1 (Shaw); *id.* 170:16–171:12, 171:21–173:18. *See also* Ex. D-18 at 74:2–11 (Doc. 73-18) (Shaw UOB Hrg. testimony). Some written complaints came from named students. Ex. D-1 (Doc. 73-1) at 96 (DEF_590), 150–51 (DEF_644–45), 152–53 (DEF_646–47), 156–57 (DEF_650–51), 158–60 (DEF_652–54), 164–65 (DEF_658–59), 176–77 (DEF_667–68). Other written complaints came from anonymous students. *Id.* at 154–55 (DEF_648–49), 161 (DEF_655), 162–63 (DEF_656–57), 167–68 (DEF_661–62), 169–75 (DEF_663–66). The record shows that complaints about Damsky began before her tenure began. *See, e.g.,* Trial Tr. 181:6–13 (Lidsky discussing 2023 GroupMe Chat issue involving Damsky).

176.    As an administrator, these complaints informed Shaw's impression of Damsky. She found that Damsky's classmates were "very concerned" about his comments and behavior and the safety of the law school and themselves. She determined that "it was really starting to become a major problem for the daily functioning of the law school." Trial Tr. 114:24–115:6 (Shaw).

177.    The complaints about Damsky were very different from any other complaints Shaw has received in her role at UF. These complaints were "about emotions, about fear, about the inability to focus on studies." Trial Tr. 115:9–23

43

(Shaw). Typical complaints involve daily law school functions such as rooms that need to be cleaned or empty vending machines. *Id.*

178.    Shaw attended the Town Hall meeting held by Dean McAlister in January 2025. Trial Tr. 115:24–116:3 (Shaw). Damsky was a significant topic of conversation at that meeting. *Id.* at 116:12–14; Ex. D-18 at 74:20 (Doc. 73-18) (Shaw UOB Hrg. testimony). The students' concerns were initially just about Damsky's Book Award, but then "the conversation veered to their concern about him as a person," and to "their safety." Trial Tr. at 116:15–23 (Shaw). Student comments included scanning the room looking for exits when he was present and dropping or avoiding classes he was signed up for and that "they just did not feel safe around … or near" Damsky. *Id.* at 116:23–117:7; Ex. D-18 at 74:16–19 (Doc. 73-18) (Shaw UOB Hrg. testimony). The students' comments were based on their personal experience with Damsky, not just his seminar papers in isolation. Trial Tr. 117:8–20 (Shaw). These comments were not about being offended; the students "perceived [Damsky] to be dangerous and that perhaps he could do something dangerous." *Id.* at 117:23–118:4.

179.    Shaw noted that offense in a law school environment is "pretty common," but she has not experienced "a general sense of fear that someone's a threat" or "dangerous." Trial Tr. 118:5–19 (Shaw).

180. Following the Town Hall meeting, Shaw met with Damsky at Dean McAlister's request. Ex. D-18 at 74:21–22 (Doc. 73-18) (Shaw UOB Hrg. testimony). Shaw had previously met with Damsky once before in November 2024. The first meeting was to build a rapport with Damsky since no one in the administration had a relationship with him and he was still looking for a 2L summer job. Trial Tr. 118:20–120:1 (Shaw); Ex. D-18 at 93:15–20 (Doc. 73-18) (Shaw UOB Hrg. testimony).

181. In the January 2025 meeting, Shaw informed Damsky about the Town Hall meeting and that his classmates were afraid of him. Trial Tr. 120:2–25 (Shaw); Ex. D-18 at 74:23–75:12, 96:16–97:11 (Doc. 73-18) (Shaw UOB Hrg. testimony). Damsky told Shaw that he was aware of the Town Hall meeting and what was said and that he was aware that his comments would offend and hurt people, including Shaw. Trial Tr. 120:2–25 (Shaw); Ex. D-18 at 75:8–9, 79:2–24 (Shaw UOB Hrg. testimony).

182. Shaw noticed a tonal shift between her November 2024 and January 2025 meetings with Damsky, due to a greater awareness of Damsky's call for violence and greater fear starting to grip the students, even beyond Damsky's classes. Trial Tr. 118:5–9 (Shaw).

183. In February 2025, Shaw was notified that the FBI had called about Damsky because someone had reported him as a threat or danger to someone in the

community. Throughout her career, Shaw has never had a similar experience with the FBI calling about a student. Trial Tr. 124:19–125:6 (Shaw). *See also* Ex. D-18 at 75:13–17 (Doc. 73-18) (Shaw UOB Hrg. testimony).

184.   The next month, Shaw was made aware of Damsky's Post through the student complaint portal. Trial Tr. 125:14–19 (Shaw). Based on Shaw's experience, the students on campus generally knew about Damsky's Post and were paying attention to them. The students were "very, very, very scared, very concerned." *Id.* at 125:20–126:18. About 20 students came to Dean McAlister's weekly Coffee with the Dean event to discuss their safety. *Id.* at 126:18–127:1.

185.   Shaw also testified that students cried in her office while telling Shaw about having survived the Parkland shooting, being Jewish and afraid to attend Jewish law student events and meetings or be on campus. Trial Tr. 127:2–24 (Shaw); Ex. D-18 at 76:1–20 (Doc. 73-18) (Shaw UOB Hrg. testimony). Another student told Shaw she no longer studied on campus because she needed noise cancelling headphones to focus and no longer felt safe being unable to hear her surroundings. Trial Tr. 127:25–128:11 (Shaw); Ex. D-18 at 76:21–77:2 (Doc. 73-18) (Shaw UOB Hrg. testimony).

186.   Students who were in Professor Lidsky's classes expressed their concerns to Shaw about Lidsky, saying that she was extremely jumpy during class and kept checking the door every time it opened. Trial Tr. 130:3–11 (Shaw);

46

Ex. D-18 at 76:2–6 (Doc. 73-18) (Shaw UOB Hrg. testimony). One of Shaw's staff members, Richard Blake, reported that Lidsky was afraid and wanted the campus doors locked earlier than normal. Trial Tr. 132:24–133:17 (Shaw); Ex. D-2 at 12 (DEF_5266) (Doc. 73-2).

187. Shaw's experience in her administrative role and with the students gave her the impression that the students' concerns were taking into account the totality of their experience with Damsky. Some of the students were aware of the incidents with Cormier and the GroupMe chat. Trial Tr. 128:12–129:5 (Shaw). She did not get the impression that the concerns she heard were limited to Damsky's Posts, rather than the totality of interactions the students had with Damsky in the small UF law school environment. *Id.* at 129:9–17.

188. Shaw received roughly the same number of oral complaints and written complaints. Trial Tr. 134:5–8 (Shaw).

189. Shaw has never received complaints about other social media posts during her career. Trial Tr. 129:18–21 (Shaw).

190. It was clear to Shaw that the number of affected students exceeded the number who actually complained to her, with some students being too afraid to make public complaints. Trial Tr. 137:12–138:1 (Shaw). *See also* Ex. D-18 at 89:17–90:19 (Doc. 73-18) (Shaw UOB Hrg. testimony).

191.   Shaw testified that from her perspective as the dean of students, Damsky's Posts caused the students to be very focused and hypervigilant for their safety, to the point that they could not properly focus on their exams, which interfered with the education that is the key focus of UF Law as an academic institution. Trial Tr. 135:6–19 (Shaw); Ex. D-18 at 77:4–18 (Doc. 73-18) (Shaw UOB Hrg. testimony). This stress was above and beyond the normal exam pressure that already exists around that time. Trial Tr. 136:13–23 (Shaw).

192.   Shaw testified that the disruption occurred near the exam period and distracted the students, which could compromise their grades, their performance, and ultimately their job and career outcomes. Trial Tr. 135:22–136:10 (Shaw).

193.   In Spring 2025, close to 70% of the complaints Shaw received were about Damsky. At that time, the bulk of Shaw's time was spent on issues related to Damsky, including students' concerns and complaints, and the safety of the law school. Shaw had never had an issue dominate so much of her attention before. Trial Tr. 138:2–139:1 (Shaw); Ex. D-18 at 77:19–22 (Doc. 73-18) (Shaw UOB Hrg. testimony).

194.   The need to focus on Damsky prevented Shaw from implementing ideas she had to improve campus life as part of her administrative role, including building the Office of Student Life and getting hot food on campus, and engaging

48

with student organizations regarding alumni. In fact, engaging alumni at all became difficult due to the Damsky situation. Trial Tr. 139:23–140:16 (Shaw).

195.    Shaw summed up the disruption on campus as a lot of anxiety, fear, hypervigilance, and concern by the students for their safety, disrupting law school functions. Trial Tr. 140:19–141:5 (Shaw). *See also* Ex. D-18 at 77:4–18 (Doc. 73-18) (Shaw UOB Hrg. testimony).

196.    Student attendance on campus outside of class, including events, went down and fewer students studied on campus. Classes that Damsky enrolled in experienced low enrollment. Trial Tr. 153:16–24 (Shaw).

197.    Shaw testified that the more she learned about Damsky, the more fearful she became. Trial Tr. 173:24–174:2 (Shaw). She testified about the Cormier, GroupMe, and seminar paper incidents to help the Court understand her state of mind and that of the administrators. Damsky showed a pattern of unpredictable behavior with little remorse or concern for other people, increasing in intensity and frequency, which led the administration to question whether his words would become actions. *Id.* at 174:13–175:12.

198.    When Shaw read Damsky's Posts, she was aware of the Cormier incident, the GroupMe posts, the seminar papers, and student complaints. Those circumstances influenced her interpretation of Damsky's posts. Trial Tr. 175:18–176:17 (Shaw). Based on Shaw's experience with how information travels through

49

the law school and the presence of students at those same incidents, students were aware of many of these same incidents as well. *Id.* at 176:18–177:22.

## VI.    Trial Testimony of Professor Lyrissa Lidsky

199.    Lyrissa Lidsky, a professor at UF Law, Trial Tr. 179:14–16 (Lidsky), testified at the bench trial. *Id.* at 179:12–211:6.

200.    Lidsky was aware in the Fall of 2023 of the controversy involving Damsky's post in the group chat. Trial Tr. 181:6–13 (Lidsky). She recalled that his post touted white replacement theory. *Id.* at 181:10–11, 181:16–23. *See also* Ex. D-18 at 108:5–7 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

201.    Lidsky was also aware in the Fall of 2024 of the controversy over Damsky's draft seminar paper "American Restoration" for Professor Marshfield's class. Trial Tr. 182:15–183:11, 183:14–23 (Lidsky). *See* Ex. D-1 at 97–123 (Doc. 73-1). Lidsky read the last two pages of the paper as "using rhetoric that might be interpreted as violent, but it's a very abstract call to violence." Trial Tr. 184:11–13 (Lidsky); Ex. D-1 at 122–23 (Doc. 73-1).

202.    Lidsky was also aware of Damsky's other seminar paper, one written for a class taught by Judge Badalamenti. Trial Tr. 184:18–185:6 (Lidsky); *see* Ex. D-1 at 65–91 (Doc. 73-1). This paper "also ended on a call to violence[.]" Trial Tr. 185:15–17 (Lidsky); *see* Ex. D-1 at 90–91 (Doc. 73-1). She heard about this paper in connection with the controversy over it. Trial Tr. 185:22–24 (Lidsky).

203.   Lidsky learned about Damsky's Post of March 21, 2025, on April 1, 2025, at the same time she learned that "Damsky's offer of a job with the state attorney's office had been rescinded based on the post." Trial Tr. at 186:11–14 (Lidsky). *See also* Ex. D-18 at 101:13–15 (Doc. 73-18) (Lidsky UOB Hrg. testimony) ("I knew he had already lost a job as a prosecutor based on his extreme views"); *id.* at 104:25–105:5 ("In order to be admitted to have a law license, one has to pass a character and fitness examination and one of the rules of conduct for Florida lawyers says you cannot engage in conduct prejudicial to the administration of justice, which is why he lost his job at the prosecutor's office.").

204.   On April 1, Lidsky sent an email to her colleagues on the UF Law faculty about Damsky's post. Trial Tr. 186:18–25 (Lidsky); *id.* at 227:8–14 (Kaufman); Ex. D-2 at 3 (Doc. 73-2). The email stated in part that "We want to bring this genocidal antisemitic statement to your attention. He has posted additional antisemitic messages." Trial Tr. 187:7–9 (Lidsky); Ex. D-2 at 3 (Doc. 73-2). *See also* Ex. D-18 at 100:10–17 (Doc. 73-18) (Lidsky UOB Hrg. testimony); Trial Tr. 227:15–230:25 (Kaufman).

205.   The email also stated that "Other faculty and students have expressed concern about other hateful statements made by [Damsky], and there seems to be a pattern of escalation." Trial Tr. 187:10–12 (Lidsky); *id.* at 227:25–228:8 (Kaufman); Ex. D-2 at 3 (Doc. 73-2).

206.   Lidsky sent the email on behalf of herself and Professors Zachary Kaufman and Stacey Steinberg. Trial Tr. 187:13–16 (Lidsky); Ex. D-2 at 3 (Doc. 73-2). *See also* Trial Tr. 227:8–229:9 (Kaufman).

207.   At the time of the three professors' email, the October 7, 2023 attacks by Hamas in Israel was on their mind. Trial Tr. 187:24–188:2 (Lidsky). Lidsky testified: "It absolutely was. So all three of us are Jewish, and all three of us … since the events of October 7th have seen a surge of not only violent rhetoric against Jews, but actual violence against Jews around the country," including "the bombing of the governor's mansion in Pennsylvania, the shooting of Jews in Colorado. So we're very concerned about this rising tide of antisemitism in society and where it's leading." *Id.* at 188:2–9. Her knowledge of those events affected how she viewed Damsky's post. *Id.* at 188:12–14. *See also* Ex. D-18 at 100:14–22 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

208.   Lidsky commented on the reference in her email to Damsky's post as a "genocidal antisemitic statement," explaining that "this language about by any means necessary, suggests to me a Holocaust-type final solution. It basically says if violence is necessary, then so be it. Jews need to be completely abolished or eliminated." Trial Tr. 188:15–21 (Lidsky).

209.   On April 1, Lidsky knew Damsky had posted additional antisemitic messages. Trial Tr. 189:14–18 (Lidsky); *id.* at 189:24–190:6. She saw an earlier

tweet that said "Jews are the common enemy of humanity." *Id.* at 190:3–6; Ex. D-16 at 269 (Doc. 73-16) (Damsky's Mar. 7, 2025 Post).

210.  Lidsky had "read down through his stream of posts on Twitter." Trial Tr. 188:22–23 (Lidsky). "He had used the same language for immigrants saying they needed to be abolished by any means necessary, and had also called the Jews the common enemy of humanity. So I read it [the March 21 post] as a call to violence against Jews." *Id.* at 188:23–189:1. *See also* Ex. D-18 at 112:24–113:13 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

211.  Lidsky also viewed Damsky's Post as promoting violence against Jews. Trial Tr. 189:11–13 (Lidsky). "I thought that was the result he desired." *Id.* at 188:13. *See also* Ex. D-18 at 113:12–13 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

212.  In reply to her April 1 email, Judge Badalamenti sent Lidsky an email about Damsky's post that stated "This is absolutely awful in so many ways. It's indefensible and horrifying. I've tried to counsel him, Lyrissa. He just doesn't get it. This is unacceptable. It isn't even close." Ex. D-2 at 4 (Doc. 73-2); Trial Tr. 191:6–20 (Lidsky).

213.  On April 1, sometime after sending the email to her faculty colleagues, Lidsky responded to Damsky's original Post. Trial Tr. 192:4–11, 192:21–25 (Lidsky); Ex. D-7 at 5 (Doc. 73-7). She posted: "Are you saying you would murder me and my family? Is that your position?" Ex. D-7 at 5 (Doc. 73-7); Trial Tr. 193:11–

53

12 (Lidsky). *See also* Ex. D-18 at 100:22–101:4 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

214.    Lidsky posted this because she "really wanted to know what his intent was." Trial Tr. 193:13–15 (Lidsky). She also wanted to engage in counter-speech. *Id.* at 193:20–21. *See also* Ex. D-18 at 100:22–25 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

215.    Lidsky wanted to give Damsky an opportunity "to step back from the edge" and to "give him a chance to say that's not what I'm saying." Trial Tr. 193:25–194:6 (Lidsky); Ex. D-18 at 101:5–9, 111:3–10 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

216.    Lidsky "interpreted his reply as a deflection, an attempt to perpetuate ambiguity about what it is he's actually saying and whether he does have the intent to do violence[.]" Trial Tr. 194:11–13 (Lidsky); Ex. D-18 at 101:9–12, 111:3–10 (Doc. 73-18) (Lidsky UOB Hrg. testimony). *See* Ex. D-7 at 5 (Doc. 73-7).

217.    Damsky answered Lidsky's questions with questions of his own. Trial Tr. 194:17–19 (Lidsky); *id.* at 24:12–18, 50:22–51:22 (Damsky); *see* Ex. D-7 at 5 (Doc. 73-7). And he didn't say no. Trial Tr. 194:20–21 (Lidsky).

218.    Lidsky had learned on April 1 that Damsky had lost a summer internship with the local prosecutor's office, and she testified that that knowledge made his post "more surprising to me because I thought maybe this is a person who

has nothing left to lose, and they care more about perpetuating this ideology than they care about their future career, about being a lawyer, about even … getting through law school. Like they're willing to jeopardize everything that you would think a person would want in order to further this … violent rhetoric." Trial Tr. 195:8–20 (Lidsky); Ex. D-18 at 101:13–21 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

219.  Lidsky believed that Damsky's posts were directed toward the UF Law community. Trial Tr. 196:22–24 (Lidsky). She testified "I did because he doesn't have a huge Twitter following … and I felt like he hadn't gotten enough attention and so he's striking out looking for another way to get attention, but primarily within the law school community because … he knows they're reading it, they're paying attention. That's how I came to learn of it." *Id.* at 196:24–197:7.

220.  Damsky's original post and Lidsky's exchange with him on April 1 circulated around the law school. Trial Tr. 197:9–11 (Lidsky). "By the next day it seemed as if everyone was aware of it." *Id.* at 197:11–12.

221.  At least 15 students came to Lidsky's office and expressed fear for her safety and concern that Damsky might come to the law school armed. Trial Tr. 197:13–17 (Lidsky); Ex. D-18 at 101:22–25 (Doc. 73-18) (Lidsky UOB Hrg. testimony). She "actually spent the next few days … trying to quell the fear among the students. … I had students – they brought me an orchid and a card. Students

asked me did I think he had a gun. They asked me what do I think the law school is doing to protect our safety, do they think they're doing enough. They asked me if I thought I was safe. I mean, they asked me if I had a gun. You know, they were really anxious about their safety and mine." *Id.* at 197:17–24. *See also* Ex. D-18 at 102:1–2 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

222.    Lidsky testified: "I had students saying they were afraid to come to my class. I had a student ask if I would move the class to a different room. Maybe move the class online." Trial Tr. 198:2–4 (Lidsky); Ex. D-18 at 102:2–3 (Doc. 73-18) (Lidsky UOB Hrg. testimony); Ex. D-2 at 12 (Doc. 73-2) (Robinson email to Lidsky dated April 3, 2025). "After my con law class the next day, there were a couple [of] students that stayed after, and one of the women was sobbing so hard because she was so afraid, she said I don't know if I can … keep coming to class. So it was … quite disruptive." Trial Tr. 198:5–9 (Lidsky); Ex. D-18 at 103:1–4 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

223.    Lidsky testified: "I was not afraid when I did this. I wasn't even afraid … the night after. But when all these people [who] actually knew him came and basically … brought home to me [that] I don't know who I'm dealing with and they do and they're afraid, it did make me afraid[.]" Trial Tr. 198:10–14 (Lidsky). *See also* Ex. D-18 at 102:7–16, 111:9–19 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

224.   In her constitutional law class, her head would pivot to the door every time someone came in late. Trial Tr. 205:6–9 (Lidsky). She testified: "I tried not to make it very visible, but it really was an abrupt pivot … any time you hear that door click." *Id.* at 205:9–11. *See also* Ex. D-18 at 102:24–25 (Doc. 73-18) (Lidsky UOB Hrg. testimony); Ex. D-2 at 13 (Blake email to Shaw dated April 4, 2025).

225.   A parent of a student called Lidsky "and she wanted to know if the school was doing enough to protect her daughter." Trial Tr. 200:1–2 (Lidsky); Ex. D-18 at 102:3–7 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

226.   Rabbi Meyer at Chabad, a Jewish organization in Gainesville, called Lidsky "before Shabbat on Friday night [April 4] started and offered to send security to my house that night, and he offered to help me get a weapon if I wanted one." Trial Tr. 200:8–15 (Lidsky). *See also* Ex. D-18 at 103:13–25 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

227.   Lidsky shared what she was hearing from students and perceiving about their emotional state to Dean McAlister. Trial Tr. 200:16–19 (Lidsky). Lidsky made the Dean aware of what she (Lidsky) knew about student reactions. *Id.* at 201:5–7.

228.   One of Lidsky's students at the time, Chase Robinson, emailed her and stated: "Hi Professor Lidsky, I am sorry for what is happening right now. I am a little concerned about your safety with the comments that were made by a student[.] I just became aware of what happened. I wanted to know if class Monday and maybe

Wednesday too would be moved to a different room or online for safety? Do you know what security precautions the school is taking? I am also Jewish and the comments made are very scary. I hope you stay safe." Ex. D-2 at 12 (Doc. 73-2) (email from Robinson to Lidsky dated April 3, 2025); *see also* Trial Tr. at 201:8–20 (Lidsky).

229. Other students expressed similar concerns to Lidsky orally, face-to-face. Trial Tr. 201:21–23 (Lidsky).

230. Lidsky canceled one of her classes in early April. Trial Tr. 202:14–16 (Lidsky). She testified: "I just was so distracted from having to deal with all this, … trying to calm other people and so exhausted emotionally from having to try to be like it's going to be okay to everyone, that I just felt like I couldn't go in and do what I needed to do well." *Id.* at 202:19–23. *See also* Ex. D-18 at 104:2–11 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

231. Lidsky took down her X account in the wake of the Damsky posts. Trial Tr. 203:5–7 (Lidsky); Ex. D-18 at 102:16 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

232. Lidsky and her husband began sleeping with a baseball bat after the Damsky Post. Trial Tr. 203:15–22 (Lidsky). They kept a bat with them for a couple of weeks. *Id.* at 204:3–4. *See also* Ex. D-18 at 102:20–22 (Doc. 73-18) (Lidsky UOB Hrg. testimony).

233.   On April 4, 2025, Richard Blake, the Director for Student Life at UF, sent Assistant Dean Janice Shaw an email recounting a conversation he just had with Lidsky. *See* Ex. D-2 at 13 (Doc. 73-2). Blake wrote:

"Sharing a review of concerns Professor Lidsky shared with me in the hallway a few moments ago.

- Asking if consideration could be made to secure the campus doors earlier than exam period to quell the fear amongst students

- Professor Lidsky was not fearful at first, but is now slightly fearful after the amount of students who have reached out to her to share their concerns and interactions with student

- She has found herself looking back at her classroom door during teaching anytime someone enters or leaves the room. She emphasized that this is something she has never done before

- Students have asked her to change her classroom time/location from the published record because they fear she is a target

I shared with Professor Lidsky that I would share this information with you."

234.   Lidsky testified that the statements in Blake's email were true. Trial Tr. 204:14–205:18 (Lidsky).

## VII.   Trial Testimony of Professor Zachary Kaufman

235.   Zachary Kaufman, a professor at UF Law, Trial Tr. 222:2–3 (Kaufman), testified at the bench trial. *Id.* at 221:19–266:10.

236.   Kaufman teaches several classes, including a course on genocide, his leading area of specialty. Trial Tr. 222:5–9 (Kaufman); *id.* at 224:14–16. He is also the faculty advisor to the Jewish Law Students Association, which requires him to

frequently meet and communicate with Jewish students where he discusses their concerns and issues facing Jewish law students. *Id.* at 222:15–223:5.

237.    Kaufman previously served in the U.S. Supreme Court, the U.S. Court of Appeals for the First Circuit, the U.S. Senate Foreign Relations Committee, and the U.S. Departments of State and Justice. He also served at three international criminal tribunals: The International Criminal Court, and the U.N. International Criminal Tribunals for Rwanda and the former Yugoslavia. Trial Tr. 223:20–224:4 (Kaufman). Kaufman's work on those international tribunals involved work relating to genocide. *Id.* at 224:10–13.

238.    Damsky has not taken a class from Kaufman, and Kaufman had not met Damsky prior to Damsky's student conduct hearing in July 2025. Trial Tr. 225:3–10 (Kaufman). *See also* Ex. D-18 at 161:7–11 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

239.    Students brought Damsky's Post to Kaufman's attention shortly after Damsky posted it. The Post "shocked and terrified" Kaufman. Trial Tr. 225:11–23 (Kaufman). Kaufman interpreted the Post as a call for genocidal violence against Jews, including Jews in the UF Law community and their families. *Id.* at 225:24–226:3.

240.    Kaufman summarized his testimony as follows. Damsky's Post sowed terror and anguish among Jewish members of the UF Law school, including students,

staff, and faculty. Non-Jewish members experienced similar feelings who were afraid of what Damsky might do to their Jewish friends and colleagues and of becoming collateral damage if Damsky or someone he might incite were to attack Jews at UF Law school. In short, Damsky "massively disrupted the academic community." Trial Tr. 226:4–16 (Kaufman). *See also* Ex. D-18 at 162:8–20 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

241. At trial, Kaufman reiterated his testimony from the student conduct hearing that Damsky "has disrespected, discriminated against, intimidated, harassed, and threatened Jews in and beyond" the UF Law community. Trial Tr. 226:17–24 (Kaufman). *See also* Ex. D-18 at 161:21–162:5, 170:15–19 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

242. On April 1, 2025, Kaufman and two other law school professors, Lyrissa Lidsky and Stacey Steinberg, sent an email to the rest of the law school faculty regarding Damsky. Trial Tr. 227:8–14 (Kaufman); Ex. D-2 at 3 (Doc. 73-2).

243. Kaufman, Lidsky, and Steinberg decided to send that email because they thought it was crucial that their faculty colleagues knew about Damsky's Post and because they were concerned about how "outrageous, shocking, and terrifying" it was. Trial Tr. 227:15–24 (Kaufman). They wanted their colleagues to be aware of the antisemitic violence that Damsky was demanding, that Damsky's rhetoric was intensifying in a pattern of escalation, and to know what exactly Damsky had said

61

in case they were asked by concerned students. *Id.* at 227:25–228:8. *See also* Trial Tr. 186:18–188:21 (Lidsky).

244.   Kaufman interpreted Damsky's statement to be genocidal and antisemitic because it specifically targets Jews and calls for the killing of members of a group with intent to partially or totally destroy that group. Trial Tr. 228:9–229:3 (Kaufman). And his statement that the abolition of Jews be done "by any means necessary" would include killing. *Id.* at 228:24–229:3.

245.   When Kaufman sent that email, he was aware of additional messages from Damsky, including antisemitic tropes and conspiracy theories, including a post two weeks before his March 21 Post that declared that "the Jews are the common enemy of humanity." Trial Tr. 229:7–25 (Kaufman); *see* Ex. D-16 at 269 (Doc. 73-16) (Damsky's Mar. 7, 2025 Post: "The Jews are the common enemy of humanity."). *See also* Ex. D-18 at 162:6–8 (Doc. 73-18) (Kaufman UOB Hrg. testimony). These posts are pervasive and continue to the present day. Trial Tr. 230:1–25 (Kaufman).

246.   Kaufman advised Dean McAlister about the Posts he had seen and brought them to her attention. Trial Tr. 231:1–4 (Kaufman). Kaufman also told her what he had been told by students, faculty, and staff in his role as faculty advisor to the Jewish Law Students Association. He conveyed their grave concerns about Damsky's Posts and that he might be planning to follow through on his demands by perpetrating a violent attack on Jews in the UF Law community. *Id.* at 231:8–22.

247.  Following the email, several of Kaufman's colleagues reached out to him to express their outrage and solidarity, but also to express their belief that preventative and security measures needed to be taken to guard against what Damsky might be planning and inciting. Trial Tr. 231:23–232:15 (Kaufman).

248.  Kaufman noted that in response to Professor Lidsky's question posed in her April 1 post—*see* Ex. D-7 at 5 (Doc. 73-7)—Damsky could have said "no," but didn't, and could have clarified his intent, but didn't. For those reasons, Kaufman, and many other readers, took that to mean Damsky may very well follow through with his Posts. Trial Tr. 232:16–233:7 (Kaufman). *See also* Ex. D-18 at 162:21–163:2 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

249.  Kaufman testified that Jewish members of the UF Law community were aware of Damsky's Post, which had spread like wildfire. He knew this because many Jewish and non-Jewish students sought him out to discuss Damsky's Post and other concerning conduct and whether the law school could take preventive measures to protect against an attack by Damsky. Trial Tr. 233:16–25 (Kaufman). *See also* Ex. D-18 at 163:2–164:15 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

250.  Kaufman testified that Damsky's Post caused Jews and non-Jews at the law school "immense fear and anxiety." Both feared that they or their friends, classmates, or faculty members or staff would be caught up in an attack. This fear and anxiety "massively disrupted the law school community" and was the only thing

people were talking about. Trial Tr. 234:1–14 (Kaufman). *See also* Ex. D-18 at 164:15–165:22 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

251. Kaufman testified that Damsky's Posts interrupted and greatly diminished students' ability to study and learn. Students felt that they could not go to classes Damsky was in, and they did everything they could to avoid him, including leaving campus, and avoiding classes and events. Trial Tr. 234:15–235:4, 235:10–14 (Kaufman). Students even began carrying weapons like pepper spray to defend themselves and escorting each other to and from their cars in the parking lot. *Id.* at 235:7–9. These disruptions occurred in the weeks leading up to finals. *Id.* at 235:15–22. Students told Kaufman that they were unable to concentrate properly on their studying and exams and that they felt their employment opportunities resultantly suffered. *Id.* at 236:3–25. *See also* Ex. D-18 at 164:15–165:22, 168:14–169:4 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

252. Security measures at the law school also increased, with additional police patrols and event security and swipe-card access to the building. New security cameras were also installed. Trial Tr. 237:4–17 (Kaufman). *See also* Ex. D-2 at 15–16 (Doc. 73-2); *see also* Ex. D-18 at 167:17–168:13 (Doc. 73-18) (Kaufman UOB Hrg. testimony). Kaufman was personally affected when he requested a uniformed police presence at his April 2nd public lecture on Israel that was sponsored by various Jewish student groups. Kaufman has given hundreds of public lectures but

64

never before requested security. Trial Tr. 237:18–240:12 (Kaufman). *See also* Ex. D-2 at 11 (Doc. 73-2). *See also* Ex. D-18 at 165:23–167:25 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

253. On April 4, 2025, Dean McAlister announced that Damsky had been trespassed from campus. *See* Ex. D-2 at 15–16 (Doc. 73-2). Kaufman testified that the campus was in turmoil before that announcement was made. Trial Tr. 240:13–18 (Kaufman). *See also* Ex. D-18 at 168:1–13 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

254. On April 7, 2025, the law school went to swipe-card access. Trial Tr. 240:19–25 (Kaufman). *See* Ex. D-2 at 15–16 (Doc. 73-2); *see also* Ex. D-18 at 168:15–13 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

255. Kaufman was aware that at least three UF Law students were students at Marjory Stoneman Douglas High School in 2018 when the deadliest high school shooting occurred. The students told him that their experiences there shaped their perception of the threat posed by Damsky. Trial Tr. 241:1–13 (Kaufman). *See also* Ex. D-18 at 163:21–25, 164:10–15 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

256. Kaufman also noted that attacks on Jews, including more recent attacks which have surged since October 7, 2023, shaped the perception of people reading Damsky's Posts. And Kaufman noted that Damsky himself has invoked the October

7th attacks. Trial Tr. 241:14–242:18 (Kaufman). *See also* Ex. D-18 at 163:25–164:15 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

257. Kaufman reiterated his testimony at the student conduct hearing that UF Law's Jewish students, staff, and faculty are all too familiar with mass murder driven by antisemitism and other hate and that such events and trends were important contextual factors driving community members' interpretations of Damsky's disturbing behavior and rhetoric. Trial Tr. 242:21–243:8 (Kaufman). *See also* Ex. D-18 at 163:9–164:15 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

258. Kaufman testified that antisemitic attacks in the United States and abroad in recent years have made Jewish students, staff, and faculty all too familiar with mass murder driven by the type of antisemitism that Damsky states and promotes. He also testified that Jews have been conditioned to be prepared for such attacks through repeated training and active shooter drills. For these reasons, these events and trends are important contextual factors that drove community members' interpretation of Damsky's disturbing behavior and rhetoric and led them to take his Posts very seriously. Trial Tr. 243:10–23 (Kaufman). *See also* Ex. D-18 at 163:9–164:15 (Doc. 73-18) (Kaufman UOB Hrg. testimony).

259. Kaufman testified that Damsky has disrespected, discriminated against, intimidated, harassed, and threatened Jews in and beyond the UF Law community, causing massive, widespread disruption, anxiety, and fear about prospective violence

that Damsky might perpetrate or incite. Trial Tr. 243:24–244:12 (Kaufman). *See also* Ex. D-18 at 161:21–162:5, 164:13–165:22, 168:14–169:4, 170:15–19 (Doc. 73-18) (Kaufman UOB Hrg. testimony). Kaufman broke Damsky's Posts and conduct into those categories because only some of them are in themselves threatening, although he emphasized that taken as a whole, Damsky's rhetoric shows a repeated violent tinge and efforts to dehumanize Jews, which informs the context in which his Posts were understood. Trial Tr. 245:16–247:6.

260.    Kaufman testified that, apart from concern that Damsky himself might take violent action, he was also concerned that his Posts were inciting and promoting violence and might encourage other people to seek to abolish Jews by any means necessary. Trial Tr. 247:13–248:7 (Kaufman). *See, e.g.,* Ex. D-18 at 169:5–24 (Doc. 73-18) (Kaufman UOB Hrg. testimony: "In his posts on X, Mr. Damsky spewing anti-Semitic tropes and conspiracy theories refers to Jews as, for example, 'A tribe of rootless, child-killing vice merchants who are "Evil", "Socially destructive", "Psychopathic", "Murderers", and "A rogue gang of butchers" who, "Love war, peace as their foe", who engage in "Bad faith, nepotistic scheming", who, even if American citizens[,] are more loyal to Israel than the United States, who "Occupy" the whole American government, who control and manipulate the media, who seek[] "Supremacy and domination", who harm[] "Whites in the United States", and whom word governments must[] "Subdue."'")).

67

261.   Kaufman considered the March 21 Post alone to be a threat, bolstered by the context of Damsky's other posts, and the April 1 exchange with Lidsky ten days later to be a separate event where Damsky had a lot of time to think and reconsider but instead doubled down. Trial Tr. 249:15–24 (Kaufman). Kaufman noted that Damsky "did not say no, Professor Lidsky, I do not intend to murder you and your family." *Id.* at 264:11–19. Kaufman interpreted that to mean that Damsky intentionally was espousing a violent approach to Jews, including a prominent Jewish professor at the law school and her family. *Id.* at 264:20–265:5.

## VIII.  Trial Testimony of Dean Chris Summerlin

262.   Chris Summerlin, the Dean of Students at UF, Trial Tr. 88:20–22 (Summerlin), testified at the bench trial. *Id.* at 78:22–104:5. Summerlin is the Defendant in this action.

263.   Summerlin was involved in the student conduct process involving Damsky. Trial Tr. 89:20–22 (Summerlin). The UOB made recommendations to Summerlin. Ex. D-3 (Doc. 73-3); Trial Tr. 90:15–17 (Summerlin). The UOB recommended that Damsky be found responsible for disruption and harassment and recommended expulsion as a sanction. Ex. D-3 (Doc. 73-3); Trial Tr. 90:18–91:9 (Summerlin).

264.   Summerlin's role was to review the record before the UOB and the UOB's recommendations. Trial Tr. 91:10–15 (Summerlin) ("My role is to review

everything that they have seen, everything that they have been given in the case packet, and then to review their decision[.]"). *See also id.* at 80:4–6 (testifying that he reviewed all the information in the UOB's case packet).

265.   Summerlin upheld the UOB's recommendations in full and explained in writing his reasons for accepting the UOB's recommendations. Trial Tr. 91:16:24 (Summerlin); Ex. D-3 (Doc. 73-3) (UOB recommendations); Ex. D-5 at 18–21 (Doc. 73-5) (Summerlin August 8, 2025 letter upholding UOB's findings and proposed sanction). *See also* Trial Tr. 94:17–95:7 (Summerlin) (testifying that he reviewed Doc. 73-3 (Ex. D-3), "University Officials Board Hearing: Recommendations," the document in which the UOB found Damsky responsible for disruption and harassment and recommended expulsion); *id.* at 96:5–8 (testifying that Doc. 73-5 (Ex. D-5) is the August 8, 2025 letter he sent to Damsky upholding the UOB's findings and proposed sanction).

266.   Summerlin testified that Damsky was sanctioned for his social media posts but other matters discussed at the UOB hearing, such as the door incident and the seminar papers, provided context for the posts. Trial Tr. 92:9–21, 93:1–3 (Summerlin).

## IX.    Additional Findings on Disruption at UF Law Caused by Damsky's Posts

267.   Within a day of Damsky's exchange with Lidsky, UF Law received multiple complaints and expressions of fear and concern from students. Some

examples: "This is hate speech meant to in[cite] violence against a large population of the UF campus, including against professors." Ex. D-2 at 2 (DEF_000005) (Doc. 73-2). "No one feels safe on campus. … [H]e is advocating for the death of all Jews to a Jewish professor." Ex. D-1 at 47 (DEF_000541) (Doc. 73-1). "Because of [Damsky] I do not feel safe attending JLSA events or being by myself. ... I do not feel safe walking the halls at UF. … He explicitly called for my death openly[.]" *Id.* at 48 (DEF_000542). "I do not feel safe going to school while this person has access to our campus. This person's initial message and response to a UF Law Professor were direct threats.... Extremely concerned." *Id.* "UF Law has one of the largest Jewish communities at any law school in the country. … [T]he student's calls for violence have become more expressive and deeply concern me and others that this student may result to violence." *Id.* at 49 (DEF_000543). "I fear for when his words will be actions." *Id.* "I am a Jewish student who is an officer of the Jewish Law Students Association (the organization sponsoring this event) and I am afraid to go because I think this student may take violent action. … Jewish students are all terrified to walk around the school already because of him[.]" Ex. D-2 (DEF_004071) (Doc. 73-2).

268.   The Court finds that Damsky's Posts materially and substantially disrupted the operations and learning environment at UF Law and interfered with the rights of other students to pursue their legal education. Damsky's Posts sparked

70

widespread fear and alarm on campus and disrupted the operations and learning environment as final exams at the law school were approaching. Among other things, his Posts: caused some students and faculty members to stay away from campus out of fear for their safety; caused some students to skip or come late to class; made it difficult for students to concentrate on their studies with final exams approaching; caused some students not to register for classes that Damsky was taking; caused the student who discovered Damsky's Post and told the Dean about it to ask to take his finals in a locked room; led the law school to restrict access to buildings and to increase police patrols on campus and the use of security cameras, at a financial cost to the school; led the law school to pay for police to attend a Jewish Law Students Association event; caused Professor Lidsky to cancel a class and start sleeping with a baseball bat; caused a UF Law staff member with a Jewish surname to ask that her name and picture be removed from the UF Law website and later caused her to quit her job; and distracted the Dean of UF Law from her other duties by requiring her to spend upwards of 120 hours dealing with the fallout from Damsky's Posts and other issues related to him.

## X.  Findings Concerning Contextual Facts

269.  Damsky's Post was not the first time that Damsky's conduct had caused concern and commotion at UF Law.

270.   The Court finds that prior conduct by Damsky at UF Law as described herein provides context relevant to his Posts and is properly considered in this case.

271.   Simply put, context matters. Damsky's prior conduct is relevant when viewing his Posts.

272.   The Court finds that the testimony of Dean McAlister and Dean Shaw, the declaration of Andrea Cormier, and the document Ms. Cormier prepared concerning the incident involving Damsky's aggressive behavior toward Ms. Cormier are credible and have not been denied or rebutted by Plaintiff. ¶¶ 99–100, 102, 170–77, 188.

273.   The Court finds that Dean McAlister and Dean Shaw knew of the Cormier incident before they saw Damsky's Post and that they viewed his Posts in the context of that knowledge. ¶¶ 99–102, 170–77, 198–99.

274.   The Court finds that during the Fall of his 1L year Damsky made the comment in the 1L GroupMe Chat described above in Paragraph 103. *See* ¶ 72.

275.   The Court finds that Damsky put his White Nationalism on display when he wrote that "Why should we feel anything but pure contempt for him and anyone else who expresses and shares such naked hatred for us." ¶ 72.

276.   The Court finds that Damsky's comment in the 1L GroupMe Chat was seen by many students at UF Law. ¶¶ 43, 73, 103–04, 106, 113, 176, 188, 199, 201.

277.   The Court finds that during the Fall and Spring of his 2L year at UF Law, before he tweeted out on March 21, 2025, Damsky authored two seminar papers that included calls for race-based violence to preserve the United States as a white nation. ¶¶ 40, 42, 74–75, 110–14, 117, 120–21, 202–03.

278.   With respect to Damsky's first seminar paper, titled "American Restoration," Ex. D-16 at 178–205 (Doc. 73-16), the Court finds that Damsky at trial agreed that his paper stated that "white Americans may need to fight, kill, and die to take back what is rightfully theirs." Trial Tr. 57:3–8, 58:20–59:6 (Damsky); *see also* Ex. D-16 at 29:25–30:7 (Doc. 73-16) (Damsky Dep. testimony).

279.   The Court finds that Damsky shared a draft of the paper with other students in the seminar. Trial Tr. 58:4–7 (Damsky); Ex. D-16 at 33:15–21 (Doc. 73-16) (Damsky Dep. testimony).

280.   The Court finds that a fellow student in seminar, Cooper Whisnant, asked Damsky if the paper was meant to be a call for contemporary extralegal violence, and that Damsky said that it was. ¶¶ 75, 116–17.

281.   The Court finds that the student made a complaint to the law school sharing this information. ¶¶ 116–17.

282.   The Court finds that the seminar paper was circulated by students at the law school. ¶¶ 109, 111, 113–14, 116–17, 123.

283.    With respect to Damsky's second controversial seminar paper, titled "National Constitutionalism," the Court finds that Damsky agreed at trial that his paper indicated that if the Government, including judges, do not halt the dispossession of White America, they may face the gruesome slashing of Lady Justice's sword. ¶¶ 76, 121.

284.    The Court finds that Mr. Damsky told another student, Osiris Ramos, that he should feel free to share the paper with any interested parties. ¶ 77.

285.    The Court also finds that students learned about the paper because it won a Book Award and attracted attention and controversy for that reason. ¶¶ 122–23, 179.

286.    The Court finds that Dean McAlister, Professor Lidsky, and Professor Kaufman, and many students at UF Law, some of whom complained to the law school about Damsky's seminar papers, knew of the calls for violence in the seminar papers before they saw Damsky's Posts and that they viewed his Posts in the context of that knowledge. ¶¶ 123, 202–03.

287.    The Court finds that in January 2025 Damsky met with Dean Shaw and that she told him about the Town Hall meeting held earlier that month and what students had said about him at that meeting. ¶¶ 78–79, 131, 181–82.

288.    The Court finds that after they learned of the March 21 Post, but before student conduct proceedings had commenced, Dean McAlister, Professor Lidsky,

and Professor Kaufman became aware of Damsky's March 7, 2025 tweet that "The Jews are the common enemy of humanity." ¶¶ 28, 138, 210–11, 246.

289. The Court finds that Professor Kaufman referenced this March 7, 2025 tweet at the UOB hearing. ¶ 246.

290. The Court finds that, before he saw or replied to Professor Lidsky's tweet on April 1, Damsky knew that he had lost his summer internship at a state prosecutor's office because of his March 21 Post. ¶¶ 62–64.

291. The morning of April 1, Damsky received and read an email from the prosecutor revoking the offer to work in his office. ¶ 62.

292. The Court finds that Damsky's knowledge of this adverse consequence of his March 21 Post did not lead him to disclaim violence when he replied to Professor Lidsky's tweet. The knowledge that he had lost a job because of the Post did not lead Damsky to temper his words during his exchange with Lidsky later that day. ¶¶ 62–68. *See also* ¶¶ 204, 219.

293. The Court finds that testimony and other evidence about each of the foregoing contextual factors came in at the Student Conduct Hearing and was considered by the three members of the University Officials Board ("UOB"), the recommendations of which were accepted by Dean Chris Summerlin.

294.   The Court finds that two other contextual factors are relevant in this case regarding Damsky's Posts, and to the extent necessary takes judicial notice of them.

295.   First, antisemitism and violence against Jews have been on the rise, including in the United States, especially since the deadly attacks by Hamas on Jews in Israel on October 7, 2023. *See* ¶¶ 208, 257.

296.   To give just one recent international example, on December 14, 2025, two gunmen shot and killed 15 men, women, and children during a Hanukkah celebration on Bondi Beach in Sydney, Australia. *See generally* ¶¶ 258–59.

297.   Second, for many years in this country there have been horrific school shootings, of which the 2018 shooting at Marjory Stoneman Douglas High School in Parkland, Florida is but one example. *See* ¶ 256 (at least three UF Law students were students at this school at the time of the shooting).

298.   As the Eleventh Circuit observed in a 2007 case: "According to a popular encyclopedic website, in the eight years preceding the incident underlying the instant appeal, there had been 10 well-known, student-perpetrated shootings in schools, not including college campuses, located within the United States." *Boim v. Fulton Cnty. Sch. Dist.*, 393 U.S. 503, 983 (11th Cir. 2007). The Eleventh Circuit then went on to say: "This, of course, does not take into account numerous other school shootings that have occurred internationally and on college campuses, both

during the relevant time period and since then, most notably the Virginia Tech massacre, in which 32 people were murdered." *Id.* at 983 n.5.

299.   School shootings, including on college and university campuses, have continued in the years since *Boim*. On April 17, 2025, less than three weeks after Damsky's exchange with Lidsky, a shooter at Florida State University killed two people and injured six others.

300.   UF Law administrators and faculty were aware of these events. *See* ¶¶ 208, 256–59.

## XI.   Findings on Damsky's Wearing of a Pro-Palestinian T-Shirt

301.   UF did not discipline Damsky for wearing on campus a t-shirt with a pro-Palestinian message. *See* Trial Tr. 96:15–18 (Summerlin) ("Q.: Was your [expulsion] decision based in any part on the T-shirt that Mr. Damsky wore expressing a pro-Palestinian message? A.: No."); *id.* at 93:8–23 (interim suspension letter does not mention T-shirt); *id.* at 93:24–94:8 (suspension appeal denial letter does not mention T-shirt); *id.* at 94:9–16 (charge letter does not mention T-shirt); *id.* at 94:17–95:10 (UOB recommendation letter does not mention T-shirt); *id.* at 96:5–14 (expulsion letter does not mention T-shirt). *See also* Ex. D-5 at 5–6, 11–12, 14–16, 18–21 (Doc. 73-5); Ex. D-3 (Doc. 73-3). The UOB was instructed to presume that the phrase "From the river to the sea, Palestine will be free" is protected speech. Ex. D-18 at 11:16–21, 257:23–258:3 (Doc. 73-18) (statements of UOB Hrg.

Chairperson). Neither the UOB's recommendations nor Dean Summerlin's letter of August 8, 2025, explaining his acceptance of those recommendations mentions the t-shirt. *See* Ex. D-3 (Doc. 73-3); Ex. D-5 at 18–21 (Doc. 73-5); Trial Tr. 94:17–95:10, 96:5–14 (Summerlin).

## PROPOSED CONCLUSIONS OF LAW

302. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

303. In this case, Plaintiff Preston Damsky claims that his expulsion from UF violated the free speech clause of the First Amendment to the U.S. Constitution and 42 U.S.C. § 1983. Doc. 1 ¶¶ 54–63. This Court disagrees and rejects that claim.

304. The Court summarizes its conclusions of law as follows:

305. First, UF administrators, along with students, faculty, and staff, could and did reasonably interpret Damsky's Posts—his original post of March 21, 2025, together with his April 1, 2025, reply to Professor Lidsky—as threatening school violence at UF.

306. Second, Damsky's Posts materially and substantially disrupted the learning environment at UF Law and materially and substantially interfered with the right of students to obtain an education.

307. Third, Damsky's Posts were reasonably seen by UF administrators as promoting illegal activity—violence against Jews.

78

308.   For any of these reasons, and for all three of them, Damsky's Posts were not protected speech and could be regulated by UF consistent with the First Amendment. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969); *Morse v. Frederick*, 551 U.S. 393 (2007); *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978 (11th Cir. 2007).

309.   Accordingly, this Court concludes that, under *Tinker*, *Morse*, and *Boim*, UF's expulsion of Damsky based on his Posts and under its Student Conduct Code did not violate his First Amendment rights as a university student.

## XII.   Analysis Under *Tinker*

310.   Although students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," it has long been held that the First Amendment rights of students are "applied in light of the special characteristics of the school environment[.]" *Tinker*, 393 U.S. at 506.

311.   Under *Tinker*, the First Amendment does not protect student speech that "substantially interfere[s] with the work of the school or impinge upon the rights of other students." *Id*. at 509. In *Tinker* the Supreme Court stated: "[C]onduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id*. at 513.

312.    In *Healy v. James*, 408 U.S. 169 (1972), the Court applied *Tinker* to expressive activity by college students and explained that "[a]ssociational activities need not be tolerated where they infringe reasonable campus rules, interrupt class, or substantially interfere with the opportunity of other students to obtain an education." *Id*. at 189; *accord Widmar v. Vincent*, 454 U.S. 263, 277 (1981) ("[W]e affirm the continuing validity of cases that recognize a University's right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education." (citing *Healy*, 408 U.S. at 189)).

313.    This Court concludes that Damsky's Posts "substantially interfere[d] with the work of the school," "materially disrupt[ed] classwork," and "substantially interfere[d] with the opportunity of other students to obtain an education." *Tinker*, 393 U.S. at 509, 513; *Healy*, 408 U.S. at 189; *Widmar*, 454 U.S. at 277. UF students, administrators, faculty, and staff could—and did—reasonably interpret his Posts as threatening violence on the UF campus, which triggered student safety concerns and resulting turmoil at UF. "And the disruption in this case—credible fear of targeted violence—is one of the most severe disruptions imaginable." *Damsky v. Summerlin*, No. 25-14171, 2026 WL 75122, at *5 (11th Cir. Jan.  8, 2026) (motions panel).

**XIII. Preclusive Effect of UF's Findings That Damsky Was Responsible for "Disruptive Conduct" and "Harassment"**

314.    Because Damsky did not challenge in state court UF's administrative findings that he was responsible for "Disruptive Conduct" and "Harassment" under the Student Conduct Code, those undisturbed agency findings are entitled to preclusive effect in this Court.

315.    In actions under 42 U.S.C. § 1983, "federal courts must give [a state administrative] agency's factfinding the same preclusive effect to which it would be entitled in the State's courts," so long as the state agency was acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties had an adequate opportunity to litigate. *Univ. of Tenn. v. Elliott,* 478 U.S. 788, 799 (1986); *accord Travers v. Jones*, 323 F.3d 1294, 1296 (11th Cir. 2003) (per curiam).

316.    "The preclusive effect applies even where the agency's fact-finding is not reviewed by a state court." *Quinn v. Monroe County*, 330 F.3d 1320, 1329 (11th Cir. 2003) (citing *Elliott*, 478 U.S. at 797–99); *Thornquest v. King*, 82 F.3d 1001, 1004 (11th Cir. 1996) ("In § 1983 actions, federal courts must afford the same preclusive effect to unreviewed state administrative agency factfinding to which it would be entitled in the state's courts[.]").

317.    "Under Florida law, the doctrine of collateral estoppel (i.e., issue preclusion) bars the re-litigation of any issue that has been decided in another action and was essential to the prior adjudication." *Fla. Transp. Serv., Inc. v. Miami-Dade*

*County*, 757 F. Supp. 2d 1260, 1272 (S.D. Fla. 2010) (citing *M.C.G. v. Hillsborough Cnty. Sch. Bd.*, 927 So.2d 224, 226 (Fla. 2d DCA 2006)), *aff'd,* 703 F.3d 1230 (11th Cir. 2012). "It applies to administrative proceedings, and the lack of appellate review will not prevent giving a prior finding preclusive effect." *Id.* (citing *M.C.G.*, 927 So.2d at 226–27).

318. After the student conduct hearing, the UOB recommended that Damsky be found responsible for Disruptive Conduct and Harassment under the UF Student Conduct Code. Ex. D-3 (Doc. 73-3). Dean of Students Chris Summerlin, in his letter of August 8, 2025, accepted the UOB's recommendation as to both of the charges. *See* Ex. D-5 at 18–21 (Doc. 73-5).

319. Section 4.C of the Code defines "Disruptive Conduct" as "Conduct that is materially or substantially disruptive to the normal operations of the University, or that incites others to do so, in any of the following activities: teaching, learning, research, administrative functions, disciplinary proceedings, other University Activities whether on or off campus, and other authorized activities that take place on campus." Ex. D-15 at 16 (Doc. 73-15).

320. Section 4.K of the Code defines "Harassment" as "Threats, intimidation, Coercion, or any other conduct that places a Reasonable person in fear of physical harm, through words or actions, or objectively disrupts a person's daily activities, including education and employment." Ex. D-15 at 17 (Doc. 73-15).

321.   UF's findings that Damsky is responsible for Disruptive Conduct and for Harassment are entitled to preclusive effect under *Elliott* and Florida law. Damsky had an opportunity to challenge these findings in a Florida circuit court, *see* Fla. R. App. P. 9.190(3), but he elected to forego such review. Damsky had an adequate opportunity to litigate the disputed issues of fact. *See* Ex. D-5 at 23–26 (Doc. 73-5) (Oct. 9, 2025 letter from Heather White informing Damsky that an Appeal Panel had rejected Damsky's argument that his rights were violated in the hearing process); *id*. at 25 ("The Appeal Panel holds that none of the eighteen student rights outlined in UF Regulation 4.040 were violated in the hearing process in a manner which materially affected the outcome of the case."). Prior to the student conduct hearing, UF informed Damsky of his rights, and he acknowledged that he had read and understood all his rights. *See* Ex. D-1 at 22–23 (Doc. 73-1). Damsky's Complaint did not assert a claim that his due process rights were violated in the student conduct process. *See generally* Complaint (Doc. 1).

322.   In the student conduct process, UF was acting in a judicial capacity. *See* Ex. D-5 at 26 (Doc. 73-5) (informing Damsky that he "may seek judicial review of this final University decision pursuant to Florida Rule of Appellate Procedure 9.190, applicable to review of quasi-judicial decisions of an administrative body not subject to the Administrative Procedure Act").

## XIV.  Analysis Under *Boim*

323.   In *Boim* the Eleventh Circuit held that there "is no First Amendment right allowing a student to knowingly make comments, whether oral or written, that reasonably could be perceived as a threat of school violence, whether general or specific, while on school property during the school day." *Boim*, 494 F.3d at 984.

324.   UF students, administrators, faculty, and staff reasonably perceived Damsky's Posts calling for Jews to be "abolished by any means necessary" as threatening violence at UF Law.

325.   The plain meaning of "abolish" is to annul, eliminate, or destroy. *See Abolish*, *Black's Law Dictionary* (12th ed. 2024) ("To annul, eliminate, or destroy"); *see also Damsky*, 2026 WL 75122, at *3 (citing the *Oxford English Dictionary*'s definition of "Abolish" and stating that "[a] reasonable reader could understand Damsky's post and its use of the word 'abolish' to mean that Jews must be murdered."). And the phrase "any means necessary" can reasonably be interpreted to include violent measures. *Damsky*, 2026 WL 75122, at *3.

326.   At the trial, in reference to Damsky's tweet, this Court used "eliminate" as a synonym for "abolish." *See* Trial Tr. 244:15–21 ("The Court: … Professor, you were just asked about the statement you made at the hearing that related to threats to the Jewish community and others, and there's been a lot of discussion about this

March 21st tweet that said basically *all Jews should be eliminated*." (emphasis added)).

327. Damsky's Posts were reasonably seen as threating school violence, i.e., violence at UF. Damsky knew that students at UF were monitoring his tweets. Trial Tr. 46:18–47:2, 47:13–48:7 (Damsky); Ex. D-18 at 274:9–13, 282:21–24 (Doc. 73-18) (Damsky UOB Hrg. testimony). And he knew he was exchanging messages with a professor at UF Law, Professor Lidsky. Trial Tr. 50:13–18 (Damsky). Damsky's X account had few followers. Trial Tr. 21:21–25 (Damsky). It was and is reasonable to view his Posts as having been directed toward his main community at the time—the UF Law community. Finally, there are large and active Jewish communities at UF and UF Law. Doc. 103-1 at 50:15–19 (McAlister). The Jewish communities at UF and UF Law could, and clearly did, view his Posts as a threat against that specific community.

## XV. Deference to School Administrators Is Appropriate in This Context.

328. It is appropriate for courts to give deference to the judgment of school administrators when it comes to concerns about student safety and perceived threats of school violence. It is also proper to defer to administrators' judgment on the proper response to such concerns and threats.

329. In *Boim*, the Eleventh Circuit explained that "it is imperative that school officials have the discretion and authority to deal with incidents" involving "speech

reasonably construed as a threat of school violence." 494 F.3d at 984. And, as the Eleventh Circuit has stated many times, "[d]eference is the hallmark of abuse-of-discretion review." *United States v. Ware*, 69 F.4th 830, 845 (11th Cir. 2023) (cleaned up) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)).

330.   UF administrators, including UF Law Dean Merritt McAlister and UF Dean of Students Chris Summerlin, acted to protect student safety in the face of "speech reasonably construed as a threat of school violence." *Boim*, 494 F.3d at 984. Deference to their judgment about student safety needs is proper. *See Ala. Student Party v. Student Gov't Ass'n of Univ. of Ala.*, 867 F.2d 1344, 1347 (11th Cir. 1989) ("The University judgment on [the disruptive effect of student speech] should be given great deference by federal courts."); *Bishop v. Aronov*, 926 F.2d 1066, 1075 (11th Cir. 1991) ("Federal judges should not be ersatz deans or educators.").

331.   Given the horrific history of school violence in this country, "threats of an attack on a school and its students *must* be taken seriously." *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 771 (5th Cir. 2007). "School administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students[.]" *Id.* at 772.

332.   UF officials acted as they did so that this case would not become one of the "numerous[] recent examples of school violence … in which students have signaled potential violence through speech, writings, or actions, and then carried out

86

violence against school communities, after school administrators and parents failed to properly identify warning signs." *Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 399 (5th Cir. 2015) (en banc).

## XVI.  Consideration of Contextual Facts Is Proper.

333.   The Court concludes that it may look to prior conduct by Damsky, not just Damsky's Posts themselves, in determining how members of the UF community could and did reasonably understand his Posts. *See Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246, 1249 (11th Cir. 2003) (per curiam) (*Tinker* allowed school to suspend students who displayed Confederate flag on campus given racial tensions at the school and racially based rights at the school); *Damsky*, 2026 WL 75122, at *3–4; *id*. at *3 n.8 ("We can look to relevant context and prior events, not just the student speech itself, to determine how members of the UF community would reasonably interpret Damsky's posts."); *see also United States v. Fleury*, 20 F.4th 1353, 1366 (11th Cir. 2021) (holding that defendant made a true threat "when viewing Fleury's messages within the context of his entire course of conduct").

334.   Damsky's statements and conduct prior to the Posts, as set forth in the Court's Findings of Fact, provide relevant context for, and inform how UF officials and community members could and did reasonably interpret Damsky's X Posts.

335.    UF did not discipline Damsky for any of his speech preceding the Posts, but those past statements are relevant to show how the UF community could reasonably interpret his posts. *Damsky*, 2026 WL 75122, at *3 n.8.

## XVII. Analysis Under *Morse v. Frederick*

336.    Damsky's speech could also be regulated because UF administrators could, and did, reasonably interpret his Posts as promoting illegal violence against Jews, including Jewish students at UF.

337.    The Supreme Court has held that a school may "restrict student speech at a school event, when the speech is reasonably viewed as promoting illegal drug use." *Morse*, 551 U.S. at 403. "The special characteristics of the school environment, and the government interest in stopping student drug abuse … allow schools to restrict student expression that they reasonably regard as promoting illegal drug use." *Id*. at 408.

338.    *Morse* is not limited to student speech promoting illegal drug use. It also applies to promotion of other forms of illegal conduct, such as illegal violence.

339.    "Like the school in *Morse*, UF is permitted to punish Damsky because … he made statements that were reasonably viewed as promoting illegal activity (murdering Jews)." *Damsky*, 2026 WL 75122, at *4 (citing *Morse*, 551 U.S. at 403, 408).

340. Damsky's Post of March 21, 2025, promoted illegal violence against Jews. After first stating that "[m]y position on Jews is simple," Damsky went on to say that "what I think must be done with Jews" is that "Jews must be abolished by any means necessary." Ex. D-7 at 5 (Doc. 73-7).

341. Damsky testified at trial that he hoped people would read his Post. Trial Tr. 45:5–10 (Damsky). He also testified that he hoped people would agree with his Post. *Id.* at 45:11–13.

342. It was reasonable for UF administrators, including Dean McAlister and Dean Summerlin, to interpret his Post as promoting extralegal violence against Jews, including the large Jewish communities at UF and UF Law.

## XVIII. Damsky's Arguments

343. This Court rejects Damsky's argument that his speech cannot be regulated because, he claims, he posted his tweets while off campus or during a break in the academic calendar. In *Tinker*, the Supreme Court held that "conduct by [a] student, *in class or out of it*, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." 393 U.S. at 513 (emphasis added).

344. After *Tinker*, the Eleventh Circuit held in *Doe v. Valencia College*, 903 F.3d 1220 (11th Cir. 2018), that "[t]here is no absolute bar against schools

disciplining a student for off-campus conduct that violates the rights of another student." *Id.* at 1231. The Eleventh Circuit rejected a suspended student's argument that "the school was powerless to do anything about his misbehavior because he did it all while he was off campus" during "the break between summer and fall classes." *Id.* The Eleventh Circuit explained in *Valencia College* that "*Tinker* does not foreclose a school from regulating all off-campus conduct." *Id.*

345.    *Mahanoy Area School District v. B. L. ex rel. Levy*, 594 U.S. 180 (2021), is not to the contrary. In that case, which involved a student's off-campus use of social media, the Supreme Court rejected the idea that "the special characteristics that give schools additional license to regulate student speech always disappear when a school regulates speech that takes place off campus." *Id.* at 188. The Court instead confirmed that "[t]he school's regulatory interests remain significant in some off-campus circumstances." *Id.* The Court cited "several types of off-campus behavior that may call for school regulation," including "threats aimed at teachers or other students." *Id.*

346.    UF's Student Conduct Code, Ex. D-15 (Doc. 73-15), expressly applies to both on-campus and off-campus conduct. Section 1(c) of the Code provides: "The University may apply the Student Conduct Code … to Students whose conduct may have an adverse impact on the health, safety, or welfare of people, property, the

University Community, or the pursuit of its objectives, regardless of where such conduct occurs, even if off campus." *Id.* at 3.

347. In addition, Florida law requires all state universities to adopt "codes of conduct and appropriate penalties for violation of rules or regulations by students, to be administered by the institution." *See* § 1006.60(1), Fla. Stat. Such rules and regulations shall provide for the "discipline of any student who intentionally acts to impair, interfere with, or obstruct the orderly conduct, processes, and functions of the institution" and "*may apply to acts conducted on or off campus*[.]" *Id.* § 1006.60(6) (emphasis added).

348. This Court also rejects Damsky's argument that the *Tinker* doctrine applies only to elementary and secondary schools. Cases decided by the Supreme Court and the Eleventh Circuit confirm that *Tinker* applies to colleges and universities, *see Healy*, 408 U.S. at 184; *Widmar*, 454 U.S. at 267 n.5, 277, and graduate schools, *see Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 667–68 & n.3, 669–70 & n.6 (1973) (per curiam).

349. In *Damsky*, the motions panel noted that the Eleventh Circuit, "in a published decision, has applied *Tinker* in the higher education context." *Damsky*, 2026 WL 75122, at *2 n.4 (citing *Valencia College*, 903 F.3d at 1229–31). The motions panel in *Damsky* observed that, "when we applied *Tinker* in the university

setting in *Valencia College* we did not apply a different standard than we apply in the primary school context." *Id.* (citing *Valencia College*, 903 F.3d at 1229–31).

350. Other circuits have also applied *Tinker* in the higher education context. *See*, *e.g.*, *Doe v. Univ. of Mass.*, 145 F.4th 158, 169–75 (1st Cir. 2025); *Ward v. Polite*, 667 F.3d 727, 732–34 (6th Cir. 2012); *Williams v. Eaton*, 443 F.2d 422, 424, 430 (10th Cir. 1971); *see also Scoville v. Bd. of Educ. Joliet Twp. High Sch. Dist. 204*, 425 F.2d 10, 13 n.5 (7th Cir. 1970) (en banc) ("[T]he relevant principles and rules apply generally to both high schools and universities.").

351. Damsky's reliance on *Leroy v. Livingston Manor Central School District* is misplaced. 158 F.4th 414 (2d Cir.), *reh'g & reh'g en banc denied,* No. 24-1241, 2025 WL 4693979 (2d Cir. 2025). *Leroy* did not involve a threat. *See id*. at 423 ("Leroy's post contained no threat at all[.]"). *Leroy* made clear that schools may regulate threatening speech: "The concurrence … argu[es] that 'if the speech does cause a significant reaction, and specifically if it makes students fear for their safety and thereby disrupts learning, *and* the speaker recklessly provoked just that response, he can hardly complain that he is being punished for someone else's reaction.' We do not disagree." *Id.* at 425 n.2 (quoting *id.* at 440 (Pérez, J., concurring)).

**XIX. Damsky's Speech Was Unprotected Because It Was a True Threat.**

352.    This Court also concludes that Damsky's Posts were "true threats" of violence and were not protected speech for that reason as well. UF was allowed to regulate Damsky's speech as it did because Damsky made a true threat.

353.    "The First Amendment does not protect violence." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). Nor does it protect true threats of violence, a "historically unprotected category of communications." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). "True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection." *Id.* at 72.

354.    "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Id.* at 74 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)).

355.    A true threat may be conveyed "to a particular individual or group of individuals." *Black*, 538 U.S. at 359. "And a statement can count as such a threat based solely on its objective content." *Counterman*, 600 U.S. at 72. "The speaker need not actually intend to carry out the threat." *Black*, 538 U.S. at 359–60. "Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat[.]" *Counterman*, 600 U.S. at 74. "The existence of a threat depends not on 'the mental state of the author,' but on 'what the

93

statement conveys' to the person on the other end." *Id.* (quoting *Elonis v. United States,* 575 U.S. 723, 733 (2015)).

356.    In his Post, Damsky published his "simple" "position" on "what [he] think[s] must be done with Jews," namely, that "Jews must be abolished by any means necessary." Ex. D-7 at 5 (Doc. 73-7); Trial Tr. 44:13–18 (Damsky). Damsky made that threat not in jest or in an unserious way. It was objectively a "serious expression" that conveyed to persons in the UF administration and to many in the UF Law community that he meant to "commit an act of unlawful violence." *Counterman*, 600 U.S. at 74 (cleaned up). It makes no difference whether Damsky intended his post to be seen as a threat. *Id.*

357.    Damsky's exchange with Lidsky confirms the threat. When she asked, "Are you saying you would murder me and my family? Is that your position?," Ex. D-7 at 5 (Doc. 73-7); Trial Tr. 193:9–12 (Lidsky), he did not say no but instead replied that "surely a genocide of all Whites" would be worse than "a genocide of all Jews." Ex. D-7 at 5 (Doc. 73-7); Trial Tr. 24:12–18, 50:22–51:22 (Damsky).

358.    Other courts have held that, in a civil case, true threats do not require a showing of mens rea. *Counterman* required such a showing because it was a criminal case. *Kansans for Const. Freedom v. Kobach*, 789 F. Supp. 3d 1062, 1081 (D. Kan. 2025) ("*Counterman*—a criminal liability case—never holds that proof of mental state is required for civil liability."); *Sealed Pl. 1 v. Front*, No. 3:22-cv-00670, 2024

94

WL 1395477, at \*29 (E.D. Va. Mar. 31, 2024) ("*Counterman* [is] inapplicable in this civil lawsuit with no criminal statute at issue."); *see also King v. Frazier*, 77 F.3d 1361, 1363 (Fed. Cir. 1996) (holding that mens rea requirement was "improperly borrowed … from criminal law and interjected" into a civil case).

359.    This Court concludes that Damsky possessed the requisite mental state of recklessness. Damsky "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman*, 600 U.S. at 69. Damsky knew that at least one UF Law student was monitoring his tweets. Trial Tr. 46:18–47:2, 47:13–48:7 (Damsky); Ex. D-18 at 274:9–13, 282:21–24 (Doc. 73-18) (Damsky UOB Hrg. testimony). Dean Shaw advised Damsky in their meeting in January 2025 that other students feared him. Trial Tr. 120:2–25 (Shaw). Before he replied to Lidsky's message, Damsky knew that the internship in the prosecutor's office had been taken away because of his March 21 post. *Id.* at 48:8–49:6, 49:9–25, 50:1–6, 50:10–12 (Damsky). And Lidsky's message put Damsky on notice that his Post might be perceived as a threat by the UF Law community. *See* Ex. D-7 at 5–6 (Doc. 73-7) (Posts); Trial Tr. 194:7–195:7 (Lidsky); *id.* at 50:25–51:22 (Damsky). Yet, instead of disavowing violence in his reply to Lidsky, he amplified his threat by raising the idea of "a genocide of all Jews" in his reply to her. Ex. D-7 at 5 (Doc. 73-7). *See also* Trial Tr. 24:12–18, 50:22–51:22 (Damsky); *id.* at 194:7–195:7 (Lidsky).

## XX.   Conclusion and Judgment to Be Entered

360.   The Court concludes that the University of Florida did not violate the First Amendment or 42 U.S.C. § 1983 by expelling Plaintiff Preston Damsky. The Court will enter judgment consistent with this conclusion, and Plaintiff's First Amendment claim against Defendant Chris Summerlin, the Dean of Students at UF, will be dismissed with prejudice.

\*   \*   \*

The foregoing Proposed Findings of Fact and Conclusions of Law are respectfully submitted by Defendant through his counsel.

Respectfully submitted,

/s/ *H. Christopher Bartolomucci*
H. Christopher Bartolomucci
Justin A. Miller (*pro hac vice*)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com
jmiller@schaerr-jaffe.com

Brande S. Smith
DOWNSAARON
200 S. Orange Avenue, Suite 2250
Orlando, FL 32801
(352) 604-4047
brande.smith@downsaaron.com

*Counsel for Defendant*
*Chris Summerlin in his*
*official capacity as Dean of Students*
*of the University of Florida*

Dated: June 26, 2026

97

## CERTIFICATE OF SERVICE

I certify that on June 26, 2026, I caused the foregoing Defendant's Proposed Findings of Fact and Conclusions of Law to be filed with the Clerk of Court and thereby served on all parties to this matter via the Court's CM/ECF filing system.

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci